Todd Ashker; C5817
Box 7500/D1-119
Crescent City, Cal. 95532

Plaintiff, In pro-se


Received

FILED

JUL - 5 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

FILED

JUN 1 6 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND · DIVISION

TODD L. ASHKER,

       Plaintiff,

    VS.

ROBERT HOREL, et al.,

       Defendants.

CASE No. C05-3759 CW

Plaintiffs Notice Of Filing, And
Filing of Defendants Response(s)
To "Written Deposition Questions"
[In Support Of Opposition]

To the defendants and their counsel of record, PLEASE TAKE NOTICE:
The plaintiff, proceeding pro-se in the above numbered action, has now filed the
original written deposition questions, and replies thereto, of the following
named defendants: Kirkland; Smith; Castellaw; Cox; and Nimrod.
These written depositions are filed in support of the plaintiffs, "Opposition
To Defendants Dispositive Motion". Plaintiffs Declaration of Verification is attached.

Dated: June 25, 2007

       Respectfully Submitted by,

       T. L. Ashker

       Todd L. Ashker

       In pro-se

1.

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND - Division

| | |
|---|---|
| TODD L. ASHKER, | CASE No. C05-3759 C.W. |
| Plaintiff, | Plaintiff's Declaration In Support |
| vs. | Of Notice Of Filing, And Filing Of |
| ROBERT HOREL, et al., | Defendants' Response(s) To |
| Defendants. | "Written Deposition Questions". |

I, Todd L. Ashker, declare:

1. I am the plaintiff, proceeding pro-se in this case. I have personal knowledge of the facts declared herein and, if called upon, I could competently testify thereto.

2. On Oct. 31, 2006, the Court authorized me to submit written Deposition Questions upon six of the defendants named in this case, and I was able to prepare and serve five of them.

3. Attached hereto are the original sets of "Written Deposition Questions," and "Answers" thereto, from the following defendants: Kirkland; Smith; Castellaw; Cox; and Nimrod.

4. The exhibits referenced in the deposition questions, are the exhibits filed under separate cover [As "Deposition Exhibits A through H"]

5. These depositions are submitted in support of my "opposition to defendant

1.

dispositive motion" filed June 26, 2006. And they have been incorporated by reference in my opposition brief, and declaration in support thereof. I declare under penalty of perjury pursuant to the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed on June 25, 2007, at Crescent City, California.

/s/ T. L. Ashker

Todd L. Ashker
Plaintiff, In pro-se

Todd Ashker, C58191
Box # 7500/D1-119
Crescent City, Cal. 95532
In proge —


THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


TODD L. ASHKER,                         CASE No. CO5-3759 CW/EDL
            Plaintiff,                  Plaintiff's Written Deposition
                                        Questions To The Below
    VS.                                 Named Defendant
EDWARD ALAMEIDA JR., et al.,            [per. F.R.C.P., Rule #31]
            Defendants.


Deponent: Plaintiff Ashker

Respondent: Defendant Richard Kirkland


To all defendants and their counsel of record, PLEASE TAKE NOTICE:
Pursuant to provisions of FRCP, Rule #31, and the Court Order dated Oct. 31, 2006, the
plaintiff Ashker, does hereby submit the attached written deposition questions
upon the above named defendant, who shall answer these questions within [21] days
of reciept of service, under penalty of perjury (attached hereto are questions #1 to 44]
Defendant(s) are reminded that: documents do not "speak for themselves" and they
must make reasonable investigative enquiries necessary to answer any questions
that are relevant [see relevant F.R.D. case law]. All documents referenced in these
questions are attached, and refered to by the exhibits, which correspond to the
questions [See also: attached Table of Exhibits]
Dated: Nov. 30, 2006                    Submitted by, T. L. Ashker
                                                       Todd L. Ashker

1. State your full name and age

ANSWER:

2. State your highest level of education and any degrees you may have earned.

Answer:

3. Please specify what, if any, specialized training, courses, or seminars you may have participated in and completed regarding the subject of adult corrections and paroles.

ANSWER:

4. State your employment history, prior to becoming an employee for the Calif. Dept. of Corrections (C.D.C.)

Answer:

5. State each position (post) you have held while employed by the (C.D.C.); please include a summary of your responsibilities for each position held.

Answer:

6. As of this date, are you experiencing any medical problems, and/or taking any medication(s), which may affect your memory or ability to answer these questions [if your answer is "yes" please be specific]

Answer:

7. Are you familiar with the Calif. Code of Regulations, Title 15, Division III. [also known as C.C.R, Title 15, Div. III]; and, "The Rules and Regulations of the department of corrections"; applicable to staff and prisoners in the California State Prison System]

ANSWER:

8. Do you believe the rules and regulations (referenced above) are supposed to apply to all correctional staff, and prisoners.

ANSWER:

9. Are you familiar with the KTVU-Channel 2 News Segment about the Aryan Brotherhood which aired in November 2002 [see: EX.A, copy of transcription of this news segment]

ANSWER:

10. If your answer to (#9) is "yes", please specify what your knowledge is, and include a summary of what the intended purpose was, for (PBSP) staff, to allow the information presented in this news segment to be aired to the public.

ANSWER:

11. During the KTVU-News Segment, PBSP- Sgt. Connie McGuyer, states that she had information that the A.B. was presently conspiring to kill prison administrators and politicians [see: EX.A, at page 1]; this news segment included prison I.D. photographs of several (PBSP-SHU) prisoners [including Ashker, Clement and Troxell's], do you know why this information [allegations], and prisoner photographs, was provided to KTVU-NEWS, to be aired

RK                                        2.

to the public.

ANSWER:

12. Are you aware that many PBSP-(SHU), and General Population prisoners have Televisions, and one of the channels available to them is KTVU-Channel 2.

ANSWER:

13. Isn't it true that once the KTVU-News segment aired the conspiracy allegations about alleged A.B. gang activity(s) at (PBSP-SHU), together with prisoner I.D. photographs, that numerous "confidential inmate informants" came forward claiming they had information closely resembling the type of information presented on the Nov. 2002 News segment

ANSWER:

14. Do you know the plaintiff in this case, Todd Ashker [if "yes", please summarize the extent of your knowledge about him]

ANSWER:

15. Do you know of Todd Ashker's reputation for being a prisoner rights litigator [utilizing the (602) appeals process and Courts to challenge conditions of confinement]; if "yes," please summarize what you know about this subject.

ANSWER

16. Do you recall an incident occurring in (PBSP-SHU), C-facility 4-block on Dec. 1, 2002 wherein inmate Allen was accused of spearing officer Dorothy Howell through his food port [if yes; please specify what you recall about this]

ANSWER:

17. Is your signature next to Capt. P.T. Smith's, on the Dec. 1, 2002, Memorandum to all C-Facility Staff, approving Allen for various additional security precautions [See: EX. B, copy of memo]

ANSWER:

18. Did you have any conversations with Capt. Smith [or any other PBSP Staff], about Ashker being involved in the Dec. 1, 2002, assault on C/o Howell, at any time between the time of the incident and Dec. 3, 2002 [if "yes" please detail what you recall about such conversations]

ANSWER:

19. Were you in any way involved in Capt. Smith's order(s) to have Ashker and Clement, housed in a Lexan cell on [12-2-02], and then single-celled on [12-3-02] [if "yes" please describe your involvement]

ANSWER:

20. Assuming it's true that Ashker and Clement were "double-celled" in C-facility, 4-block, for over 7-years, please state why the assault on C/o Howell [by Allen], would be just cause for punishing Ashker and Clement

RK                                    4.

ANSWER:

21. Do you agree that CCR Title 15 Sections 3312(A)(3), and 3315, mandate the issuance of a "CDC-115 Serious Rule Violation Report," if their is evidence any inmate is conspiring to assault a (CDC) correctional officer.

ANSWER:

22. Is it appropriate for (PBSP) staff to punish a prisoner for violating prison rules of a serious category, without issuing a "CDC-115 Rules Violation Report," and affording the prisoner due process.

ANSWER:

23. Apparently (PBSP) Lt. McKinney documented information from a "reliable confidential inmate informant," back on (11-20-01), which stated Ashker, Clement, Miller, and Allen, were conspiring to assault c/o Howell [See: EX. B, copy of Allen's "CDC-1030 Confidential Disclosure Form," referencing Lt. McKinney's, Conf. Memo dated 11-20-01]. My question is, why didn't staff move Ashker, and Clement, at some point between (11-20-01), and (12-1-01).

ANSWER:

24. Do you have any knowledge about (PBSP) staff using the (12-1-02) assault on Howell, by Allen, to punish Ashker and Clement [not based on any real evidence that they were involved in the assault, but rather in retaliation for their recent success-ful litigation efforts.]

RK                                  5.

ANSWER:

25. Why wasn't Ashker ever issued a "CDC-115 Rules Violation Report," for conspiracy to assault C/o Howell.

ANSWER:

26. Why was Ashker kept in a Lexan cell from (12-2-02), through Feb. 6, 2006, without being afforded any documentation as to why.

ANSWER:

27. Why wasn't Ashker's need to be kept on Lexan cell status, reviewed every (30) days/per guidelines in C.P. 222
        SEE: EX E at                              J; if you claim this was done, please state the title (s), and current location, of such documents.

ANSWER:

28. Do you believe "Lexan cells" are the same as non-Lexan cells? (and if your answer is "yes", please state all facts that you rely upon for this belief.)

ANSWER:

29. Have you ever recieved and responded to (PBSP-SHU) prisoners' (602) appeals complaining that the "Lexan cells" were either, hotter, or colder, with less air flud, and related problems such conditions can cause ["if yes," please give an estimate of the number of (602) appeals you recieved about Lexan cells]

RK                                          6.

ANSWER:

30. Please detail what you would personally do to investigate whether these prisoner' (CO2) appeal complaints, about the conditions in "Lexan cells, were true, or not true. [When you were Associate Warden/Warden of PBSP]
ANSWER.

31. The following questions are in reference to the attached (CO2) Appeal #CO2-03388, submitted by Ashker on 12-4-02 [See: EX.D, Copy of (CO2) Appeal, and related documents referenced therein, are also attached]

A. In response to section "F" of the appeal, your signature appears on behalf of then-Warden, McGrath. My question is were you in any way personally involved in this Warden's Level Decision, or did you merely just sign it for McGrath.
Answer:

B. If you were in any way involved in the Warden's Level Decision, please specify what your involvement was.

Answer:

C. At section "F" on the attached additional pages Ashker provides more specific references to documentation in his C-File and Medical File which he claimed supported his need for a cell-mate to assist him with his daily activities. My question is, did you personally ever review any of the documents Ashker refers to; and/or contact Dr. Winslow, or any other medical staff in order to investigate the veracity of his claims [and, if "yes" please be specific]

RK                                        7.

D. Do you agree that at the time you signed the Warden's Level Response, on or about Feb. 27, 2003 [see: EX.D, at section "6"] that PBSP - Administrative Staff were responsible for ensuring that PBSP (SHU) prisoners were not subject to cruel and unusual punishment.

ANSWER:

32. Assumming your answer to [# 31(D)] is "yes," please state, the (CDCR) purpose and objective for confining prisoners in [PBSP - SHU], for (16) years who have not been found guilty of a serious rule violation for over (6) years [in Ashker's case, close to (13) years without a guilty finding for a serious rule violation]

ANSWER:

33. Isn't it true that the conditions in (PBSP - SHU) are intended to make men go insane, and/or coerce them into becoming (CDCR) informants [if you deny this is true, please state why]

ANSWER:

34. What would be the legitimate penological justification for denying Ashker medically necessary assistive aides, in order for him to have less daily pain and suffering.

ANSWER:

35. What is the legitimate penological justification for denying [PBSP - SHU] prisoners like Ashker [meaning, subject to (PBSP - SHU) for over 14 years, for administrative reasons], the following:

A. Adequate medical care [please see "Complaint" at paragraphs # 7-12]

ANSWER:

RK                                          8.

B. Adequate assistive aides, necessary due to permanent disability.
[See: EX "H", Ashker Accommodation Request, and Dr. Hechanova's Report)

Answer:


C. Adequate clothing to keep warm [specifically, denying (SHU) prisoners knit caps and sweat pants shirts; and limiting them to (1) set of thermal underwear - while allowing general population and T.H.U. inmates two of all of these [See: EX "E", at 12-16-05, Memorandum re: personal property plan and addendum pages #2 and #3 attached there to ]

Answer:


D. The ability to have a yearly photograph taken to send home to Family members [See: EX "E", at 1-13-04, Memorandum, re: photograph program only available to inmates submitting debriefing paper work, or deemed to meet inactive-gang status criteria]

Answer:


36. If your answer(s) to questions #35 [A through D], are that such issues are based on "safety and security" concerns, please state all facts to support your position(s), for each of these questions.

Answer:


37. Based upon your experience, has it ever been appropriate for staff employed by the department of corrections to retaliate against prisoners for exercizing their First amendment right to challenge their conditions of confinement via the (602) appeal

RK
9.

process, and /or court system.

ANSWER:

38. Are you aware of any incidents of [PBSP] staff retaliating against any prisoner(s) by punishing them for their litigation efforts challenging conditions of confinement [if "yes", please qualify your answer with descriptions of what you can recall about any such incidents].

ANSWER:

39. Are you aware of Ashker's "reputation" for being a prisoner who is known for challenging conditions of confinement [if "yes", please state what you know about this]

ANSWER:

40. Have you ever heard of any of the following subjects relating to Ashker, and Clements, litigation efforts [if "yes" to any of these questions, please qualify your answer(s) with details, describing how you became aware of them]

A. In 1990 Ashker was shot by a guard at (PBSP-SHU), and in Oct. 1995 after a civil jury trial, the jury ruled in his favor finding the guard liable for committing assault and battery; and the Chief Medical Officer, Dr Astorga, guilty / liable for medical malpractice. And the jury awarded Ashker $225,000.00 in damages.

Answer:

B. In Sept. 2002 the Federal Court issued a permanent injunction prohibiting (PBSP) ~~from~~ enforcing the policy that all incoming packages of books were to have the prison generated book label ~~affixed~~ to the outside of the package. [Are you familiar with this case]

Answer:

C. Have you ever seen the memorandum issued by McGrath, on Oct 21, 2002, and addressed "to all staff and inmates," about the book-label subject [See: EX. D, copy of memo)

Answer:

D. Were you in any way involved in the creation of the MEMORANDUM referenced in [#40(c)], and if so, describe your involvement, and any conversations you recall having about the subject.

Answer:

E. Did you ever hear any (PBSP) staff making any comments about Ashker, and the Book Label ruling [if yes, please state what you recall hearing]

Answer:

F. Have you ever seen the memorandum issued by Sgt. Tatro, on Oct. 14, 2003, and addressed "to all staff and inmates" in (SHU), regarding "Compliance with Ashker v. CDC [Book Labels]" [if "yes" please state what, if any, Knowledge you may have concerning why this Oct. 14, 2003, memo was necessary (13) months after the Court Order was issued]

Answer:

RK                                11.

G. Did you ever discuss Ashker's Book label case, and compliance with the Court Order in his favor, with any other (PBSP) Staff [if "yes" please describe what you recall about such conversations]

ANSWER:

H. In Sept. 2002, the Federal Court issued a permanent injunction, prohibiting the (CDC) from enforcing the policy that inmates were not allowed to recieve material down loaded from the internet, in their incoming correspondence [In responce to Clements civil action], did you know about this ruling.

ANSWER:

I. Have you ever seen the memorandum issued by McGrath, on Oct. 29, 2002, addressed to "all staff and inmates," regarding the internet ruling, and new mail restrictions [See: EX D, copy of memo]

ANSWER:

J. Were you involved in any discussions with McGrath, or any other (PBSP) Staff regarding the Internet ruling [if "yes" please describe what you can recall about such conversations]

ANSWER:

K. Did you ever see, and/or have any knowledge of, the letter Clements' attorney, sent to deputy attorney general Pancho on Nov. 14, 2002 in response to McGrath's Oct. 29, 2002 memo [referenced in #40(I)] (See: Copy of atty MacKay's letter, at EX D )

ANSWER:

RK                          12.

L, Did you ever have any conversations with any other (PBSP) staff members concerning Clement's attorney claiming McGraths (10-29-02) mail memo appeared to be a retaliatory action in response to the internet ruling [of "yes" please describe what you recall about such conversations]

ANSWER:

M, Have you ever seen the memorandum with your signature, on behalf of McGrath, dated Nov. 22, 2002 addressed to all staff and inmates" regarding personal/internet mail,

ANSWER:

N. Please describe your knowledge of, and any involvement you may have had in the creation of, the Nov. 22, 2002 memo (referenced above]

ANSWER:

41. Are you familiar with Ashker's (602) Appeal # C04-01650, submitted on (6-23-04), challenging the decision to place him on single-cell status on June 8, 2004, and if you are please qualify your answer with details about what your familiarity consists of [See: EXF, copy of (602) Appeal with related attachments]

ANSWER:

42. The following questions pertain to Ashker's (602) Appeal referenced above [EX. F]

A. At Section(s) A and F do you see where Ashker is describing his need for Troxell's assistance with daily-activities; and that

RK                              13.

It was in response to his 7-16-03 memo about this need that BJ O'Neill, allowed them to double-cell on 7-25-03.

ANSWER:


B. Do you see at Sections A and F where Ashker is detailing his position about why the alleged reasons for single-celling him did not make sense.

ANSWER:


C. Do you see at Section F, of the attached additional page, where Ashker states that no consideration was given to his medical issues, and he believed the single-cell status was actually retaliation (because him and Troxell were challenging (CDC-PBSP) and (BPT) policy(s))

ANSWER:


D. Do you admit that you were the acting Warden at (PBSP), and in that capacity you were responsible for investigating Ashker's claims, and responding at the Second Level of Review (See: EX F, at Second Level Review response dated Aug 31, 2004)

ANSWER:


E. Did you ever consider, and investigate Ashker's claims that he was suffering more daily pain and discomfort without Troxell's assistance (if "yes", please describe what you did, and whether you documented this investigation, or not)

ANSWER:

RK                                    14.

F. Did you ever contact Dr Winslow [or any other PBSP-Medical Care staff] to enquire about Ashker's arm condition and need for assistive aides, during your Second Level Review of Ashker's appeal. [If you did, please describe who you talked to, what you recall was said, and whether or not this was documented]

Answer:

G. What did you do to ensure that Ashker's placement on single-cell status, on June 8, 2004, was not arbitrary and capricious.

Answer:

H. Did you order (PBSP-IGI) to thoroughly investigate the (2) Confidential Memos at issue in "SSU-AGENT Berklers 6-4-04 Chrono [See: EXB, copy of chrono, bates stamped word/cdcr 0059, referencing the 1995/1996 memos] per: CCR, Title 15 Section 3378(c)(7).

Answer:

I. Do you know why such an investigation concerning the (2) items of confidential information, referenced in [#42(H)], were never disclosed to Ashker prior to June 8, 2004.

Answer:

J. Do you know why (PBSP) staff never completed a thorough investigation to determine if the (2) items of confidential information referenced above [#42(H) & (I)], really established that their were

RK

15.

legitimate safety concerns for Ashker [prior to single-celling him on June 8, 2004], especially when considering the reason he was allowed to double-cell with Troxell in July 2003, was in response to his "Request For Reasonable Accommodation" submitted to McGrath, O'Neill, and Winslow on 7-16-03 [See: EX F, appeal attachments, bates stamped CDCR-0092 to 0095, copy of memo]

ANSWER

K. Why was Ashker treated differently than other [PBSP-SHU] prisoners, who had confidential inmate informants claim that they were targeted for assault by gang members [See examples at: EX C, declaration by Arturo Castellanes, C# _____ with (3) chronos from June 2004 attached; and EX G, Frank Clement, D #07919, chronos from Sept. 1994]

ANSWER:

L. When you conducted the Second Level Review of Ashkers (602) Appeal, what did you do to ensure that Ashker's placement on single-cell status, was not causing him to suffer additional pain and discomfort on a daily basis.

ANSWER:

43. Are you familiar with Ashker's CDC-1824 Reasonable Accommodation Request submitted on (9-1-04), with related (602) Appeal, both of which are Log numbered # CO4-02664 [See: EX H, copy of these documents, with related documents attached]

ANSWER:

RK                                    16.

44. The following questions pertain to Ashker's cdc-1824 Reasonable Accommodation Request, and related (602) Appeal referenced above [See: EX. H ]

A. At the Warden's Level Response, you claim that a medical exam was conducted, and substantiated Ashker's claim. Please state all facts that you relied upon to support you claim that providing Ashker with limited writing assistance at the law library" to complete projects that require extensive writing" was a reasonable accommodation

Answer:

B. Do you admit that (PBSP-shu) prisoners [who recieve few visits], sole means for communication with family, friends, attorneys, courts, correspondence school courses, is via handwritten communications.

Answer

C. Did you consider (PBSP) Dr. Heehanova's, ADA-1824 Response Sheet determination(s), when you reviewed/responded to Ashker's appeal [See: EX. H, copy of ADA-1824 Response-Sheet, bates stamped CDCR-0132]

Answer:

D. Please state all facts that you relied upon to support your claim that the only assistance Ashker needed was with writing, and that ..."he has not demonstrated an inability to function on his own or that his impairment has suffered as a result" (See: EX H, Second level Response at page #2 thereof)

RK                                          17.

<u>ANSWER</u>

E. Did you consider the additional CDC 7230 [Medical Notes], by Dr. Busko, and Dr. Enriquez, that were attached to Ashker's appeal, at the time you made the above determination [See: EX H, medical notes dated 8-2-04; 9-1-04; and Health Care Services Requests dated 6-29-04, and 8-29-04]

<u>ANSWER</u>:

F. Did you consider Dr Archanova's ADA 1824 Response Sheet at Determination section wherein he stated, "Assistance in the cleaning of his room may be given him periodically by custody [See EX.H, bates stamped # CDCR - 0132]

<u>ANSWER</u>:

Dated: 11-30-06

Submitted by, T. L. Ashker
Todd L. Ashker

**J. RANDALL ANDRADA**
(510) 287-4163

TEL:    (510) 287-4160
FAX:    (510) 287-4161

# ANDRADA
## &
## ASSOCIATES

**LORA VAIL FRENCH**      (510) 287-4160
**BRENDAN KENNY**         (510) 287-4168
**ALICIA KENNON**         (510) 287-4187
**KERRY A. RENN**         (510) 287-4170
**JOEL H. TRANTER**       (510) 287-4165
**CATHERINE WHEELER**     (510) 287-4169

April 21, 2007

Todd L. Ashker, #C58191
Box 7500/D1-119
Crescent City, CA  95532

> Re:    *Ashker v. Edward Alameida, Jr., et al.*
>         USDC Northern District Case No. C05 3759 CW
>         Our File No.:  DOC 0595

Dear Mr. Ashker:

Enclosed please find Mr. Kirkland's original verification to his responses to the written deposition questions.

Very truly yours,

**ANDRADA & ASSOCIATES**

BRENDAN KENNY

BK:lr
Enclosures

J. RANDALL ANDRADA (SBN 70000)
BRENDAN KENNY (SBN 237969)
**ANDRADA & ASSOCIATES**
**Professional Corporation**
180 Grand Avenue, Suite 925
Oakland, California 94612
Tel.: (510) 287-4160
Fax: (510) 287-4161
Email: bkenny@andradalaw.com

Attorneys for Defendants
EDWARD ALAMEIDA, JR., JEANNE WOODFORD,
JOE McGRATH, RICHARD KIRKLAND,
PATRICK T. SMITH, MARK CASTELLAW,
JAMES COX, MATTHEW J. NIMROD, ACEL K.
THACKER, and D. LANGLOIS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TODD L. ASHKER,<br><br>        Plaintiff,<br><br>   v.<br><br>EDWARD ALAMEIDA, JR.; JEANNE WOODFORD; JOE MCGRATH; RICHARD KIRKLAND; P.T. SMITH; MARK CASTELLAW; J. COX; M. J. NIMROD; A.K. THACKER; DWIGHT W. WINSLOW; DOCTOR WELTON; and D. LANGLOIS,<br><br>        Defendants. | Case No.: C 05-3759-CW (EDL)<br><br>**DEFENDANT RICHARD KIRKLAND'S RESPONSES TO PLAINTIFFS' WRITTEN DEPOSITION QUESTIONS** |

I, Richard Kirkland, declare under penalty of perjury as follows:

The following are my responses to plaintiffs' written deposition questions. They are true and correct to the best of my knowledge.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 1:**

Richard Kirkland, 54.

///

///

1

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 2:**

I provided this in my interrogatory answers. To repeat, I have a bachelor's degree from Berkeley, class of 1973.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 3:**

I have attended numerous educational programs over the years. I cannot give you a complete list.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 4:**

This is irrelevant. I have been employed by CDC since 1984.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 5:**

I provided this in my answers to interrogatories and will not repeat it here.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 6:**

This invades my privacy. Without waiving the objection, the answer is No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 7:**

I have some familiarity with Title 15.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 8:**

I have some familiarity with Title 15.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 9:**

No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 10:**

N/A.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 11:**

No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 12:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 13:**

Objection – the question is compound, argumentative, and vague and ambiguous as to the terms "numerous" and "closely resembling." Without waiving the objections, Mr. Kirkland responds as follows: I do not recall.

2

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 14:**

I know that Ashker is a prisoner. I have had to deal with various administrative matters involving him.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 15:**

I know that plaintiff has filed 602 appeals and lawsuits.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 16:**

I recall that Officer Howell was assaulted.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 17:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 18:**

I don't recall.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 19:**

I don't recall.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 20:**

Objection – the question is argumentative and assumes facts not in evidence, namely that Ashker and Troxell were "punished" for Allen's assault on Correctional Officer Howell. Without waiving the objection, Mr. Kirkland responds as follows: prisoners are not single-celled or housed in Lexan cells as punishment. Safety and security of the institution, as well as numerous other factors, determine where an inmate is housed.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 21:**

Objection – the question is compound. Without waiving the objection, Mr. Kirkland responds as follows: Section 3312(A)(3) requires issuances of CDC 115 when misconduct is believed to be a violation of the law or is not minor in nature. Section 3315 defines offenses that are "serious" in nature for purposes of CDC Form 115.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 22:**

Objection – the question is compound, argumentative, and calls for speculation.

///

///

3

{00047729.DOC/} 0595                                                    *Ashker. v. Alameida, et al.*
DEFENDANT R. KIRKLAND'S RESPONSES TO PLAINTIFFS' WRITTEN DEPOSITION QUESTIONS   C 05 3759 CW (EDL)

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 23:

Objection – the question is compound. Without waiving the objection, Mr. Kirkland responds as follows: I do not speak for the "staff" at PBSP.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 24:

Objection – the question is argumentative, compound, and assumes facts not in evidence; namely, that they had recent "successful litigation efforts." Without waiving the objections, Mr. Kirkland responds as follows: I am not aware that Ashker was punished.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 25:

I don't know that he wasn't.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 26:

I don't recall where Ashker was housed.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 27:

I don't recall.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 28:

Objection – the question is vague and ambiguous as to "the same as." In what ways? It is impossible to answer this question as phrased.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 29:

The question is overly broad, burdensome, and harassing.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 30:

I did not conduct personal investigations of such specific matters.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 31:

A. I reviewed the appeal and signed it.

B. I reviewed the appeal and signed it.

C. No.

D. Yes.

## RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 32:

SHU placement was pursuant to Title 15.

///

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

4

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1  **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 33:**

2      The question is compound. The first question is argumentative and absurd on its face. Without

3  waiving the objection, Mr. Kirkland responds as follows: Regarding the second question, I do not know

4  what conditions are referenced. Nor do I know what you mean by coerce. I can only say that some

5  prisoners become informants.

6  **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 34:**

7      Objection – the question is argumentative and the question assumes facts not in evidence;

8  namely, that the aids requested are medically necessary and would cause him to have less pain and

9  suffering.

10  **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 35:**

11      A. Objection – The question is argumentative and vague and ambiguous as to "prisoners like

12  Ashker" and "adequate medical care." The question also assumes facts not in evidence: that Ashker

13  was denied "adequate medical care." Without waiving the objections, Mr. Kirkland responds as

14  follows: the question is too broad for me to answer intelligibly.

15      B. Objection – The question is argumentative and vague and ambiguous as to "prisoners like

16  Ashker" and "[a]dequate assistive aides." The question also assumes facts not in evidence: namely, that

17  Ashker was denied "[a]dequate assistive aides." Without waiving the objections, Mr. Kirkland responds

18  as follows: the question is too broad for me to answer intelligibly.

19      C. Objection – The question is argumentative and vague and ambiguous as to "prisoners like

20  Ashker" and "[a]dequate clothing." The question also assumes facts not in evidence: that Ashker was

21  denied "[a]dequate clothing." Without waiving the objections, Mr. Kirkland responds as follows: the

22  property allowed for PBSP-SHU inmates is set forth in OP 806, which was established by PBSP

23  pursuant to Title 15.

24      D. Objection – The question is argumentative and vague and ambiguous as to "prisoners like

25  Ashker." Without waiving the objections, Mr. Kirkland responds as follows: Validated gang

26  members/associates pose a continuous threat and should not be allowed privileges not required by Title

27  15.

28  ///

**ANDRADA & ASSOCIATES**
PROFESSIONAL CORPORATION

1 **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 36:**

2     N/A

3 **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 37:**

4     Plaintiff failed to define retaliate. Thus, the question is vague, ambiguous, and overly broad.

5 Without waiving the objections, Mr. Kirkland states: No.

6 **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 38:**

7     Again, plaintiff failed to define retaliate. Thus, the question is vague, ambiguous, and overly

8 broad. Without waiving the objections, Mr. Kirkland states: No.

9 **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 39:**

10     Again, I do not know what plaintiff means by "Ashker's reputation for being a prisoner . . ."

11 The question calls for speculation. All I can state is that I know Ashker has filed certain lawsuits and

12 administrative claims.

13 **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 40:**

14     A. I have some general understanding that Ashker won the case. However, I do not know the

15 specifics.

16     B. I have some familiarity with the case.

17     C. I was employed at PBSP in October of 2002. Therefore, I probably did see that document.

18     D. Objection – the question is compound. Without waiving the objection, Mr. Kirkland

19 responds as follows: I don't recall.

20     E. I don't recall.

21     F. Objection – the question is compound. Without waiving the objection, Mr. Kirkland

22 responds as follows: I don't recall.

23     G. Objection – the question is vague and ambiguous as to "Ashker's Book Label Case."

24 Without waiving the objection, Mr. Kirkland responds as follows: Yes, I recall that it was our intent to

25 comply with the law.

26     H. I have some familiarity with the case.

27     I. Yes.

28     J. Yes, I recall that it was our intent to comply with the law.

6

K. Yes.

L. Yes. We stated that our actions were not retaliatory.

M. Since the document bears my signature, then clearly I have seen it.

N. I don't recall – other than that it was our intent to comply with law.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 41:**

I don't recall.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 42:**

A. I don't recall.

B. I don't recall.

C. I don't recall.

D. I was acting warden and had overall responsibility for such administrative matters.

E. I personally never investigated the claim.

F. I don't recall reviewing the document.

G. Single-cell status is not punishment. Safety and security of the institution, as well as numerous other factors, determine where an inmate is housed.

H. No.

I. No.

J. Objection – the question is hopelessly compound, argumentative, and assumes facts not in evidence; namely, that PBSP staff never "really established" that Ashker was in danger. Without waiving the objection, Mr. Kirkland responds as follows: the question is so broad and unintelligible that I cannot answer it.

K. Objection – the question is compound, argumentative, and vague and ambiguous as to "treated differently." Without waiving the objection, Mr. Kirkland responds as follows: As I have said before, I am not aware of any retaliation against Ashker.

L. I do not "ensure" anything.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 43:**

I see the documents you have provided in Exhibit H. I do not recall if I have seen these before.

////

7

1  **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 44:**

2     A. I do not recall seeing this document.

3     B. No.

4     C. I did not review Ashker's appeal.

5     D. I did not review Ashker's appeal.

6     E. I did not review Ashker's appeal.

7     F. I did not review Ashker's appeal.

8     I declare under penalty of perjury of the laws of the State of California and United States of

9  America that the foregoing is true and correct.

10     Executed at _Sacramento_ , California, on March 2 1, 2007.

11

12

13                   RICHARD KIRKLAND

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{00047729.DOC/} 0595

DEFENDANT R. KIRKLAND'S RESPONSES TO PLAINTIFFS' WRITTEN DEPOSITION QUESTIONS  C 05 3759 CW (EDL)

*Ashker, v. Alameida, et al.*

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

Todd Ashker, 58191
Box # 7500/D1-119
Crescent City, Cal. 95532
In prose —

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

TODD L. ASHKER,
            Plaintiff,

    VS.

EDWARD ALAMEIDA JR., et al.,
            Defendants.

CASE No. C05-3759 CW [EDL]
Plaintiff's Written Deposition
Questions To The Below
Named Defendant
[per. F.R.C.P., Rule # 31]

Deponent: Plaintiff Ashker

Respondent: Defendant Patrick T. Smith

To all defendants and their counsel of record, PLEASE TAKE NOTICE:
Pursuant to provisions of FRCP, Rule # 31, and the Court Order dated Oct. 31, 2006, the
plaintiff Ashker, does hereby submit the attached written deposition questions
upon the above named defendant, who shall answer these questions within [2] days
of reciept of service, under penalty of perjury [attached hereto are questions # 1 to 67]
Defendant(s) are reminded that: documents do not "speak for themselves", and they
must make reasonable investigative enquiries necessary to answer any questions
that are relevant [see relevant F.R.D. case law]. All documents referenced in these
questions are attached, and refered to by the exhibits, which correspond to the
questions [See also: attached Table of Exhibits]

Dated: Nov. 27, 2006                Submitted by, T. L. Ashker
                                              Todd L. Ashker

1. Please state your full name and age.

Answer:

2. State your highest level of education and include any degrees you may have earned.

Answer:

3. Please specify if you have completed any courses or attended any seminars specializing in the subject of Adult Corrections and paroles.

Answer:

4. State your employment history prior to becoming a Calif. Dept. of Corrections employee.

Answer:

5. State each position you have held while employed by the Calif. Dept. of Corrections, and your duties and responsibilities in each position (post)

Answer:

6. As of the date of todays question have you been taking any medications that adversely affects your mental state. If yes, please specify what medications you've taken and how they have affected you

Answer:

SMITH —

1.

7. HAVE YOU EVER TESTIFIED IN A CRIMINAL, OR CIVIL CASE.

Answer:

8. HAVE YOU EVER SIGNED A DECLARATION UNDER PENALTY OF PERJURY WHICH PERTAINED TO A CRIMINAL, OR CIVIL CASE.

Answer:

9. IF YOUR ANSWER TO QUESTION(S) #7 AND/OR #8, ARE YES, PLEASE STATE THE CASE INFORMATION (NAME(S) OF THE PARTIES, COURT(S), CASE FILE NUMBERS)

Answer:

10. DO YOU KNOW CORRECTIONAL OFFICER DOROTHY HOWELL.

Answer:

11. IF YOUR ANSWER TO #10 ABOVE IS YES, PLEASE STATE THE EXTENT OF YOUR RELATIONSHIP WITH HOWELL (WORK RELATED, PERSONAL FRIEND ETC)

Answer:

12. IS IT APPROPRIATE TO SUBJECT PRISONERS TO PUNITIVE MEASURES, BASED ON SPECULATION (SUSPICION), THAT A PRISONER HAS VIOLATED A (CDCR) RULE OR REGULATION

Answer:

13. Do you recall the incident of Dec. 1, 2002, wherein inmate Allen, E#24908 was accused of spearing officer Howell in PBSP C facility - 4 block

Answer:

14. If yes, to #13 above please specify how you became aware of this incident.

Answer:

15. Is it true that you approved a memo dated Dec. 1, 2002, wherein you directed Facility C staff to subject inmate Allen to special security precautions in response to the incident with officer Howell (see EX.B, copy of Dec. 1, 2002 memo)

Answer:

16. Do you recall any conversation(s) you may have had with any staff members on Dec. 1, 2002, or Dec. 2, 2002, which mentioned Ashker and/or Clement's possible involvement in the Allen-Howell incident (if yes, please specify who said what to you about Ashker and Clement)

Answer:

17. Did you issue the order that Ashker and Clement were to be moved from C4-116, to a Lexan equiped cell (on Dec. 2, 2002), (see: EX.D, Ashker 602 appeal #C02-03388, at first level response; and Clement (602) appeal #D02-03377, at informal level)

Answer:

18. If yes to #17 above, please state why you made this order.

Answer:

19. Did you issue the order that Ashker and Clement be single-celled on Dec. 3, 2002 (see EX.D. reference at Question #17) (if "yes" please explain why you ordered this)

Answer:

_Did you know that_
20. On Nov. 20, 2001, LT. McKinney, documented that confidential reliable sources had claimed Ashker and Clement were soliciting inmate Miller (who was cellmates with Allen) to assault C/o Howell threw the foodport (see: EX.B, CDC 1030)

Answer:

21. Why didn't staff move Ashker and Clement, between 11-20-01, and Dec. 2, 2002. [prior to Allen's assault on Howell]

Answer:

22. Did you document your reasons for having Ashker and Clement moved to a Lexan cell on Dec. 2, 2002 (if your answer is "yes", specify the title of the document, and where it is located; if your answer is "no", specify why you did not do so)

Answer:

23. Did you document your reasons for ordering Ashker and Clement to be "single celled" on Dec. 3, 2002 (if your answer is "yes", specify the title and location of document. If your answer is "no", specify why you did not do so)

Answer:


24. Did you order Ashker, and Clement, housed in a "lexan cell" (Dec. 2, 2002), and that they be "single-celled", (Dec. 3, 2002) because you believed they were involved in a conspiracy with Allen, to assault C/O Howell.

Answer:


25. If yes to #24 above, specify the facts you relied upon to form the basis for your belief they were involved.

Answer:


26. Does the mere suspicion that inmates are involved in a conspiracy to assault a staff member in (PBSP) SHU, warrant immediate "lexan cell", and "single-cell" status (if yes, please provide examples of what information staff would need to have to do this)

Answer:


27. Does CCR Title 15 sections 3312 (A)(3), and 3315 mandate the issuance of "serious rule violations", when there is reliable evidence that inmates have conspired to ASSAULT A (CDCR) staff member.

Answer:

28. Why didn't staff write Ashker, and Clement, up a CDC 115 rule violation for "conspiracy to assault c/o Howell", between 11-20-01, and the present date

Answer:

29. Were you aware of Ashker's disabled arm condition, and his reliance on Clement's help doing daily activities at the time you ordered Ashker single-celled.

Answer:

30. Were you aware of Ashker, and Clement's, numerous 602 appeals, and court challenges concerning (PBSP-CDC) policies and practices during the (7) years that they were cellmates, housed together in C4-block (if yes, please summarize your answer with specifics)

Answer:

31. Prior to Dec 1, 2002, had you seen warden McGrath's, Oct. 21, 2002 memo, to all staff and inmates "rescinding the book label policy (see: Ex.D, copy of memo)

Answer:

32. Did you know the Oct. 21, 2002 memo about book labels was in response to Ashker obtaining a federal court injunction prohibiting the book label policy (if yes,

summarize how you became aware of this)

Answer:

33. Prior to Dec. 1, 2002, had you seen warden McGrath's Oct. 29, 2002 memo "to all staff and inmates" re: personal and internet mail (see: EX.D, copy of memo and op. procedure 205 (supp. #4))

Answer:

34. Did you know the Oct. 29, 2002, memo about mail/internet material was in response to Clement obtaining a federal injunction prohibiting the (CDCR) from not allowing inmates to receive internet material in their incoming mail. (if yes, summarize how you became aware of this)

Answer:

35. Did you know that Clement's attorney viewed McGrath's Oct. 29, 2002 response to the internet injunction as a retaliatory act (see: EX.D, copy of atty. MacKay's letter to deputy attorney general Pancho dated: 11-14-02)

Answer:

36. Did you know that in response to attorney MacKay's letter, warden McGrath issued a memo dated Nov. 22, 2002, "to all staff and inmates", wherein he rescinded the Oct. 29,

2002 memo (if yes, summarize how you became aware of this 11-22-02, memo. See: EX.D copy of memo signed by kirkland for McGrath)

Answer:

37. Is it Appropriate to retaliate against inmates for filing (602) Appeals, and court Actions, challenging their conditions of confinement.

Answer:

38. Would you ever Admit that Actions you took Against an inmate were in retaliation for his challenges to Prison policies.

Answers:

39. Is "double-celling" A priviledge in (PBSP-SHU) (see: EX.D, Ashker And Clement 602 Appeals At second level responses; EX. E, PBSP- O.P. 222, Section 305 (A); EX.F, Ashker (602) # 604-01650 At first level response)

Answer:

40. If "yes" to #39 Above, please state the specific criteria that An inmate has meet, to be Able to have "the priviledge of double-celling"

Answer:

41. Would an inmate who has no documented cell-fights for (22) years, and no "serious rule violations" involving assaults or weapons for over (10) years, be eligible for the privilege of double-celling?"

Answer:

42. Do you believe SHU cells with "lexan fronts" are the same as cells without lexan (please explain)

Answer:

43. To your knowledge, have any PBSP-staff (custody and/or maintenance staff) ever lived in a (SHU) "lexan covered cell" for any amount of time (if yes, estimate how long, example: 5 minutes, 1 hour, 1 day, 2 days, a week)

Answer:

44. How many (4oz) appeals have you personally reviewed concerning (PBSP-SHU) inmates complaining about conditions in the "lexan" covered cells (if you can't recall, give an estimate)

Answer:

45. What did Ashker, and Clement, do to warrant being placed in a lexan cell, and then single-celled [In Dec. 2002]

Answer:

46. Why was Ashker kept in a "lexan" covered cell from Dec. 2, 2002, to Feb. 4, 2006.

Answer:

47. When (PBSP-SHU) opened, there were no "lexan" covered cells, is that correct

Answer:

48. Is it true that the reason some cells were covered with "lexan", was in response to staff complaints about being "gassed". (see: EX.E. (A) O.S.H.A. citation dated Jan. 8, 1994).

Answer:

49. Do you admit that the "lexan" cells were created in order to house (PBSP-SHU) prisoners who had assaulted, or attempted to assault, other prisoners or staff, through their cell fronts (see: EX.E, June 11, 1994 memo from Warden Cambria, and additional attachments re: security precautions and restrictions)

Answer:

50. Did you know about the November 2002 KTVU-channel 2 news segment on the Aryan Brotherhood. (see: EX A. transcript of this news segment)

Answer:

RTS

10.

51. Did you ever watch this news segment.

Answer:

52. The news segment has commentary by PBSP-I.G.I. Sgt. McGuyer, former warden McGrath, and a couple debriefers, all speaking about alleged "A.B. conspiracies" in (PBSP), including "conspiracies to assault prison staff" (see: EX.A) my question is, what was the purpose of airing this news segment

Answer:

53. Did you know that Ashker, and Clements, prison I.D. photographs were aired by this news segment

Answer:

54. Did you know that most (PBSP-SHU) prisoners watched this news segment on their T.V.s

Answer:

55. How many (PBSP-SHU) prisoners claimed Ashker, and Clement, were involved in Allen's assault on C/o Howell)

Answer:

56. How many inmate informants have stated that other inmates were "conspiring to assault C/o Howell" (other than Ashker, and Clements, alleged conspiracy in

P.T.S.                           11.

2001 - 2002)

Answer:

57. Is it not true that, the conditions in (SHU) are unnecessarily punitive in order to make prisoners miserable so that they either go insane, or debrief, so they can get out of the (SHU) (please explain your answer)

Answer:

58. Can you explain why (SHU) prisoners are not allowed to have the state issue knit caps (that general population and T.H.U. inmates get)

Answer:

59 If your answer to #58 is "safety or security", state all facts that support knit caps in (SHU) threaten safety and security, as you claim

Answer:

40. Can you explain why (SHU) inmates are not allowed to by the extra thick thermals available at Walkenhorst's, and are only allowed to buy the thin cheap thermals that wear out fast.

Answer:

41. Can you explain why (SHU) inmates can not buy sweat

PANTS/SHIRTS LIKE THE G.P./T.H.U. INMATES CAN.

ANSWER:

62. IF YOUR ANSWER(S) TO #60 AND #61 ABOVE IS RELATED TO "SAFETY/SECURITY," STATE ALL FACTS THAT SUPPORT YOUR CLAIM THAT THESE ITEMS POSE A THREAT TO (SHU) SAFETY/SECURITY.

ANSWER:

63. HAVE YOU EVER BEEN ARRESTED AND CHARGED WITH COMMITTING A CRIME (IF YES, WHAT WAS THE CRIME)

ANSWER:

64. HAVE YOU EVER BEEN CONVICTED OF A CRIME (IF YES, WHAT WAS THE CRIME, AND WHAT PENALTY DID YOU RECEIVE)

ANSWER:

65. Who made the decision to use Alley's assault on C/o Howell, as a reason to justify subjecting Ashker and Clement to punitive measures [Lexan cell and single-cell status, after over 7 years of double-celling], over what was really retaliation for their successful litigation efforts.

Answer

66. Please explain the purpose and objective of allowing (PBSP-SHU) inmates who have submitted their debriefing paperwork, and/or being deemed to meet inactive gang criteria, the opportunity to have a yearly

P.T.S,                                    13.

photograph taken of themselves to send home to Family [See: "EXE" McGrath's Memo dated: Jan. 13, 2004], while excluding all other PBSP-SHU prisoner's who have over a year or more of discipline free time in.

Answer:

67. Isn't it true that all (PBSP-SHU) prisoner's are afforded the opportunity to attend their annual Institutional Classification Committee Hearings.

Answer:

Dated: Nov. 27, 2006

Submitted by, T. L. Ashker
Todd L. Ashker
— Plaintiff —

J. RANDALL ANDRADA (SBN 70000)
BRENDAN KENNY (SBN 237969)
**ANDRADA & ASSOCIATES**
**Professional Corporation**
180 Grand Avenue, Suite 925
Oakland, California 94612
Tel.: (510) 287-4160
Fax: (510) 287-4161
Email: bkenny@andradalaw.com

Attorneys for Defendants
EDWARD ALAMEIDA, JR., JEANNE WOODFORD,
JOE McGRATH, RICHARD KIRKLAND,
PATRICK T. SMITH, MARK CASTELLAW,
JAMES COX, MATTHEW J. NIMROD, ACEL K.
THACKER, and D. LANGLOIS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TODD L. ASHKER, | Case No.: C 05-3759-CW (EDL) |
| Plaintiff, | **DEFENDANT P. T. SMITH'S RESPONSES TO PLAINTIFFS' WRITTEN DEPOSITIONS QUESTIONS** |
| v. | |
| EDWARD ALAMEIDA, JR.; JEANNE WOODFORD; JOE MCGRATH; RICHARD KIRKLAND; P.T. SMITH; MARK CASTELLAW; J. COX; M. J. NIMROD; A.K. THACKER; DWIGHT W. WINSLOW; DOCTOR WELTON; and D. LANGLOIS, | |
| Defendants. | |

I, P. T. Smith, declare under penalty of perjury as follows:

The following are my responses to plaintiffs' written deposition questions. They are true and correct to the best of my knowledge.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 1:**

Patrick T. Smith. With regards to my age, I object as an invasion of privacy. Without waiving the objection, the answer is 43.

1

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 2:**

I object as an invasion of privacy. Without waiving the objection, the answer is Associate of Science, Criminal Justice.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 3:**

I have attended numerous courses and attended numerous seminars specializing in the subject of Adult Corrections and Paroles in the past 21 years.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 4:**

My previous employment history is irrelevant. I have been employed with the California Department of Corrections and Rehabilitation since 1986.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 5:**

<u>Correctional Administrator</u> - Managed a multi-discipline Business Services division including personnel services, plant operations, food services, procurement services, a wastewater treatment facility, warehouse services, mailroom, institutional accounting services, inmate trust services, information technology services, and fire department. Responsible for $164 million dollar institutional operating budget. Ensured line item managers adhered to budget projections. Approved all institutional purchases for equipment, goods and services. Advised Warden and Chief Deputy Warden on issues critical to institutional operations. Chairman of Institutional Classification Committee.

<u>Facility Captain</u> - Managed the daily operations of a Level IV General Population Facility and a Security Housing Unit. Set expectations for supervisory as well as rank and file staff. Performed critical reviews of numerous incident reports. Performed the duties as the Administrative Officer of the Day (AOD) and was the ranking manager during non-business hours. Conducted classification hearings of inmates as Chairman of Unit Classification Committee and member of Institutional Classification Committee. Monitored the inmate appeal process and inmate disciplinary systems for the facility. Reviewed recommendations and ensured corrective action for employees that violated policies and procedures. Conducted meetings with supervisory and subordinate staff in

2

order to correct procedural safety and security violations, and with the assistance of supervisory staff, made operational changes to improve staff and inmate safety.

<u>Correctional Captain</u> - Managed the daily security operations of a Level IV maximum-security prison. Set expectations for supervisory as well as rank and file staff. Responsible for approximately $540,000.00 security budget and $130,000.00 Crisis Response Team budget. Performed critical reviews of numerous incident reports. Performed the duties as the Administrative Officer of the Day (AOD) and was the ranking manager during non-business hours. Conducted classification hearings of inmates as Chairman of Unit Classification Committee and member of Institutional Classification Committee. Monitored the inmate appeal process and inmate disciplinary systems for a minimum support facility. Reviewed recommendations and ensured corrective action for employees that violated policies and procedures. Conducted meetings with supervisory and subordinate staff in order to correct procedural safety and security violations, and with the assistance of supervisory staff, made operational changes to improve staff and inmate safety. Command of institutional Crisis Response Team.

<u>Correctional Lieutenant</u> - Supervised Correctional Sergeants in Level IV General Population, Psychiatric Services and Security Housing Units. Coordinated custody personnel movement as well as the activation and deactivation of positions as the Personnel Assignment Lieutenant. Implemented the Preferred Personnel Post Assignment bid. Insured overall institutional security as the Watch Commander. Conducted disciplinary hearings as Senior Hearing Officer on Serious Disciplinary Hearings. Managed staff responses as Incident Commander during disturbances. Performed Internal Affairs investigations and other sensitive assignments as directed by management. Met and conferred with employee Bargaining Units regarding program changes. Commanded the Special Emergency Response Team and responsible for the training and deployment of the team as well as the Line Item Manager for the $126,000.00 budget. Conducted classification hearings of inmates as Chairman of Unit Classification Committee and member of Institutional Classification Committee.

{00047734.DOC/} 0595
DEFENDANT P.T. SMITH'S RESPONSES TO PLFS' WRITTEN DEPOSITIONS QUESTIONS

*Ashker. v. Alameida. et al.*
C 05 3759 CW (EDL.)

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1     <u>Correctional Sergeant</u> - Supervised Correctional Officers in Level I, Level III

2     Gymnasium, and Level IV General Population facilities, as well as in a Security Housing

3     Unit. Supervised yard activities as a General Population Yard Sergeant. Ensured post

4     coverage as the Watch Sergeant. Conducted institutional counts and directed emergency

5     traffic as the Central Control Sergeant. Provided supervision for the perimeter towers as

6     the Outside Patrol Sergeant. Served as Hearing Officer on Administrative Disciplinary

7     Hearings. Provided training to custody and non-custody staff as a Master In-Service

8     Training Instructor. Performed the duties as the Assistant Commander of the Special

9     Emergency Response Team and was the team training officer of a highly trained 21

10     member tactical response team.

11     <u>Correctional Officer</u> - Supervised 70 maximum-security inmates during the activation of

12     Pelican Bay States Prison's Security Housing Unit. Supervised Level II and Level III

13     inmates in Dorm and Cell housing units. Supervised a Level III Psychiatric Housing Unit

14     with 100 Category J and Category K inmates. Assigned to the Administrative

15     Segregation Unit. Performed cell searches and security inspections of inner and outer

16     perimeter areas. Provided custodial presence in the Institutional Clinic and Emergency

17     Room. Provided armed perimeter and yard coverage while assigned to towers.

18     Performed Investigative Employee duties and processed disciplinary reports while

19     assigned as a Search and Escort Officer.

20

21   **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 6:**

22     I object as an invasion of privacy. Without waiving the objection, the answer is No.

23   **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 7:**

24     Yes, I have testified in both criminal and civil cases.

25   **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 8:**

26     Yes.

27   **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 9:**

28     Several criminal cases involving inmate's incarcerated at Pelican Bay State Prison, and

one criminal case involving an inmate incarcerated at the California Mens Colony. (*State of California v. Hernandez*) I have testified in two civil cases; *Barton, Duke, and Decker v. Marshall*, and *Brissette v. Marshall*. I do not recall the case file numbers.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 10:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 11:**

She is a Correctional Officer at Pelican Bay State Prison. I have been in her chain of command on several occasions.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 12:**

While it is not appropriate to subject an inmate to a punitive measure based solely on suspicion that an inmate has violated a rule or regulation, it is appropriate to take an action that an inmate <u>may</u> believe to be punitive or adverse, in order to maintain the safety and security of the institution based on suspicion that an inmate has violated a rule or regulation.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 13:**

I have some general recollection.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 14:**

I reviewed Officer Howell's and other staff reports.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 15:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 16:**

I have no specific recollection of any conversations with any specific staff regarding ASHKER's possible involvement in the assault on Officer Howell. However, I do recall general concern that ASHKER and CLEMENT, his cell mate at the time, were involved in conspiring to assault Officer Howell. This was partially based on a confidential memorandum dated November 20, 2001, authored by Correctional Lieutenant J. McKinney, which related that ASHKER and CLEMENT solicited another inmate to perform a stabbing assault on Officer Howell.

5

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 17:**

I have a vague recollection of ordering the move, due to the above mentioned memorandum, although Appeal Log # C02-03388 reflects that I ordered the move.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 18:**

As stated above, I only have a vague recollection of ordering the move. However, it would have most likely been due to ASHKER and CLEMENT's possible involvement in the stabbing assault on Officer Howell. Therefore the safety and security of the institution would have prompted the move.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 19:**

I have no specific recollection that I ordered ASHKER or CLEMENT be single celled.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 20:**

This is a statement, not a question. However, I interpret the statement as asking if I have seen the exhibit. The answer is yes, I have seen it.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 21:**

I cannot and do not speak for "the staff."

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 22:**

No. I did not document any reason for the move. Moving ASHKER and CLEMENT was simply a housing decision and was not adverse, therefore no documentation was necessary.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 23:**

As I stated above, I have no specific recollection that I ordered ASHKER or CLEMENT to be single celled.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 24:**

As stated above, I only have a vague recollection of ordering the move. However, it would have most likely been due to ASHKER and CLEMENT's possible involvement in the stabbing assault on Officer Howell. Therefore, the safety and security of the institution would have prompted the move. As to being single celled, as I stated above, I have no specific recollection that I ordered ASHKER or CLEMENT be single celled.

///

6

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 25:**

This was partially based on a confidential memorandum dated November 20, 2001, authored by Correctional Lieutenant J. McKinney, which related that ASHKER and CLEMENT solicited another inmate to perform a stabbing assault on Officer Howell. When this was brought to my attention after Officer Howell was assaulted, it was reasonable to suspect ASHKER and CLEMENT'S involvement.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 26:**

In order to ensure the safety of staff and inmate alike, and to ensure the security of the institution, it is prudent to make housing decisions based on information, even suspicion.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 27:**

This calls for a legal conclusion. However, those California Code of Regulation Title 15, sections, do require staff to document misconduct of a serious nature on a Rules Violation Report.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 28:**

I cannot speak for the "staff."

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 29:**

I had some information that ASHKER claimed a disability.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 30:**

I cannot give specifics. However, I knew that ASHKER brought some actions.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 31:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 32:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 33:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 34:**

Yes. When the memorandum was posted, staff were told of the change and how the change came about due to litigation.

7

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 35:**

No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 36:**

I knew that a memorandum was issued rescinding the October 29, 2002, memorandum and Operational Procedure amendment. I did not know the reason why. I did see the memorandum of November 22, 2002.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 37:**

I do not know what you mean by retaliate. As I understand the term, the answer is No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 38:**

My actions were not in retaliation, therefore I would not admit it.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 39:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 40:**

The question is overly broad. Generally, the specific circumstances of the situation are considered. Those circumstances would generally include, but not be limited to, the conduct of the two prisoners, an assessment of the dangers posed, and numerous other safety and security considerations.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 41:**

Not necessarily. Behavior is only one of the factors examined when determining if an inmate is suitable for double celling.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 42:**

No. Lexan covered cells have a sheet of clear Lexan covering the cell front and the cell door.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 43:**

Not to my knowledge.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 44:**

I do not specifically recall. I have probably reviewed 10-20 appeals regarding Lexan covered cells.

8

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 45:**

As I stated above, I only have a vague recollection of ordering the move. However, it would have most likely been due to ASHKER and CLEMENT's possible involvement in the stabbing assault on Officer Howell. Therefore, the safety and security of the institution would have prompted the move. It was procedure to place inmates who assaulted, attempted to assault, or threatened to assault staff or other inmates in a Lexan covered cell. Therefore it is reasonable to believe that ASHKER and CLEMENT were placed in a Lexan covered cell due to their possible involvement in the stabbing assault on Officer Howell.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 46:**

Objection – the question assumes facts not in evidence. Without waiving the objection, Mr. Smith responds as follows: I am not aware that ASHKER was in a Lexan covered cell from December 2002 until February 6, 2006. However, his placement was because it was believed that he may have constituted a danger or threat to the safety and security of the institution. Additionally, there need not be a particular reason. Placement is a discretionary housing decision.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 47:**

Correct.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 48:**

Yes.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 49:**

I have read documents to that effect. However due to the number of inmates housed in the SHU, many inmates live in Lexan covered cells that have not assaulted, attempted to assault, or threatened to assault staff or other inmates.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 50:**

No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 51:**

No.

///

9

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 52:**

You are asking me to speculate upon the reasons a television station presented a particular piece. The question should be directed to KTVU.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 53:**

No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 54:**

I am not aware of anyone who watched the news segment.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 55**

I am only aware of one inmate who claimed that ASHKER and CLEMENT were involved in the stabbing assault on Officer Howell.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 56:**

I am not aware of any other inmate claiming that ASHKER and CLEMENT were involved in the stabbing assault on Officer Howell.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 57:**

The question is absurd and argumentative. The answer is No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 58:**

The Departmental Property Schedule does not allow knit caps in the SHU, which is reflected in PBSP's Operational Procedure 806.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 59:**

N/A

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 60:**

I am not aware of any limitations on the thickness of thermal underwear for inmates housed in the SHU.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 61:**

The Departmental Property Schedule does not allow knit caps in the SHU, which is reflected in PBSP's Operational Procedure 806.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 62:**

N/A

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

10

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 63:**

I object as an invasion of privacy. Without waiving the objection, the answer is No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 64:**

I object as an invasion of privacy. Without waiving the objection, the answer is No.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 65:**

The question is absurd and argumentative. It assumes there was retaliation for the exercise of the right to bring certain litigation.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 66:**

Again, a privilege has been extended based upon certain criteria.

**RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 67:**

If you are asking whether a prisoner can attend his own hearing, the answer is Yes.

I declare under penalty of perjury of the laws of the State of California and United States of America that the foregoing is true and correct.

Executed at _Crescent City_ , California, on January _22_, 2007.

_____
P. T. Smith
Associate Warden
Business Services

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION

1 | **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 63:**

2 |     I object as an invasion of privacy. Without waiving the objection, the answer is No.

3 | **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 64:**

4 |     I object as an invasion of privacy. Without waiving the objection, the answer is No.

5 | **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 65:**

6 |     The question is absurd and argumentative. It assumes there was retaliation for the exercise

7 | of the right to bring certain litigation.

8 | **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 66:**

9 |     Again, a privilege has been extended based upon certain criteria.

10 | **RESPONSE TO WRITTEN DEPOSITION QUESTION NO. 67:**

11 |     If you are asking whether a prisoner can attend his own hearing, the answer is Yes.

15 |     I declare under penalty of perjury of the laws of the State of California and United States of

16 | America that the foregoing is true and correct.

17 |     Executed at _Crescent City_, California, on January _22_, 2007.

P. T. Smith
Associate Warden
Business Services

_ANDRADA & ASSOCIATES_
_PROFESSIONAL CORPORATION_

11

# PROOF OF SERVICE

*Todd Ashker v. Edward Alameida Jr., et al..*
U. S. District Court Case No. C 05-3759-CW (EDL)

I, the undersigned, declare that l am over the age of 18 years and not a party to the within action; that my business address is 180 Grand Avenue, Suite 925, Oakland, CA 94612, and that on January 22, 2007, I served a true copy of the foregoing document(s) entitled:

**DEFENDANT P. T. SMITH'S RESPONSES TO PLAINTIFFS' WRITTEN DEPOSITIONS QUESTIONS**

on the parties in this action by placing a true copy thereof in a sealed envelope addressed as follows:

Todd L. Ashker                                        **In Pro Per**
#C58191
Pelican Bay State Prison
Box 7500/D1-119
Crescent City, CA 95532

__X__   (By Mail) I caused each envelope with postage fully prepaid to be placed for collection and mailing following the ordinary business practices of Andrada & Associates.

_____   (By Hand) I caused each envelope to be delivered by hand to the person(s) listed above.

_____   (By Telecopy) I caused each document to be sent by fax to the fax as indicated above.

_____   (By Overnight Delivery) I caused each envelope to be delivered by overnight delivery to the person(s) indicated above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 22, 2007, at Oakland, California.

GEORGIA LEE

ANDRADA & ASSOCIATES
PROFESSIONAL CORPORATION