United States District Court
For the Northern District of California

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7              FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10

11                                              No. C 05-3759 CW

12   TODD L. ASHKER,
                                                ORDER GRANTING IN
13            Plaintiff,                        PART DEFENDANTS'
                                                MOTION TO DISMISS
14       v.                                     AND GRANTING
                                                DEFENDANTS' MOTION
15   ROBERT HOREL, Warden, Pelican Bay          FOR SUMMARY
     State Prison (PBSP), JEANE WOODFORD,       JUDGMENT
16   JOE MCGRATH, RICHARD KIRKLAND, P.T.
     SMITH, MARK CASTELLAW, J. COX, M.J.
17   NIMROD, A.K. THACKER, DWIGHT W.
     WINSLOW, DOCTOR WELTON, and D.
18   LANGLOIS,

19            Defendants.
     _____/
20

21       On September 16, 2005, Plaintiff, an inmate at Pelican State

22   Prison (PBSP) housed in the Security Housing Unit (SHU), filed his

23   original complaint against twelve named Defendants.  The complaint

24   primarily concerns the allegedly inadequate medical treatment

25   Defendants have provided to Plaintiff for his disabled arm and the

26   fact that he has been placed in a single cell in the SHU rather

27   than double-celled with another inmate who could help him with

28

United States District Court
For the Northern District of California

writing and other activities of daily living.  Plaintiff's
complaint contains the following causes of action: (1) First
Amendment violation based on Defendants' retaliation against
Plaintiff for challenging his conditions of confinement; (2) Eighth
Amendment violation based on Defendants' failure to provide
Plaintiff with the care his arm needs; (3) violation of Plaintiff's
Fourteenth Amendment right to equal protection based on the fact
that Defendants have single-celled Plaintiff when many inmates of a
different race are double-celled; (4) violation of the Americans
with Disabilities Act for failure to accommodate;[1]
(5)(a) intentional tort; (b) conspiracy; (c) negligence;
(d) medical malpractice; (e) breach of the duty of care; and
(6) breach of contract due to Defendants' failure to comply with an
agreement to provide Plaintiff with extra-thick thermal underwear.
On June 26, 2006, Defendants filed a motion to dismiss Plaintiff's
federal claim based on lack of thick thermal underwear and for
summary judgment on all of Plaintiff's other federal causes of
action.  Defendants also move to dismiss Plaintiff's fifth and
sixth state causes of action based on lack of jurisdiction in the
event the Court dismisses or grants summary judgment to Defendants
on Plaintiff's federal claims.

On June 18, 2007, the Court issued an Order Granting
Plaintiff's Request for Leave to File a Supplemental Complaint
against five new Defendants alleging four causes of action arising
from the new Defendants' improper treatment of Plaintiff's disabled

---

[1]Plaintiff moved to dismiss this cause of action.  On  March 14,
2007, the Court granted Plaintiff's motion to dismiss.  (Docket # 84).

2

United States District Court
For the Northern District of California

arm: (1) violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by not providing him with pain management, physical therapy and medically necessary assistive aids; (2) negligence and medical malpractice; (3) breach of contract due to the new Defendants' failure to comply with a 2002 settlement agreement reached in one of Plaintiff's prior cases regarding medical care for his arm; and (4) tortious interference with contract.  On August 14, 2007, the Court dismissed the fourth cause of action for interference with Plaintiff's settlement contract as not cognizable.

Defendants' June 26, 2006 motion now before the Court does not address the remaining supplemental claims against the new Defendants.[2]

FACTUAL BACKGROUND

Plaintiff has a permanently disabled right arm.  Defendant Dr. Dwight Winslow, Health Care Manager at PBSP during the time at issue, has stated that the condition of Plaintiff's right arm is "permanent and he is not expected to experience any significant improvement in his medical condition.  It is expected that he will have less than full use of his right hand and experience ongoing discomfort . . . treatment is intended to relieve discomfort and maintain as much use of the arm as possible."  Pl.'s Ex. I, Winslow Dec. in case no. C 00-1480 CW, Ashker v. California Dep't of Corrections, et al.  As a result of his discomfort and inability

_____

[2]When this motion was filed Defendants Winslow and Welton had not been served.  The docket shows that Winslow and Welton have been served and both have filed an answer to the complaint (Docket # 155). However, only Winslow filed a joinder in this motion.

fully to use his right arm and hand without experiencing pain, Plaintiff states that he requires treatment that Defendants have failed to provide to him.  Plaintiff states that he needs: (1) extra thick thermal underwear to keep his arm warm and (2) assistance with writing, cell-cleaning and clothes washing. Plaintiff states that twice he was double-celled with an inmate of his choice who helped him with his writing and housekeeping activities, but each time Defendants, for improper retaliatory and discriminatory reasons, separated him from his cell-mate.  At present he is housed in a cell by himself.  Defendants state that they separated Plaintiff from his cell-mates for legitimate penological reasons.

LEGAL STANDARD

I. Motion to Dismiss

All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion.  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  "Each averment of a pleading shall be simple, concise, and direct.  No technical forms of pleading or motions are

4

required." Fed. R. Civ. P. 8(e).  The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim.  See Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955, 1964 (2007).  To the contrary, all the Rules require is "a short and plain statement of the claim" that "will give the defendant fair notice of what the [plaintiff's] claim is and the grounds on which it rests."  Id. (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (internal quotation marks omitted).

Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. The complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level."  Id. at 1965. "Without some factual allegations in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  Id. at 1965 n.3.

When granting a motion to dismiss, a court is generally required to grant a plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment would be futile, a court examines whether the complaint could be amended to cure the defect requiring dismissal "without

5

contradicting any of the allegations of [the] original complaint."
<u>Reddy v. Litton Indus., Inc.</u>, 912 F.2d 291, 296 (9th Cir. 1990).
Leave to amend should be liberally granted, but an amended
complaint cannot allege facts inconsistent with the challenged
pleading.   <u>Id.</u> at 296-97.

II. Motion for Summary Judgment

     Summary judgment is properly granted when no genuine and
disputed issues of material fact remain, and when, viewing the
evidence most favorably to the non-moving party, the movant is
clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.
56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986);
<u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir.
1987).

     The moving party bears the burden of showing that there is no
material factual dispute.  Therefore, the court must regard as true
the opposing party's evidence, if supported by affidavits or other
evidentiary material.  <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815
F.2d at 1289.  The court must draw all reasonable inferences in
favor of the party against whom summary judgment is sought.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d
1551, 1558 (9th Cir. 1991).

     Material facts which would preclude entry of summary judgment
are those which, under applicable substantive law, may affect the
outcome of the case.  The substantive law will identify which facts
are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. <u>Id.</u>; <u>see also Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific

7

evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

DISCUSSION

I. Motion to Dismiss

Defendants move to dismiss Plaintiff's claim based on their failure to provide him with thick thermal underwear on the ground that he failed to exhaust that claim.  Ashker states that he has litigated his appeal of Defendants' refusal to provide him with thick thermal underwear to the third level of review to the California Department of Corrections and Rehabilitation (CDCR), and thus, he has exhausted the claim.

A. Exhaustion

The Prison Litigation Reform Act of 1995 (PLRA) amended 42 U.S.C. § 1997e to provide, "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Exhaustion is mandatory and no longer left to the discretion of the district court.  <u>Woodford v. Ngo</u>, 126 S. Ct. 2378, 2382 (2006) (citing <u>Booth v. Churner</u>, 532 U.S. 731, 739 (2001)). "Prisoners must now exhaust all 'available' remedies, not just those that meet federal standards." <u>Id.</u>  The PLRA's exhaustion

United States District Court
For the Northern District of California

requirement requires "proper exhaustion" of available administrative remedies.  Id. at 2387.  Failure to exhaust is an affirmative defense under the PLRA.  Jones v. Bock, 127 S. Ct. 910, 919 (2007).  Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust."  Id. at 922-23.

The State of California provides its inmates the right to appeal administratively "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  It also provides its inmates the right to file administrative appeals alleging misconduct by correctional officers.  See id. § 3084.1(e).  In order to exhaust available administrative remedies within this system, a prisoner must proceed through several levels of appeal: (1) informal resolution, (2) formal written appeal on a CDCR 602 inmate appeal form, (3) second level appeal to the institution head or designee, and (4) third level appeal to the Director of the CDCR.  Id. § 3084.5; Barry v. Ratelle, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).

B. Analysis

Plaintiff's allegations regarding thermal underwear appear in paragraph 81 of the complaint, which states:

Defendants Winslow and Thacker are each aware of Plaintiff's need for 'extra thick thermal underwear' to keep his arm warm (cold increases his pain and discomfort).  Each of these defendants are aware of the Del Norte County superior court "stipulation" wherein Winslow agreed that Plaintiff would be allowed to purchase and possess [2] sets of said thermals.  Yet these defendants have, through their acts and/or failure to act, maliciously denied, delayed, or intentionally interfered with his ability to obtain said thermals for approximately [18] months, without penological

9

United States District Court
For the Northern District of California

1    justification.

2  Comp. at ¶ 81.   In his opposition to Defendants' motion to dismiss,

3  Plaintiff elaborates on the thermal underwear allegations and

4  submits a copy of his fully exhausted 602 appeal with the third

5  level response dated April 11, 2001.   Pl.'s Ex. I.   In his

6  opposition, Plaintiff indicates that, after he received the denial

7  of the third level appeal, he filed a petition for writ of habeas

8  corpus in Del Norte County superior court.   Defendant Dr. Winslow,

9  then PBSP Chief Medical Officer, entered into a stipulated

10  settlement in which he agreed to issue a chrono permitting

11  Plaintiff to purchase and possess two pairs of extra thick long

12  underwear from a vendor other than Walkenhurst.   The parties agreed

13  that the chrono could be renewed as long as Plaintiff's medical

14  condition persists.   Plaintiff continues,

15       In spite of the above referenced stipulated settlement,
         I've had repeated problems obtaining the thermals.   After
16       over [1] year of such problems, I submitted another 602
         appeal concerning (PBSP-staff), and Dr. Winslow's refusal
17       to adhere to the terms agreed upon.   The first level
         respondent partially granted the appeal, providing
18       information that the (2) other 'approved vendors' had
         thick thermals available. . . . Based on the fact that I
19       fully exhausted a 602 appeal, and obtained a 'stipulated
         settlement' via court action in late (2001), together
20       with the partial granting of my appeal by first level
         review response of (12-28-04), as described above, . . .
21       I have fully exhausted my administrative remedies as to
         the thermal underwear issue.
22
23  Opp. at ¶¶ 11-12.

24       In their reply, Defendants point out that the allegations in

25  Plaintiff's complaint are that Defendants prevented Plaintiff from

26  purchasing extra thick thermals after stipulating on October 19,

27  2001 to allow him to do so.   Defendants present declarations from

28                                    10

PBSP administrative personnel in charge of tracking inmate appeals and printouts from their appeal tracking system that show that Plaintiff only filed a first level appeal of this claim, and thus they argue it is not exhausted.  They argue that Plaintiff "artfully attempts to circumvent the exhaustion requirement by attaching a 602 appeal to his declaration that was exhausted before the October 19, 2001 stipulation."

Defendants are correct; Plaintiff's exhausted appeal is based on events that occurred prior to the stipulation that was signed on October 19, 2001.  Plaintiff seems to acknowledge this in his opposition, stating that after Defendants did not abide by the stipulation, he filed another 602 appeal which he only took to the first level of review.  However, in his complaint, Plaintiff only alleges claims based on Defendants' breach of the 2001 stipulation, not on any actions that preceded it.

Therefore, Plaintiff's thermal underwear claims based on breach of the 2001 stipulation are dismissed for failure to exhaust.

II. Motion for Summary Judgment

    A. Equal Protection Claim

Plaintiff's Equal Protection claim is based upon the fact that he was single-celled for eight months in 2002 and 2003 and again from June 8, 2004 to the present, based upon his race, which is Caucasian.  Comp. at ¶ 86-87.  Plaintiff alleges that he has been disciplinary-free for over ten years, but he has been single-celled "while a couple of hundred hispanics, who don't have medical assistance needs, are double-celled."  Comp. at ¶ 87.  In his

United States District Court
For the Northern District of California

11

opposition, Plaintiff adds another basis for his Equal Protection claim -- that he is being discriminated against as a class of one because he has been intentionally treated differently from others similarly situated and that there is no rational basis for the different treatment.

In <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987), the Court reiterated the need for judicial deference to the problems of prison administration, holding that when a prison regulation or practice impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.  The Court set out four factors to be considered:

> (1)  Whether there is a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it.  A regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational, and the government objective must be a legitimate and neutral one.
>
> (2)  Whether there are alternative means of exercising the right that remains open.  If so, courts should be particularly conscious of the measure of judicial deference owed to corrections officials.
>
> (3)  What impact the accommodation of the asserted right will have on guards, other inmates and the allocation of prison resources generally.  If the accommodation will have a significant ripple effect the courts should be particularly  deferential to the informed discretion of correctional officials.
>
> (4)  If there is an absence of ready alternatives, this is evidence of the reasonableness of a prison regulation.

<u>Id.</u> at 89-91.

The only proper standard for determining the validity of a prison regulation or practice claimed to infringe on an inmate's constitutional rights is to ask whether the regulation or practice

United States District Court
For the Northern District of California

is "reasonably related to legitimate penological interests."  Id.
at 89.  The legitimate penological interest may not be presumed.
"To satisfy Turner, the [defendant] must, at the very least, adduce
some penological reason for its policy at the relevant stage of the
judicial proceedings."  Armstrong v. Davis, 275 F.3d 849, 874 (9th
Cir. 2001).  However, strict scrutiny is appropriate to test the
infringement of prisoners' constitutional rights to racial
equality.  Johnson v. California, 543 U.S. 499, 530-31 (2005)
(Turner does not apply to racial classifications in prison).

In order to present an equal protection claim, a prisoner must
allege that his treatment is invidiously dissimilar to that
received by other inmates.  More v. Farrier, 984 F.2d 269, 271-72
(8th Cir. 1993) (absent evidence of invidious discrimination,
federal courts should defer to judgment of prison officials); Timm
v. Gunter, 917 F.2d 1093, 1099 (8th Cir. 1990) (same).

This applies to claims of racial discrimination:  "Prisoners
are protected under the Equal Protection Clause of the Fourteenth
Amendment from invidious discrimination based on race."  Wolff v.
McDonnell, 418 U.S. 539, 556 (1974) (citation omitted).  Invidious
racial discrimination such as racial segregation, which is
unconstitutional outside prisons, also is unconstitutional within
prisons.  Johnson, 543 U.S. at 505-06.  A prison classification
based on race is immediately suspect and is subject to the same
strict scrutiny as a racial classification outside prison.  Id. at
508-10  Prison officials must therefore demonstrate that the race-
based policy or action is narrowly tailored to serve a compelling
state interest.  Id. at 510-11.  Johnson did not rule out race-

United States District Court
For the Northern District of California

based classifications and did not eliminate prison security as a reason for such classifications, but instead determined that prison officials must demonstrate that race-based policies are narrowly tailored to address a compelling government interest such as prison security. Id. at 511-13, 513. A claim of racial discrimination under the Equal Protection Clause requires demonstration of discriminatory intent. Washington v. Davis, 426 U.S. 229, 239-40 (1976).

An equal protection claim may be brought by a "class of one" when the plaintiff alleges he has been treated differently from others similarly situated and that there is no rational bases for the difference in treatment. Seariver Maritime Financial Holdings, Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002). Under the rational basis test, the action does not violate equal protection if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." Id.

1. Violation Based on Race

In support of his contention that he was single-celled based upon the fact that he is Caucasian, Plaintiff states that he was treated differently than Hispanic inmates who, like him, were labeled gang members and who posed "safety concerns." Plaintiff submits the declarations of several Caucasian inmates housed in the SHU who state that they have observed that there are more Hispanics and African-Americans double-celled in the SHU than are Caucasian inmates. Plaintiff also submits the following statistics that he states were taken from an examination of the SHU logbooks: (1) on June 8, 2004, there were 128 double-cells in the SHU and of these

14

United States District Court
For the Northern District of California

approximately ten housed Caucasians, the rest housed Hispanics;
(2) of the sixty-nine double-cells in the C-Facility of the SHU,
Plaintiff was the only Caucasian inmate separated from his cell-
mate between June 8, 2004 and July 1, 2004; (3) on June 25, 2007,
the date Plaintiff wrote his opposition, there were three double-
cells housing Caucasians and all were in "Lexan" cells whereas
there were at least sixteen to twenty Hispanics classified as
prison gang members who were double-celled and most were not in
"Lexan" cells.[3]

To prove that race is not a factor in selecting which inmates
are double-celled, Defendants submit the declaration of Brendan
Kenny, attorney for Defendants.  Kenny states that he examined the
same log books examined by Plaintiff and found that from September
18, 2002 to December 2, 2002, there were forty Hispanics housed in
pod C-4 and thirteen Caucasians.  Of the thirteen Caucasians, four
were in double-cells; of the forty Hispanics, eight were in double-
cells.  Therefore, on a percentage basis, thirty percent of the
Caucasians were double-celled and only twenty percent of the
Hispanics were double-celled.  When Plaintiff and his former cell-
mate were double-celled, forty-six percent of Caucasians were
double-celled.  On August 8, 2004, in SHU pod C-5, twelve percent
of the Caucasian inmates were double-celled and eighteen percent of
the Hispanics were double-celled.  Kenny Dec. at ¶¶ 18-20.

Although more Hispanics are double-celled, when analyzed on a

_____

[3]Plaintiff describes a Lexan cell as a plexi-glass covered cell
which has very little air coming out of the air vent and, as a result,
is very hot, humid and moist.  Ashker Dec. at ¶ 53, Johnson Dec. at
¶ 31.

15

**United States District Court**
For the Northern District of California

1  percentage basis, the percentage of Caucasians versus Hispanics

2  that are double-celled varies over time.  Based on the percentage

3  calculation, race does not appear to be a factor in determining who

4  is double-celled and who is not.  Therefore, the statistics

5  submitted by Plaintiff do not establish that race is a factor in

6  the decisions regarding which inmates are double-celled.

7      Because Plaintiff has not established that race is a factor in

8  determining which inmates are double-celled, he has not made out a

9  prima facie case of discrimination based on race.

10              2. Violation Based on Class of One

11      In support of his contention that he was discriminated against

12  as a class of one, Plaintiff states that he was treated differently

13  than other Caucasian inmates in the SHU who were also labeled

14  members of the Aryan Brotherhood gang (AB) because he was single-

15  celled but they were double-celled.  For instance, Plaintiff states

16  that he and his former cell-mate Frank Clement were separated after

17  PBSP staff received information that Plaintiff and Clement were

18  involved in an assault on a PBSP staff member.  Plaintiff was

19  placed in a Lexan cell for thirty-eight months, but Clement was

20  placed in a Lexan cell for only two months.  Ashker Dec. at ¶¶ 33-

21  35, 43-44, 51-53, and 68.  However, this evidence does not prove

22  that Plaintiff was treated differently than other inmates like

23  himself because the facts and circumstances concerning Clement's

24  treatment could have been very different than Plaintiff's.

25      Plaintiff also points to the fact that he and Danny Troxell

26  were the only Caucasian AB-classified inmates who were single-

27  celled in June, 2004.  However, he states that two other Caucasian

28                              16

AB classified inmates were single-celled in August, 2004 and were not double-celled again until August, 2006.  Plaintiff states that he believes that the two other inmates were single-celled only after he complained that he was the only Caucasian single-celled so that Defendants could point to other AB-classified inmates who had been single-celled.  Ashker Dec. at ¶ 203.  Plaintiff's belief is not evidence to support his claim.  Furthermore, at the time in question, there were three other double-cells of Caucasian, AB-identified inmates and one other pair was split up at the same time that Plaintiff and Troxell were split up.  See Troxell Dec. at ¶ 13.  This shows that half the AB-identified Caucasian inmates who were double-celled, without counting Plaintiff and Troxell, were separated.  Furthermore, Plaintiff was double-celled with inmates of his choice for two periods of time; from November, 1995 through December, 2002, Plaintiff shared a cell with Clement, Comp. at ¶ 13, and from July 25, 2003 through June 8, 2004, Plaintiff shared a cell with Troxell, Comp. at ¶ 33.

Thus, Plaintiff's evidence fails to show that he was treated differently than those similarly situated to him.

Furthermore, Defendants submit cogent arguments that the policy created to govern inmate cell assignments satisfies all four requirements explicated in Turner and they reasonably applied the policy to Plaintiff's situation.  See Defs.' Motion to Dismiss at 7-11 and supporting declarations.  Therefore, Defendants' motion for summary judgment on Plaintiff's Equal Protection claims is GRANTED.

17

**United States District Court**
For the Northern District of California

B. Eighth Amendment Cruel and Unusual Punishment Claim

Plaintiff's Eighth Amendment claim is based on the fact that he has the serious medical condition of a permanently disabled right arm and wrist. He claims that Defendants have treated him with deliberate indifference by not allowing him to be double-celled with another inmate who would provide him with assistance with writing, cleaning his cell and washing his laundry. Comp. at ¶¶ 64, 80.

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. Farmer v. Brennan, 511 U.S. 825, 832 (1994). The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 31 (1993).

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. Id.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Id. (citing Estelle, 429 U.S. at 104). The existence of an injury that a

18

reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.  Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer, 511 U.S. at 837.  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference."  Id.  If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.  Gibson v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002).

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm.  McGuckin, 974 F.2d at 1060; Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, however.  Neither a finding that a defendant's actions are egregious nor that they resulted in significant injury to a prisoner is required to establish a violation of the prisoner's federal constitutional rights, McGuckin, 974 F.2d at 1060, 1061,

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

but the existence of serious harm tends to support an inmate's deliberate indifference claims, <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing <u>McGuckin</u>, 974 at 1060).

Once the prerequisites are met, it is up to the factfinder to determine whether deliberate indifference was exhibited by the defendant. Such indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care. <u>McGuckin</u>, 974 at 1062 (delay of seven months in providing medical care during which medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1058-60 (9th Cir. 2004); <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989).

A claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment. <u>Toguchi</u>, 391 F.3d at 1060-61; <u>see, e.g.</u>, <u>Frost v. Agnos</u>, 152 F.3d 1124, 1130 (9th Cir. 1998) (finding no merit in claims stemming from alleged delays in administering pain medication, treating broken nose and providing replacement crutch, because claims did not amount to more

20

United States District Court

For the Northern District of California

than negligence).

Defendants do not dispute that Plaintiff has a serious medical condition in that his arm is permanently disabled which causes him pain when he engages in various activities, such as writing. Defendants also do not dispute that they were aware of Plaintiff's serious medical condition during the time relevant to this motion. Rather, Defendants dispute that failing to provide him with a cell-mate of his choice amounts to deliberate indifference to Plaintiff's serious medical needs.

Plaintiff admits in his complaint that Defendants have provided him with a writing assistant.  See Comp. at ¶ 64 ("Since being 'single celled' on June 8, 2004, Ashker's pain and suffering has increased because he does not have assistance with daily activities (other than writing).")  In his declaration, Ashker Dec. at 266, and opposition, Plaintiff likewise acknowledges that Defendants have offered him a writing assistant in the law library and that inmate Troxell, who is in the cell adjoining Plaintiff's, has been approved to be Plaintiff's writing assistant. Nonetheless, Plaintiff argues that he needs assistance in washing his clothes and frequent showers to prevent the development of a rash on his face and body.  He also claims he needs assistance in cleaning his cell.  Plaintiff points to the report of Dr. Hechanova, PBSP staff doctor, who, after examining Plaintiff's arm, concluded that Plaintiff was unable to perform daily tasks such as writing, cleaning his cell and washing clothes and recommended that Plaintiff receive a writing assistant and staff assistance in cleaning his cell.  See Ashker Dec. at ¶¶ 247-53.

21

United States District Court
For the Northern District of California

1    Defendants point out that his laundry, like the laundry of all

2    other inmates, is done by prison staff one time per week.  See

3    Declaration of Brendan Kenny, Ex. E, PBSP SHU Operational Procedure

4    (OP) 222 at 25.  Operational Procedure 222 also provides that SHU

5    inmates will receive a minimum of three showers per week.  Id. at

6    16.

7    As the Ninth Circuit stated in Hallett v. Morgan, 296 F.3d

8    732, 744-45 (9th Cir. 2002):

9        The officials' conduct must constitute 'unnecessary and
         wanton infliction of pain' before it violates the Eighth
10       Amendment.  This is not an easy test for Plaintiffs to
         satisfy. . . . The Eighth Amendment is not a basis for
11       broad prison reform.  It requires neither that prisons be
         comfortable nor that they provide every amenity that one
12       might find desirable.  Rather, the Eighth Amendment
         proscribes the 'unnecessary and wanton infliction of
13       pain,' which includes those sanctions that are 'so
         totally without penological justification that it results
14       in the gratuitous infliction of suffering.'

15   Id.

16   Here, Defendants cite evidence that they single-celled

17   Plaintiff for security reasons, not for punitive reasons, in

18   accordance with Department of Operations Manual (DOM) Section

19   52020.  See Kenny Dec., Ex. F, DOM Section 52020; Kenny Dec. at

20   ¶ 2, Ex. A (PBSP Classification Chrono indicating that Plaintiff is

21   an active member of the AB prison gang); Id., Ex. D, (PBSP

22   Classification Chrono indicating there are sixteen documents that

23   provide evidence that Plaintiff was a member of the AB, which is

24   "known to be involved in criminal activities which threaten the

25   safety of others and institution security").  They cite evidence

26   that double-celling Plaintiff will create potential security

27   concerns.  See Grannis Dec., Ex. F, Director's Level Appeal

28                                    22

United States District Court
For the Northern District of California

1  Decision.

2      Because Defendants have documented a legitimate penological

3  justification for their action in single-celling Plaintiff and

4  because more frequent laundry service and showers and assistance

5  with cell cleaning are not necessary to avoid a substantial risk of

6  serious harm, Plaintiff has not shown that Defendants were

7  deliberately indifferent to his medical needs by placing him in a

8  single cell.  Therefore, Defendants' motion for summary judgment on

9  this claim is GRANTED.

10      C. Retaliation Claims Based on First Amendment Rights

11      Plaintiff alleges that Defendants violated his First Amendment

12 rights by separating him from cell-mate Clement in December, 2002

13 and separating him from cell-mate Troxell in June, 2004 in

14 retaliation for Plaintiff's filing and winning lawsuits against

15 Defendants.

16      Retaliation by a state actor for the exercise of a

17 constitutional right is actionable under 42 U.S.C. § 1983, even if

18 the act, when taken for different reasons, would have been proper.

19 Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84

20 (1977).

21      "Within the prison context, a viable claim of First Amendment

22 retaliation entails five basic elements:  (1) An assertion that a

23 state actor took some adverse action against an inmate (2) because

24 of (3) that prisoner's protected conduct, and that such action

25 (4) chilled the inmate's exercise of his First Amendment rights,

26 and (5) the action did not reasonably advance a legitimate

27 correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th

28                              23

Cir. 2005) (footnote omitted).

The prisoner need not demonstrate a total chilling of his First Amendment rights in order to establish a retaliation claim. Id. at 568-69 (rejecting argument that inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit). That a prisoner's First Amendment rights were chilled, though not necessarily silenced, is enough. Id. at 569 (destruction of inmate's property and assaults on the inmate enough to chill inmate's First Amendment rights and state retaliation claim, even if inmate filed grievances and a lawsuit). All that a prisoner must show is that the defendant's acts would chill or silence a person of ordinary firmness from future First Amendment activity. Id. at 568.

Retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence. Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003).

The prisoner bears the burden of pleading and proving absence of legitimate correctional goals for the conduct of which he complains. Pratt, 65 F.3d at 806. If he does, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. Schroeder v. McDonald, 55 F.3d 454, 461-62 (9th Cir. 1995).

Prisoners may not be retaliated against for exercising their right of access to the courts. Id. at 461; Rizzo, 778

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

F.2d at 532 (retaliation for prisoner's work as jailhouse lawyer).  This constitutional prohibition clearly includes retaliation for filing a complaint.  <u>Sorrano's Gasco, Inc. v. Morgan</u>, 874 F.2d 1310, 1314 (9th Cir. 1989).

The right of access to the courts extends to established prison grievance procedures.  <u>Bradley v. Hall</u>, 64 F.3d 1276, 1279 (9th Cir. 1995).  Thus, a prisoner may not be retaliated against for using such procedures.  <u>Rhodes</u>, 408 F.3d at 567; <u>Bruce v. Ylst</u>, 351 F.3d 1283, 1288 (9th Cir. 2003).

### 1. 2002 Cell Separation

Plaintiff and Clement were cell-mates from November 17, 1995 to December 2, 2002.  During that time, Plaintiff and Clement filed several lawsuits against various CDCR defendants challenging prison conditions.  In September, 2002, the Court ruled in favor of Plaintiff and Clement in a lawsuit challenging CDCR regulations which prevented inmates from receiving material downloaded from the internet or books that were mailed without special labels.  The Court enjoined CDCR from enforcing any policy prohibiting inmates from receiving mail that contained internet-generated material and enjoined PBSP from requiring book venders to attach a special label to book packages sent to inmates.

On October 21, 2002, then-Warden Joe McGrath issued a memorandum stating that special labels were no longer required on book packages sent to inmates.  On October 29, 2002, Warden McGrath issued a second memorandum that inmates may receive material downloaded from the internet.

25

**United States District Court**
For the Northern District of California

Between 2001 and December 1, 2002, inmate Allen[4], a
validated AB member, was housed in a pod next to Plaintiff
and Clement.   In a November 21, 2001 confidential memo,
Lieutenant J.A. McKinney reported that a debriefing inmate
had stated that Plaintiff and Clement had solicited him to
assault Correctional Office (CO) Howell through a food port,
but the inmate had refused.   PBSP staff documented that
Clement had spoken with Allen several times between April 25,
2002 and August 24, 2002, through the drains in the exercise
yard.   On December 1, 2002, Allen attempted to spear CO
Howell through the food port in Allen's cell.   The spear
struck CO Howell, but she was not injured.   Allen was charged
with attempted murder and manufacturing a deadly weapon.

On December 2, 2002, Plaintiff was separated from
Clement and put in a Lexan single cell.   On December 4, 2002,
Plaintiff filed a 602 appeal challenging his separation from
Clement and placement in a Lexan single cell.   Plaintiff's
appeal was denied at the three levels of review.   In denying
Plaintiff's appeal, Defendants relied on the following
evidence.   In a December 10, 2002 Confidential Memorandum,
Sergeant Connie McGuyer reported that a debriefing inmate
stated that an AB member asked him to make a weapon and
assault a correctional officer and he believed that Plaintiff
and Clement ordered the assault.   In two February 6, 2003
Confidential Information Disclosure Forms, PBSP staff

---

[4]Allen's first name is not provided.

United States District Court
For the Northern District of California

1  reported that Allen communicated with Plaintiff and Clement

2  through the exercise yard drain and that Plaintiff and

3  Clement solicited another inmate to assault CO Howell.

4      Plaintiff first argues that he has raised an issue of

5  material fact regarding Defendants' retaliatory motive in

6  single-celling him based on the proximity of this decision to

7  the September, 2002 federal court ruling in his favor.

8  Although the timing of an allegedly retaliatory act may be

9  evidence of retaliatory motive, see Bruce, 351 F.3d at 1288-

10  89, in this case, as Defendants point out, the fact that

11  Defendants single-celled Plaintiff very soon after he was

12  awarded an injunction against CDCR defendants on another

13  issue does not provide evidence of a retaliatory motive when

14  viewed under the circumstances that between October 24, 1989

15  and April 20, 2001, Plaintiff filed eleven federal lawsuits

16  against Defendants or other prison staff members.  These

17  lawsuits, as listed by Defendants, are (1) Ashker, et al. v.

18  Rowland, et al., C 89-01473; (2) Ashker v. Marshall, et al.,

19  C 91-01231; (3) Ashker, et al. v California Dep't of

20  Corrections, et al., C 91-03952; (4) Schneider, et al. v.

21  Marshall, et al., C 92-01193; (5) Ashker, et al. v. Marshall,

22  et al., C 94-00898; (6) Schneider, et al. v. California Dep't

23  of Corrections, et al., C 96-01739; (7) Ashker, et al. v.

24  California Dep't of Corrections, et al., C 97-01109;

25  (8) Ashker v. Cambra, C 97-01463; (9) Ashker, et al. v.

26  California Dep't of Corrections, et al., C 00-1480;

27  (10) Ashker v. Steinberg, et al., C 01-03921; and

28

United States District Court
For the Northern District of California

(11) <u>Ashker, et al. v. McGrath</u>, C 01-00760.  In <u>Ashker, et al. v. California Dep't of Corrections, et al.</u>, C 91-03952 CW, judgment was entered in favor of Plaintiff in the amount of $225,000 and <u>Ashker, et al. v. California Dep't of Corrections, et al.</u>, C 01109, was settled, presumably to the satisfaction of both Plaintiff and Defendants.

     This case is unlike the usual case in which a plaintiff files or threatens to file a lawsuit and, soon after, the defendants take an adverse action.  Here, Plaintiff has filed many lawsuits, and any adverse actions taken against him may have occurred shortly after one of them.  Thus, the timing of the single-celling decision does not raise an issue of material fact in regard to retaliatory motive.

     Plaintiff also argues that Defendants did not have a legitimate security interest in single-celling him because Defendants relied on a thirteen-month-old confidential memo from a source who said Plaintiff and Clement solicited him to assault CO Howell.  Plaintiff claims that Defendants had no reason to rely on this memo to single-cell him because it had been reviewed on three separate occasions by PBSP staff and no action had been taken against him at those times. However, as correctly pointed out by Defendants, before the attack on CO Howell, the memo was merely an allegation; after the attack, the allegation was borne out.

     Therefore, Plaintiff's second argument fails to raise an issue of material fact in regard to retaliatory motive. Defendants' motion for summary judgment for retaliation based

28

United States District Court
For the Northern District of California

on the 2002 single-celling incident is GRANTED.

          2. 2004 Separation

On or about July 9, 2003, Plaintiff filed a request to double-cell with inmate Troxell.  Initially the request was denied, but on July 24, 2003, Warden B.J. O'Neill approved it.  On May 27, 2004, inmate D. Yates was found unresponsive on the floor of a cell he shared with inmate Jeremy Beasley. Yates and Beasley were both Caucasian.  Yates died of strangulation.  Beasley, a member of the Nazi Low Rider prison gang, was charged with murder.

In response to Beasley's in-cell homicide, on June 4, 2004, Special Service Unit (SSU) Special Agent Keri Berkler wrote a confidential memo indicating that she had discovered two old confidential memoranda from 1995 and 1996 which indicated Plaintiff may not be suitable for double-celling. The old memoranda suggested that Plaintiff might have safety concerns with some members of the AB.  The SSU conducted more than 300 double-celling reviews in response to the in-cell homicide and several inmates were separated from their cell-mates as a result of the reviews.

On June 8, 2004, Plaintiff and Troxell were separated. On June 25, 2004, Plaintiff filed an appeal challenging his placement in a single cell and requesting assistance with his daily activities such as writing and cleaning his cell.  The Institutional Classification Committee (ICC), chaired by Defendant Mark Castellaw, reviewed Plaintiff's charges and concluded that his separation from Troxell was appropriate

29

United States District Court
For the Northern District of California

1   based on Berkler's June 4, 2004 SSU memo.

2        Plaintiff again argues that the timing of Defendants'
3   decision to separate him from Troxell raises an issue of
4   material fact regarding their retaliatory motive because it
5   occurred after he had filed many 602 appeals challenging
6   various conditions of confinement.  However, as discussed
7   above, because Plaintiff has filed so many 602 appeals and
8   lawsuits, the fact that he was separated from Troxell after
9   he filed several specific appeals does not tend to establish
10  that Defendants separated him from Troxell in retaliation for
11  these appeals.

12       Plaintiff argues that Defendants' alleged reliance on
13  Berkler's memorandum to single-cell him was not reasonable
14  because the only evidence cited by Berkler to conclude
15  Plaintiff was not in good standing with members of the AB
16  were two documents written in 1995 and 1996, many years
17  before the incident in question.  Plaintiff argues that, not
18  only were these documents obsolete, but also other PBSP staff
19  had reviewed them and had found no reason to take any action
20  on them.  Plaintiff also argues that Defendants did not have
21  a legitimate penological interest in separating him from
22  Troxell and that Defendants' vague references to safety and
23  security concerns are pretextual.  However, the decision to
24  single-cell Plaintiff was made immediately after a Caucasian
25  inmate was murdered by his Caucasian cell-mate.  It is
26  reasonable that after this incident, Defendants would be more
27  aware that certain AB members were at risk of harm from their

28                                30

United States District Court
For the Northern District of California

cell-mates and would take more precautions against this type
of incident happening again.  Under these circumstances,
Defendants' decision to separate Plaintiff from Troxell is
supported by adequate penological concerns for security and
safety.

Plaintiff also argues that Defendants' decision to
separate him from Troxell was made without the necessary file
review or personal interview.  This argument might be
relevant to a due process claim, but not to a retaliation
claim.  Plaintiff's complaint does not allege a due process
cause of action; therefore, this argument will not be
addressed here.

Therefore, Plaintiff has failed to raise a genuine issue
of material fact as to whether Defendants separated him from
Troxell in retaliation for the exercise of his constitutional
rights.  Defendants' motion for summary judgment on this
cause of action is GRANTED.

D. Qualified Immunity

Defendants argue that, even if the Court concludes that
they committed one or more constitutional violations,
Plaintiff's suit against them is barred by the doctrine of
qualified immunity.

The defense of qualified immunity protects "government
officials . . . from liability for civil damages insofar as
their conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would
have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

31

United States District Court
For the Northern District of California

"Regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991).

A court considering a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right, then proceed to determine if the right was "clearly established." Wilson v. Layne, 526 U.S. 603 (1999); Conn v. Gabbert, 526 U.S. 286, 290 (1999). The threshold question must be: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).

Because Defendants have not violated any of the constitutional rights alleged by Plaintiff, there is no need for the Court to address Defendants' argument that qualified immunity shields them from Plaintiff's suit. However, even if a constitutional violation had occurred, it would have been reasonable for Defendants to have acted as they did. Defendants who act in reliance on a state statute are generally presumed to act reasonably, even if the statute is later found to be unconstitutional. Carey v. Nevada Gaming Control Board, 279 F.3d 873, 881 (9th Cir. 2002). Defendants acted in accordance with California regulations and PBSP

32

operating procedures.   See e.g., Cal. Code Regs., tit. 15,
§§ 3270 (security and public safety take precedence over all
other considerations), 3272 (classification of inmate may be
increased if senior officer believes it necessary to protect
security and order), 3350 (procedure for providing medical
services to inmates), 3377.1(c) (procedure for determining
inmate is to be single-celled); PBSP OP 222 (operational
procedures to be used in SHU); PBSP DOM Supplement 52020
(procedure for double-celling inmates housed in the SHU).
Therefore, Defendants are protected from liability through
application of the doctrine of qualified immunity.

III. Motion to Dismiss State Causes of Action

      Defendants move to dismiss Plaintiff's state causes of
action with leave to re-file in state court on the ground
that, without federal subject matter jurisdiction, the Court
lacks supplemental jurisdiction over these claims.   In
Plaintiff's supplemental complaint, he states additional
federal claims against additional Defendants.   These new
federal claims may provide the Court with supplemental
jurisdiction over Plaintiff's state claims.   Therefore,
Defendants' motion to dismiss Plaintiff's state claims is
denied without prejudice to re-filing in the event the new
federal claims are dismissed.

                          CONCLUSION

      For the foregoing reasons, the Court GRANTS Defendants'
motion to dismiss Plaintiff's claim based upon thermal
underwear and grants Defendants' motion for summary judgment

33

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

on Plaintiff's claims for violation of his rights under the Fourteenth and Eighth Amendments and for retaliation under the First Amendment.[5]  Defendants' motion to dismiss Plaintiff's state law claims is DENIED without prejudice. (Docket # 31).

        IT IS SO ORDERED.


        9/28/07

Dated _____          _____
                                        CLAUDIA WILKEN
                                        United States District Judge

---

        [5]Although Defendant Welton did not join in this motion, he is entitled to summary judgment also.  See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 802-03 (9th Cir. 1995) (summary judgment may be properly entered in favor of unserved defendants where (1) the controlling issues would be the same as to the unserved defendants, (2) those issues have been briefed, and (3) the plaintiff has been provided an opportunity to address the controlling issues.  Such is the case here.

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

ASHKER,

          Plaintiff,

   v.

ALAMEIDA ET AL et al,

          Defendant.

_____/

Case Number: CV05-03759 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 28,2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Brendan  Kenny
J. Randall Andrada
Andrada & Associates
180 Grand Avenue
Suite 925
Oakland,  CA 94612

Todd A. Ashker
#C58191
Pelican Bay State Prison
Box 7500
Crescent City,  CA 95532

Dated:  September 28, 2007

Richard W. Wieking, Clerk
By: Sheilah Cahill, Deputy Clerk

35

United States District Court
For the Northern District of California