VOLUME 2

PAGES 279 – 447

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

TODD L. ASHKER,               )
                              )
                              )
        PLAINTIFF,            )   NO. C-05-3759 CW
                              )
  VS.                         )   TUESDAY, MAY 12, 2009
                              )
MICHAEL C. SAYRE, ET AL.,     )   OAKLAND, CALIFORNIA
                              )
        DEFENDANTS.           )
_____)


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          TODD L. ASHKER, PRO PER
                           BOX 7500/D1-119
                           CRESCENT CITY, CALIFORNIA 9553



**FOR DEFENDANTS:**         ANDRADA & ASSOCIATES
                           180 GRAND AVENUE, SUITE 225
                           OAKLAND, CALIFORNIA 94612
                    BY:  J. RANDALL ANDRADA, ESQUIRE



**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                           OFFICIAL COURT REPORTER

1

2                        I N D E X

3    PLAINTIFF'S WITNESSES:                          PAGE

4

5    ASHKER, TODD

6    DIRECT EXAMINATION RESUMED BY MR. ASHKER        282

7    DIRECT EXAMINATION RESUMED BY MR. ASHKER        377

8    CROSS-EXAMINATION BY MR. ANDRADA                401

9

10   TROXELL, DANNY (VIA VIDEOCONFERENCE)

11   DIRECT EXAMINATION BY MR. ASHKER                340

12   CROSS-EXAMINATION BY MR. ANDRADA                357

13   REDIRECT EXAMINATION BY M. ASHKER               365

14

15   PALOMINO, ALFONSO (VIA VIDEOCONFERENCE)

16   DIRECT EXAMINATION BY MR. ASHKER                372

17

18   PLAINTIFF'S EXHIBIT:            EVD.

19        147                       386

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>TUESDAY MAY 12, 2009</u>                              <u>8:35 A.M.</u> |
| 2 | |
| 3 | (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.) |
| 4 | **THE COURT:**  GOOD MORNING. |
| 5 | **MR. ANDRADA:**  GOOD MORNING. |
| 6 | **MR. ASHKER:**  GOOD MORNING. |
| 7 | **THE COURT:**  WE XEROXED THE JURY INSTRUCTIONS.  I |
| 8 | GAVE YOU SOME DRAFT VERDICT FORMS AND YOU HAVE A COPY OF THE |
| 9 | PRELIMINARY INSTRUCTIONS. |
| 10 | **MR. ANDRADA:**  THANK YOU, YOUR HONOR.  I AM SURE AT |
| 11 | SOME POINT WE WILL HAVE AN OPPORTUNITY TO DISCUSS THE VERDICT |
| 12 | FORM WITH YOU? |
| 13 | **THE COURT:**  YEAH, TOMORROW, ALONG WITH THE JURY |
| 14 | INSTRUCTIONS. |
| 15 | **MR. ANDRADA:**  THANK YOU. |
| 16 | **THE CLERK:**  ALL RISE. |
| 17 | (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.) |
| 18 | **THE COURT:**  YOU MAY BE SEATED. |
| 19 | YOU KNOW, I THINK I GOT YOU SWITCHED SOMEHOW.  YOU |
| 20 | ARE MS. WILCOX, RIGHT? |
| 21 | **JUROR:**  YES. |
| 22 | **THE COURT:**  AND YOU ARE MS. TOROIAN? |
| 23 | **JUROR:**  YES. |
| 24 | **JUROR:**  SHOULD WE MOVE? |
| 25 | **THE COURT:**  I HAD YOUR NAMES SWITCHED. |

1         **JUROR:**  WE SWITCHED YESTERDAY.  I THINK I WAS NUMBER

2    FOUR.

3         **THE COURT:**  OKAY.

4         PLEASE BE SEATED.  SO WE'LL RESUME MR. ASHKER'S

5    TESTIMONY AT THIS TIME.

6         **MR. ASHKER:**  THANK YOU, YOUR HONOR.

7         GOOD MORNING, MEMBERS OF THE JURY.

8         YESTERDAY WHEN WE LEFT OFF WE WERE AT, I WAS

9    TESTIFYING ABOUT THE 602 I FILED IN NOVEMBER 25TH, 2001

10   CONCERNING PAIN MANAGEMENT SPECIALIST AND STOMACH PROBLEMS, AND

11   HOW DR. WOLF HAD INITIATED THE TRAMADOL MEDICATION ON

12   JANUARY 22, 2002.

13        IN MY TESTIMONY I HAD OMITTED REFERENCE TO THE

14   PROBLEMS THAT I HAD PRIOR TO THAT WITH MY ULNAR NERVE, AND I

15   WILL RESUME MY TESTIMONY NOW TO FILL YOU IN ON THAT ISSUE

16   BRIEFLY.

17                 **DIRECT EXAMINATION RESUMED**

18   BY MR. ASHKER:

19   **Q.**   MR. ASHKER, DID YOU HAVE PROBLEMS WITH YOUR ULNAR NERVE AS

20   A DIRECT RESULT OF THE SHOOTING IN 1990?

21   **A.**   NO, I DID NOT.

22   **Q.**   CAN YOU PLEASE SAY -- STATE WHEN YOU BEGAN TO HAVE

23   PROBLEMS RELATING TO YOUR ULNAR NERVE IN YOUR RIGHT ARM?

24   **A.**   I BEGAN HAVING PAIN ASSOCIATED WITH MY ULNAR NERVE AT SOME

25   POINT IN EARLY 1998, I BELIEVE AND --

ASHKER – DIRECT / MR. ASHKER

1    Q.   AND CAN YOU PLEASE DESCRIBE THAT PAIN?

2    A.   WELL, IT WAS RUNNING ALONG (INDICATING) MY, FROM MY ELBOW

3    AREA DOWN ALONG HERE (INDICATING), INTO MY HAND, INTO MY PINKIE

4    FINGER AND IT CAUSED NUMBNESS OVER TIME.  IT BEGAN IN MY PINKIE

5    FINGER, SLOWLY SPREAD TO ENCOMPASS MY ENTIRE FINGER, THEN IT

6    SPREAD INTO MY RING FINGER.

7    Q.   DID YOU SEE A NEUROLOGIST ABOUT THIS PROBLEM?

8    A.   YES.  THE FIRST TIME I SAW A NEUROLOGIST RELATING TO ANY

9    NERVE DAMAGE IN MY ARM WAS ON JUNE 9TH, 1998.

10   Q.   WHO WAS THAT NEUROLOGIST?

11   A.   IT WAS DR. MAUKONEN AT PELICAN BAY STATE PRISON IN THE

12   SPECIALTY CLINIC.

13   Q.   AND WHAT DID HE DO?

14   A.   HE CONDUCTED A NERVE CONDUCTION STUDY.

15   Q.   AND DO YOU KNOW THE RESULTS?

16   A.   YES.

17   Q.   WHAT WERE THE RESULTS, ACCORDING TO YOUR UNDERSTANDING?

18   A.   WELL, BASED ON THE REPORT THAT I READ, THE REPORTS WERE

19   NEGATIVE FOR ANY DAMAGE SHOWING UP ON THE NERVE CONDUCTION

20   STUDY.

21   Q.   DID YOU CONTINUE TO HAVE PROBLEMS ASSOCIATED WITH YOUR

22   NERVE PAIN?

23   A.   YES, I DID.

24   Q.   CAN YOU DESCRIBE THESE PROBLEMS?

25   A.   WELL, THE PAIN CONTINUED AND I SAW DOCTOR -- ORTHOPEDIC

ASHKER – DIRECT / MR. ASHKER

```
 1   SPECIALIST DR. LAU ON MARCH 3RD, 1999, AND HE ORDERED ANOTHER

 2   NERVE CONDUCTION STUDY TO BE DONE.

 3   Q.   DID YOU HAVE THAT NERVE CONDUCTION STUDY?

 4   A.   YES, I DID.

 5   Q.   WHEN DID YOU HAVE IT AND WHAT WERE THE RESULTS, ACCORDING

 6   TO YOUR UNDERSTANDING?

 7   A.   WELL, I SAW DR. MAUKONEN AGAIN, AND HE CONDUCTED ANOTHER

 8   NERVE CONDUCTION STUDY ON APRIL 27TH, 1999.  AND ACCORDING TO

 9   THE REPORT THAT I READ AND DISCUSSIONS I HAD WITH DR. LAU AND

10   DR. DUNCAN, THIS 1999 STUDY REVEALED THAT I HAD SLOWING IN THE

11   FUNCTION OF MY ULNAR NERVE.

12   Q.   AND DID YOU SEE DR. DUNCAN PERSONALLY ABOUT THIS NEW TEST?

13   A.   YES, I DID.

14   Q.   WHEN DID YOU SEE HIM?

15   A.   ON APRIL 28TH, 1999 I SAW DR. DUNCAN IN RESPONSE TO A

16   FOLLOW-UP AFTER THIS NERVE CONDUCTION STUDY.

17   Q.   AND WHAT DID DR. DUNCAN ORDER?

18   A.   AT THAT TIME ORDERED THAT I USE AN EXTENSION BRACE AT

19   NIGHT WHILE I WAS SLEEPING TO ALLEVIATE ANY PRESSURE ON THE

20   ULNAR NERVE BY KEEPING MY ARM IN A SEMI-STRAIGHT POSITION AT

21   NIGHT.  AND HE ORDERED THAT I CONTINUE TO TAKE ELAVIL WHILE

22   NOTING THE SIDE EFFECT ISSUES OF OVERSEDATION.

23   Q.   DID YOU CONTINUE -- DID YOU TRY THE BRACING AND THE

24   ELAVIL?

25   A.   YES, I DID.
```

ASHKER – DIRECT / MR. ASHKER

1   **Q.**   WAS IT EFFECTIVE?

2   **A.**   NO, IT WAS NOT.

3   **Q.**   DID YOU SEE ANY SPECIALIST AFTER THAT?

4   **A.**   YES, I DID.

5   **Q.**   DID -- WHO DID YOU SEE AND WHEN DID YOU SEE THEM?

6   **A.**   I SAW ORTHOPEDIC SPECIALIST DR. LAU ON JULY 7TH, 1999.

7   **Q.**   AND WHAT DID DR. LAU DO?

8   **A.**   HE EXAMINED MY ARM AND NOTED THE CONTINUED PAIN ASSOCIATED

9   WITH MY ULNAR NERVE, SENSITIVITY TO TOUCH, AND ALL THAT.

10  **Q.**   AND WHAT DID HE TELL YOU AT THAT TIME?

11  **A.**   WELL, HE TOLD ME WHAT TREATMENTS WERE AVAILABLE, INCLUDING

12  SURGERY CALLED AN ULNAR TRANSPOSITION SURGERY TO MOVE MY ULNAR

13  NERVE TO A DIFFERENT AREA OF MY ARM.

14          HE EXPLAINED TO ME THE POSSIBLE RISKS, INCLUDING

15  PERMANENT NERVE DAMAGE, POSSIBLE LOSS OF SOME FUNCTION TO THE

16  NERVE, AND EVEN IF THE SURGERY WAS SUCCESSFUL AT THAT TIME, IT

17  MIGHT POSSIBLY RETURN DUE TO SCAR FORMATION OF SCAR TISSUE, OR

18  THINGS OF THAT NATURE.

19  **Q.**   WHAT DID YOU ELECT TO DO?

20  **A.**   AT THAT TIME I ELECTED TO PROCEED WITH THE SURGERY.

21  **Q.**   DID YOU HAVE THE SURGERY?

22  **A.**   YES, I DID.

23  **Q.**   WHEN DID YOU HAVE IT AND WHO PERFORMED IT?

24  **A.**   I HAD THE SURGERY ON AUGUST 16TH, 1999 BY ORTHOPEDIC

25  DOCTOR, ORTHOPEDIC SPECIALIST, DR. DUNCAN.

ASHKER – DIRECT / MR. ASHKER

1   Q.   AND DID YOU REVIEW DR. DUNCAN'S REPORTS AFTER THE SURGERY?

2   A.   YES, I DID.

3   Q.   CAN YOU EXPLAIN A LITTLE BIT ABOUT ANY CONVERSATIONS YOU

4   MIGHT HAVE HAD ABOUT YOUR CONCERNS ABOUT THE SURGERY PRIOR TO

5   THE SURGERY WITH DR. DUNCAN?

6   A.   YES, I CAN.

7              MR. ANDRADA:  EXCUSE ME, MR. ASHKER.

8              YOUR HONOR, I ASSUME THAT I STILL HAVE, IF YOU WILL,

9   THE RIGHT TO MOVE TO STRIKE SOME OF THIS HEARSAY IF I BELIEVE

10  THAT IT'S, IN EFFECT, EXCESSIVE.  WE'RE ABOUT TO HEAR CLEARLY

11  HEARSAY COMMENTS FROM THE PHYSICIAN.  I UNDERSTAND THE PECULIAR

12  CIRCUMSTANCES OF THIS CASE, AND --

13             THE COURT:  FOR THE MOST PART, I THINK MR. ASHKER IS

14  QUOTING THINGS THAT ARE IN THE RECORD.

15             MR. ASHKER:  I'M QUOTING VERY SPECIFIC DETAILS THAT

16  I PERSONALLY READ IN THE DOCUMENTS THAT I HAVE RIGHT HERE.

17             THE COURT:  MAYBE YOU CAN ALERT US IF YOU ARE GOING

18  TO TELL US SOMETHING THAT IS NOT IN THE DOCUMENTS AND JUST IN

19  YOUR MEMORY, NUMBER ONE, YOU SHOULDN'T, BUT NUMBER TWO, AT

20  LEAST SAY THAT THAT'S WHAT YOU ARE DOING SO COUNSEL CAN OBJECT.

21             I THINK YOU CAN ASSUME THAT WHAT HE IS SAYING IS

22  THINGS THAT HE GOT FROM THE RECORD.

23             MR. ANDRADA:  PERHAPS ALSO, AGAIN, AND I APOLOGIZE,

24  YOUR HONOR, PERHAPS IT IS MY FAULT, BUT IT IS DIFFICULT TO

25  FOLLOW MR. ASHKER'S TESTIMONY.  AND I KNOW HE'S APPARENTLY

1   PROCEEDING THROUGH ONE OF MANY SUMMARIES HE PROVIDED ME, BUT

2   IT'S DIFFICULT TO FOLLOW THE SUMMARIES.

3           I AM NOT EVEN SURE WHAT EXHIBITS HE IS REFERRING TO.

4           **MR. ASHKER:**  I --

5           **MR. ANDRADA:**  IT'S VERY DIFFICULT.  I'M SORRY, BUT

6   IT IS.

7           **THE COURT:**  YOU KNOW WHAT THE EXHIBITS ARE?

8           **MR. ASHKER:**  YES.

9           **THE COURT:**  WHY DON'T YOU, AS YOU SPEAK, WHY DON'T

10  YOU SAY THIS IS IN EXHIBIT 45, THIS IS IN EXHIBIT 46, ET

11  CETERA, THEN COUNSEL CAN FOLLOW ALONG.

12          BUT I WOULD SAY THAT YOU PROBABLY SHOULD GIVE US A

13  LITTLE LESS DETAIL ABOUT THIS SURGERY PART AND GET TO THE PART

14  THAT DIRECTLY INVOLVES THE SETTLEMENT AGREEMENT AND DR. SAYRE

15  SINCE WE NEED TO BE SURE TO GET TO THAT, AND YOU DON'T WANT TO

16  SPEND TOO MUCH TIME ON PRELIMINARIES.

17          **MR. ASHKER:**  OKAY.  THANK YOU, YOUR HONOR.

18          **THE COURT:**  BUT, YES, IF YOU FIND THAT HE HAS SAID

19  SOMETHING THAT ISN'T IN THE RECORD, YOU CAN CERTAINLY MOVE TO

20  STRIKE IT.

21          GO AHEAD.

22          **MR. ANDRADA:**  THANK YOU, YOUR HONOR.  EXCUSE ME,

23  MR. ASHKER.  ARE YOU PROCEEDING THROUGH SUMMARY NUMBER ONE IN

24  YOUR GROUP OF SEVERAL SUMMARIES?

25          **MR. ASHKER:**  THIS TESTIMONY HERE IS NOT IN THAT

```
 1   SUMMARY.  IT'S BASED ON EXHIBITS NUMBER 115 THROUGH 120.

 2              MR. ANDRADA:  OKAY.  SO IF YOU BEAR WITH ME FOR A

 3   MOMENT.

 4              HANG ON.

 5              (PAUSE IN THE PROCEEDINGS.)

 6              MR. ASHKER:  I CAN CONTINUE TESTIFYING WHILE YOU ARE

 7   DIGGING THOSE OUT; IS THAT RIGHT?

 8              MR. ANDRADA:  I WOULD APPRECIATE THE COURTESY OF --

 9              THE COURT:  OKAY.

10              MR. ANDRADA:  AT LEAST BEING --

11              THE COURT:  THERE ARE FOUR BINDERS AND THE BINDERS

12   HAVE NUMBERS ON THEM.

13              MR. ANDRADA:  THEY ARE UNWIELDY, YOUR HONOR, I

14   APOLOGIZE.  I AM ALMOST THERE.  OKAY.

15              OKAY.  THANK YOU VERY MUCH, YOUR HONOR.

16              THE COURT:  ALL RIGHT.

17   BY MR. ASHKER:

18   Q.   YES.  DID YOU EXPRESS CONCERNS TO DR. DUNCAN ABOUT THIS

19   SURGERY BEFOREHAND?

20   A.   YES, I DID.

21   Q.   WHAT DID YOU SAY TO DR. DUNCAN?

22   A.   I ASKED DR. DUNCAN IF THE SURGERY WAS ABSOLUTELY

23   NECESSARY, BECAUSE IF IT WASN'T, I DID NOT WANT TO GO THROUGH

24   THAT SURGERY IF THERE WAS OTHER ALTERNATIVES.

25              AT THAT TIME HE TOLD ME THAT IT WAS ABSOLUTELY
```

1  NECESSARY BECAUSE WITHOUT THE SURGERY, THERE WAS A GOOD

2  POSSIBILITY I WOULD EXPERIENCE PERMANENT NERVE DAMAGE,

3  INCLUDING THE LOSS OF THAT ENTIRE FUNCTION OF THAT NERVE IN MY

4  HAND.

5  **Q.**  DID YOU HAVE THE SURGERY?

6  **A.**  YES, I DID.

7  **Q.**  CAN YOU DESCRIBE YOUR ARM AFTER THE SURGERY?

8  **A.**  AFTER THE SURGERY, MY ARM WAS SO SWOLLEN AND BLACK AND

9  BLUE FROM THE ELBOW DOWN TO MY WRIST AREA THAT I SERIOUSLY

10  THOUGHT THAT MY ARM HAD BEEN RE-BROKEN AT SOME POINT DURING THE

11  SURGERY.

12  **Q.**  DID YOU NOTIFY MEDICAL STAFF ABOUT THIS?

13  **A.**  YES, I DID.

14  **Q.**  DID YOU NOTIFY DR. DUNCAN?

15  **A.**  YES, I DID.

16  **Q.**  DID THE SWELLING AND DISCOLORATION GO AWAY?

17  **A.**  YES, IT DID.  OR OVER A PERIOD OF TIME IT DID.

18  **Q.**  WAS THE SURGERY SUCCESSFUL?

19  **A.**  YES, IT WAS.

20  **Q.**  HOW WAS IT SUCCESSFUL?

21  **A.**  WELL, THE NERVE PAIN HAD WENT AWAY.  THE NUMBNESS IN MY

22  FINGERS HAD WENT AWAY.  AND TO ME THAT WAS A SUCCESSFUL

23  OUTCOME.

24  **Q.**  OKAY.  DID THAT OUTCOME REMAIN?  AT SOME POINT DID THE

25  PAIN RETURN?

1    **A.**    YES, IT DID.

2    **Q.**    CAN YOU STATE WHEN?

3    **A.**    APPROXIMATELY IN 2000, 2001 MAYBE.

4    **Q.**    OKAY.  CAN YOU DESCRIBE THE PAIN?

5    **A.**    IT WAS A PAIN ALONG MY ULNAR NERVE OF MY ARM INTO MY

6    PINKIE AND RING FINGERS, AND THE NUMBNESS RETURNED.

7    **Q.**    DID YOU SEE DR. DUNCAN ABOUT THIS?

8    **A.**    YES, I DID.

9    **Q.**    WHEN DID YOU SEE HIM?

10   **A.**    SEPTEMBER 5TH, 2001.

11   **Q.**    AND WHAT DID HE DO AT THAT TIME?

12   **A.**    HE ORDERED ANOTHER NERVE CONDUCTION STUDY.

13   **Q.**    DID YOU HAVE THE STUDY?

14   **A.**    YES.

15          **MR. ANDRADA:**  I AM SORRY.  AGAIN, I APOLOGIZE,

16   MR. ASHKER.

17          I THINK WE HAVE NOW MOVED BEYOND 115 AND 120, AND

18   CAN YOU TELL ME --

19          **MR. ASHKER:**  YES.  WE ARE AT 136.

20          **MR. ANDRADA:**  OKAY.  BEAR WITH ME.

21          (PAUSE IN THE PROCEEDINGS.)

22          **MR. ANDRADA:**  THANK YOU, SIR.

23   **BY MR. ASHKER:**

24   **Q.**    DR. DUNCAN -- DID DR. DUNCAN ORDER ANOTHER NERVE

25   CONDUCTION TEST?

ASHKER - DIRECT / MR. ASHKER

1    **A.**   YES, HE DID.

2    **Q.**   WHEN?

3    **A.**   OCTOBER 31ST, 2001.

4    **Q.**   WHAT WERE THE RESULTS OF YOUR -- OF THE TEST, ACCORDING TO

5    YOUR UNDERSTANDING?

6    **A.**   DR. MAUKONEN CONDUCTED ANOTHER NERVE CONDUCTION TEST AND

7    IT SHOWED SLOWING TO THE ULNAR NERVE AGAIN.

8    **Q.**   AND WHAT WAS THE PROGNOSIS OF THAT ACCORDING TO THE

9    REPORTS YOU READ OF DR. MAUKONEN AND DR. DUNCAN?

10   **A.**   WELL, THEY BELIEVED IT WAS DUE TO THE FORMATION OF SCAR

11   TISSUE.

12   **Q.**   OKAY.  AND WHAT WAS -- DID YOU SEE DR. DUNCAN AFTER THAT?

13   **A.**   YES, I DID.

14   **Q.**   WHAT DID HE ORDER?

15   **A.**   HE ORDERED, AGAIN, BRACING, ELAVIL EVERY OTHER DAY

16   10 MILLIGRAMS TO AVOID OVERSEDATION AND PHYSICAL THERAPY.

17   **Q.**   DID YOU TRY ALL THOSE THINGS?

18   **A.**   YES, I DID.

19   **Q.**   WHEN DID DR. DUNCAN ORDER THOSE THINGS?

20   **A.**   ON DECEMBER 12TH, 2001.

21   **Q.**   DID YOU READ DR. DUNCAN'S REPORT OF THAT CONSULTATION?

22   **A.**   YES, I DID.

23   **Q.**   AND ACCORDING TO YOUR -- WHAT YOU READ, WHAT DID HE SAY?

24   **A.**   WELL, HE STATED THAT THE DAMAGE TO MY ARM MAKES REPEAT

25   SURGERIES SOMEWHAT HIGH RISK AND HE WANTS TO AVOID SURGERY IF

1    AT ALL POSSIBLE.

2              QUOTING THAT REPORT, DR. DUNCAN STATED THERE IS RISK

3    TO NERVE FUNCTION AND EVEN TO THE ENTIRE LIMB WITH REPETITIVE

4    SURGICAL PROCEEDINGS IN THIS SETTING.  AND HE RECOMMENDED

5    TREATMENT VIA PHYSICAL THERAPY, ARM BRACES, AND ELAVIL.

6              ON MARCH 6TH, 2002, I SAW DR. DUNCAN FOR A

7    FOLLOW-UP.  AT THAT TIME I WAS RECEIVING TRAMADOL 50 MILLIGRAMS

8    TWICE A DAY, I WAS RECEIVING 10-MILLIGRAM OF ELAVIL EVERY OTHER

9    DAY, I WAS RECEIVING TYLENOL.  I DON'T REMEMBER HOW MUCH.  I

10   WAS ON THE LIST FOR ADDITIONAL PHYSICAL THERAPY AND I HAD A

11   CELLMATE WHO WAS ASSISTING ME WITH MY DAILY ACTIVITIES.

12   **Q.**   WHAT DID DR. DUNCAN SAY OR FIND IN HIS REPORT ON THAT

13   MARCH 6TH, 2002 VISIT, WHICH WOULD BE EXHIBIT NUMBER 152?

14             **MR. ANDRADA:**  OKAY.  IF YOU WILL BEAR WITH ME AGAIN.

15             (PAUSE IN THE PROCEEDINGS.)

16             **MR. ANDRADA:**  I DON'T KNOW IT'S 152, BUT IN THE

17   INTEREST OF TIME GO AHEAD.

18   **BY MR. ASHKER:**

19   **Q.**   DR. DUNCAN STATED THAT MY CONDITION HAD IMPROVED AND THAT

20   IT WAS AS GOOD AS IT HAS EVER BEEN SINCE HIS ORIGINAL GUNSHOT

21   WOUND INJURY.

22             DID DR. DUNCAN MAKE ANY RECOMMENDATIONS AT THAT

23   TIME?

24   **A.**   YES, I DID.

25   **Q.**   WHAT WERE THOSE RECOMMENDATIONS?

ASHKER – DIRECT / MR. ASHKER

1    **A.**   QUOTING HIS REPORT, HE STATED, "MAINTENANCE TREATMENT WITH

2    MEDICATION AND BRACING.  WE WILL BE HAPPY TO SEE MR. ASHKER IN

3    FOLLOW-UP IF ANY SYMPTOMS RE-OCCUR OR IF HE IS HAVING ANY OTHER

4    PROBLEMS."

5    **Q.**   HAVE YOU SEEN DR. DUNCAN SINCE THAT TIME?

6    **A.**   NO, I HAVE NOT BEEN ALLOWED TO BY DR. SAYRE.

7    **Q.**   HAVE YOU REQUESTED TO SEE DR. DUNCAN SINCE THAT TIME?

8    **A.**   WELL, SINCE DR. SAYRE BECAME THE CHIEF MEDICAL OFFICER OF

9    PELICAN BAY PRISON AT SOME POINT IN JANUARY OF 2006, I WOULD

10   ESTIMATE THAT I HAVE REQUESTED TO SEE DR. DUNCAN THROUGH FAMILY

11   NURSE PRACTITIONER SUE RISENHOOVER AND DR. SAYRE AT LEAST TEN

12   TIMES.

13   **Q.**   AND WHAT WAS THE RESULT OF YOUR REQUEST?

14   **A.**   EVERY SINGLE ONE OF THEM WAS DENIED.

15   **Q.**   OKAY.  AT SOME POINT IN TIME DID YOU ENTER A SETTLEMENT

16   AGREEMENT WITH CDC?

17   **A.**   YES, I DID.

18   **Q.**   WHEN DID YOU DO THAT?

19   **A.**   MAY 24TH, 2002.

20   **Q.**   WAS PART OF THAT SETTLEMENT AGREEMENT CONCERNING A

21   REFERRAL TO PAIN MANAGEMENT AT UC DAVIS FOR REFERRAL,

22   CONSULTATION, EXAMINATION AND IMPLEMENTATION OF A TREATMENT

23   PLAN THAT CDC HAD PROMISED TO FOLLOW FOR AS LONG AS MY MEDICAL

24   CONDITION REQUIRED?

25   **A.**   YES, I DID.

ASHKER – DIRECT / MR. ASHKER

1  **Q.**   DID YOU SEE UC DAVIS IN RESPONSE TO THAT SETTLEMENT

2  AGREEMENT?

3  **A.**   NO.  I HAVE NEVER BEEN SEEN BY THEM.

4  **Q.**   DID YOU SEE ANY SPECIALISTS IN PAIN MANAGEMENT AFTER YOU

5  ENTERED INTO THAT MAY 24TH AGREEMENT?

6  **A.**   YES, I DID.

7  **Q.**   WHO DID YOU SEE?

8  **A.**   WELL, I SAW ON JUNE 12TH, 2002, I SAW DR. JACK FRIEDMAN

9  VIA TELEMED AT PELICAN BAY PRISON.  HE WAS DOWN IN CORCORAN

10 PRISON.

11 **Q.**   AND WHAT DID DR. FRIEDMAN DO?

12         **THE COURT:**  YOU BETTER TELL HIM WHAT TELEMED IS.

13         **MR. ASHKER:**   TELEMED IS WHERE YOU SEE THE DOCTOR

14 OVER A VIDEO SCREEN, AND THAT'S WHERE I SAW HIM AT THIS

15 SPECIALTY CLINIC.

16 **BY MR. ASHKER:**

17 **Q.**   AND AT THAT TIME WHAT DID DR. FRIEDMAN DO?

18 **A.**   WELL --

19         **MR. ANDRADA:**  EXCUSE ME, MR. ASHKER.

20         LET ME JUST GET THERE, IF YOU DON'T MIND.

21         (PAUSE IN THE PROCEEDINGS.)

22         THANK YOU, SIR.

23 **BY MR. ASHKER:**

24 **Q.**   WELL, ON JUNE 12TH, 2002, DR. FRIEDMAN TOOK A SUBJECTIVE

25 HISTORY FROM ME OF MY PAIN ISSUES, MEDICATIONS I WAS ON, WHICH

1    WAS THE TRAMADOL, ELAVIL AND TYLENOL AND PHYSICAL THERAPY.  I

2    HAD MY ARM BRACE.  AND HE TOOK ALL THAT INFORMATION DOWN.  I

3    DESCRIBED THE LEVEL OF PAIN I WAS EXPERIENCING, WHICH WITH THE

4    MEDICATIONS AND PHYSICAL THERAPY AND THE ARM BRACE AND THAT,

5    THE PAIN GENERALLY STAYED AROUND A THREE ON A SCALE OF ONE TO

6    TEN, DEPENDING ON THE USE.

7            AND WHAT DID DR. FRIEDMAN DETERMINE?

8    A.   WELL, ACCORDING TO HIS REPORT, HE STATED THAT HE WOULD

9    CONTINUE THE TRAMADOL 50 MILLIGRAMS TWICE A DAY, AND THE ELAVIL

10   10 MILLIGRAMS.  I DON'T KNOW IF IT WAS EVERY OTHER DAY OR EVERY

11   DAY.  THE TYLENOL, HE RECOMMENDED THAT IF I WANTED TO USE

12   NSAIDS, IF I WANTED TO DO THAT, I COULD DO THAT, AND JUST GET

13   SOMETHING FOR MY STOMACH.  AND -- BUT THAT WAS TO BE ON A

14   CONTINUOUS BASIS.

15           AND HE FURTHER NOTED IN HIS REPORT, PATIENT SHOULD

16   BE FOLLOWED CLOSELY FOR HIS PAIN, AS THIS TYPE INJURY CAN CAUSE

17   MORE STUBBORN PAIN PROCESSES IF UNTREATED.

18   Q.   WHAT WAS YOUR RESPONSE TO DR. FRIEDMAN'S VISIT ON

19   JUNE 12TH, 2002?

20   A.   ON JUNE 16TH, 2002, I WROTE A LETTER TO THE DEPUTY

21   ATTORNEY GENERAL GREGORY WALSTON WHO SIGNED OFF ON MY MAY 24TH,

22   2002 SETTLEMENT AGREEMENT.  I SENT COPIES OF THIS LETTER TO THE

23   LITIGATION COORDINATOR'S OFFICE AT PELICAN BAY STATE PRISON.

24           THE CONTENT OF THE LETTER WAS REGARDING PROBLEMS I

25   WAS HAVING GETTING MY MEDICATIONS REFILLED AND BY BEING SEEN BY

1    DR. FRIEDMAN INSTEAD OF UC DAVIS.

2    **Q.**    DID YOU EVER RECEIVE A RESPONSE TO THAT LETTER?

3    **A.**    NO, I DID NOT.

4    **Q.**    DID YOU SEE DR. FRIEDMAN AGAIN?

5    **A.**    YES, I DID.

6    **Q.**    WHEN DID YOU SEE HIM AND WHAT WAS THE -- WHAT HAPPENED

7    DURING THAT VISIT?

8    **A.**    I SAW HIM AGAIN ON TELEMED ON SEPTEMBER 18TH, 2002.

9    **Q.**    WHAT HAPPENED?

10   **A.**    DR. FRIEDMAN NOTED THAT I STATED THE PAIN MANAGEMENT I WAS

11   ON AT THAT TIME WAS WORKING.

12            WELL -- AND THAT I HAD STOPPED TAKING THE ELAVIL DUE

13   TO SIDE EFFECTS CONSISTING OF LETHARGY, MY BALANCE OFF, VISION

14   BLURRY, MY LEFT EYE TWITCHING.

15   **Q.**    WHAT WAS DR. FRIEDMAN'S RESPONSE?

16   **A.**    HE LAUGHED IN MY FACE AND TOLD ME TO KEEP TAKING THE

17   ELAVIL BECAUSE OVER TIME THE SIDE EFFECTS WOULD WEAR OFF.

18   **Q.**    WHAT DID DR. FRIEDMAN DO THEN?

19   **A.**    HE REPLACED THE TRAMADOL WITH A MEDICATION CALLED FLEXERIL

20   FOR 15 DAYS AND THEN STATED I WAS TO RETURN TO THE TRAMADOL AND

21   BE FOLLOWED UP BY HIM IN, I THINK, 120 DAYS, OR SOMETHING LIKE

22   THAT.

23   **Q.**    DID YOU TRY THE FLEXERIL?

24   **A.**    YES, I DID.

25   **Q.**    DID YOU TAKE IT FOR THE 15-DAY TIME PERIOD?

ASHKER – DIRECT / MR. ASHKER

1   A.   YES, ACCORDING TO MY RECOLLECTIONS, I DID.

2   Q.   AND DID IT -- WAS IT EFFECTIVE FOR YOU?

3   A.   NO, IT WASN'T.

4   Q.   DID IT HAVE ANY OTHER EFFECTS ON YOU?

5   A.   YES.  IT CAUSED LETHARGY TO THE POINT OF ME FEELING LIKE

6   NOT EVEN GETTING UP OUT OF BED ALL DAY AND SEVERE HEADACHES.

7   Q.   AFTER THAT 15-DAY TIME PERIOD, WHAT HAPPENED?

8   A.   I WAS PUT BACK ON THE TRAMADOL 50 MILLIGRAMS TWICE A DAY

9   AND WITH TYLENOL.  I HAD THE PHYSICAL THERAPY AND MY ARM BRACE.

10   Q.   DID YOU SEE DR. FRIEDMAN AGAIN?

11   A.   YES, I DID.

12   Q.   WHEN DID YOU SEE HIM AND WHAT WAS THE OUTCOME?

13   A.   I SAW HIM AGAIN ON JANUARY 15TH, 2003.

14   Q.   WHAT HAPPENED AT THAT TIME?

15   A.   I AGAIN EXPLAINED TO DR. FRIEDMAN THAT I WAS NOT TAKING

16   THE ELAVIL DUE TO SIDE EFFECTS, AND THAT THE TRAMADOL, PHYSICAL

17   THERAPY, TYLENOL AND ARM BRACE WAS PROVIDING EFFECTIVE PAIN

18   MANAGEMENT TREATMENT.

19          I ALSO TOLD HIM THAT THE FLEXERIL DID NOT WORK,

20   CAUSED SIDE EFFECTS OF LETHARGY AND HEADACHES.

21   Q.   WHAT WAS DR. FRIEDMAN'S RESPONSE?

22   A.   DR. FRIEDMAN TOLD ME TO TAKE THE ELAVIL ANYWAY AND TO

23   SWITCH THE TRAMADOL TO FLEXERIL FOR THREE WEEKS.

24   Q.   WHAT WAS YOUR RESPONSE?

25   A.   I ASKED DR. FRIEDMAN IF HE HEARD ANYTHING I TOLD HIM.

ASHKER – DIRECT / MR. ASHKER

1    **Q.**   WHAT DID DR. FRIEDMAN SAY?

2    **A.**   HE TOLD THE CUSTODY STAFF TO GET ME OUT OF THERE; THE

3    VISIT WAS OVER.

4    **Q.**   DID YOU TRY THE FLEXERIL AGAIN?

5    **A.**   YES, I DID.

6    **Q.**   WHAT DID YOU TRY AND HOW DID IT WORK?

7    **A.**   WELL, I TRIED IT ONE TIME AND GOT A VERY SEVERE HEADACHE

8    AGAIN, AND THE NEXT MORNING I GAVE THE REST OF THE PILLS IN THE

9    BAG BACK TO THE MEDICAL TECHNICAL ASSISTANT.

10   **Q.**   AND WHAT WAS IT REPLACED WITH?

11   **A.**   IT WASN'T REPLACED WITH ANYTHING.

12   **Q.**   DID YOU TELL THE MEDICAL STAFF THAT YOU NEEDED SOMETHING?

13   **A.**   YES, I DID.

14   **Q.**   WHAT WAS THEIR RESPONSE?

15   **A.**   THEIR RESPONSE WAS THAT THEY WERE TO FOLLOW DR. FRIEDMAN'S

16   ORDERS, AND HE HAD ORDERED THE FLEXERIL AND, THEREFORE, IT WAS

17   MY CHOICE WHETHER TO TAKE IT OR NOT.

18   **Q.**   DID YOU DO ANYTHING ABOUT THIS?

19   **A.**   YES, I DID.

20   **Q.**   WHAT DID YOU DO?

21   **A.**   I FILED A 602 APPEAL ON JANUARY 23RD, 2003 REGARDING THE

22   PROBLEMS I HAD HAD DESCRIBING MY VISITS WITH DR. FRIEDMAN, HIS

23   ATTITUDE TOWARDS ME, AND THE EFFECTS OF THE MEDICATIONS.

24   **Q.**   DID YOU SAY ANYTHING ELSE IN THE 602?

25   **A.**   YES, I DID.

ASHKER – DIRECT / MR. ASHKER

1    Q.    WHAT DID YOU SAY?

2    A.    I SAID DR. FRIEDMAN WAS A CLOWN, AND THAT I REQUESTED TO

3    SEE A COMPETENT PAIN MANAGEMENT SPECIALIST.

4    Q.    AND WHAT WAS THE RESPONSE TO THE 602 APPEAL?

5    A.    WELL, I GOT A RESPONSE AT THE SECOND LEVEL BY HEALTH CARE

6    MANAGER AT THE TIME, DR. WINSLOW, ON 4/28/03.

7    Q.    WHAT WAS THE RESPONSE?

8             **MR. ANDRADA:**  AGAIN, YOUR HONOR, EXCUSE ME.  I MUST

9    APOLOGIZE AGAIN.  IT WOULD BE VERY HELPFUL IF WE HAD A

10   REFERENCE TO AN EXHIBIT, MINDFUL OF THE --

11            **THE COURT:**  GO AHEAD.

12            **MR. ANDRADA:**  -- HUNDREDS OF PAGES.

13            **THE COURT:**  HE CAN GIVE IT TO YOU.

14            **MR. ANDRADA:**  THANK YOU.

15            **MR. ASHKER:**  EXCUSE ME, MR. ANDRADA.  I AM REFERRING

16   TO EXHIBIT 157.

17            **MR. ANDRADA:**  THANK YOU.

18   **BY MR. ASHKER:**

19   Q.    WHAT WAS DR. WINSLOW'S RESPONSE TO YOUR 602 APPEAL?

20   A.    DR. WINSLOW RESPONDED THAT PHYSICAL THERAPY AND TRAMADOL

21   WERE BEING PROVIDED AT THAT TIME.  THIS WAS ON APRIL 28TH,

22   2003, AND THAT THEY ATTEMPTED TO REFER ME TO UC DAVIS ON

23   11/1/02 AND 12/20/02, BUT UC DAVIS WAS UNABLE TO SEE ME, SO

24   THEY WERE TRYING TO FIND AN ALTERNATIVE.

25   Q.    DID YOU SEE DR. FRIEDMAN AGAIN?

1    **A.**   YES, I DID.

2    **Q.**   WHEN DID YOU SEE HIM AND WHAT WAS THE OUTCOME?

3    **A.**   I SAW HIM ON APRIL 9TH, 2003.  AT THAT TIME I TOLD HIM

4    THAT THE TRAMADOL AND PHYSICAL THERAPY WERE WORKING GOOD.

5    **Q.**   WHAT WAS DR. FRIEDMAN'S RESPONSE?

6    **A.**   HE SAID, OKAY, AND SCHEDULED A 60-DAY FOLLOW-UP.

7    **Q.**   AT ANY POINT IN TIME -- WHAT WAS YOUR EXPERIENCE WITH THE

8    TRAMADOL MEDICATION AFTER THAT VISIT ON APRIL 9TH, 2003 WITH

9    DR. FRIEDMAN?

10   **A.**   WELL, JUST ON MY OWN, I STOPPED TAKING IT.  SOMETIMES ONCE

11   A DAY, SOMETIMES BOTH TIMES A DAY JUST TO SEE HOW THE EFFECT OF

12   NOT TAKING IT WOULD HAVE ON MY ARM.

13        AND ON APRIL 11TH, 12TH, 13TH, 14TH, 15TH, 16TH,

14   17TH, 18TH AND 24TH, I TRIED THIS.  I TRIED IT AGAIN ON

15   JULY 3RD, 4TH, 5TH, 10TH, 11TH, AND 12TH, 15TH, 17TH AND 18TH

16   OF 2003.

17   **Q.**   AND WHAT WAS THE EFFECT OF STOPPING THE MEDICATION ON YOUR

18   OWN ON THESE DAYS?

19   **A.**   WELL, THE EFFECT WAS THAT MY ARM PAIN INCREASED.  EACH

20   TIME THE PAIN WAS WORSE.

21        **MR. ASHKER:**  AND THAT REFERS TO PHYSICAL THERAPIST

22   PAT DODGEN'S REPORTS FOR THOSE TIME PERIODS, EXHIBIT NUMBER 170

23   AND ALSO DOCUMENTS ATTACHED AS EXHIBIT 157.

24   **BY MR. ASHKER:**

25   **Q.**   OKAY.  DID YOU SEE ANOTHER PAIN MANAGEMENT SPECIALIST

ASHKER – DIRECT / MR. ASHKER

1    AFTER SEEING DR. FRIEDMAN?

2    **A.**   NO.

3    **Q.**   DID THEY TRY TO ARRANGE ONE FOR YOU?

4    **A.**   WELL, ACCORDING TO THE MEDICAL RECORDS I READ, YES, THEY

5    DID.

6    **Q.**   WHO DID THEY TRY TO ARRANGE YOU TO BE SEEN BY?

7    **A.**   WELL, ON JUNE 18TH, 2003, THE STAFF TOLD ME TO ROLL UP MY

8    PROPERTY BECAUSE I WAS GOING TO BE TRANSFERRED SO I CAN SEE A

9    PAIN MANAGEMENT SPECIALIST DOWN IN MANTECA.

10   **Q.**   AND WHAT WAS YOUR RESPONSE?

11   **A.**   AT THAT POINT I REFUSED TO GO.

12   **Q.**   WHY DID YOU REFUSE TO GO?

13   **A.**   WELL, THE MEDICATIONS AND PHYSICAL THERAPY AND THE ARM

14   BRACE THAT I WAS RECEIVING AT THAT POINT WERE ADEQUATE, NUMBER

15   ONE.

16           NUMBER TWO, ALL OF MY LEGAL PROPERTY HAD BEEN SEIZED

17   IN OCTOBER OF 2002 AND I HAD JUST HEARD FROM AN ATTORNEY I HAD

18   AT THAT TIME A FEW DAYS BEFORE THIS JUNE 18TH NOTICE, AND THE

19   LIEUTENANT VANDERHOOVEN AT THE PRISON, THEY TOLD ME THAT THEY

20   JUST GOT MY PROPERTY BACK, AND THAT THEY WERE GOING TO RETURN

21   IT TO ME BEGINNING JUNE 18TH AND THE FEW DAYS FOLLOWING THAT.

22           SO, WHEN I REFUSED, I WROTE DOWN ON THE REFUSAL FORM

23   THAT THE REASON FOR MY REFUSAL WAS I WAS JUST NOW ABLE TO GET

24   MY LEGAL PROPERTY BACK THAT HAD BEEN SEIZED SINCE OCTOBER 2002

25   AND I REALLY NEEDED IT.  I HAD LEGAL DEADLINES AND ALL KINDS OF

1    THINGS GOING ON.  AND THAT I HAD TALKED TO LIEUTENANT

2    VANDERHOOVEN AND HE HAD SAID, HEY, THIS LEGAL PROPERTY ISSUE

3    TAKES PRECEDENCE UNLESS IT'S AN EMERGENCY.

4           SO THAT'S THE REASON WHY I DIDN'T GO DOWN THERE FOR

5    THAT MANTECA VISIT.

6    Q.   OKAY.  DID YOU SEE ANY PAIN MANAGEMENT SPECIALIST AFTER

7    THAT?

8    A.   NO, I DID NOT.

9    Q.   WERE ANY RECOMMENDED AFTER THAT?

10   A.   YES, THEY WERE.

11   Q.   WHEN WERE THEY RECOMMENDED?

12   A.   WELL, I PUT IN A REASONABLE DISABILITY ACCOMMODATION

13   REQUEST FOR ASSISTANCE WITH MY DISABILITIES IN SEPTEMBER OF

14   2004.  BECAUSE I DIDN'T HAVE A CELLMATE, I WAS HAVE HAVING A

15   LOT MORE PROBLEMS WITH PAIN AND DISCOMFORT AND ALL THIS FROM

16   MY, DOING MY DAILY ACTIVITIES ON MY OWN.  AND IN RESPONSE TO

17   THAT DISABILITY ACCOMMODATION REQUEST, WHICH WOULD BE

18   EXHIBIT 159, THE PRISON ADMINISTRATORS HAD ME SEEN BY A PELICAN

19   BAY PRISON DOCTOR BY THE NAME OF HECHANOVA.

20   Q.   WHEN DID YOU SEE DR. HECHANOVA?

21   A.   I SAW HIM THREE TIMES BETWEEN SEPTEMBER AND OCTOBER 8TH OF

22   2004.

23   Q.   WHAT DID DR. HECHANOVA DO?

24   A.   WELL, HE TOOK A SUBJECTIVE HISTORY AND THEN HE HAD THEM

25   PUT ME IN THE HOLDING CELL RIGHT THERE BY THE SPECIALTY CLINIC

1   AND REMOVED MY RESTRAINTS AND HAD ME DEMONSTRATE VARIOUS

2   MOVEMENTS AND DESCRIBE WHERE MY ARM WAS HURTING AND WHAT

3   ACTIVITIES CAUSED IT.  AND I DESCRIBED EVERYTHING TO HIM.

4   **Q.**   WHAT WAS DR. HECHANOVA'S RESPONSE?

5   **A.**   WELL, INITIALLY THEY WOULDN'T GIVE ME HIS RESPONSE.  I HAD

6   TO OBTAIN A COPY OF HIS RESPONSE FROM THE ATTORNEY GENERAL

7   THROUGH A DISCOVERY MOTION ON CIVIL LITIGATION.

8        AND WHEN I GOT HIS REPORT, WHAT HE SAID WAS THAT HE

9   BASICALLY CONFIRMED MY COMPLAINTS, AND HE RECOMMENDED THAT MY

10  WRITING BE LIMITED, THAT I BE FOLLOWED UP BY A PAIN MANAGEMENT

11  SPECIALIST, AND THAT CUSTODY STAFF SHOULD ASSIST ME WITH

12  CLEANING MY CELL.

13  **Q.**   DID ANY OF THAT HAPPEN?

14  **A.**   WELL, THEY APPOINTED ME A WRITING ASSISTANT --

15       **MR. ANDRADA:**  EXCUSE ME.  I AM GOING -- EXCUSE ME

16  MR. ASHKER.

17       THIS IS NOT RELEVANT TO THE ISSUES IN THIS CASE.

18  403 WOULD APPLY.  WE ARE GETTING INTO AN AREA NOW THAT'S FAR

19  AFIELD FROM THE ALLEGATIONS OF THIS CASE, NAMELY, THE

20  MALPRACTICE OF DR. SAYRE AND THE BREACH OF CONTRACT.  THESE

21  MATTERS --

22       **THE COURT:**  YOU ARE TALKING ABOUT THE WRITING

23  ASSISTANT?

24       **MR. ANDRADA:**  SAY AGAIN?

25       **THE COURT:**  YOU ARE TALKING ABOUT THE WRITING

1    ASSISTANT?

2             **MR. ANDRADA:**  AT LEAST THAT PART.

3             **THE COURT:**  THAT, I THINK, IS SOMEWHAT RELEVANT

4    BECAUSE IT GOES TO WHY, IF HE HAD ONE OR DIDN'T HAVE ONE,

5    WHETHER HE WAS REQUIRED THEN TO WRITE, WHICH AGGRAVATED THE

6    PAIN IN HIS ARM.  I DO THINK IT'S RELEVANT.

7             IT ISN'T THE SUBJECT MATTER, TRUE ENOUGH, AND THE

8    JURY WILL BE INSTRUCTED ON THAT, BUT I THINK IT'S RELEVANT TO

9    EXPLAIN OTHER ACTIONS.

10            SO YOUR OBJECTION IS OVERRULED.  GO AHEAD.

11   **BY MR. ASHKER:**

12   **Q.**  WERE YOU EVER SEEN BY A PAIN MANAGEMENT SPECIALIST IN

13   RESPONSE TO DR. HECHANOVA'S RECOMMENDATION ON OCTOBER 8TH,

14   2004?

15   **A.**  NO, I WASN'T.

16   **Q.**  BETWEEN OCTOBER 8TH AND 2004 -- OCTOBER 8TH, 2004 AND

17   JUNE 23RD, 2005, WHAT MEDICATIONS WERE YOU TAKING?

18   **A.**  I WAS ON THE TRAMADOL 50 MILLIGRAMS TWICE A DAY, AND

19   TYLENOL, WHICH HAD BEEN INCREASED UP TO 12, 325-MILLIGRAM

20   TYLENOLS A DAY.  AND I WAS TAKING TAGAMET, MYLANTA CHEWABLE

21   TABLETS FOR MY STOMACH.

22   **Q.**  DO YOU KNOW OF A DOCTOR NAMED DR. ROWE?

23   **A.**  YES, I DO.

24   **Q.**  WHO IS SHE AND HOW DO YOU KNOW HER?

25   **A.**  SHE WAS A MEDICAL DOCTOR AT PELICAN BAY STATE PRISON WHO I

```
1    FIRST SAW IN RESPONSE TO MY REQUEST FOR MEDICATION RENEWAL ON

2    JANUARY 23RD, 2005.

3    Q.   AT THAT TIME, WHAT HAPPENED DURING THAT VISIT?

4    A.   WELL, DR. ROWE ASKED ME WHAT I NEEDED THE MEDICATIONS FOR,

5    AND I EXPLAINED TO HER ABOUT MY CHRONIC PAIN IN MY RIGHT ARM

6    AND THINGS OF THAT NATURE.

7              SHE TOLD ME THAT WAS TOO MUCH TYLENOL AND THAT SHE

8    WAS GOING TO DROP IT DOWN TO SIX A DAY.

9    Q.   DID SHE CONDUCT ANY PHYSICAL EXAM?

10   A.   NOT THAT I RECALL AND NONE THAT I SAW IN HER MEDICAL

11   RECORDS AS FAR AS DESCRIBING ANY DETAILS OF AN EXAM OR ANY

12   TESTS ON MY ARM.

13   Q.   DID SHE RENEW YOUR TRAMADOL?

14   A.   YES, SHE DID.

15   Q.   DID SHE SCHEDULE A FOLLOW-UP?

16   A.   YES, SHE DID.

17   Q.   WHEN?

18   A.   NINETY DAYS.

19   Q.   DID YOU SEE HER AGAIN?

20   A.   YES, I DID ON 9/21/05 IN RESPONSE TO MY REQUEST FOR

21   MEDICATION RENEWAL.

22   Q.   AND WHAT OCCURRED DURING THAT VISIT?

23   A.   WELL, DR. ROWE WAS VERY ANTAGONISTIC.  SHE ASKED ME, WHAT

24   DO YOU NEED ALL THESE MEDICATIONS FOR?  THIS IS TOO MUCH

25   MEDICATION.
```

ASHKER – DIRECT / MR. ASHKER

```
 1              I, AGAIN, DESCRIBED TO HER THAT I HAD A LONG HISTORY

 2    OF CHRONIC PAIN AND PROBLEMS WITH DAILY ACTIVITIES AND ALL

 3    THIS.  SHE TOLD ME, WELL, THIS IS TOO MUCH MEDICATION FOR SOME

 4    LITTLE OLE ARM PAIN, AND CUT MY TYLENOL DOWN TO FOUR A DAY.

 5    SHE TOLD ME SHE WAS GOING TO DO THAT.

 6    Q.   DID YOU RESPOND?

 7    A.   YES, I DID.

 8    Q.   WHAT WAS YOUR RESPONSE?

 9    A.   I TOLD HER THAT SHE CUT MY TYLENOL DOWN TO SIX A DAY BACK

10    IN JUNE, AND I HAD TO CUT BACK ON A LOT OF MY DAILY ACTIVITIES

11    BECAUSE OF THAT.  AND NOW SHE WAS CUTTING IT DOWN TO FOUR A

12    DAY; THAT WAS GOING TO BE A PROBLEM.

13              AT THAT TIME THE VISIT WAS OVER.

14    Q.   DID YOU HAVE PROBLEMS IN RESPONSE TO HER CUTTING YOUR

15    TYLENOL DOWN TO FOUR A DAY?

16    A.   YES, I DID.

17    Q.   AT THAT TIME DID SHE ALSO RENEW THE TRAMADOL?

18    A.   YES, SHE DID.

19    Q.   WHAT WAS YOUR PROBLEMS?

20    A.   WELL, I HAD AN INCREASE IN PAIN AND DISCOMFORT, AND

21    CUTTING BACK EVEN MORE ON MY WRITING AND CLEANING THE CELL.

22    AND FOR A PERIOD OF TIME, I JUST QUIT DOING WASHING MY CLOTHES

23    AND CLEANING MYSELF.  I STARTED DEVELOPING RASHES ON MY BODY,

24    AND PEOPLE ON THE TIER MAKING COMMENTS ABOUT MY -- THE SMELL

25    COMING FROM MY CELL, AND THINGS OF THAT NATURE.
```

ASHKER – DIRECT / MR. ASHKER

1    **Q.**   WHAT DID YOU DO ABOUT IT?

2    **A.**   WELL, ON OCTOBER 10TH, 2005, I FILED ANOTHER 602 APPEAL.

3    IN THIS 602 APPEAL, I SPECIFICALLY REFERENCED MY 2002 PAIN --

4    MY 2002 SETTLEMENT AGREEMENT AND THE LONG HISTORY OF PROBLEMS

5    THAT I HAVE BEEN HAVING.  AND I REQUESTED THAT PELICAN BAY

6    STATE PRISON MEDICAL STAFF COMPLY WITH THE TERMS OF MY

7    AGREEMENT AND ALLOW ME TO BE SEEN BY A PAIN MANAGEMENT

8    SPECIALIST.

9    **Q.**   WHAT ELSE DID YOU DO?

10   **A.**   WELL, I SUBMITTED THAT 602 APPEAL AND I HADN'T GOTTEN ANY

11   RESPONSE, SO I SUBMITTED ANOTHER 602 APPEAL ON NOVEMBER 15TH OF

12   2005.  AND AT SOME POINT AFTER A WEEK OR TWO AFTER THAT,

13   DR. ROWE CALLED ME DOWN, AND SHE WASN'T INTERESTED IN

14   DISCUSSING MY MEDICAL ISSUES.  SHE WAS INTERESTED IN TRYING TO

15   FIND OUT WHAT WAS GOING ON WITH MY 602 APPEAL.  AND I JUST

16   EXPLAINED IT TO HER.  AND THAT WAS THE END OF THE VISIT.

17          ON DECEMBER 28TH, 2005, I SAW HER AGAIN FOR

18   MEDICATION RENEWAL.  AT THAT TIME -- AND TO INTERVIEW ME ON

19   THAT OCTOBER 10TH, 2005, 602 APPEAL THAT I FILED ON HER WHEREIN

20   THAT APPEAL, I INCLUDED VERY SPECIFIC DETAILS LIKE I JUST

21   TESTIFIED TO ABOUT HER BEING VERY ANTAGONISTIC, UNPROFESSIONAL

22   IN HER DEALINGS WITH ME.

23          AND IN RESPONSE TO THAT, SHE TOLD ME THAT SHE WOULD

24   RENEW -- SHE WOULD UP MY TYLENOL FROM FOUR A DAY UP TO EIGHT A

25   DAY, AND SHE RENEWED MY CHRONOS FOR THE USE OF MY THERA-BAND.

ASHKER – DIRECT / MR. ASHKER

1   I NEED A CHRONO TO BE ABLE TO HAVE IT.  THEY ARE USUALLY

2   RENEWED FOR UP TO A YEAR AT A TIME.

3            IF YOU DON'T HAVE AN UP-TO-DATE CHRONO, CUSTODY

4   STAFF CAN TAKE THAT STUFF FROM YOU.  AND THAT HAPPENED BEFORE

5   AND IT TOOK ME TEN MONTHS TO GET A LITTLE THERAPY BALL REPLACED

6   THAT THEY THROWN AWAY.

7            **THE COURT:**  YOU BETTER EXPLAIN WHAT A CHRONO IS.

8            **MR. ASHKER:**  I JUST DID.  I EXPLAINED --

9            **THE COURT:**  IT'S A PIECE OF PAPER.  IT'S AN ORDER.

10           **MR. ASHKER:**  -- TO HAVE POSSESSION OF THE MEDICAL

11  APPLIANCE OR THINGS OF THAT NATURE.  WITHOUT THAT YOU --

12           **THE COURT:**  IT'S A NOTATION IN THE FILE OR AN ORDER

13  THAT TELLS THE CUSTODY STAFF WHAT THEY ARE SUPPOSED TO ALLOW;

14  IS THAT RIGHT?

15           **MR. ASHKER:**  YES.  THANK YOU, YOUR HONOR.

16  **BY MR. ASHKER:**

17  **Q.**  AND AT THAT TIME, I WAS UNDER THE IMPRESSION THAT MY

18  TRAMADOL WAS FINE.  ON ALL THOSE VISITS THAT I SAW WITH

19  DR. ROWE, IT'S NOTABLE THAT THERE'S NO TYPE OF ANY KIND OF

20  DETAILED PHYSICAL EXAMINATION, TESTS --

21           **MR. ANDRADA:**  I AM SORRY.  THE STATEMENTS ARE NOW

22  BECOMING ARGUMENTATIVE AND GOING INTO A NARRATIVE.

23           I AM NOT SURE WHERE HE'S -- I UNDERSTAND WE ARE

24  GOING THROUGH 2005 AND DR. ROWE.  I UNDERSTAND THAT.

25           **THE COURT:**  THE OBJECTION IS OVERRULED.

1        **MR. ANDRADA:**  THANK YOU.

2   **BY MR. ASHKER:**

3   **Q.**   OF NOTE, I WOULD LIKE TO POINT OUT THAT WHEN I SAW

4   DR. ROWE ON SEPTEMBER 21ST, 2005, THE ONLY REFERENCE TO THE

5   CONDITION OF MY ARM AT THAT TIME, THIS IS THE PHYSICIAN'S

6   PROGRESS NOTE FROM MY MEDICAL FILE FOR THIS 9/21/05 VISIT WHERE

7   SHE STATES IN A SECTION TITLED "OTHER", NOTES:  PHYSICAL EXAM

8   UNREMARKABLE.  NO OBVIOUS DEFORMITY TO ARMS.  CHRONIC

9   LIMITATION OF RANGE OF MOTION RIGHT WRIST ARE FACED WITH SOME

10  REDNESS AND NASAL AREAS, WHICH I --

11        WHAT WAS THAT REDNESS FROM?

12  **A.**   SOME OF THAT RASH STUFF I TESTIFIED ABOUT EARLIER.

13  **Q.**   WHEN I OBTAINED THIS DOCUMENT -- WHAT WAS YOUR RESPONSE

14  WHEN YOU SAW THIS DOCUMENT?

15  **A.**   I COULDN'T BELIEVE IT.

16  **Q.**   WHAT COULDN'T YOU BELIEVE?

17  **A.**   THAT DR. ROWE WOULD STATE ON HERE THAT THERE WAS NO

18  OBVIOUS DEFORMITY TO MY ARMS.

19  **Q.**   ON THAT DECEMBER 28TH, 2005 VISIT, WHAT DID -- DID

20  DR. ROWE TELL YOU ANYTHING ABOUT YOUR TRAMADOL MEDICATION?

21  **A.**   NO.  SHE DIDN'T MENTION A WORD.  I WAS UNDER THE

22  IMPRESSION THAT IT HAD BEEN RENEWED WITH ALL MY OTHER

23  MEDICATIONS FOR 90 DAYS.

24  **Q.**   AND WHEN YOU SAW HER ON THAT DECEMBER 28TH, 2005 VISIT,

25  THAT WAS IN DIRECT RESPONSE TO HER INTERVIEWING YOU ON YOUR 602

ASHKER – DIRECT / MR. ASHKER

1    APPEAL THAT YOU FILED OCTOBER 10TH, 2005, WHERE YOU WERE

2    CRITICAL OF HER AND STATED THAT SHE WAS ANTAGONISTIC AND

3    UNPROFESSIONAL?

4    **A.**   YES, THAT'S TRUE.

5    **Q.**   WHAT HAPPENED AFTER THAT DECEMBER 28TH, 2005 VISIT?

6    **A.**   WELL, ON THE EVENING OF DECEMBER 30TH, 2005, WHEN THE

7    MEDICAL TECHNICAL ASSISTANT CAME AROUND WITH THE MEDICATIONS,

8    SHE TOLD ME THAT DR. ROWE HAD DISCONTINUED MY TRAMADOL

9    MEDICATION.

10   **Q.**   AND WHAT WAS YOUR RESPONSE?

11   **A.**   WELL, I SUBMITTED THREE MEDICAL REQUESTS ON -- I HAD TO

12   WAIT.  THIS WAS LIKE ON A FRIDAY NIGHT, LIKE NEW YEAR'S WEEKEND

13   SO NOTHING WAS GOING TO BE HAPPENING FOR THREE DAYS.

14        SO ON JANUARY 1ST, BETWEEN JANUARY 1ST, JANUARY 2ND

15   AND JANUARY 4TH, 2006, I SUBMITTED MEDICAL REQUESTS FOR -- TO

16   BE SEEN BY THE DOCTOR ABOUT THE DISCONTINUANCE OF MY TRAMADOL

17   MEDICATION EXPLAINING THAT MY PAIN AND DISCOMFORT HAD

18   INCREASED.  I NEEDED THAT MEDICATION.

19   **Q.**   WHAT WAS THE RESPONSE?

20   **A.**   WELL, IN RESPONSE TO MY FIRST TWO REQUESTS, JANUARY 1ST

21   AND JANUARY 2ND, THE MEDICAL TECHNICAL ASSISTANTS OR THE RN, I

22   AM NOT SURE, I HAVE THE DOCUMENTS HERE IN EXHIBIT 162, BUT SHE

23   BASICALLY SENT ME A LITTLE POST-IT NOTE ON MY JANUARY 4TH

24   REQUEST STATING DR. ROWE IS NOT GOING TO SEE YOU.  SHE STATED

25   THAT YOU NEED TO TAKE YOUR TYLENOL MEDICATION AS INSTRUCTED.

ASHKER – DIRECT / MR. ASHKER

1    Q.    AND WHAT WAS YOUR RESPONSE?

2    A.    MY RESPONSE WAS, I WROTE A LETTER.  I WROTE A LETTER TO

3    DEPUTY ATTORNEY GENERAL MICHAEL JORGENSON, WHO I KNEW AT THAT

4    TIME WAS REPRESENTING CDCR PELICAN BAY PRISON, AND I ALSO SENT

5    A COPY OF THIS LETTER TO DR. SAYRE.

6    Q.    AND WHAT WAS IN THAT LETTER?

7    A.    WELL, I DESCRIBED THE PROBLEMS I WAS HAVING WITH DR. ROWE

8    AND HER ACTIONS OF DISCONTINUING MY TRAMADOL MEDICATION WITHOUT

9    TELLING ME A WORD ON DECEMBER 28TH AND WHAT I FELT WAS A

10   RETALIATORY MOVE FOR MY 602 APPEAL THAT SHE INTERVIEWED ME ON.

11   AND I REFERENCED MY 2002 SETTLEMENT AGREEMENT.  I INFORMED THEM

12   THAT DR. ROWE'S ACTIONS WERE -- CONSTITUTED A VIOLATION OF THAT

13   AGREEMENT REGARDING MY PAIN MANAGEMENT, AND THAT THEY WERE ON

14   NOTICE TO REMEDY THIS SITUATION OR I WOULD HAVE TO PURSUE

15   FURTHER LEGAL ACTION.

16   Q.    DID YOU RECEIVE A RESPONSE TO THIS LETTER?

17   A.    NO, I DID NOT.

18   Q.    DID YOU DO ANYTHING ELSE ON JANUARY 4TH, 2006?

19   A.    YES, I DID.

20   Q.    WHAT DID YOU DO?

21   A.    I SUBMITTED A 602 APPEAL TO THE MEDICAL DEPARTMENT WHERE I

22   DETAILED THE PROBLEMS THAT I HAD BEEN HAVING, THE WHOLE HISTORY

23   OF IT, THE FLEXERIL, THE DR. ROWE'S ACTIONS, DISCONTINUING MY

24   TRAMADOL WITHOUT TELLING ME A WORD, MY INCREASE IN PAIN AND

25   DISCOMFORT, AND HOW I BELIEVED IT WAS A VIOLATION OF MY

ASHKER – DIRECT / MR. ASHKER

1    SETTLEMENT AGREEMENT.

2    **Q.**    DID YOU RECEIVE THAT APPEAL BACK?

3    **A.**    YES, I DID.

4    **Q.**    WHEN DID YOU RECEIVE IT BACK?

5    **A.**    ON JANUARY 9TH, 2006.

6    **Q.**    WAS THERE A RESPONSE ON IT?

7    **A.**    YES.  I RECEIVED A RESPONSE ON IT SIGNED BY THE -- WELL,

8    WITH RN BROUS' NAME ON IT.

9    **Q.**    WHAT DID SHE STATE ON THERE?

10   **A.**    SHE STATED AFTER REVIEWING YOUR MEDICAL FILE, THE PAIN

11   MANAGEMENT CONSULT WAS FOUND WITH THE RECOMMENDATION TO

12   PRESCRIBE TRAMADOL.  IT WAS ORDERED TODAY.  YOUR CASE WILL BE

13   REVIEWED BY DR. SAYRE.

14            THAT WAS ON JANUARY 9TH, 2006.  ON THAT SAME DAY, MY

15   TRAMADOL WAS REORDERED BY DR. ROWE.

16   **Q.**    DID YOU SEE MEDICAL STAFF AFTER THAT INCIDENT WITH

17   DR. ROWE?

18   **A.**    WELL, YES, I DID.

19   **Q.**    WHO DID YOU SEE?

20   **A.**    WELL, ON FEBRUARY 6TH, 2006, THEY MOVED ME TO ANOTHER PART

21   OF THE SHU AND FROM C FACILITY OVER TO D FACILITY, AND AT THAT

22   TIME, ON 3/25/06, I WENT TO THE SPECIALTY CLINIC IN RESPONSE TO

23   MY REQUEST FOR MEDICATION RENEWAL, AND I MET SUE RISENHOOVER,

24   WHO IS A FAMILY NURSE PRACTITIONER FOR THE FIRST TIME.

25   **Q.**    AND WHAT DID RISENHOOVER DO?

ASHKER – DIRECT / MR. ASHKER

1   **A.**   WELL, SHE NOTED MY MEDICATIONS I WAS ON AND WHAT I WAS

2   ASKING TO BE RENEWED, AND SHE ASKED ME WHAT WAS GOING ON WITH

3   ALL THAT, SO I DESCRIBED IT TO HER.  MY CHRONIC PAIN,

4   DISCOMFORT, MY -- THOSE MEDICATIONS, AND THINGS OF THAT NATURE.

5   **Q.**   WHAT WAS HER RESPONSE?

6   **A.**   I ALSO -- TAGAMET, THE MYLANTA CHEWABLE TABS BECAUSE OF

7   STOMACH DISCOMFORT.  EVEN AT THIS POINT, YOU KNOW, TYLENOL IS

8   EVEN A LITTLE UPSETTING TO MY STOMACH.

9   **Q.**   WHAT DID SHE DO?

10  **A.**   WELL, SHE RENEWED MY MEDICATIONS AT THAT TIME FOR THE 90

11  DAYS.

12  **Q.**   WHAT MEDICATIONS?

13  **A.**   THE TRAMADOL 50 MILLIGRAMS TWICE A DAY, THE TYLENOL THAT

14  HAD -- THAT DR. ROWE HAD JUST UPPED TO EIGHT A DAY, NURSE

15  PRACTITIONER RISENHOOVER PUT BACK DOWN TO FOUR A DAY.

16          AND I EXPLAINED TO HER, HEY, I'VE JUST BEEN THROUGH

17  ALL THIS ON A 602 WITH DR. ROWE, BUT, YOU KNOW WHAT, I WILL GO

18  AHEAD AND TRY IT.  OKAY?

19          IT'S NOTABLE AT THAT TIME, FAMILY NURSE PRACTITIONER

20  RISENHOOVER DID NOT CONDUCT ANY PHYSICAL EXAM OR TESTING OF MY

21  ARM.  I THINK AT THE MOST SHE MIGHT HAVE DONE WAS STEP OVER TO

22  ME AND LIKE (INDICATING) JUST LOOK AT IT, AND JUST REAL BRIEFLY

23  GLANCED AT IT, SEEN THE SCARS AND STUFF, OKAY, AND THAT WAS IT.

24          WHEN I GOT HER MEDICAL REPORT OF THAT VISIT ON THAT

25  DAY, I COULDN'T BELIEVE WHEN SHE STATED THAT I WAS FINE WITH

1   HER CUTTING MY TYLENOL BACK TO FOUR A DAY.  THAT'S NOT WHAT

2   HAPPENED.  I COMPLAINED TO HER ABOUT IT, POINTING OUT I HAD

3   JUST BEEN THROUGH THAT WITH DR. ROWE, BUT IF SHE WANTED TO DO

4   THAT, I WOULD TRY IT AGAIN.  THAT'S WHAT HAPPENED.

5         SHE ALSO NOTED THAT I HAD TOLD HER THAT MYLANTA

6   CHEWABLE TABS WERE FOR ACID INDIGESTION WHEN I EAT SPICEY

7   FOODS, THAT IS JUST COMPLETE -- I DON'T KNOW WHERE THAT CAME

8   FROM.  IT IS WELL-DOCUMENTED IN MY MEDICAL FILE THAT THE

9   MEDICATIONS, I HAVE HAD PROBLEMS WITH MY STOMACH FOR YEARS.

10  THERE IS NO WAY I WOULD EVER HAVE TOLD HER SOMETHING LIKE THAT.

11  Q.  WHAT HAPPENED AFTER THAT?

12  A.  WELL, MY 602, AFTER I SAW DR. ROWE ON DECEMBER 28TH IN

13  RESPONSE TO MY 602 APPEAL, I RECEIVED IT BACK IN FEBRUARY WITH

14  HER RESPONSE SAYING THAT SHE WAS CLAIMING THAT SHE TOLD ME THAT

15  TRAMADOL WAS ONLY FOR ACUTE POST-OPERATIVE PAIN FOR SHORT

16  TIMES, AND THAT SHE DISCONTINUED IT, BUT IT HAD BEEN REORDERED

17  FOR 90 DAYS.  AND ALL THIS AND THAT.  SO I SENT IT ON TO THE

18  NEXT LEVEL BECAUSE I RECOGNIZED AT THAT POINT, HEY, I NEED TO

19  CONTINUE TO DOCUMENT THIS BECAUSE THE WAY THESE MEDICAL STAFF

20  ARE ACTING NOW, BASED ON MY EXPERIENCE, I HAVE BEEN THROUGH ALL

21  OF THIS BEFORE, I NEED TO DOCUMENT THIS.  I NEED TO PURSUE THIS

22  ISSUE TO THE FULLEST EXTENT IN ORDER TO PROTECT MY OWN

23  INTERESTS.

24        SO, WHAT I DID WHEN I RECEIVED DR. ROWE'S RESPONSE

25  BACK IN FEBRUARY, I SENT IT ON TO THE NEXT LEVEL.  AND ON,

ASHKER – DIRECT / MR. ASHKER

1    AROUND APRIL 13TH OR 14TH, I RECEIVED IT BACK WITH A RESPONSE

2    SIGNED BY DR. SAYRE ON 4/10/06 WHERE HE STATED IN THAT 602

3    APPEAL THAT I WAS BEING SEEN BY A NEW PRIMARY CARE

4    PRACTITIONER, SHE HAD RENEWED MY TRAMADOL PRESCRIPTION FOR 90

5    DAYS, AND THAT THAT WAS APPROPRIATE CARE.  THAT WAS ON

6    APRIL 10TH, 2006.

7    Q.    AND WHAT DID YOU DO IN RESPONSE TO THAT?

8    A.    WELL, WHEN I GOT IT BACK, I FILLED OUT THE FINAL LEVEL OF

9    REVIEW FOR THE DIRECTOR'S LEVEL IN SACRAMENTO HEADQUARTERS AND

10   I ATTACHED A COPY OF MY 2002 SETTLEMENT AGREEMENT, I

11   ATTACHED -- I HAD AN OUTSIDE DOCTOR COME UP TO SEE ME,

12   DR. WEINSTEIN, AT MY OWN EXPERIENCE IN 2000 -- IN DECEMBER 2002

13   AND ON JANUARY 2005, AND I HAD HIS REPORTS THERE ABOUT HIS, MY

14   CARE AND TREATMENT AND PROGNOSIS AND MEDICATIONS AND PHYSICAL

15   THERAPY, AND THINGS OF THAT NATURE.

16           I ATTACHED ALL THOSE.  I ATTACHED DR. FRIEDMAN'S

17   JUNE 12TH, 2002 REPORT.  AND I SENT IT ON TO THE NEXT LEVEL IN

18   SACRAMENTO.

19   Q.    WHAT HAPPENED NEXT?

20   A.    WELL, ON JUNE 21ST, 2006, I WENT TO SEE MS. RISENHOOVER IN

21   RESPONSE TO MY MEDICATION RENEWAL REQUEST.

22   Q.    WHAT HAPPENED DURING THAT VISIT?

23   A.    WELL, AT THAT TIME SHE NOTIFIED ME THAT DR. SAYRE HAD

24   RECOMMENDED TO HER ON JUNE 20TH, 2006 THAT SHE TAPER ME OFF THE

25   TRAMADOL AND RE-EVALUATE MY PAIN MEDICATION ISSUES.

1    Q.    AND WHAT WAS YOUR RESPONSE TO HER?

2    A.    WELL, MY RESPONSE WAS, I WENT INTO DETAILS AGAIN

3    DESCRIBING MY WHOLE HISTORY.  I TOLD HER, OKAY, THAT'S FINE.

4              WHAT WILL THIS MEDICATION BE REPLACED WITH THAT WILL

5    PROVIDE ME WITH EFFECTIVE PAIN MANAGEMENT WITHOUT CAUSING

6    INTOLERABLE SIDE EFFECTS?  AND MS. RISENHOOVER TOLD ME AT THAT

7    TIME, WELL, WE CAN TRY WHAT'S AVAILABLE HERE IN SHU.

8              I TOLD HER WHAT'S THAT?  SHE SAID THE MEDICATIONS

9    THAT YOU TRIED PREVIOUSLY OVER THE YEARS, THE NSAIDS, THE

10   TYLENOL, AND THINGS OF THAT NATURE.

11             SO I OBJECTED TO THAT.  I WENT INTO DETAILS ABOUT MY

12   PRIOR HISTORY AND THAT I HAD BEEN THROUGH ALL OF THIS BEFORE,

13   THAT IS WHY I ENTERED INTO THIS 2002 SETTLEMENT AGREEMENT.  AND

14   IF THEY WERE GOING TO START DOING STUFF WITH MY MEDICATIONS, I

15   WANTED TO BE SEEN BY A PAIN MANAGEMENT SPECIALIST.  AND I

16   PROVIDED HER WITH COPIES, PERSONALLY, OF THAT WHOLE 602 PACKAGE

17   THAT I SENT TO SACRAMENTO BACK IN APRIL OF 2006.

18   Q.    WHAT WAS MS. RISENHOOVER'S RESPONSE?

19   A.    WELL, AGAIN, SHE DID NOT CONDUCT ANY CAREFUL EXAMINATION

20   OR TESTING OF MY ARM, AND SHE TOLD ME AFTER HEARING ME THAT SHE

21   WAS NOT COMFORTABLE WITH DISCONTINUING OR TAPERING ME OFF THAT

22   MEDICATION AT THAT POINT, THAT SHE WANTED DR. SAYRE TO

23   PERSONALLY EXAMINE ME BEFORE ANY OF THAT HAPPENED WITH MY

24   MEDICATIONS.

25   Q.    OKAY.  WHAT HAPPENED AFTER THAT?

ASHKER – DIRECT / MR. ASHKER

1   **A.**   WELL, AFTER THAT, A SHORT TIME LATER, A WEEK OR TWO, I

2   RECEIVED A 602 BACK FROM SACRAMENTO WHERE THEY HAD DENIED MY

3   602.  ALL MY POINTS, EVERYTHING WAS DENIED.

4   **Q.**   WHAT HAPPENED AFTER THAT?

5   **A.**   ON AUGUST 21ST, 2006, I WENT TO SEE MS. RISENHOOVER AGAIN

6   AND FOR THAT 60-DAY FOLLOW UP, FOR MY MEDICATION RENEWALS.

7   **Q.**   AND AT THAT TIME, WHAT DID MS. RISENHOOVER SAY?

8   **A.**   SHE TOLD ME THAT SHE WAS STILL WAITING FOR DR. SAYRE TO

9   SEE ME BEFORE SHE DID ANYTHING, AND THAT SHE WOULD RENEW MY

10  TRAMADOL AND MY MEDICATIONS AND ALL THAT FOR 30 MORE DAYS.  I

11  SHOULD BE SEEN BY DR. SAYRE ANY TIME.

12  **Q.**   OKAY.  WHAT HAPPENED AFTER THAT?

13  **A.**   WELL, I FOUND OUT LATER THAT ON THAT SAME DAY,

14  AUGUST 21ST, 2006, AFTER I HAD SEEN HER, THERE WAS A MEETING

15  WITH DR. SAYRE, DR. ROWE, MS. RISENHOOVER AND MCLEAN.

16  **Q.**   AND WHAT WAS THE OUTCOME OF THIS MEETING?

17  **A.**   WELL, AT THAT TIME, THEY MADE THE DECISION TO TAPER ME OFF

18  TRAMADOL AND REPLACE IT WITH NSAIDS.

19  **Q.**   OKAY.  AND WHAT HAPPENED AFTER THAT?

20  **A.**   AFTER I SAW RISENHOOVER -- I DIDN'T KNOW THAT AT THE TIME,

21  BUT AFTER I SAW HER ON OCTOBER 21ST, I WAS FINALLY CALLED DOWN

22  TO SEE DR. SAYRE.  SEE, WHAT HAD HAPPENED WAS, I EXPLAINED

23  EARLIER ABOUT THE CHRONOS THAT WE NEED FOR OUR MEDICAL

24  APPLIANCES, AND THINGS OF THAT NATURE.

25        WELL, MY CHRONOS -- MOST -- BASICALLY, THEY --

1   STAFF, THEY DIDN'T HAVE UP-TO-DATE CHRONOS FOR ME WHEN I MOVED

2   OVER TO THAT NEW UNIT.  SO THE UNIT STAFF BACK IN MAY TOLD ME,

3   HEY, YOU NEED TO GET ALL YOUR CHRONOS RENEWED I HAD FOR MY ARM

4   BRACE, MY PHYSICAL THERAPY BAND, MY PHYSICAL THERAPY BALL, MY

5   TWO SETS OF THERMALS, THICK THERMALS, NAIL CLIPPERS EVERY TWO

6   WEEKS BECAUSE FOR A WHILE THEY WERE ONLY GIVING THEM TO US ONCE

7   A MONTH AND WHEN MY NAILS GROW OUT ON THIS HAND, IT WOULD CHEW

8   UP MY BALL, MY THERA-BALL, AND MAN, IT'S HARD TO GET A

9   REPLACEMENT.  SO I NEEDED TO BE ABLE TO CLIP MY NAILS WITHOUT

10  CHEWING THE BALL UP, SO I HAD A CHRONO FOR THAT FOR EVERY TWO

11  WEEKS.

12          AND THEN WHAT HAPPENED WAS, I FILED -- BY

13  AUGUST 8TH, I HADN'T GOTTEN ANY CHRONOS RENEWED.  SO I FILED A

14  602 APPEAL.  AND I ALSO POINTED OUT TO RISENHOOVER BACK IN JUNE

15  OF 2006 THAT MY ARM BRACE NO LONGER FIT GOOD, AND STAFF --

16  SOMEBODY HAD TORN THE PADDING LOOSE BACK IN FEBRUARY WHEN I WAS

17  OUT OF THE CELL, AND A FEW PARTS LIKE TORN OFF AND WORN OFF,

18  AND IT WAS JUST REAL DIFFICULT -- IT TOOK ME YEARS, IT TOOK ME

19  LIKE SEVEN YEARS TO GET A BRACE THAT ACTUALLY FIT PROPERLY.

20  THAT WAS ONLY AFTER I GOT THE COURT TO ISSUE A PRELIMINARY

21  INJUNCTION --

22          **MR. ANDRADA:**  YOUR HONOR, MOVE TO STRIKE.  THIS IS

23  CLEARLY NOT --

24          **THE COURT:**  DON'T GO INTO THE PRIOR COURT ORDERS.

25          **MR. ANDRADA:**  CLEARLY HEARSAY.

1          **MR. ASHKER:**  OKAY.

2          **THE COURT:**  STRIKE THAT.

3          **MR. ANDRADA:**  SEVEN YEARS OF TRYING TO GET AN ARM

4     BRACE, IT'S NOT RELEVANT.  I WOULD RESPECTFULLY SUGGEST.

5          **THE COURT:**  ALL RIGHT.  WE WILL STRIKE THAT.

6          **MR. ASHKER:**  OKAY.

7     BY MR. ASHKER:

8     Q.   ANYHOW, MY ARM BRACE WAS NO LONGER FITTING RIGHT, SO I

9     ASKED HER IF I NEEDED TO GET IT REPLACED OR FIXED.  AND SHE

10    TOLD ME, HEY, YOU KNOW, WE DON'T HAVE ANYBODY TO DO THAT.

11         SO, ANYHOW I FILED THAT 602 ON AUGUST 8TH.  ON

12    AUGUST 30TH, I MET DR. SAYRE IN PERSON FOR THE FIRST TIME.

13    THEY CALLED ME OVER TO HIS OFFICE.  I WAS WEARING A BAGGY

14    JUMPSUIT.  I WAS SHACKLED WITH THE WAIST CHAIN AND HANDS CUFFED

15    TO THE WAIST CHAIN.  I HAD MY ARM BRACE WITH ME.

16         AND WHAT HAPPENED DURING THAT VISIT?

17    A.   WELL, AS SOON AS I WALKED IN, DR. SAYRE KICKED BACK IN HIS

18    CHAIR LIKE THIS (INDICATING), AND HE TELLS ME, OKAY, YOU'RE

19    HERE IN RESPONSE TO THIS 602 APPEAL FOR RENEWAL OF A BUNCH OF

20    CHRONOS.  WHAT IS YOUR NEED FOR THESE CHRONOS?  WHICH ONES DO

21    YOU NEED?

22         SO I RECOGNIZED THE ATTITUDE RIGHT AWAY, AND I JUST

23    SAID, HEY, YOU KNOW WHAT?  I NEED MY ARM BRACE RENEWED.  I NEED

24    MY THERAPY BAND AND BALL.  I NEED TWO SETS OF THERMALS BECAUSE

25    COLD WEATHER.

1          THIS WAS IN RESPONSE TO A 2001 STIPULATION IN

2     ANOTHER COURT CASE THAT I GOT.

3               MR. ANDRADA:  YOUR HONOR?

4          MOVE TO STRIKE.

5               THE COURT:  DON'T MENTION HOW YOU GOT --

6               MR. ASHKER:  WELL, I HAD TWO, I WAS ALLOWED TWO SETS

7     OF THICK THERMALS BECAUSE I HAVE TO WEAR THEM PRETTY MUCH ALL

8     THE TIME IN THIS CELL I AM IN NOW.  IT'S A REAL COLD CELL.  AND

9     SOMETIMES I HAVE TO WEAR BOTH THERMALS, MY JUMPSUIT.  AND THE

10    COLD WEATHER CAUSES MY HAND TO BECOME A LOT MORE STIFF, MORE

11    PAINFUL AND IT IS HARD, IT WOULD BE HARD FOR ME TO EVEN MOVE

12    IT.

13         AND SO ANYHOW, DR. SAYRE TELLS ME, WELL, WHAT'S THE

14    NATURE OF YOUR INJURY?  HE COMES OVER TO ME, AND HE TELLS ME,

15    WHERE DID THE BULLET HIT AND WHERE WAS THE EXIT WOUND?  HE'S

16    STANDING TO MY RIGHT SIDE.  I'M SEATED ON THE LITTLE BENCH

17    THERE.

18         WOULD IT BE ALL RIGHT TO STAND UP TO SHOW THEM, TO

19    DEMONSTRATE, YOUR HONOR?

20               THE COURT:  OKAY.

21               MR. ASHKER:  SO, I AM SEATED.  I AM WEARING A BAGGY

22    JUMPSUIT WITH THE SLEEVES KIND OF LIKE THIS ONE RIGHT HERE AND

23    MY HAND IS HANDCUFFED LIKE THIS, (INDICATING).

24         AND DR. SAYRE COMES OVER TO MY SIDE.  HE SAYS, WHERE

25    DID THE BULLET STRIKE AND WHERE WAS THE EXIT WOUND?

ASHKER – DIRECT / MR. ASHKER

```
 1            AND TO ME, THAT TOLD ME HE, I DON'T KNOW, IT JUST,

 2    HE DIDN'T KNOW NOTHING ABOUT MY INJURY.  I SAID, WELL, THE

 3    BULLET STRUCK ME RIGHT HERE (INDICATING), AND THERE WAS NO EXIT

 4    WOUND.  IT JUST BLOW OUT, JUST BLOW OUT IN THE WHOLE BACK OF MY

 5    ARM RIGHT HERE AND STUFF (INDICATING).

 6            AND HE, HIS PHYSICAL EXAM CONSISTED OF THIS.  I AM

 7    DESCRIBING TO HIM -- WELL, HE TELLS ME, HE GOES LIKE THIS.  HE

 8    PUTS HIS TWO FINGERS ABOUT RIGHT HERE ON MY ARM (INDICATING)

 9    AND HE GOES OPEN AND CLOSE YOUR HAND FOR ME.

10            SO I GO LIKE THIS (INDICATING).  AND HE GOES BACK

11    AND SITS DOWN.  HE TELLS ME, ARE YOU IN PAIN RIGHT NOW?

12    DESCRIBE YOUR PAIN FOR ME RIGHT NOW.

13            THAT WAS THE FULL EXTENT OF HIS PHYSICAL EXAMINATION

14    OF MY ARM.  AND WHEN I TOLD HIM, I DESCRIBED MY PAIN, I SAID I

15    WOKE UP THAT MORNING ABOUT FOUR, 4:30 IN THE MORNING IN PAIN

16    WAITING FOR MY MEDICATIONS TO COME.

17            I SAID THE DAY BEFORE, I SPENT ABOUT THREE HOURS

18    WRITING OUT THREE SHEETS OF LETTER, LEGAL, OR SOMETHING, AND

19    JUST THAT RIGHT THERE CAUSED MY, MY WHOLE TENDONS, JUST IN

20    HERE, IT JUST TIGHT, REAL TIGHT ALL THE TIME (INDICATING).

21    THIS, AFTER -- EVER SINCE THE INJURY, THIS PART RIGHT HERE

22    (INDICATING) WHEN I OPEN AND CLOSE MY HAND, IT'S LIKE I

23    ACTUALLY HAVE TO THINK ABOUT IT AND WORK IT.  AND MY WRIST, I

24    SAID, THE BONE IS GONE RIGHT HERE.  MY WRIST AREA HURTS ALL THE

25    TIME.
```

 1          HE TELLS ME, WELL -- I SAID, YOU KNOW, I BROUGHT UP

 2     THE TRAMADOL.  AND HE SAID, HEY, THAT'S ONLY FOR SHORT-TERM.

 3     IT'S NOT FOR CHRONIC LONG-TERM PAIN CONTROL.

 4          I SAID, WELL, HEY, YOU KNOW, I DIDN'T KNOW ABOUT ALL

 5     THAT.  FIRST TIME I EVER HEARD OF TRAMADOL WAS WHEN DR. WOLF

 6     HAD FIRST -- AND I NEVER -- I AM NOT A DOCTOR, I WASN'T LIKE

 7     GOING AND TRYING TO FIND OUT ABOUT IT.

 8          SO, ANYHOW, HE TELLS ME -- I DIDN'T KNOW IF WHAT HE

 9     WAS SAYING WAS TRUE OR NOT.  ALL THESE OTHER DOCTORS HAVE

10     ORDERED THIS, AND, YOU KNOW, IT HAD BEEN WORKING BEST FOR ME.

11     THE NSAIDS CAUSED PROBLEMS, THEY ARE NOT EFFECTIVE, AND I KNOW

12     THAT DOCTORS DO PRESCRIBE MEDICATIONS THAT ARE NOT SPECIFICALLY

13     WORD-FOR-WORD BY THE FDA GUIDELINES.  AND, FOR INSTANCE, I GAVE

14     HIM AN EXAMPLE OF PRILOSEC.  I KNEW PEOPLE WHO PRILOSEC BASED

15     ON COMMERCIALS I HAD SEEN, IT WAS FOR ONLY SHORT-TERM USE.  IF

16     IT DIDN'T WORK FOR YOU AFTER 30 OR 60 DAYS YOU NEEDED TO SEE A

17     PHYSICIAN.  I KNEW RIGHT THERE AT PELICAN BAY THEY WOULD HAVE

18     GUYS ON PRILOSEC FOR A YEAR OR TWO.  YOU KNOW, IT JUST DEPENDS

19     ON YOUR CONDITION AND RISK/BENEFIT ANALYSIS.

20          AND HE TOLD ME, WELL, YOU WILL BE INFORMED OF MY

21     DECISION.  SO I LEFT.

22          AND ON SEPTEMBER 21ST, 2006 I WENT TO SEE

23     RISENHOOVER FOR A FOLLOW-UP.  I HADN'T RECEIVED ANY RESPONSE

24     FROM SAYRE AT THAT TIME.  AND SHE TOLD ME, WELL, DID YOU HEAR

25     FROM SAYRE'S RESPONSE?  I TOLD HER NO.  SO SHE READ IT TO ME

1    OFF THE COMPUTER.

2            WHAT SHE SAID WAS THAT DR. SAYRE DETERMINED THAT I

3    DIDN'T NEED ANY PHYSICAL THERAPY.  MY ARM WAS BASICALLY FULLY

4    REHABILITATED.  THERE WAS NO NEED FOR PHYSICAL THERAPY ANY

5    MORE.

6            HOLD ON A SECOND.  I WOULD LIKE TO GET THE SPECIFIC

7    DOCUMENT OUT.

8            **MR. ANDRADA:**  MR. ASHKER, IF YOU WILL LET US KNOW

9    WHAT EXHIBIT YOU ARE REFERRING TO?

10           **MR. ASHKER:**  YES.

11           **MR. ANDRADA:**  THANK YOU.

12           **MR. ASHKER:**  I AM REFERRING TO EXHIBIT 165.

13           SPECIFICALLY, WHAT DR. SAYRE FOUND WAS THAT ON THE

14   ISSUE OF BLANKETS AND UNDERWEAR, THERE WAS NO BLANKET ISSUE.  I

15   DON'T KNOW WHERE THAT CAME FROM.  IT WAS A THERMAL UNDERWEAR

16   ISSUE.

17           HE SAID THE INJURY OCCURRED ON THE FOREARM.  THE

18   CAUSE OF ANY COLD-INDUCED PAIN AT THIS STAGE WOULD BE ATOMIC

19   DYSTROPHY.  HIS CONDITION WOULD SHOW SIGNS ON THE INVOLVED

20   LIMB, WHICH HE DOES NOT HAVE.  THERE IS NO PHYSICAL EVIDENCE OF

21   THE CHANGES THAT OCCURRED WITH THE DYSTROPHY, THEREFORE, HE

22   DOESN'T HAVE ATOMIC DYSTROPHY AND TEMPERATURE REGULATION IS NOT

23   REQUIRED.  THE CHRONOS FOR UNDERWEAR AND EXTRA BLANKETS ARE

24   DENIED.

25           THE ISSUE OF THE OLD TRAM, WHICH IS ANOTHER WORD FOR

 1   TRAMADOL, IS INDICATED ONLY FOR SHORT-TERM THERAPY.  AND THIS

 2   IS A LONG-TERM CHRONIC CONDITION.  THAT MEDICATION WILL NOT BE

 3   ISSUED FOR A CHRONIC CONDITION.

 4           THE NEED FOR EXERCISE EQUIPMENT AND PHYSICAL THERAPY

 5   IS ANOTHER GROUP REQUIRING A UNIFIED REASON FOR CONTINUATION,

 6   THAT BEING THE NEED TO RECONDITION THE LIMB.  AT THIS STAGE, WE

 7   ARE WELL PASSED THAT POINT AND THESE SERVICES NO LONGER SERVE A

 8   PURPOSE.  HIS LIMB IS AT A STABLE END STAGE FOR THE INJURY AND

 9   WILL NOT CHANGE ANY FURTHER.  ANY MOBILITY AND STRETCHING

10   EXERCISES SHOULD BE WELL KNOWN TO THE INMATE AT THIS TIME.

11           THE INDICATION FOR THESE REQUESTS IS LONG PASSED AND

12   THEREFORE DENIED.

13           THEN HE MENTIONS SOMETHING ABOUT A HAND CUSHION.  I

14   NEVER HAD NO HAND CUSHION.  THERE IS NO REFERENCE AT ALL IN

15   HERE ABOUT MY ARM BRACE.  WHEN I SHOWED HIM MY ARM BRACE ON

16   THAT AUGUST 30TH VISIT, I EXPLAINED TO HIM THAT IT DIDN'T FIT

17   PROPERLY.  HE DIDN'T HAVE ME TRY IT ON.  HE DIDN'T EVEN OPEN

18   THE STRAPS.

19           I CAN SHOW YOU MY ARM BRACE.

20           **THE COURT:**  WHY DON'T YOU GO AHEAD AND GET OUT THE

21   THERA-BALL AND THE THERA-BAND, TOO, WHILE YOU ARE AT IT SO WE

22   CAN HAVE IT ALL AT ONCE.

23           **MR. ASHKER:**  (INDICATING) THIS IS THE ARM BRACE THAT

24   I HAVE BEEN TALKING ABOUT.  THAT'S HOW -- WHAT I WAS DESCRIBING

25   TO YOU ABOUT THE PADDING.  I MEAN, IT TOOK ME -- I WENT THROUGH

1    ALL KINDS OF PROBLEMS TRYING TO GET ONE THAT ACTUALLY FIT WELL

2    THAT I COULD USE.

3            THE PURPOSE OF THE BRACE WAS TO -- ORDERED BY

4    DR. DUNCAN BACK IN 1994.  AND OVER THE TIME, HE STATED THAT THE

5    REASON FOR THE BRACE WAS BECAUSE OF MY ARM AND THE POTENTIAL

6    FOR DAMAGE, ANY KIND OF DAMAGE TO MY ARM, I COULD -- COST ME MY

7    ARM.  SO HE ORDERED THIS BRACE.  AND REPEATEDLY, EVERY TIME I

8    SAW HIM, WHICH WAS AN AVERAGE OF TWICE A YEAR BETWEEN 1994 AND

9    2002, HE ORDERED THAT I NEEDED THE BRACE.  IN 1997, HE STATED

10   THAT I NEEDED THE BRACE TO PROTECT MY ARM FROM ADDITIONAL

11   INJURY AND ENABLE ME TO BE ABLE TO EXERCISE MY UPPER ARM AREA.

12   OKAY?

13           THIS IS MY LITTLE THERA-BALL.  IT IS FOR PHYSICAL

14   THERAPY.  AND I USE IT TO WORK MY ARM AND EXERCISE IT IN THE

15   CELL.  THIS IS MY THERA-BAND.

16           AND CAN I STAND, YOUR HONOR, AND SHOW THEM HOW I USE

17   MY THERA-BAND?  GIVE THEM A LITTLE DEMONSTRATION?

18              **THE COURT:**  IS IT ALL RIGHT WITH YOU ALL?

19              **DEPUTY:**  YES.

20           **MR. ASHKER:**  WHAT I DO IS (INDICATING) WHAT I DO,

21   SEE, THE ISSUE IS -- THE REASON THIS WAS ORDERED AND I WAS

22   ALLOWED TO HAVE IT IN MY CELL IS CHIEF MEDICAL OFFICER, FORMER

23   CHIEF MEDICAL OFFICER AT PELICAN BAY, DR. WINSLOW, HAD ORDERED

24   THAT I BE ALLOWED TO HAVE THE BAND.  AND THEN LATER ON I GOT

25   THE BALL, TOO.  IN MY CELL TO ENHANCE OR SO I CAN DO IN-CELL

ASHKER – DIRECT / MR. ASHKER

1    THERAPY, BECAUSE OVER THE YEARS, BETWEEN 1999 AND 2003, I

2    TRIED -- ACTUALLY FROM 1993 ON UP, I TRIED TO DO THE THERAPY ON

3    MY OWN IN THE CELL.  AND THE WAY MY ARM IS, I WASN'T ABLE TO DO

4    SO EFFECTIVELY.

5            AND BECAUSE MY ARM WILL CHANGE FROM DAY-TO-DAY AND

6    LIMITED RANGE OF MOTION PREVENTS ME FROM LIKE TO BEING ABLE TO

7    PUT IT DOWN ON SOMETHING AND GRAB SOME KIND OF WEIGHT MATERIAL

8    OR THINGS OF THAT NATURE.  I 602'D IT, WENT THROUGH ALL KINDS

9    OF CHANGES, AND EVENTUALLY BEGINNING IN LIKE 1999, I STARTED

10   GETTING PERIODIC SESSIONS OF PHYSICAL THERAPY OF SIX

11   SESSIONS --

12           **THE COURT:**  WHY DON'T YOU -- GO AHEAD.  GO AHEAD AND

13   SHOW IT SO THAT THIS GENTLEMAN CAN SIT DOWN.

14           **MR. ASHKER:**  I AM SORRY.

15           SO, WHAT I DID IS, I 602'D IT, AND ABOUT NOT BEING

16   ABLE TO DO SO ON MY OWN, BUT ANYHOW, WHAT I DO IS I ATTACH

17   THIS, I GOT A LITTLE PIECE OF LIKE SPRING-TYPE STUFF THAT I

18   ATTACH TO THE FRONT OF MY CELL SO THAT I HAVE THE BAND ATTACHED

19   RIGHT HERE AT THIS LEVEL (INDICATING), AND THE PHYSICAL

20   THERAPIST IN 1999 HAD TAUGHT ME SIX EXERCISES TO DO FOR MY

21   FOREARM.  AND THESE ARE WHERE I GRAB THE BAND AND I GO LIKE

22   THIS (INDICATING).  THAT IS THE FULL EXTENT OF MY MOTION RIGHT

23   THERE GOING DOWN, AND IT'S REAL WEAK.  OKAY.

24           I TAKE THE BAND AND I GO LIKE THIS, (INDICATING).

25   THIS IS WHILE IT'S ATTACHED UP HERE.  AND I WILL TURN AROUND

ASHKER – DIRECT / MR. ASHKER

1   AND I WILL GO LIKE THIS (INDICATING).  WHAT I AM DOING IS I AM

2   WORKING IT LIKE THIS, (INDICATING).  THAT'S THE FULL EXTENT OF

3   MY MOTION DOING THAT.

4         THEN WHAT I WILL DO IS I WILL GRAB THE HANDLES AND I

5   WILL DO THIS, (INDICATING).  I WILL GO AROUND AND I WILL DO

6   THIS (INDICATING) FOR THE BACK PART.  AND THEN I GRAB IT AND I

7   GO LIKE THIS (INDICATING).  THAT'S THE FULL -- THESE MOTIONS I

8   AM SHOWING YOU ARE THE FULL RANGE OF MOTION.

9         THEN I GRAB IT LIKE THIS (INDICATING) AND I GO LIKE

10  THIS (INDICATING).  AND I WOULD DO THOSE SIX EXERCISES FOR MY

11  ARM, MY FOREARM USUALLY -- THANK YOU -- USUALLY THREE TO FOUR

12  DAYS A WEEK.  AND I HAVE A SET PROGRAM DOWN OF HOW MANY

13  EXERCISES I DO AND WHAT WORKS BEST FOR ME.

14        THE IDEAL THING ABOUT THIS BAND IS ON ANY GIVEN DAY,

15  I AM AUTOMATICALLY ABLE TO ADJUST FOR HOW MY ARM IS FEELING ON

16  HOW MUCH PRESSURE AND HOW MUCH I WORK IT.  AND THE WORK IN MY

17  ARM, GETTING THE BLOOD FLOWING THROUGH IT AND WORKING IT IS,

18  ALWAYS PROVIDES SOME TEMPORARY RELIEF.  AND IT'S BROUGHT MY ARM

19  UP.

20        MY ARM WAS, MY ARM HAD GOTTEN IN BETTER CONDITION.

21  AND THE ARM BRACE WAS NO LONGER FITTING IN THIS AREA UP HERE

22  (INDICATING) AND THEN DOWN IN -- BUT DOWN IN HERE, WHEN PIECES

23  HAD TORN OUT AND THINGS OF THAT NATURE, THE WAY MY ARM IS

24  CONTOURED, THE BENDS IN IT AND DEFORMITIES AND STUFF, IT WAS

25  ALWAYS A REAL PROBLEM GETTING IT TO FIT PROPERLY.

ASHKER – DIRECT / MR. ASHKER

```
 1            AND HERE THEY HAD TO ATTACH SPECIAL LITTLE PADDING

 2    PIECES THAT WOULD FIT INTO AREAS TO PROVIDE THAT WITH A

 3    SUPPORT.  THIS BRACE RIGHT HERE I GOT IN MID 2000, AND WITH ALL

 4    THE MODIFICATIONS AND STUFF.  IT HADN'T BEEN CHANGED OR

 5    ADJUSTED SINCE THEN.  THIS STUFF HAD WORN OUT.  LIKE I SAID, I

 6    HAD COME BACK TO THE CELL IN 2006, THIS HAD BEEN TORN LOOSE AND

 7    STUFF.

 8            AND SO WHAT I USE IT FOR, YOU CAN SEE THE BRACE IS,

 9    IT'S ALL STAINED FROM, THAT'S FROM SWEAT.  WHEN I EXERCISE, I

10    SWEAT A LOT.  AND THAT'S SWEAT FROM EXERCISING RIGHT THERE.

11            WHEN I HAVE THE BRACE, WHEN IT'S WORKING, I HAVE IT

12    ON, I AM ALSO ABLE TO USE THE BAND FOR BACK ARM FOR MY BICEP

13    AREAS.  I WOULD DO LIKE THIS (INDICATING) FOR MY UPPER -- BACK

14    SHOULDER AREAS, AND I WILL WORK MY LEFT ARM, TOO.  AND I WOULD

15    DO CURLS FOR THE BICEPS.

16            AND I WOULD, AT THE SAME TIME I HAD A PROGRAM WHERE

17    I WOULD DO ISOMETRICS, PUSH/PULL, THE BRACE WOULD SUPPORT ME

18    FOR ALL THOSE UPPER ARM EXERCISES.

19            SINCE FEBRUARY 2006, THE BRACE HAS NOT FIT RIGHT.

20    JUST ABOUT A WEEK AGO, I PUT IT ON AND I NOTICED THAT SINCE I

21    HAD A CUT IN MY PHYSICAL THERAPY AND MY PAIN MEDICATION

22    PROBLEMS AND THINGS OF THAT NATURE, I HAD TO CUT WAY BACK.

23            I USED TO DO SIX SETS, SIX CIRCUITS OF THESE SIX

24    EXERCISES.  I CUT BACK TO THREE.  AND THE OTHER DAY I NOTICED

25    THAT THE BRACE WAS NOW FITTING AGAIN IN MY UPPER ARM AREA
```

ASHKER – DIRECT / MR. ASHKER

1  BECAUSE MY HARM HAS SHRUNK BACK DOWN TO HOW IT WAS PRIOR TO MY

2  2002 SETTLEMENT AGREEMENT.

3          AND WHILE I WAS PREPARING FOR THIS TRIAL, I STARTED

4  LOOKING AT MEASUREMENTS THAT DR. WEINSTEIN HAD DONE ON

5  MEASURING THE GIRTH OF MY ARM IN CERTAIN AREAS AND GRIP

6  STRENGTH WITH A DYNAMIC METER, WHICH YOU WILL BE HEARING ABOUT,

7  BUT ANYHOW, THE MEASUREMENTS BY DR. WEINSTEIN AND PHYSICAL

8  THERAPIST DODGEN -- AFTER I HAD BEEN GETTING PHYSICAL THERAPY

9  REGULARLY, I HAD THE ARM BRACE, I HAD MEDICATIONS, I WAS

10 WORKING MY ARM, MY ARM RIGHT HERE (INDICATING), AT A CERTAIN

11 SPECIFIC DISTANCE, THREE AND A HALF INCHES UP FROM MY WRIST

12 FOLD WAS MEASURED.

13         IN 2000 IT WAS 7 INCHES.  IN 2002, IT WAS 7.3

14 SOMETHING INCHES.  IN 2003, 2004, WITH ALL THE THERAPY, ALL

15 THAT, IT WENT UP TO ABOUT EIGHT AND A QUARTER, EIGHT AND A HALF

16 INCHES AT THIS SAME SPOT.  IT WAS PERIODICALLY CHECKED.

17         BACK ON, I THINK MARCH 25TH, I MADE MY OWN LITTLE

18 MEASURE BECAUSE NO MEASUREMENTS HAD BEEN TAKEN OF IT SINCE

19 2005, AND WHEN I TRIED THE BRACE, I SAW IT WAS LIKE MY ARM HAD

20 SHRUNK.  AND I KNEW IT HAS BEEN FEELING WEAKER AND HURTING

21 MORE, SO I DID MY OWN MEASUREMENT.  I MADE MY OWN LITTLE

22 MEASURE.  I HAVE IT HERE SOMEWHERE.

23         BUT I MADE MY OWN LITTLE MEASURE.  I DID THE EXACT

24 POINTS OF REFERENCE, AND MY ARM IS NOW BACK TO HOW IT WAS IN

25 2002, PRIOR TO MY SETTLEMENT AGREEMENT.  WHERE IT'S NOW, IT

1  WENT FROM ABOUT EIGHT AND A QUARTER, EIGHT AND A HALF INCHES

2  BACK DOWN TO SEVEN AND A HALF INCHES IN THAT AREA.

3        MY GRIP STRENGTH HAS DECREASED.  IT WAS, WHEN I HAD

4  A CELLIE ASSISTING ME WITH DAILY ACTIVITIES AND PHYSICAL

5  THERAPY, THE MEDICATION AND ALL THAT, MY GRIP STRENGTH WAS

6  TESTED IN 2004 AT 54 POUNDS ON A DEVICE KNOWN AS A DYNAMOMETER.

7  WHAT YOU DO IS YOU GRIP IT.  YOU PUT THE MAXIMUM GRIP ON IT FOR

8  A SECOND OR TWO AND IT WILL PUT A READING.

9        AND ACCORDING TO THE PHYSICAL THERAPIST MR. DODGEN,

10  THE NORMAL GRIP EXTREMITY FOR A MAN AROUND 40 YEARS OF AGE IS

11  115 POUNDS.  IN 2004, AFTER I HAD BEEN GETTING THE THERAPY, I

12  HAD CELLMATE ASSISTED ME, MEDICATIONS, ALL THIS STUFF, MY ARM

13  BRACE, MY GRIP STRENGTH ON MY RIGHT HAND WAS 54 POUNDS.  ON MY

14  LEFT IT WAS 125 POUNDS.

15        WHEN I LOST MY CELLIE AND HAD TO DO STUFF ON MY OWN

16  AGAIN, WITHIN A FEW MONTHS LATER MY GRIP STRENGTH WENT DOWN TO

17  47 POUNDS.  AND SINCE THE TIME OF DISCONTINUING ALL MY

18  MEDICATIONS, PULLING ME BACK ON NSAIDS, NO LONGER HAVING MY ARM

19  BRACE, LIMITS ON MY PHYSICAL THERAPY, MY GRIP STRENGTH TESTED

20  BY DR. SHIN ON DECEMBER 22ND, 2008 WAS AROUND 37.4 POUNDS,

21  38 POUNDS.

22        SO, SINCE I HAD A CELLIE IN 2004, HAD ALL THE THINGS

23  GOING ON, IT WENT FROM 54 POUNDS DOWN TO WHERE IT IS NOW, 38.

24  I DON'T KNOW WHAT IT IS NOW.  THAT WAS BACK IN DECEMBER.

25        SO, ALL THOSE THINGS HAVE TRANSPIRED SINCE I WAS CUT

```
 1    OFF THE MEDICATION, MY PHYSICAL THERAPY.  I HAVEN'T HAD THE ARM

 2    BRACE.  AND THESE ARE ACTUAL OBJECTIVE MEASUREMENTS.  THEY ARE

 3    IN MY MEDICAL FILE.  AND YOU KNOW, THE BOTTOM LINE IS

 4    DR. SAYRE, WHEN I SAW HIM ON AUGUST 30TH, HE DIDN'T EVEN

 5    EXAMINE ME.

 6              MR. ANDRADA:  EXCUSE ME, YOUR HONOR.  THIS IS

 7    CLEARLY --

 8              THE COURT:  SUSTAINED.

 9              MR. ANDRADA:  -- ARGUMENTATIVE.

10              THE COURT:  YOU HAVE GONE BACK TO SOMETHING YOU

11    ALREADY SAID.

12              KEEP MOVE FORWARD, ALL RIGHT?

13              THAT'S FINE.

14              MR. ASHKER:  SO BACK TO THE CHRONOLOGY.

15              ON SEPTEMBER 21ST, I SAW MS. RISENHOOVER FOR PAIN

16    MEDICATION FOLLOW UP, AND SHE, WHAT SHE DID AT THAT TIME WAS

17    SHE NOTIFIED ME OF SAYRE'S DECISION.  SHE READ ME THAT STUFF

18    THAT I READ TO YOU FROM HIS REPORT.

19              AND I TOLD HER, MAN, I USED SOME CUSS WORDS

20    REFERRING TO DR. SAYRE.  AND I, YOU KNOW, I LET HER KNOW, HEY,

21    YOU KNOW, THIS IS GOING TO BE IN COURT.  SHE DOCUMENTED ALL

22    THAT IN MY MEDICAL RECORD.

23              AND SO SHE NOTIFIED ME AT THAT TIME THAT DR. SAYRE

24    WAS GOING TO -- WANTED HER TO TAPER ME OFF THE TRAMADOL, SO IT

25    WOULD BE CUT FROM TWO A DAY TO ONE TODAY DAY FOR SEVEN DAYS AND
```

1    THEN DISCONTINUED COMPLETELY.  REPLACE WITH NSAIDS

2    400 MILLIGRAMS OF IBUPROFEN A DAY WITH FOUR, I THINK, TYLENOL,

3    325 MILLIGRAMS OF TYLENOL.

4             THAT COMBINATION OF MEDICATION RIGHT THERE, I HAVE

5    OTHER LITTLE PROBLEMS WITH MY SHOULDER AND MY KNEE.  AND I

6    MEAN, A LOT OF TIMES, I MEAN, THAT WON'T EVEN HELP THAT.  YOU

7    KNOW, AND WE ARE TALKING ABOUT MINOR ARTHRITIS AND STUFF.

8             AND SOME CREAM, SOME KIND OF CREAM, MYOFLEX CREAM,

9    SHE SAID, SO I CAN RUB ON THE SORE SPOTS ON MY ARM, RIGHT?  I

10   TOLD HER, YEAH, OKAY.  I WENT BACK TRIED THE CREAM.  IT DIDN'T

11   DO NOTHING.  THE MEDICATION WAS A JOKE.  IT WAS NOT EFFECTIVE.

12            AND, ACTUALLY, AS I STARTED USING THAT NSAIDS, I

13   DEVELOPED CHRONIC DIARRHEA WHERE I HAD TO BE GETTING ON THE

14   TOILET MAYBE, SOMETIMES TEN TIMES A DAY, JUST CRAMPED UP,

15   STOMACH BURNING.  IT WAS JUST, IT WAS A NIGHTMARE.  IT HAS BEEN

16   A NIGHTMARE LIKE THAT, LIVING, LIVING A NIGHTMARE EVER SINCE MY

17   INTERACTIONS IN 2006 WITH DR. SAYRE.

18            AND SO, ON SEPTEMBER 24TH, I FILED A MOTION IN THIS

19   COURT RIGHT HERE AND --

20            **MR. ANDRADA:**  YOUR HONOR, IS THIS RELEVANT?

21            **THE COURT:**  YOU ARE TALKING ABOUT THIS CASE?

22            **MR. ASHKER:**  YES.  MY PROTECTIVE ORDER ISSUE, AND I

23   WANT TO GET INTO DR. SAYRE'S NOVEMBER 11TH DECLARATION RESPONSE

24   WHICH TIES IN THE VIDEOTAPE AND THINGS OF THAT NATURE.

25            **MR. ANDRADA:**  OKAY.

1          **THE COURT:**  I THINK IT IS RELEVANT.

2          **MR. ANDRADA:**  ALL RIGHT.

3          **MR. ASHKER:**  SO ON SEPTEMBER 24TH, 2006 I FILED A

4     MOTION IN THIS COURT FOR A PROTECTIVE ORDER ASKING THE COURT TO

5     PROTECT ME FROM LOSING MY BAND AND BALL AND BRACE AND PHYSICAL

6     THERAPY AND TO HAVE MY MEDICATIONS REINSTATED.

7               I DETAILED IN DETAIL ABOUT MY MEETING WITH SAYRE AND

8     THE WHOLE SCENARIO.  I DESCRIBED HIS SO-CALLED EXAMINATION AS A

9     SHAM.  NOWHERE ON THIS AUGUST 30TH, 2006 REPORT THAT SAYRE DID

10    WILL YOU FIND ANY DESCRIPTION OF EXAMINING -- OF A PHYSICAL

11    EXAMINATION OR ANY KIND OF TESTS.

12              AND SO I FILED THAT WHEN MY MEDICATION WAS

13    DISCONTINUED ON THE 27TH OF SEPTEMBER.  I JUST, THE PAIN AND

14    DISCOMFORT I WAS EXPERIENCING, IT HAS GONE DOWNHILL FROM THERE.

15              AND WHAT HAPPENED WAS IN RESPONSE TO MY -- I KEPT

16    SEEING RISENHOOVER IN OCTOBER OF 2006 AND NOVEMBER OF 2006, AND

17    I WOULD DETAIL TO HER, HEY, THIS IS NOT WORKING.  I AM IN

18    SERIOUS PAIN.  IT IS EFFECTING ME ON MY DAILY ACTIVITIES.  I AM

19    NOT ABLE TO SLEEP.  THE NERVE PAIN STARTED -- SEE, WHAT

20    HAPPENED WAS, WHEN I WAS GETTING THAT TRAMADOL AND THE PHYSICAL

21    THERAPY AND ALL THAT, AND MY ARM BRACE, THE NERVE PAIN THAT IT

22    RETURNED BACK IN LIKE 2001, HAD WENT AWAY.  THE NUMBNESS HAD

23    WENT AWAY.  ALL THAT WAS WORKING GOOD.  WHEN ALL THAT STUFF GOT

24    STOPPED, THE NERVE PAIN HAS RETURNED.  THE NUMBNESS IN BOTH OF

25    MY FINGERS HAS RETURNED.

```
 1          SO I DETAILED ALL THAT TO RISENHOOVER.  AND SHE
 2    WOULD JUST TELL ME, HEY, YOU'VE GOT NSAIDS.  YOU'VE GOT A
 3    CHOICE.  AND, YOU KNOW, YOU CAN HAVE -- YOU WANT TO TRY OTHER
 4    KIND OF NSAIDS?
 5          I TOLD HER I TRIED THEM.  SHE TRIED OTHER ONE
 6    NAPROXEN.  THAT JUST MADE MY STOMACH WORSE, WHICH IS DOCUMENTED
 7    BACK IN THE '90S AS CAUSING THAT.  SO ANYHOW, IN MY RESPONSE TO
 8    MY MOTION FOR THAT PROTECTIVE ORDER IN SEPTEMBER, THE
 9    MAGISTRATE ORDERED DEFENDANTS TO RESPOND.
10          MR. ANDRADA:  WELL, YOUR HONOR --
11          THE COURT:  DON'T TALK ABOUT WHAT THE COURT DID,
12    JUST TALK ABOUT WHAT DR. SAYRE DID.
13          MR. ASHKER:  OKAY.
14          WELL, DR. SAYRE SUBMITTED A DECLARATION ON
15    NOVEMBER 11TH, 2006 IN -- OKAY.
16          MR. ANDRADA:  EXCUSE ME, YOUR HONOR.  IT SEEMS TO ME
17    THAT IF HE IS GOING TO DISCUSS THE DECLARATION, THAT PERHAPS
18    THE MORE APPROPRIATE WAY TO DO IT WOULD BE TO ADDRESS IT TO
19    DR. SAYRE DURING --
20          THE COURT:  IT'S AN ADMISSION OF PARTY OPPONENT.  IT
21    IS NOT HEARSAY.
22          IT IS AN EXCEPTION TO THE HEARSAY RULE, AND IT WILL
23    BE ALLOWED.
24          MR. ANDRADA:  THANK YOU, YOUR HONOR.
25          MR. ASHKER:  NOW, ON NOVEMBER 11TH, 2006, DR. SAYRE
```

1    RESPONDED TO MY DECLARATION OF SEPTEMBER 24TH, WHERE I VERY

2    SPECIFICALLY DESCRIBED HOW I WAS DRESSED, HOW I WAS SHACKLED,

3    THE WHOLE SCENARIO ON THAT VISIT, WHICH I DESCRIBED TO YOU

4    PREVIOUSLY.

5              IN HIS DECLARATION, HE STATES THAT AT SOME POINT IN

6    TIME PRIOR TO SEPTEMBER 2006, HE HAD A CONSULTATION WITH

7    MAUREEN MCLEAN WHO WAS THE HEALTH CARE MANAGER AT THAT TIME,

8    HIS SUPERVISOR, ALTHOUGH SHE'S A FAMILY NURSE PRACTITIONER AND

9    HE'S A DOCTOR, BUT ANYHOW, AND HE STATES VERY SPECIFICALLY HE

10   DECIDED TO DISCONTINUE USE OF MY TRAMADOL.  IT WAS HIS

11   PROFESSIONAL MEDICAL OPINION THAT MY CONTINUED USE OF THE

12   MEDICATION WAS UNSAFE, UNNECESSARY, AND UNWISE, ALTHOUGH I HAD

13   BEEN ON THAT MEDICATION FOR 4.9 YEARS UP TO THE POINT OF HIM

14   STOPPING IT, AND IT HAD BEEN PRESCRIBED AND AUTHORIZED BY OVER

15   13 DIFFERENT MEDICAL DOCTORS --

16             **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR, OBJECTION.

17   IT'S ARGUMENTATIVE.  HE ESSENTIALLY COVERED THAT PART OF THE

18   TREATMENT.  IT IS CUMULATIVE AS WELL.

19             **THE COURT:**  OKAY.  JUST GO ON WITH WHAT YOU WANTED

20   TO SAY ABOUT WHAT DR. SAYRE SAID.

21             **MR. ASHKER:**  OKAY.

22             WELL, DR. SAYRE, IN HIS DECLARATION, DID NOT

23   RESPOND.  HE DID NOT DISPUTE MY -- HE DID NOT DISPUTE MY

24   DESCRIPTION OF WHAT OCCURRED DURING THAT AUGUST 30TH, 2006

25   VISIT REGARDING HIS LACK OF PHYSICAL, WHAT I DESCRIBED AS A

1    SHAM EXAMINATION.

2            **MR. ANDRADA:**  I AM SORRY, YOUR HONOR, AGAIN, EXCUSE

3    ME.  IT SOUNDS LIKE ARGUMENT.  UNFORTUNATELY, I DO NOT HAVE THE

4    DECLARATION RIGHT HERE IN FRONT OF ME.  WE HAVE GOT OCEANS AND

5    OCEANS OF DOCUMENTS.  IF HE IS ARGUING FROM IT -- IF HE WANTS

6    TO READ PART OF IT, I UNDERSTAND THAT MIGHT BE A LOT MORE

7    APPROPRIATE.

8            **THE COURT:**  OKAY.  THAT'S ALL RIGHT.

9            **MR. ANDRADA:**  AS OPPOSED TO JUST PARAPHRASING OR

10   SAYING WHAT IS NOT THERE.

11           THANK YOU VERY MUCH, YOUR HONOR.

12           **MR. ASHKER:**  OKAY.

13           **THE COURT:**  OKAY.

14           **MR. ASHKER:**  DR. SAYRE'S DECLARATION, HE STATED THAT

15   THE DECISION OF HIS DISCONTINUATION OF THE TRAMADOL MEDICATION

16   WAS BASED ON PHYSICAL THERAPY REPORTS, REPORTS INDICATING THAT

17   MY GRIP STRENGTH WAS NORMAL FOR A MAN MY AGE, AND VIDEOTAPES

18   SHOWING ME USING MY HAND AND ARM IN ACTIVITIES WHICH

19   CONTRADICTED MY COMPLAINTS OF PAIN AND DISABILITY.  HE ALSO

20   CLAIMED THAT HE HAD CONVERSATIONS WITH THE PHYSICAL THERAPIST

21   AND REVIEWED MY MEDICAL RECORDS.

22           ALL OF THE ABOVE CLAIMS ARE PROVEN FALSE.

23           **MR. ANDRADA:**  YOUR HONOR --

24           **THE COURT:**  THAT IS ARGUMENTATIVE.

25           **MR. ANDRADA:**  -- THAT IS ARGUMENTATIVE NOW.

```
 1              THE COURT:  I WILL STRIKE THAT.

 2              MR. ASHKER:  OKAY, WELL, CAN I SAY LIKE WHAT MY --

 3    WHAT THE PHYSICAL THERAPY REPORT ACTUALLY SHOWED?

 4              THE COURT:  YES, BUT I THINK WE WILL TAKE A BREAK AT

 5    THIS POINT.

 6              MR. ANDRADA:  AND THEN, YOUR HONOR, MAY I, BEFORE WE

 7    GO ANY FURTHER, CAN WE TALK ABOUT THE VIDEOCONFERENCING FROM

 8    PELICAN BAY SCHEDULE?

 9              THE COURT:  THAT'S WHY I AM TAKING THE BREAK.

10              MR. ANDRADA:  THANK YOU.

11              THE COURT:  IT IS 10:20.  WE WILL BREAK UNTIL 10:35.

12              WE HAVE A COUPLE OF WITNESSES WHO WILL BE TESTIFYING

13    BY VIDEO FROM PELICAN BAY RATHER THAN COMING DOWN HERE, COUPLE

14    OF INMATES AND A COUPLE OF DOCTORS.  WE ARE NOT GOING TO MAKE

15    THEM COME DOWN HERE.  WE ARE HOPING THIS IS GOING TO WORK.  WE

16    WILL TRY AND SET IT UP OVER THE BREAK.  WE WILL TAKE IT OUT OF

17    ORDER JUST TO MAKE SURE WE CAN GET IT DONE.  SO IF IT WORKS, WE

18    WILL INTERRUPT MR. ASHKER FOR A WHILE AND TAKE THIS VIDEOTAPE

19    TESTIMONY.  IF IT DOESN'T WORK, WE WILL GO BACK TO MR. ASHKER.

20              WE WILL BREAK UNTIL 10:35.

21              MR. ANDRADA:  THANK YOU, YOUR HONOR.

22              THE COURT:  GO AHEAD AND TRY AND GET THAT GOING FOR

23    US.

24              MR. ASHKER:  YOUR HONOR?

25              MR. ANDRADA:  I UNDERSTAND IT IS IN THE WORKS.
```

1          **THE COURT:**  IF YOU WANT TO TALK, WE WILL WAIT UNTIL

2    THEY LEAVE.

3          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4          **THE COURT:**  YES, SIR.

5          **MR. ASHKER:**  YOUR HONOR, WERE YOU ABLE TO SELECT A

6    PORTION OF THAT --

7          **THE COURT:**  NOT YET.  I WILL DO THAT.

8          DID YOU HAVE SOMETHING ON YOUR MIND?

9          NO, OKAY.

10         **MR. ANDRADA:**  WELL, MAY I --

11         **THE COURT:**  NOT TO SOLICIT PROBLEMS.  IF YOU DON'T

12   HAVE A PROBLEM, I WILL LEAVE.

13         **MR. ANDRADA:**  MAY I FLOAT AN IDEA?

14         **THE COURT:**  OKAY.

15         **MR. ANDRADA:**  IT MIGHT EXPEDITE MATTERS IF DOCTOR --

16   WELL, I WILL WITHDRAW THE SUGGESTION.  IT IS ALL RIGHT.  WE

17   WILL JUST STUMBLE -- I WAS THINKING OF PUTTING DR. SAYRE ON

18   BEFORE I CROSS-EXAMINE MR. ASHKER BECAUSE, FRANKLY, I THINK,

19   WITH ALL DUE RESPECT TO MR. ASHKER, PERHAPS THIS HAS NOT BEEN

20   THE MOST EFFICIENT USE OF THE COURT'S TIME.  I AM WONDERING IF

21   WE CAN EXPEDITE MATTERS IF WE PUT DR. SAYRE ON, BUT IT'S JUST

22   AN IDEA, YOUR HONOR.

23         **THE COURT:**  I DON'T THINK THAT'S SUCH A GOOD IDEA.

24   BUT WHAT I DO THINK IS A GOOD IDEA IS TO TAKE DR. SAYRE ON

25   DIRECT FIRST AND THEN LET MR. ASHKER CROSS HIM, RATHER THAN TRY

1    TO HAVE HIS NARRATIVE COME OUT ON CROSS FIRST AND THEN DIRECT.

2    THAT, I THINK, WOULD BE A GOOD IDEA.

3                IF MR. ASHKER IS IN AGREEMENT WITH THAT AND YOU ARE,

4    I THINK THAT WOULD HELP A LOT.  AS TO PUTTING IT IN THE MIDDLE

5    OF MR. ASHKER'S TESTIMONY, NO, I DON'T THINK THAT WOULD HELP

6    MATTERS ANY.

7                **MR. ANDRADA:**  I WILL RAISE THAT MATTER WITH

8    DR. SAYRE THEN, YOUR HONOR.  THANK YOU VERY MUCH.

9                **THE COURT:**  OKAY.

10                   (RECESS TAKEN AT 10:22 A.M.)

11                 (PROCEEDINGS RESUMED AT 10:38 A.M.)

12                **THE COURT:**  SO, DO WE HAVE A WITNESS?

13                GO AHEAD.

14                **THE CLERK:**  ALL RISE.

15                (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

16                **THE COURT:**  PLEASE BE SEATED.  I THINK WE ARE GOING

17    TO HAVE WHAT, ONE OF THE INMATE WITNESSES?

18                **MR. ASHKER:**  MR. TROXELL WILL BE FIRST.

19                **THE COURT:**  OKAY.  SO WE ARE GOING TO CALL A

20    GENTLEMAN BY THE NAME OF DANNY TROXELL WHO IS AN INMATE.

21                ARE YOU MR. TROXELL?

22                **THE WITNESS:**  YES.

23                **THE COURT:**  CAN YOU STAND UP OR IF YOU CAN RAISE

24    YOUR RIGHT HAND.  DO IT, IF YOU CAN.

25                **THE CLERK:**  CAN YOU RAISE YOUR RIGHT HAND, SIR?  CAN

1    YOU STAND?

2              **THE COURT:**  NO, THAT'S ALL RIGHT.  HE DOESN'T HAVE

3    TO STAND.  THAT'S ALL RIGHT.

4              **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

5                        **DANNY TROXELL**,

6    CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

7    TESTIFIED AS FOLLOWS VIA VIDEOCONFERENCE:

8              **THE WITNESS:**  YES.

9              **THE CLERK:**  WOULD YOU PLEASE STATE YOUR NAME --

10             **THE WITNESS:**  YES.

11             **THE CLERK:**  WOULD YOU PLEASE STATE YOUR NAME

12   SPELLING YOUR LAST NAME FOR THE RECORD.

13             **THE WITNESS:**  DANNY TROXELL, T-R-O-X-E-L-L.

14             **THE COURT:**  THERE IS A DELAY.  IT'S NOT A PAUSE,

15   THERE IS A DELAY WHEN THE SOUND GOES BACK AND FORTH.

16             OKAY.  SO YOU CAN ASK THE QUESTIONS YOU WOULD LIKE,

17   MR. ASHKER.

18                   **DIRECT EXAMINATION**

19   **BY MR. ASHKER:**

20   **Q.**   GOOD MORNING, MR. TROXELL.

21   **A.**   MORNING.

22   **Q.**   CAN YOU PLEASE STATE YOUR AGE?

23   **A.**   56.

24   **Q.**   AND WHERE ARE YOU FROM?

25   **A.**   FRESNO, CALIFORNIA.

TROXELL – DIRECT / MR. ASHKER

1    **Q.**    AND WHERE --

2    **A.**    FRESNO, CALIFORNIA.

3    **Q.**    WHERE DO YOU RESIDE AT NOW?

4    **A.**    PELICAN BAY SHU.

5    **Q.**    HOW LONG HAVE YOU BEEN INCARCERATED?

6    **A.**    OVER 30 YEARS.

7    **Q.**    HOW LONG HAVE YOU BEEN IN PELICAN BAY SHU?

8    **A.**    SINCE DECEMBER 27TH, 1999.

9    **Q.**    HOW MANY FELONIES HAVE YOU BEEN CONVICTED OF?

10   **A.**    MAYBE EIGHT.

11   **Q.**    OKAY.

12   **A.**    I DON'T REMEMBER THE NUMBER.

13   **Q.**    ALL RIGHT.  DO YOU KNOW ME?

14   **A.**    YES.

15   **Q.**    AND HOW DO YOU KNOW ME?

16   **A.**    I MET YOU IN THE LAW LIBRARY ONE TIME BACK IN THE EARLY

17   '90S.

18   **Q.**    AND AFTER THAT POINT, WAS THERE SOME POINT IN TIME WHERE

19   YOU SUBMITTED A REQUEST TO DOUBLE-CELL WITH ME?

20   **A.**    YES.  I SUBMITTED A REQUEST FOR A DOUBLE CELL IN MID 2003.

21   **Q.**    OKAY.  AND IN RESPONSE TO THAT REQUEST, WHAT HAPPENED?

22   **A.**    IT WAS INITIALLY DENIED.  THEN ABOUT A WEEK LATER, I WAS

23   ASKED TO GO TO ASSOCIATE WARDEN O'NEILL'S OFFICE IN RESPONSE TO

24   A REQUEST, DOUBLE-CELL REQUEST.

25   **Q.**    OKAY.  AND WAS I THERE ALSO?

TROXELL – DIRECT / MR. ASHKER

1    **A.**    YEAH, YOU ARRIVED ABOUT THE SAME TIME.

2    **Q.**    OKAY.  AND WE HAD A MEETING WITH ASSOCIATE WARDEN O'NEILL

3    AT THAT TIME; IS THAT CORRECT?

4    **A.**    YES, THAT'S CORRECT.

5    **Q.**    AND DURING THAT MEETING, DID O'NEILL MENTION MY MEMORANDUM

6    REQUESTING A REASONABLE ACCOMMODATION TO BE ALLOWED TO CELL UP

7    WITH YOU SO THAT YOU COULD ASSIST ME WITH MY DAILY ACTIVITIES?

8          **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  IT'S HEARSAY.

9    IT'S NOT RELEVANT FOR OUR PURPOSES.  403 SHOULD APPLY AS WELL.

10         **THE COURT:**  WELL, IT'S RELEVANT -- WELL, I GUESS WE

11   CAN STRIKE WHY IT HAPPENED.  THE POINT IS THAT IT DID.

12         **MR. ASHKER:**  OKAY.

13   **BY MR. ASHKER:**

14   **Q.**    AT THAT POINT OF THAT MEETING, WHAT DID ASSOCIATE WARDEN

15   O'NEILL DO?

16   **A.**    HE HAD YOUR MEMORANDUM IN HIS HAND AND HE TOLD US THAT HE

17   WAS GOING TO ALLOW US TO DOUBLE-CELL IN RESPONSE TO YOUR

18   REQUEST FOR ASSISTANCE IN DAILY ACTIVITIES.

19   **Q.**    OKAY.  DID YOU KNOW ANYTHING ABOUT MY DISABILITY OR NEED

20   FOR ASSISTANCE?

21   **A.**    NO.  THAT WAS THE FIRST TIME I HEARD ABOUT IT.

22   **Q.**    PRIOR TO THAT, YOU HAD HEARD ABOUT ME BEING SHOT IN

23   PELICAN BAY BACK IN 1990, CORRECT?

24   **A.**    CORRECT.  I DIDN'T KNOW THE EXTENT OF YOUR INJURIES.

25   **Q.**    OKAY.

1   **A.**   I DIDN'T KNOW OF YOUR INJURIES.

2   **Q.**   OKAY.  WHEN WERE WE ABLE TO DOUBLE-CELL?

3   **A.**   I BELIEVE THE NEXT DAY AFTER SEEING O'NEILL.  IT WAS ON

4   THE 25TH OF JULY, 2003.

5   **Q.**   OKAY.  AND YOU MOVED OVER TO MY CELL, CORRECT?

6   **A.**   CORRECT.

7   **Q.**   CAN YOU DESCRIBE HOW MY CELL -- THE CONDITION OF MY CELL

8   WHEN YOU MOVED IN THAT DAY?

9   **A.**   YEAH.  IT WAS PRETTY MESSY, CLUTTERED, DIRTY, FLOOR WAS

10   DIRTY, WALLS, SINK AND TOILET.  I HAD TO MOVE THINGS AROUND TO

11   FIND A SPOT TO SIT.

12   **Q.**   AND AT THAT TIME, DID I SHOW YOU THE CONDITION OF MY ARM?

13   **A.**   YES, YOU DID.  YOU SHOWED ME HOW MESSED UP IT WAS.

14   **Q.**   CAN YOU DESCRIBE ANYTHING THAT STANDS OUT IN YOUR MIND?

15   **A.**   YES.  IT LOOKED CROOKED, ALL DENTED, SCARRED.  IT LOOKED

16   PRETTY BAD.

17   **Q.**   DID I DEMONSTRATE TO YOU ANY LIMITATIONS THAT I HAD WITH

18   MY RANGE OF MOTION IN THE ARM AREA OR HAND?

19   **A.**   YES, YOU DID.  YOU SHOWED ME YOUR LIMITED RANGE OF MOTION

20   IN YOUR WRIST, THUMB AND INDEX FINGER, AND YOUR INABILITY TO

21   ROTATE YOUR FOREARM.

22   **Q.**   OKAY.  DID YOU EVER OBSERVE ME HAVING PROBLEMS WITH

23   WRITING?

24   **A.**   YES.  YOU SHOWED ME THE DIFFICULTY YOU HAD WITH WRITING

25   AND THE PAIN IT CAUSED YOU TO DO IT.

TROXELL – DIRECT / MR. ASHKER

1   **Q.**   DID YOU EVER EXAMINE MY ARM AFTER I HAD BEEN WRITING FOR A

2   WHILE?

3   **A.**   YES, I DID.  YOU SHOWED ME THE TENDONS IN YOUR FOREARM,

4   HOW IT WOULD BE ALL SWOLLEN UP, AND I WOULD TOUCH IT TO FEEL

5   HOW KNOTTY, KNOTTED UP IT WOULD BE.

6   **Q.**   AND DID YOU EVER -- DID YOU HAVE SOMETHING ELSE?

7   **A.**   NO.

8   **Q.**   OKAY.

9            DID YOU EVER OBSERVE ME RINGING WATER OUT OF TOWELS

10  OR THERMALS, OR THINGS OF THAT NATURE?

11  **A.**   YES.  WHEN I FIRST MOVED IN, YOU DEMONSTRATED HOW HARD IT

12  WAS FOR YOU TO RING OUT WATER FROM WET TOWELS AND CLOTHING.

13  **Q.**   DID I APPEAR TO BE IN ANY DISTRESS WHEN I WAS DOING THAT

14  ACTIVITY?

15  **A.**   YES, YOU WERE.  YOU WERE.

16  **Q.**   OKAY.  NOW, AT THAT POINT WHEN I DEMONSTRATED THESE THINGS

17  TO YOU, DID YOU AGREE TO ASSIST ME WITH SOME OF MY DAILY

18  ACTIVITIES?

19  **A.**   YES, I DID.  IT WAS NO PROBLEM.

20  **Q.**   OKAY.  NOW, WHAT ACTIVITIES WOULD YOU ASSIST ME WITH?

21  **A.**   I WOULD KEEP THE FLOOR, WALLS, BUNK, SINK AND TOILET

22  CLEANED ON A DAILY BASIS.  I WOULD MOP UP THE WATER AFTER A

23  BIRD BATH.  I WOULD WASH YOUR CLOTHES TWO OR THREE TIMES A

24  WEEK, WHENEVER WAS NEEDED.  I WOULD ASSIST YOU IN YOUR WRITING

25  ACTIVITIES.

1    Q.   OKAY.  NOW, WHY WERE YOU ASSISTING ME WITH THESE THINGS?

2    A.   IT WAS NO BIG THING TO ME.  I DID ALL THAT MYSELF ANYWAY,

3    WHETHER I HAD A CELLIE OR NOT.  IT WAS JUST A LITTLE BIT OF

4    ADDED ACTIVITY ON A DAILY BASIS, AND IT WAS NOTHING.

5    Q.   OKAY.

6    A.   YOU WAS GOING TO HELP ME OUT ON SOME LEGAL MATTERS, SHOW

7    ME HOW TO -- FIGURE OUT HOW TO DO THE LAW AND STUFF.

8    Q.   ALL RIGHT.  CAN YOU DESCRIBE WHAT YOUR MAIN DAILY

9    ACTIVITIES ARE?

10   A.   I --

11          MR. ANDRADA:  SORRY.

12          THE COURT:  I AM SORRY?

13          WHY HIS?

14          MR. ANDRADA:  WHAT IS THE RELEVANCE OF THAT?

15          MR. ASHKER:  WHAT I AM TRYING TO ESTABLISH HERE,

16   YOUR HONOR, IS THAT IN THE CONDITIONS THAT I AM IN, WHAT THE

17   DAILY ACTIVITIES ARE.

18          THE COURT:  HOW ABOUT IF HE DESCRIBES YOUR DAILY

19   ACTIVITIES.

20          MR. ASHKER:  OKAY.

21          THE COURT:  ARE YOU TRYING TO SHOW WHAT YOU COULD

22   DO --

23          MR. ASHKER:  WHAT I AM TRYING TO ESTABLISH IS THAT

24   IN THE SHU ENVIRONMENT, WHAT BASICALLY ALL THE -- MOST OF THE

25   INMATES THAT I KNOW, INCLUDING MYSELF, WHAT OUR NORMAL DAILY

1    ACTIVITIES ARE.

2            **THE COURT:**  OKAY.  WHY DON'T YOU ASK HIM TO DO IT IN

3    TERMS OF WHAT HE OBSERVED OF YOUR NORMAL DAILY ACTIVITIES.

4    **BY MR. ASHKER:**

5    Q.   OKAY.

6            MR. TROXELL, CAN YOU DESCRIBE WHAT YOU OBSERVED WITH

7    MY NORMAL DAILY ACTIVITIES IN GENERAL DURING THE TIME PERIOD

8    THAT WE SHARED A CELL?

9    A.   BESIDES A LITTLE BIT OF WRITING, EXERCISING, WATCHING TV,

10   READING, STUFF LIKE THAT?

11   Q.   OKAY.  NOW, HOW LONG DID WE SHARE A CELL?

12   A.   ALMOST A YEAR, SHY OF A MONTH OR SO.  FROM JULY 25TH, 2003

13   UNTIL JUNE 9TH, 2004.

14   Q.   OKAY.

15           NOW, DURING THE TIME THAT WE SHARED A CELL, WHEN YOU

16   FIRST MOVED IN, CAN YOU DESCRIBE WHAT MY DEMEANOR WAS?

17   A.   YES.  YOU HAD ALL YOUR DIFFICULTIES OF WRITING, AND SLEEP

18   DEPRIVATION, AND INABILITY TO FOCUS AND CONCENTRATE.  YOU

19   SEEMED TO BE AGITATED A LOT.

20   Q.   ARE YOU TALKING ABOUT WHEN YOU FIRST MOVED IN THE CELL?

21   A.   YES.

22           **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR, OBJECTION.  HE

23   IS LEADING THE WITNESS.

24           **THE COURT:**  OVERRULED.

25

1   **BY MR. ASHKER:**

2   **Q.**   OKAY.  HOW LONG DID WE SHARE THE CELL?

3   **A.**   I HAVE THE DATE WHEN WE SPLIT UP WRONG.  WE SPLIT UP

4   JULY 8TH OF 2004.  SO IT WAS BETWEEN JULY 25TH, 2003 TO

5   JUNE 8TH OF 2004.

6   **Q.**   OKAY.  AND WHEN THEY SPLIT US UP, WHERE DID I END UP?

7   **A.**   THEY MOVED YOU OUT OF THE BLOCK TO ANOTHER SECTION.

8   **Q.**   OKAY.

9         EXCUSE ME I DIDN'T CATCH THAT LAST PART.

10  **A.**   FOR ONE DAY.

11  **Q.**   THEN WHAT HAPPENED?

12  **A.**   WELL, THEY SAID, THE REASON THEY SAID THEY SPLIT US UP WAS

13  BEHIND SAFETY AND SECURITY REASONS TO COVER UP WHAT WE BELIEVE

14  WAS RETALIATORY.

15  **Q.**   OKAY.

16          **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.

17          **THE COURT:**  YOUR OBJECTION IS SUSTAINED.  WE WILL

18  STRIKE THE ANSWER.  GO ON.

19  **BY MR. ASHKER:**

20  **Q.**   OKAY.  MR. TROXELL, WHERE DID I END UP -- DID I END UP IN

21  THE CELL NEXT DOOR TO YOU?

22  **A.**   YES.  THE NEXT DAY THEY MOVED MY NEIGHBOR OUT AND MOVED

23  YOU IN NEXT DOOR.

24  **Q.**   AND WERE WE INVOLVED IN LITIGATION?

25  **A.**   YES.  WE FILED SEVERAL 602'S REGARDING CONDITIONS OF --

1    WHAT HAPPENED?  EXCUSE ME?

2    **Q.**   IT'S NOT NECESSARY FOR YOU TO STATE WHAT THEY WERE ABOUT.

3    I JUST WANTED TO ESTABLISH --

4                   (UNINTELLIGIBLE VOICE ON VIDEOCONFERENCE.)

5                   **THE COURT:**  THAT IS NOT HIS VOICE.

6                   **MR. ASHKER:**  THAT'S FINE, DANNY --

7                   **THE COURT:**  NO.

8                   **MR. ASHKER:**  NO, NO.  OKAY.

9    **BY MR. ASHKER:**

10   **Q.**   EXCUSE ME, DANNY, THERE IS VARIOUS RESTRICTIONS ABOUT WHAT

11   TESTIMONY AND THIS AND THAT.  WE DON'T NEED THE DETAILS, JUST

12   THE FACT THAT WE WERE INVOLVED IN VARIOUS LITIGATION

13   ACTIVITIES, CORRECT?

14   **A.**   CORRECT.

15   **Q.**   OKAY.  AND YOU -- OKAY.  AND AT SOME POINT YOU WERE

16   APPOINTED AS MY WRITING ASSISTANT; IS THAT CORRECT?

17   **A.**   THAT'S CORRECT.

18   **Q.**   NOW, DURING THE TIME PERIOD THAT WE SHARED A CELL, DID

19   YOUR -- THE ASSISTANCE THAT YOU PROVIDED TO ME, DID THAT

20   INTERFERE WITH YOUR OWN DAILY ACTIVITIES?

21   **A.**   SOMETIMES MY WRITING AND DRAWING ACTIVITIES.

22   **Q.**   AND SO WHEN THEY SEPARATED US, YOU WERE APPOINTED MY

23   WRITING ASSISTANT.  CAN YOU -- DO YOU RECALL WHEN THAT WAS THAT

24   YOU WERE APPOINTED AS MY WRITING ASSISTANT?

25   **A.**   DECEMBER OF 2004.

TROXELL – DIRECT / MR. ASHKER

1    **Q.**    OKAY.  CAN YOU DESCRIBE HOW YOU WOULD PROVIDE THAT

2    ASSISTANCE TO ME WHEN WE WERE IN THE CELL NEXT DOOR TO EACH

3    OTHER?

4    **A.**    YES.  WE WOULD DO IT VIA THE VENT THAT WAS ADJOINING OUR

5    CELLS.

6    **Q.**    OKAY.

7    **A.**    SOMETIMES WE WOULD COMMUNICATE.  YOU WOULD COMMUNICATE TO

8    ME WHAT NEEDED TO BE DONE, AND I WOULD WRITE IT DOWN.

9    **Q.**    OKAY.  GO AHEAD.

10   **A.**    SOMETIMES YOU WOULD WRITE OUT ROUGH DRAFTS FOR ME TO WORK

11   FROM, AND I WOULD COMMUNICATE CLARIFICATIONS ON SOME OF THE

12   WORDS AND SENTENCES AND WHATNOT THROUGH THE VENT.

13   **Q.**    NOW, IN THOSE VENTS RIGHT THERE, ARE THOSE VENTS CONNECTED

14   TO OTHER PRISONERS' CELLS?

15   **A.**    YES, THEY ARE.  TWO CELLS ABOVE US.

16   **Q.**    OKAY.  AND WOULD OUR COMMUNICATIONS BE HEARD BY THE OTHER

17   CELL OCCUPANTS ABOVE US?

18   **A.**    YES, IT WOULD BE.

19   **Q.**    OKAY.

20          IS THERE, IN THE PELICAN BAY SHU IN THE POD AREA, IS

21   THERE KIND OF LIKE WHAT I CAN SAY WOULD BE A FUNNY ACOUSTICAL

22   ISSUES?

23              **MR. ANDRADA:**  OBJECTION, RELEVANCE, 403.

24              **THE COURT:**  WHAT IS THE RELEVANCE OF THIS?

25              **MR. ASHKER:**  THE RELEVANCE IS, YOUR HONOR, WHAT I

1   DESCRIBED IN MY OPENING STATEMENT, ON OUR COMMUNICATION LIKE

2   MR. TROXELL AND I WERE RIGHT NEXT DOOR TO EACH OTHER, AND A LOT

3   OF TIMES WHEN HE SPEAKS IN A NORMAL VOICE, IT IS HARD FOR ME TO

4   HEAR HIM, WHILE ON THE OTHER TIMES, SOMEBODY ON THE UPPER TIER

5   DOWN THE TIER TWO CELLS AWAY WILL SPEAK IN A NORMAL VOICE AND

6   IT WILL BE LIKE BOOMING, LIKE YELLING.

7          AND THE POINT IS, YOU KNOW, PEOPLE IN THE POD WERE

8   ALL THERE TOGETHER AND COMMUNICATING VERBALLY OVER THE TIER FOR

9   ASSISTANCE OR THROUGH THE VENT IS, IT'S A HARDSHIP, IT DISTURBS

10  PEOPLE, AND IT IS DIFFICULT.  THAT'S WHAT I WAS TRYING TO

11  ESTABLISH.

12          **THE COURT:**  MAYBE SO, BUT I AM NOT SURE HOW THAT'S

13  RELEVANT TO THE ISSUE OF THE MEDICATION AND THE THERAPY AIDES,

14  AND SO FORTH.

15          **MR. ASHKER:**  WELL, THE THING IS AS FAR AS THE

16  ASSISTANCE WITH MY WRITING, BECAUSE THAT IS A MAIN CAUSE OF MY

17  PAIN AND DISCOMFORT, AND THE CIRCUMSTANCES OF OUR ASSISTANT IS

18  SUCH THAT -- I WAS LEADING UP TO IT -- ABOUT NOW IT BASICALLY

19  CONSISTS OF ME DOING ROUGH DRAFTS AND HIM RECOPYING IT SO IT IS

20  NEAT.

21          BASICALLY HE IS ASSISTING ME WITH BEING ABLE TO FILE

22  NEAT BRIEFS, BUT I AM STILL HAVING TO DO ALL THAT.  AND THE

23  RELEVANCE IS THE PAIN AND DISCOMFORT THAT CAUSES ME, AND THE

24  MEDICATION NOT BEING EFFECTIVE.

25          **THE COURT:**  SO YOU ARE SAYING YOU HAVE TO WRITE THAT

1    WAY BECAUSE IF YOU COMMUNICATE VERBALLY, OTHER PEOPLE CAN HEAR

2    IT?

3            **MR. ASHKER:**  NO, IT'S JUST BOTHERSOME AND STANDING

4    UP ON THE STOOL AND LEANING OVER ACROSS EVERYTHING.

5            **THE COURT:**  OKAY.  IT IS MARGINALLY RELEVANT, SO I

6    SUGGEST YOU MOVE THROUGH IT RATHER QUICKLY.

7    **BY MR. ASHKER:**

8    **Q.**   MR. TROXELL, HAS IT BECOME A HARDSHIP FOR YOU TO PROVIDE

9    ASSISTANCE WITH ME THROUGH COMMUNICATIONS OVER THE TIER,

10   THROUGH THE VENT VERBALLY?

11           **MR. ANDRADA:**  IT IS NOT RELEVANT, YOUR HONOR, 403,

12   HARDSHIP FOR MR. TROXELL.

13           **THE COURT:**  OVERRULED.

14   **BY MR. ASHKER:**

15   **Q.**   YOU CAN ANSWER.

16   **A.**   IT'S TIME-CONSUMING.  I TRY TO WORK IT IN, BUT IT IS.

17   BECAUSE I HAVE MY OWN WRITING THAT I DO, DRAWING, AND OTHER

18   DAILY ACTIVITIES, BUT I WORK IT IN.

19   **Q.**   BUT MY QUESTION WAS, IS IT -- HAS IT BECOME A HARDSHIP

20   FOR -- WELL, STRIKE THAT.  I AM NOT GOING TO EVEN GET INTO ALL

21   THAT.

22           OKAY.  SINCE WE HAVE BEEN SEPARATED AND I HAVE BEEN

23   BACK IN THE SINGLE CELL ON MY OWN SINCE DECEMBER -- JUNE OF

24   2004, HAS IT -- HAVE YOU OBSERVED ME HAVING ANY PROBLEMS?

25   **A.**   ALL THE TIME.

TROXELL – DIRECT / MR. ASHKER

1    **Q.**   CAN YOU DESCRIBE?

2    **A.**   YES.  YOU ARE ALWAYS COMPLAINING ABOUT YOUR ARM PAIN,

3    DIFFICULTIES IN KEEPING THE CELL CLEAN, WASHING, RINGING OUT

4    YOUR CLOTHES, LACK OF SLEEP.  YOU STATED MANY TIMES OVER THE

5    COURSE OF THE LAST THREE YEARS THAT YOU ONLY GET ONE TO THREE

6    HOURS OF SLEEP AT NIGHT FOR THREE OR FOUR DAYS A WEEK.  ALWAYS

7    COMPLAINING TO NUMEROUS --

8            **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.  THIS IS --

9    IT'S HEARSAY AND IT WOULD NOT BE AN EXCEPTION.  SO WE

10   RESPECTFULLY OBJECT IT THIS.

11           **THE COURT:**  PRESENT SENSE IMPRESSION?

12           **MR. ANDRADA:**  WELL --

13           **THE COURT:**  PRESENT PHYSICAL CONDITION?

14           **MR. ANDRADA:**  HE IS SIMPLY REPEATING STATEMENTS MADE

15   BY THE PLAINTIFF.

16           **THE COURT:**  RIGHT, BUT THERE IS AN EXCEPTION FOR

17   PRESENT SENSE EXCEPTION.

18           LET ME JUST CHECK IT.

19           8033 I THINK WOULD APPLY, SO I WILL OVERRULE THE

20   OBJECTION.

21   **BY MR. ASHKER:**

22   **Q.**   DID YOU OBSERVE ANY CHANGE IN MY DEMEANOR WHEN I WAS ON

23   ELAVIL MEDICATION?

24           **MR. ANDRADA:**  NO FOUNDATION, YOUR HONOR, AS TO

25   WHEN -- AS TO WHETHER MR. TROXELL KNOWS WHEN HE WAS ON ELAVIL

1    MEDICATION.

2              **THE COURT:** WHY DON'T YOU --

3              **MR. ANDRADA:** NO FOUNDATION.

4              **THE COURT:** REPHRASE THE QUESTION.

5    **BY MR. ASHKER:**

6    Q.   MR. TROXELL, AFTER WE SEPARATED AND THEY SINGLE-CELLED ME,

7    DID YOU EVER HEAR ABOUT ME BEING ON ELAVIL MEDICATION?

8              **MR. ANDRADA:** INAPPROPRIATE HEARSAY, YOUR HONOR.

9              **THE COURT:** I GUESS WHAT YOU WILL HAVE TO DO IS ASK

10   THE DATES AND YOU CAN SAY WHEN YOU WERE ON ELAVIL AND WHEN YOU

11   WEREN'T.

12             **MR. ASHKER:** ASK THE DATES?

13             **THE COURT:** HE CAN'T -- THE ONLY WAY HE COULD KNOW

14   WHETHER YOU WERE ON ELAVIL IS IF YOU TOLD HIM.  THAT'S HEARSAY.

15             **MR. ASHKER:** OKAY.

16             **THE COURT:** YOU CAN ASK HIM ABOUT HOW DID I SEEM IN

17   THIS TIME FRAME, AND THEN LATER YOU CAN TESTIFY THAT DURING

18   THAT TIME FRAME YOU WERE ON ELAVIL, AND THEN IN ARGUMENT YOU

19   CAN TIE THOSE TWO TOGETHER.

20             **MR. ASHKER:** OKAY.

21   **BY MR. ASHKER:**

22   Q.   MR. TROXELL, DURING THE TIME PERIOD OF JUNE OF 2007 TO

23   OCTOBER 2007, DID YOU NOTICE ANY CHANGE IN MY DEMEANOR?

24   A.   YES, I DID.

25   Q.   CAN YOU DESCRIBE THE CHANGE THAT YOU -- THE CHANGE THAT

1    YOU OBSERVED?

2    **A.**   I OBSERVED YOU BEING VERY AGITATED.

3    **Q.**   OKAY.  ANYTHING ELSE?

4    **A.**   YES.  YOU WAS HAVING PROBLEMS WITH YOUR VISION.

5    **Q.**   AND I TOLD YOU THAT?

6    **A.**   YES.

7    **Q.**   OKAY.

8    **A.**   BUT I HAVE SEEN AGITATION MYSELF PERSONALLY.

9    **Q.**   OKAY.

10   **A.**   A FEW INTERACTIONS WITH STAFF AND OTHER INMATES ON THE

11   TIER.

12          **MR. ANDRADA:**  OBJECTION, MOVE TO STRIKE,

13   NONRESPONSIVE.

14          **THE COURT:**  ALL RIGHT.  WE WILL STRIKE THAT.

15   **BY MR. ASHKER:**

16   **Q.**   OKAY.

17          HAVE I MENTIONED TO YOU EXPERIENCING MORE PAIN AND

18   DISCOMFORT IN MY ARM SINCE WE WERE SEPARATED AND I HAVE BEEN

19   SINGLE CELLED SINCE JUNE OF 2006?

20          **MR. ANDRADA:**  HE IS LEADING, YOUR HONOR.  I WOULD

21   AGAIN RESPECTFULLY SUGGEST 403 SHOULD APPLY IF IT IS AT ALL

22   RELEVANT.

23          **THE COURT:**  WELL, IT IS SOMEWHAT LEADING, BUT UNDER

24   THESE DIFFICULT CIRCUMSTANCES, I THINK IT IS EASIER TO ALLOW IT

25   SO.

1              YOU MAY ANSWER.

2    **BY MR. ASHKER:**

3    **Q.**   YOU CAN ANSWER.

4    **A.**   COULD YOU REPEAT THE QUESTION?

5    **Q.**   COULD THE REPORTER READ IT BACK, PLEASE?

6              (QUESTION READ.)

7              **THE WITNESS:**  YES.

8    **BY MR. ASHKER:**

9    **Q.**   OKAY.

10   **A.**   CAN I ELABORATE ON THAT?

11             **THE COURT:**  NO, JUST WAIT FOR THE QUESTION.

12             **MR. ASHKER:**  NO, YOU HAVE TO WAIT FOR A QUESTION.

13   **BY MR. ASHKER:**

14   **Q.**   CAN YOU DESCRIBE ANY SPECIFIC OCCASIONS OF MY COMPLAINTS

15   OF PAIN AND DISCOMFORT SINCE THEY SINGLE-CELLED ME?

16   **A.**   YES.  YOU WERE HAVING TO WRITE A LOT MORE.  YOU WOULD

17   COMPLAIN ABOUT DISCOMFORT AND PAIN OF HAVING TO DO THAT.  PLUS

18   YOU WOULD SHOW ME, SOMETIMES I WOULD COME BY AND YOU WOULD SHOW

19   ME THE DISCOLORATION IN YOUR HAND AFTER PROLONGED WRITING.

20   **Q.**   OKAY.  HAVE YOU NOTICED ANYTHING -- HAVE YOU OBSERVED ANY

21   RASH AREAS ON MY BODY SINCE THEY SINGLE-CELLED ME?

22             **MR. ANDRADA:**  OBJECTION, RELEVANCE, 403.

23             **THE WITNESS:**  YES, I DID.

24             **THE COURT:**  THAT HAD TO DO WITH HIS INABILITY TO

25   WASH HIS CLOTHES.  HE TESTIFIED ABOUT THAT.  THAT IS OVERRULED.

1    **BY MR. ASHKER:**

2    **Q.**    YOU MAY ANSWER.

3    **A.**    YES, I DID OBSERVE RASHES ON YOUR BODY.

4    **Q.**    COULD YOU STATE WHERE YOU OBSERVED THESE RASHES?

5    **A.**    ONE WAS COVERING YOUR CALF ON YOUR LEFT LEG.  ONE WAS

6    MIDDLE OF YOUR LOWER BACK, AND ON YOUR FACE, PARTICULARLY ON

7    YOUR LEFT LOWER EYELID.

8    **Q.**    OKAY.  HAVE YOU--

9          **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS.  THANK

10   YOU, MR. TROXELL.

11         **THE COURT:**  THE OTHER ATTORNEY HAS SOME QUESTIONS

12   FOR YOU.  CAN HE SEE YOU OR WHAT IS HE SEEING?

13         **MR. ANDRADA:**  I DON'T KNOW, YOUR HONOR.

14         **THE COURT:**  YOUR PERSON KNOWS.  WOULD YOU ASK HIM?

15         WHY DON'T YOU STAND WHERE HE CAN SEE YOU SO HE KNOWS

16   WHO IS ASKING HIM QUESTIONS.

17         **VIDEO PERSON:**  RIGHT NOW WHAT WE CAN SEE IN HERE IS

18   WE CAN SEE THE BENCH.  WE CAN NOW SEE MR. ANDRADA RIGHT NOW.

19         **THE COURT:**  OKAY, GOOD.  SORRY, HE WILL BE IN

20   BETWEEN YOU, AND THAT IS AWKWARD, TOO.

21         **MR. ANDRADA:**  I APOLOGIZE.

22         **THE COURT:**  IS THERE ANY PLACE HE COULD STAND WHERE

23   HE WOULDN'T BE BLOCKING THE JURY'S VIEW BUT YET --

24         **MR. LAURIE:**  HE CAN STAND BETWEEN THE PODIUM AND

25   YOURSELF, OR THERE.

1          **VIDEO PERSON:**  WE CAN NOW SEE HIM AND WE CAN SEE THE

2    JURY.  HE DOESN'T SEEM TO BE BLOCKING ANYTHING.

3          **THE COURT:**  OKAY.

4                         **CROSS-EXAMINATION**

5    BY MR. ANDRADA:

6    **Q.**  ALL RIGHT, MR. TROXELL.  FIRST OF ALL, CAN YOU HEAR ME,

7    SIR?

8    **A.**  YES, I CAN HEAR YOU.

9    **Q.**  ALL RIGHT.

10          YOU, I GATHER, ARE -- YOU CONSIDER MR. ASHKER TO BE

11    ONE OF YOUR BEST FRIENDS, CORRECT?

12    **A.**  YES.

13    **Q.**  AND, IN FACT, HE IS YOUR BEST FRIEND AT PELICAN BAY; ISN'T

14    THAT TRUE?

15    **A.**  HE IS ONE OF MY BEST FRIENDS.

16    **Q.**  ALL RIGHT.  AND HE -- YOU TOLD US THAT HE HAD HELPED YOU

17    ON VARIOUS LEGAL MATTERS; ISN'T THAT RIGHT?

18    **A.**  THAT'S CORRECT.

19    **Q.**  AND THAT WOULD INCLUDE 602'S; IS THAT CORRECT?

20    **A.**  THAT'S CORRECT.

21    **Q.**  ON HOW MANY 602'S HAS MR. ASHKER HELPED YOU, SIR?

22    **A.**  QUITE A FEW.

23    **Q.**  WELL, SIR, CAN YOU GIVE ME YOUR BEST ESTIMATE?  MORE THAN

24    TEN?

25    **A.**  I WOULD SAY SO.  MORE THAN TEN.

1    **Q.**    MORE THAN 20?

2    **A.**    PROBABLY PRETTY CLOSE TO THAT NUMBER.

3    **Q.**    MORE THAN 25?

4    **A.**    NO, I DON'T THINK SO.  PROBABLY CLOSE TO 20.

5    **Q.**    HOW MANY 602'S HAVE YOU FILED OVER THE YEARS?

6    **A.**    MAYBE 30.

7    **Q.**    AND MR. ASHKER HAS HELPED YOU IN LITIGATION; IS THAT TRUE?

8    **A.**    THAT'S TRUE.

9    **Q.**    IN HOW MANY DIFFERENT LAWSUITS HAS MR. ASHKER HELPED YOU,

10   MR. TROXELL?

11   **A.**    JUST ONE.

12   **Q.**    AND, IN FACT, THE TWO OF YOU WERE PLAINTIFFS TOGETHER;

13   ISN'T THAT RIGHT?

14   **A.**    THAT'S RIGHT.

15   **Q.**    AND YOU WOULD HELP MR. ASHKER WRITE THE BRIEFS THAT HAD TO

16   DO WITH VARIOUS ISSUES IN HIS CASES OVER THE YEARS; ISN'T THAT

17   RIGHT?

18   **A.**    THAT'S RIGHT.

19   **Q.**    AND THEN HE IN TURN WOULD PROVIDE YOU WITH LEGAL HELP IN

20   CONNECTION WITH YOUR MATTERS; ISN'T THAT TRUE?

21   **A.**    YES.

22   **Q.**    NOW, YOU INDICATED THAT YOU BECAME HIS CELLMATE IN JULY OF

23   2003; IS THAT CORRECT?

24   **A.**    THAT'S CORRECT.

25   **Q.**    HANG ON.  LET ME GET JUST A LITTLE WATER HERE.

1             AND YOU TOLD US THAT DURING THE TIME THAT YOU WOULD

2    BE DOUBLE-CELLED, THAT MR. ASHKER WOULD SPEND HIS TIME WRITING,

3    CORRECT?

4    **A.**   YES.

5    **Q.**   READING, CORRECT?

6    **A.**   CORRECT.

7    **Q.**   WATCHING TELEVISION IN THE CELL; IS THAT CORRECT?

8    **A.**   CORRECT.

9    **Q.**   AND EXERCISING, CORRECT?

10   **A.**   YES.

11   **Q.**   AND HE WOULD EXERCISE IN HIS CELL; ISN'T THAT TRUE?

12   **A.**   THAT'S TRUE.

13   **Q.**   YOU ALSO KNEW HE WOULD GO OUT TO WHAT'S CALLED THE YARD

14   AND EXERCISE THERE AS WELL, CORRECT?

15   **A.**   WALK AROUND.

16   **Q.**   AND WHEN YOU WOULD EXERCISE IN HIS CELL, HE WOULD DO

17   SQUATS AMONG OTHER THINGS; ISN'T THAT TRUE?

18   **A.**   THAT IS TRUE.

19   **Q.**   AND HE WOULD WORK OUT WITH HIS EQUIPMENT, ISN'T THAT TRUE,

20   THE BAND AND THE THERA-BALL, CORRECT?

21   **A.**   YES.

22   **Q.**   AND HE WOULD DO ARM EXERCISES, CORRECT?

23   **A.**   YEAH.  WELL, WHATEVER HE DID WITH THE BAND, PULLED ON IT,

24   DID DIFFERENT THINGS WITH IT.

25   **Q.**   DID YOU EVER SEE HIM DO PUSH-UPS?

1    A.    NO.

2    Q.    HE'S TOLD YOU THAT HE WAS ABLE TO DO PUSH-UPS IN HIS CELL;

3    ISN'T THAT CORRECT?

4    A.    NO.

5    Q.    DID HE EVER –– DID YOU EVER LOOK AT HIS RIGHT HAND?

6    A.    YES.

7    Q.    DID YOU SEE THAT THERE WAS A DEFORMITY OF THE RIGHT HAND?

8    A.    YES.

9    Q.    HE TOLD YOU HOW HE GOT THAT DEFORMITY, CORRECT?

10   A.    CORRECT.

11   Q.    HE BROKE A COUPLE OF KNUCKLES WHILE HE WAS DOING PUSH-UPS

12   IN HIS CELL; ISN'T THAT WHAT HE TOLD YOU?

13   A.    NO.

14   Q.    WHAT DID HE TELL ––

15   A.    I KNEW ––

16   Q.    SAY AGAIN?

17   A.    I KNEW HE HAD A KNUCKLE INJURY, BUT I DIDN'T KNOW WHAT IT

18   WAS FROM.

19   Q.    OKAY.

20         NOW, YOU WERE TOGETHER FOR 11 MONTHS, FROM JULY OF

21   '03 TO JUNE OF '04; IS THAT CORRECT?

22   A.    THAT'S CORRECT.

23   Q.    SO I ASSUME YOU HAVE A PRETTY GOOD IDEA OF MR. ASHKER'S

24   CHARACTER; IS THAT CORRECT?

25   A.    THAT'S CORRECT.

1    Q.   IN YOUR OPINION, IS HE AN HONEST MAN?

2    A.   YES, HE IS.

3              MR. ASHKER:   OBJECTION.  I DON'T SEE THE RELEVANCE

4    OF GETTING INTO CHARACTER.  THAT IS NOT AT ISSUE RIGHT NOW.

5              THE COURT:   I CAN'T REMEMBER THE RULE.  I THINK YOU

6    CAN ONLY BRING IT UP IF IT IS BROUGHT UP BY THE OTHER SIDE

7    FIRST.  THE ANSWER IS THAT HE IS HONEST, SO I DON'T --

8              MR. ASHKER:   RIGHT.

9              THE COURT:   -- KNOW IF THERE IS ANY HARM IN THAT.

10   BUT IF YOU ARE PLANNING ON GOING ANY FURTHER WITH HIM, I WILL

11   HAVE TO LOOK UP THE RULE.

12             MR. ANDRADA:   WHY DON'T WE MOVE ON AND COME BACK TO

13   IT LATER, JUDGE.

14             THE COURT:   ALL RIGHT.

15   BY MR. ANDRADA:

16   Q.   MR. TROXELL, YOU SAID THAT MR. ASHKER -- LET ME MAKE SURE

17   I HAVE THIS STRAIGHT.

18             YOU SAID THAT DURING THE TIME -- EXCUSE ME, THAT

19   IMMEDIATELY PRIOR TO JULY OF '03, THAT MR. ASHKER, TO YOUR

20   UNDERSTANDING, HAD BEEN SUFFERING FROM SLEEP DEPRIVATION,

21   CORRECT?

22   A.   WHAT WAS THE DATE AGAIN THAT YOU MENTIONED?

23   Q.   LET'S GO BACK.  YOU BECAME HIS CELLMATE IN JULY OF '03; IS

24   THAT CORRECT?

25   A.   THAT'S CORRECT.

TROXELL – CROSS / MR. ANDRADA

1    Q.   ALL RIGHT.

2         YOU TOLD US, I THINK, THAT PRIOR TO THAT TIME,

3    IMMEDIATELY PRIOR TO THAT TIME, YOU NOTICED THAT HE WAS

4    SUFFERING FROM SLEEP DEPRIVATION.

5         DID I UNDERSTAND YOUR TESTIMONY CORRECTLY?

6    A.   PRIOR TO JULY OF '03 I ONLY MET ASHKER ONE TIME IN THE LAW

7    LIBRARY.

8    Q.   ALL RIGHT.  SO IS IT YOUR TESTIMONY THEN THAT YOU HAVE NO

9    KNOWLEDGE AS TO WHETHER HE SUFFERED FROM SLEEP DEPRIVATION OR

10   INABILITY TO FOCUS OR WAS AGITATED PRIOR TO YOUR BECOMING HIS

11   CELLMATE IN JULY OF '03?

12   A.   THAT'S CORRECT.

13   Q.   ALL RIGHT.

14        SO IT WAS DURING THE TIME THAT YOU WERE HIS CELLMATE

15   THAT YOU NOTICED THAT HE SUFFERED FROM SLEEP DEPRIVATION; IS

16   THAT CORRECT?

17   A.   YES, THAT'S CORRECT.  AND BEYOND.

18   Q.   AND HE HAD AN INABILITY TO FOCUS DURING THAT TIME; IS THAT

19   CORRECT?

20   A.   WELL, IT WAS MAINLY AFTER WE SPLIT UP.

21   Q.   WELL, IT WAS --

22   A.   THAT HE COMPLAINED --

23   Q.   DIDN'T YOU TESTIFY THAT IT WAS DURING THE TIME THAT YOU

24   WERE HIS CELLMATE THAT HE HAD AN INABILITY TO FOCUS?

25        **MR. ASHKER:**  OBJECTION, MISSTATES THE TESTIMONY.

1          **THE COURT:**  WELL, OVERRULED.  HE CAN SAY WHETHER

2    THAT IS WHAT HE SAID OR NOT.

3          **THE WITNESS:**  YES.  I WOULD GO TO BED AT

4    10:00 O'CLOCK AT NIGHT AND HE WOULD BE UP PRETTY MUCH FOR HOURS

5    AFTERWARDS FROM LACK OF SLEEP.

6    **BY MR. ANDRADA:**

7    Q.   AND HE HAD AN INABILITY TO FOCUS DURING THAT TIME.  TRUE?

8    A.   WHEN -- YES, WHEN HIS PAIN BECAME SEVERE.

9    Q.   AND HE WAS AGITATED DURING THAT TIME.  TRUE?

10   A.   NO.  NO, HE JUST COMPLAINED A LOT FROM THE DIFFICULTY OF

11   WRITING AND THE PAIN THAT IT CAUSED HIM.

12   Q.   SO, LET'S MAKE SURE WE HAVE THIS.

13         DURING THE TIME THAT YOU WERE HIS CELLMATE, YOU

14   TALKED ABOUT THE SLEEP DEPRIVATION AND AN INABILITY TO FOCUS,

15   CORRECT?  RIGHT?

16   A.   YES, BEHIND HIS -- CORRECT.

17   Q.   AND THAT WAS --

18         **MR. ANDRADA:**  I AM SORRY.  IT'S DIFFICULT TO FOLLOW

19   HERE.

20   **BY MR. ANDRADA:**

21   Q.   AND THAT WAS DURING THE TIME THAT HE TOOK TRAMADOL; ISN'T

22   THAT RIGHT?

23   A.   YES, THAT'S BECAUSE TRAMADOL ONLY LASTED FOR A FEW HOURS.

24   Q.   AND SO THEN WHEN THEY MOVED YOU APART, THAT WAS IN -- LET

25   ME MAKE SURE I HAVE THIS -- IN JUNE OF '04; IS THAT CORRECT?

TROXELL – CROSS / MR. ANDRADA

1    **A.**    THAT'S CORRECT.

2    **Q.**    ALL RIGHT.

3           AND YOU CONTINUED TO ASSIST YOUR FRIEND, MR. ASHKER,

4    AFTER YOU TWO SEPARATED AND SPECIFICALLY YOU HELPED HIM WITH

5    HIS WRITING, CORRECT?

6    **A.**    THAT'S CORRECT.

7    **Q.**    NOW, YOU MENTIONED THAT VERY SPECIFICALLY BETWEEN JUNE OF

8    '07 AND OCTOBER OF '07 THAT THERE WAS SOME CHANGE IN HIS

9    DEMEANOR; IS THAT CORRECT?

10   **A.**    THAT'S CORRECT.

11   **Q.**    AND SO HOW WOULD YOU KNOW THAT THERE WOULD BE A CHANGE IN

12   HIS DEMEANOR?  IN OTHER WORDS, WOULD YOU LEARN THAT THROUGH

13   TALKING TO HIM?

14   **A.**    YES.  AND HIS INTERACTIONS WITH OTHER PRISONERS AND STAFF.

15   **Q.**    AND THAT DEMEANOR IMPROVED AND HAS BEEN ABSOLUTELY

16   APPROPRIATE SINCE OCTOBER OF 2007; IS THAT YOUR TESTIMONY?

17   **A.**    COULD YOU REPEAT THAT AGAIN?

18   **Q.**    SURE.  THE REPORTER CAN READ IT BACK I THINK.

19           (QUESTION READ BACK.)

20   **A.**    NO, I DIDN'T KNOW IT HASN'T IMPROVED.

21   **Q.**    SO HE REMAINS AGITATED AFTER OCTOBER 2007 IN ESSENTIALLY A

22   SIMILAR WAY THAT HE WAS AGITATED PRIOR TO THAT DATE; IS THAT

23   YOUR TESTIMONY?

24   **A.**    AFTER HE GOT OFF OF ELAVIL, THE AGITATION WASN'T AS

25   SEVERE.

1    Q.   SO --

2    A.   HE WAS STILL AGITATED.

3    Q.   HE REMAINED AGITATED THEREAFTER; IS THAT TRUE?

4    A.   YES, BUT NOT AS SEVERE AS WHEN HE WAS ON ELAVIL.

5         MR. ANDRADA:   ALL RIGHT, SIR.   I THINK THAT IS ALL I

6    HAVE.   THANK YOU VERY MUCH.

7         MR. ASHKER:   BRIEFLY I WOULD LIKE TO REDIRECT?

8         THE COURT:   ALL RIGHT.

9                    REDIRECT EXAMINATION

10   BY MR. ASHKER:

11   Q.   MR. TROXELL, WHEN WE WERE DOUBLE-CELLED, WAS I ALLOWED TO

12   USE THE BAND IN THE CELL WHILE YOU WERE IN THE CELL?

13   A.   IN WHAT YEAR?

14   Q.   WHEN WE WERE DOUBLE-CELLED, FROM JULY --

15   A.   YES.

16   Q.   OKAY.

17   A.   YES, YOU WERE ABLE TO USE THE BAND IN THE CELL.

18   Q.   OKAY.   AND YOU OBSERVED ME -- WERE YOU IN THE CELL AT THE

19   SAME TIME WHEN I WAS USING THE BAND?

20   A.   SOMETIMES.

21   Q.   OKAY.

22   A.   SOMETIMES YOU WOULD USE IT WHEN I WAS OUT ON THE YARD.

23   Q.   AND I SHOWED YOU THE EXERCISES THAT I WOULD DO, RIGHT?

24   A.   YES, YOU DEMONSTRATED THE EXERCISES YOU WOULD DO.

25   Q.   DID THAT ABILITY TO USE THE BAND AND BALL, DID THAT APPEAR

TROXELL – REDIRECT / MR. ASHKER

1  TO YOU TO BE BENEFICIAL TO ME?

2  **A.**   YES.  YES, IT WAS.

3  **Q.**   OKAY.

4          NOW, WHILE WE WAS IN THE CELL TOGETHER WHEN YOU

5  FIRST MOVED IN, FROM THE TIME PERIOD THAT YOU FIRST MOVED IN TO

6  THE TIME PERIOD THAT THEY SEPARATED US WHILE WE WAS

7  DOUBLE-CELLED, DID YOU NOTICE AN IMPROVEMENT IN MY DEMEANOR AND

8  ALL THAT AFTER YOU HAD MOVED IN THE CELL AND BEGAN ASSISTING

9  ME?

10 **A.**   YES.  I DID NOTICE AN IMPROVEMENT IN YOUR OVERALL

11 APPEARANCE OF ATTITUDE, MENTAL STATE, AND HEALTH.

12 **Q.**   DID I, EVEN WHEN YOU WAS IN THE CELL WITH ME, I WOULD

13 STILL WRITE ALMOST EVERY DAY; IS THAT CORRECT?

14 **A.**   YES.  YOU WOULD WRITE ALMOST EVERY DAY.  YOU HAD

15 CORRESPONDENCE AND PERSONAL LETTERS, WHATNOT TO DO.

16 **Q.**   NOW, WHILE YOU -- DID YOU EVER -- DID I EVER ASK YOU TO

17 ASSIST ME WITH WRITING TO MY WIFE?

18 **A.**   YES.

19 **Q.**   OKAY.

20 **A.**   YES, YOU HAVE.

21 **Q.**   AND HOW OFTEN HAS THAT BEEN?

22 **A.**   I CAN'T RECALL, BUT IT WAS A FEW TIMES.

23 **Q.**   A FEW TIMES OUT OF THE LAST FOUR OR FIVE YEARS THAT WE

24 HAVE BEEN AROUND EACH OTHER, RIGHT?

25 **A.**   YEAH.  I DID SO MUCH WRITING FOR YOU ON DIFFERENT THINGS

TROXELL − REDIRECT / MR. ASHKER

1    IT IS HARD TO RECALL HOW MANY.

2    **Q.**   OKAY.

3          NOW, WHEN WE WERE IN THE CELL, WOULD I, DID I EVER

4    MENTION TO YOU THAT THE TRAMADOL WAS ONLY EFFECTIVE FOR PART OF

5    THE, PART OF EACH DAY?

6    **A.**   CORRECT.

7    **Q.**   OKAY.

8    **A.**   IT WAS ONLY FOR A FEW HOURS EACH DAY.

9    **Q.**   DID I EVER TELL YOU THAT I WAS WAKING UP EARLY IN THE

10   MORNING BECAUSE THE MEDICATION HAD WORN OFF AND I WAS WAITING

11   FOR THEM TO BRING IT AROUND THAT MORNING?

12          **MR. ANDRADA:**  WELL, YOUR HONOR −−

13          **THE COURT:**  THE OBJECTION IS SUSTAINED.

14          **MR. ANDRADA:**  THANK YOU.  THAT IS LEADING, NOT

15   RELEVANT.

16          **MR. ASHKER:**  OKAY.

17   **BY MR. ASHKER:**

18   **Q.**   OKAY.  YOU TESTIFIED THAT I STILL APPEARED AGITATED AFTER

19   I CAME OFF THE ELAVIL IN OCTOBER 2007, BUT IT WASN'T AS BAD.

20   HAVE I EVER TALKED TO YOU ABOUT BEING AGITATED AND FRUSTRATED

21   ABOUT THE MEDICAL CARE ISSUES THAT I AM DEALING WITH AGAINST

22   SAYRE AND RISENHOOVER?

23          **MR. ANDRADA:**  OBJECTION, HEARSAY.

24          **THE COURT:**  THAT IS HEARSAY.

25          **MR. ANDRADA:**  403.

1      **THE COURT:**  THERE IS AN EXCEPTION FOR A STATEMENT OF

2   IMMEDIATE FEELING, LIKE, OH MY GOSH THAT HURTS, OR SOMETHING

3   LIKE THAT.  BUT OTHERWISE, JUST SAYING, TELLING SOMEONE ELSE

4   FACTS, THEY CAN'T REPEAT THAT.  THAT IS HEARSAY.

5        SO HE CAN SAY WHAT HE OBSERVED AS TO YOUR CONDITION.

6   HE CAN SAY IF YOU MADE SOME IMMEDIATE COMPLAINT ABOUT HOW YOU

7   FELT RIGHT AT THAT MOMENT, BUT OTHERWISE, HE CAN'T TESTIFY TO

8   THINGS YOU TOLD HIM.

9        **MR. ASHKER:**  WELL, I'M NOT ASKING ABOUT WHAT I TOLD

10  HIM.  I AM ASKING -- HE HAD TESTIFIED IN RESPONSE TO

11  MR. ANDRADA'S QUESTION THAT I STILL APPEARED AGITATED --

12       **THE COURT:**  YOUR IMMEDIATE QUESTION WAS, DID I EVER

13  TALK TO YOU ABOUT.

14       **MR. ASHKER:**  OKAY.

15       **THE COURT:**  THAT IS WHAT DREW THE OBJECTION.  YOU

16  CAN ASK HIS OBSERVATIONS, BUT NOT WHAT YOU TOLD HIM ABOUT IT.

17       SO GO AHEAD AND ASK A DIFFERENT QUESTION.

18  **BY MR. ASHKER:**

19  **Q.**   OKAY.  MR. TROXELL, YOU TESTIFIED THAT I APPEARED AGITATED

20  EVEN AFTER I CAME OFF OF THE ELAVIL IN OCTOBER OF 2007, BUT IT

21  DIDN'T APPEAR TO BE AS AGITATED.  DO YOU KNOW --

22  **A.**   CORRECT.

23  **Q.**   DO YOU KNOW THE CAUSE OF THAT AGITATION?

24       **MR. ANDRADA:**  NO FOUNDATION.

25       **THE WITNESS:**  NO.

1          **THE COURT:**  NO, YOU CAN TESTIFY TO IT.

2          **MR. ASHKER:**  OKAY.

3          ALL RIGHT.

4  **BY MR. ASHKER:**

5  Q.   MR. TROXELL, HOW IMPORTANT IS IT -- CAN I -- DO I HAVE TO

6  LIMIT MY REDIRECT TO WHAT WAS PREVIOUSLY TESTIFIED TO?

7          **THE COURT:**  YOU DO IF THERE'S AN OBJECTION.

8  **BY MR. ASHKER:**

9  Q.   OKAY.  MR. TROXELL --

10          **MR. ANDRADA:**  IT'S COMING.

11  **BY MR. ASHKER:**

12  Q.   -- CAN YOU DESCRIBE THE IMPORTANCE OF KEEPING OUR CLOTHES

13  CLEAN IN SHU?

14          **MR. ANDRADA:**  OBJECTION, YOUR HONOR, BEYOND THE

15  SCOPE, RELEVANCE, 403.

16          **MR. ASHKER:**  HE TESTIFIED ABOUT HELPING ME WASH MY

17  LAUNDRY AND THE PROBLEMS THAT IT CAUSED ME.

18          **THE COURT:**  WHAT YOU ACTUALLY HAVE TO DO IS KEEP

19  YOUR REDIRECT WITHIN HIS CROSS.

20          **MR. ASHKER:**  ALL RIGHT.  OKAY.  I HAVE NOTHING

21  FURTHER.

22          **THE COURT:**  ANYTHING ELSE?

23          **MR. ANDRADA:**  I DON'T THINK SO, YOUR HONOR.  THANK

24  YOU.

25          **THE COURT:**  YOU ARE EXCUSED.  THANK YOU,

```
 1   MR. TROXELL.

 2            MR. ASHKER:  THANK YOU, MR. TROXELL.

 3            THE COURT:  IF IT IS CONVENIENT, WE CAN GO AHEAD

 4   WITH THE OTHER GENTLEMAN RIGHT NOW AND BE OVER.

 5            (PAUSE IN THE PROCEEDINGS.)

 6            IF IT IS GOING TO TAKE SOME TIME, WE CAN DO

 7   SOMETHING ELSE IN THE MEANTIME.

 8            MR. ASHKER:  THEY WILL BRING HIM IN RIGHT AWAY.

 9            THE COURT:  IS THIS GOING TO BE MR. PALOMINO?

10            MR. LAURIE:  THEY ARE BRINGING IN MR. PALOMINO RIGHT

11   NOW.

12            THE COURT:  THANK YOU.

13            MR. LAURIE:  THE LITIGATION COORDINATOR HERE IS

14   EXPLAINING TO MR. PALOMINO SOME OF THE DIFFICULTIES ABOUT

15   SOUND, YOUR HONOR, AND HE SHOULD BE IN DIRECTLY.

16            THE COURT:  OKAY.

17            MR. LAURIE:  CUSTODIAL STAFF WOULD LIKE TO RETURN

18   MR. TROXELL TO HIS CELL.  ANY REASON FOR HIM TO STAY?

19            THE COURT:  NO, HE CAN GO BACK.  THAT'S FINE.

20            (PAUSE IN THE PROCEEDINGS.)

21            MR. ASHKER:  YOUR HONOR, LIKE FOR QUESTIONING, LIKE

22   I AM HONESTLY NOT TRYING TO LEAD WITNESSES AND GET IN

23   INAPPROPRIATE STUFF.

24            THE COURT:  YOU'RE DOING FINE.  DON'T WORRY ABOUT

25   IT.
```

1          **MR. ASHKER:**  WHAT I WAS GOING TO ASK YOU IS, FOR

2    INSTANCE, ON THAT ISSUE THAT JUST CAME UP, AM I ALLOWED TO ASK

3    HIM ABOUT QUESTION PERTAINING TO HOW TO PROPERLY QUESTION

4    SOMEBODY?

5          **THE COURT:**  NOT REALLY.

6          **MR. ASHKER:**  ALL RIGHT.

7          **THE COURT:**  GIVE IT A TRY.  IF COUNSEL DOESN'T LIKE

8    IT, HE WILL OBJECT.

9          (PAUSE IN THE PROCEEDINGS.)

10          **THE COURT:**  DO WE KNOW WHAT IS GOING ON?

11          **MR. ANDRADA:**  I BELIEVE, YOUR HONOR, THAT THEY

12    ARE -- THEY HAVE TO GO NEXT DOOR -- I HAVE BEEN IN THAT ROOM --

13    THEY HAVE TO GO NEXT DOOR INTO A HOLDING CELL, BRING THE

14    PRISONER OUT.  SO THEY SHOULD BE HERE.

15          **VIDEO PERSON:**  HE IS COMING NOW.

16          **THE COURT:**  OKAY, GOOD.

17          YOU DON'T HAVE TO MAKE THEM STAND UP, SHEILAH.

18          **THE CLERK:**  WILL THE WITNESS PLEASE RAISE HIS RIGHT

19    HAND AS BEST YOU CAN.

20                    **ALFONSO PALOMINO,**

21    CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

22    TESTIFIED AS FOLLOWS VIA VIDEOCONFERENCE:

23          **THE WITNESS:**  YES.

24          **THE CLERK:**  PLEASE STATE YOUR FULL NAME FOR THE

25    RECORD SPELLING YOUR LAST NAME.

1              **THE WITNESS:**  ALFONSO PALOMINO, P-A-L-O-M-I-N-O.

2                          <u>**DIRECT EXAMINATION**</u>

3   **BY MR. ASHKER:**

4   **Q.**   GOOD MORNING, MR. PALOMINO.

5   **A.**   GOOD MORNING.

6   **Q.**   CAN YOU STATE HOW OLD YOU ARE?

7   **A.**   58 YEARS OLD.

8   **Q.**   OKAY.  AND WHERE ARE YOU FROM?

9   **A.**   I WAS BORN IN PITTSBURG, CALIFORNIA.

10  **Q.**   OKAY.

11  **A.**   1951.  APRIL 26.

12  **Q.**   WHERE DO YOU CURRENTLY RESIDE AT?

13  **A.**   IN PELICAN BAY SHU.

14  **Q.**   HOW LONG HAVE YOU BEEN IN PELICAN BAY SHU?

15  **A.**   SEVENTEEN YEARS.

16  **Q.**   OKAY.

17  **A.**   SINCE '92.

18  **Q.**   ALL RIGHT.  AND YOU HAVE BEEN CONVICTED OF HOW MANY

19  FELONIES?

20  **A.**   FOUR -- FIVE.

21  **Q.**   OKAY.  DO YOU KNOW ME FROM PELICAN BAY SHU?

22  **A.**   YES.  WE ARE IN THE SAME POD.

23  **Q.**   OKAY.

24  **A.**   AND I SEE YOU IN THERAPY.

25  **Q.**   YOU SAW ME BEFORE OVER IN PHYSICAL THERAPY?

1    A.    YES.   THAT IS WHEN I FIRST SAW YOU.

2    Q.    OKAY.   AND IN THE PELICAN BAY SHU POD WHERE WE'RE AT, DO

3    YOU CLEAN THE TIER?

4              MR. ANDRADA:   OBJECTION, YOUR HONOR, RELEVANCE, 403.

5              THE COURT:   OVERRULED.

6              THE WITNESS:   YES.

7    BY MR. ASHKER:

8    Q.    YOU ARE THE TIER TENDER IN THE POD; IS THAT CORRECT?

9    A.    YES.

10   Q.    AND BY "TIER TENDER", CAN YOU DESCRIBE WHAT YOU DO?

11   A.    I SWEEP, MOP, CLEAN THE SHOWERS, AND CLEAN THE SACK THAT

12   GOES OUTSIDE OF ALL THE CELLS.

13   Q.    HOW OFTEN DO YOU DO THAT?

14   A.    TWICE A WEEK.

15   Q.    ALL RIGHT.   AND WHEN YOU DO THAT, ARE YOU ABLE TO STAND IN

16   FRONT OF MY CELL AND TALK TO ME?

17   A.    YES, WHEN I HAVE TIME.

18   Q.    OKAY.   AND HOW --

19   A.    OFF AND ON.

20   Q.    DO YOU RECALL HOW LONG I HAVE BEEN IN THE SAME POD THERE

21   WITH YOU?

22   A.    I THINK YOU CAME AROUND IN 2005.   I AM NOT SURE, 2005 OR

23   '6.

24   Q.    OKAY.   AND --

25   A.    IT WAS THE BEGINNING OF 2006.

1    **Q.**    OKAY.

2    **A.**    I AM NOT TOO SURE.

3    **Q.**    HAVE I EVER SHOWN YOU MY RIGHT HAND OR ARM?

4    **A.**    MANY A TIMES.

5    **Q.**    CAN YOU, CAN YOU DESCRIBE --

6    **A.**    YES.  YOU HAVE NO FLEXIBILITY IN YOUR ARM.  ME AND YOU

7    HAVE HAD NUMEROUS CONVERSATIONS BECAUSE I HAD SURGERY ON MY

8    LEFT ARM --

9              **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.

10             **THE COURT:**  YOU JUST NEED TO ANSWER THE QUESTION AND

11   THEN STOP, AND HE WILL ASK ANOTHER QUESTION.

12             **MR. ANDRADA:**  I WOULD MOVE TO STRIKE.

13             **THE WITNESS:**  YES.

14             **THE COURT:**  OKAY.

15   **BY MR. ASHKER:**

16   **Q.**    OKAY.

17   **A.**    I SEEN YOUR ARM.

18   **Q.**    OKAY.  AND YOU ALSO HAD A PROBLEM WITH YOUR ARM; IS THAT

19   CORRECT?

20   **A.**    YES.  YES.

21   **Q.**    OKAY.  AND WE'VE HAD DISCUSSIONS ABOUT OUR ARM CONDITIONS

22   AND PROBLEMS RELATED THERETO; IS THAT CORRECT?

23   **A.**    YES.

24   **Q.**    HAVE YOU EVER SEEN ANY DISCOLORATION ON MY HAND?

25   **A.**    YES.

PALOMINO – DIRECT / MR. ASHKER

1    Q.    OKAY.  AND DO YOU KNOW WHAT CAUSED THAT DISCOLORATION?

2              MR. ANDRADA:  CALLS FOR SPECULATION, NO FOUNDATION,

3    HEARSAY, 403.

4              THE COURT:  SUSTAINED.

5    BY MR. ASHKER:

6    Q.    DID I HAVE A CONVERSATION WITH YOU ABOUT THE DISCOLORATION

7    IN MY HAND BEFORE?

8    A.    YES.

9    Q.    AND CAN YOU TELL US WHAT THAT CONVERSATION WAS?

10             MR. ANDRADA:  HEARSAY, YOUR HONOR, 403.

11             THE COURT:  SUSTAINED.

12   BY MR. ASHKER:

13   Q.    OKAY.  DID I EVER –– OKAY.  CAN YOU DESCRIBE HOW MY HAND

14   LOOKED WHEN YOU OBSERVED THE DISCOLORATION?

15             MR. ANDRADA:  VAGUE AND AMBIGUOUS AS TO TIME, YOUR

16   HONOR.

17             THE COURT:  OVERRULED.

18             MR. ANDRADA:  LAST YEAR?  TWO YEARS AGO?

19             THE WITNESS:  PURPLE.

20             THE COURT:  SOMETIME BETWEEN '06 AND NOW.

21             MR. ANDRADA:  OKAY.

22   BY MR. ASHKER:

23   Q.    YOU TESTIFIED THAT IT LOOKED A PURPLE COLOR?

24   A.    YES.  YES.

25   Q.    DO YOU REMEMBER WHEN THE LAST TIME WAS THAT I SHOWED YOU

1   MY HAND IN THAT CONDITION?

2   **A.**   A FEW WEEKS AGO, I THINK.  I AM NOT TOO SURE ABOUT THE

3   DATE.  BUT I SEE IT ALL THE TIME.  WE ARE ALWAYS TALKING UP

4   THERE.

5   **Q.**   NOW ARE YOU ON A NARCOTIC MEDICATION RIGHT NOW?

6            **MR. ANDRADA:**  OBJECTION, YOUR HONOR, RELEVANCE.

7            **THE COURT:**  SUSTAINED.

8            **MR. ANDRADA:**  403.

9            **MR. ASHKER:**  WELL, IN MY OFFER OF PROOF ON THIS

10  WITNESS, I HAD STATED ABOUT HIM INTERACTING WITH RISENHOOVER

11  ABOUT HIS MEDICATIONS AND SAYRE AND THAT IT IS RELEVANT IN THE

12  SENSE OF RELATED TO MY SAME INTERACTION.

13           **THE COURT:**  HE CAN TALK ABOUT HIS OBSERVATIONS OF

14  YOU.

15           **MR. ASHKER:**  OKAY.  ALL RIGHT.

16           OKAY.  THANK YOU, MR. PALOMINO.  I HAVE NO FURTHER

17  QUESTIONS.

18           **THE COURT:**  DO YOU HAVE ANY QUESTIONS?

19           **MR. ANDRADA:**  I MAY HAVE ONE OR TWO, YOUR HONOR.

20           (PAUSE IN THE PROCEEDINGS.)

21           **MR. ANDRADA:**  YOUR HONOR, I DON'T HAVE ANY QUESTIONS

22  OF THIS WITNESS.

23           **THE COURT:**  ALL RIGHT.

24           ALL RIGHT.  THAT'S ALL THEN.  THANK YOU,

25  MR. PALOMINO.  YOU ARE EXCUSED.

1      SO THAT IS ALL WE HAVE OF THE PELICAN BAY FOR TODAY?

2          **MR. ANDRADA:**  THAT IS CORRECT, YOUR HONOR.

3          **THE COURT:**  OKAY.  SO IF WE CAN TURN THIS THING OFF,

4   PLEASE.  AND THEN YOU CAN GO BACK TO YOUR OWN TESTIMONY UNLESS

5   YOU WERE FINISHED.

6          **MR. ASHKER:**  ALL RIGHT.

7          **THE COURT:**  ALL RIGHT.  MR. ASHKER WILL FINISH UP

8   HIS OWN TESTIMONY WHICH WE INTERRUPTED TO TAKE THESE WITNESSES.

9                **DIRECT EXAMINATION RESUMED**

10         **MR. ASHKER:**  PRIOR TO OUR BREAK, I WAS TALKING --

11  TESTIFYING ABOUT DR. SAYRE'S 11/11/06 DECLARATION AND HIS

12  DECISION TO DISCONTINUE MY MEDICATION, PHYSICAL THERAPY, ARM

13  BRACE AND THE BASIS FOR THAT DECISION WHERE HE HAD STATED THAT

14  IT WAS BASED ON PHYSICAL THERAPY REPORTS, CONVERSATIONS WITH

15  THE THERAPIST AND MEDICAL RECORD REVIEW AND OBSERVATIONS OF ME

16  ON YARD SURVEILLANCE VIDEOTAPE.

17         AND I WOULD LIKE TO SHOW THAT SECTION OF THE

18  VIDEOTAPE WHENEVER POSSIBLE.

19         **THE COURT:**  WE ARE WORKING ON IT.  WE HAVE TO GET A

20  VIDEOTAPE MACHINE IN HERE.  I HAVE SOMEBODY TRYING TO DO THAT.

21  IT'S ALMOST TIME TO DO THE NEXT BREAK, SO WE MIGHT BE ABLE TO

22  DO IT AFTER THE NEXT BREAK HOPEFULLY.

23         YOU CAN STOP WHENEVER YOU ARE FINISHED AND WE CAN

24  SHOW THE VIDEO WHEN WE GET TO IT.

25         **MR. ASHKER:**  I AM TRYING TO COLLECT MY THOUGHTS.

1          **THE COURT:**  OKAY.

2          **MR. ASHKER:**  YOUR HONOR?

3          **THE COURT:**  WHY DON'T WE TAKE A BREAK.  IT IS

4    QUARTER TO 12.  WE WILL BREAK UNTIL NOON.  AND WE WILL SEE IF

5    WE CAN GET THAT VIDEO TOGETHER.

6                    (RECESS TAKEN AT 11:45 A.M.)

7                 (PROCEEDINGS RESUMED AT 12:00 P.M.)

8          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

9          **THE COURT:**  I HAD MY LAW CLERK LOOK AT THE

10   VIDEOTAPE.  SHE SAID IT WAS PRETTY MUCH THE SAME ALL THROUGHOUT

11   AND IT DIDN'T MATTER WHICH FIVE MINUTES WE PICKED, SO WE WILL

12   PICK THE FIRST FIVE MINUTES.  AND I WILL FIRST EXPLAIN TO THE

13   JURY WHAT IT IS AND WHERE IT CAME FROM, AND THEN WE WILL PLAY

14   IT, AND THEN YOU CAN FINISH UP YOUR TESTIMONY.

15         **MR. ASHKER:**  OKAY.

16         **THE COURT:**  OKAY.  ARE YOU READY TO GO, RUMAR?

17         **THE CLERK:**  I CAN DO IT.

18         **THE COURT:**  OKAY.

19         **THE CLERK:**  ALL RISE.

20         **THE COURT:**  IS IT THE ONLY COPY?

21         **MR. ANDRADA:**  YOUR HONOR, I DON'T KNOW THE ANSWER.

22   IT'S THE ONLY ONE I HAVE.

23         **THE COURT:**  WE ARE GOING TO NEED TO KEEP IT IN THE

24   RECORDS.  I HATE IT TO BE THE ONLY ONE.  I WOULD LIKE TO MAKE

25   SOME ARRANGEMENT TO GET IT COPIED.

1          **MR. ANDRADA:**  I AM SURE WE CAN DISCUSS THAT.

2          **THE COURT:**  OKAY.

3          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

4          **THE COURT:**  PLEASE BE SEATED.

5          SO, JUST BY WAY OF EXPLANATION, MR. ASHKER WAS

6    MENTIONING THAT THERE WAS THIS DECLARATION THAT DR. SAYRE HAD

7    FILED WHICH REFERRED TO HAVING VIEWED A VIDEOTAPE OF MR. ASHKER

8    ON THE YARD.

9          MR. ASHKER ASKED THROUGH PROCEDURES THAT ARE ALLOWED

10   IN LITIGATION TO GET A COPY OF THAT VIDEOTAPE.  THE DEFENDANTS

11   PROVIDED TO THE COURT WHAT THEY REPRESENT IS THE VIDEOTAPE IN

12   QUESTION.

13         IT'S AN HOUR LONG.  WE ARE NOT GOING TO WATCH IT

14   ALL.  WE ARE GOING TO SHOW YOU WHAT I THINK IS JUST THE FIRST

15   FIVE MINUTES WHICH IS KIND OF A REPRESENTATIVE SAMPLE.  IF THE

16   DEFENDANT WANTED TO SHOW YOU SOMETHING ELSE ON IT, HE CERTAINLY

17   COULD, BUT THAT'S WHAT WE ARE GOING TO DO FOR NOW.

18         IT'S APPARENTLY JUST FROM THE TOP.  AND IT'S PRETTY

19   HARD TO SEE, BUT WHAT YOU ARE LOOKING AT IS A CAMERA FOCUSING

20   DOWN ON WHAT IS CALLED THE YARD WITH A PERSON WALKING AROUND,

21   AND APPARENTLY THAT PERSON IS MR. ASHKER.

22         SO, GO AHEAD AND PLAY ABOUT FIVE MINUTES SO YOU CAN

23   SEE THAT.

24         (VIDEOTAPE PLAYED.)

25         **THE COURT:**  OKAY.  I THINK THAT IS ENOUGH.

1        UNLESS THERE IS SOMETHING ELSE YOU WANT TO SHOW,

2   MR. ANDRADA.

3        **MR. ANDRADA:**  NO.

4        **THE COURT:**  YOU MAY RESUME YOUR TESTIMONY.

5   **BY MR. ASHKER:**

6   **Q.**   MR. ASHKER, YOU JUST OBSERVED THAT VIDEOTAPE.  CAN YOU

7   DESCRIBE TO THE JURY WHAT YOU ARE DOING THERE ON THE YARD?

8   **A.**   YES, I CAN.

9        I HAVE A SMALL PET FROG IN MY CELL.  AND WHEN I GO

10  OUT TO THE YARD -- IF WE WATCHED MORE OF THE TAPE, YOU WOULD

11  SEE I AM WALKING AROUND AND STANDING.  WHEN I FIRST GO OUT, I

12  USUALLY LOOK AROUND TO SEE IF I CAN FIND ANY LITTLE BUGS TO

13  FEED TO MY PET FROG THAT I HAVE IN MY CELL.  SO THAT'S WHAT I

14  WAS DOING RIGHT THERE.

15       I WAS NOT EXERCISING.  I DON'T EXERCISE ON THE YARD.

16  ALL I DO IS WALK OR STAND.  OTHER THAN WHAT YOU JUST HAPPENED

17  TO BE THAT PART RIGHT THERE WAS WHERE I AM TRYING TO FIND THE

18  LITTLE BUGS FOR MY FROG.

19       NOW, IN SAYRE'S DECLARATION, HE STATES THAT I WAS

20  NOT OBSERVED WEARING MY ARM BRACE ON THE YARD BECAUSE HIS

21  POSITION IS IS THAT I NO LONGER NEED THE ARM BRACE AND I WAS

22  NOT OBSERVED WEARING IT ON THAT VIDEOTAPE.

23       THE TAPE SPEAKS FOR ITSELF.  YOU CAN'T SEE WHETHER I

24  AM WEARING A BRACE OR NOT.

25       **MR. ANDRADA:**  EXCUSE ME.  A LOT OF THIS SOUNDS LIKE

ASHKER – DIRECT / MR. ASHKER

1    ARGUMENT, AND SO I'D ASK MR. ASHKER FROM HIS --

2              **THE COURT:**  SO IT IS ARGUMENT TO SAY YOU CAN'T SEE

3    THE ARM BRACE.  YOU CAN SAY THAT IN ARGUMENT.

4              **MR. ASHKER:**  OKAY.

5              **THE WITNESS:**  NOW, DR. SAYRE'S DECLARATION OF

6    11/11/06, WHEN I RECEIVED IT AND I READ IT ON WHAT HE CLAIMED

7    WAS THE REASON FOR HIS STOPPING MY MEDICATION, I RECOGNIZED

8    IMMEDIATELY THAT THE CLAIMS WERE FALSE.

9    **BY MR. ASHKER:**

10   **Q.**   HOW DO YOU MEAN THAT THE CLAIMS IN THE DECLARATION WAS

11   FALSE?

12   **A.**   WELL, I READ WHERE HE STATED THAT HIS DECISION WAS BASED

13   IN PART ON THE PHYSICAL THERAPY REPORTS.  AND THE FACT IS THAT

14   EVERY TIME THAT I SAW THE PHYSICAL THERAPIST, MR. DODGEN, WHEN

15   I WAS SEEING HIM BETWEEN 2002 AND 2007, I WOULD EXPLAIN TO HIM

16   THAT I WAS EXPERIENCING ONGOING PAIN AND DISCOMFORT FROM MY

17   DAILY ACTIVITIES AND THAT THE THERAPY WAS PARTIALLY HELPFUL,

18   TEMPORARILY -- WOULD PROVIDE TEMPORARY RELIEF.

19             AND THOSE PHYSICAL THERAPY REPORTS THAT I AM

20   REFERRING TO ARE ATTACHED AS EXHIBIT 170 RIGHT HERE.

21             HE ALSO CLAIMED THE BASIS OF IT WAS MY GRIP STRENGTH

22   WAS 50 POUNDS, WHICH WAS NORMAL, WHICH I TESTIFIED PREVIOUSLY

23   IS NOT EVEN HALF OF WHAT'S NORMAL.  AND IT'S ACTUALLY GONE DOWN

24   TO ABOUT 38 POUNDS SINCE -- IN THE -- SINCE DECEMBER OF 2002.

25             THE VIDEOTAPE DOESN'T SHOW ME REALLY DOING ANYTHING

ASHKER – DIRECT / MR. ASHKER

1   WITH MY RIGHT HAND.  YOU CAN'T EVEN SEE MY RIGHT HAND OR MY

2   PHYSIQUE OR HOW I AM BUILT.  IN HIS DECLARATION, DR. SAYRE GOES

3   INTO DETAILS ON AND ON ABOUT MY PHYSIQUE AND HOW HEALTHY I AM

4   AND IN BETTER PHYSICAL CONDITION THAN THE AVERAGE MAN OF MY

5   AGE.

6            BASED ON THOSE OBSERVATIONS ON VIDEOTAPE, DR. SAYRE

7   MADE STATEMENTS ABOUT WHAT TRAMADOL IS USED FOR AND PRESCRIBED

8   FOR.  AND THE REASON WHY THE 8/21/06 MAR COMMITTEE DISCONTINUED

9   IT WAS DEEP CONCERNS ABOUT ADVERSE EFFECTS OF MEDICATION USED

10  OVER A PERIOD OF YEARS.  THESE CONCERNS WERE CHARACTERIZED IN

11  THE 11/11/06 DECLARATION AS RISK OF SEIZURES.  TRAMADOL IS ONLY

12  FOR ACUTE SEVERE POST-OPERATIVE PAIN, FOR SHORT-TERM USE ONLY,

13  NOT FOR LONG-TERM CHRONIC PAIN, AND CONCERNS ABOUT DRUG

14  DEPENDENCY AND ADDICTION.

15           DR. SAYRE ALSO STATED IN THE 11/11/06 DECLARATION

16  THAT TRAMADOL WAS ABUSED BY INMATES AND NOT ON THE APPROVED

17  FORMULARY MEDICATIONS FOR THE INSTITUTION.

18           AND WHAT THAT IS, THEY HAVE A SET OF MEDICATIONS

19  THAT ARE APPROVED FORMULARY MEDICATIONS, AND THIS TRAMADOL WAS

20  NOT ON THAT LIST.  OKAY?

21           AND WHEN I READ THOSE THINGS, I -- MY RESPONSE --

22  Q.   WELL, WHEN YOU READ THOSE, WHAT WAS YOUR RESPONSE?

23  A.   WELL, I NEVER IN 4.9 YEARS, I NEVER REQUESTED MORE THAN

24  THE TWO, 50 MILLIGRAM TRAMADOL A DAY WITH THE COMBINATION OF

25  TYLENOL.  I NEVER REQUESTED MORE.

1        ON MY OWN INITIATIVE, I PERIODICALLY STOPPED USING

2   IT TO SEE HOW I WOULD BE ABLE TO FUNCTION WITHOUT IT OR WITH

3   LESS.

4        AND WHEN FAMILY NURSE PRACTITIONER RISENHOOVER TOLD

5   ME DR. SAYRE WANTED ME TAPERED OFF TRAMADOL, MY RESPONSE TO HER

6   WAS, OKAY, FINE.  WHAT WILL IT BE REPLACED WITH THAT'S

7   EFFECTIVE WITHOUT SIDE EFFECTS?

8        HER RESPONSE WAS, WE CAN TRY THE MEDS AVAILABLE IN

9   SHU THAT YOU TRIED BEFORE THE NSAIDS.

10        THROUGH THIS LITIGATION I OBTAINED A COPY FROM THE

11   DEFENDANTS' COUNSEL BECAUSE IN HIS 11/11/06 DECLARATION, HE

12   TALKS ABOUT FDA GUIDELINES.  AND HE STATES THAT --

13        **MR. ANDRADA:**  I AM SORRY.

14        YOUR HONOR, OBJECTION, HEARSAY.  IS THIS QUOTING?

15        **THE COURT:**  THAT DECLARATION IS AN ADMISSION OF A

16   PARTY OPPONENT.  WE HAVE BEEN OVER THAT.

17        **MR. ANDRADA:**  I UNDERSTAND THAT.  I AM NOT SURE WHO

18   HE'S QUOTING --

19        **THE COURT:**  DR. SAYRE.  HE IS QUOTING THE 11/06

20   DECLARATION.

21        **MR. ANDRADA:**  OKAY.  IT WASN'T CLEAR TO ME HE WAS

22   STILL QUOTING DR. SAYRE.

23        **THE COURT:**  I THINK THAT IS THE CASE.

24        GO ON.

25        **MR. ASHKER:**  YES, I AM REFERRING TO DR. SAYRE'S

```
 1    11/11/06 DECLARATION.

 2              MR. ANDRADA:  VERY WELL.  THANK YOU, YOUR HONOR.

 3    BY MR. ASHKER:

 4    Q.   RIGHT HERE AT PARAGRAPH 8 OF HIS DECLARATION, HE STATES

 5    THAT IT IS THE POLICY OF PRIMARY CARE PROVIDERS AT PBS TO LIMIT

 6    THE USE OF TRAMADOL WHEN REASONABLY ABLE TO DO SO BECAUSE OF

 7    THE SIDE EFFECTS ASSOCIATED WITH TRAMADOL.  THE ADVERSE EFFECTS

 8    INCLUDE HARM TO THE NERVOUS SYSTEM, SEIZURES, DEPRESSION AND

 9    DEPENDENCY.  FOR THESE REASONS, TRAMADOL IS NOT INDICATED FOR

10    LONG-TERM THERAPY BY FEDERAL AND MANUFACTURER GUIDELINES.

11    ADDITIONALLY, TRAMADOL HAS HAD MANY SIGNIFICANT ABUSE PROBLEMS

12    IN THE CORRECTIONAL ENVIRONMENT HERE AT PELICAN BAY STATE

13    PRISON.

14              NOW WHEN I READ THAT, I OBTAINED A COPY OF THE

15    MANUFACTURER GUIDELINES FROM DEFENSE COUNSEL, AND WHAT I FOUND

16    WAS --

17              MR. ANDRADA:  EXCUSE ME, YOUR HONOR, THIS WOULD BE

18    HEARSAY, 403, THE FACT --

19              THE COURT:  WE CAN PUT IN THE GUIDELINES THEMSELVES.

20              DO YOU HAVE THEM?

21              MR. ASHKER:  YES, I DO.

22              THE COURT:  LET'S PUT THEM IN EVIDENCE THEN.

23              MR. ANDRADA:  WELL, MAY WE BE HEARD ON THAT LATER,

24    YOUR HONOR?

25              THE COURT:  I SUPPOSE SO.  IN THE MEANTIME WE WILL
```

ASHKER – DIRECT / MR. ASHKER

1    GO AHEAD RECEIVE THEM INTO EVIDENCE AND YOU CAN MOVE TO STRIKE

2    THEM IF YOU THINK THERE'S SOMETHING WRONG WITH THEM.

3          **MR. ANDRADA:**  MAY WE ASK WHAT YEAR THESE ARE FROM?

4    BECAUSE THEY HAVE CHANGED.

5          **THE COURT:**  APPARENTLY HE GOT THEM FROM YOU.

6          **MR. ANDRADA:**  I KNOW HE DID.

7          **THE COURT:**  YOU CAN TELL US.

8          **MR. ANDRADA:**  WELL, YOUR HONOR, WE HAVE BEEN

9    PRODUCING DOCUMENTS BACK AND FORTH FOR MANY YEARS.  AGAIN, I

10   DON'T MEAN TO BE DIFFICULT.  I AM TRYING TO DETERMINE WHAT

11   EXACTLY --

12         **THE COURT:**  WELL, IF YOU CAN GET OUT THE GUIDELINES,

13   MR. ASHKER, AND HAND THEM TO THE GENTLEMAN HERE, HE CAN SHOW IT

14   TO COUNSEL AND THEN GIVE IT TO THE CLERK.

15         **THE CLERK:**  IS THERE AN EXHIBIT NUMBER?

16         **MR. ASHKER:**  YES.

17         **THE COURT:**  IF IT IS ALREADY IN YOUR BOOK, YOU DON'T

18   NEED TO GET IT OUT.

19         **MR. ASHKER:**  147.

20         **THE COURT:**  IT IS 147.  SO YOU CAN LOOK AT IT

21   COUNSEL.

22         **THE CLERK:**  SO THAT IS ADMITTED SUBJECT --

23         **THE COURT:**  YES.  WE WILL RECEIVE 147 SUBJECT TO A

24   MOTION TO STRIKE.

25

ASHKER – DIRECT / MR. ASHKER

```
 1                    (PLAINTIFF'S EXHIBIT 147 RECEIVED IN

 2               EVIDENCE)

 3          MR. ASHKER:  IS MY TESTIMONY LIMITED ABOUT WHAT -- I

 4     MEAN --

 5          THE COURT:  WELL, TECHNICALLY IT SPEAKS FOR ITSELF.

 6     I DON'T KNOW, COUNSEL, I DON'T KNOW QUITE HOW YOU WANT TO

 7     HANDLE THIS.  IF HE CAN POINT OUT THE PART HE'S REFERRING TO,

 8     OR I GUESS ONE THING YOU CAN DO IS ASK DR. SAYRE ABOUT IT WHEN

 9     YOU HAVE HIM ON THE STAND.

10          MR. ANDRADA:  I THINK THAT MIGHT BE THE BEST

11     APPROACH, YOUR HONOR.

12          THE COURT:  OKAY.

13          MR. ASHKER:  OKAY.

14          I NEVER HAD ANY SIDE EFFECT PROBLEMS WITH 4.9 YEARS

15     I TOOK THE TRAMADOL.  I NEVER ABUSED IT.  I NEVER ASKED FOR

16     MORE THAN WAS PRESCRIBED.

17          AND WHEN I ASKED DEFENDANTS TO PRODUCE EVIDENCE TO

18     SUPPORT DR. SAYRE'S CLAIM THAT TRAMADOL HAD A SIGNIFICANT ABUSE

19     PROBLEM AT PELICAN BAY STATE PRISON, THEIR RESPONSE WAS NO

20     SPECIFIC -- NO SPECIFIC DOCUMENTS EXIST.

21          TRAMADOL WAS ALWAYS ISSUED AS, WHAT'S REFERRED TO AS

22     A HOT MED AT PELICAN BAY STATE PRISON, WHICH THE HOT MEDICATION

23     PROCEDURE MEANS, LIKE MEDICATIONS LIKE NARCOTICS, HEART

24     MEDICATIONS, ELAVIL, THINGS OF THAT NATURE, THEY CALL YOU UP TO

25     THE SECTION DOOR, THE RN WILL CRUSH UP THE MEDICATION IN A
```

1    POWDER, YOU POUR IT IN YOUR MOUTH, DRINK YOUR WATER AND YOU

2    SHOW YOUR MOUTH.

3           THAT WAS MEMORIALIZED IN A MEMORANDUM ON

4    OCTOBER 31ST, 2003 BY FORMER CHIEF MEDICAL OFFICER DWIGHT

5    WINSLOW.

6           AND TRAMADOL, FOR THE MAJORITY OF THE TIME THAT I

7    WAS ON IT, FOR THAT 4.9 YEAR TIME PERIOD WAS NOT ON THE PELICAN

8    BAY STATE PRISON FORMULARY MEDICATIONS.  THEY HAVE WHAT'S KNOWN

9    AS A NONFORMULARY MEDICATION ORDER PROCEDURE, AND THE CRITERIA

10   FOR THAT IS WHEN THE FORMULARY MEDICATIONS DO NOT MEET --

11           **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.  MOVE TO

12   STRIKE.  THERE IS NO FOUNDATION AS TO THIS WITNESS --

13           **THE COURT:**  YOU CAN ASK DR. SAYRE ABOUT THAT.

14           **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

15   **BY MR. ASHKER:**

16   **Q.**   MR. ASHKER, CAN YOU PLEASE STATE THE EFFECTS OF BEING OFF

17   TRAMADOL HAS HAD ON YOU SINCE YOU WERE TAKEN OFF OF IT ON

18   SEPTEMBER 27TH, 2006?

19   **A.**   YES, I CAN.

20   **Q.**   PLEASE DO SO.

21   **A.**   EVER SINCE I WAS TAKEN OFF TRAMADOL ON 9/27/06, I HAVE

22   BEEN IN A LOT MORE PAIN AND DISCOMFORT, WHEREAS BEFORE BEING

23   TAKEN OFF TRAMADOL, MY PAIN LEVEL WAS GENERALLY AROUND A THREE.

24   IT WAS GENERALLY, FAIRLY EFFECTIVE ABOUT 16 HOURS PER DAY.  I'D

25   OFTEN WAKEN AT FOUR TO FIVE A.M. IN THE MORNING IN PAIN WAITING

ASHKER – DIRECT / MR. ASHKER

1    ON MY MORNING DOSE, AND IT WOULD WEAR OFF AROUND THREE OR FOUR

2    P.M. WAITING FOR PM DOSE, DEPENDING ON THE USE OF MY ARM.

3              SINCE GOING BACK TO NSAIDS AND TYLENOL, MY PAIN

4    LEVEL HAS BEEN AROUND A SEVEN DEPENDING ON USE.  ALL WRITING IS

5    PAINFUL FOR ME IN THE WRIST JOINT, FINGERS, INNER FOREARM,

6    TENDONS ALONG ULNAR NERVE INTO ELBOW.  THIS PAIN EFFECTS MY

7    ABILITY TO SLEEP.  I MIGHT GET ONE TO THREE HOURS OF SLEEP A

8    NIGHT.  AFTER THREE TO FOUR NIGHTS, I MIGHT GET THREE TO FOUR

9    HOURS.

10             AND IT'S AFFECTED MY ABILITY TO CONCENTRATE AND

11   FOCUS ON TASKS, LIKE DRAFTING LEGAL DOCUMENTS AND WRITING

12   LETTERS.  I DREAD HAVING TO DO ANY WRITING, BUT STILL MUST

13   GENERALLY DO SOME WRITING EVERY DAY REGARDING LEGAL ISSUES,

14   PERSONAL ISSUES, MAINTAINING CONTACT WITH WIFE, FAMILY,

15   FRIENDS, CORRESPONDENCE COURSES, ET CETERA.  IF I DON'T DO

16   THIS, IT WILL NOT GET DONE.

17             I WAS APPOINTED A WRITING ASSISTANT IN 2004, MY

18   NEIGHBOR DANNY TROXELL.  THIS OFTEN REQUIRES ME TO STATE WHAT

19   TO WRITE VIA OUR ADJOINING AIR VENT OR YELL OVER THE TIER.

20   STANDING ON THE STOOL TO TALK THROUGH THE VENT REQUIRES ME TO

21   STAND AT AN ODD ANGLE, AND WHEN I HAVE TO DO THAT FOR ANY

22   AMOUNT OF TIME IS VERY UNCOMFORTABLE AND MESSES UP MY LOWER

23   BACK.  PLUS IT BOTHERS THE TWO INMATES UP ABOVE US WHO ARE

24   SHARING OUR VENT.  YELLING OVER THE TIER IS NOT VERY EFFECTIVE

25   EITHER DUE TO ACOUSTICS.  IT'S HARD TO HEAR AND IT CAN BOTHER

ASHKER – DIRECT / MR. ASHKER

1    OTHER INMATES.

2            THUS, DANNY ASSISTS MAINLY BY REWRITING MY MESSY

3    ROUGH DRAFTS ON LEGAL BRIEFS WHEN HE CAN.  SOMETIMES I HAVE HAD

4    TO WRITE THESE LENGTHY BRIEFS MYSELF SO WE CAN MEET AN

5    IMPORTANT LEGAL DEADLINE FOLLOWING NUMEROUS, NUMEROUS

6    EXTENSIONS OF TIME.  AT THESE TIMES, I MAY SPEND THE ENTIRE

7    EIGHT HOURS IN A DAY WHERE I WILL WRITE FOR A WHILE, TAKING

8    FREQUENT BREAKS TO REST, EAT, STRETCH MY BACK, TAKE MORE

9    IBUPROFEN AND TYLENOL.

10           AS TIME PROGRESSES, THE PAIN IN MY WRIST, INNER

11   FOREARM, HAND AND FINGERS BECOMES WORSE.  MY INNER FOREARM

12   TENDONS WILL BE BURNING WITH STABBING PAIN INTO INNER WRIST.

13   EACH LETTER THAT I MAKE WITH PAIN FROM ELBOW TO THE SMALL

14   FINGERS IN MY HAND ALONG THE ULNAR NERVE.  MY HAND AND FINGERS

15   BECOME SLIGHTLY SWOLLEN AND A DARK RED NEARLY PURPLISH COLOR.

16           IF I AM LUCKY, I MIGHT GET AN HOUR OF SLEEP AND HAVE

17   TO DO MORE OF THE SAME THE NEXT DAY.  THE MORE I DO, THE WORST

18   IT BECOMES.  AND THE PAINS WILL CONTINUE LIKE DESCRIBED ABOVE

19   FOR DAYS UNTIL I CAN REST COMPLETELY FOR A FEW DAYS, WHICH IS

20   NOT OFTEN.

21           HAVING TO SPEND UP TO EIGHT HOURS A DAY ON LEGAL

22   DEADLINE WRITING DOES NOT OCCUR OFTEN BECAUSE I USUALLY WORK AT

23   A DRAFT IN ADVANCE SPREADING IT OUT OVER A ONE- TO THREE-HOUR

24   PERIOD EACH DAY.  AND ONCE DRAFTED, DANNY WILL REWRITE IT.  BUT

25   THE FACT IS, ALL WRITING IS VERY SLOW, PAINFUL PROCESS FOR ME

ASHKER – DIRECT / MR. ASHKER

1    AND THE 200 MILLIGRAMS OF IBUPROFEN AND TYLENOL 13 MILLIGRAMS

2    PER DAY DOES NOT WORK FOR THIS PAIN.

3         I GET IT FOR HELP WITH OTHER LITTLE ACHES AND PAINS

4    LIKE MY KNEE, MY SHOULDER, WHICH IS OFTEN NOT VERY EFFECTIVE

5    FOR THOSE EITHER.  AND I HAVE HAD TO TAKE A LOT MORE AROUND

6    1200 MILLIGRAMS OF IBUPROFEN AND 1300 MILLIGRAMS OF TYLENOL PER

7    DAY FOR THE PAST -- BETWEEN I WOULD SAY OCTOBER AND APRIL OF

8    THIS YEAR IN ORDER TO DO THE LEGAL WRITING THAT I HAVE HAD TO

9    DO AND GET A BIT MORE SLEEP INCLUDING AN UNBELIEVABLE AMOUNT TO

10   PREPARE FOR THIS TRIAL RIGHT HERE.

11        AT THE EXPENSE OF MY STOMACH, WHICH HAS FELT A LOT

12   WORSE, TAKING FOUR SUPERFED (PHONETIC) A DAY.  SUPERFED IS A

13   MEDICATION THAT COATS YOUR STOMACH.  IT'S GIVEN -- I AM TAKING

14   FOUR A DAY OF THAT NOW.

15        UP UNTIL MARCH 26TH OF 2009, WHICH IS WHEN I GOT TO

16   SEE PELICAN BAY STATE PRISON DR. WILLIAMS FOR THE FIRST TIME,

17   AND WHEN I SAW HIM, HE -- I DESCRIBED MY PROBLEMS AND PAIN WITH

18   HIM.  HE TOOK A DETAILED SUBJECTIVE SUMMARY OF MY COMPLAINTS.

19   HE HAD THEM REMOVE MY RESTRAINTS AND PHYSICALLY EXAMINED ME,

20   CHECKED MY RANGE OF MOTION, HAD ME DESCRIBE WHERE THE PAIN AND

21   DISCOMFORT WAS.  AND AT THAT TIME HE PRESCRIBED CODEINE TYLENOL

22   NUMBER THREE, TWO IN THE MORNING AND TWO AT NIGHT, WITH REGULAR

23   TYLENOL EVERY SIX HOURS AS NEEDED.  THE FOUR SUPERFED AND ON

24   TOP OF THAT THE TWO ZANTAC.  THAT WAS ON MARCH 26TH, 2009.  AND

25   HIS ORDER IS GOOD FOR 90 DAYS.  AND THAT'S WHAT I HAVE BEEN ON,

ASHKER – DIRECT / MR. ASHKER

1    AS YOU HAVE BEEN OBSERVING ME, WHICH REALLY CAME AT A GREAT

2    TIME BECAUSE THAT HAS ENABLED ME TO DO THE PREPARATIONS THAT I

3    HAVE NEEDED TO DO ON THIS CASE.

4          NOW, I WILL TELL YOU, AFTER GOING FOR ALL THAT TIME

5    PERIOD WITH JUST THE IBUPROFEN AND THE TYLENOL, WHEN I GOT THAT

6    CODEINE TYLENOL THREE, IT MESSES WITH MY STOMACH.  I TRIED IT

7    BEFORE IN 2007, BUT I WAS ONLY GIVEN ONE A DAY.  ONE TWICE A

8    DAY AND WITH TYLENOL AND IBUPROFEN AT THE SAME TIME, AND IT

9    WASN'T VERY EFFECTIVE.  MY STOMACH JUST CRAMPED UP REAL, REAL

10   BAD.  I HAD DIARRHEA EVEN WORSE.

11         AND SO I WAS LIKE, WELL, THIS IS NOT WORKING, YOU

12   KNOW.  AND IT MIGHT LAST -- IT MIGHT HELP A LITTLE BIT FOR TWO,

13   THREE HOURS, BUT THOSE OTHER SIDE EFFECTS.  I TOLD RISENHOOVER,

14   WHEN I SAW HER, HEY, I DON'T EVEN WANT THAT ANY MORE GOING

15   THROUGH THOSE CHANGES.

16         WHEN WILLIAMS ORDERED IT ON MARCH 26TH, 2009, I

17   SAID, OKAY, I WILL TRY IT.  YEAH, AND IT, AS FAR AS THE PAIN

18   LEVEL GOES, IT HELPED TO CLEAR MY MIND A LITTLE BIT.  AS IT

19   WEARS OFF AS THE DAY GOES ON, I START DRAGGING AND THE ARM WILL

20   START HURTING.

21         WITH THIS WRITING THAT I HAVE DONE, IT HAS BEEN

22   HELPFUL WITH THE PAIN, BUT SOME DAYS IT WILL BE, MIGHT LAST AN

23   HOUR, OTHER DAYS IT MIGHT BE GOOD FOR SIX TO EIGHT HOURS, BUT I

24   DON'T LIKE IT.

25         I HAVE THE STOMACH DISCOMFORT.  THREE DAYS AFTER I

1    FIRST STARTED TAKING IT, MY STOMACH PAIN GOT SO BAD THAT I WAS

2    DOUBLED OVER HOLDING ONTO MY STOMACH AND THEY HAD TO TAKE ME

3    OUT.  I HAD TO CALL UP TO THE CO'S AND TELL THEM, HEY, I NEED

4    MEDICAL ATTENTION IMMEDIATELY RIGHT NOW.

5            THEY TOOK ME, WHEELED ME OUT OF THERE IN A

6    WHEELCHAIR, TOOK ME OVER TO THE SPECIALTY CLINIC.  I SAW THE

7    DOCTOR OVER THERE.  THE RN GAVE ME A COCKTAIL OF LIDOCAINE,

8    SOMETHING, NUMBING STUFF.  I DRANK THAT, I SWALLOWED THAT DOWN.

9    AND WITHIN 20 MINUTES OR SO, IT HELPED.  MY STOMACH IS STILL --

10   I WILL HAVE CRAMPS, BUT NOT THAT BAD.

11           THE DIARRHEA HAS GOTTEN BETTER.  MY BOWEL MOVEMENTS

12   HAVE BEEN, I GUESS, NORMAL SINCE I HAVE BEEN ON THAT AMOUNT OF

13   CODEINE TYLENOL.  AND SO THAT IS WHERE I STAND AT RIGHT NOW.

14           NOW, I ALSO HAVE TO WASH AND RING OUT MY HEAVY

15   THERMALS ONCE A WEEK.

16           I WOULD LIKE THE JURY TO BE ABLE TO FEEL THESE, IF

17   POSSIBLE, THE WEIGHT OF THEM.  IS THAT POSSIBLE, YOUR HONOR?

18   THEY ARE NOT --

19           **THE COURT:**  I THINK A VISUAL OBSERVATION WILL BE

20   SUFFICIENT.

21           **MR. ASHKER:**  THESE THERMALS, THE WEIGHT OF THEM WHEN

22   THEY ARE HIT WITH WATER, THESE ARE HEAVY, HEAVY THERMALS.  AND

23   RINGING THEM OUT, IT TAKES -- WHEN I RING SOMETHING OUT, WHAT I

24   DO IS I USE MY RIGHT HAND TO TRY TO HOLD IT WHILE I GRIP WITH

25   MY LEFT.  IT PUTS A LOT OF TORQUE ON MY FOREARM, AND MY WRIST,

ASHKER – DIRECT / MR. ASHKER

1    AND STUFF IT WILL CAUSE LASTING PAIN, DISCOMFORT, LASTING THE

2    REST OF THE DAY.  I HAVE TO WASH THEM OUT AT LEAST ONCE A WEEK.

3          I LIKE TO KEEP MY BODY CLEAN.  I CLEAN -- I SHOWER

4    IN THE CELL THREE, FOUR DAYS A WEEK, WHICH ENTAILS FILLING MY

5    SINK WITH WATER.  I SIT ON THE TOILET.  I USE A MILK CARTON TO

6    POUR THE WATER OVER MYSELF AND THEN SOAP DOWN AND USE THE MILK

7    CARTON TO DUMP THE WATER OVER MYSELF, WHICH GETS WATER ALL OVER

8    THE FLOOR.  I HAVE TO RING THAT UP.  THEY DON'T WANT YOU HAVING

9    THE TIER FLOODED WITH WATER WHEN THE OFFICERS ARE WALKING DOWN

10   THE TIER AND STUFF.

11         THE PAIN AND DISCOMFORT THAT I EXPERIENCED FROM THE

12   WRITING AND CLEANING, WASHING HAS MADE ME HAVE TO CUT BACK ON

13   EVERYTHING.  I HAVE CUT DOWN TO WRITING MY WIFE ABOUT ONCE A

14   WEEK, JUST FILLING THE INSIDE OF A CARD WHICH WOULD EQUAL ABOUT

15   ONE SIDE OF A SHEET OF PAPER.  WHEREAS BEFORE, WHEN I WAS ON

16   THE TRAMADOL, I WOULD WRITE HER THREE- TO FIVE-PAGE LETTERS TWO

17   TO THREE TIMES PER WEEK.  THIS HAS A NEGATIVE EFFECT ON US

18   CAUSING DEPRESSION, ANGER AND FRUSTRATION IN ME.

19         OKAY.  I RARELY WRITE ANY OTHER FRIENDS AND FAMILY

20   NOW, WHEREAS BEFORE I WOULD WRITE FAIRLY REGULARLY.

21         THE STRESS ABOUT HEARING ABOUT MY MEDICAL ISSUES ON

22   TOP OF HER OWN MEDICAL PROBLEMS HAS CAUSED MY MOM TO WITHDRAW.

23         **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  THAT'S NOT

24   RELEVANT, 403, HEARSAY.

25         **THE COURT:**  IT'S RELEVANT.  IT MIGHT BE HEARSAY.  I

1    GUESS --

2              **MR. ANDRADA:**  ABOUT THE MOTHER'S CONDITION?

3              **THE COURT:**  I AM SORRY?

4              **MR. ANDRADA:**  THE MOTHER'S CONDITION.

5              **THE COURT:**  HER STOPPING COMMUNICATING WITH HIM.

6    BUT YOU CAN TESTIFY, I GUESS, TO HOW MANY LETTERS YOU GET FROM

7    HER AND YOU WILL HAVE TO ARGUE AS TO THE REASON FOR IT.  YOU

8    CAN'T --

9              **MR. ANDRADA:**  I THOUGHT HE WAS TALKING ABOUT HIS

10   MOTHER'S HEALTH CONDITION.

11             **THE COURT:**  NO.  HE'S TALKING ABOUT HIS RELATIONSHIP

12   WITH HIS MOTHER.

13             **MR. ANDRADA:**  OH, ALL RIGHT.  ALL RIGHT.

14             **MR. ASHKER:**  I'VE HEARD NOTHING FROM HER FOR TWO

15   YEARS NOW.

16             I HAVE QUIT DOING CORRESPONDENCE COURSES ALTOGETHER

17   NOW, WHEREAS BEFORE I WAS PARTICIPATING IN SELF-HELP COURSES BY

18   AN ORGANIZATION CALLED CRIMINON STUDYING RELIGION, BOTH

19   CHRISTIAN AND BUDDHISM AND LAW.

20             I TOOK A PARALEGAL COURSE AND OBTAINED MY ASSOCIATE

21   ART'S DEGREE IN PARALEGAL LAW COURSE.  SUCH COURSES MEANT A LOT

22   TO ME FOR PERSONAL GROWTH AND KNOWLEDGE.  PLUS THEY HELP FOR

23   PAROLE CONSIDERATION.  I HAVE HAD TO QUIT THESE DUE TO

24   INABILITY TO CONTINUE DUE TO THE PAIN ISSUES WITH WRITING I

25   HAVE TO DO.

1    WITH WRITING I HAVE TO DO THE LEGAL ISSUES IS MORE

2    THAN I CAN STAND NOW.  SO BASED ON ALL THE LEGAL STUFF, I HAVE

3    HAD TO CUT OUT ALL THAT OTHER STUFF.

4        I HAVE MADE DR. SAYRE PERSONALLY AWARE OF THE ABOVE

5    ACTIVITY RELATED PAIN AND DISCOMFORT ISSUES NUMEROUS TIMES.

6    PRIOR TO THE DISCONTINUANCE OF TRAMADOL, I SENT HIM A COPY OF A

7    LETTER ON JUNE 4, 2006.  ON OCTOBER 10TH, 2005, I SENT HIM THAT

8    602 APPEAL ON ROWE, AND DR. SAYRE RESPONDED ON 4/10/06.

9        ON 3/25/06, 6/21/06, AND 8/21/06, I DETAILED THE

10   PROBLEMS AND PAINS AND WHY I WAS ON THE TRAMADOL TO RN

11   RISENHOOVER, WHICH IS A PART OF MY MEDICAL RECORD, AND NUMEROUS

12   TIMES AFTER HIS 8/21/06 DECISION WAS MADE AS FOLLOWS:

13       I DESCRIBED TO YOU PREVIOUSLY MY MEETING WITH HIM ON

14   AUGUST 30TH, 2006.

15   **BY MR. ASHKER:**

16   **Q.**   DID YOU LET HIM KNOW OTHER TIMES?

17   **A.**   YES.  ON 9/26, 2006 I FILED ANOTHER 602 APPEAL WHERE I

18   WENT INTO GREAT DETAIL ABOUT THE PROBLEMS I WAS HAVING, THE

19   AUGUST 30TH, '06 MEETING WITH HIM, AND WHY I BELIEVED THAT HIS

20   DETERMINATIONS WERE TOTALLY CONTRARY TO ALL MY MEDICAL RECORDS

21   AND ACTUAL CONDITION.

22       ON 10/16/06 VIA ANOTHER 602 APPEAL, WHICH DR. SAYRE

23   CANCELED ON 12/14/06 CLAIMING THAT I HAD REFUSED THE INTERVIEW

24   SCHEDULED FOR 11/8/06, BUT I WAS NEVER INFORMED THAT I WAS TO

25   BE INTERVIEWED FOR A 602 APPEAL.

1        AND ON 4/5/07, I SUBMITTED A 602 WHICH DR. SAYRE

2   PARTIALLY GRANTED ON 5/25/07, BUT HE DOES NOT RESPOND IN THAT

3   RESPONSE TO MY COMPLAINTS THAT THE MOTRIN WAS INADEQUATE.

4        I ALSO REFERENCED IN THAT 602 APPEAL MY VISIT WITH

5   FNP RISENHOOVER ON 5/18/07 WHERE SHE WENT TO GREAT LENGTHS TO

6   DETAIL MY COMPLAINTS AND PROBLEMS AND PAIN AND DISCOMFORT, AND

7   HOW THE IBUPROFEN AND TYLENOL WAS NOT EFFECTIVE.  AT THAT TIME

8   I ALSO PROVIDED DR. WEINSTEIN'S JANUARY 22ND, 2007 REPORT TO

9   RISENHOOVER ON 5/18/07.

10       ON 4/3/07 THE -- WELL, ON 6/6/07, DR. SAYRE SAW ME

11  AGAIN IN RESPONSE TO A COURT ORDER.  AND HE CLAIMS -- I WILL

12  SKIP THAT.

13       OKAY.  ON 6/6/07, I SEE DR. SAYRE AGAIN.  DURING

14  THIS VISIT, HE -- HIS EXAMINATION CONSISTED OF HAVING THEM

15  REMOVE MY WRIST RESTRAINT.  HE COME OVER AND SAT DOWN NEXT TO

16  ME, AND HE TELLS ME TO JUST RELAX MY ARM.  AND HE GOES LIKE

17  THIS (INDICATING).  HE HOLDS MY ARM ABOUT, PROBABLY RIGHT HERE

18  AND RIGHT IN HERE, (INDICATING), AND HE GOES (INDICATING).  AND

19  THEN HE GOES -- AS HE IS DOING IT, I AM DESCRIBING WHERE IT IS

20  HURTING AND PAIN AND STUFF.  I SHOW HIM MY LIMITED -- HE GOES

21  (INDICATING).

22       AND I SHOW HIM MY FINGER, MY THUMB.  I TELL HIM

23  ABOUT THE BONE MISSING RIGHT HERE (INDICATING) AND HOW THIS

24  HURTS ALL THE TIME.  AND THAT WAS THE FULL EXTENT.  I TRIED ON

25  MY ARM BRACE.  I SHOWED HIM WHERE IT DIDN'T FIT RIGHT.  I TOLD

1    HIM, HEY, IF NOTHING ELSE, CAN I JUST GET A TEMPORARY FIX HERE

2    BY HAVING THIS PADDING GLUED IN HERE.  AND THERE WAS NO

3    RESPONSE TO THAT.

4            AND HE SAT BACK DOWN.  THAT WAS THE FULL EXTENT OF

5    HIS PHYSICAL EXAMINATION.  HE TOLD ME AT THAT TIME THAT THE

6    PAIN I WAS EXPERIENCING WAS JUST MINOR ARTHRITIS.  AND I TOLD

7    HIM, HEY, IT'S IN MY TENDONS AND LIGAMENTS, AND ALL THIS IN

8    HERE AND THE NERVE AND STUFF.  I AM NOT TALKING ABOUT THE

9    BONES.  AND HE DIDN'T HAVE A RESPONSE.  AND THEN HE SAID, HE

10   GOES 200 -- 400 MILLIGRAMS OF IBUPROFEN AND 1300 MILLIGRAMS OF

11   TYLENOL IS EFFECTIVE FOR YOU ISN'T IT?  I TOLD HIM, NO, IT'S

12   NOT EFFECTIVE FOR ME.  IT'S NOT WORKING.  AND THAT WAS IT.

13           HE -- WE TALKED ABOUT MY STOMACH.  THAT WAS IT ON MY

14   ARM RIGHT THERE.  AND IN HIS REPORT THAT HE DID, HE FILED A

15   DECLARATION AFTER THAT ON JULY 6TH, 2007 TO THE COURT.  AND IN

16   THAT DECLARATION WHAT HE SAYS IS THAT DURING THAT EXAM -- SEE,

17   WHEN DR. WEINSTEIN EXAMINED ME IN JANUARY, HE DOCUMENTED ABOUT

18   MY COMPLAINTS AND LACK OF FOCUS, CONCENTRATION, PAIN AND

19   DISCOMFORT.  DR. SAYRE WAS -- HIS REPORT IS CLEARLY IN RESPONSE

20   TO DR. WEINSTEIN'S REPORT BECAUSE THE REASON I SAY THIS IS

21   BECAUSE I HAVE READ BOTH REPORTS AND --

22           **MR. ANDRADA:**  EXCUSE ME.  THIS IS SPECULATION.

23           **THE COURT:**  IT SOUNDS LIKE ARGUMENT.  YOU CAN SAY

24   WHAT SAYRE SAID, BUT YOU CAN'T ARGUE.

25           **MR. ASHKER:**  THANK YOU, YOUR HONOR.

ASHKER – DIRECT / MR. ASHKER

```
 1              WHAT DR. SAYRE SAID TO THE COURT WAS THAT I DID NOT
 2    MAKE ANY COMPLAINTS OF PAIN OR DISCOMFORT.  I DID NOT SHOW ANY
 3    SIGNS OF INABILITY TO FOCUS OR CONCENTRATE, AND THINGS OF THAT
 4    NATURE.  HE JUST -- AND THE THING ABOUT IT IS, I HAD JUST FILED
 5    A 60 -- HE HAD JUST RESPONDED TO MY 5/26/07, 602 APPEAL WHERE I
 6    DESCRIBED IN DETAIL ALL THAT, AND HE STATES THAT HE REVIEWED
 7    DOCTOR -- FAMILY NURSE PRACTITIONER RISENHOOVER'S MAY 18TH,
 8    2007 REPORT WHERE SHE DOES A LONG LIST DOCUMENTING ALL THIS.
 9    AND HE -- BUT YET HE SAYS THAT I NEVER MENTIONED A WORD ABOUT
10    ANYTHING DURING OUR VISIT ON JUNE 6TH, '07.
11              ON 8/5/07, I FILED ANOTHER 602 APPEAL NOTIFYING
12    SAYRE OF ALL OF THE ABOVE.
13              ON 11/6/07, I FILED ANOTHER DECLARATION -- I MEAN
14    602 NOTIFYING DR. SAYRE ABOUT ALL OF THE ABOVE.
15              ON 1/14/08, I FILED ANOTHER 602 DESCRIBING AND
16    DETAILING TO DR. SAYRE ALL OF THE ABOVE.
17              AS FAR AS MY ARM BRACE GOES, THE ARM BRACE WAS
18    ORIGINALLY ORDERED IN '94.  I BASICALLY TESTIFIED ABOUT THAT
19    ALREADY.
20              IN DR. SAYRE'S 11/11/06 DECLARATION, HE STATES THAT
21    THE ARM BRACE WAS ORIGINALLY ORDERED FOR ULNAR DRIFT OF MY
22    HAND, WHICH HE'S TALKED ABOUT THE HAND DRIFTING TOWARD THE
23    ULNAR SIDE, AND THERE IS NO MORE ULNAR DRIFT.  THE ARM MUSCLES
24    HAVE RECOVERED AND REDEVELOPED.  HE HAS NORMAL GRIP STRENGTH.
25    OKAY.  GRIP STRENGTH FUNCTIONALITY AND ACTIVITIES ON THE YARD
```

1   ON THE VIDEO OBSERVATION TAPE ALL SUPPORT THE CONCLUSION HE

2   DOES NOT NEED THE BRACE.

3          THE ARM BRACE WAS NEVER FOR ULNAR DRIFT IN MY HAND.

4          **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.  THERE IS NO

5   FOUNDATION FOR THAT.

6          **THE COURT:**  IT MAY BE IN THE MEDICAL RECORDS.

7          **MR. ASHKER:**  IT IS.

8          THE ARM BRACE WAS ORDERED BY DR. DUNCAN IN '94 AND

9   IT WAS FOR, TO PROTECT MY FOREARM FROM ADDITIONAL INJURY AND

10  ENABLED ME TO EXERCISE MY UPPER ARM AND SHOULDER AREAS.

11         I REPEATEDLY BROUGHT THAT TO DR. SAYRE'S ATTENTION

12  AND PROVIDED HIM WITH COPIES OF ALL THE MEDICAL RECORDS.  HE

13  REFUSED TO DO ANYTHING, INSISTING THAT IT WAS ULNAR DRIFT OF

14  THE HAND AND THEN HE SAID IT IS NO LONGER RELEVANT.  YOU

15  DON'T -- IT'S MOOT.  IT'S A MOOT ISSUE BECAUSE YOU DO NOT NEED

16  THE BRACE ANY MORE PERIOD.

17         SINCE I HAVE BEEN WITHOUT THE BRACE, ABLE TO USE THE

18  BRACE FOR EXERCISE AND THINGS OF THAT NATURE ON MY UPPER ARM,

19  MY UPPER ARM HAS GOTTEN SMALLER.  I HAVE LOST ABOUT AN INCH,

20  INCH AND A HALF IN SIZE ON MY UPPER ARM.  AS I TESTIFIED

21  EARLIER, I HAVE THE NERVE PAIN BACK, THE NUMBNESS IN MY

22  FINGERS, AND PAIN INTO MY FINGERS.

23         ON THE PHYSICAL THERAPY AND ASSISTIVE AIDES, THE

24  ONLY REASON I STILL HAVE THEM IS IN RESPONSE TO A COURT

25  DIRECTING THEM NOT TO TAKE THEM.

1          **MR. ANDRADA:**  EXCUSE ME.  THIS IS CLEARLY ARGUMENT

2     AND IT IS NOT RELEVANT.

3          **THE COURT:**  I DON'T THINK SO.  I THINK HE IS

4     ENTITLED TO EXPLAIN WHY IT IS HE HAS THEM.  BECAUSE IF IT

5     HADN'T BEEN FOR THAT, HE WOULDN'T HAVE THEM.  AND THAT'S WHAT

6     THE LAWSUIT IS ABOUT, I THINK.

7          **MR. ANDRADA:**  WELL, I RESPECTFULLY SUGGEST, YOUR

8     HONOR, THAT IT IS, IT IS NOT RELEVANT TO THE CASE --

9          **THE COURT:**  IT IS RELEVANT.  THAT'S ONE OF THE

10    THINGS THAT WAS ADDRESSED IN THE SETTLEMENT AGREEMENT.

11         **MR. ANDRADA:**  WELL, HE HAS, HE HAS THE --

12         **THE COURT:**  HE HAS THEM BECAUSE?

13         **MR. ANDRADA:**  OF THAT EARLIER SETTLEMENT AGREEMENT.

14    SO THAT'S --

15         **MR. ASHKER:**  NO.

16         **THE COURT:**  AND ALSO BECAUSE?

17         **MR. ANDRADA:**  IT IS NOT IN DISPUTE THAT --

18         **THE COURT:**  HE HAS THEM BECAUSE THE COURT ORDERED

19    THEM.

20         **MR. ANDRADA:**  WELL, ALL RIGHT.  THANK YOU.

21         **MR. ASHKER:**  MAY I CONTINUE, YOUR HONOR?

22         **THE COURT:**  YES.

23         **MR. ASHKER:**  ON APRIL 3RD, 2007, THE COURT RULED ON

24    MY MOTION FOR PROTECTIVE ORDER AND DIRECTED THAT DR. SAYRE AND

25    THEM ALLOW ME TO KEEP MY BAND AND BALL AND BRACE AND THERMALS

1    PENDING RESOLUTION OF THE CASE.  THAT'S THE ONLY REASON I STILL

2    HAVE THEM.

3              I AM DONE, YOUR HONOR.

4              **THE COURT:**  DO YOU HAVE ANY CROSS-EXAMINATION?

5              **MR. ANDRADA:**  YES, YOUR HONOR.  THANK YOU.

6              MAY I HAVE ABOUT FIVE MINUTES TO ORGANIZE MYSELF?

7              **THE COURT:**  WE HAVE HAD BOTH BREAKS, BUT WE WILL

8    WAIT UNTIL YOU ARE READY.

9              **MR. ANDRADA:**  THANK YOU.

10             **THE COURT:**  IF YOU WANT TO STAND UP AND STRETCH

11   WHILE YOU ARE WAITING, YOU CAN DO THAT.

12             **MR. ANDRADA:**  YOUR HONOR, MAY I -- MAY I TRY IT FROM

13   HERE AND SEE IF THIS WORKS?

14             **THE COURT:**  SURE.

15                         <u>**CROSS-EXAMINATION**</u>

16   **BY MR. ANDRADA:**

17   **Q.**   ALL RIGHT.

18             MR. ASHKER, YOU WERE PRESCRIBED TRAMADOL IN JANUARY

19   OF 2002 BY DR. WOLF; IS THAT CORRECT?

20   **A.**   YES.

21   **Q.**   AND DID HE ACTUALLY EXAMINE YOU AT THAT TIME?

22             IT WAS A TELEMEDICINE CONSULT, WASN'T IT?

23   **A.**   NO, SIR.  I SAW HIM AT THE SPECIALTY -- I MEAN AT THE

24   REGULAR CLINIC THERE IN C FACILITY.

25   **Q.**   IN JANUARY OF 2002?

1    **A.**    YES.

2    **Q.**    ALL RIGHT.

3            AND THEN THEREAFTER YOU FOLLOWED UP WITH HIM FOR

4    SEVERAL VISITS; IS THAT CORRECT?

5    **A.**    YES, I BELIEVE THAT'S CORRECT.

6    **Q.**    ALL RIGHT.

7            AND JUST TO KEEP EVERYONE ORIENTED, YOU THEN SAW

8    DR. DUNCAN IN MARCH OF 2002, CORRECT?

9    **A.**    YES, THAT'S CORRECT.

10   **Q.**    HE IS AN OUTSIDE CONSULTANT, ORTHOPEDIC PHYSICIAN,

11   CORRECT?

12   **A.**    YES.

13   **Q.**    AND THEN IN JUNE OF 2002, YOU TOLD ONE OF THE CLINICIANS

14   THAT -- THIS IS JUNE 11TH -- AND YOU TOLD THE CLINICIAN THAT

15   YOU HAVE HAD AN ULNAR NERVE TRANSPLANT -- TRANSPORT, EXCUSE ME,

16   BUT NOW MY ARM IS WORSE THAN EVER.  CORRECT?

17   **A.**    COULD I SEE THE DOCUMENT?

18   **Q.**    SURE.

19            (DOCUMENT HANDED TO WITNESS.)

20   **A.**    THAT'S CORRECT IN PART.

21   **Q.**    OKAY.  WAS THAT A CORRECT STATEMENT ON YOUR PART THAT YOUR

22   ARM WAS WORSE THAN EVER ON OR ABOUT JUNE 11TH, 2002,

23   MR. ASHKER?

24   **A.**    WELL, THE REASON WAS IS BECAUSE I WASN'T ON ELAVIL.

25            **MR. ANDRADA:**  I AM SORRY, YOUR HONOR, MOVE TO

1    STRIKE, NONRESPONSIVE.  I THINK THE QUESTION WAS, WAS IT A

2    CORRECT STATEMENT THAT HE MADE AS MEMORIALIZED IN THE RECORD.

3            **THE COURT:**  I THINK THAT'S A REASONABLE ENOUGH

4    ANSWER.

5    **BY MR. ANDRADA:**

6    **Q.**  ALL RIGHT.

7            THEN YOU SAW DR. FRIEDMAN ON JUNE 11TH; IS THAT

8    CORRECT?

9            EXCUSE ME, JUNE 12TH; IS THAT RIGHT?

10   **A.**  YES.

11   **Q.**  AND YOU DISCUSSED WITH HIM YOUR USE OF VARIOUS

12   MEDICATIONS, CORRECT?

13   **A.**  YES.

14   **Q.**  AND YOU INDICATED TO HIM THAT YOU HAD BEEN HAVING ONGOING

15   INCREASING AMOUNTS OF PAIN OVER THE LAST TWO YEARS; IS THAT

16   CORRECT?

17   **A.**  CAN I SEE THE DOCUMENT?

18   **Q.**  SURE.

19           (DOCUMENT HANDED TO WITNESS.)

20   **A.**  YES, THAT WOULD BE CORRECT.

21   **Q.**  ALL RIGHT.

22           AND THEN THAT WAS ON JUNE 12TH.  LET ME TAKE YOU

23   BACK TO JUNE 11TH.  DID YOU ALSO TELL A MEDICAL PROVIDER ON

24   JUNE 11TH THAT YOU HAD PAIN, BURNING KNIFE-LIKE THROUGH THE

25   RIGHT FOREARM?

1              (DOCUMENT HANDED TO WITNESS.)

2    **A.**   YES, THAT WAS MY ULNAR NERVE PAIN.

3    **Q.**   OF COURSE THIS WAS DURING THE TIME THAT YOU WERE TAKING

4    TRAMADOL, TRUE?

5    **A.**   YES.

6    **Q.**   AND ON JUNE 14TH, YOU REPORTED PAIN AT A CONSTANT LEVEL OF

7    SIX TO EIGHT ON A LEVEL OF TEN; IS THAT CORRECT?

8              (DOCUMENTED HANDED TO WITNESS.)

9    **A.**   YES.  I ALSO STATED THAT BECAUSE I HAD NOT BEEN RECEIVING

10   THE ELAVIL.

11   **Q.**   AND THEN YOU, YES, YOU DESCRIBED THE PAIN AS TERRIBLE; IS

12   THAT CORRECT?

13   **A.**   YES, SIR.

14   **Q.**   AND THAT WAS AFTER YOU HAD BEEN ON TRAMADOL FOR ABOUT FIVE

15   MONTHS; IS THAT CORRECT?

16   **A.**   YES, SIR.

17   **Q.**   NOW, AS OF SEPTEMBER OF 2002, WAS THERE A NOTE IN YOUR

18   MEDICAL RECORDS TO THE EFFECT THAT DRUG PARAPHERNALIA HAD BEEN

19   FOUND IN YOUR CELL?

20             (DOCUMENT HANDED TO WITNESS.)

21   **A.**   YES, BUT IT WASN'T MINE.

22   **Q.**   NOW, YOU SAW DR. FRIEDMAN ON JUNE -- EXCUSE ME,

23   SEPTEMBER 18TH, 2002; IS THAT CORRECT?

24   **A.**   CAN YOU STATE THE QUESTION AGAIN?

25   **Q.**   YES.

ASHKER – CROSS / MR. ANDRADA

1       YOU SAW DR. FRIEDMAN ON SEPTEMBER 18TH, 2002; IS

2   THAT CORRECT?

3   **A.**   WHAT WAS THE DATE?

4   **Q.**   SEPTEMBER 18TH, 2002.

5   **A.**   YES.

6   **Q.**   EXCUSE ME FOR ONE SECOND.

7       DIDN'T YOU DISCUSS WITH DR. FRIEDMAN ON OR ABOUT

8   SEPTEMBER 18TH HIS CONCERN THAT TRAMADOL WAS HABIT FORMING?

9       (DOCUMENT HANDED TO WITNESS.)

10  **A.**   DID HE DISCUSS WITH ME THAT TRAMADOL WAS HABIT FORMING ON

11  THIS DATE RIGHT HERE?

12      NO, SIR.

13  **Q.**   ALL RIGHT.

14      LET ME -- DOES THIS MEDICAL RECORD SAY AS FOLLOWS IN

15  PART:  HAVE DISCUSSED -- HAVE DISCUSSED HABIT FORMATION OF

16  TRAMADOL AND NEED TO SWITCH FOR THREE WEEKS BEFORE RETURNING TO

17  THIS MEDICATION.

18      (DOCUMENT HANDED TO WITNESS.)

19  **A.**   WELL, IT SAYS THAT ON HERE, BUT HE DID NOT -- I DON'T

20  RECALL HIM EVER TELLING ME THAT.

21  **Q.**   DOES IT ALSO SAY DOWN AT THE BOTTOM:  MAY RETURN TO ULTRAM

22  AFTER THREE WEEKS AND THEN DC, DISCONTINUE, FLEXERIL.

23      (DOCUMENT HANDED TO WITNESS.)

24  **A.**   YES, SIR.

25  **Q.**   NOW, AND THEN ON OCTOBER 10TH, 2002 DID YOU TELL A MEDICAL

ASHKER – CROSS / MR. ANDRADA

```
 1   PROVIDER THAT AS FOLLOWS:  IF YOU WERE GIVING HER BACK THE
 2   FLEXERIL THAT IT DIDN'T WORK EVEN THOUGH YOU HAD ONLY TAKEN ONE
 3   PILL AND THAT YOU WANTED TRAMADOL?
 4              (DOCUMENT HANDED TO WITNESS.)
 5   A.   YES, SIR.  THAT WAS BASED ON MY PREVIOUS USE OF FLEXERIL.
 6   Q.   DURING OCTOBER 2002, AND I THINK YOU TESTIFIED TO THIS,
 7   YOU WERE REFERRED TO UC DAVIS; ISN'T THAT TRUE?
 8   A.   EXCUSE ME?
 9   Q.   YES.
10              YOU TESTIFIED EARLIER, IF MY NOTES ARE CORRECT AND
11   MEMORY IS CORRECT, THAT IN OCTOBER OF 2002 YOU WERE REFERRED TO
12   UC DAVIS, CORRECT?
13   A.   WELL, I DON'T KNOW IF THAT EVER HAPPENED OR NOT.
14   Q.   ALL RIGHT.  LET ME SHOW YOU THIS DOCUMENT.
15   A.   I MEAN I CAN CLARIFY THAT IF YOU WOULD LIKE.
16   Q.   HANG ON.
17   A.   IT MIGHT SAVE YOU THE TROUBLE OF EXAMINING THAT DOCUMENT.
18   Q.   WELL, WHAT DOES IT SAY AT THE TOP OF THAT DOCUMENT,
19   MR. ASHKER, AND I MARKED IT IN YELLOW.
20              (DOCUMENT HANDED TO WITNESS.)
21   A.   IT SAYS, UC DAVIS HEALTH SERVICE REFERRAL FORM.
22   Q.   OKAY.
23              AND IS THERE A -- WHO IS THE PATIENT BEING DESCRIBED
24   IN THE REFERRAL FORM, MR. ASHKER?
25   A.   THAT WOULD BE ME.
```

 1  Q.   ALL RIGHT.

 2            AND THEN DOWN AT THE BOTTOM, DOES IT REFER -- DOES

 3  IT STATE REFERRAL NOTES AND DATE OF ARE OCTOBER 25TH, 2002?

 4            (DOCUMENT HANDED TO WITNESS.)

 5  A.   YES, SIR.

 6            THE COURT:   YOU DON'T HAVE A SECOND SET OF THESE

 7  DOCUMENTS YOU CAN GIVE HIM?

 8            MR. ANDRADA:   WE HAVE SEVERAL OF THEM, YOUR HONOR,

 9  BUT, AGAIN, MINDFUL OF HOW THE CASE IS PLAYED OUT ON DIRECT --

10            THE COURT:   SOMETIMES THERE'S A BINDER FOR THE

11  WITNESS THEY CAN JUST LOOK.

12            MR. ANDRADA:   I KNOW, YOUR HONOR.   I APOLOGIZE FOR

13  THAT.   THE DOCUMENTS ARE SO CONVOLUTED AND SO --

14            THE COURT:   ALL RIGHT.   ALL RIGHT.   I WAS JUST

15  ASKING.

16            MR. ANDRADA:   THANK YOU.

17            THE COURT:   YOU DON'T HAVE IT, YOU DON'T HAVE IT.

18            MR. ANDRADA:   I APPRECIATE IT.

19            MR. ASHKER:   YOUR HONOR, EXCUSE ME, MR. ANDRADA.

20            I WOULD BE WILLING TO STIPULATE TO SAVE TIME THAT

21  THERE ARE UC DAVIS REFERRALS FOR THE TIME PERIOD, DOCUMENTS OF

22  UC DAVIS REFERRALS FOR THE TIME PERIOD ON OCTOBER 25TH, 2002

23  AND DECEMBER 20TH, 2002.   MY ISSUE IS THE BASIS BEHIND THOSE

24  REFERRALS.

25            BUT AS FAR AS THE DOCUMENTS GO, YES, THERE IS

ASHKER – CROSS / MR. ANDRADA

1    REFERRALS THAT HAVE BEEN PRODUCED DURING THIS LITIGATION.

2            **MR. ANDRADA:**  SO, YOUR HONOR, IF I AM UNDERSTANDING

3    HIM, HE'S STIPULATED THAT PELICAN BAY REFERRED --

4            **THE COURT:**  HE STIPULATED THAT THOSE PIECES OF PAPER

5    HAVE BEEN PRODUCED TO HIM AND THEY EXIST.  IT WOULD BE -- HE

6    WOULD NOT BE ABLE TO TESTIFY AS TO WHERE THEY WERE SENT, WHEN

7    THEY WERE SENT, WHO GOT THEM, HOW THEY WERE RESPONDED TO, AND

8    SO ON.  THAT JUST WOULDN'T BE SOMETHING HE WOULD KNOW.

9            SO, YES, THOSE DOCUMENTS EXIST.  WE WILL RECEIVE

10   THEM INTO EVIDENCE.  THAT'S NO PROBLEM.

11           **MR. ANDRADA:**  ALL RIGHT.  AM I AT LEAST STILL

12   ALLOWED TO ASK HIM A MINIMAL AMOUNT OF QUESTIONS ABOUT --

13           **THE COURT:**  YOU CAN ASK HIM WHATEVER YOU WANT.

14           **MR. ANDRADA:**  GREAT.  THANK YOU.  THANK YOU.

15   **BY MR. ANDRADA:**

16   **Q.**   THEN LET'S, MR. ASHKER, DOWN AT THE BOTTOM OF THAT ONE,

17   SIR, WHAT IS THE SENTENCE THAT IS MARKED IN YELLOW?

18           (DOCUMENT HANDED TO WITNESS.)

19   **A.**   (READING)

20           UNRESOLVED ARM PAIN DUE TO INJURY.  PLEASE SEE

21   ATTACHED.  MARY FROM THE PRISON IS AWARE OF A THREE-MONTH

22   WAITING PERIOD.

23   **Q.**   THEN YOU WERE REFERRED AGAIN TO DAVIS IN THREE MONTHS;

24   ISN'T THAT RIGHT?

25   **A.**   THAT'S WHAT ANOTHER DOCUMENT SAYS.  I DON'T KNOW WHETHER

ASHKER – CROSS / MR. ANDRADA

1   THAT HAPPENED OR NOT.

2   **Q.**   OKAY.

3   **A.**   THE OTHER DOCUMENT SAYS THAT.

4   **Q.**   HANG ON.  LET ME FIND THAT OTHER DOCUMENT.

5           (PAUSE IN THE PROCEEDINGS.)

6           I WILL COME BACK TO IT CHRONOLOGICALLY IN THE

7   INTEREST OF TIME HERE.

8           NOW, IT IS THE NEXT IMPORTANT DOCUMENT IN ORDER, SO,

9   YOUR HONOR, I NEED ONE MOMENT HERE TO FIND -- HERE IT IS.

10  OKAY.

11          MR. ASHKER, DOES THAT DOCUMENT MEMORIALIZE THE

12  REFERRAL IN DECEMBER?

13          (DOCUMENT HANDED TO WITNESS.)

14  **A.**   YES, SIR.

15  **Q.**   OKAY.

16          AND DOES IT ALSO SAY ON THE FOLLOWING.  I HAVE

17  MARKED IT IN YELLOW FOR YOU.  IF YOU WOULD READ IT TO THE JURY,

18  THAT WOULD BE APPRECIATED.

19          (DOCUMENT HANDED TO WITNESS.)

20  **A.**   (READING)

21          DATE, JANUARY 9, 2003.  TIME 14:34.  ARTHUR D.

22  SHARMA 2.  NOTE:  REFERRAL DENIED BY DR. KREIS.  WE HAVE

23  NOTHING ADDITIONAL TO OFFER.

24          OKAY.  THAT WAS IT?  THAT'S THE ONLY PART YOU WANTED

25  ME TO READ?

1    Q.   THANK YOU.  YES.

2              NOW WE ARE GOING TO MOVE TO 2003.

3              AND IN JANUARY OF 2003, DID YOU SEE DR. FRIEDMAN?

4    A.   YES, SIR.

5    Q.   AND DID YOU DISCUSS WITH DR. FRIEDMAN THE NEED TO HAVE A

6    PAUSE IN THE USE OF THE TRAMADOL?

7    A.   YES, SIR.

8    Q.   AND THE PLAN AT THAT POINT WAS TO DISCONTINUE THE TRAMADOL

9    FOR THREE WEEKS; IS THAT CORRECT?

10   A.   YES.  THERE'S -- I DON'T UNDERSTAND BECAUSE IN THE

11   9/18/02 DOCUMENT YOU SHOWED ME, IT SAID THREE WEEKS, BUT

12   ACTUALLY HE ONLY DISCONTINUED IT FOR TWO WEEKS AT THAT TIME.

13             MR. ANDRADA:  I THINK THAT IS NONRESPONSIVE.  I

14   THINK WE ARE TALKING ABOUT JANUARY 15TH, 2003 VISIT.

15             THE COURT:  WHY DON'T YOU TRY AND CLARIFY THAT WITH

16   ANOTHER QUESTION.

17             MR. ANDRADA:  WELL, SURE.

18   BY MR. ANDRADA:

19   Q.   WOULD YOU JUST READ THE PART OF THIS JANUARY 15TH

20   DOCUMENT, MR. ASHKER, THE PART THAT IS IN MARKED IN ORANGE?

21             (DOCUMENT HANDED TO WITNESS.)

22   A.   (READING)

23             DISCUSS THE NEED TO AGAIN HAVE A PAUSE FROM ULTRAM.

24   WHEN TOLD HE WILL NEED TO BE REPLACED WITH ELAVIL AND FLEXERIL

25   FOR THREE WEEKS, HE BECAME -- SOMETHING I CAN'T READ, AND SAID

1    THAT I DID NOT HEAR OF ANYTHING HE SAID.

2    **Q.**    FOR THREE WEEKS HE BECAME INDIGNANT?  IS THAT HOW YOU

3    WOULD INTERPRET THAT HANDWRITING?

4              **THE COURT:**  WELL, I THINK IT WOULD BE BEST TO HAVE

5    THE PERSON --

6              **MR. ANDRADA:**  THAT IS DR. FRIEDMAN, BUT IT'S GOING

7    TO BE IN EVIDENCE.  WE CAN HAVE DR. FRIEDMAN READ IT LATER,

8    YOUR HONOR.

9              **THE COURT:**  I GUESS THE JURY CAN READ IT.  I DON'T

10   KNOW THAT IT IS APPROPRIATE TO HAVE PEOPLE GUESSING ABOUT WHAT

11   IT SAYS.

12   **BY MR. ANDRADA:**

13   **Q.**    ALL RIGHT.  AND THEN THE PLAN WAS ON JANUARY 15TH TO

14   DISCONTINUE THE TRAMADOL FOR THREE WEEKS, CORRECT, SIR?

15   **A.**    YES, SIR.

16   **Q.**    ALL RIGHT.

17             AND SO THEN ON JANUARY 29TH YOU EXPRESSED TO THE

18   MEDICAL PROVIDERS YOUR DISAGREEMENT WITH DR. FRIEDMAN'S

19   MANAGEMENT; IS THAT CORRECT?

20   **A.**    CAN I SEE THE DOCUMENT?

21   **Q.**    SURE.  YOU CAN JUST READ -- BE SO KIND AS TO READ OUT LOUD

22   THE PART I MARKED IN ORANGE?

23             (DOCUMENT HANDED TO WITNESS.)

24   **A.**    (READING)

25             I GUESS "S" MEANS SUBJECT CLAIMED ULTRAM IS

ASHKER − CROSS / MR. ANDRADA

1    EFFECTIVE ONLY FOR ABOUT 16 HOURS.  PATIENT CURRENTLY NOT

2    AGREEABLE TO DR. FRIEDMAN'S MANAGEMENT.  REFUSED TO TAKE

3    FLEXERIL AND ELAVIL BECAUSE OF SIDE EFFECTS.

4    **Q.**   DR. FRIEDMAN YOU DESCRIBED EARLIER AS A CLOWN; IS THAT

5    CORRECT?

6    **A.**   YES, SIR.

7    **Q.**   AND NOW, ON JANUARY 29TH WOULD YOU READ THIS NOTE INTO THE

8    RECORD PLEASE JANUARY 29TH, 2003 THE PART MARKED IN YELLOW?

9              (DOCUMENT HANDED TO WITNESS.)

10   **A.**   (READING)

11             STATES ADDENDUM:  PER RN POMERLEAU AND RN HALLS THAT

12   PATIENT WAS ACTUALLY REFERRED AND DENIED TWICE BY UC DAVIS PAIN

13   CLINIC BECAUSE THEY AGREED WITH DR. FRIEDMAN'S RECOMMENDATIONS

14   AND MANAGEMENT.  WILL OBTAIN DOCUMENTATION FROM UC DAVIS.

15   **Q.**   ALL RIGHT.  THANK YOU.

16             MOVING FORWARD TO APRIL OF '03, IN WHICH THIS IS A

17   NOTE FROM DR. FRIEDMAN; IS THAT CORRECT, SIR?

18             (DOCUMENT HANDED TO WITNESS.)

19   **A.**   I WOULD ASSUME SO.

20   **Q.**   AND WOULD YOU READ OUT LOUD THE PART THAT'S MARKED IN

21   COLOR?

22   **A.**   (READING)

23             RENEW TRAMADOL 50 MILLIGRAMS BREAKFAST AND DINNER

24   FOR 60 DAYS AND ACETAMINOPHEN 350 WHATEVER.  OKAY.  CONSIDER

25   FURTHER WEANING AT NEXT VISIT OF TRAMADOL.

ASHKER – CROSS / MR. ANDRADA

1    **Q.**    OKAY.

2              AND IN HERE, THIS IS FROM JUNE OF 2003.  COULD YOU

3    READ THE PART THAT'S IN THIS FIRST PARAGRAPH UP THERE, SIR?

4              (DOCUMENT HANDED TO WITNESS.)

5    **A.**    YES.

6              IT STATES:  CANCEL APPOINTMENT AT HOSPITAL OF

7    MANTECA PAIN MANAGEMENT REFERRAL DUE TO PATIENT'S REFUSAL TO

8    GET ON THE BUS AND SIGNED REFUSAL FOR TREATMENT.

9    **Q.**    ALL RIGHT.  SO THAT WAS, AS YOU UNDERSTOOD IT, THAT WAS A

10   REFERRAL TO A PAIN MANAGEMENT SPECIALIST; IS THAT CORRECT?

11   **A.**    WELL, AT THE TIME THEY DIDN'T TELL ME WHAT IT WAS FOR.  I

12   FOUND OUT LATER WHEN I GOT COPIES OF THE MEDICAL RECORDS.

13   **Q.**    ALL RIGHT.

14             NOW MOVING FORWARD INTO -- TALK ABOUT 2005 AND

15   DR. ROWE, YOUR EXAMINATIONS BY DR. ROWE.

16             NOW YOU FIRST SAW DR. ROWE ON JUNE 23RD, 2005; IS

17   THAT CORRECT?

18   **A.**    YES, SIR.

19   **Q.**    AND WAS THAT THE DATE ON WHICH SHE WAS ANTAGONISTIC?  IS

20   THAT WHAT YOU WERE TALKING ABOUT EARLIER TODAY?

21   **A.**    NO, SIR.

22   **Q.**    WHEN WAS SHE ANTAGONISTIC THEN, LATER?

23   **A.**    I BELIEVE THAT WOULD BE THE SEPTEMBER VISIT.

24   **Q.**    WHEN SHE EXPRESSED CONCERN ABOUT TRAMADOL TO YOU?

25   **A.**    NO, SIR.  SHE NEVER VERBALLY EXPRESSED SPECIFIC REFERENCE

1   TO TRAMADOL CONCERNS TO ME.

2   **Q.**   SO WHY WAS -- HELP ME OUT HERE.  REFRESH MY MEMORY.  WHY

3   WAS SHE ANTAGONISTIC IN SEPTEMBER?

4   **A.**   WELL, SHE -- WELL, SHE MENTIONED -- SHE TALKED TO ME ABOUT

5   THE CONCERNS ABOUT TYLENOL BACK IN JUNE.  AND IN THE SEPTEMBER

6   ISSUE IT WAS ALSO IN REFERENCE TO CONCERNS ABOUT TYLENOL.

7   TRAMADOL WAS NEVER MENTIONED DURING THOSE TWO VISITS.

8   **Q.**   BUT IT WAS ON THE DECEMBER VISIT, WASN'T IT?

9   **A.**   NO, SIR.

10   **Q.**   DIDN'T SHE TELL YOU ON OR ABOUT DECEMBER 28TH -- WELL,

11   HERE.  LET ME JUST GIVE YOU THE NOTE AND THIS PARAGRAPH HERE

12   THAT IS NEXT TO THE BLUE POST-IT.  JUST READ THAT OUT LOUD.

13            (DOCUMENT HANDED TO WITNESS.)

14   **A.**   (READING)

15            HE ALSO EXPECTS TO TAKE TRAMADOL CHRONICALLY, AND I

16   TOLD HIM THIS DRUG IS INDICATED AS SHORT-TERM RELIEF OF ACUTE

17   PAIN AND POST-OP, ET CETERA.

18   **Q.**   OKAY.  AND DID SHE, IN FACT -- DID SHE, IN FACT, STOP YOUR

19   MEDS, TRAMADOL FOR A FEW DAYS AT THE END OF 2005?

20   **A.**   YES, SHE DID SO WITHOUT INFORMING ME OF HER INTENT TO DO

21   IT.

22   **Q.**   YOU PROTESTED ABOUT THAT; IS THAT CORRECT?

23   **A.**   YES, SIR.

24   **Q.**   ALL RIGHT.  AND THE MEDICATION WAS, IN FACT, REINSTATED A

25   FEW DAYS LATER; IS THAT CORRECT?

ASHKER – CROSS / MR. ANDRADA

1    **A.**   YES.  IT WAS DISCONTINUED ON DECEMBER 30TH AND REINSTATED

2    IN RESPONSE TO MY 602 APPEAL ON JANUARY 9TH, 2006 I BELIEVE.

3    **Q.**   AND SO THEN THE NEXT MEDICAL PROVIDER WHO EXPRESSED

4    CONCERN ABOUT TRAMADOL WAS MS. RISENHOOVER; IS THAT CORRECT?

5    **A.**   NO, SIR.

6    **Q.**   WHO WAS THE NEXT ONE WHO EXPRESSED CONCERN ABOUT IT?

7    **A.**   SHE TOLD ME THAT ON, IN JUNE OF 2006 THAT DR. SAYRE HAD

8    RECOMMENDED THAT SHE TAPER ME OFF TRAMADOL AND RE-EVALUATE MY

9    PAIN MEDICATION ISSUES.  AND SHE WAS NOT COMFORTABLE DOING

10   THAT.

11   **Q.**   SO IS IT YOUR TESTIMONY THAT MR. RISENHOOVER IN NEITHER

12   MARCH NOR JUNE OF 2006 EXPRESSED ANY CONCERN TO YOU ABOUT YOUR

13   LONG-TERM USE OF TRAMADOL?

14   **A.**   I DON'T RECALL HER EVER DOING THAT, SIR, DURING THAT MARCH

15   OR JUNE VISIT.

16   **Q.**   BUT YOU DO HAVE AN UNDERSTANDING THAT SHE APPROVED WITH --

17   AGREED WITH DR. SAYRE'S RECOMMENDATION IN AUGUST THAT YOU BE

18   WEANED OFF OF TRAMADOL AND TAKEN OFF TRAMADOL, CORRECT?

19   **A.**   WHAT TIME PERIOD OF AUGUST ARE YOU TALKING ABOUT?

20   **Q.**   LATE AUGUST, AUGUST 21ST THE MEDICAL COMMITTEE MEETING.

21          YOU HAVE A --

22   **A.**   WELL --

23   **Q.**   LET ME FINISH.

24          YOU HAVE AN UNDERSTANDING FROM THE RECORDS, DO YOU

25   NOT, AND FROM YOUR CONVERSATIONS WITH THE HEALTH CARE PROVIDERS

1    THAT MS. RISENHOOVER, DR. SAYRE, AND DR. ROWE MET ON OR ABOUT

2    AUGUST 21ST, 2006 TO DISCUSS YOUR USE OF TRAMADOL, CORRECT?

3    **A.**   I SAW HER EARLIER THAT DAY, AND AT THAT TIME SHE TOLD ME

4    THAT SHE WAS GOING CONTINUE MY TRAMADOL FOR 30 ADDITIONAL DAYS

5    BECAUSE I STILL NOT PERSONALLY PHYSICALLY EXAMINED BY

6    DR. SAYRE, AND SHE DID NOT EXPRESS ANY CONCERNS AT THAT TIME

7    ABOUT TRAMADOL TO ME AT ALL.

8    **Q.**   WELL, WERE YOU EVENTUALLY INFORMED THAT MS. RISENHOOVER

9    AND DR. ROWE AND DR. SAYRE MET ON OR ABOUT AUGUST 21ST, 2006,

10   MR. ASHKER?

11   **A.**   YES, SIR.

12   **Q.**   ALL RIGHT.  AND YOU WERE TOLD THAT THEY MET TO DISCUSS

13   YOUR USE OF ULTRAM, CORRECT?

14   **A.**   ON, I THINK, SEPTEMBER 21ST, SOMETHING LIKE THAT, I MET

15   WITH MS. RISENHOOVER.  AND AT THAT TIME SHE TOLD ME THAT ON

16   THAT 8/21 MAR COMMITTEE ATTENDED BY HER, MCLEAN, RISENHOOVER,

17   AND DR. SAYRE.  WHAT SHE VERY SPECIFICALLY TOLD ME WAS THAT

18   DR. ROWE WAS EMPHATIC ABOUT HAVING TRAMADOL DISCONTINUED FOR ME

19   AND THAT DEMANDED THAT IT BE DONE, AND THAT DR. SAYRE WAS IN

20   AGREEMENT BECAUSE OF HIS CONCERNS ABOUT POSSIBLE SEIZURE SIDE

21   EFFECTS.  SHE DIDN'T MENTION NOTHING ABOUT HERSELF.  THAT'S

22   WHAT SHE TOLD ME ABOUT ROWE AND SAYRE.

23   **Q.**   THOSE WERE THE TWO MEDICAL DOCTORS WHO HAD BEEN FOLLOWING

24   YOU AT PELICAN BAY IN 2005 AND 2006; ISN'T THAT CORRECT?

25   **A.**   YES.  THOSE ARE THE TWO DOCTORS I HAVE BEEN FILING

1    NUMEROUS COMPLAINTS ABOUT.  THAT'S CORRECT.

2              **MR. ANDRADA:**  MOVE TO STRIKE, NONRESPONSIVE, YOUR

3    HONOR.

4              **THE COURT:**  ALL RIGHT.  WE WILL STRIKE THAT.

5    **BY MR. ANDRADA:**

6    **Q.**   AND HERE, WOULD YOU LOOK AT THIS NOTE FROM SEPTEMBER 20TH,

7    2006 PLEASE, THE PART THAT IS IN YELLOW THERE.

8              IF YOU WOULD BE SO KIND TO READ THAT OUT LOUD FOR

9    THE JURY.

10             (DOCUMENT HANDED TO WITNESS.)

11   **A.**   (READING)

12             PATIENT HERE FOLLOW-UP.  DR. SAYRE'S CONSULT OF

13   8/30/06.  PATIENT STATES I ALREADY KNEW THIS WAS COMING THEN

14   WAS USING PROFANITY REGARDING DR. SAYRE AND APOLOGIZED TO THIS

15   PROVIDER FOR THE LANGUAGE USED.

16   **Q.**   ALL RIGHT.  AND THEN THIS IS A NOTE FROM NOVEMBER 6TH.

17   WOULD YOU READ THAT SLOWLY TO THE JURY?  NOVEMBER 6TH, 2006.

18             (DOCUMENT HANDED TO WITNESS.)

19   **A.**   (READING)

20             UPDATED ENTRY DATE 11/6/2006, TIME 10:07.  PATIENT

21   HERE FOLLOW-UP VOLTAREN.  PATIENT STATES, YEAH, I TRIED IT.

22   IT'S BULLSHIT.  I WANT IT DOCUMENTED THAT YOU AREN'T GIVING ME

23   FUCKING NOTHING.  I WANT YOU TO DOCUMENT FOR THE LAST SEVERAL

24   MONTHS THAT I HAVE BEEN SEEING YOU FOR SEVERE ARM PAIN AND YOU

25   ARE NOT GIVING ME NOTHING FOR IT.  AND WHEN I HAVE ASKED YOU

ASHKER – CROSS / MR. ANDRADA

1   FOR IT, YOU HAVE NOT GIVEN ME NOTHING.  THE VOLTAREN MESSED MY

2   STOMACH UP AND I PUT IN A 602 ON IT.  I PUT IN FOR SOMETHING

3   FOR MY STOMACH.  I GOT A REPLY THAT I AM GETTING EVERYTHING

4   THAT DR. SAYRE ORDERED.

5           PATIENT STATES HIS AMITRIPTYLINE, THE ONLY THING FOR

6   NERVE PAIN.  WHEN I TAKE THAT, MY VISION IS MESSED UP, SENSE OF

7   BALANCE IS MESSED UP.  WITHIN A WEEK LEFT EYE STARTS TWITCHING

8   THEN LEFT SIDE OF FACE TWITCHING.  I AM NOT SUPPOSED TO GET

9   NEURONTIN PER DR. DUNCAN ORTHO SPECIALIST.  PATIENT STATES I

10  WILL TRY THE IBUPROFEN AND THE TYLENOL FOR PAIN.  I WILL TRY

11  THE PEPCID FOR MY STOMACH.  UNDER MY SOLAR PLEXUS IS SORE.

12  **Q.**  WOULD YOU TAKE A LOOK AT THIS DOCUMENT, PLEASE.  THIS IS

13  FROM MARCH 19TH, 2007.  READ THE PART THAT IS IN ORANGE.

14          (DOCUMENT HANDED TO WITNESS.)

15  **A.**  (READING)

16          MEMBERS DISCUSSED PATIENT HAS ACCOMPLISHED A VERY

17  GOOD RESULT SINCE HIS INJURY, AND NO FURTHER PHYSICAL THERAPY

18  IS REQUIRED.  HIS REQUEST IS DENIED.

19  **Q.**  THANK YOU.

20          SO YOUR PHYSICAL THERAPY WAS ENDED AT THE END OF

21  MARCH OF 2007; IS THAT CORRECT?

22  **A.**  NO, SIR.

23  **Q.**  OKAY.  WHEN WAS IT ENDED?

24  **A.**  I BELIEVE THE LAST TIME I RECEIVED PHYSICAL THERAPY WAS IN

25  FEBRUARY OF 2007.

1   Q.   FAIR ENOUGH.  AND JUST SO WE ARE CLEAR, THE DECISION TO

2   END THE PHYSICAL THERAPY WAS A RESULT OF A DISCUSSION BY THE

3   MAR COMMITTEE, CAPITAL M, CAPITAL A, CAPITAL R, CORRECT?

4   A.   WHAT IS THE DATE ON THAT?

5   Q.   THE DOCUMENT YOU JUST READ.  HERE, I WILL SHOW IT TO YOU

6   AGAIN.

7            (DOCUMENT HANDED TO WITNESS.)

8   A.   I JUST NEED TO KNOW THE DATE.  I DON'T NEED TO SEE THE

9   DOCUMENT AGAIN.

10  Q.   MARCH 19TH, 2007.  THAT NOTE ABOUT THE END OF THE PHYSICAL

11  THERAPY, IS THAT IN REFERENCE TO A MAR MEETING?

12           (DOCUMENT HANDED TO WITNESS.)

13  A.   THAT'S WHAT IT SAYS ON HERE.  I FILED A 602 ABOUT THE

14  ISSUE, AND THAT'S THE RESPONSE I GOT.

15  Q.   OKAY.  AND THEN THE -- BEAR WITH ME HERE.

16           ALL RIGHT.  THEN YOU SAW DR. SAYRE AGAIN IN JUNE OF

17  2007; IS THAT CORRECT?

18  A.   YES, SIR.

19  Q.   ALL RIGHT.  AND THIS IS PART OF DR. SAYRE'S NOTE.  WOULD

20  YOU READ THE PART THAT I HAVE MARKED IN YELLOW THERE, SIR,

21  PLEASE?  THIS IS AGAIN JUNE 6, 2007.

22           (DOCUMENT HANDED TO WITNESS.)

23  A.   THIS DOCUMENT IS DATED JUNE 6, 2007.  I WAS VERY

24  INTERESTED IN EXAMINING HIS HAND.  THIS WAS DONE WITH AND

25  WITHOUT THE SPLINT.

1          DID YOU WANT ME TO READ THE WHOLE PARAGRAPH OR JUST

2     THE PART THAT'S HIGHLIGHTED IN YELLOW?

3     **Q.**   YES.

4               **THE COURT:**   THIS IS A LITTLE ODD TO HAVE HIM READ

5     OUT LOUD THE MEDICAL RECORDS.  DO YOU HAVE QUESTIONS YOU WANTED

6     TO ASK HIM?

7               **MR. ANDRADA:**   IT'S IN EVIDENCE, SO JUST, AGAIN, FOR

8     THE SAKE OF CONTINUITY HERE AND SPEED, I THOUGHT THIS WOULD

9     FRANKLY BE THE FASTEST WAY TO DO IT.  AND IF --

10              **THE COURT:**   TELL HIM HOW MUCH YOU WANT HIM TO READ

11    OUT LOUD.

12              **MR. ANDRADA:**   THE PARAGRAPH IS MARKED ALL IN YELLOW,

13    SO THAT PARAGRAPH THERE, MR. ASHKER, IF YOU CAN READ THE WHOLE

14    PARAGRAPH I WOULD APPRECIATE IT.

15              **THE WITNESS:**   OKAY.  I WASN'T CLEAR IF YOU MEANT

16    JUST THE HIGHLIGHTED YELLOW PARTS OR THE ENTIRE PARAGRAPH.

17              I WAS VERY INTERESTED IN EXAMINING HIS HAND.  THIS

18    WAS DONE WITH AND WITHOUT THE SPLINT.  AS FAR AS A PROTECTIVE

19    DEVICE, I CAN FIND NO REASON WHY THE FIT HAS TO BE SO IMPROVED.

20    HE JUST DOES NOT WANT TO HIT THE AREAS WITHOUT OVERLYING

21    MUSCLES.  EVEN WITHOUT THE SPLIT, HE NO LONGER HAS ANY ULNAR

22    GRIP WITH FLEXION EXTENSION.  HE DOES HAVE SOME DEFINED MUSCLE

23    LOSS, BUT THE AREA IS WELL HEALED.  NO INFLAMMATION, SWELLING

24    OR SIGNS OF ACUTE PROCESS.  THE WRIST DOES HAVE A REDUCED RANGE

25    OF MOTION, BUT WITH ACTIVE AND PASSIVE MOTION TO HIS LIMITS,

1    THERE WAS NO EXPRESSION OF PAIN OR DISCOMFORT.  THE FINGERS

2    WERE SOMEWHAT COOL, BUT THERE WERE GOOD PULSES AND CAPILLARY

3    FILLING.

4            MY IMPRESSION WAS THAT THE ENTIRE LOWER ARM AND HAND

5    SHOWED END STAGE INJURY WITH STABLE AND STATIONARY

6    DISABILITIES.  THE ARM AND HAND WERE BUT NOT PARTICULARLY

7    PAINFUL OR PROBLEMATIC OTHER THAN WITH DECREASED FUNCTION.

8    Q.  ALL RIGHT.

9            AUGUST 2ND, 2007, DOWN AT THE BOTTOM HERE.  WOULD

10   YOU READ THIS NOTE THAT IS IN THE -- MARKED IN ORANGE, PLEASE?

11           (DOCUMENT WITH HANDED TO WITNESS.)

12           **MR. ASHKER:**  I HAVE THE ABILITY TO OBJECT ON MY OWN

13   BEHALF SINCE I AM MY OWN LAWYER, CORRECT?

14           **THE COURT:**  YES.

15           **MR. ASHKER:**  SO, MY OBJECTION WOULD BE BASED ON

16   THESE RECORDS THAT I AM READING UNLESS OTHERWISE SPECIFIED IS

17   NO WAY AN ADMISSION ON MY PART THAT THE DOCUMENTS ARE TRUE.

18           **THE COURT:**  THAT'S DEFINITELY TRUE.

19           HE IS ASKING YOU TO READ THEM OUT LOUD.  I DON'T

20   EXACTLY KNOW WHY, BUT IT CERTAINLY IS NOT AN ADMISSION ON YOUR

21   PART THAT ANYTHING YOU ARE READING OUT LOUD IS TRUE.

22           **MR. ASHKER:**  THANK YOU, YOUR HONOR.

23           YOU WANTED ME TO READ THIS WHOLE PAGE?

24           **MR. ANDRADA:**  NO.

25   ///

1    **BY MR. ANDRADA:**

2    **Q.**   MR. ASHKER, IF YOU WOULD BE SO KIND, I THINK I INDICATED

3    THE PART IN ORANGE DOWN AT THE BOTTOM THAT IS MARKED.

4    **A.**   THE ORANGE PART?

5    **Q.**   YES, SIR.

6    **A.**   OKAY.  NOTE -- WELL, THIS DOCUMENT IS DATED 8/2/07.  IT

7    SAYS, NOTE:  RN'S HAVE INFORMATION OF INMATE DRUG ABUSE ISSUES.

8    **Q.**   THANK YOU.  AND THIS IS AUGUST OF 2007.

9            NOW, SINCE THAT TIME, SIR, HAVE YOU BEEN SEEN BY

10   VARIOUS CLINICIANS AT PELICAN BAY?

11   **A.**   YES, SIR, I HAVE.

12   **Q.**   AND, AGAIN, IN THE INTEREST OF TIME, CAN YOU TELL US WHICH

13   PHYSICIANS YOU HAVE SEEN AT PELICAN BAY SINCE AUGUST OF 2007?

14           **THE COURT:**  LET ME INTERRUPT FOR A SECOND AND

15   EXPLAIN THAT WHILE THESE ARE THE MEDICAL RECORDS, THEY CONTAIN

16   STATEMENTS OF OTHER PEOPLE.  AND SO WHEN IT SAYS RN SAID

17   SOMETHING, WE DON'T KNOW WHAT RN SAID IT OR ON WHAT BASIS THEY

18   SAID IT AND SO FORTH.  SO WHILE THAT IS IN THERE, IT'S -- WE

19   DON'T HAVE ANY TESTIMONY ABOUT THAT.

20           **MR. ANDRADA:**  YES, MR. ASHKER?

21           **THE WITNESS:**  I DIDN'T CATCH THE WHOLE QUESTION.

22   **BY MR. ANDRADA:**

23   **Q.**   TELL US WHAT OTHER PHYSICIANS YOU HAVE SEEN AT PELICAN BAY

24   SINCE AUGUST OF 2007, IF YOU WOULD BE SO KIND.

25   **A.**   PHYSICIANS?

ASHKER – CROSS / MR. ANDRADA

1   **Q.**   PHYSICIANS.

2   **A.**   I SAW DR. MARTINELLI AND I SAW DR. WILLIAMS.

3   **Q.**   OKAY.  AND YOU UNDERSTAND THAT DR. MARTINELLI IS A

4   SPECIALIST; IS THAT CORRECT?

5   **A.**   I AM NOT SURE ABOUT THAT.

6   **Q.**   ALL RIGHT.  AND DID YOU DISCUSS WITH DR. MARTINELLI ANY OF

7   YOUR COMPLAINTS ABOUT STOMACH UPSET?

8   **A.**   YES, SIR, I DID.

9   **Q.**   YOU HAD THAT PROBLEM AND YOU DISCUSSED THIS ALREADY, BUT

10  YOU HAD STOMACH UPSET IN THE 1990'S, CORRECT?

11  **A.**   BEGINNING AROUND 1995.

12  **Q.**   AND IT'S BEEN A PERIODIC PROBLEM SINCE THAT TIME, CORRECT?

13  **A.**   IT PRETTY MUCH DISSIPATED DURING THE TIME I WAS ON THE

14  TRAMADOL.

15  **Q.**   IT WAS STILL A CONCERN, STILL A PROBLEM, AND YOU STILL

16  MADE COMPLAINTS ABOUT IT; ISN'T THAT TRUE?

17  **A.**   NO, SIR.

18  **Q.**   NO COMPLAINTS AT ALL FOR THOSE FOUR YEARS ABOUT STOMACH

19  UPSET?

20  **A.**   I MEAN, I WAS GETTING MYLANTA TABS, BUT THEY WERE WORKING

21  FOR ME.  I WASN'T HAVING ANY PROBLEMS.

22  **Q.**   ALL RIGHT.  WE CAN COME BACK TO THAT.

23          DR. WILLIAMS IS THE OTHER PROVIDER THAT YOU'VE SEEN,

24  CORRECT?

25  **A.**   YES, SIR.

ASHKER – CROSS / MR. ANDRADA

1   Q.   AND THEN HOW ABOUT ANY NURSES OR NURSE PRACTITIONERS?

2   HAVE YOU SEEN ANY NURSE -- ANY OF THOSE TYPES OF PROFESSIONALS

3   IN THE LAST TWO YEARS AT PELICAN BAY?

4   A.   YES, SIR.

5   Q.   WHO HAVE YOU SEEN IN THAT REGARD?

6   A.   I COULDN'T TELL YOU ALL THE NURSES I HAVE SEEN, BUT I HAVE

7   SEEN FAMILY NURSE PRACTITIONER RISENHOOVER.

8   Q.   HOW ABOUT MR. FLOWERS, DO YOU RECOGNIZE THAT NAME AS ONE

9   OF YOUR NURSES?

10  A.   YES, SIR.

11  Q.   AND HOW OFTEN ARE YOU SEEN -- HOW OFTEN ARE YOU SEEN AT

12  PELICAN BAY BY A MEDICAL PROVIDER OF ANY SORT?

13          TAKE A MONTHLY BASIS, YEARLY BASIS, WHATEVER WAY IS

14  EASIEST FOR YOU, MR. ASHKER.

15  A.   I DON'T UNDERSTAND THE CONTEXT OF YOUR QUESTION AS FAR AS

16  HOW OFTEN.  I MEAN, I AM SEEN WHEN I PUT IN A MEDICAL CARE

17  REQUEST.

18  Q.   HOW MANY TIMES HAVE YOU BEEN SEEN IN 2009?

19  A.   I COULDN'T TELL YOU.  OH.  WELL, IN 2009, I THINK -- WELL,

20  I SAW DR. WILLIAMS IN MARCH AND ON MARCH, I THINK, 23RD, AND

21  THEN I WENT OVER TO THE THING WHEN I HAD THAT STOMACH PAIN ON

22  MARCH 30TH.  SO THOSE TWO TIMES THAT I RECALL.

23  Q.   OKAY.  TWO TIMES.  HOW ABOUT IN 2008?

24          **THE COURT:**  WHY DON'T WE BREAK FOR THE DAY.

25          **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

1         **THE COURT:**  WE WILL GET BACK TOGETHER AT

2    8:30 TOMORROW MORNING.

3              THANK YOU FOR BEING PROMPT THIS MORNING.  AND WE

4    WILL TRY TO BE PROMPT AGAIN TOMORROW.  REMEMBER TO LEAVE YOUR

5    NOTES AND YOUR JURY INSTRUCTIONS IN THE JURY ROOM.  WEAR YOUR

6    BADGES WHEN YOU LEAVE AND WHEN YOU COME BACK IN THE MORNING.

7    DON'T DISCUSS THE CASE AMONGST YOURSELVES OR WITH ANYONE ELSE.

8    DON'T DO ANY RESEARCH ABOUT THE CASE.  KEEP AN OPEN MIND, AND

9    WE WILL SEE YOU TOMORROW.

10             AND I WOULD LIKE TO SEE THE PARTIES FOR A MOMENT,

11   PLEASE.

12             (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

13        **THE COURT:**  SO I GUESS TOMORROW WE HAVE

14   DR. WEINSTEIN COMING IN AT 8:30.  SO I THINK WE WILL

15   PROBABLY -- HOW MUCH MORE DO YOU HAVE?  I AM INCLINED TO

16   INTERRUPT THIS AND JUST GET THE TWO DOCTORS ON AND OFF THE

17   STAND UNLESS YOU'RE ALMOST FINISHED.

18        **MR. ANDRADA:**  WHY DON'T YOU PUT THEM ON FIRST.

19   THAT'S FINE.

20        **THE COURT:**  IF YOU ARE ALMOST FINISHED, IT WOULD

21   PROBABLY BE BETTER TO FINISH UP.  YOU ARE NOT GOING TO GO ON

22   WITH READING A LOT MORE --

23        **MR. ANDRADA:**  WE ARE DONE --

24        **THE COURT:**  -- MEDICAL RECORDS.

25        **MR. ANDRADA:**  I WENT THROUGH IT, AGAIN, JUDGE, BY

1    ESSENTIALLY RESPONSE TO HIS USE OF THE MEDICAL RECORDS ON

2    DIRECT.  IT MADE IT VERY DIFFICULT.  IT WAS A LITTLE UNUSUAL TO

3    HAVE HIM READ.

4              **THE COURT:**  OKAY, ALL RIGHT.  YOU ARE DONE WITH THAT

5    PART?

6              **MR. ANDRADA:**  I AM DONE WITH THAT PART NOW.

7              **THE COURT:**  CAN YOU ESTIMATE ABOUT HOW MUCH MORE YOU

8    HAVE ON CROSS?

9              **MR. ANDRADA:**  MAYBE HALF HOUR, 45 MINUTES AT THE

10   MOST.

11             **THE COURT:**  OKAY.

12             MAYBE WE WILL CHECK WITH DR. WEINSTEIN AS TO HIS

13   SCHEDULE.

14             DO YOU CARE?

15             **MR. ASHKER:**  NO.

16             **THE COURT:**  WE CAN EITHER FINISH YOUR CROSS AND HE

17   WOULD HAVE TO WAIT, AND ALLEN AS WELL, OR WE CAN INTERRUPT IT

18   AND CALL THEM RIGHT AWAY.

19             **MR. ASHKER:**  I DON'T KNOW WHAT DR. WEINSTEIN MIGHT

20   HAVE GOING ON, SO WHATEVER WORKS FOR THE COURT, I MEAN.  BUT HE

21   MIGHT HAVE -- HE HAD CONCERNS ABOUT KNOWING THE SPECIFIC DAY.

22             **THE COURT:**  I WILL CHECK WITH HIM.  WE PROBABLY WILL

23   INTERRUPT AND GO AHEAD AND CALL WEINSTEIN AND ALLEN.  NOW, ON

24   ALLEN, YOU HAD WANTED JUDICIAL NOTICE OF HIS SUSPENSION.

25             **MR. ANDRADA:**  YES, MA'AM.

1          **THE COURT:**  YOU CAN CERTAINLY ASK HIM IF HE WAS

2     SUSPENDED AND YOU CAN ASK HIM WHY.  IF HE DENIES IT, YOU CAN

3     PROVE IT WITH THE CERTIFICATE.  BUT I AM NOT GOING TO GO INTO

4     ALL OF THE DETAILS OF EVERYTHING THAT'S WRITTEN DOWN IN THAT

5     SUSPENSION.  I DON'T THINK THAT'S RELEVANT TO ALL OF HIS

6     CREDIBILITY.  I IMAGINE HE WILL ADMIT THAT HE WAS SUSPENDED FOR

7     DRUG USE AND I WILL ALLOW THAT.  IF HE DENIES IT, YOU CAN

8     IMPEACH HIM WITH IT.

9          **MR. ANDRADA:**  ALL RIGHT.

10         **THE COURT:**  AND THEN YOU WERE GOING TO HAVE PREPARED

11    A LIST OF EVERYTHING ELSE THAT YOU HAD THAT YOU HAD IN MIND TO

12    IMPEACH HIM WITH.

13         **MR. ANDRADA:**  YES, YOUR HONOR.  I AM MINDFUL OF THAT

14    AND IT ESSENTIALLY ARISES -- AGAIN, OUR IMPEACHMENT WOULD ARISE

15    OUT OF HIS PROBLEMS WITH THE MEDICAL BOARD.  THAT'S ONE ASPECT

16    OF IT.

17         **THE COURT:**  WELL, PROBLEMS WHICH ARE THAT HE WAS

18    SUSPENDED FOR A YEAR.

19         **MR. ANDRADA:**  WELL, IT WAS MORE THAN THAT.

20         **THE COURT:**  THAT'S WHAT I SAW.  WAS THERE SOMETHING

21    ELSE?

22         **MR. ANDRADA:**  MY GOODNESS.  IT'S ALL RIGHT THERE IN

23    THAT REQUEST FOR JUDICIAL NOTICE.

24         **THE COURT:**  BUT THE RESULT WAS A DISCIPLINARY

25    ACTION.

1          **MR. ANDRADA:**  WELL --

2          **THE COURT:**  ONE DISCIPLINARY ACTION.

3          **MR. ANDRADA:**  WITH MANY COMPONENTS TO IT.

4          **THE COURT:**  THE ONE THAT STRUCK ME AS RELEVANT WAS

5    DRUG USAGE.

6          **MR. ANDRADA:**  YES, BUT YOUR HONOR.

7          **THE COURT:**  ALL THAT'S RELEVANT IS WHAT WOULD BE

8    RELEVANT TO HIS CREDIBILITY AS A WITNESS.  I ASSUME IT WAS THE

9    DRUG USAGE YOU ARE GETTING AT.  I DON'T KNOW IF THERE WAS

10   SOMETHING ELSE IN PARTICULAR.

11         **MR. ANDRADA:**  WELL, WHAT CAUSED THE PROBLEM WITH THE

12   MEDICAL BOARD WAS DRUG USE.

13         **THE COURT:**  YEAH.

14         **MR. ANDRADA:**  AND I DON'T HAVE THE DOCUMENTS RIGHT

15   IN FRONT OF ME, BUT MY RECOLLECTION IS THAT THERE WAS A --

16   MIGHT HAVE BEEN A PREVIOUS PROBLEM WITH THE BOARD WHICH LED TO

17   THIS MORE SERIOUS IMPOSITION OF A SANCTION.

18         BUT THE POINT IS THAT WE WANT TO DEAL -- WE WANT TO

19   TALK ABOUT HIS PROBLEMS WITH THE BOARD, WHAT CAUSED THOSE

20   PROBLEMS, AND THEN HIS TERMINATION AT PELICAN BAY.  AND

21   DR. SAYRE WAS INVOLVED IN THAT TERMINATION.  AND HE WAS

22   ESSENTIALLY TERMINATED BECAUSE OF THE DRUG PROBLEMS.

23         SO THOSE WOULD BE THE TWO MAIN AREAS, NONE OF WHICH,

24   OF COURSE, WAS INFORMATION THAT I GOT FROM DR. ALLEN WHEN I WAS

25   REPRESENTING HIM.

1          **THE COURT:** OKAY.

2          **MR. ANDRADA:** SO, THOSE WOULD BE THE TWO MAIN AREAS

3   OF FOCUS WITH REGARD TO DR. ALLEN.

4          **THE COURT:** OKAY.

5          **MR. ANDRADA:** NOW, MAY I ASK THE COURT A QUESTION

6   WITH REGARD TO DR. ALLEN JUST SO I AM CLEAR ABOUT WHAT HE IS

7   GOING TO BE TESTIFYING TO TOMORROW?  IF I CAN TAKE A MOMENT OF

8   YOUR TIME.

9          YOUR ORDER, IN MY MIND, WAS A LITTLE UNCLEAR AS TO

10  WHAT HE'S GOING TO BE TALKING ABOUT, PARTICULARLY IF HE FOLLOWS

11  DR. WEINSTEIN, WHO PRESUMABLY IS GOING TO SAY THAT THERE WAS A

12  BREACH OF THE STANDARD OF CARE IN THIS MANAGEMENT OF THIS

13  PATIENT.

14         I AM NOT QUITE SURE WHAT DR. ALLEN IS SUPPOSED TO

15  ADD TO THAT.  HE'S MERELY GOING TO REPEAT THAT.  OF COURSE, IT

16  WOULD BE CUMULATIVE AND PREJUDICIAL.

17         **THE COURT:** WELL, PLAINTIFF PUT HIM ON THE WITNESS

18  LIST AND PLAINTIFF CAN CALL HIM UNLESS YOU HAD SOME OBJECTION

19  TO IT.  DID I WRITE ON ORDER SAYING WHAT HE COULD OR COULD NOT

20  TESTIFY?

21         **MR. ASHKER:** YES.

22         **MR. ANDRADA:** YES, YOU DID.

23         **THE COURT:** I DON'T REMEMBER IT.

24         **MR. ANDRADA:** I UNDERSTAND THAT.  THERE'S A LOT OF

25  PAPER IN THIS CASE.

1           THE GIST OF IT WAS THAT HE COULD TALK ABOUT, IF I

2    REMEMBER, THE GIST OF IT WAS HE COULD TALK ABOUT INSTANCES AT

3    PELICAN BAY WHERE HE THOUGHT MALPRACTICE HAD OCCURRED.  AND WE

4    SUGGEST THAT WOULD HAVE NO RELEVANCE, WOULD BE HIGHLY

5    PREJUDICIAL.  THE CDCR IS NOT A DEFENDANT HERE.

6           **THE COURT:**  I GUESS IT WOULD -- I WILL HAVE TO LOOK

7    IT UP.  I GUESS IT WOULD BE MALPRACTICE BY DR. SAYRE.

8           **MR. ANDRADA:**  MAY I RESPOND TO THAT?

9           HOW WOULD THAT BE RELEVANT FOR PURPOSES OF THE

10   MALPRACTICE CLAIM FOR THE DELIBERATE INDIFFERENCE CLAIM WHEN

11   THE ALLEGED DELIBERATE INDIFFERENCE HERE IS NOT AN

12   INSTITUTIONAL ACTIVITY ON THE PART OF DR. SAYRE, BUT RATHER

13   DEALING WITH ONE PATIENT ABOUT ONE MEDICATION.  HOW COULD --

14          **THE COURT:**  IT'S NOT JUST MEDICATION, IT'S THE

15   THERAPY, PHYSICAL THERAPY AND THE ARM BRACE AND THE BALL AND

16   THE THERA-BAND.  BUT I GUESS --

17          **MR. ANDRADA:**  THROW THOSE IN, TOO.

18          **THE COURT:**  I DON'T KNOW WHAT DR. ALLEN HAS TO SAY.

19   IF HE OBSERVED INSTANCES OF MALPRACTICE COMMITTED BY DR. SAYRE

20   ON MR. ASHKER, THEN HE COULD TESTIFY ABOUT THAT AS A PERCIPIENT

21   WITNESS.

22          **MR. ASHKER:**  MAY I BE HEARD ON IT?

23          **MR. ANDRADA:**  EXCUSE ME, MR. ASHKER, JUST A MINUTE.

24          **THE COURT:**  IN A MINUTE.

25          **MR. ANDRADA:**  ARE YOU SAYING, YOUR HONOR, THAT

1    DR. ALLEN CAN TESTIFY ABOUT MALPRACTICE THAT HE MIGHT HAVE

2    OBSERVED BEING COMMITTED UPON MR. ASHKER, IS THAT WHAT YOU ARE

3    SAYING AS OPPOSED TO OTHER INMATES?

4              **THE COURT:**  THE FIRST THING I AM SAYING IS, YES,

5    THAT WOULD BE ADMISSIBLE.  IF WE ARE TALKING ABOUT MALPRACTICE

6    COMMITTED ON OTHER INMATES, I DON'T KNOW IF HE HAS THAT TO SAY

7    OR DOESN'T HAVE THAT TO SAY.  AND I SUPPOSE IT WOULD DEPEND IF

8    IT WERE RELEVANT FOR SOME REASON SUCH AS MOTIVE, INTENT,

9    OPPORTUNITY, PLAN, OR DESIGN, WHICH ARE THE RULES OF EVIDENCE.

10   I DON'T KNOW WHAT HE HAS GOT TO SAY.

11             **MR. ASHKER:**  MAY I RESPOND, YOUR HONOR?

12             **THE COURT:**  YES.

13             **MR. ASHKER:**  IN MY MOTION IN LIMINE NUMBER SIX, WHAT

14   I HAD SAID IS THAT I GIVE A LITTLE OFFER OF PROOF ON WHAT

15   DR. ALLEN'S TESTIMONY WAS GOING TO BE ON:  ACCORDING TO

16   STATEMENTS HE MADE IN HIS DECLARATION THAT I FILED IN SUPPORT

17   OF MY OPPOSITION TO SUMMARY JUDGMENT.

18             **THE COURT:**  YOU'RE RIGHT.  I FOUND IT.

19             **MR. ASHKER:**  YOU HAD RULED --

20             **THE COURT:**  IT SAYS, HE MAY TESTIFY TO HIS PERSONAL

21   KNOWLEDGE OF PELICAN BAY STATE PRISON'S PROCEDURES FOR MEDICAL

22   CARE OR REFERRAL, TO MEDICAL SPECIALISTS TO ANY DIRECT

23   OBSERVATIONS OF DR. SAYRE'S MALPRACTICE THAT ARE PROBATIVE OF

24   SIMILAR TREATMENT OF PLAINTIFF, AND TO ANY ADMISSIONS BY

25   DR. SAYRE.

1        HE MAY NOT TESTIFY ABOUT THE INMATE DEATH IN

2   WASHINGTON, OR ABOUT A MEDICAL BOARD INVESTIGATION OF DR. SAYRE

3   THAT DR. ALLEN INITIATED.

4        SO THAT'S WHAT I SAID.  THAT'S BASED ON WHAT I WAS

5   TOLD HE HAD TO SAY.  I DON'T KNOW IN DETAIL WHAT HE MIGHT HAVE

6   TO SAY.  SO THAT'S ABOUT THE BEST I CAN DO AT THIS POINT.  YOU

7   CAN CERTAINLY OBJECT IF HE SAYS SOMETHING THAT YOU THINK IS

8   OBJECTIONABLE.

9        **MR. ANDRADA:**  OKAY.  YOUR HONOR, THANK YOU.  SO WE

10  WILL HAVE WEINSTEIN AND THEN ALLEN, BACK TO MR. ASHKER.

11       NOW, YOUR HONOR, WE PREVIOUSLY APPLIED FOR

12  PERMISSION TO HAVE THE DOCTORS AT DAVIS TESTIFY BY

13  VIDEOCONFERENCE FROM DAVIS.  WE BRIEFED THIS LATE LAST WEEK.

14       I THINK WE MENTIONED TO YOU OUR CONCERN THAT THERE

15  WAS SOMEHOW THIS CONTENTION BY THE PLAINTIFF THAT THERE HADN'T

16  BEEN REFERRALS.  SO, WE STILL HAVE THOSE -- ONE OF THOSE

17  DOCTORS IS GOING ON A TRIP.  HE IS LEAVING THE COUNTRY.  HE IS

18  GOING TO BE GONE AFTER TOMORROW.  SO TOMORROW WOULD BE MY LAST

19  CHANCE TO PUT HIM ON THE STAND AND GO THROUGH WHAT HAPPENED

20  FROM THE PROSPECTIVE OF UC DAVIS IN REGARDS TO THIS MATTER.

21       **THE COURT:**  WE CAN CALL HIM OUT OF ORDER.

22       **MR. ANDRADA:**  OKAY.

23       **THE COURT:**  ARE YOU STILL DESIROUS OF HAVING HIM

24  TESTIFY BY VIDEO?

25       **MR. ANDRADA:**  THAT WOULD BE THE ONLY WAY I COULD

1    HAVE HIM.  AS A PRACTICAL MATTER, YOUR HONOR, IT IS THE ONLY

2    WAY I CAN GET HIM.

3              **THE COURT:**  IT IS NOT THAT FAR AWAY.

4              **MR. ANDRADA:**  BELIEVE ME --

5              **THE COURT:**  DO YOU HAVE AN OBJECTION HAVING HIM

6    TESTIFY BY VIDEO?

7              **MR. ASHKER:**  NOT AT ALL, YOUR HONOR.  I JUST AM

8    CURIOUS ABOUT -- I MEAN, HOW -- I AM NOT CLEAR ON HOW THIS

9    WOULD WORK BECAUSE I DON'T BELIEVE EITHER DOCTOR THAT HE PLANS

10   TO CALL HAS A RECOLLECTION OF PERSONAL KNOWLEDGE ABOUT

11   PERSONALLY REVIEWING AND DENYING MY REFERRAL.  THE DOCUMENTS

12   THAT HE HAS REFERENCED WERE CREATED BY SOMEBODY ELSE.

13             **THE COURT:**  I GUESS THEY COULD SAY THEY SAW THEM AND

14   THEY, IN FACT, DID SAY THEY WOULDN'T SEE YOU.

15             **MR. ASHKER:**  THEY WOULD HAVE TO SAY THAT THEY

16   SPECIFICALLY REMEMBER MY REFERRAL?

17             **THE COURT:**  I SUPPOSE THEY COULD HAVE THEIR

18   RECOLLECTION REFRESHED BY LOOKING AT A PIECE OF PAPER AND MAYBE

19   THEY WOULD REMEMBER IT, MAYBE THEY WOULDN'T.  I DON'T KNOW.

20   THEY WEREN'T DEPOSED?

21             **MR. ANDRADA:**  YES, THEY WERE, YOUR HONOR.

22             **MR. ASHKER:**  MY ABILITY TO CROSS-EXAMINE THEM WAS

23   SEVERELY RESTRICTED DURING THAT DEPOSITION BECAUSE MR. ANDRADA

24   HAD TAKEN UP LIKE, FOR INSTANCE, THE FIRST DOCTOR IT WAS

25   LIMITED TO AN HOUR BECAUSE HE HAD TO LEAVE ON AN EMERGENCY OR

1    SOME KIND OF MEDICAL PROCEDURE, AND MR. ANDRADA TOOK UP, I

2    THINK, 50 MINUTES OR SO.  AND THEN I HAD LIKE THE LAST FEW

3    MINUTES.  I WASN'T GOING TO MAKE THE DOCTOR STAY THERE TO

4    PREVENT HIM FROM GOING AND PROVIDING THIS IMPORTANT MEDICAL --

5    THAT'S WHY, WHEN HE ASKED ME IF I WOULD STIPULATE TO HAVING

6    THEIR DEPOSITIONS READ, I DID NOT WANT TO DO SO BECAUSE OF

7    THOSE RESTRICTIONS.  SO, THAT'S WHAT HAPPENED RIGHT THERE.

8            **THE COURT:**  OKAY.  WELL, APPARENTLY, MR. ASHKER DOES

9    NOT OBJECT TO HAVING HIS TESTIMONY COME IN BY VIDEOCONFERENCE.

10   SO IF THAT IS WHAT YOU WOULD LIKE TO DO, I GUESS I WOULD ALLOW

11   IT, ALTHOUGH DAVIS IS NOT REALLY THAT FAR AWAY.

12           **MR. ANDRADA:**  JUDGE, I KNOW, BELIEVE ME.

13           **THE COURT:**  OKAY.  AND YOU WANT -- SO WHICH ONE IS

14   THAT, FISHMAN OR KREIS?

15           **MR. ANDRADA:**  THAT'S ACTUALLY KREIS, DR. KREIS, AND

16   THAT WOULD BE LATE TOMORROW MORNING, YOUR HONOR.

17           **THE COURT:**  OKAY.  WE CAN TAKE HIM AFTER WEINSTEIN

18   AND ALLEN, OR LATER IF YOU WANT.  WHATEVER YOU WOULD LIKE.

19           **MR. ANDRADA:**  ALL RIGHT.  I SUSPECT WE ARE GOING TO

20   BE A WHILE WITH WEINSTEIN AND ALLEN, DEPENDING ON HOW FAR THE

21   COURT ALLOWS DR. ALLEN TO GO.

22           SO, BUT I WILL ENDEAVOR TO HAVE HIM AVAILABLE.  WE

23   HAVE -- COURT CONNECT IS NOT HERE RIGHT NOW.  I AM TOLD THAT WE

24   HAVE ALREADY MADE THE ARRANGEMENTS FOR THE VIDEOCONFERENCING

25   FROM DAVIS.  SO THAT PART, AS I UNDERSTAND IT, IS TAKEN CARE

1    OF.  AND I WANT TO SAY THAT I THINK WE HAVE HIM DOWN AT 11:30.

2              **THE COURT:**  BE BRIEF WITH WEINSTEIN AND ALLEN IS MY

3    ADVICE IF YOU WANT TO BE DONE BY 11:30.

4              AND THEN WHAT ABOUT FISHMAN?

5              **MR. ANDRADA:**  WELL, IF WE CAN GET DR. KREIS ON THE

6    STAND AND GO THROUGH IT, I SUSPECT THAT WE PROBABLY WON'T NEED

7    FISHMAN.

8              **THE COURT:**  OKAY.  THEN WE FINISH ASHKER'S CROSS,

9    WE'LL SAYRE'S -- HAVE YOU DECIDED WHAT YOU WANT TO DO ABOUT

10   SAYRE'S DIRECT?

11             **MR. ANDRADA:**  WE DECIDED WE WILL PUT DR. SAYRE ON BY

12   WAY OF DIRECT FIRST.

13             **THE COURT:**  SO SAYRE'S DIRECT AND THEN HIS CROSS.

14             **MR. ASHKER:**  YOUR HONOR, IN THAT SITUATION RIGHT

15   THERE, WOULD MY CROSS BE -- I CALLED HIM AS A WITNESS ALSO AS A

16   DEFENDANT, WOULD I BE PERMITTED TO ACT AS IF IT WAS A DIRECT

17   ALSO?

18             **THE COURT:**  YES.

19             **MR. ASHKER:**  OKAY.

20             **THE COURT:**  YOU CAN ASK HIM WHATEVER YOU WANT.  IN

21   FACT, ON CROSS YOU CAN ASK LEADING QUESTIONS.

22             **MR. ASHKER:**  OKAY.  I WAS GOING TO HAVE HIM PURSUANT

23   TO A HOSTILE WITNESS PROVISIONS ANYWAY.

24             **THE COURT:**  YOU CAN DO THAT, TOO, BUT YOU WON'T BE

25   LIMITED IN SCOPE TO WHAT HE SAYS ON DIRECT BECAUSE YOU HAD HIM

1    AS YOUR OWN WITNESS.

2                **MR. ASHKER:**  I WANTED TO CLARIFY THAT.

3                ONE THING I WANTED TO BRING UP.  YESTERDAY THERE WAS

4    MENTION ABOUT TAKING PHOTOS OF THESE EXHIBITS.  IF POSSIBLE, I

5    WOULD LIKE TO DO THAT.

6                **THE COURT:**  SHEILAH, DO YOU HAVE OUR CAMERA HANDY?

7                IF YOU COULD GET THE EXHIBITS FROM HIM AND PUT THEM

8    SOMEPLACE ON A FLAT SURFACE.

9                **THE CLERK:**  LEAVE THEM THERE --

10               **THE COURT:**  I DON'T WANT TO LEAVE OF THEM OVERNIGHT

11   BECAUSE HE NEEDS TO KEEP TRACK OF THEM, I THINK.

12               **MR. ASHKER:**  I WILL LEAVE --

13               **DEPUTY:**  HE LEFT THEM LAST NIGHT.

14               **THE COURT:**  IN THAT CASE WE CAN TAKE THEM AFTER YOU

15   ARE GONE.  I DIDN'T WANT YOU TO LOSE TRACK OF THEM.

16               **MR. ASHKER:**  THEY ARE SAFER HERE THAN BACK AT THE

17   PRISON MAYBE.

18               **THE COURT:**  SO WE WILL LEAVE THEM HERE AND TAKE

19   PICTURES TONIGHT AND GIVE THEM BACK TO YOU TOMORROW.

20               **MR. ASHKER:**  THANK YOU, YOUR HONOR.

21               **THE COURT:**  DO YOU HAVE ANYONE ELSE COMING IN

22   TOMORROW?

23               **MR. ANDRADA:**  WELL, WE COULD.  WELL, DR. SAYRE, I

24   WOULD THINK, IS GOING TO BE A WHILE, YOUR HONOR.

25               **THE COURT:**  I THINK THIS SHOULD PROBABLY TAKE UP THE

1    DAY.

2              **MR. ANDRADA:**  I THINK THAT WOULD BE MORE THAN A FULL

3    DAY.

4              IS IT THE COURT'S INTENTION STILL TO END THE CASE AT

5    NOON OR SO ON FRIDAY?

6              **THE COURT:**  THAT IS MY HOPE.  THAT'S WHAT I TOLD THE

7    JURY.  IT'S THEIR HOPE, I AM SURE.

8              **MR. ANDRADA:**  I KNOW THAT, BUT ARE YOU KEEPING TRACK

9    OF TIME AND SO ON?

10             **THE COURT:**  YES.  YOU MIGHT WANT TO DOUBLE-CHECK ME

11   BY KEEPING YOUR OWN TRACK.  IT CAN ALSO BE DONE BY THE

12   TRANSCRIPT HAS THE TIME STAMP IN THE MARGIN, SO IF YOU ARE --

13   YOU CAN ALWAYS GO BACK TO THAT.

14             **MR. ANDRADA:**  YOUR HONOR, I AM SORRY.  WITH REGARD

15   TO DR. ALLEN, MS. GOODMAN HAS CALLED TO MY ATTENTION THERE ARE

16   A COUPLE OTHER MATTERS IN THE MEDICAL BOARD RECORDS.

17             **THE COURT:**  WHAT WE WERE GOING TO DO AND I WOULD

18   LIKE YOU TO STILL DO IT, YOU WERE GOING TO MAKE ME A WRITTEN

19   LIST OF THE THINGS THAT YOU WANTED TO PUT IN SO THAT HE WOULD

20   KNOW THAT IT WASN'T SOMETHING THAT AROSE OUT OF ATTORNEY-CLIENT

21   PRIVILEGE, THAT MR. ASHKER AND I WOULD KNOW WHAT WAS GOING TO

22   COME UP IN ADVANCE.

23             SO I'D FORGOTTEN WHEN YOU WERE GOING TO DO THAT.

24             **MR. ANDRADA:**  YOU SAID BY CLOSE OF BUSINESS TODAY,

25   YOUR HONOR.

1            **THE COURT:**  SO YOU HAVE GOT A COUPLE MORE HOURS.

2            **MR. ANDRADA:**  ALL RIGHT.

3            **THE COURT:**  IT IS TOO LATE TO GET IT TO MR. ASHKER

4   BECAUSE I GUESS HE IS LEAVING.  YOU CAN GET IT TO THE COURT.

5            **MR. ANDRADA:**  YES, YOUR HONOR.  AGAIN, IT WOULD NOT

6   BE ANYTHING --

7            **THE COURT:**  IT DOESN'T MATTER.  JUST PUT IT DOWN AND

8   I WILL TAKE A LOOK AT IT.

9            **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

10           **THE COURT:**  THEN ON THURSDAY, WE HAVE DODGEN.  YOU

11  HAVE ARRANGED FOR DODGEN ON THURSDAY?

12           **MR. ANDRADA:**  I BELIEVE HE IS AVAILABLE ON THURSDAY.

13  YES, YOUR HONOR.

14           **THE COURT:**  SO HE IS GOING TO GO OVER TO PELICAN

15  BAY?

16           **MR. ANDRADA:**  YES, YOUR HONOR.

17           **THE COURT:**  DO YOU KNOW WHAT TIME?

18           **MR. ANDRADA:**  AS I STAND HERE I DON'T.

19           **THE COURT:**  SO YOU'LL CHECK INTO THAT AND MAKE SURE

20  THAT'S SETTLED FOR THURSDAY.

21           **MR. ANDRADA:**  YES.

22           **THE COURT:**  THEN DUNCAN SUPPOSEDLY WAS GOING TO GET

23  SERVED TODAY.  AND I THINK WE TOLD HIM -- WHAT DID WE TELL HIM,

24  SHEILAH, 9:30 ON THURSDAY?

25           **THE CLERK:**  ON THE 14TH.

```
1              THE COURT:  WE TOLD DUNCAN 9:30 ON THURSDAY.

2              MR. ASHKER:  DR. WINSLOW WAS ALSO ON FOR THURSDAY.

3              THE COURT:  HE IS AT PELICAN BAY?

4              MR. ANDRADA:  HE'S ACTUALLY AT SACRAMENTO, BUT I

5    UNDERSTAND HE'S AVAILABLE ON THURSDAY ALSO.

6              THE COURT:  WHEREABOUTS?

7              MR. ANDRADA:  AS I STAND HERE, I AM NOT SURE WHETHER

8    HE'S GOING TO COME DOWN HERE.  IT WOULD CERTAINLY MAKE MORE

9    SENSE FOR HIM TO COME HERE THAN TO GO TO PELICAN BAY.

10             THE COURT:  IT'S CLOSER.

11             MR. ANDRADA:  I UNDERSTAND, YOUR HONOR.

12             THE COURT:  HE WORKS IN SACRAMENTO?

13             MR. ANDRADA:  YES, YOUR HONOR.

14             THE COURT:  OKAY.  WELL, IT LOOKS LIKE HE SHOULD --

15             MR. ANDRADA:  I WILL INQUIRE AS TO WHERE HE WILL BE.

16             THE COURT:  OKAY.

17             AND THEN MCLEAN IS HERE.

18             MR. ANDRADA:  MCLEAN IS HERE.  WE HAVE SUE

19   RISENHOOVER.

20             THE COURT:  WHERE IS SHE GOING TO BE?

21             MR. ANDRADA:  PELICAN BAY.

22             THE COURT:  AND ANYONE ELSE?

23             MR. ANDRADA:  AS I STAND HERE -- DR. FRIEDMAN.

24             THE COURT:  WHERE IS HE?

25             MR. ANDRADA:  HE'S IN LOS ANGELES SO HE'S -- MY
```

1    UNDERSTANDING IS HE'S GOING TO COME UP HERE.

2              **THE COURT:**  OKAY.  AND THEN SHIN FRIDAY MORNING.

3              **MR. ANDRADA:**  YES, YOUR HONOR.

4              I AM LEAVING A LITTLE WIGGLE ROOM ON FRIDAY NOT

5    BOOKING ANYBODY ELSE THINKING THAT MURPHY'S LAW MIGHT APPLY AND

6    SOMEBODY MIGHT SPILL OVER FROM THURSDAY.

7              **THE COURT:**  THAT MAY BE, BUT WE ALSO HAVE TWO HOURS

8    OF ARGUMENT AND ABOUT A HALF HOUR OF INSTRUCTION.

9              **MR. ANDRADA:**  I UNDERSTAND, YOUR HONOR.

10             **THE COURT:**  OKAY.  SO, I THINK THAT IS ALL THEN.

11             **THE CLERK:**  COUNSEL, BOTH PARTIES ARE REFERRING TO

12   DOCUMENTS WITHOUT GIVING EXHIBIT NUMBERS.  I ASSUME THERE IS

13   GOING TO BE SOME SORT OF A STIPULATION AS TO EXACTLY WHICH

14   EXHIBITS ARE BEING ADMITTED.

15             **MR. ANDRADA:**  WE CAN DEAL WITH THAT.

16             **THE COURT:**  YOU ARE GOING TO NEED, MR. ASHKER, TO

17   FIGURE OUT WHICH ACTUAL EXHIBITS YOU WANT ADMITTED INTO

18   EVIDENCE TO GO TO THE JURY.  AND YOU HAVE TO MOVE FOR ADMISSION

19   OF THOSE DOCUMENTS.  I THINK YOU HAVE MOVED FOR ADMISSION OF A

20   COUPLE SO FAR THAT HAVE BEEN RECEIVED, BUT IF THERE'S MORE, I

21   AM NOT ENCOURAGING YOU TO HAVE A LOT OF THEM, BUT YOU SHOULD

22   PICK OUT THE ONES YOU WANT AND THEN MOVE THEM INTO EVIDENCE.

23   AND YOU SHOULD -- IT IS ACTUALLY EASIER IF YOU DO IT AS YOU GO

24   ALONG.

25             **MR. ANDRADA:**  AGAIN, I TRIED TO SPEED IT UP, YOUR

1    HONOR.  YOU MIGHT NOT THINK SO, BUT I TRIED TO.

2              **THE COURT:**  ALL RIGHT.

3              **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

4              **THE COURT:**  SEE YOU TOMORROW.

5              **MR. ASHKER:**  THANK YOU, YOUR HONOR.

6              **THE COURT:**  THERE IS ONE OTHER THING I WANTED TO

7    RAISE.  THIS IS THE QUESTION OF THE CONTRACT, SETTLEMENT

8    AGREEMENT.  I'M CONCERNED ABOUT THAT BECAUSE I AM AFRAID

9    PERHAPS IT IS A MATTER OF CONTRACT INTERPRETATION TO SAY WHAT

10   IS THE MEANING OF THE WORD "REFERRED".

11             **MR. ANDRADA:**  CORRECT.

12             **THE COURT:**  TO ME, WHAT THE CONTRACT SAYS IS HE WILL

13   BE REFERRED TO THIS CLINIC AND THE REGIMEN PRESCRIBED BY THE

14   CLINIC WILL BE FOLLOWED.

15             SO, TO ME THAT IMPLIES THAT WHAT THE PARTIES

16   UNDERSTOOD WAS NOT JUST THAT A PIECE OF PAPER WOULD BE SENT AND

17   THAT WOULD BE THE END OF IT, BUT THE PARTIES HAD A MUTUAL

18   UNDERSTANDING THAT UC DAVIS WOULD ACTUALLY SEE HIM AND

19   PRESCRIBE A REGIMEN WHICH COULD THEN BE FOLLOWED.

20             SO I AM NOT SEEING AS COMPLIANCE WITH THE CONTRACT

21   THE SIMPLE ACT OF REFERRING, I AM CONSTRUING REFERRING TO MEAN

22   AN UNDERSTANDING ON BOTH SIDES THAT THAT WOULD RESULT IN AN

23   EXAMINATION.

24             **MR. ANDRADA:**  WELL --

25             **THE COURT:**  AND IF THE DEFENDANT DIDN'T KNOW WHETHER

1    THAT WOULD BE POSSIBLE, THEN THE DEFENDANT WAS PROBABLY THE ONE

2    IN THE BEST POSITION TO KNOW WHETHER THAT WOULD BE POSSIBLE AND

3    PROBABLY SHOULDN'T HAVE AGREED TO DO IT IF THE DEFENDANT

4    WASN'T -- DIDN'T KNOW THAT HE COULD.

5            THE IMPOSSIBILITY DEFENSE IS A PRETTY LIMITED ONE.

6    IF YOU ARE CALLING -- SIGNING A PIECE OF PAPER AND SENDING IT

7    OFF ALONE TO BE A REFERRAL SUFFICIENT TO COMPLY, I DON'T THINK

8    SO.  I AM TRYING TO FIGURE OUT HOW THE JURY WOULD UNDERSTAND

9    THAT BECAUSE THE CONTRACT INTERPRETATION IS FOR THE COURT.

10           **MR. ANDRADA:**  WELL, YOUR HONOR, THE INSISTENCE UPON

11   DAVIS CAME ON THE PART OF THE PLAINTIFF'S LAWYER.

12           **THE COURT:**  PERHAPS SO, BUT WE HAVE TO INTERPRET THE

13   CONTRACT BASED ON THE FOUR CORNERS OF THE CONTRACT UNLESS IT IS

14   AMBIGUOUS AND THEN PAROL EVIDENCE WOULD BE RECEIVED TO SHOW THE

15   INTENT OF THE PARTIES.

16           AND I'VE THOUGHT OF THAT, AND I'VE LOOKED TO WHO THE

17   SIGNATORIES ARE, AND THERE'S SOME DEPUTY ATTORNEY GENERAL AND

18   THIS LAWYER.  SO, IF THERE WERE A DISPUTE AS TO THE MEANING OF

19   IT, THOSE WOULD BE THE ONLY PEOPLE WHO COULD TESTIFY.

20           **MR. ANDRADA:**  WELL, THEN, MR. ASHKER HAS TO CALL HIS

21   LAWYER OR THE DEPUTY ATTORNEY GENERAL TO TALK ABOUT WHAT

22   SPECIFICALLY WERE THE ARRANGEMENTS, WHAT WAS THE UNDERSTANDING

23   ABOUT DAVIS.  THERE'S NOTHING IN THERE --

24           **THE COURT:**  TO ME IT'S NOT UNAMBIGUOUS, FRANKLY.  TO

25   ME IT IMPLIES AN UNDERSTANDING THAT HE WOULD ACTUALLY BE SEEN

1    AT DAVIS.

2                 **MR. ANDRADA:**  WELL --

3                 **THE COURT:**  BECAUSE YOU CAN'T FOLLOW MEDICAL

4    REGIMENS SOMEWHERE IF YOU DON'T ACTUALLY GO THERE.

5                 **MR. ANDRADA:**  A REFERRAL IS A -- IS NOTHING MORE

6    THAN A REFERRAL.  IF MR. ASHKER'S LAWYER FAILED TO ENVISION THE

7    POSSIBILITY THAT A VERY BUSY, PRESTIGIOUS CLINIC MAY NOT HAVE

8    THE TIME TO SEE MR. ASHKER, WE SUGGEST THAT THAT IS PROBABLY A

9    DEFICIENCY ON THE PART OF THE LAWYER.

10                **THE COURT:**  ONE MIGHT ALSO SEE IT AS A DEFICIENCY ON

11   THE PART OF THE DEFENDANT WHO AGREED TO DO SOMETHING THAT HE

12   KNEW HE COULDN'T ACCOMPLISH OR DIDN'T KNOW IF HE COULD

13   ACCOMPLISH.

14                AND WHAT I AM SAYING IS, THE WORD "REFERRED" IS

15   SUBJECT TO INTERPRETATION, TO CONTRACT INTERPRETATION.  I WOULD

16   INTERPRET IT IN THE LIGHT OF THE REST OF THE PARAGRAPH AS

17   MEANING THAT THE PARTIES UNDERSTOOD IT TO MEAN REFERRED TO AND

18   TAKE HIM THERE AND HAVE HIM SEEN.  BECAUSE, AS I SAY, YOU

19   COULDN'T AGREE TO HAVE A REGIMEN FOLLOWED UNLESS THAT WAS THE

20   UNDERSTANDING OF WHAT WAS GOING TO HAPPEN.

21                THAT WOULD BE MY INTERPRETATION OF THE PLAIN

22   LANGUAGE OF THE CONTRACT, AND I DON'T SEE IT AS AMBIGUOUS.  SO

23   I GUESS WHAT I NEED TO DO IS DRAFT AN INSTRUCTION THAT EXPLAINS

24   THAT TO THE JURY.

25                **MR. ANDRADA:**  WELL, I MEAN, DR. SAYRE CAN TESTIFY

1    AND I WAS GOING TO HAVE HIM TESTIFY ABOUT THE NATURE OF A

2    REFERRAL.

3            **THE COURT:**  HE WASN'T A SIGNATORY OF THE CONTRACT.

4            **MR. ANDRADA:**  I KNOW THAT, BUT THE NATURE OF A

5    REFERRAL DOESN'T CHANGE OVER THE COURSE OF FOUR OR FIVE YEARS.

6    IT, IN MANY RESPECTS, IS A TERM OF ART.

7            THE REFUSAL TO TAKE A REFERRAL, THE DECLINATION

8    OCCURS ALL THE TIME.  AND THAT IS JUST AS WELL KNOWN OR SHOULD

9    BE JUST AS WELL KNOWN TO ONE SIDE NEGOTIATING A CONTRACT AT

10   ARM'S LENGTH AND THE OTHER SIDE; NAMELY, MR. ASHKER'S LAWYER.

11   I DON'T THINK IT'S UNREASONABLE FOR THE LAWYER TO BE REQUIRED

12   TO THINK, WELL, YOU KNOW, SUPPOSE THEY DON'T SEE HIM.  IT WOULD

13   HAVE BEEN VERY EASY FOR THE LAWYER TO SUBMIT OR INCLUDE A

14   CONDITION SUBSEQUENT, BUT IF THEY WON'T SEE HIM, THEN WE WILL

15   SEND HIM TO SOMEPLACE ELSE.

16           **THE COURT:**  THE PERSON MOST LIKELY TO KNOW WHAT THE

17   LIKELIHOOD OF THEM BEING SEEN WOULD BE THE PERSON AT THE PRISON

18   WHO DOES REFERRALS.  SO I GUESS THAT WOULD BE SOMETHING

19   DR. ALLEN CAN PERHAPS TESTIFY ABOUT; WHETHER A LOT OF REFERRALS

20   DO COME TO DAVIS?  WHETHER DAVIS DOES ACCEPT OR REJECT?

21   WHETHER THE PRISON WAS IN A POSITION TO KNOW THAT IT MIGHT NOT

22   BE ABLE TO FULFILL THAT AND TO BE PROMISING SOMETHING IT KNEW

23   IT COULDN'T FULFILL.

24           I GUESS WE WILL JUST HAVE TO WAIT AND SEE HOW THE

25   TESTIMONY COMES OUT.  BUT I AM SAYING THAT I THINK I WILL NEED

1    TO INTERPRET THE CONTRACT AS A MATTER OF LAW, AND YOU MIGHT BE

2    THINKING ABOUT THE INSTRUCTION THAT MIGHT BE NEEDED TO EXPLAIN

3    WHAT THAT CONTRACT MEANS.

4              **MR. ANDRADA:**  OKAY.

5              **THE COURT:**  AS WELL AS IMPOSSIBILITY.

6              **MR. ANDRADA:**  CAN WE LEAVE WITH JUST ONE MORE

7    THOUGHT YOUR HONOR?  NOT ABOUT THE REFERRAL ISSUE, BUT YOU

8    INCLUDED IN YOUR PROPOSED VERDICT FORM MONEY DAMAGES FROM THE

9    CONTRACT.

10             I RESPECTFULLY SUGGEST IT'S INAPPROPRIATE TO SEEK

11   AND TO BE REWARDED MONEY DAMAGES FOR PAIN AND SUFFERING WHICH

12   IS ESSENTIALLY WHAT THE COURT IS SAYING HE'S ENTITLED TO BY

13   VIRTUE OF THE BREACH.

14             **THE COURT:**  YOU BETTER BRIEF THAT.  WHAT DO YOU

15   THINK THE DAMAGES WOULD BE?

16             **MR. ANDRADA:**  NONE.  ZERO.  HE DIDN'T -- THERE'S NO

17   DAMAGE BECAUSE HE DIDN'T INCUR -- HE DIDN'T GO OUT AND GET

18   ANOTHER REFERRAL FROM THE X, Y, Z CLINIC AND HAVE TO PAY FOR

19   THAT.  THERE ARE NO DAMAGES.

20             **THE COURT:**  YOU BETTER BRIEF THAT ONE BECAUSE THAT'S

21   NOT OBVIOUS TO ME.

22             SPECIFIC PERFORMANCE I COULD ORDER, AND I THINK

23   THERE'S A CLAIM FOR INJUNCTIVE RELIEF.  SO I CAN ORDER

24   INJUNCTIVE RELIEF.  BUT IN TERMS -- IF YOU THINK THERE'S NO

25   POSSIBLE DAMAGES FROM THE BREACH OF CONTRACT CLAIM, THEN YOU

```
 1   SHOULD BRIEF THAT TONIGHT BECAUSE WE WILL HAVE TO DO THESE

 2   INSTRUCTIONS TOMORROW.

 3             MR. ANDRADA:  ALL RIGHT.

 4             THE COURT:  OKAY.

 5

 6             (PROCEEDINGS CONCLUDED AT 2:02 P.M.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

### CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-05-3759 CW, TODD L. ASHKER V. MICHAEL SAYRE AND METTHEW CATE, PAGES NUMBERED 279 THROUGH 447, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.


/S/ DIANE E. SKILLMAN

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR