VOLUME 3

PAGES 448 - 627

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

```
TODD L. ASHKER,              )
                            )
                            )
           PLAINTIFF,       )   NO. C-05-3759 CW
                            )
  VS.                       )   WEDNESDAY, MAY 13, 2009
                            )
MICHAEL C. SAYRE, ET AL.,   )   OAKLAND, CALIFORNIA
                            )
           DEFENDANTS.       )
_____)
```

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**            TODD L. ASHKER, PRO PER
                             BOX 7500/D1-119
                             CRESCENT CITY, CALIFORNIA 9553


**FOR DEFENDANTS:**           ANDRADA & ASSOCIATES
                             180 GRAND AVENUE, SUITE 225
                             OAKLAND, CALIFORNIA 94612
                        BY:  J. RANDALL ANDRADA, ESQUIRE


**REPORTED BY:**              DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                             OFFICIAL COURT REPORTER

1

2                              I N D E X

3       PLAINTIFF'S WITNESSES:                           PAGE

4       WEINSTEIN, COREY

5       DIRECT EXAMINATION BY MR. ASHKER                 459

6       CROSS-EXAMINATION BY MR. ANDRADA                 529

7       REDIRECT EXAMINATION BY MR. ASHKER               560

8

9       DUNCAN, GREGORY (VIA VIDEOCONFERENCE)

10      DIRECT EXAMINATION BY MR. ASHKER                 568

11

12      ASHKER, TODD

13      CROSS-EXAMINATION RESUMED BY MR. ANDRADA         607

14

15      DEFENDANTS' WITNESS:

16      KREIS, PAUL (VIA VIDEOCONFERENCE)

17      DIRECT EXAMINATION BY MR. ANDRADA                588

18      CROSS-EXAMINATION BY MR. ASHKER                  599

19      QUESTIONS BY THE COURT                           603

20      CROSS-EXAMINATION RESUMED BY MR. ASHKER          604

21

22

23      PLAINTIFF'S EXHIBIT:              ID.            EVD.

24          180                          528

25

```
 1   TUESDAY, MAY 13, 2009                                    8:30 A.M.

 2

 3              (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

 4          THE COURT:  GOOD MORNING.

 5          MR. ANDRADA:  YES, YOUR HONOR, GOOD MORNING.

 6          EXCUSE ME.  YOUR HONOR?

 7          THE COURT:  YES, SIR.

 8          PLEASE BE SEATED.  YOU HAD AN ISSUE?  IS THIS

 9   SOMETHING WE NEED TO WAIT FOR THE BREAK ON?

10          MR. ANDRADA:  WELL --

11          THE COURT:  I DIDN'T HEAR YOU BEFORE THE JURY CAME

12   IN.

13          MR. ANDRADA:  I AM SORRY, YES, YOUR HONOR.

14          DR. ALLEN IS IN THE COURTROOM, AND PERHAPS IT WOULD

15   BE APPROPRIATE IF HE STEPPED OUTSIDE DURING DR. WEINSTEIN'S

16   TESTIMONY.

17          THE COURT:  NO ONE HAS MOVED TO EXCLUDE WITNESSES

18   AND ONE OF YOUR WITNESSES HAS BEEN HERE, SO I AM NOT SURE IF

19   THE MOTION TO EXCLUDE CAN BE MADE IN THE MIDDLE OF THE TRIAL OR

20   NOT.  WE WILL HAVE TO LOOK INTO THAT.

21          MR. ANDRADA:  VERY WELL.  THANK YOU, YOUR HONOR.

22          THE COURT:  IN ANY EVENT, I DID -- DR. WEINSTEIN IS

23   HERE, I GUESS?  THERE WAS A MATTER WE NEEDED TO GO OVER WITH

24   HIM BEFORE -- WHICH I FORGOT ABOUT.

25          I AM REALLY SORRY, LADIES AND GENTLEMAN.  I FORGOT I
```

```
1    WAS SUPPOSED TO GIVE AN INSTRUCTION TO THIS WITNESS BEFORE YOU

2    CAME OUT.  I FORGOT TO DO IT AND I HAVE TO DO IT NOW.  IT WILL

3    JUST BE A MINUTE, BUT I AM GOING TO HAVE TO ASK YOU TO COME

4    BACK INTO THE JURY ROOM AND THEN COME BACK OUT.

5              (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

6              DR. WEINSTEIN, IF YOU WOULD COME UP TO THE STAND

7    PLEASE.

8              HAVE A SEAT UP HERE.  I HAVE ONE THING I WANTED TO

9    TELL YOU.

10             AS FAR AS THE EXCLUSION OF WITNESSES, I HAVEN'T HAD

11   OCCASION TO -- THERE'S A REQUEST THAT EITHER SIDE CAN MAKE TO

12   EXCLUDE WITNESSES AT THE BEGINNING OF THE TRIAL, WHICH MEANS

13   THAT NEITHER PARTY'S WITNESSES CAN SIT IN ON THE OTHER PARTY'S

14   EVIDENCE.

15             NOBODY MADE THAT MOTION, AND SO I DIDN'T RAISE IT.

16   SO I GUESS COUNSEL IS MAKING THAT MOTION TO EXCLUDE WITNESSES,

17   BUT GIVEN THAT COUNSEL'S WITNESSES HAVE BEEN HERE AND IT'S THE

18   MIDDLE OF TRIAL, I JUST DON'T KNOW WHAT THE CASE LAW WOULD SAY

19   ABOUT EXCLUDING WITNESSES IF THE MOTION ISN'T MADE RIGHT AT THE

20   BEGINNING OF THE TRIAL SINCE IT HAS BEEN YOUR WITNESSES WHO

21   HAVE BEEN SITTING IN.

22             SO OFFHAND IT STRIKES ME AS UNFAIR TO RAISE IT AT

23   THIS POINT.  SO I GUESS I WILL DENY IT.  IF YOU CAN FIND ME

24   CASE LAW IT CAN BE RAISED AT ANY TIME EVEN IF YOU HAVE HAD YOUR

25   OWN WITNESSES IN, I WILL BE HAPPY TO RECONSIDER THAT.  UNLESS
```

1    YOU KNOW OF SOMETHING RIGHT NOW THAT I DON'T KNOW ABOUT.

2              **MR. ANDRADA:**  I DON'T KNOW A CASE, YOUR HONOR.

3              **THE COURT:**  I DON'T EITHER.

4         THE THING I WANTED TO MENTION TO YOU,

5    DR. WEINSTEIN -- YOU ALL CAN HAVE A SEAT.

6         WE HAVE HAD SOME LEGAL DISPUTES HERE ABOUT WHETHER

7    MR. ASHKER'S POSSIBLE GANG STATUS CAN BE MENTIONED.  AND I HAVE

8    AGREED TO EXCLUDE ANY EVIDENCE OF HIS POSSIBLE GANG STATUS

9    UNLESS HE WERE TO BRING IT UP HIMSELF OR ONE OF HIS WITNESSES

10   WERE TO BRING IT UP.  SINCE HE'S UNABLE TO SPEAK WITH YOU, HE

11   ASKED THE COURT TO INSTRUCT YOU THAT HE DOES NOT WISH TO BRING

12   THAT UP, SO AS NOT TO HAVE IT BECOME AN ISSUE IN THE CASE, AND

13   HE WOULD ASK YOU NOT -- HE WON'T ASK YOU ANY QUESTIONS THAT

14   WILL BE WANTING YOU TO BRING IT UP, AND HE WOULD ASK THAT YOU

15   NOT BRING IT UP ON YOUR OWN SO AS NOT TO OPEN THE DOOR TO

16   ISSUES ABOUT HIS POSSIBLE GANG MEMBERSHIP.

17        IT CAME UP IN YOUR DEPOSITION IN WHICH YOU

18   APPARENTLY EXPRESSED THE OPINION THAT PERHAPS DR. SAYRE WAS

19   PURPOSELY WITHHOLDING MEDICAL TREATMENT IN ORDER TO GET HIM TO

20   REPUDIATE HIS GANG STATUS, OR SOMETHING ALONG THOSE LINES, SO

21   HE WOULD -- HE WILL NOT BE ASKING YOU A QUESTION THAT WILL

22   ELICIT THAT RESPONSE, AND HE WOULD ASK YOU NOT TO VOLUNTEER

23   SUCH A RESPONSE, AND THE DEFENSE ATTORNEY IS INSTRUCTED NOT TO

24   ASK YOU ANY QUESTION THAT WOULD ELICIT SUCH A RESPONSE.

25        AM I MAKING MYSELF CLEAR?

```
 1              THE WITNESS:  YES, MA'AM.

 2              MR. ASHKER:  WITH THAT IN MIND, YOUR HONOR, REAL

 3   QUICK.  AT DR. WEINSTEIN'S JANUARY 22ND, 2007 REPORT, WHICH I

 4   WILL BE MOVING TO PUT INTO EVIDENCE AFTER HIS TESTIMONY OR AT

 5   SOME POINT, AT PAGE 3 OF THE FIRST PARAGRAPH --

 6              THE COURT:  OKAY.  WELL, I WILL TELL YOU THAT A

 7   WITNESS' -- EXPERT WITNESS' REPORT ISN'T ADMISSIBLE INTO

 8   EVIDENCE.

 9              MR. ASHKER:  IT'S NOT?

10              THE COURT:  NO.

11              MR. ASHKER:  OKAY.

12              THE COURT:  ALL THAT COMES IN IS WHAT HE SAYS ON THE

13   STAND.

14              MR. ASHKER:  THAT'S GOOD TO KNOW.

15              THE COURT:  YES.  SO DOES THAT CIRCUMVENT YOUR

16   PROBLEM?

17              MR. ASHKER:  YEAH.

18              THE COURT:  OKAY.

19              AND I GUESS AS LONG AS WE ARE HERE, I MIGHT AS WELL

20   TELL DR. ALLEN THAT YOU HAD FILED SOME PAPERWORK INDICATING

21   THAT YOU HAD AN OBJECTION TO MR. ANDRADA REPRESENTING

22   MR. ASHKER GIVEN THAT MR. ANDRADA HAD REPRESENTED YOU AT SOME

23   POINT IN THE PAST.

24              THE PROBLEM WITH THAT IS THAT IT'S -- WAS ONLY

25   BROUGHT TO MY ATTENTION NOW AND IT IS TOO LATE FOR ME TO SAY
```

1  THAT MR. ANDRADA CAN'T REPRESENT HIS CLIENT BECAUSE THAT WOULD

2  LEAVE HIS CLIENT WITHOUT A LAWYER, SO I CAN'T DO THAT.  NOR CAN

3  I EXCLUDE YOU AS A WITNESS BECAUSE MR. ASHKER WANTS TO CALL

4  YOU, SO I REALLY HAVE NO OPTION IN THAT REGARD.

5          BUT WHAT I CAN DO AND I HAVE DONE IS INSTRUCT

6  MR. ANDRADA NOT TO USE ANYTHING IN HIS QUESTIONING OF YOU THAT

7  HE LEARNED FROM YOU IN THE COURSE OF HIS REPRESENTATION OF YOU.

8  HE SAYS HE DIDN'T LEARN MUCH AT ALL, AND HE HAS PROMISED NOT TO

9  USE ANYTHING THAT HE DID LEARN.

10          NOW, THERE ARE SOME THINGS ABOUT YOU THAT ARE IN THE

11  PUBLIC RECORD THAT HE KNOWS ABOUT OTHERWISE, AND HE WILL

12  QUESTION YOU ABOUT THAT.  AND, SPECIFICALLY, HE WILL ASK YOU

13  WHETHER YOU WERE DISCIPLINED BY THE MEDICAL BOARD AT A CERTAIN

14  POINT.  I GATHER THAT YOU WERE.  IF YOU ARE WILLING TO SAY SO,

15  THEN THAT WILL BE THE END OF IT.  IF YOU WERE TO DENY IT, THEN

16  HE WOULD PUT IN THE RECORD OF YOUR DISCIPLINE.

17          HE WILL BE ALLOWED TO ASK YOU WHAT THE BASIS OF THAT

18  DISCIPLINE WAS AND WHY IT HAPPENED.  AND IT WOULD SEEM THE

19  ANSWER MIGHT RELATE TO SOME DIFFICULTIES YOU HAD WITH SUBSTANCE

20  ABUSE IN THE PAST.  IF YOU ANSWER THAT, THEN HE WILL HAVE NO

21  OCCASION TO GO ANY FURTHER WITH IT.  IF YOU DENY THAT, THEN HE

22  CAN IMPEACH YOU WITH THE RECORD OF YOUR DISCIPLINARY

23  PROCEEDING.

24          HE WILL ASK YOU WHETHER YOU WERE TERMINATED FROM

25  PELICAN BAY AND WHY.  AND, AGAIN, IF THAT RELATES TO SUBSTANCE

1     ABUSE ISSUES, THEN YOU WOULD NEED TO ANSWER THAT.

2              AND THAT -- YOU JUST NOW GAVE ME THE THING, BUT LET

3     ME READ THROUGH IT REAL QUICK TO SEE IF THERE'S ANYTHING ELSE

4     HE'S PLANNING ON IMPEACHING YOU WITH.

5              OH, TAX FRAUD.  WHETHER YOU WERE CONVICTED OF A

6     MISDEMEANOR TAX FRAUD AND YOU WILL NEED TO ANSWER THAT ONE.

7              I GUESS IT'S -- SO, THAT'S THAT.

8              YES, SIR?

9              **DR. ALLEN:**  MAY I MAKE A STATEMENT?  MAY I INFORM

10    YOU OF SOMETHING?

11             **THE COURT:**  OKAY.

12             **DR. ALLEN:**  IN THE DOCUMENTS I GAVE YOU --

13             **THE COURT:**  I'M AFRAID YOU'LL HAVE TO COME UP.  WE

14    CAN'T HEAR YOU FROM BACK THERE.

15             **DR. ALLEN:**  CAN YOU HEAR ME?  IS THIS GOOD ENOUGH?

16             **THE COURT:**  YES.

17             **DR. ALLEN:**  IN THE DOCUMENTS I GAVE YOU, MY CONCERN

18    WAS THAT MR. ANDRADA WAS MY LAWYER UP UNTIL A FEW WEEKS AGO FOR

19    A CASE IN WHICH HE WAS DEFENDING ME.  NOT ONLY THOSE IN THE

20    PAST, BUT JUST A FEW WEEKS AGO.

21             AT A POINT IN TIME WHEN THERE WAS A CHANGE AND HE

22    CALLED ME TO PUSH ME OFF OF THAT CASE WHERE HE WAS DEFENDING ME

23    UP UNTIL A FEW WEEKS AGO WAS A POINT IN TIME IN WHICH HE HAD

24    COMMUNICATED WITH SOMEONE ON THE MEDICAL BOARD.

25             **THE COURT:**  I AM SORRY, THE COURT REPORTER CAN'T

1  HEAR YOU.  YOU'RE GOING TO HAVE TO COME UP TO THE PODIUM AND

2  USE THE MICROPHONE.

3         I DON'T HAVE A LOT OF TIME TO TALK ABOUT THESE

4  ISSUES RIGHT NOW.

5         **DR. ALLEN:**  THE BASIS OF MY COMPLAINT TO THE STATE

6  BAR ABOUT HIM --

7         **THE COURT:**  IT DOESN'T MATTER TO ME.  I AM NOT

8  CONCERNED WITH YOUR DISPUTES WITH HIM.  THAT'S ANOTHER ISSUE.

9  ALL I AM CONCERNED WITH IS I CAN'T DISQUALIFY HIM, I CAN'T

10 DISQUALIFY YOU.  WE HAVE TO GO FORWARD AS BEST WE CAN.

11        **DR. ALLEN:**  YOU MENTIONED THAT IT WAS LAST MINUTE.

12        **THE COURT:**  THERE'S NOTHING I CAN DO ABOUT THAT.

13 MAYBE THERE IS NO REASON --

14        **DR. ALLEN:**  THERE IS A VERY GOOD REASON.

15        **THE COURT:**  MAYBE THERE WAS A GOOD REASON, BUT IT

16 DOESN'T HELP ME.  THERE'S NOTHING I CAN DO ABOUT IT.  WE ARE IN

17 THE TRIAL.  I CAN'T DISQUALIFY --

18        **DR. ALLEN:**  I UNDERSTAND THAT.  I DID EVERYTHING I

19 COULD --

20        **THE COURT:**  I AM SURE YOU DID.

21        **DR. ALLEN:**  -- INCLUDING CALLING YOUR CLERK.

22        **THE COURT:**  I'M SURE YOU DID.

23        **DR. ALLEN:**  COULDN'T COMMUNICATE WITH HIM ABOUT IT.

24        **THE COURT:**  OKAY.  I UNDERSTAND THAT.

25        **DR. ALLEN:**  THE ONLY THING I COULD DO IS AT THE LAST

1    MINUTE.

2           **THE COURT:**  I AM NOT BLAMING YOU.  THERE'S NOTHING I

3    CAN DO ABOUT IT.

4           **DR. ALLEN:**  SORRY TO HAVE TO MAKE THE COMPLAINT THAT

5    I MADE AT THE TIME I MADE IT BECAUSE THAT WAS THE ONLY OPTION I

6    HAD LEFT.

7           **THE COURT:**  OKAY.  VERY GOOD.

8           THANK YOU, SIR.

9           **MR. ANDRADA:**  SO, YOUR HONOR, IS THIS PREVIOUS

10   REPRESENTATION OFF LIMITS ENTIRELY?  I ASSUME THAT IT IS.

11          **THE COURT:**  SO YOU WANT TO EXCLUDE THE FACT THAT YOU

12   REPRESENTED HIM IN THE PAST.

13          **MR. ANDRADA:**  I DON'T THINK THAT IT IS PROBATIVE OF

14   ANYTHING, AND IT ONLY --

15          **THE COURT:**  THAT WASN'T RAISED.  DID YOU WANT TO

16   QUESTION DR. ALLEN ABOUT THE FACT THAT MR. ANDRADA HAD

17   REPRESENTED HIM IN THE PAST?

18          **MR. ASHKER:**  WELL, I DON'T KNOW ENOUGH ABOUT THE

19   ISSUE.  REALLY, WHAT I AM GOING TO BE QUESTIONING, WHAT I AM

20   GOING TO BE QUESTIONING DR. ALLEN ABOUT, IT'S -- I DON'T SEE

21   THAT IT'S GOING TO BE RELEVANT OR NECESSARY TO DO THAT.

22          **THE COURT:**  GOOD.  MR. ASHKER HAS NO INTENTION OF

23   DOING SO.

24          **MR. ANDRADA:**  I THINK IT WILL OPEN --

25          **THE COURT:**  FINE, WE WILL BRING IN THE JURY.

1          **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

2          **THE COURT:**  YOU'RE WELCOME.

3          **MR. ASHKER:**  REAL QUICK, YOUR HONOR?  THE REPORT IS

4    NOT ALLOWED TO BROUGHT IN.  WHAT ABOUT CURRICULUM VITAE?

5          **THE COURT:**  GENERALLY THE WAY THAT'S DONE IS -- I

6    THINK IT'S PRONOUNCED VITAE.

7          **MR. ASHKER:**  OKAY.

8          **THE COURT:**  NORMALLY WHAT'S DONE IS EACH PARTY ASKS

9    THE WITNESS TO SAY VERBALLY WHAT THEIR QUALIFICATIONS ARE.

10          NOW, OCCASIONALLY BOTH SIDES WILL AGREE THAT TO SAVE

11    TIME THE VITAE CAN BE PUT INTO EVIDENCE.  IF MR. ANDRADA WAS

12    INCLINED TO AGREE TO THAT FOR BOTH EXPERT WITNESSES, WE CAN DO

13    IT THAT WAY.  HE IS SHAKING HIS HEAD, SO I GATHER NOT.

14          SO THAT MEANS WHAT YOU WILL NEED TO DO IS DRAW OUT

15    ON QUESTIONING WHAT HIS QUALIFICATIONS ARE.

16          **MR. ASHKER:**  OKAY.

17          **THE COURT:**  AND IT'S NOT THAT THE REPORT IS OFF

18    LIMITS.  YOU CAN ASK ABOUT IT AND MR. ANDRADA WILL ASK ABOUT

19    IT, I AM SURE, IT'S JUST THAT THE REPORT AS A WHOLE DOESN'T GO

20    INTO EVIDENCE TO THE JURY.

21          **MR. ASHKER:**  OKAY.  THANK YOU, YOUR HONOR.

22          **THE COURT:**  ALL RIGHT.

23          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

24          **THE COURT:**  PLEASE BE SEATED.

25          SORRY, LADIES AND GENTLEMAN.  AT THIS POINT WE ARE

1    AGAIN GOING TO INTERRUPT MR. ASHKER'S TESTIMONY BECAUSE WE HAVE

2    A COUPLE OF WITNESSES WHO ARE PHYSICIANS AND WE ARE GOING TO

3    ACCOMMODATE THEIR SCHEDULE BY CALLING THEM AT A TIME WHEN THEY

4    CAN MAKE IT.

5            SO, THE WITNESS WHO IS ON THE STAND IS MR. ASHKER'S

6    WITNESS.

7            IF YOU WOULD STAND AND RAISE YOUR RIGHT HAND, SIR.

8                          **COREY WEINSTEIN**,

9    CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

10   TESTIFIED AS FOLLOWS:

11           **THE WITNESS:**  I DO.

12           **THE CLERK:**  PLEASE BE SEATED AND STATE YOUR FULL

13   NAME, SPELLING YOUR LAST NAME FOR THE RECORD.

14           **THE WITNESS:**  MY NAME IS COREY WEINSTEIN.  LAST NAME

15   IS SPELLED W-E-I-N-S-T-E-I-N.

16                        **DIRECT EXAMINATION**

17   **BY MR. ASHKER:**

18   **Q.**   GOOD MORNING, DR. WEINSTEIN.

19           I RETAINED YOU AS MY EXPERT WITNESS IN THIS CASE; IS

20   THAT CORRECT?

21   **A.**   YES, IT IS.

22   **Q.**   AND WITH THAT IN MIND, I WOULD LIKE TO GO OVER YOUR

23   CREDENTIALS FIRST.

24           ARE YOU LICENSED TO PRACTICE MEDICINE IN THE STATE

25   OF CALIFORNIA?

1   **A.**   YES, I AM.

2   **Q.**   AND WHERE DID YOU GO TO MEDICAL SCHOOL?

3   **A.**   I ATTENDED THE UNIVERSITY OF ILLINOIS MEDICAL SCHOOL

4   BETWEEN '65 AND '69 IN CHICAGO, ILLINOIS.

5   **Q.**   AND DID YOU DO ANY TYPE OF INTERNSHIP?

6   **A.**   I HAD A ROTATING INTERNSHIP AT SAN FRANCISCO GENERAL

7   HOSPITAL IN THE YEAR FOLLOWING.

8   **Q.**   OKAY.  DO YOU HAVE ANY SPECIAL TRAINING IN ORTHOPEDICS?

9   **A.**   I ONLY HAVE THE TRAINING THAT AN ORDINARY GENERAL

10  PRACTITIONER WOULD DO ON A ROUTINE BASIS WITH MY CLIENTS, BUT I

11  HAVE NO SUBSPECIALTY TRAINING IN AN ACADEMIC CENTER.

12  **Q.**   HAVE YOU ANY EXPERIENCE WITH ORTHO-BIONOMY?

13  **A.**   I AM A CERTIFIED PRACTITIONER OF ORTHO-BIONOMY WHICH IS

14  CONSIDERED A GENTLE FORM OF BODY WORK, AND I EARNED THAT

15  CERTIFICATION IN THE MID '80S, EARLY '80S.

16  **Q.**   AND AT SOME POINT IN TIME DID YOU TEACH AT A CHIROPRACTIC

17  COLLEGE?

18  **A.**   BETWEEN 1982 AND 1985 I TAUGHT AT PALMER CHIROPRACTIC

19  COLLEGE WEST IN SUNNYVALE.  MY DUTIES THERE WERE TO TEACH

20  CLINICAL DIAGNOSIS TO THE CHIROPRACTIC STUDENTS, AND I RAN THE

21  DIAGNOSTIC CLINIC AS WELL AS I TAUGHT RECORDKEEPING AND

22  GERONTOLOGY.

23  **Q.**   AND HOW LONG HAVE YOU BEEN IN THE PRIVATE PRACTICE OF

24  MEDICINE?

25  **A.**   SINCE 1985 I HAVE HAD A PRIVATE PRACTICE ONLY.

1  **Q.**   AND YOU ARE ALSO A MEDICAL CORRECTIONAL CONSULTANT?

2  **A.**   YES.  BEGINNING IN ABOUT 1990, I BEGAN A PARALLEL CAREER

3  TO MY MEDICAL CAREER DOING CORRECTIONAL MEDICAL CONSULTING.

4  **Q.**   CAN YOU EXPLAIN WHAT CORRECTIONAL MEDICAL CONSULTING IS?

5  **A.**   SURE.

6          I WORK FOR PRISONERS, THEIR FAMILIES, OR

7  CORRECTIONAL AUTHORITIES IN REVIEWING STANDARDS OF CARE.  IN --

8  I HAVE WORKED FOR A TEAM OF LAWYERS, AND THIS IS HOW I STARTED

9  IN 1990, GOING FROM ABOUT SIX COUNTIES, RURAL COUNTIES IN

10  CALIFORNIA REVIEWING THEIR MEDICAL PROCEDURES, AND IN GENERAL

11  WHAT WAS GOING ON IN THOSE JAIL MEDICAL PROGRAMS, I HAVE ALSO

12  DONE MORE WORK IN RELATION TO INDIVIDUAL CLAIMS OF TROUBLE FROM

13  MEDICAL NEGLIGENCE TO CONSTITUTIONAL VIOLATIONS OF DELIBERATE

14  INDIFFERENCE FOR INDIVIDUAL PARTIES, PRIMARILY PRISONERS IN THE

15  STATE CALIFORNIA SYSTEM.

16          I HAVE VISITED PRISONERS IN 18 OF THE PRISONS IN

17  CALIFORNIA IN PURSUANT OF THIS WORK AND HAVE TESTIFIED NUMEROUS

18  TIMES IN DEPOSITIONS AND A FEW TIMES IN TRIAL ON BEHALF OF

19  THOSE KINDS OF CLAIMS.

20          IN PURSUIT OF THAT WORK, I EARNED A CERTIFICATION AS

21  A CERTIFIED CORRECTIONAL HEALTH CARE PROVIDER FROM THE NATIONAL

22  COMMISSION ON CORRECTIONAL HEALTH CARE.  I WAS PART OF THE TASK

23  FORCE FOR THE AMERICAN PUBLIC HEALTH ASSOCIATION THAT WROTE OUT

24  STANDARDS FOR HEALTH SERVICES IN CORRECTIONAL INSTITUTIONS AND

25  SERVED AS A CONSULTANT EVEN RECENTLY TO THE WORLD HEALTH

1   ORGANIZATION HEALTH PRISON PROJECT IN PREPARATION OF A BOOKLET

2   ON CARE FOR WOMEN PRISONERS IN GREATER EUROPE.

3   **Q.**   THANK YOU.

4          NOW, AS PART OF YOUR CORRECTIONAL CONSULTING WORK,

5   HAVE YOU ONLY APPLIED THAT WORK TO INDIVIDUAL PRISONERS?

6          I BELIEVE YOU TESTIFIED THAT YOU ALSO DEALT WITH

7   CORRECTIONAL PERSONNEL AS WELL; IS THAT CORRECT?

8   **A.**   MY WORK IS PRIMARILY, ASIDE FROM THE INSTITUTIONAL WORK

9   THAT I DESCRIBED ABOUT WRITING STANDARDS AND ASSISTING

10  RESEARCHERS IN THEIR WORK, I PRIMARILY WORK FOR INDIVIDUAL

11  PRISONERS IN THE STATE SYSTEM OR A FEW COUNTY JAILS AS WELL AS

12  I THINK A COUPLE IN ARIZONA.  SO THAT'S BEEN MY PRIMARY WORK IS

13  FOR INDIVIDUALS.

14          I HAVE NEVER WORKED PARTICULARLY FOR STAFF.  I HAD

15  ONE CASE THAT THE, A CORRECTIONAL, ADMINISTRATIVE CORRECTIONAL

16  MEDICAL PROGRAM HIRED ME TO REVIEW SOME RECORDS, BUT THEY

17  DIDN'T PURSUE MY OPINION WHEN I TOLD THEM I THOUGHT THERE WERE

18  A FEW PROBLEMS THAT HAPPENED.

19  **Q.**   AND APPROXIMATELY HOW MANY PRISONERS HAVE CONTACTED YOU

20  OVER THE YEARS FOR YOUR ASSISTANCE WITH CORRECTIONAL MEDICAL

21  CONSULTANCY AND ASSISTANCE ON THEIR MEDICAL ISSUES?

22  **A.**   I WOULD SAY THOUSANDS.  I MEAN, I HAVE BEEN DOING

23  CORRECTIONAL MEDICAL CONSULTING FORMALLY AS A BUSINESS SINCE

24  1990, BUT FROM THE EARLY '70S THROUGH ABOUT TWO OR THREE YEARS

25  AGO, I WORKED DOING PRO BONO WORK WITH A COUPLE OF

1    ORGANIZATIONS, AND THEREBY HAD THE OPPORTUNITY TO READ

2    THOUSANDS OF MEDICAL DOCUMENTS AND MEDICAL RECORDS FOR

3    PRISONERS.

4           AND I WOULD SAY MOST OF THE TIME IN THOSE CASES I

5    WOULD TELL THE PRISONER, WELL, YOU KNOW, YOU MAY HAVE HAD A BAD

6    RESULT, IT MAY HAVE BEEN MEDICATION OR TREATMENT THAT DIDN'T

7    WORK OUT WELL FOR YOU AND YOU ARE DISCONTENT, BUT THERE WAS NO

8    VIOLATION OF LAW OR REALLY ETHICS INVOLVED.  AND THAT, I WOULD

9    SAY, WOULD BE THE ROUTINE CASE THAT I HAVE REVIEWED.  AND IN

10   THE MINORITY OF CASES HAVE I FOUND THERE TO BE ACTUAL, IN MY

11   OPINION, VIOLATIONS OF LAW AND/OR ETHICS.

12   Q.   THANK YOU.

13          HAVE YOU MADE ACADEMIC PRESENTATIONS IN YOUR WORK?

14   A.   I HAVE.

15          I HAVE MADE ACADEMIC PRESENTATIONS FOR THE AMERICAN

16   PUBLIC HEALTH ASSOCIATIONS AND A VARIETY OF OTHER PLACES.  I

17   JUST CAME BACK FROM, IF I AM A LITTLE JET LAGGED, I JUST CAME

18   BACK FROM ISTANBUL WHERE I MADE PRESENTATIONS FOR THE WORLD

19   FEDERATION OF PUBLIC HEALTH, WORLD FEDERATION OF PUBLIC HEALTH

20   ASSOCIATIONS IN REGARDS TO THIS BOOKLET THAT I DESCRIBED

21   EARLIER.

22   Q.   OKAY.  AND ARE YOU ALSO A MEMBER OF THE SOCIETY OF

23   CORRECTIONAL PHYSICIANS?

24   A.   YES, I AM.

25   Q.   CAN YOU PLEASE DESCRIBE WHAT THAT INVOLVES?

1    **A.**   THE SOCIETY OF CORRECTIONAL PHYSICIANS IS A SIDE GROUP OF

2    THOSE PEOPLE WHO HAVE EARNED THE CERTIFICATION FOR CORRECTIONAL

3    HEALTH CARE PROVIDER.

4           AND SO THAT CERTIFICATION CAN BE EARNED BY NURSES,

5    PHARMACISTS, HEALTH TECHNICIANS WITHOUT REGARD TO LICENSURE.

6    THEN THE PHYSICIANS WHO EARN THAT CERTIFICATION HAVE CREATED

7    OUR OWN GROUP WHERE WE GET TOGETHER ON A YEARLY BASIS AND

8    DISCUSS ISSUES THAT ARE CONCERNING THE PHYSICIANS WHO WORK IN

9    CORRECTIONS.

10   **Q.**   OKAY.  AND YOU HAVE ALSO AUTHORED SEVERAL PUBLICATIONS?

11   **A.**   YES, I HAVE.

12   **Q.**   YOU HAVE AUTHORED A PUBLICATION STANDARDS FOR THE --

13   "STANDARDS FOR HEALTH SERVICES IN CORRECTIONAL INSTITUTIONS"?

14   **A.**   YES.  I WAS A CORE MEMBER OF A TASK FORCE CREATED BY THE

15   AMERICAN PUBLIC HEALTH ASSOCIATION TO REWRITE OUR STANDARDS

16   THAT HAD BEEN FIRST PROMULGATED IN 1996, I BELIEVE.  SO, WE

17   FELT THAT IN '03, I THINK IT WAS '03, THAT WE UPDATED THEM.

18   **Q.**   YOU ALSO AUTHORED THE PUBLICATION TITLED "STANDARDS FOR

19   HEALTH SERVICES IN CORRECTIONAL INSTITUTIONS"?

20   **A.**   I THINK I JUST ANSWERED THAT QUESTION.

21   **Q.**   OKAY.  THAT WAS THE -- ALL RIGHT.

22           COULD YOU PLEASE BRIEFLY DESCRIBE YOUR LEGAL

23   ADVOCACY EXPERIENCE?

24   **A.**   WELL, AS I SAID, I REVIEWED MANY, MANY MEDICAL RECORDS.  I

25   CALL IT THE DETECTIVE WORK, WHICH I ENJOY VERY MUCH, OF LOOKING

1    OVER MEDICAL RECORDS AND TRYING TO UNDERSTAND WHAT, IN FACT,

2    HAS HAPPENED IN RELATION TO VARIOUS COMPLAINTS.  AND I HAVE

3    DONE THAT THOUSANDS OF TIMES.

4            I HAVE TESTIFIED NUMEROUS TIMES IN DEPOSITIONS FOR

5    THESE KINDS OF CASES AND TESTIFIED IN COURT, OPEN COURT A FEW

6    TIMES FOR THAT.

7            I HAVE DONE ABOUT TWO PAGES OF VARIOUS CASES THAT I

8    HAVE WORKED ON.

9    **Q.**   YOU WERE RETAINED AS A MEDICAL EXPERT FOR THE ACLU IN THE

10   SHUMA (PHONETIC) CASE?

11   **A.**   YES, I WAS.

12           THERE WAS A CLASS ACTION LAWSUIT BROUGHT AGAINST THE

13   DEPARTMENT OF CORRECTIONS IN CALIFORNIA FOR INADEQUATE CARE OF

14   WOMEN PRISONERS AS A CLASS.  AND THEY -- I WORKED AS ONE OF

15   THEIR MEDICAL EXPERTS REVIEWING RECORDS OF, INTERVIEWING

16   PRISONERS, DOING EXAMS, AND FINALLY TESTIFYING IN DEPOSITION.

17   **Q.**   OKAY.

18           EXCUSE ME, YOUR HONOR.  DO I -- CAN I NOW PROCEED

19   WITH MY QUESTIONS ABOUT MY CASE?

20           **THE COURT:**  YES.

21           DID YOU WANT ANY VOIR DIRE?

22           **MR. ANDRADA:**  NOT AT THIS TIME.

23           THANK YOU, YOUR HONOR.

24           **MR. ASHKER:**  THANK YOU.

25   ///

1    BY MR. ASHKER:

2    **Q.**   DR. WEINSTEIN, YOU PREVIOUSLY TESTIFIED THAT I HAD

3    RETAINED YOU BACK IN EARLY JANUARY OF 2007 AS AN EXPERT ON MY

4    MEDICAL ISSUES; IS THAT CORRECT?

5    **A.**   THAT IS CORRECT.

6    **Q.**   OKAY.  AND YOU CAME TO VISIT ME AT PELICAN BAY STATE

7    PRISON; IS THAT CORRECT?

8    **A.**   YES, I DID.

9    **Q.**   ON 1/22/07?

10   **A.**   YES.

11   **Q.**   AND HAD YOU VISITED ME PRIOR TO THIS?

12   **A.**   YES, I HAD.

13   **Q.**   CAN YOU DESCRIBE YOUR PREVIOUS CONTACTS WITH ME REAL

14   BRIEFLY IN SUMMARY FASHION?

15   **A.**   I WOULD BE PLEASED TO.

16         I THINK THE FIRST EXAMINATION WAS IN THE YEAR 2000

17   WHEN I DID A HISTORY AND PHYSICAL PARTICULARLY RELATED TO THE

18   ASPECTS OF YOUR CARE AROUND THE POST-INJURY STATE OF YOUR RIGHT

19   FOREARM.  THAT WAS THE FIRST TIME WE MET.  AND SUBSEQUENTLY I

20   THINK I HAD DONE AN EXAM AS WELL IN '02, '05, AND THEN '07.  I

21   THINK THERE WERE FOUR VISITS WHERE I FOLLOWED YOUR CASE.

22   **Q.**   OKAY.

23         AND CAN YOU PLEASE DESCRIBE THE DOCUMENTATION AND

24   RECORDS THAT YOU REVIEWED FOR YOUR JANUARY 22, 2007 EXAMINATION

25   REPORT?

WEINSTEIN - DIRECT / MR. ASHKER

1   A.   WELL, ONE OF THE THINGS THAT I ALWAYS DO IS TO GO THROUGH

2   THE CLINICAL MEDICAL RECORD AS PART OF MY VISIT TO THE PRISON.

3           AND IN THE PAST, I HAD WRITTEN AND RECORDED THAT I

4   FELT THAT THE MEDICAL RECORD WAS SUPERFICIAL, INADEQUATE, AND

5   NOT REALLY --

6           **MR. ANDRADA:**  I AM SORRY, YOUR HONOR.  EXCUSE ME.

7           WE DON'T HAVE A QUESTION PENDING THAT WOULD

8   CERTAINLY CALL FOR SUCH A RESPONSE.

9           SO MOVE TO STRIKE, NONRESPONSIVE, AND IT IS NOT --

10  NOR IS IT RELEVANT, AND 403 WOULD ALSO APPLY, YOUR HONOR.

11          **THE COURT:**  IT IS NOT RESPONSIVE TO THE QUESTION,

12  BUT WE WILL STRIKE THAT.  BUT IT'S NOT INADMISSIBLE.  SO IF

13  THERE IS ANOTHER QUESTION THAT CALLS FOR THAT, HE MAY ANSWER

14  THAT.

15          SO WHY DON'T YOU REPHRASE THE -- RESTATE THE --

16  WELL, I DON'T KNOW.

17  **BY MR. ASHKER:**

18  Q.   CAN YOU PLEASE --

19          **THE COURT:**  DO YOU REMEMBER WHAT THE QUESTION WAS?

20          **THE WITNESS:**  NO.

21          **THE COURT:**  HE'S ASKING HIM TO DESCRIBE -- WELL, I

22  GUESS IT IS RESPONSIVE BECAUSE HE'S DESCRIBING THE

23  DOCUMENTATION AND HE'S INDICATING THAT THE DOCUMENTATION WAS

24  INADEQUATE.  SO I WILL REVERSE MYSELF.  I THINK IT IS

25  RESPONSIVE.

1              I AM SORRY, YOU CAN CONTINUE.

2              **MR. ASHKER:**  THANK YOU.

3              **MR. ANDRADA:**  JUST BRIEFLY, YOUR HONOR?  I THINK WE

4   ARE TALKING ABOUT RECORDS, IF I UNDERSTOOD HIM, FROM THE

5   1990'S; RESPECTFULLY NOT BE RELEVANT WHETHER HE THOUGHT THOSE

6   RECORDS WERE COMPLETE.  IT IS NOT THE SUBJECT OF THE ALLEGED

7   MALPRACTICE.

8              **THE COURT:**  I THINK THAT OBJECTION IS OVERRULED.

9              **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

10             **THE WITNESS:**  SO I WILL CONTINUE.

11             AND SO -- AND EACH TIME THAT, OF THESE FOUR TIMES,

12  THAT I HAVE ATTENDED TO EXAMINE YOU, I HAVE HAD SIMILAR

13  FEELINGS, SOME MORE AND LESS.

14             THERE HAS NEVER BEEN A TIME IN WHICH THE CLINICAL

15  RECORD WAS REALLY CLEARLY STATING A TREATMENT PROGRAM THAT WAS

16  COHERENT AND CLEAR.

17             THERE IS A PROBLEM LIST THAT'S SUPPOSED TO BE AT THE

18  FRONT OF THE CHART THAT HAS NEVER BEEN COMPLETE OR CLEAR ABOUT

19  ALL OF THE ISSUES THAT YOU ARE SUFFERING FROM.

20             AND SO THAT -- AND CERTAINLY IN THE TWO YEARS

21  BETWEEN '05 AND '07, THERE WAS NOT A LOT OF DOCUMENTATION

22  ABOUT, FOR EXAMPLE, WHAT HAS BEEN HAPPENING TO THE RIGHT ARM IN

23  TERMS OF STRENGTH, FLEXIBILITY, LEVELS OF PAIN.

24             I FOUND NOT A SINGLE PHYSICAL EXAMINATION IN THE

25  CLINICAL RECORD BETWEEN '05 AND '07 THAT WAS FULL OF, OR EVEN

1    PARTIAL IN TERMS OF USING MEDICAL EXAMINATIONS AND THE CLINICAL

2    RECORD TO FOLLOW THE COURSE OF TREATMENT AND, THEREFORE, BE

3    ABLE TO ANALYZE WHETHER ARE OR NOT THE VARIOUS ASPECTS OF CARE

4    WERE PRODUCING A USEFUL CLINICAL RESULT.

5            SO, IN TERMS OF THE MEDICAL CHART REVIEW, I WOULD

6    SAY I HAVE ALWAYS BEEN DISCONTENT WITH THE CHART THAT I HAVE

7    OBSERVED AND FOUND IT CONFUSED, DISORGANIZED, AND SUBSTANDARD.

8    **BY MR. ASHKER:**

9    **Q.**  ALL RIGHT, THANK YOU.

10           AND PRIOR TO YOUR VISIT ON JANUARY 22ND, 2007, I

11   ALSO PROVIDED YOU WITH DECLARATIONS OF DR. SAYRE DATED

12   11/11/06; IS THAT CORRECT?

13   **A.**  I THINK I DID REFER -- I THINK I DID SEE THAT

14   DEPOSITION -- I MEAN DECLARATION, YES, AND REFERRED TO IT IN MY

15   REPORT.

16   **Q.**  OKAY.  AND YOU ALSO CONDUCTED A PHYSICAL EXAMINATION OF ME

17   ON THAT DATE; IS THAT CORRECT?

18   **A.**  YES, IT IS.

19   **Q.**  OKAY.  CAN YOU PLEASE SUMMARIZE YOUR EXAMINATION OF ME IN

20   JANUARY 2007?

21   **A.**  WELL, TO START WITH, I DON'T KNOW IF THIS TESTIMONY HAS

22   BEEN PRESENTED, BUT THE EXAMINATION BEGINS WITH A MEDICAL

23   HISTORY.  AND THE HISTORY IS THAT YOU WERE SUBJECTED TO A

24   GUNSHOT WOUND WHILE IN A STAND UP FISTFIGHT IN A SECURE 8-CELL

25   POD AT PELICAN BAY STATE PRISON IN OCTOBER 1990.

WEINSTEIN – DIRECT / MR. ASHKER

1      **THE COURT:**  HE HAS TESTIFIED ALREADY ABOUT THAT, SO

2   YOU CAN DEAL WITH THAT JUST BRIEFLY.

3      **THE WITNESS:**  SO I WILL GO PASSED THAT HISTORY.

4   JUST TO MENTION FROM A MEDICAL POINT OF VIEW, THAT THE GUNSHOT

5   CAUSED A TOTAL DISRUPTION OF THE RADIUS, WHICH IS, OF COURSE,

6   THE MAGIC BONE OF OUR ARMS THAT ALLOWS OUR THUMBS TO DO ALL THE

7   THINGS THAT MAKES US HUMAN AND ALSO THE TOTAL DISRUPTION OF

8   THAT BONE AS WELL AS THE FRACTURE OF THE OTHER BONE CALLED THE

9   ULNA, AND HAD TO BE TREATED WITH REMARKABLY AGGRESSIVE AND

10  SOPHISTICATED ORTHOPEDIC SURGERY.  I WILL JUST START THERE.

11      SO, WHEN I SAW YOU ON JANUARY 22ND, '07, YOUR

12  STATEMENT TO ME WAS THAT AFTER A COUPLE OF YEARS OF MORE

13  ADEQUATE CARE ORDERED BY THE COURT IN A PREVIOUS CASE, THAT

14  YOU'RE BACK TO SQUARE ONE.

15      I THINK YOU FELT THAT THE KINDS OF THINGS THAT HAD

16  ASSISTED YOU IN MAINTAINING STRENGTH AND HEALTH, INSOFAR AS YOU

17  CAN OF THE ARM, HAD BEEN REMOVED.

18      THAT YOU COMPLAINED THAT YOU WERE OFF AN EXCELLENT

19  AND LOW DOSE OF PAIN MEDICATION THAT WAS VERY USEFUL AND DIDN'T

20  HAVE SIDE EFFECTS.  THAT YOU WERE HAVING -- AND AS A RESULT, IN

21  MUCH MORE PAIN.  YOUR FUNCTIONAL CAPACITY TO DO YOUR DAILY LIFE

22  ACTIVITIES LIKE WRITING, CLEANING YOUR CELL, WASHING THE

23  CLOTHES, ALL OF THAT REQUIRED IN YOUR PRISON, PARTICULAR PRISON

24  SETTING WHERE YOU ARE HOUSED WERE DIMINISHED AND THAT INSOMNIA

25  WAS THERE AGAIN, AS IT HAD BEEN CONTROLLED DUE TO PAIN, AND

1    THAT YOU WERE DOING THE BEST YOU COULD IN TERMS OF TRYING TO

2    GET BY WITH NO PHYSICAL THERAPY, NO -- WHICH WE CAN TALK ABOUT

3    LATER.  SO YOU WERE VERY DISCONTENT WITH YOUR CARE.

4            YOU HAD NOT HAD AN ADEQUATE ARM BRACE, WHICH THE

5    COURT HAD PREVIOUSLY ORDERED, AND THAT HAD BEEN NEVER FIXED IN

6    MANY YEARS.  AND THAT YOU ACTUALLY HAD NEW KINDS OF PAINS OF

7    YOUR ARM THAT YOU HAD NOT PREVIOUSLY EXPERIENCED SINCE THE

8    WITHDRAWAL OF THESE VARIOUS TREATMENTS AND SUPPORTS.

9    **BY MR. ASHKER:**

10   **Q.**   AND THAT -- EXCUSE ME.  CONTINUE.

11           **MR. ANDRADA:**  YOUR HONOR, SORRY.  CAN WE HAVE A

12   QUESTION?  I AM NOT QUITE SURE WHAT THE QUESTION IS.  THIS IS

13   CLEARLY A NARRATIVE ON THE PART OF THE WITNESS.

14           **THE COURT:**  WHY DON'T YOU ASK ANOTHER QUESTION.

15           **MR. ASHKER:**  OKAY.

16   **BY MR. ASHKER:**

17   **Q.**   AND AT THAT TIME, DID I DESCRIBE A RASH TO YOU?

18   **A.**   YES.  YOU HAD A RASH ON YOUR BACK, AND THE RIGHT LOWER

19   LEG, AND LEFT FOREARM, AND THE BRIDGE OF YOUR NOSE.  AND --

20   THAT WHICH I OBSERVED ON PHYSICAL EXAM.

21   **Q.**   OKAY.

22   **A.**   THEN I CONTINUED TO DO THE REST OF THE PHYSICAL EXAM,

23   PARTICULARLY FOCUSING ON YOUR RIGHT ARM.

24   **Q.**   OKAY.  AND DURING THE SUBJECTIVE PART OF YOUR EXAMINATION,

25   I ALSO DESCRIBED A PROBLEM WITH MY STOMACH?

1    **A.**   YES.   THAT IN THE PAST AND THEN YOU HAD STOMACH PAIN AND

2    YOU ATTRIBUTED IT TO TAKING NONSTEROIDAL ANTI-INFLAMMATORY LIKE

3    IBUPROFEN, NAPROSYN THAT HAD PREVIOUSLY, WE HAD KNOWN FROM YOUR

4    PREVIOUS CLINICAL RECORD HAD BEEN SHOWN TO CAUSE INFLAMMATION

5    OF YOUR STOMACH.

6    **Q.**   AND I DESCRIBED HAVING A LOT OF DIARRHEA; IS THAT ALSO

7    CORRECT?

8    **A.**   I THINK THAT IS IN MY REPORT AS WELL.   I ASSOCIATED THAT

9    WITH THE IRRITATION FROM THE NONSTEROIDAL PAIN MEDICATION.

10   **Q.**   DID I MENTION THE EFFECT OF THE COLD ON MY RIGHT ARM

11   CONDITION?

12   **A.**   YOU DID.   YOU MENTIONED THAT WHEN, AS WE WOULD EXPECT,

13   WITH POST-INJURY STATES LIKE THIS, COLD INFLUENCES ADVERSELY

14   THE ARM AND CAN CAUSE PAIN.

15   **Q.**   AND AT THAT POINT DID YOU INITIATE A PHYSICAL EXAMINATION?

16   **A.**   YES.

17   **Q.**   AND CAN YOU PLEASE DESCRIBE YOUR PHYSICAL EXAMINATION AND

18   FINDINGS?

19   **A.**   I FOCUSED PRIMARILY ON THE ISSUE OF YOUR RIGHT ARM, AND

20   FOUND THAT THE RIGHT FINGERS, FINGERS OF THE RIGHT ARM WERE

21   SOMEWHAT MORE COOL THAN THE LEFT, WHICH WOULD BE EXPECTED

22   CONSIDERING THE TOTAL DISRUPTION OF THE TISSUES AND BONES THAT

23   HAD OCCURRED MANY YEARS BEFORE.

24          THAT THERE WAS A MILD DUSTY HUE, BUT GOOD, REALLY,

25   KIND OF GOOD CIRCULATION INTO THE FINGERNAIL BEDS, WHICH IS AN

1    IMPORTANT CLINICAL SIGN SO THAT THE RESULT OF THE CIRCULATION

2    WAS PRETTY GOOD.

3              THERE WAS WEAKNESS OF ALL THE FINGERS OF THE RIGHT

4    HAND.  MOST PROFOUNDLY THE THUMB, INDEX FINGER AND THE FIFTH

5    FINGER.  OF COURSE THAT'S CRITICAL IN TERMS OF PINCER

6    ACTIVITIES AND DOING FINE MOTOR THINGS SO THAT THAT WAS A VERY

7    IMPORTANT PART OF THE DISABILITY THAT'S CREATED BY THIS

8    POST-INJURY STATE.

9              YOUR GRIP WAS VERY WEAK.  I COULD JUST PULL MY

10   FINGERS RIGHT OUT OF YOUR GRIP ON THAT HAND QUITE EASILY, AND

11   ABSOLUTELY NOT WHEN YOU USED YOUR LEFT HAND.

12             I MIGHT SAY, TOO, THAT I EXAMINED YOU ONE HAND AT A

13   TIME, UNSHACKLED.  AND THE PRISON STAFF WAS VERY HAPPY TO

14   ASSIST ME IN ALWAYS BRINGING THE ARM, ON EXAMINING, OUT OF THE

15   SHACKLES SO I CAN EXAMINE THEM FULLY.

16             THE RIGHT WRIST WAS ALSO VERY WEAK IN TERMS OF

17   RESISTING MY MOTIONS TO MOVE IT IN VARIOUS DIRECTIONS.  THERE

18   WAS EXQUISITE TENDERNESS AROUND THE ELBOW THAT RADIATED DOWN

19   INTO THE HAND WHEN I TOUCHED IT.

20             THE FIFTH FINGER WAS NUMB, MORE NUMB THAN THE LEFT

21   AND NUMB TO LIGHT TOUCH AND VIBRATION TESTING.  ALTHOUGH THE

22   REFLEXES OF THE BICEPS WHEN I TESTED THEM WERE GOOD ON THE

23   RIGHT ARM AND EQUAL TO THE LEFT, NOT SO WHEN WE TESTED THE

24   REFLEX OF THE, BELOW THE ELBOW ON THE RIGHT ARM, WHICH WOULD BE

25   EXPECTED GIVEN THE INJURY.

1        I TESTED THE, YOUR ABILITY TO MOVE THE HAND AND

2   FOUND THAT THERE IT WAS RESTRICTED.  THE WAY I TESTED WAS I

3   ASKED YOU TO GO AS FAR AS YOU COULD.  AND GIVEN HOW YOU HAD

4   PARTICIPATED IN ALL OF THE EXAMS, I FELT LIKE IT WAS CERTAINLY

5   AN ADEQUATE EXAM REFLECTIVE OF YOUR ABILITY.  AND THAT WAS

6   QUITE LIMITED COMPARED TO NORMAL, WHICH IS FAIRLY FULL KINDS OF

7   MOTIONS THAT OUR WRIST CAN MAKE, AND HAD DIMINISHED IN THE TWO

8   YEARS SINCE I HAD SEEN YOU PREVIOUSLY.

9        SO THAT I FOUND THAT THE USE OF THE WRIST WAS MORE

10  RESTRICTIVE THAN HAD BEEN IN THE PAST SO THAT THERE HAD BEEN

11  SOME DETERIORATION OF FUNCTION IN THAT REGARD.

12  **Q.**   OKAY.  THANK YOU.

13        AND YOUR PHYSICAL EXAMINATION REVEALED THAT THE

14  CONDITION OF MY ARM HAD DETERIORATED FROM THE TIME THAT YOU

15  EXAMINED ME IN 2005?

16  **A.**   THAT'S CORRECT.

17  **Q.**   IN WHAT WAY?

18  **A.**   THE MOVEMENT AROUND THE WRIST.

19  **Q.**   OKAY.  YOU ALSO CONDUCTED A CHART REVIEW?

20  **A.**   YES, I DID.

21  **Q.**   AND YOU TESTIFIED PREVIOUSLY THAT YOU FOUND NO EVIDENCE OF

22  COMPLETE OR CAREFUL PHYSICAL EXAMINATION OF THE HAND OR ARM; IS

23  THAT CORRECT?

24  **A.**   THAT'S CORRECT.

25  **Q.**   AND WHAT WOULD A COMPLETE AND CAREFUL PHYSICAL EXAMINATION

1   ENTAIL?

2   **A.**   I WOULD SAY THE KIND OF EXAM THAT I DID.  I CERTAINLY

3   DIDN'T HAVE SOME SPECIALTY EQUIPMENT AND TOOLS THAT MIGHT BE

4   RENDERED BY A SPECIALTY PHYSICIAN, BUT I THINK THAT IN TERMS OF

5   GENERAL TESTING THAT THERE IS A LOT THAT CAN BE GAINED BY

6   UNDERSTANDING AND FOLLOWING THESE PARAMETERS IN TERMS OF ALL OF

7   THE THINGS THAT I DESCRIBED.

8   **Q.**   OKAY.  NOW, YOU TESTIFIED YOU ALSO EXAMINED ME IN 2005; IS

9   THAT CORRECT?

10  **A.**   YES.

11  **Q.**   AND THAT WOULD BE JANUARY 28TH, 2005?

12  **A.**   ON OR ABOUT THAT DATE, I GUESS.  I DO HAVE MY REPORT.  I

13  DON'T REMEMBER THE EXACT DATE JUST OFFHAND.

14              **THE COURT:**  YOU CAN REFER TO YOUR REPORT.

15              **THE WITNESS:**  YES, IT WAS ON THE 28TH OF '05.

16  **BY MR. ASHKER:**

17  **Q.**   OKAY.

18              AND IN THAT REPORT, PAGE 2, IT HAS A SECTION ON

19  THERE PHYSICAL EXAMINATION.  CAN YOU DESCRIBE WHAT YOUR

20  PHYSICAL EXAMINATION CONSISTED OF ON THAT DATE?

21  **A.**   BASICALLY THE KINDS OF THINGS THAT I DESCRIBED ALREADY.

22  AND ALSO INCLUDED, ALTHOUGH I DID OBSERVE THIS IN '07 I DIDN'T

23  COMMENT ON IT, YOU KNOW, THAT THE DEXTERITY, THE ABILITY TO

24  MOVE THE HAND LIKE THIS (INDICATING) WAS SEVERELY LIMITED.  SO

25  I AM JUST ADDING TO WHAT I HAD ALREADY DESCRIBED TWO YEARS

1    LATER.

2              YOUR RIGHT THUMB COULD NOT TOUCH THE FOURTH FINGER

3    IN THIS AREA, SO SHOWS HOW LIMITED THE USE OF THE THUMB IS IN

4    THE HAND.  AND LOT OF TENDERNESS OF THE RIGHT TENDONS AND ARM.

5              AND I DID DO THEN AND THIS TIME WHAT'S CALLED A

6    TINEL'S TEST WHERE YOU BEND THE WRIST FORWARD, HAND ON THE

7    WRIST TO SEE IF IT CAUSES ANY NERVE ISSUES, AND THERE WAS SOME

8    REFERRED PAIN OR NERVE ISSUES EACH TIME, WHICH WOULD BE, AGAIN,

9    EXPECTED WITH THIS KIND OF INJURY AND WHAT WAS REQUIRED IN THE

10   SURGERY TO FIX IT AS BEST AS COULD BE DONE DURING THAT TIME.

11             ALSO I DID AT THAT TIME MEASURE THE GIRTH, THE

12   CIRCUMFERENCE OF YOUR ARM AND VARIOUS PLACES AND NOTED THAT AND

13   COMPARED THAT IN PREVIOUS EXAMS.  UNFORTUNATELY I DID NOT DO

14   THAT IN '07, AND I THINK THAT THAT WAS AN ERROR, THAT I SHOULD

15   HAVE LOOKED MORE CAREFULLY AND BROUGHT THAT INFORMATION

16   FORWARD.

17             SO, I AM AFRAID TO SAY I DID NOT DO THAT IN '07 TO

18   COMPARE.

19   **Q.**   OKAY.  YOU, IN FACT, TOOK MEASUREMENTS OF GIRTH FROM THE

20   SAME POINT ON MY ARM 2000, 2002 AND 2005; IS THAT CORRECT?

21   **A.**   THAT'S CORRECT.

22   **Q.**   AND ACCORDING TO YOUR 2005 REPORT, THE MEASUREMENTS OF MY

23   ARM CIRCUMFERENCE HAD IMPROVED FROM THE TIME OF MY EXAMINATION

24   IN 2002; IS THAT CORRECT?

25   **A.**   THAT IS CORRECT.

1    **Q.**    AND DURING THAT TIME PERIOD YOU WERE AWARE THAT I HAD BEEN

2    RECEIVING REGULAR PHYSICAL THERAPY?

3    **A.**    YES, YOU HAD BEEN RECEIVING REGULAR PHYSICAL THERAPY AND

4    ADEQUATE PAIN CONTROL FOR AT LEAST LARGE PARTS OF THAT TIME,

5    AND I THINK THAT THAT WAS A RESULT OF THAT.

6    **Q.**    AND WAS THAT A POSITIVE RESULT, IN YOUR OPINION?

7    **A.**    YES, IT WAS.

8    **Q.**    OKAY.

9              AND I WILL PRESENT TO YOU THAT IN MARCH, I CONDUCTED

10   MY OWN MEASUREMENT OF MY ARM IN THE SAME POINTS THAT YOU HAD

11   MEASURED IT FROM IN 2000, 2002, AND 2005 USING A LITTLE

12   HOMEMADE MEASURE WITH MY MEASURING TAPE HERE.  AND FROM THE

13   EXACT SAME POINTS THAT YOU HAD USED DURING THOSE THREE TIMES,

14   AND THE RESULTS WERE THAT MY RIGHT FOREARM GIRTH HAD WENT DOWN

15   TO APPROXIMATELY SEVEN AND A HALF INCHES FROM WHAT IT WAS WHEN

16   YOU MEASURED IT IN 2005 AT EIGHT AND ONE/EIGHTH INCH.

17             WOULD YOU CONSIDER THAT, IN YOUR OPINION, TO BE

18   OBJECTIVE EVIDENCE THAT THE CONDITION OF MY ARM HAD BEEN

19   DETERIORATING?

20   **A.**    I GUESS ALL I CAN SAY IS IF THAT WERE TRUE, HAD I MADE

21   THOSE MEASUREMENTS AND FOUND THAT, THEN THAT WOULD BE EVIDENCE,

22   BUT I CAN'T VERIFY THAT.

23   **Q.**    NOW, I WOULD ALSO PRESENT TO YOU THAT -- WELL, LET ME

24   REPHRASE THAT.

25             DURING YOUR REVIEWS OF MY MEDICAL RECORDS AND EXAMS

1    AND ALL THIS, DID YOU SEE REFERENCE TO GRIP STRENGTH TESTS BY A

2    DEVICE KNOWN AS A DYNAMOMETER?

3    **A.**   YES, I HAVE.

4    **Q.**   NOW CAN YOU DESCRIBE WHAT A DYNAMOMETER IS?

5    **A.**   THAT KIND OF METER IS A DEVICE THAT IS A GRIP DEVICE THAT

6    IS METAL USUALLY, AND IT HAS TWO BARS.  AND THE HAND IS PLACED

7    HERE AND HERE (INDICATING).  AND THEN THE PERSON GRIPS LIKE

8    THAT (INDICATING) IN ORDER TO MAKE AS MUCH FORCE AS POSSIBLE.

9    AND THEN A LITTLE SCALE METER REGISTERS WHAT THE POUND STRENGTH

10   OF THAT GRIP IS.

11   **Q.**   OKAY, THANK YOU.

12            AND I WILL PRESENT TO YOU THAT ACCORDING TO MY

13   PHYSICAL THERAPY REPORTS ON MARCH 9TH, 2004, THE PHYSICAL

14   THERAPIST PATRICK DODGEN HAD DONE A DYNAMOMETER TEST ON ME AND

15   MY GRIP STRENGTH FOR MY RIGHT HAND WAS AT 54 POUNDS AND ON MY

16   LEFT HAND IT WAS 125 POUNDS.

17            CAN YOU DESCRIBE FROM YOUR EXPERIENCE OF WHAT THAT

18   IS IN RELATION TO WHAT WOULD BE NORMAL GRIP STRENGTH AND WHAT

19   WOULD THAT 54 POUNDS EQUATE TO?

20   **A.**   NORMAL GRIP STRENGTH FOR A MAN YOUR AGE IS ABOUT

21   100 POUNDS.  AND SO YOUR LEFT ARM IS STRONGER THAN AVERAGE AND

22   YOUR RIGHT -- I AM SORRY, YOUR LEFT HAND WAS STRONGER THAN

23   AVERAGE AND YOU RIGHT HAND WAS MUCH WEAKER AT ABOUT 50 PERCENT

24   NORMAL, WHICH IS INTERESTING BECAUSE NOW WE HAVE DATA FROM THE

25   DEFENSE CONSULTANT THAT YOUR GRIP STRENGTH IS 37 POUNDS,

1    SHOWING A CLEAR DETERIORATION SINCE '04.

2            THE PHYSICAL THERAPIST THAT YOU MENTIONED, I WAS

3    VERY PLEASED WITH HIS WORK WITH YOU AND THE FACT THAT HE DID

4    MONITOR THINGS AND WAS THE PERSON IN THE -- AMONG THE PRISON

5    MEDICAL DEPARTMENT THAT MONITORED THINGS VERY CAREFULLY AND

6    KEPT A GOOD CLINICAL RECORD OF YOUR PROGRESS OR NOT.

7    Q.    OKAY.  I WOULD PRESENT TO YOU THAT WHEN THAT GRIP STRENGTH

8    TEST WAS DONE ON MARCH 9TH, 2004, MEASURING MY GRIP STRENGTH ON

9    MY RIGHT HAND AT 54 POUNDS, THAT I HAD A CELLMATE TO ASSIST ME

10   WITH DAILY ACTIVITIES, I WAS RECEIVING THE TRAMADOL MEDICATION

11   50 MILLIGRAMS TWICE A DAY WITH TYLENOL, AND I WAS RECEIVING

12   REGULAR PHYSICAL THERAPY TWICE A WEEK AND HAD THE USE OF MY

13   THERA-BAND AND THERA-BALL IN THE CELL.

14           A SUBSEQUENT GRIP TEST WAS DONE ON 6/8/04 WHERE MY

15   RIGHT GRIP STRENGTH WAS MEASURED AT 47 POUNDS.  AT THAT TIME I

16   DID NOT HAVE A CELLIE.  I HAD LOST MY CELLMATE, AND I WAS STILL

17   RECEIVING THE REGULAR PHYSICAL THERAPY AND THE MEDICATIONS.

18   AND THEN RECENTLY, ON DECEMBER 22ND, 2008, DR. SHIN HAD

19   EXAMINED ME AND FOUND MY GRIP STRENGTH TO BE 37 POUNDS.

20           AND YOU TESTIFIED THAT WAS CONSTITUTED OBJECTIVE

21   EVIDENCE OF DETERIORATION IN MY ARM; IS THAT CORRECT?

22   A.    THAT'S CORRECT.

23   Q.    NOW, WITH THE RANGE OF MOTION TESTING, DID YOU HAVE AN

24   OPPORTUNITY TO REVIEW DR. SHIN'S MARCH 23RD, 2008 -- 2009

25   REPORT?

1    A.   YES.

2    Q.   AND DO YOU RECALL COMMENTS HE MADE CONCERNING RANGE OF

3    MOTION ISSUES?

4    A.   NOT PARTICULARLY.  I KNOW THAT HE AND I USE DIFFERENT

5    TECHNIQUES TO ACHIEVE OUR RANGE OF MOTION FIGURES, SO THEY'RE

6    REALLY NOT, IN TERMS OF COMPARING HIS EXAM AND MY EXAM, THEY

7    ARE NOT QUITE COMPARABLE BECAUSE I KNOW HE USED A TECHNIQUE

8    WHERE YOU ACTUALLY -- THE EXAMINER DOES THE ACTION AND PRESSES

9    AS HARD AS HE OR SHE CAN TO SEE WHAT THE ABSOLUTE, WHAT WE SAY,

10   TOTAL PASSIVE RANGE IS.  SO THAT'S WHAT I REMEMBER FROM THAT.

11   SO I DIDN'T LOOK FURTHER.

12   Q.   OKAY.

13             THE COURT:  DR. SHIN IS THE DEFENDANT'S MEDICAL

14   EXPERT, I TAKE IT?

15             THE WITNESS:  YES.

16             MR. ASHKER:  THANK YOU.

17   BY MR. ASHKER:

18   Q.   DID YOU -- IN YOUR -- BASED ON YOUR EXPERIENCE, IS

19   THERE -- WHEN YOU ARE TESTING THE RANGE OF MOTION OF THE WRIST,

20   IS THERE A DIFFERENCE IN THE FULL RANGE OF MOTION BETWEEN THE

21   ACTIVE TEST AND THE PASSIVE TEST?

22   A.   THERE IS COMMONLY THAT THE ACTIVE TEST, WHAT THE PERSON

23   DOES IS OFTEN LESS THAN WHAT THE OPERATOR CAN DO.

24   Q.   AND ON THOSE TESTS, HOW DO YOU TEST THAT?  IS THERE A

25   DEVICE USED?

1   **A.**   YES.  WE USE A PROTRACTOR.  IT'S A DEVICE THAT HAS TWO

2   ARMS AND IN THE CENTER A CIRCLE THAT HAS THE DEGREES OF MOTION

3   THAT ARE OBSERVED.

4            SO IT GOES LIKE THIS (INDICATING).  SO IF SOMETHING

5   MOVES THIS MUCH, IT'S 90 DEGREES AND WILL SHOW ON THE LITTLE

6   PROTRACTOR CIRCLE.

7   **Q.**   AND HOW DO YOU CONDUCT THE TEST USING THE PROTRACTOR?

8            CAN YOU PLEASE DESCRIBE THE PROCESS YOU USE?

9   **A.**   WELL, WHEN YOU ARE GOING, AS I DID, ACTIVE TESTING, YOU

10  JUST ASK THE PERSON TO GO AS FAR AS THEY CAN, DETERMINE THEY

11  ARE REALLY WORKING AT IT, THEN YOU TAKE A PROTRACTOR AND PUT IT

12  AT THE POINT OF WHERE THE BEND IS.  AND THEN THE TWO LITTLE

13  ARMS, PUT THEM RIGHT AGAINST WHAT HAS OCCURRED, AND THEN YOU

14  READ OFF YOUR DIAL.  SO LIKE THAT (INDICATING).

15  **Q.**   IS THERE ANY SUBJECTIVITY ON THE PART OF THE EXAMINER

16  INVOLVED IN THAT TYPE OF TEST?

17  **A.**   WELL, IT'S NOT A PERFECTLY ACCURATE TEST.  AND IT'S BEST

18  USED TO REALLY INITIALLY ANALYZE WHERE A PERSON STARTS AND HOW

19  THEY MOVE.  BUT IT'S NOT A TEST THAT YOU CAN SAY IS ACCURATE TO

20  TWO OR THREE DEGREES OF MOTION, BUT IT'S GENERALLY ACCURATE AND

21  CERTAINLY A REASONABLE STANDARD OF CARE.

22  **Q.**   AND IN YOUR EXAMINATION IT REVEALED TO YOU THAT I HAD

23  MUSCLE DAMAGE?

24  **A.**   IN MY EXAMINATION, THAT REVEALED THAT YOUR MOBILITY ACROSS

25  YOUR WRIST, FROM WRIST TO HAND, IT DECREASED OVER TIME IN THREE

1   OR FOUR MEASURES.

2             SO I FELT THAT THERE HAD BEEN A DECREASE IN YOUR

3   FUNCTIONAL CAPACITY OF YOUR USE OF YOUR WRIST FOR MOBILITY.

4   **Q.**   BASED ON YOUR EXAMINATION, IN THIS 2007 REPORT, YOU HAD

5   INCORPORATED YOUR 2005 EXAMINATION AND FINDINGS ALSO; IS THAT

6   CORRECT?

7   **A.**   I THINK I REFER TO THEM.

8   **Q.**   AND DID YOU FORM A DIAGNOSIS AT THAT TIME?

9   **A.**   YES, I DID.

10  **Q.**   CAN YOU PLEASE DESCRIBE WHAT IT WAS?

11  **A.**   MY DIAGNOSES WERE ONE, A POST GUNSHOT WOUND INJURY

12  SYNDROME OF THE RIGHT ARM WITH PAIN AND WEAKNESS.

13            NUMBER TWO WAS DISABILITY FOR ACTIVITIES OF DAILY

14  LIVING, SECONDARY TO THE GUNSHOT WOUND OF THE RIGHT ARM.

15            AND THEN THE RASH, SEBAREA DERMATITIS AND EXEMIA,

16  SEBAREA DERMATITIS IT'S LIKE DANDRUFF, HEPATITIS C, PALPATIONS

17  OF THE HEART UNKNOWN DIAGNOSIS OR CAUSE, AND PAIN, EPIGASTRIC

18  PAIN, PAIN IN THE STOMACH ASSOCIATED WITH IBUPROFEN MEDICATION

19  WITH THE HISTORY OF AN ABNORMAL UPPER GI EXAMINATION.

20  **Q.**   AND WOULD YOU CONSIDER MY CONDITION TO CONSTITUTE A

21  DISABILITY?

22  **A.**   OH, YES.

23  **Q.**   AND WOULD YOU CONSIDER THE ABILITY TO COMMUNICATE TO BE A

24  MAJOR LIFE ACTIVITY?

25            **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  IT'S NOT

1    RELEVANT AS PHRASED.

2              **THE COURT:**  THE QUESTION REALLY IS DO YOU CONSIDER

3    MR. ASHKER TO HAVE A SERIOUS MEDICAL NEED.

4              **THE WITNESS:**  I DO CONSIDER MR. ASHKER TO HAVE A

5    SERIOUS MEDICAL NEED.

6              **MR. ASHKER:**  OKAY.

7              **THE WITNESS:**  AND THAT ONE OF THOSE NEEDS RELATES TO

8    COMMUNICATION AND THE ABILITY TO WRITE.

9              AS I HAVE DESCRIBED, THE PARTICULAR ASPECT OF

10   WEAKNESS AND DIFFICULTY IN MOVING THE RIGHT HAND MAKES WRITING

11   VERY HARD.

12             AND WE DID A WRITING TEST IN '05 THAT SHOWED THAT, I

13   THINK, IF I REMEMBER CORRECTLY, I COULD WRITE MORE THAN TWICE

14   AS FAST AS YOU WERE ABLE TO.  WE WROTE THE SAME THING.  AND

15   WHEN -- IF YOU WERE -- WHAT I NOTED FROM YOUR CLINICAL HISTORY

16   AND WHAT I OBSERVED IS WHEN YOUR HAND WAS RELATIVELY BETTER

17   CONTROLLED AND YOU WERE ENGAGED IN REGULAR PHYSICAL THERAPY

18   ACTIVITIES, AND I WOULD ALSO INCLUDE THINGS THAT CAN'T BE DONE

19   IN THE CELL LIKE WET HEAT AND THINGS LIKE THAT, THAT YOU COULD

20   WRITE FIVE TO SIX PAGES A DAY.  WHEN WITHOUT THOSE TREATMENTS,

21   NEEDED TREATMENTS, MEDICALLY NEEDED TREATMENTS, YOU COULD ONLY

22   WRITE HALF THAT.  SO YOU HAD A 50 PERCENT FUNCTIONAL DEFICIT

23   WHEN YOU ARE NOT UNDER GOOD CARE.

24             LET'S SEE.  OF THE TESTS WE DID IN '05, IT TOOK YOU

25   THREE MINUTES TO HURRIEDLY WRITE LESS THAN THREE LINES AND YOU

WEINSTEIN – DIRECT / MR. ASHKER

1    HAD PAIN.  I DID THE SAME THING IN ONE MINUTE WITHOUT PAIN.  SO

2    THAT, IN MY VIEW, FROM THAT FUNCTIONAL EXAMINATION, YOU WERE AT

3    LEAST 33 PERCENT UNDER THE ABILITY TO WRITE.

4            AND FOR SOMEONE IN YOUR SETTING, IN PRISON, BEING IN

5    A SECURED FACILITY, TO TAKE CORRESPONDENCE COURSES, TO WRITE TO

6    YOUR FAMILY, TO ENGAGE IN YOUR LEGAL WORK IN RELATION TO THIS

7    ALL TAKES WRITING.  THERE'S NO COMPUTER KEYBOARD FOR YOUR USE.

8    AND SO THE ABILITY TO WRITE IS A CORE FUNCTION OF YOUR, OF

9    DAILY LIFE, YES.

10           **MR. ASHKER:**  THANK YOU.

11   **BY MR. ASHKER:**

12   **Q.**   AND THERE WAS SOME DISCUSSION AND CONSIDERATION ABOUT PAIN

13   MEDICATIONS AT THIS 2007 EXAM; IS THAT CORRECT?

14   **A.**   YES.

15   **Q.**   AND I HAD INFORMED YOU THAT THEY HAD DISCONTINUED A

16   MEDICATION CALLED TRAMADOL; IS THAT CORRECT?

17   **A.**   YES.

18   **Q.**   AND CAN YOU PLEASE DESCRIBE YOUR UNDERSTANDING OF WHAT

19   TRAMADOL MEDICATION IS, WHAT IT IS, WHAT IT IS USED FOR?

20   **A.**   TRAMADOL IS A NONNARCOTIC PAIN MEDICATION THAT IS A

21   DIFFERENT CLASS FROM NARCOTICS AND IT'S A DIFFERENT CLASS FROM

22   THE NONSTEROIDAL ANTI-INFLAMMATORY DRUG MEDICATIONS LIKE

23   NAPROSYN OR MOTRIN.  AND IT'S USED ROUTINELY IN MEDICINE FOR

24   BOTH SHORT AND LONG TERM PAIN CONTROL.

25           IT WAS VERY WELL TOLERATED BY YOU AND DIDN'T HAVE

1    THE SIDE EFFECTS OF THE STOMACH TROUBLE THAT YOU HAD WITH A

2    NONSTEROIDAL ANTI-INFLAMMATORIES.  AND TYLENOL WAS ALSO --

3    TYLENOL USED WITH TRAMADOL APPARENTLY HAS AN ADDITIVE EFFECT

4    WHERE THEY BOTH BECOME BETTER AT THEIR WORK, SO THAT IS A

5    COMMON KIND OF PRESCRIPTION THAT'S RENDERED FOR LONG-TERM CARE

6    OF CHRONIC PAIN.

7              IN FACT, THERE ARE COMBINATION PILLS NOW THAT ARE

8    MADE WITH TRAMADOL AND TYLENOL.  IT IS CONSIDERED TO BE LESS OF

9    ABUSE POTENTIAL THAN OPIATES AND ABOUT AS THE SAME ABUSE

10   POTENTIAL, ODDLY ENOUGH, IN RECENT STUDIES IN PAIN MANAGEMENT

11   JOURNALS WITH NONSTEROIDAL ANTI-INFLAMMATORY MEDICATIONS.  SO

12   IT'S A SLOW ABUSE POTENTIAL OF THE VARIOUS KINDS OF MEDICATIONS

13   THAT ARE USED TODAY.

14             **THE COURT:**  WHAT IS AN EXAMPLE OF A NONSTEROIDAL,

15   WHATEVER YOU JUST SAID?

16             **THE WITNESS:**  ALEVE, MOTRIN, THOSE KINDS OF

17   MEDICATIONS.

18             **THE COURT:**  IBUPROFEN?

19             **THE WITNESS:**  IBUPROFEN, NAPROSYN ARE THE TWO THAT

20   ARE OVER-THE-COUNTER AND USED MOSTLY.

21             **THE COURT:**  IS THERE A LITTLE SHORT PHRASE OR

22   ABBREVIATION USED FOR NONSTEROIDALS?

23             **THE WITNESS:**  NSAIDS.

24             **THE COURT:**  COULD YOU SPELL THAT?

25             **THE WITNESS:**  NONSTEROIDAL ANTI-INFLAMMATORY DRUG,

 1    N-S-A-I-D.

 2              **MR. ASHKER:**  THANK YOU, DR. WEINSTEIN.

 3    **BY MR. ASHKER:**

 4    **Q.**   NOW, IN THE CONTEXT OF A DISABILITY LIKE MY ARM CONDITION

 5    AND EFFECT ON MAJOR ACTIVITY LIKE COMMUNICATION, IN YOUR

 6    OPINION, IS IT APPROPRIATE TO PRESCRIBE A PAIN MEDICATION TO

 7    ENABLE ME PAIN RELIEF, QUALITY OF LIFE, AND BETTER PHYSICAL

 8    FUNCTIONING?

 9    **A.**   YES, IT IS.

10              SOME MEDICATION THAT IS SUITABLE FOR YOU THAT IS

11    ACCEPTABLE TO YOU IN TERMS OF VARIOUS POSSIBLE IRRITATING OR

12    TOXIC SIDE EFFECTS THAT AT THE LOWEST DOSE POSSIBLE, THAT

13    PROVIDES THE MAXIMUM PAIN CONTROL, THAT IS WHAT WE WANT.

14              I MEAN, TRAMADOL IS ONE EXAMPLE THAT WAS FOR YEARS

15    EXCELLENT FOR YOU.  IT DOESN'T MEAN IT'S THE ONLY ONE.  I DON'T

16    THINK THAT THIS IS A TRIAL ABOUT TRAMADOL.  BUT FOR YOU IT WAS

17    VERY USEFUL.

18              SO I WOULD SAY THAT -- BUT SOME PAIN MANAGEMENT

19    STRATEGY THAT IS CONSISTENT WITH IMPROVING YOUR FUNCTION AND

20    ALLOWING YOU TO DO THINGS IS IMPORTANT.

21    **Q.**   OKAY.

22              AND IN YOUR EXPERIENCE WITH THE PERSON IN SAY MY

23    CIRCUMSTANCES AND CONDITIONS OF LIFE AND THINGS, WOULD IT BE

24    APPROPRIATE TO TELL A PATIENT, WELL, THE SIMPLE ANSWER IS IF

25    ACTIVITIES ARE CAUSING YOU PAIN AND DISCOMFORT, DON'T DO THE

1    ACTIVITY.  PAIN MEDICATION IS NOT A PROPER USE FOR THAT.

2              **MR. ANDRADA:**  I AM SORRY, YOUR HONOR, EXCUSE ME.  IT

3    IS VAGUE AND AMBIGUOUS, OVERLY BROAD, NO FOUNDATION.

4              **THE COURT:**  OVERRULED.

5              I THINK THERE IS, AS I UNDERSTAND IT, THERE IS A

6    FOUNDATION FOR THAT.

7              **MR. ASHKER:**  I WILL --

8              **MR. ANDRADA:**  IT SEEMS TO BE OVERLY BROAD, YOUR

9    HONOR.

10             **THE COURT:**  OVERRULED.

11             **MR. ANDRADA:**  I AM NOT SURE WHAT THE CONTEXT HERE

12   IS.

13             **MR. ASHKER:**  I WILL GO AHEAD AND REPHRASE THE

14   QUESTION TO PUT IT IN PROPER CONTEXT.

15             **THE COURT:**  ALL RIGHT.

16   **BY MR. ASHKER:**

17   **Q.**   DR. WEINSTEIN, I WILL PRESENT TO YOU THAT I SUBMITTED

18   WRITTEN DEPOSITION QUESTIONS TO DR. SAYRE, AND ONE OF MY

19   QUESTIONS WAS CONCERNING HIS DECISIONS TO DENY ME TRAMADOL

20   MEDICATION AND PUT ME BACK ON NSAIDS.

21             AND HIS RESPONSE WAS -- I DESCRIBED MY PAIN AND

22   THAT, YOU KNOW, COMMUNICATION, THE NEED TO WRITE, AND THAT

23   WRITING INCREASED MY PAIN AND DISCOMFORT SINCE BEING TAKEN OFF

24   THE TRAMADOL TO WHERE IT WAS ADVERSELY EFFECTING MY ABILITY TO

25   COMMUNICATE AND CARRY OUT MY DAILY NEEDS OF COMMUNICATION.

1          AND DR. SAYRE'S RESPONSE WAS, PAIN MEDICATION IS NOT

2   TO BE USED FOR THAT.  THAT'S NOT PROPER.  IF ACTIVITIES ARE

3   CAUSING YOU PAIN, THE ANSWER IS DON'T DO THE ACTIVITY.

4          NOW, IN YOUR OPINION -- WHAT'S YOUR OPINION ABOUT

5   THAT?

6   **A.**  WELL --

7          **MR. ANDRADA:**  EXCUSE ME.  I THINK THE QUESTION IS

8   VAGUE AND AMBIGUOUS.  ALSO ASSUMES -- THE PREFACE ASSUMES FACTS

9   NOT IN EVIDENCE.  IT IS OVERLY BROAD AS WELL.

10         **THE COURT:**  ARE YOU SAYING THAT THERE IS NO SUCH --

11  WE WILL CALL IT A HYPOTHETICAL THEN.  I DON'T KNOW IF DR. SAYRE

12  REALLY SAID THAT IN HIS ANSWER TO THE INTERROGATORY, BUT WE

13  CAN -- IF HE DIDN'T, OR IF IT IS NOT CLEAR, WE CAN PHRASE IT AS

14  A HYPOTHETICAL.

15         IF HE DID SAY SUCH A THING, THEN WHAT WOULD YOUR

16  OPINION BE.

17         AND TO DEAL WITH THE VAGUENESS PROBLEM, WHAT YOU MAY

18  ANSWER IS IN YOUR MEDICAL OPINION, WOULD SUCH A RESPONSE BE

19  INDICATIVE OF CARE WITHIN THE STANDARD OF CARE FOR A PHYSICIAN?

20         **THE WITNESS:**  SO SHALL I RESPOND.

21         **THE COURT:**  YES PLEASE.

22         **THE WITNESS:**  OKAY.  SO LET ME JUST SAY THAT THE

23  GOAL OF TREATMENT IN ANY KIND OF DISABLING AND CHRONIC PAIN

24  CONDITION AS YOU HAVE, IS TO MAXIMUM FUNCTION AT ALL LEVELS.

25         SO, IT IS NOT ADEQUATE FOR THE PHYSICIAN THAT IT IS

1    TRULY NEGLIGENT FOR THE PHYSICIAN TO SAY THAT, JUST DON'T DO

2    IT.  JUST DON'T WRITE OR DON'T HAVE LARGE MUSCLE EXERCISE TO

3    STRENGTHEN THE SHOULDERS; THAT THESE THINGS ARE A MATTER OF

4    CHOICE.  THEY ARE NOT.  THEY ARE A MATTER OF DAILY LIFE AND

5    FUNCTION.

6             AND IMPORTANT IN THE OVERALL CARE OF THE PATIENT

7    BECAUSE WE WANT A PATIENT NOT ONLY TO HAVE AS STRONG A MUSCLE

8    AS POSSIBLE, AS STRONG AN UPPER BODY AS POSSIBLE, BUT ALSO A

9    STRONG MENTALLY HEALTH AS POSSIBLE, STRONG AND EMOTIONAL BODY

10   AS POSSIBLE TO COPE WITH THE RIGGERS OF DAILY LIFE IN A

11   CHRONICALLY DISABLING AND PAINFUL CIRCUMSTANCE.

12            IT AIN'T EASY.  IT'S NEVER EASY.

13   **BY MR. ASHKER:**

14   **Q.**   ALL RIGHT, THANK YOU.

15            CAN YOU PLEASE DESCRIBE IN THE MEDICAL FIELD YOU

16   STATE YOU HAD ACTED AS AN INSTRUCTOR AT A CHIROPRACTIC COLLEGE

17   CONCERNING RECORDS AND PROPER RECORD DOCUMENTATION, AND THINGS

18   OF THAT NATURE.

19            BASED ON YOUR EXPERIENCE AND KNOWLEDGE AND STUFF,

20   HOW IMPORTANT IS IT THAT YOU HAVE PROPER EXAMINATION DOCUMENTED

21   AND CONDUCT OBJECTIVE TESTING AND THINGS OF THAT NATURE?  ARE

22   YOU FAMILIAR WITH THE TERM, THE ACRONYM SOAP, S-O-A-P?

23   **A.**   YES, I AM.  I HAVE TAUGHT THE SOAP RECORD AT CHIROPRACTIC

24   COLLEGE.

25   **Q.**   CAN YOU PLEASE DESCRIBE WHAT SOAP IS?

1    **A.**    SOAP IS A WAY TO REMEMBER HOW TO CREATE A CLINICAL

2    ENCOUNTER OF DOCUMENT.  S IS SUBJECTIVE.  THAT'S WHAT THE

3    PATIENT SAYS.  O IS OBJECTIVE.  THAT'S WHAT THE PRACTITIONER

4    FINDS ON EXAMINATION.  ASSESSMENT IS THE DIAGNOSIS OR THE

5    DESCRIPTION OF THE CONCLUSION IN THE MIND OF THE PRACTITIONER.

6    IN THESE CASES, CHIROPRACTOR OR PHYSICIANS, WHAT WE CALL

7    DIAGNOSES PERHAPS.  AND THEN P IS PLAN.  WHAT I AM GOING TO DO

8    ABOUT IT.

9    **Q.**    OKAY.  NOW WITH THAT IN MIND -- HOLD ON ONE SECOND.  LET

10   ME GRAB A DOCUMENT OUT HERE.

11             (PAUSE IN THE PROCEEDINGS.)

12             **MR. ASHKER:**  THIS WOULD BE EXHIBIT 142.  I HAVE HERE

13   A UTILIZATION PROGRAM GUIDELINES FOR HEALTH CARE SERVICES,

14   CALIFORNIA DEPARTMENT OF CORRECTIONS 2005.  AND I WANTED TO ASK

15   YOU A FEW QUESTIONS ABOUT THIS.

16             ARE YOU FAMILIAR WITH THE MEDICAL SYSTEM THAT

17   REVOLVES AROUND OUTCOME DATA?

18             **MR. ANDRADA:**  OBJECTION, VAGUE AND AMBIGUOUS,

19   RELEVANT.

20             **MR. ASHKER:**  WELL --

21             **THE COURT:**  APPARENTLY IT REFERS TO A SPECIFIC

22   DOCUMENT OF THE CDC.  SO IT'S EXTENT IT IS VAGUE AND AMBIGUOUS,

23   I GUESS IT IS IN THERE.  PERHAPS YOU COULD TELL US THE PAGE?

24             **MR. ASHKER:**  IT'S AT PAGE 8 ALSO MARKED SRMR00613.

25             **THE COURT:**  I DON'T IMAGINE YOU HAVE A COPY OF THIS.

1          **THE WITNESS:**  I DO NOT.

2          **THE COURT:**  I WILL GIVE YOU MINE.  THAT WILL LEAVE

3     ME WITHOUT ONE, BUT COUNSEL YOU HAVE ONE, I GUESS.

4          **MR. ANDRADA:**  YOUR HONOR, WOULD YOU LIKE MINE?  I'M

5     HAPPY TO GIVE IT TO YOU.

6          **THE COURT:**  I THINK YOU NEED IT MORE THAN I DO

7     PROBABLY.

8          **MR. ANDRADA:**  I AM DOING FINE.

9          **THE COURT:**  YOU WERE SAYING YOU WEREN'T FAMILIAR

10    WITH THAT TERM.  IS IT ON -- YOU WOULDN'T HAPPEN TO HAVE AN

11    EXTRA COPY?

12         WE WILL GIVE THE WITNESS MY COPY.

13         **THE WITNESS:**  THANK YOU, YOUR HONOR.

14         **THE COURT:**  SO YOU WERE GOING TO ALERT US TO THE

15    PAGE AND LINE FOR COUNSEL AND THE WITNESS THAT YOU WERE

16    REFERRING TO.

17         **MR. ASHKER:**  PAGE 8, ALSO NUMBER SRMR00613, AT THE

18    TOP OF THE PAGE UNDER OUTCOME DATA.

19         **MR. ANDRADA:**  YES.

20         **THE COURT:**  SO WHAT WAS YOUR QUESTION THEN?

21    BY MR. ASHKER:

22    **Q.**  ARE YOU FAMILIAR WITH THE USE OF OUTCOME DATA IN A MEDICAL

23    CARE SYSTEM?

24    **A.**  I WOULD SAY I'M NOT MUCH OF A TECHIE, BUT IN GENERAL I AM.

25    THAT WE WANT TO USE WHAT WE CALL IN CLINICAL PRACTICE TEST

1    PRACTICES BASED ON ACTUAL INFORMATION THAT STUDIES HAVE SHOWN

2    THAT THESE TECHNIQUES OR PROCEDURES ARE USEFUL AND THAT THE

3    OUTCOMES OF THOSE PROCEDURES, TECHNIQUES, OR TREATMENTS CAN BE

4    JUDGED AND EVALUATED.

5    **Q.**   OKAY.  CAN YOU PLEASE READ THAT SHORT PARAGRAPH RIGHT

6    THERE?

7    **A.**   AT THE TOP OF THE PAGE?

8    **Q.**   YES.  UNDER OUTCOME DATA.

9    **A.**   (READING)

10            STATISTICS, SUCH AS DIAGNOSES, PROCEDURES, DISCHARGE

11   STATUS, LENGTH OF HOSPITAL STAY, MORBIDITY AND MORTALITY OF

12   PATIENTS COLLECTED AND EVALUATED USING SCIENCE-BASED

13   METHODOLOGIES --

14            **THE COURT:**  YOU NEED TO SLOW DOWN A LITTLE BIT FOR

15   THE REPORTER.

16            **THE WITNESS:**  COLLECTED AND EVALUATED USING

17   SCIENCE-BASED METHODOLOGIES AND EXPERT CLINICAL JUDGMENT FOR

18   PURPOSES OF OUTCOME STUDIES.

19   **BY MR. ASHKER:**

20   **Q.**   NOW, ARE YOU FAMILIAR WITH THE TERM AND PROCESS OF

21   SCIENCE-BASED METHODOLOGIES?

22   **A.**   YES.  THAT REFERS IN GENERAL TO WHAT I DESCRIBE THAT WE

23   WANT TO DO THINGS THAT ARE NOT BASED ON, LIKE WE USED TO A

24   HUNDRED YEARS AGO, WHAT THE GREAT MAN SAYS.  WHAT THE TOP

25   SURGEON AT HOPKINS OR SOMETHING HAS SAID.  WE WANT TO USE

1   TECHNIQUES AND THINGS THAT ARE BASED ON CLINICAL OUTCOME

2   STUDIES AND PRACTICES THAT CAN BE EVALUATED.

3   Q.   OKAY.

4          AND BASED ON YOUR REVIEW OF MY MEDICAL RECORDS, DID

5   YOU FIND EVIDENCE OF OUTCOME DATA?  I MEAN, MY QUESTION IS,

6   WITHOUT DOCUMENTED PHYSICAL EXAMINATIONS, HOW IS IT POSSIBLE

7   TO -- I MEAN, WAS THAT -- IS THAT SCIENCE-BASED METHODOLOGY

8   THERE?

9          **MR. ANDRADA:**  EXCUSE ME, AGAIN.  OBJECTION,

10  RELEVANCE, 403.

11         **THE COURT:**  I AM GOING TO SUSTAIN THE OBJECTION TO

12  THIS.

13         THE APPROPRIATE QUESTION MIGHT BE:  IS IT WITHIN THE

14  STANDARD OF REASONABLE MEDICAL CARE TO DO A CERTAIN THING, NOT

15  IS IT WITHIN THE SCIENCE BASED WHATEVER.  YOU CAN REPHRASE THAT

16  QUESTION IN TERMS OF THE STANDARD OF MEDICAL CARE FOR A

17  PHYSICIAN.

18         **MR. ASHKER:**  OKAY.

19  **BY MR. ASHKER:**

20  Q.   CAN YOU DESCRIBE THE STANDARD OF MEDICAL CARE FOR A

21  PHYSICIAN --

22         **THE COURT:**  YOUR QUESTION HAD TO DO WITH EXAMINING A

23  PATIENT.  YOU ASKED IT IN TERMS OF THE SCIENTIFIC WHATEVER.

24  YOU CAN ASK THAT SAME QUESTION, WOULD IT BE REASONABLE TO,

25  WHATEVER IT WAS, NOT WITHIN THE SCIENTIFIC REGIMEN, BUT WITHIN

1    THE STANDARD OF CARE FOR A PHYSICIAN.

2              **MR. ASHKER:**  OKAY.  I WILL TRY.

3    **BY MR. ASHKER:**

4    **Q.**   WOULD IT BE REASONABLE TO -- WITHIN THE STANDARD OF CARE,

5    WOULD IT BE REASONABLE TO NOT DOCUMENT OR NOT CONDUCT PHYSICAL

6    EXAMINATIONS AND DOCUMENT IT IN THE MEDICAL RECORDS BEFORE YOU

7    MADE DECISIONS ON MEDICATION ISSUES?

8    **A.**   DEPENDING ON THE CASE, I WOULD SAY THAT IN GENERAL, I'LL

9    JUST MAKE A GENERAL RESPONSE TO THAT, WHICH IS, DECISIONS ABOUT

10   MEDICATIONS ARE, SHOULD BE BASED ON THE BEST EVIDENCE THAT'S

11   REQUIRED TO RENDER THOSE DECISIONS.  AND IN A CASE LIKE YOURS,

12   WE WOULD WANT SERIAL MEASURES TO SHOW HOW TREATMENT IS

13   PROCEEDING, AND WHAT THE EFFECTIVE TREATMENT HAS BEEN, AND

14   THEREFORE, BE ABLE TO MAKE REASONABLE JUDGMENTS.

15   **Q.**   AND YOU TESTIFIED PREVIOUSLY YOU DIDN'T FIND ANY OF THAT

16   IN MY MEDICAL RECORDS; IS THAT CORRECT?

17   **A.**   IN TERMS OF YOUR MUSCULAR SKELETAL TROUBLE, I FOUND IT

18   ONLY WHEN YOU WERE UNDER PHYSICAL THERAPY CARE BY MR. DODGEN,

19   AND HE DID THOSE TESTS.  AND SOME OF WHICH YOU DESCRIBE,

20   REGARDING YOUR HEPATITIS C CARE, I FOUND THAT THOSE TESTS WERE

21   DONE.

22              **THE COURT:**  HEPATITIS C IS NOT AN ISSUE.  SKIP THAT.

23              **THE WITNESS:**  THERE WERE OTHER THINGS THAT WERE

24   DOCUMENTED, OKAY, BUT NOT YOUR MUSCULAR-SKELETAL PARAMETERS.

25

1   BY MR. ASHKER:

2   Q.   AND IN YOUR 2007 EXAMINATION FINDINGS, THERE IS A SECTION

3   IN YOUR REPORT CALLED DISCUSSION AND RECOMMENDATIONS?

4   A.   YES.

5   Q.   OKAY.

6           MR. ANDRADA:  I AM SORRY, MR. ASHKER, WHICH ONE ARE

7   YOU TALKING ABOUT, 2007?

8           MR. ASHKER:  YES, JANUARY 22ND.

9           MR. ANDRADA:  THANK YOU.

10          MR. ASHKER:  PAGE 4.

11  BY MR. ASHKER:

12  Q.   CAN YOU PLEASE SUMMARIZE WHAT YOUR FINDINGS WERE IN THE

13  SECTION DISCUSSION AND RECOMMENDATIONS?

14          MR. ANDRADA:  YOUR HONOR, EXCUSE ME.  COULD WE HAVE

15  A MORE SPECIFIC QUESTION?  IT IS OVERLY BROAD PARTICULARLY IN

16  LIGHT OF WHAT IS IN THIS REPORT.  I THINK IT SHOULD BE MORE

17  SPECIFIC, PLEASE.

18          THE COURT:  OKAY.  IS THAT REPORT AN EXHIBIT

19  SOMEWHERE THAT I CAN LOOK AT?

20          MR. ASHKER:  YES.  IT WAS EXHIBIT --

21          THE COURT:  COUNSEL, DO YOU HAPPEN TO KNOW WHAT THE

22  EXHIBIT NUMBER IS SO I CAN LOOK AT IT OR, MR. ASHKER, DO YOU

23  KNOW THE EXHIBIT NUMBER?

24          MR. ASHKER:  I THINK IT'S 180.

25          THE COURT:  WELL, WHILE I AM DOING THAT, IF CAN YOU

1  BREAK YOUR QUESTION DOWN INTO MORE SPECIFIC SEGMENTS.

2  **BY MR. ASHKER:**

3  **Q.**   IN YOUR REPORT HERE, YOU STATED THAT THE CONDITION OF MY

4  RIGHT ARM CONSTITUTED A DISABILITY SUBSTANTIALLY AND

5  PERMANENTLY IMPAIRED; IS THAT CORRECT?

6  **A.**   THAT IS CORRECT.

7  **Q.**   OKAY.  YOU ALSO STATED THAT I CANNOT WRITE ADEQUATELY FOR

8  MY REASONABLE NEEDS; IS THAT CORRECT?

9  **A.**   YES.

10  **Q.**   YOU ALSO STATED I CANNOT USE MY RIGHT ARM ADEQUATELY FOR

11  MY DAILY SELF-CARE, PARTICULARLY KEEPING HIS CLOTHES AND CELL

12  CLEAN; IS THAT CORRECT?

13  **A.**   YES.

14         REGARDING THE CELL CLEAN, I THINK IT IS IMPORTANT

15  FOR US TO UNDERSTAND THAT THERE IS NO ONE ELSE TO CLEAN YOUR

16  CELL; THAT THOSE ARE THE -- THE WAY IN WHICH CLOTHES NEED TO BE

17  CLEANED IN THE CELL IS PECULIAR TO YOUR HOUSING UNIT IN THAT

18  SENSE WHERE THE CLOTHES ARE CLEANED IN THE WASHBASIN AND NEED

19  TO BE -- WHILE THIS MOTION IS A MOTION THAT IS MORE EASY FOR

20  YOU TO DO, THIS TORQUING MOTION IS ONE THAT'S PARTICULARLY

21  DIFFICULT AND CAUSES A LOT OF PAIN.

22         SO RINGING OUT THE CLOTHES TO DRY ADEQUATELY, DOING

23  THE MOTIONS TO CLEAN THE CELL WITH THE RIGHT HAND ARE VERY

24  DIFFICULT AND ALSO WOULD RESULT, WOULD EXPECT A RESULT OF A LOT

25  OF PAIN PARTICULARLY IF THE PAIN MANAGEMENT PROGRAM IS NOT

1    ADEQUATE.  SO THERE ARE PECULIARITIES ABOUT YOUR PRISON SETTING

2    WHICH MAKES THESE SEEMLY TRIVIAL THINGS VERY IMPORTANT.

3    **Q.**   OKAY, THANK YOU.

4            ARE YOU FAMILIAR WITH THE ACRONYM MRSA?  M-R-S-A?

5    **A.**   YES.

6    **Q.**   CAN YOU PLEASE DESCRIBE WHAT THAT IS?

7    **A.**   THAT'S A KIND OF STAPH BACTERIA THAT'S RESISTANT TO A

8    ROUTINE ANTIBIOTIC THAT HAD BEEN PREVIOUSLY USED FOR YEARS,

9    METHICILLIN TO TREAT IT.  METHICILLIN RESISTANT STAPH AUREUS.

10   THAT'S WHAT THAT REFERS TO.

11           THAT'S BECOME A REAL PROBLEM.  IT BEGAN IN

12   HOSPITALS.  IT WAS ONLY AN IN-HOSPITAL PROBLEM.  NOW IT'S A

13   GENERAL COMMUNITY-WIDE PROBLEM.  AND PARTICULARLY IN

14   INSTITUTIONS LIKE PRISONS, NURSING HOMES, SCHOOLS, ANY

15   INSTITUTION WHERE PEOPLE CONGREGATE MRSA IS SOMETHING WE HAVE

16   TO GUARD AGAINST.

17           SO TO BE ABLE TO CLEAN YOUR CELL ADEQUATELY IS JUST

18   A GOOD PUBLIC HEALTH MEASURE.

19   **Q.**   OKAY, THANK YOU.

20           YOU ALSO FOUND IN YOUR DISCUSSION AND

21   RECOMMENDATIONS THAT MY ENTHUSIASTIC AND ACTIVE PARTICIPATION

22   IN ANY THERAPY PROGRAM OFFERED, HE HAS -- I HAVE MADE ONLY

23   MODEST GAINS AND CONTINUES TO SUFFER DISABILITY THAT IS

24   PERMANENT.  IS THAT CORRECT?

25   **A.**   THAT'S CORRECT.  I ALWAYS FELT AND THE PHYSICAL THERAPIST

WEINSTEIN – DIRECT / MR. ASHKER

1    CONFIRMED IN HIS REPORTS THAT YOU REALLY WORKED HARD AT BOTH AT

2    YOUR IN-CELL PROGRAM AND YOUR OUT-OF-CELL PHYSICAL THERAPY UNIT

3    PROGRAM, BUT THAT SOME THINGS THAT WHEN THE PHYSICAL THERAPIST

4    WAS DISCONTINUED, THAT WAS NOT ALLOWED, AND THEN BY NOT HAVING

5    AN ADEQUATE BRACE THAT ALLOWS COMFORT OF THE ARM IN DOING LARGE

6    MUSCLE EXERCISE IN YOUR CELL, THAT IT MADE IT MORE DIFFICULT

7    FOR YOU TO DO THAT, INCREASING YOUR LEVEL OF PAIN.

8            THE BRACE, I WOULD SAY, PARENTHETICALLY WAS ORDERED

9    BY THE COURT IN '02 TO BE A PART OF YOUR ROUTINE CARE.

10   **Q.**   OKAY, THANK YOU.

11           YOU ALSO DETERMINED THAT YOUR RECENT EXAMINATION

12   FOUND THAT MY RANGE OF MOTION OF THE INJURED ARM AND WRIST HAS

13   DECREASED SINCE JANUARY OF 2005, THE NUMBNESS OF THE RIGHT

14   FIFTH FINGER HAS WORSENED, AND HIS GRIP AND WRIST REMAIN

15   PROFOUNDLY WEAK.  IS THAT CORRECT?

16   **A.**   THAT'S CORRECT.

17   **Q.**   YOU STATED THAT I WAS FORCED TO ENDURE ARM AND HAND PAIN

18   SINCE WITHDRAWAL FROM TRAMADOL AND THE PAIN HAS LIMITED MY

19   ABILITY TO EXERCISE, CLEAN MY CLOTHES AND CELL, AND WRITE; IS

20   THAT CORRECT?

21   **A.**   THAT IS CORRECT.

22   **Q.**   YOU COMMENTED ABOUT THE -- WHEN I WAS PRESCRIBED THE

23   MYOFLEX CREAM TO RUB ON MY ARM WHEN IT WAS SORE, DO YOU RECALL

24   THAT?

25   **A.**   I DO.

WEINSTEIN – DIRECT / MR. ASHKER

1    **Q.**   DO YOU HAVE AN OPINION ABOUT THEIR PRESCRIBING ME THE

2    MYOFLEX CREAM TO RUB ON MY ARM WHEN IT WAS SORE?

3    **A.**   MYOFLEX IS NOT A TREATMENT OF EFFICACY AND HAS BEEN SHOWN

4    REPEATEDLY IN CLINICAL TRIALS TO BE USELESS.

5            SO I FELT IT WAS A POOR SUBSTITUTE FOR AN ADEQUATE

6    TREATMENT THAT HAD BEEN RENDERED FOR YEARS THAT ALLOWED YOU TO

7    FUNCTION MORE EFFECTIVELY.  IT WAS NO SUBSTITUTE AT ALL.

8    **Q.**   THANK YOU.

9            YOU ALSO NOTED THAT I WAS PRESCRIBED IBUPROFEN AND

10   MEDICATION KNOWN TO CAUSE STOMACH IRRITATION AND ULCERS, AND

11   FROM WHICH I DO EXPERIENCE STOMACH PAIN PRESENTLY.  IS THAT

12   CORRECT?

13   **A.**   YES.

14   **Q.**   AND YOU STATED AT THE SAME TIME I WAS DENIED TRAMADOL, A

15   MEDICATION HE WAS PRESCRIBED BY THE CDCR PAIN CONSULTANT WHO

16   WROTE ON 6/12/02 A RECOMMENDATION OF ULTRAM, WHICH IS TRAMADOL

17   15-MILLIGRAM TABS TWICE A DAY ON A CONTINUOUS BASIS.  IS THAT

18   CORRECT?

19   **A.**   THAT'S CORRECT.

20   **Q.**   AND YOU STATED THAT THAT RECOMMENDATION IS WELL-SUPPORTED

21   IN THE MEDICAL LITERATURE AS A SUCCESSFUL TREATMENT FOR

22   LONG-TERM PAIN CONTROL; IS THAT CORRECT?

23   **A.**   I CITED IN THE REPORT MULTIPLE STUDIES THAT GO TO THAT

24   EXACT POINT.

25   **Q.**   OKAY.  AND YOU REVIEWED DR. SAYRE'S 11/11/06 DECLARATION

1    WHEREIN HE STATED THAT TRAMADOL WAS NOT FOR LONG-TERM CHRONIC

2    PAIN CONTROL.  DO YOU RECALL THAT?

3    **A.**    I DO.

4    **Q.**    AND WHAT IS YOUR OPINION ABOUT DR. SAYRE'S STATEMENT?

5    **A.**    THAT IT'S INCORRECT.

6    **Q.**    AND WHAT'S THE BASIS FOR YOUR DETERMINATION THAT THAT'S

7    INCORRECT?

8    **A.**    ITS COMMON USE IN GENERAL IN MEDICINE AND THE STUDIES THAT

9    I CITED THAT SHOW THAT THE SCIENTIFIC BASIS FOR THAT COMMON

10   USAGE.

11   **Q.**    OKAY.

12           AND THE STUDIES THAT YOU CITED, DID YOU DO SOME

13   RESEARCH ON THE MATTER?

14   **A.**    I JUST DID A LITERATURE SEARCH.  SO IT'S NOT PERSONAL

15   RESEARCH I WAS INVOLVED IN, I JUST FOUND STUDIES THAT -- TWO

16   THINGS.  I FOUND STUDIES THAT SUPPORTED THE USE OF TRAMADOL IN

17   LONG-TERM CHRONIC PAIN PARTICULARLY EFFECTIVE WHEN USED WITH

18   TYLENOL AS WELL.  AND I FOUND NO STUDIES THAT SHOWED THAT IT

19   WAS NOT EFFECTIVE.  AND RECENTLY I JUST DID ANOTHER SEARCH TO

20   SEE THAT AROUND ITS ACTUAL USE POTENTIAL AS A MEDICATION --

21           **MR. ANDRADA:**  I AM SORRY, YOUR HONOR.  EXCUSE ME,

22   DOCTOR.  PARDON ME, SIR.

23           IF THIS IS SINCE HIS DEPOSITION, YOUR HONOR, I THINK

24   IT WOULD BE INAPPROPRIATE FOR HIM TO BE COMMENTING ON THIS

25   SUBSEQUENT WORK HE HAS DONE.  I WOULD MOVE TO STRIKE --

1           **THE COURT:**  YOU WILL NEED TO ASK WHETHER THIS IS

2    SOMETHING THAT HE DID AFTER HIS DEPOSITION WAS TAKEN.

3    **BY MR. ASHKER:**

4    **Q.**   DR. WEINSTEIN, WHAT TIME PERIOD DID YOU OBTAIN THIS

5    INFORMATION THAT YOU ARE TALKING ABOUT?

6    **A.**   THE INFORMATION ABOUT THE ORDINARY USE OF TRAMADOL FOR

7    CHRONIC PAIN I DID BEFORE THE DEPOSITION.  THE INFORMATION

8    ABOUT ITS VERY LOW ABUSE POTENTIAL I DID AFTER THE DEPOSITION.

9           **THE COURT:**  SO WE WILL HAVE TO STRIKE THE

10   INFORMATION ABOUT THE LOW ABUSE POTENTIAL.

11   **BY MR. ASHKER:**

12   **Q.**   OKAY, THANK YOU.

13           DR. WEINSTEIN, YOU ALSO FOUND YOU –– YOUR OPINION

14   WAS THAT REGARDING MY CONDITION AND CIRCUMSTANCES THAT YOU

15   STATED, AS WITH ANY OTHER PERSON WITH A PROFOUND LOCAL

16   DISABILITY AND SECONDARY SEVERE FUNCTIONAL LIMITATIONS, A

17   REGULAR PROGRAM OF ASSISTANCE SUPPORTIVE AND REHABILITATIVE

18   CARE IS NEEDED AND ORDINARY; IS THAT CORRECT?

19   **A.**   YES.

20   **Q.**   YOU ALSO STATED THAT I REQUIRED SPECIAL EXERCISE

21   EQUIPMENT, PROTECTIVE SUPPORT OF THE INJURED ARM, PROTECTION

22   FROM THE ELEMENTS, REGULAR MONITORING OF THE CONDITION,

23   ASSISTANCE WITH DAILY ACTIVITIES, AND SPECIALIZED TREATMENT; IS

24   THAT CORRECT?

25   **A.**   YES.

WEINSTEIN – DIRECT / MR. ASHKER

1    **Q.**    AND THEN YOU OUTLINED THE ELEMENTS OF A STANDARD MEDICAL

2    PROGRAM THAT WOULD MEET MY NEEDS; IS THAT CORRECT?

3    **A.**    I DID.

4    **Q.**    ONE OF WHICH WAS EFFECTIVE PAIN MANAGEMENT, WHICH YOU

5    STATED WOULD –– WELL, YOU STATED IS ONE THAT WOULD ALLOW

6    MAXIMUM COMFORT, ABILITY TO EXERT AND SAFELY.  TRAMADOL AND

7    TYLENOL ARE THE STANDARD OF CARE FOR MY KIND OF CHRONIC PAIN

8    MANAGEMENT NEEDS.  HIS PRESENT REGIMEN OF IBUPROFEN AND TYLENOL

9    IS INEFFECTIVE AND CAUSES HARM.

10             IS THAT CORRECT?

11   **A.**    THAT'S WHAT I STATED.

12             AND I WOULD ADD, AGAIN, YOU KNOW, IT DOESN'T HAVE TO

13   BE TRAMADOL, ALTHOUGH TRAMADOL WOULD BE THE ORDINARY THING THAT

14   I THINK WOULD BE USEFUL, BUT SOME EFFECTIVE MEASURE.  AND

15   CERTAINLY THE USE OF NSAIDS AND TYLENOL WAS A POOR CHOICE, ONE

16   THAT CAN BE PREDICTED TO BE HARMFUL TO YOU AND HAD BEEN IN THE

17   PAST.

18   **Q.**    OKAY, THANK YOU.

19             AND WHEN I –– YOU ALSO STATED THAT SPECIAL EXERCISE

20   EQUIPMENT WAS REQUIRED.

21   **A.**    THAT'S TRUE.  ANYONE WITH THIS KIND OF DISABILITY REQUIRES

22   SPECIAL EQUIPMENT OFTEN TO MAINTAIN STRENGTH OTHERWISE –– AND

23   FUNCTION, OTHERWISE IT DETERIORATES.  I MEAN, WHETHER IT'S MY

24   PATIENT WHO HAS A TROUBLED KNEE OR BACK TROUBLE WHO NEEDS THE

25   POOL, TO GO TO A WARM POOL AND SWIM FOUR TIMES A WEEK,

1    WHATEVER, THAT WE WOULD PREDICT THAT IF YOU DON'T HAVE THE

2    ABILITY TO EXERCISE A PARTICULAR TROUBLED AREA, THAT YOUR

3    FUNCTION AND FUNCTIONAL CAPACITY STRENGTH AND FLEXIBILITY WILL

4    DECREASE OVER TIME.

5    Q.   AND I PRESENTED TO YOU EARLIER THAT -- WELL, LET ME

6    PRESENT TO YOU THAT SINCE MARCH OF 2007 I HAVE NOT RECEIVED ANY

7    PHYSICAL THERAPY FROM THE PHYSICAL THERAPIST.  I HAVE BEEN OFF

8    THE TRAMADOL MEDICATION AND ON NSAIDS AND TYLENOL AND

9    REPEATEDLY COMPLAINED ABOUT THOSE BEING INEFFECTIVE, AND MY

10   PAIN AND DISCOMFORT INCREASING SINCE SEPTEMBER OF 2006.  AND I

11   DON'T HAVE A CELLMATE'S ASSISTANCE, WHICH, IN TURN, HAS

12   EFFECTED MY ABILITY TO EXERCISE ON MY OWN IN MY CELL LIKE I

13   USED TO, EVEN THOUGH I STILL HAVE THE BAND AND THE BALL, I HAVE

14   HAD TO CUT BACK ON WHAT I AM ABLE TO DO WITH THOSE.  I HAVE NOT

15   HAD AN ARM BRACE THAT FIT PROPERLY THAT I COULD USE TO EXERCISE

16   MY UPPER ARM SINCE FEBRUARY OF -- WELL, MARCH, APRIL 2006 AND

17   EARLIER I PRESENTED TO YOU THAT MY GRIP STRENGTH BETWEEN 2004

18   AND --

19              THE COURT:  I AM AFRAID THIS QUESTION IS GETTING A

20   LITTLE LONG.  YOU NEED TO BREAK IT DOWN AND ASK ONE THING AT A

21   TIME.

22              MR. ANDRADA:  THANK YOU, YOUR HONOR.

23              MR. ASHKER:  OKAY.

24   BY MR. ASHKER:

25   Q.   ON THE FIRST PRESENTATION THAT I MADE TO YOU, SHOULD I

1    START ALL OVER, YOUR HONOR?

2              **THE COURT:**  YES.  I WOULD ASK AS TO EACH INDIVIDUAL

3    THING THAT YOU FEEL YOU NEED WHETHER IN THE DOCTOR'S OPINION

4    YOU HAVE A MEDICAL NEED FOR THAT ITEM.

5              **MR. ASHKER:**  WHAT I WAS GETTING AT IS WHERE HE

6    STATED HERE THAT WITHOUT SUCH ASSISTIVE TOOLS, IT CAN BE

7    EXPECTED THAT HE WILL WEAKEN WITH THE RESULTING INCREASE IN

8    PAIN AND DISABILITY.  I WAS GOING TO PRESENT THAT, AS I

9    PRESENTED EARLIER, MY GRIP STRENGTH TEST --

10             **THE COURT:**  WHY DON'T YOU GO THROUGH EACH ONE AND

11   ASK WHETHER THE DOCTOR'S OPINION IS THAT YOU HAVE A MEDICAL

12   NEED FOR THOSE THINGS.  AND THEN AFTER YOU HAVE DONE ALL THAT,

13   YOU CAN PERHAPS ASK WHETHER -- WHAT, IN HIS MEDICAL OPINION,

14   WOULD BE THE RESULT OF BEING NOT GIVEN THAT COMBINATION OF

15   THINGS.

16             **MR. ASHKER:**  I UNDERSTAND.

17   **BY MR. ASHKER:**

18   Q.   DR. WEINSTEIN, I WILL PRESENT TO YOU THAT I HAVE NOT HAD A

19   USABLE ARM BRACE TO DO UPPER ARM EXERCISE SINCE MARCH OF 2006.

20   I HAVE BEEN NOT HAD ADEQUATE MEDICATION --

21             **THE COURT:**  LET'S GO WITH THAT.

22             **MR. ASHKER:**  OKAY.

23   **BY MR. ASHKER:**

24   Q.   IN YOUR OPINION --

25             **THE COURT:**  DOES MR. ASHKER HAVE A MEDICAL NEED FOR

1    A PROPERLY-FITTED ARM BRACE?

2             **THE WITNESS:**  YES.  MR. ASHKER HAS A MEDICAL NEED

3    FOR A PROPERLY-FITTED ARM BRACE.

4    **BY MR. ASHKER:**

5    **Q.**   AND I HAVE A MEDICAL NEED FOR EFFECTIVE PAIN MEDICATION?

6    **A.**   YES.  YOU HAVE A MEDICAL NEED FOR SUCH.

7    **Q.**   AND I HAVE A MEDICAL NEED FOR REGULAR PHYSICAL THERAPY?

8    **A.**   YOU DO.  AND LET ME DESCRIBE AND ENLARGE THAT A BIT.

9             IT DOESN'T MEAN NECESSARILY THAT YOU HAVE TO BE OUT

10   TO A PHYSICAL THERAPY UNIT THREE TIMES A WEEK EVERY WEEK.

11   THAT'S NOT NECESSARILY WHAT I MEAN WHEN I SAY THAT.

12            BUT WHAT IS REQUIRED IS THAT YOU HAVE REGULAR

13   MONITORING AND THAT YOU HAVE A PHYSICAL THERAPIST WHO

14   BECOMES -- WHO MAKES THE ALLIANCE WITH YOU AND IS PART OF YOUR

15   CARE.

16            JUST LIKE I HAVE AN OCCUPATIONAL THERAPIST FOR MY

17   ARM AND HAND THAT IS TROUBLING ME.  I SEE ME OT TWICE A YEAR,

18   AND SHE HELPS ME.  AND BECAUSE PROFESSIONALS WILL LEARN NEW

19   THINGS THAT CAN BE APPLIED TO YOUR CARE.  SO YOU NEED TO BE

20   WITH THEM IN AN ALLIANCE.  THAT'S CRITICAL.  YOU CAN'T BE

21   DENIED OUTRIGHT.

22            NOW, THERE SOMETIMES WHERE YOU MIGHT NEED THREE

23   SOMETIMES A WEEK, PHYSICAL THERAPY, SOMETIMES NOT.  BUT

24   CERTAINLY YOU NEED A REGULAR RELATIONSHIP WITH A PHYSICAL

25   THERAPIST.  AND PARTICULARLY IN YOUR CASE, I THINK IT WOULD BE

1   USEFUL TO HAVE A REGULAR HOT WHIRLPOOL BECAUSE THAT'S SOMETHING

2   YOU CANNOT ACHIEVE IN YOUR CELL.  BUT YOU NEED THAT KIND OF

3   RELATIONSHIP.  AND THEN THE MEDICAL TEAM WORKS OUT WHAT THE

4   NATURE OF THAT RELATIONSHIP AND THE FREQUENCY OF APPOINTMENTS

5   WOULD BE.

6   Q.   ALL RIGHT, THANK YOU.

7            AND IT'S YOUR OPINION THAT I HAVE A NEED, MEDICAL

8   NEED FOR SPECIAL CLOTHING?

9   A.   YES, YOU DO.  AS IS SO COMMON IN ANY SEVERE INJURED

10  MUSCULAR SKELETAL SITUATION LIKE YOURS, THAT IT GOES WITHOUT

11  SAYING THAT ALL OF OUR EXPERIENCE IS THAT WHEN THAT PART GETS

12  COLD, THE PAIN GETS WORST.  PEOPLE CAN TELL WHO HAD INJURIES

13  LIKE YOURS CAN TELL WHEN THE RAINS ARE COMING, WHEN THE COLD

14  WINTER RAINS ARE COMING IN CALIFORNIA.

15           AND SO HAVING SOMETHING TO KEEP YOURSELF WARM OF

16  THAT PART IS, I THINK, JUST AN ORDINARY AND ROUTINE THING THAT

17  SHOULD −− THAT CERTAINLY HAS A CLEAR MEDICAL NEED.

18  Q.   AND YOU STATED I, IN YOUR OPINION, I HAVE A MEDICAL NEED

19  FOR ASSISTANCE WITH DAILY ACTIVITIES; IS THAT CORRECT?

20  A.   YES.  YOU NEED HELP WITH WRITING, PARTICULARLY, DUE TO THE

21  ISSUE OF YOUR CIRCUMSTANCE BEING SEQUESTERED IN A PRISON, IN A

22  PARTICULARLY ISOLATED UNIT AS WE HAVE DESCRIBED FROM ALL KINDS

23  OF THINGS, PERSONAL REHABILITATION, OF CORRESPONDENCE COURSES,

24  CONNECTIONS WITH YOUR FAMILY AND FRIENDS, AND ANY OTHER KIND OF

25  LEGAL WORK OR THINGS YOU NEED TO BE DOING.

1              THE CELL CLEANING, AS YOU SAID, IS VERY HARD.  AND

2    THEN IF WHEN YOU EXERCISE IN YOUR CELL, IT IS ROUTINE IN YOUR

3    UNIT THAT PEOPLE ALL WASH OUT THEIR PRISON ISSUE.  SO WHEN THEY

4    SWEAT, THEY EXERCISE, MEN EXERCISE IN THEIR CELLS, THEY GET

5    SWEATY, THEY TAKE A LITTLE BIRD BATH IN THE CELL, I MEAN, IN

6    FRONT OF THE WASHBASIN, DRY DOWN, PUT ON FRESH CLOTHES, AND

7    THEN WASH OUT THEIR UNDERWEAR.

8              PRETTY MUCH PEOPLE LIVE IN THEIR UNDERWEAR A LOT IN

9    YOUR UNIT.  AND IF YOU HAVE THERMALS TO KEEP THE ARM WARM, YOU

10   HAVE TO WASH THOSE OUT AS WELL.  THAT'S PARTICULARLY A

11   DIFFICULT THING FOR YOU TO DO.

12             WE WANT YOU TO BE ABLE TO DO LARGE MUSCLE EXERCISES

13   IN YOUR CELL FOR CARDIOVASCULAR FITNESS, FOR UPPER BODY

14   STRENGTH BECAUSE THE STRENGTH OF THE PINKIE, AS WE SAY IN

15   MEDICINE, COMES FROM THE SHOULDER.  SO IF YOU HAVE A WEAK UPPER

16   BODY, THEN THE WRIST AND HAND FUNCTION LESS WELL BECAUSE

17   THEY'RE SUPPORT, THEY'RE A BASIS OF SUPPORT THERE.  SO IT IS

18   CRITICALLY IMPORTANT IN ORTHOPEDICS TO HAVE THAT.

19             SO FOR ALL THOSE REASONS, IT IS IMPORTANT TO HAVE

20   THAT ASSISTANCE, OR SOME ACCOMMODATION.

21   Q.   OKAY, THANK YOU.

22             IN YOUR OPINION, DO I HAVE A MEDICAL NEED FOR

23   MEDICAL CARE AND FOLLOW-UPS BY SPECIALTY MEDICAL PROVIDERS?

24   A.   I THINK YOU DO.  AND THAT HAS BEEN ONE OF THE NEGLIGENT

25   ASPECTS OF YOUR CARE CERTAINLY IN TERMS OF THIS COMPLAINT THAT

1    YOU HAVE AND PREVIOUSLY.

2            IT'S SHOCKING TO ME THAT YOU HAVE NEVER SEEN AN

3    OCCUPATIONAL THERAPIST.  OCCUPATIONAL THERAPISTS SPECIALIZE IN

4    THE USE OF THE HAND AND HOW TO ASSIST PEOPLE.  I MYSELF SEE MY

5    OT AT LEAST ONCE A YEAR SINCE I HAD AN INJURY THAT RENDERED MY

6    THUMB WEAK DUE TO A NERVE DETERIORATION AFTER AN INJURY.  I SEE

7    HER AND SHE'LL MAKE A NEW BRACE FOR ME.  SHE'LL TEACH ME NEW

8    EXERCISES THAT SHE JUST LEARNED SO THAT MY HAND, WHICH IS MY

9    DOMINANT HAND AND WHAT I MAKE MY MONEY IN, WRITING AND

10   EXAMINING PEOPLE, AND MY PLEASURE IN PLAYING MY CLARINET, THAT

11   STAYS OKAY.  AND I HAVE THE BEST FUNCTION I CAN.

12           YOU HAVE NEVER SEEN AN OCCUPATIONAL THERAPIST IN THE

13   ENTIRE TIME OF THESE 19 YEARS.  TO ME THAT IS HOPELESS

14   NEGLIGENCE AND REALLY TRAGIC BECAUSE IT DENIES YOU THE

15   POSSIBILITY FOR THAT KIND OF EXPERT CARE AND REHABILITATIVE

16   EXPERTISE.

17           ALSO, TO SEE AN ORTHOPEDIST WHO SPECIALIZES IN WRIST

18   AND HAND PROBLEMS, AND THEN, AGAIN, NOT TO SEE THE PERSON ONCE,

19   BUT SEE THE PERSON ON A REGULAR BASIS INTERMITTENTLY.  IT

20   DOESN'T MEAN YOU HAVE TO GO ONCE A MONTH.  YOU MIGHT FOR A

21   BRIEF TIME, BUT CERTAINLY YEARLY VISITS AFTER A PROGRAM IS

22   STABILIZED AND RENDERED WOULD BE ROUTINE AND IMPORTANT AND

23   ANYONE WITH YOUR LEVEL OF TROUBLE GIVEN THE MASSIVE INJURY THAT

24   YOU HAD PREVIOUSLY WOULD BE JUST KIND OF ORDINARY.

25           AND, AGAIN, THIS WOULD BE A WAY OF BUILDING AN

1   ALLIANCE BETWEEN YOU AND YOUR MEDICAL CARE TEAM AND PROVIDERS,

2   SO THAT WE ENCOURAGE YOU TO TRY AND KEEP YOU GOING AND DEALING

3   WITH THE DAILY, CHRONIC, NAGGING, GNAWING PAIN AND DIFFICULTY

4   THAT IS PART OF YOUR DAILY LIFE.

5   **Q.**   ALL RIGHT, THANK YOU.

6           BASED ON YOUR EXPERIENCE, TRAINING, AND OPINION,

7   WITH THE CONDITION LIKE MINE, SAY ME, SAY I WAS -- THIS IS LIKE

8   A HYPOTHETICAL QUESTION.

9           WHAT IT IS, WHAT I AM TRYING TO GET AT IS, SAY I WAS

10  PROVIDED MEDICATION THAT WORKED FOR ME, AND I WAS PROVIDED

11  REGULAR PHYSICAL THERAPY, AND I WAS PROVIDED WITH A PROPERLY

12  FITTING ARM BRACE THAT ENABLED ME TO DO THE UPPER ARM EXERCISE,

13  AND THE COMBINATION OF THOSE THINGS OVER A PERIOD OF TIME

14  BROUGHT MY ARM INTO THE BEST HEALTH THAT IT COULD BE.

15          AT THAT POINT IN TIME, IN YOUR OPINION, WOULD IT BE

16  APPROPRIATE TO DISCONTINUE ALL OF THOSE THINGS?

17  **A.**   ABSOLUTELY NOT.  THAT'S THE MOMENT IN WHICH YOU TRY TO

18  THEN RETAIN THAT FUNCTION THROUGH REGULAR CONSULTATIVE CARE AND

19  CONTINUING THE USE OF THE ASSISTIVE DEVICES.

20          AS MY OCCUPATIONAL THERAPIST SAYS I'M GOING TO BE

21  USING MY LITTLE CHINESE BALLS TO STRENGTHEN THE INTRINSIC

22  MUSCLES OF MY HAND FOR THE REST OF MY LIFE, AND THAT'S JUST HOW

23  IT IS BECAUSE OF THE CONDITION.

24          AND THAT'S TRUE FOR YOU.  THERE WILL BE THINGS THAT

25  YOU WILL DO FOR THE REST OF YOUR LIFE IN ORDER TO FUNCTION

1    ADEQUATELY AND EFFECTIVELY THAT YOU WILL JUST NEED TO BE DOING.

2         AND MORE AND MORE WE HOPE YOU LEARN TO DO THOSE ON

3    YOUR OWN, BUT BECAUSE OF THE NATURE OF YOUR HOUSING, AND THE

4    RESTRICTIONS OF THE PRISON, YOU ACTUALLY IN AN ODD WAY NEED

5    MORE HELP FROM YOUR MEDICAL PROVIDERS THAN SOMEONE ON THE

6    OUTSIDE WHO CAN, LIKE THE PEOPLE I GO TO THE Y AND SIX O'CLOCK

7    HERE I AM AND THERE'S THE GUY IN THE WHEELCHAIR DOING HIS UPPER

8    BODY EXERCISE.  HE DOESN'T NEED -- HE GETS THERE, HIS WIFE

9    DRIVES HIM.

10        SO ON THE OUTSIDE, WE ALL CAN ACCESS THOSE SPECIAL

11   TOOLS IN ORDINARY WAYS.  YOU CAN'T.  SO YOU NEED AN ALLIANCE

12   WITH YOUR MEDICAL PROVIDERS BECAUSE OF THE RESTRICTIONS OF YOUR

13   SETTING AND, I WOULD SAY, AS A CORRECTIONAL MEDICAL

14   PROFESSIONAL, THAT IT IS IN EVERY STANDARD THAT IS WRITTEN

15   ABOUT MEDICAL CARE --

16        **MR. ANDRADA:**  YOUR HONOR, I AM SORRY.  EXCUSE ME,

17   DOCTOR.  EXCUSE ME, DOCTOR.

18        MAY I MOVE TO STRIKE NOW.  THIS IS REALLY A

19   NARRATIVE.

20        **THE COURT:**  I THINK IT'S QUITE RELEVANT AND I WILL

21   ALLOW HIM TO CONTINUE.

22        **THE WITNESS:**  THANK YOU.

23        IN EVERY STANDARD, IT IS SAID AND STATED THAT THE

24   KIND OF HOUSING A PERSON HAS CANNOT INTERFERE WITH THEIR

25   ABILITY TO RECEIVE ORDINARY ADEQUATE COMMUNITY EQUIVALENT CARE,

```
 1    THAT THAT HAS -- THAT THE LEVEL OF INCARCERATION, WHAT KIND OF

 2    PRISON THEY ARE IN, ANYTHING LIKE THAT, THAT'S IRRELEVANT TO

 3    THE DELIVERY OF CARE.  THAT'S SUPPOSED TO BE COMPLETELY

 4    INDEPENDENT.

 5              AND I JUST NEED TO SAY THAT BECAUSE PERHAPS THAT'S

 6    NOT SO OBVIOUS TO PEOPLE WHO DON'T HAVE CONTACT WITH PRISONS

 7    AND JAILS VERY MUCH.

 8              MR. ASHKER:  ALL RIGHT, THANK YOU.

 9              THE COURT:  WE NEED TO TAKE A BREAK UNLESS YOU ARE

10    VERY CLOSE TO FINISHING.

11              MR. ASHKER:  I PROBABLY HAVE ABOUT AT LEAST ANOTHER

12    HALF AN HOUR, YOUR HONOR.  MAYBE 15 MINUTES.

13              THE COURT:  WE WILL TAKE A BREAK.  IT'S 10:15.  WE

14    WILL BREAK UNTIL 10:30.

15              AND DR. WEINSTEIN, IF YOU WOULD BE BACK ON THE STAND

16    AT 10:30.

17              MR. ANDRADA:  MAY WE SEE YOU ABOUT SCHEDULING?

18              THE COURT:  YES.

19              MR. ANDRADA:  I HAVE A SCHEDULING QUESTION, IF IT

20    PLEASES THE COURT.

21              (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

22              THE COURT:  YOU CAN GO AHEAD AND STEP DOWN.  LEAVE

23    IT ON THE TABLE THERE.  THE CLERK WILL GET IT.

24              THE WITNESS:  THANK YOU.

25              CAN I LEAVE MY STUFF?
```

1        **THE COURT:**  YES.

2        **MR. ANDRADA:**  YES, YOUR HONOR.

3        WE HAVE DR. KREIS FROM DAVIS AT NOON BY

4    VIDEOCONFERENCE.  I WAS JUST ALERTING THE COURT THAT WE HAVE

5    HIM READY TO GO.  AND I DON'T KNOW -- WELL, MR. ASHKER IS

6    INDICATING HE MAY HAVE ANOTHER HALF HOUR OR SO.

7        **MR. ASHKER:**  I THINK IT WILL BE -- I AM GOING TO TRY

8    AND JUST --I'M ALMOST DONE.

9        **THE COURT:**  GIVE IT SOME THOUGHT.  I THINK YOU

10   PRETTY MUCH COVERED THE TERRITORY.

11       **MR. ASHKER:**  I WANT TO GET INTO VERY LAST THING ON

12   HIS SPECIFIC OPINION ABOUT DR. SAYRE.

13       **THE COURT:**  OKAY.  SO YOU WILL HAVE TO TELL

14   DR. KREIS HE NEEDS TO REMAIN AVAILABLE UNTIL 1:30, AND WE WILL

15   GET TO HIM WHEN WE CAN, IF THAT'S WHAT YOU ARE GETTING AT.

16       YOU CAN TELL HIM THE COURT HAS ORDERED HIM TO DO SO.

17       **MR. ANDRADA:**  VERY WELL, YOUR HONOR.  WE WILL DO SO.

18       **THE COURT:**  IS THAT IT?

19       **MR. ANDRADA:**  I THINK THAT IS -- I THINK THAT'S IT

20   FOR THE MOMENT.  THANK YOU VERY MUCH.

21       (RECESS TAKEN AT 10:17 A.M.)

22       (PROCEEDINGS RESUMED AT 10:30 A.M.)

23       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

24       **THE COURT:**  I DON'T KNOW IF THE CLERK TOLD YOU, WE

25   HEARD FROM DR. DUNCAN -- YOU CAN COME ON BACK UP,

1    DR. WEINSTEIN.

2              WE HEARD FROM DR. DUNCAN.  HE'S AT PELICAN BAY.

3    HE'S GRACIOUSLY AGREED TO MAKE HIMSELF AVAILABLE BETWEEN 11 AND

4    12, AT WHICH TIME HE PLANS TO GO TO LUNCH.  SO THAT'S ANOTHER

5    PROBLEM.

6              SO WE NEED TO FINISH UP DR. WEINSTEIN AS EFFICIENTLY

7    AS WE CAN SO THAT WE CAN -- I DON'T KNOW WHAT DR. ALLEN'S TIME

8    CONSTRAINS ARE.  IF HE WOULD BE WILLING TO WAIT UNTIL AFTER

9    DUNCAN AND KREIS OR IF HE HAS HIS OWN PROBLEMS, BUT WE NEED TO

10   MOVE AS QUICKLY AS WE CAN AND AS EFFICIENTLY AS WE CAN SO THAT

11   WE CAN GET TO DUNCAN AND KREIS.

12             **MR. ASHKER:**  DR. ALLEN INFORMED ME THAT WITH THAT

13   SCHEDULING RIGHT THERE, HE CAN BE AVAILABLE TOMORROW, IF

14   NECESSARY.

15             **THE COURT:**  OH, OKAY.  THAT WOULD BE GREAT.  THANKS

16   SO MUCH.

17             ALL RIGHT.  SO, BE AS QUICK AS YOU CAN FINISHING UP

18   ON YOUR DIRECT, BE AS EFFICIENT AS WE CAN ON YOUR CROSS, AND

19   THEN WE WILL GO TO THE OTHER TWO DOCTORS.

20             **MR. ANDRADA:**  YES, YOUR HONOR.

21             **MR. ASHKER:**  YOUR HONOR, ONE QUESTION ON THESE

22   REPORTS OF DR. WEINSTEIN ON HIS MEDICAL, I WANTED TO PUT THESE

23   INTO EVIDENCE.

24             **THE COURT:**  WHICH REPORTS?

25             **MR. ASHKER:**  THE REPORTS ATTACHED TO EXHIBIT 180

```
1    WHICH ARE INFORMATION ON TRAMADOL FROM THE INTERNET AND STUFF.

2              THE COURT:  OH.  THESE ARE THINGS THAT HE HAS

3    PROVIDED?

4              MR. ASHKER:  YES.

5              THE COURT:  IN HIS REPORT?

6              MR. ASHKER:  WELL, THEY WERE PROVIDED IN RESPONSE TO

7    THEIR SUBPOENA FOR HIM TO SHOW UP AT DEPOSITION.  THEY ASKED

8    HIM WHAT HIS STATEMENTS IN HIS REPORT WERE BASED ON CONCERNING

9    TRAMADOL AND ITS USES, AND FDI RESEARCH ON -- HE DID --

10             THE COURT:  HE GAVE THESE AT HIS DEPOSITION?

11             MR. ASHKER:  HE PROVIDED THEM IN RESPONSE TO

12   SUBPOENA --

13             THE COURT:  LET'S DO THIS.  YOU CAN HAVE HIM

14   IDENTIFY THEM AND SAY THEY ARE THINGS HE RELIED UPON AND THEN

15   WE'LL TALK LATER ABOUT WHETHER WE CAN RECEIVE THEM INTO

16   EVIDENCE.

17             MR. ASHKER:  OKAY.  THEY ARE ATTACHED AS PART OF

18   EXHIBIT 180.

19             THE COURT:  OKAY.

20             MR. ANDRADA:  WE WOULD TAKE THE VIEW THAT THEY

21   SHOULD NOT BE ADMITTED, YOUR HONOR. IT'S MEDICAL LITERATURE.

22   CLASSIC HEARSAY, AND WE WILL --

23             THE COURT:  NO.  IT CAN BE -- THERE'S A RULE ON

24   THIS.  AND IT SAYS THAT YOU CAN ASK -- I FORGET WHAT IT SAYS,

25   BUT SO YOU ARE NOT OBJECTING YOU DIDN'T KNOW ABOUT IT.
```

1          **MR. ANDRADA:**  I ASSUMED THAT THESE ARE THE -- THEY

2     ARE NOT EVEN THE ARTICLES.  THEY ARE EXCERPTS FROM THE

3     ARTICLES -- NOT EVEN EXCERPTS.

4          **THE COURT:**  WE NEED TO BE QUICKER ABOUT THIS.  ARE

5     YOU SAYING YOU DID NOT KNOW ABOUT HEM?

6          **MR. ANDRADA:**  NO, YOUR HONOR, WE KNEW ABOUT THEM.

7          **THE COURT:**  GOOD.  I WILL LOOK UP THE EXPERT RULE

8     WHILE WE ARE GOING ON.  YOU CAN ASK HIM WHETHER THESE ARE

9     THINGS HE RELIED UPON IN --

10         **MR. ASHKER:**  I WAS GOING --

11         **THE COURT:**  -- BASING HIS OPINION, AND THEN WE CAN

12     TALK LATER ABOUT WHETHER THEY ARE ACTUALLY ADMITTED OR NOT.

13         **MR. ASHKER:**  I WAS ALSO GOING TO ASK DR. SAYRE AND

14     DR. SHIN QUESTIONS BASED ON RIGHT FROM THESE REPORTS ALSO.

15         **THE COURT:**  YOU CAN DO THAT.  YOU CAN DEFINITELY DO

16     THAT.

17         **MR. ASHKER:**  THEN I CAN PRESENT THEM INTO EVIDENCE

18     AT THAT TIME?

19         **THE COURT:**  I DON'T KNOW IF YOU CAN PUT THEM INTO

20     EVIDENCE.  I THINK THE RULE IS THAT THE EXPERT CAN BE ASKED

21     ABOUT THINGS THAT HE RELIED UPON EVEN THOUGH THEY ARE HEARSAY,

22     BUT THAT THOSE THINGS THEMSELVES CAN'T BE PLACED INTO EVIDENCE,

23     WHICH IS UNFORTUNATE SINCE IT WILL TAKE A LOT LONGER TO ASK HIM

24     ABOUT THEM, WHICH HE CAN DO, THAN IT WILL TO PUT THEM IN

25     EVIDENCE, BUT IF COUNSEL WANTS TO STAND ON THAT RULE, THEN

1    THAT'S THE WAY WE WILL HAVE TO DO IT.  I THINK THAT'S THE WAY

2    THE RULE IS.  I AM GOING TO DOUBLECHECK THAT, BUT LET'S BRING

3    IN THE JURY.

4              **MR. ANDRADA:**  THAT IS THE RULE -- I BELIEVE THAT IS

5    THE RULE.

6              **THE COURT:**  AND THAT'S HOW YOU WOULD LIKE TO HANDLE

7    IT EVEN THOUGH WE HAVE THESE WITNESS PROBLEMS?

8              **MR. ANDRADA:**  YES, YOUR HONOR.  I DON'T WANT THIS

9    LITERATURE IN.

10             **THE COURT:**  YOUR WITNESS IS AVAILABLE AT WHAT TIME?

11             **MR. ANDRADA:**  DR. KREIS -- WE CALLED HIM AGAIN AND

12   APPARENTLY HE WILL BE HERE -- HE WILL BE AVAILABLE, AS I

13   UNDERSTAND IT, UNTIL WE QUIT FOR THE DAY.

14             **THE COURT:**  UNTIL 1:30.  OKAY.

15             **THE CLERK:**  ALL RISE.

16             (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

17             **THE COURT:**  PLEASE BE SEATED.  YOU MAY PROCEED.

18   **BY MR. ASHKER:**

19   **Q.**   DR. WEINSTEIN, REFERRING BACK TO YOUR 1/22/07-REPORT,

20   BOTTOM OF PAGE 5 AT THE COMMENT SECTION, YOU STATED:  I FIND IT

21   IMPORTANT TO COMMENT DIRECTLY ON THE DEPOSITION AND MEDICAL

22   PROGRESS NOTATION OF DR. SAYRE, THE CONCERN PA'S -- PA APPLIES

23   TO ME, TODD ASHKER, DIAGNOSIS, CONDITION, AND MEDICAL CARE; IS

24   THAT CORRECT?

25   **A.**   YES.

1    Q.    AND YOU FURTHER STATED:  DR. SAYRE'S VIEWS HAVE BEEN

2    SUPPORTED IN DEPOSITION BY MY TREATING FAMILY NURSE

3    PRACTITIONER, MS. RISENHOOVER, AND BY HER HEALTH CARE MANAGER,

4    MS. MCLEAN; IS THAT CORRECT?

5    A.    YES.

6    Q.    YOU FURTHER STATED:  IN HIS PROGRESS NOTE OF 8/31/06 AND

7    IN HIS DEPOSITION OF 11/11/06, DR. SAYRE STATES INACCURATE

8    MEDICAL FACTS CREATES FALSE ARGUMENTS AND VAGUE DATA TO

9    SUBSTANTIATE THE DENIAL OF ORDINARY AND STANDARD MEDICAL CARE

10   AND SUPPORT FOR HIS DISABLED PATIENT, TODD ASHKER.

11              IS THAT CORRECT?

12   A.    YES, IT IS.

13   Q.    YOU FURTHER STATED IN THE PROGRESS NOTE THAT THE ASSERTION

14   IS MADE THAT THE ONLY REASON TO ASSIST ME WITH WARM CLOTHING

15   WOULD BE IF HE WAS DIAGNOSED WITH AN AUTONOMIC DYSTROPHY.

16              THAT IS A FALSE ARGUMENT; IS THAT CORRECT?

17   A.    YES.

18   Q.    AND WHAT WAS THE BASIS OF YOUR STATEMENT THERE, YOUR

19   OPINION?

20   A.    THAT WHILE IT IS TRUE THAT THOSE AUTONOMIC DYSTROPHY ARE

21   VERY SENSITIVE TO COLD AND HAVE A LOT OF PAIN DUE TO IT, IT IS

22   COMPLETELY FALSE THAT THAT'S THE ONLY REASON TO WARM A PART,

23   ESPECIALLY THAT HAS BEEN SUBJECTED TO THE KIND OF INJURIES AND

24   MULTIPLE SURGERIES THAT YOUR ARM AND WRIST HAD, IT WOULD BE

25   ROUTINE, AND IN MY 40 YEARS OF MEDICAL PRACTICE IS ROUTINE,

1    THAT COLD INFLUENCES ADVERSELY PEOPLE WITH THOSE KINDS OF

2    INJURIES AND THE PAIN IS FELT MORE.

3           I THINK THAT'S COMMON KNOWLEDGE AND CERTAINLY MY

4    CLINICAL EXPERIENCE.

5    Q.   THANK YOU.

6           YOU FURTHER WITH STATED THAT:  DR. SAYRE ASSERTS

7    THAT I SHOULD NOT DO DAILY IN-CELL EXERCISE THAT WOULD REQUIRE

8    A SHOWER; THAT SUCH EXERCISE IS A MATTER OF CHOICE.

9           DR. SAYRE SEEKS TO DAMPEN MY ENTHUSIASM FOR NEED OF

10   LARGE MUSCLE EXERTION AND UNDERCUT A HELPFUL PART OF HIS

11   MAINTENANCE PROGRAM.  IS THAT CORRECT?

12   A.   YES.

13   Q.   YOU FURTHER STATED:  DR. SAYRE PROVIDES INCORRECT MEDICAL

14   DATA WHEN HE STATES THAT ULTRAM IS INDICATED ONLY FOR

15   SHORT-TERM PAIN CONTROL.  IS THAT CORRECT?

16   A.   YES.

17   Q.   AND WHAT WAS THE BASIS OF YOUR OPINION ON THAT?

18   A.   WELL, I CALLED COLLEAGUES, BUT ALSO I LOOKED AT THE

19   CLINICAL LITERATURE, DID A LITERATURE SEARCH THROUGH THE NIH

20   LIBRARY.

21          AND AS I STATED PREVIOUSLY, FOUND ARTICLES TO

22   SUPPORT CLEARLY THAT TRAMADOL, ESPECIALLY WITH TYLENOL IS

23   USEFUL IN THE TREATMENT OF CHRONIC PAIN.  IT'S COMMON AND

24   ORDINARY TO DO SO, AND I FOUND NO ARTICLES THAT STATED THAT IT

25   IS NOT USED IN THAT WAY.

1    Q.    OKAY, THANK YOU.

2              DID YOU PROVIDE COPIES OF THOSE EXCERPTS OF ARTICLES

3    TO THE DEFENDANTS?

4    A.    WHAT I PROVIDED WERE ABSTRACTS WHICH ARE A SUMMARY OF

5    THOSE ARTICLES THAT WERE PUBLISHED IN THE NATIONAL INSTITUTE OF

6    HEALTH JOURNAL SEARCH WEBSITE.

7    Q.    AND I WOULD ASK THE WITNESS TO BE ABLE TO LOOK AT THE

8    EXCERPTS ATTACHED AS A PART OF EXHIBIT 180.

9              **THE WITNESS:**  THANK YOU.  I DID NOT BRING THEM.

10             **MR. ANDRADA:**  ONE SECOND, YOUR HONOR, IF I MAY.

11             **THE COURT:**  YOU CAN LOOK THOSE OVER AND SEE IF THOSE

12   ARE THE ONES THAT YOU PROVIDED.

13             LET US KNOW WHEN YOU ARE READY.

14             (PAUSE IN THE PROCEEDINGS.)

15             **MR. ANDRADA:**  I AM LOOKING AT THE DOCUMENTS.

16             THANK YOU, YOUR HONOR.

17             **THE COURT:**  I MEANT THE WITNESS, BUT I AM GLAD YOU

18   ARE READY ALSO.

19             **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

20             **THE WITNESS:**  YES, THESE ARE THE ONES I PROVIDED.

21   BY MR. ASHKER:

22   Q.    THANK YOU.

23             AND ARE YOU THE ONE THAT MADE THE MARKS ON SOME OF

24   THE PAGES?

25   A.    I THINK I AM.  YES.

1   Q.   CAN YOU EXPLAIN WHY YOU MADE THOSE MARKS ON THOSE

2   PARTICULAR PARTS OF THE PAGES, AND IDENTIFY WHICH PAGES THEY

3   ARE, PLEASE?

4   A.   I MADE THOSE MARKS TO BE ABLE FOR ME TO JUST GO BACK

5   QUICKLY AND SEE WHAT SOME ESSENTIAL STATEMENTS WERE.

6           AND, FOR EXAMPLE, ON PAGE 39, I MARKED THE

7   COMBINATION OF --

8           MR. ANDRADA:  EXCUSE ME, I DON'T THINK IT WOULD BE

9   APPROPRIATE FOR HIM TO COMMENT.  HE WOULD ESSENTIALLY BE

10  READING FROM THESE DOCUMENTS, WHICH WOULD BE INADMISSIBLE

11  HEARSAY, WE RESPECTFULLY SUGGEST.

12          THE COURT:  I DON'T THINK SO.

13          HE MAY SUMMARIZE WHAT HE LEARNED IN HIS RESEARCH.

14  DON'T NECESSARILY READ IT A LOUD.  IF YOU CAN SUMMARIZE WHAT

15  YOU LEARNED, IF YOU HAVEN'T ALREADY, FROM YOUR RESEARCH.

16          THE WITNESS:  SO IN THE SEVEN ARTICLES THAT I

17  PRESENT THE ABSTRACTS OF, THE SUMMARY, AS I DESCRIBED, ALL OF

18  THEM DEMONSTRATE THAT TRAMADOL, PARTICULARLY WITH TYLENOL, IS

19  AN EFFECTIVE PAIN MANAGEMENT STRATEGY FOR BOTH ACUTE AND

20  CHRONIC PAIN.

21  BY MR. ASHKER:

22  Q.   AND IS IT CORRECT THAT IT DOES NOT HAVE THE SAME

23  STOMACH -- CAUSE STOMACH PROBLEMS AS NONSTEROIDAL

24  ANTI-INFLAMMATORIES DO?

25  A.   THAT'S CORRECT.

WEINSTEIN – DIRECT / MR. ASHKER

1    Q.   OKAY.

2              YOU FURTHER STATED IN YOUR OPINION THAT THE FINAL

3    ASSERTION IN THE PROGRESS NOTE IS THAT ASSISTIVE EXERCISE

4    EQUIPMENT IS NOT NEEDED.  IN FACT, I AM SHOWING FURTHER

5    LIMITATION OF MOTION AND NEUROLOGICAL DEFICIENT SINCE MY LAST

6    VISIT, AND AS ANYONE WITH SUCH AN INJURY HISTORY REQUIRES

7    REGULAR, SPECIAL EXERCISES LIFELONG TO ATTEMPT TO PREVENT JUST

8    SUCH DETERIORATION.

9              IS THAT CORRECT?

10   A.   YES.

11   Q.   OKAY.

12             YOU ALSO STATED THAT IN DEPOSITION DR. REESE STATES

13   THE ABOVE MISINFORMATION IN CONTRADICTION TO FIRM MEDICAL

14   RESEARCH AND STANDARD USE, HE OPINES THAT THE USE OF TRAMADOL

15   IS UNSAFE, UNNECESSARY, AND UNWISE, AND IT LACKS RESULTS IN --

16   ITS LACK RESULTS IN NO INJURY AND THAT MOTRIN AND TYLENOL IS

17   ADEQUATE.  QUITE THE OPPOSITE IS TRUE.

18             IS THAT CORRECT?

19   A.   YES.

20   Q.   AND WHAT WAS THAT BASED ON?

21   A.   TWO THINGS.  ONE THE RESEARCH I HAD DONE IN TERMS OF THE

22   ORDINARY COMMON USE OF TRAMADOL IN ACUTE AND CHRONIC PAIN.  AND

23   THE SECOND IN THE COMMON IRRITATION THAT THE NSAIDS CAUSE THE

24   STOMACH AND IT HAD CAUSED YOU IN THE PAST AND CAUSED YOU AGAIN

25   WHEN IT WAS PRESCRIBED.

1    Q.   THANK YOU.

2              AND YOU STATED THE PARACETAMOL, WHICH IS TYLENOL,

3    CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   THUS TRAMADOL COMBINATION IS ALSO FREE OF ORGAN TOXICITY

6    ASSOCIATED WITH SELECTIVE AND NONSELECTIVE NONSTEROIDAL

7    ANTI-INFLAMMATORY DRUGS.

8              IS THAT CORRECT?

9    A.   YES.

10   Q.   YOU ALSO STATED PARACETAMOL PLUS TRAMADOL IS AN EFFECTIVE

11   AND SAFE MULTIMODAL ANALGESIC REGIMEN FOR THE MANAGEMENT OF

12   BOTH ACUTE AND CHRONIC MODERATE TO SEVERE PAIN AND CITED A

13   REFERENCE TO A 2006 ARTICLE.  IS THAT CORRECT?

14   A.   YES.

15   Q.   YOU ALSO STATED THAT DR. SAYRE ASSERTS FEDERAL

16   MANUFACTURER GUIDELINES TO BOLSTER HIS OPINION THAT CONTRADICT

17   THE CDCR SPECIALIST, AND THAT YOU COULD NOT FIND SUCH FEDERAL

18   GUIDELINES; IS THAT CORRECT?

19   A.   YES.

20   Q.   YOU ALSO STATED IT IS TRUE THAT THE PHYSICIAN DESK

21   REFERENCE STATES THAT TRAMADOL BE USED ONLY FOR ACUTE PAIN, BUT

22   THAT IS NOT HOW IT IS USED IN CLINICAL PRACTICE AS INDICATED BY

23   THE PAIN SPECIALIST CONSULTATION AND THE REVIEW ARTICLES I HAVE

24   QUOTED.  IS THAT CORRECT?

25   A.   YES.  IN FACT, BY GOING TO THE PHYSICIANS DESK REFERENCE,

WEINSTEIN - DIRECT / MR. ASHKER

1    WHICH IS THE KIND OF ROUTINE COMPENDIUM OF MEDICATIONS THAT ARE

2    USED IN THE STANDARD OF PRACTICE, AND STATING THAT TRAMADOL

3    THERE HAD SAID IT IS ONLY USED FOR ACUTE PAIN, AND HEARING

4    PREVIOUSLY THAT THE PAIN MANAGEMENT SPECIALIST OF THE

5    DEPARTMENT OF CORRECTIONS HAD RECOMMENDED IT ON A CONTINUOUS

6    BASIS.

7              SO THOSE TWO FACTS WERE IN CONFLICT.  THAT'S WHAT

8    DROVE ME TO GO TO THE LITERATURE AND FIND OUT, IN FACT, WHAT IS

9    GOING ON HERE.  AND WHAT I FOUND OUT WAS THAT THE PDR IS QUITE

10   LIMITED AND DID NOT INDICATE THE ORDINARY COMMON USE AS

11   EVIDENCED BY THESE STUDIES GOING BACK A NUMBER OF YEARS.

12   Q.  OKAY.

13             YOU ALSO STATED THAT ALSO NONE OF THE SIDE EFFECTS

14   MENTIONED BY DR. SAYRE FOR TRAMADOL HAVE BEEN EXPERIENCED BY ME

15   IN THE YEARS HE HAD TAKEN THE MEDICATION.  IS THAT CORRECT?

16   A.  YES.

17   Q.  YOU ALSO STATED THAT IN DEPOSITION, DR. SAYRE SAYS THAT

18   MY -- I HAVE AN AVERAGE GRIP STRENGTH IN THE INJURED ARM, AND

19   THAT THAT IS FACTUALLY NOT CORRECT.

20             IS THAT CORRECT?

21   A.  YES.  HE HAD STATED THAT YOUR GRIP STRENGTH WAS NORMAL AT

22   50 POUNDS, AND AS I STATED BEFORE, THE NORMAL FOR YOUR AGE IS

23   100 POUNDS.

24   Q.  OKAY.  AND YOU STATED IN YOUR EXAMINATION YOU FOUND MY

25   GRIP STRENGTH TO BE ON A PAR OF PERHAPS A TEN-YEAR-OLD CHILD AS

WEINSTEIN – DIRECT / MR. ASHKER

1   YOU COULD PULL YOUR FINGERS FROM MY GRASP WITH RELATIVE EASE.

2   IS THAT CORRECT?

3   **A.**   YES.

4   **Q.**   YOU CONTINUED BY STATING:  FURTHER, THE CONTENTION IS MADE

5   THAT I HAVE ABOVE AVERAGE RECOVERY FROM MY INJURY.  IS THAT

6   CORRECT?

7   **A.**   YES.

8   **Q.**   AND THEN YOU STATED:  WHATEVER DR. SAYRE'S CLINICAL

9   EXPERIENCE IS WITH MEN WHO HAVE SUFFERED SUCH A DEVASTATING ARM

10  INJURY, IT IS CLEAR FROM YOUR EXAMINATION OF ME THAT MY

11  CONDITION IS WORSENING IN THE LAST TWO YEARS AND PROBABLY MOST

12  RECENTLY SINCE WITHDRAWAL OF THE MEDICATION AND SUPPORT.

13          IS THAT CORRECT?

14  **A.**   YES.

15  **Q.**   YOU STATED THERE IS WEAKNESS, LIMITATION OF MOTION, AND

16  NEUROLOGICAL DEFICIENCY OF THE EFFECTED LIMB.

17          IS THAT CORRECT?

18  **A.**   NEUROLOGICAL DEFICIT OF THE EFFECTED LIMB.  YES, THAT IS

19  TRUE.

20  **Q.**   YOU ALSO STATED:

21          DR. SAYRE GOES SO FAR AS TO DENY THAT I EXPERIENCE

22  SIGNIFICANT PAIN IN THE ARM AT ALL AND THAT HE USES A VAGUE

23  REFERENCE TO VIDEOTAPES OBSERVED TO BOLSTER HIS OPINION WITHOUT

24  ANY COMMENT AS TO WHAT THE PROOF IS, AND USES CONVOLUTED LOGIC

25  ABOUT MY UPPER ARM STRENGTH BEING IMPOSSIBLE IF THERE WERE

1    PAIN.

2              IS THAT CORRECT?

3    **A.**   YES.

4    **Q.**   AND I WOULD LIKE TO PRESENT TO YOU THAT WE VIEWED THE

5    VIDEOTAPE, AND THAT THE VIDEOTAPE -- IN THE VIDEOTAPE I AM

6    WEARING A JACKET AND A LONG-SLEEVED JACKET AND A JUMPSUIT, AND

7    YOU DON'T SEE -- YOU CANNOT SEE MY PHYSIQUE AND YOU DON'T SEE

8    ME USING MY HAND OR ARM FOR ANY KIND OF ACTIVITIES.

9              BASED ON THAT PRESENTATION RIGHT THERE, WHAT IS YOUR

10   OPINION ABOUT DR. SAYRE'S STATEMENTS THAT HE SUPPORTED PART OF

11   HIS DECISIONS ON MY MEDICATION AND NEED FOR PHYSICAL THERAPY

12   AND AN ARM BRACE ON THESE VIDEOTAPE OBSERVATIONS?

13   **A.**   I HAVEN'T SEEN THE VIDEOTAPE.  IF IT JUST SHOWS YOU

14   STANDING AND WALKING NORMALLY WITHOUT ANY -- DOING ANY DRAMATIC

15   OR EXERTIONAL THINGS WITH YOUR ARM, AND THAT IS THE EVIDENCE

16   THAT YOU DON'T HAVE PAIN, I WOULD SAY THAT THAT'S SPURIOUS

17   EVIDENCE AND GOES ALONG WITH THIS PATTERN THAT WE HAVE SEEN

18   THAT YOU DESCRIBE THAT THE FACTS ARE BEING TWISTED LIKE A

19   PRETZEL IN ORDER TO FORM A FOREGONE CONCLUSION OF DENIAL OF

20   CARE.

21   **Q.**   THANK YOU.

22              YOU ALSO STATED THAT DR. SAYRE DENIES EVEN THE

23   SIMPLE EXERCISE TOOLS OF BAND AND BALL BECAUSE OF HIS BELIEF

24   THAT I AM -- MY CONDITION IS STABLE AND AT PLATEAU.

25              IS THAT CORRECT?

1    **A.**   YES.  AS I HAVE DESCRIBED, THOSE ROUTINE TOOLS OF

2    REHABILITATION AND MAINTENANCE ARE CRITICALLY IMPORTANT AND

3    WILL HOPEFULLY BE USED LIFELONG AND BE REPLACED AS NEEDED AND

4    THAT NEW ONES THAT ARE BETTER, AS YEARS GO BY AND WE FIND OUT

5    NEW THINGS, WILL BE OFFERED TO YOU SO YOU CAN CONTINUE TO HAVE

6    THE BEST POSSIBLE FUNCTION THAT YOU CAN.

7    **Q.**   THANK YOU.

8          YOU FURTHER STATED THAT PATIENTS WITH PERMANENT

9    DISABILITIES LIKE MINE REQUIRE REGULAR SPECIAL EXERCISE IN

10   ORDER TO MAINTAIN THE STRENGTH, FLEXIBILITY, AND TONE OF THE

11   INJURED AREA AND TO REDUCE PAIN.

12          IS THAT CORRECT?

13   **A.**   YES.

14   **Q.**   AND THAT SUCH DAILY ACTIVITY IS ONE OF THE BURDENS TO THE

15   PATIENT AND PROPER MEDICAL CARE IS DESIGNED TO ASSIST, SUPPORT

16   AND ENCOURAGE THE FULFILLMENT OF THAT NECESSITY.

17          IS THAT CORRECT?

18   **A.**   YES.

19   **Q.**   AND THEN YOU CONCLUDED YOUR REPORT BY STATING YOUR

20   OPINION:  BY DENYING HIS PATIENT, TODD ASHKER, ORDINARY TOOLS

21   TO ACCOMMODATE HIS DISABILITY, SUCH AS PAIN CONTROL, ASSISTIVE

22   DEVICES AND HELP, IN-CELL EXERCISES, PROTECTION FROM INJURY AND

23   COLD, FREEDOM FROM STOMACH IRRITATION, FROM NSAIDS, AND BY NOT

24   MAKING APPROPRIATE REFERRALS FOR OCCUPATIONAL AND PHYSICAL

25   THERAPY AND ORTHOPEDIC CONSULTATION, DR. SAYRE IS ENSURING THAT

1   TODD ASHKER'S CONDITION WILL WORSEN AND ALSO THAT HIS CONDITION

2   WILL NOT BE MONITORED AS IT DETERIORATES.

3          IS THAT CORRECT?

4   **A.**   YES.

5   **Q.**   THEN YOU CONCLUDED WITH:  CERTAINLY DR. SAYRE'S WITHDRAWAL

6   OF MEDICATION, SUPPORT AND LACK OF APPROPRIATE REFERRALS FALLS

7   BELOW THE STANDARD OF CARE IN THE COMMUNITY, VIOLATES THE

8   INTENT OF THE ARMSTRONG AGREEMENT TO ASSURE PRISONERS ARE CARED

9   FOR IN COMPLIANCE WITH THE ADA, AND IS BELOW THE STANDARD OF

10  CARE TO A KNOWN AND SERIOUS MEDICAL NEED.

11         IS THAT CORRECT?

12         **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  I MUST OBJECT.

13  THIS CALLS NOW FOR LEGAL CONCLUSIONS.

14         **THE COURT:**  WE WILL STRIKE THE PORTION ABOUT THE

15  ARMSTRONG LITIGATION, BUT THE REST OF THE QUESTION CAN STAND.

16         **MR. ANDRADA:**  I THINK IT IS CUMULATIVE, YOUR HONOR,

17  BUT BE THAT AS IT MAY.

18         **THE COURT:**  LET ME JUST READ IT BACK WITHOUT THE

19  ARMSTRONG PART.

20         DID YOU CONCLUDE THEN WITH CERTAINTY THAT

21  DR. SAYRE'S WITHDRAWAL OF MEDICATION, SUPPORT AND LACK OF AN

22  APPROPRIATE REFERRAL FALLS BELOW THE STANDARD OF CARE IN THE

23  COMMUNITY AND IS BELOW THE STANDARD OF CARE TO A KNOWN AND

24  SERIOUS MEDICAL NEED; IS THAT CORRECT?

25         **THE WITNESS:**  THAT'S CORRECT.

1   BY MR. ASHKER:

2   Q.   HAS YOUR OPINION CHANGED BETWEEN THE TIME THAT YOU

3   AUTHORED THIS REPORT ON 1/22/07 AND TODAY?

4   A.   IT HAS NOT.

5            MR. ASHKER:   I HAVE NO FURTHER QUESTIONS AT THIS

6   TIME, YOUR HONOR.

7            THE COURT:   ALL RIGHT.

8            MR. ANDRADA:   HE'S DONE?

9            THE COURT:   YES.

10           MR. ANDRADA:   YOUR HONOR, A HOUSEKEEPING MATTER.

11           WHERE WOULD YOU LIKE ME TO STAND DURING THE

12   CROSS-EXAMINATION?   COULD I --

13           THE COURT:   YOU MAY STAND WHEREVER YOU LIKE.

14           MR. ANDRADA:   -- MOVE THE PODIUM AROUND HERE?

15           THE COURT:   SURE.   DO WHATEVER YOU WANT.

16           MR. ANDRADA:   THANK YOU.   EXCUSE ME FOR JUST A

17   MOMENT.

18           (PAUSE IN THE PROCEEDINGS.)

19           THE COURT:   SHEILAH, WHY DON'T YOU GET THOSE

20   ARTICLES BACK AND THOSE SHOULD BE MARKED FOR IDENTIFICATION AS

21   PLAINTIFF'S EXHIBIT 180.

22           THE CLERK:   OKAY.

23                (PLAINTIFF'S EXHIBIT 180 MARKED FOR

24                IDENTIFICATION)

25           THE COURT:   I DON'T KNOW IF THE TECHNICIAN IS ABLE

```
 1   TO -- TECHNICIAN, ARE YOU THE TECHNICIAN?

 2              I DON'T KNOW IF YOU ARE ABLE TO START GETTING

 3   DR. DUNCAN ON THE VIDEO QUIETLY AND UNOBTRUSIVELY.  CAN YOU DO

 4   THAT?

 5              VIDEO PERSON:  IT TAKES A COUPLE OF SECONDS.  WHEN

 6   HE IS DONE, I CAN DIAL HIM IN.  I AM TRYING TO TRACK HIM DOWN.

 7              THE COURT:  IF YOU CAN GET MOVING ON THAT AND GET

 8   HIM SO THAT AS SOON AS WE ARE READY FOR HIM, WE CAN SWITCH HIM

 9   ON.

10              AND I THINK THE CLERK MAY HAVE SOME SORT OF CONTACT

11   NUMBER FOR HIM.

12                        CROSS-EXAMINATION

13   BY MR. ANDRADA:

14   Q.   DR. WEINSTEIN, GOOD MORNING, SIR.

15              YOU HAVE BEEN A PHYSICIAN FOR ABOUT 40 YEARS; IS

16   THAT CORRECT?

17   A.   YES.

18   Q.   YOU'VE NEVER INITIATED A PRESCRIPTION FOR TRAMADOL; ISN'T

19   THAT TRUE?

20   A.   I THINK -- I THINK I HAVE REFILLED A TRAMADOL FOR ONE OF

21   MY PATIENTS, BUT I CAN'T BE SURE.  I HAVE WRITTEN PRESCRIPTIONS

22   FOR LOTS OF NARCOTICS, BUT PERHAPS NOT.

23   Q.   MAY I READ FROM YOUR DEPOSITION THEN, SIR?

24   A.   SURE.

25   Q.   THIS IS PAGE --
```

WEINSTEIN – CROSS / MR. ANDRADA

1        **THE COURT:**  CAN I HAVE A PAGE AND LINE?

2        **MR. ANDRADA:**  YES, YOUR HONOR.

3        **THE COURT:**  DOES MR. ASHKER HAVE A COPY OF THE

4    DEPOSITION?

5        **MR. ANDRADA:**  I ASSUME HE DOES.

6        **THE WITNESS:**  I HAVE WRITTEN THOUSANDS OF

7    PRESCRIPTIONS, SO IT'S HARD FOR ME TO REMEMBER WHETHER I HAVE.

8    BUT IF I HAVE, IT HAS BEEN VERY INFREQUENT.

9        **MR. ANDRADA:**  I WOULD LIKE TO READ FROM PAGE 62,

10   LINE 19 THROUGH 21.

11       **THE COURT:**  OKAY.

12       **MR. ANDRADA:**  (READING)

13       "QUESTION:  BUT YOU HAVE NEVER ACTUALLY

14       INITIATED A TRAMADOL PRESCRIPTION?

15       "ANSWER:  THAT'S CORRECT."

16   **BY MR. ANDRADA:**

17   **Q.**   THAT WAS YOUR DEPOSITION TESTIMONY ON FEBRUARY 11TH OF

18   THIS YEAR; IS THAT CORRECT, SIR?

19   **A.**   YES, THAT'S ABSOLUTELY CORRECT.

20   **Q.**   ALL RIGHT.  NOW YOU TOLD US, SIR, YOU DID AN INTERNSHIP

21   BACK IN 1970; IS THAT CORRECT?

22   **A.**   FROM '69 UNTIL '70.

23   **Q.**   GENERALLY, AN INTERNSHIP IS A ONE-YEAR PROGRAM THAT

24   INVOLVES, IN SIMPLE TERMS, DOCTORS PARTICIPATING IN VARIOUS

25   ASPECTS OF MEDICINE WHILE THEY ARE WORKING IN A HOSPITAL.  IN

WEINSTEIN – CROSS / MR. ANDRADA

1    GENERAL TERMS, THAT'S BASICALLY WHAT AN INTERNSHIP IS, CORRECT?

2    **A.**   YES.  I WORKED IN THE HOSPITAL AND OUT-PATIENT CLINICS AS

3    WELL.

4    **Q.**   THEN GENERALLY SPEAKING WHAT OFTEN OCCURS WITH DOCTORS IN

5    TERMS OF THEIR TRAINING IS THAT THEY PARTICIPATE IN A

6    RESIDENCY.  ISN'T THAT TRUE?

7    **A.**   MANY DOCTORS DO.

8    **Q.**   AND A RESIDENCY INVOLVES, IN GENERAL TERMS, MORE

9    SPECIALIZED TRAINING; ISN'T THAT TRUE?

10   **A.**   YES.

11   **Q.**   YOU DIDN'T PARTICIPATE IN A RESIDENCY, DID YOU?

12   **A.**   NO, I DIDN'T.

13   **Q.**   THEN THE NEXT STEP THAT CAN OCCUR IN A DOCTOR'S EDUCATION,

14   TRAINING AND EXPERIENCE IS KNOWN AS A FELLOWSHIP; ISN'T THAT

15   TRUE?

16   **A.**   FEWER PHYSICIANS DO GO INTO FELLOWSHIPS, WHICH ARE

17   SO-CALLED SUBSPECIALTY TRAINING.

18   **Q.**   YES.  AND SO BASICALLY WHAT YOU REALLY DO IN A FELLOWSHIP

19   IS REALLY HONE IN AND FOCUS ON A PARTICULAR SKILL, CORRECT?

20   **A.**   YES.

21   **Q.**   NOW, AND YOU DIDN'T PARTICIPATE IN A FELLOWSHIP EITHER,

22   DID YOU?

23   **A.**   NO, I DIDN'T.

24   **Q.**   NOW, YOU TOLD US THAT YOU WERE CERTIFIED BY A SOCIETY

25   THAT -- WHOSE MEMBERS INCLUDED OTHER HEALTH CARE PROVIDERS SUCH

1   AS LVN'S AND OTHER NONPHYSICIANS, CORRECT?

2   A.   IT'S CALLED THE NATIONAL COMMISSION ON CORRECTIONAL HEALTH

3   CARE.  AND THE CERTIFICATION IS THE CERTIFIED CORRECTIONAL

4   HEALTH CARE PROVIDER.

5   Q.   YES.  BUT YOU DON'T NEED TO BE A DOCTOR FOR THE

6   CERTIFICATION.  THAT'S MY POINT.  CORRECT, SIR?

7   A.   THAT'S RIGHT.  IT IS FOR ALL PEOPLE WHO ARE PROFESSIONALS,

8   MEDICAL PROFESSIONALS WITHIN A CORRECTIONAL SETTING.

9   Q.   YOU HAVE NEVER WORKED IN A PRISON, HAVE YOU?

10  A.   I HAVE NEVER BEEN EMPLOYED BY A CORRECTIONAL AUTHORITY.  I

11  HAVE DONE A LOT OF WORK IN PRISONS AS A CORRECTIONAL

12  CONSULTANT, BUT I'VE NEVER BEEN EMPLOYED BY A CORRECTIONAL

13  AUTHORITY.

14  Q.   EVER; ISN'T THAT RIGHT?

15  A.   THAT'S CORRECT.

16  Q.   AND YOUR 20 YEARS OF ADVOCACY FOR -- IN YOUR 20 YEARS OF

17  INVOLVEMENT IN SO-CALLED PRISON MATTERS, YOU HAVE ALWAYS BEEN

18  RETAINED ON THE PART OF THE PRISONER, ON BEHALF OF THE PRISONER

19  EXCEPT, I BELIEVE, IN ONE INSTANCE; ISN'T THAT RIGHT?

20  A.   YES, THAT'S CORRECT.

21  Q.   SO, THE -- I THINK YOU SAID THIS MORNING THAT YOU HAD BEEN

22  CONTACTED LITERALLY THOUSANDS OF TIMES OVER THESE 20 YEARS; IS

23  THAT CORRECT?

24  A.   YES, BY PRISONERS AND THEIR FAMILIES.

25  Q.   SO HOW MANY THOUSANDS OF TIMES, DOCTOR, AS BEST YOU CAN

WEINSTEIN – CROSS / MR. ANDRADA

1    TELL US?

2    **A.**    IT WOULD BE ONLY A GUESS.

3    **Q.**    WELL 5,000?

4    **A.**    I WOULD SAY A COUPLE OF THOUSAND.

5    **Q.**    SO 2,000 TIMES YOU HAVE BEEN CONTACTED BY PRISONERS OR

6    THEIR FAMILIES OR THEIR LAWYERS, AND THEN ONE TIME YOU'VE BEEN

7    CONTACTED BY A PRISON ITSELF TO LOOK AT A CASE; IS THAT

8    CORRECT?

9    **A.**    THAT'S CORRECT.

10   **Q.**    AND YOU'VE SPENT AS MUCH AS SAY ONE HALF OF YOUR

11   PROFESSIONAL TIME WORKING ON THESE PRISON MATTERS OVER THE --

12   AT VARIOUS TIMES OVER THE PAST 20 YEARS; ISN'T THAT TRUE?

13   **A.**    I WOULD SAY IT'S NOT -- THAT'S A LITTLE BIT, I THINK,

14   DIFFICULT TO ANSWER BECAUSE IN TERMS OF IT BEING A BUSINESS

15   THAT I BEGAN IN 1990 AND ENDED A FEW YEARS AGO, ACTUALLY WITH

16   THIS CASE, MY VISIT TO MR. ASHKER, WHILE I MAY HAVE SPENT A LOT

17   OF TIME, I GUESS REALLY NEVER HAD MORE THAN A MINORITY OF MY

18   INCOME COME FROM IT.  PRIOR TO THAT I --

19   **Q.**    GO AHEAD, SIR.

20   **A.**    PRIOR TO THAT, I WORKED AND VISITED PRISONERS SINCE 1971.

21   **Q.**    WELL, BUT, SIR, I WANT TO KNOW ABOUT -- YOU TOLD US, I

22   THINK, AT YOUR DEPOSITION THAT BASICALLY AT ONE POINT IN YOUR

23   CAREER YOU WERE SPENDING SAY TWO DAYS, TWO AND A HALF DAYS A

24   WEEK IN YOUR CLINIC IN SAN FRANCISCO, AND THEN YOU WOULD SPEND

25   THE REMAINDER OF YOUR PROFESSIONAL TIME DOING PRISON CONSULTING

1   WORK ON BEHALF OF PRISONERS; ISN'T THAT TRUE?

2   **A.**   BY AND LARGE FOR TIMES ON AND OFF, YES, SINCE BETWEEN 1990

3   AND 2007.

4   **Q.**   IN FACT, YOU HAVE PARTICIPATED IN SEMINARS, IN MEETINGS

5   WHERE YOU HAVE DISCUSSED STRATEGIES ABOUT HOW TO SUCCEED IN

6   PRISONER LITIGATION; ISN'T THAT TRUE?

7   **A.**   THAT'S NOT SOMETHING I REALLY EVER -- I WAS NOT SOMEONE

8   WHO HAD ANY OPINIONS ABOUT HOW TO SUCCEED IN PRISON LITIGATION;

9   THAT I LEAVE TO THE LAWYERS.

10          I THINK THERE WAS ONE MEETING THAT PERHAPS YOU ARE

11  REFERRING TO THAT CAME UP IN THE DEPOSITION WHERE IT WAS A

12  HUMAN RIGHTS CONFERENCE AT THE UNIVERSITY OF ATLANTA, AND SOME

13  LAWYERS DISCUSSED THAT AND I PRESENTED JUST ISSUES AROUND

14  MEDICAL CARE IN PRISONS.

15          SO, YES, I HAVE BEEN AT MEETINGS WHERE THAT HAS BEEN

16  DISCUSSED, BUT IT'S NOT BEEN ANYTHING THAT I HAD ANY OPINIONS

17  ABOUT THAT ARE WORTHWHILE.

18  **Q.**   YOU HAVE NO OPINIONS ABOUT PRISON LITIGATION; IS THAT YOUR

19  TESTIMONY?

20  **A.**   YOU KNOW, I HAVE NO OPINIONS ABOUT WHAT ARE SUCCESSFUL

21  STRATEGIES OF PRISONER LITIGATION, OR THINGS LIKE THAT.

22          I HAVE BEEN HIRED TO SUPPORT PRISON LITIGATION.  I

23  HAVE BEEN PARTY TO LAWSUITS IN LIKE THIS, BUT IN TERMS OF

24  STRATEGIES ABOUT LITIGATION AND THESE KINDS OF THINGS, THAT'S

25  NOT MY FIELD OF INTEREST NOR MY SKILL.

1              I AM A DOCTOR.

2    **Q.**   YOU ARE COMPLETELY NEUTRAL THEN IN THIS CASE?

3    **A.**   OH, OF COURSE.

4    **Q.**   COMPLETELY OBJECTIVE?

5    **A.**   YES.  THAT'S MY JOB.

6    **Q.**   AND ARE YOU ALWAYS OBJECTIVE WHEN YOU DEAL WITH THESE

7    PRISONER CASES?

8    **A.**   ABSOLUTELY.  MY -- THE PEOPLE WHO CONSULT ME DEPEND ON MY

9    OBJECTIVITY.  IF I WERE NOT AND WERE NOT OBJECTIVE, I WOULD

10   GIVE THEM FALSE ADVICE, AND IT WOULD BE DIFFICULT FOR THEM,

11   RUINOUS IN SOME CASES BECAUSE IT IS EXPENSIVE.  OF COURSE I AM

12   OBJECTIVE.

13   **Q.**   WE WILL COME BACK TO THAT IN A MINUTE.

14              SPEAKING OF EXPENSE, HAVE YOU BEEN PAID OVER THE

15   YEARS BY MR. ASHKER AND/OR HIS LAWYERS?

16   **A.**   I HAVE.

17   **Q.**   AND YOU'VE BEEN -- HOW MUCH MONEY HAVE YOU CHARGED

18   MR. ASHKER AND HIS LAWYERS FOR THESE FOUR EXAMS OVER NINE

19   YEARS, AND YOUR TESTIMONY, AND EVERYTHING ELSE YOU HAVE DONE

20   FOR HIM, PREPARING THE REPORTS AND SO ON?

21   **A.**   I DON'T HAVE THOSE TOTALS.  I CAN TELL YOU WHAT MY FEES

22   ARE.

23   **Q.**   WOULD YOU PLEASE BE SO KIND TO GIVE US YOUR BEST ESTIMATE,

24   SIR, AS TO HOW MUCH MONEY YOU HAVE CHARGED MR. ASHKER AND HIS

25   LAWYERS OVER THE YEARS?

WEINSTEIN – CROSS / MR. ANDRADA

1  **A.**   I WOULD BE HAPPY TO SIT HERE AND CALCULATE IT IF THE COURT

2  WILLS, BUT I WOULD DO BETTER TO JUST TELL YOU WHAT MY FEES ARE.

3       MY DAY FEES FOR A TRIP UP TO PELICAN BAY IS $1,600

4  FOR THAT DAY.  BECAUSE -- AND THEN I CHARGE FOR THE MOTEL

5  BECAUSE I HAVE TO SPEND THE NIGHT.  I CHARGE FOR MY TRAVEL

6  BECAUSE OFTEN I RENT A CAR.  AND THEN THE FEE FOR WRITING THE

7  REPORT IS INCLUDED IN THE DAY FEE.

8       SO THOSE HAVE BEEN THE, REALLY, THOSE CHARGES HAVE

9  BEEN PRETTY MUCH THE CHARGES THAT I HAVE BILLED MR. ASHKER FOR.

10  IF I HAVE TO DO SOMETHING OUTSIDE OF THAT, MY FEE UNTIL THIS

11  YEAR HAS BEEN $175 PER HOUR FOR RESEARCH AND DOUBLE THAT, $350,

12  FOR TESTIMONY.  BUT I NEVER TESTIFIED FOR MR. ASHKER UNTIL THIS

13  DEPOSITION.  I THINK THIS IS THE ONLY DEPOSITION I GAVE AND THE

14  ONLY COURTROOM APPEARANCE I HAVE MADE IN THIS REGARD.

15       MY ESTIMATE WOULD BE 7,000 BUCKS BEFORE THIS, AND I

16  HAVE TO ADD TO IT.

17  **Q.**   THE ENTIRE CHARGES, ASSUMING THAT YOU ARE DONE TODAY, I AM

18  SURE YOU WILL BE, WILL BE WHAT, ABOUT $9,000?

19  **A.**   MAYBE NINE OR $10,000, SOMETHING LIKE THAT.

20  **Q.**   SO THEN YOU ARE -- LET'S TALK A LITTLE BIT MORE ABOUT YOUR

21  PRACTICE.  I WANT TO -- LITTLE BIT MORE ABOUT YOUR EXPERT

22  CONSULTING WORK PARTICULARLY WITH MR. ASHKER.

23       YOU HAVE BEEN ACTUALLY PAID THAT MONEY; IS THAT

24  CORRECT?

25  **A.**   YES.

1    **Q.**   OVER THE YEARS?

2    **A.**   YES.

3    **Q.**   AND SO THEN YOU HAVE AN UNDERSTANDING THAT MR. ASHKER HAS

4    BROUGHT PREVIOUS LAWSUITS; IS THAT CORRECT?

5    **A.**   YES.

6    **Q.**   DO YOU HAVE AN UNDERSTANDING HE HAS BROUGHT ABOUT 15 OF

7    THEM?

8    **A.**   I HAVE NO IDEA HOW MANY.  I HAVE BEEN INVOLVED IN, I THINK

9    THIS IS THE SECOND ACTION THAT I HAVE HAD TO FILE REPORTS ON.

10              **MR. ASHKER:**  I WANT TO OBJECT.  EXCUSE ME.  I WOULD

11    LIKE TO OBJECT TO THAT ON RELEVANCY GROUNDS.

12              **THE COURT:**  YES.  I DON'T THINK WE NEED TO GO INTO

13    ALL OF THOSE PRIOR LAWSUITS.

14              **MR. ANDRADA:**  I WASN'T GOING TO GO INTO THEM.

15              **THE COURT:**  IF YOU GO INTO THEM, IF YOU BRING THEM

16    UP, THEN THAT MIGHT REQUIRE GOING INTO THEM.

17              SO I AM GOING TO STRIKE THAT, AND ASK YOU NOT TO GO

18    INTO THAT AGAIN.

19              **MR. ANDRADA:**  FINE.

20    **BY MR. ANDRADA:**

21    **Q.**   SO THEN, DOCTOR, LET'S CONTINUE ON WITH A DISCUSSION ABOUT

22    YOUR QUALIFICATIONS BEFORE WE GET TO THE ACTUAL SUBSTANCE OF

23    YOUR TESTIMONY.

24              AND WE TALKED A LITTLE BIT ABOUT THIS CERTIFICATION

25    BY THIS NATIONAL COMMISSION OF CORRECTIONAL HEALTH CARE.  ARE

1    YOU BOARD CERTIFIED IN ANY SPECIALTY BY THE AMERICAN BOARD OF

2    MEDICAL SPECIALTIES?

3    **A.**    NO.

4    **Q.**    AND TYPICALLY WHAT HAPPENS WITH MANY DOCTORS, YOU TELL ME

5    IF THIS IS TRUE OR NOT, IS THAT THEY SEEK ADMISSION TO A

6    PARTICULAR BOARD SPECIALTY.  FOR EXAMPLE, THERE MIGHT BE A

7    BOARD SPECIALTY IN PHYSICAL MEDICINE, NEUROLOGY, FAMILY

8    PRACTICE; ISN'T THAT TRUE?

9    **A.**    THERE ARE THOSE SPECIALTIES.

10   **Q.**    AND THOSE ORGANIZATIONS REQUIRE CERTAIN QUALIFICATIONS OF

11   THEIR MEMBERS; ISN'T THAT TRUE?

12   **A.**    YES.

13   **Q.**    AND YOU ARE NOT QUALIFIED, YOU ARE NOT EVEN BOARD ELIGIBLE

14   IN ANY FIELD, ARE YOU?

15   **A.**    NO.  I AM A GENERAL PRACTITIONER.

16   **Q.**    THERE IS A FAMILY PRACTICE BOARD, ISN'T THERE?

17   **A.**    THERE IS.

18   **Q.**    INTERNAL MEDICINE BOARD, ISN'T THERE?

19   **A.**    YES.

20   **Q.**    YOU ARE NOT ELIGIBLE FOR THOSE, ARE YOU?

21   **A.**    NO.  I AM A GP WITH 40 YEARS OF CLINICAL EXPERIENCE.

22   **Q.**    AND WITH REGARD TO YOUR WORK AS A GP AND YOUR EXPERIENCE

23   WITH MR. ASHKER'S TYPES OF INJURIES, YOU TOLD US AT YOUR

24   DEPOSITION THAT IN YOUR 40 YEARS OF PRACTICE, THAT THE TWO

25   CASES MOST ANALOGOUS TO MR. ASHKER'S INVOLVED FRACTURES OF THE

WEINSTEIN – CROSS / MR. ANDRADA

1   LEGS; ISN'T THAT RIGHT?

2   **A.**   YES, BECAUSE THEY WERE BOTH COMPOUND FRACTURES, SERIOUS

3   CRUSHING INJURIES WITH MASSIVE DESTRUCTION OF THE TISSUES.

4   **Q.**   TWO CASES OUT OF HOW MANY PATIENTS HAVE YOU SEEN OVER 40

5   YEARS?

6   **A.**   THOUSANDS.

7   **Q.**   AND YOUR PRACTICE IS ONE THAT IS NOT LIMITED TO PATIENTS

8   OF A PARTICULAR AGE; ISN'T THAT TRUE?

9   **A.**   I SEE PEOPLE OF ALL AGES.

10   **Q.**   FROM LITTLE -- FROM CHILDREN TO GERIATRICS; ISN'T THAT

11   TRUE?

12   **A.**   YES.

13   **Q.**   SO YOU, IN YOUR PRACTICE, WILL REFER PATIENTS TO OTHER

14   SPECIALISTS; ISN'T THAT TRUE?

15   **A.**   OF COURSE.

16   **Q.**   AND YOU DO THAT OFTEN WHEN YOU HAVE A PATIENT WHO HAS A

17   CHRONIC PAIN PROBLEM, CORRECT?

18   **A.**   I HAVE REFERRED PEOPLE FOR PAIN MANAGEMENT, YES.

19   **Q.**   AND THEN, BY THE WAY, WITH REGARD TO ANOTHER ASPECT OF

20   YOUR PRACTICE, YOU DON'T HAVE HOSPITAL PRIVILEGES ANYWHERE, DO

21   YOU?

22   **A.**   NO, I DON'T AT THE PRESENT TIME.

23   **Q.**   SO YOU HAVEN'T HAD THEM FOR 20 PLUS YEARS; ISN'T THAT

24   RIGHT?

25   **A.**   YES.

WEINSTEIN – CROSS / MR. ANDRADA

1    **Q.**   AND THAT MEANS THAT YOU CAN'T ADMIT A PATIENT TO A

2    HOSPITAL; ISN'T THAT TRUE?

3    **A.**   THAT'S RIGHT.

4         I AM AN OUT-PATIENT SPECIALIST.

5    **Q.**   NOW, YOU SAID THAT YOU DID A LITERATURE SEARCH; IS THAT

6    RIGHT?

7    **A.**   YES.

8    **Q.**   WHEN YOU DID YOUR FIRST LITERATURE SEARCH, DID YOU COME

9    ACROSS AN ARTICLE IN A JOURNAL CALLED CLINICAL INVESTIGATOR

10   WITH THE TITLE OF THE ARTICLE "BEING DEPENDENCE ON TRAMADOL"?

11   **A.**   NOT TO MY MEMORY.  PERHAPS I DID.  I COULDN'T TELL YOU

12   WHETHER I CAME ACROSS ONE.

13   **Q.**   DID YOU COME ACROSS AN ARTICLE IN THE AMERICAN JOURNAL OF

14   PSYCHIATRY THAT IS ENTITLED "ABUSE, DEPENDENCE, OR WITHDRAWAL

15   ASSOCIATED WITH TRAMADOL"?

16   **A.**   I, PERHAPS I DID.  I CAN'T TELL YOU.

17   **Q.**   WAS THAT ONE OF THE ARTICLES THAT YOU BROUGHT TO YOUR

18   DEPOSITION?

19   **A.**   NO, IT'S NOT.

20   **Q.**   NOW, DID YOU COME ACROSS AN ARTICLE IN DRUG AND ALCOHOL

21   DEPENDENCE CALLED "PHYSICAL DEPENDENCE ON ULTRAM, BOTH OPIATE

22   LIKE AND ATYPICAL WITHDRAWAL SYSTEMS OCCURRED."

23        DID YOU COME ACROSS THAT ARTICLE?

24   **A.**   I DON'T BELIEVE I DID.

25   **Q.**   HOW ABOUT THIS ONE IN HEALTH CARE INDUSTRY ENTITLED "WHAT

1    IS THE ADDICTION RISK ASSOCIATED WITH TRAMADOL"?

2    **A.**    NOT THAT I RECALL.

3    **Q.**    HOW ABOUT THIS ONE FROM JAMA, "TRAMADOL ABUSE AND

4    DEPENDENCE AMONG PHYSICIANS."

5                DID YOU SEE THAT ARTICLE?

6    **A.**    NO.

7    **Q.**    SO, DOCTOR, DO YOU BELIEVE THAT THERE ARE CERTAIN RISKS

8    ASSOCIATED WITH THE USE OF TRAMADOL?

9    **A.**    WELL, FIRST OF ALL, THERE ARE RISKS WITH ANY MEDICATION.

10   AND, SECONDLY, THE DOSAGE THAT MR. ASHKER WAS AFFORDED AND WAS

11   GOOD FOR HIM WAS A LOW DOSE.

12              THIRDLY, THE TITLES OF THE ARTICLES DON'T TELL ME

13   ABOUT THE CONCLUSIONS OF THE ARTICLES.  SO I THINK THAT I AM A

14   LITTLE BIT DISTRESSED THAT YOU ARE –– THAT YOU PRESENT TITLES

15   OF ARTICLES AS SOME KIND OF CONCLUSION THAT –– AND YOU ARE

16   ASKING ME OR ASKING THE JURY TO KIND OF MAKE THIS PRIMA FACIE

17   EVALUATION BASED ON WHAT THE TITLE OF THE ARTICLE IS.  PERHAPS

18   THE ARTICLE ON PHYSICIANS SAID THAT IT'S OF ONLY MODERATE

19   POTENTIAL, AND SO I DON'T KNOW.

20              SO, YES, EVERY MEDICATION HAS POTENTIAL.  YES,

21   TRAMADOL HAS MODEST PSYCHIC EFFECTS.  YES, IT'S IN BROAD USE IN

22   PAIN CONTROL.  AND, AS I POINTED OUT EARLIER IN RESPONSE TO THE

23   ARTICLE, THAT AT LEAST ONE ARTICLE THAT I SAW, IT'S MUCH LESS

24   OF ABUSE POTENTIAL THAN OPIATES AND ABOUT THE SAME AS NSAIDS.

25   **Q.**    ARE YOU AN EXPERT IN THE USE OF TRAMADOL IN YOUR PRACTICE,

WEINSTEIN – CROSS / MR. ANDRADA

1    YES OR NO?

2    **A.**    I AM NOT.  I WAS RELYING ON THE EXPERTS FROM THE

3    DEPARTMENT ITSELF THAT SAID THAT TRAMADOL ON A CONTINUOUS BASIS

4    WAS GOOD.

5    **Q.**    AND --

6    **A.**    ALSO DR. SHIN WHO SAID THAT HE WOULD NOT OBJECT TO

7    TRAMADOL BEING USED.

8    **Q.**    YOU HAVE AN UNDERSTANDING, HOWEVER, THAT HE STATED IN HIS

9    REPORT THAT DR. SAYRE MET THE STANDARD OF CARE; ISN'T THAT

10   TRUE?

11   **A.**    YES.  AND I DISAGREE WITH THAT.

12   **Q.**    AND SO, DOCTOR, I WANT TO FOLLOW UP WITH A COUPLE MORE

13   THINGS.

14            YOU SAID THAT SOME CONSULTANTS OR SPECIALISTS

15   RETAINED BY THE CDCR HAD SAID THAT TRAMADOL SHOULD BE USED

16   CONTINUOUSLY; IS THAT CORRECT?

17   **A.**    THAT WAS ONE OF THE PAIN CONSULTANTS FROM THE DEPARTMENT.

18   **Q.**    AND THAT WAS -- YOUR UNDERSTANDING THAT WAS DR. FRIEDMAN?

19   **A.**    I THINK IT WAS DR. FRIEDMAN.

20   **Q.**    YOU THINK DR. FRIEDMAN PROVIDED GOOD, SOUND ADVICE IN THAT

21   REGARD, CORRECT?

22   **A.**    HE DID AT THAT TIME.

23   **Q.**    DO YOU HAVE AN UNDERSTANDING THAT MR. ASHKER CONSIDERS

24   DR. FRIEDMAN TO BE A CLOWN IN TERMS OF HIS MEDICAL PRACTICE?

25   **A.**    MR. ASHKER IS A CLOWN?

WEINSTEIN – CROSS / MR. ANDRADA

1    Q.   YOU DON'T THINK HE'S A CLOWN, DO YOU?

2    A.   WELL, I DON'T THINK HE'S A CLOWN.

3    Q.   IN FACT, ISN'T IT -- DID YOU READ DR. FRIEDMAN'S NOTES AND

4    REPORTS?

5    A.   I CERTAINLY DID.  IF THEY WERE IN THE CLINICAL RECORD, I

6    READ THEM.

7    Q.   DID YOU SEE IN THOSE NOTES HIS DISCUSSION ABOUT A CONCERN

8    ABOUT DEPENDENCE ON TRAMADOL ON THE PART OF MR. ASHKER?

9    A.   I DON'T REMEMBER THAT SPECIFICALLY.  I DO KNOW THAT HE

10   STOPPED AND RESTARTED TRAMADOL A NUMBER OF TIMES.

11   Q.   AND DID YOU GLEAN FROM HIS NOTES THAT HE HAD ANY CONCERN

12   ABOUT TRAMADOL IN MR. ASHKER?

13   A.   MY INFERENCE WAS THAT HE HAD SOME CONCERN, AND HE DID TRY

14   OTHER MEDICATIONS, WHICH WERE NOT WELL ACCEPTED.

15   Q.   AND SO WOULD IT BE INAPPROPRIATE FOR DR. FRIEDMAN TO

16   EXPRESS A WRITTEN CONCERN ABOUT MR. ASHKER BECOMING DEPENDENT

17   UPON TRAMADOL?

18   A.   WOULD IT BE INAPPROPRIATE FOR HIM TO WRITE SOMETHING LIKE

19   THAT?

20   Q.   YES.

21   A.   I DON'T THINK SO.

22   Q.   BY THE WAY, YOU MENTIONED YOU'VE TESTIFIED THAT IT WAS

23   APPROPRIATE TO USE TRAMADOL FOR MANY, MANY YEARS IN THIS CASE;

24   ISN'T THAT TRUE?

25   A.   YES.

1   **Q.**   IN OTHER WORDS, MR. ASHKER WAS ON IT FOR QUITE SOME TIME,

2   CORRECT?

3   **A.**   HE WAS, AND IT WAS A SUCCESSFUL MEDICATION FOR HIM.

4   **Q.**   DO YOU HAVE AN UNDERSTANDING THAT AS MANY AS SIX OF HIS

5   PROVIDERS EXPRESSED CONCERN ABOUT THE LENGTH OF HIS USE OF

6   TRAMADOL?

7           **MR. ASHKER:**  I WILL MAKE AN OBJECTION TO THAT ON THE

8   BASIS THAT I HAVE NOT SEEN ANY EVIDENCE PRESENTED SHOWING THAT

9   SIX MEDICAL PROVIDERS EXPRESSED CONCERNS ABOUT TRAMADOL.

10          **THE COURT:**  THAT WOULD BE AN OBJECTION FOR ASSUMING

11  FACTS NOT IN EVIDENCE, AND THAT WOULD BE SUSTAINED.

12          WE DON'T HAVE TIME TO DIG THEM OUT UNLESS YOU CAN

13  CITE THEM RIGHT OFF THE TOP OF YOUR HEAD OR YOU COULD ASK A

14  HYPOTHETICAL, I SUPPOSE.

15  **BY MR. ANDRADA:**

16  **Q.**   YOU HAVE AN UNDERSTANDING CERTAINLY THAT DR. SAYRE HAD

17  CONCERNS ABOUT THE TRAMADOL, CORRECT?

18  **A.**   YES.

19  **Q.**   YOU KNOW ALSO FROM YOUR REVIEW OF THE RECORDS THAT

20  DR. ROWE HAD STRONG CONCERNS ABOUT TRAMADOL, CORRECT?

21  **A.**   I DON'T REMEMBER THAT.

22  **Q.**   WELL, DIDN'T SHE VOTE TO DROP THE TRAMADOL USE IN AUGUST

23  OF 2006?

24  **A.**   AGAIN, I DON'T REMEMBER WHETHER --

25          **MR. ASHKER:**  I WOULD OBJECT --

1      **THE COURT:**  GIVEN OUR TIME ISSUES HERE, I THINK

2    QUIZZING THIS DOCTOR ABOUT THINGS IN A VOLUMINOUS MEDICAL

3    RECORD AREN'T USEFUL.  IF SHE SAID THAT, FINE, WE WILL FIND

4    THAT OUT LATER.

5           I DON'T THINK THIS IS A –– I AM CONCERNED ABOUT YOUR

6    DOCTOR AND ASHKER'S DOCTOR WHO WE HAVE SCHEDULING PROBLEMS WITH

7    AND SUGGESTING PERHAPS WE COULD LOOK LATER AT WHAT'S IN THE

8    MEDICAL RECORD.

9           **MR. ANDRADA:**  I WILL DO THE BEST I CAN.  OBVIOUSLY

10   HE IS A STANDARD OF CARE WITNESS.

11          **THE WITNESS:**  CAN I SAY THIS, PLEASE, IN RESPONSE TO

12   YOUR QUESTION?

13          **THE COURT:**  IF IT'S IN RESPONSE TO A PENDING

14   QUESTION, YOU MAY.

15          **THE WITNESS:**  THE QUESTION IS ABOUT TRAMADOL, YOU'RE

16   GOING ON ABOUT TRAMADOL.  THIS, TO ME, THIS IS NOT –– ADEQUATE

17   PAIN MANAGEMENT IS WHAT IS REQUIRED.  TRAMADOL IS ONE THING

18   THAT CAN BE USED.  THERE ARE OTHER THINGS THAT CAN BE USED.

19          IF DR. SAYRE WAS CONCERNED ABOUT TRAMADOL AND ONLY

20   PRESCRIBED NSAIDS, WHICH WE KNOW HURTS HIS STOMACH, AND THAT

21   WAS IT, THEN THAT IS BELOW THE STANDARD OF CARE.  IT'S NOT

22   ABOUT TRAMADOL AS SOME GREAT SAVIOR OF MR. ASHKER AT ALL.

23          MAYBE THERE'S ANOTHER MEDICATION.  HE'S PRESENTLY ON

24   TYLENOL WITH CODEINE, WHICH IS HIGHER THAN TRAMADOL.

25   ///

1   **BY MR. ANDRADA:**

2   **Q.**   SO, IN OTHER WORDS, THERE ARE -- YOU WOULD AGREE, DOCTOR,

3   MANY PAIN MEDICATION MODALITIES THAT ARE USED BY TREATERS IN

4   GOOD STANDING TO MANAGE CHRONIC PAIN, CORRECT?

5   **A.**   AND NONE OF THEM IN THIS CASE IS MOTRIN AND TYLENOL.  NONE

6   OF THEM.  SO, YES, THERE WOULD BE HYPOTHETICALLY, YES.

7   **Q.**   WAIT A MINUTE.   TYLENOL AND IBUPROFEN ARE OFTEN PRESCRIBED

8   TO PATIENTS WITH CHRONIC PAIN; ISN'T THAT TRUE?

9   **A.**   IN THAT HYPOTHETICAL, IT IS TRUE.

10  **Q.**   DOCTOR, THE LITERATURE THAT YOU LOOKED AT DISCUSSED THE

11  USE OF TYLENOL AND IBUPROFEN AND VARIOUS OTHER REGIMENS; ISN'T

12  THAT RIGHT?

13  **A.**   YES.

14  **Q.**   BY THE WAY, YOU DIDN'T READ THE ARTICLES, YOU JUST READ

15  THE LITTLE EXCERPTS, RIGHT?

16  **A.**   THE EXCERPTS ARE CALLED ABSTRACTS.

17  **Q.**   YES.

18  **A.**   AND, YOU KNOW, IT IS ROUTINE FOR DOCTORS, I NEED TO

19  DESCRIBE TO YOU, IT IS ROUTINE FOR DOCTORS TO RELY ON

20  ABSTRACTS.  I GET A WHOLE THING CALLED JOURNAL WATCH, WHICH I

21  TESTIFIED IN MY DEPOSITION, THAT GOES OVER -- PRESENTS ABOUT 40

22  OF THE MOST IMPORTANT ARTICLES IN ABSTRACT FORM FOR US TO

23  REVIEW.

24          THE ABSTRACT IS DESIGNED TO CARRY THE ESSENTIAL

25  INFORMATION THAT IS PROVEN BY THE CASE.

1          I DON'T KNOW STATISTICS ENOUGH AND THINGS REALLY TO

2    EVALUATE THE INNER WORKINGS OF THE DATA AND HOW THEY COME UP

3    WITH THIS, SO I, LIKE MOST PHYSICIANS, RELY ON ABSTRACTS TO

4    ASSIST US IN UNDERSTANDING HERE.

5    **Q.**   YOU SAID THAT THESE ABSTRACTS ESSENTIALLY ENDORSED THE

6    VIEW THAT TRAMADOL COULD BE USED OVER A LONG PERIOD OF TIME,

7    CORRECT?

8    **A.**   YES.

9    **Q.**   WHAT IS THE LONGEST PERIOD OF TIME THAT WAS STUDIED IN ANY

10   OF THOSE ARTICLES, DOCTOR?

11   **A.**   I DON'T HAVE A MEMORY FOR THOSE EXACT DETAILS.

12   **Q.**   IT WAS MONTHS, WASN'T IT?

13   **A.**   I DON'T KNOW.  AS I SAID, I DON'T KNOW.

14   **Q.**   DID YOU SEE IN THE FOOTNOTES THAT THERE WAS AN ARTICLE

15   THAT DEALT WITH TWO-YEAR USE OF TRAMADOL?

16          DID YOU SEE THAT IN THE FOOTNOTES OF THE ARTICLES

17   YOU READ?

18   **A.**   AS I JUST STATED, I CANNOT REMEMBER FROM THOSE CITINGS

19   WHAT THE EXACT DETAILS OF THE LENGTH OF USE.  THEY TALKED ABOUT

20   CHRONIC PAIN AND CONTINUOUS USE.

21   **Q.**   WHAT IS THE LONGEST STUDY THAT HAS EVER BEEN DONE ON

22   TRAMADOL; DO YOU KNOW?

23   **A.**   I DON'T KNOW.

24   **Q.**   HOW MANY PATIENTS WERE INVOLVED IN THESE STUDIES UPON

25   WHICH YOU BASE YOUR OPINION?

1  **A.**   ALL OF THESE STUDIES WERE OF -- WERE ACCEPTED FOR

2  PUBLICATION IN STANDARD JOURNALS WITH RIGOROUS PEER REVIEW AND

3  THEIR SCIENTIFIC FINDINGS WERE PRESENTED.

4  **Q.**   BUT, DOCTOR, HOW MANY PATIENTS WERE INVOLVED IN THEM?

5  **A.**   I DIDN'T COUNT.

6  **Q.**   NOW, DOCTOR, YOU TALKED SEVERAL TIMES ABOUT MR. ASHKER'S

7  NEED FOR PHYSICAL THERAPY, CORRECT?

8  **A.**   YES.

9  **Q.**   I THINK YOU OPINED THAT IT WAS INAPPROPRIATE TO STOP THE

10  PHYSICAL THERAPY IN MARCH OF 2007, CORRECT?

11  **A.**   YES.

12  **Q.**   HAVE YOU EVER TALKED TO THE PHYSICAL THERAPIST,

13  MR. DODGEN?

14  **A.**   I NEVER TALKED TO HIM.

15  **Q.**   DO YOU HAVE AN UNDERSTANDING THAT HE OPINED THAT PHYSICAL

16  THERAPY WAS NO LONGER NECESSARY FOR MR. ASHKER AT THAT TIME?

17       **MR. ASHKER:**  I OBJECT.  THERE'S NO EVIDENCE OF THAT

18  AND IT MISSTATES THE EVIDENCE.

19       **MR. ANDRADA:**  I AM JUST ASKING IF HE HAD THAT

20  UNDERSTANDING.

21       **THE COURT:**  WELL, THE OBJECTION IS THAT IT ASSUMES

22  FACTS NOT IN EVIDENCE.  SO, YOU MAY EITHER SHOW US THAT TO SHOW

23  THAT THAT FACT EXISTS, OR YOU MAY ASK HIM AS A HYPOTHETICAL.

24  **BY MR. ANDRADA:**

25  **Q.**   WELL, ASSUME THAT THE TREATER HIMSELF, WITH WHOM

1    MR. ASHKER APPARENTLY GOT ALONG FOR SO MANY YEARS, TESTIFIES

2    THAT IT WAS REASONABLE TO END THE PHYSICAL THERAPY IN JANUARY,

3    FEBRUARY, MARCH OF 2007.

4            IS IT YOUR OPINION THAT THAT -- STRIKE THAT.

5            WOULD YOU DEFER TO THE OPINION OF THE TREATER WHO

6    HAD TREATED HIM TIME AND TIME AGAIN OVER FOUR YEARS?

7    **A.**  WELL, FIRST OF ALL, I WOULD CALL AND SPEAK TO HIM, AND

8    FIND OUT WHAT HE IS SAYING WHEN HE SAYS THAT.

9            SECONDLY, AS THE PHYSICIAN WHO, OF COURSE, IS THE

10   REFERRAL AGENT OF THE PHYSICAL THERAPY, I WOULD APPLY THE SAME

11   STRATEGY THAT I DESCRIBED EARLIER, THAT PERHAPS THE PHYSICAL

12   THERAPIST IS SAYING, HEY, THIS GUY DOESN'T NEED TWO TIMES A

13   WEEK PHYSICAL THERAPY.  THAT'S FINE, AND PERHAPS I WOULD AGREE

14   TO THAT AT THAT TIME.

15           BUT MY STRATEGY, AGAIN, WOULD BE TO SAY, OKAY, BUT

16   WE ARE NOT GOING TO END THE RELATIONSHIP HERE.  YOU ARE GOING

17   TO LEARN STUFF.  YOU'RE GOING TO GO TO A SEMINAR.  YOU'RE GOING

18   TO FIND OUT STUFF ABOUT HOW TO HELP THIS GUY FURTHER.  I WANT

19   YOU TO SEE HIM EVERY ONCE EVERY THREE, ONCE EVERY SIX MONTHS.

20   I WANT YOU TO MAKE SURE THAT HIS DYNAMOMETER READINGS ARE

21   STABLE, THAT HIS PAIN LEVEL IS CONTROLLED, I WANT YOU TO

22   CONTINUE YOUR ALLIANCE WITH HIM AS A PERSON WHO HAS A CHRONIC

23   DISABILITY.

24           SO THAT'S WHAT I WOULD HAVE DONE IN THAT

25   HYPOTHETICAL CASE.

WEINSTEIN – CROSS / MR. ANDRADA

1   Q.   WELL, THE QUESTION IS THEN, IF I UNDERSTOOD YOU, YOU

2   BASICALLY SAID IT WOULD BE -- COULD BE REASONABLE ON THE PART

3   OF THE PHYSICAL THERAPIST TO ARRIVE AT THE CONCLUSION THAT

4   FORMAL PHYSICAL THERAPY WAS NO LONGER NEEDED AT THAT TIME,

5   CORRECT?

6   A.   WELL, FIRST OF ALL, I DON'T KNOW WHAT HE MEANS OR WHAT YOU

7   MEAN BY FORMAL PHYSICAL THERAPY.  I WILL LET MY ANSWER STAND.

8   IT BECOMES A DIALOGUE BETWEEN ME AND THE PHYSICAL THERAPIST,

9   AND I WANT TO ENCOURAGE THE ALLIANCE BETWEEN THE PHYSICAL

10  THERAPY DEPARTMENT AND MR. ASHKER, AND THAT'S WHAT I WOULD BE

11  PROMOTING FOR HIS CARE.

12  Q.   SO DEPENDING ON THE VIEWS OF THE PHYSICAL THERAPIST, THE

13  DECISION TO DROP PHYSICAL THERAPY MAY WELL HAVE BEEN REASONABLE

14  AND APPROPRIATE; IS THAT YOUR TESTIMONY?

15  A.   THE DECISION TO DROP PHYSICAL THERAPY IS ALWAYS OF THE

16  PHYSICIAN.  THE PHYSICIAN IS THE ULTIMATE ARBITER OF THAT.

17         THE PHYSICAL THERAPIST CAN MAKE A RECOMMENDATION,

18  HEY, WE ARE DONE.  THEN THE PHYSICIAN SEES HIS PATIENT, PERHAPS

19  IN THE BEST SENSE TALKS TO THE PHYSICAL THERAPIST, WHAT DO YOU

20  MEAN BY THAT, AND AS I TOLD YOU AS MY PREVIOUS ANSWERS STATED

21  TWICE WHAT I WOULD DO.

22  Q.   ASSUME DR. SAYRE DISCUSSED THAT VERY ISSUE WITH THE

23  PHYSICAL THERAPIST WHO INFORMED THAT ALLIANCE WITH THE PATIENT.

24  AND THE PHYSICAL THERAPIST SAYS, I DON'T THINK HE NEEDS IT ANY

25  MORE.

1          WOULDN'T IT BE REASONABLE FOR DR. SAYRE TO THEN

2    DECIDE, YES, I AGREE WITH THE PHYSICAL THERAPIST, HE DOESN'T

3    NEED FORMAL PHYSICAL THERAPY SESSIONS ANY MORE?  WOULDN'T THAT

4    BE REASONABLE?

5    **A.**   AS I DESCRIBED, I THINK IT IS BELOW THE STANDARD OF CARE

6    BECAUSE YOU WANT TO CONTINUE THAT ALLIANCE WITH THE PHYSICAL

7    THERAPY DEPARTMENT SO THAT IT'S NOT AN END.  IT DOESN'T END

8    WITH INJURIES SUCH AS HIS.  YOU CONTINUE A RELATIONSHIP.

9          SO WHERE IS THE ORDER -- FIRST OF ALL, I DIDN'T SEE

10   THAT IN THE CHART.

11         SECONDLY -- THAT I RECALL.  SECONDLY, WHERE IS THE

12   ORDER FOR, YOU KNOW, SOME KIND OF RELATIONSHIP THAT CONTINUES?

13   I DIDN'T SEE THAT IN THE CHART.

14         SO, HYPOTHETICALLY, I DON'T KNOW WHAT YOU ARE

15   TALKING ABOUT.  PRACTICALLY I JUST GAVE YOU MY ANSWER.

16   **Q.**   LET'S TURN TO ANOTHER SUBJECT HERE.  I KNOW THE JUDGE, HER

17   HONOR WANTS US TO MOVE ALONG HERE.  I WILL TRY AS FAR AS I CAN.

18         **THE COURT:**  SINCE WE HAVE TWO WITNESSES, AS YOU

19   KNOW, THAT HAVE SCHEDULING PROBLEMS, ONE OF THEM IS YOURS, SO

20   THAT'S WHAT I AM TRYING TO ACCOMMODATE.

21         **MR. ANDRADA:**  I APPRECIATE YOUR COURTESY, YOUR

22   HONOR.

23   **BY MR. ANDRADA:**

24   **Q.**   DOCTOR, YOU MENTIONED THAT MR. ASHKER HAD A DECREASE IN

25   FLEXION AND EXTENSION IN 2007 FROM WHAT YOU HAD SEEN IN 2005;

1    ISN'T THAT TRUE?

2    **A.**    WHATEVER THOSE NUMBERS ARE.  IN THREE OF FOUR WAYS IN

3    WHICH THE WRIST MOVES THERE WAS DECREASE IN FLEXIBILITY.

4    **Q.**    NOW, IN 2000, YOU FOUND 10 DEGREES OF FLEXION, CORRECT?

5    **A.**    I WOULD BE HAPPY TO LOOK AT MY RECORD.

6    **Q.**    WOULD YOU DO THAT FOR US?

7    **A.**    I THINK I HAVE IT.

8             SO I DID HAVE THAT CHARTED ACTUALLY.

9    **Q.**    SO, THE -- THERE HAD BEEN AN INCREASE IN THE SEVEN YEARS

10   FROM 10 DEGREES OF FLEXION TO 20 DEGREES OF FLEXION, TRUE?

11            ISN'T THAT WHAT HAPPENED?

12   **A.**    WE HAD 10 DEGREES IN 2000, 32 DEGREES IN '02, 38 DEGREES

13   IN '05, AND 20 IN '07.  SO THERE WAS AN IMPROVEMENT AND THEN A

14   DECLINE.

15   **Q.**    BUT, DOCTOR, IT WAS BETTER IN 2007 THAN IT WAS IN 2000,

16   CORRECT?

17   **A.**    YES.  AND THAT'S CERTAINLY WHAT WE EXPECT OVER TIME.

18   **Q.**    AND LIKEWISE, SIR, THE EXTENSION WAS BETTER IN 2007 THAN

19   IT WAS IN 2000, CORRECT?

20   **A.**    YES.

21   **Q.**    NOW, YOU TALKED ABOUT DOING ACTIVE FLEXION AND EXTENSION,

22   CORRECT?

23   **A.**    YES.

24   **Q.**    YOU NEVER DID PASSIVE -- YOU NEVER DID A PASSIVE

25   MEASUREMENT, DID YOU?

1  **A.**   NO.

2  **Q.**   SO, YOU NEVER DETERMINED IN THE FOUR TIMES YOU SAW HIM,

3  YOU NEVER DETERMINED THE ACTUAL RANGE OF MOTION FOR WHICH THE

4  JOINT WAS CAPABLE; ISN'T THAT RIGHT?

5  **A.**   NO.   I WAS INTERESTED IN HIS ACTIVE MOTION.

6         AND WE SHOULD MENTION FOR THE FAIRNESS, THAT

7  PRONATION AND SUPINATION DECLINED OVER THE -- FROM 2000 TO

8  2007, JUST TO BRING THE FIGURES INTO HARMONY FOR THE JURY.

9         **MR. ANDRADA:**   YOUR HONOR, I MOVE TO STRIKE.   IT IS

10  NONRESPONSIVE.

11  **BY MR. ANDRADA:**

12  **Q.**   I THINK THE QUESTION WAS:   YOU NEVER TESTED HIM PASSIVELY

13  AND, THUS, IN YOUR FOUR SESSIONS WITH HIM NEVER DETERMINED THE

14  ACTUAL FULL RANGE OF MOTION IN THE JOINT; ISN'T THAT TRUE?

15  **A.**   THAT'S CORRECT.   I DIDN'T DO THE PASSIVE RANGE OF MOTIONS.

16  I DID THE ACTIVE RANGE OF MOTION TEST.

17  **Q.**   NOW, DOCTOR, YOU CRITICIZE THE CHARTING.   HOW MUCH

18  MATERIAL DID YOU SEE?   HOW MANY INCHES OF MATERIAL DID YOU SEE?

19  **A.**   I CAN'T TELL YOU HOW MANY INCHES OF MATERIAL I SAW.   I

20  LOOKED AT THE MEDICAL CHART THAT WAS AVAILABLE AT THE TIME

21  GIVEN TO ME BY THE MEDICAL RECORD TECHNICIAN AT THE PRISON.

22  **Q.**   YOU LOOKED AT THE CHART WHEN?

23  **A.**   WHEN I WAS THERE IN '07.

24  **Q.**   AND YOU SAW NOTES REGARDING THE ACTUAL ADMINISTRATION OF

25  MEDICATION, CORRECT?

1    **A.**   YES.

2    **Q.**   YOU SAW PHYSICAL THERAPY NOTES, CORRECT?

3    **A.**   I THINK SO.

4    **Q.**   YOU SAW PROGRESS NOTES ON THE PART OF VARIOUS SPECIALISTS,

5    CORRECT?

6    **A.**   I REVIEWED WHATEVER WAS IN THE CHART.

7    **Q.**   AND DID YOU LOOK AT THE NOTES THAT DEALT SPECIFICALLY WITH

8    THE DECISION IN 2006 TO WITHDRAW TRAMADOL?

9    **A.**   I DON'T KNOW IF THOSE ARE IN THE CHART OR IF THEY WERE --

10   PERHAPS THEY WERE IN THE CHART.  I WOULD HAVE TO SEE IF I

11   COMMENTED ON THEM IN MY REPORT.  I DO HAVE A SECTION ON CHART

12   REVIEW.

13            I DIDN'T COMMENT ON IT, SO I WOULD BE HAPPY TO LOOK

14   AT THEM.  IF THEY WERE IN THE CHART, I SAW THEM.  THAT'S ALL I

15   CAN SAY.

16   **Q.**   WELL, DID YOU SEE ANYWHERE IN THE CHART WHERE ANY

17   PHYSICIAN EXPRESSED CONCERN OVER MR. ASHKER'S USE OF TRAMADOL

18   OVER SUCH AN EXTENDED PERIOD OF TIME?

19   **A.**   I DON'T NOTE IT IN MY REPORT.  I DON'T KNOW IF IT WAS

20   EXISTENT IN THE CHART AT THE TIME THAT I SAW HIM.  I CAN'T BE

21   SURE OF THAT, SO I REALLY CAN'T BE RESPONSIVE.

22   **Q.**   AND AMONG THE SPECIALISTS HE'S SEEN ARE SURGEONS, CORRECT?

23   **A.**   HE HAD SEEN SURGEONS IN THE PAST, YES.

24   **Q.**   NEUROLOGISTS, CORRECT?

25   **A.**   YES.

1    **Q.**   AND THAT WAS ALL SINCE SAY 2001, CORRECT?

2    **A.**   YOU KNOW, YOU ARE ASKING ME FOR MEMORY OF A CHART REVIEW I

3    DID EIGHT YEARS AGO.  SO, I AM TRYING TO BE RESPONSIVE.

4              AND YOU ARE ASKING ME, CORRECT, CORRECT, BUT I AM

5    HAVING A HARD TIME BECAUSE I KNOW −− LET'S JUST SAY I KNOW THAT

6    HE HAS SEEN SPECIALISTS A VARIETY OF TIMES DURING HIS

7    INCARCERATION.  THAT WOULD BE BEST TO RESPOND THAT WAY.

8    **Q.**   YOU MENTIONED THIS OCCUPATIONAL THERAPIST.  AND YOU SAID

9    HE HADN'T BEEN REFERRED TO AN OCCUPATIONAL THERAPIST FOR 19

10   YEARS.

11             HOW MANY DOCTORS HAS HE SEEN IN 19 YEARS?

12   **A.**   I DON'T KNOW.  NONE OF THEM IS AN OCCUPATIONAL THERAPIST.

13   **Q.**   DID DR. ALLEN REFER HIM TO AN OCCUPATIONAL THERAPIST?

14   **A.**   AS FAR AS I KNOW HE WAS NEVER REFERRED.

15   **Q.**   SO DID ALL THOSE DOCTORS COMMIT MALPRACTICE?

16   **A.**   I THINK THAT BY NOT REFERRING SOMEONE WITH HIS

17   CONDITION −− YOU KNOW, ONE OF THE REASONS THAT MAY HAVE

18   OCCURRED −− IT'S AN INTERESTING ASPECT OF HIS CASE BECAUSE IT

19   IS SO COMMON IN MEDICINE THAT ANYONE WITH THIS KIND OF HAND

20   DISABILITY AND DYSFUNCTIONS TO BE REFERRED TO AN OCCUPATIONAL

21   THERAPIST, IT MAY BE THAT THEY DON'T HAVE ONE AVAILABLE UP

22   THERE OR THEY ARE NOT ON CONTRACT.  JUST LIKE, FOR EXAMPLE, HE

23   DOESN'T HAVE A BRACE FIXING BECAUSE THEY DON'T HAVE A CONTRACT

24   WITH A BRACE FIXER.

25             SO THESE KINDS OF THINGS INTERFERE WITH STANDARD OF

1    CARE.

2              **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.

3              MOVE TO STRIKE, NONRESPONSIVE, CLEARLY --

4              **THE COURT:**  IT'S NOT RESPONSIVE, HOWEVER, IT IS

5    RELEVANT, AND IT COULD BE ASKED ON REDIRECT.  SO IN THE

6    INTEREST OF TIME, I AM NOT GOING TO STRIKE IT.

7              IF YOU WANT TO ASK A DIFFERENT QUESTION, YOU MAY.

8    **BY MR. ANDRADA:**

9    **Q.**  I JUST WANT TO KNOW -- DID ANY OF THE OUTSIDE DOCTORS, DID

10   DOCTOR -- DID THE SPECIALIST WHO SAW HIM ON THE OUTSIDE

11   PRESCRIBE AN OCCUPATIONAL THERAPIST?

12   **A.**  NOT HAVING SEEN THOSE NOTES, I DON'T KNOW.  BUT I CAN TELL

13   YOU THAT IN THE CHART THAT I LOOKED AT --

14             **MR. ASHKER:**  OBJECTION, YOUR HONOR.  I WOULD LIKE TO

15   SAY HE'S ANSWERED THAT QUESTION SEVERAL TIMES ALREADY WHEN HE

16   STATED THAT IN THE 19-YEAR-OLD TIME PERIOD THAT HE HAS REVIEWED

17   I WAS NEVER SEEN BY AN OCCUPATIONAL THERAPIST BY ANYWHERE, SO

18   OBVIOUSLY NO ONE THAT HE'S AWARE OF SUBMITTED ME OR RECOMMENDED

19   THAT I SEE ONE.  THAT'S ALREADY IN EVIDENCE AND I FAIL TO SEE

20   WHY HE KEEPS GOING ON ABOUT IT.

21   **BY MR. ANDRADA:**

22   **Q.**  SO THEN DO -- DOCTOR --

23             **THE COURT:**  I WILL OVERRULE THE OBJECTION.

24   **BY MR. ANDRADA:**

25   **Q.**  SO THEN, DOCTOR, DID DR. DUNCAN BREACH THE STANDARD OF

1    CARE BY FAILING TO RECOMMEND AN OCCUPATIONAL THERAPIST?

2    **A.**   IN THAT RESPECT, HE DID.

3    **Q.**   ARE YOU AN EXPERT IN ORTHOPEDICS?

4    **A.**   NO, I AM A GENERAL PRACTITIONER WHO MANAGES THE CARE OF

5    COMPLEX CONDITIONS AND WITH 40 YEARS OF CLINICAL EXPERIENCE.

6    **Q.**   DID THE NEUROLOGIST -- DO YOU KNOW WHO THE NEUROLOGIST WAS

7    WHO WAS CONSULTING ON THIS CASE IN 2000, 2001?

8    **A.**   I DON'T REMEMBER HIS NAME.

9    **Q.**   DID HE PRESCRIBE AN OCCUPATIONAL THERAPIST?

10   **A.**   IF HE WAS AN EXTERNAL CONSULTANT, SOMETIMES THOSE NOTES

11   AREN'T IN THE CHART.

12          I CAN'T TELL YOU -- ALL I KNOW IS THAT AN

13   OCCUPATIONAL THERAPY REFERRAL WAS NEVER ACHIEVED.

14          YOU ARE ASKING ME IF SPECIFIC DOCTORS MADE THE

15   REFERRAL.  ALL I CAN TELL YOU IS, IN THE NOTES I SAW IN THE

16   CLINICAL RECORD, NO REFERRAL WAS MADE.

17          NOW, SOMETIMES THE SPECIALIST'S REPORTS ARE NOT IN

18   THE CHART, YOU KNOW, BUT THAT'S ALL I CAN BE RESPONSIVE TO.

19   **Q.**   DID YOU -- DO YOU KNOW A DR. MAUKONEN IN CONNECTION WITH

20   THIS CASE?

21   **A.**   I NEVER MET HIM.

22   **Q.**   DO YOU KNOW BY VIRTUE OF HIS INVOLVEMENT WITH MR. ASHKER?

23   **A.**   I DON'T HAVE MEMORY OF HIS NAME.

24   **Q.**   ASSUME HE IS A NEUROLOGIST, ASSUME HE DIDN'T PRESCRIBE

25   OCCUPATIONAL THERAPY, DID HE BREACH THE STANDARD OF CARE?

1   **A.**   YES.

2   **Q.**   ARE YOU AN EXPERT IN NEUROLOGY?

3   **A.**   NO.

4              SOMETIMES WHAT HAPPENS IS THAT EXPERTS SEE THEIR

5   LITTLE PART OF IT, AND THEY DON'T –– SO THAT HE'S THINKING

6   ABOUT THE NEUROLOGY ISSUE AND THE OTHER ONE IS THINKING ABOUT

7   THIS OTHER ISSUE, AND NO ONE THINKS ABOUT THE FACT THAT THE MAN

8   HAS A DISABLED HAND, AND THE OCCUPATIONAL THERAPIST IS THE BEST

9   PERSON TO SEE.

10   **Q.**   WHAT'S THE NATURE OF DR. DUNCAN'S PRACTICE?

11   **A.**   I THINK HE'S AN ORTHOPEDIST, AS FAR AS I REMEMBER.

12   **Q.**   IT WAS APPROPRIATE FOR HIM TO SEE DR. ASHKER (SIC); HE HAD

13   THE EXPERTISE, RIGHT?

14   **A.**   OF COURSE IT'S APPROPRIATE FOR HIM TO BE SEEN BY

15   DR. DUNCAN.

16   **Q.**   LET'S MOVE TO SOMETHING ELSE IN THE INTEREST OF TIME HERE.

17              YOU, BY THE WAY, HAD AN UNDERSTANDING FROM

18   MR. ASHKER THAT HE FRACTURED HIS KNUCKLE IN HIS RIGHT HAND

19   DOING PUSH-UPS IN HIS CELL; IS THAT CORRECT?

20   **A.**   YES.

21   **Q.**   WITH HIS BRACE ON; IS THAT CORRECT?

22   **A.**   YES.

23   **Q.**   NOW –– ALL RIGHT.

24              NOW, IN 2002 YOU SAID THAT MR. ASHKER FELT WIRED AND

25   HAD PAIN IN AREAS OUTSIDE HIS ARM.

1              WHAT WERE YOU TALKING ABOUT THERE?

2    **A.**   WHAT WAS I TALKING ABOUT SEVEN YEARS AGO IN A REPORT?  I

3    WOULD BE HAPPY TO LOOK AT MY REPORT AND SEE.

4    **Q.**   SURE.  PLEASE, IF YOU WOULD BE SO KIND.

5              AND WE ARE ALMOST DONE.

6    **A.**   2002.

7              I THINK I HAVE THAT AVAILABLE.

8              **THE COURT:**  IF YOU HAVE HANDY WHAT YOU WANT HIM TO

9    COMMENT ON, IT MIGHT BE QUICKER IF YOU WOULD JUST SHOW IT TO

10   HIM.

11             **MR. ANDRADA:**  I JUST THOUGHT HE WOULD HAVE HIS OWN

12   REPORT WITH HIM, YOUR HONOR.

13             **THE COURT:**  HE DOES.  BUT I THOUGHT IF YOU HAD A

14   PARTICULAR THING YOU WANTED --

15             **MR. ANDRADA:**  YES, I DO.

16             **THE COURT:**  -- SHOW IT TO HIM AND THAT MIGHT SPEED

17   THINGS UP A LITTLE BIT.

18             **MR. ANDRADA:**  SURE.

19             **THE WITNESS:**  WHAT PAGE?

20             **MR. ANDRADA:**  FIRST PAGE DOWN AT THE BOTTOM.

21   **BY MR. ANDRADA:**

22   **Q.**   YOU TALK ABOUT ULTRAM HAVING SIDE EFFECTS, CORRECT?

23   **A.**   WHAT I SAY IS, ULTRAM IS FOUND HELPFUL.  IT DECREASES PAIN

24   SIGNIFICANTLY FOR 16 OF EACH 24 HOURS.  THERE IS STILL

25   SIGNIFICANT PAIN FROM ANY EXERTION OR EVEN MINOR TRAUMA.

1    ULTRAM IS ASSOCIATED WITH SIDE EFFECTS SEEN IN 10 PERCENT OF

2    THOSE USING IT, WHICH HE FEELS WIRED AND HAS PAINS OUTSIDE THE

3    RIGHT ARM.

4    **Q.**   SO THE WIRE REFERS TO THE EFFECT OF THE ULTRAM, CORRECT?

5    **A.**   YES.

6    **Q.**   ALL RIGHT.

7         DOCTOR, I THINK THAT IS ALL I HAVE IN THE INTEREST

8    OF TIME HERE.  THANK YOU VERY MUCH FOR YOUR TIME, SIR.

9         **THE WITNESS:**  YOU ARE WELCOME.  THANK YOU.

10        **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

11        **MR. ASHKER:**  BRIEFLY, YOUR HONOR, I NEED TO

12   CROSS-EXAMINE.

13        **THE COURT:**  REDIRECT IT'S CALLED, BUT, YES, YOU MAY.

14        **MR. ASHKER:**  REDIRECT, OKAY.

15              <u>**REDIRECT EXAMINATION**</u>

16   **BY MR. ASHKER:**

17   **Q.**   DR. WEINSTEIN, IS IT COMMON FOR A PATIENT TO EXPERIENCE

18   SIDE EFFECTS FROM A MEDICATION TEMPORARILY?

19   **A.**   YES.  AND KIND OF IRRITATING OR TOXIC REACTION SOMETIMES

20   GO AWAY.

21   **Q.**   OKAY, THANK YOU.

22        WHAT IS YOUR OPINION -- IF I PRESENT TO YOU THAT

23   ONCE DR. SAYRE SWITCHED ME FROM THE TRAMADOL TO THE LOW DOES

24   NSAID AND TYLENOL COMBINATION IN SEPTEMBER 2006, I WILL PRESENT

25   TO YOU THAT I REPEATEDLY MADE HIM AWARE, PERSONALLY AWARE OF

1    THE FACT THAT NOT ONLY WERE -- WAS THAT LOW DOSE NSAID TYLENOL

2    COMBINATION NOT EFFECTIVE FOR MANAGING MY PAIN AND DISCOMFORT,

3    BUT ALSO WAS CAUSING EXTREME DISTRESS TO MY STOMACH, CHRONIC

4    DIARRHEA, AND HIS RESPONSE WAS TO DO NOTHING, WHAT IS YOUR

5    OPINION ABOUT THAT?  IS THAT WITHIN THE STANDARD OF CARE?

6    **A.**   IF THAT OCCURRED AND INSOFAR AS IT COULD OCCUR, IT IS

7    BELOW THE STANDARD OF CARE.

8    **Q.**   NOW THEY MENTIONED DR. FRIEDMAN AND MY REFERENCE TO HIM AS

9    BEING A CLOWN.

10             DO YOU REMEMBER THAT?

11   **A.**   YES.

12   **Q.**   IS IT THE PROPER STANDARD OF CARE IF A PATIENT PRESENTS TO

13   A DOCTOR THAT A MEDICATION HE IS BEING GIVEN IS CAUSING

14   INTOLERABLE SIDE EFFECTS, IS IT APPROPRIATE -- DOES IT MEET THE

15   STANDARD OF CARE FOR THE DOCTOR TO LAUGH IN THE PATIENT'S FACE

16   AND INSIST THAT HE CONTINUE TO TAKE THE MEDICATION ANYHOW?

17   **A.**   ALL I CAN SAY IS IF THAT OCCURRED, THEN IT'S ALWAYS

18   INAPPROPRIATE TO LAUGH IN THE PATIENT'S FACE AND IGNORE THE

19   PATIENT'S COMPLAINTS IN TRYING TO MANAGE THEIR CHRONIC

20   SYMPTOMS.

21   **Q.**   WOULD YOU CONSIDER -- I WILL PRESENT TO YOU THE ELAVIL

22   MEDICATION CAUSES ME TO EXPERIENCE THE SIDE EFFECTS WHICH

23   INCLUDE VISION PROBLEMS, BALANCE PROBLEMS, LETHARGY, AND MY

24   LEFT EYELID WILL BEGIN TWITCHING AND THEN GO TO THE WHOLE LEFT

25   SIDE OF MY FACE.

1           WOULD YOU CONSIDER IT UNREASONABLE FOR ME TO NOT

2    WANT TO TAKE A MEDICATION THAT WAS CAUSING THAT KIND OF SIDE

3    EFFECT?

4    **A.**   I WOULD SAY NOT AFTER A REASONABLE TRIAL OF SIX TO 12

5    WEEKS TO SEE IF THOSE IRRITATING OR TOXIC EFFECTS WENT AWAY.

6    **Q.**   NOW, YOU WERE PRESENTED WITH EVIDENCE OR A STATEMENT THAT

7    DR. FRIEDMAN WAS CONCERNED ABOUT MY TRAMADOL USE AND HAD

8    STOPPED AND STARTED IT.

9           NOW, WHEN A DOCTOR STOPS AND RE-STARTS A MEDICATION

10   LIKE THAT, IS THAT NORMAL IF HIS CONCERN IS ACTUALLY BASED ON

11   ADDICTION?

12   **A.**   IN RESPONSE TO YOUR QUESTION, I REALLY DID NOT UNDERSTAND

13   THAT STRATEGY OF GIVING AN INTERVENING MEDICATION AND THEN

14   STARTING IT AGAIN.  IT ALLUDED -- THE THERAPEUTIC REASON FOR IT

15   ALLUDED ME AT THE TIME.

16   **Q.**   WELL, I WILL PRESENT TO YOU THAT DR. FRIEDMAN TOLD ME AT

17   THE TIME THAT HE DID THAT VERBALLY THAT THE REASON HE WANTED TO

18   DO THAT WAS NOT OUT OF HIS CONCERNS ABOUT DRUG DEPENDENCY OR

19   ANYTHING OF THAT NATURE, BUT RATHER IT WAS BECAUSE OF TOLERANCE

20   ISSUES.

21           **MR. ANDRADA:**  YOUR HONOR, I ASSUME THIS IS A

22   HYPOTHETICAL, ASSUME HE HAS TOLD HIM THIS?

23           **THE COURT:**  OKAY.

24   **BY MR. ASHKER:**

25   **Q.**   DOES THAT MAKE MORE SENSE ABOUT DR. FRIEDMAN'S STRATEGY

1    THERE?

2    **A.**   YES, IT WOULD.  THAT BY TAKING A BREAK FROM A MEDICATION,

3    THEN THE –– SOMETIMES THE MEDICATION CAN BE DETOXIFIED FROM THE

4    SYSTEM WHICH IS WHAT TOLERANCE IS ABOUT, AND THEN IT CAN BE

5    MORE USEFUL AGAIN.  SO THAT DOES MAKE SENSE.

6    **Q.**   AND IN THE MEDICAL LITERATURE, IT STATES THAT TRAMADOL ––

7    WELL, IT STATES THAT TRAMADOL DOES NOT HAVE TOLERANCE BUILDING

8    EFFECTS AS OTHER MEDICATIONS.  IN OTHER WORDS, THAT IT'S GREAT.

9    LET ME GIVE YOU A HYPOTHETICAL.

10              DURING THE 4.9 YEAR TIME PERIOD THAT I WAS ON THAT

11   TRAMADOL, I NEVER ASKED FOR MORE THAN THE 50-MILLIGRAM DOSE

12   TWICE A DAY.

13              DOES THAT INDICATE DRUG SEEKING BEHAVIOR TO YOU?

14   **A.**   NO, IT DOES NOT.

15   **Q.**   OKAY.

16              DOES THAT INDICATE THAT MEDICATION AT THAT DOSAGE

17   WAS EFFECTIVE FOR ME AS FAR AS THE BEST OUT OF –– BETTER THAN

18   NSAIDS OR ANYTHING ELSE I EVER HAD UP TO THAT POINT, AND I

19   NEVER ASKED FOR MORE, DOES THAT INDICATE TO YOU THAT THERE WAS

20   A PROBLEM WITH ME BUILDING A TOLERANCE TO THAT MEDICATION?

21   **A.**   BEING SATISFIED AND HAVING ADEQUATE PAIN CONTROL FROM A

22   STABLE DOSE OVER TIME WOULD INDICATE THAT IT IS A SUCCESSFUL

23   MEDICATION, AND YOU WERE NOT HAVING TOLERANCE –– HAVING

24   PROBLEMS WITH TOLERANCE, WHICH MEANS THAT ITS EFFECT WOULD BE

25   DECREASING.

1    Q.   I WOULD PRESENT TO YOU THAT IN 2005 PHYSICAL THERAPIST

2    PATRICK DODGEN MADE A RECOMMENDATION TO THE MEDICAL STAFF AT

3    PELICAN BAY STATE PRISON -- HOLD ON A SECOND --

4              THE COURT:  I AM AFRAID WE ARE GOING TO HAVE TO

5    BREAK HERE AND TAKE OUR TWO VIDEO WITNESSES AND ASK

6    DR. WEINSTEIN TO BE AVAILABLE AFTER WE ARE FINISHED WITH THEM.

7              CAN YOU STAY UNTIL 1:30 TODAY?

8              THE WITNESS:  YES, I CAN.

9              THE COURT:  OKAY.  IT MAY BE THAT WE ARE FINISHED,

10   BUT I AM WORRIED ABOUT THESE TWO --

11             MR. ASHKER:  I WAS ALMOST DONE, YOUR HONOR.

12             THE COURT:  OKAY.

13             MR. ASHKER:  I HAD LIKE MAYBE ONE OR TWO MORE

14   QUESTIONS.

15             THE COURT:  ASK ONE OR TWO.

16   BY MR. ASHKER:

17   Q.   OKAY.  DR. WEINSTEIN, I WILL PRESENT TO YOU THAT ON

18   FEBRUARY 3RD, 2005, PHYSICAL THERAPIST PATRICK DODGEN MADE A

19   RECOMMENDATION WHICH STATES:  TEAM CONFERENCE REGARDING PAIN

20   MANAGEMENT PROGRAM FOR PATIENT.  FUNCTIONAL COORDINATION, IF

21   NEEDED BY INDEPENDENT AGENCY TO DETERMINE FUNCTIONAL

22   LIMITATIONS.

23             AND I WILL PRESENT TO YOU THAT WHEN I ASKED PATRICK

24   DODGEN ABOUT THIS AND WHAT THE OUTCOME WAS, HE STATED TO ME

25   THAT HE COULD NOT RECALL WHO HE MADE THIS RECOMMENDATION TO OR

1    WHAT THEIR RESPONSE WAS.  THE FACT THAT THE PRISON MEDICAL

2    STAFF DID NOT HAVE ME SEEN BY AN INDEPENDENT AGENCY TO

3    DETERMINE FUNCTIONAL LIMITATIONS.

4              IN YOUR OPINION, DOES THAT FALL BELOW THE STANDARD

5    OF CARE?

6              **MR. ANDRADA:**  IT IS BEYOND THE SCOPE, YOUR HONOR.

7              **THE COURT:**  YOU DID TALK ABOUT THINGS THAT DODGEN

8    SUPPOSEDLY SAID.

9              **MR. ANDRADA:**  YES.

10             **THE COURT:**  IF THAT'S WHAT WE'RE GETTING AT HERE,

11   THEN IT WOULDN'T BE BEYOND THE SCOPE.

12             **MR. ANDRADA:**  VERY WELL, YOUR HONOR.

13             **THE WITNESS:**  IT'S HARD FOR ME TO OPINE ON THAT.

14             I WOULD SAY THIS:  THAT WAS HIS OPINION THAT HE

15   PRESENTED PERHAPS THE DOCTOR WHO WOULD BE THE AGENT OF REFERRAL

16   DECIDED NOT TO.  YOU KNOW, AGAIN, I DON'T THINK THERE WAS

17   REALLY GOOD DOCUMENTATION OF YOUR FUNCTIONAL LIMITATIONS IN

18   YOUR CHART AND THE STAFF WAS NOT REALLY PAYING ATTENTION TO

19   THAT ADEQUATELY, AND PERHAPS THAT'S WHY HE MADE THAT

20   RECOMMENDATION.  BUT THE FACT THAT THERE WAS NO REFERRAL, THE

21   PROBLEM IS THAT THAT WAS NEVER DONE, I WOULD SAY.

22   **Q.**   OKAY.

23   **A.**   RATHER THAN THE REFERRAL.

24   **Q.**   ONE LAST QUESTION.  REGARDING MY RANGE OF MOTION ON THE

25   EXAMINATIONS THAT YOU CONDUCTED BETWEEN 2000 AND 2007,

1    ACCORDING TO YOUR EXAMINATION AND REPORT IN 2007, MY RANGE OF

2    MOTION HAD ACTUALLY DECLINED SINCE YOUR 2005 EXAMINATION; IS

3    THAT CORRECT?

4    **A.**    THAT IS CORRECT.  AND IN THREE OUT OF FOUR OF THE

5    MOVEMENTS, THE MOVEMENTS BEING THIS (INDICATING), THESE FOUR,

6    AND I JUST NEED TO POINT OUT TO BE COMPLETE AND TO SAY CLEARLY

7    THAT IN 2000, PRONATION WAS 22 PERCENT, AND IN 2007, IT WAS

8    15 PERCENT.

9            SUPINATION IN 2000 WAS 40 PERCENT, AND IN 2007, WAS

10   20 PERCENT.  SO THERE'S ACTUALLY IN TWO PARAMETERS HAVE BEEN

11   DECLINED FROM 2000 WHILE FLEXION AND EXTENSION HAD IMPROVED

12   SOME, SO IT WAS A MIXED PICTURE.

13           **MR. ASHKER:**  THANK YOU.  I HAVE NO FURTHER

14   QUESTIONS.

15           **MR. ANDRADA:**  I DON'T HAVE ANYTHING MORE.

16           **THE COURT:**  WE CAN EXCUSE YOU.  THANK YOU VERY MUCH.

17   WE WILL TAKE A BREAK.  IT'S FIVE TO TWELVE.  WE WILL BREAK

18   UNTIL 12:10.

19           IF WE CAN GET THE -- FIGURE OUT WHICH DOCTOR TO GET

20   FIRST.  WE WILL GET ONE OF THEM.

21           (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

22           **THE COURT:**  AS I UNDERSTAND IT, YOU CAN HAVE A SEAT

23   IF YOU WANT TO.

24           DUNCAN, WHO SAID HE WAS ONLY AVAILABLE UNTIL NOON IS

25   CURRENTLY GOING THROUGH CHECK-IN OR SECURITY PROCEDURES AND

1   IT'S GOING TO TAKE THEM 20 MINUTES --

2              **VIDEO PERSON:**  HE IS READY NOW.

3              **THE COURT:**  OKAY, GOOD.  WE WILL DO DUNCAN FIRST AND

4   THEN WE WILL DO DR. KREIS AFTER THAT.

5              **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

6              ONE OTHER THING.  IF YOU CAN INSTRUCT YOUR CLIENT,

7   COUNSEL, NOT TO MAKE FACIAL EXPRESSIONS OF AGREEMENT OR

8   DISAGREEMENT WITH THE WITNESSES.  IT IS NOT EFFECTIVE.

9              **MR. ANDRADA:**  PLEASE DON'T DO THAT.

10             **THE COURT:**  ALL RIGHT.

11             **MR. ASHKER:**  YOUR HONOR, DO WE KNOW WHO THE NEXT

12  WITNESS WILL BE?

13             **THE COURT:**  WE ARE GOING TO DO DUNCAN NEXT AND THEN

14  WE'RE GOING TO DO DR. KREIS.

15             **MR. ASHKER:**  ALL RIGHT.

16             **THE COURT:**  IF WE STILL HAVE TIME AFTER THAT, WE

17  WILL GO BACK TO YOUR CROSS.

18                  (RECESS TAKEN AT 11:55 A.M.)

19                (PROCEEDINGS RESUMED AT 12:10 P.M.)

20             **THE COURT:**  SO WE ARE GOING TO HAVE TO KEEP THIS

21  DOWN TO 15 MINUTES PER SIDE, SO WE HAVE 15 MINUTES PER SIDE FOR

22  DR. KREIS.

23             OKAY.

24             **THE CLERK:**  ALL RISE.

25                (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

```
 1              THE COURT:  PLEASE BE SEATED.

 2              NEXT, LADIES AND GENTLEMAN, WE HAVE ANOTHER WITNESS

 3    BY VIDEO.  THIS IS A PHYSICIAN WHO PRACTICES UP NEAR PELICAN

 4    BAY, SO FOR HIS CONVENIENCE, WE HAVE HAD HIM GO TO THE PRISON

 5    TO PARTICIPATE IN THE VIDEO LINK THAT WE HAVE GOT SET UP THERE.

 6              SO THIS IS PLAINTIFF'S WITNESS, AND WE WILL ASK HIM

 7    TO STATE HIS NAME AND SPELL HIS LAST NAME FOR THE RECORD.

 8              THE CLERK:  WILL THE WITNESS PLEASE STAND AND RAISE

 9    HIS RIGHT HAND?

10                       GREGORY JOHN DUNCAN,

11    CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

12    TESTIFIED AS FOLLOWS VIA VIDEOCONFERENCE:

13              THE WITNESS:  I DO.

14              THE CLERK:  PLEASE STATE YOUR NAME FOR THE RECORD

15    SPELLING YOUR LAST NAME.

16              THE WITNESS:  GREGORY JOHN DUNCAN.  LAST NAME IS

17    SPELLED D-U-N-C-A-N.

18                       DIRECT EXAMINATION

19    BY MR. ASHKER:

20    Q.   GOOD AFTERNOON, DR. DUNCAN.  THIS IS TODD ASHKER HERE.

21    CAN YOU SEE ME?

22    A.   YES.

23    Q.   DO YOU REMEMBER WHO I AM?

24    A.   I READ -- I WAS READ PART OF YOUR CHART, SO I HAVE A

25    RECOLLECTION FROM THE CHART.
```

DUNCAN – DIRECT / MR. ASHKER

1   **Q.**   AND CAN YOU PLEASE DESCRIBE WHAT DOCUMENTS YOU ARE

2   REFERRING TO BY "THE CHART"?

3   **A.**   SOME OF THE NOTES FROM MY OFFICE FROM YOUR EXAMINATIONS.

4   **Q.**   OKAY.  AND IS IT TRUE THAT YOU EXAMINED ME AND PROVIDED

5   RECOMMENDATIONS REGARDING MY RIGHT ARM BETWEEN 1994 AND 2002?

6   **A.**   YES, I BELIEVE THOSE ARE THE DATES.

7   **Q.**   OKAY.

8           AND AS FAR AS YOUR QUALIFICATIONS GO, CAN YOU PLEASE

9   GIVE A BRIEF SUMMARY OF YOUR QUALIFICATIONS AND ANY BOARD

10  SPECIALTIES THAT YOU MAY HAVE?

11  **A.**   I'M A BOARD CERTIFIED ORTHOPEDIC SURGEON.  I ATTENDED

12  MEDICAL SCHOOL AT JOHNS HOPKINS UNIVERSITY.  I RECEIVED MY

13  RESIDENCY TRAINING AT U.C.L.A. MEDICAL CENTER, AND I HAVE A

14  ONE-YEAR FELLOWSHIP TRAINING IN UPPER EXTREMITY SURGERY FROM

15  UNIVERSITY OF NEW MEXICO, AND I HAVE BEEN IN PRIVATE PRACTICE

16  FOR 17 YEARS HERE IN CRESCENT CITY.

17  **Q.**   OKAY, THANK YOU.

18          BASED ON YOUR REVIEW, THE READING OF MY REPORTS THAT

19  YOU HAD, CAN YOU DESCRIBE THE NATURE OF MY INJURY TO MY RIGHT

20  ARM?

21  **A.**   NO.  I NEED TO CLARIFY THE SEQUENCE WHICH BROUGHT ME HERE

22  TODAY.  APPARENTLY A SUBPOENA WAS DROPPED OFF AT MY OFFICE

23  YESTERDAY --

24          **THE COURT:**  DR. DUNCAN --

25          **THE WITNESS:**  -- AND I HAD NOT YET SEEN THAT.

1          **THE COURT:**  DR. DUNCAN --

2          **THE WITNESS:**  GO AHEAD.

3          **THE COURT:**  I NEED YOU TO ANSWER THE QUESTION.  ANY

4    ISSUES YOU MAY HAVE WITH YOUR SUBPOENA IS NOT SOMETHING THAT

5    THE JURY NEEDS TO HEAR ABOUT AT THIS TIME.

6          IF YOU CAN'T ANSWER THE QUESTION FOR SOME REASON,

7    YOU CAN SAY SO, BUT YOU NEED TO DO YOUR BEST TO ANSWER THE

8    ACTUAL QUESTION POSED TO YOU.

9          WE WILL HAVE --

10          **THE WITNESS:**  THANK YOU.

11          **THE COURT:**  WE WILL --

12          **THE WITNESS:**  AND THE ANSWER --

13          **THE COURT:**  DO YOU REMEMBER THE QUESTION OR SHOULD

14    WE HAVE THE COURT REPORTER READ IT BACK TO YOU?

15          **THE WITNESS:**  NO, I REMEMBER THE QUESTION.

16          **THE COURT:**  OKAY.

17          **THE WITNESS:**  AND THE ANSWER IS I HAVE A

18    RECOLLECTION, BUT I DID NOT PERSONALLY READ THE CHART.

19          AND MY RECOLLECTION IS THAT HE HAD BEEN -- THAT

20    MR. ASHKER HAD BEEN SHOT IN THE ARM SOMETIME PRIOR TO MY

21    ARRIVAL HERE, AND THAT HE HAD HAD INJURIES FROM THAT TIME THAT

22    I HAD SEEN IN FOLLOW-UP TO HIS RIGHT -- I BELIEVE IT WAS HIS

23    RIGHT FOREARM.

24    **BY MR. ASHKER:**

25    **Q.**  OKAY, THANK YOU.

1          WOULD YOU, BASED ON YOUR RECOLLECTION, WOULD YOU

2     DESCRIBE THAT INJURY TO MY FOREARM AS BEING A SERIOUS INJURY?

3     **A.**   I BELIEVE THE INITIAL INJURY WAS A SERIOUS INJURY, YES.

4     **Q.**   AND WOULD YOU DESCRIBE IT AS BEING A COMPLICATED INJURY?

5     **A.**   THE INITIAL INJURY, I BELIEVE, WAS A FRACTURE OF THE

6     FOREARM, AND I BELIEVE THERE WAS AN ARTERY INVOLVED, SO I WOULD

7     SAY THAT IS COMPLICATED.

8     **Q.**   AND AT SOME POINT IN TIME YOU PROVIDED ME WITH AN ULNAR

9     TRANSPOSITION SURGERY; IS THAT CORRECT?

10    **A.**   YOU ARE REMINDING ME OF THAT.  AND, YES, I BELIEVE THAT IS

11    CORRECT.

12    **Q.**   AND SUBSEQUENT TO THAT -- CAN YOU PLEASE DESCRIBE BRIEFLY

13    WHAT AN ULNAR TRANSPOSITION SURGERY IS?  WHAT IT IS AND WHY I

14    NEEDED ONE?

15    **A.**   YES.

16          THE ULNAR NERVE TRANSPOSITION REFERS TO A SURGERY

17    WHERE YOU MOVE THE NERVE ON THE INNER PART OF THE ELBOW TO THE

18    FRONT PART OF THE ELBOW TO RELIEVE PRESSURE OR RELEASE SCAR

19    TISSUE FROM THE NERVE.  AND THE REASON THAT IT IS PERFORMED IS

20    FOR SOME PINCHING OF THE NERVE IN THE REGION OF THE ELBOW.

21    **Q.**   DO YOU RECALL THAT AFTER I HAD THAT SURGERY, IMMEDIATELY

22    AFTERWARD FOR APPROXIMATELY THE NEXT WEEK, WEEK AND A HALF MY

23    FOREARM WAS EXTREMELY SWOLLEN AND DISCOLORED PURPLE, BLACK,

24    PURPLE AND GREEN?

25    **A.**   NO, I DON'T RECALL THAT DETAIL.

DUNCAN – DIRECT / MR. ASHKER

1  **Q.**   IN MY TYPE OF INJURY -- WELL, I WOULD LIKE TO -- DO YOU

2  RECALL FITTING ME WITH A -- RECOMMENDING THAT I HAVE THE USE OF

3  AN ARM BRACE?

4  **A.**   I REMEMBER DISCUSSING AN ARM BRACE.  AND I BELIEVE IT WAS

5  ORDERED FROM A BRACE SPECIALIST IN EUREKA, IF I RECALL

6  CORRECTLY.

7  **Q.**   AND IN MY TYPE OF INJURY -- WELL, CAN I SHOW HIM -- CAN HE

8  SEE MY ARM WHERE I COULD LET HIM HOLD IT UP THERE WHERE HE CAN

9  SEE IT AND THEN I CAN ASK HIM QUESTIONS ABOUT RELEVANT TO THE

10 ARM BRACE ISSUE?

11              **THE COURT:**  I GUESS YOU CAN TRY.

12              **MR. ASHKER:**  OKAY.

13 **BY MR. ASHKER:**

14 **Q.**   HOPEFULLY YOU CAN SEE THIS, DR. DUNCAN.  I AM GOING TO

15 SHOW YOU MY ARM FOR YOUR RECOLLECTION.

16              (INDICATING.)

17 **A.**   YES, I SEE IT.

18 **Q.**   ARE YOU ABLE TO SEE ALL THOSE ANGLES?

19 **A.**   YES.  THANK YOU.

20 **Q.**   DOES THAT HELP YOU TO RECALL THE ACTUAL CONDITION OF MY

21 ARM?

22 **A.**   YES.

23 **Q.**   AND I WILL PRESENT TO YOU THAT BACK ON -- THAT YOU HAD

24 ORIGINALLY ORDERED MY -- RECOMMENDED I HAVE THE USE OF AN ARM

25 BRACE BACK ON AUGUST 3RD, 1994 BASED ON MY PRESENTATION TO YOU

DUNCAN – DIRECT / MR. ASHKER

1   THAT I WAS HAVING ACTIVITY-RELATED PAIN IN MY HAND AND FOREARM,

2   AND YOU RECOMMENDED A WRIST SPLINT AND ANTI-INFLAMMATORIES PER

3   REQUEST AS NEEDED AND REDUCE ACTIVITIES AS NEEDED.

4              DO YOU RECALL THAT?

5   **A.**   NO, BUT I BELIEVE THAT TO BE REASONABLE.

6   **Q.**   OKAY.  AND IN THIS TYPE OF INJURY -- DO YOU HAVE

7   EXPERIENCE DEALING WITH THE TYPE OF INJURY THAT I SUSTAINED TO

8   MY FOREARM?

9   **A.**   YES.

10  **Q.**   AND IN THIS TYPE OF INJURY, WHEN I PRESENTED TO YOU

11  BETWEEN THE TIME PERIOD OF 1994 TO 2002 THAT I WAS HAVING

12  ACTIVITY-RELATED PAIN AND DISCOMFORT, DID THAT SEEM CREDIBLE TO

13  YOU AFTER -- UPON YOUR EXAMINATIONS?

14  **A.**   YES.

15  **Q.**   AND IS IT APPROPRIATE TO DENY ADEQUATE MEDICATION FOR PAIN

16  THAT IS ASSOCIATED WITH ACTIVITIES?

17              **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  WHEN --

18  OBJECTION, VAGUE AND AMBIGUOUS AS TO TIME.  WHEN ARE WE TALKING

19  ABOUT NOW?

20              **THE COURT:**  IT WAS JUST A QUESTION.  IT WAS --

21              **MR. ASHKER:**  CAN HE ANSWER?

22              **THE COURT:**  YES.

23  **BY MR. ASHKER:**

24  **Q.**   YOU CAN ANSWER THE QUESTION, DR. DUNCAN.

25              **THE COURT:**  IT WASN'T A QUESTION AIMED AT HIM; IT

DUNCAN – DIRECT / MR. ASHKER

1    WAS A GENERAL QUESTION, AND I THINK IT'S ONE HE CAN ANSWER.

2              **MR. ANDRADA:**  ALL RIGHT.  THANK YOU.

3              **THE WITNESS:**  IN GENERAL, I WOULD NOT RECOMMEND LONG

4    TERM MEDICATION FOR YOUR CONDITION BECAUSE YOU WILL HAVE

5    CHRONIC DISCOMFORT.  AND THE USE OF MEDICATION INDEFINITELY

6    WOULD BE ASSOCIATED WITH AN INCREASING RISK OF A SIDE EFFECT TO

7    THE REST OF YOUR SYSTEM.

8              SO, WHETHER IT'S A BRACE OR MEDICATION, IT WOULD BE

9    MORE FOR BRIEF PERIODS OF FLAREUP, BUT NOT INTENDED AS A

10   PERMANENT TREATMENT.

11   **BY MR. ASHKER:**

12   Q.   WELL, WHAT IF, IN THE CONTEXT OF ACTIVITY-RELATED PAIN AS

13   FAR AS NOT -- LIKE, FOR EXAMPLE, MY PAIN HAS BEEN -- I

14   PRESENTED TO YOU BEFORE THAT I WAS HAVING PAIN BACK IN 1997,

15   11/19TH, 1997 I PRESENTED TO YOU FOR A RECHECK OF CHRONIC PAIN

16   IN MY RIGHT WRIST AREA AND FOREARM AREA.  THE PATIENT HAS HAD

17   PAIN WHEN TRYING TO USE THE BRACE DUE TO PRESSURE.  AND I WAS

18   TAKING UP TO 400-MILLIGRAM MOTRIN TABLETS A DAY, AND NOTED SOME

19   GI UPSET.

20             AND THAT I WAS REQUESTING ASSISTANCE WITH WRITING,

21   AND YOU NOTED HERE ON THIS REPORT, "HE DOES HAVE PAIN WITH

22   WRITING DUE TO HIS INJURY, AND THE REQUEST WILL BE ADDRESSED BY

23   PELICAN BAY STATE PRISON MEDICAL STAFF REGARDING THE

24   POSSIBILITY OF OBTAINING ASSISTANCE WITH WRITING."

25             WAS -- IS THAT A FAIR DIAGNOSIS AND TREATMENT RIGHT

1   THERE?

2   **A.**   COULD YOU REPEAT THE QUESTION?  I AM NOT SURE EXACTLY WHAT

3   THE --

4   **Q.**   MY -- LET ME REPHRASE THAT.

5           I PRESENTED TO YOU THE WRITING IS MY ONLY WAY OF

6   COMMUNICATING OUTSIDE OF MY CELL IN PELICAN BAY SHU, AND I HAVE

7   TO DO IT.  IF I DON'T DO IT, IT DOESN'T GET DONE.  MY WRITING

8   WITH FAMILY, LEGAL, EVERYTHING, EVERY TYPE OF COMMUNICATION.

9   THAT'S VERY IMPORTANT TO ME TO BE ABLE TO DO THAT.  WRITING

10  CAUSES SEVERE PAIN AND DISCOMFORT IN MY FOREARM EVERY DAY.

11          AND IS IT YOUR TESTIMONY THAT I SHOULD NOT

12  COMMUNICATE RATHER THAN OBTAIN MEDICATION THAT ENABLES ME TO

13  DO -- BE ABLE TO COMMUNICATE FOR WHAT I NEED TO COMMUNICATE ON?

14          **MR. ANDRADA:**  IT'S ARGUMENTATIVE, YOUR HONOR, AS

15  PHRASED.  NOT RELEVANT AS PHRASED, I DON'T THINK.

16          **THE COURT:**  OVERRULED.

17  **BY MR. ASHKER:**

18  **Q.**   YOU MAY ANSWER.

19  **A.**   I AM REALLY SORRY, BUT CAN YOU JUST -- I DIDN'T REALLY

20  KNOW WHAT THE EXACT QUESTION IS.

21          IS THE QUESTION ABOUT THE MEDICATION, OR THE BRACE,

22  OR --

23  **Q.**   THE QUESTION IS -- MY POSITION IS I HAVE TO -- MY ONLY

24  MEANS OF COMMUNICATION IS THROUGH WRITING.  THE WRITING CAUSES

25  EXTREME PAIN AND DISCOMFORT TO ME.  THE MORE I WRITE, THE MORE

DUNCAN – DIRECT / MR. ASHKER

1   PAIN AND DISCOMFORT I AM IN.  IT RESULTS IN A LACK OF SLEEP,

2   WHERE I AM ONLY GETTING ONE TO THREE HOURS OF SLEEP A DAY IF I

3   AM LUCKY.

4           AND IF I DON'T WRITE, IN OTHER WORDS, IF I DON'T DO

5   THAT ACTIVITY, THEN I DO NOT COMMUNICATE.

6           AND MY QUESTION IS, IN THAT CIRCUMSTANCE, VERY

7   SPECIFIC CIRCUMSTANCE, KIND OF A UNIQUE CIRCUMSTANCE DUE TO MY

8   CONDITIONS, AND MY QUESTION IS, IN THAT CIRCUMSTANCE, IS IT

9   APPROPRIATE TO PROVIDE MEDICATION THAT IS SUFFICIENT TO EASE MY

10  PAIN AND DISCOMFORT AND ENABLE ME TO TAKE CARE OF MY

11  COMMUNICATION NEEDS?

12          **MR. ANDRADA:**  AGAIN, YOUR HONOR -- EXCUSE ME,

13  OBJECTION.

14          **THE COURT:**  OVERRULED.

15  **BY MR. ASHKER:**

16  **Q.**   YOU MAY ANSWER.

17  **A.**   I THINK I UNDERSTAND THE QUESTION.

18          THE ANSWER IS IF THERE WERE A PERFECT MEDICATION

19  WITH NO SIDE EFFECTS THEN, YES, YOU SHOULD BE ON THAT MEDICINE.

20  BUT THE REALITY IS, THERE IS NO MEDICATION FOR PAIN THAT COULD

21  BE TAKEN INDEFINITELY THAT WOULDN'T SUBJECT YOU TO SIDE EFFECTS

22  THAT COULD BE WORSE THAN THE PROBLEM THAT'S BEING TREATED.

23          AND I CAN TELL YOU THAT A BLEEDING ULCER CAN BE A

24  FATAL COMPLICATION OF MEDICATIONS, AND THERE ARE NUMEROUS OTHER

25  POTENTIAL COMPLICATIONS THAT I DON'T HAVE TIME TO TALK ABOUT.

DUNCAN – DIRECT / MR. ASHKER

1          SO, IN TERMS OF YOUR ACTIVITY, THE GENERAL ANSWER IS

2    YOU WANT TO USE THE MUSCLES THAT YOU HAVE TO THE DEGREE THAT

3    THEY DON'T BECOME ATROPHIC OR WASTED.  AND SO SOME USE IS GOOD.

4    AND THE IDEA BEHIND THE BRACE IS INTERMITTENT USE TO PROTECT

5    THE ARM BUT NOT TO BE SOMETHING THAT YOU USE EVERY DAY OR EVEN

6    LONG TERM, IF POSSIBLE.  THE BRACE IS FOR COMFORT, BUT IT'S NOT

7    TREATING ANY SPECIFIC CONDITION THAT REQUIRES THE BRACE.

8    **Q.**  OKAY.  WELL, THE BRACE AND THE MEDICATION.  OKAY.

9          LET ME PRESENT TO YOU --

10         **THE COURT:**  MR. ASHKER, YOU NEED TO FINISH UP.  SO

11   YOU NEED TO ASK YOUR MOST IMPORTANT QUESTIONS AND FINISH UP.

12         **MR. ASHKER:**  OKAY.

13   **BY MR. ASHKER:**

14   **Q.**  ON A BLEEDING ULCER, YOU WERE REFERRING TO, ON NUMEROUS

15   OCCASIONS YOU NOTED IN MY MEDICAL RECORDS YOUR CONCERNS ABOUT

16   MY NSAID USE AND STOMACH PROBLEMS.  THAT'S WHAT YOUR CONCERNS

17   WERE ABOUT A BLEEDING ULCER, CORRECT?

18   **A.**  YES.

19   **Q.**  AND I WILL PRESENT TO YOU THAT FOR 4.9 YEAR TIME PERIOD, I

20   WAS ON A MEDICATION TRAMADOL 50 MILLIGRAMS TWICE A DAY WITH A

21   COMBINATION OF TYLENOL.  AND DURING THAT ENTIRE TIME PERIOD

22   RIGHT THERE IT WAS THE MOST EFFECTIVE MEDICATION.  IT DIDN'T

23   ALLEVIATE ALL THE PAIN, IT BROUGHT IT DOWN TO ABOUT A THREE ON

24   A SCALE OF ONE TO TEN, AND IT ONLY WAS EFFECTIVE APPROXIMATELY

25   ON AVERAGE 16 HOURS A DAY DEPENDING ON THE USE.  AND I WOULD

1    NEVER HAVE ANY SIDE EFFECT ISSUES AT ALL.

2           DO YOU BELIEVE -- AND IT WAS PRESCRIBED BY 13

3    DIFFERENT DOCTORS DURING THAT 4.9 TIME PERIOD.  DO YOU BELIEVE

4    THAT THAT WAS BELOW THE STANDARD OF CARE FOR THOSE DOCTORS TO

5    PRESCRIBE THAT MEDICATION TO ME FOR 4.9 YEARS?

6           **MR. ANDRADA:**  I AM GOING TO OBJECT, YOUR HONOR.  I

7    THINK THIS IS BEYOND WHAT THE COURT HAD INDICATED WOULD BE THE

8    SUBJECT OF DR. DUNCAN'S TESTIMONY.

9           MY RECOLLECTION IS HE WASN'T GOING TO OPINE ABOUT

10   MATTERS THAT OCCURRED AFTER HE LAST SAW MR. ASHKER, WHICH WAS

11   IN MARCH OF 2002, BUT THAT'S MY RECOLLECTION OF YOUR ORDER.

12          **THE COURT:**  WELL, I FIND THIS QUESTION RELEVANT.

13          **MR. ASHKER:**  YOU MAY ANSWER.

14          **THE COURT:**  TO EXPLAIN HIS OPINION THAT HE GAVE

15   EARLIER ABOUT THE MEDICATION.

16          **THE WITNESS:**  IN GENERAL, I MUST SAY THAT OVER THE

17   YEARS I HAVE PRESCRIBED TRAMADOL LESS THAN I USED TO AS A

18   RESULT OF SOME WARNINGS THAT HAVE COME OUT WITH LONG TERM USE.

19   THERE WAS A SEIZURE WARNING THAT WAS ISSUED.

20          SO IN MY PRIVATE PRACTICE, I USED TO USE IT MORE FOR

21   INTERMEDIATE TERM PAIN RELIEF AND NOW I ACTUALLY USE IT LESS.

22   BUT AT THE TIME IT FIRST CAME OUT, IT WAS A MORE POPULAR

23   MEDICATION, AND I DID USE IT MORE OFTEN AT THAT POINT.

24   **BY MR. ASHKER:**

25   Q.   OKAY.  ARE THERE OTHER MEDICATIONS BESIDES NSAIDS AND

1   TRAMADOL FOR TREATING THE PAIN CONDITION THAT I DESCRIBED TO

2   YOU?

3   **A.**   MY PERSONAL OPINION IS FOR CHRONIC PAIN I WOULD AVOID, IF

4   POSSIBLE, ANY MEDICATION.  THE SAFEST, IF IT WAS ABSOLUTELY

5   NECESSARY, WOULD BE TYLENOL.  EVEN THAT WITH LONG TERM USE

6   COULD HAVE SIDE EFFECTS.

7            AND I PERSONALLY, IF IT WERE MY SITUATION, I WOULD

8   RESTRICT LONG TERM MEDICINE USE FOR WHAT WILL BE A CHRONIC

9   PROBLEM TO THE MINIMUM NECESSARY.

10  **Q.**   OKAY.  FAIR ENOUGH.

11           SO, WHAT WOULD YOUR PROGNOSIS BE FOR ME BASED ON

12  WHAT I PRESENTED TO YOU ABOUT THE CHRONIC PAIN TO THE –- TO

13  WHERE IT EFFECTS MY ABILITY TO SLEEP AND FUNCTION AND LIMITS MY

14  ABILITY TO COMMUNICATE?

15  **A.**   I AM NOT SURE WHAT YOU MEAN BY "THE PROGNOSIS".  I HAVE

16  NOT SEEN YOU IN SEVEN YEARS, SO THAT PERIOD OF TIME WOULD BE

17  IMPORTANT IN MAKING A LONG-TERM PROGNOSIS.

18  **Q.**   OKAY.

19           YOU ORDERED THE BRACE FOR –- YOU STATED THAT IT

20  SHOULD BE –- ON NOVEMBER 6TH, 1996 YOU STATED THAT "THE ARM

21  BRACE SHOULD BE CONTINUED INDEFINITELY TO PROTECT THE FOREARM

22  AND INCREASE HIS ABILITY TO EXERCISE THE MUSCLES ABOVE THE

23  ELBOW."

24           DO YOU BELIEVE THAT THAT WAS AN APPROPRIATE

25  DECISION?

1    **A.**   YES.  IF IT WERE USED INTERMITTENTLY.  I WOULDN'T WANT YOU

2    TO BE LIVING IN IT 24/7, BUT AT THAT POINT I FELT LIKE YOU

3    MIGHT NEED A BRACE LONG TERM, YES.

4    **Q.**   AND WHEN YOU LOOKED AT MY ARM EARLIER, DID IT LOOK LIKE I

5    STILL WOULD NEED THAT BRACE FOR PROTECTION?

6              **MR. ANDRADA:**  VAGUE AND AMBIGUOUS AS TO -- AS TO

7    PROTECTION.  ARE WE TALKING ABOUT PROTECTION --

8              **THE COURT:**  WHY DON'T YOU --

9              **MR. ASHKER:**  TO PROTECT THE --

10             **THE COURT:**  YOU CAN REPHRASE IT TO MAKE IT MORE

11   SPECIFIC.

12   **BY MR. ASHKER:**

13   **Q.**   DID IT LOOK LIKE MY FOREARM NEEDED SOME TYPE OF PROTECTION

14   FROM ADDITIONAL INJURY?

15   **A.**   NO.  THE FOREARM IS HEALED.

16             WHAT IT NEEDED WAS A BRACE IF THAT WAS HELPFUL FOR

17   COMFORT.  BUT THE BONES, ONCE THEY ARE HEALED AND SOLID, THEN

18   ROUTINE BRACE USE FOR PROTECTION IS NOT RECOMMENDED.

19             SO, YOU MAY NEED THE BRACE, BUT IT WOULD BE FOR PAIN

20   RELIEF, INTERMITTENT USE AND NOT FOR PROTECTION PER SE.

21   **Q.**   WELL, BACK ON -- WELL, I WILL -- I DON'T UNDERSTAND,

22   DR. DUNCAN, BECAUSE WHEN I SAW YOU AT ONE POINT YOU WERE

23   CONCERNED AND THE BRACE WAS BECAUSE YOU FOUND I HAD POOR SOFT

24   TISSUE COVERAGE OVER THE FOREARM BONES, AND YOUR CONCERN WAS

25   THAT IT WAS SUSCEPTIBLE TO ADDITIONAL TRAUMA AND INJURY.

1           AND ON DECEMBER 12TH, 2001 YOU STATED THAT "DUE TO

2     THE PATIENT'S PREVIOUS VASCULAR INJURY AND THE FACT HE HAS

3     ALREADY HAD A INTERIOR TRANSPOSITION OF THE ULNAR NERVE, REPEAT

4     SURGERY IN THIS AREA IS SOMEWHAT HIGH RISK PROCEDURE.  I HAVE

5     TRIED TO AVOID SURGERY IF AT ALL POSSIBLE.  HE DEVELOPED

6     SIGNIFICANT SWELLING AFTER HIS LAST SURGICAL PROCEDURE ON THE

7     ARM CONSISTENT WITH HIS PREVIOUS VASCULAR INJURY.  AND THERE'S

8     RISK TO NERVE FUNCTION, AND EVEN TO THE ENTIRE LIMB WITH

9     REPETITIVE SURGICAL PROCEDURES IN THIS SETTING.  HE ELECTED TO

10    TRY PHYSICAL THERAPY.  HE ALREADY HAS A FOREARM BRACE THAT HE

11    USES DURING THE DAY."

12          AND I MEAN I HAVE YOUR RECORDS HERE FROM JUST IN

13    2001 ALONE I SAW YOU ON MAY 2ND, 2001, JULY 25TH, 2001,

14    SEPTEMBER 5TH, 2001, DECEMBER 12TH, 2001, AND EVERY YEAR THAT I

15    SAW YOU, YOU CONTINUED TO SAY THAT I CONTINUED TO REQUIRE THE

16    BRACE.  AND ALL THE WAY UP TO MARCH 6TH, 2002 YOUR

17    RECOMMENDATION WAS FOR MY TREATMENT PLAN TO TREAT -- DEAL WITH

18    THE NERVE PROBLEMS AND MY ARM ISSUES WAS CONTINUED BRACING AND

19    MEDICATION.

20          **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  THE QUESTION

21    IS ARGUMENTATIVE, IT'S OVERLY BROAD.

22          **THE COURT:**  WELL, THAT NEEDS TO BE FOLLOWED UP WITH

23    A QUESTION.

24    **BY MR. ASHKER:**

25    **Q.**   WHAT I AM ASKING YOU IS, NOW YOU ARE SAYING THAT I DON'T

1  NEED THE BRACE?

2  A.  NO.  NO, NOT AT ALL.  IN FACT, I AGREE WITH THAT STATEMENT

3  THAT YOU JUST MADE, THAT YOU SHOULDN'T HAVE SURGERY BECAUSE OF

4  THE SCAR TISSUE AND THE REDUCED BLOOD SUPPLY TO THE LIMB.

5        AND I DO AGREE THAT A BRACE MAY BE USEFUL FOR PAIN

6  RELIEF OR TO ALLOW YOU TO USE THE ARM, BUT IT SHOULDN'T BE USED

7  INTERMITTENTLY.

8        AND I WANT TO CLARIFY, THE PROTECTION IS, IT'S NOT

9  BECAUSE THE BONES ARE FRAGILE, IT WOULD BE JUST TO PROTECT YOU

10  FROM BUMPING IT OR FROM A SKIN SORE, SOMETHING LIKE THAT.

11        SO I CONTINUE TO SAY BASED ON WHAT I SEE THAT A

12  BRACE WOULD BE USEFUL.  BUT IT WAS THE QUESTION AS TO WHAT THE

13  PURPOSE OF THE BRACE WAS THAT IT'S NOT TO PROTECT THE ARM

14  BECAUSE IT IS FRAGILE, IT IS TO PROTECT THE ARM BECAUSE IT MAY

15  BE UNCOMFORTABLE.

16  Q.  OKAY.  AND JUST LET ME COLLECT MY THOUGHTS JUST REAL

17  QUICK.

18        NOW, I ALSO PRESENTED TO YOU THAT ON MARCH 6TH,

19  2002, THE LAST TIME THAT I SAW YOU -- IF I COULD HAVE JUST A

20  MINUTE TO GRAB THAT DOCUMENT OUT.

21        EXCUSE ME.

22        (PAUSE IN THE PROCEEDINGS.)

23        ON MARCH 6TH, 2002, I SAW YOU FOR A RE-EVALUATION OF

24  PAIN IN THE RIGHT ELBOW AND RIGHT ARM.  HE STATES THAT "HE IS

25  IMPROVED WITH THE USE OF NIGHT ELBOW EXTENSION SPLINT AND A

DUNCAN – DIRECT / MR. ASHKER

1    DAYTIME FUNCTIONAL BRACE AS WELL AS USE OF ELAVIL.  HE HAS MUCH

2    LESS PAIN AND IS FUNCTIONING AS WELL AS HE EVER HAS FUNCTIONED

3    FOLLOWING HIS PREVIOUS INJURY.  ON PHYSICAL EXAM THERE IS NO

4    LOCAL TENDERNESS, NO IRRITABILITY OF THE ULNAR NERVE.  THERE'S

5    SOME MILD TENDERNESS ALONG THE COURSE OF THE ULNAR NERVE.  THE

6    REMAINDER OF THE PHYSICAL EXAM IN UNCHANGED WITH CHRONIC

7    SCARRING INVOLVING THE SOFT TISSUES OF THE RIGHT FOREARM AND

8    WRIST AREA.  IMPRESSION:  PAIN RIGHT ARM, RIGHT ELBOW.  HISTORY

9    OF GUNSHOT WOUND.  POST TRAUMATIC ANEURYSM.  FOREARM FRACTURE

10   CUBITAL TUNNEL SYNDROME."

11            AND IN THE PLAN, YOU STATED, "THE PATIENT'S CURRENT

12   CONDITION IS AS GOOD AS IT HAS EVER BEEN SINCE HIS ORIGINAL

13   GUNSHOT INJURY.  I WOULD RECOMMEND CONTINUATION OF THE ELAVIL

14   WHICH WAS RENEWED FOR SIX MONTHS, A NIGHTTIME ELBOW SPLINT, A

15   DAYTIME FUNCTIONAL BRACE AND AVOIDANCE OF HIGH STRESS

16   ACTIVITIES.  THIS WAS DISCUSSED WITH THE PATIENT.  HE IS

17   SATISFIED WITH THIS COURSE OF TREATMENT.  APPROPRIATE CHRONOS

18   WERE PROVIDED.  HE IS REFERRED BACK TO THE CARE OF HIS

19   PHYSICIANS HERE AT PELICAN BAY FOR HIS MAINTENANCE TREATMENT

20   WITH MEDICATION AND BRACING.  WE WILL BE HAPPY TO SEE

21   MR. ASHKER FOLLOW-UP IF ANY SYMPTOMS RE-OCCUR OR IF HE IS

22   HAVING ANY OTHER PROBLEMS."

23            NOW, MY QUESTION TO YOU IS, I WILL -- WELL, I WILL

24   PRESENT TO YOU THAT AT THAT TIME, I A CELLMATE TO ASSIST ME

25   WITH MY DAILY ACTIVITIES.  I WAS TAKING THE ELAVIL

1   10 MILLIGRAMS EVERY OTHER DAY BECAUSE OF OVERSEDATION PROBLEMS

2   AND SIDE EFFECT ISSUES.  I WAS ON THE TRAMADOL 50 MILLIGRAMS

3   TWICE A DAY, AND I WAS ON THE LIST FOR ADDITIONAL PHYSICAL

4   THERAPY.  I JUST HAD SOME -- I WAS WAITING ON THE LIST.  I JUST

5   HAD SOME A FEW MONTHS BEFORE.  AND THAT WAS WHEN I TOLD YOU

6   THAT MY CONDITION WAS AS GOOD AS IT HAS EVER BEEN.  AND MY

7   QUESTION TO YOU IS, YOU DETERMINED THAT THAT WAS APPROPRIATE

8   TREATMENT FOR MY CONDITION AT THAT TIME; IS THAT CORRECT?

9   **A.**   YES.

10  **Q.**   OKAY.

11          AND WHAT DID YOU MEAN WHEN YOU SAID "WE WILL BE

12  HAPPY TO SEE MR. ASHKER FOLLOW UP IF ANY SYMPTOMS RE-OCCUR OR

13  IF HE IS HAVING ANY OTHER PROBLEMS."  CAN YOU PLEASE GIVE ME

14  SOME EXAMPLES OF WHAT YOU MEANT BY THAT?

15  **A.**   TYPICALLY AS A CONSULTANT PHYSICIAN, I WILL BE IN CHARGE

16  OF THE PATIENT'S CARE DURING THE INITIAL PHASE, AND THEN AFTER

17  THE TREATMENT HAS BEEN ESTABLISHED THE PHYSICIANS AT PELICAN

18  BAY WILL TAKE OVER THE CARE.  BUT I ACTUALLY CONTINUED TO COME

19  OUT HERE WHERE I AM NOW TO SEE PATIENTS IF THERE IS AN

20  ORTHOPEDIC NEED THAT THE PHYSICIANS WOULD LIKE ME TO ADDRESS.

21  **Q.**   OKAY.

22          AND IN MY -- I HAD BEEN SEEING YOU AN AVERAGE OF

23  TWICE A YEAR BETWEEN 1994 AND MARCH 6TH, 2002.  AND ON EVERY

24  OCCASION MY COMPLAINTS WERE FOUND TO BE CREDIBLE; IS THAT

25  CORRECT?

1    **A.**    YES.

2    **Q.**    AND IN MY TYPE OF INJURY, WOULD IT BE UNUSUAL FOR ME TO

3    HAVE CONTINUING PROBLEMS THAT MAY REQUIRE ORTHOPEDIC

4    CONSULTATION AND EXAMINATIONS FOR THE REST OF MY LIFE?

5    **A.**    WELL, IT WOULD DEPEND ON IF SOMETHING ELSE AROSE THAT WAS

6    NEW.  THAT IS NOT A QUESTION YOU CAN ANSWER AS TO WHETHER IT

7    WILL ARISE, BUT IT IS A POSSIBILITY.

8    **Q.**    OKAY.

9           AND HOW -- WHEN A PATIENT PRESENTS TO YOU WITH NERVE

10   PAIN AS I DID BACK IN -- WHEN THE NERVE PAIN RETURNED, YOU

11   DETERMINED IT WAS ON -- I HAD THE NERVE TRANSPOSITION SURGERY

12   IN AUGUST OF 1999 AND EVERYTHING WAS OKAY FOR A YEAR OR TWO,

13   AND THEN I STARTED HAVING THE NERVE PROBLEMS AGAIN.  AND ON

14   OCTOBER 30TH, 2001, DR. MAUKONEN DID SOME ULNAR NERVE TESTING

15   AND HE DETERMINED THAT THERE WAS SLOWING.

16          AND ON DECEMBER 12TH, 2001 WAS WHEN YOU MADE THE

17   DECISION ABOUT MEDICATION AND BRACING, AND THEN YOU RE-ORDERED

18   MORE PHYSICAL THERAPY BECAUSE YOU DID NOT WANT TO DO ANY

19   ADDITIONAL SURGERY.

20          AND MY QUESTION TO YOU IS, IF I PRESENT TO YOU THAT

21   I AM HAVING THIS NERVE PAIN IN MY ARM, MY FINGERS ARE NUMB, I

22   HAVE PAIN GOING DOWN MY ULNAR NERVE INTO MY FINGERS, HOW WOULD

23   YOU BE ABLE TO DETERMINE IF THAT WAS VALID OR NOT WITHOUT A

24   PHYSICAL EXAMINATION?

25   **A.**    I WOULDN'T BE ABLE TO TELL WITHOUT A PHYSICAL EXAMINATION

1    ON ANY PATIENT.

2    **Q.**    OKAY.  AND WOULD YOU --

3    **A.**    IF YOU ARE ASKING ME PERSONALLY.

4    **Q.**    YES.  AND WOULD YOU HAVE MADE THESE MEDICATION

5    RECOMMENDATIONS THAT YOU DID BETWEEN 1994 AND 2002 WITHOUT

6    PERSONALLY PHYSICALLY EXAMINING ME FIRST?

7    **A.**    NO.  IN FACT, I ALMOST -- I CAN HARDLY THINK OF A TIME

8    WHEN I PRESCRIBE A MEDICINE WITHOUT EXAMINING SOMEONE FIRST.

9             **THE COURT:**  YOU NEED TO FINISH UP.

10            **MR. ASHKER:**  THANK YOU, DR. DUNCAN.

11            **MR. ANDRADA:**  NO QUESTIONS.  THANK YOU, DR. DUNCAN.

12            **THE COURT:**  THAT SOLVES THAT PROBLEM.

13            ALL RIGHT.  THANK YOU.

14            YOU ARE EXCUSED.

15            NEXT WE ARE GOING TO BE HOOKING UP WITH A DR. KREIS,

16   WHO IS UP IN DAVIS.

17            **MR. ANDRADA:**  YOUR HONOR, I WAS GOING TO USE THE

18   ELMO.  I DON'T KNOW WHETHER THE COURT TECHNICIAN HAS BEEN HERE.

19   IN THE INTEREST OF TIME, I AM JUST NOT GOING TO USE IT FOR THIS

20   WITNESS.  WE ONLY HAVE TWO OR THREE DOCUMENTS.

21            **THE COURT:**  YOU ARE WELCOME TO USE IT.

22            **MR. ANDRADA:**  APPARENTLY THIS PART OF IT IS NOT

23   WORKING AND I WAS INFORMED BY SOMEONE THAT THE COURT --

24            **THE CLERK:**  I THOUGHT THEY GOT IT WORKING.

25            **MR. ANDRADA:**  WE CAN GET BY WITHOUT IT.  IT IS ONLY

1   TWO OR THREE DOCUMENTS.

2           **MR. ASHKER:**  YOUR HONOR?  I WANTED TO ASK YOU A

3   QUESTION REAL QUICK.

4           **THE COURT:**  DO YOU KNOW WHERE HE IS?  WE JUST HAVE A

5   CHAIR.  DO WE KNOW WHERE THE DOCTOR IS?

6           **MR. ANDRADA:**  HE IS GOING TO GO -- HE HAS BEEN IN

7   TOUCH WITH THE FOLKS AT DAVIS, YOUR HONOR.  HE IS GOING TO CALL

8   AGAIN SO I AM REASONABLY CONFIDENT THAT HE IS AVAILABLE.

9           **THE COURT:**  OKAY.

10          **MR. ASHKER:**  YOUR HONOR, I WANTED TO ASK A QUESTION

11  IN REGARDS TO MY ABILITY TO ASK -- IS THIS GOING TO BE

12  DR. KREIS?

13          **THE COURT:**  RIGHT.

14          **MR. ASHKER:**  -- ONE QUESTION, AND IT HAS TO DO WITH

15  MY CONTRACT CLAIM.  AND THE QUESTION WOULD BE --

16          **THE COURT:**  YOU CAN JUST ASK HIM.  IF THERE IS AN

17  OBJECTION --

18          **MR. ASHKER:**  WE'LL SEE HOW IT PLAYS OUT?  OKAY.  ALL

19  RIGHT.

20          **MR. ANDRADA:**  YOUR HONOR, DO I HAVE TIME FOR A

21  TWO-MINUTE BATHROOM BREAK?

22          **THE COURT:**  YOU HAVE 40 MINUTES.  IT'S YOUR WITNESS.

23          **MR. ANDRADA:**  OKAY.  ALL RIGHT.

24          **THE COURT:**  HE'S NOT HERE.

25          **MR. ANDRADA:**  ALL RIGHT.  I UNDERSTAND.

1              (PAUSE IN THE PROCEEDINGS.)

2              **THE COURT:**  I GUESS IF ANYONE NEEDS TO LEAVE THE

3    ROOM BRIEFLY, YOU CAN STAND UP AND STRETCH, YOU CAN DO SO.

4              **MR. LAURIE:**  YOUR HONOR, IT WILL BE JUST A COUPLE OF

5    MINUTES.  HE IS -- HERE HE IS.

6              **THE COURT:**  OKAY.  NOW WE DON'T HAVE THE LAWYER.

7              **THE WITNESS:**  HELLO.  THIS IS DR. KREIS.

8              **THE COURT:**  WHY DON'T YOU SWEAR HIM IN, SHEILAH.

9              **THE CLERK:**  COULD YOU STAND AND RAISE YOUR RIGHT

10   HAND?

11             **THE WITNESS:**  CROUCHING AND RAISE --

12                      **PAUL GREGORY KREIS**,

13   CALLED AS A WITNESS FOR THE DEFENDANT, HAVING BEEN DULY SWORN,

14   TESTIFIED AS FOLLOWS VIA VIDEOCONFERENCE:

15             **THE WITNESS:**  I DO.

16             **THE CLERK:**  PLEASE BE SEATED AND STATE YOUR FULL

17   NAME, SPELLING YOUR LAST NAME FOR THE RECORD.

18             **THE WITNESS:**  PAUL GREGORY KREIS, K-R-E-I-S.

19             **THE COURT:**  WE JUST SWORE HIM, TOOK HIS NAME, AND

20   THAT'S IT.

21                      **DIRECT EXAMINATION**

22   BY MR. ANDRADA:

23   Q.   DOCTOR, HOW ARE YOU?

24   A.   FABULOUS.  HOW ARE YOU?

25   Q.   I'M JUST DOING GREAT.  NICE TO SEE YOU.

KREIS – DIRECT / MR. ANDRADA

1           I TOOK YOUR DEPOSITION A FEW MONTHS AGO.  DO YOU

2    RECALL THAT, SIR?

3    **A.**   YES.

4    **Q.**   VERY BRIEFLY, IF YOU WOULD BE SO KIND, BECAUSE WE ARE

5    REALLY PUSHED FOR TIME, TELL US A LITTLE BIT ABOUT YOUR

6    EDUCATION, YOUR BACKGROUND, AND WHAT YOU DO AT DAVIS?

7    **A.**   I AM A MEDICAL DOCTOR WITH AN MD DEGREE.  BOARD CERTIFIED

8    IN ANESTHESIOLOGY, PAIN MEDICINE, AND ADDICTION MEDICINE.

9    **Q.**   HOW LONG HAVE YOU BEEN AT UC DAVIS?

10   **A.**   SINCE APPROXIMATELY THE YEAR 2000.

11   **Q.**   WHAT DO YOU DO AT UC DAVIS?

12   **A.**   I'M A PAIN SPECIALIST AND THE MEDICAL DIRECTOR OF THE PAIN

13   MANAGEMENT CLINIC.

14   **Q.**   WHAT DO YOU DO AS MEDICAL DIRECTOR OF THE CLINIC?

15   **A.**   BASICALLY I AM IN CHARGE OF OPERATIONS FOR THE PAIN

16   CLINIC.

17   **Q.**   AND IN SIMPLE TERMS, I THINK YOU REPORT TO A DR. FISHMAN;

18   IS THAT CORRECT?

19   **A.**   YES.  HE'S THE CHIEF OF THE DIVISION.

20   **Q.**   OKAY.  NOW DO YOU HAVE YOUR DEPOSITION THERE?

21   **A.**   I DO.

22   **Q.**   ALL RIGHT.

23           WOULD YOU TURN TO THE FIRST EXHIBIT.

24           **MR. ANDRADA:**   AND, YOUR HONOR, WHILE HE IS DOING

25   THAT, I CAN TELL THE COURT THAT THIS IS DEFENDANT'S EXHIBIT 1.

1    THIS IS A –– THE OCTOBER 25TH REFERRAL FORM.

2              **THE COURT:**  DO YOU HAVE A COPY OF HIS DEPOSITION FOR

3    ME?

4              **MR. ANDRADA:**  I DO.  YES, YOUR HONOR.

5              **THE CLERK:**  IS THERE A DIFFERENT NUMBER ON YOUR

6    EXHIBIT LIST?

7              **MR. ANDRADA:**  IT SHOULD BE EXHIBIT NUMBER 1.

8              **THE COURT:**  YOU START WITH 200.

9              **MR. ANDRADA:**  I'M SORRY.  I HAVE THE OLD FORM.  THEN

10   IT WOULD BE 200.

11             **THE COURT:**  DON'T WORRY ABOUT THE DEPO, JUST GO

12   AHEAD.

13             **MR. ANDRADA:**  ALL RIGHT.

14   **BY MR. ANDRADA:**

15   **Q.**   DOCTOR, DO YOU HAVE THE FORM THERE, SIR?

16   **A.**   I DO.

17   **Q.**   THIS IS A UC DAVIS HEALTH SYSTEM REFERRAL FORM, CORRECT?

18   **A.**   YES.

19   **Q.**   AND IT BEARS A DATE AT THE BOTTOM OF OCTOBER 25TH, 2002,

20   CORRECT?

21   **A.**   CORRECT.

22   **Q.**   AND THE PATIENT IS MR. TODD ASHKER, CORRECT?

23   **A.**   YES.

24   **Q.**   THE REFERRING PROVIDER IS DWIGHT WINSLOW.  DO YOU SEE THAT

25   THERE, SIR?

1    A.    YES.

2    Q.    I WILL REPRESENT TO YOU THAT HE IS A PHYSICIAN AND THAT HE

3    WAS AT PELICAN BAY IN 2002.

4              AND THEN TO THE RIGHT OF DR. WINSLOW'S NAME, DO YOU

5    SEE A NAME MARY STATHAM, S-T-A-T-H-A-M?

6    A.    YES.

7    Q.    AND I WILL REPRESENT TO YOU THAT SHE IS AN EMPLOYEE AT

8    PELICAN BAY.

9              NOW, IF WE CONTINUE DOWN THE PAGE -- WELL, LET'S

10   ACTUALLY GO ALL THE WAY TO THE TOP OF THE PAGE, AND IT SAYS,

11   TYPE OF REQUEST.  DO YOU SEE THAT?

12   A.    YES.

13   Q.    CONSULTATION, CORRECT?

14   A.    YES.

15   Q.    AND THEN WE GO DOWN THE PAGE.  IF WE GO TO THE REFERRAL

16   INFORMATION SECTION?

17   A.    YES.

18   Q.    DO YOU SEE THAT THERE?

19   A.    YES.

20   Q.    IT SAYS, SPECIALTY REQUESTED:  PAIN MANAGEMENT.  SPECIALTY

21   LOCATION:  PAIN MANAGEMENT CLINIC.  AND THEN IT SAYS, MEDICAL

22   RECORDS ATTACHED.  AND THEN IT SAYS REFERRAL DATE 10/25, 2002.

23   CORRECT?

24   A.    YES.

25   Q.    AND THEN IT ALSO SAYS MED REC PAGE 48, CORRECT?

1    **A.**   YES.

2    **Q.**   THEN FURTHER DOWN THE PAGE IT SAYS, BY THE DATE 10/25,

3    2002, THEN THERE'S THE ENTRY AUTHOR, AND THEN THERE'S A NAME OF

4    A DAVIS EMPLOYEE, CORRECT?

5    **A.**   YES.

6    **Q.**   AND MY COPY THAT I AM LOOKING AT IS RATHER BLURRY, SO I

7    CANNOT MAKE OUT HER NAME.

8            WOULD YOU TELL US WHAT HER NAME IS?

9    **A.**   IT SAYS, "S. HOBBS".  THAT'S SHORT FOR SUE HOBBS.

10   **Q.**   OKAY.

11           AND THEN BELOW THAT IS THE PHRASE -- JUST READ THAT

12   PHRASE OUT LOUD FOR US, WOULD YOU BE SO KIND?

13   **A.**   (READING)

14           UNRESOLVED ARM PAIN DUE TO INJURY.  PLEASE SEE

15           ATTACHED.  MARY FROM THE PRISON IS AWARE OF

16           THREE-MONTH WAITING PERIOD.

17   **Q.**   OKAY.

18           AND BASED UPON YOUR MANY YEARS AT UC DAVIS, YOUR

19   BEING IN CHARGE OF OPERATIONS WITHIN THE CLINIC -- BUT LET'S

20   BACK UP.

21           WHEN YOU TALK ABOUT OPERATIONS, WHAT DO YOU MEAN?

22   **A.**   SCHEDULING, IF THERE ARE VACATION CONFLICTS, THINGS OF

23   THAT NATURE.

24   **Q.**   OKAY.  ALL RIGHT.

25           SO THEN WE HAVE READ THE PHRASE WHICH ENDS WITH MARY

1   FROM THE PRISON IS AWARE OF THREE-MONTH WAITING PERIOD.

2              AND LOOKING AT THE FOUR CORNERS OF THE DOCUMENT,

3   DOES THE MARY AT THE BOTTOM APPEAR TO YOU TO BE MARY STATHAM?

4   **A.**   I DON'T KNOW IF THAT IS THE SAME MARY OR NOT.  IT DOESN'T

5   SAY MARY STATHAM AT THE BOTTOM.

6   **Q.**   OKAY.  FAIR ENOUGH.

7              AT THE BOTTOM OF THE PAGE, WHAT IS DOWN THERE AT THE

8   VERY BOTTOM?

9   **A.**   CAN YOU BE MORE SPECIFIC?

10  **Q.**   SURE.  THERE ARE THE INITIALS P.K., CORRECT?

11  **A.**   IS THAT WHAT YOU ARE TALKING?

12  **Q.**   YES, SIR.

13  **A.**   THOSE ARE MY INITIALS, AND THEY ARE PLACED THERE BY ME.

14  **Q.**   OKAY.  AND WHAT IS THE SIGNIFICANCE OF THAT PLACEMENT?

15  **A.**   WELL, IT MEANS THAT I PLACED MY INITIALS THERE.  AND THERE

16  IS ANOTHER SIGN NEXT TO IT, WHICH MEANS THAT I PLACED THE SIGN

17  THAT'S NEXT TO IT.

18  **Q.**   WHAT'S THE SIGN NEXT TO IT?

19  **A.**   IT'S A ZERO WITH A SLASH.

20  **Q.**   SO WHAT IS THE SIGNIFICANCE OF YOUR INITIALS AND THE ZERO

21  WITH A SLASH, IF YOU WOULD BE SO KIND AS TO TELL US?

22  **A.**   IT MEANS THAT THE REFERRAL HAS BEEN DENIED.

23  **Q.**   OKAY.

24              AND ARE YOU ABLE TO TELL FROM THIS PARTICULAR PIECE

25  OF PAPER WHY THE REFERRAL WAS DENIED?

KREIS – DIRECT / MR. ANDRADA

1   **A.**   NO.  THAT WOULD BE INFERENCE ON MY PART ONLY.

2   **Q.**   NOW, TURN TO EXHIBIT 2, AND YOU JUST TELL ME WHEN YOU ARE

3   READY.

4   **A.**   OKAY, READY.

5   **Q.**   FOR THE COURT REPORTER -- FOR THE CLERK, THIS WOULD BE

6   201.  THIS IS A LETTER FROM THE UC DAVIS PAIN MANAGEMENT CENTER

7   TO DR. WINSLOW; IS THAT CORRECT?

8   **A.**   YES.

9   **Q.**   AND IT'S DATED NOVEMBER 1ST, 2002, CORRECT?

10  **A.**   YES.

11  **Q.**   AND WOULD YOU BE SO KIND AS TO SLOWLY READ THAT FIRST

12  PARAGRAPH?  IT IS JUST THREE LINES.

13  **A.**   (READING)

14          THANK YOU FOR YOUR REFERRAL TO THE PAIN

15          MANAGEMENT CENTER FOR YOUR PATIENT TODD ASHKER.

16          UNFORTUNATELY, WE ARE UNABLE TO ACCOMMODATE YOUR

17          REQUEST AT THIS TIME AND MUST RETURN THE

18          ATTACHED REFERRAL.

19  **Q.**   AND THEN WOULD YOU BE SO KIND AS TO JUST SLOWLY READ THE

20  FIRST SENTENCE OF THE NEXT PARAGRAPH?

21  **A.**   (READING)

22          THE CURRENT DEMAND OF OUR SPECIALTY SERVICE HAS

23          EXCEEDED OUR CAPACITY TO ACCEPT EVERY INDIVIDUAL

24          REFERRAL REQUEST.

25  **Q.**   OKAY.  AND THEN LET'S SKIP THE NEXT -- LET'S DO THIS.

```
 1              WHY DON'T YOU SLOWLY READ THE ENTIRE PARAGRAPH.

 2   A.   WOULD YOU LIKE ME TO RE-READ THAT FIRST SENTENCE?

 3   Q.   NO, THAT IS FINE.

 4   A.   (READING)

 5              THEREFORE, BASED ON OUR MISSION OF QUALITY

 6              CLINICAL CARE TEACHING AND RESEARCH, WE HAVE HAD

 7              TO IMPLEMENT A PRIORITY SYSTEM.  WE ARE

 8              OBLIGATED TO GIVE PRIORITY TO PATIENTS WHO HAVE

 9              CHOSEN UCD MEDICAL GROUP AS THEIR PRIMARY

10              PROVIDER AS WELL AS EXCEPTIONAL CASES FOR OUR

11              MISSION OF TEACHING AND RESEARCH.  ALL OTHER

12              REFERRALS ARE ROUTINES -- FOR ROUTINE SPECIALTY

13              CARE ARE ACCEPTED AS CAPACITY AND AVAILABILITY

14              ALLOWS.

15   Q.   SKIP, IN THE INTEREST OF TIME, SKIP THE NEXT PARAGRAPH AND

16   THEN READ OUT LOUD THE LAST SENTENCE IN THE LETTER?

17   A.   (READING)

18              I REGRET THAT WE CANNOT ACCOMMODATE THIS

19              PARTICULAR REQUEST, BUT HOPE THAT YOU WILL

20              CONTINUE TO USE OUR SERVICES FOR YOUR PATIENT'S

21              TERTIARY CARE NEEDS.

22   Q.   SO NOW LET'S MOVE TO EXHIBIT 3, WHICH, MADAME CLERK, WOULD

23   BE 202 --

24              THE COURT:  AS LONG AS HE'S READ THE WHOLE LETTER,

25   LET'S GO AHEAD AND HAVE THAT PARAGRAPH IN THE MIDDLE READ AS
```

1    WELL.

2              **MR. ANDRADA:**  FINE, YOUR HONOR.  THAT'S FINE.

3              **THE WITNESS:**  I AM SORRY, WOULD YOU LIKE ME TO READ

4    AN ADDITIONAL --

5              **THE COURT:**  I WILL DO IT.  IT WOULD BE QUICKER.

6              IF YOU FEEL THIS CASE MERITS THE SPECIAL

7    CONSIDERATION BY ONE OF OUR SPECIALIST, OR YOU HAVE ADDITIONAL

8    INFORMATION RELATIVE TO THE TERTIARY NEEDS OF THIS PATIENT,

9    PLEASE CALL THE PAIN CLINIC AT A COUPLE OF DIFFERENT PHONE

10   NUMBERS.

11             **MR. ANDRADA:**  THAT IS CORRECT.

12             **THE COURT:**  GO AHEAD.

13   **BY MR. ANDRADA:**

14   Q.   NOW, DOCTOR, WOULD YOU KINDLY TURN YOUR ATTENTION TO WHAT

15   IS EXHIBIT 3 TO THE DEPOSITION, AND TO WHAT IS EXHIBIT 202 IN

16   THE DEFENSE DOCUMENTS?

17             **THE COURT:**  ACTUALLY, THE OTHER WAY AROUND, BUT WE

18   WILL SWITCH IT LATER.

19             **MR. ANDRADA:**  I AM SORRY.

20             **THE WITNESS:**  I AM LOOKING AT THAT RIGHT NOW.

21   **BY MR. ANDRADA:**

22   Q.   AGAIN, DOCTOR, THIS IS AN ESSENTIALLY SIMILAR REFERRAL

23   INTAKE FORM; IS THAT CORRECT, SIR?

24   **A.**   YES.

25   Q.   AGAIN FROM DR. WINSLOW IN CRESCENT CITY.  DO YOU SEE THAT?

KREIS – DIRECT / MR. ANDRADA

1    **A.**   YES.

2    **Q.**   AGAIN, THERE IS A REFERENCE TO A MARY.  DO YOU SEE THAT

3    THERE?

4    **A.**   YES.

5    **Q.**   ALL RIGHT.  LET'S GO DOWN TO THE PART OF THE DOCUMENT

6    WHERE IT SAYS A DATE, 1/9/2003.  DO YOU SEE THAT THERE, SIR?

7    **A.**   YES.

8    **Q.**   WOULD YOU BE SO KIND AS TO READ THE REMAINDER OF THE

9    DOCUMENT INTO THE RECORD HERE?  TAKE YOUR TIME.

10   **A.**   SURE.  (READING)

11           IT SAYS AUTHOR:  D. SHARMA, WITH THE NUMBER 2

12           AFTER IT.  NOTE:  REFERRAL DENIED BY DR. KREIS,

13           WE HAVE NOTHING ADDITIONAL TO OFFER.

14   **Q.**   SO WHAT DOES IT MEAN, DOCTOR, WHERE IT SAYS THERE,

15   REFERRAL DENIED BY DR. KREIS, WE HAVE NOTHING ADDITIONAL TO

16   OFFER?

17   **A.**   WELL, IT'S UNCLEAR.  THIS NOTE WAS NOT ACTUALLY PLACED

18   THERE BY ME.  THIS WAS PLACED BY DAVEKA SHARMA, WHO WAS ONE OF

19   OUR EMPLOYEES AT THE CLINIC.

20           IT SAYS THAT I REFERRED THE SECOND REFERRAL, THAT WE

21   HAVE NOTHING ADDITIONAL TO OFFER BEYOND THE DENIAL FROM THE

22   FIRST REFERRAL, OR WHETHER IT WAS AFTER REVIEWING RECORDS.  I

23   CAN'T BE SURE.  IT WOULD BE ONE OF THOSE.

24           SO IT MAY CONTINUE TO BE A LIMITED CAPACITY ISSUE

25   HERE IN THAT WE STILL HAVE THE LIMITED CAPACITY AND STILL HAVE

1    NOTHING ADDITIONAL TO OFFER.

2    **Q.**   RIGHT.  SO LET'S MAKE SURE WE HAVE THIS.

3          WHAT I THINK YOUR TESTIMONY IS, IS THAT THERE ARE

4    TWO POSSIBILITIES TO EXPLAIN THE DECEMBER 2002 DENIAL, OR MORE

5    PRECISELY, THE DENIAL ACTUALLY OCCURRED ON JANUARY 9TH, 2003,

6    CORRECT?

7    **A.**   YES.

8    **Q.**   ALL RIGHT.  THE FIRST IS THAT YOU WERE STILL --

9          **THE COURT:**  COUNSEL, I FEEL I HAVE TO INTERVENE HERE

10   GIVEN THAT MR. ASHKER IS REPRESENTING HIMSELF AND ISN'T AWARE

11   OF OBJECTIONS, BUT YOU ARE LEADING DRAMATICALLY.

12         **MR. ANDRADA:**  I KNOW I AM.

13         **THE COURT:**  HE SAID WHAT HE SAID.  IF YOU HAVE

14   ANOTHER QUESTION --

15         **MR. ASHKER:**  YOUR HONOR?  I APPRECIATE THAT.

16         I HAVE NO PROBLEM.  IF HE WANTS, FOR TIME PURPOSES,

17   IF HE WANTS TO LEAD HIM ON, THAT'S FINE.

18         **THE COURT:**  OKAY.  ALL RIGHT.

19   **BY MR. ANDRADA:**

20   **Q.**   SO, DOCTOR, IF I UNDERSTAND YOUR TESTIMONY, THERE ARE TWO

21   POSSIBILITIES TO EXPLAIN THE DENIAL OF THE SECOND REFERRAL; IS

22   THAT CORRECT?

23   **A.**   YES.

24   **Q.**   THE FIRST WOULD BE THAT THERE WAS JUST SIMPLY NOT THE

25   CAPACITY TO SEE THIS PATIENT BECAUSE OF OTHER NEEDS OF OTHER

1    PATIENTS, CORRECT?

2    **A.**   BECAUSE WE HAVE AN OBLIGATION TO SEE THOSE CAPITATED

3    PATIENTS WITH THE UC DAVIS SYSTEM FIRST.

4    **Q.**   YES.  THE OTHER POSSIBILITY IS THAT YOU REVIEWED SOME

5    MEDICAL RECORDS AND DETERMINED THAT THE CARE WAS APPROPRIATE

6    AND THAT ESSENTIALLY UC DAVIS HAD NOTHING MORE TO OFFER BY WAY

7    OF A CHANGE IN THE PATIENT'S CARE, CORRECT?

8    **A.**   I WOULD SAY THAT WOULD BE A LESS LIKELY POSSIBILITY, BUT

9    STILL A POSSIBILITY.

10   **Q.**   SO THERE ARE TWO POSSIBILITIES, CORRECT?

11   **A.**   ONE BEING MORE LIKELY THAN THE OTHER.

12   **Q.**   FAIR ENOUGH.

13            VERY GOOD, SIR.  THANK YOU VERY MUCH.  THAT IS ALL I

14   HAVE.

15            THANK YOU VERY MUCH.

16            **THE COURT:**  MR. ASHKER MAY HAVE SOME QUESTIONS FOR

17   YOU, I DON'T KNOW.

18            **THE WITNESS:**  OKAY.

19            **THE COURT:**  CAN YOU SEE HIM?

20                   **CROSS-EXAMINATION**

21   **BY MR. ASHKER:**

22   **Q.**   GOOD AFTERNOON, DR. KREIS.

23   **A.**   GOOD AFTERNOON.

24   **Q.**   I JUST HAVE A FEW QUESTIONS HERE FOR YOU.

25   **A.**   SURE.

KREIS – CROSS / MR. ASHKER

1  Q.   I SEE HERE ON WHAT HAS BEEN MARKED AS EXHIBIT 2 IN

2  PARAGRAPH 2, YOU STATE -- WELL, IT STATES ON THE DOCUMENT THAT

3  YOU ARE OBLIGATED TO GIVE PRIORITY TO PATIENTS WHO HAVE CHOSEN

4  UC MEDICAL GROUP AS THEIR PRIMARY PROVIDER AS WELL AS

5  EXCEPTIONAL CASES FOR OUR MISSION OF TEACHING AND RESEARCH.

6           NOW, WOULD IT HAVE MADE A DIFFERENCE TO YOUR

7  DECISION AT THE TIME IF YOU WOULD HAVE KNOWN THAT I HAD CHOSEN

8  YOU, UC DAVIS, AS MY PRIMARY CARE PROVIDER FOR PAIN MANAGEMENT?

9           **MR. ANDRADA:**  CALLS FOR SPECULATION.

10          **THE WITNESS:**  I AM NOT SURE.  I DON'T KNOW.

11  **BY MR. ASHKER:**

12  Q.   IF I WAS A PATIENT ON THE STREETS AND I PRESENTED MYSELF

13  TO --

14          **THE COURT:**  ACTUALLY, I THINK WHAT THEY MEAN BY

15  PRIMARY PROVIDER IS WHAT HE REFERRED TO EARLIER AS CAPITATED

16  PEOPLE WHO ACTUALLY HAVE INSURANCE THAT CAN ONLY GO THERE.  SO

17  I THINK --

18  **BY MR. ASHKER:**

19  Q.   IS THAT WHAT CAPITATED MEANS?

20  A.   YES, THAT'S CORRECT.

21  Q.   SO PEOPLE WHO HAVE INSURANCE THAT CAN ONLY OBTAIN MEDICAL

22  CARE FROM UC DAVIS OR THE UC SYSTEM?

23  A.   CORRECT.

24  Q.   OKAY.

25          NOW, I SEE HERE THAT YOU STATED -- IT ALSO STATES ON

1    THAT SAME FORM IN THE BOTTOM OF THAT PARAGRAPH:  ALL OTHER

2    REFERRALS FOR ROUTINE SPECIALTY CARE ARE ACCEPTED AS CAPACITY

3    AND AVAILABILITY ALLOWS.

4             CORRECT?

5    A.   CORRECT.

6    Q.   OKAY.  AND WOULD IT HAVE MADE A DIFFERENCE IN THE DECISION

7    TO ACCEPT OR DENY ME IF YOU WOULD HAVE BEEN INFORMED THAT MY

8    REFERRAL WAS, IN FACT, NOT ROUTINE?

9    A.   I DON'T KNOW.

10   Q.   WELL, WHAT IF YOU WOULD HAVE BEEN PRESENTED IN THE

11   REFERRAL WITH A DIRECT STATEMENT THAT I WAS BEING REFERRED IN

12   RESPONSE TO A FEDERAL COURT SETTLEMENT AGREEMENT WHICH STATED

13   THAT I WAS TO BE REFERRED FOR CONSULTATION AND EXAMINATION BY

14   UC DAVIS PAIN MANAGEMENT CLINIC AND THAT ANY TREATMENT PLAN

15   THAT YOU GUYS CREATED WOULD BE FOLLOWED BY THE CORRECTIONAL

16   SYSTEM?

17             MR. ANDRADA:  CALLS FOR SPECULATION, YOUR HONOR.

18             THE COURT:  OVERRULED.

19   BY MR. ASHKER:

20   Q.   YOU MAY ANSWER.

21   A.   I DON'T KNOW.  THAT PARTICULAR SCENARIO I WOULD HAVE

22   REFERRED TO OUR LEGAL DEPARTMENT BECAUSE IT INVOLVES LEGAL

23   ISSUES.

24   Q.   OKAY.  THAT WOULD HAVE BEEN YOUR RESPONSE IF THAT WOULD

25   HAVE BEEN DIRECTLY STATED ON THE REFERRAL?

1    **A.**   I AM NOT SURE THAT I CAN GIVE A YES OR NO ANSWER.  IT

2    WOULD BE PROBABLY MORE COMPLICATED THAN THAT.

3         I WOULD NEED ADDITIONAL INPUT AND ADDITIONAL LEGAL

4    ADVICE TO HELP ME TO PROCEED IN THAT PARTICULAR SITUATION.

5    **Q.**   OKAY.  SO, YOU WOULD HAVE NOT JUST DENIED IT; IS THAT

6    CORRECT?

7         **MR. ANDRADA:**  THAT MISSTATES HIS TESTIMONY, YOUR

8    HONOR.

9         **THE WITNESS:**  I DON'T KNOW.  IT DEPENDS ON THE SET

10   OF CIRCUMSTANCES.  I DON'T KNOW.

11   **BY MR. ASHKER:**

12   **Q.**   OKAY.  FAIR ENOUGH.

13   **A.**   IF WE DON'T HAVE CAPACITY, WE DON'T HAVE CAPACITY.  SO, I

14   AM JUST NOT SURE.

15   **Q.**   OKAY.  BUT EARLIER YOU TESTIFIED THAT THERE WAS TWO

16   POSSIBILITIES, ONE BEING CAPACITY AND THE OTHER THAT YOU

17   DETERMINED THAT THE CARE I WAS RECEIVING WAS APPROPRIATE.

18        AND WHAT I AM INTERESTED IN IS MY REFERRAL WAS IN

19   RESPONSE TO A COURT SETTLEMENT AGREEMENT.  IT WAS NOT A

20   ROUTINE, SUPPOSED TO BE A ROUTINE REFERRAL.  AND YOU STATED

21   THAT THAT COMPLICATED THINGS IF YOU WOULD HAVE KNOWN THAT.

22        **MR. ANDRADA:**  EXCUSE ME.  IT'S ARGUMENTATIVE WITH

23   REGARD TO WHETHER IT'S A ROUTINE REFERRAL, AND SO PERHAPS --

24        **THE COURT:**  YOU CAN REPHRASE IT.

25   ///

1   **BY MR. ASHKER:**

2   **Q.**   IF YOU WOULD HAVE KNOWN THAT MY REFERRAL WAS IN RESPONSE

3   TO A VERY SPECIFICALLY WORDED FEDERAL COURT SETTLEMENT

4   AGREEMENT, THAT WOULD HAVE COMPLICATED THE MATTER FOR YOU; IS

5   THAT CORRECT?

6   **A.**   I WOULD HAVE ASKED FOR ADDITIONAL INPUT.

7   **Q.**   FROM WHO?

8   **A.**   PROBABLY FROM OUR LEGAL DEPARTMENT.

9   **Q.**   OKAY.  FAIR ENOUGH.

10              **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS.

11              **MR. ANDRADA:**  NOTHING, YOUR HONOR, THANK YOU.

12              **THE COURT:**  I HAVE ONE OTHER QUESTION.

13              IN TERMS OF YOUR CAPACITY, DO YOU HAVE ANY SORT OF

14   WAITING LIST OR ABILITY TO RE-REFER AT PERHAPS LESS CROWDED

15   TIMES?

16              **THE WITNESS:**  THAT'S, YOU KNOW, THAT'S UP TO THE

17   REFERRING PHYSICIAN.  THAT'S UP TO THE PATIENT.

18              AT THE TIME OF THE FIRST REFERRAL, OUR WAIT WAS

19   THREE MONTHS.  AND THERE IS A POINT AT WHICH WE CHOOSE TO NOT

20   EXTEND THAT WAITING LIST OUT ANY FURTHER.  AND THAT'S IN THE

21   CASE WHERE PATIENTS FROM OUTSIDE PROVIDERS HAVE THE OPTION TO

22   REFER TO OTHER PAIN SPECIALISTS IN THE AREA.

23              SO WHERE WE -- WHERE WE ARE OBLIGATED TO SEE

24   PATIENTS WITHIN A PARTICULAR TIME FRAME, OR FOR THOSE PATIENTS

25   WHO HAVE CAPITATED AGREEMENTS WITH THE HEALTH SYSTEM, WE ARE

1    OBLIGATED TO SEE THEM WITHIN A SPECIFIC TIME FRAME.

2            **THE COURT:**  HOWEVER, IF SOMEONE WERE WILLING TO WAIT

3    AND RE-APPLY TIME AFTER TIME, YOU WOULD CONTINUE CONSIDERING

4    THEIR REQUEST AND ACCOMMODATE IT IF YOU COULD, I PRESUME?

5            **THE WITNESS:**  POSSIBLY, POSSIBLY NOT.  IT WOULD

6    DEPEND ON OTHER -- THERE ARE OTHER ELEMENTS TO THE REFERRAL

7    PROCESS APART FROM CAPACITY.

8            **MR. ASHKER:**  YOUR HONOR, MAY I EXPLORE THAT A LITTLE

9    BIT?

10           **THE COURT:**  YES.

11                    **CROSS-EXAMINATION RESUMED**

12   **BY MR. ASHKER:**

13   **Q.**   DR. KREIS, COULD YOU EXPLAIN A LITTLE BIT FURTHER ON, LIKE

14   GIVE SOME EXAMPLES OF WHAT YOU ARE TALKING ABOUT RIGHT THERE?

15   **A.**    IF THE PATIENT -- CAN YOU GIVE ME A MORE SPECIFIC

16   QUESTION?  IT'S A VERY OPEN-ENDED QUESTION.

17           THERE IS A FAIR AMOUNT OF COMPLEXITY THAT GOES INTO

18   EACH PARTICULAR CASE THAT WE LOOK AT.  AND SO IT'S A FAIRLY

19   OPEN-ENDED QUESTION AND I DON'T WANT TO JUST START RAMBLING ON

20   OTHER THAN TO SAY THERE ARE MEDICAL CONSIDERATIONS, THERE ARE

21   TEACHING CONSIDERATIONS, THERE ARE RESEARCH CONSIDERATIONS THAT

22   GO INTO MAKING A DECISION FOR WHETHER WE ARE GOING TO SEE A

23   PATIENT WHO IS A NONCAPITATED PATIENT.  THAT'S REALLY AT OUR

24   DISCRETION.

25   **Q.**   OKAY.

KREIS – CROSS / MR. ASHKER

1              SO IT WOULD DEPEND ON BASICALLY THE TYPE OF MEDICAL

2    CONDITION AND THE TREATMENT THAT THE PATIENT WAS RECEIVING AND

3    HOW HE WAS, HE OR SHE WAS REACTING TO THAT TREATMENT WHICH

4    WOULD FORM A LARGE PART OF YOUR DECISION ON REFERRALS; IS THAT

5    CORRECT?

6    **A.**   THAT'S PART OF IT.

7    **Q.**   AND IF YOU WERE PRESENTED WITH A PATIENT WHO WAS

8    CONTINUING TO EXPERIENCE SEVERE PAIN AND DISCOMFORT FROM

9    ACTIVITY-RELATED ISSUES, FOR INSTANCE, I WILL GIVE YOU AN

10   EXAMPLE.

11             SAY YOU HAD A PATIENT WHO EXPERIENCED EXTREME OR

12   SEVERE PAIN AND DISCOMFORT WHILE CARRYING OUT THE DAILY

13   ACTIVITY OF WALKING AND HE HAD BEEN ON MEDICATIONS FOR A NUMBER

14   OF YEARS, HAD TRIED EVERY MEDICATION THAT HAD EVER BEEN

15   PRESCRIBED TO HIM, AND VARIOUS MEDICATIONS WERE NOT EFFECTIVE

16   DUE TO SIDE EFFECTS, AND HE CONTINUED TO HAVE THESE PROBLEMS

17   AND MAYBE OVER A TWO- OR THREE-YEAR TIME PERIOD YOU KEPT

18   GETTING THESE REFERRALS.  THIS IS UNRESOLVED, OR THERE WAS AN

19   EXPRESSION OF, HEY, WE HAVE THIS PERSON, HE HAS THIS CONDITION

20   LIKE I DESCRIBED TO YOU, AND WE'RE CONCERNED ABOUT -- HE'S ON

21   THIS CERTAIN TYPE OF MEDICATION FOR A NUMBER OF YEARS AND WE

22   HAVE CONCERNS ABOUT THAT, WOULD YOU PLEASE SEE HIM FOR US TO

23   DEVELOP A TREATMENT PLAN, WOULD THAT HAVE AN EFFECT ON YOUR

24   RESPONSE?

25             **MR. ANDRADA:**  VAGUE AND AMBIGUOUS, OVERLY BROAD,

1    CALLS FOR SPECULATION.  IF IT'S A HYPOTHETICAL, THERE IS NO

2    FOUNDATION.  I AM NOT AWARE OF ANY EVIDENCE ABOUT HIS HAVING

3    TROUBLE WALKING, AMONG OTHER THINGS THAT CONCERN ME WITH THE

4    QUESTION.

5              THE COURT:  ALL RIGHT.  SUSTAINED.

6              MR. ASHKER:  DR. KREIS, I HAVE NO FURTHER QUESTIONS.

7    I CAN'T JUST OFF THE TOP OF MY HEAD COME WITH A QUESTION.  SO,

8    THANK YOU.

9              THE COURT:  ANYTHING ELSE?

10             THE WITNESS:  YOU'RE WELCOME.

11             THE COURT:  DID YOU HAVE --

12             MR. ANDRADA:  I HAVE NO OTHER QUESTIONS.  THANK YOU,

13   YOUR HONOR.

14             THE COURT:  YOU ARE EXCUSED THEN.  THANK YOU.  WE

15   WILL TURN YOU OFF.

16             THE WITNESS:  THANK YOU.

17             MR. ANDRADA:  THANK YOU, DOCTOR.

18             THE COURT:  WE CAN CALL DR. ALLEN, BUT I DON'T THINK

19   WE CAN FINISH HIM.  WE WERE, WHAT WERE WE DOING?  YOU HADN'T

20   FINISHED CROSS-EXAMINING MR. ASHKER.

21             MR. ANDRADA:  CORRECT.  YOU WANT ME TO GO FOR TEN

22   MINUTES?

23             THE COURT:  OKAY.  LET'S DO THAT.

24             MR. ANDRADA:  OR IF HE WANTS TO PUT ON DR. ALLEN.

25             THE COURT:  I WOULD IF I THOUGHT WE COULD FINISH,

ASHKER – CROSS / MR. ANDRADA

1    BUT I HAVE A FEELING WE CAN'T.

2                UNLESS, DO YOU JUST NEED FIVE OR TEN MINUTES WITH

3    DR. ALLEN OR WILL IT TAKE YOU LONGER?

4                **MR. ASHKER:**  I WILL PROBABLY NEED A LITTLE BIT MORE

5    THAN THAT, YOUR HONOR.

6                **THE COURT:**  THEN WE CAN JUST CONTINUE ON WITH

7    DOCTOR -- WITH MR. ASHKER'S CROSS-EXAMINATION.

8                **MR. ANDRADA:**  LET ME JUST FIND MY NOTES FROM THAT

9    PIECE OF THE CASE, YOUR HONOR.

10               (PAUSE IN THE PROCEEDINGS.)

11               **MR. ANDRADA:**  BEAR WITH ME.

12                       **CROSS-EXAMINATION RESUMED**

13   **BY MR. ANDRADA:**

14   **Q.**   MR. ASHKER, I'M JUST GOING TO TRY TO CLEAN UP A COUPLE OF

15   THINGS.  WE ONLY HAVE A FEW MINUTES HERE THIS AFTERNOON.

16               NOW, IF I CORRECTLY RECALL YOUR OPENING STATEMENT,

17   YOU INDICATED THAT HAD YOU BEEN CONVICTED OF SEVERAL FELONIES.

18   SO MY QUESTION, SIR, IS, HOW MANY FELONIES HAVE YOU BEEN

19   CONVICTED OF?

20   **A.**   I AM NOT SURE.

21   **Q.**   WELL, DO YOU HAVE AN ESTIMATE?

22   **A.**   WELL, THEY ARE ALL OVER TEN YEARS OLD, SO I ADMITTED TO

23   HAVING A FELONY CONVICTION, SO I FAIL TO SEE WHAT RELEVANCE IS

24   AS FAR AS THE NUMBERS GO.

25               **THE COURT:**  IT'S TRUE FELONY CONVICTIONS ARE

1   RELEVANT FOR IMPEACHMENT, BUT ONLY IF THEY ARE LESS THAN TEN

2   YEARS OLD.

3            MR. ASHKER HAS A POINT.

4            **MR. ANDRADA:**  YOUR HONOR, HE MADE THE POINT IN

5   OPENING STATEMENT THAT HE WAS A FELON.

6            **THE COURT:**  RIGHT.  THAT WAS THE AGREEMENT.

7            **MR. ANDRADA:**  SO IT SEEMS TO ME THAT WE ARE ALLOWED

8   TO INQUIRE AS TO JUST HOW MANY.  AND, MOREOVER, HE ASKED HIS

9   OWN WITNESSES, MR. TROXELL AND MR. PALOMINO, HOW MANY.

10           SO IT SEEMS TO US, RESPECTFULLY, YOUR HONOR, THAT HE

11  HAS OPENED THE DOOR A LITTLE BIT YEAR.

12           **MR. ASHKER:**  THE THING IS, YOUR HONOR, IN RESPONSE

13  TO THAT COURT ORDER ON THE FELONY CONVICTION ISSUES, IS I

14  BROUGHT IT OUT LIKE THAT SAYING I HAD SEVERAL FELONY

15  CONVICTIONS, AND I MEAN, I THOUGHT THAT WOULD BE SUFFICIENT.

16  THAT'S WHY I ASKED MY WITNESSES IF THEY ALSO HAD FELONY

17  CONVICTIONS.

18           AS FAR AS THE NUMBERS GO, I MEAN, I AM SURE HE HAS

19  THE PAPER RIGHT THERE.  HE CAN PROBABLY TELL ME HOW MANY

20  BECAUSE IT WILL TAKE ME A WHILE TO TRY TO REMEMBER THEM ALL.

21  AND SO HE CAN JUST SAY WHAT THEY ARE −− HOW MANY THEY ARE.  AND

22  I WON'T DISPUTE IT.  GO AHEAD.

23           **MR. ANDRADA:**  WELL −−

24           **THE COURT:**  DO YOU KNOW HOW MANY?

25           **MR. ANDRADA:**  DO I KNOW AS I STAND HERE?  I DO NOT.

1    NO, YOUR HONOR, I DO NOT.

2            **THE COURT:**  OKAY.  ALL RIGHT.  LET'S MOVE ON TO

3    SOMETHING ELSE THEN AND WE WILL LOOK INTO IT AND SEE IF WE CAN

4    GET A RAP SHEET.

5            **MR. ASHKER:**  I WOULD GIVE AN ESTIMATE OF

6    APPROXIMATELY MAYBE SEVEN.  IT COULD BE MORE.

7            **MR. ANDRADA:**  ALL RIGHT.  THANK YOU.

8    **BY MR. ANDRADA:**

9    **Q.**  HANG ON HERE.

10           YOU CALLED MR. TROXELL TO TESTIFY.  HE, IN FACT, IS

11   ONE OF YOUR BEST FRIENDS AT PELICAN BAY, CORRECT?

12   **A.**  YES, SIR.

13   **Q.**  ONE OF YOUR TWO BEST FRIENDS, CORRECT?

14   **A.**  YES, SIR.

15   **Q.**  AND NOW YOU ALSO MENTIONED THE OTHER DAY THAT YOU WERE

16   MARRIED, CORRECT?

17   **A.**  YES, SIR.

18   **Q.**  YOU GOT MARRIED IN 2006, CORRECT?

19   **A.**  YES, SIR.

20   **Q.**  IN DECEMBER OF 2006, CORRECT?

21   **A.**  YES, SIR.

22   **Q.**  AND YOU, OF COURSE, WERE ALREADY OFF TRAMADOL AT THAT

23   TIME, CORRECT?

24           ISN'T THAT RIGHT?

25   **A.**  YES, SIR.

1    Q.   NOW, YOU MENTIONED THE OTHER DAY THAT YOU --

2              MR. ANDRADA:  WELL, YOUR HONOR, I AM GOING TO PASS

3    ON THAT.  THAT'S ALSO ANOTHER MATTER MAYBE WE SHOULD DISCUSS

4    OFF THE RECORD.

5              LET ME GET SOME OTHER NOTES.

6    BY MR. ANDRADA:

7    Q.   MR. ASHKER, YOU MENTIONED THE OTHER DAY AND TODAY AGAIN

8    THAT YOU DO A LOT OF WRITING, CORRECT?

9    A.   YES, SIR.

10   Q.   AND YOU, I BELIEVE, YOU MENTIONED THE OTHER DAY THAT YOU

11   HELPED MR. TROXELL WITH HIS LEGAL MATTERS, CORRECT?

12   A.   YES.

13   Q.   YOU HELP OTHER PRISONERS, DON'T YOU?

14   A.   YES.

15   Q.   HOW MANY OTHER PRISONERS DO YOU HELP?

16   A.   WELL, I HELPED A LOT OF PRISONERS OVER THE YEARS.

17   Q.   MORE THAN 20?

18   A.   COULD BE MORE THAN 20.

19   Q.   MORE THAN 30?

20   A.   IT'S POSSIBLE IT COULD BE MORE THAN 30.

21   Q.   YOU HELPED THEM WITH THEIR -- YOU LITERALLY HELP THEM

22   WRITE THEIR BRIEFS, CORRECT?

23   A.   WELL, NOT ALL OF THEM.  VERBAL ASSISTANCE, THINGS OF THAT

24   NATURE.

25   Q.   PART OF IT IS THAT YOU HELP WRITE SOME OF THEIR LEGAL

1    DOCUMENTS, CORRECT?  YOU HAVE DONE THAT FOR THEM, RIGHT?

2    **A.**   I HAVE DONE THAT FOR SOME.

3    **Q.**   AND YOU WERE ABLE TO DO THAT -- YOU HAVE DONE THAT SINCE

4    SEPTEMBER OF 2006, CORRECT?

5    **A.**   I HAVEN'T HAD A CHOICE.  THAT'S CORRECT.

6    **Q.**   AND, IN OTHER WORDS, YOU HAVE BEEN ABLE TO DO THAT AFTER

7    THE TRAMADOL WAS STOPPED, CORRECT?

8    **A.**   YES.

9    **Q.**   AND YOU CONTINUE TO PURSUE YOUR LEGAL MATTERS SINCE YOU

10   WERE TAKEN OFF TRAMADOL, CORRECT?

11   **A.**   YES, WITH A LOT OF PAIN AND I DON'T HAVE ANY CHOICE.

12   **Q.**   AND YOU ALSO HAVE CONTINUED TO EXERCISE AFTER THE TRAMADOL

13   WAS TAKEN FROM YOU, CORRECT?

14   **A.**   SINCE THE TRAMADOL HAS BEEN DISCONTINUED, MY EXERCISE HAS

15   PROBABLY BEEN CUT DOWN TO HALF OF WHAT IT WAS BEFORE.

16   **Q.**   BUT YOU ARE STILL EXERCISING, CORRECT?

17   **A.**   YES, SIR.

18   **Q.**   ALL RIGHT.  SO LET'S -- WHAT I WOULD LIKE YOU TO TELL US

19   RIGHT NOW IS, AT LEAST SINCE 2006, SINCE SEPTEMBER 2006, TELL

20   US WHAT YOUR EXERCISE REGIMEN HAS BEEN?

21   **A.**   WELL, I DO MY EXERCISE WITH MY BAND.  I DO A LEG ROUTINE.

22   I DO -- I WAS DOING STOMACH ROUTINE, BUT I STOPPED DOING THAT

23   BECAUSE IT, WITH THE NSAIDS AND STUFF, IT STARTED CRAMPING UP

24   MY STOMACH AND MAKING MY STOMACH EVEN WORSE, SO I STOPPED DOING

25   ANY STOMACH ROUTINES.

ASHKER – CROSS / MR. ANDRADA

1              I DO ARM ROTATIONS WHERE I STAND THERE AND ROTATE MY

2    ARMS.  AND JUST DO SQUATS.  AND THE BAND ON MY FOREARM THREE

3    CIRCUITS OF THAT, AND THAT'S ABOUT IT.  I COULD BE FORGETTING

4    SOMETHING, BUT THAT'S ABOUT IT.  THAT'S WHAT I AM DOING RIGHT

5    NOW.

6    **Q.**  SO WHAT ABOUT -- THE BAND AND THE STOMACH I THINK WE

7    UNDERSTAND.

8              WHAT LEG EXERCISES DO YOU DO?

9    **A.**  I DO SQUATS, LUNGES.  THAT'S ABOUT IT.

10   **Q.**  DO YOU DO SETS OF THOSE?

11   **A.**  YES, SIR, I DO.

12   **Q.**  HOW MANY SETS DO YOU DO?

13   **A.**  IT VARIES.  GENERALLY I TRY AND DO AT LEAST MAYBE TEN SETS

14   OF 30.

15   **Q.**  AND THAT IS WHAT, EVERY DAY?

16   **A.**  NO, SIR.

17   **Q.**  HOW MANY TIMES A WEEK?

18   **A.**  I DO MY LEGS ABOUT THREE TIMES, THREE TIMES A WEEK.

19   **Q.**  AND THE ARM ROTATION, I THINK WE KNOW WHAT THAT IS.

20             THEN THE SQUATS, ARE THE SQUATS THE ONLY LEG

21   EXERCISE THAT YOU ENGAGE IN?

22   **A.**  NO, SIR.

23   **Q.**  WHAT ELSE DO YOU DO?

24   **A.**  WHEN I DO MY SQUAT ROUTINE, I'LL DO A SET OF SQUATS AND

25   THEN I'LL DO A SET OF LUNGES.

ASHKER – CROSS / MR. ANDRADA

```
1    Q.   BRIEFLY, WHAT ARE LUNGES?

2    A.   WHERE YOU STAND THERE, YOU STAND THERE AND YOU DO -- WELL,

3    COULD I -- YOU WANT --

4    Q.   I DON'T KNOW.  THAT'S NOT MY PAY GRADE.

5    A.   I CAN'T DEMONSTRATE ANYHOW.

6              WHAT I DO IS, YOU STAND THERE LIKE THIS

7    (INDICATING), AND YOU'LL STEP FORWARD WITH THE ONE LEG AND BEND

8    AT THE KNEE WITH THE OTHER, AND THEN STEP BACK AND DO THE OTHER

9    ONE BACK AND FORTH LIKE THAT.

10   Q.   ALL RIGHT.

11   A.   IT WORKS THE UPPER LEG AREA.

12   Q.   SO, NOW, TAKE US THROUGH A TYPICAL DAY FOR YOU,

13   MR. ASHKER.

14             WHAT TIME DO YOU GET UP IN THE MORNING?

15   A.   WELL, WHAT TIME PERIOD ARE YOU TALKING ABOUT?

16   Q.   WELL, HOW ABOUT WHEN YOU WERE AT PELICAN BAY IN -- LAST

17   MONTH.  JUST TAKE APRIL OF 2009.

18   A.   OKAY.  APRIL OF 2009 I WAS GETTING UP AT ABOUT BREAKFAST

19   TIME, WHICH WOULD BE ABOUT SIX, 6:30.

20   Q.   ALL RIGHT.

21   A.   AND I WOULD START IN ON MY LEGAL PREPARATIONS FOR THIS

22   CASE.

23   Q.   AND THEN WOULD THAT TAKE YOU ALL THE WAY THROUGH THE

24   MORNING?

25   A.   WELL, I WOULD GO, I WAS GOING TO THE YARD FOR LIKE AN
```

1    HOUR, HOUR AND A HALF.  AND I WAS -- YEAH.  ACTUALLY, I WAS IN

2    THAT MONTH RIGHT THERE, I WAS SPENDING LIKE TILL DINNERTIME

3    WITH BREAKS TO EAT AND MAYBE DO MY EXERCISE AND GO TO THE YARD.

4             OTHER THAN THAT, I WAS EITHER DOING LEGAL READING,

5    STUDYING, WRITING, WITH BREAKS TO STRETCH AND ALL THAT FROM

6    BREAKFAST TO DINNER.

7    **Q.**   AND SO THEN HOW ABOUT AT NIGHT, ONCE YOU HAD YOUR DINNER,

8    WHAT WOULD YOU DO SAY IN APRIL OF 2009?

9    **A.**   WELL, I WOULD GENERALLY USUALLY AFTER DINNER, I CHECK OUT

10   THE PRIME TIME NEWS UNTIL ABOUT SIX, 6:30, AND THEN I MIGHT

11   STUDY SOME MORE ON THE PREPARATION FOR THIS CASE UNTIL ABOUT

12   8:00 O'CLOCK, AND THEN I WOULD WATCH TV UNTIL ABOUT 10 OR 11,

13   AND GO TO BED.

14   **Q.**   GO TO SLEEP?

15   **A.**   NO.

16   **Q.**   WHAT WOULD YOU DO THEN?

17   **A.**   WELL, I WOULD LAY THERE AND TRY TO GO TO SLEEP.

18   **Q.**   SO, IS IT YOUR -- HOW MANY HOURS OF SLEEP ARE YOU

19   CURRENTLY GETTING?

20   **A.**   WELL, I WILL GIVE YOU AN EXAMPLE.

21            LAST NIGHT I PROBABLY GOT MAYBE, I WOULD HAVE TO

22   ESTIMATE I DON'T HAVE NO CLOCK OR NOTHING IN MY CELL, BUT I

23   WOULD ESTIMATE MAYBE MAXIMUM OF ABOUT THREE HOURS.

24   **Q.**   SO, AND SO THEN LET'S NOT TALK ABOUT A PERIOD -- LET'S GO

25   BACK FURTHER IN TIME AND TALK ABOUT WHEN YOU ARE NOT IN THE

1    MIDST OF ALL THIS PRETRIAL PREPARATION.

2              BRIEFLY TAKE US THROUGH A 24-HOUR PERIOD.

3    **A.**   IT WOULD ALL DEPEND.  I MEAN, IN GENERAL, IT WOULD BE I

4    WOULD PROBABLY SPEND MAYBE THREE HOURS, THREE, FOUR HOURS

5    STUDYING AND DOING THE LEGAL AND THEN MY EXERCISE.

6              IT WOULD ALL DEPEND.  IT ALL DEPENDS, TOO, THE ONLY

7    REASON I WAS DOING WHAT I WAS ABLE TO DO IN APRIL LAST MONTH ON

8    UP TO NOW IS BECAUSE DR. WILLIAMS HAD CHANGED MY MEDICATIONS

9    AND IT ENABLED ME BETTER TO BE ABLE TO DO THAT STUFF.

10   **Q.**   I WANT TO KNOW, SIR, AGAIN, IF YOU COULD TAKE US THROUGH A

11   TYPICAL DAY AT ANY GIVE TIME WHEN YOU ARE NOT IN THE MIDST OF

12   THIS PRETRIAL PREPARATION.

13             IS THERE SUCH A THING AS A TYPICAL DAY?

14   **A.**   IT'S, WITH THE LEGAL STUFF THAT I HAD GOING ON, FOR WHAT

15   TO ME IS FAIRLY COMPLEX ISSUES, I MEAN IT'S JUST EVERY DAY.

16   **Q.**   FULL TIME, ESSENTIALLY?

17   **A.**   WELL, IT'S -- I DON'T KNOW IF YOU CONSIDER IT FULL TIME,

18   BUT I SPEND SOME TIME ON LEGAL STUFF SEVEN DAYS A WEEK.

19   **Q.**   OKAY.  AND SO OTHER THAN THE EXERCISE IN THE YARD WHICH

20   YOU SHOWED ON THE TAPE, CORRECT?

21   **A.**   YES.

22   **Q.**   AND THE EXERCISE IN YOUR CELL AND THEN YOUR LEGAL WORK, DO

23   YOU ENGAGE IN ANY OTHER ACTIVITIES?

24   **A.**   WELL, I WAS BEFORE, BUT I HAVEN'T BEEN ABLE TO.  I HAVE

25   HAD TO CUT LOOSE A LOT OF THE STUFF I USED TO DO BEFORE.

```
1              MR. ANDRADA:  YOUR HONOR, IS IT -- I HAVE ABOUT 25

2    TO TWO.

3              THE COURT:  YOU WANT TO BREAK?

4              IT'S 1:30.  WE WILL BREAK FOR THE TODAY.

5              MR. ANDRADA:  THANK YOU.

6              THE COURT:  TODAY IS WEDNESDAY, SO WE WILL BE BACK

7    IN SESSION.

8              IF YOU CAN STEP ASIDE SO I CAN SEE THE JURY.

9    THANKS.

10             MR. ANDRADA:  I THOUGHT YOU WERE TALKING TO ME.

11             THE COURT:  WE WILL RECONVENE TOMORROW MORNING AT

12   8:30.  THE SAME ADMONITIONS APPLY, AND WE WILL SEE YOU THEN.

13             (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

14             THE COURT:  SO, I GAVE YOU EACH, I THINK, A SET OF

15   DRAFT FINAL INSTRUCTIONS.

16             MR. ASHKER:  YES.

17             THE COURT:  DID YOU GET THAT?

18             MR. ANDRADA:  YOU DID, YOUR HONOR.  THANK YOU.

19             THE COURT:  AND I HAD WRITTEN AN IMPOSSIBILITY

20   INSTRUCTION.  I HAVEN'T GOTTEN ONE FROM YOU YET, THAT I AM

21   AWARE OF, BUT I THOUGHT YOU MIGHT WANT THE CITES THAT WE USED

22   TO DRAFT THAT SINCE IT WASN'T IN THE INSTRUCTION ITSELF.

23             SHEILAH, IF YOU COULD.  I AM SORRY, I ONLY HAVE THE

24   ONE COPY, MR. ASHKER, BUT I AM GUESSING YOU DON'T HAVE ACCESS

25   TO A LAW LIBRARY ANYWAY.  DO YOU WANT A COPY?
```

1        BETWEEN NOW AND 3:00 O'CLOCK YOU WON'T HAVE A LAW

2   LIBRARY.

3        **MR. ANDRADA:**  I AM SORRY, YOUR HONOR, IS THIS FOR

4   ME?

5        **THE COURT:**  YES.

6        **MR. ANDRADA:**  THIS COPY?

7        **THE COURT:**  YES.

8        **MR. ANDRADA:**  THANK YOU.

9        **THE COURT:**  AND YOU ARE ALREADY HAVE THE DRAFT

10   VERDICT FORM.  I HAVE A 2:00 O'CLOCK CRIMINAL CALENDAR.  I AM

11   HOPING IT WILL BE DONE NOT TOO LONG AFTER 2:30, SO IF YOU WOULD

12   COME BACK AT 2:30 WITH ANY OBJECTIONS YOU MIGHT HAVE WITH THE

13   INSTRUCTIONS AND THE VERDICT FORM.

14        **MR. ANDRADA:**  OH, ALL RIGHT.

15        **THE COURT:**  I THOUGHT THAT'S WHAT WE TALKED ABOUT.

16        **MR. ANDRADA:**  I THOUGHT WE HAD TALKED ABOUT THAT.

17   THAT SOUNDS OKAY.

18        CAN WE BRIEFLY, MAYBE WE CAN TALK AT 2:30 ABOUT THE

19   SCHEDULE FOR TOMORROW?

20        **THE COURT:**  WELL, WE CAN DO THAT RIGHT NOW SINCE YOU

21   MAY BE WANTING TO CONTACT WITNESSES.

22        HOW MUCH MORE DO YOU HAVE WITH MR. ASHKER?

23        **MR. ANDRADA:**  I DON'T THINK VERY MUCH LONGER, YOUR

24   HONOR.

25        **THE COURT:**  OKAY.  DR. ALLEN, IF YOU COULD, IS

1    8:30 TOMORROW OKAY FOR YOU?

2              **DR. ALLEN:**  YES.

3              **THE COURT:**  SINCE YOU HAVE BEEN WAITING, WE WILL

4    TAKE YOU FIRST.

5              **DR. ALLEN:**  THANK YOU.

6              **THE COURT:**  AND THEN YOU SHOULD BE FINISHED FAIRLY

7    SHORTLY.

8              **DR. ALLEN:**  OKAY.

9              **THE COURT:**  WE WILL DO DR. ALLEN FIRST SINCE HE

10   WAITED HERE ALL DAY TODAY.  AND THEN YOU HAVE A LITTLE BIT

11   MORE, ANOTHER TEN MINUTES OR SOMETHING WITH MR. ASHKER?

12             **MR. ANDRADA:**  MAYBE 15 OR SO.  NOT MUCH LONGER.

13             **THE COURT:**  AND THEN, WELL THE REST ARE -- WE NEED

14   DODGEN.  WE DID DUNCAN.  WE NEED DODGEN UP IN PELICAN BAY.  DO

15   WE HAVE A TIME SET FOR HIM?

16             **MR. ANDRADA:**  AS I SIT HERE I'M NOT SURE.  WE HAVE A

17   WHOLE SLEW OF THEM.

18             **THE COURT:**  I GUESS ALL THOSE PEOPLE ARE UP IN

19   PELICAN BAY?

20             **MR. ANDRADA:**  TOMORROW, ONCE WE GET THROUGH

21   DR. ALLEN AND DR. SAYRE, MR. ASHKER'S INDICATED HE WILL BE A

22   WHILE WITH DR. SAYRE, WE HAVE MS. RISENHOOVER, POSSIBLY

23   MS. MCLEAN AS WELL, MR. DODGEN, DR. ROWE.  DR. WINSLOW IS

24   TRYING TO GET SQUEEZED INTO TOMORROW FROM -- JUDGE, HE WANTS TO

25   TESTIFY BY VIDEO FROM SACRAMENTO.  IS THAT OKAY?  HE TOLD ME

```
1    THIS LAST NIGHT.

2            THE COURT:  WELL, ORDINARILY I WOULD NOT ALLOW THAT,

3    BUT IF MR. ASHKER DOESN'T CARE, I SUPPOSE IT'S --

4            MR. ASHKER:  AS FAR AS DR. WINSLOW TESTIFYING FROM

5    SACRAMENTO OVER VIDEOCONFERENCE?  I HAVE NO PROBLEM WITH THAT,

6    YOUR HONOR.  I JUST WANT TO GET A FEW THINGS FROM HIM.  IT'S

7    FINE WITH ME.

8            THE COURT:  OKAY.

9            MR. ANDRADA:  THEN --

10           THE COURT:  YOU CAN LET HIM KNOW THAT I WOULD NOT

11   HAVE ALLOWED THAT, BUT MR. ASHKER HAS AGREED.

12           MR. ANDRADA:  WE APPRECIATE THE COURTESY, YOUR

13   HONOR.

14           THEN ON FRIDAY WE STILL HAVE DR. SHIN.  I AM AWARE

15   OF ARGUMENTS, AND SO ON AND SO FORTH.

16           I AM WONDERING ALSO, JUDGE, I ASKED -- I TOOK THE

17   LIBERTY OF ASKING YOUR COURT REPORTER WHETHER SHE COULD PROVIDE

18   ME THE AMOUNTS OF TIME THAT HAVE BEEN USED.  AND I UNDERSTAND

19   THAT, IN FACT, HER MACHINE DOES NOT RECORD THE TIMES.

20           SO I AM WONDERING IF THE COURT WOULD FAVOR US WITH

21   WHAT YOU BELIEVE IS OUR STATUS.

22           THE COURT:  OKAY.  I WILL TRY TO ADD UP MY NOTES.

23   YOU HAVEN'T BEEN TAKING NOTES?

24           MR. ANDRADA:  I APOLOGIZE, IT HAS BEEN HAPHAZARD.  I

25   APOLOGIZE.
```

1              **THE COURT:**  OKAY.

2              **MR. ANDRADA:**  AFTER ALL IT IS LIKE THE REFEREE,

3    YOURS IS THE CLOCK THAT COUNTS.

4              **THE COURT:**  I WILL SEE WHAT I CAN DO.  I CAN'T DO IT

5    BETWEEN NOW AND MY CRIMINAL CALENDAR.

6              **MR. ANDRADA:**  I UNDERSTAND.  I ASSUME YOU WANT TO

7    GET SOME LUNCH AND SO FORTH.  THAT'S UNDERSTANDABLE.

8              SO WHY DON'T WE SEE YOU BACK AT 2:30 IF THAT'S WHAT

9    THE COURT WOULD LIKE.

10             **THE COURT:**  OKAY.  SO AS FAR AS THE WITNESSES

11   TOMORROW, WE WILL DO ALLEN, ASHKER, SAYRE.  THEN AFTER THAT

12   IT'S BASICALLY ALL OF YOUR WITNESSES AT YOUR DISCRETION EXCEPT

13   FOR DODGEN.  DODGEN IS PLAINTIFF'S WITNESS SO I WANT TO MAKE

14   SURE WE GET HIM IN TOMORROW.  OTHERWISE YOU CAN ARRANGE THE

15   REST OF THE DAY HOWEVER YOU LIKE.

16             **MR. ANDRADA:**  I THOUGHT DR. WINSLOW WAS ACTUALLY THE

17   PLAINTIFF'S AS WELL.

18             **MR. ASHKER:**  YES.

19             **THE COURT:**  OKAY.

20             **MR. ANDRADA:**  THAT WAS MY RECOLLECTION.

21             **THE COURT:**  LET'S MAKE SURE AND GET HIM IN TOMORROW

22   ALSO.

23             **MR. ANDRADA:**  BELIEVE ME, I AM DOING THE BEST I CAN,

24   YOUR HONOR.

25             **THE COURT:**  OKAY.

 1          **MR. ASHKER:**  YOUR HONOR, DR. ALLEN WANTED TO HAVE A

 2   WORD WITH ME REAL QUICK.  THE CUSTODY SAID THAT THAT WOULD BE

 3   FOR YOU, WHETHER YOU WOULD ALLOW THAT OR NOT.  THEY DON'T HAVE

 4   A PROBLEM WITH IT IF YOU WOULD ALLOW IT.

 5          **THE COURT:**  WELL, I DON'T MIND, BUT I DON'T WANT TO

 6   IMPOSE ON YOU ALL.

 7          **DEPUTY:**  WE HAVE A FEW MINUTES.

 8          **THE COURT:**  YOU DON'T MIND?

 9          **DEPUTY:**  A FEW MINUTES.

10          **THE COURT:**  OKAY.

11          **THE WITNESS:**  THANK YOU.

12               (RECESS TAKEN AT 1:40 P.M.)

13              (PROCEEDINGS RESUMED AT 3:10 P.M.)

14          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY

15   AND PLAINTIFF.)

16          **MR. ANDRADA:**  HOW LONG AGO DID THEY LEAVE; DO YOU

17   KNOW?

18          **THE COURT:**  THAT DOESN'T MATTER.

19          **MR. ANDRADA:**  YOUR HONOR, MAY I ASK YOU, THIS IS A

20   SCHEDULING ISSUE.  IT HAS TO DO WITH DR. WINSLOW.

21          **THE COURT:**  ARE WE ON THE RECORD?

22          **MR. ANDRADA:**  YEAH, IN FAIRNESS TO MR. ASHKER.

23          YOUR HONOR, YOU WILL RECALL THAT WE AGREED TO

24   PRODUCE DR. WINSLOW BY SUBPOENA AT THE REQUEST OF MR. ASHKER,

25   PRODUCE HIM WITHOUT A SUBPOENA AT THE REQUEST OF MR. ASHKER.

1          DR. WINSLOW WORKS IN SACRAMENTO.  YOU WILL RECALL

2     THAT I HAD -- THAT HE HAD ASKED ME IF HE COULD APPEAR BY

3     VIDEOCONFERENCE.  I CONVEYED THAT TO THE COURT EARLIER TODAY.

4     YOU WERE NICE ENOUGH TO ALLOW HIM TO DO THAT.

5          MY TECHIE SAYS, AS I UNDERSTAND IT, IN SIMPLE TERMS,

6     THE EQUIPMENT HERE DOESN'T JIVE WITH THE EQUIPMENT AT

7     DR. WINSLOW'S BUSINESS.

8          SO, I SUPPOSE WE HAVE THE ONE OPTION IS OBVIOUSLY

9     MAKE HIM COME DOWN HERE.  THE OTHER OPTION, IN THEORY, COULD BE

10    THAT HE WOULD GO OVER TO UC DAVIS MEDICAL CENTER IN SACRAMENTO

11    AND TESTIFY FROM THE SAME LOCATION THAT DR. KREIS TESTIFIED.

12         IF THE COURT WANTS HIM TO BE HERE IN PERSON, BEFORE

13    I CALL HIM AND CONVEY THAT NEWS, I WOULD LIKE TO KNOW FROM THE

14    COURT WHEN YOU THINK HE WOULD BE GOING ON AS A WITNESS.

15         IF IT HELPS YOUR SCHEDULING, I THINK I MAY BE DONE

16    WITH MR. ASHKER.  I DON'T KNOW.  I MIGHT HAVE A COUPLE OF

17    QUESTIONS, BUT I MAY WELL BE DONE.

18         **THE COURT:**  SO UC DAVIS IS WILLING TO SORT OF MAKE

19    THEIR FACILITY AVAILABLE TO --

20         **VIDEO PERSON:**  WE DON'T KNOW YET.  WE WANTED TO ASK

21    YOU FIRST.

22         **THE COURT:**  WELL, I DON'T LIKE IT, BUT MR. ASHKER

23    DOESN'T SEEM TO CARE, SO I GUESS IT'S ALL RIGHT.

24         **MR. ANDRADA:**  THAT WOULD BE MY SENSE AS WELL.

25         **THE COURT:**  AS LONG AS IT CAN BE ARRANGED WITH UC

1    DAVIS.  I DON'T KNOW WHY THEY WOULD WANT TO ALLOW RANDOM PEOPLE

2    TO COME IN AND USE THEIR OFFICES.

3             **MR. ANDRADA:**  HE'S A PHYSICIAN, HE'S NOT JUST A

4    PERSON OFF THE STREET, YOUR HONOR.

5             **THE COURT:**  I KNOW.  ALL RIGHT.  IF YOU CAN ARRANGE

6    THAT, THEN THAT'S FINE.  OTHERWISE, HE NEEDS TO BE HERE.

7             **MR. ANDRADA:**  OKAY.

8             WHEN, IDEALLY, WOULD THE COURT LIKE HIM TO TESTIFY,

9    MINDFUL THAT WE HAVE DR. ALLEN AND DR. SAYRE?  WE JUST

10   BASICALLY SQUEEZE --

11            **THE COURT:**  I HAVE NO --

12            **MR. ANDRADA:**  YOU DON'T CARE.

13            **THE COURT:**  BASICALLY THE REST IS UP TO YOU.  THOSE

14   TWO I WANT TO MAKE SURE I GET IN AND THE REST OF THE DAY IS

15   YOURS.  YOU CAN PLAN IT HOWEVER YOU WANT TO AS LONG AS YOU PLAN

16   ENOUGH TIME FOR THOSE.  MAYBE IT WOULD BE SAFEST TO HAVE THOSE

17   TWO GO FIRST AND THEN YOU'LL HAVE YOUR DISCRETION FOR THE REST

18   OF THE DAY.

19            **MR. ANDRADA:**  OKAY.  ALL RIGHT.  SO MAYBE I WILL

20   TELL HIM -- AGAIN, I AM THINKING OUT LOUD, MAYBE I WILL TELL

21   HIM LATE MORNING.  RIGHT?

22            **THE COURT:**  OKAY.

23            **MR. ANDRADA:**  10:30.

24            **THE COURT:**  THAT'S FINE.  WHATEVER.

25            **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

1        **THE COURT:**  AS FAR AS JURY INSTRUCTIONS, THIS PUTS

2   US IN A PROBLEM BECAUSE I HAVE A TALK I HAVE TO GIVE TOMORROW

3   AFTERNOON IN SAN FRANCISCO, SO I CAN'T -- I HAVE A CALENDAR AT

4   TWO, I'VE GOT A TALK AT 5:30.  I CAN'T BE SURE I'LL HAVE ANY

5   TIME IN BETWEEN THERE TO TALK ABOUT INSTRUCTIONS.

6        SO, WHAT WILL WE DO?  MAYBE YOU BETTER WRITE UP YOUR

7   OBJECTIONS.

8        **MR. ANDRADA:**  OKAY.

9        **THE COURT:**  MR. ASHKER ISN'T GOING TO HAVE ANY

10  OBJECTIONS.  HE DOESN'T KNOW -- I MEAN, HE HAS NO ABILITY TO

11  RESEARCH THE LAW OR DO ANYTHING AT THIS POINT OVER AT SAN

12  QUENTIN, SO I FEEL IT'S UNLIKELY THAT HE WILL HAVE ANY

13  OBJECTIONS, BUT YOU MAY, SO I GUESS WHAT I BETTER DO IS HAVE

14  YOU WRITE THEM DOWN IN A BRIEF THAT I CAN READ AND WORK ON IN

15  THE EVENING.

16       **MR. ANDRADA:**  OKAY.  WE WILL BE HAPPY TO DO THAT.

17       **THE COURT:**  ONE THING I WILL TELL YOU IS THAT WE

18  DIDN'T HEAR ANYTHING FROM YOU ON THIS ISSUE OF NO DAMAGES FOR

19  THE BREACH OF CONTRACT.  SO WE HAVE DONE SOME RESEARCH ON THAT

20  OURSELVES AND HAVE FOUND CALIFORNIA CASES WHICH SEEM TO

21  INDICATE THAT AS LONG AS THE CONTRACT CONTEMPLATES REASONABLY

22  FORESEEABLE, EVEN EMOTIONAL DAMAGES, BUT CERTAINLY PHYSICAL

23  DAMAGES, THAT THOSE CAN BE AWARDED EVEN THOUGH THE GENERAL RULE

24  IS YOU DON'T GET EMOTIONAL DISTRESS AS A SORT OF COLLATERAL

25  DAMAGE.

```
 1              SO I WILL JUST GIVE YOU THE ONE CASE AND THEN YOU
 2    CAN FIND THE OTHERS FROM THERE.  IT'S WINDELER 8 CAL.APP.3D,
 3    844.  AND THAT WILL GIVE YOU THE CITES TO SOME OTHER CASES THAT
 4    IT RELIES ON.
 5              MR. ANDRADA:  YOUR HONOR, I THOUGHT THAT MY
 6    SECRETARY WAS GOING TO FILE A BRIEF BY E-MAIL WITH REGARD TO
 7    THE BREACH OF CONTRACT.
 8              THE COURT:  MAYBE SHE HAS.  I AM NOT UP TO DATE ON
 9    MY E-MAIL.
10              MR. ANDRADA:  I BROUGHT SOME COPIES WITH ME.
11              THE COURT:  OKAY.
12              MR. ANDRADA:  SO --
13              THE COURT:  IF YOU HAVE A COPY --
14              MR. ANDRADA:  THEN YOU GAVE -- DO YOU HAVE THE CITE
15    THAT SHE GAVE US?
16              8 CAL. 3D, 844?
17              THE COURT:  YES -- CAL.APP.3D.
18              MR. ANDRADA:  I AM JUST ASKING, BY ANY CHANCE IS
19    THAT AN INSURANCE BAD FAITH CASE, BY ANY CHANCE?
20              THE COURT:  NO.  IT WAS ACTUALLY A DEAD HUSBAND
21    WHOSE WIFE WANTED TO HAVE HIS JEWELS SET IN A RING FOR HER
22    DAUGHTER, AND THE JEWELER LOST THEM.  SHE WANTED EMOTIONAL
23    DISTRESS BECAUSE THEY WERE HER DEAD HUSBAND'S JEWELS AS WELL
24    AS -- JUST SHE LOST THE JEWELS.  IT CITES OTHER CASES,
25    UNDERTAKERS, THINGS LIKE THAT WHERE IT'S OBVIOUS THERE'S GOING
```

1    TO BE EMOTIONAL DISTRESS.

2            THE POINT BEING IT SEEMS -- IT SEEMED

3    COUNTERINTUITIVE TO ME THAT ONE COULD MAKE A CONTRACT TO GIVE

4    SOMEONE MEDICAL CARE, BREACH IT, AND THEN SAY THAT THERE WERE

5    NO DAMAGES FOR INJURY CAUSED BY NOT GETTING MEDICAL CARE.  THAT

6    DIDN'T SEEM RIGHT TO ME, AND THAT'S WHY WE LOOKED INTO IT.  BUT

7    IF YOUR CASES SAY THAT IS RIGHT, THEN I WILL CERTAINLY TAKE A

8    LOOK AT THEM.

9            **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

10           **THE CLERK:**  THERE WAS A DAMAGES RECOVERABLE FOR

11   BREACH OF CONTRACT THAT WAS E-FILED TODAY.

12           **MR. ANDRADA:**  AND WE'LL LOOK AT YOUR CASE AS WELL,

13   YOUR HONOR.

14           **THE COURT:**  OKAY.

15           THAT'S THE JEWELRY CASE, WHICH WON'T HELP YOU TOO

16   MUCH.  IT CITES A BUNCH OF OTHER CASES UNDER DIFFERENT FACTUAL

17   CIRCUMSTANCES.

18           **MR. ANDRADA:**  THANK YOU, YOUR HONOR, FOR YOUR TIME.

19           **THE COURT:**  THANK YOU.

20               (PROCEEDINGS CONCLUDED AT 3:20 P.M.)

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-05-3759 CW, TODD L. ASHKER V. MICHAEL SAYRE AND MATTHEW CATE, PAGES NUMBERED 448 THROUGH 627, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.


/S/ DIANE E. SKILLMAN

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR