VOLUME 4

PAGES 628 – 858

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

```
TODD L. ASHKER,              )
                            )
                            )
          PLAINTIFF,         )   NO. C-05-3759 CW
                            )
  VS.                        )   THURSDAY, MAY 14, 2009
                            )
MICHAEL C. SAYRE, ET AL.,    )   OAKLAND, CALIFORNIA
                            )
          DEFENDANTS.        )
_____ )
```

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**            TODD L. ASHKER, PRO PER
                            BOX 7500/D1-119
                            CRESCENT CITY, CALIFORNIA 9553


**FOR DEFENDANTS:**           ANDRADA & ASSOCIATES
                            180 GRAND AVENUE, SUITE 225
                            OAKLAND, CALIFORNIA 94612
                      BY:  J. RANDALL ANDRADA, ESQUIRE


**REPORTED BY:**              DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER

1

2                           I N D E X

3     PLAINTIFF'S WITNESSES:                        PAGE

4

5     ALLEN, EVERETT

6     DIRECT EXAMINATION BY MR. ASHKER              639

7     CROSS-EXAMINATION BY MR. ANDRADA              658

8     REDIRECT EXAMINATION BY MR. ASHKER            667

9

10    ASHKER, TODD

11    REDIRECT EXAMINATION BY MR. ASHKER            668

12    RECROSS-EXAMINATION BY MR. ANDRADA            682

13

14    DODGEN, PATRICK   (VIA VIDEOCONFERENCE)

15    DIRECT EXAMINATION BY MR. ASHKER              745

16    CROSS-EXAMINATION BY MR. ANDRADA              767

17    REDIRECT EXAMINATION BY MR. ASHKER            769

18

19    WINSLOW, DWIGHT (VIA VIDEOCONFERENCE)

20    DIRECT EXAMINATION BY MR. ASHKER              772

21    CROSS-EXAMINATION BY MR. ANDRADA              797

22

23

24

25

DEFENDANTS' WITNESSES:                              PAGE


SAYRE, MICHAEL

DIRECT EXAMINATION BY MR. ANDRADA                  686


ROWE, LINDA (VIA VIDEOCONFERENCE)

DIRECT EXAMINATION BY MR. ANDRADA                  799

CROSS-EXAMINATION BY MR. ASHKER                    803



DEFENDANTS' EXHIBIT:            ID.       EVD.

    242                         718

1    THURSDAY, MAY 14TH, 2009                              8:30 A.M.

2

3                 (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4                 **THE COURT:**  GOOD MORNING.

5                 **MR. ASHKER:**  GOOD MORNING.

6                 **THE COURT:**  SO, MR. ANDRADA HAD ASKED ME FOR THE

7    TIMING.

8                 WHAT I HAVE IS SEVEN HOURS AND 35 MINUTES FOR THE

9    PLAINTIFF AND TWO HOURS AND 45 MINUTES FOR THE DEFENDANT, GIVE

10   OR TAKE.  SO -- AND I THOUGHT ABOUT MY SCHEDULE A LITTLE BIT

11   MORE, AND I THINK THAT MY 2:00 O'CLOCK CALENDAR IS NOT VERY

12   LONG.  I HAVE TO BE IN THE CITY FOR A TALK IN THE LATE

13   AFTERNOON, BUT I THINK I CAN FIT IN A HALF AN HOUR, HOUR SAY AT

14   2:30, 3:00 O'CLOCK.

15                **MR. ANDRADA:**  YOU ARE TALKING ABOUT THIS AFTERNOON?

16                **THE COURT:**  TALK ABOUT JURY INSTRUCTIONS.  SO IF

17   THAT WORKS FOR YOU.

18                **MR. ANDRADA:**  THAT WOULD BE --

19                **THE COURT:**  I AM WILLING TO DO THAT.

20                **MR. ANDRADA:**  -- THAT WOULD BE MOST APPRECIATED.

21                **THE COURT:**  WE OBVIOUSLY DIDN'T MAKE OURSELVES

22   CLEAR.  WE WERE ACTUALLY TRYING TO GET A CONFERENCE YESTERDAY

23   AFTERNOON TO TALK ABOUT THE JURY INSTRUCTIONS, AND I DIDN'T

24   MAKE IT CLEAR THAT I NEEDED MR. ASHKER TO BE HERE AND YOU ALL

25   TOOK OFF.  SO THIS AFTERNOON, WHAT I NEED TO DO IS BREAK AT

1    1:30, TAKE A LUNCH BREAK, I HAVE ANOTHER CALENDAR I HAVE TO

2    CALL, AND THEN WE WILL GET BACK TOGETHER HERE AT 2:30,

3    3:00 O'CLOCK AS SOON AS WE GET DOWN WITH THE OTHER CALENDAR AND

4    THEN WE WILL GO FOR ABOUT AN HOUR.

5              **DEPUTY:**  WHATEVER YOU NEED, WE WILL BE HERE.

6              **MR. ANDRADA:**  SO IF WE ASSUME THAT MR. ASHKER IS

7    GOING TO TAKE AN HOUR FOR HIS CLOSING TOMORROW, HOW MUCH MORE

8    TIME DOES HE HAVE?  IN OTHER WORDS, YOU MADE IT CLEAR IN THE

9    BEGINNING IT WAS A 50/50 DEAL.

10             **THE COURT:**  WELL, PROBABLY NOT TOO MUCH.

11             **MR. ANDRADA:**  OKAY.

12             **THE COURT:**  I MEAN, I HATE TO SAY THIS, BUT IF WE

13   HAD TO, WE COULD HAVE CLOSING ARGUMENT AND INSTRUCTIONS ON

14   MONDAY MORNING.

15             **MR. ANDRADA:**  WELL --

16             **THE COURT:**  I WOULD RATHER NOT DO THAT, BUT IF WE

17   HAD TO, THAT'S WHAT WE WOULD DO.

18             **MR. ANDRADA:**  I UNDERSTAND.  BUT I JUST WANT TO MAKE

19   SURE THAT WE ARE ALL CLEAR THAT IT'S A 50/50 DEAL AND HE IS

20   VERY CLOSE, AS I DO THE MATH, HE'S VERY CLOSE TO THE END.

21             AND IF HE RUNS OUT OF TIME, HE'S NOT GOING TO BE

22   ABLE TO CROSS-EXAMINE SOME OF MY FOLKS.

23             **THE COURT:**  YOU NEED TO KEEP IN MIND DOING YOUR

24   CROSS-EXAMINATIONS THAT YOU HAVE TO BE BRIEF AND CONCISE

25   BECAUSE WE DO HAVE TO SPLIT THE TIME 50/50 AND -- WELL, WE HAVE

1   BEEN ON YOUR CASE, OF COURSE YOU WOULD HAVE MORE, BUT YOU HAVE

2   QUITE A BIT MORE TIME THAN THEY DO, SO YOU WILL HAVE TO BE

3   CAREFUL WHEN YOU DO YOUR CROSS-EXAMINATION, ESPECIALLY OF

4   DR. SAYRE, TO BE EFFICIENT.

5              **MR. ASHKER:**   YOUR HONOR, I AM GOING TO TRY TO JUST

6   CUT TO THE CHASE AS MUCH AS POSSIBLE ON THE REMAINING

7   WITNESSES.  WITH DR. SAYRE, I MEAN HE'S THE MAIN DEFENDANT, SO,

8   THAT'S WHAT I AM GOING TO DO WITH THE REMAINING WITNESSES, I

9   WILL CUT TO THE CHASE AND RIGHT THROUGH THEM, AND HOPEFULLY

10  HAVE ENOUGH TIME TO DO WHAT I NEED TO DO WITH DR. SAYRE.

11             **THE COURT:**   OKAY.

12             **MR. ANDRADA:**   ONE OPTION IS THAT HE JUST NOT CALL

13  DR. ALLEN.  THAT'S HIS DECISION.  I KNOW THE COURT WILL ALLOW

14  HIM TO CALL HIM, BUT --

15             **THE COURT:**   THAT SHOULDN'T BE TOO LONG.

16             IN THAT REGARD THOUGH, THAT REMINDED ME OF SOMETHING

17  ELSE.  AND THAT IS, YOU KNOW, THE PRIOR CONVICTIONS ARE

18  ACTUALLY, AS MR. ASHKER POINTS OUT, ONLY IN THE LAST TEN YEARS.

19  SO THAT MISDEMEANOR TAX CONVICTION FROM '92, THAT WON'T COME

20  IN.  THAT'S WAY TOO OLD.

21             **MR. ANDRADA:**   VERY WELL, YOUR HONOR.

22             **THE COURT:**   WE GOT THE PHOTOS OF THE EXHIBITS.  I

23  WANTED TO -- WE NEED A COPY OF THAT VIDEOTAPE FOR THE RECORD,

24  BUT I DON'T WANT TO KEEP THE ONLY ONE IN EXISTENCE.  SO I WAS

25  WONDERING IF YOU WOULD BE ABLE TO, IDEALLY, GET IT COPIED OVER

```
1    TO DVD INSTEAD OF A VIDEOTAPE.

2              MR. ANDRADA:  WHATEVER THE COURT WOULD LIKE.

3              THE COURT:  UNLESS YOU HAVE ANOTHER COPY.  I HATE TO

4    HAVE THE ONLY COPY.

5              MR. ANDRADA:  I UNDERSTAND.  I DON'T -- I DON'T

6    THINK WE HAVE ANOTHER COPY.  IF THE COURT WILL RELEASE THE VCR

7    TO US, I WILL DO MY BEST TO GET SOMEBODY DOWN HERE TO GET IT

8    INTO A DVD FORMAT.

9              THE COURT:  YES.

10             MR. ANDRADA:  AND THEN, EXCUSE ME, YOUR HONOR, LET

11   ME MAKE A NOTE HERE IF THAT'S OKAY.

12                  (PAUSE IN THE PROCEEDINGS.)

13             MR. ANDRADA:  YOUR HONOR, ONE OTHER -- CAN I JUST

14   FILL YOU IN ON WHAT THE SCHEDULE IS WITH REGARD TO WITNESSES?

15   IT WILL BE VERY BRIEF.

16             THE COURT:  OKAY.

17             MR. ANDRADA:  I KNOW WE HAVE DR. ALLEN, WE HAVE

18   DR. SAYRE.  DR. WINSLOW IS AVAILABLE LATE THIS MORNING TO

19   APPEAR BY VIDEOCONFERENCE, AND THEN FROM PELICAN BAY WE HAVE

20   MS. RISENHOOVER, MR. DODGEN, DR. ROWE.  WE HAVE MS. MCLEAN

21   HERE, ALTHOUGH I SUSPECT THAT WILL BE A FULL DAY.  AND THEN

22   TOMORROW, YOUR HONOR, WE HAVE DR. FRIEDMAN VERY BRIEFLY IN THE

23   MORNING AND DR. SHIN, AND THAT SHOULD DO IT.

24                  NOW, THERE'S ONE OTHER SMALL ISSUE.  THERE HAS BEEN

25   A SUGGESTION BY MR. ASHKER -- MORE THAN A SUGGESTION, THAT
```

1    SOMEHOW THE SHU IS TOO COLD AND THIS PLACE WHERE MILDEW

2    ACCUMULATES AND SO FORTH, AND WE HAVE A WITNESS WHO CAN

3    TESTIFY, WHO IS COMPETENT TO TESTIFY ABOUT THE AMBIENT

4    TEMPERATURE IN THE SHU.  IT SHOULDN'T TAKE MORE THAN FIVE

5    MINUTES OR TEN MINUTES.  AND SO, WE WOULD LIKE TO BE ABLE TO

6    SQUEEZE THAT PERSON IN AS WELL.

7              **THE COURT:**  WHO IS THAT?

8              **MR. ANDRADA:**  OF COURSE I ANTICIPATED THAT QUESTION

9    AND AS I SIT HERE, I DO NOT KNOW HIS NAME.  MR. LAURIE, MY

10   ASSOCIATE IS UP IN PELICAN BAY, HE'S LOCATED THE GENTLEMAN.  I

11   CAN GET HIS NAME FOR YOU AND PROVIDE IT TO YOU AT THE BREAK.

12             **THE COURT:**  WELL, WHAT IS IT, LIKE A GUARD OR

13   SOMETHING UP THERE WHO IS GOING TO SAY HOW HE FEELS OR DO YOU

14   HAVE A MAINTENANCE PERSON TO SAY WHAT THE TEMPERATURE IS?

15             **UNIDENTIFIED SPEAKER:**  HE HAS A --

16             **THE COURT:**  I CAN'T HAVE TESTIMONY FROM SOMEONE WHO

17   IS NOT SWORN.  IF YOU WANT TO CONSULT WITH SOMEONE AND THEN

18   ANSWER MY QUESTION, YOU CAN.

19             (PAUSE IN THE PROCEEDINGS.)

20             **MR. ANDRADA:**  THERE IS A LOG THAT'S DONE PER SHIFT

21   THAT RECORDS THE AMBIENT TEMPERATURE IN THE SHU POD.  SO, THE

22   TESTIMONY WOULD BE BASED ON THOSE LOGS.

23             **MR. ASHKER:**  WELL, YOUR HONOR, I MEAN I HAVE NO

24   DOUBT THAT THE LOG EXISTS.  THE PROBLEM WITH IT IS, I MEAN THE

25   TEMPERATURE GAUGE IS UP ON THE WALL OUTSIDE OF THE CELLS.  IT'S

1    NOT THE TEMPERATURE INSIDE THE CELL.  AND IT'S NOT AN ACCURATE

2    READING OF THE TEMPERATURE INSIDE THE ACTUAL CELLS.  AND THAT

3    IS BASED ON MY 19 YEARS OF EXPERIENCE THERE.

4         AND SO, YEAH, SURE, THEY GOT A LOG.  I DON'T DISPUTE

5    THAT THEY HAVE A LOG THAT THEY WALK THROUGH AND LOOK UP AT THE

6    TEMPERATURE GAUGE UP ON THE WARMEST PART OF THE AREA OF EACH

7    POD, UP 15 FEET HIGH ON THE WALL, WHILE OUR CELLS ARE

8    SIX INCHES OF CONCRETE BETWEEN THE OUTSIDE AND OUR CELL.  AND

9    THE TEMPERATURE IS A BIG, BIG DIFFERENCE.  SO, I DON'T -- I

10   MEAN --

11        **THE COURT:**  ONE PROBLEM IS IT'S NOT ON THE WITNESS

12   LIST.  IT WASN'T DISCLOSED.  AND IT'S NOT LIKE IT IS A NEW

13   ISSUE.  IT'S NOT LIKE IT'S A NEW ISSUE.  HE HAS BEEN TALKING

14   ABOUT HIS THERMALS FOR A NUMBER OF YEARS NOW.

15        SO I THINK MAYBE IT'S A LITTLE LATE TO BRING THAT

16   IN.  I SUPPOSE YOU CAN ASK ALL THESE PEOPLE WHO ARE TESTIFYING

17   WHO ARE IN AND ABOUT THE SHU, YOU CAN ASK ALL OF THEM WHETHER

18   IT'S COLD THERE.

19        **MR. ANDRADA:**  WE WILL DO THAT THEN.

20        **MR. ASHKER:**  NOT ONLY THAT, YOUR HONOR, BUT IN 2001,

21   DR. WINSLOW AGREED TO A STIPULATED SETTLEMENT IN DEL NORTE

22   SUPERIOR COURT ON MY THERMAL HABEAS CORPUS ISSUE WHERE HE

23   PROMISED THAT I WOULD BE ABLE TO HAVE TWO SETS OF THICK

24   THERMALS FOR AS LONG AS MY MEDICAL CONDITION REQUIRED.  HE DID

25   NOT DISPUTE OR SAY A WORD ABOUT, WELL, THE CELLS AREN'T COLD.

1          **THE COURT:**  OKAY.  ALL RIGHT.  SO LET'S GO AHEAD.

2     WE ARE GOING TO --

3          **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

4          **THE COURT:**  WE STILL HAVE TEN MORE MINUTES OF CROSS

5     OF MR. ASHKER.

6          **MR. ANDRADA:**  I THINK WE ARE DONE.  IN THE INTEREST

7     OF TIME, I AM DONE WITH MR. ASHKER.

8          **THE COURT:**  HE MAY HAVE REDIRECT.

9          **MR. ASHKER:**  I HAVE ABOUT MAYBE ABOUT FIVE MINUTES

10    OF REDIRECT.

11         **THE COURT:**  WELL, LET ME TELL YOU THAT I THINK YOU

12    HAVE, UNLESS I MISSED IT, PROBABLY NOT ADEQUATELY ADDRESSED

13    YOUR BREACH OF CONTRACT CLAIM IN TERMS OF JUST SAYING WHETHER

14    OR NOT -- WHAT YOU UNDERSTOOD THE CONTRACT MEANT, AND ONE, TWO,

15    THREE, FOUR, WHAT YOUR EVIDENCE IS THAT IT WAS BREACHED OR THAT

16    YOU WEREN'T GIVEN THE BENEFIT OF WHAT WAS AGREED TO.

17         **MR. ASHKER:**  AS FAR AS --

18         **THE COURT:**  DID YOU GO TO DAVIS?  DID YOU GO

19    ANYWHERE ELSE?  DID YOU GET THE BALL?  DID YOU GET THE

20    THERA-BAND?  DID YOU GET THE ARM BRACE?  DID YOU GET THE

21    PHYSICAL THERAPY?

22         MAYBE I MISSED IT, BUT I THINK IT WOULD BE HELPFUL

23    IF YOU WOULD JUST GO THROUGH THAT BRIEFLY.

24         **MR. ASHKER:**  OKAY, AND JUST STATE WHAT MY

25    UNDERSTANDING WAS AND HOW I BELIEVE IT WAS A BREACH?

```
 1              THE COURT:  NOT THE ARGUMENT OF HOW YOU BELIEVED IT

 2    WAS BREACHED, BUT THE FACTS.  I UNDERSTOOD I WAS TO GET THIS.

 3    I DIDN'T GET THIS.  I UNDERSTOOD I WAS TO GET THAT.  THAT WAS

 4    TAKEN AWAY AT SUCH AND THUS A POINT.  WHATEVER THE CASE MAY BE.

 5              MR. ASHKER:  OKAY.

 6              THE COURT:  IF YOU ALREADY DID IT AND I MISSED IT, I

 7    CAN'T RECALL EVERYTHING, BUT -- OKAY.  LET'S BRING IN THE JURY.

 8              SHEILAH, IF YOU WOULD GIVE HIM THAT VIDEOTAPE

 9    SOMETIME.  I THINK IT'S STILL IN THE MACHINE PROBABLY.

10              THE CLERK:  NO, I HAVE IT.

11              ALL RISE.

12              (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

13              THE COURT:  PLEASE BE SEATED.

14              GOOD MORNING, LADIES AND GENTLEMAN.

15              JURY:  GOOD MORNING.

16              THE COURT:  AT THIS TIME THE PLAINTIFF IS GOING TO

17    CALL HIS NEXT WITNESS, WHICH IS DR. ALLEN.

18              YOU CAN COME UP TO THE STAND, SIR.

19              IF YOU WOULD REMAIN STANDING AND RAISE YOUR RIGHT

20    HAND.

21                         EVERETT ALLEN,

22    CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

23    TESTIFIED AS FOLLOWS:

24              THE WITNESS:  I DO.

25              THE CLERK:  PLEASE BE SEED STATE YOUR FULL NAME
```

1    SPELL YOUR LAST NAME FOR THE RECORD.

2              **THE WITNESS:**  MY NAME IS EVERETT, FIRST NAME

3    E-V-E-R-E-T-T, DOUGLAS, D-O-U-G-L-A-S, ALLEN, A-L-L-E-N.

4              **THE COURT:**  LADIES AND GENTLEMAN, WE ARE RUNNING A

5    LITTLE BIT BEHIND SCHEDULE, SO I AM PUTTING SOME PRESSURE ON

6    THE PARTIES TO MOVE THINGS ALONG RATHER QUICKLY.

7              SO DON'T TAKE THAT NEGATIVELY, BUT I AM TRYING TO

8    MOVE THINGS ALONG HERE.

9                      <u>**DIRECT EXAMINATION**</u>

10   **BY MR. ASHKER:**

11   **Q.**  GOOD MORNING, DR. ALLEN.

12             WERE YOU -- AT SOME POINT DID YOU WORK AT PELICAN

13   BAY STATE PRISON?

14   **A.**  YES.  I WORKED AT PELICAN BAY STATE PRISON IN TOTAL FROM

15   1999 TO -- FROM ACTUALLY THE IDES OF MARCH 1999 TO THE END OF

16   SEPTEMBER 2006.

17   **Q.**  OKAY.  ARE YOU STILL EMPLOYED THERE?

18   **A.**  NO, I AM NOT.

19   **Q.**  VERY BRIEFLY, COULD YOU STATE WHAT YOUR CREDENTIALS ARE?

20   **A.**  I DID MY -- I DID UNDERGRADUATE COMPLETED DEGREE AT

21   HARVARD IN THE CLASS OF 1973, FROM '69 TO '73 IN BIOLOGY AND

22   TRAINING IN AFRICAN-AMERICAN STUDIES.  DID A YEAR AS A SPECIAL

23   GRADUATE STUDENT AT MIT IN THE DEPARTMENT OF BIOLOGY, AND THEN

24   WENT TO PERDUE UNIVERSITY IN INDIANA IN A BIOLOGY STUDIES

25   PROGRAM WHERE I OBTAINED A MASTER'S IN BIOLOGY.  THEN

ALLEN – DIRECT / MR. ASHKER

1   TRANSFERRED TO U.C.L.A. TO THE DEPARTMENT OF BIOLOGY AND THEN

2   MOLECULAR BIOLOGY INSTITUTE FOR A YEAR.  THEN WENT INTO AN

3   MD/PH.D CALLED MEDICAL SCIENTIST TRAINING PROGRAM AT UNIVERSITY

4   CALIFORNIA SAN FRANCISCO MEDICAL SCHOOL, WHICH WAS COMBINED MD

5   AND PH.D. PROGRAM, AND DID SOME TEACHING AT HARVARD SUMMER

6   SCHOOL IN 1973, TAUGHT MY OWN CLASS CALLED THE BIOLOGY OF BLACK

7   RELATED DISEASES AT UCSF.  I TAUGHT THE SUMMER BIOCHEMISTRY

8   COURSE TO THE MEDICAL, PHARMACY, AND DENTAL STUDENTS IN THE

9   SUMMER OF 1980.

10  **Q.**  THANK YOU, DOCTOR.

11          AND DO YOU KNOW ME?

12  **A.**  YES, I DO.

13  **Q.**  HAVE YOU PROVIDED ME WITH TREATMENT IN THE PAST?

14  **A.**  YES, I HAVE.

15  **Q.**  DO YOU RECALL WHAT THAT TREATMENT WAS FOR?

16  **A.**  YES.  INITIALLY I FIRST MET YOU IN THE C-SHU FACILITY WHEN

17  I WAS A REGISTRY POSITION BEFORE I HIRED ON AS AN EMPLOYEE TO

18  THE CDCR IN THE SUMMER OF 1999 IS WHEN I FIRST ENCOUNTERED YOU.

19  **Q.**  CAN YOU BRIEFLY SUMMARIZE WHAT YOU TREATED ME FOR?

20  **A.**  YOUR ISSUES WERE GASTROINTESTINAL PROBLEMS OF VARIOUS

21  SORTS THAT WE ATTEMPTED TO TREAT AND THE ISSUE OF THE DEBILITY

22  OF YOUR RIGHT FOREARM.

23  **Q.**  OKAY.  AND DID YOU CONSIDER MY CONDITION TO BE A SERIOUS

24  CONDITION?

25  **A.**  I DID.

1   Q.   AND WAS IT COMPLICATED IN YOUR OPINION?

2   A.   IT WAS COMPLICATED FOR ME AND THERE WERE A NUMBER OF

3   SPECIALISTS INVOLVED IN -- I DID FIND OUT THE UNDERSTANDING

4   THAT YOU HAD WON SOME COURT ORDER FOR TREATMENT OF THAT

5   SPECIFIC CONDITION.

6   Q.   AND HOW DID YOU COME TO BE AWARE OF THAT KNOWLEDGE?

7           MR. ANDRADA:   CALLS FOR HEARSAY, YOUR HONOR.   IT'S

8   NOT RELEVANT AS TO THIS WITNESS, 403.

9           THE COURT:   SUSTAINED.

10  BY MR. ASHKER:

11  Q.   DR. ALLEN, AT SOME POINT IN TIME DID YOU PRESCRIBE

12  TRAMADOL AS A MEDICATION FOR MY ARM PAIN?

13  A.   I BELIEVE THAT I MAY HAVE.

14           I WOULD HAVE TO SEE THE RECORDS, AND I HAVEN'T BEEN

15  ABLE TO GET ACCESS TO THE RECORDS TO SEE EXACTLY WHAT I DID.

16  BUT IT WAS A MEDICATION THAT I WAS VERY FAMILIAR WITH AND WAS

17  USING.

18  Q.   OKAY.   AND YOU ARE NO LONGER EMPLOYED AT PELICAN BAY STATE

19  PRISON; IS THAT CORRECT?

20  A.   NO, I RESIGNED, THE RECORD WILL REVEAL, IN SEPTEMBER OF

21  2006.

22  Q.   WHAT WAS THE BASIS OF YOUR RESIGNATION?

23  A.   WELL, THERE WAS CONFLICT, HABITUAL CONFLICT BETWEEN MYSELF

24  AND SOME OF THE MEDICAL MANAGERS, LOCAL AND IN SACRAMENTO, THAT

25  INVOLVED AN ATTEMPTED FIRING IN 2001, WHICH WAS -- IN WHICH I

ALLEN – DIRECT / MR. ASHKER

1   WAS MADE WHOLE RELATIVE TO THAT SET OF CREATED FACTS.  AND THE

2   FIRING WAS AROUND THE ISSUE OF ME BEING PROMOTED INTO

3   MANAGEMENT AND MY REPORTING TO MY BOSS'S BOSSES THAT I THOUGHT

4   HE WAS NOT DOING A GOOD JOB AND THAT THEY SHOULD DO SOMETHING

5   ABOUT IT.  THEY DID; THEY FIRED ME.

6            **MR. ANDRADA:**  OBJECTION, MOVE TO STRIKE, YOUR HONOR.

7   NO FOUNDATION WITH REGARD TO -- IT CALLS FOR SPECULATION.  IT'S

8   NOT RELEVANT.

9            **THE COURT:**  WELL, I AM ASSUMING THAT YOU WERE -- YOU

10  HAD TOLD US YOU WERE PLANNING ON GOING INTO THESE ISSUES ON

11  CROSS, SO I BELIEVE --

12           **MR. ANDRADA:**  I AM.

13           **THE COURT:**  -- MR. ASHKER IS ATTEMPTING TO BRING IT

14  IN ON DIRECT IN ANTICIPATION THAT THAT WOULD BE SOMETHING YOU

15  WOULD BE GOING INTO.

16           GIVEN YOUR REPRESENTATION, UNLESS YOU WANT TO STRIKE

17  THE WHOLE SUBJECT MATTER --

18           **MR. ANDRADA:**  NO.

19           **THE COURT:**  -- I WILL ALLOW IT.

20           **MR. ANDRADA:**  I AM VERY HAPPY TO INQUIRE INTO THE

21  SUBJECT.

22           THANK YOU.

23           **THE COURT:**  OKAY.

24           **THE WITNESS:**  OKAY.  THE RESIGNATION WAS ACTUALLY

25  THE RESULT OF A NEGOTIATION THROUGH THE STATE PERSONNEL BOARD

1    IN WHICH I HAD COME TO WORK ON A PARTICULAR DAY, AND HAD FALLEN

2    ASLEEP --

3            THE COURT:  BE THAT AS IT MAY, I DON'T WANT TO GO

4    INTO A LENGTHY RECITATION.  YOU CAN ADDRESS IT VERY BRIEFLY.

5            THE WITNESS:  IT WAS, RESIGNATION WAS A REINSTATION

6    AND SETTLEMENT FROM AN ATTEMPT TO FIRE ME.

7    BY MR. ASHKER:

8    Q.   HAS YOUR LICENSE TO PRACTICE MEDICINE BEEN SUSPENDED?

9    A.   MY LICENSE TO PRACTICE MEDICINE HAS NEVER BEEN SUSPENDED

10   TO MY KNOWLEDGE.

11   Q.   OKAY.

12   A.   TO THIS DAY.

13   Q.   AND DURING YOUR EMPLOYMENT AT PELICAN BAY STATE PRISON,

14   DID YOU HAVE PERSONAL INTERACTIONS WITH DR. SAYRE?

15   A.   YES, I HAD.  DR. SAYRE CAME INTO THE JOB AS MY IMMEDIATE

16   SUPERVISOR AND WE HAD PROFESSIONAL INTERACTIONS AND FAIRLY

17   EXTREMELY FRICTIONAL PROFESSIONAL INTERACTIONS.

18   Q.   DO YOU HAVE ANY PERSONAL KNOWLEDGE OF DR. SAYRE

19   DISCONTINUING PATIENT'S MEDICATIONS WITHOUT ANY PHYSICAL EXAM?

20           MR. ANDRADA:  OBJECTION, YOUR HONOR, RELEVANCE, NO

21   FOUNDATION, 403.  THIS IS VERY FAR AFIELD HERE.  IT'S NOT

22   EVEN -- IT WASN'T EVEN LIMITED TO TRAMADOL.  THIS IS --

23           THE COURT:  IT WILL BE ALLOWED IF HE HAS PERSONAL

24   KNOWLEDGE OF IT, NOT THROUGH HEARSAY.

25           THE WITNESS:  YES.  IT'S -- I HAVE DIRECT PERSONAL

1  KNOWLEDGE BECAUSE I WORKED AT THE PRISON.  THIS IS ONE OF THE

2  TREMENDOUS ISSUES OF CONFLICT BETWEEN MYSELF AND --

3          **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.

4          **THE WITNESS:**  SPECIFIC SITUATION --

5          **MR. ANDRADA:**  -- EXCUSE ME, DOCTOR, IF YOU WOULD BE

6  SO KIND.

7          THIS CERTAINLY SOUNDS LIKE HEARSAY, YOUR HONOR.

8          **THE WITNESS:**  I CAN GIVE YOU THE CASES.

9          **THE COURT:**  WHAT YOU NEED TO DO IS ASK BEFORE HE

10  SAYS WHAT HE KNOWS, ASK HOW HE KNOWS IT SO THAT WE CAN EVALUATE

11  WHETHER IT'S HEARSAY OR NOT.

12          **MR. ANDRADA:**  AND, AGAIN, I STILL DON'T,

13  RESPECTFULLY -- IF YOU WOULD BE SO KIND, I RESPECTFULLY OBJECT

14  ON THE BASIS OF RELEVANCE AND 403.  WE ARE GOING TO BE --

15          **THE COURT:**  THAT WILL BE OVERRULED.  IF WE ARE

16  TALKING ABOUT INFORMATION AS SIMILAR AS DESCRIBED HERE,

17  SPECIFICALLY PRESCRIBING MEDICATION WITHOUT EXAMINATION.

18          **MR. ANDRADA:**  THERE'S NO -- YOUR HONOR --

19          **THE COURT:**  THAT'S WHAT WE ARE GOING TO FIND OUT.  I

20  DON'T KNOW IF THERE IS OR THERE ISN'T --

21          **MR. ANDRADA:**  AS FAR AS --

22          **THE COURT:**  -- BUT THERE'S ONLY ONE WAY TO FIND OUT

23  THAT I KNOW OF AND THAT'S TO ASK HOW YOU KNOW OF SUCH.

24          **MR. ANDRADA:**  VERY WELL.

25          **MR. ASHKER:**  HOW DR. ALLEN KNOWS OF THIS?

1    **THE COURT:** RIGHT.

2    **BY MR. ASHKER:**

3    **Q.**   DR. ALLEN, WHILE YOU WERE EMPLOYED AT PELICAN BAY STATE

4    PRISON, DID YOU HAVE PERSONALLY HAVE ANY PATIENTS THERE WHOSE

5    MEDICATIONS WERE DISCONTINUED BY DR. SAYRE WITHOUT CONSULTING

6    YOU AND WITHOUT PHYSICALLY EXAMINING THOSE PATIENTS?

7    **A.**   YES.

8    **MR. ANDRADA:** EXCUSE ME.  IF YOU WOULD BE SO KIND.

9    AGAIN, YOUR HONOR, I STILL DON'T BELIEVE THAT THIS

10   IS ADEQUATE FOUNDATION.

11   **THE COURT:** WELL, HE HASN'T LAID IT YET.

12   **MR. ANDRADA:** WELL -- THANK YOU.

13   **THE COURT:** THE QUESTION IS HOW DO YOU KNOW THAT?

14   HOW DID YOU GET THAT INFORMATION?

15   **BY MR. ASHKER:**

16   **Q.**   HOW DID YOU GET THAT INFORMATION, DR. ALLEN?

17   **A.**   I PERSONALLY HAD PATIENTS WHO HAD THEIR MEDICATIONS

18   DISCONTINUED BY DR. SAYRE AND I COULD NOT FIND EVIDENCE OF AN

19   ORDER TO DISCONTINUE THEM OR ANY NOTES THAT HE HAD TALKED --

20   PUT IN THE CHART TO DESCRIBE WHY HE DISCONTINUED THEM.  THIS

21   WAS A MAJOR PROBLEM FOR ME.

22   **MR. ANDRADA:** OBJECTION, YOUR HONOR, MOVE TO STRIKE

23   THE LATTER COMMENT.  IT'S NONRESPONSIVE.  IT'S NOT RELEVANT.

24   **THE COURT:** THE COMMENT THAT IT WAS A MAJOR PROBLEM

25   WILL BE STRICKEN.

1   **BY MR. ASHKER:**

2   **Q.**   AND CAN YOU GIVE A FEW EXAMPLES?

3   **A.**   YES, I CAN.

4          I HAD A PATIENT WHO, IN DECEMBER OF 2004, I BELIEVE

5   IT WAS, HAD A MASSIVE GASTROINTESTINAL BLEED AND WAS TAKEN TO

6   AN OUTSIDE HOSPITAL.  THAT PATIENT BLED BECAUSE HE HAD LOW

7   PLATELET COUNT --

8          **THE COURT:**  WE DON'T NEED --

9          **THE WITNESS:**  HE BLED, AND HE WAS EVALUATED AND HE

10  WAS SEEN BY TWO DIFFERENT SPECIALISTS, GASTROLOGIST AND A

11  HEMATOLOGIST PRESCRIBED A CERTAIN MEDICINE FOR HIM TO TREAT THE

12  BLEEDING SITE THEY FOUND ON SCOPING.

13         THAT PARTICULAR MEDICINE, THE PATIENT WAS TREATED

14  WITH FOR SIX MONTHS AND ON INTO -- THIS WAS AUGUST OF 2005.

15  THAT PATIENT MEDICATION DID NOT RECEIVE HIS MEDICATION

16  INITIALLY, UNBEKNOWNST TO ME.  I HAD WRITTEN A PRESCRIPTION TO

17  RENEW IT.  SUBSEQUENTLY I TOOK CARE OF THAT PATIENT THREE WEEKS

18  LATER, WENT OUT -- BECAUSE HE WENT OUT TO THE HOSPITAL WITH

19  ANOTHER MASSIVE GASTROINTESTINAL BLEED, AND THE STORY THAT I

20  GOT FROM HIM --

21         **MR. ANDRADA:**  OBJECTION, HEARSAY.

22         **THE COURT:**  THAT WOULD BE HEARSAY.

23         **THE WITNESS:**  I RESEARCHED THE STORY.  I CHECKED

24  INTO THE CHART AFTER I TALKED TO HIM --

25         **MR. ANDRADA:**  EXCUSE ME.

1          **THE WITNESS:**  -- I HAD WRITTEN THE MEDICATION, THE

2     ORDER ON A CERTAIN DATE --

3          **MR. ANDRADA:**  EXCUSE ME --

4          **THE COURT:**  YOU NEED TO STOP AND LET HIM MAKE HIS

5     OBJECTION.

6          **MR. ANDRADA:**  THANK YOU.

7          IT'S STILL HEARSAY, YOUR HONOR.  THESE RECORDS -- HE

8     IS TALKING ABOUT RECORDS OF ANOTHER PATIENT, ANOTHER PATIENT.

9     THE RECORDS ARE NOT HERE.  THEY HAVE NOT BEEN MARKED.

10          THERE IS NO FOUNDATION FOR THIS, YOUR HONOR.  403

11     ALSO SHOULD APPLY HERE IF THIS IS AT ALL RELEVANT.  WE DON'T

12     EVEN KNOW IF THIS IS TRAMADOL.

13          **THE COURT:**  I AM NOT RELYING ON THE FACT IT'S

14     TRAMADOL.  IT'S A LITTLE DIFFICULT IN THAT MR. ASHKER, NOT

15     BEING A LAWYER, DOESN'T KNOW HOW TO LAY A FOUNDATION OR HOW TO

16     DETERMINE WHAT THE BASIS OF HIS KNOWLEDGE IS, SO IT'S A LITTLE

17     DIFFICULT.

18          I GUESS ONE MIGHT ASK WHETHER LATER ON THAT PATIENT

19     WAS TAKING THE MEDICATION AND HAD DR. ALLEN DISCONTINUED IT AND

20     THEN I GUESS ONE MIGHT ARGUE AN INFERENCE FROM THAT.

21     **BY MR. ASHKER:**

22     **Q.**  DR. ALLEN, YOU HAD PRESCRIBED THIS MEDICATION FOR THIS

23     PATIENT?

24     **A.**  IN CONTINUUM.  WHEN I FIRST BEGAN TO SEE HIM IN, I THINK

25     IT WAS MAY OF 2005, HE WAS ALREADY ON IT.  I CONTINUED IT.  AND

1   I DISCUSSED THE CONTINUATION OF THAT WITH THE TWO SPECIALISTS.

2   **Q.**   OKAY.  AND --

3   **A.**   DOCUMENTED THAT IN THE CHART.

4   **Q.**   HOW DO YOU -- WHAT MADE YOU COME TO BELIEVE THAT DR. SAYRE

5   WAS SOMEHOW INVOLVED IN INTERRUPTING YOUR TREATMENT PLAN FOR

6   THAT PATIENT?

7   **A.**   WELL, THE ELECTRONIC MEDICAL RECORDS SYSTEM THAT WE

8   WERE -- THAT WE JUST BEGAN TO USE IN JULY HAD SOME MAJOR FLAWS

9   IN IT.

10              ONE OF THOSE FLAWS WAS THAT A MEDICATION CAN BE

11  DISCONTINUED WITHOUT AN ORDER.  YOU CAN ACTUALLY GO INTO THE

12  COMPUTER AND MANIPULATE AND DISCONTINUE A MEDICATION WITHOUT

13  LEAVING A TRAIL.  AND THERE WOULD BE NO ORDER THAT YOU WOULD

14  NORMALLY HAVE TO WRITE ON PAPER TO DISCONTINUE THE MEDICATION,

15  AND SOME NURSE OR PRACTITIONER WOULD HAVE TO NOTE THAT ORDER.

16  THAT WAS A DEFECT OF THE COMPUTER.  THAT WAS IDENTIFIED --

17              **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.

18              **THE WITNESS:**  -- BEFORE --

19              **MR. ANDRADA:**  DOCTOR, PLEASE.

20              **THE COURT:**  YOU NEED TO STOP.

21              **MR. ANDRADA:**  WOULD YOU BE SO KIND, SIR.  THANK YOU.

22              **THE WITNESS:**  OKAY.

23              **MR. ANDRADA:**  THIS IS NOT RELEVANT.  THERE IS NO --

24              **THE WITNESS:**  IT IS VERY RELEVANT.

25              **THE COURT:**  DR. ALLEN.

1              **THE WITNESS:**  I AM SORRY.

2              **THE COURT:**  THOSE MATTERS WILL BE DECIDED BY THE

3    COURT.  SO YOU DON'T NEED TO ARGUE THE OBJECTIONS.

4              **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR, AGAIN, I JUST

5    WANT TO --

6              **THE COURT:**  LET'S PUT IT THIS WAY:  DID YOU

7    DISCONTINUE THE MEDICATION?

8              **THE WITNESS:**  I WROTE AN ORDER TO GET THE MEDICATION

9    AND IT WAS DISCONTINUED.

10             **THE COURT:**  DID YOU DISCONTINUE IT?

11             **THE WITNESS:**  NO.  THAT'S THE REASON THE PATIENT

12   BLED.

13             **THE COURT:**  ALL RIGHT.

14             **THE WITNESS:**  THAT'S THE POINT, THE PATIENT WAS

15   DAMAGED.

16             **THE COURT:**  WE WILL LET IT GO AT THAT.

17             **MR. ANDRADA:**  CALLS FOR --

18   **BY MR. ASHKER:**

19   **Q.**   HOW DO YOU KNOW DR. SAYRE IS THE ONE THAT DISCONTINUED IT?

20   **A.**   THERE ARE TWO WAYS IN WHICH DR. SAYRE COULD HAVE DONE

21   THIS.  ONE OF THEM WAS THAT HE COULD HAVE NOT APPROVED THE

22   RENEWAL OF THE MEDICATION BECAUSE IT WAS A SPECIAL MEDICATION

23   CALLED A FORMULARY MEDICATION.  AND IN THOSE DAYS THE COMPUTER

24   WAS DEFECTIVE AND I COULD PROVE MY OWN, AND THE OTHER WAS THAT

25   IT WAS DISCOVERED THAT YOU COULD DISCONTINUE MEDICATIONS FROM A

1   DISTANCE WITH STEALTHS.

2         **MR. ANDRADA:**  OBJECTION.  EXCUSE ME.  EXCUSE ME.

3   THE COMMENT, THE LATTER COMMENT WE WOULD ASK THAT BE STRICKEN.

4         **THE COURT:**  THAT WILL BE STRICKEN.

5         **MR. ANDRADA:**  IT'S INAPPROPRIATE.

6         **THE COURT:**  WHO IN THE MEDICAL DEPARTMENT WOULD HAVE

7   HAD THE AUTHORITY OR THE ABILITY TO DISCONTINUE A MEDICATION

8   BESIDES YOURSELF AND DR. SAYRE?

9         **THE WITNESS:**  ANYBODY WHO HAD ACCESS TO THE

10  COMPUTER.

11        **THE COURT:**  ALL RIGHT.  WELL, THAT'S NOT

12  SUFFICIENTLY PROBATIVE.  WE ARE GOING TO HAVE TO GO ON TO

13  SOMETHING ELSE.

14  **BY MR. ASHKER:**

15  **Q.**  WAS THERE ANOTHER INCIDENT IN EARLY 2006 REGARDING A

16  DISCHARGE OF A PATIENT FROM THE INFIRMARY WHO –– AND IT WAS

17  DIAGNOSED WITH MS?

18  **A.**  YES, THERE WAS.  THIS IS A PATIENT WHOSE CARE I WAS

19  DIRECTLY INVOLVED IN.  THE PROBLEM, THE ISSUE HERE IS, I WAS

20  CALLED IN TO CONSULT ON THIS PATIENT BECAUSE THE NURSING STAFF

21  WERE AFRAID THE PATIENT WAS BEING PREMATURELY DISCHARGED BY

22  DR. SAYRE.

23        **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.  AGAIN, MAY I

24  RESPECTFULLY OBJECT?

25        **THE COURT:**  THIS IS ––

1          **MR. ANDRADA:**  THIS IS NOT RELEVANT --

2          **THE COURT:**  I WAS SPEAKING.

3          **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

4          **THE COURT:**  NO.  THIS IS NOT A QUESTION OF CUTTING

5    OFF MEDICATION WITHOUT AN EXAMINATION.  I WON'T ALLOW IT.

6          **MR. ASHKER:**  OKAY.  ALL RIGHT, YOUR HONOR.

7    **BY MR. ASHKER:**

8    **Q.**  DR. ALLEN, ARE YOU PERSONALLY FAMILIAR WITH THE MASSIVE

9    DISCONTINUATION OF ASTHMA MEDICATIONS?

10   **A.**  YES.

11         **MR. ANDRADA:**  OBJECTION, AGAIN, RELEVANCE, RULE 403.

12         **THE COURT:**  YES.  IF THIS IS -- IF THIS IS A SIMILAR

13   SITUATION WITH THE ACCESS TO THE COMPUTER, I WON'T ALLOW IT.

14         **MR. ASHKER:**  OKAY.

15         **THE WITNESS:**  IF DR. SAYRE ADMITTED THIS TO

16   WITNESSES.  IT'S DOCUMENTED IN ANOTHER SETTING.

17         **THE COURT:**  TO YOURSELF?

18         **THE WITNESS:**  NO, HE ADMITTED --

19         **THE COURT:**  NO, I AM SORRY --

20         **THE WITNESS:**  HE DIDN'T ADMIT IT TO ME.

21         **THE COURT:**  THAT IS HEARSAY.  I AM SORRY, I CAN'T

22   ALLOW IT.

23         **THE WITNESS:**  OKAY.

24   **BY MR. ASHKER:**

25   **Q.**  DR. ALLEN, DO YOU HAVE ANY PERSONAL KNOWLEDGE WHERE -- OF

ALLEN – DIRECT / MR. ASHKER

1    ANY CONVERSATIONS WITH DR. SAYRE CONCERNING DISCONTINUING

2    MEDICATIONS WITHOUT PHYSICALLY EXAMINING THE PATIENT?

3              **THE COURT:**  BY THAT, THE ONLY ADMISSIBLE EVIDENCE

4    WOULD BE IF YOU HEARD YOURSELF DR. SAYRE SAY SOMETHING TO THIS

5    EFFECT, NOT THAT SOMEONE ELSE TOLD YOU THAT THEY HEARD HIM SAY

6    IT.

7              **THE WITNESS:**  IN MY DISCUSSIONS WITH DR. SAYRE,

8    THERE WERE TWO PATIENTS IN AUGUST OF 2005 IN WHICH HE

9    DISCONTINUED A MEDICATION THAT WAS PRESCRIBED, ONE BY A

10   NEUROLOGIST AND ONE BY AN ORTHOPEDIC SURGEON.  HE DID SAY HE

11   DISCONTINUED THOSE MEDICATIONS.  AND I HAVE PAPER EVIDENCE OF

12   THAT.

13             I COULDN'T, OF COURSE, I COULDN'T BRING IT FOR THIS.

14   HE DID NOT EXAMINE THOSE PATIENTS NOR PUT A NOTE IN THE CHART,

15   BUT I STILL HAVE THE PAPER TRAIL FOR ALL THAT EXTERNAL DATA.

16   **BY MR. ASHKER:**

17   **Q.**   HOW DO YOU KNOW THAT HE DID NOT EXAMINE THEM?

18   **A.**   BECAUSE I COULD NOT FIND A NOTE IN THE CHART AND BECAUSE I

19   HAVE HAD OTHER PHYSICIANS DEALT WITH IT FOR DOING THAT SAME

20   PARTICULAR --

21             **MR. ANDRADA:**  EXCUSE ME.  THE LATTER PART --

22             **THE COURT:**  THE LATTER COMMENT IS STRICKEN.

23             **THE WITNESS:**  OKAY.

24   **BY MR. ASHKER:**

25   **Q.**   DR. SAYRE PERSONALLY TOLD YOU THAT HE HAD DONE THIS ON

ALLEN – DIRECT / MR. ASHKER

1   THESE TWO PATIENTS?

2   **A.**   RIGHT.  I CONFRONTED HIM.

3   **Q.**   HOW DID YOU COME TO CONFRONT HIM ABOUT THAT?

4   **A.**   BECAUSE HE WAS MY SUPERVISOR AND I HAD THE DENIALS OF CARE

5   AND I HAD THE DISCONTINUATIONS ON PAPER, SOME OF THE THINGS

6   WERE ON THE PAPER IN FRONT OF ME.  HE TOLD ME THAT HE

7   DISCONTINUED THE MEDICINES BECAUSE IT WAS A CDC POLICY TO NOT

8   USE THOSE MEDICATIONS IN THAT SITUATION.

9   **Q.**   DID HE –– YOU WERE THOSE PATIENTS' PRIMARY CARE ––

10  **A.**   I WAS THERE DIRECT PROVIDER.  THIS IS IN AUGUST OF 2005.

11  **Q.**   DID HE CONSULT WITH YOU BEFORE HE DID THAT?

12  **A.**   NO, HE DID NOT, WHICH IS WHY I HAD TO HAVE THE

13  CONFRONTATION WITH HIM.

14  **Q.**   AND WHAT WAS HIS RESPONSE WHEN YOU CONFRONTED HIM?

15  **A.**   HIS RESPONSE WAS THAT HE FELT THE MEDICATION, EVEN THOUGH

16  IT WAS RECOMMENDED BY EXTERNAL SPECIALISTS, WAS NOT TO BE USED

17  IN THAT SITUATION, ALTHOUGH HE DIDN'T WRITE A NOTE IN THE CHART

18  TO THAT EFFECT EXPLAINING THAT THAT WAS THE REASON.

19          THE ONLY WAY I FOUND OUT ABOUT IT WAS THAT THE

20  INMATES CAME AT ME MAD ––

21          **MR. ANDRADA:**  WELL, THEN THAT ––

22          **THE WITNESS:**  –– BECAUSE THEY WERE NO LONGER GETTING

23  MEDICATIONS ––

24          **MR. ANDRADA:**  EXCUSE ME –– EXCUSE ME.

25          (SIMULTANEOUS COLLOQUY.)

1              **THE WITNESS:**  I WAS THEIR DOCTOR --

2              **THE COURT:**  EXCUSE ME.  YOU NEED TO STOP WHEN HE

3    OBJECTS.

4              **MR. ANDRADA:**  MOVE TO STRIKE HEARSAY WITH REGARD TO

5    THE PATIENTS COMING TO HIM.

6              **THE COURT:**  ALL RIGHT.

7              **MR. ANDRADA:**  IT'S HEARSAY.

8              **THE COURT:**  WE WILL STRIKE THE FACT THAT THE

9    PATIENTS CAME TO HIM.

10             **MR. ANDRADA:**  AND EXPLAINED THIS, ALLEGEDLY

11   EXPLAINED THE SITUATION.

12             **THE COURT:**  STRIKE THAT PART.  THE PART THAT IS

13   ADMISSIBLE IS THE TESTIMONY OF WHAT DR. SAYRE'S ADMISSIONS

14   WERE.

15             LET'S MOVE ON.

16   **BY MR. ASHKER:**

17   **Q.**   DR. ALLEN, DID YOU ATTEND A PHARMACY SPONSORED BANQUET AT

18   SOME POINT IN TIME?

19   **A.**   I ATTEND MANY OF THOSE FREE FEEDS AS WE SOMETIMES CALL

20   THEM.

21   **Q.**   AND DOES ONE PARTICULAR BANQUET COME TO MIND WAS ATTENDED

22   BY YOURSELF AND DR. SAYRE?

23   **A.**   YES.

24   **Q.**   AND WHEN WAS THAT?

25   **A.**   THAT WAS IN EARLY 2007, IF I BELIEVE CORRECTLY.  I AM

1    TRYING TO REMEMBER THE DATE ON THAT PARTICULAR ONE WAS.

2              I AM SORRY.  THAT WAS IN EARLY -- EITHER LATE 2007

3    OR EARLY 2008.

4    Q.   OKAY.  AND YOU ATTENDED THIS BANQUET.  CAN YOU STATE WHAT

5    THE BANQUET WAS ABOUT?

6    A.   THIS WAS A PHARMACEUTICAL COMPANY THAT MADE --

7    MANUFACTURES FOR ONE OF THE FAIRLY EXPENSIVE ANTIPSYCHOTIC

8    MEDICATIONS THAT IS USED QUITE A BIT ON OUR MENTAL HEALTH

9    PATIENTS.

10             AND THEY -- I, AS A MEDICAL DOCTOR, WAS NOT TRAINED

11   IN THESE MEDICINES AS THEY CAME OUT AFTER I WAS OUT OF

12   TRAINING.  SO THE WAY -- BECAUSE THEY USE A LOT OF THEM AND

13   THEY HAVE MEDICAL SIDE EFFECTS, I HAVE TO GO TO THESE MEETINGS

14   TO ASK THESE DETAIL REPS ABOUT THE MEDICAL SIDE EFFECTS OF

15   THESE MEDICATIONS.  SO THAT'S WHY I WAS AT THAT PARTICULAR

16   MEETING.

17   Q.   OKAY.  AND DOES A PARTICULAR INCIDENT STAND OUT IN YOUR

18   MIND THAT YOU PERSONALLY WITNESSED INVOLVING DR. SAYRE?

19   A.   YES.

20             MR. ANDRADA:  YOUR HONOR, EXCUSE ME.  DOCTOR.

21   RELEVANCE, 403.  THIS IS AT SOME DINNER.  THIS ISN'T -- IT JUST

22   CAN'T BE RELEVANT.

23             THE COURT:  ARE YOU FAMILIAR WITH THE TESTIMONY?  IT

24   WAS DESCRIBED, AND I DO FIND IT RELEVANT AND IT WILL BE

25   ALLOWED.

1    BY MR. ASHKER:

2    Q.    YOU MAY CONTINUE, DR. ALLEN.

3    A.    THANK YOU.

4            AT THIS PARTICULAR PHARMACEUTICAL DINNER, THE

5    SPEAKER GAVE US A MOVING MODEL OF CERTAIN SITUATIONS AND THEN

6    WOULD ASK US QUESTIONS ABOUT HOW WOULD YOU DIAGNOSE THIS OR HOW

7    WOULD YOU MANAGE THIS.  WHAT MEDICATIONS WOULD YOU CONSIDER?

8    AND THIS IS ALL TO EDUCATE US ABOUT HIS PARTICULAR MEDICATION,

9    OF COURSE.

10           DURING ABOUT 40 MINUTES INTO HIS PRESENTATION,

11   DR. SAYRE STOPPED AND MADE A COMMENT.

12   Q.    WHAT DO YOU MEAN HE STOPPED?

13   A.    HE RAISED HIS HAND TO -- WHEN YOU USED TO ASK A QUESTION

14   FROM THE FLOOR.  WHEN YOU WANT TO ASK THE SPEAKER SOMETHING.

15   THIS PARTICULAR SPEAKER WAS VERY TOLERANT AND WOULD LET YOU AT

16   ANY POINT IN TIME RAISE YOUR HAND AND ASK QUESTIONS RELATIVE TO

17   WHAT HE WAS SAYING AND WHAT WAS GOING ON.

18           MR. ANDRADA:  I JUST WANT TO MAKE SURE THE RECORD IS

19   CLEAR I HAVE AN OBJECTION TO THIS.

20           THE COURT:  I UNDERSTAND YOU OBJECT TO IT.

21           MR. ANDRADA:  THANK YOU.

22           THE WITNESS:  RIGHT.

23           AND DR. SAYRE MADE A COMMENT THAT WE WERE DEALING

24   WITH AN ANTIPSYCHOTIC PATIENT ON THE -- IN THE MODEL, IN THE

25   FILM, AND HE MADE A COMMENT THAT, YOU KNOW, THESE PEOPLE -- I

1    AM SORT OF PARAPHRASING -- BUT I TALKED TO A NUMBER OF PEOPLE

2    AND IT WASN'T JUST ME WHO WAS THERE.

3    **Q.**   YOU PERSONALLY WITNESSED THIS?

4    **A.**   I WITNESSED THIS.  THE WORDS THAT CAME OUT OF HIS MOUTH

5    WAS, YOU KNOW THESE PEOPLE THAT COME INTO -- I CAN'T KNOW IF HE

6    SAID O-R OR E-R, WHO ARE SAYING THEY ARE PSYCHOTIC.  I HAVE

7    FOUND THAT WHEN I TREAT THEM WITH A MUSCLE PARALYZER, THEY COME

8    OUT OF IT.  THEY ARE NO LONGER PSYCHOTIC.  THEY ARE FAKING

9    PSYCHOSIS.

10           OKAY?  AND THE ROOM STOPPED AND --

11   **Q.**   THE ENTIRE ROOM WENT SILENT?

12   **A.**   THE ROOM WENT SILENT.  AND I DIDN'T BELIEVE WHAT I HEARD.

13   THERE WAS A LITTLE BIT OF A MURMUR.  THE SPEAKER STOPPED.  HE

14   DID NOT HAVE A RESPONSE.  I LOOKED AROUND THE ROOM TO SEE IF

15   ANYBODY HAD HEARD WHAT I HAD HEARD, AND I SAW ONE PERSON

16   THROWING UP.  I TALKED TO HER ABOUT THAT LATER, BUT THE PEOPLE

17   AT THE TABLE BEGAN TO TELL ME --

18           **MR. ANDRADA:**  OBJECTION, YOUR HONOR.

19           **THE WITNESS:**  ALL RIGHT.

20           **THE COURT:**  NO.

21           **MR. ANDRADA:**  EXCUSE ME, DOCTOR.

22           **THE COURT:**  I HAVE INSTRUCTED HIM TO STOP --

23           **MR. ANDRADA:**  THANK YOU.

24           **THE COURT:**  -- TELLING WHAT THE PEOPLE AT THE TABLE

25   MAY HAVE SAID.

1            **MR. ANDRADA:**  THANK YOU.

2     **BY MR. ASHKER:**

3     **Q.**   DR. ALLEN, WHAT WAS SO -- YOU APPEARED -- WERE YOU

4     SHOCKED?

5     **A.**   I WAS VERY SHOCKED.

6     **Q.**   WHAT WAS SO SHOCKING ABOUT THAT STATEMENT?  I DON'T

7     UNDERSTAND.  COULD YOU EXPLAIN THAT TO THE JURY?

8     **A.**   THAT'S NOT THE TREATMENT THAT YOU WOULD USE FOR MENTALLY

9     ILL PATIENTS TO TREAT THEM WITH A MUSCLE PARALYZER.

10            THE COMMENT, AT THAT POINT IN TIME, WHAT WAS

11     RELEVANT WAS THE ISSUE OF TORTURE USING --

12            **THE COURT:**  DR. ALLEN, NO.  THAT COMMENT IS

13     STRICKEN.  LET'S MOVE ON.  IF YOU CAN DESCRIBE IN CALM TERMS

14     WHAT -- WELL, WE WILL JUST MOVE ON.

15            **MR. ASHKER:**  OKAY.  SO, I HAVE NO FURTHER QUESTIONS,

16     YOUR HONOR.

17            **THE COURT:**  ALL RIGHT.

18                    **CROSS-EXAMINATION**

19     **BY MR. ANDRADA:**

20     **Q.**   DR. ALLEN, ON OR ABOUT DECEMBER 26TH, 1997 THERE WAS A

21     DECISION RENDERED BY THE MEDICAL BOARD OF CALIFORNIA AGAINST

22     YOU WITH REGARD TO YOUR LICENSE; ISN'T THAT TRUE?

23     **A.**   YES, THAT IS TRUE.

24     **Q.**   AND, IN FACT, YOUR LICENSE -- THAT DECISION WAS THAT YOUR

25     MEDICAL LICENSE WAS TO BE REVOKED, BUT THE REVOCATION WAS

ALLEN – CROSS / MR. ANDRADA

1    STAYED AND THAT YOU WERE PUT ON FIVE YEARS OF PROBATION WITH

2    VARIOUS TERMS AND CONDITIONS.  ISN'T THAT TRUE?

3    **A.**    THAT'S TRUE.

4    **Q.**    SIR, ON OR ABOUT APRIL 13TH, 2009, THIS YEAR, A FEW WEEKS

5    AGO, THERE WAS ANOTHER DECISION BY THE MEDICAL BOARD WITH

6    REGARD TO YOUR LICENSE; ISN'T THAT TRUE?

7    **A.**    YES, A STAYED DECISION.

8    **Q.**    AND A FEW WEEKS AGO, ON APRIL 13TH, 2009 YOUR LICENSE WAS

9    REVOKED, THE REVOCATION WAS STAYED, AND YOU WERE PUT ON TEN

10   YEARS OF PROBATION WITH ONE YEAR OF ACTUAL SUSPENSION OF YOUR

11   ABILITY TO PRACTICE MEDICINE IN THE STATE OF CALIFORNIA; ISN'T

12   THAT TRUE?

13   **A.**    THAT IS NOT TRUE.

14   **Q.**    WELL, WAS THERE SOME ACTION TAKEN AGAINST YOU ON OR ABOUT

15   APRIL 13TH?

16   **A.**    THERE WAS NO ACTION THAT WAS INITIATED.  THERE WAS A

17   DECISION THAT WAS MADE THAT WAS STAYED.  SO THERE'S NO ACTION.

18              I HAVE A LICENSE TODAY TO FULLY PRACTICE MEDICINE

19   WITH NO RESTRICTIONS.  I AM NOT ON PROBATION TODAY BECAUSE THE

20   ADMINISTRATIVE PROCESS HASN'T BEEN RUN.  SO THAT IS CURRENTLY

21   IN PLACE.  SO THERE WAS A STAY PUT IN PLACE UNTIL THE MEDICAL

22   BOARD COULD DECIDE WHETHER OR NOT TO RECONSIDER THAT.  THEY ARE

23   IN THE PROCESS OF DOING THAT.

24   **Q.**    RIGHT.

25   **A.**    WHILE THAT STAY IS IN PLACE, I HAVE A FULL AND ACTIVE

1    LICENSE, AND IT HAS NEVER BEEN SUSPENDED.

2    **Q.**   WELL, THE STAY ENDS ON MAY 13TH, DOESN'T IT?

3    **A.**   THEY HAVEN'T GOTTEN BACK TO ME ON WHETHER OR NOT -- IF I

4    HAVE HAD ANYTHING HAPPEN TO MY LICENSE, IT HAS BEEN WITHIN THE

5    LAST WEEK, AND I HAVEN'T BEEN, SINCE I HAVE BEEN HERE, AND I

6    HAVEN'T SEEN ANY EVIDENCE OF THAT.

7            SO, THE MEDICAL BOARD HASN'T GIVEN ME A DECISION YET

8    AS TO WHETHER OR NOT THEY'RE RECONSIDER IT AND CONTINUE THE

9    STAY.  SO I HAVEN'T SEEN ANY EVIDENCE OF THAT.

10           HAVE YOU SEEN A DECISION BY THEM TO NOT RECONSIDER

11   IT?

12   **Q.**   HAVE I SEEN --

13   **A.**   BECAUSE I WOULD HAVE TO BE SERVED WITH IT.

14           **THE COURT:**  YOU CAN'T ASK HIM QUESTIONS.

15           (SIMULTANEOUS COLLOQUY.)

16           **MR. ANDRADA:**  HAVE I SEEN THAT DECISION?

17           **THE COURT:**  MR. ANDRADA, I JUST INSTRUCTED THE

18   WITNESS THAT HE MAY NOT ASK YOU ANY QUESTIONS --

19           **MR. ANDRADA:**  THANK YOU.

20           **THE COURT:**  NOR MAY YOU ANSWER THEM.

21           YOU MAY ASK QUESTIONS.

22           **MR. ANDRADA:**  I APPRECIATE IT.

23   **BY MR. ANDRADA:**

24   **Q.**   SO LET'S BE CLEAR, DOCTOR, ON OR ABOUT APRIL 13TH OF THIS

25   YEAR, THE BOARD DID RENDER A DECISION WITH REGARD TO YOUR

1    LICENSE, CORRECT?

2    **A.**   THEY DID, AN APPEALABLE DECISION.

3    **Q.**   AND THE DECISION WAS TO REVOKE, STAY THE REVOCATION, PUT

4    YOU ON TEN YEARS OF PROBATION --

5         **MR. ASHKER:**  I OBJECT, YOUR HONOR, ON THE BASIS OF

6    IT HAS BEEN ASKED AND ANSWERED.

7         **THE COURT:**  IT HAS, BUT YOU MAY GO THROUGH IT ONE

8    MORE TIME, IF YOU WOULD LIKE.

9         **MR. ANDRADA:**  THANK YOU.

10   **BY MR. ANDRADA:**

11   **Q.**   WITH ONE YEAR OF ACTUAL SUSPENSION OF YOUR LICENSE; ISN'T

12   THAT WHAT THE BOARD DECIDED A MONTH AGO?

13   **A.**   YES, AND IT WAS STAYED.  IT'S NOT EFFECTIVE.  THAT'S THE

14   POINT.

15   **Q.**   AND THE REASON WHY YOUR LICENSE WAS -- THE REASON YOU WERE

16   PUT ON PROBATION IN 1997, SIR, HAD TO DO WITH SUBSTANCE ABUSE;

17   ISN'T THAT TRUE?

18   **A.**   THAT IS HALF OF THE REASON, ACCORDING TO THE STATEMENT, IF

19   YOU READ IT PROPERLY.

20   **Q.**   AND YOU, IN FACT, DOCTOR, HAD BEEN PARTICIPATING IN THE

21   MEDICAL BOARD DIVERSION PROGRAM FOR SUBSTANCE ABUSE AS EARLY AS

22   1991?

23   **A.**   YES.

24   **Q.**   ISN'T THAT TRUE?

25   **A.**   YES.

ALLEN – CROSS / MR. ANDRADA

1    **Q.**   AND, IN FACT, DOCTOR, WHAT LED TO YOUR LEAVING PELICAN BAY

2    IN 2005 WAS AN INCIDENT THAT OCCURRED IN SEPTEMBER OF 2005 WHEN

3    YOU REAR-ENDED ANOTHER VEHICLE ON YOUR WAY TO WORK; ISN'T THAT

4    TRUE?

5    **A.**   THAT, IN FACT, DID HAPPEN AND IT WAS INVESTIGATED BY THE

6    CRESCENT CITY POLICE, AND NO CHARGES FILED.

7    **Q.**   YES.

8          AND, IN FACT, LATER THAT SAME DAY YOU WERE FOUND

9    ASLEEP ON THE JOB BY COWORKERS; ISN'T THAT TRUE?

10   **A.**   THAT'S TRUE.

11   **Q.**   AND YOU WERE THEN TAKEN TO SUTTER COAST HOSPITAL BY

12   AMBULANCE, CORRECT?

13   **A.**   THAT IS TRUE.

14   **Q.**   AND YOU WERE FOUND TO BE UNDER THE INFLUENCE OF COCAINE;

15   ISN'T THAT TRUE?

16   **A.**   THAT IS NOT TRUE.

17   **Q.**   AND SO THEN DIDN'T YOU ADMIT TO HAVING A COCAINE -- STRIKE

18   THAT.

19          DIDN'T YOU ADMIT TO THE MEDICAL BOARD, SIR, THAT YOU

20   HAD A RELAPSE OF COCAINE USE IN SEPTEMBER OF 2005?

21   **A.**   YES, I DID.

22   **Q.**   AND, IN FACT, SIR, THE PROBLEM THAT DEVELOPED BY VIRTUE OF

23   YOUR BEING IN THIS AUTO ACCIDENT, BEING ASLEEP AT WORK, THAT

24   WAS, IN FACT, RELATED TO SUBSTANCE ABUSE, WASN'T IT?

25   **A.**   THAT WAS, IN FACT, RELATED TO FATIGUE FROM PRIOR SUBSTANCE

1    ABUSE.  AND THE HOSPITAL DID TEST ME POSITIVE FOR METABOLITE OF

2    COCAINE, BUT THE MEDICAL BOARD HAS REALIZED THAT THAT IS ALL

3    OFF-DUTY USE.

4              SO THE CHARGES ARE ALL ABOUT OFF-DUTY USE, THE

5    CONSEQUENCES OF FATIGUE FROM THAT, THE ER DOCTOR MADE THE

6    CHARGE OF ACUTE COCAINE INTOXICATION, AND THAT CHARGE HAS BEEN

7    DISPROVEN.  THEY WROTE TO THE MEDICAL BOARD AND TO INTERNAL

8    AFFAIRS.

9    Q.   SO WHAT LED TO YOUR LEAVING PELICAN BAY, SIR, IN SEPTEMBER

10   OF 2005 WAS YOUR SUBSTANCE ABUSE, CORRECT?

11   A.   THAT COULD BE ONE WAY OF LOOKING AT IT.  BUT YOU

12   UNDERSTAND THAT THEY COULD HAVE OUT AND OUT FIRED ME, AND THERE

13   WERE MITIGATING CIRCUMSTANCES IN EVIDENCE TO PREVENT THEM FROM

14   FIRING ME BECAUSE THAT WASN'T THE WHOLE STORY.  IT IS TOO

15   COMPLICATED TO STATE HERE.  PEOPLE WHO HAVE SUBSTANCE ABUSE

16   PROBLEMS STILL WORK THERE.

17             **MR. ANDRADA:**  MOVE TO STRIKE THE LATTER, YOUR HONOR,

18   AS NONRESPONSIVE.

19   **BY MR. ANDRADA:**

20   Q.   AND DR. SAYRE WAS INVOLVED IN THE DECISION TO HAVE YOU

21   LEAVE PELICAN BAY IN 2005; ISN'T THAT CORRECT?

22   A.   DR. SAYRE WAS MY IMMEDIATE SUPERVISOR AND DECIDED THAT

23   THOSE WERE FIRING OFFENSES, SLEEPING ON THE JOB AND USE OF AN

24   ILLEGAL SUBSTANCE OFF DUTY, WHICH IS WHAT INTERNAL AFFAIRS

25   FOUND AND CRESCENT CITY POLICE FOUND.

1   **Q.**   YOU WOULD CONSIDER THEM TO BE LEGITIMATE GROUNDS FOR

2   TERMINATION FOR A PHYSICIAN?

3   **A.**   NOT NECESSARILY.  NO, NOT NECESSARILY.  THEY HAVE AN

4   ACTUAL SCALE OF WHAT CONSTITUTES FIRING OFFENSES RELATIVE AND

5   THEY CONSOLIDATE THIS FOR CUSTODY AND FOR MEDICAL LEGAL, SO

6   THAT THE PUNISHMENT IN ALL SETTINGS WOULD BE THE SAME.

7   **Q.**   SO --

8   **A.**   THAT COULD HAVE BEEN ONE OUTCOME, BUT THERE WERE

9   MITIGATING FACTORS.  AND IN THE END, I ENDED UP RESIGNING AND

10  BEING MADE WHOLE WITH SUBSEQUENT PAY.  AND SO THE RECORD WAS

11  CLEARED OF ALL THAT INTERNAL TO MY PERSONNEL RECORDS PER THEIR

12  OWN AGREEMENT.

13          NOW, IN THE MEDICAL BOARD SETTING, OF COURSE, I COME

14  FORWARD AND I WAS HONEST AND ALL THAT CAME OUT.  I NEVER TRIED

15  TO HIDE ANY OF THAT.

16          SO THE ISSUE OF MY LEAVING PELICAN BAY IN PART IS

17  RELATED TO MY HISTORY OF SUBSTANCE ABUSE, RIGHT, SOME THREE AND

18  A HALF YEARS AGO.

19  **Q.**   WELL, YES.  AND ARE YOU SUGGESTING THAT YOU HAVE BEEN

20  CLEAN EVER SINCE?

21  **A.**   I AM SUGGESTING THAT I HAVE NOT USED COCAINE SINCE.

22  **Q.**   WELL, DIDN'T YOU HAVE, ON OR ABOUT SEPTEMBER 15TH, 2007,

23  DIDN'T YOU HAVE A POSITIVE URINE TEST FOR MORPHINE METABOLITE?

24  YES OR NO.

25  **A.**   THE ANSWER TO THAT IS THAT IS NOT A POSITIVE.  THAT HAS

1    BEEN THE ISSUE WITH THE MEDICAL BOARD NOW WHILE THEY HAVE

2    STAYED THEIR DECISION.

3            PART OF THE PROBATION AGREEMENT THAT WAS IN EFFECT

4    FROM '97 ON WAS THAT THE MEDICAL BOARD FORCED ME TO TAKE

5    COURSES IN DRUG TESTING AND ADDICTION MEDICINE.  IN THE PROCESS

6    OF DOING THAT, I LEARNED THE FEDERAL LAWS RELATED TO THAT.

7            THE CALIFORNIA MEDICAL DIVERSION BOARD USES A CUTOFF

8    OF 300 NANOGRAMS ML FOR MORPHINE WHICH WAS ADJUSTED UP IN

9    '98 BY THE FEDERAL GOVERNMENT AND IS DEFENSIBLE IN ALL SETTINGS

10   TO BE AT 2000 NANOGRAM PER ML CUTOFF.

11           SO THE MEDICAL BOARD HAS HAD TO BACK DOWN BECAUSE

12   THEY HAVE HAD AN ARCHAIC CUTOFF LEVEL.  AND THEY ARE THE ONES

13   THAT TAUGHT ME TO DEFEND MYSELF.  THEY ACTUALLY MADE ME TAKE

14   THOSE COURSES.  WHY THEY ARE STILL STUCK IN THE DARK AGES OF

15   DRUG TESTING, I DON'T KNOW, BUT THAT DOES NOT CONSTITUTE

16   POSITIVE, AND THAT CAME FROM AN OVER-THE-COUNTER MEDICATION

17   THAT I KNEW BECAUSE I WAS MODERNLY TRAINED IN IT.  THEY DIDN'T

18   EVEN TELL US NOT TO TAKE IT AND THAT WAS DEMONSTRATED, AND THEY

19   HAD TO BACK DOWN ON THAT.

20           SO WHAT THEY CALL A RELAPSE WAS NOT A RELAPSE.  IT

21   WAS NEVER A RELAPSE.  AT ANY RATE, IT WAS A POSITIVE -- WHAT

22   THEY CONSIDERED A POSITIVE TEST BY THEIR CRITERIA BUT WHICH WAS

23   SHOT DOWN BY THE FEDERAL GOVERNMENT AND THE SUBSTANCE ABUSE

24   MENTAL HEALTH SERVICES ADMINISTRATION IN TERMS OF FEDERAL LAW

25   WHAT CONSTITUTES A POSITIVE.  SO IT WASN'T A POSITIVE.

1    **Q.**   LET ME SEE --

2    **A.**   THEY TRAINED ME TO LEARN ALL THAT.

3    **Q.**   LET ME SEE IF I UNDERSTAND THIS.

4           YOU BEAR DR. SAYRE, WHO WAS YOUR BOSS, AND

5    PARTICIPATED IN YOUR BEING LET GO AT PELICAN BAY, YOU BEAR HIM

6    NO ILL WILL?

7    **A.**   IT'S NOT THAT I DON'T BEAR HIM ANY ILL WILL.  I THINK THAT

8    HE IS BAD FOR PATIENT CARE AT PELICAN BAY.  AND THE WORK THAT I

9    DO NOW IS IN HABEAS CORPUS CASES MOSTLY AGAINST DR. SAYRE IN

10   SUPERIOR COURT IN DEL NORTE COUNTY.  THAT WAS WHERE THE

11   INTEREST -- HE HAS BEEN MY ADVERSARY IN ABOUT EIGHT OF THOSE

12   CASES EXTERNALLY HERE.  THEY DON'T WIN THOSE CASES.

13   **Q.**   SO YOU --

14   **A.**   THOSE CASES ARE ALL VERY SIMILAR TO THIS IN TERMS OF THE

15   ISSUES.

16           **MR. ANDRADA:**  I AM SORRY, YOUR HONOR.

17           **THE COURT:**  THERE IS NO QUESTION PENDING.  THAT

18   COMMENT IS STRICKEN.

19   **A.**   OKAY.

20           **MR. ANDRADA:**  THANK YOU, DR. ALLEN.  THAT IS ALL I

21   HAVE.

22           **THE COURT:**  ANYTHING ELSE?

23           **MR. ASHKER:**  JUST REAL BRIEFLY.

24   ///

25   ///

<u>**REDIRECT EXAMINATION**</u>

**BY MR. ASHKER:**

Q.    WHEN YOU OBSERVED DR. SAYRE'S COMMENT AT THE BANQUET THAT YOU DISCUSSED EARLIER, WERE –– WAS YOUR MIND CLEAR ON THAT OCCASION?

A.    MY MIND WAS VERY CLEAR ON THAT OCCASION.

Q.    AND YOU HAVE A HISTORY OF SUBSTANCE ABUSE THAT YOU ADMITTED TO?

A.    RIGHT.  AND I GET TESTED VERY REGULARLY.

Q.    AND YOU –– HAVE YOU EVER HARMED A PATIENT?

A.    NO.  THAT'S A QUESTION THE MEDICAL BOARD ––

            **MR. ANDRADA:**  YOUR HONOR ––

            **THE COURT:**  I AM SUSTAINING –– I ASSUME YOU ARE TRYING TO OBJECT HERE, AND THE OBJECTION IS SUSTAINED.

            **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS.

            THANK YOU, DR. ALLEN.

            **THE WITNESS:**  THANK YOU.

            **THE COURT:**  ALL RIGHT.

            WE HAVE –– MR. ANDRADA HAS COMPLETED HIS CROSS-EXAMINATION OF MR. ASHKER.  MR. ASHKER DOES HAVE A RIGHT TO TESTIFY ON REDIRECT EXAMINATION.  I AM SORRY WE HAVE KIND OF BEEN JUMPING AROUND HERE, BUT WE ARE TRYING TO ACCOMMODATE THE SCHEDULE OF ALL THESE DOCTORS.

            SO AT THIS TIME WE WILL DO WHAT THEN, MR. ANDRADA?

            **MR. ANDRADA:**  I AM SORRY, I THOUGHT ––

1      **THE COURT:**  SHALL WE CALL DR. SAYRE NOW OR SHALL WE

2   DO THE REDIRECT?  I JUST WANT TO ACCOMMODATE YOUR WITNESS'

3   SCHEDULES TO MAKE SURE WE DON'T RUN INTO TIME PROBLEMS.

4      **MR. ANDRADA:**  I RATHER HAVE MR. ASHKER FINISH HIS,

5   IF HE'S GOING TO BE FIVE MINUTES, LET'S FINISH WITH HIM.

6      **THE COURT:**  OKAY.  THAT'S FINE.  YOUR

7   CROSS-EXAMINATION IS FINISHED.  YOU MAY GIVE REDIRECT

8   EXAMINATION, WHICH MEANS TESTIMONY ABOUT THINGS THAT YOU WERE

9   QUESTIONED ABOUT ON CROSS-EXAMINATION.

10      **MR. ASHKER:**  INCLUDING MY CONTRACT CLAIM ISSUES?

11      **THE COURT:**  YOU MAY TESTIFY BRIEFLY ABOUT THE

12   CONTRACT CLAIM ISSUES.

13      **MR. ASHKER:**  OKAY.

14                    **REDIRECT EXAMINATION**

15      **MR. ASHKER:**  AS FAR AS MY MAY 24TH, 2002 SETTLEMENT

16   AGREEMENT, MY UNDERSTANDING WAS AS FAR AS THE PAIN MANAGEMENT

17   RECOMMENDATION TO UC DAVIS, THE WHOLE PURPOSE OF THAT WAS I

18   WANTED AN INDEPENDENT OUTSIDE EXAMINATION BY A PAIN MANAGEMENT

19   SPECIALIST WHO WAS NOT IN CDC'S POCKET.  IN OTHER WORDS, NOT ON

20   CONTRACT WITH THEM, DIDN'T OWE THEM ANYTHING, WEREN'T THEIR

21   COLLEAGUE OR BUDDIES.  AND SO I COULD -- I FELT SO THAT I COULD

22   GET A FAIR, FULL EXAMINATION AND CONSULT AFTER ALL THE THINGS

23   THAT I HAD BEEN THROUGH FOR A 12-YEAR TIME PERIOD.

24              AND I DIDN'T SUGGEST UC DAVIS, MY LAWYER -- I WASN'T

25   AT THE HEARING.  I HAD A LAWYER AT THAT TIME.  AND WHAT

1   HAPPENED WAS, I WAS ON THE PHONE WHILE HE WAS AT THE

2   CONFERENCE.  AND I TOLD HIM, HEY, I WANT AN INDEPENDENT.  THERE

3   NEEDS TO BE A CLAUSE SPECIFICALLY IN THERE FOR AN INDEPENDENT

4   OUTSIDE SPECIALIST TO SEE ME AND TO EXAMINE ME, REVIEW ALL MY

5   MEDICAL RECORDS, AND COME UP WITH A TREATMENT PLAN THAT CDC

6   WOULD PROMISE TO FOLLOW.

7           AND HE SAID, HOW ABOUT UC DAVIS?  I SAID, OKAY,

8   THAT'S FINE.  OKAY.  THAT WAS MY EXPECTATION.  AND I DON'T

9   BELIEVE THE CDC ACTED WITH GOOD FAITH IN COMPLYING WITH THEIR

10  END OF THAT AGREEMENT BECAUSE EVIDENCE HAS COME OUT --

11          **MR. ANDRADA:**  EXCUSE ME, THIS SOUNDS LIKE ARGUMENT

12  NOW.

13          **THE COURT:**  YOU CAN'T ARGUE.  WHAT YOU CAN SAY IS

14  JUST THE FACTS.  WERE YOU OR WERE YOU NOT EVER TAKEN TO UC

15  DAVIS FOR A CONSULT.

16          **MR. ASHKER:**  OKAY.

17          **THE COURT:**  WERE YOU OR WERE YOU NOT TAKEN ANYWHERE

18  ELSE FOR AN INDEPENDENT CONSULT.  THAT SORT OF THING.

19          **MR. ASHKER:**  I WAS NEVER EXAMINED BY UC DAVIS.  AND

20  I WAS INFORMED, I TESTIFIED BEFORE, ABOUT THEY PUT ME UP FOR --

21  THEY COME ON JUNE 18TH AND TOLD ME, HEY, YOU ARE BEING

22  TRANSFERRED TO MANTECA.  I DON'T EVEN RECALL THEM SAYING FOR

23  PAIN MANAGEMENT.  THEY JUST SAID YOU ARE BEING TRANSFERRED TO

24  MANTECA FOR AN OUTSIDE CONSULT.

25          **THE COURT:**  WHAT IS MANTECA?

1        **MR. ASHKER:**  MANTECA WAS, I FOUND OUT LATER WHEN I

2   GOT THE PAPERWORK FROM MY FILE, BECAUSE ON THIS DAY THEY JUST

3   HAD THE MEDICAL TECHNICAL ASSISTANT COME TO THE DOOR AND SAY,

4   HEY, YOU NEED TO ROLL UP YOUR PROPERTY, YOU ARE BEING

5   TRANSFERRED TOMORROW TO SEE THE DOCTOR IN MANTECA.  AND I --

6        **THE COURT:**  I'M SORRY.  IS THIS A PRISON IN MANTECA?

7   WERE YOU BEING TRANSFERRED TO A PRISON?

8        **MR. ASHKER:**  THEY WERE GOING TO TRANSFER ME TO --

9   THEY WERE GOING TO TRANSFER ME TO FOLSOM PRISON AND THEN HAVE

10  ME SEEN BY AN OUTSIDE DOCTOR IN MANTECA.

11       OKAY.  AND WHAT HAD HAPPENED WAS, MY, ALL MY LEGAL

12  PROPERTY HAD BEEN CONFISCATED IN OCTOBER.

13       **THE COURT:**  THIS PART YOU DID TALK ABOUT.

14       **MR. ASHKER:**  OKAY.  SO, I EXPLAINED THAT PREVIOUSLY

15  ON WHY I PASSED ON THAT BECAUSE I NEEDED MY PROPERTY.  OKAY.

16       AS FAR AS THE PART OF MY AGREEMENT THAT DEALS WITH

17  MY ARM BRACE, MY UNDERSTANDING WAS BASED ON EIGHT YEARS --

18  WELL, I WILL SAY SIX AND A HALF YEARS OF PROBLEMS GETTING AN

19  ARM BRACE THAT ACTUALLY FIT PROPERLY THAT I COULD USE WITHOUT

20  AGGRAVATING MY ARM WAS THAT I WOULD CONTINUE TO HAVE THE USE OF

21  THAT ARM BRACE TO PROTECT MY FOREARM FROM ADDITIONAL INJURY AND

22  ENABLE ME TO EXERCISE MY UPPER ARM AREA.

23       AND MY -- IN FEBRUARY 2007, THEY TOOK ME OUT OF MY

24  CELL TO DO SOME MAINTENANCE.  WHEN I RETURNED TO MY CELL, THE

25  ARM BRACE PADDING IN THE HAND AREA --

1          **THE COURT:**  YOU TALKED ABOUT THAT PART.

2          **MR. ASHKER:**  OKAY.

3          **THE COURT:**  SINCE THEN, WHAT HAS HAPPENED WITH YOUR

4     ARM BRACE?

5          **MR. ASHKER:**  HAD BEEN TORN LOOSE, OTHER PARTS HAD

6     WORN AWAY.  IT NO LONGER FIT RIGHT.

7          I CONTACTED DR. SAYRE AND ASKED HIM, I SHOWED HIM

8     THAT IT DID NOT FIT RIGHT.  I NEEDED IT REPAIRED.  AND HE TOLD

9     ME INITIALLY, THAT'S PROBABLY THE BEST YOU ARE GOING TO GET.

10         I TOLD HIM, WHAT DO YOU MEAN THAT'S THE BEST I AM

11    GOING TO GET?  IT DOESN'T FIT.  I CAN'T USE IT.  IT CAUSES ME

12    ADDITIONAL PAIN.  HE HAD NO RESPONSE TO THAT.

13         THEN, I SEE HIM, I 602'D IT.  I'LL BE PUTTING THE

14    602'S INTO EVIDENCE.  I SAW HIM, THAT FIRST TIME WHEN I BROUGHT

15    THAT TO HIS ATTENTION IS AUGUST 30TH, 2006.  I KEPT PURSUING

16    IT, KEPT BRINGING IT UP.  ON JUNE 7TH, 2007 -- NO, JUNE 6TH,

17    2007, I SEE DR. SAYRE AGAIN.  AT THAT TIME, FOR THE VERY FIRST

18    TIME, THIS WAS THE SECOND TIME I'D EVER SEEN HIM, I PUT THE

19    BRACE ON AND I SHOWED HIM THAT IT DID NOT FIT PROPERLY.

20         THE REASON WHY IT WAS NOT FITTING PROPERLY IS

21    BECAUSE FROM THE FEW YEARS OF PHYSICAL THERAPY, THE MUSCLE IN

22    MY ARM UP HERE (INDICATING) THIS AREA, HAD GROWN WHILE THIS

23    AREA (INDICATING) HAD STAYED THE SAME.  THIS IS ALL JUST TORE

24    UP.  AND IT STAYED THE SAME.  SO THAT THREW THE FIT OFF.

25         AND I EXPLAINED THAT TO HIM.  AND HIS POSITION WAS,

1    BEHIND THE MUSCLE IN MY ARM HAD GROWN FROM THE PHYSICAL THERAPY

2    UP HERE, I DIDN'T NEED THE BRACE ANYMORE PERIOD.  SO,

3    THEREFORE, I WASN'T GOING TO GET A NEW BRACE.

4           THE ONLY REASON I HAVE THIS OLD ONE IS BECAUSE ON

5    APRIL 3RD, 2007 BEFORE THAT SECOND VISIT, THE COURT --

6           **MR. ANDRADA:**  WELL, YOUR HONOR, IS THIS RELEVANT?

7           **THE COURT:**  I THINK SO BECAUSE THE CLAIM IS BREACH

8    OF CONTRACT FOR NOT HAVING THE ARM BRACE.  SINCE HE ACTUALLY

9    HAS IT, I CAN'T THINK OF ANY OTHER WAY HE CAN EXPLAIN WHY HE

10   HAS IT WHILE STILL CLAIMING THE CONTRACT WAS BREACHED.

11          **MR. ANDRADA:**  I AM NOT AWARE OF ANY -- ALL RIGHT.

12          THANK YOU.  GO AHEAD.

13          **MR. ASHKER:**  WHAT HAD HAPPENED WAS, WHEN I SAW

14   DR. SAYRE ON AUGUST 30TH, ABOUT THREE WEEKS LATER I FOUND OUT

15   HIS DECISION FROM RISENHOOVER BECAUSE HE DIDN'T TELL ME NOTHING

16   AT THE TIME.  HE SAID, YOU WILL BE INFORMED OF MY DECISION.  I

17   HADN'T HEARD NOTHING FOR THREE YEARS.  AND I WENT TO SEE FAMILY

18   NURSE PRACTITIONER RISENHOOVER ABOUT MY MEDICATION RENEWALS.

19   AND AT THAT TIME, SHE INFORMED ME ABOUT SAYRE'S DECISION THAT I

20   DIDN'T NEED A BRACE.  I DIDN'T HAVE NOTHING COMING ON ANY OF MY

21   STUFF.

22          SO I FILED A MOTION FOR PROTECTIVE ORDER IN THIS

23   COURT ASKING THE COURT TO PROTECT ME FROM LOSING MY THERA-BAND,

24   THERA-BALL FOR PHYSICAL THERAPY, WHICH HE HAD STATED, YOU DO

25   NOT NEED, AND IT WAS SUBJECT TO CONFISCATION AT ANY TIME.  IF

1    IT WAS CONFISCATED, BASED ON MY PREVIOUS EXPERIENCE, AND I DID

2    FILE IN COURT AND GET SOME KIND OF RELIEF, IT MIGHT TAKE THEM

3    SIX MONTHS, TEN MONTHS TO ORDER AND PROVIDE ME WITH A

4    REPLACEMENT BECAUSE THOSE -- THESE WOULD HAVE BEEN THROWN IN

5    THE TRASH.  THAT'S BASED ON MY PERSONAL PRIOR EXPERIENCE WITH

6    ANOTHER BALL PREVIOUSLY, AND SO I FILED A MOTION, AN

7    EMERGENCY --

8              **THE COURT:**  I AM SORRY.  WHAT HAPPENED WITH THE

9    THERA-BALL AND THE THERA-BAND?

10             **MR. ASHKER:**  THE ONLY REASON I STILL HAVE THE

11   THERA-BALL AND THERA-BAND IS THE SAME AS THE BRACE; BECAUSE OF

12   THAT APRIL 3RD, 2007 PROTECTIVE ORDER WHERE THE MAGISTRATE

13   JUDGE ORDERED THEM TO ALLOW ME TO KEEP THIS STUFF UNTIL THE

14   RESOLUTION OF THIS CASE --

15             **THE COURT:**  WAS THERE --

16             **MR. ASHKER:**  -- IS THE ONLY REASON.

17             **THE COURT:**  WAS THERE SOMETHING THAT DR. SAYRE SAID

18   OR DID OR CDC SAID OR DID ABOUT THE BAND OR THE BALL?

19             **MR. ASHKER:**  YES.

20             **THE COURT:**  WHAT LED YOU TO BELIEVE THAT YOU

21   WOULDN'T BE ALLOWED TO KEEP THOSE THINGS?

22             **MR. ASHKER:**  DR. SAYRE'S AUGUST 30TH, 2006 DECISION

23   WAS THAT MY ARM WAS FULLY REHABILITATED, WAS IN GOOD CONDITION,

24   AND NO FURTHER THERAPY OR THERAPY EQUIPMENT WAS REQUIRED.

25             AND I REPEATEDLY 602'D AND COMPLAINED.  I VERBALLY

1    TOLD HIM AT THE TIME, HEY, THE REASON I HAVE THIS STUFF IS

2    BASED ON, I GOT IT -- I GOT THE BAND IN 2003, THE BALL A LITTLE

3    BIT LATER.  AND THE ONLY REASON THAT I HAD THAT IN THE CELL WAS

4    BECAUSE FOR YEARS I TRIED TO DO STUFF ON MY OWN, AS I DESCRIBED

5    TO YOU EARLIER, WHERE I WASN'T ABLE TO WORK THE ARM GOOD AND

6    THESE JUST WORK GREAT FOR ME FOR THAT.  AND THAT'S WHY.  THAT'S

7    WHY I HAD IT.

8            AND DR. SAYRE WAS -- I EXPLAINED THAT TO HIM.  I

9    SAID, HEY, THE REASON I HAVE THIS STUFF IS BASED ON MY HISTORY

10   OF PROBLEMS AND NOT BEING ABLE TO DO IT ON MY OWN WITHOUT ANY

11   ASSISTIVE AIDES.  HE COMPLETELY IGNORED THAT AND SAID, HEY, YOU

12   DON'T NEED IT.  YOU ARE NOT GOING TO GET THE CHRONOS RENEWED

13   FOR YOU TO KEEP POSSESSION OF THEM.

14           AND IN RESPONSE TO THAT, I TOLD HIM THAT'S A

15   VIOLATION OF MY SETTLEMENT AGREEMENT BECAUSE ON MY PHYSICAL

16   THERAPY, IT SAYS THE PHYSICAL THERAPY SHALL CONTINUE UNLESS --

17   FOR AS LONG AS MY MEDICAL CONDITION REQUIRES, UNLESS

18   CONTRANINDICATED (PHONETIC).  IN OTHER WORDS, I TOOK THAT, MY

19   UNDERSTANDING OF THAT TERM WAS UNTIL IT WAS HARMING ME.  THAT'S

20   MY INTERPRETATION OF CONTRANINDICATED.

21           **THE COURT:**  CONTRAINDICATED.

22           **MR. ASHKER:**  CONTRAINDICATED, EXCUSE ME.

23           SO BASED ON THAT, IF IT WAS ON SAYRE, WITHOUT THE

24   COURT'S PROTECTING ME FROM HIS ACTIONS, BY ALL RIGHTS AND

25   PURPOSES I WOULD HAVE LOST THIS STUFF ON AUGUST 30TH, 2006.

1       **THE COURT:**  AND THE PHYSICAL THERAPY, OTHER THAN

2    THOSE AIDES, WHAT PHYSICAL THERAPY WERE YOU RECEIVING AS OF

3    2002 AND WHAT HAPPENED TO THAT AFTERWARDS?

4       **MR. ASHKER:**  ON THE PHYSICAL THERAPY, I WAS

5    RECEIVING PHYSICAL THERAPY WITH THE THERAPIST TWICE A WEEK

6    FOR -- WHAT I WOULD DO IS, WHEN I GOT THE BAND IN JANUARY OF --

7    FEBRUARY 2003, I WOULD GO OVER THERE TO THE THERAPY ROOM AND I

8    WOULD, AS SOON AS I GOT OVER THERE, I WOULD SOAK MY ARM IN THE

9    WHIRLPOOL.  AND IT WOULD ALWAYS PROVIDE TEMPORARY RELIEF

10   BECAUSE I COULD SIT RIGHT THERE AND LET THAT WATER, THAT JET OF

11   THAT WATER HIT RIGHT HERE (INDICATING) ON MY ULNAR NERVE AREA.

12       AND THE HOT WATER, MY HAND IS ALWAYS KIND OF STIFF

13   AND HARD TO MOVE.  AND WITH THAT HOT TREATMENT, IT FEEL LIKE I

14   HAD JUST HAD POT OF WARM OIL SQUIRT INTO MY JOINT AND MY HAND

15   AND ALL THAT.  IT WOULDN'T LAST THAT LONG.  IT MIGHT LAST THE

16   REST OF THAT DAY, BUT IT DID PROVIDE SOME TEMPORARY RELIEF.

17   AND I WOULD GET THAT TWICE A WEEK.

18       AND THEN I WOULD BE ABLE TO SQUEEZE A HAND GRIPPER.

19   AND I MIGHT DO THAT, I DO THAT AFTERWARDS BECAUSE THE HOT

20   TREATMENT AND THEN AFTERWARDS I DO THE LITTLE GRIPPER AND JUST

21   GET THAT BLOOD FLOWING REAL GOOD THROUGH THE MUSCLE AND STUFF.

22   I DO THAT FOR MAYBE THREE TO FIVE MINUTES.  AND THE WHOLE

23   PROCESS WOULD BE, I WOULD SOAK THE ARM FOR ABOUT 15, 20

24   MINUTES, AND THEN I DO THE GRIPPER FOR THREE TO FIVE MINUTES,

25   PERIODICALLY THE PHYSICAL THERAPIST.  EVERY SINGLE TIME I SAW

1    HIM, I TALKED TO HIM ABOUT WHAT WAS GOING ON WITH MY CONDITION,

2    WHICH HE DOCUMENTED THAT I WAS CONTINUOUSLY HAVING

3    ACTIVITY-RELATED PAIN AND THAT THE THERAPY PROVIDED PARTIAL

4    RELIEF.  AND THIS WAS FOR THE TIME PERIOD FROM JULY OF 2002 UP

5    UNTIL FEBRUARY 2007.

6              IN FEBRUARY OF 2007, I MISSED TWO SESSIONS.  THE

7    REASON I MISSED TWO SESSIONS IN A ROW IS BECAUSE MY LOWER BACK

8    HAD WENT OUT.  I COULD BARELY GET UP OFF MY BUNK TO GO UP TO

9    THE DOOR TO GET MY FOOD AND STUFF.  AND SO I TOLD THE ESCORT

10   OFFICERS, HEY, I AM GOING TO PASS ON THE THERAPY TODAY BECAUSE

11   MY LOWER BACK HAD WENT OUT.  I CAN BARELY WALK.  OKAY.

12             IN THE PAST, I HAD DONE THAT ONE OTHER TIME BEFORE.

13   AND THE THERAPIST HAD ALWAYS TOLD ME, HEY, WE HAVE A

14   THREE-REFUSAL RULE.  IF YOU REFUSE THREE TYPES, THEN YOU'RE

15   CANCELED FROM THERAPY AND YOU'LL HAVE TO HAVE THEM ORDER YOU UP

16   AGAIN.

17             I TOLD THEM, WELL, OKAY, I DON'T KNOW IF THAT

18   APPLIES TO ME OR NOT BECAUSE MY STUFF IS UNDER THIS FEDERAL

19   COURT SETTLEMENT AGREEMENT, BUT, OKAY.  I UNDERSTAND THAT.  I

20   NEVER MISSED THREE SESSIONS IN A ROW.  I HAD MISSED TWO

21   SESSIONS BEFORE.  ON AT LEAST ONE OCCASION I WASN'T CANCELED.

22             IN FEBRUARY OF 2007, I MISSED THOSE TWO SESSIONS IN

23   A ROW, AND THE NEXT TIME I WAS SUPPOSED TO GO, THEY DIDN'T CALL

24   ME.  I HEARD THEM GET SOMEBODY ELSE OUT OF ANOTHER SECTION, SO

25   I HOLLERED AT THEM.  THEY SAID, HEY, YOU HAVE BEEN CANCELED.

1          I GO, WHAT DO YOU MEAN I'VE BEEN CANCELED?  I AM

2     SUPPOSED TO HAVE PERMANENT THERAPY.  THEY SAID, YOU'VE BEEN

3     CANCELED.  SO I DID A 602 APPEAL.  AND THEIR RESPONSE WAS

4     PURSUANT TO THE TWO-REFUSAL RULE, YOU HAVE BEEN CANCELED.

5          AND I PURSUED THE 602 FURTHER, AND THEY SAID, MAN,

6     THAT'S IT.  YOU ARE NOT GOING TO GET PHYSICAL THERAPY

7     REINSTATED UNTIL -- UNLESS THE COURT ORDERS US TO REINSTATE

8     YOUR THERAPY.  THAT'S IT.  PERIOD.  YOU ARE NOT GOING TO GET

9     IT.

10         AND I PURSUED THAT.  WHAT DO YOU MEAN TWO-REFUSAL

11    RULE?  AND THEY SAID THAT WAS A NEW RULE THAT THEY JUST -- I

12    DON'T KNOW WHEN THEY MADE THAT UP.  SO THAT'S WHAT HAPPENED

13    RIGHT THERE.  I HAVEN'T RECEIVED ANY OF THAT THERAPY FROM THE

14    THERAPIST SINCE THEN.  AND THAT'S ON MY -- OKAY.

15         THAT'S WHAT HAPPENED.  NOW I WILL GO ON TO A LITTLE

16    BIT OF BRIEF RESPONSE TO RESPONDING TO SOME THINGS THAT

17    MR. ANDRADA ASKED ME.

18    **BY MR. ASHKER:**

19    **Q.**  DID YOU EVER HAVE -- DID YOU EVER GET CHARGED WITH HAVING

20    DRUG PARAPHERNALIA IN YOUR CELL WHILE YOU WERE AT PELICAN BAY

21    STATE PRISON?

22    **A.**  NO, I DID NOT.

23    **Q.**  WELL, MR. ANDRADA ASKED YOU, MADE A REFERENCE TO DRUG

24    PARAPHERNALIA BEING FOUND IN YOUR CELL BACK IN 2001 IN YOUR

25    MEDICAL RECORD.  CAN YOU EXPLAIN THAT?

1   **A.**   YES, I CAN.

2   **Q.**   WHAT HAPPENED RIGHT THERE?

3   **A.**   AT THE TIME I HAD A CELLMATE, AND HE WAS ON INTERFERON

4   TREATMENT AND HE WAS TAKING SHOTS AND TAKING WHATEVER HE WAS ON

5   AT THAT TIME FOR HEPATITIS C, AND ON ONE OR TWO OCCASIONS HE

6   GOT AHOLD OF THE POINT ON THE END OF THE NEEDLE.  OKAY?  NOW,

7   WHEN HE DID THAT, I ASKED HIM, WHAT YOU WANT THAT FOR?  WHAT

8   ARE YOU GOING TO DO FOR IT?  HE SAID, WELL --

9           **MR. ANDRADA:**  OBJECTION, YOUR HONOR.  THIS WOULD BE

10  HEARSAY FROM THIS --

11          **MR. ASHKER:**  OKAY.

12          **MR. ANDRADA:**  -- CELLIE.

13          **MR. ASHKER:**  WELL, THE BOTTOM LINE IS, I WAS NEVER

14  CHARGED.  IT WAS MY CELLIE'S STUFF.  HE HAD STASHED IN HIS

15  TELEVISION SET.  IT WAS NOT IN ANY OF MY PROPERTY.  IF IT WOULD

16  HAVE BEEN FOUND IN MY PROPERTY, I WOULD HAVE BEEN ISSUED A RULE

17  VIOLATION REPORT FOR CONTRABAND PURSUANT TO RULES AND

18  REGULATIONS OF THE DEPARTMENT OF CORRECTIONS.  AND THE

19  DEFENDANTS ARE NOT ABLE TO PRODUCE ANY RULE VIOLATION REPORT

20  SHOWING I EVER HAD ANY DRUG PARAPHERNALIA IN MY CELL AT PELICAN

21  BAY STATE PRISON.

22          MOVING ON.  MR. ANDRADA ASKED ME ABOUT A NOTATION ON

23  A MEDICAL RECORD FROM 8/2/07 WHICH WAS ON DR. MARTINELLI'S

24  DOCUMENT.  IN THE MARGIN IT SAID, NOTE:  PATIENT HAS A DRUG

25  ABUSE HISTORY.  WELL, THAT'S COMPLETELY FALSE BECAUSE MY -- I

1    HAVE NEVER BEEN ARRESTED FOR DRUGS.  MY DRUG -- WHEN I WAS A

2    TEENAGER, I EXPERIMENTED WITH DRUGS BETWEEN THE AGES OF LIKE

3    TEN TO 16 OR SO.  I NEVER BEEN ARRESTED FOR DRUGS.  I DON'T USE

4    DRUGS.

5         AND THE -- I 602'D THAT AS SOON AS I BECAME AWARE OF

6    IT BECAUSE I WAS CONCERNED THAT THAT KIND OF INFORMATION IN MY

7    MEDICAL FILE WOULD EFFECT HOW ANY KIND OF PAIN MANAGEMENT

8    DOCTOR WOULD LOOK AT ME AS FAR AS ANY KIND OF TREATMENT PLAN

9    WOULD GO.

10        AND I 602'D THAT, AND THEIR RESPONSE, WHEN I WAS

11   INTERVIEWED ON THE 602, THEIR RESPONSE WAS THAT THAT STATEMENT

12   WAS PUT ON THERE BECAUSE I HAD USED TRAMADOL FOR SUCH A LONG

13   PERIOD OF TIME.  I SAID, WELL, HOW IS THAT DRUG ABUSE HISTORY

14   WHEN THAT WAS PRESCRIBED FOR ME BY 13 DIFFERENT DOCTORS HERE

15   AND I TOOK IT AS PRESCRIBED.  AND THEY SAID, WELL, YOU WERE ON

16   IT FOR A SUCH A LONG TIME, THAT'S GOING TO REMAIN IN YOUR

17   MEDICAL FILE.  I PURSUED THAT 602 ALL THE WAY UP THROUGH EACH

18   LEVEL.  THEY SHOT ME DOWN.  THAT'S STILL IN MY FILE.

19        MOVING ON.  HE REFERENCED TWO MEDICAL RECORDS FROM

20   JUNE 11TH AND JUNE 12TH OF 2002 WHERE I WAS COMPLAINING OF

21   BURNING PAIN AND ULNAR NERVE PAIN.  WHEN I STARTED GETTING MY

22   PHYSICAL THERAPY IN JULY OF 2002, AS I GOT THE PHYSICAL THERAPY

23   AND THE TRAMADOL AND THE MEDICATION, I HAD A CELLMATE ASSIST

24   ME, THE NERVE PAIN BY OCTOBER OF 2002 HAD WENT AWAY.  THE NERVE

25   PAIN -- IT HAD DISSIPATED ENOUGH TO WHERE IT WAS NO LONGER

1   HURTING, YOU KNOW.  IT BASICALLY HAD GOT PRETTY GOOD.  MY TWO

2   FINGERS WERE NO LONGER NUMB.

3          SO, SINCE I HAVE BEEN DISCONTINUED FROM THE

4   TRAMADOL, I HAVE NOT HAD MY ARM BRACE TO DO UPPER ARM EXERCISES

5   BECAUSE THE UPPER ARM EXERCISE, WHEN I AM ABLE TO WORK MY UPPER

6   ARM GOOD, IT WORKS GOOD ON FREEING THAT NERVE UP.  AND THAT'S

7   WHEN ALL THE COMBINATION OF THE THERAPY AND THE EXERCISE AND

8   THE MEDICATION, IT MADE THAT PAIN GO AWAY.  THE NUMBNESS WENT

9   AWAY.  MY TWO FINGERS WERE COMPLETELY NUMB.

10          SINCE I HAVE BEEN TAKEN OFF THAT MEDICATION, I

11   HAVEN'T HAD MY ARM BRACE AND I HAVE NOT HAD THAT THERAPY, THAT

12   NERVE PAIN HAS RETURNED.  MY FINGERS ARE NUMB AGAIN.

13          I HAVE REPEATEDLY COMPLAINED ABOUT THESE THINGS TO

14   DR. SAYRE.  AND HIS RESPONSE TO ME WAS, YOU DON'T HAVE ANY

15   OBJECTIVE SIGNS TO SUPPORT YOUR COMPLAINT OF ANY NERVE PAIN.

16   SO, WITHOUT ANY -- AND HE DID NOT DO ANY TESTS.

17          AND THAT'S ALL I HAVE RIGHT THERE.

18          **THE COURT:**  DID YOU HAVE ANY FURTHER RECROSS?

19          **MR. ANDRADA:**  JUST VERY BRIEFLY.

20          **THE COURT:**  MR. ANDRADA, HAVE WE EVER ACTUALLY TOLD

21   THE JURY WHAT'S IN THIS CONTRACT AS FAR AS -- I AM WONDERING IF

22   I SHOULDN'T OR YOU SHOULDN'T JUST READ OUT SECTION 4.0 OF THIS

23   THING SO THE JURY KNOWS WHAT WE ARE TALKING ABOUT SINCE WE

24   HAVEN'T BEEN ABLE TO GET IT UP ON THE ELMO.

25          **MR. ASHKER:**  I HAVE A COPY I CAN READ TO THEM.

1          **MR. ANDRADA:**  I DON'T HAVE MY COPY RIGHT HERE IN

2    FRONT OF ME.

3          **THE COURT:**  I WILL JUST READ IT TO YOU.  THAT WILL

4    BE QUICKER.  HOWEVER, YOU HAVEN'T ACTUALLY HEARD THIS THING.

5    SO IT IS A SETTLEMENT AGREEMENT.  PART OF IT IS SECTION 4.0.

6    IT SAYS, "MEDICAL CARE".

7          4.1.  THE RELEASEES, AND THAT MEANS MR. ASHKER --

8    NO, I AM SORRY, THAT MEANS THE CDCR, THE CALIFORNIA DEPARTMENT

9    OF CORRECTIONS, AGREE TO CONTINUE TO ALLOW THE RELEASOR, THAT'S

10   MR. ASHKER, APPROPRIATE USE OF HIS ARM BRACE.  RELEASOR,

11   ASHKER, THAT IS, SHALL HAVE APPROPRIATE USE OF THE ARM BRACE

12   UNTIL HIS MEDICAL NEEDS REQUIRE OTHERWISE.

13         THE RELEASEES, CDCR, FURTHER AGREE TO REFER

14   RELEASOR, ASHKER -- AND DON'T WORRY, YOU WILL HAVE A COPY OF

15   THIS IN THE JURY ROOM, YOU DON'T NEED TO WRITE IT DOWN.

16         RELEASEES AGREE TO REFER RELEASOR TO A PAIN

17   MANAGEMENT SPECIALIST AND, THEN HANDWRITTEN IN HERE IT SAYS, AT

18   UC DAVIS CLINIC, AND THAT'S INITIALED BY THE ATTORNEY WHO WAS

19   REPRESENTING MR. ASHKER AT THAT TIME AND BY THE ATTORNEY

20   GENERAL OF THE STATE OF CALIFORNIA WHO WAS NEGOTIATING FOR THE

21   STATE, FOR A PAIN MANAGEMENT EXAMINATION AND CONSULTATION.

22         THE RELEASEES, CDCR, FURTHER AGREE TO IMPLEMENT THE

23   PAIN MANAGEMENT REGIMEN RECOMMENDED BY THE SPECIALIST AND

24   CONTINUE DOING THE PAIN MANAGEMENT REGIMEN UNTIL RELEASOR'S

25   MEDICAL NEEDS CHANGE.

1           NEXT SECTION, 4.3 SAYS:  THE RELEASEES, AGAIN CDCR,

2    AGREE TO REINSTATE RELEASOR'S RECEIPT OF THE PHYSICAL THERAPY

3    HE WAS PREVIOUSLY RECEIVING TO REHABILITATE HIS ARM.  THE

4    PHYSICAL THERAPY SHALL CONTINUE UNTIL A CHANGE IN RELEASOR'S

5    MEDICAL NEEDS CONTRAINDICATE THE THERAPY.

6           SO THAT IS WHAT IT SAYS.  SORRY WE DIDN'T TELL YOU

7    THAT EARLIER.

8           DID YOU HAVE SOME QUESTIONS THEN?

9           **MR. ANDRADA:**  YES, VERY BRIEFLY, YOUR HONOR.

10                    **REDIRECT EXAMINATION**

11   BY MR. ANDRADA:

12   **Q.**   YOU MENTIONED SUBSTANCE ABUSE AS A TEENAGER.  DID YOU

13   INFORM A PSYCHOLOGIST AT PELICAN BAY THAT YOU BEGAN DRINKING

14   ALCOHOL AT AGE 12 AND THAT IT ESCALATED TO HEAVY DAILY DRINKING

15   BY AGE 14 THROUGH 16?

16   **A.**   YES, SIR.

17   **Q.**   AND THEN DID YOU ALSO TELL THAT PSYCHOLOGIST THAT YOU

18   BEGAN SMOKING MARIJUANA AT AGE TEN?

19   **A.**   YES, SIR.

20   **Q.**   YOU USED BARBITURATES BEGINNING AT AGE 10?

21   **A.**   POSSIBLE.

22   **Q.**   AND ALSO THAT YOU USED METHAMPHETAMINES APPARENTLY

23   BEGINNING AT AGE TEN?

24   **A.**   NO, I DON'T BELIEVE SO.

25   **Q.**   YOU DID TELL HIM, THOUGH, THAT YOU HAD USED

1  METHAMPHETAMINES AS AN ADOLESCENT AND/OR TEENAGER; ISN'T THAT

2  TRUE?

3  **A.**   I THINK I TOLD HIM I USED IT ONCE OR TWICE.

4  **Q.**   AND THEN ALSO LSD AND -- IS THAT TRUE, YOU TOLD HIM YOU

5  USED LSD?

6  **A.**   YES, I DID ONCE OR TWICE.

7  **Q.**   AND THEN COCAINE?  YOU ALSO TOLD HIM THAT YOU USED

8  COCAINE, CORRECT?

9  **A.**   I THINK ONE TIME.

10  **Q.**   ALL RIGHT.

11          **MR. ANDRADA:**  THANK YOU.

12          **THE COURT:**  THAT'S IT?

13          **MR. ANDRADA:**  THAT'S IT.

14          **THE COURT:**  ANYTHING ELSE?

15          **MR. ASHKER:**  I AM DONE.

16          **MR. ANDRADA:**  SO I THINK WE ARE DONE WITH

17  MR. ASHKER.

18          **THE COURT:**  SO IT SEEMS.

19          **MR. ANDRADA:**  IS IT --

20          **THE COURT:**  WE USUALLY GO AN HOUR AND A HALF BEFORE

21  THE FIRST BREAK.

22          **MR. ANDRADA:**  I WAS GOING TO ASK IF I COULD RUN OUT,

23  BUT THAT'S FINE.

24          **THE COURT:**  WE USUALLY MAKE IT AN HOUR AND A HALF,

25  BUT IF YOU NEED TO WE CAN BREAK EARLY.

1          **MR. ANDRADA:**  WOULD YOU MIND IF WE BROKE NOW?

2          **THE COURT:**  IS THAT ALL RIGHT WITH YOU?

3          **MR. ANDRADA:**  IS THAT WITH EVERYBODY?

4          **THE COURT:**  QUARTER TO TEN.  WE WILL HAVE TO GO A

5     LITTLE LONGER LATER SO PREPARE YOURSELF.

6          **MR. ANDRADA:**  SAY AGAIN?

7          **THE COURT:**  THAT WILL MEAN WE WILL HAVE TO GO LONGER

8     THE NEXT TIME, SO YOU HAVE TO PREPARE YOURSELF.

9          **MR. ANDRADA:**  THANK YOU, YOUR HONOR.  I APPRECIATE

10    THE COURTESY.

11              (RECESS TAKEN AT 9:45 A.M.)

12             (PROCEEDINGS RESUMED AT 10:00 A.M.)

13         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

14         **THE COURT:**  PLEASE BE SEATED.

15         SO WE HAVE CALLED A FEW OF THE DEFENDANTS' WITNESSES

16    OUT OF ORDER AND THERE ARE A FEW MORE WITNESSES FOR PLAINTIFF

17    COMING UP ON VIDEO, BUT AT THIS TIME WE ARE GOING TO HEAR FROM

18    A DEFENSE WITNESS OR FROM THE DEFENDANT, DR. SAYRE.

19         **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

20         WE WOULD CALL DR. SAYRE.

21         **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

22              **MICHAEL SAYRE,**

23    CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

24    TESTIFIED AS FOLLOWS:

25         **THE WITNESS:**  I DO.

1          **THE CLERK:**  PLEASE BE SEATED AND STATE YOUR FULL

2     NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

3          **THE WITNESS:**  MY NAME IS MICHAEL C., C. FOR CLIFTON,

4     SAYRE, S-A-Y-R-E.

5          **THE COURT:**  WE HAVE A COUPLE OF QUESTIONS FROM ONE

6     OF THE JURORS.  TWO OF THEM ARE OBVIOUS.  I WILL ANSWER THEM,

7     AND I WILL ASK THE OTHER ONE LATER.

8          ONE IS, DO YOU HAVE ACCESS TO THE EXHIBITS DURING

9     DELIBERATION?  AND THE ANSWER TO THAT IS YES.  YOU ARE NOT

10    GOING TO SEE EVERY PIECE OF PAPER THAT'S INVOLVED HERE, BUT THE

11    EXHIBITS THAT ARE MOVED INTO EVIDENCE, WHICH WILL BE A MUCH

12    SMALLER AMOUNT, THE IMPORTANT ONES, YOU WILL HAVE ACCESS TO.

13         AND WILL YOU HAVE ACCESS TO A TRIAL TRANSCRIPT?  NO,

14    THAT YOU WILL NOT.  YOU MAY SEE WE HAVE KIND OF A ROUGH TRACK

15    GOING, BUT IT'S NOT USABLE.  SO IF NECESSARY, YOU CAN ASK FOR

16    CERTAIN THINGS TO BE READ BACK TO YOU AND THE REPORTER CAN READ

17    IT BACK IF YOU NEED PARTS OF IT REREAD, BUT THERE WON'T BE A

18    WHOLE TRANSCRIPT PREPARED, NO.

19         THE LAST QUESTION, THAT'S A LITTLE MORE COMPLICATED

20    AND I WILL SAVE THAT FOR LATER.

21         **MR. ANDRADA:**  MAY I PUT THIS UP?  I WANT TO MAKE

22    SURE THAT WE ARE....

23         (COUNSEL PUTS DOCUMENT ON ELMO.)

24         **THE COURT:**  IT'S UPSIDE DOWN.  TURN IT OVER.

25         THERE YOU GO.

1          **THE WITNESS:**  THAT'S BETTER.  STILL CAN'T READ IT.

2          **THE COURT:**  THERE'S A CONTROL ON THERE WHERE YOU CAN

3   PRESS THE BUTTON AND THE CAMERA WILL UP OR DOWN.  YOU CAN GO

4   DOWN ON THE CAMERA.  SHEILAH, DO YOU WANT TO SHOW HIM HOW TO DO

5   IT?

6          **MR. ANDRADA:**  DO YOU MIND?  I AM SORRY.  I AM

7   PATHETIC THIS WAY.

8          **THE COURT:**  I THOUGHT YOU HAD A HELPER.

9          **MR. ANDRADA:**  I DID, BUT SHE ––

10         **THE COURT:**  SHEILAH DOESN'T USUALLY HAVE TO DO IT

11  EITHER.

12         KEEP GOING.  JUST MOVE THE PAPER.

13         **MR. ANDRADA:**  OKAY.

14         **THE COURT:**  WHY DON'T YOU SHOW COUNSEL WHERE THE

15  BUTTON IS SO YOU CAN DO IT.  PRESS THE BUTTON BIGGER OR

16  SMALLER.

17         YOU NEED TO TAKE THAT DOWN UNTIL IT IS RECEIVED INTO

18  EVIDENCE.

19         **MR. ANDRADA:**  THAT'S FINE.  THANK YOU, YOUR HONOR.

20                       **DIRECT EXAMINATION**

21  **BY MR. ANDRADA:**

22  **Q.**  DR. SAYRE, I AM GOING TO SIT BACK HERE.  IS THAT ALL

23  RIGHT?

24  **A.**  PLEASE DO.

25  **Q.**  ALL RIGHT.

1          SIR, WOULD YOU TELL US ABOUT YOUR MEDICAL EDUCATION

2    AND TRAINING?

3    **A.**   HIGH SCHOOL, COLLEGE AS A BIOLOGY MAJOR.  BA IN BIOLOGY AT

4    WHAT'S NOW CALIFORNIA STATE UNIVERSITY AT NORTHRIDGE.  IN THOSE

5    DAYS IT WAS A STATE COLLEGE.  WENT TO MEDICAL SCHOOL AT

6    UNIVERSITY OF CALIFORNIA AT IRVINE.  GRADUATED IN '72 AND WENT

7    AND DID A YEAR ROTATING INTERNSHIP AT ST. MARY'S HOSPITAL IN

8    LONG BEACH.  THEN WENT TO SANTA CLARA VALLEY MEDICAL CENTER

9    WITH COMBINED ANESTHESIA RESIDENCY WHERE I GRADUATED FROM THAT

10   IN LATE JUNE OF '75.

11   **Q.**   IF I MAY, SLOW DOWN JUST A LITTLE BIT.

12   **A.**   I AM NERVOUS.  I AM TALKING FAST.

13   **Q.**   TAKE YOUR TIME.

14   **A.**   PRACTICE, PRIMARY ANESTHESIOLOGY IN THE ORANGE COUNTY BASE

15   STATION TRAUMA CENTER AT WESTERN MEDICAL CENTER FOR 17 YEARS

16   DOING GENERAL ANESTHESIA, PAIN CONSULTATIONS, AND A LOT, A LOT

17   OF HEAVY DUTY TRAUMA.  SEVERE INJURIES, YOU NAME IT.  I HAD TO

18   TAKE CARE OF THE IMMEDIATE AND POST-OPERATIVE AND LONG-TERM

19   CARE OF SEVERE INJURIES.

20          DID A JOB IN WASHINGTON, AND THEN I DECIDED TO DO A

21   FAMILY PRACTICE RESIDENCY.  I WENT AND DID A THREE-YEAR

22   RESIDENCY IN FAMILY PRACTICE, WHICH ACTUALLY TOOK A WEE BIT

23   SHORTER BECAUSE I GOT A LITTLE BIT OF CREDIT FOR MY PREVIOUS

24   TRAINING, AND GRADUATED BOARD ELIGIBLE IN FAMILY PRACTICE.  I

25   PASSED MY BOARDS, AND SO I AM BOARD CERTIFIED BOTH IN

SAYRE – DIRECT / MR. ANDRADA

```
1   ANESTHESIOLOGY AND FAMILY PRACTICE.  I'VE BEEN RE-CERTIFIED IN

2   FAMILY PRACTICE AND I DID A PRIMARY CARE PRIVATE PRACTICE IN

3   NEWPORT, OREGON FOR SEVEN OR SO YEARS, AND TOOK THE JOB AT

4   PELICAN BAY.

5   Q.   ALL RIGHT.  BRIEFLY WHAT IS BOARD CERTIFICATION?

6   A.   BOARD CERTIFICATION IS, NUMBER ONE, YOU HAVE TO MEET

7   CRITERIA.  YOU HAVE TO --

8   Q.   LET ME STOP YOU.  AGAIN, GO A LITTLE SLOWER AND START --

9   WHAT DOES IT MEAN TO BE BOARD CERTIFIED?

10  A.   ELIGIBILITY IN EDUCATION, LICENSE, LICENSE STANDARDS,

11  MORAL ETHICAL STANDARDS, AND THEN PASS A VERY RIGOROUS

12  EXAMINATION.

13  Q.   OKAY.  AND BRIEFLY, WITH REGARD TO EDUCATION AND

14  EXPERIENCE, WHAT QUALIFIED YOU TO TAKE THE BOARD IN ANESTHESIA?

15  A.   MY RESIDENCY IN ANESTHESIOLOGY, MY PRACTICE IN

16  ANESTHESIOLOGY -- AT THAT TIME, AND I DON'T ACTUALLY KNOW TODAY

17  WHAT IT IS, BUT YOU HAD TO PRACTICE A NUMBER OF YEARS BEFORE

18  YOU'RE ELIGIBLE TO TAKE THE BOARDS.  THEN YOU HAD TO TAKE THE

19  EXAMINATION.

20  Q.   OKAY.  WHAT, TELL US ABOUT THE NATURE OF THE EXAMINATION?

21  A.   IT WAS --

22  Q.   IT'S ORAL AND WRITTEN, RIGHT?

23  A.   ORAL AND WRITTEN.  JUST TWO DAYS OF REALLY WRINGING YOUR

24  HANDS TOUGH EXAMINATIONS.

25  Q.   OKAY.
```

1   **A.**   THEY SEND TOP NOTCH PROS TO QUIZ YOU AND GRILL YOU AND

2   TAKE YOU THROUGH SEVERE AND DIFFICULT CASE SCENARIOS ORALLY.

3   YOU HAVE TO REALLY PERFORM YOUR STUFF ON YOUR FEET AND UNDER

4   STRESS.

5   **Q.**   WHEN WERE YOU BOARDED IN ANESTHESIA?

6   **A.**   I GOT MY NOTIFICATION OFFICIALLY IN APRIL OF, I WANT TO

7   SAY '78?

8   **Q.**   ALL RIGHT.

9   **A.**   THAT, I AM VAGUE ON THAT, ON THE EXACT DATES.  IT HAS BEEN

10  A NUMBER OF YEARS.

11  **Q.**   AND THEN TO OBTAIN BOARD CERTIFICATION IN FAMILY PRACTICE,

12  IS THE PROTOCOL ESSENTIALLY SIMILAR TO WHAT YOU DISCUSSED WITH

13  REGARD TO ANESTHESIA?

14  **A.**   YES.

15  **Q.**   WHEN WERE YOU BOARDED IN FAMILY PRACTICE?

16  **A.**   IN THE SUMMER OF '94.

17  **Q.**   OKAY.

18          NOW, IN YOUR WORK AS AN ANESTHESIOLOGIST, WERE YOU

19  INVOLVED IN MANAGEMENT OF PATIENTS WHO PRESENTED WITH PAIN

20  PROBLEMS?

21  **A.**   ABSOLUTELY.

22  **Q.**   OKAY.  PLEASE EXPLAIN WHAT YOU WERE DOING BY WAY OF PAIN

23  MANAGEMENT BY VIRTUE OF YOUR HAVING BECOME BOARDED IN

24  ANESTHESIA?

25  **A.**   I WOULD GET CONSULTATIONS FROM PHYSICIANS ON THE STAFF TO

1    HAVE ME EVALUATE, RECOMMEND, POSSIBLY TREAT THEIR PATIENTS FOR

2    CHRONIC PAIN CONDITIONS.

3    Q.    AND GENERALLY WHAT WERE YOU ABLE TO DO AS AN

4    ANESTHESIOLOGIST IN TERMS OF PAIN MANAGEMENT?

5    A.    MY FAMILIARITY WITH PHARMACOLOGICS, DRUGS, INJECTIONS.

6    MANY TIMES -- AT THAT TIME, THE STATE OF THE ART FOR MAKING

7    DIAGNOSES IS SORT OF AN EXCLUSIONARY DIAGNOSIS.

8              IF THERE WAS THOUGHT THAT A PARTICULAR NERVE OR A

9    GROUP OF NERVES OR TYPE OF NERVES WERE CAUSING THE PAIN, THEN

10   THEY WOULD WANT ME TO COME IN THERE AND PRECISELY PUT A NEEDLE

11   NEAR THOSE NERVES AND INJECT A MEDICATION THAT WOULD DEADEN

12   THOSE NERVES.  AND BY DEADENING THOSE NERVES, AND IF THE PAIN

13   WENT AWAY, THEN THOSE NERVES WERE RESPONSIBLE FOR TRANSMISSION

14   OF THE PAIN, THAT WAS THE DIAGNOSIS.

15             IF, ON THE OTHER HAND, AFTER I COULD PUT THE

16   MEDICATION RIGHT NEXT TO THAT NERVE THE SYMPTOMS DIDN'T GO

17   AWAY, WE COULD EXCLUDE THOSE NERVES IN THAT AREA, THAT TYPE OF

18   PHYSIOLOGY PATHOLOGY IS CAUSING THE PAIN.

19   Q.    ALL RIGHT.  SO, WOULD PART OF YOUR WORK AS A PAIN

20   MANAGEMENT PHYSICIAN, WOULD THAT INVOLVE THE PRESCRIBING OF

21   MEDICATIONS?

22   A.    ABSOLUTELY.

23   Q.    AND, AGAIN, WE'RE GOING TO TRY TO GO THROUGH THIS VERY

24   QUICKLY.

25             ARE THERE MANY TYPES OF MEDICATIONS THAT ARE

SAYRE – DIRECT / MR. ANDRADA

1    GENERALLY USED TO DEAL WITH PAIN MANAGEMENT PROBLEMS?

2    **A.**    ABSOLUTELY.

3    **Q.**    OKAY.  PLEASE, PLEASE EXPLAIN SOME OF THE CATEGORIES, IF

4    YOU WILL, OF MEDICATIONS THAT ARE USED BY PHYSICIANS TO ADDRESS

5    PAIN PROBLEMS?

6    **A.**    THERE ARE MANY TYPES OF PAIN, MANY STRUCTURES IN THE BODY

7    THAT CAUSE PAIN, AND SO YOU HAVE MANY DIFFERENT MEDICINES THAT

8    EFFECT DIFFERENT PARTS AND SYSTEMS OF THE BODY THAT EFFECT

9    PAIN.

10            EVERYWHERE FROM THE INFLAMMATION OF JOINTS FOR

11   ARTHRITIS AND TO VERY SPECIFIC TYPES OF NERVE FIBERS, NEURO

12   RECEPTORS IN DIFFERENT NERVE AREAS OF THE BRAIN AND SPINAL CORD

13   AND PERIPHERAL NERVES, NERVE GANGLIONS.

14            YOU WOULD USE -- A LOT OF OUR DRUGS WERE ORIGINALLY

15   MARKETED FOR SEIZURE, PSYCHOTIC, DEPRESSIVE ISSUES, BUT BECAUSE

16   THEY EFFECT NERVES, THEY EFFECT PAIN.

17   **Q.**    SO, ARE THERE -- IS THERE A GROUP OF PAIN MEDICATIONS THAT

18   ARE GENERALLY DESCRIBED AS NON-OPIATE ANALGESICS?

19   **A.**    OH, ABSOLUTELY.

20   **Q.**    JUST GIVE US ONE EXAMPLE.

21   **A.**    TYLENOL.

22   **Q.**    OKAY.

23            IS THERE ANOTHER CATEGORY OF PAIN MEDICATION THAT'S

24   GENERALLY DESCRIBED AS ANTI-INFLAMMATORY MEDICATIONS?

25   **A.**    ABSOLUTELY.  NONSTEROIDAL ANTI-INFLAMMATORY, NSAIDS.

SAYRE – DIRECT / MR. ANDRADA

1   **Q.**   GIVE US AN EXAMPLE OF ANTI-INFLAMMATORY THAT'S USED

2   COMMONLY --

3   **A.**   IBUPROFEN, NAPROXEN, VOLTAREN.   THE LIST IS HUGE.

4   **Q.**   THERE ARE OTHER -- THERE ARE OPIATE-BASED ANALGESICS,

5   CORRECT?

6   **A.**   ABSOLUTELY.

7   **Q.**   GIVE US AN EXAMPLE OF ONE OF THOSE.

8   **A.**   MORPHINE.

9   **Q.**   NOW, ARE THERE OTHER DRUGS THAT ARE COMMONLY USED TO TREAT

10  PAIN, FOR EXAMPLE, ARE ANTIDEPRESSANTS USED?

11  **A.**   ABSOLUTELY BECAUSE THEY EFFECT NERVES, THEY CAN EFFECT

12  PAIN.   ALSO THEY EFFECT A PERCEPTION IN THE BRAIN HOW YOU

13  INTERPRET THE SENSATION OF THE NERVES COMING TO THE BRAIN.   SO

14  THEY CAN BE VERY BENEFICIAL.

15  **Q.**   ARE THERE OTHER CLASSES OF MEDICATIONS USED TO TREAT PAIN?

16  **A.**   SEIZURE MEDICATIONS ARE VERY APPROPRIATE.   THEY --

17  **Q.**   LET ME STOP YOU.   SO WE GET A NICE, CLEAN RECORD.

18          WHY ARE SEIZURE MEDICATIONS USED?

19  **A.**   BECAUSE SEIZURE MEDICATIONS ARE MEANT TO DAMPEN THE

20  AMPLITUDE OF NEURAL TISSUE, THEREBY PREVENTING SEIZURES BECAUSE

21  CONDUCTION OF PAIN COMES UP NERVES.   WHEN YOU DAMPEN THE

22  AMPLITUDE OF THOSE NERVES, YOU DAMPEN PAIN.

23  **Q.**   ARE MUSCLE RELAXANTS USED AS A COMMON MODALITY IN A PAIN

24  MANAGEMENT SETTING?

25  **A.**   LESS AND LESS.

1    **Q.**   BUT THEY ARE STILL USED?

2    **A.**   MUSCLE RELAXANTS ARE USED SHORT-TERM ACUTE TREATMENT

3    BECAUSE MUSCLE SPASM CAN CAUSE PAIN.  SO IF YOU CAN RELAX THE

4    MUSCLES, YOU CAN ALLEVIATE THE PAIN.

5    **Q.**   NOW, IS TRAMADOL USED?

6    **A.**   ABSOLUTELY.  I HAVE USED IT MANY TIMES.

7    **Q.**   OKAY.

8         AND WHAT CATEGORY WOULD TRAMADOL FIT INTO?  IN OTHER

9    WORDS, IS IT AN OPIATE, ANALGESIC, NON-OPIATE ANALGESIC?  WHAT

10   IS IT?  AND IN SIMPLE TERMS THAT EVEN A LAWYER CAN UNDERSTAND.

11   **A.**   GEE, I HAVE TO TALK -- OKAY.

12        IT IS NOT AN OPIATE IN THE SENSE IT'S NOT FROM THAT

13   CLASS OF CHEMICALS.  HOWEVER, IT EFFECTS THE MUE OPIATE

14   RECEPTOR IN THE NEURAL TISSUE.

15   **Q.**   WE HAVE TO STOP YOU RIGHT THERE.

16        WHAT, AND AGAIN, SO EVEN I CAN UNDERSTAND, WHAT'S A

17   MUSE RECEPTOR?

18   **A.**   ALL NATURAL OCCURRING SUBSTANCES AND DRUGS HAVE THEIR

19   EFFECT ON CELLS BY EFFECTING A RECEPTOR SITE.  AND WE CLASSIFY

20   IN SCIENCE, IN MEDICINE, WE GIVE NAMES TO THESE RECEPTOR SITES.

21   AND BECAUSE OPIATES WERE ORIGINALLY SHOWN TO EFFECT CERTAIN

22   PARTICULAR NEURAL RECEPTOR SITES, THEY ARE CALLED THE OPIATE

23   RECEPTORS.  WE FOUND THAT THERE ARE MULTIPLE TYPES OF OPIATE

24   RECEPTORS.  WE HAVE GIVEN THEM GREEK LETTERS.  THE ONE THAT

25   TRAMADOL EFFECTS IS MUSE OPIATE SITE.

1    **Q.**   ALL RIGHT.  HOW LONG HAVE YOU USED TRAMADOL?

2    **A.**   STARTED USING IT IN MY RESIDENCY REALLY A LOT AND FAMILY

3    PRACTICE.  IT WAS A VERY IN VOGUE MEDICATION AT THAT TIME.  I

4    USED IT IN MY PRIVATE PRACTICE --

5            **MR. ASHKER:**  EXCUSE ME.  I AM NOT CLEAR ON THE TIME

6    PERIOD WE ARE TALKING ABOUT.

7            **THE WITNESS:**  ALL RIGHT.  FROM --

8    **BY MR. ANDRADA:**

9    **Q.**   WAIT, WAIT.  LET ME --

10   **A.**   I AM SORRY.

11   **Q.**   THAT'S QUITE ALL RIGHT.  SLOW DOWN, TAKE A BREATH.  ALL

12   RIGHT.  ALL RIGHT.  LET'S REVIEW.

13           YOU GOT YOUR MEDICAL DEGREE WHEN NOW?

14   **A.**   I RECEIVED MY MEDICAL DEGREE IN 1972.

15   **Q.**   OKAY.  AND THEN, OF COURSE, YOU DID YOUR INTERNSHIP IN THE

16   NEXT YEAR?

17   **A.**   '72, '73.

18   **Q.**   WHEN DID YOU DO YOUR RESIDENCY IN ANESTHESIOLOGY?

19           **THE COURT:**  WE DON'T HAVE TO GO BACK OVER

20   EVERYTHING.

21           **MR. ANDRADA:**  NO, I KNOW.

22           **THE COURT:**  JUST THE PRIVATE PRACTICE WAS WHAT HE

23   SAID.  SO THE YEAR THAT WAS INVOLVED IN THAT PARTICULAR --

24           **THE WITNESS:**  I WAS --

25           **THE COURT:**  -- THAT YOU WERE ASKING ABOUT.

1          **THE WITNESS:**  I DID MY FAMILY PRACTICE RESIDENCY

2    FROM '94 TO '97.  SO MY EXPERIENCE WITH USE OF ULTRAM TO A

3    LARGE DEGREE STARTED IN '94 TO '97 PERIOD.

4    **BY MR. ANDRADA:**

5    **Q.**    NOW, YOU USED THE WORD "ULTRAM".  IS THAT THE SAME AS

6    TRAMADOL?

7    **A.**    IT'S THE TRADE NAME VERSUS THE GENERIC NAME.

8    **Q.**    OKAY.

9    **A.**    I SWITCH THEM BACK AND FORTH.

10   **Q.**    NOW, ARE THERE BENEFITS OF TRAMADOL?

11   **A.**    YES.

12   **Q.**    WHAT ARE SOME OF THE BENEFITS?

13   **A.**    IT'S A GOOD OPIATE RECEPTOR DRUG.  IT DOES DO OPIATE-TYPE

14   SYMPTOMS.  SO -- AND THE FACT THAT IT'S NOT REALLY AN OPIATE,

15   THE LAWS AND REGULATIONS, IT SLID UNDER THE OPIATE RADAR SORT

16   OF THING.

17          IT IS EASIER TO PRESCRIBE.  IT BECAME VERY POPULAR

18   BECAUSE IT HAD AN OPIATE EFFECT.  SO IT WAS USED A LOT WHENEVER

19   YOU WANTED TO USE AN OPIATE AND YOU DIDN'T WANT TO HAVE THE

20   NARCOTIC REGULATIONS TO DEAL WITH.

21   **Q.**    ARE THERE SOME COMPLICATIONS THAT CAN ARISE FROM THE USE

22   OF TRAMADOL?

23   **A.**    IT EFFECTS THE MUSE OPIATE RECEPTOR.  AND THAT RECEPTOR IS

24   SPECIFICALLY NOTED TO BE ASSOCIATED WITH EUPHORIA, A HIGH WITH

25   THE UTILIZATION, DEPENDENCY AND PROBLEMS OF THAT NATURE.

SAYRE – DIRECT / MR. ANDRADA

1    **Q.**   IS THERE A RISK OF SEIZURES FROM TRAMADOL?

2    **A.**   YES, THERE IS.

3    **Q.**   PLEASE EXPLAIN.

4    **A.**   LIKE I SAY, IT CAN GIVE SORT OF A HIGH.  IT APPEARS THAT

5    THERE ARE GENETIC DIFFERENCES IN PEOPLE.  SOME PEOPLE GET VERY

6    MINIMAL EFFECT AND SOME PEOPLE GET A REAL STIMULATED BUZZ

7    HIGH --

8            **THE COURT:**  THE QUESTION WAS WHETHER THERE WAS A

9    RISK OF SEIZURE.  SO IF YOU CAN ADDRESS THAT ONE.

10           **THE WITNESS:**  GOING TO RISK OF SEIZURES, WHEN YOU

11   GET A BUZZ HIGH, YOU ARE STIMULATED.  YOUR NEURONS ARE

12   STIMULATED.  AND STIMULATION OF NERVES HAS A RISK OF SEIZING.

13           I WAS GETTING THERE.

14   **BY MR. ANDRADA:**

15   **Q.**   ALL RIGHT.

16           AND THERE -- ARE THERE OTHER RISKS THAT ARE

17   DISCUSSED IN THE LITERATURE?

18   **A.**   DEPENDENCY, SEIZURES ARE THE MAIN PROBLEMS.  THERE ARE

19   OTHER THINGS, BUT THEY ARE MINOR.  THOSE ARE THE MAJOR ISSUES.

20   **Q.**   ALL RIGHT.

21           NOW, WHAT DO YOU MEAN BY DEPENDENCY IN RELATION TO A

22   DRUG SUCH A TRAMADOL?

23   **A.**   A PSYCHOLOGICAL OR PHYSIOLOGICAL DESIRE NOT RELATED TO THE

24   PHARMACOLOGICAL EFFECTS NEEDED.

25   **Q.**   ELABORATE A LITTLE BIT MORE.  WHAT DO YOU MEAN --

SAYRE - DIRECT / MR. ANDRADA

1   A.   WHEN A PATIENT --

2   Q.   STOP.  LET ME POSE MY QUESTION.  WE HAVE A REPORTER HERE

3   TRYING TO TAKE US DOWN.

4   A.   I TALK WAY TOO FAST.

5   Q.   IT IS DIFFICULT FOR TWO PEOPLE TO TALK AT ONCE.

6        WHAT WERE YOU REFERRING TO WHEN YOU TALKED ABOUT A

7   PSYCHOLOGICAL DEPENDENCE?

8   A.   THEY CONSTANTLY WANT TO HAVE THAT BUZZ AGAIN AND AGAIN AND

9   AGAIN.

10  Q.   WHAT WERE YOU TALKING ABOUT WHEN YOU WERE REFERRING TO A

11  PHYSICAL DEPENDENCE?

12  A.   WITH THE -- AN OPIATE RECEPTOR EFFECT GIVES YOU A FEELING

13  OF EUPHORIA AND A HIGH.  WHEN YOU DON'T HAVE IT, YOU KIND OF

14  FEEL CRAPPY.

15  Q.   ALL RIGHT.  ARE THERE RISKS WITH OTHER PAIN MEDICATIONS

16  THAT ARE GENERALLY USED?

17  A.   I CAN'T THINK OF A PAIN MEDICATION THAT DOESN'T HAVE RISK.

18  Q.   YOU WERE HERE, OBVIOUSLY, FOR DR. DUNCAN'S TESTIMONY ABOUT

19  COMPLICATIONS FROM VARIOUS PAIN MEDICATIONS?

20  A.   ABSOLUTELY.

21  Q.   SO YOU WOULD AGREE WITH HIS COMMENTS IN THAT REGARD?

22  A.   ABSOLUTELY.

23  Q.   NOW, LET'S TALK ABOUT TRAMADOL AND ITS USE WITHIN THE

24  STATE PRISON SYSTEM.

25        CAN YOU TELL US, HAS THERE BEEN SOME INSTITUTIONAL

1    CONCERNS EXPRESSED BY THE CDCR?

2    **A.**   ABSOLUTELY.

3    **Q.**   PLEASE EXPLAIN.

4    **A.**   TRAMADOL NEVER HAS BEEN ON OUR FORMULARY.

5    **Q.**   LET ME STOP YOU NOW.

6            WHAT IS A FORMULARY?  THAT'S A TERM I DON'T THINK WE

7    HAVE HEARD YET.

8    **A.**   A FORMULARY IS A LIST OF DRUGS THAT ARE GOING TO BE USED

9    PREFERENTIALLY AND THE DRUGS OFF THE FORMULARY ARE TO ONLY BE

10   USED IN EXCEPTIONAL CIRCUMSTANCES.

11           IT IS A RESEARCHED-APPROVED APPROPRIATE LIST OF

12   DRUGS FOR THAT ENVIRONMENT.

13   **Q.**   OKAY.  SO, WHY HAS TRAMADOL NEVER BEEN ON THE APPROVED

14   LIST, IF YOU WILL?

15           **THE COURT:**  COUNSEL, I AM NOT SURE YOU HAVE LAID A

16   FOUNDATION FOR THIS WITNESS TO EXPLAIN THE MAKING OF THE LIST.

17   I DOUBT THAT THAT -- UNLESS HE WAS INVOLVED IN THAT.

18           **MR. ANDRADA:**  SURE.

19   **BY MR. ANDRADA:**

20   **Q.**   BASED UPON YOUR WORK AT THE CDCR, YOU ARE FAMILIAR WITH

21   HOW THE LIST IS COMPILED, CORRECT?

22   **A.**   I AM CURRENTLY AWARE OF HOW THE CURRENT LIST IS COMPILED.

23   ACTUALLY, THE FORMULARY THAT I WAS WORKING UNDER DURING THE

24   PERIOD OF THIS LITIGATION PRECEDED MY EMPLOYMENT.

25   **Q.**   ALL RIGHT.  BUT DURING THE TIME THAT WE HAVE BEEN TALKING

1    ABOUT, FROM 2002 THROUGH THE PRESENT, TRAMADOL WAS A

2    NONFORMULARY MEDICATION?

3    **A.**    ABSOLUTELY.

4    **Q.**    OKAY.

5              **MR. ASHKER:**  I OBJECT ON THE GROUNDS THAT I DON'T --

6    DR. SAYRE WASN'T EMPLOYED AT PELICAN BAY PRISON IN 2002, WAS

7    HE?

8              **THE COURT:**  THAT'S TRUE.

9    **BY MR. ANDRADA:**

10   **Q.**  WELL, BASED UPON YOUR WORK AS THE CHIEF --

11             **THE COURT:**  EXCUSE ME.  YOU CAN LIMIT YOUR QUESTION

12   TO THE TIME THAT HE WAS WORKING THERE.

13             **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

14   **BY MR. ANDRADA:**

15   **Q.**  WHEN YOU CAME TO WORK THERE IN 2005, WAS IT ON THE

16   FORMULARY LIST?

17   **A.**  I REVIEWED THE FORMULARY FOR THE PRECEDING YEARS.  IT WAS

18   NOT ON THE FORMULARY FROM AS FAR BACK AS I CALL, THE 2000 ERA.

19   **Q.**  NOW WHEN YOU ARRIVED AT PELICAN BAY, WHEN DID YOU START

20   THERE?

21   **A.**  MY OFFICIAL DATE TO START WAS JANUARY 18TH, 2005.

22   **Q.**  ALL RIGHT.  AND WHAT IS YOUR JOB TITLE?

23   **A.**  TODAY?

24   **Q.**  WHAT WAS IT THEN?

25   **A.**  I STARTED AS THE CHIEF PHYSICIAN AND SURGEON.

SAYRE − DIRECT / MR. ANDRADA

1    **Q.**    WHAT DOES THAT TITLE MEAN?

2    **A.**    AT THAT TIME, THERE WAS A CHIEF MEDICAL OFFICER WHO HAD

3    THE DUTIES OF HEALTH CARE MANAGER IS ALSO A DUAL DUTY, AND

4    BECAUSE THAT JOB WAS SO BROAD, THE CHIEF PHYSICIAN SURGEON WAS

5    RESPONSIBLE FOR RUNNING ALL OF THE MEDICAL ASPECTS OF THE

6    CLINIC OUT OF THE PRISON AND CLINICS.

7    **Q.**    WHO WAS THE CHIEF MEDICAL OFFICER AT THAT TIME?

8    **A.**    DWIGHT WINSLOW, DR. DWIGHT WINSLOW.

9    **Q.**    AND THEN AT SOME POINT DID YOU BECOME THE CHIEF MEDICAL

10   OFFICER?

11   **A.**    DR. WINSLOW, VERY SHORTLY AFTER I ARRIVED, STARTED

12   TRANSITIONING INTO MORE EXECUTIVE POSITIONS IN SACRAMENTO.  HE

13   WAS FIRST A REGIONAL DIRECTOR, AND WAS VERY RAPIDLY PROMOTED --

14           **MR. ASHKER:**  EXCUSE ME.  NONRESPONSIVE TO THE

15   QUESTION.  THE QUESTION WAS --

16           **THE COURT:**  TRUE.  IT'S NONRESPONSIVE.  YOU MAY

17   CONTINUE.

18           **MR. ANDRADA:**  SURE.

19   **BY MR. ANDRADA:**

20   **Q.**    WHEN DID YOU BECOME THE CHIEF MEDICAL OFFICER,

21   APPROXIMATELY?

22   **A.**    I WAS ACTING CHIEF MEDICAL OFFICER MORE AND MORE DURING

23   THIS WHOLE PERIOD OF TIME BECAUSE DWIGHT WINSLOW WAS OUT IN

24   SACRAMENTO.

25           THE FEDERAL COURT ACTUALLY RULED ON THIS --

SAYRE – DIRECT / MR. ANDRADA

1        **THE COURT:**  DR. SAYRE, I AM AFRAID -- YOU NEED TO

2   KEEP IT SIMPLE.  IF COUNSEL WANTS MORE, HE WILL BE SURE TO ASK

3   YOU MORE QUESTIONS.

4        **THE WITNESS:**  I OFFICIALLY --

5        **THE COURT:**  ALL HE'S ASKING YOU RIGHT NOW IS WHEN

6   YOU BECAME CHIEF MEDICAL OFFICER.  IF YOU CAN'T ANSWER THAT,

7   JUST LET HIM KNOW THAT.

8        **THE WITNESS:**  I OFFICIALLY BECAME THE CHIEF MEDICAL

9   OFFICER BY FEDERAL COURT ORDER --

10        **THE COURT:**  COUNSEL -- MR. SAYRE, YOU DON'T NEED TO

11   INCLUDE EXTRANEOUS MATTERS.  ALL HE ASKED YOU IS A DATE.  YOU

12   CAN GIVE A DATE.  IF HE WANTS TO ASK ANOTHER RELEVANT QUESTION,

13   HE WILL ASK IT.

14        **THE WITNESS:**  JULY 1, 2005.

15        **THE COURT:**  THANK YOU.

16   **BY MR. ANDRADA:**

17   **Q.**   AND WHAT ARE YOUR DUTIES AS THE CMO?

18   **A.**   AS THE CMO, MY JOB IS TO RUN ALL THE MEDICAL ASPECTS OF

19   THE PRISON MEDICAL CARE.

20   **Q.**   OKAY.  AND, GENERALLY, WHAT DOES THAT MEAN?  FOR

21   EXAMPLE -- LET'S START WITH THE BASIC QUESTION.

22        HOW MANY INMATES ARE THERE AT PELICAN BAY?

23   **A.**   3500.

24   **Q.**   AND SO YOU WOULD BE RESPONSIBLE FOR THEIR MEDICAL -- YOU

25   WOULD BE THE EXECUTIVE RESPONSIBLE FOR THEIR MEDICAL CARE; IS

1   THAT WHAT YOU ARE SAYING?

2   **A.**   THAT'S TRUE.

3   **Q.**   AND, GENERALLY SPEAKING, IN 2005, HOW MANY PHYSICIANS

4   WOULD THERE BE WHO WOULD WORK AT PELICAN BAY?

5   **A.**   THAT VARIES IN, I THINK -- BECAUSE WE HAVE -- I LOOK UPON

6   IT AS PROVIDERS.

7   **Q.**   LET ME STOP YOU.  PROVIDERS WOULD INCLUDE DOCTORS, NURSE

8   PRACTITIONERS, AND NURSES, I ASSUME?

9   **A.**   NO.

10  **Q.**   WHO ARE PROVIDERS?

11  **A.**   PROVIDERS ARE PEOPLE LICENSED TO GIVE MEDICAL CARE.  SO

12  THAT WOULD INCLUDE PHYSICIANS.

13  **Q.**   YES.

14  **A.**   NURSE PRACTITIONERS.

15  **Q.**   YES.

16  **A.**   AND PA'S.

17  **Q.**   WHAT IS A PA?

18  **A.**   PHYSICIAN ASSISTANTS.

19  **Q.**   CAN YOU TELL US, JUST IN ROUND NUMBERS SO WE GET A SENSE

20  OF THE SIZE OF THE STAFF, HOW MANY PROVIDERS WOULD THERE HAVE

21  BEEN ON STAFF AT PELICAN BAY IN 2005, APPROXIMATELY?

22  **A.**   BETWEEN FOUR AND FIVE.  IT VARIES SO MUCH.  WE ARE ALWAYS

23  HAVING SUCH TURNOVER.

24  **Q.**   SO THESE PROVIDERS WOULD SEE PATIENTS IN THE CLINIC THERE;

25  IS THAT CORRECT?

SAYRE - DIRECT / MR. ANDRADA

1   **A.**   CORRECT.

2   **Q.**   AND IF YOU HAD TO CALL IN A CONSULTANT OR A SPECIALIST,

3   COULD YOU DO THAT?

4   **A.**   YES.

5   **Q.**   GENERALLY, HOW WOULD YOU GO ABOUT DOING THAT?

6   **A.**   THERE IS A REQUIRED UTILIZATION PROCESS THAT REQUIRES

7   SUBMITTING OF A UTILIZATION REQUEST.  IT GOES THROUGH A

8   UTILIZATION PROCESS THAT -- IF IT IS JUST A SLAM DUNK OBVIOUS

9   THING, THE FIRST LEVEL IS DONE BY A UTILIZATION NURSE AND

10  APPROVED.  SHE IS NOT ALLOWED TO DISAPPROVE.

11          IT GOES TO A SECOND LEVEL WHERE I REVIEW THEM.  IF

12  IT'S A SLAM DUNK MEDICAL ISSUE THAT I THINK, OH, THIS IS

13  OBVIOUS, JUST DO IT, I APPROVED IT ON THE SECOND LEVEL.

14          THEN IF I HAVE QUESTIONS OR THERE'S ISSUES INVOLVED

15  WITH IT, THEN IT GOES TO OUR MEDICAL AUTHORIZATION REVIEW, OUR

16  MAR COMMITTEE.

17  **Q.**   DO YOU HAVE OCCASION TO ACTUALLY OBTAIN OUTSIDE

18  CONSULTATIONS FOR PRISONERS?

19  **A.**   ABSOLUTELY.  DO IT ALL THE TIME.

20  **Q.**   NOW, DO YOU I GATHER THAT YOU ACTUALLY SEE PATIENTS IN THE

21  CLINIC?

22  **A.**   ACTUALLY, I AM NOT A PRIMARY CARE PROVIDER.  I ONLY DEAL

23  WITH SPECIALIZED QUESTIONS.  I DO A LOT OF THE 602'S, THE

24  APPEALS, A LOT OF ADA, AMERICAN DISABILITY DETERMINATIONS.  I

25  SEE A FEW PROBLEM CASES.  BECAUSE I HAVE A LOT OF FEMALES,

SAYRE – DIRECT / MR. ANDRADA

1   GENERAL EXAMINATIONS AND GENERAL TREATMENTS ARE SOMETIMES I

2   TEND TO DO MORE OF THIS TO TAKE THE BURDEN OFF THE FEMALE

3   PROVIDERS, BUT AS A PRIMARY CARE PROVIDER, I ACTUALLY DO VERY

4   LITTLE, IF ANY, PRIMARY CARE.

5   **Q.**   YOU DO SEE PATIENTS UP THERE?

6   **A.**   I SEE THEM FOR DIFFERENT ADMINISTRATIVE THINGS PRIMARILY.

7   **Q.**   IN CONNECTION WITH APPEALS, YOU MEAN?

8   **A.**   YES.

9   **Q.**   PLEASE EXPLAIN HOW THAT COMES ABOUT JUST IN GENERAL TERMS.

10  **A.**   QUITE FREQUENTLY AN APPEAL IS ABOUT A DECISION OF ONE OF

11  THE PROVIDERS.  SO, THE PROVIDER CANNOT JUDGE THEIR OWN

12  ACTIONS, SO IT HAS TO BE KICKED UP ANOTHER LEVEL.  SO IT WOULD

13  COME UP TO MY LEVEL.

14          SO IF THERE IS A 602 ABOUT WHAT A PROVIDER HAS DONE,

15  I HAVE TO SEE THE INMATE, DO AN INTERVIEW -- AN ACTUAL

16  INTERVIEW IS AN ABSOLUTE CRITERIA OF THE PROCESS.

17          SO, THERE'S GOT TO BE A FACE-TO-FACE SOMEWHERE.

18  I'VE GOT TO WEIGH IN ON THE PROCESS.  SOMETIMES THE INTERVIEW

19  CAN BE DONE BY SOMEONE ELSE IF I HAVE REVIEWED THE CHART AND

20  MADE A DETERMINATION ON WHAT'S THE ISSUES.

21  **Q.**   OKAY.  ALL RIGHT.

22          NOW, LET'S TURN OUR ATTENTION TO 2006 AND THE

23  DECISION TO NO LONGER PRESCRIBE TRAMADOL TO MR. ASHKER.  OKAY.

24          HOW, GENERALLY, DID THAT DECISION COME ABOUT?  I AM

25  GOING TO STOP YOU, BUT JUST GIVE US A GENERAL FRAMEWORK HERE.

SAYRE – DIRECT / MR. ANDRADA

1    **A.**   I SUPERVISE NURSE PRACTITIONERS, SO I GET A LOT OF

2    QUESTIONS FROM NURSE PRACTITIONERS.

3    **Q.**   ALL RIGHT.

4    **A.**   THEY QUESTIONED WHAT SHOULD I DO ABOUT THIS, I AM DOING

5    THIS, IS THIS OKAY, ET CETERA.

6               NURSE RISENHOOVER --

7    **Q.**   THAT'S SUE RISENHOOVER?

8    **A.**   CORRECT.

9    **Q.**   OKAY.

10   **A.**   -- WAS CONTACTING ME ABOUT MR. ASHKER, HER CONCERNS HE NO

11   LONGER NEEDED CERTAIN THINGS, THAT THE THERAPY NEEDED TO BE

12   CHANGED.

13               **THE COURT:**   COUNSEL, YOU'RE ELICITING HEARSAY HERE.

14   **BY MR. ANDRADA:**

15   **Q.**   LET ME PUT IT THIS WAY.

16               DID SUE RISENHOOVER COME TO TALK TO YOU ABOUT

17   MR. ASHKER'S USE OF TRAMADOL?

18   **A.**   YES.

19   **Q.**   OKAY.  AND BASED UPON THAT CONVERSATION -- WAS THERE A

20   SERIES OF CONVERSATIONS WITH MS. RISENHOOVER ABOUT THIS?

21   **A.**   YES.

22   **Q.**   MINDFUL THAT THE TRAMADOL WAS STOPPED IN SEPTEMBER OF

23   2006, ARE YOU ABLE TO RECALL GENERALLY WHEN THESE CONVERSATIONS

24   WITH MS. RISENHOOVER BEGAN?

25   **A.**   THE DISCUSSIONS WITH MS. RISENHOOVER BEGAN IN THE SPRING

SAYRE – DIRECT / MR. ANDRADA

```
1    OF '06.  THERE WAS MAR COMMITTEE DECISIONS AND DISCUSSIONS

2    ABOUT THIS.  WE -- MR. ASHKER IS A HIGH PROFILE INMATE --

3              THE COURT:  YOU HAVE ANSWERED THE QUESTION.

4              MR. ASHKER:  I OBJECT.

5              THE COURT:  YOU'VE ANSWERED THE QUESTION.

6              DR. SAYRE, I AM GOING TO HAVE TO ASK YOU TO LISTEN

7    CAREFULLY TO THE QUESTION, CONFINE YOUR ANSWER TO THE QUESTION.

8    DON'T GO ON INTO OTHER MATTERS.  IF COUNSEL NEEDS TO HEAR MORE

9    FROM YOU, HE WILL HAVE PLENTY OF CHANCE TO ASK YOU MORE.  YOU

10   DON'T NEED TO INSERT THINGS INTO IT.

11             THE WITNESS:  I'M SORRY.

12             THE COURT:  HE IS ONLY ASKING YOU FOR A DATE.

13             THE WITNESS:  I JUST HAVE SO MUCH INFORMATION.

14             THE COURT:  JUST WAIT FOR THE QUESTIONS AND COUNSEL

15   WILL BE SURE TO BRING OUT EVERYTHING THAT HE NEEDS TO.

16   BY MR. ANDRADA:

17   Q.  ALL RIGHT.  SO I THINK YOU TOLD US, JUST TO GET ORIENTED

18   HERE, MS. RISENHOOVER HAD SOME DISCUSSIONS WITH YOU ABOUT

19   MR. ASHKER AND HIS USE OF TRAMADOL, CORRECT?

20   A.  CORRECT.

21   Q.  NOW, THERE HAVE BEEN REFERENCES TO THE MAR COMMITTEE.  THE

22   M-A-R COMMITTEE.  WHAT IS THE MAR COMMITTEE?

23   A.  THE MAR COMMITTEE CONSISTS OF ALL THE MEDICAL PROVIDERS.

24   Q.  ALL RIGHT.  AND DOES THAT COMMITTEE MEET TO DISCUSS CASES?

25   A.  ABSOLUTELY EVERY WEEK.
```

1    Q.    OKAY.  AND SO IN APPROXIMATELY AUGUST OF 2006, WAS THERE A

2    MEETING TO -- OF THE MAR COMMITTEE TO DISCUSS MR. ASHKER'S USE

3    OF TRAMADOL?

4    A.    YES.

5    Q.    DID THE CONVERSATION THAT TOOK PLACE AFFECT OR INFLUENCE

6    YOUR DECISION WITH REGARD TO WHETHER HE SHOULD CONTINUE TO USE

7    TRAMADOL?

8    A.    THERE WAS A LOT OF DISCUSSION.  IT BOILED DOWN TO THAT

9    I --

10                **THE COURT:**  IT WAS A "YES" OR "NO" QUESTION.

11                **THE WITNESS:**  YES.

12   **BY MR. ANDRADA:**

13   Q.    SO WHAT TOPICS WERE DISCUSSED?

14   A.    THE NEED TO CONTINUE IT.  WHAT WAS -- WHAT PURPOSE WAS IT

15   SERVING?  THE POSSIBLE RAMIFICATIONS OF ITS USE, THE POSSIBLE

16   COMPLICATIONS OF ITS USE, ONGOING DEPENDENCY POSSIBILITIES.

17   Q.    DID YOU HAVE SOME CONCERN AS OF THAT MAR MEETING IN AUGUST

18   ABOUT MR. ASHKER'S CONTINUED USE OF TRAMADOL?

19   A.    YES, I DID.

20   Q.    OKAY.  I WOULD LIKE YOU TO GO THROUGH YOUR CONCERNS, LIST

21   ONE OF THEM AND EXPLAIN WHY IT WAS A CONCERN TO YOU, IF YOU

22   WOULD BE SO KIND.

23   A.    AT THAT TIME, THE FDA RECOMMENDATIONS FOR TRAMADOL WERE

24   FOR SHORT-TERM USE.  THIS HAD BEEN CHRONICALLY USED.  RIGHT

25   THERE IS A RED FLAG.

SAYRE – DIRECT / MR. ANDRADA

1  **Q.**   WHAT DO YOU MEAN IT WAS A RED FLAG?

2  **A.**   IT WAS SOMETHING I WAS CONCERNED ABOUT.  RED FLAG FOR ME.

3  **Q.**   PLEASE EXPLAIN WHAT WAS YOUR CONCERN ABOUT THE LENGTH OF

4  USE?

5  **A.**   WITH MY PREVIOUS EXPERIENCE WITH TRAMADOL IN MY PRIVATE

6  PRACTICE AND INTO THE PRISON SITUATION, I BECAME VERY CONCERNED

7  ABOUT ABUSE OF TRAMADOL, DEPENDENCY OF TRAMADOL, AND I WAS

8  PRESCRIBING IT LESS AND LESS BEFORE I EVEN GOT TO PELICAN BAY.

9  **Q.**   HAVE YOU HAD EXPERIENCE WITH PATIENTS WHO YOU THOUGHT WERE

10  ABUSING OR HAD BECOME DEPENDENT UPON TRAMADOL?

11  **A.**   YES.

12  **Q.**   AND SO THEN WAS THERE SOMETHING ABOUT THE LENGTH OF TIME

13  THAT MR. ASHKER HAD BEEN USING TRAMADOL THAT WAS A CONCERN?

14  **A.**   HE HAD BEEN USING IT A LONG TIME.

15  **Q.**   WAS THERE ANYTHING ELSE THAT WAS A CONCERN WITH REGARD TO

16  HIS CONTINUED USE OF TRAMADOL?

17  **A.**   THE QUESTION WAS DID HE NEED IT.  DID HIS ONGOING MEDICAL

18  CONDITION WARRANT THE USE OF THIS DRUG?

19  **Q.**   ALL RIGHT.  AND SO WHAT DID YOU CONCLUDE?

20  **A.**   FROM ALL THE AVAILABLE EVIDENCE I HAD BEFORE ME, THERE WAS

21  A SIGNIFICANT CONCERN THAT HIS MEDICAL CONDITION HAD REACHED

22  THE POINT WHERE HE NO LONGER NEEDED THE DRUG.

23  **Q.**   OKAY.  NOW, WHAT WAS THAT EVIDENCE THAT LED YOU TO

24  CONCLUDE THAT HE NO LONGER NEEDED THE DRUG?

25  **A.**   DISCUSSIONS WITH THE OTHER PROVIDERS WHO HAD A LONG TIME

SAYRE – DIRECT / MR. ANDRADA

1    PRIMARY EXPERIENCE WITH HIM, REVIEW OF THE CHART, DEALING WITH

2    MULTIPLE 602'S, OF THE INVESTIGATION FOR THOSE.

3             I CAN'T THINK OF ALL THE SPECIFICS RIGHT NOW, BUT I

4    HAD A LOT OF INPUT AND THOUGHTS AND PIECES OF EVIDENCE TO PUT

5    ALL THIS TOGETHER.

6    **Q.**   ALL RIGHT.

7             AND SO WITH REGARD TO THE DISCUSSIONS WITH THE

8    PROVIDERS, WHAT WAS IT THAT THEY TOLD YOU THAT INFLUENCED YOUR

9    STATE OF MIND WITH REGARD TO THE FURTHER USE OF TRAMADOL?

10   **A.**   THAT HE DID NOT NEED IT.

11            **THE COURT:**  WHAT COUNSEL IS ALLUDING TO HERE IS,

12   GENERALLY SPEAKING, WE DON'T ALLOW HEARSAY.  WE DON'T ALLOW ONE

13   PERSON TO SAY WHAT SOME OTHER PERSON SAID BECAUSE THAT PERSON

14   ISN'T HERE TO BE CROSS-EXAMINED ABOUT WHY THEY SAID IT, WHETHER

15   IT'S TRUE OR NOT.

16            THERE'S AN EXCEPTION TO THAT RULE THAT ALLOWS A

17   WITNESS TO SAY SOMETHING HE HEARD, NOT TO PROVE THAT WHAT HE

18   HEARD IS TRUE, BUT ONLY TO EXPLAIN WHAT HIS STATE OF MIND WAS.

19            SO I AM GOING TO ALLOW COUNSEL TO BRING OUT THIS

20   TESTIMONY ABOUT WHAT OTHER PEOPLE TOLD HIM.  YOU ARE NOT TO

21   TAKE THAT AS EVIDENCE THAT WHAT THEY SAID WAS TRUE, BUT ONLY AS

22   EVIDENCE THAT THAT'S WHAT HE THOUGHT OR WHAT INFLUENCED HIM IN

23   MAKING HIS DECISION.

24   **BY MR. ANDRADA:**

25   **Q.**   OKAY.  DO YOU HAVE THE QUESTION IN MIND, DOCTOR?

SAYRE – DIRECT / MR. ANDRADA

1   **A.**   MY STATE OF MIND WAS THAT HE PROBABLY DIDN'T NEED THE

2   MEDICATION.

3   **Q.**   AND WAS THERE SOMETHING THAT THE PROVIDERS TOLD YOU THAT

4   AFFECTED YOUR STATE OF MIND IN THAT REGARD?

5   **A.**   THEIR EXPERIENCES WITH HIM, THEIR EXAMINATIONS WITH HIM,

6   THEIR HISTORY WITH HIM.

7   **Q.**   AND WHAT WAS IT ABOUT THEIR HISTORY WITH HIM THAT THEY

8   RELATED TO YOU THAT AFFECTED YOUR STATE OF MIND?

9   **A.**   MOST SIGNIFICANTLY WAS HIS INCREDIBLE INSISTENCE ON

10  TRAMADOL.  IT MADE ME THINK OF DEPENDENCY.

11  **Q.**   WHAT DO YOU MEAN THAT THEY RELATED TO YOU AN INSISTENCE ON

12  TRAMADOL?  WHAT ARE YOU TALKING ABOUT?

13  **A.**   THEY HAD APPROACHED HIM, DISCUSSED WITH HIM --

14          **THE COURT:**  EXCUSE ME.

15          **MR. ASHKER:**  EXCUSE ME.

16          **THE COURT:**  ALTHOUGH I WILL ALLOW THE HEARSAY, I

17  DON'T THINK IT IS APPROPRIATE TO HAVE VAGUE, BROAD "THEY" TYPES

18  OF THINGS.  IF YOU WANT TO BRING OUT SOMETHING SPECIFIC THAT

19  SOMEONE WHO KNEW SOMETHING ABOUT IT AT A CERTAIN TIME TOLD HIM,

20  THAT WOULD BE ACCEPTABLE UNDER THE STATE OF MIND EXCEPTION, BUT

21  NOT A VERY VAGUE --

22          **THE WITNESS:**  THE SPECIFIC --

23          **THE COURT:**  WHY DON'T YOU LET COUNSEL ASK YOU A

24  QUESTION.

25  ///

SAYRE – DIRECT / MR. ANDRADA

1  **BY MR. ANDRADA:**

2  **Q.**   THE PROVIDERS WITH WHOM YOU WERE HAVING THESE DISCUSSIONS

3  INCLUDED DR. ROWE; IS THAT CORRECT?

4  **A.**   CORRECT.

5  **Q.**   MS. RISENHOOVER; IS THAT CORRECT?

6  **A.**   THAT'S CORRECT.

7  **Q.**   AND ANY OTHER PROVIDERS?

8  **A.**   THEY WOULD BE THE PRIMARY ONES.

9  **Q.**   ALL RIGHT.

10         WHAT WAS IT THAT THOSE TWO WERE TELLING YOU --

11         **THE COURT:**  BREAK IT DOWN TO ONE OR THE OTHER

12  BECAUSE THEY WILL BOTH BE TESTIFYING.  SO THAT WAY WE CAN

13  FOLLOW UP PROPERLY AS TO WHO SAID WHAT.

14         **MR. ANDRADA:**  VERY GOOD, YOUR HONOR.

15  **BY MR. ANDRADA:**

16  **Q.**   WHAT WAS IT THAT MS. RISENHOOVER RELATED TO YOU ABOUT HIS

17  INSISTENCE THAT YOU THOUGHT, IN YOUR MIND, AFFECTED YOUR

18  DECISION TO WITHDRAW THE TRAMADOL?

19  **A.**   HE WAS VERY PUSHY, DEMANDING, INSISTENT.

20  **Q.**   AND WHAT ABOUT DR. ROWE, WHAT DID SHE CONVEY TO YOU IN

21  THAT REGARD?

22  **A.**   SAME THING.

23  **Q.**   OKAY.

24         AND WHEN A PATIENT IS IN -- IS INSISTENT ABOUT A

25  MEDICATION, A PAIN MEDICATION, DOES THAT SUGGEST SOMETHING TO

SAYRE – DIRECT / MR. ANDRADA

1    YOU AS A PRACTITIONER?

2    **A.**   IT RAISES CONCERNS OF DEPENDENCY.

3    **Q.**   PLEASE EXPLAIN.

4    **A.**   MOST PATIENTS WANT RELIEF, CURE, SOME TYPE OF POSITIVE

5    INTERVENTION.  THEY DON'T CARE HOW IT IS; THEY EXPECT YOU TO

6    TELL THEM WHAT WOULD BE BEST FOR THEM.

7          WHEN SOMEONE NAMES A SPECIFIC DRUG, THAT'S ALWAYS

8    INTERESTING, CAUTIONARY OF NOTE.  WHEN THEY REALLY START

9    POUNDING ON THE FACT THEY WANT THAT SPECIFIC DRUG, YOU REALLY

10   HAVE TO BE VERY ALERT THAT THIS MAY VERY WELL BE DEPENDENCY.

11   **Q.**   ALL RIGHT.

12          NOW, YOU ALSO INDICATED THAT YOU HAD REVIEWED THE

13   CHART AND THAT THAT AFFECTED YOUR STATE OF MIND WITH REGARD TO

14   WITHDRAWING TRAMADOL, CORRECT?

15   **A.**   CORRECT.

16   **Q.**   AND WHAT DO YOU RECALL READING IN THE CHART THAT AFFECTED

17   YOUR STATE OF MIND?

18   **A.**   THE LENGTH OF THERAPY --

19   **Q.**   NAMELY, YOU ARE TALKING ABOUT THE THERAPY WITH TRAMADOL?

20   **A.**   CORRECT.

21          THE OVERALL WELL-BEING OF THE INMATE, HIS PROGRESS,

22   HIS INJURY, HOW THINGS HAD BEEN -- WHAT NEEDED TO BE DONE.  HIS

23   RESPONSE TO THE LATEST SURGERY, WHICH HAD BEEN SEVERAL YEARS.

24   HIS RECOVERY FROM THAT, THE LACK OF ANY FURTHER COMPLICATIONS,

25   THE EMG STUDIES, THE NEGATIVE X-RAYS, ALL THE OBJECTIVE DATA IN

1    THE CHART THAT WOULD INDICATE AN ONGOING PAIN SITUATION OR

2    PROBLEM.

3    **Q.**   LET'S REVIEW NOW.

4           WHAT SURGERY ARE YOU TALKING ABOUT?

5    **A.**   IMMEDIATELY AFTER HIS GUNSHOT WOUND, HE HAD HAD A SERIES

6    OF INJURIES AND IMMEDIATE COMPLICATION OF AN ANEURYSM.  ALL

7    THAT HAD BEEN RESOLVED DURING THAT '90S PERIOD.

8           IN THE LATE '90S, HE HAD SCAR TISSUE AROUND HIS

9    ULNAR NERVE.  THAT HAD BEEN RELEASED BY DR. DUNCAN.  IT WAS A

10   VERY SUCCESSFUL OPERATION.  OBJECTIVE CONSULTATIONS BY

11   DR. DUNCAN, THE NEUROLOGIST, EMG'S, ALL INDICATED THAT HAD BEEN

12   AN OUTSTANDING SUCCESS.

13   **Q.**   MY I INTERRUPT YOU?  WHAT IS AN EMG?

14   **A.**   THAT IS WHERE THEY PUT ELECTRODES OVER NERVES AND ACTUALLY

15   PUT NEEDLES IN WHERE THEY TEST SEVERAL MODALITIES OF NERVE

16   FUNCTION, THE CONDUCTION OF IMPULSES.  THEY RECORD HOW FAST IT

17   GETS DOWN, HOW WELL IT GETS DOWN.

18   **Q.**   SLOW DOWN.  SLOW DOWN.  OKAY.  GO AHEAD.

19   **A.**   THE PHYSIOLOGY -- I AM NOT AN EXPERT IN EMG'S, BUT THE NET

20   RESULT IS THEY CAN GET A VERY CONCRETE, OBJECTIVE MEASUREMENT

21   OF NERVE CONDUCTION AND FUNCTION.

22   **Q.**   OKAY.  ALL RIGHT.

23           AND THEN YOU MENTIONED SOMETHING ABOUT THE X-RAYS.

24   WHAT INFORMATION IN THE X-RAYS OR X-RAY REPORTS WERE YOU

25   RELYING ON?

SAYRE – DIRECT / MR. ANDRADA

1    A.   THE NORMAL X-RAYS -- THE X-RAYS THAT SHOWED NORMAL JOINTS

2    IN HIS ELBOW, IN HIS WRIST, NO SIGNS OF INFLAMMATION, NO SIGNS

3    OF SWELLING, NO SIGNS OF SECONDARY ARTHRITIS.

4         IF THERE WERE ANY SIGNS THEY WERE REGARDED BY THE

5    RADIOLOGIST AS VERY MINIMAL.  BASICALLY HE HAD CLEAN JOINTS.

6    Q.   AND IN THIS -- FOR THIS PATIENT, MR. ASHKER, WHAT IS THE

7    SIGNIFICANCE OF HAVING A CLEAN WRIST JOINT?

8    A.   THERE IS NO JOINT IMPINGEMENT THAT WOULD RESTRICT HIS

9    MOBILITY AND USE OF HIS WRIST.

10   Q.   SPEAKING ABOUT THE WRIST, THERE WAS SOME TESTIMONY ABOUT

11   FLEXION AND SO FORTH.  WHAT IS FLEXION?

12   A.   WE HAVE TO PUT DEFINITIONS ON EVERYTHING.  THE ANATOMICAL

13   POSITION IS THIS.  (WITNESS STANDS.)

14        THIS IS THE ANATOMICAL POSITION (INDICATING).

15        NOT THIS (INDICATING).

16   Q.   YOU HAVE TO STOP.  WE WILL HAVE TO DESCRIBE THAT FOR THE

17   COURT REPORTER.

18   A.   IT IS STANDING, ARMS AT YOUR SIDE, PALMS FORWARD.

19   Q.   OKAY.  AND I BELIEVE, YOU CAN CORRECT ME IF I AM WRONG,

20   BUT THE ARMS IN THAT POSITION ARE ACTUALLY DEEMED TO BE SUPINE;

21   IS THAT CORRECT?

22   A.   SUPINATE.

23   Q.   IF YOU TURN THEM OVER, WHAT ARE THEY?

24   A.   PRONATED.

25   Q.   SO I THINK WE WERE TALKING ABOUT FLEXION AND EXTENSION.

SAYRE – DIRECT / MR. ANDRADA

1    WHAT THEN, FOR OUR PURPOSES, IS FLEXION?

2    **A.**   (INDICATING).

3    **Q.**   YOU HAVE TO TELL THE REPORTER WHAT THAT IS.

4    **A.**   FLEXION IS FROM THE ANATOMICAL POSITION A FORWARD BENDING.

5    **Q.**   WHAT IS EXTENSION?

6    **A.**   THE EXACT OPPOSITE.

7    **Q.**   OKAY.  WHAT IS ACTIVE FLEXION AND EXTENSION?

8    **A.**   (INDICATING)

9           WHAT I COULD DO WITH MY MUSCLES.

10   **Q.**   AND YOU'RE INDICATING YOU'RE GOING BACK AND FORTH WITH

11   YOUR WRIST TO MOVE YOUR HAND?

12   **A.**   CORRECT.

13   **Q.**   ALL RIGHT.

14           PASSIVE FLEXION AND EXTENSION IS WHAT?

15   **A.**   WHAT I OR ANOTHER PERSON, WITHOUT USING MY OWN MUSCLES,

16   CAN MAKE THE JOINT -- WHAT RANGE OF MOTION THE JOINT CAN GO

17   THROUGH.

18   **Q.**   SO IS, GENERALLY SPEAKING, IS PASSIVE RANGE OF MOTION A

19   TRUER ASSESSMENT OF THE ABILITY TO FLEX AND EXTEND THE JOINT?

20   **A.**   NO.

21   **Q.**   WHAT IS IT?

22   **A.**   IN THE NORMAL STATE, IF YOU DON'T HAVE PATHOLOGY, THAT IS

23   MY -- THE ACTIVE AND THE PASSIVE RANGE OF MOTION ARE THE SAME.

24   I CANNOT PUSH MAY WRIST DOWN ANY MORE THAN I CAN ACTIVELY PUSH

25   IT DOWN WITH MY OTHER HAND.  THAT'S IT.

1    **Q.**  ALL RIGHT.  NOW, ALL RIGHT.

2           SO, I THINK YOU TALKED ABOUT WHAT YOU WERE

3    CONSIDERING IN TERMS OF MAKING YOUR DECISION WHETHER DOCTOR --

4    WHETHER MR. ASHKER SHOULD CONSIDER USING TRAMADOL.  YOU TALKED

5    ABOUT THE MAR COMMITTEE MEETING.  WHO ATTENDED THAT MEETING?

6    **A.**  YOU ARE TALKING FOUR AND A HALF YEARS OF WEEKLY MEETINGS.

7           THE MEDICAL STAFF AVAILABLE THAT DAY.

8    **Q.**  OKAY.  LET ME TRY TO REFRESH YOUR MEMORY.

9           WAS DR. ROWE THERE?

10   **A.**  I BELIEVE SO.

11         **THE COURT:**  IS THERE A DOCUMENT THAT REFLECT THIS

12   MEETING?

13         **MR. ANDRADA:**  THERE IS, BUT IN THE INTEREST OF

14   TIME --

15         **THE WITNESS:**  TO THE BEST OF MY KNOWLEDGE, I BELIEVE

16   I WAS THERE, DR. ROWE WAS THERE, NURSE RISENHOOVER WAS THERE,

17   AND THERE MAY HAVE BEEN OTHER PEOPLE THERE.

18   **BY MR. ANDRADA:**

19   **Q.**  ALL RIGHT.  OKAY.

20         WAS THERE A DECISION MADE IN CONNECTION WITH

21   MR. ASHKER'S USE OF TRAMADOL AT THAT MEETING?

22   **A.**  WE WERE IN UNANIMOUSLY AGREED THAT IT'S TIME TO TAPER HIM

23   DOWN.

24   **Q.**  WHAT DO YOU MEAN TAPER HIM DOWN?

25   **A.**  IT IS AN OPIATE RECEPTOR ACTIVE DRUG.  YOU DON'T QUICKLY

SAYRE – DIRECT / MR. ANDRADA

1    STOP OPIATES.

2    **Q.**   NOW, DID YOU THEN EXAMINE MR. ASHKER?

3    **A.**   YES.

4    **Q.**   OKAY.  AND THAT OCCURRED ON AUGUST 31ST; IS THAT CORRECT?

5    **A.**   CORRECT.

6              **MR. ASHKER:**  EXCUSE ME.  I AM UNCLEAR ON WHAT DAY

7    THIS MAR COMMITTEE OCCURRED?

8              **MR. ANDRADA:**  OH, SURE.

9              **THE WITNESS:**  I DON'T KNOW THE DATE OFFHAND.

10             **THE COURT:**  LET'S GET THE DOCUMENT OUT AT THE NEXT

11   BREAK.

12             **MR. ANDRADA:**  WE WILL.

13             **THE COURT:**  UNLESS YOU KNOW WHAT IT IS.

14             **MR. ASHKER:**  ACCORDING TO MY RECORDS, THE DAY WAS

15   AUGUST 21ST, 2006 --

16             **MR. ANDRADA:**  YES.

17             **MR. ASHKER:**  -- THAT THIS MAR COMMITTEE OCCURRED.

18             **MR. ANDRADA:**  THAT IS CONSISTENT WITH MY NOTES AS

19   WELL.

20             **THE COURT:**  DO YOU HAVE AN EXHIBIT NUMBER WE CAN

21   PULL OUT?

22             **MR. ASHKER:**  YES, I DO, YOUR HONOR.

23             **THE COURT:**  IF YOU CAN DO IT QUICKLY, OTHERWISE WE

24   CAN DO IT AT THE BREAK.  MAYBE IT IS ONE OF YOUR EXHIBITS.

25             (PAUSE IN THE PROCEEDINGS.)

1          **THE COURT:**  WE CAN GET IT LATER.

2          **MR. ANDRADA:**  ALL RIGHT.

3     **BY MR. ANDRADA:**

4     **Q.**   IS THIS YOUR NOTE FROM THE EXAM OF AUGUST 31ST?

5     **A.**   YES, IT IS.

6     **Q.**   OKAY.

7              AND, YOUR HONOR, MAY I ASK --

8          **THE COURT:**  GENERALLY --

9          **MR. ANDRADA:**  -- THE JURY IF THEY CAN SEE IT?

10         **THE COURT:**  YOU MAY, BUT GENERALLY WHAT YOU NEED TO

11    DO IS MARK IT FOR IDENTIFICATION, SHOW IT TO THE CLERK, MOVE IT

12    INTO EVIDENCE, AND THEN SHOW IT TO THE JURY.

13         **MR. ANDRADA:**  ALL RIGHT.  LET'S MARK IT AS, FOR EASE

14    OF REFERENCE HERE, LET'S MARK IT AS 300.  THAT WILL BE NICE AND

15    EASY FOR YOU OR GIVE IT NEXT IN ORDER.

16         **THE CLERK:**  THAT WILL BE DEFENDANTS' 242.

17                   (DEFENDANTS' EXHIBIT 242 MARKED FOR

18                    IDENTIFICATION)

19         **MR. ANDRADA:**  ALL RIGHT.

20         **MR. ASHKER:**  THAT EXHIBIT NUMBER THAT I HAVE FOR

21    THAT DOCUMENT IS 164.

22         **THE COURT:**  OKAY.  SO IF YOU WANT TO PULL THAT OUT.

23    IF YOU WANT TO GO INTO THAT ANY MORE?

24         **MR. ANDRADA:**  IT'S ACTUALLY FASTER JUST TO DO THIS,

25    YOUR HONOR.

1      **THE COURT:**  164 IS THE MAR REPORT, I THINK, THAT YOU

2   HAD BEEN TRYING TO --

3      **MR. ANDRADA:**  I DON'T REALLY -- PERHAPS WE CAN COME

4   BACK TO THIS, BUT IN THE INTEREST OF TIME, I RATHER JUST GO

5   AHEAD WITH THIS.

6      **THE WITNESS:**  PLEASE DON'T ASK ME TO READ THAT.

7   IT'S OUTSIDE MY --

8      **THE COURT:**  YOU HAVE A MONITOR THERE AS WELL.

9      **THE WITNESS:**  I DO?

10      NO, I DON'T.

11      **THE COURT:**  IS IT TURNED ON?

12      **THE WITNESS:**  IT HAS A YELLOW LIGHT ON.

13      **MR. ASHKER:**  EXCUSE ME, YOUR HONOR, THAT WAS 163.

14      **THE COURT:**  OKAY.

15      OR YOU CAN GIVE HIM A HARD COPY, OR HONE IN ON THAT

16   A LITTLE BIT MORE, WHATEVER YOU LIKE.

17   **BY MR. ANDRADA:**

18   **Q.**   CAN YOU READ IT DOCTOR, OR NO?

19   **A.**   NO.  I BARELY JUST -- I CAN GET 75 PERCENT OF THE WORDS.

20   **Q.**   YOU WANT TO COME DOWN HERE?

21   **A.**   I CAN DO THAT.

22   **Q.**   NOW CAN YOU READ IT?

23   **A.**   YES.

24      **MR. ANDRADA:**  YOUR HONOR, MAY I ASK, WILL YOU ASK

25   THE JURY IF THEY CAN READ IT?

SAYRE – DIRECT / MR. ANDRADA

1        **THE COURT:**  DO YOU SEE IT, READ IT?  THOSE OF YOU AT

2   THE FAR END?

3            (JURORS NOD AFFIRMATIVELY.)

4        **MR. ANDRADA:**  GREAT.  ALL RIGHT.

5   **BY MR. ANDRADA:**

6   **Q.**   SO, DOCTOR, THIS NOTE INDICATES THAT YOU SAW MR. ASHKER ON

7   AUGUST 30TH, 2006 TO REVIEW AN UPDATE, LONG LIST OF CHRONOS,

8   CORRECT?

9   **A.**   YES.

10  **Q.**   WHAT'S A CHRONO?

11  **A.**   CHRONO IS AN ORDER.  IT'S A MEANS OF COMMUNICATION.  IT IS

12  A MEANS OF COMMUNICATION FROM ONE ASPECT OF CUSTODIAL CARE TO

13  THE ANOTHER ASPECT OF CUSTODIAL CARE.

14            IN THE CASE OF MEDICAL CARE, IT IS THE MEANS OF

15  COMMUNICATING TWO CUSTODY PERSONNEL SOMETHING THAT WE NEED TO

16  HAVE OCCUR FOR THE MEDICAL CARE OF AN INMATE.  IT IS USED IN

17  THIS FORM BECAUSE MEDICAL CARE IS PRIVILEGED.  SO WE --

18        **THE COURT:**  I AM SORRY, MEDICAL CARE IS WHAT?

19        **THE WITNESS:**  PRIVILEGED.

20        **THE COURT:**  PRIVILEGED?

21        **THE WITNESS:**  YES.  WE DON'T TELL DIAGNOSES OR

22  DETAILS OF A MEDICAL CONDITION, WE SIMPLY TELL --

23        **THE COURT:**  BY THAT YOU MEAN PRIVATE?

24        **THE WITNESS:**  PRIVATE.  WE TELL THEM FOR A MEDICAL

25  REASON, THIS INMATE NEEDS X, Y Z.  THAT'S ALL I SAY IN A

1  CHRONO.

2          **MR. ASHKER:**  IS IT REALLY NECESSARY FOR HIM TO STAND

3  UP THERE LIKE THAT?

4          **THE COURT:**  WHAT ARE WE DOING HERE?

5          **MR. ANDRADA:**  HE SAID HE WAS HAVING TROUBLE SEEING

6  IT FROM --

7          **THE COURT:**  DO YOU HAVE A HARD COPY YOU CAN HAVE HIM

8  LOOK AT?

9          **MR. ANDRADA:**  I CAN TRY TO FIND IT.  AGAIN, JUDGE,

10  IN THE INTEREST OF TIME IT MIGHT BE JUST FASTER --

11          **THE COURT:**  OKAY.

12          **MR. ANDRADA:**  -- IF HE STOOD THERE.  I AM SORRY.

13          **THE COURT:**  IT'S NOT COMING UP ON MY MONITOR EITHER.

14  YOU DON'T HAVE IT -- IS IT NOT SET UP?  IS IT ON YOUR MONITOR?

15          IT IS SUPPOSED TO COME UP ON THE COMPUTER MONITORS.

16          **MR. ASHKER:**  NOT ON THIS ONE.  I DON'T KNOW IF THIS

17  ONE IS ON.

18          **THE COURT:**  MAYBE AT THE BREAK WE CAN MAKE THAT

19  HAPPEN.

20          **MR. ASHKER:**  IT JUST CAME ON.  IT HADN'T BEEN

21  ACTIVATED.

22          **THE COURT:**  IS THE DOCUMENT ON THERE?

23          **MR. ASHKER:**  YES.

24          **THE COURT:**  SO YOU HAVE THE DOCUMENT.

25          **THE WITNESS:**  I DON'T KNOW HOW TO OPERATE IT, YOUR

1    HONOR.

2              **THE CLERK:**  IT MIGHT HAVE GOTTEN DISCONNECTED.

3              **MR. ASHKER:**  YOUR HONOR?  I HAD ALSO -- I APOLOGIZE.

4    THAT DOCUMENT OF THAT 8/21/06 MAR COMMITTEE ACTION IS ACTUALLY

5    166.

6              **THE COURT:**  166, OKAY.

7    **BY MR. ANDRADA:**

8    **Q.**   MR. ASHKER HAD ASKED FOR RENEWAL OF SEVERAL CHRONOS; IS

9    THAT CORRECT?

10   **A.**   THIS HAD BEEN IN DISCUSSION, YES.

11   **Q.**   AND CAN YOU JUST BRIEFLY TAKE US THROUGH THOSE CHRONOS?

12   **A.**   THERE WAS A LIST OF THEM THAT INVOLVED THE BRACE, EXTRA

13   SHOWERS, EXTRA BLANKETS, MORE THERMAL UNDERWEAR.  I BROKE THEM

14   DOWN INTO GROUPS IN THIS DOCUMENT.

15   **Q.**   ALL RIGHT.  THEN WHY DON'T YOU --

16   **A.**   ULTRAM WAS ALSO UNDER CONSIDERATION.

17   **Q.**   WE WILL GET THERE.  I WANT TO GO THROUGH THE CATEGORIES

18   FIRST, IF YOU CAN DO THAT FOR US.

19   **A.**   I SEE MY SUMMATION SENTENCE.  THE LAST SENTENCE -- NEXT TO

20   LAST SENTENCE IN THE FIRST PARAGRAPH IS MY SUMMATION REQUEST.

21   **Q.**   WHY DON'T YOU GO DOWN TO THAT?

22   **A.**   HE WANTS CHRONOS FOR HAND EXERCISE BALL, ARM PT, DOUBLE

23   BLANKETS, SPECIAL THERMAL UNDERWEAR, A HAND CUSHION FOR

24   WRITING, AN EXERCISE BAND FOR HIS ARM, DAILY SHOWERS, AND

25   ULTRAM FOR HIS PAIN.

1   **Q.**   ALL RIGHT.  DID YOU APPROVE ANY OF HIS REQUESTS?

2   **A.**   YES, I DID.

3   **Q.**   WHICH REQUEST DID YOU APPROVE?

4   **A.**   I APPROVED HIS -- THE CUSHION FOR HIS WRITING.

5   **Q.**   OKAY.  WHY DID YOU DO THAT?

6   **A.**   IT SEEMED LIKE A REASONABLE THING TO DO CONSIDERING HIS

7   INJURY.

8   **Q.**   ALL RIGHT.  DID YOU DENY CERTAIN REQUESTS?

9   **A.**   YES.

10  **Q.**   WHICH ONES DID YOU DENY?

11  **A.**   THE REST I DENIED.  DAILY SHOWERS.

12  **Q.**   DID YOU SEE ANY MEDICAL REASON FOR HIM TO HAVE A DAILY

13  SHOWER?

14  **A.**   NO.

15  **Q.**   DID YOU SEE ANY MEDICAL REASON FOR HIM TO HAVE ADDITIONAL

16  BLANKETS?

17  **A.**   NO.

18          **THE COURT:**  I'M SORRY, I CAN'T REALLY READ IT

19  EITHER.  COULD YOU ASK HIM WHAT ELSE HE DENIED?

20          **THE WITNESS:**  ALL RIGHT.

21          YOUR HONOR, TO THE BEST OF MY KNOWLEDGE BASED ON

22  THIS DOCUMENT IN FRONT OF ME, I HAND BALL --

23          **MR. ASHKER:**  I THINK THE DOCUMENT SPEAKS FOR ITSELF.

24  I MEAN, HE JUST STATED THAT HE GRANTED THE --

25          **THE COURT:**  I JUST CAN'T READ THE DOCUMENT.  HE SAID

1    HE DENIED EVERYTHING BUT THE CUSHION.  SO READ TO ME WHAT IS ON

2    THERE.

3              **THE WITNESS:**  HAND EXERCISE BALL, ARM PT, DOUBLE

4    BLANKETS, SPECIAL THERMAL UNDERWEAR, HAND CUSHION FOR WRITING,

5    EXERCISE BAND FOR ARM, DAILY SHOWERS, AND ULTRAM FOR PAIN.

6    **BY MR. ANDRADA:**

7    **Q.**  ALL RIGHT.

8              WHY DID YOU DENY A REQUEST FOR FURTHER PT?

9    **A.**  I HAD HAD A DISCUSSION WITH THE PHYSICAL THERAPIST AND I

10   CALLED HIM IN MY OFFICE, AND I SAYS, "PAT" --

11             **MR. ASHKER:**  EXCUSE ME.  I WOULD LIKE TO GET A TIME

12   FRAME HERE.

13   **BY MR. ANDRADA:**

14   **Q.**  WHEN DID YOU HAVE THIS DISCUSSION WITH MR. DODGEN; DO YOU

15   REMEMBER?

16   **A.**  NO, I DON'T.  SOMEWHERE IN ALL THIS.

17             AND BASICALLY WE SAT DOWN.  I SAYS, PAT, WHAT'S -- I

18   WILL DO WHAT YOU WANT TO DO.  WHAT DOES HE NEED?  HE SAYS, HE

19   DOESN'T NEED MORE PHYSICAL THERAPY.

20   **Q.**  ALL RIGHT.

21             SO, THEN THAT TAKES CARE OF THE PHYSICAL THERAPY.  I

22   THINK WE TALKED ABOUT BLANKETS.

23             WERE THERE -- WAS THERE ANY EQUIPMENT THAT WAS

24   REQUESTED THAT YOU DENIED?

25   **A.**  I FELT THAT HE HAD REACHED A DECENT LEVEL OF RECUPERATION

SAYRE – DIRECT / MR. ANDRADA

1    FROM HIS INJURY, AND SO THE HAND BALL AND EXERCISE BAND, WHICH

2    WERE ACUTE REHABILITATIVE DEVISES, WERE NO LONGER NEEDED AT

3    THIS STAGE OF HIS DISEASE.

4    Q.   PLEASE EXPLAIN WHY YOU THOUGHT THAT THEY WERE NO LONGER

5    NECESSARY.

6         MR. ASHKER:  CAN THE WITNESS SIT DOWN NOW?

7         THE COURT:  ARE YOU STILL USING THE DOCUMENT?

8         MR. ANDRADA:  WE ARE A LITTLE BIT, YOUR HONOR.

9         THE COURT:  OKAY.

10        MR. ANDRADA:  I AM SORRY.  I APOLOGIZE.

11        THE WITNESS:  THERE IS ABSOLUTELY NO DOUBT THAT

12   MR. ASHKER SUSTAINED A SEVERE INJURY.  THERE IS NO DOUBT THAT

13   HE LOST A LOT OF TISSUE.  MAJOR DESTRUCTION.  BUT THAT HAD BEEN

14   16 YEARS.  A LOT OF HEALING HAD GONE ON.  HE HAD REHABILITATED

15   HIMSELF TREMENDOUSLY.

16        DID FURTHER REHABILITATION REACH THE MEDICAL

17   NECESSITY?  AND I THOUGHT HE HAD PLATEAUED.  HE HAD GOTTEN

18   THAT.

19   BY MR. ANDRADA:

20   Q.   ALL RIGHT.

21        NOW, THERE IS A REFERENCE IN THE SECOND PARAGRAPH

22   WITH REGARD TO THERE BEING -- I WILL READ THE SENTENCE.

23        "THERE IS NO PHYSICAL EVIDENCE OF THE CHANGES THAT

24   OCCUR WITH A DYSTROPHY."

25        DO YOU SEE THAT?

1    **A.**   YES.  AUTONOMIC DYSTROPHY.

2    **Q.**   SLOW DOWN.  WHAT'S AUTONOMIC DYSTROPHY?

3    **A.**   POST-TRAUMA, CHRONIC POST-TRAUMA, A VERY FREQUENT AND

4    PROBABLY THE MOST FREQUENT CAUSE OF SEVERE ONGOING POST-TRAUMA

5    PAIN OF THE TYPE OF TRAUMA MR. ASHKER HAD IS JUST A TOTAL

6    HODGEPODGE MAKEUP OF AN AUTONOMIC NERVOUS SYSTEM AND IT RESULTS

7    IN A SEVERE PAIN SYNDROME CALLED AUTONOMIC DYSTROPHY.

8    **Q.**   WHAT IS THE AUTOMATIC NERVE SYSTEM?

9              **THE COURT:**  IT REALLY WOULD BE EASIER TO RETURN --

10             **MR. ANDRADA:**  OKAY, THAT'S FINE.

11             **THE COURT:**  -- ON THE STAND.  EASIER FOR THE COURT

12   REPORTER TO HEAR HIM, EASIER FOR HIM --

13             **MR. ANDRADA:**  I APOLOGIZE, YOUR HONOR.  I'M SORRY.

14             **THE COURT:**  IF YOU WANT, WE CAN GET MS. CAHILL TO

15   RUN OUT TO THE COPY MACHINE AND MAKE ANOTHER COPY TO HAVE IT IN

16   FRONT OF HIM.

17             **MR. ANDRADA:**  THAT MIGHT BE FASTER.  THAT WOULD BE

18   WONDERFUL.

19             **THE COURT:**  TAKE THAT PIECE OF PAPER AND MAKE A COPY

20   FOR COUNSEL.

21             **THE WITNESS:**  SHOULD I CONTINUE OR WAIT?

22             **THE COURT:**  GO AHEAD.

23             **THE WITNESS:**  THERE ARE MULTIPLE NERVE SYSTEMS.  ONE

24   IS THE VOLUNTARY NERVES.  YOU CONTROL THEM.  (INDICATING).

25             ANOTHER ONE IS ONE YOU DO NOT CONTROL, IT'S

SAYRE – DIRECT / MR. ANDRADA

1    AUTOMATIC.  IT CONTROLS YOUR VISCERAL FUNCTIONS, THE ACTION OF

2    YOUR INTERNAL ORGANS, YOUR HEART, YOUR BLOOD VESSELS, YOUR GI

3    SYSTEM, YOUR BLADDER, YOUR SEXUAL ORGANS.  THESE ARE THE

4    AUTONOMIC NERVE SYSTEM FUNCTIONS.

5            WITH AN INJURY, THAT GETS SEVERELY MESSED UP AND YOU

6    GET SEVERE SPASM OF THE BLOOD VESSELS RESULTING IN LACK OF

7    BLOOD FLOW TO THE PERIPHERAL TISSUES, SEVERE HYPOXIA, PAIN AND

8    DAMAGE, COLD, BLUE LIMBS, SEVERE PAIN.  IT'S A VERY SEVERE

9    SITUATION, BUT IT IS ALWAYS ASSOCIATED WITH A DIFFERENCE IN

10   TEMPERATURE, CERTAIN VASOMOTOR SIGNS OF DILATATION OR LACK OF

11   DILATATION, CONSTRICTION.  IT'S FAIRLY EASY TO RECOGNIZE WHEN

12   YOU SEE IT.

13           HE HAD NONE OF THE SIGNS THAT WOULD INDICATE AN

14   AUTONOMIC DYSTROPHY.  THE AUTONOMIC DYSTROPHY WOULD BE THE

15   PRIMARY COLD INDUCED POSTTRAUMATIC PAIN SYNDROME THAT I WOULD

16   NEED TO HAVE BEEN CONCERNED ABOUT.

17   **BY MR. ANDRADA:**

18   **Q.**   OKAY.

19           DID YOU CONDUCT AN EXAMINATION OF MR. ASHKER ON OR

20   ABOUT AUGUST 31ST?

21   **A.**   I CHECKED HIS SKIN, HIS CAPILLARY.

22   **Q.**   LET ME STOP YOU.

23           WHAT DO YOU MEAN YOU CHECKED HIS SKIN?

24   **A.**   THE COLOR, THE TEMPERATURE, COMPARE IT TO THE OTHER SIDE.

25   WHEN YOU PRESS IN AND YOU RELEASE, HOW FAST DOES THE BLOOD COME

1    BACK?  YOU LITERALLY CONSTRICT THE CAPILLARIES WITH PRESSURE,

2    AND THE SPEED OF WHICH YOUR BLOOD VESSELS CAN RE-SUPPLY THE

3    BLOOD IN THE CAPILLARY BED, GIVE YOU THE RED COLOR AGAIN WOULD

4    BE NORMAL SKIN COLOR IS CAPILLARY FILL.

5         IT CAN BE DONE IN THE FINGERNAILS.  IT'S MORE

6    TRANSPARENT ISSUE, BUT IT CAN BE DONE ON ANY TISSUE.

7    Q.   DID YOU DO ANYTHING ELSE?

8    A.   I EXAMINED HIS PASSIVE RANGE OF MOTION.

9    Q.   PLEASE EXPLAIN.

10   A.   I MOVED HIS JOINT ABOUT.  I EXAMINED HIS INJURY.  HAD HIM

11   TURN IT OVER AND SHOW ME ALL ASPECTS OF IT.  WE TALKED ABOUT

12   WHERE THE ENTRY WOUND WAS.

13        AT THAT TIME, I DID NOT KNOW HE HAD BEEN HIT WITH A

14   GLASER BULLET THAT WOULD NOT HAVE HAD AN EXIT WOUND.

15   Q.   DID YOU DO ANYTHING ELSE BY WAY OF A PHYSICAL EXAMINATION?

16   A.   CHECKED HIS PULSES, HIS CAPILLARY FILLS, HIS GRIP.

17   Q.   AND WHY DID YOU CHECK THE PULSES?

18   A.   PART OF THE AUTONOMIC DYSTROPHY ISSUE, PART OF IT JUST TO

19   SEE IF YOU GET DECENT BLOOD FLOW DOWN THERE.

20   Q.   I THINK YOU SAID YOU CHECKED -- MENTIONED SOMETHING ELSE.

21   CHECKED HIS PULSES AND THE WRIST JOINT.

22   A.   EXACTLY.

23   Q.   WHAT DID YOU FIND OF SIGNIFICANCE IN CONNECTION WITH

24   MR. ASHKER WHEN YOU EXAMINED HIS WRIST JOINT?

25   A.   I FELT THAT HE HAD SUFFICIENT AND ADEQUATE FUNCTION THAT

1    HE COULD PERFORM THE ACTIVITIES OF DAILY LIVING.

2         THIS -- WHEN YOU GIVE A CHRONO -- THIS EXAMINATION

3    WAS DETERMINATION DID HE NEED CHRONOS.  WE ARE OBLIGATED TO

4    MAKE MEDICAL EXCEPTIONS TO PENIAL CUSTODY RULES WHEN THERE'S A

5    MEDICAL NECESSITY, WHEN AN INMATE CANNOT PERFORM THE ACTIVITIES

6    OF DAILY LIVING.  THAT'S THE CRITERIA THAT THEY NEED A

7    ACCOMMODATION, EXCEPTION TO THE RULES.

8         THE WHOLE POINT OF DOING A CHRONO DETERMINATION IS

9    THIS IS BASICALLY A DISABILITY DETERMINATION.  IS THIS PERSON

10   DISABLED TO THE POINT THAT THEY NEED ACCOMMODATION, I.E., A

11   CHRONO.

12   **Q.**   OKAY.

13        **THE COURT:**  WELL, YOUR WITNESS IS GETTING INTO LEGAL

14   AREAS HERE.  HE'S TALKING ABOUT AN ADA DETERMINATION WHICH, OF

15   COURSE, ISN'T AT ISSUE HERE, AMERICAN DISABILITIES ACT.

16   **A.**   WELL --

17        **MR. ANDRADA:**  DOCTOR.

18        **THE COURT:**  AND CERTAINLY THAT'S SOMETHING HE NEEDED

19   TO CONSIDER IN GENERAL, BUT IT'S NOT THE SUBJECT OF THIS

20   LAWSUIT.

21        **MR. ANDRADA:**  OKAY.

22        **THE COURT:**  IN THIS LAWSUIT WE HAVE AN ADDITION TO

23   THE AMERICAN DISABILITIES ACT, THE SETTLEMENT AGREEMENT.  SO, I

24   AM JUST CAUTIONING YOU AGAINST LEGAL OPINIONS COMING FROM THIS

25   WITNESS AS TO WHAT LAWS APPLIED IN THE CASE.  IT WASN'T -- THIS

1    CASE ISN'T ABOUT THE ADA.

2              **MR. ANDRADA:**  WE AGREE, YOUR HONOR.

3              **THE COURT:**  OKAY.

4              **MR. ANDRADA:**  WE AGREE.

5              **THE COURT:**  MAYBE YOU CAN FOCUS YOUR WITNESS.

6              **MR. ANDRADA:**  I WILL TRY.  THANK YOU, YOUR HONOR.

7    **BY MR. ANDRADA:**

8    **Q.**   SO, IF YOU WOULD BE SO KIND -- STRIKE THAT.

9              HAVE YOU TOLD US ALL ABOUT THE EXAM?

10   **A.**   I BELIEVE SO.

11   **Q.**   ALL RIGHT.  GO DOWN TO THE LAST PARAGRAPH.  I SHOULD

12   REALLY SAY, THE LAST THE PARAGRAPH THAT BEGINS "THE NEED FOR

13   EXERCISE EQUIPMENT."

14   **A.**   ALL RIGHT.  I AM THERE.

15   **Q.**   OKAY.  WERE YOU SATISFIED THAT THE LIMB WAS RECONDITIONED?

16   **A.**   YES, I WAS.

17   **Q.**   WHY DID YOU CONCLUDE THAT THESE DEVICES WERE SERVING NO

18   PURPOSE?

19   **A.**   I FELT THAT HE HAD REACHED HIS MAXIMUM REHABILITATION

20   POTENTIAL BASED ON HIS LEVEL OF INJURY.

21   **Q.**   WHAT DID YOU MEAN BY THAT?

22   **A.**   CONSIDERING THE SEVERITY OF THE ORIGINAL GUNSHOT WOUND,

23   THE RESULTING DAMAGE TO HIS TISSUE AND THE TIME THAT PASSED AND

24   WHAT HE HAD DONE WITH IT, HE WASN'T GOING TO GET MUCH MORE

25   COMEBACK.

SAYRE – DIRECT / MR. ANDRADA

1   Q.   AND SO THEN, WITH REGARD TO THE MOBILITY AND STRETCHING

2   EXERCISES, WHAT DID YOU MEAN THERE WHEN YOU SAID THAT THEY

3   SHOULD BE WELL-KNOWN TO HIM?

4   A.   ONE OF THE PRIMARY PURPOSES OF PHYSICAL THERAPY IS TO

5   TEACH PATIENTS WHAT THEY NEED TO DO LIFELONG.  SOME STRETCHING,

6   SOME EXERCISE, SOME MOBILITY, MOBILIZING ACTIVITIES.  FOR

7   SOMEONE WITH AN INJURY LIKE MR. ASHKER'S, ARE GOING TO BE

8   LIFELONG.

9           HOWEVER, AFTER MULTIPLE PHYSICAL THERAPY SESSIONS,

10  HE'S AN INTELLIGENT MAN.  HE KNOWS WHAT TO DO.  HE CAN CONTINUE

11  THESE ON HIS OWN.  IT HAS BEEN REINFORCED TO HIM.  HE NEEDS TO

12  DO THIS.  HE KNOWS WHAT TO DO, WHAT ACTIVITIES HE'S GOING TO

13  NEED TO DO.  IT IS WELL-KNOWN TO HIM.

14          SO, IN MY PRACTICE, I ALWAYS THOUGHT OF PHYSICAL

15  THERAPY AS PRIMARILY PHYSICAL EDUCATION.

16  Q.   AND MR. ASHKER HAD PHYSICAL THERAPY SINCE WHAT YEAR, DO

17  YOU RECALL?  AT LEAST AROUND 2001 OR SO WHEN HE --

18  A.   AT LEAST.

19  Q.   HE HAD IT, AS YOU UNDERSTAND, ON ESSENTIALLY CONTINUOUS

20  BASIS FOR FIVE YEARS OR SO?

21  A.   ABSOLUTELY.

22  Q.   IS THAT EXTRAORDINARY?

23  A.   IN THE PRIVATE SECTOR, YES.

24  Q.   PLEASE EXPLAIN.

25  A.   BECAUSE IT IS PHYSICAL EDUCATION.  PRIVATE INSURERS DRAW A

 1    LINE AFTER A WHILE.

 2    **Q.**   SO, IN YOUR OPINION, HAD MR. ASHKER BEEN IN THE COMMUNITY

 3    HE WOULD NOT HAVE BEEN PROVIDED FIVE YEARS OF PHYSICAL THERAPY;

 4    IS THAT WHAT YOU ARE SAYING?

 5    **A.**   ABSOLUTELY.

 6    **Q.**   ALL RIGHT.

 7              AND SO THEN I THINK WE ARE DONE DISCUSSING THIS

 8    ITEM.

 9              AND SO WAS IT BASED ON WHAT YOU TOLD US ALREADY, AND

10    INCLUDING YOUR EXAMINATION OF MR. ASHKER ON THE 31ST, THAT LED

11    YOU TO THE CONCLUSION THAT HIS TRAMADOL SHOULD BE REDUCED AND

12    REPLACED?

13    **A.**   CORRECT.

14    **Q.**   OKAY.  AND WHAT DID YOU REPLACE IT WITH?

15    **A.**   WITH AN IN-STAGE INJURY AT MANY YEARS PASS --

16              **MR. ASHKER:**  EXCUSE ME.  I OBJECT BECAUSE THERE IS

17    NO FOUNDATION THAT DR. SAYRE HAD REPLACED IT WITH ANYTHING.

18              **THE COURT:**  IT IS NONRESPONSIVE.  THE QUESTION IS

19    WHAT DID YOU REPLACE IT WITH.

20    **BY MR. ANDRADA:**

21    **Q.**   WAS THE MEDICATION REPLACED?

22    **A.**   YES.

23    **Q.**   PLEASE TELL US --

24    **A.**   I SUGGESTED A COMBINATION OF NONSTEROIDAL

25    ANTI-INFLAMMATORIES AND TYLENOL.

SAYRE – DIRECT / MR. ANDRADA

1    **Q.**   WHY DID YOU MAKE THAT SUGGESTION?

2    **A.**   BECAUSE OF THE LENGTH OF TIME SINCE THE ORIGINAL INJURY,

3    THE SUCCESS OF ALL HIS REHABILITATIVE PROCESSES, INCLUDING

4    REHABILITATED SURGERY, I THOUGHT HE WAS AT THAT LEVEL OF

5    MEDICATION.

6    **Q.**   DON'T THOSE MEDICATIONS HAVE SOME COMPLICATIONS?

7    **A.**   ABSOLUTELY.

8    **Q.**   ALL RIGHT.  AND IS THERE ANY WAY TO REDUCE THE LIKELIHOOD

9    OF COMPLICATIONS FROM THOSE MEDICATIONS?

10   **A.**   KEEP THEM AT A LOW DOSE, ENCOURAGE THE PATIENT TO USE THEM

11   ONLY WHEN ABSOLUTELY NECESSARY, ENCOURAGE THE EVENTUAL WEANING

12   OFF OF THOSE, AND PERHAPS PRESCRIBE PROTECTED MEDICINES.

13   **Q.**   WHAT DO YOU MEAN "PROTECTED MEDICINES"?

14   **A.**   ONE OF THE MAJOR COMPLICATIONS IS GASTROINTESTINAL GI

15   STOMACH IRRITATION AND POSSIBLE ULCER.  AND SO THERE ARE

16   SEVERAL MEDICATIONS THAT CAN MITIGATE THOSE EFFECTS.

17   **Q.**   AND WAS HE PRESCRIBED SUCH MEDICATIONS?

18   **A.**   YES.

19   **Q.**   NOW, I WANT TO GO BACK IN TIME JUST BRIEFLY TO THE MAR

20   MEETING.  AND WE NOW HAVE THE NOTE.

21            **MR. ANDRADA:**  AND THIS IS EXHIBIT 166, YOUR HONOR,

22   AND I WILL TRY AND ZOOM THIS ONE IN.

23            **THE COURT:**  THAT IS PLAINTIFF'S 166?

24            **MR. ANDRADA:**  YES, MA'AM.

25            **THE COURT:**  MS. CAHILL WILL GIVE YOU AN EVIDENCE TAG

1    FOR THAT.

2              **MR. ANDRADA:**  THANK YOU.  THERE WE GO.

3              (EXHIBIT DISPLAYED ON ELMO.)

4    **BY MR. ANDRADA:**

5    **Q.**   DOCTOR, CAN YOU READ IT?

6    **A.**   YES, I CAN READ THIS ONE.

7    **Q.**   TAKE YOUR TIME.  SLOW DOWN.

8    **A.**   IT HASN'T BEEN OVERMARKED.

9    **Q.**   IT IS ONLY THREE OR FOUR SENTENCES.  KINDLY READ IT OUT

10   LOUD.

11   **A.**   (READING)

12             "COMMITTEE MEMBERS DISCUSS CHRONOS (SCHEDULED FOR

13   REVIEW BY DR. SAYRE) AND PATIENT'S LONG-TERM USE OF ULTRAM.

14   AFTER REVIEW OF RECORDS, MEMBERS ARE DEEPLY CONCERNED ABOUT THE

15   ADVERSE EFFECTS OF THE PATIENT'S USE OF THIS MEDICATION OVER A

16   PERIOD OF YEARS.  PCP IS ADVISED THAT ULTRAM DOSES GRADUALLY BE

17   DECREASE -- ADVISED THAT ULTAM DOSES GRADUALLY BE DECREASED,

18   AND THAT NONSTEROIDAL ANTI-INFLAMMATORY DRUGS BE USED IN PLACE

19   OF ULTRAM.

20   **Q.**   AND THE PCP THERE IS REFERRING TO HIS PRIMARY CARE

21   PROVIDER?

22   **A.**   YES.

23   **Q.**   AND THEN AFTER THE DECISION WAS MADE TO REDUCE THE

24   MEDICATION, IN FACT THAT WAS DONE AND JUST FOR SAKE OF

25   CONTINUITY THE MEDICATION WAS, IN FACT, HALTED IN SEPTEMBER OF

1    2006, CORRECT?

2    **A.**    CORRECT.

3    **Q.**    SPECIFICALLY SEPTEMBER 27TH, 2006, CORRECT?

4    **A.**    CORRECT.

5    **Q.**    AND THEN THEREAFTER, DID YOU HAVE ANY CONTACT WITH

6    MR. ASHKER?

7    **A.**    602'S, LETTERS, AND I BELIEVE ANOTHER INTERVIEW.

8    **Q.**    OKAY.  AND, AGAIN, IN THE INTEREST OF TIME, WHAT DO YOU

9    MEAN "ANOTHER INTERVIEW"?

10   **A.**    I BELIEVE I DID ANOTHER SPECIAL CLINIC VISIT WITH

11   MR. ASHKER.

12   **Q.**    DO YOU RECALL WHEN THAT WAS APPROXIMATELY?

13   **A.**    AT THIS POINT MY MIND IS FUZZY.

14   **Q.**    ALL RIGHT.  AND WHAT WAS DISCUSSED AT THE INTERVIEW?

15   **A.**    WITHOUT THE DOCUMENT IN FRONT OF ME, I AM STRESSED.  I

16   DON'T REMEMBER.  I AM REALLY BLANKING ON THIS.

17   **Q.**    ALL RIGHT.  WE CAN JUST MOVE ON THEN.

18          SO, THEN --

19   **A.**    IF I HAD THE DOCUMENT IN FRONT OF ME, I COULD QUICKLY -- I

20   AM ONE OF THESE INDIVIDUALS WHEN I SEE ONE KEY, I WILL TELL YOU

21   EVERYTHING ABOUT IT, BUT I NEED THAT KEY.

22   **Q.**    WE WILL TRY TO FIND IT AND PROVIDE IT TO YOU.

23          NOW, DOCTOR, WITH REGARD TO MR. ASHKER'S USE OF HIS

24   ARM BRACE, DID YOU EVER TAKE THAT ARM BRACE AWAY FROM HIM, THE

25   ONE THAT'S WE HAVE SEEN IN COURT?

1   **A.**   NEVER.

2   **Q.**   HE HAS HAD IT THE ENTIRE TIME YOU HAVE BEEN THERE?

3   **A.**   TO MY KNOWLEDGE THE ANSWER IS YES.

4   **Q.**   YOU HEARD DR. DUNCAN'S OPINIONS ABOUT THE USE OF THE ARM

5   BRACE YESTERDAY?

6   **A.**   YES, I DID HEAR THOSE.

7   **Q.**   DO YOU ESSENTIALLY AGREE WITH HIS VIEWS ON THAT?

8   **A.**   YES.

9   **Q.**   PLEASE EXPLAIN.

10  **A.**   MR. -- IN PREPARATION OF THIS CASE I HAVE GONE THROUGH HIS

11  ENTIRE RECORD IN DETAIL.  MR. ASHKER IS DEVELOPING A WRIST

12  ULNAR NEUROPATHY AND HE'S GOING TO NEED DIFFERENT BRACING IN

13  THE NEAR FUTURE.

14  **Q.**   PLEASE EXPLAIN.

15  **A.**   HE DEVELOPED BASICALLY AT THE WRIST, AN ULNAR NERVE --

16          **MR. ASHKER:**  EXCUSE ME.  I AM NOT CLEAR ON THE TIME

17  FRAME HERE AS FAR AS HE'S BEEN DEVELOPING.

18          **MR. ANDRADA:**  OKAY.

19          **THE COURT:**  HE WILL ASK YOU A QUESTION.  YOUR

20  ATTORNEY WILL ASK YOU A QUESTION.

21          **THE WITNESS:**  I FORGET.  I AM SO SORRY.

22          **THE COURT:**  THAT'S ALL RIGHT.

23  **BY MR. ANDRADA:**

24  **Q.**   SO, YOU'VE INDICATED THAT HE IS DEVELOPING ANOTHER PROBLEM

25  WITH HIS WRIST?

SAYRE – DIRECT / MR. ANDRADA

1    **A.**    YES.

2    **Q.**    AND WHEN DID THIS PROBLEM BEGIN?

3    **A.**    MR. ASHKER'S REPORTED SOME NUMBNESS IN HIS TWO LITTLE

4    FINGERS, AND THE CHANGES IN HIS EMG INDICATE THAT HE HAS

5    DEVELOPED A VERY MILD ULNAR NERVE CARPAL TUNNEL SYNDROME AT THE

6    WRIST.

7            **THE COURT:**  THE OBJECTION WAS THE TIME FRAME.  MAYBE

8    YOU CAN CLEAR THAT UP.

9            **MR. ANDRADA:**  I THOUGHT IT WAS CONTEMPORANEOUS.

10   **BY MR. ANDRADA:**

11   **Q.**    WHEN HAS THIS DEVELOPED?

12   **A.**    OVER THE LAST YEAR, I THINK.

13   **Q.**    OKAY.

14           AND SO WHAT DO YOU THINK -- DO YOU HAVE SOME OPINION

15   AS TO WHAT'S GOING TO HAPPEN TO THIS CONDITION?

16   **A.**    IT'S VERY MILD.  SHOULD NOT HAVE SURGERY.  HE NEEDS

17   NIGHTTIME COCKUP SPLINTS.

18   **Q.**    WHAT IS A NIGHTTIME CAULK UP SPLINT?

19   **A.**    WHEN YOU FLEX THE WRIST, YOU COMPRESS THE CARPAL TUNNEL.

20   YOU JUST DO THIS NORMALLY, ESPECIALLY ASLEEP YOU DON'T THINK

21   ABOUT IT.

22           TO GIVE THE CARPEL TUNNEL BREATHING ROOM, TO OPEN IT

23   UP, TO GIVE IT A CHANCE TO DECOMPRESS, YOU PUT THE PATIENT IN A

24   SPLINT THAT KEEPS HIS WRIST COCKED UP DURING HIS SLEEP TO GIVE

25   THE NERVE A CHANCE TO RECOVER DURING THE SLEEP.

1              IT'S A VERY BENEFICIAL AND VERY EFFECTIVE TREATMENT

2    FOR EARLY CARPEL TUNNEL.

3    **Q.**   DO YOU FORESEE GIVING HIM THIS SPLINT?

4    **A.**   AS SOON AS I GET BACK TO PELICAN BAY.

5    **Q.**   ALL RIGHT.

6              WE HAVE TALKED ABOUT THE PHYSICAL THERAPY, THE ARM

7    BRACE, THE BALL AND THE BAND, THE ULTRAM.  I THINK, AGAIN, IN

8    THE INTEREST OF TIME WE HAVE ONE MORE AREA OF INQUIRY.

9              DID DR. ALLEN EVER WORK FOR YOU?

10   **A.**   OH, YEAH.

11   **Q.**   WAS HE TERMINATED AT PELICAN BAY?

12   **A.**   YES.

13   **Q.**   PLEASE EXPLAIN.

14   **A.**   HE CAME TO WORK AFTER AN UNEXCUSED ABANDONMENT OF HIS

15   CALL.

16   **Q.**   WHAT DO YOU MEAN?  WHAT IS "CALL"?

17   **A.**   PROVIDERS ARE REQUIRED TO BE ON CALL TO TAKE CARE OF

18   EMERGENCIES IN OUR FACILITY AT NIGHT AND WEEKENDS.  HE WAS

19   SCHEDULED TO BE ON CALL FOR A GIVEN WEEKEND.  HE ABANDONED THAT

20   CALL.  I HAD TO TAKE HIS CALL.

21   **Q.**   ALL RIGHT.  WHAT ELSE, WHAT HAPPENED NEXT?

22   **A.**   HE CAME TO WORK, CAME TO WORK VERY LATE.  I WAS IN MY

23   OFFICE DOING OTHER ADMINISTRATIVE DUTIES.  AND I GOT CALLS FROM

24   ACTUALLY A SERIES OF PEOPLE VERY QUICKLY THAT HE HAD FALLEN

25   ASLEEP SEVERAL TIMES JUST WITHIN A FEW HOURS -- JUST WITHIN AN

1    HOUR OF BEING AT THE PRISON.

2    **Q.**   WHAT HAPPENED NEXT IN THIS SEQUENCE OF EVENTS?

3    **A.**   DR. WINSLOW AND I BOTH WENT DOWN TO HIS DUTY STATION TO

4    CQC, AND FOUND HIM COMPLETELY PASSED OUT.

5    **Q.**   WHAT DID YOU DO?

6    **A.**   WOKE HIM UP.

7    **Q.**   WHAT HAPPENED NEXT?

8    **A.**   HE WAS VERY SOMNOLENT, DROWSY, AND LITERALLY FELL ASLEEP

9    TALKING TO US.

10   **Q.**   WHAT DID YOU DO NEXT?

11   **A.**   WE ELICITED A HISTORY OF A RECENT MOTOR VEHICLE ACCIDENT.

12   AT THAT POINT I BECAME CONCERNED, DR. WINSLOW AND I BECAME

13   CONCERNED THAT WE COULD NOT DIFFERENTIATE WHAT WAS THE CAUSE

14   AND EFFECT.

15          **MR. ASHKER:**   EXCUSE ME.   I WOULD LIKE TO OBJECT ON

16   HOW IT CAME TO BE THAT THEY INITIATED AN INVESTIGATION OF A

17   MOTOR VEHICLE ACCIDENT?

18          **THE WITNESS:**   DR. ALLEN TOLD US.

19          **MR. ASHKER:**   OKAY.

20   **BY MR. ANDRADA:**

21   **Q.**   GO AHEAD.

22   **A.**   WE COULD NOT DETERMINE WHICH WAS CAUSE AND EFFECT, SO WITH

23   THE HISTORY OF TRAUMA, IT BEHOOVED US TO GET A MEDICAL

24   EVALUATION.   WE IMMEDIATELY ARRANGED TO HAVE AN AMBULANCE

25   TRANSPORT TO OUR NEARBY FACILITY FOR AN EVALUATION IN THE

1    EMERGENCY ROOM INCLUDING X-RAYS, CAT SCANS, AND A COMPLETE

2    EVALUATION.

3    **Q.**   OKAY.  NOW, YOU EVENTUALLY CAUSED DR. ALLEN TO BE

4    TERMINATED, CORRECT?

5    **A.**   YES, I DID.

6    **Q.**   AND SO IN CONNECTION WITH YOUR STATE OF MIND IN REACHING

7    THAT DECISION, DID YOU LEARN SOMETHING ABOUT THE FINDINGS OF

8    THE MEDICAL EXAM OF DR. ALLEN AT THE HOSPITAL?

9              **THE COURT:**  COUNSEL, HIS STATE OF MIND IN THE

10   TERMINATION IS NOT AT ISSUE.  SO, YOU CAN'T BRING OUT HEARSAY

11   TO SHOW STATE OF MIND WHEN THE STATE OF MIND ISN'T RELEVANT.

12             **MR. ANDRADA:**  WELL --

13             **THE COURT:**  DR. ALLEN TESTIFIED AS TO WHAT --

14             **MR. ANDRADA:**  YES --

15             **THE COURT:**  AS TO THE LABORATORY RESULTS.

16             **MR. ANDRADA:**   WELL, BUT DR. ALLEN AT ONE POINT

17   SAID --

18   **BY MR. ANDRADA:**

19   **Q.**   WELL, DID DR. ALLEN TELL YOU WHAT THE RESULTS WERE?

20   **A.**   HE TOLD ME HE TESTED POSITIVE FOR COCAINE.  HE TOLD ME

21   THAT HE WAS RE-USING AGAIN.

22   **Q.**   OKAY.  SO, WITH THAT INFORMATION, WHAT DID YOU DO?

23   **A.**   ILLEGAL DRUG USE IN THE CDCR IS AN ABSOLUTE UNQUESTIONABLE

24   REASON FOR DISMISSAL.

25   **Q.**   OKAY.  WHAT HAPPENED?

SAYRE – DIRECT / MR. ANDRADA

1    **A.**   I PUT HIM ON A-T-O AND STARTED DISMISSAL PROCEEDINGS.

2    **Q.**   WHAT IS Q-M-A-T?

3    **A.**   QMAT.

4    **Q.**   WHAT IS THAT?

5    **A.**   IT IS A REVIEW PROCESS IMPOSED BY THE MADRID COURT FOR

6    EVALUATION -- EVALUATING THE PERFORMANCE OF PROVIDERS.

7    **Q.**   SO IN LAYMEN'S TERMS, IT IS A --

8              **THE COURT:**  WELL, COUNSEL, WE ARE NOT GOING TO BE

9    ABLE TO GET INTO THE LEGAL PROCEEDINGS IN OTHER CASES --

10             **MR. ANDRADA:**  I UNDERSTAND --

11             **THE COURT:**  -- THE LAW OF WRONGFUL TERMINATION.  YOU

12   ARE GOING TO HAVE TO WORK AROUND THAT.

13             **MR. ANDRADA:**  LET ME TRY ONE MORE TIME, YOUR HONOR.

14   **BY MR. ANDRADA:**

15   **Q.**   WAS DR. ALLEN APPROPRIATELY CERTIFIED BY -- DID HE POSSESS

16   A Q-M-A-T CERTIFICATION?

17   **A.**   DR. ALLEN NEVER PASSED ANY OF THE QMAT REVIEWS.  HE WAS

18   ALWAYS FOUND DEFICIENT.

19   **Q.**   AND QMAT REVIEW IN SIMPLE TERMS --

20             **THE COURT:**  COUNSEL, THIS ISN'T NECESSARY.

21             **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

22   **BY MR. ANDRADA:**

23   **Q.**   WHAT ABOUT THIS DINNER WITH DR. ALLEN; WHAT WAS THE

24   SUBJECT OF THIS DINNER?

25   **A.**   IT WAS PRESENTATION OF PSYCHOTIC SYMPTOMS IN EMERGENCY

1   SETTING.

2   Q.   ALL RIGHT.  AND WHAT REMARKS DID YOU MAKE WITH REGARD TO

3   SUCH PRESENTATIONS?

4   A.   AFTER WORKING IN A LEVEL I TRAUMA CENTER IN URBAN -- FOR

5   MANY YEARS, I HAD VAST EXPERIENCE WITH THIS.

6           AND I OPTED AN OPINION AFTER DUTIFULLY RAISING MY

7   HAND AND BEING RECOGNIZED, THAT AFTER GIVING A DRUG THAT WOULD

8   NOT CAUSE ANY CHANGE IN PSYCHIATRIC SYMPTOMS BUT WOULD GIVE A

9   TIME BREAK IN THE PROCESS, THESE PEOPLE WOULD WAKE UP AFTER MY

10  ANESTHETIC INTERVENTION WITH ABSOLUTELY NO PSYCHOTIC SYSTEMS.

11  THEY HAD FORGOTTEN ABOUT THEM BECAUSE THINGS HAD GONE ON,

12  INTERVENTION HAD GONE ON AND THEY HAD BEEN DISTRACTED.

13  Q.   SO, THIS WAS IN THE CONTEXT OF PATIENTS WHO YOU THOUGHT

14  MIGHT PRESENT WITH SYMPTOMS THAT WERE INCONSISTENT WITH THEIR

15  ACTUAL CONDITION?

16  A.   YES.  IT WAS NOT INFREQUENT IN A TRAUMA CENTER TO GET

17  PEOPLE THAT WOULD PRESENT WITH SYMPTOMS THAT DID NOT BEAR

18  JUSTIFICATION OR PROOF.

19  Q.   ALL RIGHT.

20           WAS THERE ANYTHING ELSE THAT YOU SAID AT THIS DINNER

21  MEETING?

22  A.   NO.  I JUST EXPRESSED THAT THE FACT THAT YOU HAD TO BE

23  VERY CAREFUL IN EMERGENCY SETTING WITH PATIENT PRESENTATION OF

24  PSYCHOTIC SYMPTOMS BECAUSE MANY TIMES IT DID NOT BEAR OUT IN

25  REALITY.

1  **Q.**  AND ALSO -- IS IT ALSO YOUR EXPERIENCE THAT PATIENTS WHO

2  PRESENT AN EMERGENCY ROOMS WITH SUCH SYMPTOMS ARE, IN FACT,

3  DRUG SEEKERS?

4  **A.**  OH YEAH.

5  **Q.**  DOCTOR, THANK YOU VERY MUCH.

6       **MR. ANDRADA:**  IN THE INTEREST OF TIME, YOUR HONOR, I

7  THINK WE ARE DONE WITH DR. SAYRE FOR THE MOMENT.

8       **THE COURT:**  ALL RIGHT.  I AM A LITTLE -- MR. ASHKER

9  MAY CROSS-EXAMINE HIM.  I AM A LITTLE CONCERNED ABOUT THE

10  WITNESSES WE HAVE WAITING ON TV.

11       SHOULD WE INTERRUPT NOW AND --

12       **MR. ANDRADA:**  SURE.  THAT WOULD BE FINE.

13       **THE COURT:**  DR. WINSLOW, I THINK, AND MR. DODGEN.

14       **MR. ANDRADA:**  THAT WOULD BE FINE.  WE APPRECIATE IT.

15       **THE COURT:**  IF YOU WOULD STEP DOWN.

16       **MR. ASHKER:**  DO YOU KNOW WHO THE NEXT WITNESS IS

17  GOING TO BE, YOUR HONOR?

18       **THE COURT:**  I DON'T.  WE ARE WORKING ON WINSLOW AND

19  DODGEN.

20       YOU ARE GOING TO TRY FOR WINSLOW FIRST OR DODGEN?

21       (PAUSE IN THE PROCEEDINGS.)

22       **THE COURT:**  LET'S GET WHOEVER IS READY FIRST.

23       PELICAN BAY IS READY AND WHO IS THERE?

24       **MR. ANDRADA:**  SHOULD BE DR. ROWE, SHOULD BE

25  MS. RISENHOOVER.

1        **THE COURT:**  WHAT ABOUT DODGEN?

2        **MR. ANDRADA:**  I THINK MR. DODGEN IS THERE.

3        **THE COURT:**  SINCE HE IS PART OF PLAINTIFF'S CASE --

4        **MR. ANDRADA:**  PUT HIM ON FIRST AND MR. ASHKER CAN

5   ASK HIM QUESTIONS IF THAT IS WHAT THE COURT WOULD LIKE.

6        THANK YOU, YOUR HONOR.

7        **THE COURT:**  LET'S TAKE A BREAK 11:30 TO 11:45.

8             (RECESS TAKEN AT 11:30 A.M.)

9           (PROCEEDINGS RESUMED AT 11:45 A.M.)

10        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

11       **THE COURT:**  SO WE ARE READY WITH MR. DODGEN, I TAKE

12   IT?

13       **MR. ANDRADA:**  THAT IS MR. DODGEN.

14       **THE COURT:**  ALL RIGHT.

15       **THE CLERK:**  ALL RISE.

16        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

17       **THE COURT:**  ALL RIGHT.  SO WE ARE BACK.  YOU MAY BE

18   SEATED.

19        WE HAVE PLAINTIFF'S WITNESS.  I THINK IT IS

20   MR. DODGEN ON THE VIDEO AND THE CLERK WILL SWEAR HIM.  HE

21   DOESN'T NEED TO STAND.

22       **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

23              **PATRICK DODGEN**,

24   CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

25   TESTIFIED AS FOLLOWS VIA VIDEOCONFERENCE:

1          **THE WITNESS:**  I DO.

2          **THE CLERK:**  PLEASE STATE YOUR FULL NAME, SPELLING

3    YOUR LAST NAME FOR THE RECORD.

4          **THE WITNESS:**  PATRICK DODGEN, D-O-D-G-E-N.

5                    **DIRECT EXAMINATION**

6    **BY MR. ASHKER:**

7    **Q.**    GOOD MORNING, MR. DODGEN.

8    **A.**    GOOD MORNING.

9    **Q.**    WOULD YOU PLEASE STATE YOUR QUALIFICATIONS AS A PHYSICAL

10   THERAPIST?

11   **A.**    GRADUATED FROM A PHYSICAL THERAPY PROGRAM IN 1986 FROM THE

12   UNIVERSITY OF SOUTHERN CALIFORNIA WITH A MASTER'S DEGREE IN

13   PHYSICAL THERAPY, AND THEN LATER SAT FOR THE STATE BOARDS TO BE

14   LICENSED AS A PHYSICAL THERAPIST.

15   **Q.**    AND DO YOU PROVIDE PHYSICAL THERAPY SERVICES TO PRISONERS

16   AT PELICAN BAY STATE PRISON?

17   **A.**    YES, I DO.

18   **Q.**    AND THAT WAS BY WINNING A CONTRACT TO PROVIDE THOSE

19   SERVICES; IS THAT CORRECT?

20   **A.**    PART OF THE TIME I HAVE HAD A CONTRACT, PART OF THE TIME I

21   HAVE WORKED FOR OTHER PEOPLE WHO HAD A CONTRACT.

22   **Q.**    HOW LONG HAVE YOU PROVIDED PHYSICAL THERAPY SERVICES TO

23   PELICAN BAY STATE PRISONERS?

24   **A.**    ABOUT NINE YEARS.

25   **Q.**    AND HAVE YOU EVER PROVIDED PHYSICAL THERAPY AT ANY OTHER

1    CORRECTIONAL FACILITIES?

2    **A.**    NO.

3    **Q.**    HOW MUCH MONEY WOULD YOU ESTIMATE YOU MAKE PER YEAR

4    PROVIDING PRISONERS AT PELICAN BAY STATE PRISON WITH PHYSICAL

5    THERAPY?

6             **MR. ANDRADA:**  YOUR HONOR, THIS IS HIS WITNESS.  IS

7    HE IMPEACHING HIS OWN WITNESS?

8             **THE COURT:**  YOU OBJECT, I TAKE IT?

9             **MR. ANDRADA:**  I DO.

10            **THE COURT:**  ALL RIGHT.  SUSTAINED.

11            **MR. ASHKER:**  I WANT TO HAVE THIS WITNESS AS A –– BE

12   ABLE TO ASK HIM LEADING QUESTIONS AS AN ADVERSARIAL TYPE

13   HOSTILE WITNESS, YOUR HONOR.

14            **THE COURT:**  ALL RIGHT.  YOU HAVE ANY PROBLEM WITH

15   THAT?

16            **MR. ANDRADA:**  IN THE INTEREST OF TIME, NO, BUT I

17   THINK THIS INVADES THIS GENTLEMAN'S PRIVACY.

18            **THE COURT:**  WELL, NO.  I WILL SUSTAIN THE OBJECTION.

19   THE ONLY REASON HE WANTED TO DO IT WAS TO BE ALLOWED TO ASK

20   LEADING QUESTIONS.  IF YOU DON'T OBJECT TO HIM ASKING LEADING

21   QUESTIONS, WITHOUT ASKING THAT QUESTION, I WILL BE HAPPY TO

22   SUSTAIN YOUR OBJECTION.

23            **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

24            **THE COURT:**  ALL RIGHT.

25   ///

1    **BY MR. ASHKER:**

2    **Q.**    MR. DODGEN, HAVE YOU PROVIDED ME WITH PHYSICAL THERAPY IN

3    THE PAST?

4    **A.**    YES.

5    **Q.**    AND DO YOU RECALL WHAT TIME PERIOD THAT WAS?

6    **A.**    OFF AND ON SINCE ABOUT 2000, 2001 UNTIL ABOUT 2007.

7    **Q.**    AND IN -- AT SOME POINT IN TIME IN THE YEAR 2002, DID I

8    INFORM -- DID YOU START TO PROVIDE ME WITH PHYSICAL THERAPY

9    SERVICES IN RESPONSE TO A FEDERAL COURT SETTLEMENT AGREEMENT?

10           **MR. ANDRADA:**  NO FOUNDATION AS TO THIS WITNESS.

11           **THE COURT:**  I GUESS YOU NEED TO ASK FIRST WHETHER HE

12   KNEW OF THAT.

13   **BY MR. ASHKER:**

14   **Q.**    WHEN YOU BEGAN -- AT APPROXIMATELY JULY OF 2002, WHEN I

15   SAW YOU FOR PHYSICAL THERAPY, DID I INFORM YOU THAT MY PHYSICAL

16   THERAPY WAS PURSUANT TO A FEDERAL COURT SETTLEMENT AGREEMENT?

17   **A.**    I DON'T REMEMBER SPECIFIC DATES.  I RECALL DISCUSSING THAT

18   YOU HAD A COURT ORDER FOR PHYSICAL THERAPY.

19   **Q.**    DO YOU RECALL THAT I INFORMED YOU THAT IT WAS TO CONTINUE

20   UNTIL SUCH A TIME AS MY MEDICAL CONDITION CONTRAINDICATED SUCH

21   THERAPY?

22   **A.**    I DON'T KNOW.  I CAN'T ANSWER THAT.

23   **Q.**    OKAY.  DO YOU USUALLY SEE PATIENTS FOR A SET PERIOD OF

24   SESSIONS?

25   **A.**    YES.

1    Q.    AND YOU HAVE NO RECOLLECTION OF ME EVER MENTIONING TO YOU

2    THAT MY PHYSICAL THERAPY WAS TO CONTINUE UNTIL SUCH TIME AS IT

3    WAS CONTRAINDICATED?

4    A.    I CAN'T RECALL YOU SPECIFICALLY SAYING THAT.

5    Q.    DID YOU HAVE -- DID DR. WINSLOW EVER TELL YOU THAT?

6    A.    I RECALL DR. WINSLOW SAYING YOU HAD A COURT ORDER FOR

7    PHYSICAL THERAPY.  AS FAR AS THE EXACT TERMS OF THAT, I DON'T

8    KNOW THE TERMS OF THE DURATION OF THAT PHYSICAL THERAPY.

9    Q.    OKAY.  AND WHEN YOU PROVIDE PHYSICAL THERAPY, YOU DOCUMENT

10   THOSE PHYSICAL THERAPY SESSIONS ON MEDICAL PHYSICIAN PROGRESS

11   NOTES; IS THAT CORRECT?

12   A.    YES.

13   Q.    OKAY.  AND I WILL PRESENT TO YOU THAT IN THE YEARS 2002

14   AND 2003 ON YOUR PHYSICIAN PROGRESS NOTES OF MY PHYSICAL

15   THERAPY SESSIONS WHERE IT STATED NUMBER OF TREATMENTS

16   REMAINING, YOU HAD WRITTEN INDEFINITE OR INDETERMINATE; IS THAT

17   CORRECT?

18   A.    IF IT SAYS THAT I DID, THEN, YES, THAT'S CORRECT.

19   Q.    AND DO YOU RECALL WHY YOU WOULD PUT INDETERMINATE ON MY

20   REMAINING NUMBER OF SESSIONS?

21   A.    BECAUSE OF A SPECIFIC CONVERSATION WITH DR. WINSLOW

22   REGARDING THAT YOU HAD PHYSICAL THERAPY AND THAT IT WOULD

23   CONTINUE UNTIL IT WAS BASICALLY STOPPED.  SO UNTIL SOMEBODY

24   SAID IT WAS TIME TO STOP, I WOULD CONTINUE.

25   Q.    OKAY.  AND DID ANY THIRD -- I WILL PRESENT TO YOU THAT I

1  HAD BEEN RECEIVING PHYSICAL THERAPY –– STRIKE THAT.

2  YOU ARE SAYING THAT DR. WINSLOW TOLD YOU THAT I

3  WOULD CONTINUE TO HAVE THE PHYSICAL THERAPY WITH YOU UNTIL

4  SOMEBODY TOLD YOU TO STOP IT; IS THAT YOUR TESTIMONY?

5  **A.**  NO.  WHAT I AM SAYING IS HE DID NOT GIVE A SPECIFIC STOP

6  DATE.  HE TOLD ME TO START PHYSICAL THERAPY AGAIN.  HE DIDN'T

7  STATE A SPECIFIC TIME LENGTH, BUT AS A PHYSICAL THERAPIST, I

8  CHOOSE MY ORDER.  SO UNLESS I GET A STOP ORDER, BASICALLY I

9  TAKE THAT AS A CONTINUATION ORDER.

10  **Q.**  OKAY.  AND SO UNTIL SUCH A TIME AS YOU RECEIVE A STOP

11  ORDER, YOU CONTINUE THE PHYSICAL THERAPY FOR THAT PATIENT; IS

12  THAT CORRECT?

13  **A.**  YES.

14  **Q.**  OKAY.

15  **A.**  GENERALLY THERE'S A FREQUENCY GIVEN.  IN YOUR CASE, THERE

16  WAS NO FREQUENCY OR DURATION GIVEN.

17  **Q.**  IS THAT COMMON?

18  **MR. ANDRADA:**  OBJECTION, VAGUE AND AMBIGUOUS.

19  **THE WITNESS:**  NO.

20  **THE COURT:**  OVERRULED.

21  **BY MR. ASHKER:**

22  **Q.**  YOU MAY ANSWER.

23  **A.**  I ASSUMED IT WAS BECAUSE OF THE COURT ORDER THAT YOU HAD.

24  **Q.**  OKAY.

25  AND WHEN –– HOW OFTEN WOULD I RECEIVE THESE PHYSICAL

1    THERAPY SESSIONS WITH YOU?

2    **A.**   TWICE A WEEK UNTIL A CERTAIN POINT WHEN WE –– FREQUENCY

3    WAS REDUCED TO ONE TIME A WEEK.

4    **Q.**   DO YOU RECALL WHEN THAT WAS?

5    **A.**   NOT EXACTLY, NO.

6    **Q.**   WOULD IT HAVE BEEN TOWARDS THE END OF MY –– I WILL PRESENT

7    TO YOU I WAS RECEIVING PHYSICAL THERAPY FROM YOU FROM JULY 2002

8    UP UNTIL FEBRUARY OF 2007.

9            DO YOU AGREE WITH THAT?

10   **A.**   IF THAT'S WHAT'S IN THE NOTE.  I THINK WE STOPPED AROUND

11   2007.  THERE WAS A PERIOD IN THERE, I DON'T KNOW EXACTLY, BUT

12   IT'S WRITTEN WHAT WE DID.

13   **Q.**   OKAY, THANK YOU.

14           I WILL ALSO PRESENT TO YOU THAT DEFENDANTS HAVE

15   CLAIMED THAT YOU CANCELED MY PHYSICAL THERAPY IN MARCH OR

16   FEBRUARY OR MARCH OF 2007 BECAUSE YOU FELT THAT IT WAS NO

17   LONGER NEEDED.

18           IS THAT TRUE?

19   **A.**   WELL, WHEN WE CANCELED IT, IT WAS BECAUSE, IT WAS BECAUSE

20   OF THE REFUSAL POLICY.

21   **Q.**   SO, I HAVE A DOCUMENT HERE DATED MARCH 1ST, 2007, WHERE IT

22   IS A PHYSICAL THERAPY DISCHARGE SUMMARY.  AND I WOULD LIKE TO

23   READ SOME SECTIONS TO YOU AND ASK YOU IF THESE ARE CORRECT

24   REPRESENTATIONS ON YOUR PART ON THIS DOCUMENT.

25           I DON'T KNOW, WOULD HE BE ABLE TO SEE THE DOCUMENT?

```
 1              MR. ANDRADA:  I DON'T KNOW IF THEY HAVE A COPY OF

 2    THE CHART RIGHT THERE.

 3              MR. ASHKER:  I WILL JUST READ --

 4              MR. LAURIE:  PETER LAURIE.  WE HAVE THE EXHIBIT LIST

 5    OF BOTH THE DEFENDANTS' AND THE PLAINTIFF'S EXHIBIT LIST HERE

 6    IN THE ROOM.

 7              THE COURT:  DO YOU HAVE THE DOCUMENTS AS WELL OR

 8    JUST THE LIST?

 9              MR. ASHKER:  DO YOU HAVE THE DOCUMENTS THERE AS

10    WELL?

11              MR. LAURIE:  YES, I AM SORRY.  I WAS UNCLEAR, YOUR

12    HONOR.  WE ALSO HAVE THE LIST ALONG WITH THE DOCUMENTS.

13              MR. ASHKER:  GREAT.

14              THE COURT:  WHY DON'T YOU SEE IF YOU CAN PULL IT OUT

15    WHILE WE KEEP GOING.

16              MR. ASHKER:  THIS WOULD BE EXHIBIT 170.  THE FIRST

17    PAGE.

18    BY MR. ASHKER:

19    Q.  MR. DODGEN, THIS IS THE -- I WILL PRESENT TO YOU THAT THIS

20    IS THE PHYSICAL THERAPY DISCHARGE SUMMARY CREATED BY YOU ON

21    MARCH 1ST, 2007 WHERE YOU STATED THAT UNDER THE PROGRESS MADE

22    SECTION:

23                   PATIENT GENERALLY HAD LIMITED WRIST RANGE OF

24                   MOTION FOR FLEXION, EXTENSION, PRONATION,

25                   SUPINATION.  STRENGTH WAS ABOUT 30 TO 40 PERCENT
```

DODGEN – DIRECT / MR. ASHKER

1           OF AGE PREDICTED NORMAL FOR RIGHT DOMINANT HAND.

2           HE REPORTED VARIABLE ELBOW, ARM, FOREARM AND

3           SOMETIMES HAND PAIN.

4           HE HAS BEEN ISSUED THERAPY BALL FOR GRIP

5           STRENGTHENING AND RESISTIVE TUBING FOR FOREARM,

6           WRIST, UPPER ARM, AND SHOULDER REHABILITATION.

7           PATIENT'S MAIN LIMITATIONS WERE GRIP STRENGTH,

8           GRIPPING FOR PROLONGED PERIODS AS WITH

9           SCHOLASTIC, LEGAL, AND PERSONAL WRITING.  HE

10          ALSO HAS REPORTED DIFFICULTIES WITH HIS FOREARM

11          BRACE WHICH HAS MADE IT DIFFICULT FOR HIM TO

12          WORK OUT HIS UPPER ARM.  HE WAS ISSUED SOME FOAM

13          TO ASSIST WITH FATTENING HIS PEN FILLER TO

14          ASSIST WITH WRITING.

15          HE HAS ONGOING PAIN MANAGEMENT ISSUES.  THERAPY

16          CONSISTED OF WHIRLPOOL, ACTIVE RANGE OF MOTION,

17          AND GRIPPING AND HAND EXERCISES.  HE REPORTS

18          RELIEF AND (IT STATES PARTIAL) WITH THIS

19          TREATMENT.  TREATMENT CAN BE CONTINUED WITH NEW

20          PRESCRIPTION.  HE WILL BE DISCONTINUED PER

21          PROTOCOL FOR TWO REFUSALS.

22          IS THAT CORRECT?  DID YOU DOCUMENT THAT ON THIS

23   DOCUMENT?

24   **A.**   YES.

25   **Q.**   OKAY.

DODGEN – DIRECT / MR. ASHKER

1          SO, YOU DID NOT CANCEL MY PHYSICAL THERAPY

2     BECAUSE –– ON MARCH 1ST, 2007 BECAUSE YOU FELT THAT THERAPY WAS

3     NO LONGER NEEDED OR BENEFICIAL FOR ME; IS THAT CORRECT?

4     **A.**   THAT'S CORRECT.

5     **Q.**   OKAY.

6     **A.**   IT WAS BECAUSE OF THE REFUSAL POLICY.

7     **Q.**   AND AT SOME POINT IN TIME, WASN'T THERE ACTUALLY A

8     THREE–REFUSAL POLICY?

9     **A.**   THERE WAS.

10    **Q.**   DO YOU KNOW AT WHAT TIME PERIOD THAT CHANGED?

11    **A.**   SOMEWHERE PROBABLY AROUND '06.  I DON'T KNOW EXACTLY.

12    **Q.**   WELL, I WILL PRESENT TO YOU THAT –– DO YOU RECALL ME

13    SUBMITTING SOME WRITTEN DEPOSITION QUESTIONS UPON YOU DATED

14    DECEMBER 31ST, 2007?

15    **A.**   YES.

16    **Q.**   EXCUSE ME FOR A SECOND.

17          QUESTION NUMBER 30 OF THOSE WRITTEN DEPOSITION

18    QUESTIONS, I ASKED YOU IN QUESTION NUMBER –– I ASKED YOU THE

19    QUESTION BACK IN FEBRUARY, MARCH 1ST, 2007:

20          ASHKER REFUSED THERAPY TWO TIMES IN A ROW.  THE

21    SECOND TIME WAS BECAUSE HIS LOWER BACK HURT SO BAD HE COULD

22    BARELY WALK.  HE WAS SUBSEQUENTLY NOTIFIED THAT HIS PHYSICAL

23    THERAPY WAS DISCONTINUED.  WHEN HE REFUSED TWO SESSIONS IN A

24    ROW IN LATE 2004, REFERENCE YOUR NOTATIONS OF ASHKER'S REFUSALS

25    FOR 11/30/04 AND 12/2/04 ON PHYSICIAN PROGRESS NOTES.

1            AND YOUR ANSWER WAS:  PROBABLY THE POLICY WAS

2   CHANGED AFTER THAT DATE.

3            IS THAT CORRECT?

4   **A.**   I DON'T HAVE IT IN FRONT OF ME, BUT IF THAT IS WHAT IT

5   SAYS, YES.  THERE WAS A POLICY CHANGE BETWEEN THOSE DATES.

6   **Q.**   AND HAD YOU EVER INFORMED ME OF THAT POLICY CHANGE?

7   **A.**   NO.

8   **Q.**   OKAY.  DO YOU BELIEVE THAT THE PHYSICAL THERAPY YOU

9   PROVIDED TO ME WAS BENEFICIAL?

10  **A.**   I THINK THERE IS PROBABLY SEVERAL PARTS TO THAT.  I THINK

11  THE STRENGTHENING IS BENEFICIAL.  I THINK IN GENERAL THE

12  WHIRLPOOL FEELS GOOD, BUT IT DID NOT PROVIDE ANY LONG-TERM

13  BENEFIT.

14            THE WHOLE PROGRAM IS BENEFICIAL BECAUSE IT ALLOWS

15  YOU TO WORK ON THINGS ON YOUR OWN AND WHEN YOU ARE FEELING BEST

16  ABLE TO DO THAT.

17  **Q.**   AND AFTER I RECEIVED THE PHYSICAL THERAPY BAND AND BALL

18  FROM YOU AROUND FEBRUARY OF 2003, MY PHYSICAL THERAPY SESSIONS

19  WITH YOU CONSISTED OF VERBAL DISCUSSIONS, AND FEEDBACK

20  CONCERNING THE ARM, AND SOAKING THE ARM IN THE WHIRLPOOL, AND

21  SQUEEZING THE HAND GRIPPER FOR A FEW MINUTES; IS THAT CORRECT?

22  **A.**   YES.

23  **Q.**   AND AT SOME POINT YOU HAD PERSONALLY REVIEWED X-RAYS OF MY

24  RIGHT ARM AND HAND; IS THAT CORRECT?

25  **A.**   YES.

DODGEN – DIRECT / MR. ASHKER

1   **Q.**   AND IN YOUR OPINION WAS THE DAMAGE TO MY ARM SEVERE AND

2   PERMANENT?

3   **A.**   YES.

4   **Q.**   AND IN YOUR DISCHARGE SUMMARY DATED MARCH 1ST, 2007, YOU

5   STATED MY GRIP STRENGTH WAS ABOUT 30 TO 40 PERCENT OF AGE

6   PREDICTED NORMAL FOR RIGHT DOMINANT HAND FOR A MALE MY AGE; IS

7   THAT CORRECT?

8   **A.**   YES.

9   **Q.**   AND WHAT WOULD BE NORMAL GRIP STRENGTH FOR A MAN MY AGE?

10  **A.**   I GUESS IT TO BE ABOUT 120, 140.  I DON'T HAVE IT

11  MEMORIZED.

12  **Q.**   IN RESPONSE TO MY DEPOSITION QUESTION YOU STATED IT WAS

13  APPROXIMATELY 115 POUNDS.

14  **A.**   OKAY.

15  **Q.**   OKAY?

16        DO YOU USE A DEVICE -- WHAT TYPE OF DEVICE DO YOU

17  USE TO TEST GRIP STRENGTH?

18  **A.**   IT'S CALLED A JAMAR HAND DYNAMOMETER.

19  **Q.**   CAN YOU DESCRIBE HOW IT WORKS?

20  **A.**   YOU HOLD THE DEVICE, SQUEEZE FOR A FEW MOMENTS AND THE

21  LITTLE METER REGISTERS THE MAXIMUM FORCE PRODUCED.  AND USUALLY

22  WE DO THREE TRIALS AND AVERAGE THAT.

23  **Q.**   SO HOW LONG DO YOU GRIP -- OKAY.

24        SO WHAT YOU ARE SAYING IS, YOU GRAB THE DEVICE IN

25  YOUR HAND AND YOU GRIP IT AS HARD AS YOU CAN FOR A SECOND OR

1    TWO, AND IT WILL REGISTER ON THE LITTLE DIAL; IS THAT CORRECT?

2    **A.**    THAT'S CORRECT.

3    **Q.**    OKAY.  AND IS THAT GRIP STRENGTH DYNAMOMETER CAPABLE OF

4    DETERMINING A PERSON'S FUNCTIONAL LIMITATIONS IN THE HAND,

5    WRIST, OR ARM?

6    **A.**    NO.

7    **Q.**    IS IT CAPABLE OF DETERMINING STRENGTH FACTORS REQUIRING

8    MORE THAN A SECOND OR TWO OF EFFORT?

9    **A.**    WELL, IT CAN'T PREDICT ENDURANCE, JUST MAXIMAL STRENGTH.

10   **Q.**    OKAY.  CAN THE GRIP STRENGTH DYNAMOMETER MEASURE THE PAIN

11   A PERSON FEELS WHEN GRIPPING IT FOR A FEW SECONDS?

12   **A.**    NO.

13   **Q.**    DURING THE TIME YOU PROVIDED ME WITH PHYSICAL THERAPY, DID

14   YOU EVER TEST MY LIMITATIONS REGARDING WRITING, OR WRINGING OUT

15   LAUNDRY?

16   **A.**    NO.  WE DISCUSSED THEM, BUT IT WAS -- THERE WASN'T A

17   REALLY GOOD WAY TO TEST THAT.

18   **Q.**    DO YOU RECALL ON ONE OCCASION I BROUGHT MY THERMAL TOP

19   DOWN THERE TO THE PHYSICAL THERAPY ROOM TO SHOW IT TO YOU AND

20   ASK YOU TO LET ME DEMONSTRATE TO YOU WHAT PROBLEMS IT WAS FOR

21   ME TO WRING IT OUT WHEN IT WAS WET?

22   **A.**    I HAVE SOME VAGUE RECOLLECTION OF YOU BRINGING THAT DOWN,

23   YES.

24   **Q.**    OKAY.  AND DO YOU RECALL WHAT YOUR RESPONSE WAS?

25   **A.**    NO.

1   **Q.**   NO TEST WAS DONE THOUGH; IS THAT CORRECT?

2   **A.**   YES.

3   **Q.**   OKAY.

4           GO AHEAD.  DID YOU HAVE SOMETHING FURTHER?

5   **A.**   YES, THAT IS CORRECT.  NO, THERE WAS NO TEST DONE.

6           **THE COURT:**  WE NEED TO FINISH UP AS SOON AS

7   POSSIBLE.

8   **BY MR. ASHKER:**

9   **Q.**   HOW IMPORTANT IS PHYSICAL THERAPY FOR MAINTAINING THE

10  HEALTHY GAINS THAT I HAD MADE IN MY RIGHT ARM?

11          **MR. ANDRADA:**  VAGUE AND AMBIGUOUS, OVERLY BROAD, NO

12  FOUNDATION AS TO THIS WITNESS, YOUR HONOR.

13          **THE COURT:**  I DON'T UNDERSTAND THE OBJECTION.  IF

14  YOU ARE TALKING ABOUT THE BREADTH OF TIME, I GUESS WE CAN

15  NARROW IT DOWN.

16          **MR. ANDRADA:**  AND --

17          **THE COURT:**  IS THAT WHAT YOU MEAN?

18          **MR. ANDRADA:**  WHAT PARTICULAR IMPROVEMENTS?

19          **MR. ASHKER:**  I WILL REPHRASE THE QUESTION.

20  **BY MR. ASHKER:**

21  **Q.**   MR. DODGEN, IN AN INJURY -- WITH THE TYPE OF INJURY I HAD

22  TO MY ARM --

23          **THE COURT:**  YOUR QUESTION IS FINE.  JUST ANSWER THE

24  QUESTION THAT HE GAVE.

25          IF THE ANSWER IS DIFFERENT OVER DIFFERENT TIME

DODGEN – DIRECT / MR. ASHKER

1    FRAMES, YOU CAN MAKE DISTINCTION.

2                **MR. ASHKER:**  CAN YOU READ THE QUESTION TO HIM?

3                **THE COURT:**  HOW IMPORTANT IS PHYSICAL THERAPY FOR

4    MAINTAINING THE HEALTHY GAINS THAT I HAD MADE IN MY RIGHT ARM?

5                **THE WITNESS:**  IT WAS MY FEELING THAT MOST OF THE

6    GAINS COULD BE MAINTAINED ON YOUR OWN WITH THE HOME PROGRAM

7    WITH THE BALL AND THE THERA-BAND.

8    **BY MR. ASHKER:**

9    **Q.**   OKAY.

10               NOW, I CLAIM THAT WHEN I AM NOT ABLE TO REGULARLY

11   AND PROPERLY EXERCISE MY WRIST AND ARM AREAS, THE PAIN AND

12   DISCOMFORT I EXPERIENCE INCREASES AND THE MUSCLE REMAINING IN

13   MY FOREARM QUICKLY BEGIN TO GET SMALLER AND WEAKER.

14               DO YOU DISPUTE THIS CLAIM?

15               **MR. ANDRADA:**  OBJECTION.  THERE'S NO FOUNDATION FOR

16   THAT QUESTION AS TO THIS WITNESS --

17               **THE COURT:**  HE'S A PHYSICAL THERAPIST.  ISN'T THAT

18   SOMETHING HE WOULD KNOW?

19               OVERRULED.

20   **BY MR. ASHKER:**

21   **Q.**   YOU MAY ANSWER.

22   **A.**   WELL, WE GAVE YOU THE THERA-BAND AND THE BALL FOR THE

23   PURPOSE OF EXERCISING AND MAINTAINING YOUR STRENGTH.

24   **Q.**   OKAY.

25               DO YOU RECALL ME EVER TELLING YOU THAT I NEEDED

1    THOSE ITEMS BECAUSE I HAD TRIED TO DO THE EXERCISES AND STUFF

2    ON MY OWN FOR SEVERAL YEARS AND I WAS NOT ABLE TO DO SO?

3    **A.**   I READ THAT IN THE QUESTIONS IN THE DEPOSITION.  WE TALKED

4    ABOUT THAT.

5    **Q.**   DID THAT SEEM REASONABLE TO YOU?

6    **A.**   IT'S QUESTIONABLE BECAUSE IT IS DIFFICULT TO GET IN

7    CERTAIN POSITIONS.  I WOULD SAY THAT THE THERA-BAND CERTAINLY

8    ALLOWS A LOT MORE OPTIONS THAN WOULD SAY PUTTING YOUR HAND IN A

9    PILLOW CASE AND TRYING TO GET YOUR WRIST IN A PROPER POSITION

10   TO WORK AGAINST GRAVITY.  THAT'S WHAT WE USE THERA-BAND FOR.

11   **Q.**   AND ISN'T IT TRUE THAT WITHOUT PROPER EXERCISE EQUIPMENT

12   FOR AN INJURY LIKE MINE, I AM AT RISK FOR INJURY?

13   **A.**   I WOULD -- I CAN ONLY ANSWER THAT TOOLS ARE CERTAINLY

14   HELPFUL TO MAINTAIN STRENGTH.  WHETHER YOU ARE AT RISK OR NOT,

15   I CAN'T SAY WHETHER SOMETHING WOULD PUT YOU AT RISK OR NOT

16   WITHOUT A SPECIFIC EXAMPLE.

17   **Q.**   OKAY.  NOW, DO YOU KNOW DR. SAYRE?

18   **A.**   YES.

19   **Q.**   AND HAVE YOU HAD CONVERSATIONS WITH HIM OVER THE LAST FOUR

20   YEARS ABOUT INMATES' PHYSICAL THERAPY SESSIONS?

21   **A.**   YES.

22   **Q.**   AND HAVE YOU EVER DISCUSSED MY PHYSICAL THERAPY WITH

23   DR. SAYRE?

24   **A.**   YES.

25   **Q.**   DO YOU RECALL WHEN THE FIRST TIME WAS?

1    **A.**   NO.

2    **Q.**   DO YOU RECALL EVER TELLING DR. SAYRE THAT I NO LONGER

3    NEEDED ANY PHYSICAL THERAPY?

4    **A.**   I CAN'T RECALL A SPECIFIC TIME, BUT WE DISCUSSED WHETHER

5    IT WAS NECESSARY.  AND I FELT THAT YOU COULD DO WHAT YOU NEEDED

6    TO DO WITH THE HOME PROGRAM.

7            SO, YES, I GUESS WE STATED THAT IT WOULD BE BETTER,

8    THERAPY WAS NO LONGER NECESSARY, YES.

9    **Q.**   BUT BY "THERAPY", YOU MEAN THERAPY WITH YOU DOWN AT THE

10   THERAPY ROOM, CORRECT?

11   **A.**   THAT'S RIGHT.

12   **Q.**   YOU WERE NOT MEANING THAT I DID NOT NEED TO CONTINUE TO DO

13   THE EXERCISES ON MY OWN TO MAINTAIN THE PROGRESS THAT I HAD

14   MADE; IS THAT CORRECT?

15   **A.**   IF I UNDERSTAND YOU, YES.  I BELIEVE YOU NEEDED TO

16   CONTINUE THE EXERCISES ON YOUR OWN IN ORDER TO MAINTAIN YOUR

17   STRENGTH.

18   **Q.**   OKAY.  AND YOU -- I WILL PRESENT TO YOU THAT IN THE

19   LAST -- DO YOU HAVE AN ESTIMATE OF WHEN YOU MIGHT HAVE HAD THIS

20   CONVERSATION WITH DR. SAYRE ABOUT I NO LONGER NEEDED THE

21   THERAPY?

22   **A.**   I CAN'T REALLY BECAUSE WE SORT OF WOULD RUN INTO EACH

23   OTHER AND, YOU KNOW, THINGS HAPPEN SPONTANEOUSLY.  THERE WAS NO

24   PLANNED MEETING, SO I DON'T KNOW.

25   **Q.**   DO YOU AGREE THE PHYSICAL THERAPY SESSIONS WERE BENEFICIAL

1    FOR MY RIGHT ARM AND OFTEN PROVIDED SOME RELIEF FOR MY PAIN AND

2    STIFFNESS?

3    **A.**   WHETHER THE BENEFIT IS LONG TERM, I DON'T KNOW.  I THINK

4    IT PROBABLY GAVE YOU SHORT-TERM RELIEF FOR THE SYMPTOMS.

5    **Q.**   I WILL PRESENT TO YOU THAT ON ALL OF YOUR FOUR YEARS'

6    WORTH OF PHYSICAL THERAPY PHYSICIAN PROGRESS NOTES, YOU NOTED

7    THAT WHEN I CAME OVER THERE TO THE THERAPY, I WOULD EXPLAIN TO

8    YOU THE PAIN AND DISCOMFORT I HAD BEEN IN, WAS EXPERIENCING

9    FROM WRITING AND ACTIVITIES, AND YOU WOULD NOTE THAT THE

10   THERAPY PROVIDED PARTIAL RELIEF.

11             IS THAT CORRECT?

12   **A.**   IT'S CORRECT, BUT IT'S BASED ON YOUR STATEMENTS TO ME.  I

13   CAN'T REALLY MEASURE THE DEGREE OF PAIN YOU ARE IN.  THAT'S THE

14   PROBLEM.

15   **Q.**   WELL, WHAT DO YOU MEAN IT'S A PROBLEM?

16   **A.**   IT'S ALL BASED ON YOUR SUBJECTIVE FEEDBACK.  RANGE OF

17   MOTION.

18   **Q.**   DID MY -- GO AHEAD.

19             DID MY SUBJECTIVE FEEDBACK SEEM CREDIBLE TO YOU?

20   **A.**   YES.

21   **Q.**   OKAY.

22             AND ON FEBRUARY 3RD, 2005, IN YOUR PHYSICAL THERAPY

23   PROGRESS NOTES WHICH YOU HAVE THERE IN FRONT OF YOU, IT WOULD

24   BE HANDWRITTEN NUMBER EIGHT AT THE BOTTOM OF THE RIGHT-HAND

25   PAGE, IT STATES:

1              PROGRESS MADE.  REASONABLE PAIN CONTROL FOR

2              MONTH OF JANUARY.  PATIENT HAS VARIABLE PAIN

3              LEVELS DEPENDING ON ACTIVITIES.  PAIN IS IN

4              MEDIAL ELBOW, FOREARM, WRIST AND OCCASIONALLY IN

5              THE HAND.

6              YOU DID FOREARM RANGE OF MOTION TESTS.  FLEXION

7              40 DEGREES, EXTENSION 40 DEGREES, SUPINATION 40

8              DEGREES, PRONATION 25 DEGREES.

9              AND THE RECOMMENDATIONS YOU STATED:  TEAM

10             CONFERENCE REGARDING PAIN MANAGEMENT PROGRAM FOR

11             PATIENT.  FUNCTIONAL COORDINATION -- FUNCTIONAL

12             LOOKS TO BE LIKE COORDINATION IF NEEDED BY

13             INDEPENDENT AGENCY TO DETERMINE FUNCTIONAL

14             LIMITATIONS.

15             DO YOU SEE THAT ON THE DOCUMENT?

16   **A.**   YES.

17   **Q.**   AND DO YOU RECALL WHAT YOU MEANT BY -- WHAT IS THAT WORD

18   NEXT TO FUNCTIONAL, COORDINATION?

19   **A.**   EVALUATION.

20   **Q.**   CAN YOU READ THAT LAST SENTENCE RIGHT THERE FROM

21   FUNCTIONAL EVALUATION?

22   **A.**   (READING)

23             FUNCTIONAL EVALUATION NEEDED BY INDEPENDENT

24             AGENCY TO DETERMINE FUNCTIONAL LIMITATIONS.

25   **Q.**   OKAY.  AND WHAT DID YOU MEAN BY THAT?

DODGEN – DIRECT / MR. ASHKER

1    **A.**   BECAUSE YOU HAD -- WE HAD SEEN EACH OTHER FOR A LONG TIME

2    AND BECAUSE YOU HAD ISSUES REGARDING WRITING AND, AS YOU SAID,

3    WRINGING OUT YOUR CLOTHES, THAT SORT OF THING, I DIDN'T REALLY

4    FEEL I HAD A BASIS TO MAKE THAT DETERMINATION BECAUSE I HAD NOT

5    OBSERVED YOU DOING THOSE.

6         ALSO I FELT THAT IT WOULD BE BETTER IF SOMEONE

7    INDEPENDENT WHO -- YOU WOULDN'T HAVE ANY KIND OF BIASES, AN

8    INDEPENDENT FRESH PERSPECTIVE.  THAT WAS MY THOUGHT IF THIS WAS

9    AN ONGOING ISSUE FOR YOU.

10        AND THE PAIN MANAGEMENT IS THE SAME KIND OF THING.

11   IT INVOLVES MEDICATIONS AND A BUNCH OF THINGS.  SO, THAT WAS MY

12   RECOMMENDATION, IF THERE WAS SOME QUESTIONS, THAT COULD BE

13   CLEARED UP.

14   **Q.**   OKAY.

15   **A.**   TO AVOID SOMETHING LIKE THIS.

16   **Q.**   SO YOU -- I UNDERSTAND.

17        SO YOU BASICALLY BELIEVED THAT YOU -- AN EVALUATION

18   SHOULD BE HAD BY AN INDEPENDENT TYPE OF AGENCY; IS THAT

19   CORRECT?

20   **A.**   IF THERE WERE ISSUES -- BASICALLY I DIDN'T FEEL THAT I

21   COULD RESOLVE THOSE ISSUES, WHAT YOU SPECIFICALLY NEEDED

22   REGARDING WRITING OR LAUNDRY.  SO I FELT THAT I COULDN'T REALLY

23   MAKE THAT DECISION.

24   **Q.**   WHAT TYPE OF -- ARE YOU TALKING ABOUT LIKE AN OCCUPATIONAL

25   THERAPIST?

DODGEN – DIRECT / MR. ASHKER

1   **A.**   SOME, YES, COULD BE OCCUPATIONAL THERAPIST OR ANOTHER

2   PHYSICAL THERAPIST.

3   **Q.**   OKAY.

4           NOW, IN THESE PHYSICAL DISCHARGE SUMMARIES AND IN

5   YOUR REPORTS, YOU DOCUMENTED MY RANGE OF MOTION.

6           AND I SEE HERE THAT LIKE ON, FOR EXAMPLE, MAY 20TH,

7   '05, MY PASSIVE RANGE OF MOTION WAS FLEXION 30 DEGREES,

8   EXTENSION 30 DEGREES.  THE ACTIVE FLEXION WAS 22 DEGREES AND

9   THE EXTENSION WAS 30 -- WELL, STRIKE THAT.

10          ON JULY 19TH, 2005, MY ACTIVE WAS MEASURED AT

11  FLEXION 22 DEGREES, EXTENSION 35 DEGREES, PASSIVE MOTION WAS

12  45 DEGREES, FLEXION AT 45 DEGREES EXTENSION.

13          BASED ON YOUR EXPERIENCE AS A PHYSICAL THERAPIST AND

14  DOING RANGE OF MOTION, HAVE YOU MUCH EXPERIENCED WITH DEALING

15  WITH WRIST CONDITIONS LIKE MINE?

16  **A.**   I'VE WORKED WITH WRISTS, NOT SO MUCH WITH GUNSHOT WOUNDS.

17  **Q.**   BUT YOU HAVE WORKED WITH WRISTS WITH LIMITED RANGE OF

18  MOTION; IS THAT CORRECT?

19  **A.**   RIGHT.  YES.

20          **THE COURT:**  YOU NEED TO ASK YOUR MOST IMPORTANT

21  REMAINING QUESTIONS AND FINISH UP.

22          **MR. ASHKER:**  OKAY.

23  **BY MR. ASHKER:**

24  **Q.**   MR. DODGEN, MY PHYSICAL THERAPY WAS TO BE ABLE TO HAVE

25  THAT PHYSICAL THERAPY CONTINUED UNTIL IT WAS CONTRAINDICATED.

DODGEN – DIRECT / MR. ASHKER

1              AND WHAT IS YOUR INTERPRETATION OF CONTRAINDICATED?

2    **A.**   WOULD BE IN GENERAL MEDICAL USE, CONTRAINDICATION THAT

3    MEANS IT WOULD BE HARMFUL TO YOU TO DO.

4    **Q.**   MY QUESTION TO YOU IS, WAS THAT PHYSICAL THERAPY EVER

5    HARMFUL TO ME?

6    **A.**   NO.

7    **Q.**   IN FACT, ON ALL OF YOUR DOCUMENTS -- OF YOUR DOCUMENTED OF

8    MY PHYSICAL THERAPY SESSIONS, YOU DOCUMENTED THAT IT PROVIDED

9    PARTIAL RELIEF; IS THAT CORRECT?

10   **A.**   YES, I DID SO BASED ON YOUR STATEMENTS.

11   **Q.**   MY STATEMENTS APPEARED TO BE CREDIBLE TO YOU; IS THAT

12   CORRECT?

13   **A.**   I HAD NO REASON TO THINK OTHERWISE.

14   **Q.**   I WILL PRESENT TO YOU THAT SINCE YOUR PHYSICAL THERAPY

15   STOPPED BACK ON MARCH 1ST OF 2007, AROUND THERE, THAT YOU

16   MEASURED MY GIRTH OF MY ARM AT A CERTAIN SPECIFIC POINT AT

17   THREE AND A HALF INCHES UP MY FOREARM FROM THE WRIST FOLD.  ON

18   SEVERAL OCCASIONS IN 2003 AND 2004, AND THE GIRTH MEASUREMENT

19   OF MY FOREARM WAS BETWEEN EIGHT AND A QUARTER AND EIGHT AND

20   THREE-EIGHTH INCHES.  I WILL PRESENT TO YOU THAT I TOOK A

21   MEASUREMENT OF THIS AT THE SAME AREA ABOUT A MONTH AGO AND IT

22   MEASURED AT APPROXIMATELY SEVEN AND A HALF INCHES NOW.

23              I WILL PRESENT -- WOULD YOU CONSIDER THAT TO BE AN

24   INDICATION OF DETERIORATION IN MY CONDITION?

25   **A.**   IF THE MEASUREMENTS ARE ACCURATE, THEN IT WOULD SHOW THERE

DODGEN – DIRECT / MR. ASHKER

1    HAD BEEN SOME ATROPHY OF THE MUSCLES.

2    **Q.**    WHAT WOULD THAT INDICATE TO YOU?

3    **A.**    THAT YOU HADN'T BEEN USING IT AND THE MUSCLES WERE GETTING

4    SMALLER FROM DISUSE.

5    **Q.**    AND AS FAR AS -- WHEN I FIRST STARTED SEEING YOU FOR THIS

6    PHYSICAL THERAPY IN 2002, JULY OF 2002, I WILL PRESENT TO YOU

7    THAT YOU DOCUMENTED THAT I HAD NERVE PAIN RUNNING FROM MY ELBOW

8    UP INTO MY HAND AND MY FINGERS AND MY TWO FINGERS WERE NUMB AND

9    BY OCTOBER OF 2002, YOU HAD DOCUMENTED THAT THAT PAIN WAS GONE

10   AND MY FINGERS WERE NO LONGER NUMB.

11          AND, NOW SINCE THAT PHYSICAL THERAPY HAS BEEN

12   STOPPED, THE PAIN RUNNING ALONG MY ULNAR NERVE INTO MY FINGERS

13   HAS RETURNED AND MY FINGERS ARE NOW NUMB AGAIN.

14          WOULD THAT -- WHAT WOULD THAT INDICATE TO YOU?

15   **A.**    THAT SOUNDS LIKE YOUR ULNAR NERVE IS GIVING YOU PROBLEMS

16   AGAIN AS IT HAS IN THE PAST.

17   **Q.**    WOULD THAT INDICATE SOME FORM OF DETERIORATION IN MY

18   CONDITION FROM WHEN THE LAST TIME YOU SAW ME?

19   **A.**    SOUNDS LIKE IT, YES.

20   **Q.**    OKAY.

21          **THE COURT:**  WE NEED TO CONCLUDE THIS.

22          **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS OF

23   MR. DODGEN.

24          OH, ONE THING.  I WILL HOLD UP THIS BAND AND THIS

25   BALL HERE JUST FOR IDENTIFICATION PURPOSES OF THESE ITEMS ARE

```
1    THE ITEMS THAT YOU HAVE PROVIDED ME FOR MY IN-CELL PHYSICAL

2    THERAPY -- MY INSIDE CELL EXERCISE NEEDS.

3              CAN YOU SEE THEM?

4    A.   YES.  AND THE BALL?  YOU HAVE THE BALL, TOO?  YES, IT'S

5    OKAY.  YEAH.

6              MR. ASHKER:  OKAY, THANK YOU.

7              MR. ANDRADA:  I HAVE ABOUT FIVE MINUTES, YOUR HONOR.

8              THE COURT:  ALL RIGHT.

9                      CROSS-EXAMINATION

10   BY MR. ANDRADA:

11   Q.   MR. DODGEN, CAN YOU SEE ME?

12   A.   YES, I CAN.

13   Q.   YOU CAN HEAR ME ALL RIGHT?

14   A.   YES.

15   Q.   YOU MENTIONED, SIR, THAT IT WAS YOUR OPINION THAT MOST OF

16   THE GAINS THAT MR. ASHKER HAD ACHIEVED COULD BE MAINTAINED IN

17   A, IF YOU WILL, A HOME EXERCISE PROGRAM.

18              IS THAT YOUR TESTIMONY?

19   A.   YES.

20   Q.   PLEASE EXPLAIN WHAT YOU MEANT BY THAT.

21   A.   WELL, CONTINUE TO DO STRETCHES TO MAINTAIN THE RANGE OF

22   MOTION, AND THEN USING SOME KIND OF RESISTANCE, LIKE HE HAS THE

23   BALL, AND JUST TO WORK THE FOREARM MUSCLES.  SO USE OF

24   RESISTANCE EXERCISES AND STRETCHING TO MAINTAIN MOBILITY AND

25   STRENGTH.
```

DODGEN – CROSS / MR. ANDRADA

1    Q.    AND, AGAIN, HE CAN DO ALL OF THAT IN HIS CELL OR IN THE

2    YARD TO WHICH HE HAS ACCESS; IS THAT CORRECT?

3    A.    I FELT THAT HE COULD, YES.

4    Q.    AND SO THEN THAT WOULD PRECLUDE, IN YOUR OPINION, THEN THE

5    NEED FOR FORMAL PHYSICAL THERAPY FROM A THERAPIST, CORRECT?

6    A.    THAT'S RIGHT, YES.

7    Q.    AND SO HE NO LONGER, IN YOUR MIND, NO LONGER NEEDED FORMAL

8    PHYSICAL THERAPY FROM A THERAPIST CERTAINLY IN FEBRUARY OF 2007

9    WHEN YOU STOPPED GIVING HIM THERAPY, CORRECT?

10   A.    YES.

11   Q.    AND TRUTH BE TOLD, HE -- YOU WERE ALSO OF THE OPINION, ARE

12   YOU NOT, THAT HE REALLY DIDN'T NEED FORMAL PHYSICAL THERAPY

13   FROM A THERAPIST EVEN BEFORE FEBRUARY OF 2007; ISN'T THAT

14   CORRECT?

15   A.    YES.

16   Q.    AND WHEN, IN FACT, DID HE CEASE TO NEED FORMAL PHYSICAL

17   THERAPY FROM A THERAPIST, IN YOUR OPINION?

18   A.    WELL, WHEN -- HE CAME BACK FOR THE ULNAR NERVE THINGS HE

19   MENTIONED.  THEN THERE WAS A TIME PROBABLY AROUND '02, '01 OR

20   '02 THAT I FELT IT WAS NO LONGER NECESSARY.  THAT WAS THE POINT

21   WHEN I WAS ASKED TO CONTINUE.

22   Q.    SO, IN OTHER WORDS, FROM YOUR POINT OF VIEW, HE DIDN'T

23   NEED FORMAL PHYSICAL THERAPY FROM A THERAPIST AFTER 2002,

24   CORRECT?

25   A.    THAT'S RIGHT.

1    **MR. ANDRADA:**  THANK YOU VERY MUCH, SIR.  THAT'S ALL

2   I HAVE.

3                    **REDIRECT EXAMINATION**

4   **BY MR. ASHKER:**

5   **Q.**   WELL, MR. DODGEN, CAN YOU EXPLAIN THEN WHY ON MAY 20TH,

6   2005, IN YOUR PHYSICAL THERAPY DISCHARGE SUMMARY IN YOUR

7   RECOMMENDATION SECTION YOU STATED IN YOUR RECOMMENDATION:

8            CONTINUE WHIRLPOOL AS PART OF PAIN MANAGEMENT.

9            CONSIDER TEAM CONFERENCE TO REVIEW AND DETERMINE

10           BEST COURSE OF ACTION FOR PATIENT'S ONGOING CARE

11           REGARDING HIS CHRONIC CONDITION.

12  **A.**   I WROTE THAT BECAUSE I DID NOT FEEL THAT THERAPY WAS

13  NECESSARY, BUT I WAS BEING ASKED TO PROVIDE IT.  THEREFORE, I

14  FELT THERE NEEDED TO BE SOME RESOLUTION TO THIS PROBLEM SO YOU

15  COULD GET WHAT YOU NEEDED, BUT NOT NECESSARILY INVOLVING ACTIVE

16  PHYSICAL THERAPY.

17  **Q.**   OKAY.

18           NOW, BY THAT, I MEAN, YOU -- THE THERAPY WAS TO

19  CONTINUE -- WELL, OKAY.

20           YOU STATED IN YOUR PHYSICAL THERAPY DISCHARGE

21  SUMMARY WITH DATES 7/19/05 IN YOUR RECOMMENDATION SECTION THAT

22  PATIENT HAS ACHIEVED GOOD SYMPTOM CONTROL, VARIOUS DEGREES OF

23  PAIN LEVELS IN FOREARM AND HAND.  HE GENERALLY IMPROVES WITH

24  PERIODS OF REST AND WITH PHYSICAL THERAPY.

25           SO THE PHYSICAL THERAPY WAS ALWAYS BENEFICIAL AND

1    YOU JUST FELT THAT I DIDN'T NEED YOU THERE TO TELL ME HOW TO DO

2    IT; IS THAT CORRECT?

3    **A.**   IT SOUNDS LIKE THERE'S A LOT OF PARTS TO THAT QUESTION,

4    BUT I FEEL THAT MY SERVICES AS A PHYSICAL THERAPIST WERE NOT

5    NEEDED AT THAT POINT.

6    **Q.**   BUT THE ABILITY TO MAINTAIN MY ARM IN A HEALTHY CONDITION

7    AS POSSIBLE, YOU ADMIT THAT THAT IS IMPORTANT; IS THAT CORRECT?

8    **A.**   SURE.  YOU WANT TO MAINTAIN YOUR STRENGTH AND RANGE OF

9    MOTION AS WE DISCUSSED BEFORE, AND THE PAIN CONTROL IS A WHOLE

10   NOTHER ISSUE.

11          **MR. ASHKER:**  THANK YOU, MR. DODGEN.  I HAVE NO

12   FURTHER QUESTIONS.

13          **THE COURT:**  I NEED AN EXHIBIT NUMBER FOR THAT OTHER

14   EXHIBIT YOU WERE REFERRING TO.

15          **MR. ASHKER:**  THIS IS 170.

16          **THE COURT:**  WE HAVE 170.  THAT'S A NOTE FROM

17   MARCH 1ST OF '07.  JUST NOW YOU WERE REFERRING TO SOMETHING IN

18   '05.

19          **MR. ASHKER:**  THEY WERE ALL PART OF THAT EXHIBIT.

20   ALL THE PHYSICAL THERAPY, EVERY ONE OF THEM.

21          **THE COURT:**  ALL RIGHT.

22          DID YOU HAVE ANYTHING ELSE THEN?

23          **MR. ANDRADA:**  NOTHING, YOUR HONOR.  THANK YOU VERY

24   MUCH, MR. DODGEN.

25          **MR. LAURIE:**  WE HAVE TWO OTHER WITNESSES READY TO GO

1   WHEN NEEDED, BUT IT'S OUR UNDERSTANDING THAT WE ARE GOING TO BE

2   SHUTTING OFF AT THIS END?

3           **THE COURT:**  WELL, JUST HOLD ON FOR A SECOND.  I WAS

4   CONCERNED ABOUT DR. WINSLOW BECAUSE I KNOW YOU SAID HE HAD

5   SCHEDULING PROBLEMS.

6           **MR. ANDRADA:**  I BELIEVE HE'S STILL READY TO GO.

7           **THE COURT:**  DO YOU WANT TO GO TO WINSLOW NOW OR DO

8   YOU WANT TO DO THESE OTHER TWO?

9           **MR. ANDRADA:**  THANK YOU FOR ASKING, YOUR HONOR.  I

10  THINK TO GIVE MR. ASHKER THE COURTESY TO FINISH HIS CASE, HE

11  CAN CALL DR. WINSLOW.

12          **THE COURT:**  OKAY.  IS THAT A TECHNICAL PROBLEM?  CAN

13  WE SWITCH OVER TO WINSLOW?

14          THAT'S ALL FOR YOU, MR. DODGEN.  THANK YOU.

15          AND WE WILL GO OVER TO -- MR. LAURIE, WE'LL DO

16  DR. WINSLOW NEXT AND THEN WE'LL COME BACK TO YOUR LOCATION IF

17  WE HAVE TIME TODAY TO FINISH UP THOSE OTHER TWO WITNESSES.

18          **MR. LAURIE:**  THANK YOU, YOUR HONOR.

19          **THE COURT:**  IF YOU WANT TO STAND UP AND STRETCH

20  WHILE WE GET DR. WINSLOW ON CAMERA.

21          **THE WITNESS:**  GOOD AFTERNOON.

22          **THE COURT:**  THE CLERK WILL SWEAR YOU IN.  YOU CAN

23  REMAIN SEATED AND RAISE YOUR RIGHT HAND.

24          **THE CLERK:**  RAISE YOUR RIGHT HAND.

25

1          **DWIGHT WINSLOW,**

2    CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

3    TESTIFIED AS FOLLOWS VIA VIDEOCONFERENCE:

4              **THE WITNESS:**  I DO.

5              **THE CLERK:**  PLEASE STATE YOUR FULL NAME, SPELLING

6    YOUR LAST NAME FOR THE RECORD.

7              **THE WITNESS:**  DWIGHT WALTER WINSLOW, W-I-N-S-L-O-W.

8              **THE COURT:**  ALL RIGHT.

9                    **DIRECT EXAMINATION**

10   **BY MR. ASHKER:**

11   **Q.**   GOOD AFTERNOON, DR. WINSLOW.  THIS IS TODD ASHKER HERE.

12             DO YOU KNOW WHO I AM?

13   **A.**   GOOD AFTERNOON.

14   **Q.**   DO YOU REMEMBER ME?

15   **A.**   I DON'T THINK WE HAVE EVER MET.

16             HAVE WE, MR. ASHKER?

17   **Q.**   YES, SIR.  YOU PROVIDED ME WITH MEDICAL CARE PERSONALLY

18   AROUND, BETWEEN 1993 AND 1995.

19   **A.**   ALL RIGHT.  FORGIVE ME.  THANK YOU.

20             I FORGOT.

21   **Q.**   CAN YOU PLEASE STATE YOUR CREDENTIALS?

22   **A.**   WELL, I AM A MEDICAL DOCTOR.  I HAVE A DEGREE IN MEDICINE,

23   AND I AM ALSO BOARD CERTIFIED IN INTERNAL MEDICINE THROUGH THE

24   AMERICAN BOARD OF INTERNAL MEDICINE.

25   **Q.**   AND AT WHAT YEARS DID YOU WORK IN PELICAN BAY STATE

WINSLOW – DIRECT / MR. ASHKER

1   PRISON?

2   **A.**   I STARTED IN ABOUT SEPTEMBER OF 1990 AND I LEFT PELICAN

3   BAY SOMETIME IN THE FALL OF 2005.

4   **Q.**   OKAY.  AND AT SOME POINT YOU BECAME THE CHIEF MEDICAL

5   OFFICER THERE; IS THAT CORRECT?

6   **A.**   THAT'S CORRECT.

7   **Q.**   OKAY.  AND AS PART OF YOUR DUTIES AS A CHIEF MEDICAL

8   OFFICER WAS TO APPROVE NONFORMULARY MEDICATIONS; IS THAT

9   CORRECT?

10  **A.**   THAT'S CORRECT.

11  **Q.**   AND ARE YOU FAMILIAR WITH THE MEDICATION TRAMADOL?

12  **A.**   YES, I AM.

13  **Q.**   CAN YOU DESCRIBE WHAT TRAMADOL IS FOR?

14           STRIKE THAT.  THAT'S UNNECESSARY.

15           I WILL PRESENT TO YOU THAT BETWEEN THE TIME PERIOD

16  OF JANUARY 22ND, 2002 AND JANUARY 1ST OF 2006, I WAS ON

17  50 MILLIGRAMS OF TRAMADOL TWICE A DAY WITH TYLENOL PRESCRIBED

18  FOR MY RIGHT ARM PAIN.

19           DURING THAT TIME PERIOD, WERE YOU THE CHIEF MEDICAL

20  OFFICER?

21  **A.**   YES.  WELL, FOR MOST OF THAT TIME.

22  **Q.**   AND SO FOR MOST OF THAT TIME WHEN YOU WERE IN THAT OFFICE,

23  YOU WOULD HAVE BEEN THE ONE TO APPROVE THAT -- FIRST OFF, WAS

24  TRAMADOL A NONFORMULARY MEDICATION?

25  **A.**   I BELIEVE SO.

1    **Q.**   AND DURING THAT TIME PERIOD, IS IT NOT TRUE THAT YOU WOULD

2    HAVE BEEN THE ONE TO APPROVE THAT MEDICATION FOR ME?

3    **A.**   THAT WOULD HAVE BEEN THE NORMAL COURSE OF BUSINESS.

4    **Q.**   OKAY.  AND ARE YOU FAMILIAR WITH THE DRUG TRAMADOL?

5    **A.**   YES.

6    **Q.**   AND I JUST DESCRIBED TO YOU THAT I WAS ON THAT MEDICATION

7    FOR A FOUR-YEAR TIME PERIOD; IS THAT CORRECT?

8    **A.**   WELL, I DON'T HAVE THE RECORDS, MR. ASHKER, BUT I DO

9    RECOLLECT YOU BEING ON TRAMADOL FOR A PERIOD OF TIME.

10             I DON'T, I CAN'T TESTIFY TO EXACTLY THE DATES OF

11   STARTING AND STOPPING.  I AM AWARE THAT YOU WERE ON TRAMADOL.

12   **Q.**   I AM PRESENTING TO YOU THAT THAT IS, IN FACT, TRUE.

13             AND THAT DIDN'T POSE ANY LIKE CONCERNS FOR YOU?

14             **MR. ANDRADA:**  OBJECTION, NO FOUNDATION --

15             **THE WITNESS:**  ANY TIME ANY -- EXCUSE ME?

16             **MR. ANDRADA:**  WITHDRAW THE OBJECTION.

17             **THE COURT:**  GO AHEAD.

18   **BY MR. ASHKER:**

19   **Q.**   YOU MAY ANSWER.

20   **A.**   I THINK ANY TIME ANYBODY PRESCRIBES MEDICATIONS,

21   ESPECIALLY PRESCRIPTION MEDICATIONS, WE DO HAVE CONCERNS.

22   THERE ARE -- THEY ARE PRESCRIPTION MEDICATIONS FOR A REASON

23   BECAUSE THERE ARE POTENTIAL SIDE EFFECTS, AND THERE ARE

24   BENEFITS.  SO ANY TIME YOU PRESCRIBE MEDICATIONS, YOU HAVE TO

25   WEIGH THE POTENTIAL BENEFITS OF THE MEDICATION AGAINST THE

WINSLOW – DIRECT / MR. ASHKER

1    POTENTIAL RISKS.

2              SO ONE DOES HAVE TO BE MONITORED PERIODICALLY

3    DEPENDING UPON WHAT THE MEDICATION IS FOR SIDE EFFECTS AND ALSO

4    FOR ITS EFFECTIVENESS TO DECIDE WHETHER OR NOT ONE SHOULD

5    CONTINUE PRESCRIBING THE MEDICATION OR NOT, OR ANY OTHER

6    TREATMENT FOR THAT MATTER.

7    **Q.**   OKAY.

8              AND I WOULD ASSUME THAT WHEN YOU APPROVED THE

9    MEDICATION FOR ALL THAT TIME IT WAS BASED ON YOUR FINDING THAT

10   THE BENEFITS OUTWEIGHED THE RISK; IS THAT CORRECT?

11   **A.**   NOT EXACTLY.  I DON'T PRESCRIBE THE MEDICATION DIRECTLY.

12   THE PROVIDERS RECOMMENDED, YOUR PROVIDERS ARE THE ONES THAT

13   DECIDE WHAT YOU MAY OR MAY NOT NEED.

14             I SIMPLY APPROVE WHEN THE FORMULARIES COME, I

15   APPROVE WHETHER OR NOT WE SHOULD PRESCRIBE IT OFF FORMULARY.  I

16   DON'T DIRECTLY PRESCRIBE THE MEDICATION.  I MAKE AN APPROVAL OF

17   THE DOCTOR'S RECOMMENDATIONS.

18   **Q.**   OKAY.

19             AND CAN YOU DESCRIBE WHAT YOU MEAN BY -- WELL STRIKE

20   THAT.  WE HAVE ALREADY HEARD TESTIMONY.

21             SO WITH MY HISTORY, I WILL PRESENT TO YOU THAT I

22   HAVE -- BETWEEN 1990 -- YOU ARE AWARE OF MY INJURY WITH THE

23   GUNSHOT WOUND AND THE ALL THE INJURY TO MY ARM AND ALL THE

24   PROCEDURES I HAVE HAD.

25             DO YOU HAVE A RECOLLECTION OF SOME OF THAT?

WINSLOW – DIRECT / MR. ASHKER

1    **A.**   I AM PERFECTLY AWARE OF, MR. ASHKER, OF YOUR INJURIES.

2    **Q.**   YOU ARE PERSONALLY?

3    **A.**   I NEVER EXAMINED YOU PERSONALLY, I DON'T BELIEVE.  MAYBE I

4    HAVE, BUT I DON'T RECALL THE EXAMINATION, BUT I AM AWARE OF

5    YOUR INJURIES IN A GENERAL SENSE.

6    **Q.**   OKAY.  AND BASED ON YOUR AWARENESS, WOULD YOU CONSIDER THE

7    INJURIES AND CONDITION OF MY ARM TO CONSTITUTE A SERIOUS

8    MEDICAL CONDITION?

9    **A.**   WELL, AGAIN, I MEAN OBVIOUSLY YOU'VE BEEN INJURED.  I

10   DON'T THINK ANYBODY IS DISPUTING THAT.  AND I HAVEN'T EXAMINED

11   YOU RECENTLY.  YOU DID SUFFER A SERIOUS INJURY, FROM MY

12   UNDERSTANDING.  I DON'T KNOW WHAT YOUR CURRENT STATUS IS, TO BE

13   HONEST WITH YOU, NOT HAVING EXAMINED YOU IN A PERIOD OF YEARS,

14   BUT I KNEW YOU DID SUFFER SERIOUS INJURY IN THE PAST AND HAVE

15   ONGOING DIFFICULTIES WITH YOUR ARM.

16   **Q.**   OKAY.

17        DO YOU HAVE ANY RECOLLECTION OF REFERRING ME TO

18   ORTHOPEDIC SPECIALISTS NUMEROUS TIMES IN BETWEEN THE TIME

19   PERIOD THAT YOU WERE CHIEF MEDICAL OFFICER AT PELICAN BAY STATE

20   PRISON?

21   **A.**   WELL, I DON'T THINK I MADE THE DIRECT REFERRALS.  I AM NOT

22   SURE EXACTLY WHAT PROCEDURES OR REFERRALS YOU HAD DONE IN

23   TOTAL, MR. ASHKER.  I WASN'T THE ONE THAT DIRECTLY PRESCRIBED

24   YOUR DRUGS OR YOUR TREATMENTS.  SO I AM AWARE YOU HAD

25   PROCEDURES, OR AT LEAST A CONSULTATIONS DONE, BUT I DON'T

WINSLOW – DIRECT / MR. ASHKER

1    RECOLLECT WHAT THEY WERE AT THIS TIME, MR. ASHKER.

2    **Q.**   OKAY.  CAN YOU PLEASE STATE WHAT YOUR CURRENT POSITION IS

3    WITHIN THE CDCR?

4    **A.**   RIGHT NOW I AM THE ACTING CHIEF MEDICAL OFFICER OF MEDICAL

5    SERVICES.

6    **Q.**   MEDICAL SERVICES, CAN YOU EXPLAIN THAT JUST A LITTLE BIT

7    BETTER?

8    **A.**   WELL, RIGHT NOW I WORK FOR THE RECEIVER AND I AM OVER ALL

9    OF THE CLINICAL SERVICES FOR THE DEPARTMENT, NURSING, MEDICAL,

10   ANCILLARY.

11   **Q.**   OKAY.  SO YOU ARE BASICALLY THE MEDICAL DOCTOR IN CHARGE

12   OF THE ENTIRE CDCR SYSTEM AT THIS POINT; IS THAT CORRECT?

13   **A.**   I, THAT'S -- I AM THE CHIEF MEDICAL OFFICER.  I AM THE

14   HEAD OF THE MEDICAL SERVICES AND I ADVISE THE RECEIVER ON

15   MEDICAL ISSUES.

16   **Q.**   AND DO -- ARE PATIENTS IN THE CDCR ENTITLED TO INFORMED

17   CONSENT?

18   **A.**   I THINK ALL PATIENTS ENTITLED TO AN INFORMED CONSENT.

19   THAT'S PART OF THE PROCESS.

20   **Q.**   SO IS IT PROPER TO TELL A PATIENT, A PRISONER IN THE CDCR,

21   SAY, FOR INSTANCE, I WILL GIVE YOU AN EXAMPLE.  I HAVE BEEN ON

22   ELAVIL FOR MANY YEARS OFF AND ON AND EXPERIENCED SIDE EFFECTS.

23   I WILL DESCRIBE THEM FOR YOU.  THEY WOULD BE LETHARGY, VISION

24   PROBLEMS, BALANCE PROBLEMS, MY LEFT EYELID AND WHOLE LEFT SIDE

25   OF MY CHEEK WILL BEGIN TO START HAVING INVOLUNTARY MUSCLE

 1   SPASMS.  AND BASED ON THOSE SIDE EFFECTS, AT VARIOUS TIMES I

 2   HAVE TRIED THE DRUG, THE SIDE EFFECTS COME BACK AND I WILL STOP

 3   IT.  AND I HAVE ASKED IF THERE'S OTHER MEDICATION FOR THE NERVE

 4   PAIN, AND, FOR INSTANCE, DR. FRIEDMAN IN 2002 LAUGHED IN MY

 5   FACE AND TOLD ME TO TAKE THE MEDICATION ANYWAY.

 6            IS THAT AN APPROPRIATE WAY FOR A DOCTOR TO TREAT A

 7   PATIENT IN THE CDCR SYSTEM?

 8            **MR. ANDRADA:**  OBJECTION, RELEVANCE, 403.

 9            **THE COURT:**  THAT'S NOT AN APPROPRIATE QUESTION.

10            **MR. ASHKER:**  IT'S NOT?

11            **MR. ANDRADA:**  ARGUMENTATIVE.

12   **BY MR. ASHKER:**

13   **Q.**  DR. WINSLOW, IS IT PROPER TO INSIST -- GIVE A PATIENT A

14   CHOICE BETWEEN TAKING A MEDICATION TO DEAL WITH HIS PAIN

15   CONDITION, TAKE THAT ONE MEDICATION OR LEAVE IT, YOU DON'T GET

16   NOTHING ELSE?

17            **MR. ANDRADA:**  OBJECTION, YOUR HONOR, ARGUMENTATIVE,

18   NO FOUNDATION, OVERLY BROAD, VAGUE AND AMBIGUOUS.

19            **THE COURT:**  SUSTAINED.

20   **BY MR. ASHKER:**

21   **Q.**  DR. WINSLOW, IS IT APPROPRIATE TO INSIST THAT A PATIENT

22   CONTINUE TO TAKE MEDICATIONS THAT ARE CAUSING HIM HARM?

23            **MR. ANDRADA:**  OBJECTION, VAGUE AND AMBIGUOUS, OVERLY

24   BROAD.

25            **THE COURT:**  OVERRULED.

1        **MR. ANDRADA:**  NO FOUNDATION AS TO ANY SPECIFIC

2   SITUATION.

3        **THE COURT:**  OVERRULED.

4   **BY MR. ASHKER:**

5   **Q.**   YOU MAY ANSWER.

6   **A.**   WELL, THAT'S A DIFFICULT QUESTION TO ANSWER, MR. ASHKER.

7   I THINK OBVIOUSLY WHEN YOU PRESCRIBE A MEDICATION, OR ANY

8   TREATMENT FOR THAT MATTER, YOU HOPE THAT THE BENEFIT WILL

9   OUTWEIGH ANY RISK INVOLVED.  AND OUR FIRST ORDER OF BUSINESS IS

10  TO DO NO HARM.

11        SO, GENERALLY SPEAKING, ALTHOUGH THERE ARE MANY

12  CASES WHERE MEDICATIONS HAVE SERIOUS SIDE EFFECTS AND YOU DO

13  PROCEED, SUCH CHEMOTHERAPY, FOR EXAMPLE.  TO SAVE A LIFE, YOU

14  MAY TAKE A MEDICATION THAT HAS RATHER SEVERE SIDE EFFECTS

15  INCLUDING RISKS OF DEATH, BUT TO ACHIEVE A BETTER OUTCOME.

16        BUT, IN GENERAL, YOU VERY, VERY CAREFUL BEFORE YOU

17  RECOMMEND A COURSE OF TREATMENT THAT WOULD BE CONSIDERED

18  HARMFUL OR HAVE SERIOUS SIDE EFFECTS.  ALTHOUGH SOMETIMES

19  PEOPLE DO ELECT TO PROCEED WITH TREATMENTS THAT, SUCH AS

20  SURGERY, THAT ACTUALLY CAUSE HARM BUT EVENTUALLY MAY END UP

21  DOING SOME GOOD.

22        SO IT'S A DIFFICULT QUESTION TO ANSWER WITHOUT SOME

23  SPECIFICS.  BUT IN GENERAL, WE NEED TO EVALUATE CAREFULLY

24  WHETHER THE RISKS OF A TREATMENT ARE GREATER THAN THE BENEFITS.

25  SOMETIMES WE DO PROCEED WITH RATHER UNPLEASANT TREATMENTS UNDER

1    CERTAIN CIRCUMSTANCES.

2    **Q.**   I WOULD PRESENT TO YOU THEN THAT I WAS TAKEN OFF TRAMADOL

3    IN 2006, AND -- IN SEPTEMBER 2006, AND I WAS PUT ON THE -- I

4    WILL ALSO PRESENT TO YOU THAT DURING THE 4.9 YEAR TIME PERIOD I

5    WAS ON THE TRAMADOL IT WAS THE MOST EFFECTIVE PAIN MEDICATION.

6    I WAS ON THE LOW DOSE OF 50 MILLIGRAMS TWICE A DAY WITH TYLENOL

7    COMBINATION.  I NEVER HAD ANY SIDE EFFECTS.  WHEN I FIRST

8    STARTED ON IT, IT MADE ME A LITTLE BIT WIRED, BUT AFTER A FEW

9    WEEKS OR MONTHS IT PASSED, AND IT WOULD JUST, IT WOULD ENABLE

10   ME TO CARRY OUT MY DAILY ACTIVITIES BETTER.  I WAS ABLE TO LIKE

11   HAVE BETTER PAIN CONTROL.  THE PAIN NEVER WENT ALL THE WAY

12   AWAY, BUT THE THING IS --

13           **THE COURT:**  YOU NEED TO FINISH UP THIS QUESTION AND

14   TURN IT INTO A QUESTION.

15           **MR. ASHKER:**  OKAY.

16   **BY MR. ASHKER:**

17   **Q.**   THE MEDICATION WAS CHANGED TO NSAIDS, LOW DOSE

18   400 MILLIGRAMS IBUPROFEN AND 1300 MILLIGRAMS OF TYLENOL.  AND I

19   HAVE A HISTORY OF PROBLEMS, STOMACH GI PROBLEMS WITH NSAID USE.

20           AS SOON AS I STARTED ON THAT, IT WAS NOT EFFECTIVE

21   FOR THE PAIN AND I BEGAN TO HAVE STOMACH PROBLEMS.  I HAD

22   CHRONIC DIARRHEA.  IT RESULTED IN SLEEP DEPRIVATION.

23           IS THAT APPROPRIATE TREATMENT?

24   **A.**   WELL, MR. ASHKER, SOUNDS LIKE YOU ARE HAVING SOME

25   PROBLEMS.  UNFORTUNATELY, I AM SORRY ABOUT THAT.  IT'S

1    DIFFICULT FOR ME TO ANSWER IN A DEFINITIVE MANNER NOT HAVING

2    YOUR MEDICAL RECORDS IN FRONT OF ME OR EXAMINING -- HAVING

3    EXAMINED YOU RECENTLY.

4            BUT THE SYMPTOMS YOU DESCRIBE WOULD NEED TO BE TAKEN

5    INTO CAREFUL CONSIDERATION AS YOU ARE PRESCRIBED TREATMENTS FOR

6    YOUR MEDICAL CONDITION.

7            AGAIN, IT IS VERY HARD FOR ME TO ANSWER YES OR NO AS

8    A PHYSICIAN NOT KNOWING ALL OF YOUR CURRENT HISTORY AND YOUR

9    CURRENT STATUS.  SO, AGAIN, I DON'T MEAN TO BE EVASIVE, IT'S

10   DIFFICULT TO GIVE YOU A MEDICAL OPINION WITHOUT HAVING REALLY

11   EXAMINED YOU AND YOUR RECORDS CAREFULLY.

12   Q.   SO WHAT YOU ARE SAYING IS, IN MY TYPE OF CONDITION, IT --

13   AN ACTUAL PHYSICAL EXAMINATION IS VERY IMPORTANT; IS THAT

14   CORRECT?

15           **MR. ANDRADA:**  OBJECTION, VAGUE AND AMBIGUOUS.

16           **THE WITNESS:**  I THINK --

17           **THE COURT:**  OVERRULED.

18           **MR. ANDRADA:**  FOR WHAT PURPOSE?

19           **THE COURT:**  FOR THE PURPOSE HE JUST STATED.

20           **THE WITNESS:**  OKAY.

21   **BY MR. ASHKER:**

22   Q.   YOU MAY ANSWER.

23           **THE COURT:**  YOU MAY ANSWER.

24           **THE WITNESS:**  OKAY.  WELL, AGAIN, MR. ASHKER, ANY

25   TIME ANYBODY IS PRESCRIBING THERAPIES, IT'S BEST TO HAVE A FULL

1   PICTURE OF WHAT'S GOING ON, WHICH, USUALLY, NOT ALWAYS, BUT

2   USUALLY INCLUDES REVIEW OF THE RECORDS AND EXAMINATION OF THE

3   PATIENT.

4   **BY MR. ASHKER:**

5   **Q.**   OKAY.

6        NOW, YOU SAID NOT ALWAYS.  I AM SPECIFICALLY

7   REFERRING TO A CONDITION LIKE MINE WITH MY 16, 19 YEARS OF

8   ONGOING PROBLEMS, AND PAIN, AND ALL KINDS OF ISSUES.  IN THAT

9   CIRCUMSTANCE RIGHT THERE, HOW IMPORTANT IS AN ACTUAL CAREFUL,

10  THOROUGH PHYSICAL EXAMINATION BEFORE MAKING DECISIONS ON

11  MEDICATIONS AND PAIN MANAGEMENT?

12  **A.**   WELL, I WOULD EXPECT THAT GENERALLY YOU SHOULD HAVE A

13  REVIEW OF YOUR CONDITION AND SOME, AND APPROPRIATE EXAMINATION

14  DONE WHEN CHANGES ARE MADE.

15  **Q.**   WOULD MY TYPE OF CONDITION MERIT PERIODIC FOLLOW-UPS WITH

16  AN ORTHOPEDIC OR PAIN MANAGEMENT SPECIALIST?

17        **MR. ANDRADA:**  NO FOUNDATION, YOUR HONOR.  HE HAS

18  INDICATED THAT HE HAS NEVER SEEN THE RECORDS AND THERE IS NO

19  FOUNDATION.

20        NOW WE ARE GETTING INTO AN AREA WHERE THIS WITNESS

21  WAS NEVER DISCLOSED FOR PURPOSES OF TESTIMONY.

22        **THE COURT:**  OVERRULED.

23        **MR. ASHKER:**  YES, HE WAS.

24        **THE COURT:**  HE MAY ANSWER IF HE IS ABLE TO.  IF HE

25  IS NOT ABLE TO ANSWER, I AM SURE HE WON'T.

1    **BY MR. ASHKER:**

2    **Q.**   YOU MAY ANSWER, DR. WINSLOW.

3    **A.**   OKAY.  OKAY.  SO I UNDERSTAND, CAN YOU REPEAT THE QUESTION

4    AGAIN, MR. ASHKER?  I APOLOGIZE.

5    **Q.**   YES, SIR.

6                    **THE COURT:**  WE WILL HAVE IT READ BACK.

7                    **MR. ASHKER:**  THEY WILL READ IT BACK TO YOU.

8                    (QUESTION READ BACK AS FOLLOWS:

9                    WOULD MY TYPE OF CONDITION MERIT PERIODIC

10                   FOLLOW-UPS WITH AN ORTHOPEDIC OR PAIN MANAGEMENT

11                   SPECIALIST?)

12                   **THE WITNESS:**  OKAY.

13                   WELL, AGAIN, IT IS GOING TO BE HARD TO ANSWER

14   WITHOUT KNOWING YOUR CURRENT STATUS.  WHILE CERTAINLY YOU MAY

15   FROM TIME TO TIME NEED EVALUATIONS BY PAIN MANAGEMENT

16   SPECIALISTS, ORTHOPEDICS, MANY CONDITIONS OF CHRONIC PAIN AND

17   CHRONIC ILLNESSES THAT PLAGUE US FROM TIME TO TIME CAN BE

18   HANDLED BY OUR PRIMARY CARE PROVIDERS WITHOUT SPECIAL

19   CONSULTATION.  BUT AT CERTAIN TIMES IT MAY REQUIRE THAT

20   DEPENDING UPON THE CONDITIONS THAT THE PRIMARY CARE PROVIDER

21   MIGHT FIND OR WHETHER OR NOT YOUR TREATMENTS ARE PROGRESSING IN

22   AN APPROPRIATE MANNER.

23                   SO YOU CAN PROBABLY BE FOLLOWED AND MOSTLY BE

24   FOLLOWED BY THE PRIMARY CARE PROVIDER FOR MOST OF THE PROBLEM,

25   BUT ONE MAY FROM TIME TO TIME NEED TO SEE CONSULTATION.

1    **BY MR. ASHKER:**

2    **Q.**   I WILL PRESENT TO YOU THAT DURING THE TIME PERIOD THAT YOU

3    WERE THE CHIEF MEDICAL OFFICER, THERE WERE SEVERAL OCCASIONS

4    WHERE I COMPLAINED ABOUT NOT RECEIVING ADEQUATE CARE FROM MY

5    PRIMARY CARE PROVIDER ON PAIN MANAGEMENT AND ARM CARE ISSUES,

6    AND I SUBMITTED 602 APPEALS AND YOU GRANTED THOSE 602 APPEALS

7    AND HAD ME REFERRED TO ORTHOPEDIC SPECIALISTS.

8              IS THAT APPROPRIATE?

9    **A.**   WELL, I DON'T HAVE IT IN FRONT OF ME, MR. ASHKER, BUT I AM

10   GOING TO GUESS OR I AM GOING TO ASSUME AT THAT TIME WHEN I READ

11   THOSE REPORTS AND READ YOUR APPEALS THAT I FELT THAT -- I MUST

12   HAVE FELT THAT WAS A REASONABLE DECISION AND I SIGNED THE

13   APPEALS IN THAT MANNER.

14             WITHOUT IT IN FRONT OF ME, I DON'T KNOW THE

15   SPECIFICS, BUT IF I SIGNED THEM, I GET THAT POINT, I MUST HAVE

16   FELT THAT WAS THE BEST DECISION.

17   **Q.**   I WILL GO ON TO ANOTHER ISSUE.

18             ARE YOU FAMILIAR WITH MY 2002 FEDERAL COURT

19   SETTLEMENT AGREEMENT WHEREIN CDCR AGREED TO PROVIDE ME WITH A

20   PAIN MANAGEMENT REFERRAL CONSULTATION AND EXAMINATION BY UC

21   DAVIS MEDICAL CENTER PAIN CLINIC?

22   **A.**   AT SOME POINT I WAS AWARE OF IT.  I HAVEN'T REVIEWED IT

23   LATELY, MR. ASHKER, BUT I AM AWARE THERE IS A SETTLEMENT.

24   **Q.**   OKAY.  AND I WILL PRESENT TO YOU THAT THE SETTLEMENT

25   AGREEMENT WAS DATED MAY 24TH, 2002 AND THAT THERE HAS BEEN

1    TESTIMONY THROUGH DEPOSITION OF MEDICAL TECHNICAL ASSISTANT

2    MARY STATHAM THAT YOU HAD ASKED HER TO SUBMIT MY ROUTINE

3    REFERRAL TO UC DAVIS PAIN CLINIC ON OCTOBER 25TH, 2002.

4            DO YOU RECALL THAT?

5    **A.**   YES, I DID SUBMIT A REQUEST FOR YOU TO BE SEEN AT UC

6    DAVIS.

7    **Q.**   AND CAN YOU EXPLAIN WHY THERE WAS A FIVE-MONTH GAP THERE

8    BETWEEN THE TIME THAT THE SETTLEMENT AGREEMENT WAS SIGNED ON

9    MAY 24TH, 2002 AND THE TIME OF THE REFERRAL ON OCTOBER 25TH,

10   2002?

11            **MR. ANDRADA:**  YOUR HONOR --

12            **THE WITNESS:**  I DON'T HAVE ANY RECOLLECTION.  I AM

13   SORRY.

14            **MR. ANDRADA:**  THAT'S FINE.

15   **BY MR. ASHKER:**

16   **Q.**   AND CAN YOU EXPLAIN WHY YOU ASKED MS. STATHAM TO MAKE THE

17   REFERRAL TO UC DAVIS PAIN CLINIC A ROUTINE REFERRAL?

18   **A.**   I DON'T HAVE A RECOLLECTION OF THE FACTS AT THAT TIME WHY

19   IT WAS ROUTINE.  I DON'T KNOW WHY IT WOULD HAVE BEEN ANYTHING

20   OTHER THAN A REFERRAL FOR ROUTINE.  IT WASN'T AN EMERGENCY, SO

21   I WOULD IMAGINE THAT A ROUTINE MEANS GO ABOUT IT IN THE NORMAL

22   FASHION AND GET A REFERRAL, GET A CONSULTANT TO SEE THE PATIENT

23   IN THE NORMAL FASHION.

24   **Q.**   SO, YOU THINK -- YOUR BELIEF IS, IS THAT FEDERAL COURT

25   SETTLEMENT AGREEMENT WHERE CDCR PROMISED TO REFER ME FOR

1    CONSULTATION AND EXAMINATION BY UC DAVIS WAS ROUTINE?

2    **A.**   I AM JUST RESPONDING TO THE MEDICAL ROUTINE VERSUS URGENT

3    OR EMERGENT.  I DON'T HAVE ANY -- I AM NOT GOING TO MAKE A

4    JUDGMENT CALL ABOUT THE FEDERAL COURT SETTLEMENT.

5             ALL I AM SUGGESTING IS WHEN I MAKE A REFERRAL TO A

6    MEDICAL FACILITY, YOU MAKE IT BASED UPON THE URGENCY OF THE

7    PATIENT.  AND YOU WOULD GENERALLY CLASSIFY THEM URGENT,

8    EMERGENT OR ROUTINE.

9             AND IN A CONDITION WHERE YOU HAVE CHRONIC PAIN, THAT

10   WOULD INDICATE THAT IT'S NOT EMERGENT OR URGENT AND, THEREFORE,

11   WE MAKE AN APPROPRIATE REFERRAL, AND IT WOULD BE IN THE ROUTINE

12   CATEGORY IN TERMS OF THE MEDICAL NEED AT THAT TIME.

13   **Q.**   OKAY.  YOU ARE FAMILIAR WITH GOOD FAITH IN EXECUTION OF A

14   CONTRACT; IS THAT CORRECT?

15           **MR. ANDRADA:**  WELL, YOUR HONOR --

16           **THE WITNESS:**  I AM FAMILIAR WITH THE CONCEPT, YES.

17           **MR. ANDRADA:**  ALL RIGHT.

18   **BY MR. ASHKER:**

19   **Q.**   OKAY.

20           MY QUESTION IS, WHY WAS THERE NO REFERENCE IN THAT

21   OCTOBER 25TH, 2002 REFERRAL THAT THIS REFERRAL WAS BEING MADE

22   SPECIFICALLY IN RESPONSE TO MY FEDERAL COURT SETTLEMENT

23   AGREEMENT SPECIFICATIONS?

24           **MR. ANDRADA:**  CALLS FOR SPECULATION ON THE PART OF

25   THIS WITNESS.

1          **THE COURT:**  HE WAS THE ONE THAT DIRECTED THE

2     REFERRAL TO BE MADE I THOUGHT HE SAID.

3          **MR. ASHKER:**  YES.

4          **THE COURT:**  SO IT WOULDN'T BE SPECULATION ON HIS

5     PART, I DON'T THINK.  IF HE DOESN'T KNOW, I AM SURE HE WILL SAY

6     HE DOESN'T KNOW.

7          **MR. ANDRADA:**  OKAY.

8     **BY MR. ASHKER:**

9     **Q.**   YOU MAY ANSWER THE QUESTION.

10    **A.**   WELL, YOU KNOW, I DON'T REFER PEOPLE -- FIRST OF ALL, UC

11    DAVIS DOESN'T WANT TO KNOW ABOUT -- THEY ARE NOT INTERESTED IN

12    WHETHER OR NOT THERE'S A LEGAL ACTION OR NOT.

13          WHAT THEY ARE INTERESTED IN IS SEEING THE PATIENT.

14    SO I DON'T -- SO WE MADE A GOOD FAITH EFFORT TO REFER YOU.

15          I DON'T THINK IT IS GERMANE TO UC DAVIS AS TO

16    WHETHER OR NOT THERE IS AN AGREEMENT.  THEY ARE NOT BOUND BY AN

17    AGREEMENT.  OUR AGREEMENT WAS TO REFER YOU TO THE PAIN

18    MANAGEMENT AT UC DAVIS, WHICH WE DID.

19          AND, YOU KNOW, IT DOESN'T REALLY MATTER WHETHER OR

20    NOT -- TO UC DAVIS, WHETHER OR NOT THERE'S AN AGREEMENT BETWEEN

21    YOU AND THE COURTS AND PLAINTIFFS AND DEFENSE FOLK, BUT IT'S A

22    MEDICAL REFERRAL.  SO WE MADE IT UPON A MEDICAL BASIS JUST AS

23    WE AGREED TO DO.

24    **Q.**   IT WAS A MEDICAL REFERRAL IN RESPONSE TO A LEGAL CONTRACT;

25    IS THAT CORRECT?

WINSLOW – DIRECT / MR. ASHKER

1  **A.**   YES.  I MADE IT AS PART OF THE SETTLEMENT AGREEMENT.  I

2  MADE THE REFERRAL BASED UPON OUR AGREEMENT IN THE SETTLEMENT

3  REFERRAL.

4  **Q.**   AND YOUR TESTIMONY IS THAT YOU BELIEVE THAT FAILURE TO

5  REFERENCE ANYTHING ABOUT IT BEING IN RESPONSE TO A FEDERAL

6  COURT SETTLEMENT AGREEMENT WAS GOOD FAITH EXECUTION OF THE

7  AGREEMENT?

8  **A.**   AGAIN, I MADE THE REFERRAL BASED UPON A MEDICAL DECISION.

9  IT WASN'T -- I DON'T KNOW HOW THAT PLAYS INTO GOOD FAITH OR

10  NOT, MR. ASHKER.

11        WE REFERRED YOU TO UC DAVIS AND -- FOR THE PAIN

12  TREATMENT, AND I THINK IT'S IRRELEVANT FROM UC DAVIS' POINT OF

13  VIEW WHETHER THEY SHOULD SEE YOU OR NOT.  WHETHER THERE IS

14  AGREEMENT, THEY ARE NOT PART OF THE ACTION.  I REFERRED YOU

15  BECAUSE IT WAS A MEDICAL -- WE BELIEVED THERE WAS A REASONABLE

16  MEDICAL NEED FOR YOU TO GO SEE A PAIN SPECIALIST, SO THE

17  REFERRAL WAS MADE.

18  **Q.**   OKAY.  I WILL PRESENT TO YOU THAT YESTERDAY DR. KREIS

19  TESTIFIED THAT IF THEY -- IF IT WOULD HAVE HAD REFERENCE TO THE

20  2002 SETTLEMENT AGREEMENT IN THE REFERRAL RATHER THAN JUST

21  STATING IT WAS ROUTINE, IT WOULD HAVE BEEN HANDLED DIFFERENTLY.

22        **MR. ANDRADA:**  YOUR HONOR, I THINK THAT MISSTATES THE

23  TESTIMONY.

24        **THE COURT:**  HE SAID HE WOULD HAVE CONSULTED HIS

25  LEGAL DEPARTMENT.

1          YOU CAN REPHRASE THE QUESTION TO THAT EXTENT.

2     **BY MR. ASHKER:**

3     **Q.**   DR. KREIS SAID IF THAT REFERRAL, INSTEAD OF JUST STATING

4     IT WAS A ROUTINE MATTER AND HAD INCLUDED THAT IT WAS IN

5     RESPONSE TO A PROMISE MADE TO ME ON A LEGALLY BINDING FEDERAL

6     COURT SETTLEMENT AGREEMENT TO REFER ME TO UC DAVIS FOR A

7     CONSULT, EXAMINATION, AND A PROMISE TO FOLLOW ANY TREATMENT

8     PLAN THAT THEY CAME UP WITH, DR. KREIS TESTIFIED THAT HE WOULD

9     NOT HAVE DENIED IT OUTRIGHT, HE WOULD HAVE SENT IT TO HIS

10    LEGAL -- THE LEGAL DEPARTMENT FOR CONSIDERATION.

11          NOW, MY QUESTION TO YOU IS, WHY DIDN'T YOU DO THAT?

12          **MR. ANDRADA:**   IT IS ARGUMENTATIVE, YOUR HONOR,

13    ASSUMES -- IT'S ARGUMENTATIVE AS PHRASED, AND IT ASSUMES,

14    AGAIN, THAT HE SPECIFICALLY AUTHORED THE REFERRAL FORM, AND

15    THERE'S NO TESTIMONY THAT HE DID.  IN FACT, THERE IS TESTIMONY

16    THAT SOMEONE ELSE DID IT.

17          **THE COURT:**   OVERRULED.  AT HIS DIRECTION.

18    OVERRULED.

19    **BY MR. ASHKER:**

20    **Q.**   YOU MAY ANSWER THE QUESTION.

21    **A.**   I DON'T RECALL, MR. ASHKER, ALL THE THOUGHT PROCESS WE

22    WENT THROUGH AT THAT TIME.  I DON'T REALLY HAVE AN ANSWER FOR

23    YOU.

24    **Q.**   THANK YOU.

25          ANOTHER PART OF MY PHYSICAL THERAPY, ANOTHER PART OF

WINSLOW – DIRECT / MR. ASHKER

1   MY 2002 AGREEMENT WAS FOR PHYSICAL THERAPY TO CONTINUE UNTIL

2   CONTRAINDICATED.

3           DO YOU RECALL THAT PART OF MY AGREEMENT?

4   A.   NO, I DON'T.

5   Q.   OKAY.

6           WELL, I WILL PRESENT TO YOU I HAVE A MEMORANDUM

7   DATED JANUARY 31ST, 2003 WHICH IS PART OF MY EXHIBIT NUMBER

8   154, AND IT STATES:

9           THERA-BAND FOR TODD ASHKER.  ENCLOSED YOU WILL

10          FIND A PIECE OF THERA-BAND THAT IS USED IN

11          PHYSICAL THERAPY FOR STRENGTHENING.  THIS DEVICE

12          HAS BEEN USED BY MR. ASHKER IN HIS PHYSICAL

13          THERAPY PROGRAM.  CURRENTLY HE IS BEING SEEN

14          ONCE A WEEK AND WE BELIEVE THAT THIS MIGHT

15          SUPPLEMENT PHYSICAL THERAPY, OR EVEN IN THE

16          FUTURE, REPLACE PERMANENT PHYSICAL THERAPY.  I

17          WOULD RECOMMEND THAT HE BE ALLOWED TO USE THIS

18          DEVICE THREE TIMES A WEEK FOR 20 MINUTES.

19          AND IT IS SIGNED BY YOURSELF.

20          DO YOU RECALL THAT MEMORANDUM?

21  A.   I DON'T, MR. ASHKER.

22  Q.   OKAY.  GO AHEAD.

23  A.   NO, I MEAN, I AM NOT THERE WITH YOU NOW.  IF THAT'S WHAT

24  IT IS, THAT IS WHAT IT IS.  I DON'T RECALL SIGNING IT AT THIS

25  TIME.

1   Q.   OKAY.

2           I MEAN, DID YOU CONSIDER THAT PART OF MY AGREEMENT

3   ON THE PHYSICAL THERAPY WHERE IT STATED I WAS TO CONTINUE TO

4   HAVE THE PHYSICAL THERAPY UNTIL MY CONDITION -- THE THERAPY WAS

5   CONTRAINDICATED.  AND DID THAT -- WHAT DID THAT MEAN TO YOU

6   THAT PHYSICAL THERAPY WAS PERMANENT; IS THAT NOT CORRECT?

7   A.   WELL, I DON'T KNOW ABOUT PHYSICAL THERAPY BEING PERMANENT.

8   THERE'S NOTHING THAT IS PERMANENT.  IN TERMS OF YOU CAN'T HAVE

9   SOMETHING GOES ON FOR PERPETUITY JUST FOR THE PURPOSE OF GOING

10  ON FOR PERPETUITY.  IT ALL HAS TO BE IN THE CONTEXT OF WHAT'S

11  NEEDED AND WHAT'S NECESSARY AND WHAT'S EFFECTIVE IN TREATING A

12  MEDICAL CONDITION.

13  Q.   YES, I UNDERSTAND THAT.  AND THAT'S WHY THE CONTRACT

14  INCLUDED UNTIL CONTRAINDICATED.

15          AND CAN YOU STATE WHAT CONTRAINDICATED MEANS IN THE

16  MEDICAL COMMUNITY?

17  A.   WELL, CONTRAINDICATED WOULD INDICATE THAT IT IS SOMETHING

18  THAT SHOULD NOT BE DONE.

19  Q.   THAT IS HARMFUL, CORRECT?

20  A.   THAT'S -- THAT WOULD BE ONE REASON IT SHOULDN'T BE DONE.

21  Q.   AND SO, IT WOULD BE UNDERSTANDABLE THAT I TOOK THAT TO

22  MEAN THAT I WOULD HAVE PHYSICAL THERAPY FOR SUCH TIME UNTIL --

23  UNLESS IT ENDED UP HARMING ME?

24          MR. ANDRADA:  YOUR HONOR, EXCUSE ME.  HE IS

25  ASKING -- IT CALLS FOR SPECULATION.  HE IS ASKING THE WITNESS

WINSLOW – DIRECT / MR. ASHKER

```
 1    IF HE --

 2                THE COURT:  OVERRULED.

 3    BY MR. ASHKER:

 4    Q.   YOU MAY ANSWER THE QUESTION.

 5    A.   I GUESS I AM NOT FOR SURE WHAT THE QUESTION IS,

 6    MR. ASHKER.  I'M SORRY.

 7    Q.   EXCUSE ME.  I WILL REPHRASE IT.

 8            MY QUESTION IS, MY INTERPRETATION OF THE TERM

 9    "CONTRAINDICATED" IN THAT PART OF THE CONTRACT WAS THAT I WOULD

10    CONTINUE TO RECEIVE THE PHYSICAL THERAPY UNTIL, UNLESS IT

11    STARTED TO HARM ME.  AND IS THAT A FAIR AND REASONABLE

12    INTERPRETATION?

13                MR. ANDRADA:  YOUR HONOR, HE HASN'T SEEN --

14                THE WITNESS:  I SUPPOSE IT'S--

15                MR. ANDRADA:  EXCUSE ME.  HE HASN'T SEEN THE

16    DOCUMENT.

17                THE COURT:  THAT'S WHAT IT SAYS.  IF YOU WOULD LIKE

18    TO SHOW IT TO HIM, YOU'RE WELCOME TO DO SO.

19                MR. ANDRADA:  IT IS --

20                THE COURT:  OR WE CAN READ IT TO HIM.  BUT IT'S A

21    FAIR CHARACTERIZATION OF WHAT THE DOCUMENT SAYS, IT SEEMS TO

22    ME.  I AM HAPPY TO READ IT TO HIM, SHOW IT TO HIM, WHATEVER YOU

23    LIKE.

24                MR. ANDRADA:  I THINK IN FAIRNESS TO THE WITNESS, IT

25    MIGHT BE HELPFUL FOR HIM TO HAVE IT READ TO HIM BY YOUR HONOR.
```

1          **THE COURT:**  SURE.  THAT SENTENCE READS:

2          THE PHYSICAL THERAPY SHALL CONTINUE UNTIL A CHANGE

3   IN RELEASOR'S, THAT'S MR. ASHKER, MEDICAL NEEDS CONTRAINDICATE

4   THE THERAPY.

5          SO, MR. ASHKER HAS ASKED YOU WHETHER HIS

6   INTERPRETATION OF THAT IS A REASONABLE INTERPRETATION.  THAT'S

7   THE QUESTION IF YOU CAN ANSWER IT.

8          **THE WITNESS:**  WELL, IT WOULD SEEM SO.

9   **BY MR. ASHKER:**

10  **Q.**   AND I READ TO YOU THIS MEMORANDUM FROM JANUARY 31ST, 2003,

11  WHERE YOU HAD STATED ABOUT PROVIDING ME WITH THAT THERA-BAND,

12  AND YOU STATED THAT WITH THE USE OF THAT THERA-BAND IT MIGHT AT

13  SOME POINT IN THE FUTURE REPLACE WHAT YOU TERMED "PERMANENT

14  PHYSICAL THERAPY."

15         CAN YOU STATE WHAT YOU MEANT BY "PERMANENT PHYSICAL

16  THERAPY"?

17  **A.**   WELL, PHYSICAL THERAPY IS A BROAD TERM FOR TREATMENTS OF A

18  MEDICAL CONDITION AND CAN TAKE MANY FORMS.  IT CAN BE EXERCISE

19  YOU DO YOURSELF.  IT CAN BE PHYSICAL THERAPY BY A PHYSICAL

20  THERAPIST.  IT CAN BE USING A DEVICE LIKE YOUR THERA-BAND THAT

21  YOU ARE REFERRING TO.  IT JUST MEANS THAT YOU WILL TAKE -- DO

22  SOME PHYSICAL ACTIVITIES THAT WILL THEN PROVIDE YOU SOME

23  THERAPEUTIC BENEFIT DOWN THE ROAD.

24  **Q.**   CORRECT.

25         NOW, I UNDERSTAND THAT IN THE COMMUNITY ON THE

WINSLOW – DIRECT / MR. ASHKER

1    STREETS, A PERSON WOULD BE TAUGHT EXERCISES AND THEN END

2    THERAPY MAYBE FIVE, SIX THERAPY SESSIONS, THEN YOU NO LONGER

3    HAVE TO GO TO THE THERAPY SESSIONS BECAUSE YOU HAD BEEN TAUGHT

4    HOW TO DO THOSE ON HIS OWN.

5            IN THE PRISON CONTEXT, YOU HAVE AN UNDERSTANDING OF

6    PELICAN BAY SHU; IS THAT CORRECT?

7    **A.**    YES, I DO.

8    **Q.**    AND IN PELICAN BAY SHU, WE ARE LIMITED BY THE AMOUNT AND

9    TYPE OF PROPERTY THAT WE CAN HAVE IN OUR CELLS; IS THAT

10    CORRECT?

11    **A.**    THAT'S MY UNDERSTANDING.

12    **Q.**    SO, WITHOUT ASSISTIVE AIDES LIKE THERA-BAND OR BALL, IT

13    WOULD BE DIFFICULT FOR ME TO CONTINUE TO DO PHYSICAL THERAPY ON

14    MY OWN; ISN'T THAT CORRECT?

15    **A.**    IF IT WAS PART OF YOUR THERAPY THAT WAS PRESCRIBED, YES,

16    IT WOULD BE DIFFICULT TO DO WITHOUT THE DEVICES.

17    **Q.**    NOW, IN JUNE 18TH OF 2003 YOU REFERRED ME TO -- I WILL

18    PRESENT TO YOU YOU REFERRED ME TO A MANTECA DOCTOR FOR PAIN

19    MANAGEMENT.

20            DO YOU RECALL THAT?

21    **A.**    NO, I DON'T.

22    **Q.**    OKAY.  NOW, MY POSITION IS --

23            **THE COURT:**  WHAT YOU NEED TO DO IS ASK A QUESTION,

24    NOT STATE YOUR POSITION.

25            **MR. ASHKER:**  ALL RIGHT.

1    **BY MR. ASHKER:**

2    **Q.**   ON THOSE TYPE OF REFERRALS RIGHT THERE, WOULD I HAVE BEEN

3    NOTIFIED IN ADVANCE OF THE TRANSFER THAT I WAS GOING TO BE

4    TRANSFERRED TO MANTECA?

5    **A.**   THAT'S A GOOD QUESTION.  YOU KNOW, I WOULD HAVE ASSUMED

6    SO.  I DON'T KNOW.  TO BE HONEST WITH YOU, I HAVE WORKED MANY,

7    MANY YEARS, I REALLY DON'T KNOW WHAT THE OFFICIAL PROCESS IS.

8    I NOTICE YOU FOR A TRANSFER, IT WOULD SEEM REASONABLE, BUT I

9    CAN'T TESTIFY FOR A FACT THAT'S THE PROCESS FOR TRANSFER,

10   MR. ASHKER.

11   **Q.**   SO YOU HAVE NO PERSONAL RECOLLECTION OR KNOWLEDGE ABOUT

12   HOW THAT WORKS; IS THAT CORRECT?

13   **A.**   NOT THE ACTUAL PART OF NOTIFYING, YOU KNOW, THE PATIENT OR

14   THE INMATE AS TO WHERE THEY ARE GOING TO GO AND WHEN THEY ARE

15   GOING TO GO.

16           AGAIN, I AM NOT A CUSTODIAL OFFICER.  MAYBE I SHOULD

17   KNOW.  I DON'T -- I CAN'T HONESTLY ANSWER THAT QUESTION.  I

18   DON'T KNOW WHAT THE PROCESS FOR NOTIFYING YOU IS.

19   **Q.**   I WILL PRESENT TO YOU THAT ON 6/18/03, THE STAFF CAME AND

20   TOLD ME I WAS BEING TRANSFERRED THE NEXT DAY TO I GUESS FOLSOM

21   FOR THIS MANTECA APPOINTMENT AND I REFUSED TO GO ON THE BASIS

22   THE FEDS TOOK ALL MY PROPERTY AND I HAD LEGAL DEADLINES AND WAS

23   JUST STARTING TO GET MY LEGAL PROPERTY RETURNED ON THE DAY THEY

24   TOLD ME I WAS TO BE TRANSFERRED.

25           I EXPLAINED THE SITUATION TO LIEUTENANT VANDERHOOVEN

1    WHO WAS IN CHARGE OF RETURNING MY PROPERTY, CONFIRMED THE

2    RETURN OF MY PROPERTY TOOK PRECEDENCE OVER THE TRANSFER UNLESS

3    IT WAS AN EMERGENCY.

4              MY QUESTION TO YOU IS, WAS YOUR REFERRAL AN

5    EMERGENCY?

6    **A.**   I DON'T THINK IT WAS.  I DON'T HAVE RECOLLECTION, BUT I

7    DON'T BELIEVE I MADE AN EMERGENCY REFERRAL.  BUT I DON'T HAVE

8    DIRECT RECOLLECTION TO KNOW THAT, MR. ASHKER.

9    **Q.**   BASED ON WHAT I HAVE JUST READ TO YOU ON WHAT IS

10   DOCUMENTED IN MY MEDICAL FILE AS THE BASIS FOR MY REFUSAL FOR

11   THAT TRANSFER ON THAT DAY, CAN YOU -- AND I WILL PRESENT TO YOU

12   THAT THERE WAS NO FURTHER PAIN MANAGEMENT REFERRALS AFTER THIS

13   JUNE 18TH, '03 DATE UP UNTIL 2007, 2008, CAN YOU STATE WHY I

14   WAS NOT REFERRED TO ANOTHER PAIN MANAGEMENT CLINIC AFTER THIS

15   DATE?

16             **MR. ANDRADA:**  AGAIN, YOUR HONOR, THERE'S NO

17   FOUNDATION.  THERE'S NO INDICATION THAT HE'S REVIEWED THE

18   RECORDS AND HAS ANY KNOWLEDGE AS TO MR. ASHKER'S ACTUAL

19   PHYSICAL STATUS.

20             **THE COURT:**  IF HE DOESN'T KNOW, I AM SURE HE WILL

21   TELL US THAT.

22   **BY MR. ASHKER:**

23   **Q.**   YOU MAY ANSWER.

24   **A.**   YEAH, I DON'T RECALL THAT, MR. ASHKER.

25   **Q.**   ALL RIGHT.

1        **MR. ASHKER:**  THANK YOU, DR. WINSLOW.  I HAVE NO

2   FURTHER QUESTIONS.

3            **THE WITNESS:**  ALL RIGHT.  THANK YOU.

4            **THE COURT:**  THE OTHER ATTORNEY MAY, SO STAY.

5            **THE WITNESS:**  I'M STILL HERE.

6                        **CROSS-EXAMINATION**

7   BY MR. ANDRADA:

8   **Q.**   DR. WINSLOW, GOOD AFTERNOON.  I JUST --

9   **A.**   GOOD AFTERNOON.

10  **Q.**   I JUST HAVE A COUPLE OF QUESTIONS FOR YOU.

11           WITH REGARD TO THE DEFINITION OF CONTRAINDICATED,

12  CAN I TAKE YOU BACK TO YOUR TESTIMONY ABOUT THAT SUBJECT FOR A

13  MOMENT?

14  **A.**   OKAY.

15  **Q.**   IF MY NOTES ARE CORRECT, I THINK MR. ASHKER ASKED YOU IF

16  CONTRAINDICATED MEANT ESSENTIALLY THAT SOMETHING WAS HARMFUL.

17           CONTRAINDICATED HAS A BROADER MEANING WITHIN THE

18  MEDICAL COMMUNITY, DOESN'T IT?

19  **A.**   YES, IT DOES.

20  **Q.**   AND IT CAN ALSO MEAN THAT SOMETHING IS NO LONGER NEEDED,

21  CORRECT?

22  **A.**   THAT'S CORRECT.  IT MAY MEAN NO BENEFIT, NOT REQUIRED, NOT

23  NEEDED.

24  **Q.**   ALL RIGHT.

25           **MR. ANDRADA:**  THANK YOU.  I THINK THAT'S ALL I HAVE.

1    THANK YOU VERY MUCH, SIR.

2              **THE WITNESS:**  OKAY.

3              **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS, YOUR

4    HONOR.

5              **THE COURT:**  ALL RIGHT.  YOU ARE FINISHED THEN,

6    DR. WINSLOW.  THANK YOU.  YOU ARE EXCUSED.

7              **THE WITNESS:**  THANK YOU.

8              **THE COURT:**  WE WILL BE TURNING YOU OFF.

9              **THE WITNESS:**  OKAY.  THANK YOU.

10             **THE COURT:**  OKAY.  IT IS UP TO YOU THEN WHAT YOU

11   WOULD LIKE TO DO NEXT.

12             **MR. ANDRADA:**  WELL, I THINK WE HAVE SOME FOLKS AT

13   PELICAN BAY, YOUR HONOR.

14             **THE COURT:**  OKAY.  SO WE ARE GOING TO CALL THEM, I

15   THINK.

16             ALL RIGHT.

17             WHO ARE YOU CALLING?

18             **MR. ANDRADA:**  EITHER SUE RISENHOOVER OR DR. ROWE,

19   YOUR HONOR.

20             **THE COURT:**  YOU ARE, MA'AM?

21             COULD YOU STATE YOUR NAME?

22             **THE WITNESS:**  DR. LINDA ROWE.

23             **THE COURT:**  IF YOU WOULD REMAIN SEATED AND RAISE

24   YOUR RIGHT HAND TO BE SWORN.

25             **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

1                           **LINDA ROWE,**

2    CALLED AS A WITNESS FOR THE DEFENDANT, HAVING BEEN DULY SWORN,

3    TESTIFIED AS FOLLOWS VIA VIDEOCONFERENCE:

4              **THE WITNESS:**  I DO.

5              **THE CLERK:**  PLEASE STATE YOUR NAME SPELLING YOUR

6    LAST NAME FOR THE RECORD.

7              **THE WITNESS:**  DR. ROWE, R-O-W-E.

8                      **DIRECT EXAMINATION**

9    **BY MR. ANDRADA:**

10   **Q.**   DR. ROWE, CAN YOU HEAR ME?

11   **A.**   YES.

12   **Q.**   YOU ARE A MEDICAL DOCTOR, CORRECT?

13   **A.**   YES.

14   **Q.**   ARE YOU BOARDED?

15   **A.**   I AM.

16   **Q.**   IN WHAT SPECIALTY?

17   **A.**   FAMILY MEDICINE.

18   **Q.**   WE ARE GOING TO TRY TO GO THROUGH THIS VERY QUICKLY.  ALL

19   RIGHT?

20   **A.**   OKAY.

21   **Q.**   DO YOU -- YOU'VE TREATED MR. ASHKER AT PELICAN BAY; IS

22   THAT CORRECT?

23   **A.**   YES.

24   **Q.**   IN FACT, YOU SAW HIM ON A COUPLE OF OCCASIONS IN 2005,

25   CORRECT?

1    A.   YES.

2    Q.   AND YOU ALSO PARTICIPATED IN A M-A-R COMMITTEE MEETING

3    WITH REGARD TO THE TERMINATION OF MR. ASHKER'S TRAMADOL,

4    CORRECT?

5    A.   YES.

6    Q.   DID YOU AGREE WITH THE DECISION TO TERMINATE THE TRAMADOL?

7    A.   YES.

8    Q.   PLEASE EXPLAIN WHY YOU THOUGHT IT WAS APPROPRIATE TO

9    TERMINATE THE TRAMADOL?

10   A.   BECAUSE HE HAD BEEN ON THE TRAMADOL FOR YEARS AND IT WAS

11   THE CONSENSUS OF MYSELF AND THE COMMITTEE THAT LONG-TERM USE OF

12   THAT DRUG COULD BE DETRIMENTAL TO HIS LIVER.  AND AT THE TIME,

13   THE POLICY STATED THAT HE REALLY SHOULD ONLY USE TRAMADOL FOR

14   SHORT-TERM PAIN MANAGEMENT.  AND THERE WAS CONCERN ABOUT THE

15   DRUG AFFECTING HIS LIVER.

16   Q.   WHAT EFFECTS --

17   A.   AND IT CAUSING --

18   Q.   I AM SORRY, DOCTOR, I APOLOGIZE.  I CUT YOU OFF.  YOU

19   STARTED TO SAY IT HAS EFFECTS ON THE LIVER AND, AND THEN I

20   RUDELY INTERRUPTED YOU.

21   A.   AND, OKAY.  YES, LIVER TOXICITY WAS A CONCERN AS WELL AS

22   POSSIBLE THE THRESHOLD FOR SEIZURES.

23   Q.   VERY BRIEFLY, HOW DOES TRAMADOL ADVERSELY EFFECT THE

24   LIVER?

25   A.   IT IS TOXIC TO THE LIVER IF YOU -- IN HIGH DOSES OR OVER A

1    LONG PERIOD OF TIME OR IF IT'S IN CONJUNCTION WITH PEOPLE WHO

2    MAY BE PRONE TO LIVER DISEASE OR HAVE LIVER DISEASE.

3    **Q.**    THEN YOU MENTIONED ANOTHER CONCERN, NAMELY, THE

4    POSSIBILITY OF SEIZURES; IS THAT CORRECT?

5    **A.**    YES.

6    **Q.**    HOW DOES TRAMADOL CAUSE SEIZURES?

7    **A.**    TRAMADOL HAS A PROPENSITY TO LOWER THE THRESHOLD FOR

8    SEIZURES.  IN PEOPLE WHO'VE NEVER HAD SEIZURES OR IN PEOPLE

9    ALREADY HAD SEIZURES, THERE IS A PRECAUTION TO WATCH OUT FOR

10   SEIZURE INCIDENTS.

11   **Q.**    NOW, PRIOR TO AUGUST OF 2006, AND THAT'S WHEN MR. ASHKER'S

12   TRAMADOL -- THAT'S WHEN THE VOTE WAS HELD TO CEASE GIVING HIM

13   TRAMADOL, YOU HAD SEEN MR. ASHKER AND I THINK YOU TOLD US THAT

14   WAS BACK IN 2005; IS THAT CORRECT?

15   **A.**    YES.

16   **Q.**    DID YOU HAVE ANY CONCERNS ABOUT HIS USE OF TRAMADOL DURING

17   THAT PERIOD OF TIME?

18   **A.**    YES.

19   **Q.**    WHAT WERE YOUR CONCERNS?

20   **A.**    HE WAS ENROLLED IN CHRONIC CARE FOR HEPATITIS C.  AT ONE

21   OF THE VISITS I WAS WONDERING IF HE HAD ACTIVE HEPATITIS C, SO

22   I TOLD HIM THAT I WAS CONCERNED ABOUT THE USE OF TRAMADOL AND

23   TYLENOL.  I DID SOME BLOOD WORK TO MAKE SURE IF HE ACTUALLY HAD

24   ACTIVE HEPATITIS C.

25            **MR. ASHKER:**  EXCUSE ME.  I AM UNCLEAR WHAT TIME

1    PERIOD.  IS THIS JUST IN GENERAL IN 2005 OR IS IT RELEVANT TO A

2    SPECIFIC DATE?

3              **MR. ANDRADA:**  AGAIN, IN THE INTEREST OF TIME, THE

4    QUESTION WAS BROAD AND INCLUDED ALL OF 2005.

5    **BY MR. ANDRADA:**

6    **Q.**   DID YOU EVER MAKE ANY CHANGE IN MR. ASHKER'S MEDICATION

7    REGIMEN?  THAT IS TO SAY, DID YOU EVER CAUSE HIS TRAMADOL TO BE

8    HALTED?

9    **A.**   I PERSONALLY DID NOT CAUSE HIS TRAMADOL TO BE HALTED.

10   **Q.**   DID YOU CAUSE THAT TO HAPPEN?

11   **A.**   NO.

12   **Q.**   DO YOU HAVE SOME UNDERSTANDING THAT HIS TRAMADOL WAS

13   STOPPED DURING 2005 FOR AT LEAST A BRIEF PERIOD OF TIME?

14   **A.**   I DON'T HAVE THAT KNOWLEDGE.

15   **Q.**   ALL RIGHT.

16             NOW, DO YOU RECALL THE MEETING OF THE MAR COMMITTEE

17   IN CONNECTION WITH MR. ASHKER AND TRAMADOL?

18   **A.**   I DO NOT SPECIFICALLY RECALL THAT MEETING.

19   **Q.**   OKAY.  DO YOU RECALL WHO WAS PRESENT?

20   **A.**   NO, I DO NOT.

21   **Q.**   ALL RIGHT.

22             DO YOU RECALL THAT YOU EXPRESSED CONCERN ABOUT HIS

23   CONTINUING THE USE OF TRAMADOL?

24   **A.**   AFTER REVIEWING THE RECORDS, I WAS -- THEY SAY I WAS

25   PRESENT, AND I WAS A MEMBER OF THAT COMMITTEE, SO I AGREED WITH

1    THE REST OF THE PEOPLE AT THE MEETING.

2              **MR. ANDRADA:**  THANK YOU VERY MUCH.  THAT'S ALL I

3    HAVE, YOUR HONOR, AGAIN IN THE INTEREST OF TIME.

4              THANK YOU, DOCTOR.

5              **THE WITNESS:**  YOU ARE WELCOME.

6                        <u>**CROSS–EXAMINATION**</u>

7    **BY MR. ASHKER:**

8    **Q.**   GOOD AFTERNOON, DR. ROWE.

9    **A.**   GOOD AFTERNOON.

10   **Q.**   THIS IS TODD ASHKER HERE.  DO YOU REMEMBER ME?

11   **A.**   SORT OF.

12   **Q.**   OKAY.  ARE YOU CURRENTLY EMPLOYED AT PELICAN BAY STATE

13   PRISON?

14   **A.**   I AM AS AN INDEPENDENT CONTRACTOR.

15   **Q.**   OKAY.

16             I WILL PRESENT TO YOU THAT ON JUNE 23RD, 2005 I WAS

17   SEEN BY YOU IN THE C FACILITY SPECIALTY CLINIC IN RESPONSE TO

18   MY REQUEST FOR MEDICATION RENEWALS OF MY TRAMADOL AND TYLENOL.

19             DO YOU REMEMBER THAT VISIT?

20   **A.**   NOT SPECIFICALLY.

21   **Q.**   OKAY.

22             I WILL PRESENT TO YOU THAT IN THE MEDICAL RECORD OF

23   THAT VISIT, I DON'T SEE ANY REFERENCES TO –– WELL, STRIKE THAT.

24             AT THAT VISIT RIGHT THERE, I WAS ON 12 –– I HAD A

25   PRESCRIPTION FOR 12 TYLENOL EACH DAY AND TWO, 50–MILLIGRAM

1    TRAMADOL.  AND IN THE MEDICAL RECORD I WILL PRESENT TO YOU THAT

2    YOU HAD CUT DOWN MY TYLENOL TO SIX PER DAY, BUT YOU DID NOT

3    DISCONTINUE MY TRAMADOL; IS THAT CORRECT?

4    **A.**   IF THAT IS WHAT THE RECORD SAYS.

5    **Q.**   WELL, YOU HAVE THE RECORD RIGHT THERE, BUT, YES, I WILL

6    SUBMIT TO YOU THAT THAT IS WHAT THE RECORD SAYS.

7           NOW, YOU STATED THAT TRAMADOL, THE POLICY AT THE

8    TIME WAS TO PRESCRIBE TRAMADOL FOR SHORT-TERM; IS THAT CORRECT?

9    **A.**   CORRECT.

10   **Q.**   AND YOU STATE THAT YOU REVIEWED MY MEDICAL FILE AT THE

11   TIME OF THAT 6/23/05 VISIT; IS THAT CORRECT?

12   **A.**   THAT'S CORRECT.

13   **Q.**   AND I WILL PRESENT TO YOU THAT AS OF JUNE 23RD, 2005 I HAD

14   BEEN ON TRAMADOL SINCE JANUARY 22ND, 2002, WHICH WOULD HAVE

15   BEEN A TIME PERIOD OF THREE YEARS SIX MONTHS, AND MY QUESTION

16   TO YOU IS, IF TRAMADOL WAS ONLY BEING -- THE POLICY WAS ONLY TO

17   PRESCRIBE IT SHORT-TERM, WHY DIDN'T YOU DISCONTINUE THE

18   TRAMADOL WHEN I SAW YOU ON 6/23/05?

19   **A.**   I DON'T RECALL THAT WE WERE SPECIFICALLY DISCUSSING

20   RENEWAL OF TRAMADOL ON 6/23/05.

21   **Q.**   OKAY.

22   **A.**   I DON'T HAVE THE RECORDS BEFORE ME.

23   **Q.**   WELL, THEY DO HAVE THE EXHIBITS THERE AND I AM REFERRING

24   TO EXHIBIT NUMBER 162.

25   **A.**   I DON'T HAVE THE EXHIBIT BEFORE ME, SIR.

1          **THE COURT:**  THE ATTORNEY WHO'S THERE, MR. LAURIE, HE

2    HAS THEM.  HE CAN GIVE WHATEVER YOU LIKE.

3          **MR. LAURIE:**  I JUST HANDED HER EXHIBIT 162, YOUR

4    HONOR.

5          **THE COURT:**  THANK YOU.

6    **BY MR. ASHKER:**

7    **Q.**  I AM REFERRING TO YOUR PHYSICIAN ORDER OF 6/23/05 WHERE

8    YOU CUT MY TYLENOL DOWN TO SIX PER DAY.  AND THERE IS NO

9    MENTION AT ALL OF DISCONTINUING MY TRAMADOL.

10          DO YOU SEE THAT DOCUMENT?

11   **A.**  I SEE THAT, BUT THERE WAS ALSO NO REQUEST TO RENEW

12   TRAMADOL AT THAT TIME EITHER.  THAT WAS NOT UP FOR DISCUSSION

13   AT THAT VISIT.

14   **Q.**  WELL --

15   **A.**  YOU PROBABLY HAD A CURRENT ORDER OR SOMETHING.

16   **Q.**  OKAY.  WELL, I PRESENT TO YOU THAT I SAW YOU ON 9/21/05.

17   AND IN FRONT OF THE PHYSICIAN PROGRESS NOTE FOR 9/21/05, YOU

18   WILL SEE MY HEALTH CARE SERVICES REQUEST FORM DATED 9/11/05.

19          DO YOU SEE THAT DOCUMENT?

20   **A.**  I DO.

21   **Q.**  AND CAN YOU PLEASE READ THE FIRST REQUEST ON THAT

22   DOCUMENT?

23   **A.**  (READING)

24          NEEDS MEDICATION RENEWED.  TRAMADOL, TYLENOL,

25   MYLANTA TABS, SELENIUM SHAMPOO OINTMENT.

ROWE – CROSS / MR. ASHKER

1   **Q.**   OKAY.  I WILL PRESENT TO YOU THAT YOU HAD RENEWED MY

2   TRAMADOL FOR 90 DAYS.

3   **A.**   I DID DO THAT THAT DAY.

4   **Q.**   CAN YOU EXPLAIN WHY YOU DID THAT WHEN THE POLICY WAS TO

5   ONLY RENEW -- ONLY PRESCRIBE TRAMADOL FOR SHORT-TERM, AND AT

6   THAT POINT I WOULD HAVE BEEN ON TRAMADOL FOR THREE YEARS AND

7   NINE MONTHS?

8   **A.**   AT THAT TIME I WAS UNAWARE OF THAT AS A POLICY.

9   **Q.**   WELL, YOU STATED THAT YOU REVIEWED MY MEDICAL FILE, RIGHT?

10  **A.**   I DID.

11  **Q.**   AND THAT YOU SAW THAT I HAD HEPATITIS C; IS THAT CORRECT?

12  **A.**   I SAW THAT YOU HAD A HISTORY OF HEPATITIS C.

13  **Q.**   OKAY.

14  **A.**   I DID NOT SEE YOUR VIRAL LOAD HAD BEEN NEGATIVE AS OF

15  12/04.

16  **Q.**   WHAT DOES THAT MEAN?  EXCUSE ME.  WHAT DOES THE -- YOU

17  SAID MY VIRAL LOAD HAD INDICATED THAT I WAS NEGATIVE.

18          WHAT DOES THAT MEAN?

19  **A.**   THAT MEANS THAT YOU DID NOT HAVE AN ACTIVE CASE OF

20  HEPATITIS C AT THAT TIME.

21  **Q.**   OKAY.  I WILL PRESENT TO YOU THAT AT THAT TIME, I HAD BEEN

22  ON TRAMADOL TYLENOL COMBINATION FOR 3.9 YEARS.  AND ACCORDING

23  TO THE LAB RESULTS THAT YOU REVIEWED, I DID NOT HAVE ANY

24  PROBLEMS WITH MY HEPATITIS C CONDITION; IS THAT CORRECT?

25  **A.**   YOU DID NOT HAVE ACTIVE HEPATITIS C.

1    **Q.**   OKAY, THANK YOU.

2              NOW, YOU SEE THAT 602 THAT'S ABOUT THREE PAGES

3    BEHIND YOUR 9/21/05 -- OH, WAIT A MINUTE.  STRIKE THAT.

4              PLEASE LOOK AT THE PHYSICIAN PROGRESS NOTE DATED

5    9/21/2005 AT THE PART OF THE PAGE THAT SAYS "OTHER", WHERE YOU

6    STATED:

7              PHYSICAL EXAM UNREMARKABLE.  NO OBVIOUS

8              DEFORMITY TO ARMS.  CHRONIC LIMITATION RANGE OF

9              MOTION RIGHT WRIST ARM FACED WITH SOME REDNESS

10             AND NASAL AREAS.

11             NOW, DID YOU WRITE THAT?  IS THAT YOUR NOTE THERE?

12   **A.**   IT IS.

13   **Q.**   AND ON 9/21/05 YOU CONDUCTED, ACCORDING TO THIS NOTE, YOU

14   CONDUCTED A PHYSICAL EXAMINATION OF ME; IS THAT CORRECT?

15   **A.**   IT WAS LIMITED, VERY LIMITED PHYSICAL EXAM.

16   **Q.**   OKAY.  WHY WAS IT A LIMITED PHYSICAL EXAM?

17   **A.**   BECAUSE YOU WERE SIMPLY THERE FOR RENEWAL OF MEDS AND

18   CHRONOS.

19   **Q.**   OKAY.

20   **A.**   THAT WAS THE MAIN PURPOSE OF YOUR VISIT THAT DAY.

21   **Q.**   SO WHEN YOU WERE RENEWING THIS TRAMADOL MEDICATION THAT

22   YOU WERE FAMILIAR WITH AND HAD CONCERNS ABOUT BECAUSE I BELIEVE

23   YOU TESTIFIED WITH MR. ANDRADA THAT YOUR UNDERSTANDING OF

24   TRAMADOL WAS, IT WAS ONLY TO BE PRESCRIBED FOR SHORT-TERM

25   CHRONIC SEVERE PAIN; IS THAT CORRECT?

1    **A.**   NO, THAT IS NOT TOTALLY CORRECT.

2    **Q.**   AND WHY ISN'T IT CORRECT?

3    **A.**   BECAUSE YOU SAID SHORT-TERM CHRONIC SEVERE PAIN.  THOSE

4    TWO THINGS DON'T GO TOGETHER.

5          SHORT-TERM AND CHRONIC DON'T GO TOGETHER VERY WELL.

6    **Q.**   I UNDERSTAND.  SO, CAN YOU --

7    **A.**   CAN YOU CLARIFY THAT, PLEASE?

8    **Q.**   YES.  YOU STATED THAT IT WAS FOR SEVERE, SHORT-TERM SEVERE

9    PAIN; IS THAT CORRECT?

10   **A.**   THAT IS THE PRIMARY -- THAT'S CORRECT.

11   **Q.**   SO, MY QUESTION TO YOU IS, ON 9/21/05 WHEN I CAME TO YOU

12   TO GET A RENEWAL OF THIS PRESCRIPTION OF MEDICATION, THAT IS --

13   YOUR POSITION IS, WAS PRESCRIBED ONLY FOR SEVERE, SHORT-TERM

14   PAIN, WHY DIDN'T YOU CONDUCT A THOROUGH PHYSICAL EXAMINATION OF

15   MY ARM?

16   **A.**   I REPEAT, YOU CAME FOR RENEWAL OF MEDICATIONS AND CHRONO.

17   I SIMPLY REVIEWED YOUR CHART AND I CONTINUED THE MEDICATION

18   THAT YOU WERE ON.

19          **THE COURT:**  CAN YOU FINISH UP?

20          **MR. ASHKER:**  OKAY.

21          **THE COURT:**  CAN YOU FINISH UP WITH THIS WITNESS?

22   **BY MR. ASHKER:**

23   **Q.**   I FILED A -- YOU NOTED NO OBVIOUS DEFORMITY TO MY ARMS; IS

24   THAT CORRECT?

25   **A.**   YEAH.  THAT MEANT NEW DEFORMITIES.

1   **Q.**   OH, OKAY.  AND HOW WOULD A PERSON THAT WAS TO REVIEW THIS

2   RECORD AFTER YOU KNOW THAT THAT'S WHAT IT MEANT?

3   **A.**   WELL, IF YOU LOOK AT THE STATEMENT FOLLOWING THAT, IT SAYS

4   CHRONIC LIMITATION OF THE RANGE OF MOTION RIGHT ARM AND WRIST.

5           AND SO THIS WAS A CHRONIC PROBLEM, AND THEY WOULD

6   KEEP REVIEWING THE CHART JUST LIKE EVERYONE ELSE DID.

7   **Q.**   OKAY, THANK YOU.  ONE LAST QUESTION.

8           I WILL PRESENT TO YOU THAT ON DECEMBER 30TH -- ON

9   DECEMBER 28TH I SAW YOU IN RESPONSE TO A MEDICATION REQUEST AND

10  YOU, IN RESPONSE TO A 602 APPEAL I HAD FILED ON OCTOBER 10TH,

11  2005 ABOUT YOU CUTTING MY TYLENOL DOWN TO FOUR A DAY ON

12  9/21/05, AND YOUR -- I STATED THAT YOU WERE UNPROFESSIONAL,

13  THAT YOU WERE ANTAGONISTIC.  YOU ASKED ME WHAT DO YOU NEED ALL

14  THIS PAIN MEDICATION FOR SOME LITTLE OLE ARM PAIN.

15          AND THEN YOU INTERVIEWED ME IN RESPONSE TO THIS 602

16  APPEAL ON DECEMBER 28TH, 2005, AND YOU UPPED MY TYLENOL UP TO

17  EIGHT A DAY.  AND THEN ON DECEMBER 30TH, MY -- I ASSUMED THAT

18  YOU HAD RE-UPPED MY TRAMADOL, TOO, BUT ON DECEMBER 30TH, I WAS

19  NOTIFIED BY THE P.M. MTA THAT MY TRAMADOL HAD BEEN DISCONTINUED

20  BY YOU.  I SUBMITTED THREE --

21          **THE COURT:**  MR. ASHKER, YOU NEED TO TURN THIS INTO A

22  QUESTION.

23          **MR. ASHKER:**  I WAS TRYING TO LAY THE FOUNDATION.

24          **THE COURT:**  OKAY.

25  ///

1    **BY MR. ASHKER:**

2    **Q.**   I SUBMITTED THREE HEALTH CARE SERVICES REQUESTS ON

3    12/31/05, 1/2/06 AND 1/4/06 COMPLAINING ABOUT THE PAIN AND

4    SUFFERING THAT I WAS IN WITH THAT MEDICATION BEING DISCONTINUED

5    AT THAT TIME.  AND RN BROUS RESPONDED THAT YOU EXPLAINED TO ME

6    THAT TRAMADOL IS ONLY FOR SHORT-TERM USE AND NOT LONG-TERM USE.

7    SHE RECOMMENDED USING YOUR TYLENOL.

8           I FILED A SUBSEQUENT 602 APPEAL AND YOU RENEWED MY

9    TRAMADOL FOR 90 ADDITIONAL DAYS ON JANUARY 9TH, 2006.

10          CAN YOU EXPLAIN WHY YOU RENEWED THAT TRAMADOL FOR 90

11   DAYS ON JANUARY 9TH, 2006 WITH ALL THE CONCERNS THAT YOU HAD?

12   **A.**   I AM UNAWARE OF RENEWING THAT DRUG FOR 90 DAYS.  THE LAST

13   DATE THAT I CAN SEE OR RECALL FROM THE RECORDS THAT I HAD ANY

14   CONTACT WITH YOU WAS 12/28/05, AND THEN SOMEONE ELSE BECAME

15   YOUR PRIMARY CARE PROVIDER.

16   **Q.**   I WOULD REFER YOU TO THE LAST PAGE IN THAT EXHIBIT.

17   **A.**   WHICH PAGE ARE YOU TALKING ABOUT, SIR?

18   **Q.**   THE LAST PAGE.  IT'S MEDICATION ORDERS FOR JANUARY 2006.

19   **A.**   BEAR WITH ME I AM HAVING DIFFICULT FINDING THAT.

20   **Q.**   IT'S THE VERY LAST PAGE.  IT'S THE MEDICATION ORDER --

21          **THE COURT:**  LAST PAGE OF 162.

22          **MR. ASHKER:**  EXCUSE ME.  I THINK I SAID 163.  IT IS

23   162.

24          **MR. LAURIE:**  WHAT IS THE DATE ON THAT?

25          **THE WITNESS:**  WHAT IS THE DATE ON THAT?

1    **BY MR. ASHKER:**

2    **Q.**   AT THE TOP OF THE PAGE, IT'S LIKE A COMPUTER PRINTOUT WITH

3    MEDICATION ORDERS.  IT'S GOT JANUARY 2006.  IT SHOULD BE THE

4    LAST PAGE OF EXHIBIT 162.

5    **A.**   APPARENTLY IT IS NOT HERE.

6    **Q.**   WELL, I WILL PRESENT TO YOU --

7    **A.**   I CANNOT FIND THAT.

8    **Q.**   OKAY.  FAIR ENOUGH.

9            I WILL PRESENT TO YOU THAT THAT PAGE IS A MEDICATION

10   ORDER.  AND ON JANUARY 9TH, 2006 YOU HAD ORDERED THE TRAMADOL

11   50 MILLIGRAMS TWICE A DAY FOR 90 DAYS UNTIL APRIL 9TH, 2006.

12   AND MY QUESTION TO YOU --

13   **A.**   GO AHEAD.

14   **Q.**   MY QUESTION TO YOU IS, WITH YOUR CONCERNS ABOUT THIS

15   MEDICATION, WHY WOULD YOU PRESCRIBE IT FOR 90 ADDITIONAL DAYS

16   IN EARLY 2006?

17   **A.**   THE CONCERNS ABOUT KEEPING YOU ON THIS AS LONG AS YOU HAD

18   BEEN ON IT DID NOT COME UP UNTIL AFTER THAT DATE IN OUR MAR

19   MEETING.

20           AND THEN WHATEVER HAPPENED AFTER THAT CLEARLY WAS IN

21   THE MIDDLE OF THE DATES YOU JUST GAVE ME, FROM JANUARY ALL THE

22   WAY UNTIL APRIL.

23           AND LIKE I SAID, THE LAST PHYSICAL CONTACT OR

24   ANYTHING THAT I REALLY HAD MAJOR KNOWLEDGE OF YOU WAS

25   DECEMBER 28TH OF '05.

1    **Q.**   SO THIS JANUARY 9TH ORDER WAS MADE WITHOUT ANY PHYSICAL

2    EXAM BY YOU OR ME EVEN SEEING YOU FACE-TO-FACE; IS THAT

3    CORRECT?

4    **A.**   THAT IS CORRECT.

5    **Q.**   AND YOUR TESTIMONY IS, IS THAT PRIOR TO THAT 8/21/06 MAR

6    MEETING, YOU DID NOT HAVE ANY CONCERNS ABOUT ME BEING ON THAT

7    TRAMADOL MEDICATION; IS THAT CORRECT?

8    **A.**   THAT IS NOT CORRECT.

9    **Q.**   AND WHY ISN'T IT CORRECT?

10   **A.**   BECAUSE YOU ARE READING MORE INTO IT THAN THERE IS.  AT

11   SOME POINT I TOLD YOU BECAUSE OF YOUR HEPATITIS, THE CONCERN

12   ABOUT YOUR HEPATITIS, I WAS THE ONE WHO WENT AHEAD AND

13   REORDERED YOUR VIRAL LOAD TO ENSURE THAT WHETHER OR NOT YOU HAD

14   HEPATITIS C, I SPOKE TO YOU ABOUT THE DANGERS OF TAKING PAIN

15   MEDICATIONS AND TYLENOL IN EXCESSIVE AMOUNTS, THAT IT COULD

16   CAUSE LIVER DAMAGE.  AND THEN WHEN I FOUND THAT YOU DID NOT

17   HAVE ACTIVE HEPATITIS C, I DISENROLLED YOU FROM THE CHRONIC

18   CARE PROGRAM OF HEPATITIS C.

19   **Q.**   BUT YOU DIDN'T HAVE ANY CONCERNS THAT I WAS ON TRAMADOL

20   MEDICATION FOR ALL THAT TIME; IS THAT CORRECT?

21   **A.**   NO, THAT'S NOT CORRECT.

22   **Q.**   WHY DID YOU KEEP ORDERING IT?

23   **A.**   WELL --

24           **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.  I BELIEVE THE

25   QUESTION AS PHRASED IS ARGUMENTATIVE.  HE HAS ESSENTIALLY ASKED

1    HER, SHE ESSENTIALLY ANSWERED THE QUESTION.

2            **THE COURT:**  OVERRULED.

3    **BY MR. ASHKER:**

4    **Q.**   YOU MAY ANSWER.

5    **A.**   THE DOSAGE THAT YOU WERE ON -- DID YOU SAY IT WAS

6    50 MILLIGRAMS TWICE A DAY?

7    **Q.**   YES, MA'AM?

8    **A.**   YEAH.  THAT DOSAGE -- I ALLOWED YOU TO STAY ON THAT DOSAGE

9    UNTIL, I WAS LOOKING TO SEE IF YOU, IN FACT, HAD HEPATITIS C.

10   AND THEN AFTER I FOUND OUT THAT YOU DIDN'T, I WAS NO LONGER

11   YOUR PRIMARY CARE DOCTOR.  SO I COULDN'T SEE YOU AGAIN TO TELL

12   YOU ANYTHING ABOUT MY CONCERNS.

13   **Q.**   OKAY.

14           **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS.  THANK

15   YOU.

16           **MR. ANDRADA:**  NOTHING, YOUR HONOR.  THANK YOU.

17           **THE COURT:**  ALL RIGHT.  YOU ARE EXCUSED, DR. ROWE.

18   THANK YOU VERY MUCH.

19           WE WILL BREAK FOR THE DAY.  SORRY TO KEEP YOU OVER,

20   BUT I WAS HOPING WE COULD FINISH HER UP.

21           SO WE WILL BE BACK TOMORROW AT 8:30.  WE HOPE TO BE

22   ABLE TO FINISH THE EVIDENCE PORTION OF THE CASE TOMORROW.  WE

23   MAY HAVE TO GO OVER TO MONDAY TO DO THE ARGUMENTS AND THE

24   INSTRUCTIONS AND THE DELIBERATION, BUT I BELIEVE WE WILL BE

25   ABLE TO FINISH THE EVIDENCE PORTION AT LEAST TOMORROW.

1        IF YOU ALL WOULD STAY HERE FOR A MINUTE.

2            (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

3        **THE COURT:**  WHAT WE ARE GOING DO THEN IS TAKE A

4   BREAK WHILE I DO MY AFTERNOON CALENDAR UNTIL SAY 3:00 O'CLOCK.

5   SO IF YOU ALL COULD GET SOME LUNCH, AND THEN BE AVAILABLE.  I

6   CAN'T PREDICT EXACTLY WHAT TIME IT WOULD BE, BUT IF YOU CAN BE

7   AVAILABLE I CAN CALL THE MARSHAL AND LET THEM KNOW WHEN WE'RE

8   READY.

9        WE WILL BE TALKING ABOUT THE JURY INSTRUCTIONS, THE

10  VERDICT FORM.  WE NEED TO FIGURE OUT WHICH EXHIBITS ARE IN

11  EVIDENCE AND WHICH ONES AREN'T.  IF YOU HAVE TIME TO FIGURE OUT

12  WHAT EXHIBITS YOU THINK OUGHT TO BE IN EVIDENCE, YOU CAN WORK

13  ON THAT, AND THEN I HAVE A COUPLE OF OTHER LEGAL ISSUES TO

14  BRING UP.

15       SO WE WILL SEE YOU AS SOON AFTER THREE AS I CAN, AND

16  THEN I WILL HAVE TO LEAVE AFTER ABOUT AN HOUR OR SO TO GET TO

17  MY OTHER ENGAGEMENT.

18            **MR. ANDRADA:**  YES, YOUR HONOR.  THANK YOU.

19            **MR. ASHKER:**  THANK YOU.

20                (RECESS TAKEN AT 1:45 P.M.)

21            (PROCEEDINGS RESUMED AT 3:15 P.M.)

22            (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

23        **THE CLERK:**  PLEASE REMAIN SEATED AND COME TO ORDER.

24  COURT IS NOW IN SESSION.

25        **THE COURT:**  YOU CAN LEAVE IT OFF IF YOU WOULD BE

1    MORE COMFORTABLE.

2              **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

3              **THE COURT:**  SO, I GUESS WE SHOULD FIRST TAKE UP JURY

4    INSTRUCTIONS.

5              I HAVE THE DEFENDANTS' WRITTEN RESPONSE.  I HAVE TO

6    TELL YOU THAT I'M CONSIDERING DECIDING AS A MATTER OF LAW

7    WHETHER THE CONTRACT WAS BREACHED OR CERTAINLY THE MEANING OF

8    THE CONTRACT.  AND GIVEN THAT, YOU MAY, I DON'T KNOW IF YOU

9    WILL STILL WANT TO WITHDRAW YOUR IMPOSSIBILITY DEFENSE.

10             **MR. ANDRADA:**  WELL THEN IF -- JUST FOR THE RECORD,

11   SO WE ARE CLEAR, WE, OF COURSE, BELIEVE THAT THE TERM "REFER"

12   HAS BEEN ESSENTIALLY DEFINED BY THOSE WHO WERE INVOLVED,

13   NAMELY, THE DAVIS PEOPLE.

14             **THE COURT:**  RIGHT, BUT THE QUESTION AND

15   INTERPRETATION OF CONTRACT IS FIRST THE PLAIN LANGUAGE OF THE

16   CONTRACT.  AND IF THAT'S AMBIGUOUS, THEN THE DRAFTERS AND THE

17   SIGNATORIES TO THE CONTRACT, NOT THE PEOPLE WHO WERE CARRYING

18   IT OUT.

19             **MR. ANDRADA:**  AND I BELIEVE THAT THERE IS TESTIMONY

20   FROM -- WE HEARD DR. WINSLOW TODAY TESTIFY, IN EFFECT, THAT IT

21   WAS THE DEFENDANTS' UNDERSTANDING THAT THEY WERE TO REFER THE

22   PLAINTIFF, IN EFFECT, TRIED TO GET HIM AN APPOINTMENT AT DAVIS.

23             AND IF THE COURT SOMEHOW THINKS THAT THE EVIDENCE IS

24   INSUFFICIENT IN THAT REGARD, WE CAN PRESENT THE DEPOSITION OF

25   MARY STATHAM WHO WAS DEPOSED A FEW DAYS AGO.  IT WAS FURTHER

1    STIPULATED THAT THE DEPOSITION COULD BE USED IN LIEU OF HER

2    TESTIMONY.  SHE WAS THE ONE WHO WAS ACTUALLY INVOLVED IN MAKING

3    THE ARRANGEMENTS WITH DAVIS.

4            IT IS UNDISPUTED, YOUR HONOR, THAT THERE WERE TWO

5    REFERRALS AS THE MEDICAL PROVIDERS ALL UNDERSTAND THAT TERM.

6            NOW, WHETHER IT WAS DENIED OR NOT IS NOT REALLY THE

7    QUESTION.  WE KNOW THAT IT WAS DENIED, BUT IT REALLY DOESN'T

8    MATTER BECAUSE -- LET'S ASSUME, LET'S TAKE THE PLAINTIFF'S

9    POINT OF VIEW ON THIS FOR A MOMENT.

10           LET'S ASSUME THAT IT WAS DENIED MERELY BECAUSE --

11   AND I SAY "MERELY" IN A CAVALIER WAY, BECAUSE OF THE PRESS OF

12   BUSINESS AT DAVIS.  AND THERE WAS PLENTY OF TESTIMONY FROM

13   DR. KREIS THAT THAT MIGHT WELL HAVE BEEN THE EXPLANATION.

14           WE DID WHAT THE CONTRACT REQUIRED, WHICH WAS TO

15   CONTACT DAVIS, PROVIDE SOME MEDICAL RECORDS, AND SEEK IN GOOD

16   FAITH A REFERRAL, A CONSULTATION.  IN DECEMBER, YOU WILL RECALL

17   TESTIMONY BY DR. KREIS THAT THE PATIENT MIGHT HAVE BEEN

18   DECLINED EITHER BECAUSE OF THE PRESS OF BUSINESS OR ON THE

19   MERITS.

20           NOW, THIS CLAIM WAS PLED AS A FAILURE TO REFER.

21   THEN WHEN WE TOOK THE DEPOSITIONS OF THE DAVIS DOCTORS AND WE

22   HAVE HAD DISCUSSIONS WITH MR. ASHKER, AND I THINK HE HAS

23   INDICATED IN COURT THEN THE THEORY BECAME, YEAH, IT WAS A

24   REFERRAL, BUT IT WAS A SHAM.  AND HE SAID THAT HERE RIGHT IN

25   THIS COURT, YOUR HONOR, BEFORE -- HE MIGHT HAVE EVEN SAID IT IN

1    OPENING STATEMENT.  I KNOW HE SAID IT IN COURT.

2              THERE IS NO EVIDENCE OF A SHAM, OF A FRAUD, OF A

3    FAILURE --

4              **THE COURT:**  I WOULDN'T NECESSARILY SAY A SHAM OR

5    FRAUD, BUT YOU MAKE A GOOD POINT, A GOOD FAITH REFERRAL.  AND

6    TO ME THE CONTRACT CLEARLY CONTEMPLATED NOT SIMPLY A REFERRAL,

7    BUT IT CONTEMPLATED AN EXAMINATION, A CONSULTATION AND A

8    FOLLOWING OF THE REGIMEN.  SO IT SEEMS CLEAR TO ME THAT WHAT

9    THE PARTIES CONTEMPLATED WAS AN EFFECTIVE REFERRAL THAT

10   RESULTED IN THOSE FURTHER THINGS.  AND TO ME, TWO REFERRALS TO

11   A BUSY CLINIC ISN'T ENOUGH.

12             **MR. ANDRADA:**  WELL, MR. --

13             **THE COURT:**  FURTHERMORE, THE OTHER PORTIONS OF THE

14   CONTRACT, THE THERA-BALL, THE THERA-BAND, THE ARM BRACE, IT'S

15   ESSENTIALLY UNDISPUTED THAT THE CONTRACT WAS BREACHED IN THOSE

16   REGARDS.

17             **MR. ANDRADA:**  NOT AT ALL, YOUR HONOR.

18             **THE COURT:**  UNDISPUTED BY ANY EVIDENCE, SHALL WE

19   SAY.

20             **MR. ANDRADA:**  I AM VERY HAPPY TO RESPOND TO THAT AS

21   WELL.

22             THE CONTRACT TALKS ABOUT REFERRAL.  MR. -- WE

23   MENTIONED THIS THE OTHER DAY, YOUR HONOR.  MR. ASHKER HAD A

24   LAWYER.  THEY SPECIFICALLY WROTE IN ON THE CONTRACT, UC DAVIS.

25             NOW, YOU MIGHT HAVE A MORE REASONABLE ARGUMENT IF

1    THEY DIDN'T WRITE THAT IN.  REFER TO A CLINIC.  BUT THAT'S NOT

2    WHAT THEY -- THAT WASN'T THE BARGAIN.  AND MR. ASHKER TOLD US

3    THIS MORNING THAT, IN FACT, HE TALKED WITH HIS LAWYER AND THEY

4    WANTED SOMEONE WHO WAS SUPPOSEDLY NOT IN OUR POCKET AND,

5    THEREFORE, ASKED FOR DAVIS.

6            NOW, IF THE LAWYER MISJUDGED WHAT THE CDCR WAS ABLE

7    TO DO WITH DAVIS, THAT'S THE LAWYER'S PROBLEM.

8            **THE COURT:**  I DON'T SEE IT THAT WAY.  IT SEEMS TO ME

9    THAT BOTH SIDES WERE IN THE UNDERSTANDING AND BELIEF THAT THIS

10   WOULD BE POSSIBLE AND THAT THEY WOULD BE ABLE TO GET NOT JUST A

11   REFERRAL, BUT THE CLEARLY CONTEMPLATED EXAMINATION,

12   CONSULTATION, AND REGIMEN.  AND THAT'S ONE POINT.

13           AND THE SECOND POINT IS THAT THEN THE CARRYING OUT

14   OF THAT CONTRACT, AS I SAID A MOMENT AGO, I THINK THAT TWO

15   REFERRALS, ONE OF WHICH WAS CLEARLY DECLINED BECAUSE OF PRESS

16   OF BUSINESS AND THE OTHER WHICH WAS PROBABLY DECLINED BECAUSE

17   OF PRESS OF BUSINESS, SIMPLY WAS NOT ENOUGH OF AN EFFORT TO

18   ACCOMPLISH WHAT WAS CLEARLY CONTEMPLATED BY THE CONTRACT.

19           SO, THE ONLY QUESTION IS WHETHER THAT'S A JURY

20   QUESTION OR WHETHER I SHOULD DECIDE IT AS A MATTER OF LAW.

21           ORDINARILY I WOULD SUBMIT SOMETHING LIKE THAT TO THE

22   JURY AND WAIT AND SEE HOW THEY CAME OUT.  THE PROBLEM HERE IS

23   IF I SUBMIT IT TO THE JURY AND THEY SHOULD FIND NO BREACH, THEN

24   THEY WOULDN'T BE FINDING DAMAGES, IT WOULDN'T BE DETERMINING

25   DAMAGES.

1           IF I WERE TO SET THAT ASIDE, I WOULDN'T HAVE A

2    DAMAGE DETERMINATION.  I WOULD HAVE TO RETRY THE CASE, WHICH I

3    WOULDN'T REALLY WANT TO DO CONSIDERING THE EXPENSE AND

4    INCONVENIENCE AND SECURITY ISSUES ENTAILED WITH HAVING

5    MR. ASHKER DOWN HERE.  SO THAT'S MY PROBLEM.

6           AND THEN I DON'T KNOW IF YOU WANTED TO ADDRESS THE

7    OTHER ASPECTS OF THE CONTRACT THAT I THINK --

8           **MR. ANDRADA:**  I WOULD.

9           **THE COURT:**  -- WERE BREACHED.

10          **MR. ANDRADA:**  YOU MENTIONED DAMAGES, YOUR HONOR.

11   AND WE SCRAMBLED LAST NIGHT, READ THE CASES THAT YOU THOUGHT

12   APPLIED WITH REGARD TO DAMAGES.  WE'VE FILED NOW TWO BRIEFS.

13          THE CASES, WE SUBMIT, THAT THE CASES THAT YOU

14   REFERRED US TO TALK ABOUT VERY, VERY NARROW SITUATIONS, NOT THE

15   SORT OF SITUATION THAT WE HAVE HERE, WHICH, AS DR. WINSLOW

16   INDICATED, DEALT WITH A PATIENT WHO WAS ASKING FOR A REFERRAL

17   IN AN ESSENTIALLY STABLE CONDITION.

18          NOW, NO ONE HAS COME IN HERE AND TESTIFIED THAT HIS

19   CONDITION WAS NOT STABLE AT THAT TIME.  SO, THERE WAS NO -- AND

20   THERE WAS NO TESTIMONY FROM DR. WEINSTEIN THAT THE REFERRAL HAD

21   TO BE MADE AND ARRANGED AND PUT IN PLACE WITHIN TWO WEEKS OR

22   THREE WEEKS OR A MONTH, OR WHAT HAVE YOU.  AND DR. WEINSTEIN

23   HAS HAD NINE YEARS TO THINK ABOUT THAT QUESTION.

24          **THE COURT:**  WE ARE NOT TALKING ABOUT THE TIMING.

25   THAT WAS PROBLEMATIC, BUT THAT IS NOT WHAT WE ARE TALKING

1    ABOUT.

2              **MR. ANDRADA:**  SO WHAT MY POINT IS THAT THIS IS NOT

3    THE SORT OF SPECIAL CIRCUMSTANCE THAT WARRANTS EMOTIONAL

4    DISTRESS DAMAGES FOR BREACH OF CONTRACT.

5              **THE COURT:**  MAYBE THAT IS OUR SEMANTIC PROBLEM.

6    PERHAPS YOU'RE EVEN RIGHT ABOUT EMOTIONAL DISTRESS, BUT

7    PHYSICAL PAIN, PHYSICAL SUFFERING, INCREASE OF PHYSICAL

8    DISABILITY, THOSE ARE CLEARLY CONTEMPLATED AS POSSIBLE

9    CONSEQUENCES OF BREACH OF A CONTRACT FOR MEDICAL CARE.

10             SO YOU MIGHT BE RIGHT THAT WE SHOULD NOT ALLOW

11   PURELY MENTAL DISTRESS AS DAMAGES, BUT CERTAINLY THE DAMAGES

12   WOULD ENCOMPASS PHYSICAL PAIN, PHYSICAL SUFFERING, PHYSICAL

13   DAMAGE.

14             **MR. ANDRADA:**  ALL RIGHT.  LET ME RESPOND TO THAT.

15             WHAT EVIDENCE IS THERE THAT HAD THERE BEEN A

16   REFERRAL -- HAD DAVIS SEEN HIM IN OCTOBER OF 2002, JUDGE, WHAT

17   EVIDENCE IS THERE AS TO WHAT THEY WOULD HAVE DONE?  WHAT

18   EVIDENCE --

19             **THE COURT:**  IT IS PRETTY HARD TO PROVE SINCE HE

20   CAN'T GET THERE ON HIS OWN AND YOU DIDN'T BRING HIM.  SO I

21   THINK THAT HIS EVIDENCE OF INCREASED PAIN AND INCREASED

22   DISABILITY WOULD BE WHAT THE JURY WOULD HAVE TO CONSIDER.

23             **MR. ANDRADA:**  WELL YOUR HONOR, THE QUESTION IS, SEND

24   HIM TO A SPECIALIST.  OKAY.  WE SEND HIM TO A SPECIALIST.  HE'S

25   GOT TO PRODUCE AN EXPERT THAT SAYS, HERE'S WHAT -- IN ORDER TO

1    PROVE CAUSATION AND DAMAGES, YOUR HONOR, WE RESPECTFULLY

2    BELIEVE THAT HE NEEDED TO PRESENT AN EXPERT TO SAY, YOU KNOW

3    WHAT?  HERE'S WHAT PROBABLY WOULD HAVE HAPPENED.  THE DAVIS

4    PEOPLE PROBABLY WOULD HAVE REINSTATED TRAMADOL AND WE WOULD

5    HAVE GONE ON OUR MERRY WAY.

6             HE HASN'T DONE THAT.  HE SPENT MORE THAN HALF OF HIS

7    TIME ALREADY, AND WE ARE ALREADY GETTING THE SHORT END OF THE

8    STICK WITH REGARD TO TIME.  HE HAS A FUNDAMENTAL FAILURE OF

9    PROOF WITH REGARD TO CAUSATION AND DAMAGES EVEN IF ONE ASSUMES

10   THAT THE CONTRACT REQUIRED A REFERRAL AND THAT DAVIS WOULD HAVE

11   CHANGED HIS REGIMEN.

12            IT'S AKIN TO, YOUR HONOR, WE RESPECTFULLY BELIEVE, A

13   MALPRACTICE CASE WHERE YOU PROVE BREACH BUT NOT CAUSATION AND

14   DAMAGES.  SO THE CAUSE OF ACTION FAILS AS A MATTER OF LAW AND

15   WE ARE GOING TO BE -- I CAN SAY IT RIGHT NOW, WE ARE ENTITLED

16   TO A RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IF YOU

17   WANT TO CALL IT NONSUIT, FOR A FAILURE OF PROOF.  AND IT WOULD

18   APPLY TO EACH OF THOSE TYPES OF MEDICAL CARE.

19            THERE IS NO EVIDENCE THAT HAD HE BEEN -- THE

20   CONTRACT DOESN'T EVEN SAY HE IS ENTITLED TO A NEW BRACE.  HE

21   HAS HAD HIS BRACE.  THERE IS NO EVIDENCE THAT A DIFFERENT BRACE

22   WOULD HAVE MADE ANY DIFFERENCE.

23            AND LIKEWISE, YOUR HONOR, THROUGH ALL THOSE, I

24   CONTINUE TO BE -- PERHAPS I JUST DON'T UNDERSTAND THE FILE, BUT

25   WITH REGARD TO PHYSICAL THERAPY, HE HAD PHYSICAL THERAPY AT THE

1    TIME OF THE CONTRACT.  THEY CONTINUED THE PHYSICAL THERAPY FOR

2    FIVE YEARS.  AND HE CALLED MR. DODGEN TODAY.  MR. DODGEN SAYS,

3    MEDICALLY HE DIDN'T NEED IT.  AND THE CONTRACT SAYS SOMETHING

4    LIKE, YOU CAN HAVE IT UNTIL -- THE WORDS -- THE WORD MAY WELL

5    BE "CONTRAINDICATED", AND DR. WINSLOW STATED THAT

6    CONTRAINDICATED HAS SEVERAL MEANINGS FOR PROVIDERS AND ONE OF

7    THOSE IS, IN LAYMAN'S TERMS, IT'S NOT NEEDED ANYMORE.

8              **THE COURT:**  AGAIN, THERE I WOULD HAVE TO INTERPRET

9    THE CONTRACT BASED ON THE CONTRACT AS A WHOLE.  WHAT I WOULD

10   HAVE TO SAY ABOUT THAT IS THAT THE EARLIER SENTENCE CALLS FOR

11   CONTINUING PAIN MANAGEMENT UNTIL THE MEDICAL NEEDS CHANGE.  BUT

12   THE LANGUAGE IS DIFFERENT FOR THE PHYSICAL THERAPY.  AND THERE

13   IT SAYS UNTIL A CHANGE IN THE MEDICAL NEEDS CONTRAINDICATE THE

14   THERAPY.  SO THAT USE OF A DIFFERENT TERM IN A DIFFERENT

15   SENTENCE TO ME MEANS A DIFFERENT MEANING WAS INTENDED, AND THAT

16   THAT MEANING IS THAT CONTRAINDICATED IS A STRONGER TERM THAN

17   SIMPLY CHANGE OF NEEDS.  AND THAT CONTRAINDICATED MEANS EITHER

18   THAT IT HAS BECOME HARMFUL, OR AT THE VERY LEAST, IT IS NO

19   LONGER BENEFICIAL.  BUT THE PHYSICAL THERAPIST SAID THAT THE

20   WHIRLPOOL BATH WAS BENEFICIAL.

21              NOW, MAYBE IT'S NOT IMMEDIATELY NECESSARY, BUT IT IS

22   CERTAINLY NOT CONTRAINDICATED AND IT'S APPARENTLY BENEFICIAL.

23   SO, I THINK THAT THAT ONE LIKEWISE IS BREACHED AS A MATTER OF

24   LAW.

25              **MR. ANDRADA:**  YOUR HONOR, TO FOLLOW YOUR LOGIC, YOUR

1   HONOR, I AM GOING TO HARKEN BACK TO DR. WINSLOW'S COMMENTS, YOU

2   ARE BASICALLY SAYING THAT THE CDCR CONTEMPLATED IN 2002 THAT

3   THEY WOULD BE PROVIDING MR. ASHKER WITH PHYSICAL THERAPY FOR

4   THE REST OF HIS LIFE.  THAT IS REALLY --

5           **MR. ASHKER:**  YES.

6           **MR. ANDRADA:**  PLEASE, MR. ASHKER.  THAT IS REALLY

7   THE LOGICAL EXTENSION, YOUR HONOR, OF YOUR ARGUMENT.

8           **THE COURT:**  IT IS NOT MY ARGUMENT.  I AM READING THE

9   CONTRACT, AND IT SAYS "CONTRAINDICATED".

10          **MR. ANDRADA:**  AS DR. WINSLOW SAID, I DON'T KNOW IF

11  HE USED THE WORD ABSURD TO THINK THAT THIS WAS A LIFETIME DEAL,

12  BUT THAT WAS THE GIST OF HIS COMMENT.

13          SO, I RESPECTFULLY THINK, YOUR HONOR, THAT YOU'RE

14  NOT REALLY LOOKING AT THOSE TERMS IN LIGHT OF THE EVIDENCE THAT

15  HAS BEEN PRESENTED AND IN TERMS OF COMMON SENSE AS WELL.  NO

16  ONE IS GOING TO SIGN UP FOR LIFE -- NO ENTITY OR INSTITUTION IS

17  GOING TO SIGN A LIFETIME MEDICAL CARE CONTRACT FOR -- UNDER

18  THESE CIRCUMSTANCES.  IT JUST DOESN'T MAKE ANY SENSE.

19          MOREOVER, HE HAD THE PHYSICAL THERAPY FOR YEARS.

20  THE ONLY -- EVEN IF YOU CALL A WHIRLPOOL PHYSICAL THERAPY --

21          **THE COURT:**  I DO.  THAT SEEMED TO BE WHAT DOCTOR --

22  DODGEN WAS SAYING.

23          **MR. ANDRADA:**  WELL --

24          **MR. ASHKER:**  MAY I BE HEARD ON THESE ISSUES, YOUR

25  HONOR?

1          THE COURT:  WELL, THERE IS AN OLD ADAGE IN THE LAW

2     THAT SAYS IF YOU'RE --

3          MR. ASHKER:  KEEP MY MOUTH SHUT?

4          THE COURT:  IF YOU DON'T NEED TO CORRECT SOMETHING,

5     THAT IT IS BEST NOT TO SAY ANYTHING.  IF YOU WANT TO SAY

6     SOMETHING AFTER I FINISH HEARING OUT MR. ANDRADA, YOU MAY.

7          MR. ASHKER:  ALL RIGHT.

8          MR. ANDRADA:  LET'S DEAL WITH SOME OF THESE OTHER

9     PARTS OF THIS AGREEMENT.

10          THE BAND AND THE BALL.  THE EVIDENCE IS THAT HE HAS

11     HAD IT THE ENTIRE TIME.  SO I DON'T UNDERSTAND, YOUR HONOR --

12          THE COURT:  BECAUSE THE COURT ORDERED IT AS

13     PRELIMINARY INJUNCTIVE RELIEF.

14          MR. ANDRADA:  HE HAS HAD IT.

15          THE COURT:  WELL, YES, BUT THE COURT HAD TO ORDER

16     HIM TO HAVE IT BECAUSE THE DEFENDANTS WERE TAKING IT AWAY FROM

17     HIM.

18          MR. ANDRADA:  THEY DIDN'T TAKE IT, THAT'S THE POINT.

19          THE COURT:  THEY COULDN'T BECAUSE I ORDERED THEM NOT

20     TO.

21          MR. ANDRADA:  HE SHOULDN'T GET DAMAGES IF THE HARM

22     WASN'T CAUSED.

23          THE COURT:  OH, WELL, DAMAGE FROM THE LOSS OF THE --

24     THAT'S TRUE.  YOU'RE RIGHT.  HE SHOULDN'T GET DAMAGES FOR NOT

25     HAVING THE BALL OR THE BAND DURING TIMES THAT HE DID HAVE IT.

1          HE MIGHT WANT TO WRITE AN INSTRUCTION THAT CARVES

2     THAT OUT.  IT WOULD BE PRETTY HARD TO DO AND PRETTY HARD FOR

3     THE JURY TO, I WOULD THINK, DISTINGUISH BETWEEN DAMAGE CAUSED

4     BY ONE THING OR ANOTHER, BUT CERTAINLY YOU CAN TRY YOUR HAND AT

5     AN INSTRUCTION THAT WOULD CARVE THAT OUT.

6          **MR. ANDRADA:**  YOUR HONOR, I AM NOT AWARE -- CAN WE

7     COME BACK TO THE QUESTION -- THE POINT I MADE EARLIER ABOUT

8     CAUSATION AND DAMAGES.

9          I DON'T KNOW THAT THE COURT HAS REALLY RESPONDED TO

10    MY CONCERN ABOUT THE NEED FOR WHAT WOULD HAVE -- OF EVIDENCE AS

11    TO WHAT WOULD HAVE HAPPENED HAD HE BEEN SENT TO A PAIN

12    MANAGEMENT SPECIALIST.

13         AGAIN, I HAVE ALREADY COMMENTED THERE'S -- THERE IS

14    NO EVIDENCE OF CAUSATION AND DAMAGE IN THAT REGARD, SO WHAT IS

15    THE JURY SUPPOSED TO JUST --

16         **THE COURT:**  I THINK THE JURY WOULD --

17         **MR. ANDRADA:**  ASSUME --

18         **THE COURT:**  -- I WOLD IMAGINE WHAT MR. ASHKER WOULD

19    ARGUE WAS THAT DR. WEINSTEIN'S EVIDENCE OR TESTIMONY AS TO WHAT

20    HE THOUGHT APPROPRIATE TREATMENT WOULD BE, I GUESS ONE COULD

21    INFER THAT IF THAT'S THE APPROPRIATE TREATMENT, THAT THAT'S

22    WHAT UC DAVIS WOULD HAVE ARRIVED AT, OR SOME OTHER, PERHAPS NOT

23    TRAMADOL, MAYBE THEY WOULD HAVE COME UP WITH SOME OTHER PAIN

24    REGIMEN THAT WOULD HAVE AIDED HIS PAIN.

25         CERTAINLY THEY WOULDN'T HAVE MADE IT WORSE.  IF THE

1   TRAMADOL WAS EFFECTIVE WITH LITTLE SIDE EFFECT, THEN ONE WOULD

2   ASSUME THAT A GOOD PAIN MANAGEMENT CLINIC WOULD COME UP WITH

3   SOMETHING AT LEAST THAT GOOD, IF NOT BETTER.

4          AND THEN HE ALSO HAD SOME EVIDENCE ABOUT THE SIZE OF

5   HIS ARM AND THE FLEXIBILITY OF HIS ARM AND SO FORTH THAT IT WAS

6   BETTER IN '02 THAT GOT EVEN BETTER IN '07, AND THEN GOT WORSE

7   AFTER THAT.  THERE IS EVIDENCE ALONG THOSE LINES THAT WOULD GO

8   TOWARDS PHYSICAL IMPAIRMENT AS A RESULT.

9          AND, AGAIN, ONE WOULD ASSUME THAT THE -- HAD THE

10  REGIMEN BEEN FOLLOWED, THOSE THINGS WOULD NOT HAVE TRANSPIRED.

11         **MR. ANDRADA:**  LET ME SEE IF I UNDERSTAND WHAT THE

12  COURT --

13         **THE COURT:**  ACTUALLY, YOU KNOW WHAT, I THINK WE

14  BETTER GO ON TO SOME OF THESE OTHER POINTS IN THE INSTRUCTIONS

15  BECAUSE IT IS NOW 25 TO FOUR AND I DO HAVE A COMMITMENT IN SAN

16  FRANCISCO.

17         **MR. ANDRADA:**  VERY WELL, YOUR HONOR.

18         **THE COURT:**  LET'S GO THROUGH THE OTHER ISSUES.

19         **MR. ANDRADA:**  HAVING GRASPED THE COURT'S INDICATION,

20  THEN I SUPPOSE WE SHOULD REINSTATE THIS DEFENSE OF

21  IMPOSSIBILITY.

22         **THE COURT:**  I THOUGHT YOU MIGHT WANT TO DO THAT.

23  FRANKLY, I AM NOT REAL SURE YOU HAVE ENOUGH EVIDENCE FOR THAT

24  EITHER BECAUSE THE LAW ON IMPOSSIBILITY IS PRETTY STRICT.

25         YOU HAVE THE BURDEN OF PROOF TO A PREPONDERANCE OF

1   THE EVIDENCE, AND I AM NOT EVEN SURE THAT I COULD SUBMIT TO A

2   JURY THE NOTION THAT TWO REFERRALS BEING DENIED RENDERED IT

3   IMPOSSIBLE FOR THEM TO SEND HIM TO UC DAVIS.  I AM NOT SURE I

4   CAN EVEN SEND THAT TO THE JURY.

5            **MR. ANDRADA:**  THEN WE HAVE THE THIRD REFERRAL, YOUR

6   HONOR, IN JUNE OF 2003 TO A PAIN MANAGEMENT SPECIALIST IN

7   MANTECA.  I KNOW THERE'S A BIG DISPUTE ABOUT, WELL, YOU KNOW, I

8   COULDN'T GET ON THE BUS BECAUSE THE FEDS HAD SEIZED MY

9   PROPERTY.  HE'S ALLOWED TO GET INTO THAT EVIDENCE, BUT WE CAN'T

10  GO THERE AND COMMENT, WHAT DO YOU MEAN, MR. ASHKER, THE FEDS

11  SEIZED YOUR PROPERTY?  I GUESS THAT WAS PART OF A GANG

12  INVESTIGATION, BUT WE -- SO THEN THE CDCR SOMEHOW HAS TO BEAR

13  THE BRUNT OF SOME FEDERAL ACTIVITY?

14           **THE COURT:**  IT WOULDN'T BE THAT.  AS YOU POINT OUT,

15  THE CONTRACT DID SAY UC DAVIS.

16           NOW, I HAD SORT OF SPUN OUT A THEORY IN AN EARLIER

17  COURT PROCEEDING THAT SAID, WELL, PERHAPS IF THEY HAD FOUND

18  THAT THEY WERE SIMPLY UNABLE TO GO TO UC DAVIS, THAT IT REALLY

19  TRULY WAS IMPOSSIBLE THAT THEY WERE NEVER GOING TO BE ABLE TO

20  GET IN THERE NO MATTER WHAT THEY DID, THEN PERHAPS THE REMEDY

21  WOULD HAVE BEEN TO GO BACK AND TRY TO MODIFY THE CONTRACT; TO

22  GO TO THE ATTORNEY OR GO TO MR. ASHKER AND SAY, LOOK, JUST WE

23  CAN'T GET YOU INTO UC DAVIS, HOW ABOUT THIS?  AND PERHAPS THEY

24  COULD HAVE NEGOTIATED AN AMENDMENT TO THE CONTRACT.

25           BUT THEY DIDN'T DO THAT.  AND, INSTEAD, THEY, I

1    GUESS UNILATERALLY PERHAPS, DECIDED THAT THEY WOULD SEND HIM TO

2    MANTECA.  WE DON'T REALLY KNOW TOO MUCH ABOUT WHAT'S IN MANTECA

3    AND WE DON'T HAVE ANY EVIDENCE THAT ANYONE EXPLAINED TO

4    MR. ASHKER THAT, YOU KNOW, BY THE WAY, WE CAN'T GET YOU TO UC

5    DAVIS, HERE IS THIS ALTERNATIVE, YOU REALLY OUGHT TO GO BECAUSE

6    THIS IS YOUR ONLY SHOT.  WE'RE GOING TO TRY THIS ONCE AND THEN

7    THAT'S IT FOR YOUR SETTLEMENT AGREEMENT.

8            I DON'T THINK THERE'S ANY EVIDENCE THAT THAT

9    TRANSPIRED.  SO I AM NOT REALLY SEEING THAT AS A SUBSTITUTE

10   UNDER THESE CIRCUMSTANCES.

11           **MR. ANDRADA:**  THERE'S A 602 THAT DEALS WITH AT LEAST

12   PART OF THOSE ISSUES.  MR. ASHKER WAS INFORMED BY WAY OF A 602

13   RESPONSE THAT, IN FACT, THE REFERRALS HAD BEEN MADE TO DAVIS

14   AND THAT HE HAD BEEN DENIED.

15           **MR. ASHKER:**  AND IN THAT --

16           **THE COURT:**  AND SO WHAT?

17           **MR. ANDRADA:**  IN OTHER WORDS, WE DID TELL HIM AND

18   THERE IS -- WE CAN PRODUCE EVIDENCE FROM HIS OWN CHART, YOUR

19   HONOR, THAT HE WAS INFORMED THAT HE WAS GOING TO MANTECA TO SEE

20   A PAIN MANAGEMENT SPECIALIST AT A HOSPITAL DOWN THERE.  IT'S IN

21   THE CHART.  WE CAN DIG IT OUT AND WE CAN SUBMIT THAT.

22           IF THOSE ARE YOUR CONCERNS, YOUR HONOR, WE CAN SOLVE

23   THOSE PROBLEMS VERY EASILY.

24           **THE COURT:**  WELL, YOU CAN GIVE IT A SHOT AND I WILL

25   SEE WHAT'S THERE.  I AM NOT FAMILIAR WITH THAT EVIDENCE.

1          ANYWAY, IF WE LOOK AT THE REST OF THE INSTRUCTIONS,

2   STARTING WITH DUTY OF THE JURY, IF YOU ALL WANT TO FOLLOW ALONG

3   ON PAGE 1.

4          **MR. ANDRADA:**  YOUR HONOR, CAN I MAKE ONE MORE

5   COMMENT ABOUT THIS?  I AM SORRY.

6          **THE COURT:**  OKAY.

7          **MR. ANDRADA:**  DO YOU MIND?  I KNOW YOU HAVE TO GO.

8          **THE COURT:**  I DON'T MIND SO MUCH, BUT I KNOW YOU

9   HAVE OTHER THINGS YOU WANT TO TALK ABOUT AS WELL AND I DON'T

10  HAVE UNLIMITED TIME.

11          **MR. ANDRADA:**  I WILL BE QUIET.

12          **THE COURT:**  IF YOU WANT TO SPEND MORE TIME ON

13  THIS --

14          **MR. ANDRADA:**  LET ME ASK YOU THIS:  TOMORROW, IT

15  SEEMS TO ME, YOUR HONOR, THAT IF WE ENDED AT, CALL IT

16  11:00 O'CLOCK, AN HOUR EACH FOR ARGUMENT AND HALF HOUR FOR

17  INSTRUCTIONS, RIGHT, THAT STILL YOUR INTENTION?

18          **THE COURT:**  CORRECT.

19          **MR. ANDRADA:**  MR. ASHKER IS OUT OF TIME.  IF THE

20  DEAL WAS, YOUR HONOR, AND YOU KNOW IT WAS, 50/50, IT'S CLEAR

21  THAT HE HAS NO MORE TIME LEFT.

22          **THE COURT:**  WELL, AS I MENTIONED EARLIER, IF WE NEED

23  TO, WE WILL GO FURTHER INTO FRIDAY.  AND I ALREADY WARNED THE

24  JURY THAT WE MAY END UP HAVING TO GO, PUT THE INSTRUCTION AND

25  ARGUMENT OVER UNTIL MONDAY MORNING.  I DO HAVE ANOTHER JURY

1   TRIAL STARTING MONDAY MORNING, BUT I THINK I CAN ARRANGE TO

2   PICK THAT JURY IN THE AFTERNOON.  THAT WAY WE CAN DO THE

3   INSTRUCTION AND ARGUMENT IN THE MORNING.  THAT WAY WE CAN GIVE

4   YOU, IF WE HAD TO, THE WHOLE FIVE HOURS OR WHATEVER IT IS ON

5   FRIDAY TO EVEN YOURSELF UP.

6             **MR. ANDRADA:**  THAT'S FINE.  I WILL TAKE THE FIVE

7   HOURS THEN.

8             **MR. ASHKER:**  YOUR HONOR?

9             **THE COURT:**  YES.

10            **MR. ASHKER:**  WHAT ABOUT MY ABILITY TO DIRECT EXAM

11  DR. SAYRE?

12            **THE COURT:**  CROSS, YOU MEAN?

13            WELL, I WILL GIVE YOU SOME TIME TO DO THAT.  COUNSEL

14  IS RIGHT THAT YOU HAVE USED A LOT MORE TIME THAN THE DEFENDANT

15  HAS SO FAR, BUT I WILL GIVE YOU A SHORT AMOUNT OF TIME TO

16  CROSS-EXAMINE DR. SAYRE.  SO YOU NEED TO PLAN THAT OUT.  YOU

17  HAVE GOT TO STOP WITH THE LONG INTROS WHERE YOU DESCRIBE THE

18  WHOLE SCENARIO FOR ABOUT TWO PARAGRAPHS AND THEN END UP SAYING

19  SOMETHING AT THE END OF IT.  IT TAKES UP TOO MUCH TIME.  IT'S

20  NOT A GOOD WAY TO PROCEED.

21            CROSS-EXAMINATION QUESTIONS NEED TO BE SHORT.  YOU

22  NEED TO FIGURE OUT WAYS THAT YOU CAN -- POINTS THAT YOU CAN

23  MAKE, ADMISSIONS THAT HAVE BEEN MADE, THINGS IN THE RECORD, AND

24  GO RIGHT TO THOSE QUICKLY AND EFFICIENTLY AND NOT DO THIS LONG

25  INTRO BECAUSE YOU DON'T HAVE TIME TO DO THAT.

1          **MR. ASHKER:**  THE THING IS THOUGH, THE WAY THE TRIAL

2    HAS BEEN RAN, WHERE WE'VE BEEN SWITCHING UP WITNESSES TO MAKE

3    IT POSSIBLE TO GET EVERYBODY IN, THE TIME THAT I HAVE USED ON

4    THESE OTHER WITNESSES I WOULD HAVE DEFINITELY USED THAT TIME ON

5    DR. SAYRE BEFORE I WOULD HAVE -- YOU KNOW WHAT I MEAN?

6          **MR. ANDRADA:**  THAT'S A JUDGMENT CALL ON HIS PART.

7          **THE COURT:**  I WILL GIVE YOU SOME TIME TO

8    CROSS-EXAMINE DR. SAYRE.  I WARNED YOU, AS YOU WILL RECALL,

9    SEVERAL TIMES DURING YOUR USE OF THAT TIME ON THOSE OTHER

10   WITNESSES THAT YOU NEEDED TO FINISH UP.  AND I HAVE KEPT TRACK

11   OF THE TIME YOU'VE USED AND THE TIME THE DEFENDANTS HAVE USED,

12   AND THEY HAVE USED LESS.  SO --

13         **MR. ASHKER:**  I UNDERSTAND, YOUR HONOR.

14         **THE COURT:**  I WILL DO THE BEST I CAN TO MAKE THE

15   TRIAL FAIR.

16         **MR. ASHKER:**  I DON'T THINK -- EXCUSE ME, YOUR HONOR.

17         I WAS GOING TO SAY I DON'T THINK I WILL NEED THAT

18   MUCH TIME ON DR. SAYRE ANYHOW.

19         **THE COURT:**  YOU SHOULDN'T.  YOU SHOULD THINK OF THE

20   POINTS THAT YOU CAN MAKE --

21         **MR. ASHKER:**  I HAVE THEM READY.

22         **THE COURT:**  -- INTELLIGIBLY MAKE THEM AND FINISH.

23   YOU ARE NOT GOING TO GET ANYWHERE ARGUING WITH HIM AT LENGTH OR

24   SPINNING OUT LENGTHY SCENARIOS.  THAT'S NOT GOING TO GET YOU

25   ANYWHERE.

1          **MR. ASHKER:**  I WON'T BOTHER.

2          **MR. ANDRADA:**  SO WE ARE CLEAR, BECAUSE NOW

3    APPARENTLY --

4          **THE COURT:**  CAN WE GET TO THE INSTRUCTIONS AND THEN

5    WE WILL COME BACK TO YOUR OTHER PROBLEMS AFTER THAT?

6          **MR. ANDRADA:**  CERTAINLY, YOUR HONOR.  EXCUSE ME.  I

7    APOLOGIZE.

8          **THE COURT:**  START WITH PAGE 1, DUTY OF THE JURY.  I

9    DON'T SEE ANY PROBLEM THERE.

10          PAGE 2, CLAIMS AND DEFENSES.  IT OCCURS TO ME THAT

11    THE JURY MIGHT BECOME CONFUSED ABOUT THE ROLE OF DEFENDANT CATE

12    HERE SINCE HE HASN'T BEEN HERE AND ISN'T GOING TO TESTIFY.  SO

13    I PROPOSE TO ADD ON PAGE 2 UNDER CLAIMS AND DEFENSES ON THE

14    LINE 8, DR. MICHAEL SAYRE, THE CHIEF MEDICAL OFFICER AT PBSP

15    WHO IS BEING SUED PERSONALLY AND MATTHEW CATE, THE CURRENT

16    DIRECTOR, ET CETERA, WHO IS BEING SUED ONLY AS THE

17    REPRESENTATIVE OF THE CDCR, IN THE HOPES THAT THAT WOULD

18    EXPLAIN THE DIFFERENCE TO THEM.

19          SO IF YOU HAVE A BETTER IDEA OF HOW TO EXPLAIN THAT,

20    YOU CAN CERTAINLY GIVE ME SOMETHING, BUT THAT'S MY THOUGHT.

21          **MR. ANDRADA:**  I THINK THAT SOUNDS ALL RIGHT.

22          **THE COURT:**  OKAY.

23          **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

24          **THE COURT:**  GO ON TO THE THIRD PAGE.  THAT ALL SEEMS

25    TO BE OKAY.

1        THE FOURTH PAGE, I WASN'T SURE THERE WOULD BE ANY

2    EVIDENCE ADMITTED FOR A LIMITED PURPOSE, BUT THERE WAS, SO

3    WHERE I SAY "IF APPLICABLE", I WILL SAY IT IS APPLICABLE.

4        THE FIFTH PAGE, RULING ON OBJECTIONS, CREDIBILITY.

5        THE SIXTH PAGE, STIPULATED TESTIMONY.  I AM NOT SURE

6    WE HAVE HAD ANY STIPULATED TESTIMONY, HAVE WE?

7        **MR. ANDRADA:**  I DON'T THINK SO, YOUR HONOR.  I DON'T

8    RECALL ANY.

9        **THE COURT:**  WE WILL TAKE THAT OUT.

10        STIPULATIONS OF FACT, AGAIN, I DON'T THINK WE HAVE

11    ANY OF THAT.

12        PAGE 7, I DON'T KNOW, DID WE REALLY HAVE ANY

13    HYPOTHETICAL QUESTIONS?

14        **MR. ANDRADA:**  WELL, I THOUGHT WE --

15        **THE COURT:**  IF ANYBODY WANTS IT, I WILL GIVE IT.

16    SAY YES AND I'LL GIVE YOU.

17        **MR. ANDRADA:**  I THOUGHT YOU PHRASED --

18        **THE COURT:**  JUST SAY YES.

19        **MR. ANDRADA:**  YES, IT'S APPROPRIATE.

20        **THE COURT:**  I WILL GIVE IT.

21        JUDICIAL NOTICE.  I DON'T THINK I JUDICIALLY NOTICED

22    ANYTHING.

23        **MR. ASHKER:**  UM, YOUR HONOR, ON THIS JUDICIAL

24    NOTICE, THAT WOULD BE IF YOU ADMONISHED THE JURY TO TAKE

25    JUDICIAL NOTICE ABOUT SOMETHING?

1          **THE COURT:**  RIGHT.

2          **MR. ASHKER:**  OKAY.  I WASN'T CLEAR.

3          **THE COURT:**  I DON'T THINK I DID.  DID I,

4    MR. ANDRADA?

5          **MR. ANDRADA:**  NO, YOUR HONOR.

6          **MR. ASHKER:**  I DON'T REMEMBER YOU DOING THAT.

7          **THE COURT:**  CHARTS AND SUMMARIES.  WE HAVEN'T HAD

8    ANY SO FAR.

9          **MR. ASHKER:**  ON THE ARM BRACE ISSUE, YOUR HONOR?  IN

10   THAT CONTRACT CLAIM, I MEAN, THE CLEAR INTENT IS A USABLE ARM

11   BRACE.

12         **THE COURT:**  RIGHT.  LET'S GO ON WITH THE

13   INSTRUCTIONS FOR NOW.  IF WE HAVE TIME TO GO BACK TO THAT, WE

14   WILL.

15         **MR. ASHKER:**  OKAY.

16         **THE COURT:**  YOU HAD A SENTENCE YOU WANTED TO ADD

17   SOMEWHERE, THE DEFENDANT DID, ABOUT THE -- I GUESS IT'S TOWARDS

18   THE END.  OKAY.

19         CIVIL RIGHTS CLAIMS, SERIOUS MEDICAL NEED DEFINED.

20   ON PAGE 8 NOW.

21         PAGE 9, CAUSATION, NEGLIGENCE, STANDARD OF CARE ALL

22   SEEMS TO BE OKAY.  PAGE 10.

23         PAGE 11, PATIENT'S DUTY TO PROVIDE FOR HIS OWN

24   WELL-BEING.  THAT'S SOMETHING I THINK DEFENDANTS HAD PROPOSED

25   AND I AM WONDERING WHAT EVIDENCE THERE WAS TO SUPPORT THAT

```
 1   INSTRUCTION.

 2             MR. ANDRADA:  WELL, THERE WAS SOME TESTIMONY ON --

 3   BY MR. ASHKER CALLING DOCTORS CLOWNS, REFUSING VARIOUS PROPOSED

 4   MEDICATIONS.  SO I THINK IT IS STILL APPROPRIATE.

 5             THE COURT:  WELL, THIS INSTRUCTION SAYS FAILING TO

 6   FOLLOW DR. SAYRE'S INSTRUCTIONS AND FAILING TO SEEK MEDICAL

 7   ASSISTANCE WHEN NECESSARY.

 8             I HAVE TO SAY IT WOULD BE RATHER DIFFICULT TO ACCUSE

 9   MR. ASHKER OF FAILING TO SEEK MEDICAL ASSISTANCE.  AND TO THE

10   EXTENT THERE WAS A REFUSAL TO TAKE SOME MEDICATION, I AM NOT

11   SURE IT WAS ONE THAT DR. SAYRE HAD AUTHORIZED OR HAD ASKED FOR.

12             MR. ANDRADA:  LET ME -- I -- YOU ARE PROBABLY

13   CORRECT, YOUR HONOR.

14             THE COURT:  WHY DON'T YOU GIVE IT SOME THOUGHT AND

15   LET ME KNOW IF YOU THINK WE SHOULD HAVE THAT INSTRUCTION OR IF

16   WE SHOULD REPHRASE IT IN SOME WAY.

17             MR. ANDRADA:  YES, YOUR HONOR.

18             THE COURT:  SO I WILL PUT THAT AS A MAYBE AND YOU

19   WILL GET BACK TO ME.

20             MR. ANDRADA:  YES, YOUR HONOR.

21             THE COURT:  NOW, THE BREACH OF CONTRACT.  HERE IS

22   WHERE WE GET INTO DIFFICULTIES.  SO LET'S SKIP THAT FOR THE

23   MOMENT.

24             THE REASONABLE TIME --

25             MR. ANDRADA:  WE WOULD WANT THAT BACK IN, YOUR
```

1   HONOR.  IT SEEMS TO ME IF THE THEORY IS GOING TO BE --

2            **THE COURT:**  NO ONE HAS REALLY CLAIMED ANYTHING ABOUT

3   A LACK OF REASONABLE TIME.  I SUPPOSE YOU COULD SAY YOU STILL

4   ARE GOING TO COMPLY WITH THE CONTRACT AND THEN ONE MIGHT ARGUE

5   IT'S NOT A REASONABLE TIME TO COMPLY IN 2009.  SO FAR THERE

6   HASN'T BEEN MUCH OF AN ARGUMENT ABOUT REASONABLE TIME.

7            **MR. ASHKER:**  YOUR HONOR, ON THAT REASONABLE TIME

8   ISSUE?  THAT'S WHAT I WAS ASKING DR. WINSLOW ABOUT.  AND I

9   ASKED -- I ALSO ASKED STATHAM WHO'S DEPOSITION WAS TAKEN ABOUT

10  THAT FIVE-MONTH TIME LAPSE BECAUSE IN MY SUPPLEMENTAL

11  COMPLAINT, I VERY SPECIFICALLY SAY --

12           **THE COURT:**  OKAY.  ALL RIGHT.  WE WILL LEAVE THAT

13  IN.

14           NOW, YOU WERE -- BACK ON THE STANDARD OF CARE ABOUT

15  THE REFERRING TO A SPECIALIST.  I HAD THOUGHT THERE WAS

16  TESTIMONY ABOUT THAT.  CERTAINLY THERE WAS TESTIMONY ABOUT

17  REFERRAL TO AN OCCUPATIONAL THERAPIST.  MAYBE THAT'S NOT A

18  SPECIALIST.  AND I THOUGHT --

19           **MR. ANDRADA:**  I AM SORRY.

20           **THE COURT:**  -- THERE WAS TESTIMONY ABOUT REFERRAL TO

21  AN ORTHOPEDIST AND A PAIN SPECIALIST AS WELL.

22           **MR. ANDRADA:**  THE POINT IS, I THINK, AS I UNDERSTAND

23  THE LAW IN THIS AREA, YOUR HONOR, THE THEORY IS THAT A DOCTOR

24  WHO DOESN'T HAVE A SPECIALTY, WHO IS OUTSIDE HIS AREA OF

25  EXPERTISE, NEEDS TO REFER.  JUST LIKE A TRIAL LAWYER SHOULD

1   REFER A TAX MATTER TO A TAX LAWYER.  BUT --

2         **THE COURT:**  IF YOU LOOK ON PAGE 10, IS THE PART WE

3   ARE TALKING ABOUT, LINES 10 THROUGH 16.  I THINK THAT THAT

4   ADDRESSES YOUR ISSUE PERHAPS BECAUSE IT DOES SAY IF DR. SAYRE

5   TREATED HIM WITH THE SKILL THAT AN ORTHOPEDIST OR PAIN

6   MANAGEMENT SPECIALIST WOULD HAVE, THEN THAT WAS NOT NEGLIGENCE.

7         HOWEVER, WE DON'T SAY THE OT IN HERE, AND THAT WAS

8   ACTUALLY THE THING THAT DR. WEINSTEIN MENTIONED SPECIFICALLY.

9         **MR. ANDRADA:**  YOUR HONOR, THERE IS ANOTHER ASPECT OF

10  THAT.  THERE'S NO EVIDENCE THAT OT'S CAN PRESCRIBE.  AND, IN

11  FACT --

12        **THE COURT:**  WE ARE NOT TALKING ABOUT FOR

13  PRESCRIPTION, WE ARE TALKING ABOUT FOR THERAPY.

14        **MR. ANDRADA:**  IT IS PRESCRIPTION FOR THERAPY.

15  REMEMBER, YOUR HONOR, MR. DODGEN SAID HE DOESN'T PRESCRIBE IT.

16  THE DOCTOR WHO MAKES THE ORDER, IT'S THE DOCTOR WHO ACTUALLY

17  ENDS THE THERAPY, IT'S THE SAME FOR AN OCCUPATIONAL THERAPIST.

18  THEY DON'T PRESCRIBE.  IT'S THE DOCTORS WHO TELL THEM --

19        **THE COURT:**  PRESCRIBE MEDICATION, ARE YOU TALKING

20  ABOUT?

21        **MR. ANDRADA:**  I AM NOT TALKING ABOUT MEDICATION.

22  JUST LIKE WE'RE NOT TALKING ABOUT MEDICATIONS AS FAR AS --

23        **THE COURT:**  I AM NOT FOLLOWING YOU THEN.  THE IDEA

24  WOULD BE THAT DR. SAYRE, ACCORDING TO DR. WEINSTEIN, SHOULD

25  HAVE REFERRED MR. ASHKER TO AN OCCUPATIONAL THERAPIST TO

1    PERFORM OCCUPATIONAL THERAPY.  THAT'S WHAT HE SAID.

2            I DON'T KNOW IF THAT'S RIGHT OR WRONG, BUT THAT'S

3    WHAT HE SAID.  SO THAT, I WOULD THINK, WOULD COME UNDER THE

4    RUBRIC OF THIS INSTRUCTION.

5            **MR. ANDRADA:**  THAT ASSUMES THAT AN OCCUPATIONAL

6    THERAPIST WOULD HAVE RECOMMENDED THE -- AGAIN, IT'S THE SAME

7    PROBLEM, AGAIN, YOUR HONOR.

8            **THE COURT:**  THE OCCUPATIONAL THERAPIST CAN'T

9    RECOMMEND ANYTHING IN THIS SITUATION UNLESS THE DOCTOR REFERS

10   THE PATIENT TO THE OT.

11           **MR. ANDRADA:**  I UNDERSTAND THAT.  BUT IT'S A

12   QUESTION OF CAUSATION AND DAMAGE.

13           HE NEEDED TO GET UP THERE AND SAY, AND HAD HE BEEN

14   SENT TO AN OCCUPATIONAL THERAPIST, HERE'S WHAT PROBABLY WOULD

15   HAVE HAPPENED.  HE DIDN'T DO THAT.

16           SO, AGAIN, WE HAVE LOTS OF CLAIMS OF NEGLIGENCE, BUT

17   NO CAUSATION AND DAMAGES.  WE ARE ENTITLED TO MOTION 50 UNDER

18   THE MED-MAL CLAIM.  THERE'S NO CAUSATION AND DAMAGE.  AND

19   LIKEWISE UNDER DELIBERATE INDIFFERENCE.  FIRST OF ALL, THERE'S

20   NO EVIDENCE OF DELIBERATE INDIFFERENCE, BUT THERE'S NO

21   CAUSATION AND DAMAGE.

22           **THE COURT:**  I THINK THERE IS EVIDENCE OF DAMAGES.

23   ONE CAN NEVER PROVE A HYPOTHETICAL SCENARIO.  ONE CAN'T PROVE

24   WHAT WOULD HAVE HAPPENED IF SOMETHING ELSE HAD BEEN DONE.  ONE

25   NEVER COULD IN A MEDICAL MALPRACTICE CASE, BUT I GUESS ONE

1    PROVES -- I GUESS ONE OFFERS EVIDENCE THAT THERE WOULD HAVE

2    BEEN A BETTER OUTCOME.

3              IF YOU HAVE CASE LAW ON THE POINT THAT SAYS YOU HAVE

4    TO PROVE A NONSPECULATIVE OUTCOME, I WOULD BE INTERESTED TO SEE

5    IT.

6         **MR. ANDRADA:**  I AM SURE YOUR HONOR HAS PRESIDED OVER

7    MED-MAL CASES.  I'VE HAD THE PRIVILEGE OF TRYING THEM.

8              IN MY EXPERIENCE, MAYBE IT'S NOT AS EXTENSIVE AS THE

9    COURT'S, MY EXPERIENCE IS, IF THE DOC SAYS, HEY, YOU NEED TO

10   REFER, THEN YOU HAVE TO HAVE AN EXPERT THAT SAYS, HERE'S WHAT

11   WOULD HAVE HAPPENED.  IF YOU BRING IN A --

12        **THE COURT:**  WHAT WOULD HAVE HAPPENED AND HERE'S WHAT

13   THE OUTCOME WOULD HAVE BEEN?

14        **MR. ANDRADA:**  YES, PROBABILITY.

15        **THE COURT:**  -- HOW MUCH BETTER OFF THIS PERSON WOULD

16   HAVE BEEN?

17        **MR. ANDRADA:**  EXACTLY.

18        **THE COURT:**  ALL RIGHT.  WELL, IF YOU GIVE ME SOME

19   CASE LAW ON THAT I WILL TAKE A LOOK AT IT.

20             IN ANY EVENT, YOUR QUESTION ABOUT WHETHER THIS

21   PARAGRAPH BELONGS IN THE INSTRUCTION, I THINK IT DOES.

22   CERTAINLY WITH RESPECT TO OT.  AND I CAN'T BE POSITIVE, BUT I

23   THINK THAT WEINSTEIN SAID HE SHOULD HAVE BEEN REFERRED FOR

24   ORTHOPEDIC AND PAIN MANAGEMENT.

25        **MR. ASHKER:**  I BELIEVE HE DID, YOUR HONOR.  I WENT

1    RIGHT OFF OF HIS REPORT, AND HE ELABORATED ON A LOT OF THE

2    STUFF.

3              THE COURT:  IS IT YOUR RECOLLECTION THAT HE DIDN'T

4    SAY THAT, MR. ANDRADA?

5              MR. ANDRADA:  I DON'T RECALL HONESTLY, YOUR HONOR.

6              THE COURT:  OKAY.  WE WILL LEAVE IT IN THEN UNLESS

7    YOU WANT TO MAKE A FURTHER SHOWING.

8              SO THEN WE HAVE THIS AVOIDANCE OF DOUBLE RECOVERY

9    INSTRUCTION.

10             MR. ANDRADA:  YES, YOUR HONOR.

11             THE COURT:  YOU HAD A PROPOSAL THAT YOU WANTED TO

12   MAKE IN THE FIRST SENTENCE?

13             MR. ANDRADA:  WELL --

14             THE COURT:  I DON'T -- I GUESS THAT'S ALL RIGHT.  I

15   DON'T SEE THE DIFFERENCE REALLY.

16             MR. ANDRADA:  I JUST THOUGHT -- MAYBE I AM JUST A

17   POOR READER.

18             THE COURT:  YOU'RE RIGHT.

19             MR. ANDRADA:  I THOUGHT YOUR SENTENCE WAS A LITTLE

20   AMBIGUOUS.

21             THE COURT:  YOU'RE RIGHT.  WE SHOULD SAY THAT HE HAS

22   MADE CLAIMS AGAINST SAYRE FOR THE CIVIL RIGHTS AND AGAINST

23   CATE/CDCR.

24             MR. ANDRADA:  I KNOW THE COURT HAS TO GET OUT OF

25   HERE, BUT THE NEXT FEW SENTENCES ARE ALSO TROUBLING TO ME.

1          IT'S UNCLEAR TO ME WHETHER YOU'RE TELLING THEM TO --

2     LET'S SUPPOSE THEY FIND ON DELIBERATE INDIFFERENCE AND THE

3     MED-MAL PART OF IT.  IT'S UNCLEAR TO ME AS TO WHETHER YOU ARE

4     SAYING THAT THEY SHOULD LITERALLY DIVIDE THE TWO -- PICK A

5     NUMBER FOR DAMAGES, AND THEN DIVIDE THE TWO?

6          IN OTHER WORDS, IT SEEMS TO ME THAT THE DAMAGE,

7     ASSUMING FOR THE SAKE OF THE ARGUMENT ONLY THAT THERE IS

8     MEDICAL MALPRACTICE AND DELIBERATE INDIFFERENCE, THE INJURY

9     WOULD BE THE SAME.

10          **THE COURT:**  RIGHT.  THAT'S WHAT I AM TRYING TO GET

11    AT HERE.

12          **MR. ANDRADA:**  PERHAPS I AM JUST A POOR READER, BUT I

13    DON'T THINK THAT IT'S ALL THAT CLEAR.

14          **THE COURT:**  OKAY.  WELL, I WOULD BE HAPPY TO HAVE

15    YOU TRY AND MAKE IT MORE CLEAR.

16          MY CONCERN WAS THAT IF THEY FIND DELIBERATE

17    INDIFFERENCE AND THEY SET A CERTAIN AMOUNT OF DAMAGES AND THEN

18    THEY FIND NEGLIGENCE, IT ALMOST NECESSARILY HAS TO BE THE SAME

19    DAMAGES, AND I DIDN'T WANT THEM TO AWARD IT TWICE AND HAVE US

20    NOT BE ABLE TO INTERPRET THEIR VERDICT.

21          AND THEN IF WE GO BEYOND THAT TO THE BREACH OF

22    CONTRACT, EVEN THAT OVERLAPS TO A DEGREE, SO WE COULD END UP

23    WITH THE SAME THING BEING AWARDED THREE TIMES, WHICH I AM SURE

24    NEITHER YOU NOR I WOULD WANT TO HAVE HAPPEN.

25          IF YOU CAN THINK OF A BETTER WAY TO EXPLAIN THAT, I

1    WOULD BE HAPPY TO TAKE A LOOK AT IT.

2              **MR. ANDRADA:**  ONE WAY -- I HAVE GOT SOMEONE DRAFTING

3    ANOTHER VERSION.  ONE WAY IS TO ONLY HAVE THEM MAKE ONE

4    DETERMINATION ABOUT DAMAGES AND YOU CAN HAVE THEM COME DOWN

5    FROM EACH CAUSE OF ACTION AND COME DOWN TO THE BOTTOM AND SAY,

6    OKAY, IF YOU FOUND CAUSATION, IF YOU FOUND CAUSATION, IF YOU

7    FOUND CAUSATION, GIVE US A NUMBER.

8              **THE COURT:**  THE PROBLEM THOUGH, SINCE WE HAVE

9    SEVERAL DIFFERENT POSSIBLE THINGS, AND YOU HAVE RAISED AN EVEN

10   MORE OF A COMPLICATION, WHICH IS THAT THE DAMAGES FROM THE BALL

11   AND THE BAND WOULD HAVE TO BE SUBTRACTED OUT, LET'S SAY THEY

12   FIND NO ON THE TRAMADOL, BUT YES ON THE -- WHAT IF THEY SAY THE

13   TRAMADOL, HYPOTHETICALLY, IS DELIBERATE INDIFFERENCE, BUT THE

14   BAND AND THE BRACE AND ALL THAT IS MERELY NEGLIGENCE.  IT COULD

15   BE, YOU KNOW, SOME OF THE DAMAGES COULD BE FOR ONE AND NOT THE

16   OTHER.

17             IT'S A LITTLE MORE COMPLICATED SINCE THERE'S FOUR OR

18   FIVE DIFFERENT CLAIMS.  AND THE SAME WITH THE BREACH OF

19   CONTRACT, WHICH IS EVEN FURTHER COMPLICATED BY THE FACT THAT

20   THE BREACH HAPPENED BACK IN '02 AND THEY COULD FIND, PERHAPS,

21   THAT THERE WAS INCREASED PAIN THAT WAS SUFFERED EVEN BEFORE

22   SAYRE CAME ALONG IN '03, '04, '05, AND SO ON THAT WOULDN'T BE

23   FAIR TO PUT ON DR. SAYRE'S TAB.

24             **MR. ANDRADA:**  CORRECT.

25             **THE COURT:**  SO IT IS COMPLICATED.

1          WE HAVE KIND OF TOOK A SHOT AT IT, BUT I WOULD BE

2     MORE THAN HAPPY TO SEE A SHOT THAT YOU WOULD WANT TO TAKE AT

3     IT, INCLUDING CARVING OUT THE BAND AND THE BALL, AND SO ON.

4          WHY DON'T YOU SEE IF YOU CAN COME UP WITH SOMETHING

5     FOR ME.

6          **MR. ANDRADA:**  YES, YOUR HONOR.

7          **THE COURT:**  YOU ARE WELCOME TO TRY AS WELL IF YOU

8     WOULD LIKE, MR. ASHKER.

9          **MR. ASHKER:**  OKAY.

10         **THE COURT:**  IT'S A LITTLE TRICKY.

11         OKAY.  AND THE VERDICT FORM, MR. ANDRADA?

12         **MR. ANDRADA:**  WELL, YOUR HONOR, I JUST INDICATED TO

13    YOU THAT WE HAVE SOME CONCERNS ABOUT IT.  AGAIN, MINDFUL OF

14    YOUR COMMENTS ABOUT TRYING TO CARVE SOME THINGS OUT, WE NEED TO

15    LOOK AT IT AGAIN.

16         **THE COURT:**  YOU KNOW, IF -- YOU MIGHT BE RIGHT ABOUT

17    THE EMOTIONAL DISTRESS PART OF THE BREACH OF CONTRACT.

18         **MR. ANDRADA:**  I WOULD LIKE TO THINK THAT I AM.

19         **THE COURT:**  PURELY MENTAL PAIN AND SUFFERING.  IT IS

20    PRETTY HARD TO DISTINGUISH PHYSICAL -- THE COMPENSATION FOR

21    PHYSICAL PAIN FROM COMPENSATION FOR EMOTIONAL PAIN SINCE

22    PHYSICAL PAIN IS SORT OF AN EMOTIONAL THING.

23         **MR. ANDRADA:**  WELL --

24         **THE COURT:**  I DON'T KNOW HOW YOU WOULD --

25         **MR. ANDRADA:**  -- THAT'S PART OF MY POINT IS IT'S ALL

```
1    EMOTIONAL -- IT IS DEEMED --

2              THE COURT:  CLEARLY, A CONTRACT TO PROVIDE SOMEONE

3    MEDICAL CARE CLEARLY CONTEMPLATES THAT YOU WOULD PROVIDE THE

4    MEDICAL CARE.  AND CLEARLY CONTEMPLATES THAT IF YOU DID NOT

5    PROVIDE THE MEDICAL CARE, IT WOULD HAVE MEDICAL CONSEQUENCES.

6    AND CLEARLY SOME OF THE MOST COMMON MEDICAL CONSEQUENCES ARE

7    SUFFERING PHYSICAL PAIN.

8              SO IT'S JUST NOT EVEN A CLOSE QUESTION TO ME THAT

9    PHYSICAL PAIN FROM FAILURE TO COMPLY WITH A CONTRACT TO PROVIDE

10   MEDICAL CARE JUST HAS TO BE A POSSIBLE DAMAGE.  IT WOULD BE

11   FLAWED OTHERWISE.  YOU MAY BE RIGHT, AS I SAY, ABOUT PURELY

12   MENTAL, PURELY EMOTIONAL PAIN, HOW YOU WRITE AN INSTRUCTION TO

13   DRAW THAT DISTINCTION, I DON'T KNOW.

14             IF YOU WANT TO GIVE IT A SHOT, YOU CAN.  BUT HE'D BE

15   ENTITLED TO MENTAL PAIN AND SUFFERING ON THE FIRST TWO CLAIMS,

16   SO THEN YOU WOULD HAVE TO SAY ON THESE CLAIMS YOU CAN DO

17   PHYSICAL CLAIM AND MENTAL PAIN, BUT ON THIS CLAIM YOU CAN ONLY

18   DO PHYSICAL PAIN.

19             I GUESS WE CAN DANCE ON THE HEAD OF AN PIN LIKE THAT

20   AND TRY THAT.  BUT DID YOU HAVE ANY OTHER PROBLEMS WITH THE

21   VERDICT FORM?

22             CONTRIBUTORY NEGLIGENCE.  WHAT'S YOUR ARGUMENT ON

23   CONTRIBUTORY NEGLIGENCE?  I GUESS NOT TAKING THE ELAVIL THAT

24   TIME?  I GUESS NOT GOING TO MANTECA.

25             MR. ANDRADA:  THAT'S ONE.
```

1          **THE COURT:**  WHEN DID HE NOT GO TO MANTECA?  WAS THAT

2   WHEN SAYRE WAS TREATING HIM?

3          **MR. ASHKER:**  NO.

4          **MR. ANDRADA:**  IT WAS ACTUALLY BEFORE.

5          **THE COURT:**  SO THAT WOULDN'T HELP SAYRE.  SO WHAT'S

6   THE CONTRIB VIS-A-VIS SAYRE?

7          **MR. ANDRADA:**  I CAN'T REALLY THINK OF ANYTHING.

8          WELL, IF IT'S STRICTLY WITH REGARD TO DR. SAYRE --

9          **THE COURT:**  HE'S THE ONLY GUY WE HAVE GOT ON THE

10  NEGLIGENCE CLAIM.

11         **MR. ANDRADA:**  THERE PROBABLY ISN'T ANY.

12         **THE COURT:**  YEAH.

13         OKAY.  SO, WE HAVE ISSUES WITH -- OH.  WE HAVE A

14  JURY QUESTION.

15         MS. DIANE WILCOX, FIRST HER QUESTIONS, WHICH I

16  ANSWERED, YOU HEARD ME ANSWER THEM ABOUT THE EXHIBITS AND THE

17  TRANSCRIPT, HER THIRD QUESTION IS:  WHY IS THIS IN FEDERAL

18  JURISDICTION?

19         AND I DIDN'T WANT TO ANSWER THAT ONE WITHOUT

20  CONSULTING, BUT I COULD TELL HER THAT MAYBE THE BEST THING

21  WOULD BE TO SAY THAT WILL BE FURTHER EXPLAINED IN THE FINAL

22  JURY INSTRUCTIONS BECAUSE THERE WE DO TALK ABOUT A FEDERAL

23  CIVIL RIGHTS CLAIM, OR I CAN TELL HER THAT RIGHT NOW.

24         DO YOU HAVE A PREFERENCE?

25         **MR. ANDRADA:**  WHATEVER YOU WOULD LIKE, YOUR HONOR.

1          **THE COURT:**  I THINK I WILL JUST TELL HER THAT SHE

2     SHOULD HOLD ON TO HER HAT AND SHE'LL HEAR MORE ABOUT THAT IN

3     THE FINAL INSTRUCTIONS.

4          THEN WE HAVE -- WE ARE GOING TO NEED TO DEAL WITH

5     THESE EXHIBITS BECAUSE PEOPLE -- OF COURSE MR. ASHKER CAN'T GET

6     UP AND HAVE HIS EXHIBITS MARKED AND SO ON.  SO, THEY AREN'T.

7     AND HIS EXHIBITS TEND TO BE BIG PACKETS WITH THE RELEVANT PAGES

8     IN THERE SOMEWHERE.

9          SO I HAVE BEEN TRYING TO PULL THOSE OUT AS WE DEAL

10    WITH THEM AND MAKE UP A PACKET OF WHAT I THINK THE EXHIBIT IS

11    THAT COULD ACTUALLY GO IN.  AND THAT WILL PROBABLY WORK OUT

12    OKAY FOR THE MOST PART.

13         ONE PROBLEM I HAVE, AND I AM GOING TO HAVE TO ASK

14    YOU TO HELP ME ON THIS, MR. ANDRADA, IS EXHIBIT 170.  IT'S THE

15    FIRST PAGE OF 170.  IT'S DODGEN'S PHYSICAL THERAPY DISCHARGE

16    SUMMARY.

17         AND THE COPY THAT I HAVE, WHICH IS THE COPY THAT I

18    COULD USE FOR THE JURY, THE LAST LINE IS CUT OFF.  AND

19    MR. ASHKER READ IT OUT LOUD, SO CLEARLY HE HAS A COPY THAT HAS

20    THE LAST LINE.  SO WE NEED TO GET A COPY FOR THE JURY THAT HAS

21    THE LAST LINE ON THERE.

22         SO I DON'T KNOW IF YOUR COPY HAS THE LAST LINE.  IF

23    YOU CAN GET A COPY THAT HAS THE LAST LINE BECAUSE IT'S KIND OF

24    IMPORTANT.

25         **MR. ANDRADA:**  I HAVE SOMEONE IN THE NEXT ROOM THAT'S

1  BASICALLY TRYING TO DO WHAT IT SOUNDS LIKE YOU HAVE BEEN DOING,

2  NAMELY, TRYING TO BRING SOME ORDER TO THE CHAOS OF THE

3  EXHIBITS, AND WE WILL LOOK.

4         **THE COURT:**  OKAY.

5         AS FAR AS YOUR EXHIBITS GO, YOU SHOULD CHECK WITH

6  MS. CAHILL AS TO WHAT SHE HAS RECORDED AS BEING ADMITTED INTO

7  EVIDENCE, AND IF THERE IS SOMETHING THAT YOU WANT ADMITTED THAT

8  SHE SAYS ISN'T, THEN IT ISN'T AND YOU WILL NEED TO ASK ME TO

9  ADMIT IT.

10         **MR. ANDRADA:**  I UNDERSTAND.

11         **THE COURT:**  BEST THING WOULD BE, I DON'T KNOW IF YOU

12  ARE ALLOWED TO TALK TO EACH OTHER, THE BEST THING WOULD BE IF

13  YOU COULD ASK EACH OTHER WHETHER YOU HAVE ANY OBJECTION TO

14  ADMITTING THE VARIOUS EXHIBITS THAT HAVEN'T BEEN MOVED IN SO

15  THAT I ONLY HAVE TO DEAL WITH ONES THAT ARE DISPUTED.

16         IF THAT'S NOT POSSIBLE, THEN YOU CAN EACH JUST MOVE

17  IN THE ONES THAT YOU WANT TO MOVE IN.

18         **MR. ANDRADA:**  WE WILL LOOK AT OUR STACKS AND FIGURE

19  IT OUT, YOUR HONOR.

20         **THE COURT:**  WE HAVE THIS ISSUE ABOUT THE PUNITIVE

21  DAMAGES.  REMEMBER I ASKED YOU ABOUT YOUR THOUGHTS ON THE LAW

22  WITH RESPECT TO MR. ASHKER'S OBLIGATION TO PRESENT EVIDENCE OF

23  DR. SAYRE'S FINANCIAL CONDITION AS A PREREQUISITE TO SEEKING

24  PUNITIVE DAMAGES.

25         MY RECOLLECTION IS ON FEDERAL PUNIES, HE DOESN'T

1    HAVE TO DO THAT, WHILE ON STATE PUNIES HE DOES.  I WASN'T SURE

2    OF THAT.  IF YOU ARE GOING TO ARGUE HE DOES HAVE TO DO THAT IN

3    ORDER TO SEEK PUNIES, THEN I AM GOING TO HAVE TO LET HIM ASK

4    SAYRE ABOUT HIS FINANCIAL SITUATION.

5            HAVE YOU MADE A DECISION ON WHAT YOU WANT TO DO

6    ABOUT THAT?

7            **MR. ANDRADA:**  YES, YOUR HONOR.  WE ALSO LOOKED AT

8    THE LAW AND IT IS CLEAR IN THE STATE OF CALIFORNIA YOU HAVE TO

9    HAVE EVIDENCE OF FINANCIAL WORTH.

10           **THE COURT:**  RIGHT.  BUT THIS IS ONLY ON THE FEDERAL

11   CLAIM.

12           **MR. ANDRADA:**  I UNDERSTAND, YOUR HONOR.

13           I WAS JUST GOING TO SAY, AS I READ THE FEDERAL

14   BOOKS, THERE'S SOME DISPUTE IN THE CIRCUITS, BUT IT SEEMS TO BE

15   THE CASE THAT YOU CAN DO IT WITHOUT EVIDENCE OF FINANCIAL

16   WORTH.

17           AND SO WE ARE NOT GOING TO -- I DON'T WANT THE

18   DOCTOR'S PRIVACY TO BE INVADED AND SO WE ARE WILLING TO PROCEED

19   WITHOUT EVIDENCE OF HIS FINANCIAL WORTH.

20           **THE COURT:**  IN OTHER WORDS, YOU WILL AGREE NOT TO

21   RAISE AN ISSUE FOR ENTITLEMENT TO PUNITIVE DAMAGES BASED ON HIS

22   FAILURE TO ELICIT EVIDENCE OF DR. SAYRE'S FINANCIAL CONDITION.

23           **MR. ANDRADA:**  I THINK -- YEAH, I THINK THAT'S WHAT I

24   TRIED TO SAY.

25           **THE COURT:**  OKAY.  GOOD.  THAT SOLVES THAT PROBLEM.

1          **MR. ANDRADA:**  THERE IS SOME AUTHORITY, TOO, YOUR

2     HONOR, THAT IT SHOULD BE CLEAR AND CONVINCING, BUT I

3     UNDERSTAND --

4          **THE COURT:**  NOT IN FEDERAL COURT.  THAT ONE I DO

5     KNOW THE ANSWER TO.

6          **MR. ANDRADA:**  I UNDERSTAND.  I AM JUST TRYING TO

7     MAKE A RECORD.

8          **THE COURT:**  RIGHT.  IN STATE COURT YOU WOULD BE

9     CORRECT THAT IT WOULD BE CLEAR AND CONVINCING.  IN FEDERAL

10    COURT FOR 1983 IT IS PREPONDERANCE.

11         **MR. ANDRADA:**  I JUST WANT TO MAKE SURE, YOUR HONOR.

12    I UNDERSTAND, OF COURSE, WHAT YOU SAID.  I THINK THERE IS SOME

13    ARGUMENT TO BE MADE EVEN IN THE FEDERAL COURTS THAT IT'S CLEAR

14    AND CONVINCING, BUT I UNDERSTAND YOU ARE GOING TO INSTRUCT AS

15    PREPONDERANCE.

16          **THE COURT:**  OKAY.  I THINK THAT'S ALL I HAVE.

17          **MR. ANDRADA:**  I KNOW YOU HAVE TO GET OUT OF HERE.

18          **THE COURT:**  I HAVE A FEW MORE MINUTES.

19          **MR. ANDRADA:**  WELL, I WANT TO MAKE A MOTION UNDER

20    RULE 50 WITH REGARD TO THE DELIBERATE INDIFFERENCE CLAIM.

21    THERE IS NO EVIDENCE OF DELIBERATE INDIFFERENCE.

22          IN FACT, ACTUALLY, LET ME PREFACE ALL OF THIS.  I

23    WANT TO MOVE TO STRIKE DR. WEINSTEIN'S TESTIMONY WITH REGARD TO

24    TRAMADOL.  HE CONCEDED ON CROSS THAT HE WAS NOT AN EXPERT WITH

25    REGARD TO TRAMADOL.

1          SO, FOR HIM TO OPINE ON WHETHER IT WAS A GOOD DRUG

2    OR BAD DRUG FOR MR. ASHKER, THOSE OPINIONS SHOULD BE STRICKEN

3    BY VIRTUE OF HIS OWN ADMISSION.  HE NEVER PRESCRIBED IT.

4          **THE COURT:**  THAT WILL BE DENIED.

5          **MR. ANDRADA:**  AND THEN WITH REGARD TO THE DELIBERATE

6    INDIFFERENCE, YOUR HONOR, THERE IS NO EVIDENCE OF DELIBERATE

7    INDIFFERENCE.  THERE WAS DISCUSSION WITH DR. WEINSTEIN ABOUT

8    CHOICES ABOUT MEDICATIONS, AND SO FORTH.  NOW, IF THE COURT

9    THINKS THAT SOMEHOW THERE IS EVIDENCE OF DELIBERATE

10   INDIFFERENCE BECAUSE WE DIDN'T SEND HIM TO AN OCCUPATIONAL

11   THERAPIST --

12         **THE COURT:**  NO.

13         **MR. ANDRADA:**  -- IF THAT'S THE THEORY, THEN WE ARE

14   ENTITLED TO AN INSTRUCTION THAT THAT'S THE THEORY.

15         BUT THERE IS JUST NO -- THERE IS NO --

16         **THE COURT:**  I WOULD SAY THE DELIBERATE INDIFFERENCE

17   WOULD BE RELATING TO THE ARM BRACE, THE THERA-BALL, THE

18   THERA-BAND, AND THE MEDICATION WHICH WOULDN'T HAVE TO BE

19   TRAMADOL, BUT WHICH WOULD HAVE TO BE SOMETHING THAT WASN'T A

20   DRUG THAT HAD ALREADY BEEN TRIED AND SHOWN TO CAUSE

21   GASTROINTESTINAL SIDE EFFECTS.

22         SO I THINK DR. WEINSTEIN DIDN'T SAY -- IN FACT, HE

23   SPECIFICALLY SAID IT DIDN'T HAVE TO BE TRAMADOL, BUT IT

24   COULDN'T BE DRUGS THAT HAD ALREADY BEEN TRIED AND SHOWN TO

25   BE -- HAVE TOO MANY SIDE EFFECTS.

1          **MR. ANDRADA:**  SO THE QUESTION -- IT'S DELIBERATE

2     INDIFFERENCE THEN, YOUR HONOR, TO MAKE A CLINICAL JUDGMENT

3     AFTER FOUR PLUS YEARS OF TAKING A DRUG AS TO WHAT RISKS AND

4     BENEFITS ARE AVAILABLE THROUGH THESE VARIOUS MODALITIES?  THE

5     CHOICE OF ONE DRUG AS OPPOSED TO ANOTHER, UNDER THOSE

6     CIRCUMSTANCES, IT'S DELIBERATE INDIFFERENCE?

7          **THE COURT:**  I WOULD SAY A JURY COULD FIND THAT ON

8     THIS EVIDENCE, YES.

9          **MR. ANDRADA:**  WELL, WE OBVIOUSLY RESPECTFULLY

10    DISAGREE.  HOW CAN IT BE DELIBERATE INDIFFERENCE IF HE HAS HAD

11    THE PHYSICAL THERAPY ALL THE TIME UP UNTIL MARCH OF 2007 --

12         **THE COURT:**  AFTER THAT.

13         **MR. ANDRADA:**  SAY AGAIN?

14         **THE COURT:**  IT WOULD BE AFTER THAT, ALTHOUGH THAT --

15         **MR. ANDRADA:**  AND THE THERAPIST HIMSELF SAYS IT IS

16    NOT MEDICALLY INDICATED?  HOW CAN THAT BE DELIBERATE

17    INDIFFERENCE?

18         **THE COURT:**  THE PHYSICAL THERAPY PERHAPS NOT.

19         **MR. ANDRADA:**  OKAY.  WELL, LET'S CHIP AWAY AT IT.

20         **THE COURT:**  SEEING THE PHYSICAL THERAPIST PERHAPS

21    NOT.

22         **MR. ANDRADA:**  LET'S CHIP AWAY AT IT.

23         **THE COURT:**  THAT GOES TO THE CONTRACT CLAIM.

24         **MR. ANDRADA:**  I DON'T WANT TO EXPOSE MY CLIENT TO A

25    PUNITIVE CLAIM ON MATTERS THAT I THINK, FRANKLY, THE EVIDENCE

1    DOESN'T SUPPORT GOING TO THE JURY ON WHAT IS, IN EFFECT, A

2    PUNITIVE CLAIM.

3              CHIPPED AWAY AT THE -- HE HAS HAD THE BRACE.  HE'S

4    HAD THE --

5              **THE COURT:**  THE BRACE DIDN'T FIT.  HE COULDN'T USE

6    IT.

7              **MR. ANDRADA:**  THERE IS -- WELL, THERE IS EVIDENCE

8    FROM HIS OWN WITNESS, DR. DUNCAN, THAT THE BRACE IS NOT -- IS

9    NOT THERAPEUTIC, WAS NEVER INTENDED TO BE THERAPEUTIC.

10             **MR. ASHKER:**  YEAH, BUT --

11             **THE COURT:**  HE SAID THE PURPOSE OF THE BRACE WAS TO

12   ALLOW HIM TO EXERCISE HIS UPPER BODY, WHICH IN TURN ADDED TO

13   THE STRENGTH OF HIS FOREARM.

14             **MR. ANDRADA:**  HE CAN USE THE BRACE.  THERE IS NO

15   DISPUTE --

16             **THE COURT:**  NOT IF IT DOESN'T FIT HE CAN'T.

17             **MR. ANDRADA:**  YOUR HONOR, HE CAN USE THE BRACE --

18             **MR. ASHKER:**  NO --

19             **MR. ANDRADA:**  LET ME FINISH, MR. ASHKER.

20             **THE COURT:**  YOU CONCEDED IN YOUR OPENING STATEMENT

21   THAT IT DIDN'T FIT.

22             **MR. ANDRADA:**  WELL, HE CAN STILL STRAP IT ACROSS THE

23   ARM WITH THE VELCRO.

24             **THE COURT:**  THERE IS NO EVIDENCE OF THAT.

25             **MR. ANDRADA:**  ALL RIGHT.

1       **THE COURT:**  YOU CONCEDED IN YOUR OPENING STATEMENT

2   THAT IT DIDN'T FIT.  I WAS A LITTLE SURPRISE TO HEAR THAT, BUT

3   THERE IT IS.

4       DID YOU HAVE SOMETHING TO ADD?

5       **MR. ASHKER:**  ONLY THING I WANTED TO MENTION, YOUR

6   HONOR, IS IF YOU, WHEN YOU READ MY SUPPLEMENTAL COMPLAINT,

7   THIS -- THE DEFENDANTS AND IT HAS KEPT COMING UP, THIS CASE IS

8   ABOUT TRAMADOL.  THE WHOLE CASE IS ABOUT THE TRAMADOL

9   MEDICATION, AND THAT'S FALSE.  BECAUSE THE CASE IS ACTUALLY

10  ABOUT THE OVERALL PAIN MANAGEMENT ISSUE.  THAT'S WHAT THE CASE

11  IS REALLY ABOUT.

12      AND WHEN THEY TOLD ME THEY WERE GOING TO TAKE ME OFF

13  TRAMADOL, I PUT RIGHT IN MY SUPPLEMENTAL COMPLAINT, MY RESPONSE

14  WAS, OKAY, FINE, WHAT ARE YOU GOING TO REPLACE IT WITH THAT

15  GIVES ME ADEQUATE PAIN MANAGEMENT WITHOUT CAUSING SIDE EFFECTS.

16      **MR. ANDRADA:**  LET ME SEE WHAT WE ARE DOING TOMORROW,

17  YOUR HONOR.

18      WE HAVE DR. FRIEDMAN AND WE HAVE DR. SHIN.  AND AS I

19  UNDERSTAND IT, YOU ARE GOING TO ALLOW MR. ASHKER TO

20  CROSS-EXAMINE DR. SAYRE IN SOME LIMITED FASHION, BUT HE'S NOT

21  GOING TO BE ALLOWED --

22      **THE COURT:**  I'LL SAY I WILL GIVE YOU A HALF AN HOUR

23  ON SAYRE.

24      **MR. ASHKER:**  THAT'S FINE, YOUR HONOR.

25      **THE COURT:**  PLAN YOUR TIME ACCORDINGLY.

1     **MR. ASHKER:**  ESPECIALLY IF IT'S THE FIRST THING IN

2   THE MORNING BECAUSE BY THE TIME WE GET DOWN TO THE AFTERNOON, I

3   AM BARELY -- THAT'S WHY I NOTICED I'LL START JUST GOING ON.  I

4   CAN'T COLLECT MY THOUGHTS AND STUFF.

5     **THE COURT:**  OKAY.

6     **MR. ANDRADA:**  WE WOULD OBJECT, BEGIN, TO ANY

7   CROSS-EXAMINATION OF ANY OF OUR WITNESSES.  HE HAS RUN OUT THE

8   CLOCK.

9     **THE COURT:**  I AM GOING TO ALLOW, UNDER THE

10  CIRCUMSTANCES, A SHORT CROSS-EXAMINATION OF YOUR WITNESSES AND

11  OF SAYRE, YOUR LEAD WITNESS, I WILL ALLOW HALF AN HOUR.  AND OF

12  THE OTHERS I WILL ALLOW A LIMITED AMOUNT DEPENDING ON THE

13  AMOUNT THAT THEY HAVE GIVEN ON DIRECT.

14    **MR. ANDRADA:**  THEN THE OTHER WITNESS WE'RE GOING TO

15  CALL --

16    **THE COURT:**  AS I SAY, I WILL GIVE YOU ADDITIONAL

17  TIME TO COMPENSATE FOR THAT.

18    **MR. ANDRADA:**  SO, THE OTHER WITNESS WOULD BE

19  MS. RISENHOOVER WHO WE WILL HEAR FROM PELICAN BAY.

20    **THE COURT:**  RIGHT.

21    SO SAY AGAIN, FRIEDMAN, SHIN, RISENHOOVER.

22    **MR. ANDRADA:**  AND SAYRE ON CROSS AND THEN REDIRECT.

23    **THE COURT:**  HOW MANY ARE THOSE ARE COMING FROM

24  PELICAN BAY?

25    **MR. ANDRADA:**  MS. RISENHOOVER IS AT PELICAN BAY.

1    DR. SHIN AND DR. FRIEDMAN WILL BE HERE LIVE AND IN PERSON.

2            **THE COURT:**  OKAY.  WHAT ABOUT MCLEAN?  YOU ARE

3    TALKING ABOUT HER --

4            **MR. ANDRADA:**  I DON'T THINK I AM GOING TO CALL HER.

5            **THE COURT:**  OKAY.

6            WELL, IF WE GET DOWN, MAYBE THIS WILL GO QUICKER

7    THAN WE HAVE BEEN GOING.  IF WE GET DONE IN TIME TO CLOSE, YOU

8    ALL BETTER BE READY TO CLOSE.  IF THIS GOES QUICKER, AS I SAY,

9    QUICKER THAN WE HAVE BEEN GOING.  I DON'T WANT TO SEND THE JURY

10   HOME HALFWAY THROUGH THE DAY --

11           **MR. ANDRADA:**  I UNDERSTAND.

12           **THE COURT:**  -- IF WE HAVE TIME TO DO THE CLOSE.  BE

13   PREPARED TO MAKE THE CLOSING IF IT COMES TO THAT.

14           **MR. ANDRADA:**  I UNDERSTAND.

15           **THE COURT:**  OKAY.

16           SO, LET ME SAY ONE MORE TIME, I AM KIND OF

17   STRUGGLING WITH THIS CONTRACT ISSUE.  ONE, THE FIRST QUESTION

18   IS THE INTERPRETATION OF THE CONTRACT.  AND I AM -- THE

19   INTERPRETATION OF THE CONTRACT IS A LEGAL QUESTION FOR THE

20   COURT.  THE COURT HAS TO CONSIDER EXTRINSIC EVIDENCE IN ORDER

21   TO DETERMINE WHETHER THERE IS AMBIGUITY.  IF THERE IS

22   AMBIGUITY, THEN THE COURT HAS TO TAKE EXTRINSIC EVIDENCE.  IF

23   THERE IS A DISPUTE AS TO THE EXTRINSIC EVIDENCE, THEN I GUESS I

24   HAVE TO SUBMIT THAT TO THE JURY, SO I WOULD HAVE TO INSTRUCT

25   THE JURY ON HOW TO INTERPRET THE CONTRACT.

1          **MR. ANDRADA:**  CORRECT.

2          **THE COURT:**  SO, I AM NOT SURE WHERE WE ARE WITH

3     THAT.  I CAN SEE PERHAPS THAT THERE MIGHT BE SOME AMBIGUITY.  I

4     DON'T KNOW WHAT THE EXTRINSIC EVIDENCE WOULD BE.  THE

5     ADMISSIBLE EXTRINSIC EVIDENCE WOULD BE THE INTENT OF THE

6     PARTIES, WHICH, AS I UNDERSTAND IT, WOULD BE THE SIGNING

7     PARTIES, OR EVIDENCE WITHIN THE CONTRACT ITSELF.  BUT, OF

8     COURSE, THAT IS INTRINSIC.

9          SO I DON'T KNOW WHAT OTHER EXTRINSIC EVIDENCE THERE

10    MIGHT BE AND I DON'T KNOW IF THERE IS ANY, AND I DON'T KNOW IF

11    THERE IS ANY CONFLICT IN IT.  BUT IF THERE IS, PERHAPS YOU

12    SHOULD ALSO DRAFT ME A JURY INSTRUCTION THAT EXPLAINS WHAT THE

13    DISPUTE IS ABOUT THE CONTRACT INTERPRETATION, WHAT THE

14    EXTRINSIC EVIDENCE IS ON BOTH SIDES, AND WHAT THE JURY IS

15    SUPPOSED TO CONSIDER IN DETERMINING THE MEANING OF THE

16    CONTRACT.

17          WE'D ALSO THEN HAVE TO HAVE A JURY QUESTION.  THIS

18    MAY BE MOOT BECAUSE I MAY FIND THAT IT IS NOT AMBIGUOUS OR THAT

19    THE AMBIGUITY IS RESOLVED BY READING ALL OF THE TERMS OF THE

20    CONTRACT TOGETHER.  I AM NOT ENTIRELY SURE THERE IS ANY

21    EXTRINSIC EVIDENCE TO BE CONSIDERED IF IT WERE AMBIGUOUS, AND

22    BEYOND THAT, I HAVE SOME INCLINATION TOWARDS FINDING THAT THE

23    CONTRACT IS BREACHED AS A MATTER OF LAW, AT LEAST AS TO SOME OF

24    THE POINTS.

25          **MR. ANDRADA:**  I KNOW, YOUR HONOR, YOU WANT TO GO, I

1    AM SORRY.  WE DID COMMENT BRIEFLY ABOUT SOME OF THOSE MATTERS

2    IN THIS THREE-PAGE --

3              **THE COURT:**  I HAVE READ ALL YOUR PAPERS.

4              **MR. ANDRADA:**  WE DID LOOK ALSO, WE LOOKED ALSO AT

5    THE CACI WITH REGARD TO CONTRACT INTERPRETATION.  THERE IS AN

6    INSTRUCTION IN THE CACI, AND WE WERE GOING TO SUBMIT IT, BUT

7    FRANKLY DIDN'T HAVE ENOUGH TIME.  MAYBE WE WILL SUBMIT IT

8    TOMORROW.

9              **THE COURT:**  YOU ARE GOING TO HAVE TO.  AGAIN, IF WE

10   DO GET DONE TOMORROW, I AM GOING TO HAVE TO BE ABLE TO INSTRUCT

11   TOMORROW.  SO ANY ADDITIONAL PROPOSALS YOU HAVE ON INSTRUCTIONS

12   I AM GOING TO HAVE TO GET THOSE TONIGHT REALLY.  I CAN GET THEM

13   IN THE EVENING.

14             **MR. ANDRADA:**  E-MAIL THEM TONIGHT?

15             **THE COURT:**  E-FILE THEM.

16             **MR. ANDRADA:**  YEAH.

17             **THE COURT:**  IF YOU E-FILE THEM, I CAN GET THEM AT

18   HOME.  I HAVE TO DO THIS THING RIGHT NOW, BUT I WILL BE BACK

19   LATER SO I CAN LOOK AT IT AT HOME.  I CAN LOOK AT IT THE FIRST

20   THING TOMORROW MORNING.

21             ALL RIGHT.

22             **MR. ASHKER:**  THANK YOU, YOUR HONOR.

23             **THE COURT:**  THANK YOU.

24

25             (PROCEEDINGS CONCLUDED AT 4:20 P.M.)

### CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-05-3759 CW, TODD L. ASHKER V. MICHAEL SAYRE AND MATTHEW CATE, PAGES NUMBERED 628 THROUGH 858, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.


/S/ DIANE E. SKILLMAN

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR