VOLUME 5

PAGES 859 – 1051

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

```
TODD L. ASHKER,              )
                             )
                             )
          PLAINTIFF,         )   NO. C-05-3759 CW
                             )
  VS.                        )   FRIDAY, MAY 15, 2009
                             )
MICHAEL C. SAYRE, ET AL.,    )   OAKLAND, CALIFORNIA
                             )
          DEFENDANTS.        )
_____)
```

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFF:**            TODD L. ASHKER, PRO PER
                             BOX 7500/D1-119
                             CRESCENT CITY, CALIFORNIA 9553


**FOR DEFENDANTS:**           ANDRADA & ASSOCIATES
                             180 GRAND AVENUE, SUITE 225
                             OAKLAND, CALIFORNIA 94612
                       BY:   J. RANDALL ANDRADA, ESQUIRE


**REPORTED BY:**              DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                             OFFICIAL COURT REPORTER

1                          I N D E X

2     DEFENDANTS' WITNESSES:                              PAGE

3     SAYRE, MICHAEL

4     CROSS-EXAMINATION BY MR. ASHKER

5     REDIRECT EXAMINATION BY MR. ANDRADA

6     RECROSS-EXAMINATION BY MR. ASHKER

7     FURTHER REDIRECT EXAMINATION BY MR. ANDRADA

8     FURTHER RECROSS-EXAMINATION BY MR. ASHKER

9     FURTHER REDIRECT EXAMINATION BY MR. ANDRADA

10
      FREIDMAN, JACK
11
      DIRECT EXAMINATION BY MR. ANDRADA
12
      CROSS-EXAMINATION BY MR. ASHKER
13

14
      SHIN, CARL
15
      DIRECT EXAMINATION BY MR. ANDRADA
16
      CROSS-EXAMINATION BY MR. ASHKER
17
      REDIRECT EXAMINATION BY MR. ANDRADA
18
      RECROSS-EXAMINATION BY MR. ASHKER
19
      FURTHER REDIRECT EXAMINATION BY MR. ANDRADA
20
      FURTHER RECROSS-EXAMINATION BY MR. ASHKER
21
      QUESTIONS BY THE COURT
22
      FURTHER REDIRECT EXAMINATION BY MR. ANDRADA
23
      FURTHER RECROSS-EXAMINATION BY MR. ASHKER
24
      FURTHER REDIRECT EXAMINATION BY MR. ANDRADA
25

RISENHOOVER, SUE

DIRECT EXAMINATION BY MR. ANDRADA

CROSS-EXAMINATION BY MR. ASHKER


MCLEAN, MAUREEN

DIRECT EXAMINATION BY MR. ANDRADA

CROSS-EXAMINATION BY MR. ASHKER



PLAINTIFF'S EXHIBITS:                    ID.              EVD.

     182


DEFENDANTS' EXHIBITS:

     243

     244

     245

     246

     247

     248

1    FRIDAY, MAY 15TH, 2009                              8:30 A.M.

2

3              (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4              **THE COURT:**  WHY DON'T WE START WITH DR. SAYRE AND

5    FINISH THAT UP.

6                   **MR. ANDRADA:**  I HAVE A COUPLE OF EXPERTS HERE.

7              **THE COURT:**  I AM GIVING HIM ONLY A HALF AN HOUR.

8                   **MR. ANDRADA:**  VERY WELL.  THANK YOU, YOUR HONOR.

9              **THE COURT:**  MIGHT BE GOOD TO GET THAT OUT OF THE

10   WAY.

11              YOU CAN BRING IN THE JURY.

12              (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

13              **THE COURT:**  YOU MIGHT REMEMBER THAT DR. SAYRE HAD

14   TESTIFIED ON DIRECT EXAMINATION FOR MR. ANDRADA, BUT WE DIDN'T

15   HAVE -- WE INTERRUPTED HIS CROSS-EXAMINATION TO ACCOMMODATE

16   SOME OF THE DOCTORS.  SO WE ARE NOW GOING TO GO BACK TO THAT,

17   AND THIS WILL BE MR. ASHKER'S CROSS-EXAMINATION OF DR. SAYRE.

18              DR. SAYRE, YOU HAVE PREVIOUSLY BEEN SWORN AND YOU

19   ARE STILL UNDER OATH.

20              **THE WITNESS:**  THANK YOU, YOUR HONOR.

21              **THE COURT:**  AND, AGAIN, I AM LIMITING THE TIME THAT

22   THE PARTIES HAVE, SO I MAY HAVE TO STOP THEM AT A CERTAIN

23   POINT.

24                   **MR. ASHKER:**  ALL RIGHT.  THANK YOU, YOUR HONOR.

25              **THE COURT:**  I'M SORRY.  THERE WAS ONE OTHER QUESTION

1    FROM ONE OF THE JURORS YESTERDAY OR SO, WHY IS THIS FEDERAL

2    JURISDICTION?  I AM GOING TO GIVE YOU SOME MORE COMPLETE

3    INSTRUCTIONS AT THE END OF THE CASE, AND THAT WILL BE ONE OF

4    THE THINGS THAT WE WILL BE ADDRESSING AT THAT TIME.

5                           **CROSS–EXAMINATION**

6    **BY MR. ASHKER:**

7    **Q.**  DR. SAYRE, ISN'T IT TRUE THAT ALL MEDICATIONS HAVE

8    POTENTIAL SIDE EFFECTS?

9    **A.**  YES.

10   **Q.**  AND WHEN YOU'RE DEALING WITH A PATIENT WITH A CONDITION

11   LIKE MINE AND CHRONIC PAIN, DO YOU AGREE THAT MY CONDITION IS

12   CHRONIC PAIN SYNDROME?

13   **A.**  NO.

14   **Q.**  SO YOU DISAGREE WITH DR. SHIN?

15   **A.**  IT'S HOW YOU DEFINE CHRONIC PAIN.  YES, NO, IT'S NEBULOUS.

16   I THINK I CAN CONSIDER IT CHRONIC PAIN, AND THEN, AGAIN,

17   SOMETIMES I CONSIDER IT SOMETHING DIFFERENT.

18              JUST STANDARD POST–INJURY ACHES AND PAINS.

19   **Q.**  HOW WOULD YOU KNOW THAT IF YOU HAD NEVER DONE A COMPLETE

20   AND THOROUGH CAREFUL EXAMINATION OF MY ARM AND HAND?

21              **MR. ANDRADA:**  WELL, ASSUME FACTS NOT IN EVIDENCE,

22   NAMELY ––

23              **THE COURT:**  WHY DON'T YOU ASK.

24              **MR. ANDRADA:**  –– DIDN'T DO A THOROUGH EXAM.

25              **THE COURT:**  THAT'S THE TESTIMONY FROM MR. ASHKER.  I

1   GUESS YOU CAN ASK HIM THAT FIRST.

2   **BY MR. ASHKER:**

3   **Q.**    DR. SAYRE, YOU TESTIFIED YESTERDAY THAT YOU HAD CONDUCTED

4   A PHYSICAL EXAM OF MY ARM ON AUGUST 30TH, 2006; IS THAT

5   CORRECT?

6   **A.**    I EXAMINED YOU IN CONJUNCTION WITH CHRONOS, WHICH ARE

7   BASICALLY --

8   **Q.**    EXCUSE ME, SIR.  I JUST ASKED YOU TO ANSWER WHETHER THAT

9   WAS CORRECT OR NOT.

10   **A.**    COULD YOU REPHRASE YOUR QUESTION, PLEASE?

11   **Q.**    YOU STATED YESTERDAY THAT YOU HAD PHYSICALLY EXAMINED ME

12   ON AUGUST 30TH, 2006; IS THAT CORRECT?

13   **A.**    YES.

14   **Q.**    AND THERE IS NO REFERENCE OF ANY PHYSICAL EXAMINATION IN

15   YOUR AUGUST 30TH, 2006 REPORT, IS THERE?

16   **A.**    THAT WAS A CONSULTATIVE REPORT, SUMMATION, AND

17   RECOMMENDATIONS.

18   **Q.**    WELL, WHY WASN'T THERE ANY REFERENCE TO YOUR ALLEGED

19   PHYSICAL EXAMINATION?

20   **A.**    BECAUSE I WAS WRITING A SUMMARY.  I WAS NOT DOING A SOAP

21   NOTE, I WAS DOING A SUMMARY.

22   **Q.**    OKAY.

23          NOW, YOU STATED THAT IN RESPONSE TO THAT VISIT ON

24   AUGUST 30TH, 2006, THAT WAS THE FIRST TIME YOU HAD EVER MET ME;

25   IS THAT CORRECT?

1    **A.**    I BELIEVE THAT IS CORRECT.

2    **Q.**    AND PRIOR TO THAT, YOU HAD ALREADY MADE THE DECISION TO

3    DISCONTINUE MY TRAMADOL MEDICATION AND REPLACE IT WITH NSAIDS;

4    ISN'T THAT ALSO CORRECT?

5    **A.**    YES.

6    **Q.**    AND THAT WAS WITHOUT ANY PHYSICAL EXAMINATION, CORRECT?

7    **A.**    YES.

8    **Q.**    OKAY.

9              ISN'T IT TRUE THAT BACK ON APRIL 10TH, 2006, IN

10   RESPONSE TO MY 602 APPEAL AGAINST DR. ROWE, YOU REVIEWED NURSE

11   PRACTITIONER RISENHOOVER'S MARCH 25TH, 2006 RENEWAL OF MY

12   TRAMADOL MEDICATION FOR 90 DAYS AND YOU DETERMINED THAT THAT

13   WAS APPROPRIATE CARE AND TREATMENT.

14             IS THAT ALSO NOT CORRECT?

15   **A.**    I DON'T REMEMBER MY RATIONING AND THINKING ON THAT ISSUE.

16   THERE'S MANY CONSIDERATIONS OF WHY SOMETHING WOULD BE

17   APPROPRIATE.  AND I DON'T KNOW AT THIS POINT WHY I WOULD

18   CONSIDER THAT APPROPRIATE OR NOT CONSIDER IT APPROPRIATE.

19   **Q.**    WELL, YOU TESTIFIED YESTERDAY THAT TRAMADOL WAS ONLY

20   INDICATED FOR SHORT-TERM USE BACK IN 2006; IS THAT NOT CORRECT?

21   **A.**    WHETHER WE SHOULD CONTINUE A MEDICATION AFTER A LONG

22   PERIOD OF USE, HOW WE DO THE WEANING AND ALL OTHER ASPECTS OF

23   DISCONTINUING OR CONTINUING, IS AN INVOLVED QUESTION.  AND I

24   DON'T REMEMBER MY TOTAL THINKING ON THAT ISSUE.  WHETHER I

25   CONTINUED IT OR NOT IS A VERY COMPLEX DECISION-MAKING PROCESS.

1   **Q.**   WELL, YOU TESTIFIED YESTERDAY THAT IT WAS ONLY FOR

2   SHORT-TERM USE PURSUANT TO FDA GUIDELINES BACK IN 2006 AND THAT

3   WHEN YOU BECAME AWARE THAT I HAD BEEN ON THAT MEDICATION FOR

4   SUCH A LONG TIME PERIOD, WHICH WOULD HAVE BEEN OVER FOUR YEARS

5   AS OF MARCH OF 2006, YOU WERE CONCERNED ABOUT THE POSSIBLE SIDE

6   EFFECTS AND OTHER ISSUES, AND THAT'S THE REASON YOU DECIDED TO

7   TAKE ME OFF TRAMADOL AND REPLACE IT WITH NSAIDS WITHOUT ANY

8   PHYSICAL EXAMINATION; IS THAT CORRECT?

9   **A.**   I HAD EVALUATED REPORTS, X-RAYS, TALKED WITH MY PROVIDERS,

10  REVIEWED THE CHART, AND I WAS MOVING IN THAT DIRECTION I

11  BELIEVE.

12  **Q.**   WELL, ON MARCH 10TH -- NO.  EXCUSE ME.  APRIL 10TH, 2006,

13  YOU REVIEWED MY MEDICAL RECORDS AT THAT TIME; IS THAT NOT

14  CORRECT?

15  **A.**   I DON'T SPECIFICALLY REMEMBER HOW -- YES OR NO ON THAT.  I

16  REVIEW SO MANY RECORDS.  ALL DAY LONG, THAT'S WHAT I DO.

17  **Q.**   OKAY, FAIR ENOUGH.

18          I WILL PRESENT TO YOU THAT IN YOUR SECOND LEVEL

19  RESPONSE TO MY 602 APPEAL ON DR. ROWE THAT IT STATES:

20          THAT HEALTH CARE MANAGER MCLEAN WAS ASSIGNED TO

21          INVESTIGATE MY ALLEGATIONS AGAINST ROWE ON HER

22          MEDICATION DECISIONS, INCLUDING DISCONTINUING MY

23          TRAMADOL ON DECEMBER 30TH OF 2005, AND THAT A.

24          THACKER REVIEWED YOUR MEDICAL FILE AND RESPONSES

25          ON APRIL 10TH, 2006, AND THEY WERE ALSO REVIEWED

1                BY M.C. SAYRE, MD, CHIEF MEDICAL OFFICER.

2                YOU WERE SEEN BY SUE RISENHOOVER ON 3/25/06 TO

3                REVIEW YOUR MEDICATIONS.  SHE RENEWED THE

4                TRAMADOL.  YOU TOLD HER THAT SHE COULD STOP THE

5                CREAM SINCE THE RASH CLEARED UP.  YOU HAVE A NEW

6                PRIMARY CARE PROVIDER AND ARE BEING GIVEN

7                ADEQUATE AND APPROPRIATE CARE FOR YOUR MEDICAL

8                CONDITIONS.

9                DO YOU RECALL THAT?

10   **A.**   DID I SIGN THAT?

11   **Q.**   YES, YOU DID.

12                WOULD YOU LIKE TO SEE YOUR SIGNATURE?

13   **A.**   YES, I WOULD.

14   **Q.**   EXHIBIT 162.

15           **THE COURT:**  EITHER WAY, WHATEVER IS EASIER FOR YOU.

16           **THE WITNESS:**  OKAY.  I SEE THAT I DID SIGN IT.

17           **THE COURT:**  I AM SORRY.  WHERE IN 162 IS IT?

18           **MR. ASHKER:**  IT'S BEHIND THE, FEW PAGES BEHIND THE

19   602 APPEAL DATED OCTOBER 10TH, 2005.  IT'S PART OF THAT APPEAL

20   RIGHT THERE.  SECOND LEVEL RESPONSE.

21           **THE COURT:**  OKAY.

22           **THE WITNESS:**  THIS IS A TYPED SINGLE-SPACED DOCUMENT

23   GOING TWO PAGES.

24   **BY MR. ASHKER:**

25   **Q.**   ALL I ASKED YOU WAS IF THAT'S YOUR --

SAYRE – CROSS / MR. ASHKER

1    **A.**    AND I DID SIGN IT.

2    **Q.**    THANK YOU.

3             NOW, AT SOME -- IN JUNE 20TH OF 2006, YOU

4    RECOMMENDED TO RISENHOOVER TO TAPER ME OFF THE TRAMADOL; IS

5    THAT CORRECT?

6    **A.**    TO MY RECOLLECTION, YES.

7    **Q.**    AND CAN YOU EXPLAIN WHY, WITHOUT ANY PHYSICAL EXAMINATION,

8    NEVER HAVING MET ME IN PERSON IN MY LIFE, THAT YOU, ON

9    APRIL 10TH, 2006, YOU WOULD HAVE REVIEWED MY MEDICAL RECORDS

10   AND NOTED THAT I HAD BEEN ON TRAMADOL FOR OVER FOUR YEARS AT

11   THAT TIME AND YOU WOULD HAVE STATED IN THIS DOCUMENT RIGHT HERE

12   THAT THAT WAS APPROPRIATE AND PROPER TREATMENT.  AND THEN

13   APPROXIMATELY TWO MONTHS LATER YOU WOULD RECOMMEND TO

14   RISENHOOVER TO TAPER ME OFF THE MEDICATION; IS THAT CORRECT?

15   **A.**    THAT WAS A LONG QUESTION.  I GOT LOST.

16   **Q.**    WELL, MY QUESTION IS, WHAT HAD CHANGED BETWEEN APRIL 10TH

17   AND JUNE 20TH WHEN YOU MADE THAT RECOMMENDATION FOR HER TO

18   TAPER ME OFF THAT MEDICATION?

19   **A.**    MULTIPLE ONGOING DISCUSSIONS WITH MY PROVIDERS, MORE

20   CHANCE TO REVIEW THE RECORD.  I DON'T KNOW WHAT NEW EVIDENCE

21   WAS INVOLVED IN IT.

22             THIS IS ONE OF MULTIPLE CASES I HAVE IN THE PRISON,

23   BUT IT WAS AN EVOLVING PICTURE WITH AMPLE EVIDENCE THAT YOU

24   NEEDED TO COME OFF TRAMADOL.  DECISIONS ARE MADE IN PROGRESSIVE

25   STEPS.

SAYRE – CROSS / MR. ASHKER

1    **Q.**   WHAT I AM ASKING YOU IS WHAT EVIDENCE ARE YOU TALKING

2    ABOUT?

3    **A.**   AT THIS POINT, ALL I CAN SAY IS I REVIEWED THE CHART, I

4    REVIEWED ALL THE DOCUMENTS.  I TALKED TO MY PROVIDERS.  I WAS

5    IN CONSTANT COMMUNICATION WITH RISENHOOVER.

6            ANY TIME THAT ANY CASE REACHES -- ANY INMATE'S CARE

7    REACHES MY LEVEL, IT IS WHEN A PROVIDER CALLS ME AND SAYS, YOU

8    KNOW, I HAVE QUESTIONS, I WANT TO TALK TO YOU ABOUT THIS, I

9    NEED YOUR ADVICE.  AND WE WOULD DISCUSS IT.  I DISCUSSED

10   RISENHOOVER'S FINDINGS, I LOOK AT THE CHART, AND I MAKE A

11   DETERMINATION BASED ON AVAILABLE INFORMATION.

12   **Q.**   ALL RIGHT, THANK YOU.

13           WELL, DO YOU RECALL WHAT MS. RISENHOOVER'S RESPONSE

14   WAS TO YOUR RECOMMENDATION?

15   **A.**   SHE WAS IN TOTAL AGREEMENT AND ENTHUSIASTIC.  SHE THOUGHT

16   THAT'S WHAT NEEDED TO BE DONE.

17   **Q.**   WELL, CAN YOU EXPLAIN THEN WHY -- I WILL PRESENT TO YOU

18   THAT WHEN SHE INFORMED ME OF THAT AND I DESCRIBED IN DETAIL MY

19   PAST HISTORY, MY PROBLEMS WITH NSAIDS, AND MY SETTLEMENT

20   AGREEMENT AND JUST EVERYTHING, AND SHE DOCUMENTED IT PARTIALLY

21   IN HER 6/21/06 EXAMINATION.  AND AFTER I GOT DONE EXPLAINING

22   ALL THAT STUFF TO HER, SHE, IN FACT, SAID THAT SHE WAS NOT

23   COMFORTABLE DOING THAT AND THAT SHE WAS GOING TO EXTEND THE

24   MEDICATION FOR 60 MORE DAYS BECAUSE SHE WANTED TO HAVE YOU

25   PERSONALLY PHYSICALLY EXAMINE ME BEFORE SHE DID THAT.

1            ISN'T THAT CONTRADICTORY TO WHAT YOU SAID HER

2    POSITION WAS TO YOU?

3    **A.**   I CAN'T --

4            **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR, THE QUESTION IS

5    ARGUMENTATIVE.

6            **THE COURT:**  OVERRULED.

7            **THE WITNESS:**  I CAN'T GET INTO SUE RISENHOOVER'S

8    MIND.  I DON'T KNOW WHAT SHE WAS THINKING.  MAYBE SHE

9    RECONSIDERED SOMETHING, MAYBE THE FORCEFULNESS OF YOUR

10   PRESENTATION MADE HER THINK OF SOMETHING ELSE, I DON'T KNOW

11   WHAT SHE WAS THINKING.

12           THE FACT OF THE MATTER IS THAT WE WENT BACK, WE

13   DISCUSSED IT AGAIN IN MAR.  I SAID, OKAY, I WILL GO SEE THE

14   GENTLEMAN.  I WILL MAKE A HANDS-ON ASSESSMENT, AND WE DID IT.

15   **BY MR. ASHKER:**

16   **Q.**   WELL, THAT'S NOT COMPLETELY TRUE, IS IT, BECAUSE ON

17   AUGUST 21ST, 2006, YOU HAD NOT PHYSICALLY EXAMINED ME, HAD YOU?

18   **A.**   NO, I HADN'T.

19   **Q.**   BUT ISN'T THAT, IN FACT, THE DAY THAT THE DECISION WAS

20   MADE TO DISCONTINUE THE -- TAPER ME OFF THE MEDICATION AND

21   REPLACE IT WITH NSAIDS?

22   **A.**   AFTER WE, AGAIN, DISCUSSED IT, AGAIN THOUGHT OF

23   EVERYTHING, AND THEN HAD EVERYONE PUT IN THEIR THOUGHTS AND

24   THEIR PROCESSES.

25           WE TRIED TO MAKE SURE THAT WE INCLUDE EVERYONES

1    THINKING IN THESE DISCUSSIONS SO WE CAN GET A FAIR AND UNBIASED

2    APPROACH.

3    Q.   EXCUSE ME, DR. SAYRE, BUT I THOUGHT YOU JUST SAID THAT

4    WHEN RISENHOOVER PRESENTED TO YOU IN JUNE THAT SHE WAS NOT

5    COMFORTABLE DOING THAT WITHOUT YOU PHYSICALLY EXAMINING ME

6    FIRST, YOU SAID, OKAY, I WILL GO AHEAD AND DO THAT.

7              BUT, IN FACT, YOU JUST NOW ADMITTED THAT THE

8    DECISION ACTUALLY WAS MADE ON AUGUST 21ST WITHOUT ANY PHYSICAL

9    EXAMINATION; IS THAT NOT TRUE?

10             MR. ANDRADA:  EXCUSE ME, YOUR HONOR.  THE QUESTION

11   IS ARGUMENTATIVE AND IT MISSTATES WHAT THIS WITNESS SAID THIS

12   WITNESS --

13             THE COURT:  OVERRULED.

14             THE WITNESS:  I THINK WORDS ARE BEING PUT INTO MY

15   MOUTH.

16             TO REMEMBER EVERY DETAIL OF A THOUGHT PROCESS THAT

17   FAR BACK -- I KNOW WE WENT THROUGH A CAREFUL CONSIDERATION

18   PROGRAM, WE THOUGHT ABOUT ALL THESE ISSUES.  THERE'S A LOT OF

19   REVIEW, THERE'S A LOT OF DISCUSSION, THERE'S A LOT OF BACK AND

20   FORTH.

21             THE COURT:  YOU MIGHT WANT TO GO ON TO ANOTHER

22   ISSUE.

23             MR. ASHKER:  THANK YOU DR. SAYRE.

24   BY MR. ASHKER:

25   Q.   YOU TESTIFIED YESTERDAY THAT I HAD BEEN DEVELOPING

1   NUMBNESS OVER THE WRIST AREA FOR THE LAST YEAR OR SO; IS THAT

2   CORRECT?

3   **A.**   I TESTIFIED THAT THE EMG EVIDENCE INDICATED THAT.

4   **Q.**   OKAY.

5          AND THE FACT IS I HAD BEEN COMPLAINING ABOUT

6   WORSENING ULNAR PAIN, NERVE PAIN THAT I ASSOCIATED WITH NERVE

7   PAIN AND PAIN IN MY WRIST EVER SINCE SEPTEMBER AND OCTOBER OF

8   2006; IS THAT NOT CORRECT?

9   **A.**   I BELIEVE SO.

10  **Q.**   BUT YET YOU DID NOT ORDER, HAVE ME SEEN BY ANY SPECIALIST

11  WHO COULD DETERMINE WHAT WAS GOING ON WITH MY NERVE FUNCTION;

12  IS THAT CORRECT?

13  **A.**   YOU WERE HAVING REGULAR EXAMINATIONS AND CONSULTATIONS

14  WITH OUR NEUROLOGIST.

15  **Q.**   EXCUSE ME?  I WAS -- CAN YOU PLEASE EXPLAIN WHERE THOSE

16  DOCUMENTS ARE?

17  **A.**   I HAVE READ SEVERAL CONSULTATIONS FROM THE NEUROLOGIST.  I

18  DON'T REMEMBER THE EXACT DATES, BUT IN -- AND THIS ISSUE HAD

19  BEEN ADDRESSED BY A SPECIALIST.

20  **Q.**   WELL, DR. SAYRE, I WILL PRESENT TO YOU THAT THE LAST TIME

21  I HAD SEEN A NEUROLOGIST BEFORE I SAW DR. SHIN ON

22  DECEMBER 22ND, 2008 WAS ON OCTOBER 30TH, 2001.

23          WHAT NEUROLOGIST CONSULTS ARE YOU TALKING ABOUT?

24  **A.**   YOU KNOW, WITHOUT THE MEDICAL RECORD IN FRONT OF ME, I AM

25  AT THE POINT OF SPECULATION NOW.

1     **THE COURT:**  WELL, FINE.  WHEN WE TAKE A BREAK, YOU

2   CAN LOOK AT THOSE RECORDS AND SHOW THEM TO US.

3     **THE WITNESS:**  YOUR HONOR, THEY ARE ON A COMPUTER.

4     **THE COURT:**  WE HAVE THEM HERE.

5     **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS FOR

6   DR. SAYRE.

7     **THE COURT:**  ANYTHING ELSE FROM YOU?

8     **MR. ANDRADA:**  YES.

9               **REDIRECT EXAMINATION**

10  BY MR. ANDRADA:

11  **Q.**   DOCTOR, WILL YOU PLEASE EXPLAIN WHAT YOU MEANT WHEN YOU

12  TESTIFIED THAT YOU REACHED A DECISION ABOUT TRAMADOL PRIOR TO

13  YOUR EXAMINATION OF MR. ASHKER?

14  **A.**   I DETERMINED THAT THE LENGTH OF TIME, THE EXTENT OF

15  HEALING, THE OVERALL PROGRESSION IN THE CASE, THE REPORTS IN

16  THE CHART, DISCUSSION WITH THE PROVIDERS, THAT IT WAS TIME TO

17  MOVE OFF THIS MEDICATION.

18  **Q.**   AND, AGAIN, WERE YOU HIS PRIMARY CARE PROVIDER?

19  **A.**   NO, I WAS NOT.

20  **Q.**   ALL RIGHT.

21       AND THAT WAS IN 2006 THAT WOULD HAVE BEEN

22  MS. RISENHOOVER; IS THAT CORRECT?

23  **A.**   THIS WOULD BE CORRECT.

24  **Q.**   AND DID YOU EXAMINE MR. ASHKER BEFORE HE WAS ACTUALLY

25  TAKEN OFF THE MEDICATION?

SAYRE – REDIRECT / MR. ANDRADA

1    **A.**   WHEN WAS HE TAKEN OFF THE MEDICATION?  I FORGOT.

2    **Q.**   LET ME REPRESENT TO YOU THAT THERE'S EVIDENCE THAT HE WAS

3    TAKEN OFF THE MEDICATION AT THE END OF SEPTEMBER OF 2006.

4    **A.**   NO, I ALREADY INTERVIEWED HIM ON THE 31ST OF AUGUST.

5    **Q.**   AND, AGAIN, YOU INDICATED YOU INTERVIEWED HIM.  DID YOU

6    PERFORM AN EXAMINATION?

7    **A.**   YES, I DID.

8    **Q.**   ALL RIGHT.  AND WE TALKED ABOUT THAT YESTERDAY; IS THAT

9    CORRECT?

10   **A.**   I BELIEVE SO, YES.

11   **Q.**   ALL RIGHT.

12           **THE COURT:**  I AM SORRY.  WHEN YOU SAY TAKEN OFF THE

13   MEDICATION, ARE YOU REFERRING TO THE DATE THE ORDER WAS

14   ENTERED, OR THE DATE THE TAPERING OFF BEGAN, OR THE DATE THE

15   MEDICATION WAS FINALLY ENDED?

16           I AM LOSING TRACK A LITTLE BIT HERE.

17           **MR. ANDRADA:**  WE CAN -- LET'S REVIEW.

18   **BY MR. ANDRADA:**

19   **Q.**   WAS THERE A DECISION MADE -- WAS THERE A VOTE AT THE M-A-R

20   COMMITTEE MEETING ON OR ABOUT AUGUST 21ST TO TAKE MR. ASHKER

21   OFF THE MEDICATION?

22   **A.**   YES.

23   **Q.**   THE VOTE WAS UNANIMOUS, CORRECT?

24   **A.**   YES.

25   **Q.**   PRIOR TO -- PRIOR TO ACTUALLY INITIATING, FORMALLY

SAYRE — RECROSS / MR. ASHKER

1    INITIATING THAT ORDER, YOU EXAMINED HIM, CORRECT?

2    **A.**   YES.

3    **Q.**   AND THEN THE ORDER WAS, IN FACT, FORMALLY INITIATED,

4    CORRECT?

5    **A.**   YES.

6    **Q.**   AND AS PART OF THAT ORDER, HE WAS WEANED OFF THE

7    MEDICATION, CORRECT?

8    **A.**   YES.

9    **Q.**   AND WHAT IS WEANED OFF MEDICATION MEAN?

10   **A.**   YOU JUST DON'T ABRUPTLY HAVE IT ONE DAY A FULL DOSE AND

11   THE NEXT DAY ZERO.  YOU REDUCE THE DOSE, HOWEVER YOU WANT TO DO

12   IT, YOU MAKE REDUCTIONS SO THAT IT GOES DOWN AT LEAST ONE OR

13   TWO SETS.

14   **Q.**   ALL RIGHT, SIR.

15         **MR. ANDRADA:**  I THINK THAT'S ALL I HAVE.

16         THANK YOU VERY MUCH.

17         **THE WITNESS:**  YOU ARE WELCOME.

18         **THE COURT:**  ANYTHING ELSE?

19         **MR. ASHKER:**  YES, BRIEFLY.

20                **RECROSS—EXAMINATION**

21   BY MR. ASHKER:

22   **Q.**   DR. SAYRE, I WILL PRESENT TO YOU THAT ON SEPTEMBER 24TH,

23   2006, I HAD SIGNED AND FILED A DECLARATION IN SUPPORT OF MY

24   MOTION FOR PROTECTIVE ORDER.

25         IN THIS MOTION FOR PROTECTIVE ORDER, I DESCRIBED

1    YOUR SO-CALLED EXAMINATION THAT YOU CLAIM YOU CONDUCTED ON

2    AUGUST 30TH, 2006.  AND WHAT I SAID WAS:

3               DR. SAYRE STOOD AND ASKED ME TO OPEN MY HAND AND

4               HE TOUCHED MY WRIST AREA LIGHTLY FOR ABOUT TEN

5               SECONDS ASKING ME TO TELL HIM WHERE THE PAIN WAS

6               IN MY HAND RIGHT NOW.

7               I SAID IT'S THROUGH MY HAND, INTO MY PINKY,

8               COMING ALONG MY ULNAR NERVE AND MY TENDONS UP

9               THE FOREARM ARE REALLY TIGHT AND FEEL INFLAMED.

10              THAT WAS THE FULL EXTENT OF HIS PHYSICAL EXAM.

11              HE DID NOT ASK ME TO DEMONSTRATE ANY OTHER

12              MOVEMENT NOR DID HE ASK ME WHAT OTHER PAIN, ET

13              CETERA, I HAVE.  NOTABLY --

14         **THE COURT:**  ARE YOU WORKING YOUR WAY TO A QUESTION?

15         **MR. ASHKER:**  YES, I AM, YOUR HONOR.  I'M LAYING A

16   FOUNDATION RIGHT HERE.

17         **MR. ANDRADA:**  WELL, IT'S INAPPROPRIATE, YOUR HONOR.

18   HE IS, IN EFFECT, TESTIFYING --

19         **THE COURT:**  HE TESTIFIED TO THE SAME EFFECT.  WHAT

20   IS YOUR QUESTION ABOUT THIS?

21   **BY MR. ASHKER:**

22   **Q.**  MY QUESTION IS, DR. SAYRE, IS WHEN YOU FILED A RESPONDING

23   DECLARATION ON NOVEMBER 11TH, 2006, YOU -- I WILL PRESENT TO

24   YOU THAT YOU DID NOT DISPUTE MY DESCRIPTION OF YOUR EXAMINATION

25   NOR DID YOU INCLUDE ANYWHERE IN THAT DECLARATION THAT YOU HAD

1    CONDUCTED ANY TYPE OF PHYSICAL EXAMINATION ON AUGUST 30TH,

2    2006.

3            CAN YOU EXPLAIN THAT?

4            MR. ANDRADA:  WELL, YOUR HONOR, THIS IS

5    INAPPROPRIATE.  IF HE'S GOING TO --

6            THE COURT:  I DON'T THINK SO.  WE CAN GET OUT THE

7    DECLARATION, IF YOU WOULD LIKE.

8            MR. ANDRADA:  PERHAPS WE SHOULD.

9            THE COURT:  OKAY.  GO RIGHT AHEAD.

10           MR. ANDRADA:  WELL, HE --

11           THE COURT:  IT WAS A DECLARATION FILED IN COURT.  WE

12   CAN GET IT OFF THE COMPUTER.

13           MR. ASHKER:  I HAVE IT HERE, YOUR HONOR.

14           MR. ANDRADA:  SURE.

15           THE COURT:  IS IT --

16           MR. ANDRADA:  IF HE HAS IT.  I HAVE VOLUMES OF

17   DOCUMENTS.  YOUR HONOR, I APOLOGIZE, I DON'T HAVE IT RIGHT AT

18   MY DISPOSAL.  I'M SORRY.

19           THE COURT:  WE DO.

20           DO YOU HAVE AN EXHIBIT NUMBER?

21           MR. ASHKER:  IT WOULD BE UP UNDER EXHIBIT 182, THE

22   FIRST DECLARATION IN THAT SECTION.

23           THE COURT:  SO YOU WOULD HAVE IT AS WELL BECAUSE

24   MR. ASHKER GAVE YOU HIS EXHIBITS.

25           MR. ANDRADA:  WOULD YOU MIND GOING TO GET IT?

1          **THE WITNESS:**  SO COULD I HAVE THE QUESTION AGAIN?

2          **MR. ANDRADA:**  WAIT.

3          **THE COURT:**  IT WAS KIND OF A LONG QUESTION.

4          **MR. ASHKER:**  THE QUESTION WAS --

5          **THE COURT:**  LET'S JUST SAY IN BRIEF, IN RESPONSE TO

6   A DECLARATION THAT HE GAVE, WHICH HE JUST DESCRIBED, HE'S

7   ASKING YOU WHY, IN YOUR RESPONDING DECLARATION, YOU DID NOT

8   DISPUTE WHAT HE SAID AND DESCRIBE THIS PHYSICAL EXAMINATION

9   THAT YOU ARE NOW TELLING US ABOUT.

10          IF YOU DON'T REMEMBER THAT, THEN WE ARE GOING TO GET

11  YOU A COPY OF THE DECLARATION SO YOU CAN TAKE A LOOK.  BUT IF

12  YOU CAN ANSWER IT WITHOUT THE DECLARATION, THAT'S FINE, TOO.

13          **THE WITNESS:**  TO THE BEST OF MY KNOWLEDGE, I DON'T

14  EVEN REMEMBER READING HIS DECLARATION.  I WAS ASKED TO DESCRIBE

15  WHAT HAPPENED AND I DID.

16  **BY MR. ASHKER:**

17  **Q.**  SO YOU DID NOT READ MY DECLARATION, BUT YET -- WELL, I

18  WILL PRESENT TO YOU THAT IF YOU READ MY DECLARATION AND THEN

19  YOU READ YOUR DECLARATION, IT'S CLEAR THAT YOU WERE RESPONDING

20  TO MY ALLEGATIONS.  AND THE DECLARATION'S TITLED, "DECLARATION

21  OF M. SAYRE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE

22  ORDER."

23          HOW ARE YOU GOING TO OPPOSE THAT AND RESPOND TO WHAT

24  I'M SAYING WITHOUT READING IT?

25          **MR. ANDRADA:**  YOUR HONOR, THIS IS ARGUMENT.  THESE

1    MATTERS ARE HANDLED BY LAWYERS.  HE'S NOT INVOLVED IN THE

2    FILING OF AN OPPOSITION.  HE MIGHT SIGN A DECLARATION, BUT THIS

3    IS ARGUMENT.  THIS IS INAPPROPRIATE.

4              **THE COURT:**  I DON'T THINK SO.  I GUESS THE JURY CAN

5    READ IT AND SEE IF IT SEEMS TO BE RESPONSIVE.

6              **MR. ANDRADA:**  ARE WE GOING TO GIVE HIM THE COURTESY

7    OF LOOKING AT THE DOCUMENT?

8              **THE COURT:**  HE DOESN'T SEEM TO WANT IT, BUT WE

9    CERTAINLY CAN IF YOU LIKE.

10             **MR. ANDRADA:**  WOULD YOU MIND, JUDGE, IF WE GAVE HIM

11   THE DOCUMENT?

12             **THE COURT:**  NOT AT ALL.  I HAVE A COPY RIGHT HERE, I

13   THINK.

14             **MR. ANDRADA:**  I THINK THIS IS THE ONE THAT HE IS

15   SPEAKING OF.

16             IF I MAY I APPROACH, YOUR HONOR?

17             **THE COURT:**  OKAY.  YOU HAVE IT?

18             GO AHEAD.  I HAVE ONE, TOO.  WHY DON'T YOU USE YOURS

19   THEN I CAN USE MINE FOR THE CLERK.

20             (DOCUMENT HANDED TO WITNESS.)

21             **MR. ANDRADA:**  THIS IS A DECLARATION OF MICHAEL SAYRE

22   IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT --

23             **THE COURT:**  NO.  IT'S THE NEXT ONE.  THERE'S ONE

24   RIGHT AFTER THAT ONE THAT HE'S REFERRING TO, NOVEMBER --

25             **MR. ASHKER:**  11 --

1          **THE COURT:**  AND IT IS RESPONSIVE TO THE OPPOSITION

2      TO PLAINTIFF'S MOTION FOR RELIEF.  RIGHT AFTER THE ONE YOU'VE

3      GOT.

4          **MR. ANDRADA:**  OKAY.  THAT'S FINE.

5          MAY I READ IT BRIEFLY FOR A MOMENT BEFORE I GIVE IT

6      TO THE WITNESS, YOUR HONOR?

7          **THE COURT:**  YES.

8          **MR. ANDRADA:**  THANK YOU.

9          **MR. ASHKER:**  WHILE HE IS DOING THAT, CAN I ASK A FEW

10     MORE QUESTIONS?

11         **MR. ANDRADA:**  I THOUGHT THERE WAS A QUESTION

12     PENDING.

13         **THE COURT:**  I DON'T THINK SO.  I THINK HE ANSWERED

14     IT.

15     **BY MR. ASHKER:**

16     **Q.**  DR. SAYRE, AFTER I WAS DISCONTINUED OFF THE TRAMADOL, YOU

17     STATED THAT THIS -- THAT I WAS INSISTENT, I WANTED TRAMADOL.  I

18     NEED THAT TRAMADOL AND THAT WAS A RED FLAG TO YOU; IS THAT

19     CORRECT?

20     **A.**  YES.

21     **Q.**  OKAY.

22         IN THE SAME DECLARATION THAT I JUST REFERENCED TO

23     YOU, I PRESENT TO YOU THAT -- WHAT I SAID IN MY DECLARATION WAS

24     THAT ON AUGUST 30TH, 2006, WHEN YOU TOLD ME THAT TRAMADOL WAS

25     ONLY FOR SHORT-TERM USE, NOT FOR LONG-TERM CHRONIC PAIN

1    CONTROL, I TOLD -- MY RESPONSE TO YOU WAS, OKAY, WHAT WILL IT

2    BE REPLACED WITH THAT DOES NOT -- THAT IS EFFECTIVE FOR MY PAIN

3    AND DOES NOT CAUSE SIDE EFFECTS.

4            DO YOU RECALL THAT?

5    **A.**   YES.

6    **Q.**   AND CAN YOU EXPLAIN WHAT YOUR RESPONSE WAS?

7    **A.**   THERE HAVE BEEN SO MANY RESPONSES TO YOUR WRITTEN

8    DOCUMENTATION, I COULDN'T -- THEY HAVE ALL BLENDED.

9    **Q.**   WELL, HOW IS IT WHEN YOU TOLD ME THAT TRAMADOL WAS GOING

10   TO BE DISCONTINUED AND I RESPONDED TO YOU, OKAY, WHAT WILL IT

11   BE REPLACED WITH THAT IS EFFECTIVE FOR MY PAIN WITHOUT CAUSING

12   INTOLERABLE SIDE EFFECTS, HOW IS THAT INSISTENCE ON DEMANDING

13   TRAMADOL?

14           **MR. ANDRADA:**  OBJECTION, VAGUE AND AMBIGUOUS.

15           **THE COURT:**  OVERRULED.

16           **THE WITNESS:**  MY IMPRESSION OF INSISTENCE IS BASED

17   ON YOUR DEMEANOR IN THE CLINIC THAT WAS PROVIDED TO ME BY MY

18   PROVIDERS.  THE CONSTANT BARRAGE OF 602'S, THE CONSTANT BARRAGE

19   OF LETTERS FROM YOU, ALL THE WRITING THAT YOU WERE SUBMITTING,

20   IT WAS INCREDIBLE.

21   **BY MR. ASHKER:**

22   **Q.**   WELL, THESE 602'S AND WRITING THAT YOU ARE TALKING ABOUT,

23   AREN'T THOSE, IN FACT, THE 602'S WHERE I WAS REPEATEDLY

24   COMPLAINING THAT I WAS IN SEVERE PAIN AND DISCOMFORT, I WAS --

25   HAD -- RESULTING IN SLEEP DEPRIVATION, AND THAT BECAUSE THE

SAYRE – RECROSS / MR. ASHKER

1    NSAIDS WERE NOT EFFECTIVE AND WERE, IN FACT, CAUSING ME TO HAVE

2    CHRONIC DIARRHEA, ISN'T THAT WHY I WAS FILING ALL THOSE 602'S?

3    **A.**   ONE OF THE COMPLICATIONS OF TRAMADOL IS GI UPSET.  I

4    CAN'T --

5    **Q.**   EXCUSE ME, WE ARE NOT TALKING ABOUT TRAMADOL HERE.  WE ARE

6    TALKING ABOUT WHEN I WAS SWITCHED OVER TO THE NSAIDS.

7              **MR. ANDRADA:**  IS THERE A QUESTION?

8              **MR. ASHKER:**  YES.

9    **BY MR. ASHKER:**

10   **Q.**   MY QUESTION IS, IN ALL THOSE 602 APPEALS YOU ARE TALKING

11   ABOUT, I WAS REPEATEDLY COMPLAINING THAT THE NSAIDS WERE NOT

12   EFFECTIVE; IS THAT CORRECT?

13   **A.**   YES, YOU DID MAKE THAT ALLEGATION.

14   **Q.**   AND I WAS REPEATEDLY COMPLAINING THAT I WAS IN SEVERE

15   PAIN, IT WAS HAVING AN IMPACT ON MY ABILITY TO DO DAILY

16   ACTIVITIES SUCH AS WRITING AND CAUSING SLEEP DEPRIVATION; IS

17   THAT CORRECT?

18   **A.**   YOU DID MAKE THAT ALLEGATION.

19   **Q.**   OKAY.  AND WHAT EVIDENCE DO YOU HAVE THAT THAT WASN'T

20   TRUE?

21   **A.**   THE PHYSICAL EVIDENCE IN THE CHART OF BONA FIDE MEDICAL

22   TESTS, A DEC OF DATA, OBSERVATIONS BY MY PROVIDERS, EXAMINATION

23   BY MY PROVIDERS.

24              I CUSTODY GIVE ME A REPORT ON HOW WELL YOU KEPT YOUR

25   CELL CLEAN, IF YOU KEPT IT VERY CLEAN, THERE WAS NO EVIDENCE

1    WHATSOEVER YOU WERE HAVING ANY DIFFICULTIES WITH ACTIVITIES OF

2    DAILY LIVING.

3             I GATHERED AS MUCH INFORMATION AS I COULD, AND I

4    COULD NOT SUBSTANTIATE YOUR SUBJECTIVE ALLEGATIONS WITH ANY

5    BONA FIDE EVIDENCE OF PROOF.

6    Q.   WELL, I MEAN DID YOU PERSONALLY -- DID YOU PERSONALLY

7    EXAMINE ME?

8                 MR. ANDRADA:  YOUR HONOR --

9                 MR. ASHKER:  I MEAN --

10                MR. ANDRADA:  EXCUSE ME, MR. ASHKER.  IF YOU COULD

11   BE SO KIND.

12                THE COURT:  WHAT IS YOUR OBJECTION?

13                MR. ANDRADA:  THE OBJECTION IS THAT THE COURT

14   ESSENTIALLY IS GOING TO LIMIT THE TIME, AND IT SEEMS TO ME --

15                THE COURT:  I SAID I WOULD GIVE HIM HALF AN HOUR AND

16   SOME OF THAT WAS TAKEN BY YOU, AND THE HALF HOUR HASN'T PASSED

17   YET.

18                MR. ANDRADA:  I'M SORRY.

19                THE COURT:  THAT OBJECTION IS OVERRULED.

20                MR. ANDRADA:  PARDON ME.  I THOUGHT HE WAS PASSED A

21   HALF HOUR.

22                THE COURT:  NO.

23                MR. ANDRADA:  EXCUSE ME.

24                THE COURT:  IT'S ONLY FIVE AFTER NINE.  WE STARTED

25   AT TWENTY OF AND YOU TOOK A BIT OF IT FOR YOUR REDIRECT.

1    **MR. ANDRADA:**  PARDON ME.  EXCUSE ME.

2    **BY MR. ASHKER:**

3    **Q.**   DR. SAYRE, YOU STATED THAT PART OF THE EVIDENCE YOU RELIED

4    ON WAS TESTS; IS THAT CORRECT?

5    **A.**   X-RAYS, NERVE CONDUCTION STUDIES, EXAMINATIONS.

6    **Q.**   BUT, DR. SAYRE, AT THE TIME PERIOD WE ARE TALKING ABOUT IN

7    2006, 2007, 2008, I HAD NOT HAD ANY NERVE CONDUCTION TEST SINCE

8    2001.  THE --

9        **THE COURT:**  YOU NEED TO STOP AND ASK A QUESTION.

10   ISN'T THAT RIGHT?

11   **BY MR. ASHKER:**

12   **Q.**   DR. SAYRE, DID YOU --

13       **THE COURT:**  I MEAN YOU NEED TO BREAK UP THAT

14   QUESTION.  IF YOU WANT TO ASK THAT ONE, STOP THERE AND SAY

15   ISN'T THAT RIGHT BEFORE YOU GO ON TO A LONG LIST.

16   **BY MR. ASHKER:**

17   **Q.**   DR. SAYRE, ISN'T IT TRUE THAT DURING THE TIME -- AT THE

18   TIME PERIOD IN QUESTION '06, '07, '08, I HAD NOT HAD ANY NERVE

19   CONDUCTION TESTS DONE SINCE 2001?

20   **A.**   IF YOU SAY SO.

21   **Q.**   AND ISN'T IT TRUE THAT DR. ROWE ADMITTED IN COURT

22   YESTERDAY THAT WHEN SHE SAW ME THOSE THREE TIMES IN 2005, SHE

23   HAD NOT CONDUCTED ANY CAREFUL PHYSICAL EXAMINATION?

24       **MR. ANDRADA:**  WELL, OBJECTION, MISSTATES THE

25   TESTIMONY.  I DON'T REMEMBER HER SAYING I DIDN'T CONDUCT A

1    CAREFUL EXAMINATION.

2              THE COURT:  SUSTAINED.

3              MR. ASHKER:  WELL, YOUR HONOR, SHE --

4              THE COURT:  IT JUST IS NOT RELEVANT FOR HIM TO

5    REMEMBER WHAT SHE SAID.  SHE SAID WHAT SHE SAID.  IT'S UP TO

6    THE JURY TO REMEMBER.  IF THEY FIND HIS TESTIMONY INCONSISTENT,

7    YOU WILL ARGUE THAT AND THEY WILL DETERMINE THAT.

8              YOU DON'T NEED TO ASK HIM IF HE REMEMBERS WHAT OTHER

9    PEOPLE SAID.

10             MR. ASHKER:  ALL RIGHT.

11   BY MR. ASHKER:

12   Q.   SO, DR. SAYRE, I WILL PRESENT TO YOU THAT -- WHAT YOU ARE

13   SAYING IS THAT YOU, WITHOUT ANY CAREFUL PHYSICAL EXAMINATION OF

14   ME, YOU DISCOUNTED MY COMPLAINTS, MY SUBJECTIVE COMPLAINTS?

15             MR. ANDRADA:  OBJECTION, YOUR HONOR.  IT'S

16   ARGUMENTATIVE AND THIS WITNESS HAS NOT TESTIFIED THAT HE --

17             THE COURT:  ARGUMENTATIVE OBJECTION IS OVERRULED.

18             DID YOU HAVE ANOTHER OBJECTION?

19             MR. ANDRADA:  I AM SORRY, YOUR HONOR?

20             THE COURT:  THE OBJECTION THAT IT IS ARGUMENTATIVE

21   IS OVERRULED.

22             MR. ANDRADA:  I AM SORRY.

23             THE COURT:  WHAT IS YOUR OTHER OBJECTION?

24             MR. ANDRADA:  THANK YOU, YOUR HONOR.  IT MISSTATES

25   THIS WITNESS' TESTIMONY TO THE EFFECT THAT HE --

1          **THE COURT:**  IF HE'S ASKING THIS WITNESS WHAT HE

2     SAID, THEN THIS WITNESS KNOWS WHAT THE FACTS ARE AND HE CAN

3     CORRECT HIM.  SO MISSTATES THE TESTIMONY ISN'T APPROPRIATE ON A

4     CROSS-EXAMINATION WHEN THE WITNESS IS RIGHT THERE TO SAY

5     WHETHER HE SAID IT OR HE DIDN'T SAY IT.

6          SO THAT IS OVERRULED AS WELL.

7          **MR. ANDRADA:**  EXCUSE ME.

8          **THE WITNESS:**  AT THIS POINT I DON'T EVEN KNOW WHAT

9     THE QUESTION IS.

10          **THE COURT:**  WELL -- WE CAN HAVE IT RESTATED OR READ

11     BACK.  I WILL TAKE A LOOK AT IT.  I DON'T REMEMBER WHAT IT WAS

12     EITHER.

13          **MR. ASHKER:**  WE CAN JUST MOVE ON, YOUR HONOR.

14          **THE COURT:**  THE QUESTION WAS FINE.  IF YOU WOULD

15     LIKE IT READ BACK AND ANSWERED, WE CAN DO THAT.  IF YOU WANT TO

16     MOVE ON, THAT'S FINE, TOO.

17          **MR. ASHKER:**  WE CAN HAVE HIM ANSWER WHEN I GET DONE.

18     **BY MR. ASHKER:**

19     **Q.**   DR. SAYRE, I WOULD LIKE YOU TO LOOK AT THIS DOCUMENT RIGHT

20     HERE, WHICH IS EXHIBIT, PART OF EXHIBIT 171.  AND IT'S A

21     PELICAN BAY STATE PRISON SECURITY HOUSING CELL SEARCH RECEIPT.

22          AND I WOULD LIKE YOU TO LOOK AT IT AND STATE WHAT IT

23     SAYS.  IT IS DATED 1/13/07.  AND STATE WHAT BOX IS MARKED WHERE

24     IT SAYS "CONDITION OF THE CELL."

25     **A.**   IT IS LABELED DIRTY.

1          I HAVE NEVER SEEN THIS DOCUMENT.  I HAVE NEVER --

2     ACTUALLY, I DON'T ROUTINELY SEE THESE DOCUMENTS.  I DO KNOW

3     THAT I DID INQUIRE OF THE CUSTODY OFFICERS IN YOUR HOUSING HOW

4     YOUR CELL WAS BEING MAINTAINED, AND I WAS TOLD THAT THERE WAS

5     NO PROBLEMS.  IT WAS ORDERLY AND CLEAN, AND THAT'S WHAT I BASED

6     MY JUDGMENT ON.

7     Q.   OKAY.  WELL, I AM SINGLE-CELLED IN SHU, AM I NOT?

8     A.   YES, I BELIEVE SO.  I HAVE NO CONTROL OR INFORMATION ABOUT

9     YOUR CELL CAPACITY.

10    Q.   THAT'S FINE.  I AM NOT ASKING YOU THAT.  ALL I ASKED YOU

11    WAS, YOU ARE AWARE THAT I AM SINGLE-CELLED, CORRECT?

12    A.   ACTUALLY, I AM NOT AWARE.  I HAVE NO INFORMATION.

13    Q.   I WILL PRESENT TO YOU THAT I AM SINGLE-CELLED AND WITH

14    THAT PRESENTATION, I WILL ASK YOU, IF I DON'T CLEAN MY CELL,

15    WHO IS GOING TO DO IT?

16         **MR. ANDRADA:**  ARGUMENTATIVE, YOUR HONOR.

17         **THE COURT:**  SUSTAINED.

18         YOU HAVE A COUPLE MORE MINUTES.  GO TO YOUR MOST

19    IMPORTANT QUESTIONS.

20         **MR. ASHKER:**  I HAVE NOTHING FURTHER, YOUR HONOR.

21         **THE COURT:**  ANYTHING ELSE?

22         **MR. ANDRADA:**  I DO WANT TO CLARIFY THIS ISSUE ABOUT

23    THE DECLARATIONS.

24         **THE COURT:**  OKAY.

25         **MR. ANDRADA:**  PERHAPS WE SHOULD MARK THESE.

1          **THE COURT:**  OKAY.

2          **MR. ANDRADA:**  PERHAPS MR. ASHKER MENTIONED THAT THEY

3    WERE PART OF ONE GROUP EXHIBIT.  I THINK HE MIGHT HAVE DONE IT.

4          **THE COURT:**  THEY ARE BOTH PART OF 182, YES.

5          **MR. ANDRADA:**  OKAY.

6          **THE COURT:**  ONE OF THEM IS DATED OCTOBER --

7    NOVEMBER 11TH, WHICH IS THE ONE MR. ASHKER REFERRED TO.  THERE

8    IS ANOTHER ONE.

9          **MR. ANDRADA:**  YES, YOUR HONOR.

10          **THE COURT:**  THAT ONE IS DATED AUGUST 31ST, '07.  I

11   DON'T KNOW WHICH ONE YOU ARE WISHING TO MARK.

12          **MR. ANDRADA:**  ACTUALLY I THINK THERE ARE TWO MORE AT

13   LEAST.  I HAVE ONE NOVEMBER 11TH, 2006 AND THEN I HAVE ONE

14   NOVEMBER 6TH, 2007.  ALL ARE PART OF THE SAME EXHIBIT.

15          BE THAT AS IT MAY, LET ME FIRST SHOW YOU, DOCTOR --

16          **THE COURT:**  LET'S GET THEM MARKED FOR IDENTIFICATION

17   FIRST.

18          **MR. ANDRADA:**  OKAY.  THAT'S FINE.

19          **MR. ASHKER:**  WOULD THAT INCLUDE MY DECLARATION FROM

20   9/24/06?

21          **THE COURT:**  WELL, YES, IF THE IDEA IS TO SHOW

22   WHETHER IT APPEARS TO BE RESPONDING POINT BY POINT, WHICH WOULD

23   LEAD TO AN INFERENCE THAT DR. SAYRE HAD READ IT, THAT WAS, I

24   GUESS, WHAT WE WERE GETTING AT.  SO IN ORDER TO MAKE THAT

25   DETERMINATION, IF YOU WERE GOING TO OFFER HIS DECLARATION, WE

```
1    WOULD NEED TO INCLUDE MR. ASHKER'S.

2              MR. ANDRADA:  VERY WELL, YOUR HONOR.

3              THE COURT:  OR WE COULD NOT PUT IN EITHER.

4              MR. ANDRADA:  SO THIS WOULD BE, THE FIRST ONE OF --

5              THE COURT:  JUST TELL THEM THE DATE.  JUST TELL HER

6    THE DATE.

7              MR. ANDRADA:  ALL RIGHT.  THIS IS THE DECLARATION OF

8    JULY 6TH --

9              MR. ASHKER:  THAT'S NOT THE CORRECT DECLARATION.

10             THE COURT:  THE ONE WE WERE REFERRING TO IS

11   NOVEMBER 11TH.

12             MR. ASHKER:  OF 2006.  AND THAT WOULD BE EXHIBIT 182

13   OF MY EXHIBITS.

14             THE COURT:  CORRECT.

15             MR. ASHKER:  AND MY DECLARATION IS ATTACHED AS

16   EXHIBIT 181.

17             MR. ANDRADA:  ALL RIGHT.  ALL RIGHT.

18             SO, LET'S MOVE TO -- THIS IS THE DEC OF

19   NOVEMBER 11TH, 2006, ONE OF THE FOUR DECLARATIONS THAT ARE PART

20   OF THIS EXHIBIT.

21             SO, MADAME CLERK --

22             THE COURT:  WE WILL MARK THAT AS 182.  PLAINTIFF'S

23   182.

24                       (PLAINTIFF'S EXHIBIT 182 MARKED FOR

25                        IDENTIFICATION)
```

1          **MR. ANDRADA:**  THEN, YOUR HONOR, I WOULD LIKE TO MARK

2    TWO OF THESE OTHER DECLARATIONS.

3          **THE COURT:**  THOSE WOULD BE BEYOND THE SCOPE, I

4    THINK.  WHY DON'T YOU START WITH THE ONE, AND THEN IF YOU –– I

5    DON'T KNOW WHAT THE RELEVANCE OF THE OTHER TWO WOULD BE IN

6    TERMS OF THE SCOPE.

7          **MR. ANDRADA:**  IN OTHER WORDS, HE SAID THAT HE

8    DIDN'T –– HE HAS NEVER RESPONDED ––

9          **THE COURT:**  HE DIDN'T SAY HE'S NEVER RESPONDED.  HE

10   SAID THAT HE HAD SUBMITTED A DECLARATION ON A CERTAIN DATE FOR

11   A CERTAIN LEGAL PROCEEDING AND THAT DR. SAYRE HAD SUBMITTED ONE

12   SHORTLY THEREAFTER.  IT WAS HIS CONTENTION THAT THAT ONE

13   OMITTED SOMETHING AND WAS CLEARLY IN RESPONSE TO HIS.

14          SO THOSE WERE THE TWO THAT WE WERE TALKING ABOUT.

15   AND THAT WAS THE SUBJECT MATTER.

16          **MR. ANDRADA:**  VERY WELL, YOUR HONOR.

17              **FURTHER REDIRECT EXAMINATION**

18   BY MR. ANDRADA:

19   Q.   WHY DON'T YOU TAKE A LOOK AT THIS DECLARATION, DR. SAYRE,

20   AND LET ME KNOW WHEN YOU ARE READY.

21          **THE COURT:**  I AM SORRY, IT IS GOING TO TAKE –– YOU

22   WANT HIM TO READ THE WHOLE SIX PAGES?

23          **THE WITNESS:**  NO, I DON'T NEED TO READ IT, YOUR

24   HONOR.

25          **THE COURT:**  OKAY.

1            WHAT IS YOUR QUESTION THEN, COUNSEL?

2            **MR. ANDRADA:**  WELL, I AM GOING TO APPROACH, YOUR

3    HONOR, IF THAT IS ALL RIGHT.

4            **THE COURT:**  SURE.

5            (PAUSE IN THE PROCEEDINGS.)

6            **MR. ANDRADA:**  ALL RIGHT.  WELL, YOUR HONOR, MAY I

7    ASK THE WITNESS WHAT THE GENERAL CONTENT IS OF THIS

8    DECLARATION?

9            **THE COURT:**  THE SPECIFIC QUESTION HAD TO DO WITH

10   WHETHER HE STATED IN IT THAT HE HAD ACTUALLY EXAMINED

11   MR. ASHKER.

12           **MR. ASHKER:**  THERE WERE TWO QUESTIONS, YOUR HONOR.

13   ONE WAS I HAD PRESENTED IN MY DECLARATION THAT DR. SAYRE HAD --

14   THAT HIS PHYSICAL EXAMINATION, I DESCRIBED IT IN MY DECLARATION

15   AS A SUPERFICIAL EXAMINATION BASICALLY.  AND ALSO I HAD IN MY

16   DECLARATION STATED THAT WHEN HE INFORMED ME OF THE DECISION TO

17   TAKE ME OFF TRAMADOL, I SAID, OKAY, WHAT WILL IT BE REPLACED

18   WITH.

19           **THE COURT:**  THAT HE HAS AGREED HE SAID SO.  THAT

20   ISN'T AT ISSUE.

21           **MR. ASHKER:**  AND THE ISSUE WAS IS, I MADE IT VERY

22   SPECIFIC DESCRIPTION OF WHAT THE ACTUAL SO-CALLED EXAMINATION

23   CONSISTED OF AND MY POSITION WAS TO HIM --

24           **THE COURT:**  RIGHT.  I UNDERSTAND.  THAT'S THE POINT

25   OF THE QUESTIONING.  AND THE POINT THAT WAS BEING MADE, AND I

1  DON'T KNOW EVEN KNOW, I HAVEN'T HAD A CHANCE TO READ THIS

2  MYSELF, BUT THE POINT THAT WAS BEING MADE WAS THAT THIS

3  DECLARATION DID NOT DISPUTE MR. ASHKER'S CHARACTERIZATION OF

4  THE PHYSICAL EXAM ON AUGUST 30TH AS BEING SUPERFICIAL, AND SO

5  THAT'S WHAT YOU MAY ASK ABOUT.

6          IF THAT'S IN HERE, YOU CAN POINT THAT OUT.

7  **BY MR. ANDRADA:**

8  **Q.**  WOULD YOU BE SO KIND AS TO FIND IF THERE'S ANY REFERENCE

9  IN HERE TO THE EXAM ONE WAY OR ANOTHER?

10  **A.**  I DON'T BELIEVE THERE IS.

11          TO THE BEST OF MY RECOLLECTION, WHAT TYPICALLY

12  HAPPENS IN THESE DECLARATIONS IS I AM CONTACTED BY MY LEGAL

13  REPRESENTATIVES.  WE DISCUSS THE CONTENTIONS.  I AM ASKED WHAT

14  IS MY MEDICAL KNOWLEDGE OF THE FACTS, LEGAL KNOWLEDGE OF THE

15  FACTS, WHAT WENT ON.  WE HAVE A CONFERENCE ABOUT THESE THINGS.

16          THE LEGAL REPRESENTATIVES PREPARE A DECLARATION.  I

17  GO THROUGH SEVERAL DRAFTS, MAKE SURE IT IS FACTUAL AND CORRECT,

18  AND THEN I FINALLY READ IT FOR THE FINAL DRAFT AND SIGN IT.

19          THAT'S WHERE THESE THINGS COME FROM.  I DON'T THINK

20  I ACTUALLY EVER READ MR. ASHKER'S ORIGINAL DECLARATION TO BE

21  PERFECTLY FRANK.

22          **MR. ASHKER:**  MAY I ASK ONE QUESTION?

23          **THE COURT:**  NO.  WE ARE STILL ON RE-REDIRECT AND YOU

24  MAY HAVE RECROSS WHEN WE FINISH THE REDIRECT.

25  ///

1   **BY MR. ANDRADA:**

2   **Q.**   AND, DR. SAYRE, HAVE YOU SIGNED DECLARATIONS WHEREIN YOU

3   HAVE DISCUSSED THE EXAMINATION IN AUGUST OF 2006?  IF YOU CAN'T

4   RECALL, I WOULD BE HAPPY TO REFRESH YOUR RECOLLECTION.

5   **A.**   I CAN'T RECALL.

6   **Q.**   MAY I REFRESH YOUR RECOLLECTION?

7            **MR. ANDRADA:**  LET'S MARK THIS.

8            LET'S MAKE THIS MINE, MADAME CLERK, IF YOU DON'T

9   MIND.

10           **THE COURT:**  THAT WILL BE 247.

11                   (DEFENDANTS' EXHIBIT 247 MARKED FOR

12                   IDENTIFICATION)

13           **MR. ANDRADA:**  THANK YOU VERY MUCH.

14           (COUNSEL HANDS WITNESS EXHIBIT.)

15   **BY MR. ANDRADA:**

16   **Q.**   OKAY.  TAKE A LOOK AT THAT.

17   **A.**   IS THERE A SPECIFIC POINT YOU WANT ME TO LOOK AT?

18   **Q.**   YES, THERE IS.

19           **MR. ANDRADA:**  IF I MAY APPROACH?

20           **THE COURT:**  YOU ARE SHOWING HIM AN EXHIBIT MARKED AS

21   DEFENDANTS' --

22           **MR. ANDRADA:**  THIS IS 247.  AND THIS IS A

23   DECLARATION -- FOR IDENTIFICATION PURPOSES, DECLARATION OF

24   MICHAEL SAYRE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY

25   JUDGMENT AS TO PLAINTIFF'S SUPPLEMENTAL COMPLAINT.

1      **THE COURT:**  AND THE DATE ON THAT IS?

2      **MR. ANDRADA:**  THE DATE ON THIS IS AUGUST 31ST, 2007.

3      **THE WITNESS:**  OKAY.

4  **BY MR. ANDRADA:**

5  **Q.**  ALL WE WANT TO KNOW IS DOES THIS REFRESH –– TAKE A LOOK AT

6  PAGE 3.

7  **A.**  PAGE 3.

8  **Q.**  DOES THAT REFRESH YOUR RECOLLECTION THAT YOU PREPARED A

9  DECLARATION IN THE PAST WITH REGARD TO YOUR EXAMINATION OF

10 AUGUST 30TH?

11 **A.**  YES, IT DOES.

12      **MR. ANDRADA:**  MADAME CLERK, IF YOU HAVE A STAPLER.

13      **THE COURT:**  IT WOULD BE BETTER TO USE A CLIP BECAUSE

14 MR. ASHKER ISN'T ALLOWED TO HAVE STAPLES.

15      **MR. ANDRADA:**  I AM SORRY.

16      **THE COURT:**  PLASTIC ONE WOULD BE BETTER.

17      **MR. ANDRADA:**  YES, MA'AM.

18      **THE COURT:**  SORRY.

19 **BY MR. ANDRADA:**

20 **Q.**  DO YOU RECALL SIGNING A SECOND DECLARATION WITH REGARD TO

21 THE EXAMINATION OF AUGUST 30TH?

22 **A.**  THERE HAS BEEN SO MANY DECLARATIONS.

23 **Q.**  LET ME SEE IF I CAN REFRESH YOUR MEMORY ABOUT A SECOND

24 ONE.

25      **THE CLERK:**  EXHIBIT 248.

1                    (DEFENDANTS' EXHIBIT 248 MARKED FOR

2                        IDENTIFICATION)

3           **MR. ANDRADA:**  THANK YOU.

4    **BY MR. ANDRADA:**

5    **Q.**   THIS IS A DECLARATION OF MICHAEL SAYRE REGARDING

6    VIDEOTAPE.  LET ME DIRECT YOU TO PAGE 2.

7    **A.**   OKAY.

8    **Q.**   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU PROVIDED THE

9    COURT AND MR. ASHKER WITH A DECLARATION IN CONNECTION WITH THE

10   EXAMINATION OF AUGUST OF 2006?

11   **A.**   YES.

12   **Q.**   AND THIS DECLARATION IS DATED?

13   **A.**   IT'S DATE NOVEMBER 6TH, YEAR 2007, CRESCENT CITY,

14   CALIFORNIA.

15           **THE COURT:**  DO YOU NEED TO SEE THOSE OR DO YOU HAVE

16   THEM?

17           **MR. ASHKER:**  I HAVE COPIES, YOUR HONOR.

18           **MR. ANDRADA:**  IT IS ALL PART OF THE SAME EXHIBIT,

19   YOUR HONOR.

20           **THE COURT:**  THAT PARTICULAR ONE ISN'T.

21           **MR. ANDRADA:**  I THOUGHT IT WAS.  THAT'S WHERE WE GOT

22   THEM.

23           MADAME CLERK, I GUESS WE NEED ANOTHER -- I AM SORRY.

24           **THE COURT:**  I GUESS WE DON'T NEED TO WORRY ABOUT THE

25   STAPLER.  HE ALREADY HAS COPIES.

1          **MR. ANDRADA:**  VERY WELL.  THANK YOU, MADAME CLERK.

2          THANK YOU VERY MUCH, DR. SAYRE.  I HAVE NO MORE

3    QUESTIONS OF YOU.

4          **THE COURT:**  ANYTHING ELSE?

5          **MR. ASHKER:**  JUST REAL BRIEFLY, YOUR HONOR.

6                **FURTHER RECROSS-EXAMINATION**

7    BY MR. ASHKER:

8    **Q.**   DR. SAYRE, IN YOUR 11/11/06 DECLARATION, I WILL PRESENT TO

9    YOU THAT THERE IS NO REFERENCE TO YOU CONDUCTING ANY PHYSICAL

10   EXAMINATION ON AUGUST 30TH, 2006.

11         DO YOU DISPUTE THAT?

12   **A.**   IN THAT PARTICULAR DECLARATION, NO, I DO NOT DISPUTE IT.

13   **Q.**   OKAY.  AND THERE IS NO REFERENCE TO ANY PHYSICAL

14   EXAMINATION IN THAT AUGUST 30TH, 2006 EXAMINATION REPORT, IS

15   THERE?

16   **A.**   THAT WAS A SUMMARY REPORT.

17   **Q.**   AND, IN FACT, I WILL PRESENT TO YOU THAT IN THIS

18   11/11/06 DECLARATION, YOU REPRESENTED THAT YOUR DECISION WAS

19   BASED ON MY GRIP STRENGTH, ACCORDING TO THE PHYSICAL THERAPIST

20   REPORTS, AND OBSERVATIONS ON VIDEO SURVEILLANCE OF MY USE OF

21   THE HAND AND ARM.  AND DO YOU DISPUTE THAT?

22   **A.**   NO, THAT'S A CORRECT STATEMENT.  IT WAS, THE VIDEO WAS

23   INCLUDED IN MY ASSESSMENT.

24   **Q.**   AND, IN FACT, IN THESE OTHER DECLARATIONS WHERE YOU -- NOW

25   WHERE YOU SUBSEQUENTLY A YEAR OR SO LATER CLAIMED THAT YOU DID

1   CONDUCT A PHYSICAL EXAMINATION OF ME ON AUGUST 30TH, THERE IS

2   NO DETAILS OF WHAT THE EXAMINATION CONSISTED OF, IS THERE?

3           **MR. ANDRADA:**  I AM SORRY, YOUR HONOR, COULD I JUST

4   HAVE THE QUESTION REREAD?  I WANT TO MAKE SURE I HAVE THE

5   CORRECT DECLARATION.

6           (QUESTION READ BACK.)

7           **THE WITNESS:**  THE WRITINGS STAND FOR ITSELF.  THERE

8   ARE NO DETAILS.

9   **BY MR. ASHKER:**

10  **Q.**  OKAY.  AND, IN FACT, DIDN'T YOU MAKE REFERENCE TO HAVING

11  CONDUCTED A PHYSICAL EXAMINATION ON AUGUST 30TH BECAUSE –– OF

12  2006 BECAUSE YOU KNOW THAT THOSE DECISIONS THAT YOU WERE MAKING

13  WOULD BE UNETHICAL WITHOUT HAVING CONDUCTED A PHYSICAL

14  EXAMINATION?

15  **A.**  I DON'T UNDERSTAND THE QUESTION.  I AM CONFUSED.

16          **THE COURT:**  WOULD YOU LIKE IT REREAD OR DO YOU

17  THINK ––

18          **THE WITNESS:**  I NEED TO HAVE IT RESTATED, YOUR

19  HONOR.

20          **THE COURT:**  I WILL HAVE IT REREAD FIRST AND SEE IF

21  IT CAN BE ANSWERED.

22          (QUESTION READ AS FOLLOWS:

23          OKAY.  AND, IN FACT, DIDN'T YOU MAKE REFERENCE

24          TO HAVING CONDUCTED A PHYSICAL EXAMINATION ON

25          AUGUST 30TH BECAUSE –– OF 2006 BECAUSE YOU KNOW

1             THAT THOSE DECISIONS THAT YOU WERE MAKING WOULD

2             BE UNETHICAL WITHOUT HAVING CONDUCTED A PHYSICAL

3             EXAMINATION?)

4             **THE WITNESS:**  I AM INTERPRETING THAT QUESTION TO

5     MEAN DID I LIE.  AND MY ANSWER IS NO, I DID NOT LIE.

6             **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS.

7             **MR. ANDRADA:**  WITH REGARD TO THOSE TWO DECLARATIONS,

8     YOUR HONOR.

9             IF I MAY JUST LOOK AT THEM BRIEFLY FOR A MOMENT.

10                    **FURTHER REDIRECT EXAMINATION**

11    **BY MR. ANDRADA:**

12    **Q.**   REFERRING TO NUMBER 247.

13            MR. ASHKER, I THINK, ASKED YOU ABOUT WHETHER THERE

14    WAS ANYTHING IN HERE ABOUT THE EXAM ITSELF.

15            **THE COURT:**  AND THE DATE ON THAT IS?

16            **MR. ANDRADA:**  THIS ONE, YOUR HONOR, IS -- THANK YOU

17    FOR ASKING, THIS ONE IS AUGUST 31ST, 2007.

18    **BY MR. ANDRADA:**

19    **Q.**   OKAY.  THIS IS A COPY.  LET ME REPRESENT TO YOU THIS WAS

20    THE COPY THAT WE RECEIVED FROM MR. ASHKER.  OKAY?

21    **A.**   OKAY.

22    **Q.**   SO, JUST READ THAT PARAGRAPH THERE FOR A MOMENT TO

23    YOURSELF AND LET ME KNOW WHEN YOU ARE READY.

24            **MR. ASHKER:**  WHAT PARAGRAPH ARE WE TALKING ABOUT?

25            **MR. ANDRADA:**  THE PARAGRAPH THAT DEALS WITH THE

SAYRE - FURTHER REDIRECT / MR. ANDRADA

1   EXAMINATION.

2           **MR. ASHKER:**  WHAT PARAGRAPH?

3           **MR. ANDRADA:**  PARAGRAPH SEVEN.

4           **THE WITNESS:**  OKAY, THANK YOU.

5           YES.  WHAT IS YOUR QUESTION, SIR?

6   **BY MR. ANDRADA:**

7   **Q.**   CAN YOU READ THAT OUT LOUD?

8   **A.**   (READING)

9           ON AUGUST 30TH, 2006, I CONDUCTED A PHYSICAL

10  EXAMINATION OF MR. ASHKER --

11  **Q.**   SLOW DOWN.  SLOW DOWN.

12  **A.**   (READING)

13          ON AUGUST 30TH, 2006, I CONDUCTED A PHYSICAL

14          EXAMINATION OF MR. ASHKER AND REVIEWED HIS

15          CHRONOS.  I HAD SOME INDEPENDENT RECOLLECTION OF

16          THE EXAM, BUT MY KNOWLEDGE OF WHAT OCCURRED

17          COMES LARGELY FROM MY REVIEW OF THE MEDICAL

18          CHART I COMPLETED DURING THE EXAM.

19  **Q.**   OKAY.  WE HAVE A VERY CAPABLE COURT REPORTER, BUT SHE

20  STRUGGLED A LITTLE BIT, SO WHY DON'T YOU REREAD IT TO MAKE SURE

21  WE GET IT CLEAR.

22          **THE COURT:**  THAT'S ALL RIGHT.  SHE CAN ASK YOU

23  AFTERWARDS.

24          **MR. ANDRADA:**  ALL RIGHT.

25          **THE WITNESS:**  DO YOU WANT ME TO CONTINUE, SIR?

1   **BY MR. ANDRADA:**

2   **Q.**   LET ME SEE WHAT IS NEXT IN THE DECLARATION.

3          SURE.  PARAGRAPH EIGHT SINCE IT RELATES TO THE

4   EXAMINATION, YOUR HONOR.

5          **THE COURT:**  ALL RIGHT.

6          **THE WITNESS:**  (READING)

7          DURING THE EXAM, I NOTED THAT MR. ASHKER

8          ORIGINAL INJURY TO HIS --

9   **BY MR. ANDRADA:**

10  **Q.**   DOCTOR, YOU HAVE TO SLOW DOWN AND ENUNCIATE.

11  **A.**   (READING)

12          I NOTED THAT MR. ASHKER'S ORIGINAL INJURY TO HIS

13          RIGHT ARM AROSE FROM A GUNSHOT WOUND, RESULTING

14          IN A CLAIM OF CHRONIC PAIN, AND THAT A COURT

15          ORDER STATED MR. ASHKER BE PROVIDED CERTAIN

16          TREATMENT MODALITIES AS LONG AS MEDICALLY

17          INDICATED.  AMONG THEM ARE --

18          **THE COURT:**  ARE WE TALKING ABOUT THE EXAMINATION

19  NOW?

20          **MR. ANDRADA:**  THAT WAS, YOUR HONOR.

21          **THE COURT:**  OKAY.  THEN HE CAN STOP THERE.  WE NEED

22  TO FINISH UP HERE WITH THIS WITNESS AND THE ONLY ISSUE LEFT ON

23  THE TABLE IS THAT ONE EXAMINATION.

24          **MR. ANDRADA:**  VERY WELL, YOUR HONOR.

25  ///

1    **BY MR. ANDRADA:**

2    **Q.**   AND, OKAY.  BRIEFLY, NOW WE ARE GOING TO LOOK AT 248.  AND

3    I AM NOT GOING TO HAVE YOU READ IT IN THE INTEREST OF TIME

4    HERE.

5              **THE COURT:**  WHAT IS THE DATE ON THAT ONE?

6              **MR. ANDRADA:**  THIS ONE, YOUR HONOR, IS NOVEMBER 6TH,

7    2007.

8    **BY MR. ANDRADA:**

9    **Q.**   JUST, AGAIN, JUST READ THE FIRST SENTENCE.  THAT IS ALL

10   YOU NEED TO DO.

11   **A.**   (READING)

12             ON AUGUST 30TH, 2006, I CONDUCTED A PHYSICAL

13             EXAMINATION OF MR. ASHKER AND REVIEWED HIS

14             CHRONOS.

15   **Q.**  OKAY, THANK YOU.

16             **MR. ANDRADA:**  THANK YOU VERY MUCH, DOCTOR FOR YOUR

17   TIME.

18             YOUR HONOR, THAT'S ALL I HAVE.  THANK YOU.

19             **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS, YOUR

20   HONOR.

21             **THE COURT:**  ALL RIGHT.  YOU ARE EXCUSED.  YOU MAY

22   STEP DOWN.

23             **THE WITNESS:**  THANK YOU, YOUR HONOR.

24             **THE COURT:**  YOU MAY CALL YOUR NEXT WITNESS.

25             **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

1          WE CALL DR. FRIEDMAN.

2          **THE CLERK:**  PLEASE STEP UP TO THE WITNESS STAND AND

3    BE SWORN.

4                         <u>**JACK FRIEDMAN**</u>,

5    CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

6    TESTIFIED AS FOLLOWS:

7          **THE WITNESS:**  I DO.

8          **THE CLERK:**  PLEASE BE SEATED, AND STATE YOUR FULL

9    NAME, SPELL YOUR LAST NAME FOR THE RECORD.

10         **THE WITNESS:**  JACK FRIEDMAN, MD.  F-R-I-E-D-M-A-N.

11                      <u>**DIRECT EXAMINATION**</u>

12   **BY MR. ANDRADA:**

13   **Q.**   GOOD MORNING, DR. FRIEDMAN.

14   **A.**   GOOD MORNING.

15   **Q.**   WOULD YOU TELL US PLEASE, SIR, A LITTLE BIT ABOUT YOUR

16   EDUCATION AND EXPERIENCE AS A PHYSICIAN?

17         I KNOW THAT IS A BROAD QUESTION, BUT IN THE INTEREST

18   OF TIME HERE, I WOULD LIKE TO SEE IF WE CAN GET THROUGH THIS AS

19   FAST AS WE CAN.

20   **A.**   BACHELOR OF SCIENCE DEGREE FROM ROOSEVELT UNIVERSITY,

21   CHICAGO, ILLINOIS.

22         **THE COURT:**  WHICH UNIVERSITY?

23         **THE WITNESS:**  ROOSEVELT UNIVERSITY.

24         **THE COURT:**  GO AHEAD.

25         **THE WITNESS:**  AS OUR PRESIDENT.

1          **THE COURT:**  THE COURT REPORTER DIDN'T GET IT, SO I

2    WAS ASKING YOU TO REPEAT IT.

3          **THE WITNESS:**  MEDICAL SCHOOL, UNIVERSITY OF IOWA

4    SCHOOL OF MEDICINE, IOWA CITY.  RESIDENCY, UNIVERSITY OF

5    CALIFORNIA, UNIVERSITY OF SOUTHERN CALIFORNIA, LOS ANGELES, LA

6    COUNTY HOSPITAL.  FELLOWSHIP, UNIVERSITY OF SOUTH FLORIDA.

7    **BY MR. ANDRADA:**

8    **Q.**   FELLOWSHIP IN WHAT SPECIALTY, IF YOU PLEASE?

9    **A.**   CHRONIC PAIN.

10   **Q.**   VERY WELL.  GO AHEAD, SIR, I AM SORRY.

11   **A.**   CURRENTLY IN PRIVATE PRACTICE.

12   **Q.**   ALL RIGHT.

13   **A.**   I AM BOARDED IN CHRONIC PAIN MANAGEMENT, ADDICTION

14   MEDICINE, AND ANESTHESIOLOGY.

15   **Q.**   SO YOU WOULD CONSIDER YOURSELF AS A PAIN MANAGEMENT

16   SPECIALIST?

17   **A.**   YES.

18   **Q.**   YOU EXAMINED MR. TODD ASHKER ON FOUR OCCASIONS; IS THAT

19   CORRECT?

20   **A.**   THAT'S CORRECT.

21   **Q.**   AND DURING THAT TIME YOU WERE EMPLOYED BY THE STATE OF

22   CALIFORNIA DEPARTMENT OF CORRECTIONS; IS THAT CORRECT?

23   **A.**   THAT'S CORRECT.

24   **Q.**   ALL RIGHT.  AND YOU -- TELL US A LITTLE BIT ABOUT WHAT YOU

25   DID FOR THE DEPARTMENT OF CORRECTIONS WHEN YOU WERE AN

1    EMPLOYEE.  JUST GENERALLY.

2    **A.**   GENERALLY, I RUN THE VIDEOCONFERENCING AND CONSULTATION,

3    AND I WOULD SEE PATIENTS, CHRONIC PAIN PATIENTS THAT WERE

4    REFERRED TO ME FROM VARIOUS INSTITUTIONS.

5    **Q.**   VERY WELL.  NOW, YOU HAVE YOUR NOTES FROM YOUR EXAMS?

6    **A.**   I AM SORRY, I HAVE IT AT MY SEAT OVER THERE.

7    **Q.**   ALL RIGHT.  PERHAPS I CAN GET THEM.

8          **MR. ANDRADA:**  MADAME CLERK, I THINK WE MARKED THEM

9    EARLIER TODAY.

10          (DOCUMENTS HANDED TO WITNESS.)

11          **THE WITNESS:**  THANK YOU.

12          **MR. ANDRADA:**  THANK YOU VERY MUCH.

13   **BY MR. ANDRADA:**

14   **Q.**   THIS IS DEFENDANTS' 243.  AND FOR MR. ASHKER'S SAKE, THIS

15   IS DR. FRIEDMAN'S NOTE OF JUNE 12TH, 2002.

16          **THE COURT:**  IS THIS IN YOUR EXHIBIT BINDER?

17          **MR. ANDRADA:**  WELL, WHAT WE -- THEY ARE SOMEWHERE,

18   YOUR HONOR.  I AM SORRY.  I GOT THEM OUT EARLIER TODAY.

19          **MR. ASHKER:**  IT'S EXHIBIT 157 OF MY EXHIBITS.

20          **THE COURT:**  OKAY.

21          I WILL USE HIS.

22          **MR. ANDRADA:**  I AM HAPPY TO WAIT FOR THE COURT TO --

23          **THE COURT:**  NO, GO AHEAD.

24   **BY MR. ANDRADA:**

25   **Q.**   DOCTOR, DID YOU SEE MR. ASHKER ON JUNE 12TH, 2002?

FRIEDMAN – DIRECT / MR. ANDRADA

1    **A.**    I DID.

2    **Q.**    AND WAS THAT A SESSION AT PELICAN BAY?

3    **A.**    NO, THAT WAS OVER THE VIDEOCONFERENCING.

4    **Q.**    SO CALLED TELEMEDICINE?

5    **A.**    YES.

6    **Q.**    BRIEFLY, WHAT IS TELEMEDICINE?

7              **THE COURT:**  I THINK WE HAVE HEARD THAT FROM

8    MR. ASHKER, UNLESS THERE WAS SOMETHING INACCURATE ABOUT IT.  DO

9    IT AGAIN IF YOU WOULD LIKE.  THAT'S FINE.

10             **MR. ANDRADA:**  HE'S THE PHYSICIAN.

11             **THE COURT:**  THAT'S FINE.

12   **BY MR. ANDRADA:**

13   **Q.**    WHAT IS TELEMEDICINE?

14   **A.**    THE PHYSICIANS THAT ARE INVOLVED IN THE CARE OF A PATIENT

15   AT, IN THIS CASE, PELICAN BAY INSTITUTION, ASK TO HAVE THE

16   PATIENT SEEN BY ME AND EVALUATED AND VARIOUS RECOMMENDATIONS

17   THAT WERE APPROPRIATE TO BE MADE.

18             IF THEN CONSEQUENT TO THAT, IF I NEEDED TO SEE THAT

19   PATIENT IN PERSON, THAT WOULD OCCUR WITH PERMISSION OF THE

20   CHIEF AT THAT INSTITUTION, OR IF FURTHER FOLLOW-UPS WERE

21   NECESSARY, THIS PATIENT WOULD AGAIN BE PRESENTED IN FOLLOW-UP

22   CONFERENCING VIDEO.

23   **Q.**    IN SIMPLE TERMS, TELEMEDICINE IS VERY COMMON THESE DAYS?

24   **A.**    VERY COMMON NOW, YES.  IN THOSE DAYS, NOT SO COMMON.

25   **Q.**    CUTTING EDGE THEN?

FRIEDMAN – DIRECT / MR. ANDRADA

1    **A.**   YES.

2    **Q.**   AND MR. ASHKER COMPLAINED OF STILL HAVING SOME PAIN AS A

3    RESULT OF THIS GUNSHOT WOUND, CORRECT?

4    **A.**   THAT'S CORRECT.

5    **Q.**   AND DID YOU PERFORM AN EXAM?

6    **A.**   NOT HANDS-ON EXAM.

7    **Q.**   PLEASE EXPLAIN.

8    **A.**   THE PATIENT IS -- THE INTERVIEW IS DONE LIVE AND THE

9    CAREGIVERS ARE AT THE INSTITUTION WHERE THE PATIENT IS.  AND I

10   AM AT MY INSTITUTION IN FRONT OF THE CAMERA.  AND THEN WE GO

11   ABOUT VARIOUS MANEUVERS.  AND THEN I ALSO ASK THE PERSONNEL TO

12   GIVE ME OBSERVATIONS FROM THE MANEUVERS THAT I ASK FOR.

13   **Q.**   OKAY.  AND DID YOU FORM AN IMPRESSION AT THAT TIME?

14   **A.**   YES.  THE PATIENT'S HISTORY WAS CONVINCING THAT THERE WAS

15   TRAUMA.  THERE WAS A FOLLOW-UP REPORT OF A NERVE CONDUCTION

16   STUDY, AND I READ THAT.

17           THEN THE VARIOUS MANEUVERS THAT WE ASKED FOR, PLUS

18   THE CLOSE OBSERVATION.  WE HAD VARIOUS DIFFERENT CAMERAS AND

19   CLOSE OBSERVATION OF THE EXTREMITY INVOLVED.

20           MY IMPRESSION AT THAT TIME WAS THAT ONE, I STATED

21   HERE, WELL-DOCUMENTED PALSY IN THE RIGHT UPPER EXTREMITY DISTAL

22   TO THE ELBOW.  TWO, CHRONIC PAIN SYNDROME SECONDARY TO A

23   GUNSHOT WOUND WITH INJURY AND RESIDUAL NERVE DAMAGE.  AND,

24   THREE, SLEEP DISTURBANCE SECONDARY TO NUMBER TWO, I.E., THE

25   NERVE DAMAGE.

FRIEDMAN – DIRECT / MR. ANDRADA

1    **Q.**   ALL RIGHT.  AND YOU RECOMMENDED THAT HE USE ELAVIL AND

2    TRAMADOL, CORRECT?

3    **A.**   THAT'S CORRECT.

4    **Q.**   AND YOU UNDERSTOOD HE WAS ALREADY ON TRAMADOL, CORRECT?

5    **A.**   THAT'S CORRECT.

6    **Q.**   ALL RIGHT.

7            **MR. ANDRADA:**  NOW, LET'S MOVE -- YOUR HONOR, CAN WE

8    INTRODUCE THIS DOCUMENT INTO EVIDENCE?  THIS WOULD BE HIS --

9    DEFENDANTS' 243?

10           **THE COURT:**  THAT'S THE TELEMEDICINE CONSULTATION?

11           **MR. ANDRADA:**  YES, YOUR HONOR.

12           **THE COURT:**  DO YOU HAVE ANY OBJECTION?

13           **MR. ASHKER:**  NO, YOUR HONOR.

14           **THE COURT:**  THAT WILL BE RECEIVED.

15                   (DEFENDANTS' EXHIBIT 243 RECEIVED IN

16                   EVIDENCE)

17   **BY MR. ANDRADA:**

18   **Q.**   DR. FRIEDMAN, LET'S LOOK AT YOUR NEXT NOTE, WHICH IS

19   SEPTEMBER 18TH, 2002.  YOU TELL US WHEN YOU ARE READY TO

20   PROCEED.

21           **THE COURT:**  WHY DON'T YOU ASK HIM THE QUESTION --

22           **MR. ANDRADA:**  ALL RIGHT.

23   **BY MR. ANDRADA:**

24   **Q.**   DOCTOR, YOU SAW -- THIS NOTE INDICATES YOU SAW MR. ASHKER

25   AGAIN BY TELEMEDICINE ON SEPTEMBER 18TH, 2002, CORRECT?

1  **A.**   THAT'S CORRECT.

2  **Q.**   AND YOU ESSENTIALLY ASKED HIM HOW HE WAS DOING AND LEARNED

3  THAT HE WAS STILL TAKING TRAMADOL, CORRECT?

4  **A.**   THAT'S CORRECT.

5  **Q.**   THEN DID YOU HAVE A DISCUSSION WITH HIM ABOUT TRAMADOL?

6  **A.**   WE DISCUSSED THE MATTER OF HABITUATION, THAT'S IN LAY

7  TERMS.  IN MEDICAL TERMS, IT'S A MATTER OF DEPENDENCE, OF A

8  MEDICATION DEPENDENCE.  AND WE HAD THIS FULL DISCUSSION, YES.

9  **Q.**   AND LET ME, IF I MAY -- WHY DON'T YOU, IF YOU WOULD BE SO

10  KIND, READ THE PART OF YOUR NOTE THAT BEGINS WITH "HAVE

11  DISCUSSED."  IT'S ABOUT A THIRD OF THE WAY DOWN THE PAGE,

12  RIGHT?

13  **A.**   YES.

14  **Q.**   KINDLY READ THAT SENTENCE OUT LOUD.

15  **A.**   (READING)

16        HAVE DISCUSSED HABITUATION OF TRAMADOL AND NEED

17        TO SWITCH OUT FOR TWO WEEKS BEFORE RETURNING TO

18        THIS MEDICATION.

19  **Q.**   WHY DID YOU BELIEVE THAT HE NEEDED TO SWITCH OUT FOR

20  SEVERAL WEEKS BEFORE RETURNING TO THIS MEDICATION?

21  **A.**   THIS IS ONE TECHNIQUE TO REDUCE THE BODY'S DEPENDENCE ON

22  THE MEDICATION.  THIS ALLOWS THE PATIENT TO BE PUT ON ANOTHER

23  MEDICATION HOPEFULLY TO GAIN THE SAME EFFECT AND YET HAVE THE

24  PATIENT UNDER MEDICATION RATHER THAN ON NOTHING.

25  **Q.**   WHAT CONCERNS DID YOU HAVE AT THAT TIME ABOUT DEPENDENCY?

1   **A.**   I HAD CONCERN BECAUSE THE PATIENT HAD BEEN ON QUITE SOME

2   TIME ON THE MEDICATION WITHOUT THAT ASPECT BEING DISCUSSED.

3   **Q.**   VERY WELL.  AND SO THE PLAN WAS TO SUBSTITUTE FLEXERIL FOR

4   TRAMADOL AND THEN RENEW THE TRAMADOL IF THOUGHT APPROPRIATE

5   THREE WEEKS LATER, CORRECT?

6   **A.**   RIGHT.

7   **Q.**   ALL RIGHT.

8          NOW, LET'S MOVE TO --

9          **MR. ANDRADA:**  YOUR HONOR, MAY WE HAVE THIS DOCUMENT

10  ADMITTED INTO EVIDENCE, NAMELY, DEFENDANTS' 244, THE NOTE OF

11  SEPTEMBER 18TH, 2002?

12          **THE COURT:**  ANY OBJECTION?

13          **MR. ASHKER:**  NO, YOUR HONOR.

14          **THE COURT:**  RECEIVED.

15                  (DEFENDANTS' EXHIBIT 244 RECEIVED IN

16                  EVIDENCE)

17  **BY MR. ANDRADA:**

18  **Q.**   NOW, DOCTOR, LET'S MOVE TO JANUARY 15TH, 2003.  THIS IS

19  DEFENSE EXHIBIT 245.

20          DID YOU LEARN FROM MR. ASHKER THAT THE -- THAT HE

21  HAD TAKEN FLEXERIL FOR AT LEAST SOME PERIOD OF TIME AND THEN

22  HAD BEEN PUT BACK ON TRAMADOL?

23  **A.**   YES.  BY THE WAY --

24  **Q.**   I AM SORRY.  GO AHEAD.

25  **A.**   MY NOTE STATES THAT HE WAS STOPPED.  HE STATED THAT HE

1    DIDN'T LIKE THE CONDITION HE WAS IN WHEN THAT WAS STOPPED EVEN

2    THOUGH HE WAS TAKING THE FLEXERIL, BUT, HOWEVER, HE WAS PLACED

3    BACK ON ULTRAM.  AND I MADE A NOTE HERE THAT HE FELT THAT THE

4    PAIN HAD WORSENED SINCE PHYSICAL THERAPY WAS STOPPED ALSO.

5    **Q.**   OKAY.

6              NOW, THERE'S A NOTE THERE ALSO WHERE YOU DISCUSSED

7    THE NEED FOR ANOTHER PAUSE WITH REGARD TO TRAMADOL, CORRECT?

8    **A.**   THAT'S RIGHT.

9    **Q.**   DID YOU HAVE DISCUSSION WITH MR. ASHKER ON JANUARY 15TH

10   ABOUT THE NEED TO STOP TRAMADOL AGAIN?

11   **A.**   YES.

12   **Q.**   AND CAN YOU READ YOUR -- THE PART OF YOUR NOTE THAT DEALS

13   WITH THAT DISCUSSION?

14             AND I THINK WHAT I HAVE IN MIND, SIR, IS THE PART

15   THAT BEGINS WITH "DISCUSSED THE NEED TO AGAIN."

16             **THE COURT:**  I AM SORRY.  IS THIS -- YOU DON'T HAVE A

17   COPY OF THIS FOR ME?  IS IT -- DOES IT LOOK LIKE THIS?  IS IT

18   JUST HANDWRITTEN?

19             **MR. ANDRADA:**  YES, YOUR HONOR.

20             **THE COURT:**  IS THAT IT?

21             **MR. ANDRADA:**  YES, MA'AM.

22             **THE COURT:**  WHERE IS THAT?

23             **MR. ANDRADA:**  IT'S A QUARTER OF THE WAY DOWN THE

24   PAGE, YOUR HONOR, NOTE OF JANUARY 15TH.

25             **THE COURT:**  GO ON.

1    **BY MR. ANDRADA:**

2    **Q.**   READ THAT PART OF THE NOTE PLEASE, OUT LOUD AND SLOWLY.

3    **A.**   (READING)

4                 DISCUSSED THE NEED TO AGAIN HAVE A PAUSE FROM

5                 ULTRAM.  WHEN TOLD HE WILL NEED TO BE REPLACED

6                 WITH ELAVIL AND FLEXERIL FOR THREE WEEKS HE

7                 BECAME --

8    **Q.**   INDIGNANT?

9    **A.**   (READING)

10                -- INDIGNANT AND SAID THAT I DID NOT HEAR ANYTHING

11   THAT HE SAID.

12                NOW, MR. ASHKER, I RECALL WAS VERY UNHAPPY WITH THE

13   WAY I DISCUSSED THAT PROBLEM WITH HIM.

14   **Q.**   YOU RECALL ANYTHING ELSE ABOUT THAT DISCUSSION?

15   **A.**   HE DID NOT FEEL THAT THAT WAS THE CORRECT WAY TO PROCEED.

16   AND, OF COURSE, THAT HE WAS UNHAPPY BECAUSE OF THAT DECISION.

17   **Q.**   DID YOU PROCEED TO DISCONTINUE THE ULTRAM FOR THREE WEEKS?

18   **A.**   THE PLAN AT THAT TIME, I MADE CLEAR, WOULD BE THE

19   RECOMMENDATION.  NOW, THESE ARE, OF COURSE, RECOMMENDATIONS

20   SINCE I WAS NOT DIRECTLY TAKING CARE OF MR. ASHKER.

21                THAT ULTRAM BE STOPPED FOR THREE WEEKS, REPLACED

22   WITH FLEXERIL FOR THREE WEEKS, AND HE BE GIVEN ELAVIL OR

23   AMITRIPTYLINE AT BEDTIME FOR THREE MONTHS TO HELP HIM WITH ANY

24   PROBLEMS WITH INSOMNIA, WHICH MIGHT BE CAUSED FROM STOPPING THE

25   ULTRAM.

1    **Q.**   OKAY.

2    **A.**   AND THEN A RETURN TO ULTRAM FOR A PERIOD OF TIME AFTER THE

3    FLEXERIL WAS FULLY GIVEN.

4    **Q.**   WHY DID YOU THINK IT WAS IN THE BEST INTERESTS OF

5    MR. ASHKER TO TAKE A BREAK FROM ULTRAM?

6    **A.**   THE WITHDRAWAL IN SUCH A FASHION IS VERY APPROPRIATE TO

7    ALLOW MR. ASHKER'S BODY TO BE LESS DRUG DEPENDENT.

8    **Q.**   PLEASE EXPLAIN.

9    **A.**   WITH THIS -- WITH MANY ANALGESICS OR PAIN MEDICATIONS,

10   OPIATES AND OTHER SYNTHETIC COMPOUND THERE DEVELOPS A DRUG

11   DEPENDENCY SEPARATE FROM THE EFFECT OF ANALGESIA OR MITIGATION

12   OF PAIN.

13   **Q.**   IN LAYMAN'S TERMS, YOU WERE CONCERNED ABOUT DEPENDENCY OR

14   ABUSE, CORRECT?

15   **A.**   YES.

16   **Q.**   ALL RIGHT.

17           **MR. ANDRADA:**  AND THAT IS DEFENDANTS' 245, YOUR

18   HONOR.  WE WOULD MOVE THAT INTO EVIDENCE.

19           **THE COURT:**  ANY OBJECTION?

20           **MR. ASHKER:**  NO, YOUR HONOR.

21           **THE COURT:**  CAN I SEE THAT ONE?  I AM NOT SURE IT IS

22   THE SAME ONE.

23           IT WILL BE RECEIVED.

24               (DEFENDANTS' EXHIBIT 245 RECEIVED IN

25                 EVIDENCE)

1   **BY MR. ANDRADA:**

2   **Q.**   AND THEN THE LAST ONE, DOCTOR, IS APRIL 9TH, 2003,

3   CORRECT?

4   **A.**   THAT'S CORRECT.

5   **Q.**   AND THIS IS, AGAIN, BY TELEMEDICINE, RIGHT?

6   **A.**   THAT'S CORRECT.

7   **Q.**   AND, AGAIN, TO MAKE IT SHORT AND SWEET, THE NOTE INDICATES

8   UNDER "PLAN" IF YOU GO DOWN TO NUMBER THREE, KINDLY TELL US

9   WHAT IT SAYS THERE?

10  **A.**   (READING)

11         CONSIDER FURTHER WEANING NEXT VISIT OF TRAMADOL --

12  CONSIDER WEANING AT NEXT VISIT OF TRAMADOL.

13  **Q.**   KINDLY EXPLAIN WHAT YOU WERE REFERRING TO BY THAT COMMENT.

14  **A.**   WELL, MY OBSERVATION AT THAT TIME WAS THAT THE PATIENT

15  STATED HE WAS FEELING BETTER.  HE WAS REALLY INTERESTED IN

16  PHYSICAL THERAPY.  AND AT THAT POINT HE HAD RESUMED PHYSICAL

17  THERAPY WITH WHIRLPOOL AND THAT WAS VERY SATISFACTORY FOR HIM.

18  AND ALSO HE STATED THAT HE DIDN'T NEED THE ELAVIL OR

19  AMITRIPTYLINE TO IMPROVE HIS SLEEPING STATUS.  AND THEN MY

20  EXAMINATION AT THAT TIME SHOWED THAT HE DIDN'T HAVE ANY

21  CONSEQUENCES OF FURTHER NEUROLOGICAL IMPORTANT FINDINGS AND/OR

22  FURTHER DETERIORATION OF MERE FINDINGS, AND THUS I SAID

23  CONSIDER FURTHER GOING ON, CONTINUING WITH THE WEANING PROCESS.

24  **Q.**   WHAT DO YOU MEAN THE WEANING PROCESS WITH REGARD TO

25  TRAMADOL?

FRIEDMAN – DIRECT / MR. ANDRADA

1   A.   WELL, ULTIMATELY AN INDIVIDUAL, ONCE THE DEPENDENCY IS

2   CONTROLLED, THEN AN INDIVIDUAL MAY BE TAKEN SLOWLY DOWN FROM

3   THE MEDICATION WITHOUT PHYSICAL CONSEQUENCES OF THE WITHDRAWAL

4   PROCESS.

5   Q.   SO I GATHER WHAT YOU ARE SAYING, YOU WERE STILL CONCERNED

6   ABOUT DEPENDENCY?

7   A.   WELL, IT APPEARED THAT THE SITUATION HAD IMPROVED AND I

8   THOUGHT THE MEDICINE COULD BE REMOVED WITHOUT CONSEQUENCES.

9   AND AT THAT TIME, ONCE IT WAS REMOVED, IF THERE WERE

10  CONSEQUENCES, PERHAPS OTHER MEDICINES WOULD BE TRIED.  THAT WAS

11  A POSSIBILITY.

12  Q.   VERY WELL, THANK YOU VERY MUCH, DOCTOR.

13           MR. ANDRADA:  THIS IS DEFENDANTS' 246.  THIS IS THE

14  NOTE OF APRIL 9TH, 2003.  WE WOULD MOVE THIS INTO EVIDENCE.

15           THE COURT:  ANY OBJECTION?

16           MR. ASHKER:  NO, YOUR HONOR.

17           MR. ANDRADA:  THANK YOU, DOCTOR.  I HAVE --

18           THE COURT:  IT WILL BE RECEIVED.

19                (DEFENDANTS' EXHIBIT 246 RECEIVED IN

20                EVIDENCE)

21           MR. ANDRADA:  I HAVE NO FURTHER QUESTIONS OF THE

22  WITNESS.

23  BY MR. ANDRADA:

24  Q.   YOU NEVER SAW HIM AFTER THAT, DID YOU?

25  A.   NO.  I WAS NEVER ASKED TO -- OBVIOUSLY, I WAS NEVER ASKED

1    TO SEE THE PATIENT.  OTHERWISE I WOULD HAVE HAD A NOTE.

2              **MR. ANDRADA:**  THANK YOU.

3              **MR. ASHKER:**  I NEED TO GET THAT EXHIBIT.

4              **THE COURT:**  WHICH ONE?

5              **MR. ASHKER:**  THE ONE HE JUST ENTERED INTO EVIDENCE I

6    DON'T HAVE THAT AND IT IS SOMEWHERE IN THERE.

7              **THE COURT:**  DO YOU HAVE A COPY FOR MR. ASHKER?  IT

8    WASN'T IN YOUR BINDER THAT YOU DISCLOSED IN ADVANCE.  I GUESS

9    IF YOU CAN GIVE HIM A COPY NOW OR TELL HIM WHERE IT IS IN YOUR

10   BINDER.

11             **MR. ANDRADA:**  HANG ON, YOUR HONOR.

12             **THE COURT:**  OR WE CAN SHOW HIM THE COURT'S COPY.

13             **MR. ANDRADA:**  LET'S DO THAT.

14             **THE COURT:**  TAKE THE STAPLE OUT.

15             **MR. ANDRADA:**  OKAY.

16             **THE CLERK:**  THIS IS EXHIBIT 246.

17             **MR. ANDRADA:**  THE LAST ONE.

18             **THE COURT:**  IS THAT THE ONE YOU ARE TALKING ABOUT?

19             **MR. ASHKER:**  YES, IT IS, YOUR HONOR.  THANK YOU.

20             IS IT MY --

21             **THE COURT:**  YOU MAY QUESTION.

22                        **CROSS–EXAMINATION**

23   **BY MR. ASHKER:**

24   **Q.**   GOOD MORNING, DR. FRIEDMAN.

25   **A.**   YES, MR. ASHKER.

FRIEDMAN – CROSS / MR. ASHKER

1  Q.   NOW, GOING BACK TO YOUR JUNE 12TH, 2002 REPORT, AT THE

2  VERY LAST SENTENCE, IT STATES:

3            IT SHOULD BE NOTED THAT THIS PATIENT SHOULD BE

4            FOLLOWED FOR HIS PAIN PROCESS CLOSELY IN THAT

5            UNRELENTING AND UNMEDICATED PAIN IN THIS SORT OF

6            INJURY OFTEN LEADS TO MORE STUBBORN NEURITITIES

7            AND PAIN PROCESSES.

8            DO YOU RECALL MAKING THAT STATEMENT?

9  A.   YES.

10 Q.   AND CAN YOU EXPLAIN WHAT YOU MEANT BY UNRELENTING AND

11 UNMEDICATED PAIN IN THIS SORT OF INJURY OFTEN LEADS TO MORE

12 STUBBORN NEURITITIES AND PAIN PROCESSES?

13           THE COURT:  CAN YOU FIRST SAY WHAT THAT WORD IS?

14           THE WITNESS:  NEURITITIES.

15           THE COURT:  COULD YOU SPELL IT AND DEFINE IT?

16           THE WITNESS:  SPELL IT?  N-E-U-R-I-T-I-T-I-E-S.

17           THE COURT:  WHAT DOES IT MEAN?

18           THE WITNESS:  I BEG YOUR PARDON?

19           THE COURT:  WHAT DOES IT MEAN?

20           THE WITNESS:  IT MEANS THE SAME THING AS NEURITIS.

21           THE COURT:  WHICH IS?

22           I DON'T KNOW.

23           THE WITNESS:  NEURITIS, IN SIMPLE TERMS,

24 INFLAMMATION OF NERVES.

25           THE COURT:  INFLAMMATION.  OKAY.

1              SO IF YOU CAN EXPLAIN THAT SENTENCE AS MR. ASHKER

2      HAD ASKED.

3              **THE WITNESS:**  WHAT WE ARE FEARFUL IN TRAUMATIC

4      INJURIES OF NERVES, PERIPHERAL NERVES, IS THAT IF THE PAIN IS

5      NOT ATTENDED TO, THE SIGNALS OF PAIN THAT THEN GO INTO THE

6      SPINAL CORD START TO TALK TO OTHER NERVES THAT HAVE NOT BEEN

7      AFFECTED.  AND SO THE PAIN PROCESS EXPANDS.

8              AND IT SOMETIMES EXPANDS TO THE DEGREE THAT VARIOUS

9      SENSATIONS WHICH NORMALLY ARE FELT AS INNOCUOUS BECOME PAINFUL,

10     SUCH AS TOUCH, SUCH AS PRESSURE, SUCH AS INCREASED TEMPERATURE.

11             THESE KIND OF THINGS ARE -- WE -- THIS KIND OF

12     PROCESS WE DEFINE AS THE REGIONAL COMPLEX PAIN SYNDROME THEN

13     DEVELOPS.

14             **MR. ASHKER:**  THANK YOU, DOCTOR.

15     **BY MR. ASHKER:**

16     **Q.**   AND THAT WAS YOUR PROGNOSIS.  I DON'T KNOW IF THAT IS

17     THE --

18     **A.**   THAT WAS MY FEAR.

19     **Q.**   OKAY.  AND WAS MY -- THE CONDITION OF MY ARM, THAT WAS A

20     POSSIBILITY THAT YOU WERE WORRIED ABOUT; IS THAT CORRECT?

21     **A.**   THAT'S CORRECT.

22     **Q.**   AND YOU WOULD CONSIDER THE TRAUMA TO MY ARM AND ALL THE

23     ONGOING PROBLEMS I HAD TO BE A SERIOUS MEDICAL CONDITION, WOULD

24     YOU NOT?

25     **A.**   OF COURSE.

1    Q.   AND WHEN -- YOU ALSO STATED THAT THE ULTRAM 50 MILLIGRAMS

2    TWICE A DAY ON A CONTINUOUS BASIS DURING THIS JUNE 12TH, 2002

3    EXAMINATION, CORRECT?

4    A.   YES, THAT'S CORRECT.

5    Q.   AND WOULD YOU SAY THAT 100 MILLIGRAMS OF ULTRAM A DAY IS

6    AN EXCESSIVE DOSE?

7    A.   I WOULDN'T SAY IT'S EXCESSIVE, NO.

8    Q.   AND AT THAT TIME WAS ULTRAM USED FOR THE TREATMENT OF

9    CHRONIC PAIN?

10   A.   YES.

11   Q.   AND WAS IT USED TO TREAT LONG-TERM CHRONIC PAIN?

12   A.   I DON'T KNOW WHAT YOU MEAN BY LONG-TERM CHRONIC PAIN.

13   Q.   WELL, IT WASN'T ONLY FOR SHORT-TERM USE AT THAT TIME, WAS

14   IT?

15   A.   WHAT IS DEFINED SHORT-TERM AND LONG TERM?

16   Q.   WELL, FOR INSTANCE -- WELL, I WILL ASK YOU TO DEFINE YOUR

17   INTERPRETATION OF THOSE TERMS.

18   A.   IT MAY NOT BE THE SAME AS YOUR DEFINITION.

19   Q.   I UNDERSTAND THAT.

20   A.   IN MY ESTIMATION OF YOU AS THE PATIENT, I THINK IT WAS

21   APPROPRIATE AT THAT TIME.  OF COURSE I LEFT IT OPEN FOR HOW

22   LONG IT WAS GOING TO BE USED.

23   Q.   OKAY.  THANK YOU.

24        AND YOU ALSO PRESCRIBED ELAVIL; IS THAT CORRECT?

25   A.   THAT'S CORRECT.

FRIEDMAN – CROSS / MR. ASHKER

1  **Q.**  AND YOU SCHEDULED ME TO COME BACK FOR FOLLOW-UP IN 90

2  DAYS; IS THAT CORRECT?

3  **A.**  YES.

4  **Q.**  OKAY.

5      AND THE NEXT TIME YOU SAW ME WAS ON 9/18/02, AND YOU

6  STATED THAT YOU WERE CONCERNED ABOUT MY TRAMADOL USE FOR THAT

7  PERIOD OF TIME, CORRECT?

8  **A.**  IN ESSENCE, THE WAY YOU RESPONDED, I FELT THAT WE NEEDED

9  TO MODIFY THE TREATMENT PATTERN.

10  **Q.**  NOW, BASED ON MY RECOLLECTION, WHEN I SAW YOU ON 9/18/02,

11  YOU HAD EXPLAINED TO ME THAT -- I REMEMBER YOU MENTIONED

12  TOLERANCE ISSUES AND THINGS OF THAT NATURE AND YOU ALSO STATED

13  THAT YOU WANTED TO SWITCH ME OUT FOR TWO WEEKS.  ON THIS REPORT

14  IT LIKES LIKE A THREE.  BUT MY RECOLLECTION WAS THAT THAT FIRST

15  TIME IT WAS FOR A TWO-WEEK TIME PERIOD.

16      AND IS THAT CORRECT?  IS THAT --

17  **A.**  I CAN'T ARGUE WITH YOU.  I WROTE HERE THREE.  I DON'T KNOW

18  WHAT HAPPENED.

19  **Q.**  OKAY.  IT WAS -- WELL, IT WAS TWO WEEKS.  THAT'S THE TIME

20  PERIOD, BUT THE THING IS, YOU HAD EXPLAINED TO ME THAT YOUR

21  CONCERN WAS THAT I WOULD BUILD A TOLERANCE TO THE ULTRAM; DO

22  YOU RECALL THAT?

23  **A.**  YES.  TOLERANCE IS A CHARACTERISTIC THAT GOES ALONG WITH

24  WHAT HAPPENS TO THESE KINDS OF MEDICINES IN THE BODY.

25      OUR BODY LEARNS HOW TO METABOLIZE.  IN OTHER WORDS,

1   BREAK DOWN THESE PRODUCTS BECAUSE THEY ARE FOREIGN PRODUCTS,

2   AND IT'S PART OF THE BODY'S DEFENSE OF KEEPING THINGS STABLE.

3   **Q.**   OKAY.

4          AND IS THAT A WAY OF DEALING WITH THE TOLERANCE

5   ISSUE TO SWITCH OUT A MEDICATION WITH ANOTHER MEDICATION?

6   **A.**   IT HELPS.  IT HELPS.

7   **Q.**   OKAY.  AND WHEN I SAW YOU ON 9/18/02, AT THAT TIME I TOLD

8   YOU THAT THE ELAVIL, I WASN'T GOING TO TAKE THE ELAVIL ANY MORE

9   BECAUSE OF SIDE EFFECTS.  DO YOU RECALL THAT?

10  **A.**   I DON'T RECALL THE SPECIFIC CONVERSATION.  IT HAS BEEN A

11  LONG TIME.

12         I WOULD LIKE TO ADD THIS TO THE COMMENT OF ELAVIL.

13  I FOUND WHEN I WAS WORKING IN THIS AREA WITH THE CORRECTIONAL

14  SYSTEM THAT MANY PATIENTS DIDN'T LIKE THE THOUGHT OF TAKING

15  ELAVIL BECAUSE IT HAD A PSYCHOTROPIC EFFECT OR THEY THOUGHT IT

16  HAD IN THOSE LOW DOSAGES ALSO A PSYCHOTROPIC EFFECT.  BY

17  PSYCHOTROPIC EFFECT, I MEAN IN THE BRAIN.

18         AND THE INMATES DON'T LIKE ANYBODY TO MESS WITH

19  THEIR BRAIN.  SO THAT WAS THE THING THAT MOST OF THEM SAY.  AND

20  I REALLY DIDN'T KNOW WHY YOU DIDN'T WANT TO TAKE THE ELAVIL.

21  **Q.**   OKAY.  WELL, I WILL PRESENT TO YOU THAT I EXPLAINED TO YOU

22  THAT I HAD SIDE EFFECTS FROM THE ELAVIL MEDICATION, WHICH WERE

23  BLURRED VISION, A SENSE OF MY BALANCE BEING OFF, AND LETHARGY,

24  AND ALSO THE LEFT SIDE OF MY -- IT BEGAN WITH MY LEFT EYELID

25  AND SPREAD TO MY LEFT CHEEK OF INVOLUNTARY MUSCLE SPASMS IN MY

FRIEDMAN – CROSS / MR. ASHKER

1    FACE.

2            ARE THOSE -- DO YOU HAVE ANY RECOLLECTION OF ME

3    TELLING YOU THAT?

4    **A.**   I MADE IN MY NOTES THAT YOU WERE SAYING THAT YOU HAD SOME

5    COMPLICATIONS OF TAKING THE ELAVIL.

6            HOW LONG WERE YOU -- HOW LONG DID YOU TAKE THE

7    ELAVIL?

8    **Q.**   I WAS ON IT OFF AND ON FROM BEGINNING AROUND MAY OF 1998

9    AT THAT TIME WHEN I SAW YOU, I HAD BEEN ON IT FOR PROBABLY A

10   YEAR OR SO.

11   **A.**   I SEE.

12           **THE COURT:**  ARE THOSE SIDE EFFECTS ONES THAT YOU

13   MIGHT EXPECT TO SEE FROM ELAVIL, ANY OF THEM?

14           **THE WITNESS:**  THEY COULD HAPPEN.  THEY ARE NOT

15   COMMON, BUT THEY COULD HAPPEN.

16   **BY MR. ASHKER:**

17   **Q.**   OKAY.  NOW, WITH THE PRESENTATION OF A PATIENT PRESENTING

18   CONCERNS TO YOU ABOUT THOSE TYPE OF SIDE EFFECTS, IS IT

19   UNDERSTANDABLE THAT THAT PATIENT WOULD NOT WANT TO CONTINUE TO

20   TAKE THAT MEDICATION?

21           **MR. ANDRADA:**  VAGUE AND AMBIGUOUS AS TO WHAT --

22           **THE COURT:**  OVERRULED.

23           YOU MAY ANSWER.

24           **THE WITNESS:**  WELL, YOU KNOW, THAT IS A PERSONAL

25   PREFERENCE DECISION THAT I THINK YOU ARE SPEAKING OF.

1    BY MR. ASHKER:

2    Q.   WELL, IS IT PROPER TO INSIST THAT A PATIENT CONTINUE TO

3    TAKE A MEDICATION THAT IS CAUSING WHAT TO THAT PATIENT IS AN

4    INTOLERABLE SIDE EFFECT?

5    A.   I WOULD NOT INSIST ON A PATIENT TAKING ANYTHING.  IT'S A

6    100 PERCENT CHOICE OF WHAT THE PATIENT WILL TAKE INTO THEIR

7    BODY.

8    Q.   OKAY.

9         SO IF -- ASSUMING THAT IT'S TRUE YOU STATED YOU

10   DON'T HAVE ANY INDEPENDENT RECOLLECTION OF ME DESCRIBING THOSE

11   THINGS TO YOU, BUT ASSUMING THAT THEY ARE TRUE AND ASSUMING

12   THAT I TOLD YOU I AM NOT GOING TO TAKE THAT MEDICATION ANY MORE

13   BECAUSE OF THOSE SIDE EFFECTS, WAS THERE OTHER MEDICATIONS

14   AVAILABLE THAT COULD HAVE HELPED WITH MY NERVE PAIN?

15   A.   YES.

16   Q.   DID YOU CONSIDER ANY OF THOSE?

17   A.   I CONSIDERED, YES.

18   Q.   BUT ACCORDING TO YOUR 9/18/02 REPORT, YOU CONTINUED THE

19   ELAVIL MEDICATION; IS THAT CORRECT?

20   A.   I DIDN'T THINK THAT IT WAS, THE CONSEQUENCES OF THAT, OF

21   THE SIDE EFFECTS THAT YOU WERE DESCRIBING THAT REALLY CAUSED A

22   DANGER TO YOU.

23         HOWEVER, I HAVE WRITTEN MEDICATIONS THAT PATIENTS

24   REFUSE TO TAKE AND THEY JUST REFUSE TO TAKE IT, AND THEY DON'T

25   TAKE IT.  WE NEVER MADE ANYBODY TAKE ANYTHING THAT THEY REFUSED

1    TO TAKE.

2    **Q.**   WELL, YOU ALSO DIDN'T OFFER ME ANYTHING ELSE, DID YOU?

3    **A.**   IT'S NOT A GROCERY STORE.   YOU DON'T GO IN THERE AND SAY I

4    DON'T LIKE CARROTS, THEREFORE, I WON'T BARGAIN FOR SOMETHING

5    ELSE.

6    **Q.**   I MEAN, A PATIENT HAS A RIGHT TO INFORMED CONSENT,

7    CORRECT?

8    **A.**   YES.

9    **Q.**   AND WHAT IS INFORMED CONSENT?

10   **A.**   I GAVE YOU THE INFORMED.

11   **Q.**   EXCUSE ME?

12   **A.**   I GAVE YOU MY DISCUSSION AND YOU HAD --

13          **THE COURT:**  HE IS ASKING IN GENERAL WHAT THAT IS,

14   WHAT DOES THAT TERM MEAN.

15          **THE WITNESS:**  OH, IN GENERAL.

16          **THE COURT:**  HE IS ASKING WHAT INFORMED CONSENT IS.

17          **THE WITNESS:**   THE PATIENT GETS INFORMATION AND THEN

18   HE CONSENTS.

19   **BY MR. ASHKER:**

20   **Q.**   OKAY.   AND THERE IS ALSO RISK/BENEFIT DISCUSSIONS,

21   CORRECT?

22   **A.**   THERE CAN BE, YES.

23   **Q.**   AND IT'S THE PATIENT'S CHOICE TO -- IF A MEDICATION IS NOT

24   WORKING FOR HIM OR CAUSING HIM INTOLERABLE SIDE EFFECTS AND

25   THERE ARE OTHER MEDICATIONS AVAILABLE THAT CAN HELP WITH THAT

1    CONDITION AND POSSIBLY NOT CAUSE THOSE SIDE EFFECTS, IS THE

2    PATIENT'S CHOICE TO BE -- WELL, IS THE DOCTOR'S DUTY TO INFORM

3    THAT PATIENT OF OTHER MEDICATIONS; IS THAT NOT CORRECT?

4    A.   WELL, IT'S A RELATIVE CORRECT.  BECAUSE ONE CANNOT INFORM

5    THE PATIENT OF ALL THEIR CHOICES.  IT'S JUST TOO CUMBERSOME TO

6    DO THAT.

7              BUT IN GENERAL, IN A DISCUSSION THERE'S A FRAMEWORK

8    DURING THAT DISCUSSION WITH THE PATIENT HOW MUCH OF A

9    DISCUSSION THEY REALLY NEED.

10   Q.   NOW, WHAT I HAVE STATED BEFORE, I WILL PRESENT TO YOU IS

11   THAT WHEN I DESCRIBED MY -- WHEN I TOLD YOU I WAS NOT TAKING

12   THE ELAVIL ANY MORE BECAUSE OF THE SIDE EFFECTS, YOU ASKED ME

13   WHAT SIDE EFFECTS WAS I HAVING.  AND WHEN I DESCRIBED THE SIDE

14   EFFECTS TO YOU, THE LETHARGY, THE BLURRED VISION, THE SENSE OF

15   BEING OFF BALANCE WHEN I WOULD WALK, AND MY LEFT EYELID AND

16   THEN MY LEFT SIDE OF MY CHEEK HAVE AN INVOLUNTARY MUSCLE

17   SPASMS, AND YOUR RESPONSE WAS TO LAUGH BOISTEROUSLY IN MY FACE,

18   DO YOU RECALL THAT?

19   A.   NO, I DON'T HAVE ANY SUCH THING.

20   Q.   EXCUSE ME?

21   A.   I DON'T HAVE ANY SUCH THING IN MY NOTES.  NO, I DON'T

22   RECALL.

23   Q.   YOU WOULDN'T HAVE WRITTEN THAT DOWN, WOULD YOU, IF THAT

24   HAD OCCURRED?

25   A.   IF WE HAD AN -- I WROTE HERE THAT WE HAD A DISCUSSION.

1    YOU WERE NOT HAPPY WITH MY RECOMMENDATION.  BUT I WOULD HAVE

2    WRITTEN, WOULD HAVE HAD SOME KIND OF AN ALTERCATION OR

3    ARGUMENT.  OTHER THAN THAT, I WOULD HAVE WRITTEN IT IN HERE.

4    **Q.**   WELL, I WILL PRESENT TO YOU THAT OTHER DOCTORS THAT WERE

5    SEEING ME, MY PRIMARY CARE PHYSICIANS AT PELICAN BAY AROUND

6    THAT TIME PERIOD HAD DOCUMENTED MY COMPLAINTS TO THEM ABOUT THE

7    ELAVIL SIDE EFFECTS THAT I JUST DESCRIBED TO YOU AND YET THERE

8    IS NO REFERENCE TO THEM IN YOUR 9/18/02 REPORT; IS THAT

9    CORRECT?

10   **A.**   THAT'S VERY POSSIBLE BECAUSE I NEVER RECEIVED ANY OF THAT

11   INFORMATION.

12   **Q.**   SO YOU NEVER RECEIVED ANY OF MY MEDICAL RECORDS FROM THE

13   PRISON THERE WHILE YOU WERE TREATING ME?

14   **A.**   I NEVER RECEIVED THAT PORTION OF THE MEDICAL RECORD.

15   **Q.**   OKAY.  WOULD YOU LIKE TO LOOK AT SOME OF THE RECORDS I AM

16   TALKING ABOUT WHERE THE DOCTORS DOCUMENTED THOSE SIDE EFFECTS

17   THAT I WAS COMPLAINING ABOUT?

18           **MR. ANDRADA:**  I AM SORRY.

19           **THE COURT:**  WE ARE NOT GOING TO HAVE TIME FOR THAT.

20           **MR. ANDRADA:**  IT'S NOT RELEVANT, 403.

21           **THE COURT:**  IT'S RELEVANT, BUT WE DON'T HAVE TIME

22   FOR IT.  LET'S MOVE ON.

23   **BY MR. ASHKER:**

24   **Q.**   DR. FRIEDMAN --

25           **THE COURT:**  YOU ARE GOING TO NEED TO FINISH UP

 1    FAIRLY QUICKLY.  SO ASK YOUR MOST IMPORTANT QUESTIONS.

 2    **BY MR. ASHKER:**

 3    **Q.**   DO YOU RECALL LAUGHING IN MY FACE WHEN I DESCRIBED THE

 4    SIDE EFFECTS TO YOU ON 9/18/02?

 5    **A.**   I DON'T THINK SO.

 6    **Q.**   OKAY.  AND WOULD THAT BE APPROPRIATE BEHAVIOR FOR A DOCTOR

 7    TO DO THAT TO A PATIENT WHO JUST DESCRIBED THOSE TYPE OF SIDE

 8    EFFECTS TO HIM?

 9    **A.**   NO.  THE DOCTOR WOULD HAVE LISTENED AND HE WOULD HAVE

10    RESPONDED APPROPRIATELY.

11    **Q.**   OKAY.  AND ON 1/15/03 I SAW YOU AGAIN AND YOU NOTED THAT I

12    HAD STOPPED THE ULTRAM AS ORDERED FOR TWO WEEKS, AND REPLACED

13    BY THE FLEXERIL, THEN REPLACED ON THE ULTRAM AGAIN, BUT IS THAT

14    CORRECT?

15    **A.**   MY NOTES REFLECT THAT, YES.

16    **Q.**   I WILL PRESENT TO YOU THAT WHEN I SAW YOU, I TOLD YOU THAT

17    THE FLEXERIL HAD MADE ME REAL LETHARGIC AND IT CAUSED SEVERE

18    HEADACHE AND WAS NOT EFFECTIVE.  AND YOU ASKED -- YOU INSISTED

19    I TAKE THE ELAVIL.  I TOLD YOU, AGAIN, I WAS NOT GOING TO TAKE

20    THAT ELAVIL BECAUSE OF THOSE SIDE EFFECTS.  AND YOUR RESPONSE

21    WAS TO IGNORE WHAT I HAD TOLD YOU, AND ORDER THE SAME THING

22    AGAIN.  AND WHEN I ASKED YOU, DID YOU HEAR ANYTHING THAT I HAD

23    JUST TOLD YOU, YOU TOLD THE STAFF, IS CUSTODY THERE?  GET HIM

24    OUT OF HERE.  THIS VISIT IS OVER.

25              DO YOU RECALL THAT?

FRIEDMAN — CROSS / MR. ASHKER

1  **A.**   YOUR HONOR, IT IS VERY CONFUSING TO ME WHETHER MR. ASHKER

2  IS ACTING AS AN ATTORNEY OR WHETHER HE IS ACTING AS A WITNESS

3  AND ATTORNEY AT THE SAME TIME.

4          **THE COURT:**  HE IS ACTING NOW AS AN ATTORNEY.  HE IS

5  ASKING YOU QUESTIONS AND YOU NEED TO ANSWER THEM.

6          **THE WITNESS:**  BUT HE ALSO GAVE WITNESS TO MY

7  COMMENTS.

8          **THE COURT:**  HE IS ASKING YOU IF YOU SAID THAT.  THAT

9  IS A LEGITIMATE QUESTION.

10          **THE WITNESS:**  IT HAS BEEN YEARS AGO.

11          **THE COURT:**  IF YOU CAN'T REMEMBER, THAT'S FINE.

12          **THE WITNESS:**  OKAY.

13          **THE COURT:**  JUST ANSWER THEM AS BEST YOU CAN.  HE

14  HAS TESTIFIED AS A WITNESS PREVIOUSLY AND THE JURY HAS HEARD

15  WHAT HE HAD TO SAY.

16          **THE WITNESS:**  DID HE TESTIFY JUST WHAT HE SAID RIGHT

17  NOW?

18          **THE COURT:**  WELL, THAT REALLY ISN'T YOUR CONCERN,

19  SIR.

20          I AM SORRY, SIR.  WHAT YOU NEED TO DO IS LISTEN TO

21  THE QUESTION, ANSWER IT AS BEST YOU CAN.  IF YOU CAN'T ANSWER

22  IT, JUST SAY I CAN'T ANSWER IT.  IF YOU CAN'T REMEMBER, JUST

23  SAY I CAN'T REMEMBER.  DON'T CONCERN YOURSELF WITH THE REST OF

24  IT BECAUSE I WILL DO THE BEST I CAN TO RUN THE TRIAL IN A

25  PROPER WAY.

1              **THE WITNESS:**  IT'S CONFUSING FOR ME.

2              **THE COURT:**  SURE.  OKAY.

3    **BY MR. ASHKER:**

4    **Q.**   DR. FRIEDMAN, DO YOU HAVE ANY INDEPENDENT RECOLLECTION AT

5    THIS TIME OF THAT SITUATION I JUST DESCRIBED TO YOU?

6    **A.**   NO, I DON'T.

7    **Q.**   OKAY.  AND ON 4/9/03 I SAW YOU AGAIN FOR ANOTHER

8    FOLLOW-UP, RIGHT?

9    **A.**   THAT'S CORRECT.

10   **Q.**   AND DURING THAT FOLLOW-UP, YOU DID NOT MENTION ANYTHING IN

11   YOUR REPORT HERE ABOUT SWITCHING OUT THE ULTRAM FOR ANOTHER

12   MEDICATION; IS THAT CORRECT?

13   **A.**   THAT'S CORRECT.

14   **Q.**   OKAY.  AND YOU, IN FACT, RENEWED IT FOR 60 ADDITIONAL DAYS

15   AT THAT TIME; IS THAT CORRECT?

16   **A.**   THAT'S CORRECT.

17   **Q.**   AND YOU NOTED THAT I WAS DOING VERY WELL ON THE

18   COMBINATION OF ULTRAM AND PHYSICAL THERAPY; IS THAT CORRECT?

19   **A.**   WELL, THAT'S NOT COMPLETELY CORRECT BECAUSE YOU WERE JUST

20   DOING WELL BECAUSE OF THE COMBINATION OF MANY THINGS.  I WOULD

21   IMAGINE NOT NECESSARILY JUST THOSE TWO.

22   **Q.**   FAIR ENOUGH, SIR.

23            NOW, WITH THE ULTRAM, I WILL PRESENT TO YOU THAT I

24   WAS ON THE ULTRAM FOR 4.9 YEAR TIME PERIOD AND IT HAD BEEN

25   ORDERED BY 13 DIFFERENT DOCTORS INCLUDING THE APPROVAL BY CHIEF

FRIEDMAN – CROSS / MR. ASHKER

1  MEDICAL OFFICER DR. WINSLOW.

2          DO YOU KNOW DR. WINSLOW?

3  **A.**   YES.

4  **Q.**   DO YOU CONSIDER HIM TO BE A GOOD DOCTOR?

5  **A.**   HE IS A GOOD DOCTOR.

6  **Q.**   OKAY.  AND HE APPROVED THAT MEDICATION FOR AT LEAST A

7  FOUR-YEAR TIME PERIOD.  DO YOU BELIEVE THAT THAT WAS WRONG FOR

8  HIM TO DO THAT?

9          **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR, I THINK IT

10  MISSTATES THE TESTIMONY WITH REGARD TO DR. WINSLOW APPROVING

11  THE MEDICATION FOR FOUR PLUS YEARS.  I DON'T THINK THERE IS ANY

12  EVIDENCE OF THAT.

13          **MR. ASHKER:**  YES.

14          **THE COURT:**  WELL, IT SEEMS LIKE THERE WAS EVIDENCE

15  IT WAS A NONFORMULARY DRUG AND THAT HE HAS TO APPROVE IT SINCE

16  IT WAS A NONFORMULARY DRUG.

17          THAT IS MY RECOLLECTION.  I MAY BE WRONG.  WE WILL

18  HAVE TO DEFER TO THE JURY'S RECOLLECTION ON THAT, AS WITH

19  EVERYTHING.

20          **MR. ANDRADA:**  SO -- ALL RIGHT.

21          **MR. ASHKER:**  CAN YOU --

22          **MR. ANDRADA:**  IS THIS BEYOND THE SCOPE, YOUR HONOR?

23          **MR. ASHKER:**  THAT'S MY LAST QUESTION.

24          **THE COURT:**  I WOULD SAY NOT.

25          **MR. ANDRADA:**  VERY WELL.

1          **THE COURT:**  THERE WAS DISCUSSION OF THE TRAMADOL AND

2     HIS USAGE OF IT.  SO I THINK IT'S FAIR QUESTIONING AND HE SAYS

3     IT'S HIS LAST ONE, SO LET'S GO AHEAD AND GET THE ANSWER TO IT.

4          MOVE ON.

5          **MR. ANDRADA:**  VERY WELL.  THANK YOU.

6          **THE COURT:**  DO YOU REMEMBER THE QUESTION?

7          **THE WITNESS:**  NO.

8          **THE COURT:**  WOULD YOU READ IT BACK?

9          **THE WITNESS:**  I REMEMBER BEING ASKED WHETHER

10    DR. WINSLOW IS A GOOD DOCTOR.  I WOULD SAY YES.

11         **THE COURT:**  WE GOT THAT ONE, BUT THERE WAS ANOTHER

12    ONE THAT YOU HADN'T ANSWERED YET.  WE WILL HAVE IT READ BACK.

13         (QUESTION READ BACK AS FOLLOWS:

14         OKAY.  AND HE APPROVED THAT MEDICATION FOR AT

15         LEAST A FOUR-YEAR TIME PERIOD.  DO YOU BELIEVE

16         THAT THAT WAS WRONG FOR HIM TO DO THAT?)

17         **THE WITNESS:**  THAT WAS THEN AND I FULLY RESPECT WHAT

18    DR. WINSLOW SAID.  I GO WITH MY OBSERVATIONS, AND THAT'S THE

19    WAY WE ARE TRAINED.

20         **MR. ASHKER:**  THANK YOU, DR. FRIEDMAN.  I HAVE NO

21    FURTHER QUESTIONS.

22         **THE WITNESS:**  THANK YOU.

23         **MR. ANDRADA:**  NOTHING FURTHER, YOUR HONOR.

24         THANK YOU VERY MUCH, DOCTOR.

25         **THE COURT:**  YOU ARE EXCUSED.  YOU MAY STEP DOWN.

```
 1              IT'S 10:15.  WE WILL BREAK UNTIL 10:30.

 2              YOU CAN HAVE YOUR WITNESS ON THE STAND AT 10:30.

 3          MR. ANDRADA:  YES, MA'AM.  HE IS HERE AND READY TO

 4    GO.

 5          THE COURT:  OKAY.

 6              (RECESS TAKEN AT 10:15 A.M.)

 7            (PROCEEDINGS RESUMED AT 10:30 A.M.)

 8      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

 9          THE COURT:  PLEASE BE SEATED.

10              EXCEPT YOU, IF YOU WOULDN'T MIND, REMAIN STANDING

11    AND RAISE YOUR RIGHT HAND.

12          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

13                      CARL SHIN,

14    CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

15    TESTIFIED AS FOLLOWS:

16          THE WITNESS:  YES.

17          THE CLERK:  PLEASE BE SEATED STATE YOUR FULL NAME

18    AND SPELL YOUR LAST NAME FOR THE RECORD.

19          THE WITNESS:  CARL H, H IS MY MIDDLE INITIAL, LAST

20    NAME IS SHIN, S-H-I-N.

21          MR. ANDRADA:  GOOD MORNING, DR. SHIN.

22              YOUR HONOR, IF IT WOULD HELP THE COURT, DR. SHIN'S

23    REPORT IS PLAINTIFF'S 179.  I DON'T KNOW IF YOU HAVE OUR

24    BINDERS CLOSER.  IN OURS I THINK IT'S 241.  I THINK IT MIGHT BE

25    THE LAST ONE IN THE BINDER.
```

1          MAY I BEGIN, YOUR HONOR?

2          **THE COURT:**  PLEASE.

3                      **DIRECT EXAMINATION**

4    **BY MR. ANDRADA:**

5    **Q.**   GOOD MORNING, DR. SHIN.

6              WOULD YOU TELL US A LITTLE BIT ABOUT YOUR EDUCATION

7    AND TRAINING AND EXPERIENCE AS A PHYSICIAN?

8    **A.**   I -- MEDICAL SCHOOL AT LOMA LINDA, FINISHED IN 1995.  DID

9    RESIDENCY IN PHYSICAL MEDICINE REHAB.

10   **Q.**   I AM GOING TO ASK YOU TO SLOW DOWN JUST A LITTLE BIT.  WE

11   HAVE A VERY CAPABLE REPORTER, BUT IT'S--

12   **A.**   I WILL DO MY BEST.

13   **Q.**   -- BUT IT IS DIFFICULT TO TAKE YOU DOWN.

14   **A.**   PHYSICAL MEDICINE REHAB.  1999 WAS MY RESIDENCY COMPLETION

15   AND I SPENT ONE YEAR OF FELLOWSHIP IN CHRONIC PAIN AND SPINE

16   MANAGEMENT AT THE UNIVERSITY OF PENNSYLVANIA.  FINISHED IN THE

17   YEAR 2000 AND I HAVE BEEN IN PRIVATE PRACTICE EVER SINCE IN

18   SACRAMENTO.

19   **Q.**   ARE YOU BOARDED?

20   **A.**   YES.  PHYSICAL MEDICINE REHAB AS OF THE YEAR 2000.

21   **Q.**   WHAT IS PHYSICAL MEDICINE AND REHABILITATION?

22   **A.**   WE DEAL WITH MUSCULOSKELETAL ISSUES, MUSCLES AND BONES

23   TECHNOLOGIES.  WE DON'T DO SURGERY, BUT WE DO NONOPERATIVE

24   MANAGEMENT OF KNEES, SHOULDERS, ARMS, NECK.  AND THEN MY

25   FELLOWSHIP HAS ALLOWED ME TO DO SOME SPECIAL PROCEDURES FOR

1    SPINAL ISSUES.

2    **Q.**   YOUR -- LET'S TALK ABOUT THAT.  YOUR RESUME AT THE TOP

3    DESCRIBES YOU AS HAVING A PRACTICE IN INTERVENTIONAL SPINE.

4    WHAT DOES THAT MEAN FOR YOUR PURPOSES?

5    **A.**   GENERALLY, ABOUT 80 PERCENT OF ALL CHRONIC PAIN PATIENTS

6    HAVE SOME SORT OF SPINE ORIGIN PAIN.  SO FOR ME, I DO SPECIAL

7    PROCEDURES, EPIDURALS AND DISCOPATHY AT SITE INJECTIONS.  IT'S

8    VERY SIMPLE INJECTIONS THAT WE DO UNDER X-RAY GUIDANCE IN THE

9    NECK, THORACIC AND LUMBAR SPINE.

10              I DO PERIPHERAL NERVE -- I'M SORRY PERIPHERAL JOINT

11    INJECTIONS.  I ROUTINELY SEE WRIST PROBLEMS, HAND PROBLEMS,

12    ELBOW PROBLEMS, SHOULDER, AND KNEE, ANKLE, FOOT, HIP JOINT

13    PROBLEMS.

14    **Q.**   PHYSICAL MEDICINE REHABILITATIONS THE NEXT ITEM ACROSS THE

15    TOP OF YOUR C.V.  I THINK WE MENTIONED THAT.

16              THERE'S ALSO A REFERENCE HERE TO ELECTRO-DIAGNOSTIC

17    MEDICINES?

18    **A.**   THERE'S TWO RESIDENCIES THAT ACTUALLY PROVIDE SPECIFIC

19    TRAINING FOR THE ELECTRICAL STUDIES THAT I PERFORMED ON

20    MR. ASHKER.  THOSE ARE NEUROLOGISTS AND PHYSICAL MEDICINE

21    REHABS.  SO WE ARE THE ONLY TWO RESIDENCY PROGRAMS THAT

22    ROUTINELY PROVIDE SPECIFIC TRAINING SO WE CAN PERFORM THESE

23    DIAGNOSTIC TESTING.

24    **Q.**   SO IN LAYMAN'S TERMS, HOW MUCH OF YOUR PRACTICE IS RELATED

25    TO PAIN MANAGEMENT, PAIN ASSESSMENT?

SHIN - DIRECT / MR. ANDRADA

1    **A.**   HUNDRED PERCENT.

2    **Q.**   HOW LONG HAS THAT BEEN THE CASE?

3    **A.**   SINCE YEAR 2000.

4    **Q.**   ALL RIGHT.

5    **A.**   AFTER MY TRAINING.

6    **Q.**   NOW, DOCTOR, OUR OFFICE RETAINED YOU TO EXAMINE

7    MR. ASHKER; IS THAT CORRECT?

8    **A.**   YES.

9    **Q.**   AND WHEN DID YOU PERFORM THAT EXAMINATION?

10   **A.**   DECEMBER 22ND, 2008.

11   **Q.**   AND DID YOU PREPARE A REPORT?

12   **A.**   YES.

13   **Q.**   AND WOULD YOU BE SO KIND AS TO -- DO YOU HAVE IT RIGHT

14   THERE?

15   **A.**   YES.

16   **Q.**   ALL RIGHT.  SO, WHERE DID YOU MEET MR. ASHKER?

17   **A.**   AT THE PRISON, PELICAN -- IS IT PELICAN BAY OR PELICAN

18   HILL?

19   **Q.**   PELICAN BAY.

20   **A.**   PELICAN BAY.

21   **Q.**   AND ON WHAT DATE DID YOU MEET HIM?

22   **A.**   DECEMBER 22ND.

23   **Q.**   AND DID YOU TAKE A HISTORY FROM HIM?

24   **A.**   YES.

25   **Q.**   AND I KNOW THAT THE HISTORY THAT YOU SET DOWN HERE IN THE

SHIN – DIRECT / MR. ANDRADA

1    REPORT GOES ON FOR MANY PAGES, BUT GENERALLY, CAN YOU SUMMARIZE

2    WHAT YOU THINK ARE THE IMPORTANT POINTS OF THE HISTORY THAT

3    MR. ASHKER PROVIDED YOU?

4    **A.**   IT STARTED WITH AN INJURY, A GUNSHOT WOUND TO HIS RIGHT

5    FOREARM.  I THINK IT'S IMPORTANT TO NOTE THAT HE HAD FRACTURE

6    OF BOTH ULNAR --

7    **Q.**   DOCTOR, EXCUSE ME.  I AM GOING TO ASK YOU TO SLOW DOWN A

8    LITTLE BIT BECAUSE I CAN TELL FROM THE FACES OF SOME OF THE

9    JURORS THEY ARE HAVING --

10   **A.**   IT WAS A SIGNIFICANT GUNSHOT.

11   **Q.**   OKAY.  THANK YOU.

12   **A.**   HE ENDED UP FRACTURING OR BREAKING BOTH OF THE BONES IN

13   THE FOREARM, BUT THERE WAS NO MENTION OF ANY OF THE NERVE THAT

14   WAS BEING -- THAT WAS DAMAGED FROM THE GUNSHOT.  THAT'S

15   IMPORTANT TO NOTE.  WE KNOW THAT WHEN WE --

16   **Q.**   LET ME STOP YOU.

17           **THE COURT:**  IT MIGHT HELP IF YOU PULL THAT MIC --

18   YOU'RE FACING THE JURY.  PUT THE MIC IN THE LINE BETWEEN YOU

19   AND THE JURY SO YOU ARE SPEAKING INTO IT AS YOU SPEAK TO THE

20   JURY.

21           **MR. ANDRADA:**  MUCH BETTER.  MUCH BETTER.

22           **THE COURT:**  IT HELPS TO BE A LITTLE BIT CLOSER TO

23   THE MIC SO IT PICKS UP YOUR VOICE THERE.

24           **THE WITNESS:**  OKAY.

25

1    BY MR. ANDRADA:

2    Q.   THERE YOU GO.

3    A.   SO HE HAD FRACTURES OF THE BOTH OF THE BONES OF THE

4    FOREARM.  THERE WAS NO MENTION OF NERVE DAMAGE.  THERE ARE

5    SEVERAL LARGE NERVES THAT GO IN -- BUNCH OF SMALL ONES THAT GO

6    THROUGH THE FOREARM.  HE WAS FORTUNATE ENOUGH TO NOT HAVE

7    INJURED ANY OF THE SPECIFIC NERVES FROM THE GUNSHOT.

8                 AFTER THAT THERE WAS A COUPLE OF, A FEW

9    COMPLICATIONS.

10   Q.   I AM GOING TO ASK YOU A QUESTION.

11   A.   OKAY.

12   Q.   MIGHT SOUND SELF-EVIDENT, BUT WHAT WERE THOSE

13   COMPLICATIONS?

14   A.   I BELIEVE HE DEVELOPED AN ANEURYSM THAT THEY HAD TO

15   CORRECT.

16   Q.   I DON'T KNOW IF WE HAVE DEFINED THAT TERM.

17                 BRIEFLY, IN SIMPLE TERMS, WHAT IS AN ANEURYSM?

18   A.   I DID MY BEST TO REVIEW THE MEDICAL RECORDS, AND I DIDN'T

19   SPEND TOO MUCH TIME TRYING TO UNDERSTAND EXACTLY WHAT BROUGHT

20   ABOUT THE ANEURYSM, I CAN'T REMEMBER, BUT THE ANEURYSM IS AN

21   ABNORMALITY ON THE, I THINK IN THIS CASE IT WAS AN ARTERIAL

22   ANEURYSM.  THE ARTERIES, THE PRESSURIZED VESSEL THAT SUPPLIES

23   THE BLOOD TO OUR BODY AND TISSUES, AND IF YOU HAVE WEAKENED

24   LINING IN THE WALL OF THE VESSEL, THEN A PART OF IT CAN

25   ACTUALLY POOCH OUT OR LIKE A BALLOON HAVE A LITTLE DIMPLE AND

1  CAN CAUSE PROBLEMS.  AND, OF COURSE, IT CAN RUPTURE AND CAUSE

2  MORE PROBLEMS.  SO TYPICALLY THE ARM'S SURGICALLY REPAIRED.  I

3  THINK THAT'S -- THAT WAS MY UNDERSTANDING OF WHAT HAPPENED.

4          FROM A MEDICAL PERSPECTIVE, IT'S NOT A HUGE ISSUE.

5  IT'S JUST A -- IT WAS A PLUMBING JOB.  IN LAYMAN'S TERMS, IT

6  JUST HAD TO BE FIXED.  IT IS NOT TYPICALLY ASSOCIATED WITH A

7  LONG-TERM COMPLICATION OR PROBLEMS.

8          AND THEN HE HAD SOME --

9  **Q.**  DID HE HAVE SOME OTHER --

10 **A.**  I DON'T BELIEVE HE HAD ANY PROBLEMS WITH THE ARTERY

11 ITSELF.  OBVIOUSLY HE'S GETTING GOOD PROFUSION INTO THE HAND.

12 THAT'S AN EASY PROBLEM THAT DEVELOPS RATHER READILY.

13          AND THEN HE HAD A COUPLE OF OTHER PROCEDURES WHERE

14 HE HAD SOME BLUNT BULLET FRAGMENTS THAT WERE REMOVED.  OF

15 COURSE THAT THEN HAPPENS, FROM A MEDICAL PERSPECTIVE, IT'S NOT

16 A HUGE ISSUE.  IF THE FOREIGN OBJECT OR MATERIAL, IN THIS CASE

17 BULLET FRAGMENT, IS LEFT IN TISSUES, A LOT OF TIMES NOTHING

18 HAPPENS, YOU JUST LIVE WITH IT.  BUT IF IT DOES BECOME A SOURCE

19 OF IRRITATION, IN HIS CASE I THINK ONE OF THE FRAGMENT WAS

20 INFECTED, THEN YOU CAN GO IN THERE OR YOU SHOULD GO IN THERE

21 AND HAVE IT REMOVED.  SO IT HAPPENED, I THINK, A COUPLE OF

22 TIMES.  THAT RESOLVED WITHOUT ANY PROBLEMS.

23          AND THEN AFTER THAT, HE DEVELOPED ULNAR NEUROPATHY

24 OR THE ULNAR NERVE THAT GOES TO THE MEDIAL PART OF YOUR ELBOW,

25 THERE'S AN AREA THAT IT GOES, IT'S CALL AN ULNAR GROOVE OR

SHIN – DIRECT / MR. ANDRADA

1   TUNNEL.  IT IS A TUNNEL, AND SINCE IT'S A TUNNEL, IT CAN BE

2   COMPROMISED.  AND HE DID DEVELOP A COMPRESSIVE PROBLEM OF THE,

3   OF THAT PARTICULAR NERVE.

4   **Q.**   MAY I INTERRUPT YOU FOR A MOMENT?

5   **A.**   YES.

6   **Q.**   JUST TELL US A LITTLE BIT ABOUT WHAT THE ULNAR NERVE IS;

7   WHAT DOES IT DO?

8   **A.**   THERE ARE THREE MAIN NERVES THAT GO INTO YOUR HAND.  ONE

9   IS THE ULNAR NERVE THAT GOES THROUGH THE ULNAR SIDE OR THE

10  INSIDE OF YOUR FOREARM.  THE OTHER ONE IS THE MEDIAN NERVE,

11  THAT GOES TO THE MIDDLE PART OF THE ARM, AND THE RADIAL NERVE

12  GOES TO THE OUTSIDE, AND THEY HAVE DIFFERENT REPRESENTATION AND

13  THEY CONTROL DIFFERENT MUSCLES.

14         AND THE ULNAR NERVE, THAT IS WHERE IT IS MOSTLY

15  COMMONLY COMPROMISED.  HE DID VERY WELL FROM THE SURGERY.  AND

16  YOU CAN EITHER TAKE THE NERVE AND PUT IT OVER TO THIS SIDE SO

17  YOU HAVE A LITTLE MORE ROOM OF ULNAR TRANSPOSITION OR THEY CAN

18  GO IN THERE AND DISSECT THE NERVE OUT AND CREATE MORE ROOM.

19         AND KIND OF RELIEVE, SO TO SPEAK, RELIEVE THE

20  PRESSURE.  I'M SURE ALL THE JURY MEMBERS HAVE HARD OF CARPAL

21  TUNNEL SYNDROME.  THAT'S A VERY COMMON DISORDER.  THAT'S A

22  TUNNEL THAT'S IN YOUR HAND.  CARPAL MEANS HAND.  AND THAT CAN

23  OFTEN DEVELOP A COMPRESSIVE LESION, AND THEN SURGEONS WILL GO

24  IN THERE AND SNIP, SNIP THE ROOF OUT OF IT AND MAKE A LITTLE

25  MORE ROOM.

SHIN – DIRECT / MR. ANDRADA

1           SIMILAR PROCEDURE IN THE ULNAR NERVE.  HE DID VERY

2    WELL.  WHENEVER YOU ARE DEALING WITH NERVES, IT IS POTENTIAL

3    FOR COMPLICATIONS.  YOU CAN CAUSE SCARRING TO THE NERVE.  WHEN

4    THE NERVE IS DAMAGED, IT CAN PERMANENTLY SCAR INTERNALLY,

5    CALLED INTRAMURAL FIBROSIS.  FIBROSIS SIMPLY SCARRING,

6    INTRAMURAL MEANS INSIDE THE NERVE.  SO THESE PERIPHERAL NERVES

7    ARE NERVES THAT ARE OUTSIDE OUR BRAIN ARE CALLED PERIPHERAL

8    NERVES.  IT'S A VERY COMPLEX STRUCTURE.  AND WHEN IT SCARS

9    INTERNALLY, IT CAN GIVE YOU A PERMANENT PAIN BECAUSE THEY ARE

10   HOT WIRES.  AND THE WIRES ARE SUPPOSED TO CONDUCT ELECTRICITY

11   IN A CERTAIN DIRECTION.  AND IF YOU HAVE INTERNAL SCARRING, THE

12   NERVE CONDUCTIONS GO BACK AND FORTH AND CAUSE ADDITIONAL --

13   LIKE A SHORT CIRCUITRY.

14           AND THEY CAN DELIVER INFORMATION TO YOUR BODY WHICH

15   IS INTERPRETED AS PAIN AND WE CALL THAT NEURITIC PAIN, OR

16   PAINFUL NERVE, OR NEUROPATHY, OR PATHOLOGIC NERVE.

17           FORTUNATELY MR. ASHKER DOESN'T SUFFER SIGNIFICANTLY

18   IN ANY WAY THAT I CAN SEE FROM ANY PERMANENT DAMAGE OF THE

19   NERVE.  HE HAS DONE VERY WELL.  FIRST, HE AVOIDED NERVE INJURY

20   WHEN HE WAS SHOT.  THERE WAS NO EVIDENCE THAT ANY OF THE NERVES

21   WERE DAMAGED.

22           THEN HE DEVELOPED A COMPLICATION OF ULNAR

23   NEUROPATHY.  HE HAD SURGERY.  HE HAD EXCELLENT RESOLUTION OF

24   HIS SYMPTOMS.  WHEN YOU HAVE NERVE DAMAGE, IT'S SOMETHING THAT

25   WE CAN SEE.  WE CAN HOOK IT UP TO ELECTRICAL MACHINERY.  OUR

SHIN – DIRECT / MR. ANDRADA

1   NERVES WORK BY USE OF ELECTRICITY.  THERE'S ACTUAL ELECTRICAL

2   CONDUCTION ON THESE NERVES.  AND SO, THEREFORE, WE CAN MIMMICK

3   THE CONDITION BY DELIVERING ELECTRICAL STIMULATION TO THESE

4   NERVES.

5   **Q.**   HOW DO YOU DO THAT?

6   **A.**   WE TAKE A PRONG.  IT SOUNDS LIKE A TORTURE, BUT WE USE

7   SMALL AMOUNTS OF ELECTRICITY.  WE CAN STIMULATE THESE NERVES.

8   A LOT OF THE NERVES ARE ACCESSIBLE, WHICH MEANS THEY ARE CLOSE

9   ENOUGH TO THE SKIN SURFACE SO THEY CAN TAKE A PRONG AND DELIVER

10  SUFFICIENT AMOUNT OF ELECTRICITY.

11          AND THEN WHAT WE DO IS WE HOOK IT UP, THESE

12  RECEIVING ELECTRODES EITHER ON THE MUSCLE OR THE SKIN, AND WE

13  CAN RECORD IT.  WE CAN DETERMINE THE VELOCITY OF THE NERVE.  WE

14  CAN SEE -- LOOK AT THE AMPLITUDE OR SIZE OF THE RESPONSE.  AND

15  THEN WE CAN COMPARE IT TO, FROM ONE NERVE TO ANOTHER.  I

16  MENTIONED THERE'S THREE NERVES.

17          AND WE KNOW FROM EXPERIENCE AND WE HAVE OVER LAST 70

18  YEARS DEVELOPED A LARGE AMOUNT OF DATA ABOUT HOW FAST THESE

19  NERVES CONDUCT.  AND WE HAVE THE SENSORY NERVES.  WE HAVE THE

20  MOTOR NERVES, NERVES THAT GO WITH THE MUSCLE, NERVES THAT GO TO

21  THE SKIN, AND WE CAN ACTUALLY TEST THEM OUT.  SO YOU CAN

22  ACTUALLY DAMAGE A NERVE, THESE ARE READILY OBSERVABLE DISEASE

23  PROCESSOR PATHOLOGIES.

24  **Q.**   IS THERE A NAME FOR THAT TEST OR TESTS?

25  **A.**   IT'S CALLED AN ELECTRODE DIAGNOSTICS, SIMPLY DIAGNOSTIC

SHIN – DIRECT / MR. ANDRADA

1    MEASURE USING ELECTRICITY.  ANOTHER WORD IS ELECTROMYOGRAPHY OR

2    ELECTRIC RECORDING OF THE MUSCLES.  AND THEN NERVE CONDUCTION

3    STUDIES, STUDY OF THE NERVES CONDUCTION PROPERTIES.

4              SO MR. ASHKER HAS, I BELIEVE, SEVERAL, INCLUDING

5    MINE, AND WHAT I --

6    Q.   YOU PERFORMED WHAT ON HIM?

7    A.   I DID BOTH.

8    Q.   BOTH?  TELL US WHAT YOU DID.

9    A.   THERE'S TWO COMPONENTS.  ONE IS THE NERVE CONDUCTION

10   STUDIES THAT I MENTIONED.  YOU ACTUALLY DELIVER ELECTRICITY TO

11   THE NERVES.

12             NOW, WE CAN'T STUDY ALL THE NERVES THAT ARE COMING

13   OUT OF OUR BODY, OUT OF OUR BRAIN.  SOME OF THEM ARE TOO DEEPLY

14   EMBEDDED.  WE WOULD HAVE TO USE SPECIAL TECHNIQUES.  AND, OF

15   COURSE, WE DON'T ROUTINELY DO THAT.

16             BUT AS FAR AS THE NERVES THAT ARE GOING INTO THE

17   HANDS, PROPORTIONALLY THEY ARE AVAILABLE FOR STUDIES.  SO I

18   PERFORMED THAT.  AND THEN THE ELECTROMYOGRAPHY IS AN

19   INTERESTING COMPONENT OF THAT STUDY.  WHAT I BASICALLY DO IS I

20   STICK A NEEDLE --

21   Q.   WHAT IS ELECTROMYOGRAPHY?

22   A.   I BASICALLY STICK A NEEDLE INTO THE MUSCLE, AND I JUST

23   LISTEN.

24   Q.   WHAT DO YOU MEAN YOU LISTEN?

25   A.   LISTEN TO THE ELECTRICAL ACTIVITY.

SHIN – DIRECT / MR. ANDRADA

1  **Q.**   HOW DO YOU DO THAT?  HOW DO YOU LISTEN, SO TO SPEAK?

2  **A.**   IT PICKS UP ELECTRICAL INFORMATION.  WHEN THE MUSCLE

3  CONTRACTS, THERE'S A VOLLEY OF ELECTRICAL -- IT'S AN ELECTRICAL

4  EVENT.

5          AND WE CAN ACTUALLY MEASURE THE VOLTAGE AND IT CAN

6  ACTUALLY MEASURE THE SIZE OF CONTRACTION.  WHEN A MUSCLE LOSES

7  ITS CONNECTION TO THE BRAIN VIA THE NERVE, AS YOU KNOW, THE

8  MUSCLES ARE NOT ACTING ON THEIR OWN, THEY ARE UNDER OUR CONTROL

9  THROUGH CONNECTIONS, THE NERVES ARE ACTUALLY CONNECTED TO THE

10 MUSCLES.  EVERY SINGLE FIBER OF THE MUSCLES THAT WE HAVE IN OUR

11 BODY ARE UNDER THE SUPERVISION AND CONTROL OF NERVES THAT ARE

12 COMING FROM OUR BRAIN.

13         IF YOU SEVER THAT RELATIONSHIP, OKAY, THE MUSCLES

14 BECOME VERY UNHAPPY.  WHAT HAPPENS IS THAT THE -- WHAT WE CALL

15 THE -- THERE IS A RESTING POTENTIAL.  THE MUSCLES ARE HAPPY AT

16 WHAT WE CALL A MINUS 30 MINIVOLTS OF RESTING POTENTIAL.

17 **Q.**   WHAT DOES THAT MEAN?

18 **A.**   THAT'S JUST -- THERE'S A CERTAIN LEVEL OF VOLTAGE ON THESE

19 MUSCLE FIBERS THAT WE CAN MEASURE.  AND WHEN IT'S CONNECTED TO

20 OUR BRAIN, IT'S HAPPY.  IT RESTS AT 30 MINIVOLTS.

21         WHEN IT IS DISCONNECTED FROM THE BRAIN, THE MUSCLE

22 TENDS TO ACT ON ITS OWN.  IN OTHER WORDS, THERE IS AN ACTUAL

23 PHYSIOLOGIC CHANGE ON THE MEMBRANE WHERE IT IS NO LONGER 30

24 MINIVOLTS, BUT IT CREEPS UP TO ABOUT MINUS TEN OR MINUS 15.

25 BUT THE PROBLEM AT THAT POINT IS THAT'S WHAT WE CALL A

1    THRESHOLD OR SPONTANEOUS OF ACTIVITY.

2              IN OTHER WORDS, THE ELECTRICAL VOLTAGE OF THE

3    MEMBRANES OF THE MUSCLES HAVE CHANGED SO THAT IT WILL

4    SPONTANEOUSLY FIBRILLATE OR GO INTO CONTRACTIONS.  BUT NOT BIG

5    CONTRACTIONS THAT CAUSE LIMB MOVEMENTS, BUT VERY SMALL SUBTLE

6    CONTRACTIONS THAT EACH INDIVIDUAL FIBERS WILL KIND OF DO ITS

7    OWN THING.  OKAY?

8              AND SOMETIMES THE PATIENTS CAN FEEL -- SOMETIMES WE

9    CAN ACTUALLY SEE THAT AS WE NOTE IT VIA CIRCULATION.  WE'LL SEE

10   A LITTLE TWITCH OF THE MUSCLE.  IF THE SEVERANCE OF THE NERVE

11   IS SEVERE AND WE CAN ACTUALLY SEE IT, BUT IF THE NERVE DAMAGE

12   IS SO SUBTLE, LET'S SAY YOU JUST LOST FEW FIBERS THAT GO INTO

13   THE, ONE OF THE SMALL MUSCLES IN YOUR HAND, I CAN ACTUALLY

14   DETECT THAT BY INSERTING A NEEDLE AND JUST LISTENING.

15             AND WHAT WE DO IS WE POKE THIS WAY, WE POKE THAT

16   WAY, WE POKE THIS WAY, POKE VARIOUS DIFFERENT WAYS AND WE

17   ACTUALLY MOVE THE NEEDLE ABOUT 20 TIMES ON EACH MUSCLE GROUP,

18   WE LISTEN TO MULTIPLE DIRECTIONS.  AND IF THERE'S BEEN A NERVE

19   DAMAGE, WHICH MEANS THAT THE CONNECTION BETWEEN THE MUSCLE AND

20   THE BRAIN HAS BEEN COMPROMISED, THEN WE WOULD BE ABLE TO PICK

21   UP WHAT WE CALL SPONTANEOUS ACTIVITIES OF THE MUSCLES BECAUSE

22   OF THE PHYSIOLOGY THAT I JUST EXPLAINED TO YOU.

23             AND BY LOOKING AT DIFFERENT MUSCLE GROUPS THAT

24   DEMONSTRATE THESE ABNORMALITIES, WE CAN MAKE A FAIRLY, A

25   CONCLUSIVE STATEMENT ABOUT EXACTLY WHERE THE PROBLEM IS.

1          AND SO IT'S AN AREA OF MEDICINE WHERE IT IS MORE

2     PRECISE THAN GUESSWORK.  AS YOU KNOW, THERE ARE A LOT OF

3     MEDICINE AREAS WHERE A LOT OF IT DEPEND ON CLINICAL

4     PRESENTATIONS AND CONJECTURE AND A LOT OF GUESSING WORK AND

5     EXPERIENCE, BUT ELECTROPHYSIOLOGIC MEDICINE FORTUNATELY IS VERY

6     CLEARCUT AND FAIRLY PREDICTABLE.

7     Q.   SO, GENERALLY, WHAT WERE THE RESULTS OF THE

8     ELECTRO-DIAGNOSTIC STUDIES?

9     A.   ANOTHER THING WE NEED TO KEEP IN MIND BEFORE I ANSWER THAT

10    QUESTION --

11    Q.   PLEASE.

12    A.   -- IS THAT YOU CAN HAVE, YOU CAN UNDERSTAND THAT WHENEVER

13    YOU HAVE A TEST, YOU CAN HAVE A POSITIVE FINDING OR NEGATIVE

14    FINDINGS, THAT'S EASY TO UNDERSTAND.  BUT WITH A POSITIVE

15    FINDING, YOU CAN HAVE MILDLY POSITIVE, YOU FIND A LITTLE BIT OF

16    ABNORMALITY, OR YOU CAN HAVE MODERATE AMOUNT OR YOU CAN HAVE

17    SIGNIFICANT AMOUNT OF ABNORMALITY.

18          BUT WHEN WE LOOKED AT STUDIES OF THE NERVE FUNCTION

19    AND, FOR INSTANCE, THE ULNAR NEUROPATHY AT VARIOUS DIFFERENT

20    PLACES, THE CARPAL TUNNEL SYNDROME, OR MEDIAL NEUROPATHY OR

21    RADIAL NERVE NEUROPATHY, WHICH IS THE OUTSIDE OF THE FOREARM,

22    ALL OF WHICH COULD HAVE BEEN COMPROMISED IN MR. ASHKER'S CASE.

23          WHEN WE LOOKED AT THOSE STUDIES, THERE'S A CORE

24    CORRELATION BETWEEN THE SEVERITY OF A FINDING, OKAY, SEVERITY

25    FINDING OF THE -- THIS PARTICULAR STUDY, VERSUS WHAT THE

1    PATIENTS ACTUALLY EXPERIENCE.

2    **Q.**   WHAT DO YOU MEAN?

3    **A.**   SO YOU CAN HAVE A VERY ABNORMAL FINDING AND HAVE PATIENTS

4    THAT ARE VIRTUALLY SYMPTOM FREE.

5              IN OTHER WORDS, YOU CAN HAVE AN ULNAR NEUROPATHY, IT

6    LOOKS REALLY BAD ON THE ELECTROPHYSIOLOGIC -- YOU CAN HAVE A

7    VERY SIGNIFICANT ABNORMALITY ON THE ELECTROPHYSIOLOGIC STUDY,

8    AND THEN YOU CAN FIND PHYSICIANS THAT WILL SAY, I DON'T HAVE

9    ANY PROBLEMS, WE DON'T GRAB THEM OUT OF THE STREET AND SAY WE

10   HAVE TO CUT YOU UP AND FIX IT UP BECAUSE YOU HAVE AN ABNORMAL

11   NERVE, WE DON'T DO THAT.  EXCEPT, UNLESS WE CAN DEMONSTRATE

12   THAT THERE'S A PROGRESSION, THERE IS A PROGRESSION OF

13   NEUROLOGIC PROBLEM.  OKAY?

14             SO I DO A STUDY TODAY AND THREE MONTHS LATER I CAN

15   CLEARLY SEE THAT THERE'S A PROGRESSION OF THE PROBLEM.  AND

16   THEN EVEN IF THE PATIENT IS NOT AS SYMPTOMATIC, USUALLY ADVISE

17   WE SHOULD DO SOMETHING BECAUSE IF WE LEAVE IT ALONE, AT SOME

18   POINT YOU BECOME SYMPTOMATIC AND AT SOME POINT YOU'RE GOING TO

19   LOSE THE FUNCTION OF THE NERVE AND YOU ARE NOT GOING TO BE

20   HAPPY ABOUT THAT.

21             SO, UNLESS WE SEE PROGRESSION OF FINDINGS, THEN WE

22   CAN BE MORE AGGRESSIVE IN TERMS OF OUR INTERVENTION.

23             BUT GENERALLY SPEAKING, IF WE GET AN INFORMATION,

24   WHATEVER IT MAY, WHETHER IT'S MILD FINDING, OR WHETHER IT'S

25   POSITIVE FINDING, OR SIGNIFICANTLY POSITIVE, WE DON'T REALLY

1    USUALLY JUMP INTO TREATING THE PATIENTS BASED ON OUR

2    ELECTROPHYSIOLOGIC STUDIES, WE GENERALLY LOOK AT THE PATIENT.

3              AND IN MR. ASHKER'S CASE --

4    Q.   WHAT ABOUT MR. ASHKER'S CASE?

5    A.   MR. ASHKER'S CASE, HE DID HAVE POSITIVE ULNAR NERVE

6    PROBLEM PREVIOUSLY AND WAS SYMPTOMATIC.  MAINLY THE ULNAR NERVE

7    WOULD EFFECT MOSTLY THE FOURTH AND FIFTH DIGITS.  IT'S ACTUALLY

8    INTERESTING THAT THE FOURTH FINGER IS, HALF OF IT IS BY ULNAR

9    NERVE AND ON THIS SIDE IT IS BY THE MEDIAN NERVE.

10             SO IT WAS EFFECTING HIS FOURTH AND FIFTH FINGER.

11   THEY DID RELEASE THE NERVE, AND SUBSEQUENTLY HIS SYMPTOMS

12   IMPROVE AND THAT'S WHAT WE WANT TO SEE IN MEDICINE.  WE SEE A

13   PROBLEM, WE CAN DOCUMENT IT -- I'M SORRY.

14             WE SEE A PROBLEM THE PATIENT IS COMPLAINING OF, WE

15   SEE THAT IT IS A PROBLEM IN ELECTROPHYSIOLOGIC STUDIES, WE DO

16   AN INTERVENTION, AND THERE'S A RESULT.  THAT'S WHAT WE SAW WITH

17   MR. ASHKER.

18             SO WE DON'T HAVE TO SPEND ANY TIME TALKING ABOUT THE

19   ULNAR NERVE PROBLEM BECAUSE HE'S REALLY NOT COMPLAINING OF

20   THAT.

21             WHEN I PERFORMED A STUDY, IT WAS INTERESTING TO NOTE

22   THAT THE ULNAR NERVE PROBLEM IN HIS ELBOW HAD COMPLETELY

23   RESOLVED.  AND THAT'S WHAT WE SEE AFTER A SURGICAL

24   INTERVENTION, IF IT HAS BEEN A SUCCESSFUL OPERATION, YOU WILL

25   SEE TYPICALLY RESOLUTION OF THE NERVE PROBLEMS UNLESS THE

1    INJURY WAS SEVERE ENOUGH TO HAVE CAUSED A PERMANENT SCARRING OF

2    THE NERVE INSIDE THAT I EXPLAINED TO YOU.

3            IN HIS PATIENT, IT DID NOT.  AND THERE ARE MANY

4    CONDITIONS WHERE YOU CAN HAVE A COMPRESSIVE LESION SO YOU ARE

5    COMPRESSING A NERVE, AND IT'S GIVING YOU PROBLEMS.  AND IF YOU

6    REVERSE THAT CONDITION, THE NERVE DOES HEAL ITSELF.  OKAY?

7            I WON'T GO INTO TOO MUCH DETAIL, BUT WE DO HAVE SOME

8    CAPACITY TO HEAL OUR OWN NERVES AND ACTUALLY GROW NERVES.  IT'S

9    NOT -- IT'S NOT DRAMATIC ENOUGH TO ACTUALLY GROW AN ENTIRELY

10   NEW NERVE, BUT IF YOU SEVER -- IF YOU HAVE A CLEAN CUT, IF YOU

11   TAKE A SINGLE FIBER AND YOU HAVE A CLEAN CUT, OKAY, BUT THERE

12   WAS NO PROBLEM WITH THE NERVE CELL ITSELF, IT WILL GROW ITSELF

13   BACK OUT.  OKAY?

14           EACH ONE OF THESE NERVES ARE WRAPPED WITH SPECIAL

15   TYPE OF CELL.  ESPECIALLY IF YOU HAVE THE CELL, THE PROTECTIVE

16   CELL IS INTACT, THE NERVE WILL GROW BACK EVERY TIME.  AND IT

17   WILL BE LIKE NEW.  AND IN COMPRESSIVE LESIONS, THAT'S OFTEN

18   WHAT YOU WILL SEE.

19           IF YOU HAVE A NERVE THAT IS INTACT, AND YOU DAMAGE

20   THE WRAPPING CELLS, THE WRAPPING CELLS WILL REGROW AND IT WILL

21   BE AS NEW.  THERE IS SOME REGENERATIVE AND HEALING CAPACITY FOR

22   THE NERVE DAMAGE THAT WE SEE, BUT AT SOME POINT, IF THE DAMAGE

23   WAS SEVERE ENOUGH WHERE YOU HAVE ACTUALLY DEVELOPED SCARRING,

24   SCAR TISSUE, WHAT WE CALL FIBROSIS, THEN THE DAMAGE MAY HAVE

25   IRREVERSIBLE.

SHIN – DIRECT / MR. ANDRADA

```
 1                IN MR. ASHKER'S CASE, AS IT PERTAINS TO THE ULNAR

 2    NERVE, THERE IS REALLY NOTHING TO TALK ABOUT AT THIS POINT

 3    BECAUSE HE'S NOT SYMPTOMATIC.  IF HE'S SYMPTOMATIC, IT IS

 4    FAIRLY MILD IN TERMS OF THE ULNAR NERVE RESOLUTION, PROBLEM IN

 5    THE ELBOW, AND THEN WHEN I DID THE STUDY, THAT SHOWED THE NERVE

 6    WAS WORKING FINE.

 7                WHAT I DID FIND --

 8    Q.   WHAT DID YOU FIND?  TELL US.

 9    A.   WAS THAT HIS NERVE IN THE ULNAR NERVE CAN BE DAMAGED HERE

10    (INDICATING) --

11    Q.   IN THE ELBOW?

12    A.   OBVIOUSLY YOU CAN HAVE IT DAMAGED ANYWHERE.  I CAN TAKE A

13    KNIFE AND CUT IT ANY WHERE ALONG THIS WAY OR TAKE A BULLET, BUT

14    WE ARE TALKING ABOUT THE MOST COMMONPLACE WHERE IT'S COMMONLY A

15    PROBLEMATIC IS THE MEDIAL ELBOW, CALLED CUBITAL TUNNEL.  IT IS

16    LESS COMMON, BUT IT HAPPENS IS THE WRIST AND WE HAVE A NAME FOR

17    THAT.  DOCTORS HAVE TO HAVE A NAME FOR EVERYTHING SO IT'S

18    CALLED --

19    Q.   I AM SORRY?

20    A.   GUION, G-U-I-O-N, GUION'S CANAL, AND IT'S AT THE WRIST.

21                AND MR. ASHKER HAS HAD POORLY FITTING BRACE FOR A

22    LONG TIME.  HE'S HAD INJURY AROUND THE AREA, SO IT IS NOT A

23    SURPRISE THAT HE HAS SOME PROBLEMS WITH THE ULNAR NERVE AT THE

24    WRIST.  BUT THE MAGNITUDE OF THE PROBLEM WAS NOT THAT SEVERE IN

25    THAT THE NERVE WAS GOING DOWN THE WRIST FINE AND IT JUST SLOWS
```

SHIN – DIRECT / MR. ANDRADA

1    DOWN JUST A LITTLE BIT, SO IT'S TAKING JUST A LITTLE BIT LONGER

2    TIME TO GET DOWN TO THE FINGERS.

3            IT WAS ONLY FOR THE SENSORY NERVE, THE MOTOR NERVE

4    WAS FINE.  IT IS ZIPPING THRU THAT CANAL WITHOUT ANY PROBLEMS.

5    AND MOTOR NERVES ARE TYPICALLY TOUGHER.  THEY ARE THE LATER

6    ONES TO GO.

7            AND THEN ANOTHER THING I FOUND IS THAT HE DOES HAVE

8    A LITTLE BIT OF CARPAL TUNNEL.  OKAY.  AGAIN, AS I EXPLAINED,

9    WE DON'T JUST TREAT ELECTROPHYSIOLOGICAL FINDINGS, WE TREAT THE

10   PATIENT'S SYMPTOMS.

11           WHEN I SPENT TIME WITH MR. ASHKER, I WAS NOT

12   IMPRESSED THAT HE REALLY HAD A WHOLE LOT OF PROBLEM WITH HIS

13   ULNAR NERVE GOING THROUGH THE WRIST OR THE MEDIAN NERVE OR

14   CARPAL TUNNEL SYNDROME.  THE CARPAL TUNNEL SYNDROME AND ULNAR

15   NEUROPATHY ACROSS THE WRIST ARE REALLY TYPICALLY PRESENT WITH

16   LOT OF NUMBNESS AND TINGLING THAT'S LIMITED TO THE FINGERS.  IT

17   DOESN'T GIVE YOU WRIST PAIN, FOREARM PAIN.  IT CAN GIVE YOU

18   PALMER PAIN, PAIN IN THE PALM.  IT CAN GIVE YOU DYSAESTHESIA OR

19   ABNORMAL SENSATIONS IN FINGERS.  IT CAN MAKE YOU FEEL NUMB AND

20   IT CAN ACTUALLY IF IT'S SEVERE ENOUGH, COMPROMISE THE GRIP

21   STRENGTH.

22           BUT ONE OF THE HALLMARK PRESENTING SYMPTOMS OF

23   CARPAL TUNNEL SYNDROME, THERE ARE SEVERAL, BUT ONE OF THE MOST

24   COMMON ONES THAT HAS THE HIGHEST DIAGNOSTIC YIELD IS WHAT WE

25   CALL NIGHT PAIN.

SHIN – DIRECT / MR. ANDRADA

1          PATIENTS TYPICALLY WAKE UP AND THEIR HANDS ARE NUMB

2     AND IT WAKES THEM UP.  THEY ARE DISTURBED.  AND THEN THEY WAKE

3     UP, IT'S CALLED FLEX TIME.  THEY HAVE TO SHAKE THEIR HANDS.

4     AND THE REASON FOR THAT IS WHEN WE SLEEP, AS YOU KNOW, OUR

5     VEINS BECOME MORE ENGORGED BECAUSE OUR MUSCLES ARE NOT -- OUR

6     MUSCLES ARE RELAXED.  AND SO MOST OF OUR BODY GOES THROUGH A

7     LITTLE BIT OF EDEMA OR SWELLING.

8          AND SO THE CARPAL TUNNEL, YOU HAVE NINE STRUCTURES

9     GOING THROUGH THE CARPAL TUNNEL.  IT'S A VERY TIGHT SPACE.  AND

10    WHEN YOUR BODY GENERALLY SWELLS, WHAT IS ALREADY COMPROMISED,

11    IT IS COMPROMISED EVEN FURTHER.  SO AT NIGHTTIME, THE NERVE

12    REALLY SUFFERS.

13         AND THEN AT NIGHTTIME, WE DON'T KNOW WHAT POSITION

14    OUR HAND OR WRIST IS, SO YOU COULD BE SLEEPING LIKE THIS

15    (INDICATING) OR YOU COULD BE SLEEPING ALL THE WAY OUT HERE

16    BECAUSE THE MOST OPTIMAL POSITION FOR CARPAL TUNNEL IS 30

17    DEGREES OF DORSAL FLEXION OR EXTENSION OF THE WRIST.

18         SO YOU COULD BE IN VARIOUS POSITIONS BECAUSE YOU

19    AREN'T THINKING ABOUT IT, AND THEN YOU DON'T WAKE UP UNTIL THE

20    SYMPTOMS HAVE GOTTEN WORSE.  YOU WAKE UP, YOU SHAKE YOUR HANDS,

21    AND THEN YOU FEEL BETTER.

22         MR. ASHKER DIDN'T HAVE THAT COMPLAINT, SO I AM NOT

23    CONCERNED ABOUT HIS CARPAL TUNNEL SYNDROME BECAUSE THE

24    TREATMENT FOR THAT WOULD BE WRIST SPLINTS AT NIGHTTIME AND

25    POSSIBLE SURGICAL RELEASE.

SHIN – DIRECT / MR. ANDRADA

1          THE ULNAR NERVE TREATMENT WOULD ALSO BE –– THEY CAN

2    DO A SURGICAL EXPLORATION RIGHT AT THE ELBOW AND ACTUALLY

3    DISSECT THE NERVE AND TAKE A LOOK AT IT AND SEE IF THERE'S ANY

4    PROBLEMS WITH THE NERVE OF COMPRESSION OR ANY LIGAMENTS THAT

5    ARE PUTTING STRESS ON IT.

6          I WAS NOT IMPRESSED WITH THAT, THOSE PARTICULAR

7    DIAGNOSIS, ALTHOUGH THE ELECTROPHYSIOLOGICALLY WE ARE SEEING

8    EVIDENCE THAT THESE NERVES ARE SLOWING DOWN AS IT'S GOING

9    THROUGH THESE CANALS.  OKAY?

10         THAT REALLY BRINGS US TO WHAT THE ISSUES AT HAND,

11   AND I WILL WAIT FOR MR. ANDRADA TO ASK SPECIFIC QUESTIONS.

12   **Q.**   SO THEN YOU TOOK A HISTORY FROM MR. ASHKER.  YOU EXAMINED

13   HIM AND YOU READ VOLUMES OF MEDICAL RECORDS?

14   **A.**   YES.

15   **Q.**   AND WOULD YOU TALK TO US FOR A MOMENT ABOUT YOUR

16   EXAMINATION OF THE PATIENT?

17   **A.**   I THINK ANYBODY THAT IS GOING TO LOOK AT HIS ARM IS GOING

18   TO, YOU KNOW, IS GOING TO UNDERSTAND THE PROBLEM THAT HE HAS.

19         IT'S –– HE'S LOST SOME MUSCLE MASS.  MUSCLE

20   OBVIOUSLY IS IMPORTANT, NOT ONLY TO GIVE US MOVEMENT OF THE

21   JOINTS AND LIMB, BUT ALSO PROVIDES US WITH PROTECTION AROUND

22   THE BONE, ET CETERA.

23         THE SPECIFIC FINDINGS, FORTUNATELY HE DIDN'T HAVE

24   ANY PROBLEMS WITH THE NECK AND SHOULDER, WHICH I SEE A LOT.  I

25   WILL JUST GET RIGHT TO THE POSITIVE FINDINGS.

1           BASICALLY, WHAT WE ARE DEALING WITH IS, YOU KNOW, HE

2    HAS COMPROMISED RANGE OF MOTION.  AND THEN HE HAS COMPROMISED

3    GRIP STRENGTH.  GRIP STRENGTH WAS SIGNIFICANT.  HE COMPARED HIS

4    NORMAL LEFT SIDE.  I DO BELIEVE HE IS RIGHT HANDED.  WE WOULD

5    EXPECT NORMALLY TO -- THE RIGHT HAND, THE DOMINANT HAND TO BE

6    ABOUT 20 PERCENT, 15 TO 20 PERCENT STRONGER WHEN WE

7    CONSISTENTLY TEST THE GRIP STRENGTH OF NORMAL PEOPLE.

8           SO, HE'S HAD ABOUT 70 PERCENT COMPROMISE, ABOUT 60

9    TO 70 PERCENT COMPROMISED OF THE GRIP STRENGTH ON HIS RIGHT

10   HAND COMPARED TO THE LEFT SIDE.

11          AND MANY OF THE PHYSICAL EXAMINATIONS ARE VERY

12   DIFFICULT TO PERFORM, AND LET ME JUST SAY THIS:  PHYSICAL

13   EXAMINATION IS LARGELY DEPENDENT ON PATIENT'S EFFORT AND

14   PATIENT'S COOPERATION.

15          AND I HAVE TO SAY, I HAVE EXAMINED TENS OF THOUSANDS

16   OF PEOPLE OVER THE LAST TEN YEARS, I AM A VERY, VERY BUSY

17   PRACTICE.  AND, YOU KNOW, HE ACTUALLY PROVIDED EXCELLENT

18   EFFORT.  AND SO HE ACTUALLY PROVIDED INFORMATION THAT WAS

19   USEFUL.

20          AND THE WAY, ESPECIALLY WITH THE GRIP STRENGTH, THE

21   WAY WE TRY TO GET INFORMATION THAT IS HELPFUL IS TO SAY, HEY,

22   WAS IT A VALID RESPONSE?  WAS THE PATIENT PROVIDING GOOD

23   EFFORT?  AND WAS THE PATIENT PROVIDING CONSISTENT EFFORT?

24          IF -- THERE ARE MANY PATIENTS THAT ARE NOT WILLING

25   TO PROVIDE GOOD EFFORT BECAUSE EITHER THEY DON'T LIKE YOU, OR

1    DON'T WANT TO BE EXAMINED, OR ANOTHER VALID REASON IS THAT THEY

2    ARE IN TOO MUCH PAIN.  AND WHEN YOU ARE EXPERIENCING PAIN, YOUR

3    BRAIN GENERALLY TELLS YOU DON'T USE THE MUSCLE.  THAT'S JUST A

4    NATURAL PROTECTIVE BRAIN RESPONSE.  SO, YOU ARE NOT ALWAYS

5    GOING TO GET A VERY CONSISTENT GOOD EFFORT FROM THE PATIENT,

6    AND YOU EXPECT THAT.

7            SO WHEN YOU GET INCONSISTENT RESULTS, THEN YOU CAN'T

8    TALK ABOUT THE RESULTS BECAUSE IT'S NOT REFLECTIVE, TRULY

9    REFLECTIVE OF THE TRUE REALITY OR THE DEFICIT THAT PATIENT IS

10   EXPERIENCING.

11           IN THIS PATIENT, I WAS ABLE TO GET THREE CONSISTENT

12   RESPONSES.  AND IF THEY ARE WITHIN 10 PERCENT OF EACH OTHER, WE

13   CONSIDER IT FAIRLY RELIABLE BASED ON STUDIES.  AND HIS WAS

14   ACTUALLY WITHIN 5 PERCENT.  SO I THINK THAT HE PROVIDED

15   EXCELLENT EFFORT.

16           I THINK THAT HIS WEAKNESS IS REAL.  I THINK THAT THE

17   DEFICIT, THE GRIP STRENGTH HE HAS IN HIS RIGHT HAND IS AN

18   ACTUAL DEFICIT THAT HE'S EXPERIENCING.  SO IT'S A TRUE WEAKNESS

19   THAT HE HAS.  AND HE'S 70 PERCENT COMPROMISED.

20           AND, OF COURSE, THAT INFORMATION HAS TO BE

21   INTERPRETED.  NO ONE WILL ARGUE THAT A HUNDRED PERCENT LOSS OF

22   GRIP STRENGTH THEN YOU DON'T HAVE USE OF THE HAND.  THE

23   QUESTION IS AT WHAT POINT DOES A LIMB BECOME USELESS.  DO YOU

24   HAVE TO HAVE A 50 PERCENT LOSS?  IS THE HAND USELESS?  IS IT AT

25   70 PERCENT?  I THINK IT'S CLOSE TO 80 TO 90 PERCENT BEFORE A

1    HAND ACTUALLY BECOMES USELESS.

2              SO HE HAS LOST A LOT OF GRIP STRENGTH IN HIS RIGHT

3    HAND.  IF HE WAS GOING TO BE AN ATHLETE, A GOLFER,

4    INSTRUMENTALIST, IF HE HAD TO WORK IN THE DATA PROCESSING

5    CENTER, THEN HE'S HANDICAPPED OR DISABILITY WOULD BE

6    SIGNIFICANTLY LARGER BECAUSE HE WOULDN'T BE ABLE TO DO THOSE

7    THINGS.

8              ALL HE HAD TO DO IS JUST TAKE CARE OF HIMSELF, WHAT

9    WE CALL ACTIVITIES OF DAILY LIVING, AND SPECIFICALLY WHAT WE

10   MEAN BY THAT IS WHEN WE WAKE UP, ARE WE ABLE TO PUT ON OUR OWN

11   CLOTHES?  ARE WE ABLE TO GET OURSELVES OUT OF BED?  BED

12   TRANSFER MOBILITY.  ARE YOU ABLE TO WALK?  ARE YOU ABLE TO

13   GROOM AND DO PERSONAL HYGIENE?

14             AND THEN A LITTLE BIT MORE THAN THAT WOULD BE WHAT

15   WE CALL INSTRUMENTAL ACTIVITIES OF DAILY LIVING.  ARE YOU ABLE

16   TO GO SHOPPING?  ARE YOU ABLE TO DRIVE?  ARE YOU ABLE TO DO

17   LAUNDRY?  ARE YOU ABLE TO COOK A SOPHISTICATED MEAL?

18             WHEN YOU ASK THOSE QUESTIONS, OBVIOUSLY, MR. ASHKER

19   IS GOING TO BE COMPROMISED.  OKAY.  BUT IN TERMS OF THE BASIC

20   ACTIVITIES OF DAILY LIVING, WHICH REALLY DOESN'T REQUIRE A

21   WHOLE LOT OF STRENGTH TO EXECUTE, HE IS GOING TO BE COMPROMISED

22   A LOT LESS.  MAYBE HE WON'T BE TO PUT ON AND OFF HIS CLOTHES AS

23   QUICKLY AS HE DID BEFORE, OR AS WITH AS MUCH EASE AND COMFORT,

24   BUT HE'S STILL ABLE TO ACCOMPLISH THAT.

25             NOW, IF HE WAS IN A RACE WHERE HE HAD TO GET DRESSED

1    HIMSELF WITHIN THREE MINUTES EVERY MORNING, THEN I WOULD SAY HE

2    HAS A PROBLEM.  IF HE HAD TO BE ON A TIGHT SCHEDULE WHERE HE

3    REALLY HAD TO GET THROUGH ALL THE THINGS AND HE HAD A, YOU

4    KNOW, TIGHT 16-HOUR SCHEDULE AND HIS HAND WAS LIKE THAT, I

5    WOULD SAY YOU ARE IN TROUBLE.  YOU'RE GOING TO NEED SOME HELP.

6    YOU'RE NOT GOING TO BE ABLE TO DO ALL THOSE THINGS.

7          BUT IF HE HAD SUFFICIENT TIME TO TAKE CARE OF

8    HIMSELF, I WOULD SAY IT'S NOT ALL THAT COMPROMISED.  AGAIN,

9    IT'S -- HIS COMPROMISE AND DISABILITY IS REALLY DEPENDENT ON

10   WHAT THE EXPECTATIONS, WHAT DO WE EXPECT THIS GENTLEMAN OR THIS

11   PATIENT TO DO?

12         AND GIVEN HIS CURRENT SITUATION, AS FAR AS THE

13   ACTIVITIES OF DAILY LIVING, SOME SIMPLE TASKS OF WHAT HE DOES,

14   I FELT HE WAS ABLE TO SUFFICIENTLY DO ALMOST EVERYTHING THAT HE

15   NEEDED TO IN HIS CELL.  AND WHEN I TALKED TO HIM, I DIDN'T

16   BELIEVE THAT THE WEAKNESS, ALTHOUGH IT IS SIGNIFICANT,

17   70 PERCENT IS SIGNIFICANT FOR ANY NORMAL INDIVIDUAL I THINK YOU

18   WILL BE VERY FRUSTRATED WITH THAT, BUT IF YOU ASK A SPECIFIC

19   QUESTION, CAN HE PUT ON HIS OWN CLOTHES?  CAN HE SUFFICIENTLY

20   WASH HIS OWN CLOTHES IN HIS CELL SO THAT HE CAN HAVE CLEAN

21   CLOTHES TO WEAR, I THOUGHT HE WOULD BE ABLE TO PERFORM THOSE

22   TASKS BASED ON THE WEAKNESS.

23         THEN THE RANGE OF MOTION, I MEASURED IT.  ANOTHER

24   QUESTION CAME UP ABOUT THE DIFFERENCE BETWEEN PASSIVE RANGE OF

25   MOTION AND ACTIVE RANGE OF MOTION.

SHIN – DIRECT / MR. ANDRADA

1    Q.   WHAT IS ACTIVE RANGE OF MOTION AND PASSIVE RANGE OF

2    MOTION?

3    A.   THAT REALLY NEEDS TO BE UNDERSTOOD IN ITS PROPER CONTEXT.

4    Q.   WHAT IS THE CONTEXT?

5    A.   NOW, THERE ARE JOINTS IN OUR BODY WHERE YOUR RANGE OF

6    MOTION IS OBVIOUSLY RANGE OF MOTION AND JOINT IS VERY, VERY

7    IMPORTANT.  THAT'S -- THAT GIVES US FUNCTION.

8              THROUGH EXPERIENCE AND STUDIES AND OBSERVATION, WE

9    HAVE BEEN ABLE TO FAIRLY DETERMINE WHAT WE CALL A FUNCTIONAL

10   RANGE OF MOTION.  OKAY?  IN OTHER WORDS, WE HAVE A LOT OF

11   EXCESSIVE CAPACITY IN OUR BODY.

12             NOW, IMAGINE, IF HE HAD TO BE A PROFESSIONAL ATHLETE

13   AND HAD TO THROW A BASEBALL, IF HE HAD 5 DEGREES OF COMPROMISED

14   ELBOW EXTENSION IN THE RIGHT ELBOW, YOU ARE NOT GOING TO BE

15   ABLE TO THROW THAT BALL 90 MILES AN HOUR.  BUT I DON'T NEED TO

16   THROW A BALL 90 MILES AN HOUR.  I DON'T NEED TO SWING A GOLF

17   CLUB AT 110 MILES AN HOUR.  I DON'T NEED TO LIFT REPETITIVELY

18   50 POUNDS EVERY DAY AND PUT IT OVER MY SHOULDER LIKE SOME OF

19   THE DOCK WORKERS ARE DOING.  SO IT REALLY DEPENDS ON WHAT YOU

20   ARE DOING.

21             WE KNOW FROM EXPERIENCE AND STUDIES THAT ALL HE HAD

22   TO DO WAS JUST LIFT AND CARRY NORMAL DAILY ACTIVITIES, THAT YOU

23   CAN ACTUALLY HAVE 15 TO 20 DEGREES OF ELBOW RANGE OF MOTION

24   COMPROMISED AND STILL REMAIN FUNCTIONAL.

25             NOW, THAT QUESTION, I KNOW I AM DIGRESSING A LITTLE

SHIN – DIRECT / MR. ANDRADA

1    BIT, BUT LET ME EXPLAIN.  THAT QUESTION IS VERY IMPORTANT

2    BECAUSE SURGEONS HAVE TO ROUTINELY MAKE A DECISION WHEN THEY

3    ARE PRESENTED WITH FRACTURES OF THE ARM.  BECAUSE MANY TIMES IT

4    IS GOING TO END UP COMPROMISING THE RANGE OF MOTION.  OKAY?

5            MANY TIMES IT IS BETTER TO LEAVE IT ALONE AND LET IT

6    HEAL ON ITS OWN.  OTHER TIMES YOU HAVE TO CUT IT UP AND DO WHAT

7    THEY CALL OPEN REDUCTION IN TUNNEL FIXATION.  ACTUALLY HAVE TO

8    CUT IN THERE AND PUT A PLATE, LINE IT UP, PUT SCREWS IN THERE

9    AND LET IT HEAL.

10           AND A LOT OF QUESTION COMES UP HOW IS IT GOING TO

11   EFFECT THE RANGE OF MOTION?  HOW MUCH IS IT GOING TO EFFECT IT?

12   AND THAT QUESTION HAS COME UP WHEN YOU HAVE A FAIRLY GOOD

13   UNDERSTANDING BASED ON THE PATIENT'S FUNCTION NOW.  IF IT'S AN

14   ATHLETE, THEY ARE GOING TO GO ALL OUT TO MAKE SURE THAT

15   EVERYTHING IS PERFECT.

16           BUT SOMETIMES YOU PAY A PRICE FOR THAT.  YOU'RE

17   GOING TO END UP WITH A LARGE SCAR.  FOR WOMEN, IT'S A DIFFERENT

18   COSMETIC MAYBE MORE IMPORTANT.

19           SO TO GET TO THE POINT, IN MR. ASHKER, HE'S HAD LOSS

20   OF RANGE OF MOTION BECAUSE OF THIS PROBLEM, BUT IT IS STILL

21   WITHIN, IN ALL FAIRNESS, IT IS STILL WITHIN WHAT WE CALL A

22   FUNCTIONAL RANGE OF MOTION.  AND WHEN I EXAMINED HIM, AND WE

23   CAN CERTAINLY ASK MR. ASHKER, WHETHER OR NOT WHEN I EXAMINED

24   THE PATIENT, WHEN I EXAMINED HIM, WHETHER OR NOT I WAS CAUSING

25   PAIN.  I WAS NOT AWARE OF THAT.  I WAS NOT AWARE THAT I WAS

SHIN – DIRECT / MR. ANDRADA

1    VERY AGGRESSION.  I WAS JUST CHECKING THE RANGE OF MOTION.

2    **Q.**   GO AHEAD.

3    **A.**   TYPICALLY, PASSIVE RANGE OF MOTION -- NOT TYPICALLY, BUT

4    LET ME DEFINE.  PASSIVE RANGE OF MOTION IS THE RANGE OF MOTION

5    THAT IS ACHIEVED PASSIVELY FOR THE PATIENT'S PART.

6            SO I GO IN THERE AND I GO THROUGH THE RANGE OF

7    MOTION.  I TRY TO GET AS MUCH AS I CAN.  THAT'S PASSIVELY.

8    THEY ARE NOT PUTTING IN ANY INPUT.  SO I AM ACTUALLY DOING

9    THAT.  ACTIVE RANGE OF MOTION IS WHAT THEY ARE ABLE TO DO ON

10   THEIR OWN.

11           SO THE DIFFERENCE REALLY COMES IN WHEN WE ARE

12   LOOKING AT THE SHOULDER AND HEAD JOINTS.  THERE ARE JOINTS

13   WHERE THE CAPSULE OF THE JOINT ACTUALLY WRAPS THE JOINT BECAUSE

14   OUR SHOULDER HAS TO GET 180 DEGREES.  ACTUALLY THE JOINT LOOKS

15   LIKE THIS, (INDICATING).  WHEN YOU LOOK AT THE BONE, IT'S LIKE

16   MORE OF A FLAT SURFACE.  AND THE JOINT IS SITTING LIKE THIS

17   (INDICATING).  AND SO THE CAPSULE HAS TO -- THE JOINT CAPSULE

18   HAS TO WRAP THE HEAD OF THE ARM SO IT DOESN'T JUST COME OFF.

19   THEN THAT CAPSULE CAN HARDEN, IT CAN CAUSE PAIN, AND GIVE YOU A

20   SHOULDER FREEZE.  AND BECAUSE OF PAIN, WHEN YOU ASK THEM, OKAY,

21   GO AHEAD AND LIFT YOUR ARM THIS WAY (INDICATING).  AND THEN YOU

22   GO OH, IT HURTS.

23           AND THEN, OKAY, THEN YOU GO IN THERE AND HAVE THEM

24   RELAX THEIR MUSCLES, AND THEN YOU TAKE IT, GENTLY PUT SOME

25   PRESSURE, AND THEN YOU GET A LITTLE BIT MORE RANGE OF MOTION.

1        THE REASON WE DO THAT IS SOMETIMES WE WANT TO TELL

2   THE DIFFERENCE, SO THEY CAN TELL THE PATIENT I KNOW IT HURTS,

3   BUT YOU CAN GO A LITTLE MORE.  THIS IS WHAT I WANT YOU TO TRY

4   TO GO GET TO.

5        THERE ARE SITUATIONS WHERE YOU HAVE INTRINSIC

6   PROBLEM OF THE JOINT ITSELF WHERE YOU CAN'T GET PASSED A

7   CERTAIN DEGREE.  OKAY.  SO THEN WE WOULD SEE THE LIMITATION OF

8   THE PASSIVE RANGE OF MOTION.  NO MATTER WHAT YOU DO, IT'S STUCK

9   AT 70 DEGREES OR 120 DEGREES WHERE THE NORMAL IS 180.

10        SO IN THOSE SITUATIONS, IT'S IMPORTANT TO DOCUMENT

11   THE PASSIVE AND ACTIVE RANGE OF MOTION.

12   Q.   WITH REGARD TO PASSIVE RANGE OF MOTION --

13   A.   IN MR. ASHKER'S CASE, THE ACTIVE AND PASSIVE RANGE OF

14   MOTION MAY HAVE BEEN PERTINENT AND RELEVANT IF HE HAD SOME KIND

15   OF A JOINT DESTRUCTIVE PROCESS OF THE WRIST JOINT, AND THERE

16   ARE MULTIPLE JOINTS THERE, AND HE WAS IN SO MUCH PAIN IN THE

17   JOINT THAT THE ACTUAL MOVEMENT OF THE JOINT CAUSED A LOT OF

18   PAIN.

19        SO, REMEMBER, IF WE HAVE PAIN, WE DON'T WANT TO MOVE

20   IT TOO MUCH.  HE MAY BE MOVING IT JUST A LITTLE BIT BECAUSE OF

21   PAIN.  THEN IF I EXAMINE, I MAY BE ABLE TO GO A LOT FARTHER

22   THAN THAT.  OF COURSE HE WOULD SCREAM IN PAIN AND THEN YOU SEE

23   THAT A LOT IN RHEUMATOID ARTHRITIS PATIENTS, OSTEOARTHRITIS

24   PATIENTS WHERE YOU ACTUALLY HAVE JOINT DESTRUCTION.

25   Q.   IS THERE ANY JOINT DESTRUCTION HERE --

1    **A.**   NO.

2    **Q.**   -- OR JOINT ATROPHY?

3    **A.**   WE ARE NOT DEALING WITH JOINT DESTRUCTION WITH MR. ASHKER.

4    SO I WANT, I REALLY WANTED TO CLARIFY WHAT IT IS THAT WE ARE

5    DEALING WITH WITH MR. ASHKER SO WE CAN ALL UNDERSTAND WHAT

6    WOULD BE AN APPROPRIATE MEDICAL TREATMENT, WHAT WOULD BE

7    INAPPROPRIATE MEDICAL TREATMENT BECAUSE WE ARE GOING TO BE

8    TALKING ABOUT THE PAIN, RIGHT?

9    **Q.**   SO WHAT IS HIS PASSIVE RANGE OF MOTION --

10   **A.**   HE HAS HAD -- I CAN GIVE YOU THE NUMBERS, BUT BASICALLY HE

11   HAS WHAT WE CALL FUNCTIONAL RANGE OF MOTION.

12           IN OTHER WORDS, UNLESS HE IS AN ATHLETE, UNLESS HE'S

13   IN A VOCATION WHERE REPETITIVE USE OF THE WRIST AND THEN THE

14   STRENGTH IS ALL IMPORTANT.

15           IN TERMS OF JUST DOING ACTIVITIES OF DAILY LIVING,

16   EVEN INSTRUMENTAL ACTIVITIES OF DAILY LIVING, YOU DON'T NEED TO

17   HAVE FULL 80 DEGREES OF EXTENSION FOR 70 DEGREES OF FLEXION OF

18   THE WRIST AND 30 DEGREES -- 45 DEGREES LATERAL DEVIATION,

19   30 DEGREES MEDIAL DEVIATION, WHICH IS CONSIDERED A NORMAL FULL

20   RANGE OF MOTION, WE DON'T NEED TO HAVE ALL THAT RANGE OF MOTION

21   TO STAY FUNCTIONAL.

22           REMEMBER, FUNCTION, WE HAVE TO PUT IT IN THE PROPER

23   CONTEXT BECAUSE IF YOU ARE GOING TO THROW A BASEBALL, YOU ARE

24   GOING TO HAVE TO HAVE -- IF YOU'RE GOING TO BE A GYMNAST,

25   YOU'RE GOING TO HAVE TO HAVE MORE THAN, YOU KNOW, 80 -- IF

SHIN – DIRECT / MR. ANDRADA

1    YOU'RE GOING TO BE A CONTORTIONIST, YOU'RE GOING TO HAVE TO

2    HAVE 150 DEGREES OF RANGE OF MOTION, ET CETERA, ET CETERA.

3            SO YOU HAVE TO PUT IT IN THE PROPER CONTEXT OF WHAT

4    IT MEANS TO BE FUNCTIONAL.  AND THAT IS THE MOST IMPORTANT PART

5    OF CHRONIC PAIN MANAGEMENT IS MAINTENANCE, RESTORATION, AND

6    IMPROVEMENT OF FUNCTION.

7    **Q.**  SO THEN, AGAIN, IN THE INTEREST OF TIME, DOCTOR, HE DOES

8    HAVE A FUNCTIONAL RANGE OF MOTION --

9    **A.**  YES.

10   **Q.**  -- IN THE WRIST?

11   **A.**  YES.

12   **Q.**  CORRECT BECAUSE THERE'S NO PATHOLOGY IN THE JOINT,

13   CORRECT?

14   **A.**  CORRECT.

15   **Q.**  AND YOU HAVE TALKED ABOUT HIS ABILITY TO USE THE FOREARM,

16   CORRECT?

17   **A.**  YES.

18   **Q.**  OKAY.  AND, AGAIN, I APOLOGIZE, BUT WE DO HAVE TIME

19   CONSTRAINTS.  I APPRECIATE VERY MUCH YOUR TESTIMONY AND

20   PROVIDING US THAT PERSPECTIVE.

21           IF YOU WOULD BE SO KIND -- CAN WE TURN OUR -- IS

22   THERE ANYTHING MORE THAT'S, IN YOUR MIND, REALLY, REALLY

23   SIGNIFICANT ABOUT HIS PHYSICAL EXAM?

24   **A.**  I THINK THE MOST IMPORTANT PART, THE WEAKNESS THAT IS

25   ALWAYS GOING TO BE A PROBLEM, AND THE FACT THAT HE HAS LOST A

1    LOT OF MUSCLE MASS.  I THINK THAT COMPARED TO HIS NORMAL LEFT

2    SIDE, LET'S SAY HE FELL AND HIT HIS ARM ON A SHARP CORNER OF A

3    TABLE.  IF THE SAME EVENT HAPPENED, WHEN COMPARED TO THE LEFT

4    SIDE, RIGHT SIDE, I THINK IT'S MORE LIKELY TO CAUSE MORE INJURY

5    PERHAPS ADDITIONAL FRACTURE TO THE RIGHT SIDE BECAUSE HIS ARM

6    IS COMPROMISED.

7              BUT OTHER THAN THAT, IN TERMS OF ACTIVITIES,

8    ACTIVITIES OF DAILY LIVING, I DON'T THINK THERE HAS BEEN MUCH

9    COMPROMISE.  NOW, THERE IS DEFINITELY A COMPROMISE.  HE HAS GOT

10   TO BE FRUSTRATED NOT ONLY FOR PAIN, BUT BECAUSE THE WEAKNESS

11   AND THE WEIGHT OF IT NO MATTER WHAT HE DOES.

12             THE QUESTION IS, IS HE ABLE TO ACCOMPLISH THOSE

13   TASKS WITHIN A REASONABLE TIME FRAME AND WITHIN A REASONABLE

14   EXPECTATION AS A HUMAN BEING.  I THINK THE ANSWER IS, YES, HE

15   IS ABLE TO STILL -- HE HAS GOOD USE OF THE HANDS IS BASICALLY

16   WHAT I AM TRYING TO SAY.

17   Q.   RIGHT.  SO WITH THAT IN MIND, LET US TURN NOW TO A

18   DISCUSSION OF HIS MANAGEMENT.

19             YOU ARE FAMILIAR, BY VIRTUE OF READING THE RECORDS,

20   THAT HE WAS PRESCRIBED TRAMADOL AND VARIOUS OTHER MEDICATIONS,

21   WITH THE TRAMADOL BEGINNING IN 2002, AND ESSENTIALLY, IN SIMPLE

22   TERMS, BEING CONTINUED THROUGH AUGUST OR SEPTEMBER OF 2006,

23   CORRECT?

24   A.   YES.

25   Q.   YOU ARE, OF COURSE, FAMILIAR WITH TRAMADOL --

1    **A.**    YES.

2    **Q.**    -- CORRECT?

3            AND GENERALLY IS IT REASONABLE FOR PHYSICIANS

4    MANAGING A CASE SUCH AS MR. ASHKER'S TO EMPLOY VARIOUS TYPES OF

5    DRUG MODALITIES TO DEAL WITH HIS COMPLAINTS?

6    **A.**    YES.

7    **Q.**    PLEASE EXPLAIN JUST A LITTLE BIT IN THAT REGARD.

8    **A.**    I CAN'T.  THAT'S--

9    **Q.**    THAT'S A BIG ONE?

10   **A.**    THAT'S A VERY GENERAL QUESTION.  ASK ME A SPECIFIC

11   QUESTION.

12   **Q.**    YOU BET.

13           THERE ARE VARIOUS TYPES OF MEDICATIONS THAT WOULD BE

14   APPROPRIATE TO USE IN A PATIENT SUCH AS MR. ASHKER, CORRECT?

15   **A.**    LET ME JUST TAKE FIVE MINUTES TO EXPLAIN, BECAUSE YOU

16   REALLY --

17   **Q.**    OKAY.  HOW ABOUT TWO MINUTES?

18   **A.**    TWO MINUTES.  TELL ME WHEN TWO MINUTES IS UP.

19   **Q.**    ALL RIGHT.

20   **A.**    WHEN WE ARE DEALING WITH CHRONIC PAIN, YOU HAVE TO

21   CATEGORIZE THE DIFFERENT SECTIONS.  THERE ARE CHRONIC PAIN --

22   WHERE -- IF THE PAIN IS LEFT UNTREATED, YOU ARE GOING TO END UP

23   WITH DEMONSTRABLE, OBSERVABLE TISSUE DAMAGE.

24           ONE EXAMPLE IS CANCER PAIN.  WHEN YOU HAVE CANCER

25   AND WHEN YOU HAVE TUMOR, WHAT HAPPENS IS THAT THE TUMOR CELLS

SHIN – DIRECT / MR. ANDRADA

```
1   EXPLODE, BASICALLY, AND THEY GO TOO BIG AND THEN THE BLOOD

2   VESSELS RUPTURE AND IT RELEASES A LOT OF DIFFERENT CHEMICALS,

3   ONE OF WHICH IS TUMOR NECROSIS FACTOR.  THAT IS A MASS OF

4   STUFF.  WHAT IT DOES IS IT GOES THROUGH THE ENTIRE BODY.  IT

5   CAUSES WHAT WE CALL A PAN INFLAMMATION.  YOU CAN ACTUALLY --

6              THE COURT:  I'M SORRY, DR. SHIN.  COULD YOU USE AN

7   EXAMPLE THAT'S RELEVANT TO THE CASE?  WE REALLY NEED TO STICK

8   TO THIS CASE.

9              MR. ANDRADA:  MOVE FORWARD.

10             THE COURT:  IT'S VERY INTERESTING, BUT WE DO NEED

11  TO --

12             THE WITNESS:  THERE ARE --

13             THE COURT:  -- CONFINE OURSELVES TO THIS INJURY AND

14  THIS CASE.

15             THE WITNESS:  THERE ARE CONDITIONS WHERE YOU HAVE TO

16  TREAT THE PAIN.

17             WHAT I AM SAYING IN MR. ASHKER'S CASE, EVEN IF YOU

18  LEFT THE PAIN UNTREATED, OKAY, THIS IS A CONDITION WHERE IT'S

19  NOT GOING TO RESULT IN ANY APPRECIABLE UNDERLYING TISSUE

20  DAMAGE, UNDERLYING JOINT DAMAGE.

21             IF YOU LEAVE RHEUMATOLOGIC CONDITION, RHEUMATOID

22  ARTHRITIS PAIN UNTREATED, THEN YOU WILL END UP IN TWO YEARS

23  MORE DESTRUCTIVE OF THE JOINT, RIGHT, AND YOU CAN SEE THAT ON

24  THE X-RAY.

25             IF MR. ASHKER HAD DEVELOPED CHRONIC REGIONAL PAIN
```

1    SYNDROME, WHICH IS WHAT DR. FRIEDMAN BRIEFLY REFERRED TO, IF

2    THAT WAS LEFT UNTREATED, HIS CONDITION WOULD HAVE SIGNIFICANTLY

3    WORSENED WHERE WE WOULD HAVE BEEN READILY BEEN ABLE TO OBSERVE

4    THE DIFFERENCE OVER A SPAN OF SIX MONTHS, OR CERTAINLY BY A

5    SPAN OF TWO TO FIVE YEARS.

6            HE HAS ONE OF THOSE CONDITIONS WHERE I RECOGNIZE IT

7    IS A CHRONIC PAIN.  I RECOGNIZE THAT HE AT LEAST BE TREATED,

8    BUT IT IS ONE OF THOSE CONDITIONS WHERE THE SPECIFIC TREATMENT

9    OF THE PAIN ITSELF IS NOT CRITICAL OR CRUCIAL TO THE OVERALL

10   MANAGEMENT OF THAT PARTICULAR PROBLEM.

11           AND I DON'T EXPECT PEOPLE TO UNDERSTAND UNTIL I

12   SPEND A LITTLE TIME EXPLAINING THE CONCEPT.  IT IS VERY

13   IMPORTANT.

14   **BY MR. ANDRADA:**

15   **Q.**  I THINK YOU -- I WOULD LOVE TO HAVE YOU HAVE THE TIME, BUT

16   UNFORTUNATELY WE DO NEED TO PUSH ON A LITTLE BIT MORE.  BUT,

17   SO, LET ME SEE IF I CAN ASK YOU THIS.

18           YOU ARE AWARE, CORRECT, THAT THE TRAMADOL WAS

19   DISCONTINUED IN AUGUST AND SEPTEMBER OF 2006, CORRECT?

20   **A.**  YES.

21   **Q.**  AND BY THE WAY, PARENTHETICALLY, YOU ARE FAMILIAR WITH

22   TRAMADOL, ARE YOU NOT?

23   **A.**  YES.

24   **Q.**  YOU USE IT IN YOUR PRACTICE, CORRECT?

25   **A.**  YES.

1    Q.   ARE THERE CERTAIN RISKS ASSOCIATED WITH TRAMADOL?

2    A.   THERE ARE, BUT IT'S NOT IMPRESSIVE.  TRAMADOL IS A VERY

3    SAFE AND MILD DRUG.

4    Q.   IS THERE -- ARE THERE REPORTS IN THE LITERATURE WITH

5    REGARD TO THE ASSOCIATION OF TRAMADOL AND SEIZURES?

6    A.   YES.

7    Q.   ALL RIGHT.  AND ARE THERE REPORTS IN THE LITERATURE ABOUT

8    DEPENDENCE AND ABUSE WITH REGARD TO TRAMADOL?

9    A.   THERE IS, BUT YOU REALLY HAVE TO ANSWER THAT QUESTION IN

10   THE CONTEXT OF REALITY.

11          TRAMADOL IS, YOU KNOW, MANY, ALMOST ALL THE PAIN

12   MEDICATION HAVE SOME STREET VALUE, BUT BASED ON MY PRACTICE --

13   NOW, IN THE PRISON SETTING IT IS A DIFFERENT QUESTION.  BUT

14   THERE IS NO STREET VALUE TO TRAMADOL.

15          IN OTHER WORDS, THE -- AND THEN WHEN THEY HAVE

16   LOOKED AT STUDIES -- I HAVE SEEN -- I HAVE HAD TWO PATIENTS

17   THAT HAVE HAD PROBLEMS WITH DEPENDENCE AND ADDICTION WITH USE

18   OF TRAMADOL, BUT THEY WERE TAKING A SIGNIFICANT HIGHER DOSE

19   THAN TWO A DAY, SO THERE IS A CONCERN.  THERE IS DEFINITELY A

20   CONCERN, BUT IT IS NOT OBVIOUSLY NEAR THE CONCERNS THAT WE HAVE

21   WITH VICODIN AND OTHER OPIATE PRODUCTS.

22   Q.   LET ME GET TO THE HEART.

23          WAS IT REASONABLE AND APPROPRIATE AND WITHIN THE

24   STANDARD OF CARE FOR THE MEDICAL PROVIDERS AT PELICAN BAY TO

25   STOP PRESCRIBING TRAMADOL IN AUGUST AND SEPTEMBER OF 2006?

SHIN – DIRECT / MR. ANDRADA

1    **A.**    THE SIMPLE ANSWER IS IT WAS APPROPRIATE.  ALTHOUGH, I WILL

2    SAY THAT IT WAS APPROPRIATE BECAUSE THE DECISION IS PRIMARILY

3    THE TREATER'S DECISION.

4    **Q.**    PLEASE EXPLAIN.

5    **A.**    BECAUSE IF THE PATIENT WALKED INTO MY CLINIC AND HAD THIS

6    CONDITION, I WOULD HAVE ACTUALLY NO PROBLEM PRESCRIBING TWO

7    TRAMADOLS A DAY.  THAT WOULD BE MY DECISION.

8    **Q.**    WHY WAS THIS DECISION BY DR. SAYRE REASONABLE?

9    **A.**    BECAUSE THERE'S SUCH A HUGE LATITUDE, OKAY, WHEN WE ARE

10   DEALING WITH CHRONIC PAIN, I AM TALKING ABOUT CHRONIC PAIN THAT

11   DOESN'T -- LEFT UNTREATED THAT DOES NOT RESULT IN TISSUE

12   DAMAGE, YOU HAVE ALREADY ESTABLISHED THAT.

13   **Q.**    CORRECT.

14   **A.**    SOME MAY ARGUE WITH ME, BUT WE CAN ARGUE, TALK ABOUT IT,

15   BUT WHEN YOU ARE TALKING ABOUT CHRONIC SPINAL PAIN, LUMBAR DISC

16   PAIN, OTHER PAIN, CHRONIC WRIST PAIN, POST-TRAUMATIC KIND OF

17   PAIN, THERE'S SUCH A WIDE RANGE OF HOW MUCH MEDICATION CAN BE

18   USED TO TREAT THAT PARTICULAR CONDITION.

19          NOW, I CAN'T SAY THE SAME FOR HYPERTENSION OR

20   DIABETES.  IF YOU HAD DIABETES, DIABETIC CONDITION, IT DOESN'T

21   MATTER, PEOPLE ON THE EAST COAST, WEST COAST, SOUTH, YOU ARE

22   GOING TO GET SAME AMOUNT, MAYBE SOME VARIATION, OKAY, BUT WHEN

23   IT COMES TO PAIN MEDICATION, THE VARIATION IS SO HUGE THAT WE

24   HAVE NOT BEEN ABLE TO COME UP WITH ANY SORT OF GUIDELINE TO

25   TELL, TO GUIDE THE PHYSICIAN.  I WISH THERE WAS.  BECAUSE THIS

1    MEANS THAT WHEN YOU GO OUT INTO THE STANDARD OR COMMUNITY, WHEN

2    YOU SEE PHYSICIANS IN PRACTICE, OKAY, FROM ONE DOOR TO NEXT

3    DOOR FOR THE SAME DIAGNOSIS, OKAY, FOR, EVEN FOR THE SAME

4    PATIENT, YOU WILL HAVE PHYSICIANS THAT PRESCRIBE 200 TO 800

5    MILLIGRAMS OF OXYCONTIN AND YOU HAVE ANOTHER PHYSICIAN THAT

6    PRESCRIBES TWO TRAMADOLS FOR THE SAME CONDITION.

7              NOW, IF THAT WAS WRONG, IF THAT WAS WRONG THING TO

8    DO, SOMEBODY WOULD HAVE BEEN SUED ALREADY OR SOME COURT WOULD

9    HAVE MADE A DETERMINATION AND SAID, HEY, DOCTOR A, YOU'VE

10   OVERTREATED THIS PATIENT BECAUSE FOR THIS DIAGNOSIS, MOST

11   EVERYONE AGREES THEY SHOULD ONLY USE 60 MILLIGRAMS OF

12   OXYCONTIN.

13             THERE HAS YET TO BE A LAW CASE IN THE UNITED STATES

14   THAT I AM AWARE OF --

15             **THE COURT:**  WELL, YOU NEED TO CONFINE YOURSELF TO

16   EXPERT INFORMATION, NOT TO LEGAL RESEARCH.

17             **THE WITNESS:**  RIGHT.  SO THERE'S SUCH A --

18             **THE COURT:**  WHY DON'T WE STOP AT THIS POINT AND SEE

19   IF COUNSEL HAS ANOTHER QUESTION FOR YOU.

20   **BY MR. ANDRADA:**

21   **Q.**   SURE.

22             YOU HAVE COMMENTED UPON THE WIDE RANGE OF OPTIONS TO

23   TREAT A CONDITION SUCH AS MR. ASHKER HAS; IS THAT CORRECT?

24   **A.**   YES.

25   **Q.**   AND IT LITERALLY CAN CHANGE FROM DOOR-TO-DOOR, CORRECT?

1   **A.**   YES.

2   **Q.**   MIGHT EVEN CHANGE WITHIN A PRACTICE GROUP, THAT IS TO SAY,

3   A GROUP OF DOCTORS WHO WORK TOGETHER, CORRECT?

4   **A.**   ABSOLUTELY.

5   **Q.**   FOR EXAMPLE, THERE IS SOME DOCTORS WHO WILL NOT --

6               **THE COURT:**   COUNSEL, WE ARE GETTING VERY, VERY

7   LEADING HERE.

8   **BY MR. ANDRADA:**

9   **Q.**   AND SO WHAT IS REASONABLE TO TAKE -- WHAT IS REASONABLE

10  FOR A PRACTITIONER TO TAKE INTO ACCOUNT WHEN HE OR SHE MAKES

11  THE DECISION TO GO FROM TRAMADOL TO OTHER MEDICATIONS?

12              IN OTHER WORDS, WHAT WOULD THEY LOOK AT?  WHAT WOULD

13  BE REASONABLE TO CONSIDER?

14  **A.**   OBVIOUSLY, LISTEN TO PAIN, THAT'S WHERE WE START.  IF THE

15  PATIENT HAD NO PAIN, WE DON'T HAVE TO WORRY ABOUT IT.  WHEN

16  THEY SAY THEY HAVE PAIN, WE VERY CLOSELY LOOK AT THE CYCLE

17  SOCIAL STRUCTURE OF THAT PARTICULAR PATIENT.

18  **Q.**   WHAT DO YOU MEAN?

19  **A.**   PSYCHOLOGY AND SOCIAL ISSUES.

20  **Q.**   PLEASE EXPLAIN.

21  **A.**   IT'S ONE WORD, FUNCTION.  GIVEN THAT PERSON'S CONTEXT.

22              IN OTHER WORDS, I WILL HAVE A PATIENT THAT HAS A LOT

23  OF BACK PAIN THAT WANTS TO WORK AS AN IRON WORKER.  THAT'S THE

24  ONLY THING HE KNOWS WHAT TO DO.  HE SAYS, DOC, I CAN'T DO THIS

25  WORK UNLESS I TAKE THIS AMOUNT OF MEDICATION.  AND THEN I TRY

1    THAT AMOUNT OF MEDICATION.  HE STAYS EMPLOYED, HE'S MAKING

2    MONEY, HE'S TAKING CARE OF HIS FAMILY.  HE COMES BACK, HE

3    DOESN'T ABUSE THE MEDICATIONS, I AM FINE WITH IT.

4              I'LL USE SIX NORCOS A DAY EVERY SINGLE DAY FOR --

5              **THE COURT:**  YOU WANT TO SPELL THAT MEDICATION?

6              **THE WITNESS:**  N-O-R-C-O.  I'M SORRY, THAT'S LIKE A

7    VICODIN OR AN OPIATE MEDICATION -- FOR THE REST OF HIS LIFE AND

8    NOT WORRY ABOUT IT BECAUSE THE MEDICATION HAS HELPED IMPROVE

9    HIS FUNCTION; NAMELY, MAINTAIN HIS JOB.

10             IF I HAVE ANOTHER PERSON THAT COMES IN, TELLS ME

11   THAT HE'S NOT DOING ANYTHING, HE JUST WORRY ABOUT PAIN, CRYING

12   AND CRYING, IS DEPRESSED.  AND I TRY LITERALLY MEDICATION.

13   THEY COME BACK.  THEY ARE DOING THE SAME THING, THE PAIN IS

14   UNCHANGED.  THEN I AM GOING TO GET THEM OFF THE MEDICATIONS FOR

15   SAME DIAGNOSIS, SAME CLINICAL MEDICAL DIAGNOSIS.  THE TREATMENT

16   IS GOING TO BE DIFFERENT.

17             SO, THE APPROPRIATE PAIN TREATMENT IS VERY, VERY

18   HEAVILY DEPENDENT ON THE PATIENT'S FUNCTION AND WHAT WE ARE

19   ABLE TO ACCOMPLISH WITH THAT PARTICULAR MEDICATION.

20             AND IN THIS SITUATION, THE BEST PERSON TO MAKE THAT

21   DETERMINATION IS NOT SOME CONSULTING PHYSICIAN THAT FLIES OUT

22   TO LOOK AT THE PATIENT FOR ONE DAY AND TRIES TO GATHER AS MUCH

23   INFORMATION OR SOMEONE WHO DOES TELEMEDICINE OR SOMEONE WHO

24   JUST REVIEWS THE MEDICAL RECORDS, BUT SOMEONE WHO HAS EMERSED

25   THEMSELVES IN THE TREATMENT OF THESE PATIENTS IN THAT

1    PARTICULAR SOCIAL ECONOMIC -- I'M SORRY, PSYCHOSOCIAL SITUATION

2    AND MAKES THE RIGHT DECISION.

3    **BY MR. ANDRADA:**

4    **Q.**   YOU ARE TALKING ABOUT THE PRIMARY CARE TREATERS AT PELICAN

5    BAY, MS. RISENHOOVER, DR. ROWE --

6    **A.**   CORRECT.

7    **Q.**   -- AND TO SOME EXTENT DR. SAYRE AS WELL, CORRECT?

8    **A.**   CORRECT.

9            AND I WILL SAY, I DON'T UNDERSTAND THE PRISON

10   SYSTEM.  I DISAGREE WITH DR. SAYRE'S CONCLUSIONS ABOUT

11   WITHHOLDING TWO TRAMADOLS.  I WOULD GIVE IT TO HIM IN A

12   HEARTBEAT IF HE WALKED INTO MY CLINIC.  I DON'T HAVE PROBLEMS

13   WITH TRAMADOL.

14   **Q.**   BUT WAS IT REASONABLE FOR DR. SAYRE TO DO THAT?

15   **A.**   CORRECT.

16           IT WAS REASONABLE FOR HIM BECAUSE, AGAIN, THE

17   STANDARD OF CARE FOR PAIN IS SO, THERE'S SO MUCH VARIATION THAT

18   I CANNOT PASS -- IF HE DID THE SAME THING WITH A DIABETIC

19   CONDITION, I CAN EASILY PASS JUDGMENT.

20           WHEN IT COMES TO PAIN -- IF HE DID THAT WITH

21   RHEUMATOID ARTHRITIS OR CANCER PAIN, I CAN PASS JUDGMENT AND

22   SAY THAT WAS NOT REASONABLE BECAUSE YOU NEEDED TO CONTROL THAT

23   PAIN.  BUT WE ARE DEALING WITH A MUSCULOSKELETAL PAIN THAT IS

24   DIFFERENT IN NATURE THAN OTHER TYPE OF PAIN CONDITION IF LEFT

25   UNTREATED WOULD RESULT IN DEFINITIVE TISSUE DAMAGE.

SHIN – DIRECT / MR. ANDRADA

1           AND THEN WE HAVE SUCH A WIDE VARIATION THAT I AM NOT

2    ABLE TO PASS THAT JUDGMENT.  IF YOU ASK ME A QUESTION, A

3    DIFFERENT QUESTION TO PASS JUDGMENT ON HIS REASONING, I CAN

4    PERHAPS DO THAT.  BUT I GOT TO LEAVE IT TO HIM TO BE THE

5    TREATER.  I'VE GOT TO LET HIM MAKE THE DECISION BECAUSE HE

6    UNDERSTANDS THE PELICAN SITUATION, THE PRISON SITUATION, THE

7    PSYCHOSOCIAL SITUATION OF THAT PARTICULAR SETTING.  THE TYPE OF

8    INFORMATION IS NOT AVAILABLE TO ME.

9    Q.   ALL RIGHT.

10          SO THEN DO YOU HAVE AN UNDERSTANDING THAT MR. ASHKER

11   WAS CHANGED FROM TRAMADOL TO TYLENOL AND IBUPROFEN IN

12   APPROXIMATELY SEPTEMBER OF 2006?

13   A.   YES.

14   Q.   AGAIN, IS THAT A REASONABLE APPROACH AND WITHIN THE

15   STANDARD OF CARE TO TREAT A PATIENT SUCH AS MR. ASHKER?

16   A.   AGAIN, STANDARD OF CARE IS REALLY LEFT DEPENDENT ON WHAT

17   THE TREATER WANTS TO DO WITH THAT PARTICULAR PAIN.  I DIDN'T

18   SEE ANY PROBLEMS WITH THAT.

19   Q.   VERY GOOD.

20          NOW, LET'S MOVE ON.  I WANT TO TRY TO KEEP MOVING

21   HERE.  WE HAVE A TIGHT SCHEDULE UNFORTUNATELY, DOCTOR.

22          DO YOU HAVE AN UNDERSTANDING THAT MR. ASHKER WAS ON

23   PHYSICAL THERAPY FOR SEVERAL YEARS AND THAT THAT WAS STOPPED IN

24   EARLY 2007?

25   A.   YES.

SHIN – DIRECT / MR. ANDRADA

1  Q.   I WANT YOU TO ASSUME THAT THE PHYSICAL THERAPIST HIMSELF

2  TESTIFIED HERE IN COURT THAT HE DID NOT BELIEVE THAT THE

3  PATIENT NEEDED FORMAL PHYSICAL THERAPY FROM A MEDICAL POINT OF

4  VIEW, OKAY?

5  A.   CORRECT.

6  Q.   DO YOU HAVE AN OPINION AS TO WHETHER IT WAS REASONABLE FOR

7  THE TREATERS AT PELICAN BAY TO HALT HIS PHYSICAL THERAPY IN

8  FEBRUARY OR MARCH OF 2007?

9  A.   I DIDN'T BELIEVE THAT WAS INAPPROPRIATE.

10  Q.   PLEASE EXPLAIN --

11          THE COURT:  I AM SORRY, I DIDN'T HEAR YOU.

12          THE WITNESS:  I DID NOT BELIEVE THAT WAS

13  INAPPROPRIATE.

14  BY MR. ANDRADA:

15  Q.   WHY WAS THAT REASONABLE WITHIN THE STANDARD OF CARE?

16  A.   PHYSICAL THERAPY IS SAME THING AS MEDICATIONS.  IT'S ALL

17  ABOUT FUNCTION.

18          IF THE PATIENT HAD SIGNIFICANT ABSORBABLE

19  DETERIORATION OF FUNCTION, THEN IT WOULD BE APPROPRIATE TO

20  PROVIDE A SHORT COURSE OF PHYSICAL THERAPY.

21          IN CHRONIC PAIN, MUSCULOSKELETAL PAIN, PHYSICAL

22  THERAPY IS USED TO RESTORE FUNCTION.  WHEN THERE HAS BEEN A

23  DETERIORATION, WHEN THERE'S A FLAREUP, WHEN THERE'S A SYMPTOM

24  EXACERBATION OR NEW INJURY, THEN YOU PROVIDE A SHORT COURSE OF

25  PHYSICAL THERAPY.

1           AND REALLY THE PURPOSE OF PHYSICAL THERAPY IS TO

2    REVIEW EXERCISE PROGRAM, AND THEN WE DO PROVIDE A LITTLE BIT OF

3    PASSIVE TREATMENT TO KIND OF COMFORT THE PATIENT, BUT THAT

4    COMPONENT IS NOT THAT IMPORTANT.  BUT WHAT IS IMPORTANT IS TO

5    REVIEW, EDUCATE, AND EMPHASIZE HOME EXERCISE PROGRAMS THAT THEY

6    CAN LEARN TO MANAGE THEIR SYMPTOMS ON THEIR OWN.

7    **Q.**   SO THEN, DOCTOR, WOULD IT BE THEN APPROPRIATE -- LET ME

8    SORT OF SUMMARIZE, AGAIN, IN THE INTEREST OF TIME HERE.

9           BASED UPON YOUR REVIEW OF THE MATERIALS THAT YOU

10   WERE PROVIDED, WHICH WERE MEDICAL RECORDS AND THE DEPOSITION OF

11   DR. WEINSTEIN, IF I RECALL; IS THAT CORRECT?

12   **A.**   CORRECT.

13   **Q.**   AND YOUR EXAMINATION OF THE PATIENT, IS IT YOUR OPINION

14   THEN THAT DR. SAYRE PERSONALLY MET THE STANDARD OF CARE IN HIS

15   MANAGEMENT OF MR. ASHKER?

16   **A.**   I DIDN'T SEE ANY PROBLEMS WITH THAT.

17           **MR. ANDRADA:**  THANK YOU VERY MUCH.  THAT'S ALL I

18   HAVE.

19           **THE COURT:**  GO AHEAD.

20                   **CROSS-EXAMINATION**

21   **BY MR. ASHKER:**

22   **Q.**   GOOD AFTERNOON, DR. SHIN.

23   **A.**   GOOD AFTERNOON.

24   **Q.**   BRIEFLY, HOW MANY CASES HAVE YOU TESTIFIED AS AN EXPERT

25   WITNESS?

SHIN – CROSS / MR. ASHKER

1   **A.**   ACTUALLY APPEARING IN COURT?

2   **Q.**   YES.

3   **A.**   I THINK THIS MAY BE MY FIFTH OR SIXTH.

4   **Q.**   HOW MANY HAVE YOU PROVIDED CONSULTING SERVICES ON?

5   **A.**   MEDICAL/LEGAL ISSUES?

6   **Q.**   YES.

7   **A.**   IF YOU MEAN BY CONSULTING SERVICE LIKE EVALUATING A

8   PATIENT THAT IS NOT MY PATIENT, JUST FOR PROVIDING A

9   MEDICAL/LEGAL OPINION?

10  **Q.**   YES.

11  **A.**   I DO UTILIZATION REVIEWS, WHICH IS REVIEW OF WHAT OTHER

12  PHYSICIANS DO.  AND I REVIEW IT AGAINST THE CURRENT CALIFORNIA

13  STATE LABOR CODE.  SO I DO A LOT OF THOSE REVIEWS.  I DO THOSE

14  ON A DAILY BASIS.

15  **Q.**   AND YOU CHARGE A FEE FOR YOUR EXPERT CONSULTING SERVICES,

16  CORRECT?

17  **A.**   YES.

18  **Q.**   AND HOW MUCH DID YOU MAKE IN THE YEAR 2008 FROM YOUR

19  CONSULTING SERVICES?

20          **MR. ANDRADA:**  I DON'T THINK THAT QUESTION IS

21  APPROPRIATE, YOUR HONOR.

22          **THE COURT:**  YOU MAY ASK HOW MUCH HE EARNED FROM THIS

23  CASE.

24          **MR. ASHKER:**  OKAY.

25          **THE COURT:**  PROPORTION BETWEEN PLAINTIFF WORK AND

1    DEFENDANT WORK.

2              **MR. ASHKER:**  OKAY.

3    **BY MR. ASHKER:**

4    **Q.**   HOW MUCH HAVE YOU MADE FOR YOUR WORK FOR THE DEFENDANTS ON

5    THIS CASE?

6    **A.**   I CHARGE $600 AN HOUR.  AND I TOOK A FULL DAY TO FLY OUT

7    TO -- SO THAT WAS -- I THINK I CHARGED EIGHT HOURS FOR THAT.

8    AND THEN I THINK THE MEDICAL RECORDS, I HAD AN ASSISTANT --

9    **Q.**   EXCUSE ME, DR. SHIN.

10   **A.**   I DON'T KNOW THE TOTAL --

11   **Q.**   FOR THE PERIOD OF TIME, JUST AN ESTIMATE FOR THE TOTAL

12   AMOUNT, JUST AN ESTIMATE.

13   **A.**   AGAIN, I THINK IT SHOULD BE PART OF THE RECORDS.  I HAVE

14   SENT MY BILLS.  I AM GIVING YOU A NUMBER OF HOURS, SO YOU CAN

15   KIND OF -- SO EIGHT HOURS.  PLUS I THINK I DID, MY RECORDS

16   REVIEW WAS ABOUT FOUR HOURS.  PLUS FIVE HOURS REPORT

17   PREPARATION, AND THEN THERE WAS ANOTHER THREE, FOUR HOURS FOR

18   DEPOSITION REVIEW.

19              SO WHAT IS THAT, ABOUT 20 SOME HOURS AT $600 AN HOUR

20   IS WHAT I HAVE CHARGED.

21   **Q.**   SO APPROXIMATELY $12,000 THEN?

22   **A.**   GIVE OR TAKE, YES.

23   **Q.**   AND HOW MUCH WILL YOU BE PAID FOR TODAY'S TESTIMONY?

24   **A.**   600 AN HOUR.

25   **Q.**   AND YOU TALKED ABOUT AN IMPORTANT ASPECT OF DETERMINING

SHIN – CROSS / MR. ASHKER

1   WHAT WOULD BE APPROPRIATE CARE FOR A PERSON IS THEIR FUNCTIONAL

2   ABILITIES, CORRECT?

3   **A.**   YES.

4   **Q.**   AND CAN YOU PLEASE DESCRIBE, PLEASE TELL ME WHAT MY DAILY

5   FUNCTIONAL REQUIREMENTS ARE?

6   **A.**   I THINK WE TALKED ABOUT, TODD, WHEN I SPENT SOME TIME WITH

7   YOU ON DECEMBER 22ND, AND YOU HAD MENTIONED THAT YOU HAD TO DO

8   A LOT OF WRITING.  I REMEMBER YOU MENTIONED THAT IF YOU HAD TO,

9   YOU COULD WRITE UP TO SEVEN TO EIGHT HOURS IN A DAY, ALTHOUGH

10  AT A SLOWER PACE AND THAT YOU WOULD HAVE A LOT OF PAIN

11  INCREASED FOR THE NEXT COUPLE OF DAYS, AND YOU WOULDN'T BE ABLE

12  TO DO ANY MORE WRITING AFTER THAT.

13          I THINK YOU TOLD ME THAT YOU WERE ABLE TO PUT ON

14  YOUR OWN CLOTHES, ON AND OFF, AND I THINK YOU ALSO MENTIONED

15  THAT YOU WERE WASHING SOME OF YOUR CLOTHES ON YOUR OWN AND THAT

16  YOU WERE ABLE TO TAKE A SHOWER THREE TIMES A WEEK, I THINK IT'S

17  MY RECOLLECTION.

18  **Q.**   OKAY.

19          NOW, YOU TESTIFIED IN THE CASE OF LIKE AN IRON

20  WORKER, THAT'S HIS JOB, AND IT IS VERY IMPORTANT TO HIM, AND

21  HE'S HAVING THIS PAIN THAT YOU WOULDN'T HAVE PROBLEMS

22  PRESCRIBING MEDICATION SO THAT HE WOULD BE ABLE TO FUNCTION FOR

23  THAT WORK; IS THAT CORRECT?

24  **A.**   CORRECT.

25  **Q.**   AND WOULD YOU CONSIDER A HUMAN BEING'S ABILITY TO

1   COMMUNICATE TO BE A MAJOR LIFE ACTIVITY?

2   **A.**   ABSOLUTELY.

3   **Q.**   AND IN MY CIRCUMSTANCES, YOU ARE AWARE THAT I AM CONFINED

4   IN PELICAN BAY SHU AND MY ONLY ABILITY TO COMMUNICATE OUTSIDE

5   OF MY CELL WITH THE OUTSIDE WORLD IS THROUGH THE WRITTEN WORD;

6   IS THAT CORRECT?

7   **A.**   YES.

8   **Q.**   WOULD IT BE REASONABLE FOR ME TO PUT A LOT OF VALUE ON

9   BEING ABLE TO COMMUNICATE WITH THE OUTSIDE WORLD?

10  **A.**   ABSOLUTELY.

11  **Q.**   AND YOU UNDERSTOOD THAT I HAVE A LOT OF LEGAL STUFF GOING

12  ON?

13  **A.**   YES.

14  **Q.**   I AM HERE IN COURT TODAY?

15  **A.**   ABSOLUTELY.

16  **Q.**   ON ONE OF THE CASES, AND I HAVE TO DO A LOT OF WRITING?

17  **A.**   CORRECT.

18  **Q.**   THE THING IS, IS IN MY CIRCUMSTANCES, I WILL PRESENT TO

19  YOU THAT IF I DON'T DO IT, IT DOES NOT GET DONE.

20        DID YOU CONSIDER THAT WHEN YOU DETERMINED THAT I WAS

21  FUNCTIONING AND BEING APPROPRIATELY MEDICATED AND CARED FOR?

22  **A.**   TODD, YOU KNOW, I REALLY STRUGGLED WITH THIS CASE BECAUSE

23  IN MANY, MANY ASPECTS I AM COMPLETELY SYMPATHETIC TO YOU.  AND

24  I AGREE FOR THE MOST PART THAT I THINK THAT USE OF TRAMADOL IS,

25  SHOULD BE APPROPRIATE IN YOUR CASE.

1           BUT THE PART THAT I COULD NOT CONCLUDE WAS, IS THE

2    FACT THAT I AM NOT YOUR TREATING PHYSICIAN.  I UNDERSTAND IF

3    YOU SAY THAT BY TAKING TWO TRAMADOL YOU ARE ABLE TO WRITE FOR

4    EIGHT HOURS A DAY AND NOT WAKE UP THE NEXT DAY WITH INFLAMED

5    WRIST AND HAND, LIKE YOU SAID, AND IF YOU HAD TOLD ME THAT IN

6    AN ISOLATED SITUATION, IF YOU CAME TO MY CLINIC, YOU WERE MY

7    PATIENT AND TOLD ME THAT, I WOULD SAY, BY ALL MEANS, TAKE TWO

8    TRAMADOL.

9    **Q.**   OKAY.

10   **A.**   NOW, THE REASON I CAN'T SAY THAT IT WAS INAPPROPRIATE FOR

11   HIM TO MAKE THAT DECISION BECAUSE THERE ARE OTHER ISSUES THAT

12   HE HAS TO CONSIDER.

13   **Q.**   I UNDERSTAND.

14   **A.**   I DON'T FULLY UNDERSTAND.

15   **Q.**   I UNDERSTAND THAT.

16   **A.**   LET ME FINISH.

17           AND THEN THERE MAY HAVE BEEN OTHER ACCOMMODATIONS

18   THAT COULD HAVE BEEN PROVIDED RATHER THAN JUST USING A TRAMADOL

19   BECAUSE LOT OF TIMES JUST USING THE MEDICATION MAY BE A SIMPLE

20   COPOUT.  THERE MAY HAVE BEEN OTHER ACCOMMODATIONS THAT HE COULD

21   HAVE PROVIDED TO YOU SO YOU CAN COMMUNICATE EFFECTIVELY WITH

22   THE PAIN THAT YOU HAVE.  AND ALSO ANOTHER THING THAT NEEDED TO

23   BE CONSIDERED IS WHETHER OR NOT IT WAS REASONABLE, OKAY,

24   WHETHER OR NOT IT WAS UNREASONABLE TO EXPECT -- I DON'T HOW

25   MUCH VOLUME YOU HAVE TO WRITE EXACTLY.  I DON'T KNOW IF YOU ARE

1   ABLE TO ACCOMPLISH THAT IN THREE HOURS, EIGHT HOURS, OR FIVE

2   DAYS STRAIGHT OF WRITING.

3   **Q.**   LET ME INTERRUPT YOU RIGHT THERE REAL QUICK.  WE DIDN'T

4   GET INTO ALL THAT DURING YOUR --

5   **A.**   CORRECT.

6   **Q.**   OKAY.

7           NOW, LET ME ASK YOU WHY DID YOU COME UP TO PELICAN

8   BAY PRISON TO, IN ORDER TO MAKE A DETERMINATION ABOUT MY CARE

9   AND TREATMENT?

10  **A.**   WELL, I AM A DOCTOR.  AND I AM IN PRIVATE PRACTICE.  WHEN

11  SOMEBODY ASKS ME, THIS IS WHAT I AM GOOD AT, I THINK, AND THIS

12  IS MY AREA OF EXPERTISE.

13          YOU KNOW, OBVIOUSLY THIS IS A VERY UNUSUAL

14  SITUATION.  I HAVE NEVER DONE A PRISON CASE BEFORE.  I HAD

15  TREPIDATIONS AND RESERVATIONS FOR MANY DIFFERENT REASONS, BUT I

16  CHOSE TO ACCEPT THE CASE AND I WANTED TO DO A GOOD AND FAIR JOB

17  OF PROVIDING AN ASSESSMENT, BUT, TODD, LIKE I SAID, FOR THE

18  MOST PART, I AM KIND OF CONFUSED AS TO WHAT THIS IS ALL ABOUT.

19  I CAN'T -- IT ESCAPES MY UNDERSTANDING THAT WE ARE FIGHTING

20  ABOUT TWO TRAMADOLS.

21  **Q.**   NO.  THAT'S NOT THE ISSUE, DR. SHIN.  AND THAT'S WHAT I

22  WOULD LIKE TO ASK YOU ABOUT.

23          THE ISSUE IN THIS CASE IS NOT ABOUT TRAMADOL.  WHAT

24  THE ISSUE IN THIS CASE IS AND WHY THE QUESTION I ASKED YOU, I

25  WAS PROBABLY NOT VERY CLEAR --

1   **A.**   OKAY.

2   **Q.**   -- IS YOU FELT, IN ORDER FOR YOU TO BE ABLE TO MAKE A

3   DIAGNOSIS, HOW IMPORTANT WAS IT THAT YOU CONDUCT A VERY

4   CAREFUL, THOROUGH EXAMINATION?

5   **A.**   VERY IMPORTANT.

6   **Q.**   AND WITH THE CONDITION LIKE MINE, IF YOU WERE PRESENTED

7   WITH MY MEDICAL RECORDS AND I WAS SUBJECTIVELY EXPLAINING TO

8   YOU THAT I'M -- WRITING CAUSES ME, USING MY ARM CAUSES ME TO

9   EXPERIENCE SERIOUS PAIN AND DISCOMFORT TO THE POINT WHERE I AM

10   ONLY ABLE TO GET UP TO ONE TO THREE HOURS A NIGHT OF SLEEP,

11   THINGS OF THAT NATURE, WOULD YOU HAVE FELT IT IMPORTANT TO

12   CONDUCT A THOROUGH, CAREFUL PHYSICAL EXAMINATION?

13   **A.**   I HAVE -- I AGREE WITH YOU ON THAT.

14   **Q.**   AND WOULD YOU -- IS IT FAIR TO SAY THAT IN MY

15   CIRCUMSTANCES, A DOCTOR WHO DID -- MADE DECISIONS ON MY

16   MEDICATIONS AND CARE AND TREATMENT WITHOUT CONDUCTING A

17   CAREFUL, THOROUGH EXAMINATION THAT THAT WOULD BE BELOW THE

18   STANDARD OF CARE?

19           **MR. ANDRADA:**   VAGUE AND AMBIGUOUS AS TO WHAT THIS

20   WITNESS MEANS UNDER THESE CIRCUMSTANCES BY "CAREFUL AND

21   THOROUGH".

22           **THE COURT:**   ALL RIGHT.   WHY DON'T YOU DESCRIBE A

23   CERTAIN TYPE OF EXAMINATION, AND ASK WHETHER HE WOULD CONSIDER

24   THAT A SUFFICIENTLY CAREFUL AND THOROUGH EXAMINATION.

25

1    **BY MR. ASHKER:**

2    **Q.**   WHAT WOULD YOU CONSIDER A SUFFICIENT CAREFUL, THOROUGH

3    EXAMINATION TO BE —— FOR MY CONDITION?

4             **MR. ANDRADA:**  OBJECTION, YOUR HONOR, VAGUE AND

5    AMBIGUOUS AS TO TIME WE TALKING ABOUT.

6             **THE COURT:**  ALL RIGHT.  WHAT TIME WOULD YOU LIKE,

7    AUGUST OF '06?

8    **BY MR. ASHKER:**

9    **Q.**   IN 2006, BEFORE MY TRAMADOL WAS DISCONTINUED.

10   **A.**   WHAT WOULD HAVE BEEN AN ESSENTIAL PHYSICAL EXAMINATION

11   THAT WOULD BE REQUIRED BEFORE A REASONABLE PHYSICIAN WOULD MAKE

12   A DETERMINATION ON CHANGING TWO TRAMADOL?

13            THAT'S A TOUGH ONE, TODD, BECAUSE PHYSICAL

14   EXAMINATION IS IMPORTANT SO THAT YOU CAN HAVE AN IMPRESSION OF

15   YOUR CONDITION, BUT I THINK WHAT IS MORE IMPORTANT IN MAKING A

16   DECISION ABOUT A MEDICATION, USE OF MEDICATION IS THE

17   INFORMATION THAT'S AVAILABLE FROM YOU, YOUR SUBJECTIVE

18   EXPERIENCE, SO THAT WE CAN GLEAN, WE CAN ASSESS YOUR FUNCTIONAL

19   LEVEL.

20            BECAUSE I THINK IT IS UNREASONABLE, FOR EXAMPLE, IF

21   YOU ARE IN TOO MUCH PAIN YOU COULDN'T SLEEP AT ALL, AND YOU

22   COULDN'T WRITE, AND THAT ACTUALLY YOU HAD A DIFFICULT TIME

23   PUTTING ON YOUR CLOTHES, AND THEN THE GUARDS TOLD YOU YOU HAVE

24   TO PUT ON YOUR OWN CLOTHES AND THEN YOU'RE RUNNING AROUND HALF

25   NAKED ALL THE TIME BECAUSE YOU COULDN'T QUITE GET THE ARM IN,

1   AND YOU COULDN'T ACTUALLY WASH YOUR CLOTHES, AND DAY AFTER DAY

2   YOUR CLOTHES WAS LEFT, AND THEN SOMEONE COULD ACTUALLY

3   PHYSICALLY OBSERVE THAT YOU COULDN'T USE THE HAND TO LIFT

4   OBJECTS AND THINGS OF THAT SORT.

5           BUT TO THE ACTUAL PHYSICAL EXAMINATION PORTION, YOU

6   KNOW, I SPENT SOME TIME BECAUSE I WANTED TO PROVIDE

7   DOCUMENTATION, BUT WHETHER OR NOT TO SAY THAT PHYSICAL EXAM

8   THERE HAVE BEEN CERTAIN PHYSICAL EXAM THAT HAD TO THAT PLACE

9   BEFORE A DECISION WAS MADE REGARDING CHANGE OF MEDICATION, I

10  DON'T KNOW WHAT ESSENTIAL PHYSICAL EXAMINATION YOU NEED TO

11  REQUIRE.

12  **Q.**   IS IT APPROPRIATE TO CHANGE AN MEDI -- IF I PRESENTED TO

13  YOU THAT I WAS IN SERIOUS PAIN AND DISCOMFORT, THAT THE TWO

14  TRAMADOL A DAY WERE ONLY EFFECTIVE FOR APPROXIMATELY 16 HOURS

15  OUT OF EACH DAY, ONLY BROUGHT MY PAIN LEVEL DOWN TO A THREE, IN

16  GENERAL --

17  **A.**   OKAY.

18  **Q.**   -- AND IT WAS HAVING AN ADVERSE IMPACT ON MY ABILITY TO

19  CARRY OUT MY MAJOR LIFE ACTIVITY --

20  **A.**   YES.

21  **Q.**   -- OF COMMUNICATING WITH THE OUTSIDE WORLD --

22  **A.**   YES.

23  **Q.**   -- IN THAT CIRCUMSTANCE RIGHT THERE, BEFORE YOU MADE A

24  CHANGE TO A MEDICATION, CHANGED THAT MEDICATION, WOULD A

25  PHYSICAL EXAMINATION HAVE BEEN WARRANTED?

1          **MR. ANDRADA:**  AGAIN, YOUR HONOR, IT'S VAGUE AND

2   AMBIGUOUS WITH REGARD TO --

3          **THE COURT:**  OVERRULED.  WELL, WITH REGARD TO WHAT?

4          **MR. ANDRADA:**  THE NATURE OF WHAT HE MEANS -- WHAT

5   MR. ASHKER MEANS BY A PHYSICAL EXAM.

6          **THE WITNESS:**  I CAN ANSWER THAT.

7          YOU KNOW, AS DOCTORS WE ARE TAUGHT TO DO PHYSICAL

8   EXAMINATIONS.  I THINK PHYSICAL EXAMS IS A VERY IMPORTANT

9   COMPONENT OF WHAT WE DO.

10          WHEN IT COMES TO CHRONIC PAIN, THERE ARE ONLY A FEW

11  THINGS THAT ARE ESSENTIAL.  EVEN THOSE THINGS ARE NOT THAT

12  IMPORTANT.

13          I DO A LOT OF PHYSICAL EXAMINATIONS BECAUSE IT IS A

14  REQUIREMENT BY THE PAYERS.  THE INSURANCE COMPANIES WILL NOT,

15  YOU KNOW, RECOGNIZE MY VISITATIONS UNLESS I HAVE DOCUMENTED A

16  RANGE OF MOTION, THIS AND THAT.

17          BUT AS FAR AS MY DECISION-MAKING AS TO WHAT IS

18  APPROPRIATE MEDICAL TREATMENT, I RELY HEAVILY, HEAVILY ON A

19  DIAGNOSIS, PRESENTATION, WHAT THE PATIENT IS TELLING ME.  IN

20  ARENA OF CHRONIC PAIN, THAT IS NOT THE SAME FOR, YOU KNOW,

21  INTERNAL MEDICINE DOCTORS, OTHER PHYSICIANS.  FOR EXACTLY WHAT

22  I DO, THE PHYSICAL EXAM'S COMPONENT IS NOT AS IMPORTANT.

23  **BY MR. ASHKER:**

24  Q.  OKAY.

25          NOW, YOU STATED THAT DR. SAYRE'S CARE AND TREATMENT

1    WAS WITHIN THE STANDARD OF CARE, CORRECT?

2    **A.**   IN MY OPINION.

3    **Q.**   AS FAR AS THE TRAMADOL DECISION GOES, RIGHT?

4    **A.**   LIKE I SAID, TODD, SOMEONE WOULD HAVE TO EXPLAIN TO ME WHY

5    IT WAS THAT THE TRAMADOL WAS NOT GIVEN TO YOU BECAUSE IT SEEMS

6    TO ME A VERY SIMPLE SOLUTION FOR THE PAIN CONDITION THAT YOU

7    HAVE.

8            I DON'T HOLD THE SIMILAR FEAR AND SIMILAR OPINION AS

9    DR. SAYRE DOES ABOUT THE TRAMADOL, BUT LIKE I SAID, FOR ME TO

10   SAY THAT IT WAS SUBSTANDARD, IS A DIFFERENT STATEMENT TO MAKE.

11   **Q.**   I UNDERSTAND THAT.  I WANT TO INTERRUPT YOU THERE BECAUSE

12   WE HAVE TIME ISSUES AND I WANT TO GET TO A FEW OTHER THINGS.

13   **A.**   SURE.

14   **Q.**   IF YOU WERE PRESENTED WITH THE CIRCUMSTANCE OF ONCE I WAS

15   SWITCHED BACK TO NSAIDS, THEY WERE NOT EFFECTIVE, CAUSED

16   DIARRHEA, MY PAIN INCREASED, MY ABILITY TO WRITE, EXERCISE,

17   WASH DIMINISHED TO WHERE PRESENTLY I HAVE LOST -- I WILL

18   PRESENT TO YOU I HAVE LOST AN INCH IN GIRTH SIZE.

19           YOU DID NOT DO ANY GIRTH MEASUREMENTS; IS THAT

20   CORRECT?

21   **A.**   YOU MAY BE RIGHT ON THAT.

22   **Q.**   OKAY.

23           AND I HAVE PAIN THAT I ASSOCIATE WITH RUNNING DOWN

24   FROM MY ELBOW INTO MY HAND, MY TWO FINGERS ARE NUMB, AND I HAVE

25   REPEATEDLY, I MEAN, I CANNOT COUNT HOW MANY TIMES OFF THE TOP

1   OF MY HEAD COMPLAINED TO DR. SAYRE PERSONALLY THIS MEDICATION

2   IS NOT EFFECTIVE.  I AM NOT ABLE TO DO MY DAILY ACTIVITIES.  IT

3   IS CAUSING ME TO HAVE CHRONIC DIARRHEA.  THE PAIN IN MY ARM AND

4   ULNAR NERVE AND ALL THAT FEELS A LOT WORSE.  I AM ONLY ABLE TO

5   GET ONE TO THREE HOURS OF SLEEP A NIGHT, AND THEN MAYBE AFTER

6   FOUR OR FIVE DAYS OF BEING TOTALLY EXHAUSTED, I MIGHT GET FOUR

7   OR FIVE MORE.

8           IN YOUR OPINION, DR. SAYRE -- I WILL PRESENT TO YOU

9   DR. SAYRE STATED THAT HE FELT REGARDLESS OF WHAT I WAS SAYING,

10  THAT THE TYLENOL AND IBUPROFEN I WAS RECEIVING WAS ADEQUATE,

11  AND THAT WAS IT.  AND MY -- WITHOUT ANY PHYSICAL EXAM.

12          AND MY QUESTION TO YOU IS, HE STATED I DID NOT HAVE

13  A CHRONIC PAIN SYNDROME PERIOD.

14          **THE COURT:**  YOU NEED TO GET TO THE QUESTION.

15          **MR. ASHKER:**  MY QUESTION IS --

16          **THE COURT:**  WAS THAT WITHIN THE STANDARD OF CARE?

17          **MR. ANDRADA:**  WHAT'S THE QUESTION?

18  **BY MR. ASHKER:**

19  **Q.**  WHAT THAT, THOSE THINGS THAT I JUST DESCRIBED TO YOU, IF

20  THAT WAS TRUE, IN YOUR OPINION WOULD THAT MEET THE STANDARD OF

21  CARE?

22          **MR. ANDRADA:**  VAGUE, OVERLY BROAD, ASSUMES FACTS NOT

23  IN EVIDENCE.

24          **THE WITNESS:**  TODD, IF YOU CAN BREAK IT DOWN TO LIKE

25  ONE SENTENCE AT A TIME THEN MAYBE IT WOULD BE EASIER FOR ME --

1        **THE COURT:**  THE OBJECTION IS OVERRULED.

2            THAT IS THE SET OF CIRCUMSTANCES THAT'S BEING

3    PROPOSED AS A HYPOTHETICAL.  UNDER THAT SET OF CIRCUMSTANCES,

4    HIS QUESTION TO YOU IS, IS THAT BEHAVIOR WITHIN THE STANDARD OF

5    CARE IN YOUR OPINION?

6        **THE WITNESS:**  I THINK I HAVE ALREADY SAID, TODD,

7    THAT I WOULD HAVE TO HAVE MORE EXPLANATION AS TO WHY DR. SAYRE

8    CHOSE TO STOP USING TRAMADOL TO TREAT YOUR CONDITION.

9            I READ HIS --

10   **BY MR. ASHKER:**

11   **Q.**  I'M NOT -- EXCUSE ME.

12       **THE COURT:**  GO AHEAD.

13       **THE WITNESS:**  I'VE READ HIS, WHAT IS THAT, THE

14   DECLARATION PORTION WHERE HE -- BASICALLY HE LAID OUT THAT IT'S

15   ADDICTIVE.

16           I WASN'T AS CONCERNED ABOUT THAT.  HE FELT THAT IT

17   WAS -- I WISH I CAN REMEMBER.  THERE ARE A FEW ARGUMENTS THAT

18   HE HAS MADE.  I DIDN'T THINK THEY WERE AS SIGNIFICANT AS AN

19   ARGUMENT.  I WOULD NOT HAVE USED THOSE ARGUMENTS TO STOP THE

20   USE OF -- I THINK THAT -- IF I CAN ELABORATE, I THINK IF

21   DR. SAYRE HAD DEMONSTRATED SOME ABUSIVE BEHAVIOR ON YOUR PART,

22   DIVERTING MEDICATIONS, YOU KNOW, POOR MANAGEMENT OF

23   SELF-CONTROL, ANGER OUTBURSTS, SOME OTHER COMMONLY THINGS WE

24   SEE WITH PEOPLE THAT ARE ADDICTED TO OPIATE MEDICATIONS, AND

25   HAVE SAID THAT, THEN I CLEARLY WOULD HAVE AGREED WITH HIM.

1                 BUT I READ IT CAREFULLY AND I DIDN'T QUITE SEE

2       ELEMENTS THAT QUITE JUST STUCK OUT IN MY MIND AND SAID, WELL,

3       YEAH, I UNDERSTAND WHY HE STOPPED USE OF THE MEDICATIONS.

4                 SO, I LIKE I SAID, THIS IS A VERY DIFFICULT QUESTION

5       FOR ME TO ANSWER BECAUSE I THINK IT IS A SIMPLE SITUATION THAT

6       COULD HAVE BEEN REMEDIED BY JUST GIVING YOU THE TWO TRAMADOL.

7                 AGAIN, I AM TOLD THAT TRAMADOL IS A HOT ITEM IN THE

8       PRISON SETTING.  I DON'T KNOW THAT.  THAT THERE ARE CERTAIN

9       VALUES TO IT.  THESE ARE --

10      **BY MR. ASHKER:**

11      **Q.**   WELL --

12      **A.**   AGAIN, THERE ARE MANY CONFIDENTIAL ISSUES ALSO THAT

13      DR. SAYRE HAS TO PROCESS, AND I HAVE TO GIVE HIM THAT.

14                  **THE COURT:**  THE QUESTION IS BASED ON WHAT YOU HAVE

15      HEARD AS A HYPOTHETICAL --

16                  **MR. ASHKER:**  NOT ABOUT TRAMADOL.

17                  **THE COURT:**  -- AND WHAT YOU READ THAT DR. SAYRE

18      SAID.

19      **BY MR. ASHKER:**

20      **Q.**   I AM NOT TALKING ABOUT TRAMADOL HERE.

21      **A.**   THEN YOU HAVE TO TELL ME THE QUESTION AGAIN, TODD.

22                  **THE COURT:**  IT'S KIND OF A LONG QUESTION.

23                  **MR. ANDRADA:**  IT IS.

24                  **THE COURT:**  YOU NEED IT READ BACK?

25                  **THE WITNESS:**  WE CAN TRY IT.

1        **THE COURT:**  DO YOU WANT TO ASK IT AGAIN IN A SHORTER

2    WAY OR SHALL WE READ IT BACK?

3    **BY MR. ASHKER:**

4    **Q.**   DR. SHIN, I APOLOGIZE FOR NOT BEING ABLE TO -- I AM TRYING

5    ON DO THE BEST I CAN RIGHT HERE.

6              MY POINT IS, YOU'VE TESTIFIED THAT I HAVE A -- YOU

7    DETERMINED I HAVE A CHRONIC PAIN SYNDROME, CORRECT?

8    **A.**   YES.

9    **Q.**   AND THAT YOU ALSO TESTIFIED THAT A PERSON'S FUNCTIONAL

10   ABILITIES ARE VERY IMPORTANT AND THAT PERSON'S NEEDS AS A HUMAN

11   TO COMMUNICATE AND TAKE MAJOR DAILY LIFE ACTIVITIES,

12   MEDICATIONS FOR THE TREATMENT OF CHRONIC PAIN IS IMPORTANT,

13   CORRECT?

14   **A.**   YES.

15   **Q.**   OKAY.

16   **A.**   CAN I GET A PEN SO I CAN WRITE JUST THE POINTS DOWN?  I

17   WANT TO BE ABLE TO ANSWER IT IN AN EFFICIENT WAY.

18              **THE COURT:**  DO YOU NEED PAPER, TOO?

19              **THE WITNESS:**  I HAVE PAPER.  I THINK I UNDERSTAND

20   WHAT HE'S TRYING TO SAY.  LET ME SEE IF I CAN ANSWER THAT.

21              **MR. ASHKER:**  DR. SHIN --

22              **THE COURT:**  HOLD ON.  LET'S LET THE DOCTOR TAKE THE

23   NOTES HE WANTS TO TAKE.

24              **THE WITNESS:**  GO AHEAD, TODD.

25

1    **BY MR. ASHKER:**

2    **Q.**    WHAT MY QUESTION IS, IS IN YOUR OPINION, IS IT APPROPRIATE

3    FOR -- I PRESENTED TO DR. SAYRE NUMEROUS TIMES -- I WILL

4    PRESENT TO YOU THAT WHEN DR. SAYRE INFORMED ME THAT HE WAS

5    GOING TO CHANGE THE TRAMADOL, I TOLD HIM, OKAY, WHAT WILL IT BE

6    REPLACED WITH THAT PROVIDES ME WITH EFFECTIVE PAIN MANAGEMENT

7    AND DOES NOT CAUSE INTOLERABLE SIDE EFFECTS?

8             AND THE RESPONSE WAS, NSAIDS.  OKAY?  AND TYLENOL.

9    ALL RIGHT?

10            NOW, AFTER I GOT ON THE NSAIDS, THERE WAS NOT

11   EFFECTIVE.  MY PAIN WAS A WHOLE LOT MORE SEVERE.  I WAS NOT

12   ABLE TO CARRY OUT MY -- I HAD TO CUT WAY BACK ON ALL MY

13   ACTIVITIES.  I BEGAN TO HAVE ONE TO THREE HOURS OF SLEEP A

14   NIGHT.  AND I REPEATEDLY COMPLAINED.  I HAD DEVELOPED CHRONIC

15   DIARRHEA.  I REPEATEDLY COMPLAINED TO DR. SAYRE.  LOOK, THIS

16   MEDICATION IS NOT WORKING.  I NEED SOMETHING.  MY NERVE PAIN

17   FEELS WORSE.  AND DR. SAYRE REFUSED TO DO ANYTHING.

18            HIS POSITION WAS THAT I DO NOT HAVE CHRONIC PAIN.  I

19   HAVE AT MOST MILD ARTHRITIS, A FEW NSAIDS EVERY NOW AND THEN IS

20   FINE.

21            IS THAT WITHIN THE STANDARD OF CARE?

22            **MR. ANDRADA:**  I AM SORRY, YOUR HONOR.

23            **THE COURT:**  IF YOU WOULD TAKE THAT AS A HYPOTHETICAL

24   QUESTION.

25            **THE WITNESS:**  I CAN ANSWER THAT.

1        **MR. ANDRADA:**  AS A HYPOTHETICAL BECAUSE IT ASSUMES

2   MANY FACTS NOT IN EVIDENCE.

3        **THE COURT:**  THAT WILL BE FOR THE JURY TO DECIDE.  WE

4   WILL TAKE IT FOR THE MOMENT --

5        **MR. ANDRADA:**  THIS HYPOTHETICAL.

6        **THE WITNESS:**  LET ME, TODD, ANSWER IT THIS WAY.

7        IF IT WAS INDEED TRUE, OKAY, THAT, NOT JUST BASED ON

8   YOUR TESTIMONY, TODD, BECAUSE THE LEVEL OF FUNCTION HAS TO BE

9   SOMETHING THAT WE CAN OBSERVE, OKAY?  IN OTHER WORDS, WHEN

10  WE --

11       **THE COURT:**  IF YOU CAN ASSUME THOSE FACTS TO BE

12  TRUE.

13       **THE WITNESS:**  IF I ASSUME THAT, IF WE ARE ABLE TO

14  DEMONSTRATE THAT YOU WERE ONLY ABLE TO SLEEP ONE TO THREE HOURS

15  OF SLEEP PER NIGHT, IF WE ALL AGREED TO THAT, THAT YOUR NERVE

16  PAIN HAD GOTTEN WORSE, AND YOU SAID SOMETHING ABOUT YOU

17  COULDN'T WRITE AS MUCH AS YOU COULD, YOUR VOLUME OF WRITING HAD

18  DIMINISHED BY, WHAT WOULD YOU SAY, 50 PERCENT?

19  **BY MR. ASHKER:**

20  **Q.**   PROBABLY 60 PERCENT.

21  **A.**   60 PERCENT.  IF YOU ASSUME THOSE THINGS AND IF A TREATING

22  PHYSICIAN DID WITHHOLD MEDICATION --

23       **THE COURT:**  THE OTHER POINT THAT WAS RAISED WAS THE

24  CHRONIC DIARRHEA AND STOMACH ISSUES --

25       **THE WITNESS:**  THE CHRONIC DIARRHEA WAS NOT FROM

1    PAIN.

2            **THE COURT:**  FROM THE NSAIDS?

3            **THE WITNESS:**  FROM THE NSAIDS.  I WOULD NOT HAVE

4    RECOMMENDED USE OF NSAIDS AFTER YOU COMPLAINED ABOUT IT.

5            I WOULD NOT HAVE RECOMMENDED USE OF NSAIDS AFTER YOU

6    HAD COMPLAINED ABOUT STOMACH PROBLEMS.  I WOULD NOT HAVE

7    RECOMMENDED USE OF ELAVIL AFTER YOU MENTIONED THOSE THINGS.

8    **BY MR. ASHKER:**

9    **Q.**   THE SIDE EFFECTS?

10   **A.**   CORRECT.  SO THAT'S, IF A PHYSICIAN CONTINUED TO PUSH

11   THOSE MEDICATIONS DESPITE THOSE, THEN IT WOULD BE SUBSTANDARD

12   CARE.

13   **Q.**   THANK YOU, DR. SHIN.

14           MOVING ON, YOUR TESTIMONY WAS THAT YOU FOUND THAT I

15   DID HAVE A CHRONIC PAIN SYNDROME; IS THAT CORRECT?

16   **A.**   YES.

17   **Q.**   AND IN YOUR RECOMMENDATIONS, YOU STATED THAT YOU DISAGREED

18   WITH DR. SAYRE'S POSITION THAT I DID NOT NEED AN ARM BRACE; IS

19   THAT CORRECT?

20   **A.**   I THINK SOMETHING SHOULD BE GIVEN TO YOU.  I WISH I COULD

21   EXPLAIN.

22           **THE COURT:**  SURE.  GO AHEAD.

23           **THE WITNESS:**  YOU KNOW, YOU DON'T NEED THE ARM

24   BRACE -- AGAIN, IF IT IMPROVES YOUR FUNCTION, OKAY.  IF IT

25   IMPROVES YOUR FUNCTION, THEN I THINK YOU SHOULD HAVE IT.

1          THEN FOR ONE OTHER REASON, I ALREADY MENTIONED THAT

2    YOU HAVE A COMPROMISED CONDITION AND YOU CAN POTENTIALLY HAVE

3    MORE INJURY.  I THINK FOR PROTECTION, I THINK YOU SHOULD HAVE

4    ONE.  AND IT PROBABLY NEEDS TO BE CUSTOM FITTED.  I MENTIONED

5    THAT IN MY REPORT BECAUSE OF THE DEFORMITY, I DON'T THINK ANY

6    OFF-THE-SHELF IS GOING TO FIT.

7    **BY MR. ASHKER:**

8    **Q.**   WOULD IT BE FAIR TO SAY THAT A PROPERLY FITTING ARM BRACE

9    WOULD ALSO ENABLE ME TO EXERCISE MY UPPER ARM AREA?

10   **A.**   I THINK YOU CAN MAKE THAT ARGUMENT.  BECAUSE IF YOU HAD TO

11   DO PUSH-UPS, WITH YOUR WRIST BEING THE WAY IT IS, I AM NOT SURE

12   IF IT IS GOING TO BE ABLE TO EXPAND THE ENTIRE WEIGHT TO

13   EFFECTIVELY EXERCISE YOUR UPPER MUSCLES.

14   **Q.**   AND I SHOWED YOU MY ARM BRACE AND YOU ACTUALLY HAD ME PUT

15   IT ON AND EXAMINED MY ARM IN THE ARM BRACE WHEN YOU CAME UP ON

16   DECEMBER 22ND, 2008; IS THAT CORRECT?

17   **A.**   YES.

18   **Q.**   AND THIS WAS THE ARM BRACE THAT YOU EXAMINED; IS THAT

19   CORRECT?

20   **A.**   CORRECT.

21   **Q.**   DOES IT LOOK FAMILIAR?

22   **A.**   YEAH.

23   **Q.**   AND YOU DETERMINED AT THAT TIME THAT THIS ARM BRACE DID

24   NOT FIT MY ARM PROPERLY; IS THAT CORRECT?

25   **A.**   CORRECT.

1   **Q.**   AND YOU RECOMMENDED THAT A PROPERLY FITTING ARM BRACE BE

2   PROVIDED; IS THAT CORRECT?

3   **A.**   YES.

4   **Q.**   YOU ALSO RECOMMENDED THAT I BE PROVIDED WITH AN EVALUATION

5   BY HAND/WRIST ORTHOPEDIC SPECIALIST; IS THAT CORRECT?

6   **A.**   YES.

7   **Q.**   AND WHY DID YOU MAKE THAT RECOMMENDATION?

8   **A.**   I THINK, I BELIEVE IT WAS DR. DUNCAN, HAD ALREADY

9   EVALUATED YOU, ALL RIGHT?  IT HAD BEEN QUITE SOME TIME, RIGHT?

10  **Q.**   YES.

11  **A.**   YOU KNOW, AS A SPECIALIST, ONE THING THAT WE TRY TO BE

12  VERY CAREFUL TO UNDERSTAND, YOU KNOW, WHAT MY EXPERTISE IS AND

13  WHATNOT, THERE ARE CERTAIN SYNDROMES THAT COULD EXPLAIN YOUR

14  SYMPTOMS.  I DON'T THINK THEY ARE, BUT BECAUSE IT'S AN AREA

15  THAT I FEEL LESS COMFORTABLE WITH, I FELT THAT IF YOU COULD GET

16  AN EXCELLENT HAND SPECIALIST, AMONG THE ORTHOPEDISTS, THEY HAVE

17  HAND AND WRIST SPECIALISTS.  AND THEY CAN HAVE A LOOK-OVER AND

18  SEE IF WE ARE ALL MISSING SOMETHING BECAUSE OF THE PAIN THAT

19  YOU HAVE.

20  **Q.**   I WILL PRESENT TO YOU THAT FOR THE FIRST, 1991 AND 1992,

21  YOU, PART OF THE RECORDS THAT YOU EXAMINED WERE THE ORTHOPEDIC

22  SURGERY REPORTS BY DR. MOEHRING; IS THAT CORRECT?

23  **A.**   I DON'T REMEMBER HIS NAME.  I DID REVIEW THE RECORDS.

24  **Q.**   I WILL PRESENT TO YOU THAT IN 1995, DR. MOEHRING STATED,

25  DECLARED THAT IN MY CONDITION OF MY ARM, REGULAR FOLLOW-UP WITH

SHIN – CROSS / MR. ASHKER

1    ORTHOPEDIC SPECIALISTS IN HAND/WRIST WOULD BE REQUIRED WITH MY

2    TYPE OF CONDITION.  DO YOU AGREE WITH THAT?

3    **A.**    YEAH.  ABSOLUTELY.

4    **Q.**    HOW OFTEN WOULD BE REASONABLE?

5    **A.**    YOU KNOW, AT SOME POINT, TODD, YOUR CONDITION PLATEAUS AND

6    I DON'T THINK YOUR COMPLAINT IS REALLY THAT YOU HAVE SOME

7    DETERIORATION OF THE UNDERLYING CONDITION.  I THINK YOUR

8    COMPLAINT HAS MORE TO DO WITH THE FACT THAT PROPER

9    ACCOMMODATIONS AND TREATMENTS HAVE BEEN WITHHELD FROM YOU.

10            SO I DON'T KNOW IF IT WAS ALL THAT CRITICAL TO HAVE

11    AN ORTHOPEDIST.  I KNOW DR. DUNCAN IS AN ORTHOPEDIST WITH

12    EXPERIENCE IN MANAGING HAND AND WRIST, SO I WOULD HAVE TO

13    ASSUME -- AND THEN, TODD, WHAT WE REALLY LOOK AT, HAS THERE

14    BEEN SIGNIFICANT DETERIORATION OF YOUR UNDERLYING CONDITION,

15    SOMETHING WHAT WE CALL OBJECTIVE, SOMETHING THAT I CAN SEE MORE

16    THAN WHAT YOU ARE ABLE TO TELL ME.

17            BECAUSE AS YOU CAN TELL, PATIENTS CAN SAY A LOT OF

18    THINGS, AND THEN PSYCHOLOGY GETS INVOLVED.  SO EVEN WHEN THEY

19    ARE TALKING ABOUT FUNCTION, WHEN YOU SAY I AM ONLY ABLE TO

20    SLEEP ONE TO THREE HOURS, IT WOULD HELP, OKAY, IF THAT

21    CONTENTION, THAT EXPERIENCE IS CONFIRMED BY OBSERVATION EITHER

22    BY THE GUARDS OR WHOEVER IS TREATING YOU, OR WHOEVER IS CLOSER

23    TO YOU, OR DURING THE DAY, THEY CAN CLEARLY SEE YOU ARE

24    LETHARGIC, THAT YOUR EYES ARE WHATEVER.  AND THERE ARE CERTAIN

25    CONSEQUENCES OF POOR SLEEP THAT WOULD BE ABLE TO OBSERVE.

1           IN THE ABSENCE OF THOSE DOCUMENTATIONS, PHYSICIANS

2     WILL OFTEN CONCLUDE THAT EVEN THOUGH YOU MAY BE COMPLAINING OF

3     INADEQUATE SLEEP, IN FACT, YOU ARE GETTING ADEQUATE SLEEP

4     BECAUSE IF YOU WERE GETTING INADEQUATE SLEEP, THERE'S SOME

5     PHYSIOLOGIC CONSEQUENCES THAT WE ARE ABLE TO SEE.

6           SO IT'S IMPORTANT FOR PHYSICIANS TO DOCUMENT THOSE

7     OBSERVABLE CONSEQUENCES AND SEQUELS OF YOUR SUBJECTIVE PAIN

8     COMPLAINTS.  AND IF WE ARE NOT ABLE TO DOCUMENT THOSE, IT IS

9     EASY FOR PHYSICIANS TO SAY, I KNOW THE PATIENT HAS COMPLAINED A

10    LOT, I KNOW HE IS SUBJECTIVELY SUFFERING A LOT, BUT GIVEN THE

11    LACK OF OBJECTIVE, OBSERVABLE PROBLEMS, THAT WE NEED TO BE

12    CONSERVATIVE WITH OUR TREATMENTS.

13    **Q.**   OKAY.  FAIR ENOUGH.

14          AS FAR AS THOSE OBSERVABLE, OBJECTIVE THINGS THAT

15    YOU ARE TALKING ABOUT THERE, DON'T THOSE HAVE TO BE DOCUMENTED

16    IN ORDER TO MAKE --

17    **A.**   RIGHT.

18    **Q.**   -- AN ASSESSMENT?

19    **A.**   I WILL MAKE ANOTHER EXAMPLE.

20          YOU COMPLAINED THAT YOU CAN'T WRITE AS MUCH, RIGHT?

21    AND THAT YOU HAVE VOLUMINOUS AMOUNT OF COMMUNICATION YOU HAVE

22    TO DO PARTICULARLY FOR THIS CASE.  IF IT HAD BEEN SUCH THAT

23    OTHER PEOPLE CAN REPEATEDLY OBSERVE THAT YOU ARE NOT ABLE TO

24    WRITE EFFECTIVELY, YOU'RE NOT ABLE TO GET THESE OUT IN A TIMELY

25    MANNER, AND THEN THE PRISONER GUARDS, FOR EXAMPLE, CAN SEE YOU

SHIN – CROSS / MR. ASHKER

1    ARE TRYING TO WRITE, TRYING TO GET IT OUT, AND THEN YOU CAN SEE

2    THE WRITING WHERE IT'S WRITING WELL FOR FIRST TWO PAGES AND

3    IT'S KIND OF, YOU KNOW, TURNING INTO GIBBERISH BECAUSE OF YOUR

4    PAIN, IF THEY HAD PRESENTED THOSE STUFF AND SHOWN TO ME, I

5    WOULD SAY, YOU KNOW WHAT, THERE'S SOMETHING TO HIS COMPLAINT.

6              A LOT OF PEOPLE, YOU HAVE TO UNDERSTAND, CHRONIC

7    PAIN PATIENTS HAVE A LOT OF COMPLAINTS.  AND AS PHYSICIANS, WE

8    HAVE TO BE ABLE TO DISCERN WHAT IS REAL.  BECAUSE THERE IS A

9    GOOD REASON FOR THAT, TODD, AND FOR THE JURY.  WHEN YOU ARE

10   ADDRESSING CHRONIC PAIN, BECAUSE YOU ARE EXPERIENCING PAIN, YOU

11   WOULD LIKE TO HAVE A LOT OF THINGS DONE TO YOU.  AND STUDIES

12   HAVE SHOWN OVER AND OVER AGAIN THAT IF WE OVERTREAT PATIENTS,

13   WE ACTUALLY MAKE PATIENTS WORSE.

14             SO THERE'S A BIG MOVEMENT -- I SHOULDN'T USE THE

15   WORD "MOVEMENT" BUT THERE'S A BIG CHANGE OF PERCEPTION ON HOW

16   WE DO CHRONIC PAIN.

17             WE USED TO SAY WE HAVE TO TREAT PAIN, IT'S THE

18   NUMBER SIX VITAL SIGN.  YOU CAN'T LEAVE IT UNTREATED.  NOW WE

19   ARE SAYING WE HAVE TO BE REASONABLE ABOUT IT.  WE HAVE TO BE

20   RATIONAL ABOUT IT.  WE HAVE TO PEG IT TO SOMETHING, OBJECTIVE,

21   OBSERVABLE DEFICITS.  OKAY?  I HAVE GIVEN YOU TWO EXAMPLES, ONE

22   ABOUT THE SLEEP AND ONE ABOUT YOUR WRITING.  AND I CAN GO ON

23   AND ON AND ON ABOUT -- I HAVE GIVEN YOU OTHER EXAMPLES.

24   Q.   YES.

25   A.   SO, WHEN I EVALUATED YOU, I WAS LISTENING AND WATCHING AND

1    READING THE MEDICAL RECORDS CAREFULLY FOR ANY OBJECTIVE

2    EVIDENCE THAT WAS A REAL CONSEQUENCE THAT I CAN SEE BASED ON

3    YOUR SUBJECTIVE PAIN EXPERIENCE THAT YOUR FUNCTION WAS

4    COMPROMISED IN A WAY THERE'S A CLEAR DETERIORATION OF YOUR

5    FUNCTION OVER THE LAST FIVE, SIX YEARS.  OKAY?

6              I THINK IT IS CERTAINLY EASY TO JUST GIVE YOU TWO

7    TRAMADOL AND JUST BE DONE WITH IT.  I THINK IT'S A VERY SIMPLE

8    THING TO DO, BUT, AGAIN, DR. SAYRE HAS MADE THAT DECISION NOT

9    TO USE THAT TRAMADOL AND I HAVE TO RESPECT HIM —— WELL, I HAVE

10   TO ——

11             **THE COURT:**  I THINK ——

12             **THE WITNESS:**  GIVEN THAT —— YOU UNDERSTAND.

13             **THE COURT:**  YOU HAVE SAID IT BEFORE.

14             **MR. ASHKER:**  OKAY.

15             **THE COURT:**  I THINK WE NEED TO MOVE ON.

16             **MR. ASHKER:**  REALLY ——

17             **THE WITNESS:**  SO, TODD ——

18             **THE COURT:**  WE NEED TO WAIT AND JUST HAVE ANOTHER

19   QUESTION.

20             **THE WITNESS:**  OKAY.

21             **THE COURT:**  IF THERE ARE ANY.

22             **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS, DR. SHIN.

23             **MR. ANDRADA:**  JUST A COUPLE OF QUESTIONS, AND I WILL

24   BE DONE.  TWO MINUTES.

25             **THE COURT:**  THAT'S FINE.

1               **REDIRECT EXAMINATION**

2    **BY MR. ANDRADA:**

3    **Q.**   DR. SHIN, YOU WERE PROVIDED RECORDS DEALING WITH

4    MR. ASHKER THAT POST DATE THE DECISION IN SEPTEMBER OF 2006 TO

5    TRY SOMETHING BESIDES TRAMADOL, CORRECT?

6               I CAN SHOW --

7    **A.**   YEAH, YEAH.  SURE.

8    **Q.**   -- IN YOUR REPORT, RIGHT?

9    **A.**   YES.

10   **Q.**   YOU REVIEWED THOSE RECORDS, CORRECT?

11   **A.**   YES.

12   **Q.**   YOU THOUGHT -- I ASSUME THAT YOU CONCLUDED THAT THE

13   TREATMENT POST CHANGE IN THE PRESCRIPTION WAS REASONABLE AS

14   WELL, CORRECT?

15   **A.**   YES.

16          **MR. ANDRADA:**  ALL RIGHT.  THANK YOU VERY MUCH.

17          **MR. ASHKER:**  JUST ONE QUESTION, DR. SHIN.

18               **RECROSS-EXAMINATION**

19   **BY MR. ASHKER:**

20   **Q.**   YOUR ASSESSMENT THAT YOU JUST STATED THAT YOU FELT IT WAS

21   REASONABLE WAS BASED ONLY ON THE MATERIALS THAT THE DEFENDANTS

22   PROVIDED YOU; IS THAT CORRECT?

23   **A.**   CORRECT.

24          **MR. ASHKER:**  OKAY.  I HAVE NO FURTHER QUESTIONS.

25          **THE COURT:**  NOW, I AM A LITTLE CONFUSED.

| | |
|---|---|
| 1 | **MR. ANDRADA:**  ONE MORE. |
| 2 | **FURTHER REDIRECT EXAMINATION** |
| 3 | **BY MR. ANDRADA:** |
| 4 | **Q.**   IT WAS ALSO BASED UPON YOUR -- WHAT MR. ASHKER TOLD YOU |
| 5 | AND IT WAS ALSO BASED UPON THE DEPOSITION OF DR. WEINSTEIN, |
| 6 | CORRECT? |
| 7 | **A.**   YES.  YES. |
| 8 | **MR. ANDRADA:**  ALL RIGHT.  THANK YOU VERY MUCH. |
| 9 | **THE COURT:**  NOW I AM CONFUSED.  LET ME YOU ALL |
| 10 | FINISH UP AND THEN I HAVE A COUPLE OF QUESTIONS. |
| 11 | **FURTHER RECROSS-EXAMINATION** |
| 12 | **BY MR. ASHKER:** |
| 13 | **Q.**   DR. SHIN, YOU REVIEWED DR. WEINSTEIN'S REPORTS FOR 2007 |
| 14 | AND 2005 AS PART OF YOUR OVERALL ANALYSIS AND DETERMINATION OF |
| 15 | YOUR REPORT, RIGHT? |
| 16 | **A.**   YES. |
| 17 | **Q.**   OKAY. |
| 18 | AND IN DR. WEINSTEIN'S REPORTS THAT YOU REVIEWED, IN |
| 19 | THE SUBJECTIVE PART OF THOSE REPORTS, HE DETAILS MY, WHAT I |
| 20 | DESCRIBED TO YOU EARLIER ABOUT THE LACK, THE LESSENING OF MY |
| 21 | DAILY ACTIVITIES, PROBLEMS WITH SLEEP, AND ALL THOSE THINGS. |
| 22 | IS THAT NOT CORRECT? |
| 23 | **A.**   YES. |
| 24 | **Q.**   AND YOU DID NOT GIVE THOSE ANY WEIGHT? |
| 25 | **A.**   I GOT THOSE INFORMATION DIRECTLY FROM YOU, TODD.  SO I DO |

1   GIVE THEM WEIGHT, BUT THAT'S WHY I WENT OUT THERE TO TALK TO

2   YOU.

3   **Q.**   RIGHT.

4   **A.**   GET INFORMATION DIRECTLY FROM YOU.

5   **Q.**   HERE'S THE THING THOUGH:  DO YOU DISAGREE WITH MY POSITION

6   THAT WHEN WE TALKED ABOUT MY -- OKAY.  PUT IT THIS WAY:  WHAT

7   ARE MY WRITING NEEDS?

8           **MR. ANDRADA:**  I THINK ISN'T THAT BEYOND THE SCOPE OF

9   MY REDIRECT, YOUR HONOR?

10          **THE WITNESS:**  I FELT THAT WHEN YOU --

11          (SIMULTANEOUS COLLOQUY.)

12          **THE COURT:**  IT IS.  I AM SORRY, THERE IS AN

13  OBJECTION.

14          I AM GOING TO SUSTAIN IT AS BEYOND THE SCOPE.

15          **MR. ASHKER:**  WHAT WAS -- HE SAID THAT THEY -- HE

16  REVIEWED MY RECORDS --

17          **THE COURT:**  IT WAS A PRETTY BROAD REDIRECT.  IT'S

18  SORT OF ENCOMPASSED EVERYTHING, SO I GUESS IT'S PRETTY HARD TO

19  SAY IT IS BEYOND THE SCOPE OF THAT BROAD OF A REDIRECT.

20  **BY MR. ASHKER:**

21  **Q.**   DR. SHIN, CAN YOU PLEASE STATE BASED UPON YOUR

22  RECOLLECTION OF OUR 12/22/08 MEETING WHAT MY WRITING NEEDS ARE?

23          WHAT ARE MY GENERAL WRITING NEEDS EACH DAY?

24  **A.**   I DON'T KNOW THAT, TODD.  FROM WHAT I RECALL --

25  **Q.**   WELL, LET ME PLEASE INTERRUPT YOU FOR A SECOND.

1        ISN'T IT A FACT THAT WE DID NOT DISCUSS THE DETAILS

2   OF WHAT MY ACTUAL WRITING NEEDS WERE EACH DAY?

3   **A.**   THAT IS CORRECT.

4        **MR. ASHKER:**  FAIR ENOUGH.  THANK YOU.  I HAVE NO

5   FURTHER QUESTIONS.

6        **MR. ANDRADA:**  NOTHING.

7        **THE COURT:**  WHAT CONFUSED ME WAS COUNSEL JUST ASKED

8   YOU WHETHER YOU FELT THAT THE TREATMENT AFTER THE TRAMADOL WAS

9   DISCONTINUED IN SEPTEMBER OF '06 WAS WITHIN THE STANDARD OF

10  CARE, BUT GIVEN THAT THE TREATMENT INCLUDED A TREATMENT OF

11  IBUPROFEN WITH A HISTORY OF GASTROINTESTINAL PROBLEMS THAT YOU

12  HAD PREVIOUSLY SAID I THOUGHT WAS BELOW THE STANDARD OF CARE.

13       **THE WITNESS:**  CORRECT.

14       IF DR. SAYRE, AFTER TODD ASHKER HAD COMPLAINED OF

15  STOMACH PROBLEMS, AND I BELIEVE HE WENT TO A GI ENDOSCOPE, IF

16  DR. SAYRE STILL RECOMMENDED THE USE OF NSAIDS, I WOULD NOT HAVE

17  DONE THAT.  SO THAT I WOULD BELIEVE WOULD HAVE BEEN

18  SUBSTANDARD.  IT IS UNREASONABLE FOR A PHYSICIAN TO CONTINUE TO

19  RECOMMEND A COURSE OF TREATMENT TO HAVE CLEARLY RESULTED IN

20  SOME SIDE EFFECTS.  THAT WOULD SMACK IN THE FACE OF BEING

21  INAPPROPRIATE.

22       **THE COURT:**  I JUST HAD A COUPLE OF OTHER QUESTIONS.

23       IF WE DEFINE PHYSICAL THERAPY, I KNOW IT HAS VARIOUS

24  PARTS, BUT LET'S LOOK AT THE PART THAT INVOLVES SEEING A

25  PHYSICAL THERAPIST, FOR MANIPULATION OR TEACHING OF EXERCISE,

1    AND SO ON, IF YOU WOULD LOOK AT MR. ASHKER'S STATE AS BEST YOU

2    UNDERSTAND IT IN, I GUESS, SEPTEMBER OF '06 --

3                MR. ANDRADA:  I AM SORRY, YOUR HONOR.

4                THE COURT:  FEBRUARY OF '07, SAY TWO YEARS AGO --

5                THE WITNESS:  OKAY.

6                THE COURT:  -- WOULD YOU FEEL THAT IT WOULD BE

7    CONTRAINDICATED TO GIVE HIM A SESSION WITH A PHYSICAL THERAPIST

8    ONCE A WEEK?  CONTRAINDICATED.

9                THE WITNESS:  YOU KNOW, ACTUALLY IF SOMEBODY IS

10   WILLING TO PAY FOR IT, YOU CAN HAVE PHYSICAL THERAPY EVERY

11   SINGLE DAY.  NO ONE WOULD BE OPPOSED TO THAT.  I THINK IT'S A

12   QUESTION OF SOCIOECONOMIC QUESTION.  IF SOMEBODY'S WILLING TO

13   PAY FOR IT, THERE'S NO -- YOU KNOW, IT WOULD BE NICE TO HAVE A

14   PERSONAL THERAPIST TO BE VISITED.  AND THEY REALLY QUESTION IS

15   IT MEDICALLY NECESSARY --

16               THE COURT:  MY QUESTION IS, IS IT CONTRAINDICATED?

17               THE WITNESS:  TO HAVE PHYSICAL THERAPY ONCE A WEEK?

18   WOULD IT HURT HIM?

19               THE COURT:  I GATHER CONTRAINDICATED IS A MEDICAL

20   TERM OF ART.  AND I AM USING IT DELIBERATELY TO ELICIT YOUR

21   ANSWER USING THAT TERM.  IS IT CONTRAINDICATED?

22               THE WITNESS:  IS IT MEDICALLY INAPPROPRIATE?  IS IT

23   MEDICALLY CONTRAINDICATED TO PROVIDE HIM WITH REGULAR, ONCE A

24   WEEK PHYSICAL THERAPY GIVEN HIS CONDITION?

25               THE COURT:  YES.

1        **THE WITNESS:**  IT CAN BE.

2        **THE COURT:**  WHY?  HOW WOULD IT BE?

3        **THE WITNESS:**  WHEN YOU ARE MANAGING CHRONIC PAIN,

4   THERE'S AN ISSUE OF TREATMENT DEPENDENCE.  THESE ARE NOT MY

5   RECORDS.  IF YOU READ ACOM AMERICAN COLLEGE OF ENVIRONMENTAL

6   MEDICINE AND OCCUPATIONAL MEDICINE, WHICH IS CURRENTLY THE

7   ACCEPTED GUIDELINES FOR WORKER'S COMPENSATION CASES, I CAN'T

8   TELL YOU THE SPECIFIC PAGE BECAUSE I USE IT ALL TIME, BUT

9   PROLONGED TREATMENT, EXCESSIVE TREATMENTS, PARTICULARLY THE

10  PHYSICAL TREATMENT INVOLVING PHYSICAL THERAPY, EXCESSIVE

11  SURGERY, ALL THESE THINGS CAN INHIBIT FUNCTIONAL RECOVERY.

12        YOU CAN ACTUALLY CREATE A LEVEL OF EXPECTATION AND

13  CREATE A SITUATION WHERE A PATIENT FEELS LIKE HE HAS TO HAVE

14  PHYSICAL THERAPY EVERY SINGLE WEEK WHEN, IN FACT, HE IS ABLE TO

15  ACCOMPLISH ALL OF THE THINGS ON HIS OWN AT HOME AND MORE

16  EFFECTIVELY.  IF YOU CONTINUE TO PRESCRIBE PHYSICAL THERAPY AND

17  COLLOCATE THE IDEA THAT YOU NEED TO HAVE THERAPY EVERY SINGLE

18  WEEK, THAT WOULD BE INAPPROPRIATE.

19        **THE COURT:**  WHAT ABOUT A HOT WHIRLPOOL TREATMENT;

20  WOULD IT BE CONTRAINDICATED FOR SOMEONE IN MR. ASHKER'S

21  POSITION TO HAVE A HOT WHIRLPOOL TREATMENT ONCE OR TWICE A

22  WEEK?

23        **THE WITNESS:**  THAT WOULD NOT BE CONTRAINDICATED.

24        **THE COURT:**  I DON'T KNOW IF YOU TALKED ABOUT THIS,

25  BUT IF A PERSON HAD A LITTLE BALL THAT THEY SQUEEZED WITH THEIR

1    HAND AND WERE TAUGHT PHYSICAL THERAPY EXERCISES BY A THERAPIST

2    TO USE THAT BALL WITH, WOULD IT BE CONTRAINDICATED --

3               **THE WITNESS:**  NO.

4               **THE COURT:**  -- TO HAVE THAT FORM OF PHYSICAL THERAPY

5    AVAILABLE?

6               **THE WITNESS:**  AGAIN, THESE ARE -- YOU TALK ABOUT

7    WHIRLPOOL --

8               **THE COURT:**  NO, NO.  NOW I AM ASKING ABOUT THE BALL.

9               **THE WITNESS:**  I KNOW.  THE EXERCISE BALL, THESE ARE

10   THINGS YOU DO ON YOUR OWN THOUGH.  YOU JUST GIVE HIM A BALL.

11              **THE COURT:**  RIGHT.  THAT'S WHAT I AM ASKING.  WOULD

12   IT BE CONTRAINDICATED --

13              **THE WITNESS:**  NO, IT'S NOT.

14              **THE COURT:**  -- TO ALLOW SUCH A PERSON TO HAVE A BALL

15   THAT SUCH A PERSON COULD USE AS DIRECTED BY A PHYSICAL THERAPY?

16              **THE WITNESS:**  IT'S NOT ONLY NOT CONTRAINDICATED, IT

17   WOULD BE ENCOURAGED.

18              **THE COURT:**  OKAY.  AND, SIMILARLY, A DEVICE THAT

19   SEEMS TO BE REFERRED TO AS A THERA-BAND, WHICH SEEMS TO ALLOW

20   CERTAIN EXERCISES, AGAIN, DIRECTED BY A PHYSICAL THERAPIST.

21              WOULD IT BE CONTRAINDICATED TO ALLOW THE PERSON TO

22   HAVE THAT BAND TO PERFORM EXERCISES THAT WERE DIRECTED BY THE

23   PHYSICAL THERAPIST?

24              **THE WITNESS:**  YOU NEED ONE VISIT BY A THERAPIST TO

25   LEARN HOW TO USE THE BALL AND BAND.

1    **THE COURT:**  I HAVE CHANGED THE SUBJECT.  I AM NOT

2    ASKING ABOUT THE VISITS ANYMORE.

3    **THE WITNESS:**  YOU MENTIONED PHYSICAL THERAPY.

4    **THE COURT:**  I DID, BUT I AM FINISHED WITH THAT

5    QUESTION NOW.  NOW I AM ASKING SIMPLY ABOUT HAVING A THERA-BAND

6    AVAILABLE --

7    **THE WITNESS:**  THEY SHOULD HAVE IT.  THEY SHOULD HAVE

8    IT.

9    **THE COURT:**  WOULD IT BE CONTRAINDICATED TO ALLOW

10   THEM TO HAVE IT?

11   **THE WITNESS:**  IT'S NOT CONTRAINDICATED THOUGH.

12   **THE COURT:**  THOSE ARE MY QUESTIONS.

13   **MR. ANDRADA:**  I DO HAVE A COUPLE, VERY BRIEFLY.

14   **THE COURT:**  SURE.

15   **FURTHER REDIRECT EXAMINATION**

16   **BY MR. ANDRADA:**

17   **Q.**   DR. SHIN, DID YOU SEE IN THE RECORDS YOU REVIEWED THAT

18   THERE WAS AN UPPER GI EXAMINATION DONE IN MAY OF 2007?

19   WHY DON'T YOU TURN TO PAGE 9 OF YOUR REPORT.

20   **A.**   YES.

21   **Q.**   WHAT IS AN UPPER GI EXAM?

22   **A.**   THEY JUST PUT A SCOPE -- THERE'S A LOWER GI, YOU GO

23   THROUGH THE ANUS, UPPER GI YOU GO THROUGH THE MOUTH.

24   **Q.**   ALL RIGHT.

25   AND THE PURPOSE WAS TO DETERMINE WHETHER THERE WERE

1    ANY PROBLEMS WITH THE ABDOMINAL TRACK; IS THAT CORRECT?

2    **A.**   YES.

3    **Q.**   AND THE TEST RESULTS INDICATED THAT THERE WERE NO

4    SIGNIFICANT ABNORMALITIES, CORRECT?

5    **A.**   CORRECT.

6    **Q.**   BUT THAT THERE WERE SOME LESS SIGNIFICANT FINDINGS

7    POSSIBLY SUGGESTIVE OF MILD GASTRITIS, CORRECT?

8    **A.**   YES.

9    **Q.**   AND HOW DOES ONE TREAT MILD GASTRITIS?

10   **A.**   IT DEPENDS ON THE CAUSE AND, OF COURSE, THIS IS CAUSATION

11   BY ASSOCIATION.

12   **Q.**   WHAT DO YOU MEAN?

13   **A.**   IF THE PATIENT HAD BEEN NSAIDS FOR A WHILE AND COMPLAINED

14   OF STOMACH PAIN AND THEN I STOPPED THE MEDICATION AND THEN YOU

15   DO AN ENDOSCOPE, YOU SEE MILD GASTRIC CHANGES, AND I WOULD JUST

16   SAY, HEY, WE ARE NOT GOING TO USE NSAIDS FOR A WHILE.

17   **Q.**   FOR A WHILE?

18   **A.**   FOR A WHILE.  YOU CAN TRY IT AGAIN.  YOU CAN CERTAINLY

19   TRY, BUT YOU CAN HAVE GASTRITIS FROM OTHER CAUSES, OR YOU CAN

20   TRY A DIFFERENT AGENT.

21          I DON'T KNOW WHAT THE EXACT RECOMMENDATION IS, BUT

22   THE RECOMMENDATION I AM AWARE OF IS TO TRY THREE DIFFERENT

23   AGENTS BEFORE YOU GIVE UP.  SO YOU CAN TRY MOTRIN AND THEN GO

24   TO NAPROSYN AND SEE IF THEY STILL HAVE STOMACH COMPLAINTS.  AND

25   THEN YOU CAN TRY RELAFEN -- THERE'S 30 DIFFERENT KINDS OF

1    NSAIDS -- BEFORE YOU GIVE UP.

2              SO IT'S NOT LIKE YOU HAVE ONE EPISODE AND THEN

3    YOU'VE GOT TO STOP IT COMPLETELY.  SO YOU CAN -- AND, OF

4    COURSE, IF THE ENDOSCOPE ACTIVITY SHOWN ULCERATIONS AND

5    WHATNOT, CRATERS AND WHATNOT, THEN I WOULD HAVE CERTAINLY HAD

6    THE PATIENT STAY AWAY FROM NSAIDS ALL TOGETHER.

7              BUT, AGAIN, THESE ARE CLINICAL DECISIONS, SMALL, BUT

8    SIGNIFICANT CLINICAL DECISIONS THAT SHOULD BE LEFT TO THE

9    TREATER.

10             NOW, IF DR. SAYRE, FOR EXAMPLE, A PHYSICIAN HAD

11   RECOMMENDED USE OF NSAIDS AND WE HAD CLEAR EVIDENCE OF ULCERS

12   AND THERE'S A HOLE AND THE PATIENT WAS HOSPITALIZED, THEN

13   NSAIDS IS JUST A GROSS SUBSTANDARD CARE.

14   Q.   WE DON'T HAVE THAT, DO WE?

15   A.   WE DON'T HAVE THAT.  IF THE PATIENT COMPLAINED OF STOMACH

16   PROBLEMS, YOU DO AN ENDOSCOPE, YOU SHOW SOME MILD CHANGES AND

17   SAY, YOU KNOW WHAT?  MAYBE IT'S SOMETHING ELSE THAT'S CAUSING

18   THAT.  WE CAN TRY THE NSAIDS, MAYBE WE CAN TRY A DIFFERENT

19   AGENT.  THAT'S NOT A PROBLEM.

20   Q.   CAN ULTRAM CAUSE GASTRITIS?

21   A.   I DON'T THINK SO.

22   Q.   CAN MANY, MANY MEDICATIONS OTHER THAN NSAIDS CAUSE

23   PROBLEMS WITH THE GI TRACK?

24   A.   OTHER MEDICATIONS, BUT NOT THE ELAVIL.  I DON'T KNOW WHAT

25   ELSE HE HAS TRIED.

1    **Q.**   ALL RIGHT.

2            AND HOW DOES ONE IN SAY A REGIMEN THAT WOULD INCLUDE

3    TYLENOL AND AN NSAID, ARE THERE ADDITIONAL MEDICATIONS THAT CAN

4    BE GIVEN TO DEAL WITH MINOR GASTRITIS?

5    **A.**   ABSOLUTELY.

6    **Q.**   PLEASE TELL US.

7    **A.**   PROTON INHIBITERS, YOU KNOW, LIKE NEXIUM OR PRILOSEC,

8    ZANTAC, STUFF YOU SEE OVER THE COUNTER NOW.

9    **Q.**   SORT OF MEDICATIONS THAT MR. ASHKER HAS ACTUALLY USED IN

10   THE PAST, CORRECT?

11   **A.**   I DON'T REMEMBER WHAT HE HAS USED.  BUT YOU CAN CERTAINLY

12   USE THAT.  I USE THEM TOGETHER ALL THE TIME, NSAIDS AND

13   PRILOSEC.

14           **MR. ANDRADA:**  ALL RIGHT.  THANK YOU VERY MUCH.

15           **THE COURT:**  YOU KNOW, I FORGOT TO TAKE OUR SECOND

16   BREAK, I THINK.

17           **MR. ASHKER:**  CAN I --

18           **THE COURT:**  I REALLY NEED TO TAKE A BREAK BECAUSE

19   THE COURT REPORTER, I SHOULDN'T KEEP HER MORE THAN A FEW HOURS.

20           **MR. ASHKER:**  I ONLY HAD ABOUT TWO QUESTIONS.

21           **THE COURT:**  LET'S TAKE A BREAK AND YOU CAN HAVE THEM

22   AFTERWARDS.

23           **MR. ASHKER:**  OKAY.

24           **THE COURT:**  SORRY.  I HAVE JUST SLIPPED MY MIND.

25           **MR. ANDRADA:**  ARE WE DONE WITH THIS WITNESS?

1       **THE COURT:**  NO, WE ARE NOT.  WE NEED TO TAKE A BREAK

2    BECAUSE I HAVE KEPT DIANE MUCH LONGER THAN I SHOULD HAVE AND

3    THE JURY, TOO, PROBABLY.  SO I NEED TO TAKE A BREAK RIGHT NOW.

4    AND IF YOU WOULD COME BACK, PLEASE.

5       **THE WITNESS:**  I WILL STAY HERE.

6       **THE CLERK:**  WHAT TIME?

7       **THE COURT:**  12:40.

8           (RECESS TAKEN AT 12:25 P.M.)

9         (PROCEEDINGS RESUMED AT 12:42 P.M.)

10      **THE CLERK:**  ALL RISE.

11       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

12      **THE COURT:**  PLEASE BE SEATED.  I THINK MR. ASHKER

13   HAD ONE OR TWO MORE QUESTIONS.

14      **MR. ASHKER:**  YES.

15              **FURTHER RECROSS-EXAMINATION**

16   BY MR. ASHKER:

17   Q.   DR. SHIN, I WOULD LIKE TO PRESENT YOU THAT BEGINNING FROM

18   1995 UP THROUGH 2002, I HAD PROBLEMS WITH MY STOMACH THAT WAS

19   ASSOCIATED WITH NSAIDS.  AND I HAVE HERE AN X-RAY REPORT FROM

20   1/15/01 WHICH IS A PART OF MY EXHIBIT NUMBER 139 THAT I WOULD

21   LIKE YOU TO LOOK AT VERY QUICKLY AT THE IMPRESSION SECTION.

22       (DOCUMENT HANDED TO WITNESS.)

23      **THE COURT:**  I AM SORRY, WHAT WAS THE NUMBER AGAIN?

24      **MR. ASHKER:**  139.

25

1    **BY MR. ASHKER:**

2    **Q.**   CAN YOU PLEASE READ THE IMPRESSION?

3    **A.**   THIS IS AN UPPER GI IMPRESSION.  MUCOSAL PROMINENCE

4    SUGGESTIVE OF DUODENITIS.  SECOND PORTION OF THE DUODENUM WHICH

5    MIGHT BE RELATED TO AN OCCULT ULCER, ALTHOUGH OTHER IDEOLOGY

6    CAN NOT BE EXCLUDED RADIOGRAPHICALLY.  CORRELATION WITH

7    CLINICAL FINDINGS IN FOLLOW-UP AND AN APPROPRIATE INTERVAL

8    FOLLOWING TREATMENT MAY BE HELPFUL.

9            IT'S 2001.

10   **Q.**   AND WITH THAT DOCUMENT IN MIND, IS IT POSSIBLE THAT MY

11   STOMACH PROBLEM DESCRIBED THERE WAS CAUSED BY LONG-TERM NSAID

12   USE?

13   **A.**   CAN BE.

14   **Q.**   OKAY.

15           AND BEGINNING IN JANUARY OF 2002, I WAS SWITCHED OFF

16   THE NSAIDS AND PUT ON THE TRAMADOL 50 MILLIGRAMS TWICE A DAY,

17   WHICH I REMAINED ON BETWEEN 2002 UP UNTIL 2006 AT WHICH TIME I

18   DIDN'T HAVE THOSE PROBLEMS ASSOCIATED WITH IT.

19           I WOULD TAKE A FEW MYLANTA TABLETS AS NEEDED, AND

20   THEN WHEN I GOT PUT BACK ON THE NSAIDS IN SEPTEMBER OF 2006, MY

21   STOMACH PROBLEMS RETURNED.

22           IS IT FAIR TO SAY THAT NSAIDS ARE CAUSING -- ARE THE

23   CAUSE OF MY STOMACH PROBLEMS?

24           **MR. ANDRADA:**  THIS IS A HYPOTHETICAL?  I THINK IT

25   MISSTATES SOME OF THE EVIDENCE YOUR HONOR.

1          **THE COURT:**  ALL RIGHT.  WE WILL CALL IT A

2    HYPOTHETICAL, IF YOU LIKE.

3          **MR. ANDRADA:**  ALL RIGHT.

4          **THE WITNESS:**  YOU'VE HAD TWO INCIDENTS, SO IT'S

5    CERTAINLY CASE IS BUILDING UP, BUT IT IS NOT CONCLUSIVE.

6    **BY MR. ASHKER:**

7    **Q.**  IT COULD SUGGEST THAT THOUGH, IS THAT CORRECT?

8    **A.**  IT CAN.

9          **MR. ASHKER:**  THANK YOU.  I HAVE NO FURTHER

10   QUESTIONS.

11                  **FURTHER REDIRECT EXAMINATION**

12   **BY MR. ANDRADA:**

13   **Q.**  DOCTOR, YOU WERE ASKED ABOUT TRAMADOL AGAIN BY MR. ASHKER.

14          DID THE STANDARD OF CARE EVER REQUIRE THAT

15   MR. ASHKER RECEIVE TRAMADOL?

16   **A.**  NO.

17   **Q.**  WHY IS THAT?

18   **A.**  IT'S AGAIN, I EXPLAINED THIS FROM THE GET-GO.  THERE'S

19   SUCH A WIDE VARIATION OF WHAT IS CONSIDERED APPROPRIATE OR

20   INAPPROPRIATE -- I AM SORRY, WHAT DOCTORS ACTUALLY DO.  IN A

21   GIVEN COMMUNITY, YOU KNOW, MR. ASHKER WALKED INTO A CLINIC AND

22   THE DOCTOR GIVES HIM NOTHING.  YOU MAY HAVE A DOCTOR THAT GIVES

23   HIM A TON OF PAIN MEDICATIONS.

24          **MR. ANDRADA:**  THANK YOU VERY MUCH, SIR.  THAT IS ALL

25   I HAVE.

1          **MR. ASHKER:**  I HAVE NOTHING FURTHER, YOUR HONOR.

2          **THE COURT:**  YOU ARE EXCUSED.  THANK YOU.

3          YOU MAY CALL YOUR NEXT WITNESS.

4          **MR. ANDRADA:**  THANK YOU, DOCTOR, VERY MUCH.

5          WE HAVE MS. RISENHOOVER UP AT PELICAN BAY.  WE WILL

6   TRY TO BE AS FAST AS WE CAN.

7          **THE COURT:**  IS THIS YOUR LAST WITNESS?

8          **MR. ANDRADA:**  WELL, WE DO HAVE MS. MCLEAN FOR A FEW

9   MINUTES.  AGAIN, I AM GOING TO TRY TO GET THROUGH BOTH OF THEM.

10  I KNOW THAT YOUR HONOR WANTS TO END TODAY.  SO, I AM MINDFUL OF

11  ALL OF THAT, BELIEVE ME.

12         **MR. ASHKER:**  YOUR HONOR, YESTERDAY I THOUGHT THE

13  DEFENDANTS PRESENTED THAT THEY WEREN'T GOING TO CALL MCLEAN AND

14  NOW THEY ARE SAYING THEY ARE?  I AM CONFUSED ABOUT THAT.

15         **THE COURT:**  YOU DID SAY THAT.

16         **MR. ANDRADA:**  A LITTLE CHANGE IN STRATEGY.  I AGREE,

17  YOUR HONOR, BUT THERE'S A COUPLE OF SMALL ISSUES I WOULD LIKE

18  TO CLEAN UP IF IT IS ALL RIGHT WITH THE COURT.

19         **THE COURT:**  WELL, ALL RIGHT.  USUALLY IT'S POLITE TO

20  INFORM THE OTHER SIDE OF WHAT YOU ARE GOING TO DO IN ADVANCE,

21  BUT THAT'S FINE.

22         **MR. ANDRADA:**  I AM SORRY, YOUR HONOR.

23         **THE COURT:**  THAT'S ALL RIGHT.

24         **MR. ANDRADA:**  I DIDN'T HAVE ANY CONTACT WITH

25  MR. ASHKER YESTERDAY AFTERNOON AFTER WE LEFT.

1          **THE COURT:**  ALL RIGHT.

2          **MR. ANDRADA:**  YOU NEED TO SWEAR THE WITNESS.

3          **THE CLERK:**  WILL THE WITNESS RAISE YOUR RIGHT HAND.

4                          **SUE RISENHOOVER,**

5     CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

6     TESTIFIED AS FOLLOWS VIA VIDEOCONFERENCE:

7          **THE WITNESS:**  I DO.

8          **THE CLERK:**  PLEASE STATE YOUR NAME SPELLING YOUR

9     LAST NAME FOR THE RECORD.

10         **THE WITNESS:**  SUE RISENHOOVER,

11    R-I-S-E-N-H-O-O-V-E-R.

12                        **DIRECT EXAMINATION**

13    BY MR. ANDRADA:

14    **Q.**   GOOD MORNING, MS. RISENHOOVER -- EXCUSE ME, GOOD

15    AFTERNOON.

16         CAN YOU HEAR ME?

17    **A.**   YES.

18    **Q.**   WE ARE GOING TO GO THROUGH THIS VERY QUICKLY, OKAY?

19    **A.**   YES.

20    **Q.**   YOU ARE A FAMILY NURSE PRACTITIONER; IS THAT CORRECT?

21    **A.**   CORRECT.

22    **Q.**   AND YOU PROVIDED SOME CARE TO MR. ASHKER IN 2006; IS THAT

23    CORRECT?

24    **A.**   CORRECT.

25    **Q.**   DID YOU RECOMMEND TO DR. SAYRE THAT YOU THOUGHT THAT

1   TRAMADOL SHOULD BE DISCONTINUED?

2   **A.**   WHEN I MET MR. ASHKER AND HE WAS TELLING ME THAT HE

3   WOULD -- WANTED THE TRAMADOL RENEWED, AND HIS OTHER SYMPTOMS,

4   STOMACH DISCOMFORT, AND THE LENGTH OF TIME HE WAS ON TRAMADOL,

5   I WANTED TO REVIEW HIS CASE AND HIS CHART.

6           AND WITH ALL OF THAT INFORMATION I GATHERED THEN, I

7   ELECTED TO TAKE THAT INFORMATION TO THE MEDICAL COMMITTEE, AND

8   DR. SAYRE IS MY COLLABORATOR, FORM OF VIEW, AND THEN A

9   UNANIMOUS DECISION WAS THEN MADE BY THAT INFORMATION THAT I

10  PRESENTED THAT HE SHOULD BE TAPERED AND DISCONTINUED FROM THE

11  TRAMADOL.

12  **Q.**   AND, BRIEFLY, WHY DID YOU THINK IT WAS APPROPRIATE TO

13  TAPER AND DISCONTINUE?

14  **A.**   MR. ASHKER WAS HAVING SYMPTOMS OF STOMACH DISTRESS, AND

15  UPON REVIEW OF THE CHART HE ALSO HAD A HISTORY OF HEPATITIS C,

16  WHICH IS A LIVER DISEASE.

17          HE ALSO WAS HAVING TROUBLE WITH A RASH AND ITCHING.

18  AND WITH REVIEW FURTHER OF THE CHART, HE WAS ACTUALLY PER

19  PSYCHOLOGIST REVIEW, HAD A HISTORY OF DRUG DEPENDENCY.

20          SO TRAMADOL, ADVERSE REACTIONS AND SIDE EFFECTS ARE

21  GI BLEEDING, GASTRITIS, ITCHING, RASH.  THE PROBLEM WITH

22  TRAMADOL THAT STOOD OUT IN MY MIND WAS THE WARNINGS ABOUT

23  SEIZURES THAT COULD OCCUR IF YOU HAD SEIZURES AND COULD OCCUR

24  AT ANY TIME IF YOU DIDN'T.  SO WITH ALL THIS INFORMATION WAS

25  THE REASON I WENT TO THE MEDICAL COMMITTEE.  AND HE HAD....

1  **Q.**   YOU HAD DISCUSSED VARIOUS TREATMENT OPTIONS WITH

2  MR. ASHKER DURING THE TIME THAT YOU WERE TAKING CARE OF HIM,

3  CORRECT?

4  **A.**   CORRECT.

5  **Q.**   AND DID HE OFFER ANY RESISTANCE TO YOUR SUGGESTIONS?

6  **A.**   HE WANTED HIS TRAMADOL.

7  **Q.**   PLEASE EXPLAIN.

8  **A.**   THAT IS WHAT, WHEN I FIRST MET HIM, THAT IS WHAT HE CAME

9  IN TO THE CLINIC FOR, WAS FOR RENEWAL OF THE TRAMADOL.

10  **Q.**   OKAY.

11  **A.**   AGAIN, UPON REVIEW AND THEN FROM THE MEDICAL COMMITTEE, I

12  TAPERED THAT DOSE AND INFORMED MR. ASHKER THAT I WAS GOING TO

13  TRY ALTERNATIVE MEDICINES, WHICH WOULD BE NSAIDS, TYLENOL, AND

14  USING COMBINATIONS OF THESE DRUGS AT LOW DOSE HOPEFULLY GIVING

15  HIM SOME RELIEF OF HIS DISCOMFORT WITH MINIMAL SIDE EFFECTS.

16  **Q.**   DID HE EVER THREATEN TO BRING 602'S AGAINST YOU?

17  **A.**   YES.  THAT WAS ONE OF THE PROBLEMS.  I WAS NOT ABLE TO DO

18  MUCH FOR MEDICAL CARE BECAUSE HE WOULD BECOME UPSET THAT HE

19  WASN'T GETTING WHAT HE WANTED AND THEN WOULD THREATEN ME WITH A

20  602, AND THEN WE'D HAVE TO DEAL WITH THAT ON THE NEXT VISIT

21  THAT TURNED INTO A LEGAL -- 602 ISSUE, THEN THAT HAD TO BE

22  DEALT WITH INSTEAD OF HIS MEDICAL CARE.

23  **Q.**   DID HE USE PROFANITY IN HIS DISCUSSIONS WITH YOU?

24  **A.**   YES.  THERE WOULD BE TIMES WHEN HE BECAME UPSET WITH ME

25  AND WOULD LEAN FORWARD AND BE THREATENING.  AND THE PROFANITY I

1    WON'T REPEAT.  AND THEN AT TIMES HE WAS REMOVED FROM THE ROOM

2    BECAUSE HE WOULD BE –– WAS UPSET.

3    Q.   WHAT DO YOU MEAN HE WAS REMOVED FROM THE ROOM?

4    A.   THE OFFICERS COULD TELL THAT MR. ASHKER WASN'T HAPPY, AND

5    THEN THEY WOULD JUST TAKE HIM AND WOULD RESCHEDULE THAT

6    MEETING.

7             MR. ANDRADA:  THANK YOU VERY MUCH.

8             THANK YOU, YOUR HONOR.

9                        CROSS–EXAMINATION

10   BY MR. ASHKER:

11   Q.   GOOD AFTERNOON, MS. RISENHOOVER.

12   A.   GOOD AFTERNOON, MR. ASHKER.

13   Q.   YOU STATED THAT –– WELL, THE FIRST TIME THAT I SAW YOU WAS

14   FOR MEDICATION RENEWAL ON MARCH 25TH, 2006; IS THAT CORRECT?

15   A.   AS I RECALL LOOKING THROUGH THE RECORDS.

16   Q.   WELL, PUT IT THIS WAY:  YOU HAVE THE EXHIBITS RIGHT THERE.

17   SO HOW ABOUT IF YOU JUST GRAB EXHIBIT, FEW DOCUMENTS THAT ARE

18   ATTACHED AS EXHIBIT 163 THERE AND WE CAN GO THROUGH SOME OF

19   THEM.

20             MR. LAURIE:  I AM GETTING THOSE EXHIBITS NOW.  AND I

21   AM PROVIDING EXHIBIT 163 TO THE WITNESS.

22             THE WITNESS:  OKAY.

23   BY MR. ASHKER:

24   Q.   THE FIRST PAGE SHOULD BE A PHYSICIAN PROGRESS NOTE DATED

25   3/25/2006.  DO YOU SEE THAT?

RISENHOOVER – CROSS / MR. ASHKER

1    **A.**   CORRECT.

2    **Q.**   AND THIS WAS THE FIRST TIME I SAW YOU FOR RENEWAL OF MY

3    MEDICATIONS INCLUDING TRAMADOL; IS THAT CORRECT?

4    **A.**   CORRECT.

5    **Q.**   AND YOU --

6    **A.**   IT APPEARS TO BE.

7    **Q.**   WAS IT AT THIS VISIT THAT YOU BECAME CONCERNED ABOUT MY

8    TRAMADOL USE?

9    **A.**   WELL, I JUST MET YOU, AND I HADN'T COMPLETELY REVIEWED

10   YOUR CHART AT THAT TIME.

11   **Q.**   OKAY.

12          WOULD YOU LOOK DOWN THERE AT THE BOTTOM WHERE IT

13   STATES:  I WOULD LIKE SOME MYLANTA CHEWS FOR INDIGESTION WHEN I

14   EAT SPICEY FOODS.  I DON'T USE THAT EVERY DAY.

15          DO YOU SEE THAT RIGHT THERE?

16   **A.**   YES.

17   **Q.**   WAS THAT THE BASIS FOR YOUR CONCERNS THAT TRAMADOL MAY BE

18   CAUSING ME STOMACH PROBLEMS?

19   **A.**   NO.  THAT'S ONE OF THEM, BUT YOU TALKED OFTEN ABOUT YOUR

20   STOMACH BEING A PROBLEM.  AND WHEN I WAS ABLE TO GET THE CHART,

21   I COULD SEE THAT YOU HAD BEEN WORKED UP FOR YOUR STOMACH.  YOU

22   HAD EGD'S AND UPPER GI'S DONE.

23   **Q.**   DO YOU KNOW WHAT TIME PERIOD EGD'S AND STOMACH X-RAYS HAD

24   BEEN DONE?

25   **A.**   IT WAS PRIOR TO ME MEETING YOU.

1   **Q.**   OKAY.

2   **A.**   EARLIER DATES.

3   **Q.**   ALL RIGHT.

4           NOW, YOU STATED THAT WHEN YOU TOLD ME THAT -- WELL,

5   GO TO THE NEXT DOCUMENT.  AT THAT VISIT RIGHT THERE -- EXCUSE

6   ME.  AT THAT VISIT RIGHT THERE, DID YOU CONDUCT A CAREFUL EXAM

7   OF MY ARM AND HAND?

8                   **MR. ANDRADA:**  VAGUE AND AMBIGUOUS.  SORRY.

9                   **MR. ASHKER:**  CAN SHE ANSWER?

10                  **THE COURT:**  YES.

11  **BY MR. ASHKER:**

12  **Q.**   YOU MAY ANSWER.

13  **A.**   WOULD YOU RESTATE YOUR QUESTION?

14  **Q.**   WHEN I SAW YOU ON 3/25/2006 FOR MY TRAMADOL MEDICATION

15  RENEWAL, DID YOU CONDUCT A CAREFUL EXAMINATION OF MY ARM AND

16  HAND?

17  **A.**   I LISTENED TO YOUR HEART AND LUNGS AND I DID CHECK AND SEE

18  ABOUT YOUR ARM, BUT THAT WAS NOT A TOTAL PHYSICAL EXAM OF YOUR

19  RIGHT ARM.  I INDICATED AT THAT TIME.

20  **Q.**   IT WAS NOT INDICATED AT THAT TIME.  THAT'S YOUR TESTIMONY?

21  **A.**   YES.

22  **Q.**   AND AT THAT TIME YOU RENEWED MY TRAMADOL FOR 90 DAYS,

23  CORRECT?

24  **A.**   CORRECT.

25  **Q.**   AND THEN THE NEXT TIME I SAW YOU WAS ON JUNE 21ST, 2006;

1    IS THAT CORRECT?

2    **A.**   I AM LOOKING.

3    **Q.**   OKAY.

4    **A.**   YES.

5    **Q.**   ALL RIGHT.

6          YOU HAVE THE DOCUMENT THERE IN FRONT OF YOU OF YOUR

7    PHYSICIAN PROGRESS NOTE FOR THAT DAY; IS THAT CORRECT?

8    **A.**   YES.

9    **Q.**   OKAY.

10          AND AT THAT TIME YOU INFORMED ME OF DR. SAYRE'S

11   RECOMMENDING THAT THE TRAMADOL BE TAPERED OFF AND MY PAIN

12   CONTROL BE RE-EVALUATED; IS THAT CORRECT?

13   **A.**   I WOULD HAVE TO READ THESE NOTES.

14   **Q.**   IT'S AT THE BOTTOM OF THE PAGE THERE.

15   **A.**   AND YOUR QUESTION IS?

16   **Q.**   AT THAT TIME YOU INFORMED ME ON 6/21/06 ABOUT DR. SAYRE'S

17   RECOMMENDATION THAT YOU TAPER MY DOSE OF TRAMADOL AND

18   RE-EVALUATE MY PAIN CONTROL; IS THAT CORRECT?

19   **A.**   THAT WAS ON THE DAY BEFORE, YES.

20   **Q.**   OKAY.

21   **A.**   IT'S WRITTEN THERE.

22   **Q.**   BUT, IN FACT, ON THAT DAY YOU CONTINUED MY TRAMADOL

23   MEDICATION FOR 60 ADDITIONAL DAYS; IS THAT NOT CORRECT?

24   **A.**   YES.

25   **Q.**   AND ON THAT DAY, DID YOU CONDUCT A CAREFUL, PHYSICAL

1    EXAMINATION OF MY ARM AND HAND?

2    **A.**   NOT ON EVERY VISIT, MR. ASHKER, DO YOU HAVE TO DO A

3    CAREFUL EXAMINATION OF YOUR RIGHT ARM.

4    **Q.**   I AM ASKING IF YOU DID ONE ON THAT DATE.

5    **A.**   I AM NOT FINDING THE OBJECTIVE NOTES ON THAT DATE.

6    **Q.**   OKAY.

7    **A.**   THEY ARE ONLY SUBJECTIVE.

8    **Q.**   ALL RIGHT.

9           ON THAT DAY UNDER YOUR SUBJECTIVE PART OF THAT

10   REPORT YOU NOTED:  PATIENT STATES RIGHT NOW SCALE OF PAIN

11   BETWEEN ONE TO TEN IS A THREE.  I AM ABLE TO SLEEP.  MY RIGHT

12   ARM DOES NOT WAKE ME UP.  I HAVE A LITTLE NUMBNESS UNDER MY

13   FIFTH FINGER ONLY.

14           IS THAT CORRECT?

15   **A.**   WHERE ARE YOU READING THAT, MR. ASHKER?

16   **Q.**   THAT'S -- IT SHOULD HAVE A HAND NUMBER AT THE BOTTOM OF

17   THE PAGE 10, AND IT'S THE END OF YOUR SUBJECTIVE NOTATION?

18   **A.**   OKAY.

19   **Q.**   VERY LAST LINE.

20   **A.**   OKAY.

21   **Q.**   IS THAT CORRECT?

22   **A.**   ON 6/21.

23   **Q.**   IS THAT CORRECT?

24   **A.**   YOU TALK ABOUT YOUR EXERCISES.  ON JUNE 21 YOU TALK ABOUT

25   YOUR EXERCISE.

RISENHOOVER – CROSS / MR. ASHKER

1    Q.    I AM TALKING ABOUT AT THE VERY LAST LINE.

2              PATIENT STATES RIGHT NOW SCALE IS A THREE OUT OF A

3    ONE TO TEN.  I AM ABLE TO SLEEP AT NIGHT.  MY RIGHT ARM DOES

4    NOT WAKE ME UP.  I HAVE A LITTLE NUMBNESS UNDER MY FIFTH FINGER

5    ONLY.

6              DO YOU SEE THAT THERE?  AT THE BOTTOM OF THE PAGE,

7    IT SHOULD HAVE A HANDWRITTEN NUMBER 10.

8    A.    I GOT IT.

9    Q.    ON THAT DAY YOU, IN FACT, RENEWED MY TRAMADOL FOR 60

10   ADDITIONAL DAYS; IS THAT CORRECT?

11   A.    YES.

12   Q.    YOU DID NOT FOLLOW DR. SAYRE'S RECOMMENDATION, DID YOU?

13   A.    THIS WAS, AT THIS TIME, I BROUGHT THIS WHOLE THING, SET IT

14   UP TO TAKE IT TO MEDICAL COMMITTEE OF YOUR CHART AND YOUR

15   HISTORY.

16   Q.    BUT YOU DID NOT FOLLOW DR. SAYRE'S RECOMMENDATION ON THAT

17   DATE; YOU RENEWED MY TRAMADOL FOR 60 ADDITIONAL DAYS.  IS THAT

18   CORRECT?

19   A.    IT WAS A RECOMMENDATION.

20   Q.    OKAY, THANK YOU.

21              YOU –– CAN I ASK WHY YOU DIDN'T FOLLOW IT AT THAT

22   TIME?

23   A.    BECAUSE IT WAS A RECOMMENDATION, AND I WAS ALSO GOING TO

24   SUBMIT THIS WHOLE CASE TO MEDICAL COMMITTEE FOR REVIEW.

25   Q.    OKAY.

1           AND DO YOU RECALL TELLING ME ON THAT DAY THAT YOU

2   WERE NOT COMFORTABLE FOLLOWING DR. SAYRE'S RECOMMENDATION UNTIL

3   HE WAS ABLE TO CONDUCT A PHYSICAL EXAMINATION OF ME PERSONALLY?

4   **A.**  NO.

5   **Q.**  OKAY.  PLEASE GO TO EXHIBIT NUMBER 66.  AT THE PAGE

6   PHYSICIAN PROGRESS NOTE DATED 9/20/2006.

7   **A.**  OKAY.

8   **Q.**  DO YOU HAVE THE DOCUMENT --

9   **A.**  YES.

10  **Q.**  OKAY.  AND WOULD YOU READ THE SECOND PARAGRAPH?

11  **A.**  ON ACTION B?

12  **Q.**  ON THE SECOND PARAGRAPH ON PAGE -- IT'S DATED 9/20/06.

13  IT'S THE SECOND PARAGRAPH DOWN.  PATIENT HERE FOLLOW UP

14  DR. SAYRE.

15  **A.**  I DON'T HAVE THAT ONE.  I HAVE YOUR 602 IN MY HAND.

16          JUST ONE MOMENT.

17  **Q.**  THIS WOULD BE PART OF EXHIBIT 166.  I THINK YOU ARE

18  REFERRING TO 165.

19          **MR. LAURIE:**  I AM SORRY, I MADE A MISTAKE.  I

20  GRABBED 66.  I AM NOW GETTING EXHIBIT 166.

21          **THE WITNESS:**  YES.

22  **BY MR. ASHKER:**

23  **Q.**  CAN YOU PLEASE READ THAT SECOND PARAGRAPH?

24  **A.**  THIS IS ON PAGE 11 WHERE YOU MARKED AT THE BOTTOM?

25  **Q.**  IT STARTS OFF:  PATIENT HERE FOLLOW UP DR. SAYRE CONSULT

1    8/30/06.

2              THE DATE ON THE DOCUMENT IS 9/20/06.

3    **A.**    JUST ONE MOMENT.

4              SECOND PARAGRAPH.  YES.

5    **Q.**    CAN YOU PLEASE READ THAT FOR ME?

6    **A.**    (READING)

7              PATIENT HERE FOLLOW UP DR. SAYRE CONSULT 8/30/06.

8    PATIENT STATES I ALREADY KNEW THIS WAS COMING.  THEN WAS USING

9    PROFANITY REGARDING DR. SAYRE AND APOLOGIZED TO PROVIDE THE

10   LANGUAGE USED.

11   **Q.**    SO, IN FACT, ON THAT DAY WHEN YOU INFORMED ME OF

12   DR. SAYRE'S DECISION TO DISCONTINUE MY TRAMADOL, I USED

13   PROFANITY TOWARDS DR. SAYRE AND THEN APOLOGIZED TO YOU FOR

14   USING THAT LANGUAGE; IS THAT CORRECT?

15   **A.**    PER THIS NOTE, THAT'S CORRECT.

16   **Q.**    SO HOW DO YOU EXPLAIN YOUR EARLIER TESTIMONY WHEN YOU

17   STATED THAT WHEN YOU INFORMED ME OF THE DECISION TO DISCONTINUE

18   MY TRAMADOL I BECAME, I FORGET YOUR WORDS, BASICALLY I WAS

19   USING PROFANITY OR BECAME BELLIGERENT TOWARDS YOU?

20              **MR. ANDRADA:**  I THINK THAT MISSTATES HER EARLIER

21   TESTIMONY.

22              **THE COURT:**  WELL, I GUESS SHE CAN TELL US IF IT DID.

23   **BY MR. ASHKER:**

24   **Q.**    YOU CAN ANSWER THE QUESTION.

25   **A.**    WOULD YOU PLEASE RESTATE IT?

1    Q.   I BELIEVE EARLIER YOU TESTIFIED THAT WHEN YOU TOLD ME THAT

2    I WOULD BE DISCONTINUED OFF TRAMADOL, I USED PROFANITY TOWARDS

3    YOU; IS THAT CORRECT?

4    A.   AS I RECALL, I DON'T HAVE THE NOTES IN FRONT OF ME, YES,

5    YOU DID BECOME UPSET.

6    Q.   WELL, DO YOU RECALL DOING A DECLARATION ON NOVEMBER 10TH,

7    2006 IN OPPOSITION TO MY MOTION FOR A PROTECTIVE ORDER?

8    A.   I DO NOT HAVE THAT RECORD IN FRONT OF ME.

9    Q.   WELL, IN THAT DECLARATION, YOU STATED ON, AT PARAGRAPH 5:

10   ON OR ABOUT SEPTEMBER 20TH, 2006, I INFORMED TODD ASHKER OF THE

11   DECISION TO DISCONTINUE HIS TRAMADOL PRESCRIPTION BY GRADUALLY

12   REDUCING THE DOSAGE.  I INFORMED HIM OF THE ADVERSE EFFECTS

13   FROM LONG-TERM USE OF TRAMADOL, INCLUDING SEIZURES.  TODD

14   ASHKER WAS AMIABLE AND DID NOT PROTEST THE DECISION.

15        DO YOU RECALL THAT?

16   A.   NO.  I AM NOT LOOKING AT THAT DOCUMENT.

17   Q.   SO YOU DON'T RECALL MAKING THAT STATEMENT IN THIS

18   DECLARATION?

19   A.   I AM NOT LOOKING AT THAT DOCUMENT, MR. ASHKER.

20   Q.   OKAY.  YOU STATED THAT ANOTHER ONE OF YOUR CONCERNS WAS A

21   PSYCHOLOGICAL EVALUATION REPORT WHERE THE PSYCHOLOGIST

22   DOCUMENTED THAT I HAD A HISTORY OF SUBSTANCE ABUSE; IS THAT

23   CORRECT?

24   A.   CORRECT.

25   Q.   AND DO YOU RECALL WHAT PSYCHOLOGICAL EVALUATION REPORT YOU

1    WERE TALKING ABOUT?

2    **A.**   IT WAS IN YOUR CHART.  NO, I DON'T REMEMBER WHICH CHART.

3    BUT WHEN I REVIEWED YOUR CHART, IT WAS DOWN IN ONE OF THEM, AND

4    THAT WAS NOTED IN THERE.

5    **Q.**   YOU ARE TALKING ABOUT BACK IN 2006 AT THE TIME THESE

6    DECISIONS ON THE TRAMADOL WERE BEING MADE; IS THAT CORRECT?

7    **A.**   I DON'T RECALL THE DATES.  THIS IS SOMETHING IN YOUR

8    HISTORY.

9    **Q.**   OKAY.

10           WELL, WHAT IF I PRESENTED TO YOU THAT THE ONLY

11   PSYCHOLOGICAL EVALUATION REPORT WHERE A PSYCHOLOGIST EVER

12   DOCUMENTED THAT I HAD A -- THAT I USED DRUGS WHEN I WAS A

13   TEENAGER WAS DR. ROY'S REPORT DATED MAY 9TH, 2008.

14           CAN YOU DISPUTE THAT?

15   **A.**   I DO NOT HAVE THOSE DOCUMENTS IN FRONT OF ME, MR. ASHKER.

16   **Q.**   SO THIS, IF I PRESENT TO YOU THAT THAT IS A FACT, THEN

17   YOU -- DO YOU ADMIT THAT YOU JUST MADE THAT UP?

18           **MR. ANDRADA:**  YOUR HONOR, IT'S ARGUMENTATIVE.

19           **THE COURT:**  PERHAPS YOU WILL BE ABLE TO FIND THE

20   DOCUMENT THAT SHE'S REFERRING TO.  BUT LET'S -- SHE CAN'T LOOK

21   FOR IT NOW, BUT COUNSEL CAN LOOK FOR IT AND LET US KNOW WHETHER

22   IT'S THERE OR NOT.

23   **BY MR. ASHKER:**

24   **Q.**   MS. RISENHOOVER, AFTER I WAS TAKEN OFF THE TRAMADOL, HOW

25   MANY TIMES DID I COMPLAIN TO YOU THAT THE NSAIDS WERE NOT

1    EFFECTIVE, WERE CAUSING CHRONIC DIARRHEA, I WAS ONLY ABLE TO

2    GET MAYBE ONE TO THREE HOURS OF SLEEP A NIGHT.  CAN YOU RECALL

3    HOW MANY TIMES I BROUGHT THAT TO YOUR ATTENTION?

4    **A.**   NO, MR. ASHKER.  I DON'T HAVE THAT IN FRONT OF ME.

5    **Q.**   WELL, DO YOU HAVE AN ESTIMATE?  HOW OFTEN WOULD I SEE YOU?

6    **A.**   I WOULD NOT.  I DO NOT RECALL THE SPECIFIC DATE THAT YOU

7    WERE DOWN THERE AND I SAW YOU.  AND WHEN YOU CAME AND TALKED

8    ABOUT YOUR STOMACH, I TRIED TO TREAT THAT.  BUT MOSTLY YOU WERE

9    CONFLICTING WITH MY MEDICAL TREATMENT AND YOU TURNED AROUND AND

10   START TALKING ABOUT ANOTHER 602 AND WE WOULD HAVE TO DEAL WITH

11   THAT.

12   **Q.**   WHAT WERE ALL THE 602'S ABOUT?

13   **A.**   YOUR MEDICAL TREATMENT.

14          YOU WANTED YOUR TRAMADOL.

15   **Q.**   WELL, OKAY.  YOU SAY THE 602'S WERE ABOUT MY MEDICAL

16   TREATMENT WANTING TRAMADOL; IS THAT CORRECT?

17   **A.**   AMONG OTHER CONCERNS I AM SURE, YES.

18          **MR. ASHKER:**  ONE MINUTE, YOUR HONOR, TO GRAB A

19   DOCUMENT HERE.

20          (PAUSE IN THE PROCEEDINGS.)

21   **BY MR. ASHKER:**

22   **Q.**   MS. RISENHOOVER, YOU TESTIFIED THAT YOU WERE FAMILIAR WITH

23   A LOT OF 602'S I WAS FILING CONCERNING MY TREATMENT, CARE AND

24   TREATMENT; IS THAT CORRECT?

25   **A.**   WHEN I WAS –– WHEN THEY WERE PRESENTED TO ME.

1   **Q.**   OKAY.  AND YOU STATED THAT I WANTED MY TRAMADOL.  THAT'S

2   WHAT THE BIG ISSUE WAS ABOUT; IS THAT CORRECT?

3   **A.**   I DON'T REMEMBER SPECIFICALLY.  I AM NOT LOOKING AT THE

4   DOCUMENTS, BUT THAT AMONG YOUR OTHER MEDICAL CONCERNS.

5   **Q.**   CAN YOU PLEASE GRAB OUT EXHIBIT NUMBER 165?

6   **A.**   I HAVE THAT.

7   **Q.**   AND LOOK -- IT'S A 602 APPEAL.  LOOK AT THE SECOND PAGE

8   WHICH IS A 602.  IT'S HARD TO SEE.  IT HAS A NOTE IN SECTION C

9   DATED 9/27/06 BY FLOWERS.

10          DO YOU SEE THAT DOCUMENT?

11  **A.**   I AM LOOKING.  ON YOUR 602, PAGE 2?

12  **Q.**   YES.  IT'S A 602, SECTION C HAS A DATE OF 9/27/06.  AT THE

13  BOTTOM RIGHT-HAND CORNER IT SHOULD HAVE A NUMBER SIX ON IT.

14  **A.**   I HAVE A DATE THAT SAYS 8/21/06.  IS THAT WHAT YOU ARE

15  SPEAKING OF?

16  **Q.**   NO.  IT WOULD BE THE 602 IN THAT SAME PACKAGE.  IT SHOULD

17  BE BEHIND THAT PAGE.

18  **A.**   I AM LOOKING.

19  **Q.**   IT HAS PELICAN BAY SHU STAMPED ACROSS THE FRONT.

20          **MR. LAURIE:**  WHAT IS THE DATE, MR. ASHKER?  I AM

21  SORRY.

22          **MR. ASHKER:**  SECTION C.  IT HAS 9/27/06 ON IT BY

23  FLOWERS.

24          **MR. LAURIE:**  OKAY.

25          **THE WITNESS:**  OKEYDOKE.  I HAVE THAT.

1   **BY MR. ASHKER:**

2   **Q.**   MS. RISENHOOVER, AT THE SECTION DOWN BELOW THAT,

3   SECTION D, FORMAL LEVEL, IT STATES THAT I WAS DISSATISFIED WITH

4   FLOWERS' RESPONSE.  I AM IN SERIOUS PAIN AND DISCOMFORT, YET

5   MEDICAL STAFF RESPONSE IS, TOO BAD, SAYRE ORDERED THIS.  I AM

6   BEING DENIED MEDICAL CARE.  MY SETTLEMENT AGREEMENT IS

7   VIOLATED.  MY RETALIATION CLAIMS ARE IGNORED.  AND FLOWERS'

8   RESPONSE SHOWS IT'S ONGOING.  I ASK FOR RELIEF STATED IN THIS

9   SECTION D ABOVE.

10          NOW, IN -- AT THE SECOND PAGE TO THAT, IT STATES

11   WHEN YOU INFORMED ME ABOUT TAKING ME OFF TRAMADOL, I STATED TO

12   YOU:  WHAT ALTERNATIVE WOULD BE PROVIDED?

13          AND YOUR RESPONSE WAS:  THEY HAVE TO JUST TRY THE

14   DIFFERENT MEDS AVAILABLE FOR SHU.

15          IS THAT CORRECT?

16   **A.**   JUST ONE MOMENT.

17          **MR. LAURIE:**  WHAT SECTION IS THIS?  I AM SORRY.

18          **MR. ASHKER:**  IT WOULD BE PAGE 2, BEHIND THE 602

19   PART, THE NEXT PAGE.

20          **THE COURT:**  THIS ISN'T HER NOTE.  SO YOU ARE JUST

21   GOING TO HAVE TO ASK HER IF SHE REMEMBERS SAYING THAT.

22   **BY MR. ASHKER:**

23   **Q.**   DO YOU REMEMBER ME SAYING THAT, MS. RISENHOOVER?

24   **A.**   I DON'T HAVE THAT DOCUMENT IN FRONT IN FRONT OF ME, NO.

25          **THE COURT:**  HE IS JUST ASKING YOU WHETHER YOU

1    REMEMBER IT.  HE'S NOT ASKING YOU WHETHER YOU HAVE A DOCUMENT.

2    HE'S ASKING YOU WHETHER YOU REMEMBER IT.

3            **THE WITNESS:**  WE HAVE DISCUSSED ALTERNATIVE

4    MEDICINES WHEN THE TAPERING DOSE OF -- WITH THE TAPERING DOSE

5    OF TRAMADOL, WHICH WOULD INCLUDE THE NSAID AND TYLENOL AND

6    ANYTHING AVAILABLE.

7    **BY MR. ASHKER:**

8    Q.   AND DID -- WITH ALL MY COMPLAINTS, DID I --

9            **MR. ASHKER:**  I HAVE NO FURTHER QUESTIONS.

10           **MR. ANDRADA:**  NOTHING FURTHER.

11           **THE COURT:**  ALL RIGHT.  YOU ARE EXCUSED.

12           ALL RIGHT.

13           **MR. ANDRADA:**  WE WOULD LIKE TO CALL MS. MCLEAN.

14           **THE COURT:**  ALL RIGHT.

15           **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

16                           **MAUREEN MCLEAN,**

17   CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

18   TESTIFIED AS FOLLOWS:

19           **THE WITNESS:**  I DO.

20           **THE CLERK:**  PLEASE BE SEATED.  STATE YOUR FILL NAME

21   SPELLING YOUR LAST NAME FOR THE RECORD.

22           **THE WITNESS:**  MAUREEN MCLEAN, M-C-L-E-A-N.

23           **THE COURT:**  WE HAVE 15 MINUTES.  I AM GOING TO ASK

24   YOU TO LEAVE IT TO TEN AND LEAVE FIVE MINUTES FOR MR. ASHKER.

25   OR LESS.  YOU DON'T HAVE TO TAKE THE WHOLE TEN.

1                        <u>**DIRECT EXAMINATION**</u>

2      **BY MR. ANDRADA:**

3      **Q.**   MS. MCLEAN, YOU ARE A NURSE PRACTITIONER; IS THAT CORRECT?

4      **A.**   YES, I AM.

5      **Q.**   WHAT SPECIFICALLY IS YOUR JOB AT PELICAN BAY?

6      **A.**   I AM THE HEALTH CARE MANAGER, WHICH MEANS I AM THE

7      ADMINISTRATOR OVER THE WHOLE HEALTH CARE PROGRAM.

8      **Q.**   THERE WAS SOME TESTIMONY BY MR. ASHKER THAT THE SHU

9      INMATES GOT CARE THAT WAS DIFFERENT FROM PRISONERS IN THE

10     GENERAL POPULATION.

11             **MR. ASHKER:**  I OBJECT TO THAT.  THERE IS NO

12     TESTIMONY OR ANY PRESENTATION MADE ABOUT THAT.

13             **THE COURT:**  I DON'T REMEMBER THAT.

14             **MR. ANDRADA:**  I RECALL HIM SUGGESTING THAT, YOUR

15     HONOR.

16             **THE COURT:**  NO.  THERE WAS A DIFFERENCE IN HOW MANY

17     SETS OF THERMALS THEY COULD HAVE.  AND PERHAPS HOW MANY

18     SHOWERS.  BUT I AM QUITE SURE THERE WASN'T ANY TESTIMONY ABOUT

19     A DIFFERENCE IN MEDICAL CARE.  YOU ARE SAYING MR. ASHKER SAID

20     THAT?

21             **MR. ANDRADA:**  WE THOUGHT WE HEARD MR. ASHKER SAY

22     THAT.

23             **THE COURT:**  I DON'T THINK SO.

24             **MR. ANDRADA:**  THERE IS NO DISPUTE ABOUT THAT.  ALL

25     RIGHT.

1    BY MR. ANDRADA:

2    Q.   NOW, YOU WERE HERE WHEN MR. ASHKER TESTIFIED ABOUT THE

3    REFERRAL TO MANTECA.

4            DO YOU REMEMBER THAT?

5    A.   YES, I DO.

6    Q.   THERE WAS SOME TESTIMONY BY HIM THAT HE WASN'T TOLD ABOUT

7    IT PRIOR THERETO.

8            DO YOU REMEMBER THAT TESTIMONY?

9    A.   I DO.

10   Q.   WHAT'S THE CUSTOM AND PRACTICE WITH REGARD TO INFORMING

11   PRISONERS ABOUT GOING OUT ON SUCH A REFERRAL?

12            THE COURT:   COUNSEL, THAT WOULD NOT -- IF YOU HAD

13   SOMEONE WHO TOLD HIM THAT CAN DISPUTE HIS TESTIMONY, THAT WOULD

14   BE FINE.   IF SHE WASN'T THERE AND DOESN'T KNOW, THEN I DON'T

15   THINK THAT WOULD BE APPROPRIATE.

16            MR. ANDRADA:   THERE'S AN OFFER OF PROOF THAT THEY

17   DON'T TELL THE PRISONERS.

18            THE COURT:   OKAY.

19            THE WITNESS:   THERE'S A VERY STRICT POLICY AT

20   PELICAN BAY THAT WHEN THERE'S AN OUTSIDE CONSULTATION PENDING,

21   WE MERELY INFORM OUR PATIENTS THAT THERE IS GOING TO BE A

22   CONSULT MADE.   AND THEY NEVER GET NOTIFICATION UNTIL THE ACTUAL

23   TRANSPORT IS HAPPENING, AND THAT'S FOR SECURITY REASONS.

24   BY MR. ANDRADA:

25   Q.   VERY GOOD.   NOW, LET'S MOVE ON.

1            BY VIRTUE OF YOUR POSITION AT PELICAN BAY, DO YOU

2   HAVE KNOWLEDGE AS TO THE TEMPERATURE, THE AMBIENT TEMPERATURE

3   IN THE SHU?

4   **A.**   VERY CLEARLY I DO.

5   **Q.**   PLEASE EXPLAIN VERY BRIEFLY.

6   **A.**   WE HAVE TO KEEP A CONSTANT MONITORING OF THE TEMPERATURE

7   WITHIN THE SHU.  SO THERE ARE LOGS DAILY.  AND FOR THE LAST 19

8   YEARS, THERE IS DOCUMENTATION THAT I HAVE REVIEWED FOR PAST

9   SITUATIONS THAT SHOW THAT IT HAS BEEN 72 DEGREES FOR THE PAST

10  19 YEARS.

11  **Q.**   NOW, THERE WAS SOME TESTIMONY, SOME REFERENCES TO A

12  CELLMATE.  DO THE MEDICAL PROVIDERS, PARTICULARLY DR. SAYRE,

13  DOES HE HAVE ANY SAY IN WHETHER A PRISONER HAS A CELLMATE?

14  **A.**   MEDICAL DOES NOT INTERVENE WITH THAT.  THAT DECISION OF

15  WHETHER AN INMATE SHOULD HAVE A CELLIE IS A CUSTODIAL ISSUE.

16            OUR PREFERENCE IS THEY THAT ARE ALWAYS DOUBLE-CELLED

17  WHEN POSSIBLE, BUT MEDICAL DOES NOT INTERVENE.  IT'S PURELY

18  CUSTODIAL.

19  **Q.**   THERE WAS A REFERENCE EARLIER TO A HOT MEDICATION.  WHAT

20  IS A HOT MEDICATION?

21  **A.**   A HOT IS A DESIGNATION THAT WE GIVE AS PROVIDERS WHEN WE

22  ORDER A PRESCRIPTION FOR MEDICINE, EITHER A CARRY MEDICINE OR A

23  HOT MEDICINE.  A CARRY MEDICINE IS A MEDICINE THEY GET TO HAVE

24  ON THEIR PERSON IN THEIR CELLS.  SO THEY GET 30 DAYS OF

25  AMOXICILLIN.  A HOT MED IS A MED THAT GETS GIVEN TO THEM BY A

MCLEAN – DIRECT / MR. ANDRADA

1    NURSE EACH DAY, EACH DOSE.

2    **Q.**   OKAY.  AND WHY ARE THERE MEDS THAT THE PRISONERS ARE

3    ALLOWED TO TAKE TO THEIR CELLS AND THEN WHY IS THERE A SEPARATE

4    CATEGORY OF SO-CALLED HOT MEDS?

5    **A.**   WELL, THERE'S LOTS OF REASONS WHY A MEDICINE WOULD BE A

6    HOT MED.  SOME OF THOSE WOULD BE VALUE IN TERMS OF BEING ABLE

7    TO TRADE TO OTHER INMATES.

8             IT COULD BE HOT BECAUSE THERE IS CONCERN THAT THERE

9    HASN'T BEEN COMPLIANCE MAYBE BECAUSE THE PATIENT IS CONFUSED

10   ABOUT A COMPLICATED MEDICATION, OR IT COULD BE A CONTROLLED

11   SUBSTANCE PERHAPS LIKE A NARCOTIC OR SOMETHING LIKE ULTRAM,

12   ELAVIL.  THERE ARE MANY OF THEM THAT GET GIVEN ONLY BY THE DOSE

13   AND DELIVERED BY THE NURSE.

14   **Q.**   YOU MEAN PRISONERS TRADE MEDICATIONS?

15   **A.**   YES.  PRISONERS DO TRADE MEDICATION.

16   **Q.**   AND SO THEN WHAT IS A MEDICAL REFERRAL?

17   **A.**   A MEDICAL REFERRAL IS KIND OF AN ART.  IT'S AN OPPORTUNITY

18   FOR A PROVIDER TO REQUEST FROM SOMEONE WHO HAS A SPECIFIC

19   EXPERTISE IN AN AREA A CONSULTATION REGARDING THE CARE OF THEIR

20   PATIENT.

21             I WOULD ASK FOR A REFERRAL FROM A DOCTOR.  I WOULD

22   SEND HISTORICAL DATA, I WOULD SEND CURRENT TREATMENT PLAN AND

23   CURRENT APPROPRIATE INFORMATION AND ASK FOR THEIR OPINION.

24             NOW, AS A PART OF THAT PROCESS, WHAT THE CONSULTANT

25   WILL DO IS HE WILL REVIEW THE HISTORICAL INFORMATION, THE

1   CURRENT TREATMENT PLAN, AND THEN BASED ON WHAT HE THINKS HE CAN

2   OFFER THAT PATIENT, WHAT HIS SPECIFIC EXPERTISE IS, OR THE

3   LIMITS OF HIS PRACTICE, HE'LL MAKE A DECISION TO SEE OR NOT SEE

4   MY PATIENT.

5          IN THIS PARTICULAR CASE, AS IN OTHER CASES, YOU WILL

6   GET A RESPONSE BACK THAT WILL SAY, NO ADDITIONAL SUPPORT THERE

7   FOR YOUR PATIENT, AND THAT ESSENTIALLY IS THE REFERRAL.

8          **MR. ASHKER:**  EXCUSE ME.  I AM NOT SURE WHAT TIME

9   PERIOD WE ARE TALKING ABOUT OR WHAT REFERRAL SHE SAID IN THIS

10  CASE.  I MISSED THAT.

11         **THE COURT:**  THIS IS NOT APPROPRIATE.  THIS IS NOT

12  APPROPRIATE.  THERE IS NO FOUNDATION FOR THIS.  UNLESS YOU

13  CAN -- THERE IS NO FOUNDATION FOR IT.

14         THE PERSON WHO KNOWS WHAT THE RESPONSE FROM UC DAVIS

15  MEANT WAS THE PERSON FROM UC DAVIS, NOT THIS WITNESS.

16         **MR. ANDRADA:**  ALL RIGHT.  BUT SHE CAN CERTAINLY --

17         **THE COURT:**  NO, SHE MAY NOT.

18         **MR. ANDRADA:**  I WILL MOVE ON, YOUR HONOR.  THANK

19  YOU.

20  **BY MR. ANDRADA:**

21  **Q.**  AND --

22         **MR. ANDRADA:**  THANK YOU.  THAT'S ALL I HAVE.

23                   <u>CROSS-EXAMINATION</u>

24  **BY MR. ASHKER:**

25  **Q.**  GOOD AFTERNOON, MS. MCLEAN.

1   A.   GOOD AFTERNOON.

2   Q.   YOU STATED THAT YOU REVIEWED LOGS GOING BACK 19 YEARS OF

3   PELICAN BAY PRISON SHU TEMPERATURES?

4   A.   NO, I DIDN'T SAY THAT.

5   Q.   I THOUGHT THERE WAS TESTIMONY THAT YOU HAD REVIEWED 19

6   YEARS WORTH OF LOGS.

7   A.   NO, I DIDN'T SAY THAT.  I SAID IN THE COURSE OF MY JOB, IT

8   HAS COME TO MY ATTENTION THAT SOMETIMES TEMPERATURE IS A

9   PROBLEM.

10          AND SO I AM AWARE THAT THEY DO DO LOGS, AND THEY

11   RECORD THEM.  AND FOR OTHER SITUATIONS I HAVE HAD TO BE

12   ACQUAINTED WITH THAT.  I NEVER REVIEWED 19 YEARS OF LOGS.

13   Q.   EXCUSE ME.  I THOUGHT YOU SAID THAT THE TEMPERATURE IN SHU

14   HAS BEEN A STEADY 72 DEGREES FOR THE LAST 19 YEARS.

15   A.   WELL, I SAID IT HAS BEEN A STEADY 72 DEGREES WITHOUT

16   SAYING -- OKAY.  I DIDN'T SEE 19 YEARS WORTH OF LOGS, BUT AS

17   FAR BACK AS I HAVE LOOKED AT LOGS, IT HAS REMAINED 72 DEGREES.

18   Q.   ARE YOU AWARE -- HAVE YOU EVER BEEN IN A SHU CELL?

19   A.   YES, I HAVE.

20   Q.   AND HOW MUCH TIME DID YOU SPEND IN ONE?

21   A.   I DIDN'T SPEND VERY MUCH TIME BECAUSE I WAS A VISITOR AND

22   NOT AN INMATE.

23   Q.   ARE YOU AWARE THAT THE TEMPERATURE IN SHU CELLS VARIES

24   PRETTY SIGNIFICANTLY DEPENDING ON WHERE THE CELL IS AT?

25   A.   NO, I AM NOT AWARE OF THAT.

1   Q.   ARE YOU AWARE OF WHERE THE TEMPERATURE GAUGE IS IN THE POD

2   AREA OF THE SHU?

3   A.   NO, I AM NOT AWARE OF WHERE THE TEMPERATURE GAUGE IS.

4   Q.   OKAY.

5           I WILL PRESENT TO YOU THAT THE TEMPERATURE GAUGE IS

6   OUTSIDE OF THE CELLS IN THE POD AREA UP ON THE WALL

7   APPROXIMATELY 15 FEET HIGH.  ON THE OPPOSITE SIDE OF THAT WALL,

8   YOU WOULD HAVE ANOTHER POD.

9           IN THE SHU CELLS, YOU HAVE SIX INCH CEMENT WALL AND

10  THE OUTSIDE, ON SOME CELLS.  OTHER CELLS YOU HAVE THE CORRIDOR

11  AND SOME CELLS HAVE PLEXIGLASS OVER THE FRONT OF THEM, WHICH

12  RESTRICTS AIR FLOW.

13          AND THOSE DIFFERENT SCENARIOS RIGHT THERE EFFECT THE

14  TEMPERATURE IN THE CELLS.  AND CAN YOU DISPUTE THAT SOME OF

15  THOSE CELLS, DEPENDING ON WHERE THEY ARE LOCATED, CAN BE A

16  WHOLE LOT COLDER THAN 72 DEGREES OR A LOT HOTTER?

17          **MR. ANDRADA:**  OBJECTION, VAGUE AND AMBIGUOUS, OVERLY

18  BROAD AS TO WHOLE LOT COLDER, WHOLE LOT HOTTER.

19          **THE COURT:**  OVERRULED.

20  **BY MR. ASHKER:**

21  Q.   YOU MAY ANSWER.

22  A.   THE BEST WAY THAT I CAN ANSWER THAT QUESTION FOR YOU IS,

23  TO THE BEST OF MY KNOWLEDGE, WITHIN THE SHU ENVIRONMENT, WE ARE

24  VERY CONCERNED ABOUT TEMPERATURE.  MOST OF YOUR FELLOW INMATES

25  ARE SITTING IN BOXER SHORTS AND T-SHIRTS.

1          ALL I CAN PROMISE YOU IS THAT WE CLOSELY MONITOR

2    THAT TEMPERATURE IN ONE SPOT, WHICH IS ON THE WALL, ACCORDING

3    TO YOUR TESTIMONY -- I DON'T DISPUTE THAT -- AND IT STAYS AS A

4    CONSTANT.  I AM NOT A THERMAL ENGINEER, BUT I CAN ASSURE YOU

5    THAT WHEREVER THAT MEASUREMENT IS, IT REMAINS AT A CONSTANT

6    TEMPERATURE.  AND THAT'S ALL I AM SAYING.

7    Q.   WELL, BASED ON YOUR LIMITED KNOWLEDGE OF THE MATTER,

8    CORRECT?

9    A.   BASED ON MY LIMITED KNOWLEDGE, YES.

10             MR. ASHKER:  THANK YOU.

11             MR. ANDRADA:  NOTHING FURTHER.

12             THE COURT:  YOU ARE EXCUSED.  YOU MAY STEP DOWN.

13          I BELIEVE WE ARE FINISHED WITH THE -- OH, WELL, DID

14   YOU HAVE ANY REBUTTAL YOU WANTED TO PRESENT?

15             MR. ASHKER:  NO, YOUR HONOR.

16             THE COURT:  WE ARE FINISHED THEN WITH THE

17   EVIDENTIARY PORTION OF THE TRIAL AND ALSO FINISHED FOR THE DAY.

18          I AM GOING TO HAVE TO ASK YOU TO COME BACK ON

19   MONDAY.  WE HAVE SOME LEGAL MATTERS TO DISCUSS, SO RATHER THAN

20   HAVE YOU COME IN AND WAIT, I WILL ASK YOU TO COME IN AT -- I AM

21   WAVERING BETWEEN 9:00 AND 9:30 TO GIVE US SOME TIME TO TALK

22   OVER A FEW THINGS.

23          LET'S SAY 9:00.  WE WILL TRY TO FINISH UP BY 9:00.

24   AT THAT TIME WE WILL HAVE CLOSINGS -- FIRST WE WILL HAVE

25   INSTRUCTIONS AND THEN WE'LL HAVE CLOSING ARGUMENTS, AND THEN

1    YOU WILL BEGIN YOUR DELIBERATIONS.

2              I AM GIVING EACH SIDE AN HOUR TO CLOSE.  THE

3    INSTRUCTIONS TAKE ABOUT A HALF AN HOUR.  IF WE START AT 9:00,

4    WE SHOULD FINISH AROUND NOON.

5              YOU MIGHT WANT TO THINK ABOUT, IF YOU CAN, ARRANGING

6    YOUR SCHEDULES SO YOU CAN STAY THROUGH THE AFTERNOON ON MONDAY

7    BECAUSE OTHERWISE YOU WILL END UP HEARING ALL THIS AND GOING

8    HOME RIGHT AWAY.  WHEREAS YOU MIGHT FEEL LIKE IT WOULD BE A

9    GOOD TIME TO START DELIBERATING AND MAYBE SPEND A COUPLE OF

10   HOURS BEFORE GOING HOME.

11             SO I DON'T WANT TO INCONVENIENCE ANYBODY WHO HAS

12   BEEN RELYING ON THE 1:30 TIME, BUT IF YOU ARE ABLE, YOU MIGHT

13   THINK ABOUT TRYING TO STAY A LITTLE BIT LATER ON MONDAY.

14             DON'T DISCUSS THE --

15        **THE CLERK:**  SHE HAS A QUESTION ABOUT HOW LATE.

16        **THE COURT:**  I WOULDN'T KEEP YOU ANY LONGER THAN WAS

17   CONVENIENT.  IF SOMEBODY CAN'T STAY LATER THAN 1:30, THEN WE

18   WON'T.  WHENEVER SOMEBODY HAS A PROBLEM, THAT'S WHEN YOU CAN

19   BREAK.  BECAUSE I DID TELL YOU 1:30, SO I DON'T WANT TO MESS UP

20   ANYONE'S PLANS.

21             DO THE BEST YOU CAN.

22             DON'T FORGET, ALL THE SAME ADMONITIONS APPLY.  DON'T

23   DISCUSS THE CASE AMONGST YOURSELVES OR WITH ANYONE ELSE.

24             (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

25        **THE COURT:**  SO I DON'T HAVE ANY TIME NOW BECAUSE I

1   HAVE TWO OTHER OBLIGATIONS THIS AFTERNOON, BUT JUST A COUPLE OF

2   QUICK THINGS.

3           YOUR VERDICT FORM, I THINK, IS A GOOD IDEA STARTING

4   WITH THE NEGLIGENCE AS SORT OF A LESSER INCLUDED AND MOVING UP

5   TO THE CIVIL RIGHTS, SO I THINK THAT IS A GOOD IDEA.

6           **MR. ANDRADA:**  CAN I TEASE YOU FOR A MOMENT?

7           **THE COURT:**  IF YOU LIKE.

8           **MR. ANDRADA:**  THAT'S THE FIRST COMPLIMENT I HAVE HAD

9   IN A WEEK.

10          **THE COURT:**  WELL, SORRY.

11          **MR. ANDRADA:**  SO AM I.

12          **THE COURT:**  THAT WILL MEAN SWITCHING THE ORDER OF

13   THE INSTRUCTIONS BECAUSE I LIKE TO HAVE THE INSTRUCTIONS TRACK

14   THE VERDICT FORM, BUT I DON'T SEE A PROBLEM WITH THAT.

15          AND IT DOES SOLVE THAT PROBLEM OF DOUBLE DAMAGES ON

16   THE NEGLIGENCE AND THE DELIBERATE INDIFFERENCE.  IT DOES RAISE

17   A PROBLEM THAT UNDER THE CIVIL RIGHTS CLAIM, THE JURY IS

18   REQUIRED TO AWARD NOMINAL DAMAGES OF $1 IF THEY FIND A

19   VIOLATION, BUT NO DAMAGES.  IF YOU WOULD AGREE TO JUST TAKE

20   THAT OUT OF THE INSTRUCTION, TAKE IT OUT OF THE VERDICT FORM,

21   AND AGREE THAT IF THE JURY DOES FIND A CIVIL RIGHTS VIOLATION

22   BUT FINDS NO DAMAGES, THAT THE COURT WILL AWARD THE DOLLAR.

23          **MR. ANDRADA:**  YOU AND I ARE REALLY TRACKING BECAUSE

24   THAT'S WHAT I THOUGHT OF LAST NIGHT.

25          **THE COURT:**  GOOD.  IF THAT'S ALL RIGHT WITH YOU?

1          **MR. ANDRADA:**  I'M GOOD.

2          **MR. ASHKER:**  THAT'S FINE WITH ME.

3          **THE COURT:**  THEN WE TAKE IT OUT OF THE INSTRUCTION,

4     OUT OF THE VERDICT FORM.

5          HOWEVER, YOU DID SAY IN THERE THAT IF THEY FOUND THE

6     CIVIL RIGHTS VIOLATION AND AWARD OF DAMAGES, THEY COULD THEN

7     AWARD PUNITIVE DAMAGES.  THAT'S NOT CORRECT.  THEY DON'T HAVE

8     TO FIND COMPENSATORY DAMAGES TO FIND PUNITIVE DAMAGES UNDER

9     1983.  YOU CAN DOUBLE-CHECK ME ON THAT IF YOU WANT, BUT THAT

10    WAS IN THE ORIGINAL INSTRUCTIONS, THAT EVEN IF ONLY NOMINAL

11    DAMAGES ARE AWARDED, PUNITIVES CAN STILL BE AWARDED.  YOU DON'T

12    NEED COMPENSATORIES TO AWARD PUNITIVES.  SO I WILL HAVE TO

13    STRIKE THAT PHRASE.

14         **MR. ANDRADA:**  ALL RIGHT.

15         **THE COURT:**  THE LAST PROBLEM I SEE, WHICH IS ONLY A

16    PROBLEM FOR YOU AND NOT FOR THE PLAINTIFF, WOULD BE THEN IF WE

17    DO GET TO THE BREACH OF CONTRACT DAMAGES, I SEE A POSSIBILITY

18    OF THOSE BEING DUPLICATIVE OF THE NEGLIGENCE DAMAGES.  SO YOU

19    DIDN'T MAKE ANY --

20         **MR. ANDRADA:**  WE GOT SOME GOOD KARMA GOING HERE.

21         WHAT YOU NEED -- I GUESS, I WAS THINKING LAST NIGHT,

22    BUT THEN I GOT REALLY TIRED AND WENT HOME, THIS MIGHT WORK, IT

23    MIGHT NOT, BUT YOU MIGHT INSTRUCT THEM THAT THEY CAN'T

24    DUPLICATE THEM.  THAT'S ONE APPROACH.

25         **THE COURT:**  THAT'S WHAT I DID BEFORE.

1          **MR. ANDRADA:**  YEAH.

2          **THE COURT:**  IN THE FIRST SET OF INSTRUCTIONS AND MY

3     FIRST VERDICT FORM, I HAD AN INSTRUCTION LIKE THAT.  YOU

4     THOUGHT IT WASN'T WELL WRITTEN AND YOU WERE GOING TO TRY

5     SOMETHING ELSE.  SO I THOUGHT WHAT YOU TRIED WAS JUST TO TAKE

6     IT OUT ALL TOGETHER, WHICH IS FINE, IF THAT IS WHAT YOU WANT

7     BECAUSE YOU WOULD BE THE ONE --

8          **MR. ANDRADA:**  WE NEED TO TELL THEM.

9          **THE COURT:**  YOU DO WANT THAT.

10         **MR. ANDRADA:**  IT WOULD BE PREJUDICIAL ERROR.

11         **THE COURT:**  OKAY.  SO YOU WANT ME TO ADD INTO THE

12    VERDICT FORM THAT IF THEY FIND DAMAGES IN ADDITION TO THE ONES

13    THEY MAY HAVE ALREADY FOUND --

14         **MR. ANDRADA:**  SOMETHING LIKE THAT.

15         **THE COURT:**  LIKE IT WAS IN THE ORIGINAL VERDICT

16    FORM.

17         **MR. ANDRADA:**  YEAH.

18         **THE COURT:**  THEN WE NEED THE INSTRUCTION, THE ONE I

19    HAD OR SOMETHING BETTER THAT YOU MIGHT WRITE THAT WOULD DEAL

20    WITH DUPLICATIVE DAMAGES IN THE JURY INSTRUCTION.

21         **MR. ANDRADA:**  ALL RIGHT.

22         **THE COURT:**  OKAY.

23         **MR. ASHKER:**  ONE THING I HAD, YOUR HONOR, WAS I HAD

24    THESE LIST OF EXHIBITS I WANTED TO MOVE INTO EVIDENCE.

25         **THE COURT:**  WELL, THAT'S ANOTHER PROBLEM.  YOU BOTH

1    PROBABLY DO.  I DON'T THINK YOU HAVE MOVED IN ALL OF YOURS

2    EITHER.

3            **MR. ANDRADA:**  WE HAVE NOT.

4            **THE COURT:**  BUT I CAN'T DO THAT NOW.  WHEN CAN I DO

5    IT?  SHEILAH, WE HAVE AN ENGAGEMENT AT 2:00.  THEN I HAVE

6    ANOTHER ENGAGEMENT AT 3:00.

7            YOU COULD CONCEIVABLY COME BACK HERE AFTER OUR

8    2:00 O'CLOCK MATTER AND GO OVER THE EXHIBITS.  I GUESS WE

9    BETTER DO THAT.

10           **MR. ANDRADA:**  I BELIEVE, YOUR HONOR, THAT THE COURT

11   REPORTER HAS GRACIOUSLY AGREED TO SIT WITH A COUPLE OF FOLKS

12   FROM MY SIDE TO MAKE SURE THAT WE HAVE CORRECTLY IDENTIFIED FOR

13   INTRODUCTION THE DOCUMENTS THAT I WAS GIVING MR. ASHKER ON

14   TUESDAY DURING MY CROSS.  SO, WE APPRECIATE HER HELP IN THAT

15   REGARD.

16           **THE COURT:**  RIGHT.  BUT MR. ASHKER NEEDS THE SAME

17   COURTESY, AND I HAVE MORE DIFFICULTY AFFORDING IT TO HIM UNDER

18   THE CIRCUMSTANCES.  HOLD ON A SECOND.

19           (DISCUSSION HELD WITH CLERK.)

20           **THE COURT:**  I HATE TO DO THIS, ESPECIALLY TO YOU ALL

21   FROM THE PRISON, BUT I DON'T SEE ANY ALTERNATIVE BUT TO HAVE

22   YOU COME BACK HERE AT 3:30 AND GO OVER THE EXHIBITS.  I DON'T

23   KNOW WHEN ELSE I CAN DO IT.  I WON'T BE HERE, BUT YOU CAN GO

24   OVER IT WITH MS. CAHILL.  SHE'S THE ONLY ONE WHO KNOWS WHAT'S

25   IN AND WHAT'S NOT IN.  AND SHE HAS SOMETHING WE ALL HAVE TO DO

1    BETWEEN 2:00 AND 3:30.  IF WE WAIT UNTIL MONDAY WE'RE JUST NOT

2    GOING TO HAVE ENOUGH TIME.  I TOLD THEM TO COME AT 9:00.

3           WE ARE GOING TO NEED -- WE HAVE GOT SOME ARGUMENT TO

4    DEAL WITH BECAUSE I AM CONSIDERING A JMOL ON THE CONTRACT CLAIM

5    AND I AM GOING TO HEAR YOU ON IT, BUT I AM CONSIDERING

6    INSTRUCTING THE JURY THAT THE CONTRACT WAS BREACHED AND GIVING

7    THEM ONLY DAMAGES.

8           IF I AM NOT GOING TO DO THAT, I AM ALSO CONSIDERING

9    INSTRUCTING THEM AS TO THE MEANING OF THE CONTRACT BECAUSE I

10   DON'T THINK THERE IS ANY EXTRINSIC EVIDENCE, EXTRINSIC PAROL

11   EVIDENCE IN DISPUTE ON THE MEANING.  SO I THINK THE MEANING IS

12   FOR THE COURT.  I THINK I WILL BE INSTRUCTING THEM AS TO WHAT

13   IT MEANS UNLESS I INSTRUCT THEM THAT IT IS BREACHED, AND I AM

14   SURE YOU WILL WANT TO BE HEARD ON THAT.

15          **MR. ANDRADA:**  I WOULD LIKE TO AGAIN BE HEARD ON

16   THAT.

17          **THE COURT:**  THAT'S WHY I DID IT MONDAY MORNING.

18          SO I AM AFRAID THAT'S WHAT WE ARE GOING TO HAVE TO

19   DO.

20          **MR. ANDRADA:**  WE SENT SOME INSTRUCTIONS AND SO FORTH

21   LAST NIGHT.

22          **THE COURT:**  I SAW THEM ALL.

23          **MR. ANDRADA:**  ALL RIGHT.  THANK YOU.

24          **THE COURT:**  THAT WAS THE VERDICT FORM AND SOME OF

25   THE INSTRUCTIONS -- SOME WE ALREADY HAD, BUT THE ONES THAT WE

1    DIDN'T, I WILL TAKE A LOOK AT.

2              **MR. ANDRADA:**  THANK YOU.

3              **THE COURT:**  BUT MAYBE YOU CAN TELL ME REAL QUICK, IF

4    YOU THINK THERE IS A DISPUTE OF EXTRINSIC EVIDENCE AS TO THE

5    MEANING OF THE CONTRACT THAT I NEED TO SUBMIT TO THE JURY, IF

6    YOU CAN TELL ME REAL QUICK, I WILL BE THINKING ABOUT IT.

7              **MR. ANDRADA:**  IF I UNDERSTAND YOUR QUESTION, YOU ARE

8    ASKING ME WHAT MR. ASHKER'S UNDERSTANDING WAS --

9              **THE COURT:**  THERE IS EVIDENCE OF THAT.

10             **MR. ANDRADA:**  AND WHAT OUR UNDERSTANDING WAS.

11             **THE COURT:**  THE OUR IS PRETTY BROAD.  THE MANNER

12   THAT IS RELEVANT IS THE NEGOTIATORS AND SIGNERS OF THE

13   AGREEMENT, AS I UNDERSTAND CONTRACT LAW.  AND WE HAVE NO

14   EVIDENCE OF ANY DIFFERENT CONCLUSION OR INTENT OR UNDERSTANDING

15   OF THE NEGOTIATORS OR SIGNERS OF THE AGREEMENT.

16             **MR. ANDRADA:**  SO, LET ME -- LET ME SEE IF I AM

17   FOLLOWING YOU.  ARE YOU TELLING ME THAT WE HAD TO CALL THE AG?

18             **THE COURT:**  I AM TELLING YOU THAT MY UNDERSTANDING

19   OF CONTRACT LAW IS THAT IF THE CONTRACT IS AMBIGUOUS ON ITS

20   FACE, THEN THE COURT MUST HEAR EXTRINSIC PAROL EVIDENCE AS TO

21   ITS MEANING.  AND MY UNDERSTANDING OF THE RELEVANT EXTRINSIC

22   EVIDENCE OF THE MEANING, OF THE INTENT OF THE CONTRACTING

23   PARTIES, WOULD BE THOSE PARTIES WHO NEGOTIATED AND ENTERED INTO

24   THE AGREEMENT.

25             I DON'T KNOW WHO NEGOTIATED IT.  I KNOW WHO SIGNED

1    IT, AND, YES, YOU ARE RIGHT, THAT WAS A DEPUTY AG.  WHO

2    NEGOTIATED IT, WHO HAD THE UNDERSTANDING OF WHAT IT MEANT AT

3    THE TIME IT WAS NEGOTIATED, I DON'T KNOW.  BUT I HAVEN'T HEARD

4    ANY EVIDENCE OF IT, AND THAT IS, THAT IS THE DISPUTED EXTRINSIC

5    EVIDENCE THAT I WOULD SUBMIT TO THE JURY.  IF THERE WASN'T ANY

6    SUCH, THEN I HAVE TO DECIDE IT MYSELF AS I UNDERSTAND

7    CALIFORNIA CONTRACT LAW.

8            **MR. ANDRADA:**  WELL, IT SEEMS TO ME THAT THERE IS AN

9    ABUNDANCE OF EVIDENCE THAT EMPLOYEES OF THE STATE OF CALIFORNIA

10   WHO WERE, FOR PRACTICAL PURPOSES, INVOLVED IN IMPLEMENTING THE

11   TERMS, I GUESS --

12           **THE COURT:**  OR NOT.

13           **MR. ANDRADA:**  WELL, THE KEY TERM, IT SEEMS TO ME, IS

14   REFERRAL.

15           **THE COURT:**  THAT'S ONE OF THEM.  BUT I ALSO THINK

16   THE CONTRACT WAS BREACHED IN TERMS OF THE BAND, THE BALL, THE

17   ARM BRACE, AND THE PHYSICAL THERAPY.

18           **MR. ANDRADA:**  MY RECOLLECTION IS --

19           **THE COURT:**  ANYWAY, I REALLY DON'T HAVE THE TIME FOR

20   THIS NOW.  I AM QUITE CERTAIN THAT WHAT'S RELEVANT IS THE

21   INTENT OF THE CONTRACTING PARTIES AT THE TIME THE CONTRACT WAS

22   ENTERED INTO.  IF I AM WRONG ABOUT THAT, I WOULD BE HAPPY TO

23   LOOK AT A CASE THAT SAYS SOMETHING DIFFERENT.  I AM QUITE SURE

24   THAT IS PRETTY STANDARD BLACK LETTER CONTRACT LAW.

25           **MR. ANDRADA:**  ISN'T WHAT HAPPENED IN TERMS OF THE

1    REFERRALS EVIDENCE OF THAT INTENT?

2              **THE COURT:**  NO, THAT'S EVIDENCE OF BREACH, TO ME.

3    THERE IS EVIDENCE -- IF YOU HAVE A COURSE OF CONDUCT OF THE

4    CONTRACTING PARTY BEFORE THERE'S A CLAIM OF BREACH, THEN THAT

5    CAN BE EVIDENCE OF WHAT THE PARTIES UNDERSTOOD.

6              BUT ONCE THERE IS A CLAIM OF BREACH, THEN ONE CAN

7    HARDLY SAY THAT THE BREACHING PARTY'S BREACH IS EVIDENCE OF

8    WHAT THE CONTRACTING PARTIES MEANT.  THAT WOULD BE SORT OF --

9              **MR. ANDRADA:**  WAIT.  THERE WASN'T ANY --

10             **THE COURT:**  IF YOU CAN FIND ME SOMETHING THAT TELLS

11   ME ANYTHING OTHER THAN THE INTENT OF THE CONTRACTING PARTIES AT

12   THE TIME THE CONTRACT WAS BREACHED OR THE CONDUCT OF THE

13   CONTRACTING PARTIES BEFORE A DISPUTE AROSE.

14             **MR. ANDRADA:**  OKAY.

15             **THE COURT:**  WHAT WOULD BE THE EXTRINSIC EVIDENCE OF

16   THE CONDUCT OF THE CONTRACTING PARTIES BEFORE THE DISPUTE

17   AROSE?

18             **MR. ANDRADA:**  THERE WASN'T -- I CAN ANSWER THAT.

19   THERE WASN'T ANY CLAIM OF BREACH OF CONTRACT WITH REGARD TO A

20   REFERRAL UNTIL LONG AFTER THE DAVIS REFERRALS HAD ENDED.  SO

21   THAT'S PRETTY GOOD EVIDENCE, WE WOULD RESPECTFULLY SUGGEST.

22             **MR. ASHKER:**  THAT'S NOT TRUE --

23             **MR. ANDRADA:**  THERE WAS NOT A CLAIM OF BREACH.

24             **THE COURT:**  I SAW QUITE A FEW OF THEM.

25             **MR. ANDRADA:**  A CLAIM OF BREACH WITH REGARD TO

1    DAVIS?

2             **THE COURT:**  I THINK SO.

3             **MR. ASHKER:**  THE CONTRACT I HAVE RIGHT HERE, ON THE

4    CONTRACT WAS MADE MAY 24TH, 2002.  AND I FILED, I SENT A LETTER

5    TO THE ONE WHO SIGNED THE CONTRACT, MR. WALSTON, ON JUNE 16TH,

6    2002 COMPLAINING ABOUT THEM NOT IMPLEMENTING THE CONTRACT,

7    FOLLOWING THE TERMS OF THE CONTRACT, AND THEN I 602'D IT AGAIN

8    IN JANUARY OF 2003.  I MEAN, I DON'T KNOW.

9             **THE COURT:**  THAT'S MY IMPRESSION.  DISPUTES ARE NOT

10   SOMETHING WE ARE SHORT OF HERE.

11            **MR. ANDRADA:**  SO, IN OTHER WORDS, YOUR HONOR IS

12   SAYING --

13            **THE COURT:**  I AM NOT SAYING THAT AT ALL.  NO, I AM

14   NOT SAYING THAT AT ALL.  I AM SAYING THAT IF WE ARE LOOKING AT

15   A COURSE OF CONDUCT PRIOR TO THE TIME THE DISPUTE AROSE, THEN

16   WE ARE LOOKING AT A COURSE OF CONDUCT PRIOR TO JUNE 13TH WHEN A

17   DISPUTE FIRST AROSE SAYING YOU ARE SUPPOSED TO GIVE ME A

18   REFERRAL.

19            FROM THEN ON, WE CANNOT SAY THAT THERE IS NO

20   DISPUTE.  THERE IS A DISPUTE.  SO THE CONDUCT OF THE PARTIES AT

21   THAT POINT BECOMES A QUESTION OF WHETHER IT'S BREACHED, NOT A

22   QUESTION OF WHAT THE CONTRACTING PARTIES UNDERSTOOD AT THE TIME

23   THEY ENTERED INTO THE CONTRACT.

24            WHAT YOU ARE TALKING ABOUT IS SOMEBODY MAKES A

25   CONTRACT TO SELL GOODS, AND THEY ARE SELLING THEM BACK AND

1    FORTH FOR SEVERAL MONTHS, EVERYBODY IS HAPPY AND THEY ACCEPT

2    THE GOODS, THEY PAY FOR THE GOODS, THEY ACCEPT THE GOODS AND

3    THEY PAY FOR THE GOODS AND SUDDENLY THERE'S A DISPUTE AND THEY

4    SAY, OH, WE NEVER MEANT THAT ALL ALONG.

5              THEN YOU CAN LOOK AT THAT CONDUCT AND SAY, OH, WELL

6    THE FACT THAT YOU ACCEPTED THOSE GOODS ALL THIS TIME MEANS THAT

7    THOSE WERE THE GOODS THAT YOU WANTED.  THAT'S THE KIND OF THING

8    WE ARE TALKING ABOUT HERE.

9              WE DON'T HAVE A COURSE OF CONDUCT THAT SHOWS THAT

10   MR. ASHKER WAS SATISFIED WITH THE COURSE OF CONDUCT THAT WAS

11   GOING ON AFTER THAT AGREEMENT WAS REACHED.  QUITE TO THE

12   CONTRARY.  WE HAVE NUMEROUS COMPLAINTS THAT THE COURSE OF

13   CONDUCT WAS IN BREACH.

14             SO THAT WOULD BE THE ONLY KIND OF THING THAT THERE

15   COULD BE OF EXTRINSIC PAROL EVIDENCE OTHER THAN THE INTENT OF

16   THE CONTRACTING PARTIES AT THE TIME.

17             I REALLY DO HAVE TO GO.  IF YOU CAN FIND ME SOME

18   CASE LAW THAT TELLS ME SOMETHING ELSE, I WILL BE HAPPY TO TAKE

19   A LOOK AT IT.  IF YOU WOULD E-FILE IT OVER THE WEEKEND, I WILL

20   LOOK AT IT OVER THE WEEKEND.

21             **MR. ASHKER:**  THANK YOU, YOUR HONOR.

22             **THE CLERK:**  SO MR. ASHKER WILL BE BACK HERE AT 3:30?

23             **DEPUTY:**  TODAY?

24             **THE COURT:**  SORRY.  WE WILL NEED HIM BACK HERE WITH

25   THE CLERK TO GO OVER THE EXHIBITS OF WHAT HAS BEEN RECEIVED AND

1    WHAT HASN'T BEEN RECEIVED.

2              **DEPUTY:**  OKAY.

3              (COUNSEL, MR. ASHKER AND CLERK CONFER REGARDING

4    EXHIBITS.)

5              (PROCEEDINGS ADJOURNED.)

CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-05-3759 CW, TODD L. ASHKER V. MICHAEL SAYRE AND MATTHEW CATE, PAGES NUMBERED 859 THROUGH 1051, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.


/S/ DIANE E. SKILLMAN

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR