VOLUME 6

PAGES 1052 – 1175

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

TODD L. ASHKER,                    )
                                   )
                                   )
          PLAINTIFF,               )   NO. C-05-3759 CW
                                   )
  VS.                              )   MONDAY, MAY 18, 2009
                                   )
MICHAEL C. SAYRE, ET AL.,          )   OAKLAND, CALIFORNIA
                                   )
          DEFENDANTS.              )
_____)


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          TODD L. ASHKER, PRO PER
                            BOX 7500/D1-119
                            CRESCENT CITY, CALIFORNIA 9553



**FOR DEFENDANTS:**         ANDRADA & ASSOCIATES
                            180 GRAND AVENUE, SUITE 225
                            OAKLAND, CALIFORNIA 94612
                    BY:  J. RANDALL ANDRADA, ESQUIRE



**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER

1053

1         I N D E X

2

3  CLOSING ARGUMENT BY MR. ASHKER       1099

4  CLOSING ARGUMENT BY MR. ANDRADA      1132

5  REBUTTAL CLOSING ARGUMENT BY MR. ASHKER   1155

6

7

8  PLAINTIFF'S EXHIBITS:    EVD.

9    176        1059

10    181        1061

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>MONDAY, MAY 18, 2009</u>                                   <u>8:40 A.M.</u>

2

3                (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4           **THE COURT:**  GOOD MORNING.

5           **MR. ANDRADA:**  GOOD MORNING.

6           **MR. ASHKER:**  GOOD MORNING.

7           **THE COURT:**  I DIDN'T SEE YOU OVER THERE.

8                SO I JUST WANTED TO POINT OUT ONE THING, MR. ASHKER.

9    I HAVE TAKEN OUT OF THE INSTRUCTIONS THE CONCEPT OF MENTAL AND

10   EMOTIONAL DAMAGES AND LEFT IN PHYSICAL PAIN AND SUFFERING

11   BECAUSE THERE'S A PROBLEM POSSIBLY WITH EMOTIONAL DAMAGES FOR

12   BREACH OF CONTRACT AND I DIDN'T WANT TO HAVE TWO DIFFERENT SETS

13   OF INSTRUCTIONS FOR THE TWO DIFFERENT THINGS SINCE THERE WASN'T

14   REALLY ANY EVIDENCE OF MENTAL OR EMOTIONAL SUFFERING AND PAIN

15   AND SUFFERING, PHYSICAL PAIN AND SUFFERING OUGHT TO DO IT.  SO

16   I TOOK THAT OUT.

17          **MR. ASHKER:**  OKAY.

18               REAL QUICK, YOUR HONOR.  ON FRIDAY, LATE AFTERNOON

19   FRIDAY, I RECEIVED DEFENDANTS' JUDICIAL NOTICE REQUEST ON THAT

20   OTHER CASE.

21          **THE COURT:**  RIGHT.

22          **MR. ASHKER:**  THAT'S ALREADY BEEN RULED ON --

23          **THE COURT:**  BEFORE YOU ARGUE IT, LET ME ASK WHAT IT

24   IS THAT THEY WANT BECAUSE I AM NOT TOO SURE.

25          **MR. ANDRADA:**  WELL, THE POINT, YOUR HONOR MENTIONED

1    THE OTHER DAY THAT MR. ASHKER HAD, IN EFFECT, DECLARED THAT

2    THERE WAS A BREACH OF CONTRACT ABOUT THREE WEEKS AFTER THE

3    AGREEMENT WAS ENTERED INTO BECAUSE THE CDCR HADN'T GOT HIM DOWN

4    TO DAVIS AT THAT POINT.

5             MY POINT WAS, YOUR HONOR, THAT IN THAT ORDER, YOU

6    INDICATED, AS I READ IT, THAT THERE -- AND THAT WAS TWO YEARS

7    AFTER THE FACT THAT THERE WAS NO OBJECTION, OR PROBLEM, OR

8    CONCERN AT THAT TIME WITH THE ALLEGED FAILURE TO GET HIM TO

9    DAVIS. SO, TO --

10            **THE COURT:** I GUESS I AM MISUNDERSTANDING. I HAD

11   THOUGHT YOU WANTED JUDICIAL NOTICE OF THE ENTIRE RECORD. SO I

12   DIDN'T LOOK -- IT'S A BIG RECORD, SO I DIDN'T KNOW WHAT IT WAS

13   YOU WANTED, SO I DIDN'T LOOK AT ANYTHING IN PARTICULAR.

14            WHAT IS IT IN PARTICULAR THAT YOU WANT? DO YOU HAVE

15   A COPY OF IT?

16            **MR. ANDRADA:** YES. I GAVE IT TO YOUR CLERK ON

17   FRIDAY, YOUR HONOR. I GAVE THE CLERK A COPY OF YOUR ORDER THAT

18   YOU ISSUED.

19            I DON'T HAVE THE DATE SQUARELY IN MY MIND, BUT THE

20   GIST OF IT WAS THAT THERE WAS NO CLAIM. AS I READ YOUR

21   ORDER -- YES, HERE IT IS. OCTOBER 19TH, 2004.

22            **THE COURT:** I HAVE IT NOW SO I WILL TAKE A QUICK

23   LOOK AT IT UNLESS YOU WANT TO GIVE ME A PAGE AND LINE NUMBER TO

24   LOOK AT. I'LL GLANCE OVER THE WHOLE THING.

25            **MR. ASHKER:** EXCUSE ME, YOUR HONOR. WHILE YOU ARE

1    LOOKING AT THAT, I WOULD LIKE TO POINT OUT THAT WHAT

2    DEFENDANTS' POSITION IS --

3            **THE COURT:**  I CAN'T DO TWO THINGS AT ONCE.  LET ME

4    LOOK AT IT FIRST AND THEN YOU CAN POINT OUT WHAT YOU WOULD

5    LIKE.

6            **MR. ASHKER:**  ALL RIGHT.

7            (PAUSE IN THE PROCEEDINGS.)

8            **THE COURT:**  THIS IS ABOUT THE WRITING ASSISTANT.

9            **MR. ASHKER:**  EXACTLY.

10           AND ON AUGUST 25TH, 2008, IN YOUR PARTIAL GRANT,

11   PARTIAL DENIAL OF THEIR SUMMARY JUDGMENT MOTION, DEFENDANTS HAD

12   RAISED THIS ISSUE IN THEIR MOTION FOR SUMMARY JUDGMENT ON A

13   COLLATERAL ESTOPPEL GROUNDS, AND MY RESPONSE WAS, IS THAT I

14   FILED MY 602 IN JANUARY OF 2003 CHALLENGING THEIR FAILURE TO

15   HAVE ME SEEN BY UC DAVIS.  AND I EXHAUSTED THAT BY MAY OF 2003.

16   AND PURSUANT TO STATUTE OF LIMITATIONS, I HAD FOUR YEARS FROM

17   THE DATE OF THAT TO FILE ON MY BREACH OF CONTRACT CLAIMS.  AND

18   THAT ORDER AND MOTION THAT THEY ARE TALKING ABOUT RIGHT THERE

19   ONLY HAD TO DO WITH THE WRITING ASSISTANT.

20           AND IN THE COURT'S AUGUST 25TH, 2008 ORDER ON PAGE,

21   BEGINNING ON PAGE 25, ON THE DISCUSSION OF THEIR COLLATERAL

22   ESTOPPEL ARGUMENT, GOING OVER TO PAGE 26, LINES 15 THROUGH 25,

23   THE COURT DISCUSSES DEFENDANT'S ARGUMENT THAT THE DOCTRINE OF

24   COLLATERAL ESTOPPEL BARS RE-LITIGATION OF THE 2002 AGREEMENT

25   WAS BREACHED, HOWEVER, THE OCTOBER 19TH, 2004 ORDER CITED BY

1    DEFENDANTS' ADDRESSED PLAINTIFF'S CONTENTION THAT THE 2002

2    SETTLEMENT AGREEMENT REQUIRED DEFENDANTS IN THAT CASE TO

3    PROVIDE HIM WITH A WRITING ASSISTANT.  ORDERED OCTOBER 19,

4    2004, PAGE 2.  THE COURT --

5              **THE COURT:**  THAT'S FINE.  IT'S -- THAT ORDER WAS

6    ABOUT THE WRITING ASSISTANT.  THAT WASN'T ABOUT THE BREACH OF

7    CONTRACT.

8              **MR. ANDRADA:**  ALL RIGHT.  YOUR HONOR, I UNDERSTAND

9    WHAT YOU'VE SAID.  CERTAINLY AS I READ SOME OF THESE SENTENCES

10   IT CERTAINLY SOUNDS A WHOLE LOT BROADER THAN THAT, BUT I HAVE

11   HEARD WHAT YOUR HONOR HAS SAID.

12             **THE COURT:**  DO YOU HAVE OBJECTIONS OR EXHIBITS TO

13   MOVE INTO EVIDENCE THAT AREN'T IN?

14             **MR. ANDRADA:**  WE HAVE BEEN WORKING --

15             **THE COURT:**  SHEILAH SAID THERE WERE THREE LEFT --

16             **MR. ANDRADA:**  THERE WERE THREE LEFT.

17             **THE COURT:**  -- THAT PLAINTIFF WANTED AND YOU

18   OBJECTED TO.

19             **MR. ANDRADA:**  YES, YOUR HONOR.

20             **THE COURT:**  WHAT ARE THOSE?

21             **MR. ANDRADA:**  IF I MAY GET TO MY NOTES, PLEASE,

22   HERE.

23             IN EXHIBIT 176, YOUR HONOR, THE PLAINTIFF HAS --

24   PART OF THE EXHIBIT DEALS WITH THE PLAINTIFF'S VERSION OF SOME

25   CASE LAW AND HOW HE INTERPRETS SOME CASES.  THAT, WE SUGGEST,

1      IS INAPPROPRIATE.

2                **THE COURT:**  WHAT WAS THIS OFFERED FOR?

3                **MR. ASHKER:**  THIS IS AN EXAMPLE OF ME INFORMING

4      DR. SAYRE AND ET AL. OF MY -- WELL, IN THE ACTUAL REQUEST THAT

5      I SAY TO BE SEEN BY QUALIFIED MEDICAL SPECIALISTS, NUMBER TWO,

6      CORRECTION TO MY MEDICAL RECORDS ABOUT THAT HISTORY OF ABUSE

7      THAT DEFENDANTS RAISED.  NUMBER THREE, FOR PELICAN BAY PRISON

8      TO CHANGE THEIR POLICIES AND PRACTICES OF REFUSING TO COMPLY

9      WITH THE U.S. CONSTITUTION REGARDING MEDICAL CARE AND START

10     PROVIDING ADEQUATE PAIN MANAGEMENT FOR MY CHRONIC PAIN.

11               AND IT HAS RESPONSES BY MCLEAN AND IT REFERENCES THE

12     MAR COMMITTEE.  AND YOU HAVE ALSO BEEN EXAMINED BY THE CHIEF

13     MEDICAL OFFICER AND, THEREFORE, YOUR ISSUES ARE DENIED.

14               AND ATTACHED TO IT, IT HAS THE 8/2/07 REPORT THAT

15     DEFENDANTS BROUGHT OUT ABOUT THE RN'S INFORMING DR. MARTINELLI

16     OF MY DRUG ABUSE ISSUES --

17               **THE COURT:**  I AM SORRY, WHERE IS THAT NOW?

18               **MR. ASHKER:**  THAT'S PART OF 177.

19               **THE COURT:**  WHICH PAGE?

20               **MR. ASHKER:**  IT IS HAND NUMBERED UP AT THE TOP

21     LEFT-HAND CORNER 92.

22               **THE COURT:**  IT IS PART OF 176?

23               **MR. ASHKER:**  YES.  IT IS INTER-DISCIPLINARY PROGRESS

24     NOTE BY DR. MARTINELLI AND ANOTHER ONE THE NEXT FOLLOWING ONE

25     IS 8/23/07 WHERE PATIENT NOT GIVEN TYLENOL THREE DUE TO ABUSE

1    ISSUES.  AND THAT IS WHAT THIS WHOLE APPEAL WAS ABOUT, THAT

2    THAT'S A COMPLETE FABRICATION.  AND IT'S ANOTHER EXAMPLE,

3    SPECIFIC EXAMPLE ALL THE WAY UP TO JANUARY 14TH, 2008 OF

4    INFORMING DEFENDANTS THAT I AM NOT RECEIVING ADEQUATE CARE AND

5    MEDICATIONS FOR MY PAIN ISSUES, AND THEY ARE POINTING OUT THIS

6    FALSE INFORMATION.

7            THE COURT:  OKAY.  WELL, THAT DOES SEEM RELEVANT.

8    IF THERE'S A PORTION OF IT YOU THINK SHOULDN'T BE THERE, THERE

9    IS A PARAGRAPH HE TALKS ABOUT THE ESTELLE CASE --

10           MR. ANDRADA:  CORRECT.

11           THE COURT:  -- WE CAN REDACT THAT IF THAT IS A

12   PROBLEM FOR YOU.

13           MR. ANDRADA:  IT IS A PROBLEM.

14           THE COURT:  OKAY.  WE WILL REDACT THAT PORTION.

15               (PLAINTIFF'S EXHIBIT 176 RECEIVED IN

16               EVIDENCE)

17           THE COURT:  AND THEN YOU HAD 180, THE FDA?  THESE

18   ARE THE ABSTRACTS OF THE ARTICLES THAT --

19           MR. ANDRADA:  YES, YOUR HONOR.

20           THE COURT:  THOSE --

21           MR. ANDRADA:  I MEAN, IT'S CLASSIC HEARSAY.  WE

22   DIDN'T WAIVE THE FOUNDATION AND THEY SHOULDN'T BE ADMITTED.

23           THE COURT:  I DON'T THINK THESE SHOULD COME IN.

24           MR. ASHKER:  OKAY.

25           THE COURT:  AND 181?

1          **MR. ANDRADA:**  YES, YOUR HONOR.  THIS DECLARATION

2     DOESN'T SEEM TO ME -- WELL, DOESN'T SEEM TO ME TO BE ADMISSIBLE

3     OR RELEVANT.

4          **MR. ASHKER:**  WELL, IT SHOULD BE ADMISSIBLE IN THE

5     CONTEXT OF SAYRE CLAIMING THAT HE EXAMINED ME AND THE WHOLE

6     ISSUE CAME UP, WELL, WHY DIDN'T HE DISPUTE WHAT I CLAIMED

7     HAPPENED IN MY DECLARATION RIGHT HERE.  AND HIS -- IN HIS

8     DECLARATION THAT WAS IN RESPONSE TO THIS DATE 11/11/06 WHICH

9     HAS BEEN ADMITTED INTO EVIDENCE, SO --

10         **THE COURT:**  WELL, THERE'S TWO OF THEM HERE.  ONE IS

11    THE PROTECTIVE ORDER AND THE OTHER --

12         **MR. ASHKER:**  IT'S THE FIRST ONE, THE 9/24/06.

13         **THE COURT:**  THAT'S THE ONE YOU WANT?

14         **MR. ASHKER:**  YES.

15         **THE COURT:**  NOT BOTH OF THEM?

16         **MR. ASHKER:**  NO.

17         **THE COURT:**  YES.  THIS DID COME UP.  THE CLAIM WAS

18    MADE THAT HE HAD FILED A DECLARATION WITH POINT BY POINT BY

19    POINT, AND SAYRE FILED AN OPPOSING DECLARATION POINT BY POINT

20    BY POINT EXCEPT HE DIDN'T REBUT ONE OF THE POINTS.  AND THAT

21    WAS THE CURSORY NATURE OF THE EXAMINATION.

22         SO I GUESS ONE CAN DRAW AN INFERENCE FROM THAT, AND

23    IN ORDER TO DRAW THAT INFERENCE, ONE NEEDS THE POINT BY POINT

24    TO COMPARE WITH THE POINT BY POINT.  SO I WILL ALLOW THE

25    PORTION OF 181, WHICH IS THE DECLARATION IN SUPPORT OF THE

1    PROTECTIVE ORDER, AND NOT THE OTHER ONE.

2              (PLAINTIFF'S EXHIBIT 181 RECEIVED IN

3              EVIDENCE)

4         **MR. ASHKER:**  ON A JUDICIAL NOTICE ISSUE --

5         **THE COURT:**  WE ARE NOT DOING THAT.

6         **THE CLERK:**  I AM SORRY.  THERE WAS ONE MORE.

7    PLAINTIFF OBJECTED TO DEFENDANT'S 247.

8         **THE COURT:**  OKAY.  WHAT'S THAT?

9         **MR. ASHKER:**  THAT WAS THE SECOND DECLARATION ON

10   SAYRE'S OPPOSITION -- MOTION FOR SUMMARY JUDGMENT, WHICH, I

11   MEAN, THEY GOT THE 11/11/06 DECLARATION IN.  I AGREED TO LET

12   THEM HAVE THAT 11/6/07 DECLARATION IN, AND I DON'T SEE WHY THEY

13   NEED THAT THIRD DECLARATION TO COME IN.

14        **THE COURT:**  THIS IS FROM AUGUST OF '07?

15        **MR. ASHKER:**  YES.

16        **MR. ANDRADA:**  I GATHER, I DON'T HAVE THE DECLARATION

17   RIGHT IN FRONT OF ME.

18             I GATHER THE COURT HAS JUST MENTIONED THIS,

19   MR. ASHKER TIME AND TIME AGAIN SAID, WELL, YOU KNOW HE DIDN'T

20   RESPOND IN THE DECLARATIONS.  I THINK THIS DECLARATION DOES

21   RESPOND AND DOES SET FORTH SOME FACTS ABOUT THE 2006

22   EXAMINATION.  SO, TO SUGGEST --

23        **THE COURT:**  CAN YOU TELL ME WHERE IT IS IN THERE?

24        **MR. ANDRADA:**  IF I MAY APPROACH, YOUR HONOR?

25        **THE COURT:**  YOU WANT MY COPY?

1          **MR. ANDRADA:**  IT MIGHT BE FASTER.

2          **MR. ASHKER:**  ALL HE SAYS IN THERE IS THAT HE

3     EXAMINED ME ON AUGUST 30TH, 2006 WITHOUT ANY DETAILS.  AND HE

4     SAYS THE SAME THING IN THE 11/6/07 DECLARATION REGARDING THE

5     VIDEOTAPE.  SO IT IS KIND OF CUMULATIVE.

6          **THE COURT:**  THE PROBATIVE VALUE OF THE OTHER WAS

7     THAT IT WAS FILED SHORTLY THEREAFTER, IT WAS IN RESPONSE TO THE

8     SAME DECLARATION.

9          SHEILAH, YOU WANT TO TAKE THAT BACK FROM HIM SO HE

10    CAN TAKE A LOOK AT IT -- AND IT WAS CLOSE IN TIME.  THIS IS

11    NINE MONTHS LATER.

12         **MR. ANDRADA:**  IT DOES TALK ABOUT THE PHYSICAL EXAM.

13         **THE COURT:**  YOU WERE JUST GOING TO TELL ME THE PAGE

14    AND LINE, AND HAND THAT UP TO SHEILAH SO I CAN TAKE A LOOK AT

15    IT.

16         **MR. ANDRADA:**  WELL, CERTAINLY PARAGRAPH 7 THROUGH

17    10, AND IT REALLY BEGINNING PARAGRAPH 6.  AND THEN -- YES,

18    THOSE PARAGRAPHS PARTICULARLY, YOUR HONOR.

19         **MR. ASHKER:**  I DON'T SEE ANY DESCRIPTION OF ANY

20    ACTUAL EXAMINATION.

21         **THE COURT:**  THIS IS NOT -- DOESN'T DISPUTE -- IT WAS

22    MORE DETAILED THAN THAT.  MR. ASHKER CLAIMED EXACTLY WHAT HE

23    DID, WHICH WAS VERY LITTLE, AND HE DOESN'T SAY, OH, YES, I DID

24    A DYNAGRIP, OR I DID A FLEX MOVEMENT, OR I DID WHATEVER.  HE

25    JUST SAYS I EXAMINED HIM, WHICH HE SAID BEFORE.

```
 1                  SO, NO, I WON'T RECEIVE THAT ONE.

 2                  OKAY.  ANYTHING ELSE?

 3                  I HAVE A QUESTION FOR YOU.  WHAT WAS THE EVIDENCE

 4     ABOUT THE -- I REMEMBER THOSE TWO PAGES OF REFERRALS TO DAVIS.

 5                  MR. ANDRADA:  YES, MA'AM.

 6                  THE COURT:  WAS THERE ANYTHING ATTACHED TO EITHER

 7     ONE OF THEM?

 8                  MR. ANDRADA:  THE -- IF YOU LOOK AT THE REFERRALS,

 9     THERE IS A REFERENCE, I THINK IN BOTH OF THEM.  WE CAN PULL

10     THEM OUT --

11                  THE COURT:  LET'S DO THAT.

12                  MR. ASHKER:  YES, THERE IS A REFERENCE TO 48 PAGES

13     OF MEDICAL RECORDS BEING ATTACHED, BUT UNDER DEPOSITION OF BOTH

14     THE MEDICAL TECHNICAL ASSISTANT WHO MADE THE REFERRAL AND THE

15     DOCTORS AT UC DAVIS, NOBODY SEEMS TO KNOW, NOBODY COULD

16     IDENTIFY SPECIFICALLY WHAT THOSE DOCUMENTS WERE OR WHATEVER

17     HAPPENED TO THEM.

18                  THE COURT:  IS THAT RIGHT?

19                  MR. ANDRADA:  WELL, YES, THAT IS CORRECT.  BUT THERE

20     ARE REFERENCES IN BOTH REFERRAL FORMS TO MEDICAL RECORDS BEING

21     ATTACHED.

22                  THE COURT:  DO WE HAVE THOSE?  CAN ANYONE GIVE ME

23     THE NUMBERS OF THEM OR --

24                  MR. ASHKER:  THEY WOULD BE DEFENDANTS, I THINK

25     DEFENDANTS' 200, 201 AND 202.
```

1              **MR. ANDRADA:**  THAT IS CORRECT.

2              **THE COURT:**  ARE THESE ALL THE ADMITTED EXHIBITS IN

3     THAT BINDER?

4              **THE CLERK:**  NO.

5              **THE COURT:**  YOU HAVE A SEPARATE STACK TO BE

6     ADMITTED?

7              **THE CLERK:**  THESE ARE ALL THE ONES THAT PLAINTIFF

8     HAS ADMITTED.  THEN I HAVE JUST A FEW OF DEFENDANTS.

9              **THE COURT:**  OKAY.

10             **THE CLERK:**  ACTUALLY, THOSE EXHIBITS PLAINTIFF DID

11    NOT OBJECT TO.

12             **THE COURT:**  NO, THESE ARE ADMISSIBLE.

13             ANYTHING ELSE THEN?

14             **MR. ASHKER:**  NO.

15             **MR. ANDRADA:**  I DON'T BELIEVE THERE ARE ANY OTHER

16    MATTERS WITH REGARD TO THE EVIDENCE, YOUR HONOR.

17             **THE COURT:**  OKAY.

18             WELL, I HAVE GIVEN THIS A LOT OF THOUGHT AND I DO

19    THINK THAT I AM NOT GOING TO BE ABLE TO SUBMIT TO THE JURY THE

20    QUESTION OF WHETHER THE CONTRACT WAS BREACHED.  I THINK IT WAS.

21             I THINK I HAVE TO INTERPRET THE CONTRACT, AND GIVEN

22    THE WAY I INTERPRET IT, I DON'T -- I AM NOT SEEING ANY DISPUTE

23    OF EXTRINSIC EVIDENCE THAT WOULD ALLOW ME TO SUBMIT IT TO THE

24    JURY.

25             I AM STARTING WITH THE NOTION THAT UNDER THE PG&E

1  CASE, I HAVE TO CONSIDER THE CONTEXT OF THE AGREEMENT TO

2  DETERMINE WHETHER THE AGREEMENT IS AMBIGUOUS.  SO I DO THAT,

3  AND I SEE THAT THE AGREEMENT IS AMBIGUOUS IN TERMS OF THE

4  DEFINITION OF THE WORD "REFERRAL" AND ALSO THE DEFINITION OF

5  THE WORD "CONTRAINDICATED".

6          SO, I THEN HAVE TO RESOLVE THE AMBIGUITY.  CAN I

7  RESOLVE IT WITHIN THE FOUR CORNERS OF THE DOCUMENT?  PERHAPS,

8  BUT I WOULD HAVE TO CONSIDER ANY PROFFERED EXTRINSIC PAROLE

9  EVIDENCE AS TO THE MEANING OF IT.  AND EVIDENCE THAT WOULD BE

10 ADMISSIBLE WOULD BE EVIDENCE OF THE INTENTION OF THE

11 CONTRACTING PARTIES AT THE TIME THE CONTRACT WAS ENTERED INTO,

12 WHICH IS 2002.

13          AND I HAVE MR. ASHKER'S TESTIMONY AS TO WHAT HE

14 UNDERSTOOD BY THE AGREEMENT.  I HAVE THE CONTEXT OF THE

15 AGREEMENT, WHICH WAS THE RESOLUTION OF A DISPUTE OVER MEDICAL

16 CARE, AND I HAVE THE AGREEMENT ITSELF.  AND I DON'T THINK THAT

17 I HAVE ANYTHING ELSE THAT COULD BE CALLED PAROL EVIDENCE OR

18 EXTRINSIC EVIDENCE THAT'S RELEVANT OR ADMISSIBLE ON THAT POINT

19 THAT WOULD CONTRADICT IT.

20          AND IF I TURN AND GIVE MOST CREDENCE TO THE LANGUAGE

21 OF THE AGREEMENT ITSELF, WHAT I SEE IS THAT ALTHOUGH IT USES

22 THE WORD "REFERRAL" WHICH COULD CONCEIVABLY MEAN ALL WE HAVE TO

23 DO IS SEND THE REFERRAL, AND IF IT'S DENIED, THAT'S TOO BAD

24 THAT'S THE END OF IT, OR MAYBE SEND IT TWICE.  GIVEN THAT THE

25 CONTEMPLATION OF THE AGREEMENT WAS THAT THIS REFERRAL WAS GOING

1    TO RESULT IN AN EXAMINATION AND CONSULTATION, WHICH IN TURN WAS

2    GOING TO RESULT IN THE DECISION AS TO WHAT MEDICAL CARE WOULD

3    BE GIVEN, AND BOTH PARTIES WERE SORT OF TAKING THEIR CHANCES

4    THAT THE THIRD PARTY SPECIALIST WOULD RECOMMEND SOMETHING THEY

5    DIDN'T LIKE, MR. ASHKER TOOK THE CHANCE THEY WOULD RECOMMEND

6    IBUPROFEN OR NOTHING, AND THE CDCR TOOK THE CHANCE THEY WOULD

7    RECOMMEND TRAMADOL OR SOMETHING ELSE, BUT I DON'T THINK EITHER

8    PARTY CONTEMPLATED THAT THERE SIMPLY WOULD BE NO

9    RECOMMENDATION, AND THAT THE LAWSUIT ABOUT THE MEDICAL CARE

10   WOULD BE RESOLVED BY SIMPLY SAYING, WELL, YOU'RE NOT GOING TO

11   CHANGE ANYTHING.

12          I JUST DON'T THINK ANY OBJECTIVE REASONABLE

13   CONTRACTING PARTIES, USING THAT LANGUAGE IN RESOLVING THE

14   DISPUTE IN THAT WAY, COULD HAVE THOUGHT THAT.  AND PARTICULARLY

15   SINCE THERE'S NO EXTRINSIC EVIDENCE THAT SAYS THAT THE

16   CONTRACTING PARTIES DID THINK THAT AT THE TIME, I JUST CAN'T

17   FIND THAT THAT IS WHAT THEY THOUGHT.

18          WITH RESPECT TO THE REST OF IT, TO ME

19   CONTRAINDICATED IS DIFFERENT FROM A CHANGE IN MEDICAL NEEDS.

20   CONTRAINDICATED IMPLIES SOMETHING MORE THAN SIMPLY A CHANGE OF

21   NEED, A LESSENING OF NEED.  AND THE CONTRACT TALKS, WHEN IT

22   REFERS TO, I THINK, THE ARM BRACE, IT SAYS USE IT UNTIL THE

23   MEDICAL NEEDS CHANGE.  BUT WHEN IT TALKS ABOUT PHYSICAL

24   THERAPY, IT SAYS USE IT UNTIL CONTRAINDICATED, WHICH IS A

25   DIFFERENT CHOICE OF WORDS, AND GIVEN WHAT THE DOCTORS WHO

1   TESTIFIED HERE SAID, I INTERPRET CONTRAINDICATED TO MEAN NOT

2   JUST YOU DON'T NEED IT ANY MORE, BUT IT WOULD ACTUALLY BE

3   HARMFUL OR AT THE VERY LEAST, WOULD NO LONGER BE BENEFICIAL,

4   NOT SIMPLY THAT YOU DON'T ABSOLUTELY NEED IT.

5           SO IN THAT CONTEXT IT SEEMS TO ME THAT THERE WAS

6   REALLY NO EVIDENCE THAT THE PHYSICAL THERAPY, OR THE WHIRLPOOL

7   BATH, OR THE BAND, OR THE BALL WERE CONTRAINDICATED, THAT IS TO

8   SAY, HARMFUL OR NOT BENEFICIAL.  THE EVIDENCE IS THAT THEY WERE

9   BENEFICIAL.

10          SO, TO ME, THAT'S THE MEANING OF THE WORDS AND ALSO

11  IS THE EVIDENCE THAT THE CONTRACT WAS BREACHED.  AND THERE IS

12  NO COUNTERVAILING EVIDENCE.

13          WITH RESPECT TO THE ARM BRACE, THE CONTRACT IS NOT

14  AMBIGUOUS IN THAT REGARD, BUT IN TERMS OF WHETHER THERE IS ANY

15  EVIDENCE THAT THE CONTRACT WASN'T BREACHED, I DON'T THINK THERE

16  IS ANY.  THERE WAS SOME EVIDENCE THAT PERHAPS THE ARM BRACE --

17  WELL, I DON'T KNOW.  THE EVIDENCE FROM THE DEFENDANT'S EXPERT

18  WAS THAT THE ARM BRACE IS NEEDED, IT DIDN'T FIT.  THE EVIDENCE

19  FROM THE ORTHOPEDIST, THE TREATING ORTHOPEDIST WAS IT WOULD BE

20  NEEDED INDEFINITELY.  SO, I DON'T REALLY SEE A DISPUTE OF FACT

21  AS TO THE ARM BRACE.

22          SO, I THINK WHAT I HAVE TO DO IS GIVE THE SORT OF

23  ALTERNATIVE TWO OF THE INSTRUCTION I GAVE YOU ON FRIDAY.  TWO

24  WAYS I WAS THINKING OF GOING WITH IT, ONE WOULD HAVE JUST

25  INSTRUCTED AS TO THE CONTRACT INTERPRETATION AND LEFT THE

1    BREACH UP TO THE JURY AND THE OTHER WOULD INSTRUCT THE JURY

2    THAT THE CONTRACT WAS BREACHED.  AND THAT'S THE ONE I AM GOING

3    TO HAVE TO GO WITH.

4            THE OTHER THING I HAVE IN MIND, TOO, IS THAT IF I

5    WERE TO RESERVE THE MATTER UNTIL AFTER THE JURY VERDICT, WHICH

6    SOMETIMES CAN BE DONE WHEN YOU ARE TALKING ABOUT A DIRECTED

7    VERDICT FOR DEFENDANT, BUT HERE, IF THE JURY FOR SOME REASON

8    DID NOT FIND A BREACH OF CONTRACT, THEN THEY WOULDN'T FIND ANY

9    DAMAGES OR THEY WOULDN'T HAVE OCCASION TO DELIBERATE ON

10   DAMAGES.  AND IF I WERE TO HAVE TO SET THEIR VERDICT ASIDE,

11   WHICH I THINK I WOULD, THEN I WOULDN'T HAVE ANY DAMAGE

12   DETERMINATION AND THE COURT COULDN'T DO THE DAMAGE

13   DETERMINATION, SO I WOULD HAVE TO RETRY THE ISSUE ON DAMAGES,

14   WHICH WOULD BE AWKWARD GIVEN THE EXPENSE AND SECURITY ISSUES

15   INVOLVED WITH BRINGING MR. ASHKER HERE FROM PELICAN BAY.  SO, I

16   THINK THAT THAT WOULDN'T BE A GOOD SOLUTION.

17           SO THE VERDICT FORM WOULD HAVE TO BE CHANGED TO TAKE

18   OUT THE QUESTION OF WHETHER THERE WAS A BREACH AND JUST ASK

19   WHETHER THERE WAS HARM FROM THE BREACH AND WHAT THE DAMAGES

20   WOULD BE.

21           THAT'S MY THINKING.  IF YOU WOULD LIKE TO ADDRESS

22   THAT FURTHER, YOU MAY, MR. ANDRADA.

23           **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

24           IF I UNDERSTAND -- ONE OF THE THINGS THAT I AM -- I

25   MUST SAY I DO NOT UNDERSTAND, IS THE COURT'S TAKING FROM THE

1    JURY, ESSENTIALLY TAKING FROM THE JURY WHEN THE BREACH

2    OCCURRED, IF ANY THERE WAS.   THE COURT HAS INDICATED OUTSIDE

3    THE PRESENCE OF THE JURY THAT IT AGREES WITH MR. ASHKER THAT

4    THE BREACH OCCURRED WITHIN THREE WEEKS OF THE CONTRACT BEING

5    SIGNED --

6              **THE COURT:**  I AM NOT GOING TO INSTRUCT THEM WHEN THE

7    BREACH OCCURRED.

8              **MR. ANDRADA:**  WELL, OKAY.  SO THEN THAT QUESTION

9    SHOULD BE, IT SEEMS TO ME, SHOULD BE LEFT TO THE JURY.  AND

10   THEN IF THEY CAN DETERMINE A DATE ON WHICH THE CONTRACT WAS

11   BREACHED, THEN THE CONDUCT PRIOR TO THE BREACH WOULD BE

12   EVIDENCE OF THE DEFENDANT'S VIEW AND UNDERSTANDING OF WHAT THE

13   CONTRACT MEANT.

14             IN OTHER WORDS, THE OTHER DAY YOU SAID WE CAN'T TAKE

15   ANYTHING INTO ACCOUNT AFTER MAY, AFTER THE MIDDLE OF JUNE WITH

16   REGARD TO INTERPRETATION OF THE CONTRACT.  WELL, WE

17   RESPECTFULLY SUGGEST, YOUR HONOR, THAT, YES, YOU CAN IF YOU LET

18   THE JURY DETERMINE WHEN THE BREACH OCCURRED.  THEN THE

19   REFERRALS TO DAVIS AND THE FACT THAT ANOTHER PAIN CONSULT WAS

20   OBTAINED FROM DR. FRIEDMAN, INDEED A SERIES OF THEM, ALL THAT,

21   WE RESPECTFULLY SUGGEST, CAN BE TAKEN INTO ACCOUNT.

22             AND LIKEWISE THERE IS EVIDENCE IN THE RECORD THAT

23   DAVIS INFORMED THE CDCR THAT MR. ASHKER WAS BEING REJECTED OR

24   DENIED BECAUSE THE CDCR WAS PROVIDING HIM APPROPRIATE CARE.

25   MR. ASHKER MIGHT NOT AGREE WITH THAT, YOU MIGHT NOT AGREE WITH

1    THAT, BUT IT'S IN THE RECORD.

2              **MR. ASHKER:**  WELL --

3              **MR. ANDRADA:**  LET ME FINISH, MR. ASHKER, PLEASE.

4    THE JUDGE HAS ASKED ME FOR MY THOUGHTS.  I AM TRYING TO GIVE

5    THEM.

6              SO IT SEEMS TO ME, YOUR HONOR, THAT THOSE MATTERS,

7    WHEN ONE LOOKS AT THE EVIDENCE IN ITS ENTIRETY, THAT IS AN

8    ABUNDANCE OF EVIDENCE WITH REGARD TO WHAT THE CDCR WAS THINKING

9    SEVEN YEARS AGO, LONG BEFORE DR. SAYRE APPEARED ON THE SCENE

10   WITH REGARD TO THIS CONTRACT.

11             SO, TO SAY, WELL, YOU KNOW, IT'S ALL OVER IN THREE

12   WEEKS, WELL, HOW CAN THAT POSSIBLY BE REASONABLE PERIOD OF TIME

13   TO OBTAIN A CONSULT WHEN, IN FACT, THE EVIDENCE IN THE CASE

14   SAYS THAT IF YOU CALL DAVIS, IT TAKES AT LEAST THREE MONTHS TO

15   GET AN APPOINTMENT.  HOW CAN YOU SAY -- HOW CAN IT BE A BREACH

16   IN THREE WEEKS?

17             THERE ISN'T EVEN EVIDENCE THAT THE CDCR UP IN

18   PELICAN BAY EVEN HAD THE DOCUMENTS IN THREE WEEKS.  HE HAD

19   EVERY OPPORTUNITY TO ASK DR. WINSLOW SPECIFICALLY, WHEN DID THE

20   DOCUMENTS GET THERE?  WHAT DID YOU KNOW?  WHEN DID YOU KNOW IT?

21   AND HE DIDN'T.

22             SO IT SEEMS TO ME THAT THERE ARE TREMENDOUS GAPS IN

23   THE LOGIC HERE THAT WE BELIEVE ENTITLES THE DEFENDANTS TO HAVE

24   THESE ISSUES REGARDING THE CONTRACT SENT TO THE JURY.

25             AND THEN BEYOND WHAT I JUST ADDRESSED, THERE ARE --

1    AND WE HAVE MENTIONED THIS BEFORE, THERE'S NO ESTABLISHMENT OF

2    CAUSATION WITH REGARD TO WHAT WOULD THE PAIN MANAGEMENT

3    SPECIALIST HAVE PROVIDED.

4            AND, IN FACT, WE KNOW THE BEST EVIDENCE MIGHT WELL

5    BE DR. FRIEDMAN'S EVALUATIONS, WHICH OCCURRED ESSENTIALLY AT

6    THE SAME TIME THAT THE DAVIS EVALUATION WAS SUPPOSED TO OCCUR,

7    AND WHAT DID DR. FRIEDMAN DO?  YES, HE DID CONTINUE THE

8    TRAMADOL DURING THAT TIME.  HE TRIED TO WEAN MR. ASHKER, AND HE

9    EXPRESSED CONCERNS ABOUT THE DRUG.

10           SO, IF THE QUESTION IS, IF THE ARGUMENT IS, WELL,

11   YOU KNOW, DAVIS, DR. KREIS WOULD HAVE PUT ME -- WOULD HAVE KEPT

12   ME ON TRAMADOL FOREVER AND EVER AND EVER, THERE IS NO EVIDENCE

13   OF THAT.  NONE.

14           IN FACT, IT FLIES IN THE FACE OF THE TESTIMONY OF

15   DR. DUNCAN WHO WAS CALLED BY THE PLAINTIFF WHO SAID, LONG-TERM

16   MEDS ARE A BAD THING, AND AT MOST, IF YOU ARE GOING TO TAKE

17   ANYTHING LONG TERM, OKAY, TAKE TYLENOL.

18           DR. FRIEDMAN EXPRESSED CONCERNS ABOUT LONG-TERM

19   MEDICATION.  DR. WEINSTEIN EXPRESSED CONCERNS ABOUT LONG-TERM

20   MEDICATION.  SO, TO SUGGEST THAT WE KNOW WHAT DAVIS WOULD HAVE

21   DONE IS BEYOND SPECULATION, YOUR HONOR.

22           THERE IS NO -- HE HASN'T ESTABLISHED PROXIMATE

23   CAUSE, AND THUS HASN'T ESTABLISHED HIS DAMAGES.  WE CAN GO

24   THROUGH ALL OF THIS.  WHAT WOULD THE -- WHAT WOULD THE PAIN

25   MANAGEMENT SPECIALIST HAVE DONE WITH REGARD TO THE BRACE?

```
1    WELL, WE KNOW -- OR THE PT, AND ON, AND ON, AND ON.

2              YOU HEARD FROM THE PHYSICAL THERAPIST THAT HE DIDN'T

3    NEED PT AFTER 2002.  MR. ASHKER'S OWN WITNESS, ONE OF HIS STAR

4    WITNESSES, HE WANTED HIM LINED UP, REMEMBER WE HAD TO GO OUT

5    AND GET THE GUY, BRING HIM IN.

6              SO WE HAVE GOT ALL THESE -- WE HAVE GOT INCREDIBLE

7    SPECULATION AS TO -- AS TO WHAT WOULD HAVE HAPPENED HAD THERE

8    BEEN A PAIN MANAGEMENT CONSULT.

9              THE BEST EVIDENCE WITH REGARD TO WHAT PROBABLY WOULD

10   HAVE HAPPENED, AGAIN, WOULD HAVE BEEN THE COMMENTS BY FRIEDMAN

11   AND THE COMMENTS BY DUNCAN, THE COMMENTS BY MR. DODGEN, EVEN IF

12   YOU DON'T EVEN WANT TO LOOK AT THE PRIMARY CARE TREATERS AT

13   PELICAN BAY.

14             I THINK IT IS ALSO PREJUDICIAL TO DR. SAYRE.  NOW --

15   AND WE ARE GOING TO HAVE -- THERE IS GOING TO BE THIS ATTEMPT

16   TO BRING ALL THIS AND POSE ALL THIS ON DR. SAYRE.  HE WASN'T

17   EVEN ON THE SCENE UNTIL THREE YEARS LATER.

18             SO RESPECTFULLY, YOUR HONOR, I KNOW I AM PASSIONATE

19   ABOUT THIS, BUT YOU WILL HAVE TO FORGIVE ME.  I JUST THINK TO

20   DECLARE THAT THERE WAS A BREACH IN SUCH A SHORT PERIOD OF TIME

21   AND THUS ELIMINATE THE COURSE OF CONDUCT AS EVIDENCE WITH

22   REGARD TO WHAT THE CONTRACT MEANT, WE BELIEVE IS UNREASONABLE,

23   PREJUDICIAL AND WILL SUBJECT THE STATE TO, IN EFFECT, BE

24   UNFAIRLY HELD TO HAVE NOT COMPLIED WITH THE TERMS OF THIS

25   AGREEMENT.
```

1          IF THE STATE BELIEVES, AND APPARENTLY IT DID, IF YOU

2     LOOK AT THE EVIDENCE, THERE ARE SEVERAL NOTES, IF THE STATE

3     BELIEVES THAT DAVIS SAID WE CAN'T DO ANYTHING MORE FOR THE GUY,

4     YOU GUYS ARE DOING A GREAT JOB, HOW CAN THAT POSSIBLY BE A

5     BREACH OF CONTRACT?  AND THAT'S THE EVIDENCE.  MR. ASHKER MIGHT

6     NOT LIKE THAT PART OF THE EVIDENCE, BUT IT'S IN THE RECORD.

7          SO WE BELIEVE, YOUR HONOR, THAT IT WILL BE

8     INAPPROPRIATE TO TAKE THE QUESTION OF BREACH OF CONTRACT FROM

9     THE JURY.  AND IF YOUR HONOR HAS ANY SPECIFIC QUESTIONS FURTHER

10    WITH REGARD TO OUR VIEW, I WOULD BE PLEASED TO ANSWER THEM.

11         **THE COURT:**  WELL, TO START WITH THE COURSE OF

12    CONDUCT ISSUE, I THINK YOU ARE CONFLATING A COUPLE OF THINGS

13    HERE.

14         I WILL NOT INSTRUCT THE JURY AS TO WHEN THE CONTRACT

15    WAS BREACHED.  YOU MAY ARGUE WHATEVER YOU LIKE ABOUT WHEN IT

16    WAS BREACHED, AND I SUPPOSE THE DAMAGES MIGHT BE EFFECTED BY

17    THE POINT AT WHICH THEY DECIDE THE CONTRACT WAS BREACHED.

18         THE REASON WE GOT INTO THE DISCUSSION THE OTHER DAY

19    ABOUT COURSE OF CONDUCT OR WHEN THE CONTRACT WAS BREACHED OR

20    WHEN I SHOULD EVEN SAY WHEN A DISPUTE AROSE IS REALLY THE

21    QUESTION, NOT WHEN THE CONTRACT WAS BREACHED, WHEN DID A

22    DISPUTE ARISE, THE REASON WE GOT INTO A DISCUSSION ABOUT THAT

23    IS THAT AS I WAS TRYING TO THINK OF WHAT POSSIBLE ADMISSIBLE

24    EXTRINSIC PAROL EVIDENCE THERE COULD BE ABOUT THE MEANING OF

25    THE CONTRACT BESIDES THE INTENT OF THE CONTRACTING PARTIES AT

1    THE TIME OF THE CONTRACT, AND BY THE WAY THAT'S NOT THEIR

2    SUBJECTIVE INTENT UNDER MODERN CONTRACT LAW, BUT IS THE

3    OBJECTIVE INTENT AS EXPRESSED BY THE LANGUAGE, THAT A

4    REASONABLE PERSON WOULD HAVE THOUGHT THAT MEANT, BUT BE THAT AS

5    IT MAY, THE OTHER FORM OF EXTRINSIC EVIDENCE I COULD THINK OF

6    WAS COURSE OF CONDUCT EVIDENCE.

7              AND THE COURSE OF CONDUCT PROVIDES THAT IF THERE IS

8    A DISPUTE ABOUT THE MEANING OF CONTRACT TERMS, ONE CAN CONSIDER

9    THE CONDUCT OF THE PARTIES UNDER THE CONTRACT BEFORE ANY

10   DISPUTE AROSE ABOUT THE MEANING OF THE CONTRACT.  AND IT'S THAT

11   THEORY JUST REALLY ISN'T APPLICABLE HERE.

12             IT'S MORE LIKE PEOPLE HAVE A CONTRACT FOR WIDGETS,

13   AND FOR A YEAR THEY ARE PROVIDING BLUE WIDGETS AND THEN

14   SUDDENLY SOMEONE SAYS, OH, NO, THIS CONTRACT REALLY MEANS RED

15   WIDGETS.  WELL, THEN, PAROL EVIDENCE THAT THE OTHER PARTY WAS

16   ACCEPTING WITHOUT QUESTION BLUE WIDGETS FOR A YEAR WOULD BE

17   ADMISSIBLE EVIDENCE THAT THE PARTIES DIDN'T INTEND THE CONTRACT

18   TO DETERMINE WHAT COLOR THE WIDGETS OUGHT TO BE.

19             WE JUST DON'T HAVE ANYTHING HERE LIKE THAT WHERE THE

20   PARTIES WENT ON FOR A PERIOD OF TIME ACCEPTING THE NOTION THAT

21   A REFERRAL MEANT NOTHING MORE THAN TWO PIECES OF PAPER AND

22   DIDN'T REALLY REQUIRE AN EXAMINATION.  THERE JUST ISN'T ANY

23   TIME WHEN MR. ASHKER EVIDENCED ANY ACCEPTANCE OF THE NOTION

24   THAT A SIMPLE REFERRAL THAT WAS UNSUCCESSFUL WITHOUT AN

25   EXAMINATION OR CONSULTATION WOULD BE ADEQUATE.

1        SO, IF THERE WERE EVIDENCE OF A COURSE OF DEALING,

2   THEN PERHAPS I WOULD HAVE TO SUBMIT TO THE JURY THE QUESTION OF

3   WHETHER A COURSE OF DEALING EVIDENCE INDICATED WHAT THE -- THAT

4   THE PARTIES REALLY INTENDED A REFERRAL ALONE TO BE SUFFICIENT.

5   BUT THERE JUST ISN'T ANY EVIDENCE LIKE THAT.

6        WITH RESPECT TO THE REFERRAL TO UC DAVIS, YOU ARE

7   NOT EXACTLY DESCRIBING HOW THE EVIDENCE CAME IN.  DR. KREIS

8   TESTIFIED THAT THIS PIECE OF PAPER THAT HE SAW, WHICH SAID -- I

9   SHOULDN'T HAVE GIVEN IT BACK -- SOMETHING LIKE REFERRAL DENIED,

10  WE HAVE NOTHING TO OFFER, WHAT HE SAID WAS THAT MEANS THE SAME

11  AS THE FIRST ONE, THAT WE ARE TOO BUSY.

12        ON CROSS, YOU -- IT WASN'T EVEN CROSS, HE WAS YOUR

13  WITNESS, YOU LED HIM QUITE STRONGLY TO SAY, WELL, COULDN'T THAT

14  POSSIBLY ALSO MEAN THAT WE THINK -- WE DON'T HAVE ANYTHING MORE

15  TO OFFER HIM.  HE SAID, WELL, I SUPPOSE, BUT THAT WOULD BE LESS

16  LIKELY.

17        SO, TO SAY THAT THERE'S -- THAT WOULD BE A QUESTION

18  OF WAS THERE A BREACH, AND IT WOULD GO TO A SORT OF

19  IMPOSSIBILITY DEFENSE, I GUESS, BUT IT JUST --

20        **MR. ANDRADA:**  I AM NOT EVEN TALKING ABOUT THAT

21  EVIDENCE.

22        **THE COURT:**  IF THE CONTRACT MEANS WHAT I THINK IT

23  MEANS, THEN YOU WOULD SAY ALL WE HAD TO DO IS REFER, AND THAT

24  WAS ADEQUATE.

25        **MR. ANDRADA:**  YOUR HONOR, WHAT I AM TALKING ABOUT,

1    AS FAR AS --

2              **THE COURT:**  LET ME JUST --

3              **MR. ANDRADA:**  PARDON ME.

4              **THE COURT:**  THE LAST POINT, WHICH IS ON THE

5    CAUSATION, NOW, I AM NOT INSTRUCTING THEM ON CAUSATION.  I AM

6    NOT TAKING CAUSATION AWAY FROM THEM.  YOU MAY ARGUE THAT THE

7    BREACH OF CONTRACT CAUSED HIM NO HARM, CAUSED HIM NO DAMAGE.

8    YOU ARE WELCOME TO ARGUE THAT.  THAT IS NOT PART OF THIS.

9              I AM INSTRUCTING SIMPLY THAT THERE WAS A BREACH.  SO

10   YOU MAY ARGUE LACK OF CAUSATION.

11             I WILL SAY THAT IN TERMS OF A FAILURE OF EVIDENCE OF

12   CAUSATION, THAT THE STRONGEST EVIDENCE OF CAUSATION ACTUALLY

13   CAME FROM DR. SHIN WHO WAS AN INDEPENDENT THIRD PARTY EXPERT IN

14   PAIN MANAGEMENT, AND WHAT HE SAID HE WOULD HAVE DONE HAD

15   MR. ASHKER COME TO HIM, WAS GIVE HIM THE TRAMADOL IN A

16   HEARTBEAT AND GIVE HIM A CUSTOM-MADE, WELL-FITTING ARM BRACE,

17   AND THAT THE OTHER THINGS WERE BENEFICIAL.

18             I THINK THAT'S THE STRONGEST EVIDENCE OF WHAT WOULD

19   HAVE HAPPENED HAD UC REFERRED MR. ASHKER TO A NON-CDC

20   INDEPENDENT, ALTHOUGH HE WAS YOUR EXPERT, BUT AT LEAST NOT AN

21   EMPLOYEE OR CONTRACTOR OF THE CDC OF WHAT SUCH A PERSON WOULD

22   HAVE DONE.

23             **MR. ANDRADA:**  WHAT HE SAID, YOUR HONOR, WAS THAT

24   WOULD HAVE BEEN HIS APPROACH.  HE ALSO CONCEDED AND SAID THAT

25   THERE WERE ANY NUMBER OF APPROACHES THAT MIGHT HAVE BEEN TAKEN.

1          HE ALSO SAID THAT THE STANDARD OF CARE DID NOT

2   REQUIRE TRAMADOL IN '02, '03 '04 --

3          **THE COURT:**  I AM NOT TALKING STANDARD OF CARE HERE.

4   YOU MADE THE ARGUMENT THAT THERE WAS NO EVIDENCE OF WHAT A

5   SPECIALIST WOULD HAVE DONE.  AND I AM SAYING THAT THERE IS

6   EVIDENCE OF WHAT, AT LEAST ONE SPECIALIST, AND I WOULD SAY THE

7   MOST SIMILARLY-SITUATED SPECIALIST, WOULD HAVE DONE, AND THAT

8   WAS TO SAY I WOULD HAVE CONTINUED THE TRAMADOL IN A HEARTBEAT.

9          I AM NOT TALKING -- I AM NOT TALKING ABOUT STANDARD

10  OF CARE NOW, I AM JUST TALKING ABOUT YOUR ARGUMENT ABOUT

11  CAUSATION.

12         **MR. ANDRADA:**  YOUR HONOR, LET'S COME BACK TO A

13  COUPLE OF ISSUES.

14         WHEN I TALK ABOUT WHAT'S IN THE RECORD WITH REGARD

15  TO WHAT HAPPENED AT DAVIS, THERE ARE NOTES, CDCR NOTES FROM

16  VARIOUS PROVIDERS, EMPLOYEES.  THEY ARE IN EVIDENCE.  THAT SAY

17  WE TALKED TO DAVIS -- IT'S IN EVIDENCE -- AND DAVIS SAID WE ARE

18  DOING FINE, AND THEY DON'T -- THEY CAN'T OFFER THE GUY

19  ANYTHING --

20         **THE COURT:**  WHERE IS THAT?

21         **MR. ANDRADA:**  I WILL TRY TO FIND IT HERE, YOUR

22  HONOR.

23         **THE COURT:**  YOU DON'T HAVE TO.  IT'S NOT

24  SOMETHING --

25         **MR. ANDRADA:**  IT IS IN THE RECORDS.

1          **THE COURT:** MAYBE SO, BUT THAT HASN'T BEEN POINTED

2    OUT TO ME.

3          **MR. ANDRADA:** IT'S IN EVIDENCE NOW.

4          **THE COURT:** YOU CAN SHOW IT TO ME OR NOT, BUT I

5    CAN'T TAKE YOUR WORD FOR IT BECAUSE I HAVEN'T SEEN IT.

6          **MR. ANDRADA:** ALL RIGHT.  WELL, I WILL TRY TO FIND

7    IT IN A MOMENT.

8          I WANT TO COME BACK TO YOUR COMMENTS ABOUT THE WORD

9    "REFERRAL" AND "CONTRAINDICATED".  ALL OF THE EVIDENCE WITH

10   REGARD TO REFERRAL INDICATES THAT THERE IS NO GUARANTEE.  A

11   DOCTOR TO WHOM -- FROM WHOM ONE SEEKS A CONSULT IS GOING TO

12   ACCEPT THE CONSULT.  THERE IS NO EVIDENCE PERIOD.  THERE'S ONE

13   ESSENTIAL MEANING OF THAT TERM.  AND YOU TAKE YOUR CHANCES WITH

14   REGARD TO WHETHER THE CONSULTING DOCTOR SAYS, HEY, I CAN HELP

15   YOU, OR I HAVE GOT TIME, OR I DON'T HAVE TIME, OR WHATEVER.

16        SO, TO SUGGEST THAT SOMEHOW THEY HAD TO KEEP

17   KNOCKING ON THE DOOR AT DAVIS FOREVER AND EVER UNTIL THEY TOOK

18   THE MAN IS JUST SIMPLY INCONSISTENT WITH THE EVIDENCE.  BUT

19   THAT IS ESSENTIALLY WHAT THE COURT HAS JUST SAID.  YOU HAVE TO

20   KEEP TRYING.  GOT TO KEEP TRYING.

21        CONTRAINDICATED.  THE COURT HAS CHOSEN TO ACCEPT THE

22   VERSION OF CONTRAINDICATED THAT'S MOST FAVORABLE TO THE

23   PLAINTIFF.  THERE WAS TESTIMONY THAT CONTRAINDICATED MEANS

24   DON'T DO IT BECAUSE IT WILL HURT YOU, OR IT'S JUST NOT

25   MEDICALLY NECESSARY, OR REASONABLE, OR YOU DON'T NEED IT.  IT

1   IS A MUCH BROADER TERM THAN, OH, MY GOD, IT'S GOING TO HURT

2   YOU, SO DON'T DO IT.

3           THE COURT IS TAKING MR. ASHKER'S VIEW, LOOK AT THAT

4   QUESTION JUST FROM MR. ASHKER'S POINT OF VIEW AND IGNORED THE

5   CONTRARY EVIDENCE.  IF THE -- WELL --

6           **MR. ASHKER:**  WELL --

7           **THE COURT:**  WHY DON'T YOU LET MR. ANDRADA FINISH.

8           **MR. ASHKER:**  OKAY.

9           **MR. ANDRADA:**  I AM LOOKING FOR THE PART OF THE

10  CONTRACT ITSELF.

11          THE OTHER PART ABOUT THIS, IF ONE LOOKS AT THE

12  LANGUAGE OF THE CONTRACT, THE COURT IS TALKING ABOUT TIME AND

13  TIME AGAIN ABOUT IMPLEMENTING THE PLAN AND PUTTING IN PLACE, SO

14  WE DON'T EVEN KNOW WHAT THAT PAIN MANAGEMENT REGIMEN WOULD HAVE

15  BEEN, BUT UNTIL THE PLAINTIFF'S MEDICAL NEEDS CHANGE.

16          SO, AGAIN, WE HAVE TO SPECULATE ABOUT WHAT WOULD

17  HAVE RESULTED IN THAT REGARD.  SO, WE HAVE GOT SPECULATION

18  ABOUT WHAT DR. KREIS SPECIFICALLY WOULD HAVE DONE, NOT WHAT

19  DR. SHIN OR OTHER PROVIDERS WOULD HAVE DONE, BECAUSE THE

20  TESTIMONY, IF YOU ACCEPT DR. SHIN'S TESTIMONY AS THE BEST

21  EVIDENCE, YOU ALSO, IN FAIRNESS TO THE DEFENDANT, HAVE TO

22  ACCEPT HIS TESTIMONY THAT THERE ARE ANY NUMBER OF WAYS TO

23  APPROACH THIS PROBLEM.

24          **THE COURT:**  AS I SAY, I AM NOT TAKING CAUSATION AWAY

25  FROM THE JURY.  YOU MAY ARGUE WHATEVER YOU LIKE ABOUT CAUSATION

1    AND HARM AND ABOUT THE DATE OF BREACH.  THAT'S NO PROBLEM.

2    THAT'S NOT WHAT I AM GETTING AT.

3            **MR. ANDRADA:**  WELL, MY POINT IS HE HASN'T PROVEN IT,

4    THEREFORE, IT SHOULD NOT EVEN GO TO THE JURY.

5            **THE COURT:**  HE DOESN'T HAVE TO PROVE IT.  HE HAS TO

6    OFFER EVIDENCE OF IT.  AND THERE IS AT LEAST EVIDENCE OF IT IN

7    THE FORM OF DR. SHIN'S TESTIMONY, IF NOTHING ELSE.

8            HE DOESN'T HAVE TO PROVE IT TO GET TO THE JURY.  HE

9    HAS TO OFFER SUFFICIENT EVIDENCE FROM WHICH A REASONABLE JURY

10   COULD FIND THAT, AND YOU CAN ARGUE TO THE CONTRARY.

11           **MR. ANDRADA:**  WELL, AGAIN, I HAVE INDICATED --

12           **THE COURT:**  DON'T REPEAT YOURSELF.

13           **MR. ANDRADA:**  I AM NOT GOING TO.

14           **THE COURT:**  WE NEED TO GET GETTING.  IT'S 9:25.

15           **MR. ANDRADA:**  I HAVE NOTHING FURTHER IN THAT REGARD.

16           **THE COURT:**  OKAY.

17           DID YOU HAVE SOMETHING?

18           **MR. ASHKER:**  JUST REAL BRIEFLY, YOUR HONOR.

19           AS FAR AS THE CONTRACT GOES, THE CONTRACT WAS ABOUT

20   ME BEING SEEN BY AN INDEPENDENT -- MUTUALLY AGREEABLE PAIN

21   MANAGEMENT SPECIALIST WHO WAS NOT IN CDC'S POCKET, IN OTHER

22   WORDS, AN INDEPENDENT ONE.

23           IF UC DAVIS REFUSED TO SEE ME, THEN ALL THEY HAD TO

24   DO IS GET AT ME AND SAY, WHO ELSE WOULD YOU BE AGREEABLE TO?

25   AND IN MY 602 OF JANUARY 23RD, 2003, I TOLD THEM, HEY, IF UC

1    DAVIS CAN'T SEE ME, WHAT ABOUT UC SAN FRANCISCO.  I RECEIVED NO

2    RESPONSE.  AND IT'S JUST ON AND ON WITH THAT CONTRACT.

3              THE THING IS, IT WAS NEVER -- I MEAN, THREE WEEKS,

4    WHATEVER, NOTIFYING CDC ON JUNE 16TH, 2002, I WROTE THE

5    ATTORNEY GENERAL WHO SIGNED THE CONTRACT A LETTER ASKING HIM

6    WHAT'S GOING ON.  THESE PEOPLE HERE DON'T SEEM TO KNOW ANYTHING

7    ABOUT THIS.

8              WHEN THEY HAD ME SEE DR. FRIEDMAN, I NEVER AGREED TO

9    THAT.  THAT WASN'T PART OF THE AGREEMENT.  AND I WAS NOT HAPPY

10   WITH HIS TREATMENT.

11             WE CAN JUST GO ON AND ON.  DR. SAYRE, I MADE HIM

12   PERSONALLY REPEATEDLY AWARE OF MY CONTRACT.  I TOLD HIM, HEY,

13   IF YOU WANT TO CHANGE MY MEDICATION, FINE.  LET ME SEE A PAIN

14   MANAGEMENT SPECIALIST WHO CAN COME UP WITH SOMETHING THAT WORKS

15   THAT DOESN'T CAUSE ME SIDE EFFECTS.  THAT WAS DENIED, IGNORED.

16             AND AS FAR AS CONTRAINDICATED GOES, I HAVE THE

17   RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY RIGHT HERE WHERE

18   ON PAGE 441, CONTRAINDICATE, UNDER THE MEDICAL DEFINITION, OF A

19   SYMPTOM OR CONDITION TO GIVE INDICATION AGAINST THE

20   ADVISABILITY OF A PARTICULAR OR USUAL REMEDY OR TREATMENT.

21             THAT'S THE MEDICAL DEFINITION.  AND DR. WINSLOW

22   ADMITTED WHEN HE WAS QUESTIONED ABOUT MY INTERPRETATION OF WHAT

23   CONTRAINDICATED MEANT, HE SAID THAT'S A FAIR INTERPRETATION.

24             **THE COURT:**  OKAY.  WE WILL BRING IN THE JURY.  I

25   WILL INSTRUCT.

1    NOW, I SHOULD HAVE MENTIONED THIS EARLIER.  ARE YOU

2    AWARE -- AS THE PLAINTIFF, YOU HAVE, IF YOU WOULD LIKE,

3    REBUTTAL TIME.  SO YOU CAN ARGUE FIRST, THEN MR. ANDRADA WILL

4    ARGUE.  YOU EACH HAVE AN HOUR, BUT IF YOU WANT TO RESERVE FIVE

5    OR TEN MINUTES OF YOUR TIME, YOU CAN SPEAK AGAIN AFTER HE

6    SPEAKS.

7         **MR. ASHKER:**  OKAY.

8         **THE COURT:**  I SHOULD HAVE MENTIONED THAT EARLIER.

9         **MR. ASHKER:**  THANK YOU, YOUR HONOR.

10        **THE COURT:**  ALL RIGHT.

11        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

12        **THE COURT:**  PLEASE BE SEATED.

13        GOOD MORNING, LADIES AND GENTLEMAN.

14        **JURY:**  GOOD MORNING.

15        **THE COURT:**  HOPE YOU HAD A GOOD WEEKEND.

16    YOU HAVE NOW HEARD ALL THE EVIDENCE.  IT'S MY DUTY

17    TO INSTRUCT YOU AS TO THE LAW OF THE CASE.  AGAIN, A COPY OF

18    THESE INSTRUCTIONS WILL BE GIVEN TO YOU IN THE JURY ROOM WHEN

19    YOU DELIBERATE.

20    YOU SHOULD DISREGARD -- DISCARD THE PRELIMINARY

21    INSTRUCTIONS.  THE FINAL INSTRUCTIONS CONTROL, AND YOU NEED NOT

22    CONCERN YOURSELVES WITH ANY DIFFERENCES THERE MIGHT BE BETWEEN

23    THESE FINAL INSTRUCTIONS AND THE PRELIMINARY INSTRUCTIONS.

24    YOU MUST NOT INFER FROM THESE INSTRUCTIONS OR FROM

25    ANYTHING THAT I MAY HAVE SAID OR DONE THAT I HAVE AN OPINION

1    REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

2            IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE

3    EVIDENCE IN THE CASE.  TO THOSE FACTS, YOU MUST APPLY THE LAW

4    AS I WILL GIVE IT TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT

5    TO YOU WHETHER YOU AGREE WITH IT OR NOT.

6            AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES

7    OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  THAT MEANS

8    THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE

9    YOU.  YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

10           IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF

11   THEM AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

12   IMPORTANT.

13           THIS IS AN ACTION ARISING FROM THE MEDICAL CARE

14   RECEIVED BY PLAINTIFF TODD LOUIS ASHKER, A STATE PRISONER,

15   WHILE AT PELICAN BAY STATE PRISON, WHICH WILL SOMETIME CALL

16   PBSP IN CRESCENT CITY, CALIFORNIA.

17           DEFENDANTS ARE DR. MICHAEL SAYRE, THE CHIEF MEDICAL

18   OFFICER AT PBSP, WHO IS BEING SUED PERSONALLY, AND MATTHEW

19   CATE, THE CURRENT DIRECTOR OF THE CALIFORNIA DEPARTMENT OF

20   CORRECTIONS AND REHABILITATION, WHICH WE WILL SOMETIMES CALL

21   THE CDCR, AND HE'S BEING SUED ONLY AS THE REPRESENTATIVE OF THE

22   CDCR.

23           PLAINTIFF CLAIMS THAT DEFENDANTS FAILED TO PROVIDE

24   HIM WITH APPROPRIATE MEDICAL CARE AND, AS A RESULT, HE SUFFERED

25   UNNECESSARY PAIN AND A PRE-EXISTING MEDICAL CONDITION WAS

1    AGGRAVATED.  PLAINTIFF SEEKS MONEY DAMAGES FOR HIS PAIN AND THE

2    ALLEGED AGGRAVATION OF HIS STRUCTURE INJURY.

3            DEFENDANTS DENY PLAINTIFF'S ALLEGATIONS, CONTEND

4    THAT THEY PROVIDED APPROPRIATE MEDICAL CARE, AND DENY THAT THEY

5    CAUSED PLAINTIFF ANY HARM.

6            PLAINTIFF ALSO ALLEGES THAT HE WAS HARMED BY THE

7    DEFENDANTS' BREACH OF A MAY 24TH, 2002 SETTLEMENT AGREEMENT IN

8    WHICH THEY PROMISED TO REFER HIM TO A PAIN MANAGEMENT

9    SPECIALIST AT THE UNIVERSITY OF CALIFORNIA AT DAVIS CLINIC FOR

10   A PAIN MANAGEMENT EXAMINATION AND CONSULTATION TO IMPLEMENT THE

11   PAIN MANAGEMENT REGIMEN RECOMMENDED BY THE SPECIALIST AND TO

12   CONTINUE THE PAIN MANAGEMENT REGIMEN UNTIL PLAINTIFF'S MEDICAL

13   NEEDS CHANGED.

14           DEFENDANTS ALSO PROMISED TO ALLOW PLAINTIFF

15   APPROPRIATE USE OF HIS ARM BRACE, TO REINSTATE THE PHYSICAL

16   THERAPY PLAINTIFF HAD BEEN RECEIVING TO REHABILITATE HIS ARM,

17   AND TO CONTINUE THE PHYSICAL THERAPY UNTIL A CHANGE IN

18   PLAINTIFF'S MEDICAL NEEDS CONTRAINDICATED THE THERAPY.

19           WHEN A PARTY HAS THE BURDEN OF PROOF ON ANY CLAIM BY

20   A PREPONDERANCE OF THE EVIDENCE, IT MEANS THAT YOU MUST BE

21   PERSUADED BY THE EVIDENCE THAT THE CLAIM IS MORE PROBABLY TRUE

22   THAN NOT TRUE.  YOU SHOULD BASE YOUR DECISION ON ALL OF THE

23   EVIDENCE REGARDLESS OF WHICH PARTY PRESENTED IT.

24           PLAINTIFF IS REPRESENTING HIMSELF AT THIS TRIAL.

25   ALL PARTIES ARE EQUAL BEFORE THE LAW, AND A PERSON WHO IS

1   REPRESENTING HIMSELF IS ENTITLED TO THE SAME FAIR AND

2   CONSCIENTIOUS CONSIDERATION BY YOU AS ANY PARTY.

3            YOU SHOULD DECIDE THE CASE AS TO EACH DEFENDANT

4   SEPARATELY.  UNLESS OTHERWISE STATED THE INSTRUCTIONS APPLY TO

5   ALL PARTIES.

6            THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT

7   THE FACTS ARE CONSISTS OF, ONE, THE SWORN TESTIMONY OF ANY

8   WITNESS AND, TWO, THE EXHIBITS WHICH HAVE BEEN RECEIVED INTO

9   EVIDENCE.

10           IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

11  TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN THINGS

12  ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT

13  THE FACTS ARE.  I WILL LIST THEM FOR YOU.

14           ARGUMENTS AND STATEMENTS BY DEFENSE COUNSEL, OR BY

15  PLAINTIFF AT TIMES WHEN HE WAS NOT UNDER OATH ARE NOT EVIDENCE.

16  DEFENSE COUNSEL AND PLAINTIFF, WHEN ACTING AS COUNSEL, ARE NOT

17  WITNESSES.  WHAT IS SAID IN OPENING STATEMENTS, CLOSING

18  ARGUMENTS, AND DURING OBJECTIONS IS INTENDED TO HELP YOU

19  INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.  IF THE FACTS

20  AS YOU REMEMBER THEM DIFFER FROM THE WAY DEFENSE COUNSEL AND

21  PLAINTIFF ARGUE THEM, YOUR MEMORY OF THEM CONTROLS.

22           NUMBER TWO, QUESTIONS AND OBJECTIONS ARE NOT

23  EVIDENCE.  PARTIES HAVE A RIGHT TO OBJECT WHEN THEY BELIEVE A

24  QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.  YOU SHOULD

25  NOT BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S RULING ON

1    IT.

2              THREE, ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN

3    COURT IS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE

4    CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

5              SOME EVIDENCE WAS ADMITTED FOR A LIMITED PURPOSE

6    ONLY.  WHEN I INSTRUCTED YOU THAT AN ITEM OF EVIDENCE WAS

7    ADMITTED FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR

8    THAT LIMITED PURPOSE.

9              EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

10   EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A

11   WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW, OR HEARD, OR

12   DID.

13             CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE

14   FACTS FROM WHICH YOU CAN FIND ANOTHER FACT.  YOU SHOULD

15   CONSIDER BOTH KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION

16   BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR

17   CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

18   WEIGHT TO GIVE TO ANY EVIDENCE.

19             THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

20   RECEIVED INTO EVIDENCE.  WHEN SOMEONE ASKED A QUESTION OR

21   OFFERED AN EXHIBIT INTO EVIDENCE AND THE OTHER SIDE THOUGHT

22   THAT IT IS NOT PERMITTED BY THE RULES OF EVIDENCE, THEY

23   OBJECTED.  IF I OVERRULED THE OBJECTION, THE WITNESS WAS

24   PERMITTED TO ANSWER THE QUESTION.  IF I SUSTAINED THE

25   OBJECTION, THE WITNESS WAS NOT PERMITTED TO ANSWER THE

1    QUESTION.

2           IF I SUSTAINED AN OBJECTION TO A QUESTION, YOU MUST

3    IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER MIGHT

4    HAVE BEEN.

5           SOMETIMES I ORDER THAT EVIDENCE BE STRICKEN FROM THE

6    RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

7    MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

8    CONSIDER ANY EVIDENCE THAT I TOLD YOU TO DISREGARD.

9           IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

10   DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

11   BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF

12   IT, OR NONE OF IT.  PROOF OF A FACT DOES NOT NECESSARILY DEPEND

13   UPON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT IT.

14          IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY

15   TAKE INTO ACCOUNT, ONE, THE OPPORTUNITY AND ABILITY OF THE

16   WITNESS TO SEE, OR HEAR, OR KNOW THE THINGS TESTIFIED TO.  TWO,

17   THE WITNESS' MEMORY.  THREE, THE WITNESS' MANNER WHILE

18   TESTIFYING.  FOUR, THE WITNESS' INTEREST IN THE OUTCOME OF THE

19   CASE AND ANY BIAS OR PREJUDICE.  FIVE, WHETHER OTHER EVIDENCE

20   CONTRADICTS THE WITNESS' TESTIMONY.  AND SIX, THE

21   REASONABLENESS OF THE WITNESS' TESTIMONY IN THE LIGHT OF ALL

22   THE EVIDENCE.  THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

23   NECESSARILY DEPEND UPON THE NUMBER OF WITNESSES WHO TESTIFY

24   ABOUT IT.

25          SOME WITNESSES, BECAUSE OF EDUCATION OR EXPERIENCE,

1    ARE PERMITTED TO STATE OPINIONS AND REASONS FOR THOSE OPINIONS.

2    OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY OTHER

3    TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT AS MUCH

4    WEIGHT AS YOU THINK IT DESERVES CONSIDERING THE WITNESS'

5    EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

6    AND ALL THE OTHER EVIDENCE IN THE CASE.

7             THE LAW ALLOWS EXPERT WITNESSES OR OPINION WITNESSES

8    TO BE ASKED QUESTIONS THAT ARE BASED ON ASSUMED FACTS.  THESE

9    ARE SOMETIMES CALLED HYPOTHETICAL QUESTIONS.  IN DETERMINING

10   THE WEIGHT TO GIVE TO THE EXPERT'S OPINION THAT IS BASED ON THE

11   ASSUMED FACTS, YOU SHOULD ALSO CONSIDER WHETHER THE ASSUMED

12   FACTS ARE TRUE.

13            THE EVIDENCE THAT A WITNESS HAS BEEN CONVICTED OF A

14   CRIME MAY BE CONSIDERED ALONG WITH ALL THE OTHER EVIDENCE IN

15   DECIDING WHETHER OR NOT TO BELIEVE THE WITNESS AND HOW MUCH

16   WEIGHT TO GIVE TO THE TESTIMONY OF THE WITNESS, AND FOR NO

17   OTHER PURPOSE.

18            PLAINTIFF CLAIMS THAT HE WAS HARMED BY DR. SAYRE'S

19   PROFESSIONAL NEGLIGENCE.  SUCH NEGLIGENCE IS COMMONLY REFERRED

20   TO AS MEDICAL MALPRACTICE.  PLAINTIFF CLAIMS DR. SAYRE WAS

21   NEGLIGENT BY DISCONTINUING HIS PHYSICAL THERAPY TREATMENTS,

22   DEPRIVING HIM OF A PROPERLY FITTING ARM BRACE, AND OF HIS

23   PHYSICAL THERAPY AIDS, AND PROVIDING INADEQUATE PAIN

24   MANAGEMENT.

25            TO ESTABLISH THIS CLAIM, PLAINTIFF MUST PROVE ALL OF

1   THE FOLLOWING:  ONE, THAT DR. SAYRE WAS NEGLIGENT, TWO, THAT

2   PLAINTIFF WAS HARMED, AND THREE, THAT DR. SAYRE'S NEGLIGENCE

3   WAS A SUBSTANTIAL FACTOR IN CAUSING PLAINTIFF'S HARM.

4           A DOCTOR IS NEGLIGENT IF HE FAILS TO USE THE LEVEL

5   OF SKILL, KNOWLEDGE, AND CARE IN DIAGNOSIS AND TREATMENT THAT

6   OTHER REASONABLY CAREFUL DOCTORS WOULD USE IN THE SAME OR

7   SIMILAR CIRCUMSTANCES TAKING INTO ACCOUNT PRISON SECURITY

8   CONCERNS.  THIS LEVEL OF SKILL, KNOWLEDGE, AND CARE IS

9   SOMETIMES REFERRED TO AS THE STANDARD OF CARE.  YOU MUST

10  DETERMINE THE LEVEL OF SKILL, KNOWLEDGE, AND CARE THAT OTHER

11  REASONABLY CAREFUL DOCTORS WOULD USE IN THE SAME OR SIMILAR

12  CIRCUMSTANCES.

13          A DOCTOR IS NOT NECESSARILY NEGLIGENT JUST BECAUSE

14  HE CHOOSES ONE MEDICALLY-ACCEPTED METHOD OF TREATMENT OR

15  DIAGNOSIS AND IT TURNS OUT THAT ANOTHER MEDICALLY-ACCEPTED

16  METHOD WOULD HAVE BEEN A BETTER CHOICE.

17          IF A REASONABLY CAREFUL GENERAL PRACTITIONER IN THE

18  SAME SITUATION WOULD HAVE REFERRED PLAINTIFF TO A SPECIALIST,

19  THEN DR. SAYRE WAS NEGLIGENT IF HE DID NOT DO SO.  HOWEVER, IF

20  DR. SAYRE TREATED PLAINTIFF WITH AS MUCH SKILL AND CARE AS A

21  REASONABLE SPECIALIST WOULD HAVE, THEN DR. SAYRE WAS NOT

22  NEGLIGENT.

23          AN INJURY OR DAMAGE IS LEGALLY CAUSED BY AN ACT OR

24  FAILURE TO ACT WHENEVER IT APPEARS FROM THE EVIDENCE THAT THE

25  ACT OR OMISSION PLAYED A SUBSTANTIAL PART IN BRINGING ABOUT OR

1    ACTUALLY CAUSING THE INJURY OR DAMAGE, AND THAT THE INJURY OR

2    DAMAGE WAS EITHER A DIRECT RESULT OR A REASONABLY PROBABLE

3    CONSEQUENCE OF THE ACT OR OMISSION.

4            A SUBSTANTIAL FACTOR IN CAUSING HARM IS A FACTOR

5    THAT A REASONABLE PERSON WOULD CONSIDER TO HAVE CONTRIBUTED TO

6    THE HARM.  IT MUST BE MORE THAN A REMOTE OR TRIVIAL FACTOR.  IT

7    DOES NOT HAVE TO BE THE ONLY CAUSE OF THE HARM.  CONDUCT IS NOT

8    A SUBSTANTIAL FACTOR IN CAUSING HARM IF THE SAME HARM WOULD

9    HAVE OCCURRED WITHOUT THAT CONDUCT.

10           PLAINTIFF ALSO SUES DR. SAYRE UNDER THE FEDERAL

11   CIVIL RIGHTS STATUTE WHICH PROVIDES THAT A STATE EMPLOYEE WHO

12   DEPRIVES ANOTHER PERSON OF ANY RIGHT SECURED BY THE

13   CONSTITUTION OF THE UNITED STATES SHALL BE LIABLE TO THE

14   INJURED PARTY.  THIS IS THE ANSWER TO THE EARLIER QUESTION OF

15   WHY THIS CASE IS IN FEDERAL COURT BECAUSE ONE OF THE CLAIMS IS

16   A FEDERAL CIVIL RIGHTS CLAIM.

17           IN ORDER TO PREVAIL ON HIS CIVIL RIGHTS CLAIM

18   AGAINST DR. SAYRE, PLAINTIFF MUST PROVE BY A PREPONDERANCE OF

19   THE EVIDENCE THAT DR. SAYRE DEPRIVED PLAINTIFF OF A RIGHT UNDER

20   THE UNITED STATES CONSTITUTION BY KNOWINGLY DISREGARDING

21   PLAINTIFF'S SERIOUS MEDICAL NEEDS.

22           TO PROVE THAT DR. SAYRE DISREGARDED PLAINTIFF'S

23   SERIOUS MEDICAL NEEDS, PLAINTIFF MUST PROVE THE FOLLOWING

24   ELEMENTS BY A PREPONDERANCE OF THE EVIDENCE.  ONE, THAT

25   PLAINTIFF HAD A SERIOUS MEDICAL NEED, TWO, THAT DR. SAYRE WAS

1  AWARE OF PLAINTIFF'S SERIOUS MEDICAL NEED, THREE, THAT

2  DR. SAYRE DISREGARDED PLAINTIFF'S SERIOUS MEDICAL NEED AND,

3  FOUR, THAT PLAINTIFF WAS HARMED AS A RESULT OF DR. SAYRE'S

4  CONDUCT.

5          PLAINTIFF'S CIVIL RIGHTS CLAIM IS BASED ON THE SAME

6  FACTS AS HIS MEDICAL MALPRACTICE CLAIM.

7          A SERIOUS MEDICAL NEED EXISTS IF THE FAILURE TO

8  TREAT A PRISONER'S CONDITION COULD RESULT IN FURTHER

9  SIGNIFICANT INJURY OR THE UNNECESSARY INFLICTION OF PAIN.  THE

10  EXISTENCE OF AN INJURY THAT A REASONABLE DOCTOR OR PATIENT

11  WOULD FIND IMPORTANT AND WORTHY OF COMMENT OR TREATMENT; THE

12  PRESENCE OF A MEDICAL CONDITION THAT AFFECTS AN INDIVIDUAL'S

13  DAILY ACTIVITIES; OR THE EXISTENCE OF CHRONIC AND SUBSTANTIAL

14  PAIN ARE EXAMPLES OF INDICATIONS THAT A PRISONER HAS A SERIOUS

15  NEED FOR MEDICAL TREATMENT.

16          CAUSATION FOR THE PURPOSE OF PLAINTIFF'S CIVIL

17  RIGHTS CLAIM IS DEFINED IN THE SAME WAY AS CAUSATION IS DEFINED

18  ABOVE IN CONNECTION WITH PLAINTIFF'S MEDICAL MALPRACTICE CLAIM.

19          PLAINTIFF AND THE CDCR ENTERED INTO A CONTRACT IN

20  WHICH THE CDCR PROMISED TO REFER PLAINTIFF TO A PAIN MANAGEMENT

21  SPECIALIST AT THE UNIVERSITY OF CALIFORNIA AT DAVIS CLINIC FOR

22  A PAIN MANAGEMENT EXAMINATION AND CONSULTATION, TO IMPLEMENT

23  THE PAIN MANAGEMENT REGIMEN RECOMMENDED BY THE SPECIALIST AND

24  TO CONTINUE THE PAIN MANAGEMENT REGIMEN UNTIL PLAINTIFF'S

25  MEDICAL NEEDS CHANGED.  THE CDCR ALSO PROMISED TO PROVIDE

1    PLAINTIFF WITH AN APPROPRIATE ARM BRACE AND TO REINSTATE THE

2    PHYSICAL THERAPY HE HAD BEEN RECEIVING TO REHABILITATE HIS ARM,

3    AND TO CONTINUE THE PHYSICAL THERAPY UNTIL A CHANGE IN HIS

4    MEDICAL NEEDS CONTRAINDICATED THE THERAPY.

5           THE FIRST SENTENCE IN THE SETTLEMENT AGREEMENT IN

6    PARAGRAPH 4.2, AND YOU WILL HAVE THIS EXHIBIT AS WELL AS THE

7    OTHERS, READS:  "THE RELEASEES FURTHER AGREE TO REFER RELEASOR

8    TO A PAIN MANAGEMENT SPECIALIST AT UC DAVIS CLINIC FOR A PAIN

9    MANAGEMENT EXAMINATION AND CONSULTATION."

10          BY THIS, THE PARTIES INTENDED THAT THE CDCR WOULD

11   ARRANGE FOR AN EXAMINATION AND CONSULTATION WITH A NEUTRAL,

12   THIRD-PARTY PAIN SPECIALIST AT UC DAVIS CLINIC WHO WOULD THEN

13   RECOMMEND A PAIN MANAGEMENT REGIMEN FOR PLAINTIFF WHICH THE

14   CDCR WOULD FOLLOW AS DESCRIBED IN THE NEXT SENTENCE OF THAT

15   PARAGRAPH.

16          THE SENTENCE, "THE PHYSICAL THERAPY SHALL CONTINUE

17   UNTIL A CHANGE IN RELEASOR'S MEDICAL NEEDS CONTRAINDICATE THE

18   THERAPY," MEANS THAT THE CDCR WOULD CONTINUE THE PHYSICAL

19   THERAPY THAT PLAINTIFF WAS RECEIVING AT THE TIME OF THE

20   AGREEMENT UNLESS THE THERAPY WAS HARMFUL TO PLAINTIFF OR NO

21   LONGER BENEFICIAL.

22          THE COURT HAS DETERMINED THAT THE CDCR BREACHED ITS

23   CONTRACT WITH PLAINTIFF BY FAILING TO MAKE SUFFICIENT EFFORT TO

24   ARRANGE FOR AN EXAMINATION AND CONSULTATION WITH A PAIN

25   MANAGEMENT SPECIALIST AT THE UC DAVIS CLINIC.  BECAUSE IT DID

1    NOT ARRANGE THE EXAMINATION, IT ALSO DID NOT FULFILL ITS

2    OBLIGATION TO FOLLOW A REGIMEN RECOMMENDED BY A SPECIALIST.

3            THE CDCR ALSO BREACHED THE CONTRACT BY FAILING TO

4    PROVIDE PLAINTIFF WITH AN APPROPRIATE ARM BRACE IN THAT THE ARM

5    BRACE HE HAD DID NOT FIT PROPERLY AND COULD NOT BE USED.  AND

6    IT BREACHED THE CONTRACT BY DISCONTINUING THE MEDICAL ORDERS

7    THAT ALLOWED PLAINTIFF TO HAVE THE USE OF HIS THERAPEUTIC

8    EXERCISE BALL AND BAND.

9            FINALLY, IT BREACHED THE CONTRACT BY DISCONTINUING

10   HIS REGULAR VISITS TO THE PHYSICAL THERAPIST AND THE USE OF THE

11   HOT WHIRLPOOL TREATMENT.  IT REMAINS FOR YOU TO DECIDE WHETHER

12   THE BREACH OF CONTRACT CAUSED HARM TO PLAINTIFF AND TO

13   DETERMINE WHAT DAMAGES, IF ANY, PLAINTIFF SUFFERED AS A RESULT

14   OF THOSE BREACHES.

15           AND, AGAIN, WHEN I USE THE WORD "CAUSATION",

16   CAUSATION IS DEFINED IN THE SAME WAY AS IT WAS DEFINED EARLIER

17   WITH REGARD TO THE CIVIL RIGHTS CLAIM AND THE MEDICAL

18   MALPRACTICE CLAIM.

19           PLAINTIFF DID NOT SUFFER DAMAGES FROM THE

20   DISCONTINUATION OF THE ORDERS FOR HIS THERAPEUTIC EXERCISE BALL

21   AND BAND BECAUSE HE WAS ABLE TO KEEP THE BALL AND BAND DUE TO A

22   COURT ORDER.

23           IF YOU AWARD DAMAGES TO PLAINTIFF ON HIS NEGLIGENCE

24   OR CIVIL RIGHTS CLAIMS, YOU SHOULD NOT AWARD DUPLICATE DAMAGES

25   FOR THE SAME INJURIES DUE TO THE BREACH OF CONTRACT.

1    YOU MUST DETERMINE PLAINTIFF'S DAMAGES.  PLAINTIFF

2  HAS THE BURDEN OF PROVING DAMAGES BY A PREPONDERANCE OF THE

3  EVIDENCE.  DAMAGES MEANS THE AMOUNT OF MONEY THAT WILL

4  REASONABLY AND FAIRLY COMPENSATE PLAINTIFF FOR ANY INJURY YOU

5  FIND WAS CAUSED BY DEFENDANTS.  YOU SHOULD CONSIDER THE

6  FOLLOWING:  THE NATURE AND EXTENT OF THE INJURIES, THE LOSS OF

7  ENJOYMENT OF LIFE EXPERIENCED AND WHICH WITH REASONABLE

8  PROBABILITY WILL BE EXPERIENCED IN THE FUTURE, AND THE PHYSICAL

9  PAIN AND SUFFERING EXPERIENCED AND WHICH WITH REASONABLE

10  PROBABILITY WILL BE EXPERIENCED IN THE FUTURE.

11    IT IS FOR YOU TO DETERMINE WHAT DAMAGES, IF ANY,

12  HAVE BEEN PROVED.  YOUR AWARD MUST BE BASED UPON EVIDENCE AND

13  NOT UPON SPECULATION, GUESSWORK OR CONJECTURE.

14    IF YOU FIND PLAINTIFF WAS INJURED AS A RESULT OF

15  CONDUCT BY DEFENDANT SAYRE OR CATE, OR BOTH, YOU MUST DETERMINE

16  WHETHER PLAINTIFF COULD HAVE DONE SOMETHING TO LESSEN THE HARM

17  SUFFERED.

18    DEFENDANTS HAVE THE BURDEN TO PROVE BY A

19  PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF COULD HAVE

20  LESSENED OR REDUCED THE HARM DONE TO HIM AND THAT HE FAILED TO

21  DO SO.

22    IF DEFENDANTS ESTABLISH BY A PREPONDERANCE OF THE

23  EVIDENCE THAT PLAINTIFF COULD HAVE REDUCED THE HARM DONE TO HIM

24  BUT FAILED TO DO SO, PLAINTIFF IS ENTITLED ONLY TO DAMAGES

25  SUFFICIENT TO COMPENSATE FOR THE INJURY THAT HE WOULD HAVE

1    SUFFERED HAD HE TAKEN APPROPRIATE ACTION TO REDUCE THE HARM.

2          PLAINTIFF IS NOT ENTITLED TO DAMAGES FOR ANY

3    PHYSICAL CONDITION THAT HE HAD BEFORE DEFENDANTS' CONDUCT

4    OCCURRED.  HOWEVER, IF PLAINTIFF HAD A PHYSICAL CONDITION THAT

5    WAS MADE WORSE BY DEFENDANTS' WRONGFUL CONDUCT, YOU MUST AWARD

6    DAMAGES THAT WILL REASONABLY AND FAIRLY COMPENSATE FOR THE

7    EFFECT ON THAT CONDITION.

8          PLAINTIFF HAS MADE CLAIMS AGAINST DEFENDANT SAYRE

9    FOR NEGLIGENCE AND VIOLATIONS OF HIS CIVIL RIGHTS.  HE HAS MADE

10   A CLAIM AGAINST DEFENDANT CATE AS THE REPRESENTATIVE OF CDCR

11   FOR BREACH OF CONTRACT.  IF YOU DECIDE THAT PLAINTIFF HAS

12   PROVEN MORE THAN ONE CLAIM AND THE DAMAGES RESULTED FROM ONE OR

13   MORE OF SUCH CLAIMS, THOSE DAMAGES CAN ONLY BE AWARDED ONCE.

14   PLAINTIFF IS ENTITLED TO BE COMPENSATED ONLY FOR THE DAMAGES

15   FOR THE INJURIES HE ACTUALLY SUFFERED.

16         THUS, IF YOU AWARD DAMAGES BECAUSE DR. SAYRE

17   COMMITTED MEDICAL MALPRACTICE OR VIOLATED PLAINTIFF'S CIVIL

18   RIGHTS, OR BOTH, YOU MAY ALSO AWARD DAMAGES BASED ON THE BREACH

19   OF THE 2002 SETTLEMENT AGREEMENT, BUT YOU MAY NOT AWARD

20   DUPLICATE DAMAGES FOR THE SAME INJURIES THAT WERE CAUSED BY

21   DR. SAYRE'S ACTS.

22         IF YOU FIND FOR PLAINTIFF ON THE CIVIL RIGHTS CLAIM

23   AGAINST DR. SAYRE, YOU MAY, BUT ARE NOT REQUIRED TO, AWARD

24   PUNITIVE DAMAGES.  THE PURPOSES OF PUNITIVE DAMAGES ARE TO

25   PUNISH A DEFENDANT AND TO DETER A DEFENDANT AND OTHERS FROM

1    COMMITTING SIMILAR ACTS IN THE FUTURE.

2              PLAINTIFF HAS THE BURDEN OF PROVING THAT PUNITIVE

3    DAMAGES SHOULD BE AWARDED AND THE AMOUNT BY A PREPONDERANCE OF

4    THE EVIDENCE.  YOU MAY AWARD PUNITIVE DAMAGES ONLY IF YOU FIND

5    THAT DR. SAYRE'S CONDUCT WAS MALICIOUS OR IN RECKLESS DISREGARD

6    FOR PLAINTIFF'S RIGHTS.  CONDUCT IS MALICIOUS IF IT IS

7    ACCOMPANIED BY ILL WILL, OR SPITE, OR IF IT IS FOR THE PURPOSE

8    OF INJURING ANOTHER.  CONDUCT IS IN RECKLESS DISREGARD FOR

9    PLAINTIFF'S RIGHTS IF, UNDER THE CIRCUMSTANCES, IT REFLECTS

10   COMPLETE INDIFFERENCE TO THE SAFETY AND RIGHTS OF OTHERS.

11             IF YOU FIND THAT PUNITIVE DAMAGES ARE APPROPRIATE,

12   YOU MUST USE REASON IN SETTING THE AMOUNT.  PUNITIVE DAMAGES,

13   IF ANY, SHOULD BE IN AN AMOUNT SUFFICIENT TO FULFILL THEIR

14   PURPOSES, BUT SHOULD NOT REFLECT BIAS, PREJUDICE, OR SYMPATHY

15   TOWARDS ANY PARTY.  IN CONSIDERING PUNITIVE DAMAGES, YOU MAY

16   CONSIDER THE DEGREE OF REPREHENSIBILITY OF DR. SAYRE'S CONDUCT

17   AND THE RELATIONSHIP OF ANY AWARD OF PUNITIVE DAMAGES TO ANY

18   ACTUAL HARM INFLICTED ON PLAINTIFF.  PUNITIVE DAMAGES MAY BE

19   AWARDED EVEN IF YOU AWARD NO COMPENSATORY DAMAGES.

20             PUNITIVE DAMAGES ARE ONLY AVAILABLE ON PLAINTIFF'S

21   CIVIL RIGHTS CLAIM.  THEREFORE, PUNITIVE DAMAGES MAY NOT BE

22   AWARDED AGAINST DEFENDANT CATE.

23             I WILL BE GIVING YOU A FEW MORE INSTRUCTIONS ABOUT

24   HOW TO GO ABOUT YOUR DELIBERATIONS AFTER WE HEAR THE CLOSING

25   ARGUMENTS, BUT WHAT I WILL DO IS READ TO YOU THE VERDICT FORM

1    THAT YOU WILL BE ASKED TO FILL OUT.

2            THE VERDICT FORM WILL ASK YOU THE FOLLOWING

3    QUESTIONS, FIRST ABOUT THE MEDICAL CLAIMS.  NUMBER ONE:  WAS

4    DR. SAYRE NEGLIGENT IN HIS TREATMENT OF PLAINTIFF?

5            ANSWER YES OR NO.

6            IF YOUR ANSWER TO QUESTION ONE IS YES, YOU WILL

7    PROCEED TO QUESTION TWO.

8            IF YOU ANSWERED NO, YOU WILL SKIP OVER TO QUESTION

9    EIGHT.

10           QUESTION TWO WILL ASK:  WAS DR. SAYRE'S NEGLIGENCE A

11   SUBSTANTIAL FACTOR IN CAUSING HARM TO PLAINTIFF?

12           ANSWER YES OR NO.

13           IF YOUR ANSWER IS YES, YOU WILL ANSWER THE NEXT

14   QUESTION.  OTHERWISE YOU WILL SKIP IT.

15           THE NEXT QUESTION WILL SAY:  DID DR. SAYRE KNOWINGLY

16   DISREGARD A SERIOUS MEDICAL NEED OF PLAINTIFF?

17           ANSWER YES OR NO.

18           IF YOU ANSWER YES, YOU WILL ANSWER THE NEXT

19   QUESTION, WHICH IS:  WAS DR. SAYRE'S KNOWING DISREGARD OF

20   PLAINTIFF'S SERIOUS MEDICAL NEED A SUBSTANTIAL FACTOR IN

21   CAUSING HARM TO PLAINTIFF?

22           ANSWER YES OR NO.

23           IF YOU ANSWER YES TO EITHER QUESTION TWO OR FOUR,

24   THEN YOU WILL ANSWER THE QUESTION ABOUT DAMAGES, WHICH IS:

25   WHAT ARE PLAINTIFF'S DAMAGES, IF ANY?

```
1              AND THEN THERE'S A BLANK THAT YOU CAN FILL IN AN

2    AMOUNT IF YOU FIND THAT'S APPROPRIATE.

3              NEXT QUESTION IS:  IF YOU ANSWERED YES TO QUESTION

4    FOUR, WHICH IS THE ONE ABOUT THE CIVIL RIGHTS CLAIM, THEN YOU

5    WILL ANSWER:  DO YOU AWARD PUNITIVE DAMAGES AGAINST DR. SAYRE

6    AS A RESULT OF HIS INTENTIONAL DISREGARD OF PLAINTIFF'S SERIOUS

7    MEDICAL NEED?

8              ANSWER YES OR NO.

9              IF YOUR ANSWER TO QUESTION SIX IS YES, WHAT AMOUNT

10   OF PUNITIVE DAMAGES DO YOU AWARD?

11             AND, AGAIN, THERE IS A LINE FOR YOU TO ENTER AN

12   AMOUNT IF YOU SHOULD FIND THAT APPROPRIATE.

13             THEN YOU WILL GO ON TO THE CONTRACT CLAIM:  WAS

14   PLAINTIFF HARMED BY THE BREACH OF A 2002 SETTLEMENT AGREEMENT?

15             ANSWER YES OR NO.

16             IF YOUR ANSWER IS YES, YOU WILL PROCEED TO QUESTION

17   NINE, WHICH WILL ASK YOU:  WHAT AMOUNT OF MONEY, IF ANY, IN

18   ADDITION TO ANY AMOUNT AWARDED ABOVE IS NECESSARY TO COMPENSATE

19   PLAINTIFF FOR THE HARM CAUSED BY THE BREACH OF THE 2002

20   SETTLEMENT AGREEMENT?

21             AND THERE'S A BLANK FOR YOU TO ENTER A NUMBER IF YOU

22   SHOULD FIND THAT APPROPRIATE.

23             AND THEN IT SAYS:  PLEASE SIGN, DATE AND RETURN THIS

24   FORM SIGNED BY THE JURY FOREPERSON.

25             AT THIS TIME THEN WE WILL HEAR OPENING CLOSING
```

1    ARGUMENT FROM MR. ASHKER.  AT THAT POINT WE WILL BE READY FOR A

2    BREAK, SO WE WILL TAKE A BREAK AND THEN WE'LL HEAR

3    MR. ANDRADA'S CLOSING ARGUMENT, AND THEN FINALLY, BECAUSE HE

4    HAS THE BURDEN OF PROOF, THE PLAINTIFF IS ALLOWED A BRIEF

5    REBUTTAL CLOSING ARGUMENT AFTER THAT.

6                        **CLOSING ARGUMENT**

7         **MR. ASHKER:**  GOOD MORNING, MEMBERS OF THE JURY.

8         YOU HAVE HEARD DEFENDANTS PLACE A LOT OF EMPHASIS ON

9    TRAMADOL IN THIS CASE, AND EVEN REPRESENTED TO THEIR RETAINED

10   EXPERT, DR. SHIN, THAT THIS CASE BOILED DOWN TO DR. SAYRE'S

11   AUGUST 21ST, 2006 DECISION TO DENY ME THE TWO TRAMADOL PER DAY

12   AND REPLACE IT WITH NSAIDS.

13        AND YOU WILL RECALL THAT DR. SHIN TESTIFIED THAT HE

14   WAS VERY CONFUSED BY THIS ISSUE BECAUSE IN HIS PRACTICE HE HAD

15   NO PROBLEM PRESCRIBING THIS LOW DOSAGE OF MEDICATION FOR WHAT

16   HE DETERMINED TO BE A LEGITIMATE CHRONIC PAIN CONDITION.

17        DR. SHIN WAS THEN ASKED BY DEFENSE COUNSEL IF HE

18   BELIEVED THAT DR. SAYRE'S DECISION TO DISCONTINUE TRAMADOL AND

19   REPLACE WITH NSAIDS FAILED BELOW THE STANDARD OF CARE, TO WHICH

20   THE OBVIOUSLY TROUBLED DR. SHIN OPINED THAT IT WAS NOT.

21        NATURALLY, THE DEFENDANTS WOULD LIKE THAT TO BE THE

22   END OF THE STORY.  BUT THE PROBLEM WITH THAT FOR THEM IS THAT

23   DR. SAYRE'S DECISION TO REPLACE TRAMADOL WITH NSAIDS IS ONLY

24   ONE SMALL SEGMENT OF THIS CASE.

25        THIS CASE IS ACTUALLY ABOUT DEFENDANTS ONGOING AND

1  REPEATED FAILURE TO PROVIDE AND ADHERE TO AN ADEQUATE PAIN

2  MANAGEMENT PROGRAM FOR MY WELL-KNOWN CHRONIC PAIN ISSUES WITH

3  MY RIGHT ARM AND WRIST EVER SINCE THE SEVERELY DAMAGING 1990

4  INJURY AND SUBSEQUENT COMPLICATIONS.

5          YOU HAVE HEARD ABOUT ALL OF THIS AND CAN REVIEW IT

6  FURTHER BY LOOKING AT THE EXHIBITS NUMBER 1, 10, 20, 114

7  THROUGH 120, 136, AND 138 THAT WILL BE PRESENTED TO YOU WHEN

8  YOU DELIBERATE.

9          THIS CASE IS ALSO ABOUT DEFENDANT CATE'S FAILURE TO

10  HAVE ME SEEN BY UC DAVIS PAIN MANAGEMENT SPECIALIST FOR

11  CONSULT, EXAM, AND TREATMENT PLAN AND DAMAGE TO ME FROM THAT

12  BREACH.  THIS CASE IS ABOUT DEFENDANTS' ACTS AND/OR FAILURES TO

13  ACT WITH RESPECT TO THE CARE AND TREATMENT MY ARM CONDITION

14  REQUIRES AND OF DR. SAYRE'S INTENTIONAL COMPLETE CALLOUSNESS

15  TOWARDS MY SERIOUS MEDICAL CONDITION AND RELATED PAIN AND

16  SUFFERING THIS HAS CAUSED ME WHEN HE REPLACED TRAMADOL WITH

17  NSAIDS AND WHEN HE WAS REPEATEDLY MADE AWARE OF SUCH

18  MEDICATIONS AS THEY HAD BEEN WELL DOCUMENTED TO CAUSE IN THE

19  PAST WERE NOT EFFECTIVE AND CAUSED ME SERIOUS STOMACH UPSET AND

20  SEVERELY IMPACTED MY ABILITY TO CARRY OUT MAJOR DAILY LIFE

21  ACTIVITIES.

22          THIS WAS DUE TO THE INEFFECTIVENESS OF THE NSAIDS.

23  DR. SAYRE'S RESPONSE WAS THERE'S NO EVIDENCE TO SUPPORT YOU,

24  YOU DON'T HAVE CHRONIC PAIN REQUIRING MORE THAN AN OCCASIONAL

25  NSAID, AND IF ACTIVITIES CAUSE PAIN, DON'T DO THE ACTIVITY.

1          DR. SAYRE ALSO DETERMINED THAT I DON'T NEED THE ARM

2     BRACE OR PHYSICAL THERAPY OR PHYSICAL THERAPY AIDES OR THE

3     THERMALS.  AND THESE DISCUSSIONS -- THESE DECISIONS WERE ALL

4     MADE WITHOUT ANY CAREFUL PHYSICAL EXAMINATION.  AND ALL OF MY

5     POINTS ABOUT WHAT THESE ITEMS WERE FOR WERE IGNORED.

6          AND SINCE BEING WITHOUT A USABLE ARM BRACE,

7     WHIRLPOOL, ADEQUATE MEDICATIONS, MY CONDITION HAS DETERIORATED.

8     MY ABILITY TO CARRY OUT THE MAJOR DAILY LIFE ACTIVITIES OF

9     SIGNIFICANT IMPORTANCE TO ME HAS BEEN DENIED, ALL OF WHICH HAS

10    HARM ME AND CAUSED MY CONDITION TO DETERIORATE AND

11    SUBSTANTIALLY DIMINISH.

12         THE QUESTION FOR YOU TO ADDRESS IN THIS CASE ARE,

13    NUMBER ONE, DO I HAVE A SERIOUS MEDICAL NEED?  NUMBER TWO, WAS

14    DR. SAYRE AWARE OF MY SERIOUS MEDICAL NEED FOR MEDICAL CARE?

15    NUMBER THREE, DID DR. SAYRE DISREGARD MY SERIOUS MEDICAL NEED?

16    NUMBER FOUR, WAS I FURTHER INJURED AS A RESULT OF DR. SAYRE'S

17    CONDUCT?  AND IF SO, WHAT DAMAGES AM I DUE.

18         I PRESENT TO YOU THAT THE EVIDENCE PROVES EACH OF

19    THESE ELEMENTS, AND I AM ASKING FOR 250,000 IN COMPENSATORY

20    DAMAGES AS WELL AS PUNITIVE DAMAGES.  I BELIEVE THAT

21    COMPENSATORY DAMAGES ARE WARRANTED IN THIS CASE, AND THAT'S

22    BECAUSE I HAVE BEEN LIVING WITH THIS EVERY MINUTE OF EVERY DAY

23    FOR SEVERAL YEARS.  AND WHEN YOU ARE ONLY GETTING ONE TO THREE

24    HOURS OF SLEEP A DAY, THE DAYS ARE VERY LONG.  I WILL GET BACK

25    TO THIS SUBJECT LATER.

1         RIGHT NOW I WANT TO SUMMARIZE THE FACTS AND EVIDENCE

2    SUPPORTING EACH ONE OF THE FOUR ELEMENTS YOU ARE BEING ASKED TO

3    CONSIDER AND FIND IN MY FAVOR ON.

4         REGARDING DR. SAYRE AND MR. CATE.  DO I HAVE A

5    SERIOUS MEDICAL NEED?  I DO.  AND THIS IS SUPPORTED BY THE

6    MEDICAL RECORDS I HAVE PLACED INTO EVIDENCE AS EXAMPLES FOR

7    YOUR REVIEW AND PURSUANT TO THE TESTIMONY I GAVE DESCRIBING MY

8    INJURIES AND ONGOING PAIN AND DISCOMFORT ISSUES SPANNING NEARLY

9    19 YEARS.

10        ADDITIONAL SUPPORT THAT MY ARM CONDITION AND RELATED

11   ISSUES CONSTITUTE A SERIOUS MEDICAL NEED REQUIRING ONGOING CARE

12   AND TREATMENT WITH MEDICATIONS AND ASSISTIVE AIDS WAS SUPPORTED

13   BY MY EXPERT, DR. WEINSTEIN, DEFENDANTS' EXPERT, DR. SHIN, WHO

14   OPINED I DO HAVE A CHRONIC PAIN CONDITION, DR. DUNCAN, BASED ON

15   HIS PERSONAL EXAMINATION REPORTS AND TREATMENT RECOMMENDATIONS

16   SPANNING 1994 TO 2002 WHICH ARE GOING TO BE PROVIDED TO YOU AS

17   EXHIBITS 23 THROUGH NUMBER 153, AND FORMER PELICAN BAY STATE

18   PRISON CHIEF MEDICAL OFFICER DR. WINSLOW, WHO ADMITTED APPROVAL

19   OF THE TRAMADOL FOR TIME PERIOD OF JANUARY '02 TO JANUARY '06,

20   AND REFERENCED IN THE JANUARY '03 MEMORANDUM, THAT PHYSICAL

21   THERAPY WAS PERMANENT, WHICH WILL BE EXHIBIT 154.

22        ADDITIONAL EVIDENCE SHOWS THAT MY CONDITION REQUIRES

23   PERIODIC QUALIFIED SPECIALIST CARE AND TREATMENT AS ILLUSTRATED

24   BY THE FOLLOWING FACTS:  DR. SHIN RECOMMENDED I BE SEEN BY AN

25   ORTHO WRIST SPECIALIST BACK ON 12/20/08.  AT TRIAL HE TESTIFIED

1  THAT HIS RECOMMENDATION WAS BASED ON HIS FINDINGS ON EXAM AND

2  TESTING HE DID ON 12/20/08, AND HE DID SO BECAUSE WRISTS ARE

3  NOT HIS AREA OF EXPERTISE.

4  HE ALSO STATED I REQUIRED A SPECIAL CUSTOM BRACE TO

5  PROTECT THE ARM FROM FURTHER TRAUMA AND PROVIDE SUPPORT FOR

6  UPPER ARM EXERCISE, AND THAT MY PRESENT BRACE DID NOT FIT

7  RIGHT.  HE ALSO TESTIFIED THAT THE ABILITY FOR EXERCISING THE

8  ARM IS VERY IMPORTANT, AND I SHOULD BE GIVEN NECESSARY AIDS FOR

9  THIS IN THE FORM OF THE BAND AND THE BALL AND ALSO THE

10  WHIRLPOOL.

11  DR. WEINSTEIN ALSO TESTIFIED THAT FOLLOW-UPS WITH

12  QUALIFIED ORTHO SPECIALISTS WOULD BE ROUTINE IN A CONDITION

13  LIKE MINE, AND HE EXPRESSED SHOCK AT MY NEVER BEING SEEN BY

14  OCCUPATIONAL THERAPISTS IN NEARLY 19 YEARS OF TIME.  HE ALSO

15  RECOGNIZED MY NEED FOR BRACE AND REGULAR PHYSICAL THERAPY AND

16  USE OF PHYSICAL THERAPY ASSISTIVE AIDS.

17  DR. DUNCAN PREVIOUSLY TREATED ME ON AVERAGE OF TWO

18  TIMES A YEAR BETWEEN '94 AND '02, WHEREUPON HE REPEATEDLY

19  RECOMMENDED THE USE OF MEDICATIONS AND ARM BRACE AS THIS

20  TREATMENT PLAN.  THE CONDITION OF MY ARM WAS SUCH THAT ANY

21  ADDITIONAL TRAUMA THAT REQUIRED SURGERY WOULD BE HIGH RISK

22  POSSIBLY RESULTING IN LOSS OF THE ARM.  AND HIS LAST REPORT,

23  WELL, ONE OF THE REPORTS WHERE HE DOCUMENTED THIS IS ATTACHED

24  AS EXHIBIT 136, AND THAT IS THE REPORT OF 12/12/02.

25  AND DURING HIS TESTIMONY, HE CONFIRMED THIS AFTER

1   SEEING MY ARM AGAIN, AND STATED THE NEED FOR FOLLOW-UPS WITH AN

2   ORTHO SPECIALIST WAS ALWAYS A POSSIBILITY IN MY CASE.

3           ADDITIONAL EVIDENCE WAS PRESENTED TO SHOW THAT THE

4   CONDITION OF MY ARM AFFECTS MY ABILITY TO CARRY ON MAJOR LIFE

5   ACTIVITIES.  I TESTIFIED ABOUT THE EFFECT MY CONDITION HAS HAD

6   ON MY ABILITY TO EFFECTIVELY COMMUNICATE, AND THAT TRYING TO DO

7   SO WITHOUT ADEQUATE MEDICATIONS CAUSES SERIOUS PAIN AND

8   AGGRAVATES MY ARM AND HAND TO THE POINT OF FORCING ME TO CUT

9   OFF MOST ALL OF MY OUTSIDE COMMUNICATIONS JUST IN ORDER TO BE

10  ABLE TO TRY TO MEET MY LEGAL RESPONSIBILITIES, WHICH I AM

11  REQUIRED TO KEEP UP ON OR FACE SANCTIONS IN THE FORM OF ADVERSE

12  RULINGS, POSSIBLE DISMISSALS.

13          THIS WAS SUPPORTED BY DR. WEINSTEIN, WHO IS THE ONLY

14  DOCTOR IN THE LAST 19 YEARS TO ACTUALLY DO ANY TYPE OF WRITING

15  TEST.  AND DR. SHIN, WHO, WHEN ASKED, ADMITTED THAT

16  COMMUNICATION IS A MAJOR LIFE ACTIVITY.  AND HE ADMITTED THAT

17  IF WHAT I DESCRIBED TO HIM WERE TRUE CONCERNING MY INABILITY TO

18  EFFECTIVELY CARRY OUT MY DAILY WRITTEN COMMUNICATION NEEDS

19  WITHOUT EXPERIENCING PAIN AND DISCOMFORT TO THE POINT OF SLEEP

20  DEPRIVATION AND CUTTING BACK ON WRITING 60 PERCENT, SINCE THE

21  SWITCH OFF TRAMADOL TO NSAIDS, IT WOULD CONSTITUTE A SERIOUS

22  IMPACT ON MY DAILY ACTIVITY.

23          NUMBER TWO, QUESTION NUMBER TWO WAS DR. SAYRE

24  PERSONALLY AWARE OF MY SERIOUS NEED FOR MEDICAL CARE?

25          YES.  THE EVIDENCE PRESENTED TO YOU PROVES THAT

1   DR. SAYRE WAS PERSONALLY AWARE OF THE SERIOUS NATURE OF MY ARM

2   CONDITION.  DR. SAYRE HIMSELF CLAIMS THAT HE REVIEWED MY ENTIRE

3   MEDICAL RECORD PRIOR TO MAKING HIS JUNE 20TH, 2006

4   RECOMMENDATION FOR MS. RISENHOOVER TO TAPER ME OFF TRAMADOL AND

5   REPLACE IT WITH NSAIDS.

6          IF WE TAKE HIM AT HIS WORD, THEN HE IS AWARE OF MY

7   HISTORY OF PROBLEMS WITH OBTAINING ADEQUATE PAIN RELIEF FROM

8   TAKING NSAIDS AND RELATED STOMACH PROBLEMS BEGINNING IN 1995.

9          AND DR. SAYRE WAS THEN AWARE OF THE SERIOUS CONCERNS

10  BY DR. DUNCAN WHO REPORTED SEVERAL TIMES BETWEEN 1995 AND 2002

11  THAT HE WAS STRONGLY RECOMMENDING NO NSAIDS, AND WE NEED TO

12  FIND A DIFFERENT MEDICATION.  FOR EXAMPLE, EXHIBIT 136,

13  DR. DUNCAN'S REPORT OF 9/5/01 WHERE HE SAYS THIS.  AND THE

14  REASON DR. WOLF ASKED ME TO TRY TRAMADOL IN JANUARY OF '02.

15         AND EVEN IF WE DON'T TAKE DR. SAYRE AT HIS WORD, THE

16  UNDISPUTED EVIDENCE PROVES THAT I PERSONALLY NOTIFIED SAYRE

17  ABOUT MY HISTORY OF NSAID PROBLEMS AND RELATED STOMACH ISSUES

18  BEGINNING JANUARY 4TH, 2006 VIA COPY OF A LETTER TO THE DEPUTY

19  ATTORNEY GENERAL JORGENSON, WHICH IS ATTACHED AT EXHIBIT 162,

20  AND NUMEROUS 602 EXAMPLES SUCH AS, 602 OF 10/10/05 ATTACHED AS

21  EXHIBIT 162 AND THE MEDICAL RECORDS BETWEEN 3/25/06 AND

22  6/21/06 AT EXHIBIT 163.

23         THIS EVIDENCE IS UNDISPUTED PURSUANT TO MY TESTIMONY

24  AND DR. SAYRE'S TESTIMONY WHERE HE ADMITTED RECEIPT OF MY MANY

25  LETTERS AND 602'S.

1      QUESTION NUMBER THREE, DID DR. SAYRE DISREGARD MY

2  SERIOUS MEDICAL NEEDS?  THE ANSWER IS YES.

3      THE EVIDENCE PRESENTED TO YOU IS THAT DESPITE, OR

4  RATHER I SHOULD SAY IN SPITE OF THIS HISTORY OF PROBLEMS

5  OBTAINING EFFECTIVE ADEQUATE RELIEF FROM NSAIDS AND RELATED

6  STOMACH PROBLEMS, DR. SAYRE WENT AHEAD AND ORDERED TRAMADOL TO

7  BE REPLACED WITH NSAIDS ANYHOW.  HE NOW CLAIMS IT WAS A

8  UNANIMOUS DECISION BY THIS COMMITTEE OF PROFESSIONAL MEDICAL

9  STAFF REFERRED TO AS THE MAR COMMITTEE COMPOSED OF DR. SAYRE,

10  DR. ROWE, FAMILY NURSE PRACTITIONER RISENHOOVER, AND MCLEAN,

11  EACH OF WHOM YOU HAVE OBSERVED TESTIFY AND WHICH WE WILL GET TO

12  IN A MINUTE.

13      BUT THE EVIDENCE PROVES THAT IT WAS DR. SAYRE WHO

14  MADE THE DECISION REGARDING CHANGING THE MEDS AND SWITCHING

15  THEM TO NSAIDS.  AND THAT EVIDENCE IS IN HIS

16  11/11/06 DECLARATION HE FILED IN OPPOSITION TO MY MOTION FOR A

17  PROTECTIVE ORDER WHERE HE STATES THAT HE IS THE ONE WHO MADE

18  THAT DECISION AFTER TALKING TO FAMILY NURSE PRACTITIONER

19  MCLEAN.

20      AND THE EVIDENCE PROVES THAT DR. SAYRE DID THIS

21  WITHOUT ANY CAREFUL EXAM OR REASONABLE RISK/BENEFIT ANALYSIS

22  BECAUSE WHILE HE CLAIMS HE MADE THE DECISION BASED ON MEDICAL

23  RECORD REVIEWS, INCLUDING PHYSICAL THERAPY REPORTS AND

24  OBSERVATIONS OF MY ACTIVITY AND USE OF THE ARM ON YARD

25  VIDEOTAPE, AND THE REASON WAS A SENSE OF DEEP CONCERN BY

1  MEMBERS OF THE MAR COMMITTEE OVER LONG-TERM USE OF TRAMADOL AND

2  POSSIBLE RISK OF SEIZURES.

3          THE ACTUAL FACTS RELATING TO THESE ALLEGED REASONS

4  DO NOT SUPPORT DR. SAYRE BECAUSE, A, MY MEDICAL RECORDS

5  DOCUMENT 12 YEARS OF PROBLEMS WITH NSAIDS AND EXCESSIVE NSAID

6  USE IN ORDER TO TRY TO GET RELIEF RESULTING IN STOMACH PROBLEMS

7  BEING FIRST DOCUMENTED IN 1995.  AND DR. DUNCAN RECOMMENDED NO

8  NSAIDS, AND NEED FOR ALTERNATIVE MEDS ARE WELL DOCUMENTED AS

9  DESCRIBED PREVIOUSLY.

10          B, I HAD NOT BEEN CAREFULLY EXAMINED BY ANY PBSP

11  MEDICAL DOCTOR SINCE DR. HECHANOVA EXAMINED ME OCTOBER 8TH,

12  2004, WHEREIN HE RECOMMENDED I BE SEEN FOR FOLLOW-UP BY A PAIN

13  MANAGEMENT SPECIALIST, AND HIS REPORT IS EXHIBIT 159.  AND THE

14  MOST RECENT CAREFUL EXAM BEING DR. WEINSTEIN'S 2005 EXAM, WHICH

15  I PROVIDED TO RISENHOOVER ON JUNE 21ST, 2006, WHICH DETAILED MY

16  HISTORY AND PAIN MANAGEMENT ISSUES.

17          AND THE PHYSICAL THERAPY REPORTS ALL DOCUMENT MY

18  REPEAT REFERENCES TO ACTIVITY-RELATED PAIN AND PARTIAL RELIEF

19  FROM TRAMADOL AND PHYSICAL THERAPY EVERY VISIT BETWEEN 2002 AND

20  2007, AND THESE REPORTS ARE GOING TO BE PRESENTED TO YOU AS

21  EXHIBIT 170, THUS RAISING THE QUESTION, WHAT RECORDS IS SAYRE

22  TALKING ABOUT?

23          C, THE EVIDENCE PROVES THAT SOON AFTER SAYRE MADE

24  THE SWITCH TO NSAIDS IN SEPTEMBER OF '06, THE CONDITION OF MY

25  ARM BECAME INCREASINGLY MORE AGGRAVATED CAUSING ME TO BE

 1   SUBJECT TO UNNECESSARY PAIN AND DISCOMFORT, AND MY STOMACH

 2   PROBLEMS RETURNED.  AND I HAD PERSONALLY MADE SAYRE AWARE OF

 3   THESE PROBLEMS IMMEDIATELY.  AND THE EVIDENCE PROVES THAT IN

 4   SPITE OF MY MEDICAL HISTORY AND BRINGING THOSE PROBLEMS TO HIS

 5   ATTENTION NUMEROUS TIMES, HE INTENTIONALLY AND CALLOUSLY

 6   REFUSED TO TAKE REASONABLE AND APPROPRIATE ACTION TO ADDRESS

 7   AND TRY TO REMEDY THE PROBLEMS, THEREBY ENSURING THAT MY

 8   CONDITION WOULD WORSEN AND THE UNNECESSARY PAIN AND SUFFERING

 9   WOULD CONTINUE INDEFINITELY ABSENT COURT INTERVENTION.

10            AND THIS IS EXACTLY WHAT DR. WEINSTEIN EXPRESSED

11   SERIOUS CONCERNS ABOUT IN HIS 1/22/07 REPORT AND IN HIS

12   TESTIMONY HERE IN FRONT OF YOU.  THUS, I SUBMIT TO YOU THAT THE

13   EVIDENCE IN THIS CASE YOU HAVE HAD PRESENTED TO YOU PROVES THAT

14   DR. SAYRE'S ACTS AND/OR FAILURES TO ACT WITH REGARD TO MY PAIN

15   MANAGEMENT ISSUES REGARDING MEDICATIONS, ARM BRACE, PHYSICAL

16   THERAPY, PHYSICAL THERAPY AIDS, AND THERMALS HAS BEEN BELOW THE

17   STANDARD OF CARE APPLICABLE TO THIS CASE AS SUPPORTED BY DR.

18   WEINSTEIN'S OPINION AND DEFENDANT'S OWN EXPERT, DR. SHIN, WHO

19   EXPRESSED THE OPINION THAT DR. SAYRE'S ACTS AND/OR FAILURES TO

20   ACT FELL BELOW THE STANDARD OF CARE IN THIS CASE WHEN PRESENTED

21   WITH THE HYPOTHETICAL QUESTION I POSED TO HIM -- IF THE

22   HYPOTHETICAL QUESTION I POSED TO HIM WAS TRUE.

23            THE HYPOTHETICAL QUESTION WAS, WHEN PRESENTED WITH

24   MY HISTORY OF PROBLEMS OBTAINING ADEQUATE MEDICAL PAIN RELIEF

25   FROM NSAIDS AND RELATED GI UPSET, THEN SWITCH TO TRAMADOL FOR

1    4.9 YEARS OBTAINING BETTER RELIEF WITHOUT SIDE EFFECTS, THEN TO

2    SWITCH BACK TO NSAIDS, WHICH ARE NOT EFFECTIVE AND CAUSE

3    STOMACH UPSET TO THE POINT OF SERIOUS PAIN, SLEEP DEPRIVATION,

4    CHRONIC DIARRHEA, ADVERSELY AFFECTING MY ABILITY TO COMMUNICATE

5    AND HARMING MY PERSONAL RELATIONSHIPS, AND MAKING SAYRE

6    REPEATEDLY AWARE OF THESE ISSUES, WHICH HE DOES NOTHING ABOUT.

7           AND I SUBMIT TO YOU THAT THIS HYPOTHETICAL QUESTION

8    I POSED TO DR. SHIN IS PART OF WHAT THIS CASE IS REALLY ABOUT

9    AND A HYPOTHETICAL QUESTION IS BASED ON THE FACTS AND THE

10   EVIDENCE YOU HAVE RECEIVED.  THUS, DEFENDANTS MUST LOSE BECAUSE

11   THE DESIGNATED EXPERTS HAVE BOTH STATED DR. SAYRE'S ACTS AND/OR

12   FAILURES TO ACT ARE BELOW THE STANDARD OF CARE.

13          AND THESE SAME POINTS APPLY TO DEFENDANT CATE AS

14   WELL BECAUSE THE EVIDENCE PROVES, I BROUGHT THESE ISSUES

15   CONCERNING MY BREACH OF CONTRACT CLAIMS TO HIS ATTENTION EIGHT

16   TIMES BETWEEN MAY OF 2003 AND FEBRUARY 2008, AND HE REFUSED TO

17   TAKE CORRECTIVE ACTION.  AND HIS FAILURE ON HIS PART TO TAKE

18   CORRECTIVE ACTION HAS CAUSED ME TO EXPERIENCE UNNECESSARY PAIN

19   AND SUFFERING, BOTH PHYSICALLY AND EMOTIONALLY, AS DETAILED IN

20   THE 602 APPEALS YOU WILL BE RECEIVING AS EXHIBITS 157, 162,

21   165, 169, 171, 174, 175 AND 176.  AND I SUBMIT TO YOU THAT

22   THESE ISSUES AGAINST MR. CATE ARE UNDISPUTED.

23          NOW, LET'S BRIEFLY LOOK AT THE WITNESS TESTIMONY

24   BEFORE I GET BACK TO THE ISSUE OF DAMAGES.

25          I AM NOT SURE OF THE ORDER, SO I WILL JUST SUMMARIZE

1   WHAT I RECALL OF EACH WITNESS.

2           THERE WAS DANNY TROXELL, WHO ADMITTED TO YOU BEING A

3   CONVICTED FELON INCARCERATED SINCE 1979 AND IN PELICAN BAY

4   STATE PRISON SINCE 1989, WHO WAS MY BEST FRIEND HAVING DONE

5   WHAT HE CAN TO ASSIST ME WITH ALL MY DAILY ACTIVITIES DURING

6   THE TIME PERIOD OF JULY 25TH, '03 TO JUNE 8, '04 AND VIA

7   WRITING AS MUCH AS HE CAN SINCE JUNE 8TH, '04.

8           HE TESTIFIED ABOUT MY DIRTY CELL, THE DIRTY

9   CONDITION OF MY CELL WHEN HE MOVED IN IN 2003 AND BRIEFLY

10  DESCRIBED HIS OBSERVANCES OF THE PROBLEMS VARIOUS DAILY

11  ACTIVITIES HAVE ON ME INCLUDING THE PERIODIC DISCOLORATION IN

12  MY HANDS AND FINGERS FROM WRITING SOMETIMES.

13          THERE IS ALFONSO PALOMINO WHO ADMITTED TO BEING A

14  CONVICTED FELON INCARCERATED SINCE 1992 AND IN PELICAN BAY EVER

15  SINCE.  HE LIVES A FEW CELLS DOWN FROM ME AND COMES OUT TWICE A

16  WEEK TO CLEAN UP THE POD, AND TESTIFIED HE'D SEEN MY HAND

17  LOOKING DISCOLORED.  AND I SPOKEN TO HIM ABOUT MY ARM MANY

18  TIMES.

19          THERE WAS DR. WEINSTEIN, WHO IS MY EXPERT WITNESS.

20  I ASKED HIM TO DESCRIBE HIS BACKGROUND AND CREDENTIALS TO YOU

21  AND YOU LEARNED DR. WEINSTEIN IS A PRACTITIONER IN GENERAL

22  MEDICINE FOR 40 YEARS, AND HAS BEEN A CORRECTIONAL MEDICAL

23  CONSULTANT SINCE 1990, ALTHOUGH, HE HAD BEEN INVOLVED IN

24  PRISONER MEDICAL CARE ISSUES FOR YEARS BEFORE THAT.

25          IN THEIR OPENING STATEMENT, DEFENDANTS CLAIM

1    DR. WEINSTEIN WAS NOT QUALIFIED AND WAS BIASED APPARENTLY

2    BECAUSE HE IS ONLY PROVIDED TESTIMONY FOR INMATES AND NONE FOR

3    THE STATE.  I SUBMIT TO YOU THAT DR. WEINSTEIN IS CERTAINLY

4    QUALIFIED TO PRESENT HIS EXPERT OPINION TO YOU CONCERNING MY

5    ARM CONDITION AND THE CARE AND TREATMENT OR RATHER LACK OF CARE

6    AND TREATMENT PROVIDED BY DR. SAYRE BASED ON HIS EDUCATION AND

7    EXPERIENCE.

8             DR. WEINSTEIN CONDUCTED MEDICAL RECORD REVIEWS AND

9    CONSULTATIONS WITH HUNDREDS OF INMATES DURING THE COURSE OF THE

10   PAST 30 YEARS OR SO, AND OUT OF THOSE, HE STATED HE INFORMED

11   THE MAJORITY OF THEM THAT THEY MAY HAVE SOME DISCONTENT OR

12   DISAGREEMENT WITH THEIR CARE, BUT HE COULD NOT HELP THEM

13   BECAUSE HIS REVIEW REVEALED NO VIOLATION WITH THE STANDARD OF

14   CARE.  THUS, DR. WEINSTEIN CAN HARDLY BE SAID TO BE BIASED.

15            DR. WEINSTEIN ACTUALLY CONDUCTED FOUR CAREFUL

16   PHYSICAL EXAMS OF MY ARM IN 2000, '02, '05 AND '07.  HE IS THE

17   ONLY DOCTOR WHO EVER CONDUCTED A WRITING TEST AND INQUIRE INTO

18   SOME DETAILS ABOUT WHAT MY ACTUAL WRITTEN COMMUNICATION NEEDS

19   AND RESPONSIBILITIES ARE.  AND DR. WEINSTEIN WAS CAREFUL TO

20   POINT OUT THAT THE ISSUES WERE NOT SIMPLY ABOUT DR. SAYRE'S

21   DISCONTINUATION OF THE TRAMADOL IN 2006, ALTHOUGH HE DID OPINE

22   SUCH ACT ON SAYRE'S PART IN THE CONTEXT OF MY MEDICAL HISTORY,

23   ET CETERA, DID FALL BELOW THE STANDARD OF CARE.  HE FURTHER

24   ELABORATED THAT DR. SAYRE'S ACTS AND/OR FAILURES TO ACT WERE

25   BELOW THE STANDARD OF CARE BY DENYING ME ADEQUATE PAIN CONTROL,

1   ASSISTIVE DEVICE AND HELP, IN-CELL EXERCISE AIDS, PROTECTION

2   FROM INJURY AND COLD, AND FREEDOM FROM STOMACH PROBLEMS FROM

3   NSAIDS, AND NOT MAKING APPROPRIATE REFERRALS TO OCCUPATIONAL

4   AND PHYSICAL THERAPY AND ORTHO CONSULTS; THAT DR. SAYRE WAS

5   ENSURING MY CONDITION WOULD WORSEN AND NOT BE MONITORED AS IT

6   DETERIORATED.

7         I ALSO ASKED DR. WEINSTEIN WHAT MADE MORE SENSE

8   REGARDING DR. FRIEDMAN'S SEPTEMBER THROUGH

9   JANUARY '03 SWITCH-OFFS WITH FLEXERIL THEN BACK TO TRAMADOL,

10  CONCERNS ABOUT ADDICTION, OR ADDRESSING POSSIBLE TOLERANCE

11  BUILDING, AND DR. WEINSTEIN SAID THE ADDICTION ISSUES DIDN'T

12  MAKE SENSE AND THE TOLERANCE-BUILDING ISSUES SEEMED MORE

13  SENSIBLE TO HIM.

14        DEFENDANTS CRITICIZE DR. WEINSTEIN FOR BEING IN

15  PRIVATE PRACTICE ALL THESE YEARS, BUT THE FACT IS,

16  DR. WEINSTEIN IS THE ONLY DOCTOR IN THE LAST, SINCE 2004 TO

17  EVER CONDUCT ANY CAREFUL PHYSICAL EXAMINATION OF MY HARM AND

18  HAND OTHER THAN DR. SHIN IN DECEMBER OF 2008, AND MOST RECENTLY

19  DR. WILLIAMS IN MARCH OF 2009.

20        AND THE FACT IS, DEFENDANTS, NOT ONE OF THE

21  DEFENDANTS EVER CONDUCTED ANY KIND OF CAREFUL PHYSICAL

22  EXAMINATION OF MY ARM IN ALL THE TIMES I SAW THEM.

23        THEN THERE WAS DR. ALLEN.  HE'S A HARVARD GRADUATE.

24  HE HAS SOME PROBLEMS WITH SUBSTANCE ABUSE, AND HE ADMITTED

25  THIS.  HE TESTIFIED HE WORKED AT PELICAN BAY A NUMBER OF YEARS

1    AND WAS PERSONALLY FAMILIAR WITH MY ARM CONDITION AND TREATED

2    ME BEFORE.  HE TESTIFIED ABOUT A COUPLE OF HIS PERSONAL

3    INTERACTIONS WITH DR. SAYRE WHEREIN DR. SAYRE HAD

4    SURREPTITIOUSLY CHANGED THE TREATMENT PLAN OF ONE OF HIS

5    PATIENTS WHO HAD SERIOUS STOMACH PROBLEMS.  AND DR. SAYRE DID

6    THIS BY DISCONTINUING THE STOMACH MEDS AND/OR REFUSING TO

7    APPROVE THE MEDICATIONS NEEDED RESULTING IN THE INMATE HAVING

8    TO BE RUSHED TO THE OUTSIDE HOSPITAL DUE TO EMERGENCY STOMACH

9    BLEEDING.  AND HIS MISDIAGNOSIS OF ANOTHER INMATE'S CONDITION

10   WHO HE SOUGHT TO DISCHARGE FROM THE CLINIC, BUT AFTER

11   DR. ALLEN'S AND OTHERS INTERVENTION WAS DIAGNOSED WITH MULTIPLE

12   SCLEROSIS, DR. ALLEN FURTHER TESTIFIED THAT DR. SAYRE OPENLY

13   BRAGGED ABOUT USING A MUSCLE PARALYZER ON PATIENTS HE BELIEVED

14   WERE FAKING MENTAL ILLNESS AND THAT THIS WAS SHOCKING TO HIM.

15        THE ENTIRE BANQUET HALL WENT SILENT, ALL OF WHICH IS

16   RELEVANT FOR YOU TO CONSIDER WITH RESPECT TO DR. SAYRE'S

17   CREDIBILITY AND PROFESSIONALISM.

18        THEN THERE WAS DR. SAYRE.  DR. SAYRE'S TESTIMONY WAS

19   TOTALLY DISCREDITED BY THE FACTS IN EVIDENCE IN THIS CASE.  HE

20   RECITED HIS CREDENTIALS CLAIMING BOARD CERTIFICATIONS IN

21   ANESTHESIOLOGY AND FAMILY MEDICINE.  HE THEN WENT INTO SOME

22   DETAILS ABOUT PAIN PROCESSES AND MEDICATIONS AND CLAIMED HE

23   PERSONALLY PRESCRIBED TRAMADOL MANY TIMES SINCE 1994.  HE THEN

24   MADE THE FOLLOWING CLAIMS, EACH OF WHICH WERE DISCREDITED.

25        ONE, HIS CONCERN ABOUT TRAMADOL -- HIS CONCERNS

1    ABOUT TRAMADOL WITH SEIZURES AND DEPENDENCE, BOTH OF WHICH

2    DR. SHIN REFUTED.  SUCH NOT A CONCERN TO HIM AT SUCH A LOW DOSE

3    IS WHAT DR. SHIN STATED.

4              NUMBER TWO, SUPERVISOR NURSE RISENHOOVER CLAIMS SHE

5    CAME TO HIM WITH CONCERNS BACK IN SPRING OF '06.  WHEN ASKED IF

6    THAT WAS TRUE, THEN WHY DID SHE RENEW FOR 90 DAYS THE

7    MEDICATIONS?  AND THEN HE SUBSEQUENTLY REVIEWED MY MEDICAL

8    RECORDS ON 4/10/06 IN RESPONSE TO MY 602 ON ROWE, AND APPROVED

9    HER ORDER.  HE APPROVED RISENHOOVER'S RENEWAL OF 90 DAYS IN

10   MARCH '06 IN RESPONSE TO MY 602.

11             I ASKED HIM WHY THAT WAS.  HE COULDN'T REALLY SAY.

12   I ALSO ASKED HIM IF RISENHOOVER WAS SO CONCERNED IN EARLY

13   SPRING OF '06, THEN WHY IS IT THAT WHEN SHE TOLD ME ABOUT HIS

14   6/20/06 RECOMMENDATION TO TAPER ME OFF THE MEDICATION, AND I

15   EXPLAINED SOME OF MY HISTORY AND GAVE HER COPIES OF

16   DR. WEINSTEIN'S 2000 AND 2002 AND '05 REPORTS AND A COPY OF MY

17   SETTLEMENT AGREEMENT, SHE DID NOT FOLLOW HIS ADVICE EXTENDING

18   THE TRAMADOL 60 DAYS SO HE COULD EXAMINE ME FIRST.

19             I ASKED HIM WHY SHE DID THAT.  HE HAD NO REAL

20   RESPONSE.  HE CLAIMED I WAS VERY INSISTENT, AND PUSHY, AND

21   CUSSING AT RISENHOOVER WANTING TRAMADOL.  WHEN I PRESENTED HIM

22   WITH EVIDENCE THAT I ACTUALLY WAS DOING NONE OF THAT AND JUST

23   SIMPLY ASKED, OKAY, WELL, WHAT WILL THE MEDICATION BE REPLACED

24   WITH THAT DOES NOT CAUSE SIDE EFFECTS AND IS EFFECTIVE FOR MY

25   PAIN, HE HAD NO REAL ANSWER.

```
 1           AND THIS 602 AND THE RELATED DOCUMENTS WILL BE

 2   EXHIBIT 165, AND SPECIFICALLY THE 9/26/06, 602 AND EXHIBIT 167

 3   IS A 602 AT SECTION D WHERE I STATE THE ISSUES ARE NOT ABOUT

 4   TRAMADOL, AND MY DECLARATION DATED 9/24/06 WHICH WILL BE

 5   EXHIBIT 181.

 6           HE CLAIMED THERE WAS ALL TYPES OF OBJECTIVE DATA IN

 7   MY MEDICAL CHART TO DISPROVE MY COMPLAINT.  HE REFERENCED

 8   X-RAYS, NERVE STUDIES, ET CETERA THAT WERE ALL FROM 2001 OR

 9   BEFORE.  WHEN I POINTED THIS OUT AND ASKED HIM HOW IS THIS

10   YEARS OLD DATA APPLICABLE TO THE CURRENT COMPLAINTS AND

11   PROBLEMS, HE HAD NO REAL RESPONSE.

12           HE CLAIMED HE CONDUCTED A PHYSICAL EXAM ON

13   8/30/06 DESCRIBING RANGE OF MOTION, GRIP TESTS, MY WRIST

14   FUNCTION.  I ASKED HIM WHY THERE'S NO REFERENCE TO THIS IN HIS

15   8/31/06 REPORT.  HIS RESPONSE WAS OH, IT'S BECAUSE THAT WAS

16   JUST AN APPEAL INTERVIEW.

17           WHEN I POINTED OUT THAT ON MY 9/24/06 DECLARATION I

18   DESCRIBED HIS SUPPOSED EXAM WAS A SHAM AND STATED WHAT ACTUALLY

19   HAPPENED, AND I ASKED HIM WHY HE DID NOT DISPUTE THIS IN HIS

20   RESPONSIVE DECLARATION OF 11/11/06.  HE CLAIMED HE DIDN'T READ

21   MY DECLARATION.

22           THEN AS I PURSUED THIS FURTHER, HE STATED HE WAS

23   CONFUSED.  NOW, DR. SAYRE'S 11/11/06 WILL BE PRESENTED TO YOU

24   IN EVIDENCE AS, I BELIEVE, EXHIBIT 182.

25           WHEN I ASKED IF HE BELIEVED I HAVE A CHRONIC PAIN
```

 1  CONDITION, HE SAID, NO.  SO I ASKED HIM IF HE DISPUTED

 2  DR. SHIN'S FINDINGS TO THAT.  HE WAS CONFUSED.

 3          HE CLAIMS STAFF TOLD HIM MY CELL WAS ALWAYS CLEAN.

 4  WHEN I SHOWED HIM MY CELL RECEIPT NOTING IT WAS DIRTY, HE

 5  EXPRESSED CONFUSION.  I CAN GO ON AND ON WITH EXAMPLES OF

 6  DR. SAYRE'S INCOMPETENCE AND OUTRIGHT BOLDFACE LIES HE HAS MADE

 7  IN THIS CASE RIGHT IN THIS COURTROOM.

 8          I WILL NOTE HE DID NOT DISPUTE OR RESPOND TO

 9  DR. ALLEN'S ACCUSATIONS ABOUT HIM DISCONTINUING TWO OF HIS

10  PATIENTS' MEDICATIONS WITH ONE OF THEM HAVING A NEARLY FATAL

11  RESULT.

12          AND ONE MORE ADDED EXAMPLE OF HIS PENCHANT FOR LYING

13  ABOUT MY MEDICAL ISSUES AS DEMONSTRATED BY A REVIEW OF HIS

14  SECOND INTERVIEW WITH ME ON 6/6/07 IN RESPONSE TO THIS COURT'S

15  4/3/07 ORDER THAT HE RE-EXAMINE MY PAIN AND STOMACH ISSUES.

16          THE EXHIBITS ATTACHED TO EXHIBIT 171 WILL REVEAL THE

17  FOLLOWING:  ON 5/18/07 I SAW RISENHOOVER REGARDING MY 4/5/07

18  602 APPEAL CONCERNING THE CONFISCATION OF MY BAND AND BALL AND

19  INADEQUATE PAIN MEDICATIONS AND STOMACH PROBLEMS.

20          **THE COURT:**  YOU NEED TO SLOW DOWN A LITTLE BIT.  THE

21  COURT REPORTER IS HAVING A LITTLE TROUBLE.

22          **MR. ASHKER:**  OKAY.  SORRY ABOUT THAT.

23          SHE DID A LENGTHY NOTATION OF MY COMPLAINTS NOTING

24  PAIN, CRAMPING, LACK OF SLEEP, ET CETERA, ET CETERA.  THIS IS

25  EXHIBIT 171 AT MEDICAL NOTE NUMBER SRMR00136.

1      SHE ALSO NOTED I GAVE HER A COPY OF DR. WEINSTEIN'S

2   1/22/07 EXAM REPORT.  AND ON 5/25/07, DR. SAYRE SIGNED OFF ON

3   THE FIRST LEVEL OF REVIEW OF THIS 602 CLAIMING HE REVIEWED

4   RISENHOOVER'S 5/18/07 NOTES, AND AS HER SUPERVISOR, SHE

5   PROVIDED DR. WEINSTEIN'S 1/22/07 REPORT.

6      DR. SAYRE THEN PARTLY GRANTS THE APPEAL WHILE

7   IGNORING MY COMPLAINTS ABOUT PAIN AND NSAIDS NOT EFFECTIVE ON

8   ME, SLEEP DEPRIVATION, AND MY OTHER ISSUES.

9      THEN, ON 6/6/07, DR. SAYRE SEES ME IN RESPONSE TO

10  THE COURT ORDER I REFERENCED BEFORE, AND A REVIEW OF HIS NOTE,

11  WHICH IS PART OF EXHIBIT 171 AT SRMR00139 SHOWS THAT HE WAS

12  FOCUSED ON DISCREDITING MY CLAIMS AND DR. WEINSTEIN'S

13  1/22/07 REPORT RATHER THAN AN OBJECTIVE, CAREFUL EXAMINATION

14  AND DEALING WITH MY MEDICAL ISSUES.

15     YOU WILL NOTE THAT HE CLAIMS THAT I APPEARED

16  RELAXED, ALERT, HAD ZERO ISSUES WITH SLEEP LOSS, NO DEPRESSION,

17  NO DISTRACTION, OR INABILITY TO USE THE LIMB, WHICH IS

18  EVERYTHING THAT I HAD BEEN TALKING TO RISENHOOVER ABOUT AS

19  RECENTLY AS 5/18/07 AND DOCUMENTED IN DRS. WEINSTEIN'S REPORT

20  FROM JANUARY OF '07.

21     SO, BASED ON THAT RIGHT THERE, WHEN I GOT

22  DR. SAYRE'S JUNE 6TH, '07 REPORT AND HIS DECLARATION HE DID,

23  THAT -- HIS 11/11/06 DECLARATION WHERE HE'S TALKING ABOUT PART

24  OF HIS REASON WAS MY ACTIVITIES ON VIDEOTAPES, ALL OF THOSE

25  REPORTS AND DR. SAYRE'S FINDINGS, I SUBMIT TO YOU, ARE STRAIGHT

1   OUT FABRICATIONS.  HIS SOLE FOCUS WAS ON TOTALLY DISCREDITING

2   ME AND SAVING HIS OWN BUTT FOR LITIGATION.

3           AND EVER SINCE THEN, I HAVE REFUSED TO SEE HIM WITH

4   ALL THIS STUFF I HAVE BEEN GOING THROUGH WITH HIM, YEAH, I HAVE

5   AN ATTITUDE.  I HAVE COME TO HAVE AN ATTITUDE TOWARDS ALL OF

6   THE MEDICAL STAFF AT PELICAN BAY BECAUSE OF ALL THIS STUFF.

7           NEXT, THERE WAS PATRICK DODGEN, THE PHYSICAL

8   THERAPIST.  HE BACKED WHAT SAYRE SAID REGARDING HAVING A

9   CONVERSATION WITH HIM.  AT SOME POINT, HE COULDN'T RECALL WHEN,

10  THE PHYSICAL THERAPY WAS NO LONGER NEEDED.

11          HE ALSO ADMITTED, THOUGH, THAT PHYSICAL THERAPY

12  ALWAYS APPEARED TO PROVIDE SOME RELIEF.  MY SUBJECTIVE

13  COMPLAINTS OF ACTIVITY-RELATED PAIN AND DISCOMFORT APPEARED

14  CREDIBLE TO HIM.  HE ADMITTED THAT THE THREE REFUSAL POLICY WAS

15  CHANGED TO TWO WITHOUT ANY NOTIFICATION TO ME.  HE ADMITTED

16  THAT THE GRIP STRENGTH DYNAMOMETER ONLY REQUIRES ONE OR TWO

17  SECONDS OF GRIP POWER AND DOESN'T INDICATE HOW MUCH PAIN A

18  PERSON IS IN, NOR THE DURATION OF A PERSON'S CAPABILITIES.

19          HE STATED THE USE OF THE BAND AND BALL IN CELL WAS

20  BENEFICIAL AND NEEDED IN ABSENCE OF ASSISTIVE AIDS TO MAINTAIN

21  ARM IMPROVEMENTS.

22          WHEN I POINTED OUT GRIP STRENGTH WAS DOWN TO

23  38 POUNDS FROM 54 POUNDS WHEN I WAS SEEING HIM AND THE GIRTH

24  SIZE DOWN BY AN INCH, HE ADMITTED THAT WAS OBJECTIVE EVIDENCE

25  OF DETERIORATION.  HE ADMITS THAT HE BELIEVED IN 2005 I NEEDED

1    AN UNBIASED CONSULT AND EXAMINATION BY AN OCCUPATIONAL

2    THERAPIST, THUS CONTRADICTING SAYRE'S CLAIMS THAT I DON'T NEED

3    THE ASSISTIVE AIDS FOR IN-CELL PHYSICAL THERAPY AND EXERCISE OF

4    THE ARM, AND THAT THERE WAS ZERO OBJECTIVE EVIDENCE OF

5    DETERIORATION.

6              DR. SAYRE, DEFENDANTS DR. SAYRE AND OTHERS HAVE ALSO

7    CLAIMED MY WRIST IS NORMAL BECAUSE THE RANGE OF MOTION ON

8    PASSIVE AND ACTIVE MOTIONS ARE THE SAME.  THIS IS AGAIN FALSE.

9    YOU CAN LOOK AT EXHIBIT 170 AT PAGES SRMR00168, 00169 AND 00171

10   WHICH EACH SHOW THAT MY ACTIVE AND PASSIVE RANGE OF MOTIONS I

11   HAVE -- THEY CAN FORCE MORE.

12             AND THAT'S EXACTLY WHAT THEY SAID WOULD INDICATE A

13   PROBLEM WITH YOUR WRIST MOTION.  THEY TRIED TO SAY THAT IF THE

14   ACTIVE AND PASSIVE ARE BOTH THE SAME READINGS, YOU DON'T HAVE

15   WRIST DAMAGE.  BUT IF YOU LOOK AT DR. DODGEN'S REPORTS, YOU

16   WILL SEE THEY ARE DIFFERENT.  THEY ARE DIFFERENT EVERY TIME.

17             THEN THERE WAS DR. DUNCAN.  DR. DUNCAN WAS THE ORTHO

18   SPECIALIST WHO TREATED ME ON AVERAGE OF TWO TIMES A YEAR FROM

19   AUGUST OF '94 UNTIL MARCH OF 2002.

20             AND HE IS THE ONE WHO CONSISTENTLY MAINTAINED I

21   NEEDED THE ARM BRACE TO PROTECT THE LOWER ARM, FOREARM AND

22   WRIST BECAUSE OF POOR SOFT TISSUE COVERAGE AND FOR SUPPORT FOR

23   UPPER ARM EXERCISE.

24             HE ALSO CONSISTENTLY RECOMMENDED MEDICATIONS TO HELP

25   MY ACTIVITY-RELATED PAIN AND DISCOMFORT ISSUES.  AND ALL OF HIS

1    REPORTS WILL BE SUBMITTED TO YOU AS EXHIBIT -- FOR EXHIBITS 23

2    THROUGH NUMBER 153.

3         NOTABLY, DR. DUNCAN WAS ALWAYS VERY CONCERNED ABOUT

4    NSAID USE.  AND AS SOON AS I BEGAN TO EXPERIENCE PROBLEMS WITH

5    GI UPSET FROM NSAIDS, HE RECOMMENDED NO MORE NSAID USE.  YOU

6    CAN LOOK AT THIS AT EXHIBITS 44 AND 136.  EXHIBIT 136 WILL

7    SPECIFICALLY BE AT THE REPORTS OF 9/5/01 AND 12/12/01.  ALL OF

8    THESE REPORTS ARE THE DOCUMENTS IN MY MEDICAL RECORDS WHICH

9    DR. SAYRE CLAIMS THAT HE REVIEWED.

10        AND THAT -- AND IT IS DR. DUNCAN'S CONCERNS IN

11   DECEMBER OF '01 WITH MY NSAID USE, AND THAT'S WHY DR. WOLF

12   ORDERED THE TRAMADOL FOR THE FIRST TIME IN JANUARY OF '02.  AND

13   YOU CAN LOOK AT THIS FIRST ORDER BY DR. WOLF AS EXHIBIT NUMBER

14   152.

15        ON MARCH 6TH, '02 I SAW DR. DUNCAN AND HE NOTED THAT

16   THE BRACING MEDICATION, ET CETERA HAD ME IN THE BEST SHAPE

17   SINCE THE 1990 INJURY AND RECOMMENDED CONTINUED BRACING AND

18   MEDICATIONS WITH RETURN TO SEE HIM IN THE FUTURE AS NEEDED.

19   AND THAT WILL BE AT EXHIBIT 153.  AND EVER SINCE MY

20   5/24/02 SETTLEMENT, I HAVE NEVER BEEN ALLOWED TO SEE DR. DUNCAN

21   EVER AGAIN.

22        AND MY POSITION IS IT IS BECAUSE I HAD SEEN HIM

23   BETWEEN '94 AND 2002 AND HE ALWAYS SUPPORTED ME.  AS SOON AS I

24   ENTERED THAT SETTLEMENT AGREEMENT, I WAS NEVER ALLOWED TO SEE

25   HIM AGAIN.  AND MY POSITION IS IT'S BECAUSE THEY DIDN'T WANT ME

 1  HAVING ANYBODY BACKING ME UP ON MY ISSUES.  AND THE EVIDENCE

 2  SHOWS -- WILL SHOW THAT AS I GO ON WITH MY CLOSING HERE.

 3          THE FIRST TIME I HAVE SEEN HIM SINCE MARCH 6TH, 2002

 4  WAS WHEN HE TESTIFIED HERE ON 5/13/09.  HE CONFIRMED THAT THE

 5  TREATMENT I WAS GETTING AS OF 3/6/02 WAS APPROPRIATE.  AND

 6  THAT'S IN HIS TRANSCRIPT AT PAGE 17 AND 18.

 7          I TRIED TO EXPLAIN THE SPECIFIC CIRCUMSTANCES

 8  RELEVANT TO MY ISSUES REGARDING COMMUNICATION NEEDS AND

 9  AGGRAVATION OF CONDITIONS SUCH CAUSES IN ORDER TO ASK HIM ABOUT

10  MEDS HE FELT APPROPRIATE.  AND HE, AGAIN, SUPPRESSED SERIOUS

11  CONCERNS ABOUT NSAID USE AND POSSIBLE GI BLEED THAT COULD BE

12  FATAL.

13          I EXPLAINED MY SITUATION AND I ASKED HIM IF, IN MY

14  CIRCUMSTANCES, IS IT APPROPRIATE TO PROVIDE MEDICATIONS THAT

15  ARE SUFFICIENT TO EASE PAIN AND DISCOMFORT AND ENABLE ME TO

16  TAKE CARE OF MY COMMUNICATION NEEDS?  HIS RESPONSE WAS YES, IF

17  THERE WAS PERFECT MEDICATION WITHOUT SIDE EFFECTS, THEN YOU

18  SHOULD HAVE IT.  BUT THERE ARE NO PERFECT MEDICATIONS AND ALL

19  HAVE POTENTIAL SIDE EFFECTS.

20          THEN HE GOES INTO THE ARM BRACE.  SO I ASKED HIM

21  AGAIN, EXPLAINING THE USE OF TRAMADOL 4.9 YEARS WITHOUT ANY

22  SIDE EFFECTS, TO WHICH HE STATED HE USED TO USE IT MORE, BUT

23  THERE WAS A SEIZURE WARNING ISSUED A WHILE BACK SO HE USES IT

24  LESS.

25          SO I ASKED HIM ABOUT OTHER MEDICATIONS FOR CHRONIC

1    PAIN AND HE SAID HE PERSONALLY PREFERS TO AVOID ALL PAIN

2    MEDICATIONS, IF POSSIBLE, AND HE PERSONALLY WOULD RESTRICT

3    LONG-TERM MEDICATIONS TO THE MINIMUM NECESSARY.

4           NOW, DEFENDANTS ARE GOING TO ARGUE TO YOU THAT

5    DR. DUNCAN'S STATEMENT WAS THAT I DIDN'T -- I SHOULDN'T HAVE

6    ANY MEDICATIONS.  IF ANY MEDICATIONS AT ALL, SOME TYLENOL.  BUT

7    I SUBMIT TO YOU, WHEN YOU REALLY LOOK AT WHAT HE SAID AND YOU

8    LOOK AT IT IN THE CONTEXT OF MY CONDITION AND THE TESTIMONY OF

9    THE OTHER SPECIALISTS LIKE DR. SHIN, THAT'S NOT WHAT DR. DUNCAN

10   SAID.  HE SAID THAT IT SHOULD BE RESTRICTED TO THE MINIMUM

11   NECESSARY, NOT THAT THERE SHOULD BE NO MEDICATIONS AT ALL.

12          THIS IS DR. DUNCAN'S PERSONAL VIEW AND HIS VIEW

13   ABOUT TRAMADOL AND SEIZURES IS OPPOSITE OF THE MANUFACTURER

14   GUIDELINES APPROVED BY THE FDA PER UPDATED 2007 PRINTOUT WHICH

15   SAYS, TRAMADOL IS APPROVED FOR LONG-TERM CHRONIC PAIN AND THE

16   POSSIBLE SIDE EFFECTS OF SEIZURES IS IN THE RARE CATEGORY.

17   USUALLY IN HIGH DOSES.

18          AND DEFENDANTS' EXPERT, DR. SHIN, STATED THAT IN THE

19   LOW DOSAGE OF 100 MILLIGRAMS A DAY, SEIZURES ARE NOT A BIG

20   WORRY, AND HE WOULD HAVE NO PROBLEM PRESCRIBING IT FOR ME IN

21   THE COMMUNITY WITH MY HISTORY OF NSAID PROBLEMS AND WITH GI

22   UPSET.

23          DR. DUNCAN ALSO STATED THE ARM BRACE IS NEEDED JUST

24   BASED ON HIS QUICK REVIEW OF MY ARM ON THE VIDEO.  AND HE WAS

25   CLEAR ABOUT NOT PRESCRIBING MEDICATIONS WITHOUT CAREFUL

1    EXAMINATION FIRST.

2            THERE'S DR. WINSLOW.  HE WAS THE PBSP CHIEF MEDICAL

3    OFFICER IN THE '90S UP TO 2006.  HE APPROVED THE TRAMADOL PER

4    NONFORMULARY PROCEDURES FOR FOUR YEARS, FROM 2002 TO 2006.  HE

5    FELT IT WAS APPROPRIATE.  HE STATED THE FIRST AND FOREMOST, A

6    DOCTOR'S DUTY IS TO CAUSE NO HARM.  HE SAID IT WAS ALWAYS

7    IMPORTANT TO DO A RISK VERSUS BENEFIT ASSESSMENT WHEN DEALING

8    WITH A CHRONIC PAIN CONDITION.

9            HE STATED THAT MY INTERPRETATION OF THE TERM

10   "CONTRAINDICATED" WAS FAIR.  MY INTERPRETATION WAS THAT

11   CONTRAINDICATED MEANT HARMFUL.  HE ADMITTED THAT HE AUTHORED

12   THE 1/23/03 MEMORANDUM WHERE HE REFERENCES THAT PHYSICAL

13   THERAPY WAS TO BE PERMANENT.  AND THAT WILL BE EXHIBIT 154.

14           THERE WAS DR. FRIEDMAN WHO TESTIFIED ABOUT HIS

15   VERSION OF THE TELEMED VISITS I HAD WITH HIM BETWEEN JUNE AND

16   SEPTEMBER AND JANUARY, APRIL '03.  HE HAD LITTLE PERSONAL

17   RECOLLECTION OF THESE VISITS, GOING OFF HIS NOTES, AND THAT'S

18   WHY WHEN HE AGREED WITH DEFENDANTS' COUNSEL THAT SUCH SWITCHING

19   BACK AND FORTH WAS DUE TO CONCERNS ABOUT DEPENDENCY, I JUST

20   TOLD HIM, OKAY, IS THERE ALSO THE POSSIBILITY THAT YOU ALSO

21   TOLD ME IT WAS BECAUSE OF POSSIBLE TOLERANCE-BUILDING ISSUES,

22   AND HE SAID YES.

23           I ASKED HIM WHY HE INSISTED ON ELAVIL IN SPITE OF

24   THE SIDE EFFECTS.  THE SAME -- I ASKED HIM THE SAME ABOUT

25   FLEXERIL TO WHICH HE DIDN'T SEEM TO HAVE A LEGITIMATE RESPONSE.

1        AND, IN FACT, DR. SHIN TESTIFIED RIGHT AFTERWARDS

2   AND SAID HE WOULD NOT HAVE PUSHED MEDICATIONS IN THAT

3   SITUATION.

4        DR. WEINSTEIN TESTIFIED THAT THE SWITCHING BACK AND

5   FORTH MADE MORE SENSE IN THE CONTEXT OF TOLERANCE ISSUES RATHER

6   THAN DEPENDENCY ISSUES.

7        I ASKED DR. FRIEDMAN IF HE REMEMBERED LAUGHING IN MY

8   FACE WHEN I DESCRIBED THE ELAVIL SIDE EFFECTS.  HIS RESPONSE

9   WAS NO.  I ASKED HIM WOULD IT BE APPROPRIATE FOR A DOCTOR TO DO

10  SO IN THAT SITUATION, TO WHICH HE ALSO SAID NO.  I MAINTAIN

11  THAT DOCTOR --

12       **THE COURT:**  MR. ASHKER, YOU HAVE ABOUT 15 MINUTES

13  LEFT.  SO HOWEVER MUCH YOU WANT TO SAVE FOR YOUR FINAL

14  STATEMENT, YOU SHOULD KEEP THAT IN MIND.

15       **MR. ASHKER:**  OKAY.  HE LAUGHED IN MY FACE AND I

16  DESCRIBED THE ELAVIL EFFECTS.

17       THERE WAS DR. SHIN.  HE BEGAN BY SAYING HIS -- HE

18  CONSULTED ON TENS OF THOUSANDS OF CASES.  HE TESTIFIED AT

19  LENGTH ABOUT NERVES AND DAMAGE AND HEALING PROCESSES.  THE

20  MEDICAL RECORDS REFLECT THAT I ACTUALLY DID SHOW THE NERVE WAS

21  DAMAGED.  AND YOU CAN SEE THAT IN EXHIBIT 120 WHERE IT STATED I

22  HAD SIGNIFICANT FIBROUS FORMATION AROUND THE ULNAR NERVE IN THE

23  CUBICAL TUNNEL RESULTING IN SIGNIFICANT COMPRESSION WITH LOSS

24  OF VASCULARITY AND NARROWING OF THE NERVE THROUGHOUT ABOUT A

25  THREE-CENTIMETER SEGMENT.  THE INITIAL SURGERY WAS SUCCESSFUL,

1   THEN THE PROBLEM RETURNED IN '01, AS NOTED BY NEUROLOGIST

2   MAUKONEN AT EXHIBIT 138 AND DR. DUNCAN'S 12/12/01 REPORT AT

3   EXHIBIT 136.  DR. DUNCAN RECOMMENDED BRACING AND MEDICATIONS TO

4   DEAL WITH THAT IN EXHIBIT 154.

5          THE MEDS AND BRACING AND REGULAR PHYSICAL THERAPY

6   HELPS, SO BY OCTOBER OF 2002, THE PAIN WAS TOLERABLE NUMBNESS

7   GONE.  ONCE THESE PAIN MANAGEMENT AIDS ALTERED AND DENIED BY

8   SAYRE, PAIN RETURNED AND MY TWO FINGERS ARE NUMB AGAIN AS

9   REPEATEDLY POINTED OUT TO DEFENDANTS IN EXHIBIT 162, 165, 169,

10  171, 174, 175 AND 176.

11         DR. SHIN ACKNOWLEDGED THE NERVE REMAINS A BIT SLOW

12  AND MADE NEW FINDINGS REGARDING RISK NERVE PAIN.  DR. SHIN

13  STATED THAT PAIN IS AN INDIVIDUAL EXPERIENCE DIFFERENT FOR

14  PEOPLE.  SOME TOLERATE IT BETTER THAN OTHERS AND THAT'S THE

15  MAIN WAY FOR DETERMINING THE LEVEL OF PAIN A PERSON IS IN IS

16  THE EFFECT ON FUNCTION.  AND HE STATED THAT BASED ON MY

17  STATEMENT TO HIM THAT I WAS ABLE TO DRESS, EAT BATHE AND WRITE,

18  I'LL BE IN SOME PAIN WAS EVIDENCE I WAS ABLE TO FUNCTION WELL

19  ENOUGH TO CARRY OUT MY NECESSARY DAILY ACTIVITIES, THUS DENYING

20  THE MEDICATION WOULD NOT CAUSE ME PHYSICAL DAMAGE, IT WAS A

21  MATTER OF COMFORT.

22         DR. SHIN EMPHASIZED THE IMPORTANCE OF CONSIDERING

23  NOT ONLY THE PATIENT'S SUBJECTIVE COMPLAINTS, BUT ALSO THE

24  OBJECTIVE EVIDENCE.  HOW DOES THE CONDITION AFFECT A PERSON'S

25  ABILITY TO CARRY OUT MAJOR LIFE DAILY ACTIVITIES AND THE

CLOSING ARGUMENT – MR. ASHKER

1    PHYSICAL EVIDENCE TO SUPPORT THIS?

2             THE QUESTION IS ON THE PHYSICAL EVIDENCE, HAS THERE

3    BEEN ANY PHYSICAL DETERIORATION SINCE THE CHANGE IN MANAGEMENT?

4    I ASKED HIM, DO YOU CONSIDER COMMUNICATION TO BE A MAJOR LIFE

5    ACTIVITY?  HE SAID YES.

6             I SAID, YOU KNOW MY ONLY WAY OF COMMUNICATING IS

7    WRITING THE WRITTEN WORD, CORRECT?  HE SAID YES.

8             WELL, CAN YOU TELL ME WHAT MY WRITTEN COMMUNICATION

9    RESPONSIBILITIES ENCOMPASS?  HE SAID NO.

10            YOU -- I SAID, YOU REVIEWED DR. WEINSTEIN'S REPORTS

11   AND NOTED THAT I DID HAVE -- THAT HE DID HAVE GIRTH

12   MEASUREMENTS IN '05, CORRECT?  HE SAID YES.

13            ON 12/20/08, YOU DID NOT DO GIRTH MEASUREMENTS, DID

14   YOU?  HE REPLIED NO.

15            I DID IN MARCH AND THE GIRTH IS ABOUT AN INCH

16   SMALLER.  IS THIS EVIDENCE OF DETERIORATION?  HE SAID YES.

17            MY GRIP STRENGTH HAS STEADILY DETERIORATED, TOO,

18   FROM 54 TO 32 POUNDS.

19            DR. SHIN APPEARED CONFUSED ABOUT THE ISSUE STATING

20   IT REALLY BOTHERED HIM, HE STRUGGLED WITH MY CASE.  HE NEVER

21   DEALT WITH A CASE LIKE MINE BEFORE.  HE STATED IN HIS PRACTICE

22   HE WOULD HAVE ZERO PROBLEMS WITH THE TRAMADOL AND HE FLAT OUT

23   DISPUTED DEFENDANTS' CLAIMS REGARDING SEIZURES, ABUSE AND

24   DEPENDENCY ON SUCH A LOW DOSE.

25            I PRESENTED HIM WITH A HYPOTHETICAL QUESTION I

1   MENTIONED BEFORE, AND HE STATED THAT IN THAT SITUATION, IF,

2   WHAT I SAID WAS TRUE, THAT THAT WOULD BE BELOW THE STANDARD OF

3   CARE.

4           DR. SHIN AND I DISCUSSED THIS ISSUE AT LENGTH AND HE

5   GAVE EXAMPLES OF SITUATION WHERE PEOPLE WITH CHRONIC PAIN NEED

6   DAILY MEDS TO BE ABLE TO CARRY OUT THEIR MAJOR LIFE ACTIVITIES.

7   AN EXAMPLE WAS AN IRON WORKER WITH CHRONIC PAIN.  BUT THE JOB

8   IS HIS ONLY LIVELIHOOD AND IF MEDS ARE AVAILABLE TO EASE HIS

9   PAIN SO HE CAN WORK, THEN THAT WORK, THAT NEEDED JOB, HE SHOULD

10  HAVE THE MEDICATIONS.

11          I ASKED HIM IF MY ABILITY TO FUNCTION AND CARRY OUT

12  MY DAILY COMMUNICATION NEEDS WAS COMPROMISED DUE TO PAIN, DOES

13  THAT MERIT ADEQUATE MEDS?  HE SAID YES.  PLUS THERE MAY BE

14  OTHER AIDS AVAILABLE.  HE ADMITTED HE DID NOT MEASURE THE GIRTH

15  OF MY ARM.  HE ADMITTED THAT AN INCH SMALLER WAS OBJECTIVE

16  SIGNS OF DETERIORATION AS WAS MY GRIP STRENGTH.

17          HE ALSO STATED THAT THE WHIRLPOOL, THERA-BAND AND

18  BALL AIDS WERE NOT CONTRAINDICATED.  AND ON 12/20/08, HE

19  RECOMMENDED A BRACE TO PROTECT THE ARM AND THAT I BE SEEN BY A

20  SPECIALIST IN THE WRIST.

21          THERE WAS DR. ROWE, RISENHOOVER, AND LASTLY MCLEAN.

22  YOU GUYS JUST SAW ALL THEIR TESTIMONY ON FRIDAY, SO I WON'T GO

23  INTO THEIRS.

24          NOW WE COME TO THE FOURTH ELEMENT, WHICH IS, WAS I

25  FURTHER INJURED AS A RESULT OF SAYRE AND CATE'S ACTS, FAILURES

 1    TO ACT, AND I SUBMIT THAT THE EVIDENCE PRESENTED TO YOU TAKEN

 2    AS A WHOLE DEMONSTRATE I HAVE BEEN INJURED PHYSICALLY, MENTALLY

 3    AND EMOTIONALLY EVERY DAY FOR THE PAST NUMEROUS YEARS.

 4            DR. WEINSTEIN, SHIN, DUNCAN, WINSLOW AND THE TEN

 5    OTHER DOCTORS WHO PRESCRIBED AND APPROVED THE TRAMADOL/TYLENOL

 6    COMBINATION FOR MY SUBJECTIVE COMPLAINTS ABOUT PAIN AND

 7    DISCOMFORT IN MY ARM FOUND MY COMPLAINTS CREDIBLE.  DR. SHIN

 8    STATED HIS EXAMINED TEST CONFIRMED I HAVE A LEGITIMATE CHRONIC

 9    PAIN CONDITION.

10            I PROVIDED TESTIMONY BEFORE YOU DESCRIBING MY DAILY

11    PAIN AND DISCOMFORT WHILE STRUGGLING TO MAINTAIN MY DAILY

12    ACTIVITIES, COMMUNICATING WITH FAMILY AND FRIENDS, COURTS,

13    CORRESPONDENCE COURSES, ET CETERA, AND SINCE BEING PUT BACK ON

14    NSAIDS, I HAVE HAD TO ENDURE NEARLY THREE YEARS OF UNNECESSARY

15    PAIN TO A LEVEL THAT RESULTS IN PROLONG SLEEP DEPRIVATION, ONE

16    TO THREE HOURS PER NIGHT ON AVERAGE.  I HAVE TO TELL YOU THAT

17    THIS WEARS ME OUT PHYSICALLY AND EMOTIONALLY TO THE POINT OF

18    FEELING DEPRESSED AND HOPELESS.

19            AS I POINTED BEFORE, IT HAS BEEN A NIGHTMARE BECAUSE

20    HERE I AM UNDER THE TOTAL CONTROL OF AND TOTALLY RELYING ON

21    DR. SAYRE AND HIS CRONIES FOR MY MEDICAL NEEDS AND MY ISSUES

22    ARE DOCUMENTED AND LEGITIMATE, AND I AM REPEATEDLY ASKING FOR

23    THEIR HELP, AND TOLD THERE'S NOTHING WRONG WITH YOU, YOU HAVE

24    ALL YOU HAVE COMING TO YOU.

25            IT'S HAD ME FEELING LIKE I AM TREATED LESS THAN

1    HUMAN, TO BE HONEST, AND IS DIFFICULT FOR ME TO EVEN TALK

2    ABOUT.  I FILED NUMEROUS 602 APPEALS, WHICH IS MY ONLY WAY OF

3    FORMALLY SEEKING HELP AND DOCUMENTING MY ISSUES, ALL OF WHICH

4    WERE TREATED WITH CONTEMPT.

5              THE PROCESS MADE A MOCKERY BY THEIR PENCHANT FOR

6    PARTLY GRANTING RELIEF WHILE THE REALITY IS THE ISSUES ARE

7    IGNORED.

8              YOU ALL HAD TO HEAR AND SEE HOW SAYRE AND

9    RISENHOOVER LOOKED AND TALKED WHEN THEY MENTIONED MY 602'S,

10   MENTIONING THEM ALMOST WITH A SNEER, ALL OF WHICH HAS CAUSED ME

11   TO GO THROUGH MANY EMOTIONS ON MOST DAYS SINCE 2006,

12   FRUSTRATION, ANGER, DEPRESSION, YOU NAME IT, BECAUSE REALLY

13   THESE PROBLEMS GO BACK ALMOST 19 YEARS.

14             I HAVE HAD TO CUT BACK ON PERSONAL WRITING.  LIKE I

15   SAID BEFORE, I WRITE MY WIFE A LITTLE NOTE ONCE A WEEK NOW FOR

16   THE PAST TWO, TWO AND A HALF YEARS.  WE MET AND HAVE BEEN A

17   COUPLE SINCE THE SPRING OF '02.  SHE LIVES FAR FROM PELICAN

18   BAY, SO VISITS ARE RARE.  AND THE MEDICAL ISSUES AND EFFECT ON

19   MY ARM CONDITION HAS TAKEN A TOLL ON BOTH OF US.

20             AND I HAD TO CUT ALL MY CORRESPONDENT COURSES LOOSE.

21   I HAVEN'T HEARD FROM MY MOM IN TWO YEARS BECAUSE SHE'S OLDER

22   NOW WITH PRETTY SERIOUS MEDICAL PROBLEMS OF HER OWN.  AND JUST

23   GOT TO BE TOO MUCH FOR HER TO HEAR WHAT I HAVE BEEN GOING

24   THROUGH.

25             EACH DAY HAS BEEN A STRUGGLE, AND ON TOP OF THE ARM

1   I HAVE THE STOMACH ISSUES WHERE THERE WILL BE DAYS WHEN MY

2   STOMACH IS CRAMPED UP ALL DAY AND I'LL BE HAVING TO USE THE

3   TOILET UP TO 15 OR MORE TIMES A DAY.  I'VE GONE FOR WEEKS AND

4   MONTHS WHERE I HAVE NOT EVEN BOTHERED TO GO OUT TO THE YARD OR

5   CLEAN MY CELL OR WASH MY CLOTHES BECAUSE OF THE ARM PAIN

6   ISSUES, AND I DEVELOPED SKIN RASHES.

7           EVEN FOOD AND EATING HAS LOST ITS APPEAL.  JUST

8   EATING BECAUSE OF HABIT AND TO SURVIVE.  I KNOW IT'S RELATED TO

9   THE CHRONIC PAIN ISSUES BECAUSE THE SAME THING HAPPENED PRIOR

10  TO GETTING ON TRAMADOL.  WHEN I GOT ON IT AND GOT BETTER

11  RELIEF, THE FOOD HAD TASTE AGAIN.  THIS HAPPENED AGAIN IN MARCH

12  OF THIS YEAR WHEN DR. WILLIAMS PUT ME ON THE TWO TYLENOL

13  CODEINE 3'S TWO TIMES A DAY WITH TYLENOL EVERY SIX HOURS, AND

14  HIS REPORT IS AT EXHIBIT 177.

15          THIS LEVEL OF CODEINE 3 HAS HELPED ME TO BE ABLE TO

16  BETTER DEAL WITH THESE TRIAL PREPARATIONS BETTER THAN I COULD

17  HAVE WITHOUT IT, BUT IT HAS MY STOMACH CRAMPING A LOT NOW.  AND

18  THERE'S ANOTHER REPORT ON MARCH 31ST DOCUMENTING THAT WHERE I

19  HAD VERY SEVERE -- THEY HAD TO RUSH ME TO THE CLINIC AND GIVE

20  ME SOME NUMBING MEDICATION FOR IT.

21          AND NOW WE'RE AT THE DAMAGES ISSUE.  I AM ALMOST

22  DONE.  HALF PAGE LEFT.

23          AND I AM ASKING YOU TO PLEASE TAKE INTO

24  CONSIDERATION WHAT I HAVE DESCRIBED TO YOU AND HOW SUCH HAS

25  BEEN MY DAILY EXPERIENCE FOR NEARLY THREE YEARS NOW.  AND I

1    WILL ASK YOU TO CONSIDER SOMETHING ELSE, TOO:  THE EVIDENCE IN

2    THIS CASE PROVES THAT DR. SAYRE AND MR. CATE'S ACTS AND/OR

3    FAILURES TO ACT HAVE BEEN INTENTIONAL AND MALICIOUS, WARRANTING

4    AN AWARD OF PUNITIVE DAMAGES.  PUNITIVE DAMAGES ARE NECESSARY

5    AND REQUIRED IN THIS CASE FOR TWO REASONS:  ONE, IS TO PUNISH

6    THE DEFENDANTS.

7              **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  THERE'S NO

8    CLAIM AGAINST --

9              **THE COURT:**  PUNITIVE DAMAGES ARE ONLY ALLOWED

10   AGAINST DEFENDANT SAYRE ON THE CIVIL RIGHTS CLAIM.  NO PUNITIVE

11   DAMAGES ARE AVAILABLE ON THE BREACH OF CONTRACT CLAIM AGAINST

12   THE CDCR.

13             **MR. ASHKER:**  EXCUSE ME, YOUR HONOR.

14             DR. SAYRE NEEDS TO BE PUNISHED FOR THE WAY HE HAS

15   TREATED ME FOR THE LAST THREE YEARS.

16             AND ALSO THE SECOND REASON IS TO SEND A MESSAGE TO

17   DR. SAYRE AND ALL THE MEDICAL STAFF AT PELICAN BAY AND IN

18   SACRAMENTO HEADQUARTERS THAT SUCH ACTIONS WILL NOT BE TOLERATED

19   IN OUR SOCIETY.

20             YOU ARE THE ONES WHO HAVE THE POWER TO REALLY MAKE A

21   STRONG STATEMENT TODAY ABOUT WHAT YOU THINK ABOUT WHAT YOU SEE

22   TODAY, SEEN IN THIS CASE.  AND I SUBMIT TO YOU THAT IT MERITS A

23   SUBSTANTIAL PUNITIVE DAMAGE AWARD, ONE THAT WILL MAKE THE

24   POWERS THAT BE OPEN THEIR EYES AND TAKE NOTICE AND IMPLEMENT

25   SOME POSITIVE CHANGES AND PROVIDE ME WITH THE APPROPRIATE LEVEL

1    OF CARE AND TREATMENT THAT I NEED AFTER ALL THESE YEARS.

2              THANK YOU.

3              **THE COURT:**  WE WILL TAKE A BREAK.  IT'S TEN TO 11.

4    WE WILL BREAK UNTIL 11:05 AND THEN HEAR FROM MR. ANDRADA.

5              **MR. ANDRADA:**  I AM SORRY, 15?

6              **THE COURT:**  YES.

7                   (RECESS TAKEN AT 10:50 A.M.)

8              (PROCEEDINGS RESUMED AT 11:10 A.M.)

9         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

10             **THE COURT:**  PLEASE BE SEATED.  WHENEVER YOU ARE

11   READY.

12             **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

13                   CLOSING ARGUMENT

14             **MR. ANDRADA:**  GOOD MORNING TO YOU, AGAIN.  GOOD

15   MORNING, LADIES AND GENTLEMAN OF THE JURY.

16             FIRST OF ALL, I STARTED THIS CASE AND I SAID IT WAS

17   A PRIVILEGE TO REPRESENT DR. MICHAEL SAYRE AND TO REPRESENT THE

18   STATE OF CALIFORNIA AND MICHAEL CATE FOR OUR PURPOSES HERE

19   DURING THIS TRIAL.  AND IT HAS BEEN MY PRIVILEGE.

20             I WANT TO THANK ALL OF YOU FOR YOUR PATIENCE AND

21   YOUR ATTENTIVENESS.  YOU WERE VERY, VERY ATTENTIVE.  I HAVE HAD

22   JURORS LITERARY FALL ASLEEP, NOT BY VIRTUE OF MY QUESTIONING,

23   BUT PERHAPS BY VIRTUE OF CERTAIN TESTIMONY THAT HAS BEEN GIVEN

24   OVER THE YEARS.  WE HAVE HAD JURORS IN OTHER CASES SHOW UP LATE

25   OR NOT EVEN MAKE IT AT ALL.  ALL OF YOU CERTAINLY SEEM TO BE

1   TIMELY AND, AGAIN, MOST ATTENTIVE AND WE APPRECIATE THAT VERY,

2   VERY MUCH.

3           I AM GOING TO TEASE YOU ALL EVER SO SLIGHTLY.  WHILE

4   YOU WERE ALL OUT THIS WEEKEND ENJOYING THE BEAUTIFUL SUNSHINE,

5   MR. ANDRADA WAS IN HIS OFFICE WITHOUT ANY AIR CONDITIONING

6   CREATING THESE MARVELOUS WORKS OF ART HERE THAT WERE IN MY

7   NOTES THAT I HOPE WILL BE OF SOME ASSISTANCE TO YOU.  AND WE

8   WILL GO THROUGH THEM IN A MOMENT HERE.

9           **THE COURT:**  IT'S A LITTLE AWKWARD BECAUSE MR. ASHKER

10  CAN'T SEE THEM NOR CAN I.

11          DID YOU, BY ANY CHANCE, SHOW THEM TO HIM BEFOREHAND?

12          **MR. ANDRADA:**  HAVE I SHOWN THEM?  NO, YOUR HONOR, I

13  MADE THEM YESTERDAY.

14          I CAN MOVE THEM OVER HERE.

15          **THE COURT:**  I'M AFRAID YOU'RE GOING TO HAVE TO

16  BECAUSE IT'S NOT REALLY FAIR TO SHOW THINGS THAT NEITHER

17  PLAINTIFF NOR THE COURT CAN SEE.

18          **MR. ANDRADA:**  THEY ARE JUST MY SUMMARY OF THE NOTES.

19          **THE COURT:**  I AM SURE THEY ARE AND I DON'T QUESTION

20  YOU, BUT IT'S JUST NOT --

21          **MR. ANDRADA:**  VERY WELL, YOUR HONOR.

22          **THE COURT:**  UNLESS YOU WANT TO STOP AND SHOW THEM

23  FIRST.

24          **MR. ANDRADA:**  NO, NO.  I DON'T WANT TO DELAY THIS

25  MATTER ANY FURTHER.  THANK YOU.

1          **THE COURT:**  CAN YOU SEE THEM?  I CAN'T.

2          **MR. ASHKER:**  NOT REALLY.

3          **THE COURT:**  DO YOU WANT TO MOVE TO A DIFFERENT --

4          **MR. ASHKER:**  I OBJECT TO THOSE NOTES ANYWAY, YOUR

5   HONOR.  HE HAS REFERENCES ON THERE GOING BACK TO THE '80S, OF

6   PRISON.  I MEAN, CUT IT OUT.

7          **MR. ANDRADA:**  I AM SORRY, YOUR HONOR.  THERE WAS

8   TESTIMONY FROM MR. ASHKER THAT HE WAS IN PRISON IN THE 1980'S.

9   I AM MERELY -- THIS IS MERELY A BROAD TIME LINE IN AN ATTEMPT

10  TO BRING SOME ORDER TO SOME OF THE MOST BASIC EVIDENCE.  THAT'S

11  ALL IT IS.

12         **THE COURT:**  ALL RIGHT.

13         OKAY.  WHAT WAS THE OTHER ONE?

14         **MR. ANDRADA:**  WELL, I HAVE SEVERAL OF THEM, YOUR

15  HONOR.

16         **THE COURT:**  NO.  YOU JUST PUT SOMETHING DOWN ON THE

17  FLOOR.

18         **MR. ANDRADA:**  YES.

19         **THE COURT:**  WHO DO YOU TRUST?

20         **MR. ANDRADA:**  THESE ARE ALL THE WITNESSES IN THE

21  CASE.

22         **THE COURT:**  OKAY.  GO AHEAD WITH THOSE TWO.  I WILL

23  TRY TO SEE THE OTHERS WHEN YOU OPEN THEM.

24         **MR. ANDRADA:**  VERY WELL, YOUR HONOR.  THANK YOU.

25         WOULD THIS BE ALL RIGHT?

1          **THE COURT:**  IT'S FINE EXCEPT WHEN YOU TURN TO A NEW

2   PAGE I WILL HAVE TO BE ABLE TO LOOK AT IT.  FOR THOSE TWO PAGES

3   I HAVE SEEN, THAT'S FINE.

4          **MR. ANDRADA:**  ALL RIGHT.

5          IS THIS A GOOD ANGLE FOR YOU, LADIES AND GENTLEMAN

6   OF THE JURY?  INDULGE ME FOR A MOMENT HERE.

7          SOME OF YOU MAY ACTUALLY REMEMBER A QUIZ SHOW CALLED

8   WHO DO YOU TRUST?  WITH JOHNNY CARSON AND HIS SIDEKICK ED

9   MCMAHON BEFORE THEY WENT ON TO GLORY ON THE TONIGHT SHOW.  IT

10  WAS REALLY A SHOW WHERE THE QUESTION WAS WHO WAS, IN EFFECT,

11  TELLING THE TRUTH.  AND THERE WOULD BE LOTS OF JOKES AND

12  REPARTEE, AND SO FORTH.  I LOVE THE LINE WHO DO YOU TRUST?

13         AND I THINK IT'S AN APPROPRIATE LINE FOR -- IDEA TO

14  HELP YOU SORT THROUGH THE EVIDENCE THAT WE HAVE ALL BEEN

15  LISTENING TO FOR THOSE FIVE DAYS LAST WEEK.

16         SO, WHO DO YOU TRUST?  SHOULD YOU TRUST THE

17  PLAINTIFF?  WE SUGGEST NO.  THE COURT HAS INSTRUCTED YOU THAT

18  YOU MAY CONSIDER HIS CRIMINAL RECORD WITH REGARD TO WHETHER HE

19  IS CREDIBLE.  YOU ARE ALSO ENTITLED TO CONSIDER WHETHER, IN

20  FACT, HE IS EXAGGERATING HIS NEEDS.  YOU ARE ENTITLED TO JUDGE

21  HIS DEMEANOR, HOW HE CONDUCTS HIMSELF IN THE COURTROOM, JUST

22  LIKE ANY OTHER WITNESS.  SO, WE SUGGEST THAT THE PLAINTIFF

23  FALLS SHORT.

24         MR. TROXELL, LIKEWISE FALLS SHORT.

25         MR. PALOMINO FALLS SHORT AND ESSENTIALLY ADDED

CLOSING ARGUMENT – MR. ANDRADA

1    NOTHING.

2              CAN YOU TRUST DR. WEINSTEIN?  WE SUGGEST -- WOULD IT

3    BE BETTER -- IS THAT BETTER?  OKAY.  EXCUSE ME.

4              WE SUGGEST THAT THE ANSWER IS NO.  SHOULD YOU TRUST

5    A WITNESS WHO'S BEEN CONSULTED ON ONE SIDE 2000 TIMES FOR

6    PLAINTIFFS AND PRISONERS, AND ONE TIME ON BEHALF OF A DEFENDANT

7    MEDICAL PROVIDER?  SHOULD YOU TRUST A WITNESS WHO ADMITS THAT

8    HE'S NEVER PRESCRIBED THE MEDICATION THAT IS AT ISSUE, THAT

9    HE'S NOT AN EXPERT IN THAT MEDICATION.  CAN YOU TRUST AN EXPERT

10   WHO HAS NO SPECIALTY TRAINING AT ALL, CANNOT ADMIT A PATIENT TO

11   A HOSPITAL, AND WHO HAS NEVER WORKED IN A PRISON.  WE SUGGEST

12   THAT THE ANSWER IS NO.

13             CAN YOU TRUST DR. ALLEN?  LET ME TELL YOU.  IN MANY

14   RESPECTS DR. ALLEN IS A TRAGEDY.  HE HAS -- I AM SURE THAT MANY

15   OF YOU WILL AGREE WITH ME THAT HE DOES HAVE ABILITY.  LOTS OF

16   GRAY MATTER.  HARVARD, UCSF, VERY WELL TRAINED.  BUT,

17   UNFORTUNATELY, HE IS UNRELIABLE.  HE CLEARLY HAS A BIAS AGAINST

18   THE CDCR.  WE SUGGEST THAT YOU SHOULD NOT TRUST A PHYSICIAN WHO

19   HAS TWICE RUN AFOUL OF THE REQUIREMENTS OF THE MEDICAL BOARD

20   WITH REGARD TO SUBSTANCE ABUSE, WHO, I UNDERSTOOD HIS

21   TESTIMONY, IS ESSENTIALLY ON THE VERGE OF LITERALLY LOSING HIS

22   LICENSE FOR A YEAR, AND WHO WAS FIRED BY PELICAN BAY AND

23   DR. SAYRE BECAUSE DR. ALLEN WAS IMPAIRED BY VIRTUE OF HIS DRUG

24   USE.  CLEARLY DR. ALLEN HAS A BIAS OR A PREJUDICE AGAINST THE

25   CDCR AND DR. SAYRE AND THUS SHOULD NOT BE BELIEVED.

CLOSING ARGUMENT – MR. ANDRADA

1     DR. DUNCAN, SHOULD YOU TRUST HIM?  YOU CERTAINLY

2  SHOULD.  WELL TRAINED.  MR. ASHKER CALLED HIM AS A WITNESS.

3  AND WHAT DID DR. DUNCAN SAY THAT WAS REALLY IMPORTANT FOR OUR

4  PURPOSES?  WHAT HE SAID WAS, THAT ANY LONG TERM USE OF

5  MEDICATION IS FRAUGHT WITH PERIL, AND THAT IF MR. ASHKER NEEDED

6  ANY LONG-TERM MEDICATION, IT WOULD BE TYLENOL.

7     HE TALKED ABOUT THE PROBLEMS WITH TRAMADOL.  AND HE

8  ALSO TALKED ABOUT THE FACT THAT THE BRACE WAS REALLY NOT FOR

9  THERAPEUTIC PURPOSES, BUT RATHER JUST FOR COMFORT.  SO, WE

10  BELIEVE THAT DR. DUNCAN IS A VERY CREDIBLE WITNESS.

11     MR. DODGEN, ALSO A VERY CREDIBLE WITNESS.

12  MR. ASHKER CALLED HIM.  YOU HEARD TIME AND TIME AGAIN

13  MR. ASHKER ESSENTIALLY RELYING UPON WHAT HE THOUGHT MR. DODGEN

14  WOULD SAY.

15     WHAT DID MR. DODGEN SAY?  HE CAME IN HERE AND HE

16  SAID, WE GAVE MR. ASHKER PHYSICAL THERAPY FOR FIVE YEARS.  I

17  PERSONALLY GAVE HIM PHYSICAL THERAPY FOR FIVE YEARS, 2002 TO

18  2007.  AND, YOU KNOW, FROM MY PERSPECTIVE AS A PHYSICAL

19  THERAPIST, IT WASN'T MEDICALLY INDICATED.  HE WAS GETTING MORE

20  THAN WHAT HE WOULD HAVE BEEN ENTITLED TO HAD HE BEEN IN THE

21  OUTSIDE WORLD, IS THE INFERENCE THAT ONE CAN DRAW FROM

22  MR. DODGEN'S TESTIMONY.

23     AND WHAT ELSE DID MR. DODGEN SAY?  HE SAID, WELL,

24  MR. ASHKER, YES, HE CAN -- IT WOULD BE NICE IF HE COULD STICK

25  HIS ARM IN A WHIRLPOOL, IN A NICE HOT WHIRLPOOL.  OTHERWISE,

1    WHAT MR. ASHKER COULD GET FROM PHYSICAL THERAPY, HE CAN DO ON

2    HIS OWN IN HIS CELL WITH HIS EQUIPMENT.  SO, WE BELIEVE

3    MR. DODGEN IS CREDIBLE.

4            DR. SHIN, IS HE CREDIBLE?  YES, HE IS CREDIBLE.

5    VERY BRIGHT, WELL TRAINED, AND SAID THAT DR. SAYRE MET THE

6    STANDARD OF CARE IN ALL RESPECTS.  HE SAID THAT TRAMADOL WAS

7    NOT REQUIRED BY THE STANDARD OF CARE AT ANY TIME IN THIS CASE.

8            DR. KREIS, ALSO A CREDIBLE WITNESS WHO SAID, YOU

9    KNOW, WE HAVE A BACKLOG HERE AT DAVIS, AND OUR RECORDS REFLECT

10   ONE OF TWO THINGS.  EITHER WE JUST SIMPLY COULDN'T SEE

11   MR. ASHKER BECAUSE OF A BACKLOG, IT IS ALSO POSSIBLE THAT WE

12   REVIEWED THE RECORDS AND DECIDED, YOU KNOW, HE WAS BEING GIVEN

13   EXCELLENT CARE AT PELICAN BAY AND THAT WE DIDN'T HAVE ANYTHING

14   MORE TO OFFER.

15           DR. FRIEDMAN, ALSO HONORABLE AND TRUSTWORTHY.

16   REMEMBER, UNFORTUNATELY, MR. ASHKER CALLED HIM A CLOWN.  YOU

17   CAN JUDGE WHETHER YOU THINK HE'S A CLOWN.  THE DEFENSE

18   CERTAINLY DOESN'T THINK HE'S A CLOWN.  HIGHLY EXPERIENCED IN

19   PAIN MANAGEMENT, SEEN MR. ASHKER FOUR TIMES.  WE WILL GO OVER

20   THE TIME LINE WHEN HE ACTUALLY SAW HIM, BUT –– AND EXPRESSED

21   CONCERNS ABOUT TRAMADOL.  OF COURSE, EVERY TIME HE EXPRESSED A

22   CONCERN ABOUT TRAMADOL, MR. ASHKER WAS UP IN ARMS.

23           AS MR. ASHKER HIMSELF SAID TODAY, HE, MR. ASHKER,

24   HAS AN ATTITUDE ABOUT THE DOCTORS AT PELICAN BAY, AND ONE COULD

25   DRAW THE INFERENCE ALL OF THE TREATERS AT PELICAN BAY, AND

1  INDEED ONE CAN DRAW THE INFERENCE FROM HIS COMMENTS AND

2  ARGUMENT THAT HE HAS BEEN UNHAPPY WITH HIS TREATMENT FOR 19

3  YEARS.  ESSENTIALLY UNHAPPY WITH ESSENTIALLY ALL OF THE MEDICAL

4  PROVIDERS IN ONE FASHION OR ANOTHER.

5         DR. SAYRE, IS HE CREDIBLE?  YES, HE IS.  HE IS BOARD

6  CERTIFIED IN TWO SPECIALTIES AND TOOK INTO ACCOUNT THE CLINICAL

7  PICTURE, HE TOOK INTO ACCOUNT THE OPINIONS OF HIS COLLEAGUES,

8  HE EXAMINED MR. ASHKER, AND THEN DECIDED, YOU KNOW, FOUR PLUS

9  YEARS IS ENOUGH.  WE'RE CONCERNED ABOUT THIS EXTENSIVE USE OF

10  THIS MEDICATION.  THERE ARE RISKS.  EVEN DR. WEINSTEIN ADMITTED

11  THERE ARE RISKS.  SO WE ARE GOING TO MAKE A CHANGE IN YOUR

12  REGIMEN.  AND WE WILL COME BACK TO DR. SAYRE.

13         DR. ROWE, MUCH LIKE DR. SAYRE.

14         DR. WINSLOW ALSO CREDIBLE.

15         AND, AGAIN, MS. MCLEAN AND MS. RISENHOOVER,

16  PARTICULARLY MS. RISENHOOVER CREDIBLE ABOUT EXPRESSING TO YOU

17  HER CONCERNS ABOUT MR. ASHKER'S DEPENDENCE OR ABUSE OR MISUSE

18  OF THIS MEDICATION.

19         SO, IF YOU ASK A SIMPLE QUESTION, WHO DO YOU TRUST,

20  WE BELIEVE THAT IT IS THE WITNESSES CALLED BY THE DEFENSE AND,

21  INDEED, MANY OF THE WITNESSES CALLED BY MR. ASHKER, THAT IS TO

22  SAY, DR. DUNCAN AND MR. DODGEN WHO SHOULD BE VIEWED AS

23  TRUSTWORTHY AND RELIABLE.

24         YOUR HONOR HAS TOLD YOU THAT IT'S THE PLAINTIFF'S

25  BURDEN TO PRODUCE CREDIBLE, RELIABLE, TRUTHFUL WITNESSES TO

1    PROVE THAT THERE WAS A BREACH OF THE STANDARD OF CARE OR THAT

2    THERE WAS DELIBERATE INDIFFERENCE, AND ALSO, WE ARE GOING TO

3    TALK ABOUT THIS MORE, THAT THERE WAS A CAUSATION BETWEEN THESE

4    ALLEGED PROBLEMS AND MR. ASHKER'S CONDITION.

5         ALL RIGHT.  THIS WAS MY MODEST ATTEMPT TO PREPARE A

6    TIME LINE.  IT TAKES US UP UNTIL 2001.

7         YOUR HONOR, MAY I ASK, WHAT TIME DID I START?

8         **THE COURT:**  11:10.

9         **MR. ANDRADA:**  SO I AM GOING TO MOVE FORWARD HERE.

10        THIS IS A TIME LINE.  LET'S GET TO THE YEAR 2002.

11        MY RECOLLECTION OF THE EVIDENCE, AND THIS IS

12   SOMETHING THAT YOU -- YOUR COLLECTIVE WISDOM WILL HAVE TO SHORT

13   OUT, BUT MY RECOLLECTION OF THE EVIDENCE IS THIS.  WE KNOW HE

14   GOT TRAMADOL IN JANUARY 2002, SO I BEGIN THEN.

15        MY RECOLLECTION IS THAT HE STARTED -- HE EITHER WAS

16   ON PHYSICAL THERAPY OR STARTED ON PHYSICAL THERAPY WITH

17   MR. DODGEN IN EARLY 2002, SO I PUT FEBRUARY HERE ON MY TIME

18   LINE.

19        HE ALREADY HAD THE BRACE.  AND WITH REGARD TO THE

20   BRACE, THERE IS EVIDENCE THAT IT FITS SOMETIMES AND IT DOESN'T

21   FIT.  AND THEN IT MIGHT FIT AGAIN, BUT, AGAIN, IF ONE RECALLS

22   DR. DUNCAN'S TESTIMONY, REMEMBER DR. DUNCAN LAST SAW THE

23   PLAINTIFF IN MARCH OF 2002, EVEN THIS EARLY THE BRACE WAS NOT

24   FOR THERAPY, BUT RATHER FOR COMFORT.

25        NOW, MR. ASHKER SETTLES ONE OF HIS 15 CASES IN MAY

CLOSING ARGUMENT – MR. ANDRADA

1   OF 2002.  HE'S THEN SEEN BY DR. FRIEDMAN IN JUNE AND SEPTEMBER,

2   HAND SPECIALIST, SENT TO DAVIS IN OCTOBER, SENT TO DAVIS IN

3   DECEMBER, AND WE HAVE ALREADY COMMENTED ON THE EVIDENCE WITH

4   REGARD TO UC DAVIS.

5         THERE'S A VERY INTERESTING NOTE THAT WE SUGGEST NEED

6   NOT BE FORGOTTEN, SHOULD NOT BE FORGOTTEN.  DR. WEINSTEIN IN

7   ONE OF HIS FOUR CONSULTATIONS OVER NINE YEARS WITH MR. ASHKER

8   SAW -- REPORTED THAT HE HAD SEEN MR. ASHKER IN DECEMBER OF

9   2002.  THE PLAINTIFF REPORTED THAT HE WAS WIRED ON HIS MEDS.

10         AND REMEMBER MR. ASHKER HIMSELF MENTIONED THAT IN

11   HIS OWN, I BELIEVE, ON HIS OWN DIRECT EXAMINATION.  SO, THROUGH

12   THE FIRST YEAR WE HAVE MR. ASHKER RECEIVING TRAMADOL, GETTING

13   PT AND BEING SEEN BY DR. FRIEDMAN WHO CERTAINLY IS QUALIFIED TO

14   RENDER OPINIONS ABOUT PAIN MANAGEMENT CARE.

15         2003, AGAIN, IN THE INTEREST OF TIME, WE ARE GOING

16   TO MOVE THROUGH THIS VERY QUICKLY.  DR. FRIEDMAN SAW HIM AGAIN

17   IN JANUARY AND FEBRUARY.  THEN WE HAVE A REFUSAL IN 2003 TO GO

18   TO THE HOSPITAL IN MANTECA TO BE SEEN BY A PAIN MANAGEMENT

19   SPECIALIST.

20         WHAT WAS THE PROFFERED REASON?  IF I UNDERSTOOD IT,

21   AND I MUST SAY IT WAS NOT A MODEL OF CLARITY, I THINK

22   MR. ASHKER WAS TRYING TO SAY, AND THERE ARE SOME RECORDS IN

23   EVIDENCE THAT TRY TO SUGGEST THIS, THAT HIS PROPERTY HAD BEEN

24   SEIZED, PERSONAL PROPERTY HAD BEEN SEIZED BY THE FEDERAL

25   AUTHORITIES, AND THAT SOMETIME WAS GOING TO BE RETURNED TO HIM

1    IN THIS MAY AND JUNE TIME FRAME.

2              2004, AGAIN, IN THE INTEREST OF TIME REALLY NOT TOO

3    MUCH GOING ON IN THE CASE.  HE CONTINUED THE SAME REGIMEN.

4              2005, I PUT VARIOUS COMPLAINTS.  THERE IS SOMETHING

5    THAT IS VERY CLEAR AND WE MENTIONED THIS IN OUR OPENING

6    STATEMENT, AND THAT WAS THAT MR. ASHKER HAD MANY OF THESE

7    PROBLEMS, COMPLAINTS ABOUT THE PAIN MEDICATION, SLEEPLESSNESS

8    ON AND ON, HAD THEM BEFORE 2002, HAD THEM DURING THE TIME HE

9    WAS TAKING TRAMADOL, HE HAS COMMENTED ON THAT.  THERE IS

10   EVIDENCE TO THAT EFFECT.  AND THEY CONTINUE THEREAFTER, AFTER

11   TRAMADOL WAS DROPPED.

12             AND THIS WAS ALL DURING THE TIME THAT HE WAS GETTING

13   PHYSICAL THERAPY ONE DAY A WEEK OR TWO DAYS A WEEK AND HAD HIS

14   BAND AND HIS BALL, COULD WORK OUT, WAS DOING PUSH-UPS, AND SO

15   FORTH.

16             AND SO DR. SAYRE COMES IN JANUARY OF 2005.  IN 2005

17   DR. SAYRE DOES NOT SEE MR. ASHKER.  HE, IN FACT, IS MANAGING

18   THE CLINIC.  DR. ROWE IS SEEING MR. ASHKER.  DR. ROWE SAYS, YOU

19   KNOW, I'VE GOT CONCERNS FOR YOU, MY PATIENT, ABOUT TRAMADOL.

20   THE PLAINTIFF'S RESPONSE?  DR. ROWE IS ANTAGONISTIC, SHE'S GOT

21   AN ATTITUDE.

22             WE SUGGEST THAT, AGAIN UNFORTUNATELY, IT SEEMS THAT

23   EVERY ONE OF THE TREATERS IN MR. ASHKER'S MIND HAS AN ATTITUDE

24   AGAINST HIM.  YOU RECALL THE COMMENT ABOUT DR. FRIEDMAN, THAT

25   HE WAS A CLOWN, AND THERE WAS ANTAGONISM BETWEEN

CLOSING ARGUMENT — MR. ANDRADA

 1   MS. RISENHOOVER AND THE PLAINTIFF THEREAFTER.

 2              ALL RIGHT.  AGAIN, IN THE INTEREST OF TIME, WE ARE

 3   GOING TO GO, SKIP FORWARD UNTIL AUGUST OF 2006 WHEN THE MAR

 4   COMMITTEE MEETS, DECIDES TO TAKE MR. ASHKER OFF THE MEDICATION,

 5   TRY SOMETHING DIFFERENT.

 6              WAS IT REASONABLE?  THE ANSWER IS YES.  THAT'S

 7   ESSENTIALLY ALL IT HAS TO BE.  A DOCTOR, WE TALKED ABOUT THIS

 8   IN OPENING, THERE'S PLENTY OF TESTIMONY ABOUT THIS.  ONE DOCTOR

 9   MAY DISAGREE WITH ANOTHER DOCTOR ABOUT HOW TO MANAGE A PATIENT

10   WITH CHRONIC PAIN.  SOME DOCTORS MAY NOT USE TRAMADOL AT ALL.

11   SOME DOCTORS MAY USE IT AT ONE POINT IN THEIR CAREER, LIKE

12   DR. DUNCAN, AND THEN BECOME MORE CONCERNED ABOUT IT AS TIME

13   GOES BY.

14              SO THE POINT IS THAT REASONABLE MINDS CAN DIFFER.

15   AND ONE OF THE INSTRUCTIONS THAT HER HONOR READ TO YOU

16   ESSENTIALLY SAYS AS MUCH.  DR. SAYRE HAS A BAD ATTITUDE, WE

17   KNOW THAT THE TRAMADOL WAS REPLACED IN SEPTEMBER 2006.  THE PT

18   ENDS IN FEBRUARY, MARCH OF 2007.  AND WE HAVE ALREADY TALKED

19   ABOUT MR. DODGEN'S TESTIMONY IN THAT REGARD.

20              THEN I PUT THIS NOTE HERE.  MR. ASHKER SAYS, SINCE I

21   NO LONGER HAVE THE TRAMADOL, SINCE I DON'T HAVE THE PT AS MUCH,

22   I CAN'T SLEEP, I HAVE PAIN, I HAVE GI PROBLEMS, CAN'T FOCUS.

23   WELL, WHAT DO YOU THINK?  WAS HE FOCUSED IN COURT?  WE SUGGEST

24   THAT HE WAS.  AND DID HE EVIDENCE ANY INDICATION OF SOME

25   PROBLEM WITH SLEEP?  WE SUGGEST THAT HE DID NOT.  SO WE SUGGEST

 1  TO YOU THAT, IN FACT, HE DOES PERFORM HIS DAILY FUNCTIONS MUCH

 2  LIKE A PERSON JUST LIKE ANY AND ALL OF US.

 3          NOW, THE BREACH -- LET'S TALK ABOUT THE MALPRACTICE.

 4  AND, AGAIN, THIS IS IN REGARDS TO DR. SAYRE, AND THE QUESTION

 5  IS:  DID HE FALL BELOW THE STANDARD OF CARE?  AND THE ANSWER TO

 6  THAT QUESTION IS NO.

 7          STATED IN THE POSITIVE, DID HE MEET THE STANDARD OF

 8  CARE?  YES.

 9          WE TALKED ABOUT THE TRAMADOL.  THE PT, THE ENDING OF

10  THE PT IN FEBRUARY, MARCH OF 2007 IN CONSULTATION WITH

11  MR. DODGEN.  I THINK THERE WAS EVIDENCE THAT IT WAS IN

12  CONSULTATION WITH SOME OF THE OTHER PROVIDERS AT PELICAN BAY.

13          THERE WAS A LOT OF TALK ABOUT DR. SAYRE NOT GIVING

14  MR. ASHKER THE BALL AND THE BAND.  MY RECOLLECTION OF THE

15  EVIDENCE IS THAT, IN FACT, HE ALWAYS HAD THE BALL AND BAND FROM

16  THE TIME DR. SAYRE CAME TO PELICAN BAY IN JANUARY OF 2005.

17          THE BRACE, AGAIN, THERE IS EVIDENCE THAT IT FIT AT

18  SOME TIME, THAT IT DID NOT FIT REAL CLOSELY AT OTHER TIMES,

19  BUT, AGAIN, IT IS REALLY JUST -- IT IS NOT A THERAPEUTIC

20  DEVICE.

21          SO, WE HAVE TALKED ABOUT THE THEORIES AGAINST

22  DR. SAYRE.  NOW, EVEN IF ANY OF THOSE THEORIES WERE TRUE,

23  MR. ASHKER MUST THEN PROVE CAUSATION AND DAMAGES.  AND SO WE

24  SUGGEST THIS.

25          LET'S ASSUME THAT THERE WAS A BREACH BY DR. SAYRE.

1   WHAT EVIDENCE IS THERE THAT IT CAUSED THE PLAINTIFF ANY HARM?

2   THERE IS NO SPECIFIC EVIDENCE THAT HE WOULD HAVE -- THAT HE WAS

3   HARMED BY WHAT DR. SAYRE DID.  THERE'S NO, FOR EXAMPLE, LET ME

4   EXPLAIN WHAT I MEAN.

5          THERE IS, THERE WAS NO EVIDENCE FROM ANY MEDICAL

6   PROVIDER, FOR EXAMPLE, THAT THE PHYSICAL THERAPY, THAT HAD HE

7   GOTTEN TWO MORE SESSIONS OF PHYSICAL THERAPY FOR THE PAST TWO

8   YEARS THAT MEDICALLY IT WOULD HAVE MADE SOME DISCERNIBLE

9   DIFFERENCE IN THE PATIENT'S CARE STATUS.  SO, AGAIN,

10  MR. ASHKER, WE SUGGEST, HAS FAILED TO MEET HIS BURDEN WITH

11  REGARD TO CAUSATION EVEN IF THERE WAS A BREACH.

12         DAMAGES, MONEY DAMAGES, WE WILL TALK ABOUT THAT A

13  LITTLE BIT LATER.

14         YOUR HONOR, I STARTED AT 10:50; IS THAT CORRECT?

15         **THE COURT:**  NO.  11:10.

16         **MR. ANDRADA:**  I'M A LITTLE BIT SHY OF A HALF HOUR

17  THEN.

18         **THE COURT:**  CORRECT.

19         **MR. ANDRADA:**  IN ASSESSING WHETHER THERE WAS A

20  BREACH OF THE STANDARD OF CARE, OF COURSE, MR. ASHKER MUST RELY

21  UPON THE TESTIMONY OF DR. WEINSTEIN.

22         WE HAVE ALREADY TALKED ABOUT MOST OF WHAT IS ON THIS

23  PAGE, SO I AM NOT GOING TO GO THROUGH IT ALL AGAIN IN GREAT

24  DETAIL, BUT WE ASK THAT YOU CONSIDER HIS CREDENTIALS, MORE

25  PRECISELY THE LACK THEREOF.  THAT HE HAS NEVER PRESCRIBED THE

1    DRUG, NEVER WORKED IN A PRISON.  OBVIOUSLY BIASED AND

2    PREJUDICED IN FAVOR OF PRISONERS AND AGAINST HEALTH CARE

3    PROVIDERS.

4            AND HERE IS SOMETHING I THOUGHT WAS INTERESTING.

5    DR. WEINSTEIN SAID, WELL, THE STANDARD OF CARE DOESN'T REQUIRE

6    TRAMADOL, BUT, YOU KNOW, HE NEVER SAID WHAT THE STANDARD OF

7    CARE WOULD HAVE REQUIRED IF NOT TRAMADOL.

8            IN OTHER WORDS, THERE IS NO MEDICATION THAT IS A

9    PANACEA.  DR. DUNCAN TOLD US THIS.  MANY OF THE OTHER EXPERTS

10   TOLD US.  THERE IS NO PAIN MEDICATION THAT DOES NOT HAVE

11   SIGNIFICANT SIDE EFFECTS.

12           AND SO THERE IS A FAILURE OF THE PLAINTIFF IN TERMS

13   OF HIM MEETING HIS BURDEN OF PROOF FOR DR. WEINSTEIN TO SAY,

14   WELL, IT DOESN'T HAVE TO BE TRAMADOL, BUT I REALLY DON'T HAVE A

15   COURSE OF THERAPY THAT WOULD HAVE BEEN -- THAT WOULD HAVE

16   WORKED, WHATEVER THAT MEANS, BECAUSE WE ARE TALKING ABOUT, OF

17   COURSE, SUBJECTIVE PAIN, AND WOULD NOT HAVE RESULTED IN

18   EXPOSURE TO SOME SIDE EFFECT.

19           AND, OF COURSE, IF DR. SAYRE HAD KEPT MR. ASHKER ON

20   TRAMADOL AND MR. ASHKER HAD SEIZED, OR OTHERWISE DEVELOPED A

21   SIDE EFFECT OR A COMPLICATION, IT IS EASY TO IMAGINE THE

22   PLAINTIFF COMING INTO THE COURTROOM HERE AND SAYING, WELL, YOU

23   KNOW, THEY SHOULD HAVE TAKEN ME OFF THE MEDICATION.  AND EVEN

24   THOUGH I WANTED IT AND DEMANDED IT AND INSISTED UPON IT BY

25   NAME, THEY SHOULD HAVE KNOWN BETTER.  THEY ARE THE EXPERTS.

1          THEY ARE THE EXPERTS, WE SUGGEST, AND THEY MADE A

2    DECISION BASED UPON THEIR EDUCATION, TRAINING, AND EXPERIENCE,

3    A DECISION THAT WAS REASONABLE.

4          ALL RIGHT.  YES, THIS IS, AGAIN, DR. WEINSTEIN.

5    FROM OUR POINT OF VIEW, THE DEFENSE POINT OF VIEW, OUR CONCERN

6    THAT DR. WEINSTEIN FAILED TO EXPLAIN WHAT WOULD HAVE HAPPENED

7    ON OTHER MEDS.  WHAT WOULD HAVE BEEN THE SPECIFIC OUTCOME IF

8    MR. ASHKER HAD BEEN GIVEN MORE PT?  WHAT WOULD HAVE BEEN THE

9    SPECIFIC OUTCOME IF HE HAD BEEN GIVEN AN ARM BRACE THAT

10   MR. ASHKER WAS HAPPY WITH?

11         DR. DUNCAN, WE TALKED ABOUT THIS ALREADY, BUT WHAT

12   WE DID, WE HAD THE REPORTER ACTUALLY TYPE UP A LITTLE BIT OF

13   DR. DUNCAN'S TESTIMONY.  I WANT TO -- CAN I TAKE YOU THROUGH

14   THIS VERY CAREFULLY IF WE CAN.

15         THIS IS WHAT DR. DUNCAN SAID.

16         "IN GENERAL, I WOULD NOT RECOMMEND LONG-TERM

17         MEDICATION FOR YOUR CONDITION BECAUSE YOU WILL

18         HAVE CHRONIC DISCOMFORT.  AND THE USE OF

19         MEDICATION INDEFINITELY WOULD BE ASSOCIATED WITH

20         AN INCREASING RISK OF A SIDE EFFECT."

21         SO WHETHER IT'S A BRACE OR MEDICATION, IT WOULD BE

22   FOR BRIEF PERIODS OF FLAREUP, BUT NOT INTENDED AS A PERMANENT

23   TREATMENT.

24         AGAIN, DR. DUNCAN.

25         "IF THERE WERE A PERFECT MEDICATION WITH NO SIDE

1          EFFECTS, THEN, YES, YOU SHOULD BE ON THAT

2          MEDICINE.  BUT THE REALITY IS THERE IS NO SUCH

3          MEDICATION.  THERE ARE NUMEROUS COMPLICATIONS.

4          THE IDEA BEHIND THE BRACE IS INTERMITTENT USE,

5          BUT NOT SOMETHING THAT YOU USE EVERY DAY OR EVEN

6          LONG TERM, IF POSSIBLE.  THE BRACE IS FOR

7          COMFORT, BUT IT'S NOT TREATING ANY SPECIFIC

8          CONDITION THAT REQUIRES THE BRACE."

9          THEN THESE ARE DR. DUNCAN'S COMMENTS ABOUT TRAMADOL

10   AND THAT HE HAS SHIED AWAY FROM IT IN THE RECENT PAST.  AND

11   THIS COMMENT, THOUGH, NEEDS TO BE STATED AGAIN.

12          "MY PERSONAL OPINION IS FOR CHRONIC PAIN, I

13          WOULD AVOID, IF POSSIBLE, ANY MEDICATION.  THE

14          SAFEST, IF IT IS ABSOLUTELY NECESSARY, WOULD BE

15          TYLENOL."

16          AND THEN ONE MORE COMMENT WITH REGARD TO THE BRACE.

17          "I WOULDN'T WANT YOU TO BE LIVING IN IT 24-7.

18          ONCE THE BONES ARE HEALED AND SOLID, THEN

19          ROUTINE BRACE USE FOR PROTECTION IS NOT

20          RECOMMENDED."

21          ALL RIGHT.  THIS IS MR. DODGEN.  WE HAVE ALREADY

22   TALKED ABOUT HIS COMMENTS ABOUT THE PT.

23          DR. SHIN, AGAIN, IN THE INTEREST OF TIME HERE, WE

24   HAVE ALREADY COMMENTED UPON HIM EXPRESSING HIS OPINION; THAT

25   THERE WAS NEVER A BREACH OF THE STANDARD OF CARE BY DR. SAYRE.

CLOSING ARGUMENT – MR. ANDRADA

1        MORE ABOUT TRAMADOL.  WITH REGARD TO THE PT, WE DO

2   NEED TO MENTION ONE IMPORTANT FACT.  WE HAVE ALREADY COMMENTED

3   ON DR. SAYRE AND MR. DODGEN AGREES THAT IT SHOULD END.

4        REMEMBER ALSO, HOWEVER, THAT IT WAS THE PLAINTIFF

5   WHO BROUGHT THE MATTER TO A HEAD BY FAILING TO SHOW FOR HIS

6   EXAM SESSIONS AND THUS VIOLATING THE RULE THAT IF YOU DON'T

7   SHOW UP, YOU ARE NOT GOING TO BE GIVEN ANY MORE TREATMENT.

8        NOW, THE BRACE.  HE'S HAD BRACES FOR YEARS.  IF I

9   RECALL THE TESTIMONY, IT WAS DR. DUNCAN WHO ACTUALLY WAS THE

10  ORIGINAL PRESCRIBER OF THE BRACE, AND THUS DR. DUNCAN, WITH

11  RESPECT TO HIS OPINIONS ABOUT WHAT IT WAS NEEDED FOR AND

12  WHETHER IT WOULD BENEFIT THE PLAINTIFF SHOULD BE GIVEN A GREAT

13  DEAL OF CREDENCE, WE BELIEVE.

14       DR. SAYRE NEVER TOOK THE BRACE AWAY, AND SO THERE

15  ARE ALLEGATIONS, WELL, WE DIDN'T FIX THE BRACE, AND IT DIDN'T

16  ALWAYS FIT RIGHT, WELL, HE, IN FACT, HE COULD ALWAYS WEAR IT

17  DURING THIS TIME FOR WHAT IT WAS REALLY NEEDED FOR, AND THAT IS

18  TO SAY COMFORT.

19       SO, EVEN IF DR. SAYRE SOMEHOW BREACHED THE STANDARD

20  OF CARE IN CONNECTION WITH HIS BRACE BY NOT MAKING SURE THAT

21  DURING THOSE FOUR YEARS NOW THAT MR. ASHKER HAS BEEN ONE OF THE

22  PATIENTS FOR WHOM HE HAS RESPONSIBILITY, ONE OF THE 3500

23  PATIENTS FOR WHOM HE HAS RESPONSIBILITY, THERE IS NO EVIDENCE

24  THAT ANY FAILURE ON THE PART OF DR. SAYRE WITH REGARD TO THE

25  BRACE ACTUALLY CAUSED MR. ASHKER ANY INJURY.

```
 1        THE BAND AND BALL WE DON'T NEED TO TALK ABOUT

 2   ANYMORE.

 3        NOW, THE JURY VERDICT FORM, DO WE HAVE IT?  RIGHT

 4   HERE.  HERE WE GO.  HER HONOR READ YOU THE JURY VERDICT FORM

 5   AND I WANT TO JUST GO OVER IT VERY BRIEFLY WITH YOU.

 6        WE BELIEVE, THE DEFENSE BELIEVES THAT FOR PURPOSES

 7   OF THE MEDICAL CLAIMS, THE MALPRACTICE AND THE DELIBERATE

 8   INDIFFERENCE, THAT YOU REALLY NEED ONLY ANSWER THE FIRST

 9   QUESTION.  AND THAT IS:  WAS DR. SAYRE NEGLIGENT IN HIS

10   TREATMENT OF THE PLAINTIFF?  WE BELIEVE THE ANSWER IS NO.

11        ON THE VERDICT FORM IT WILL SPECIFICALLY TELL YOU

12   THAT IF YOU SAY NO, THEN YOU SKIP OVER VARIOUS QUESTIONS,

13   INCLUDING THE QUESTIONS WITH REGARD TO DELIBERATE INDIFFERENCE

14   AND THEN PROCEED DOWN TO A QUESTION ABOUT THE BREACH OF

15   CONTRACT.

16        NOW, IT IS POSSIBLE, I DON'T THINK THE EVIDENCE

17   WOULD WARRANT IT, BUT YOU MIGHT DISAGREE WITH ME AND SAY, WELL,

18   YOU KNOW, WE DO THINK THAT HE BREACHED THE STANDARD OF CARE AND

19   THAT IT CAUSED SOME INJURY.

20        THE VERDICT FORM THEN SAYS THAT YOU MUST THEN

21   ADDRESS THE QUESTION OF DELIBERATE INDIFFERENCE.  AND IT IS

22   QUESTION NUMBER THREE ON THE FORM.  AND HER HONOR HAS

23   INSTRUCTED YOU ABOUT WHAT DELIBERATE INDIFFERENCE IS.  IF I MAY

24   PARAPHRASE, IT REALLY AMOUNTS TO SOMETHING LIKE THIS:  WAS

25   DR. SAYRE CAVALIER, VINDICTIVE, OR DID HE DEMONSTRATE ILL WILL
```

1    OR SPITE TOWARDS MR. ASHKER.

2           **THE COURT:**  COUNSEL, THAT'S IN THE PUNITIVE DAMAGE

3    INSTRUCTION.

4           FOR DELIBERATE INDIFFERENCE, THERE IS NO REQUIREMENT

5    OF MALICIOUSNESS OR SPITE.  YOU BETTER SHOW ME THAT PAPER.

6           **MR. ANDRADA:**  IT SAYS --

7           **THE COURT:**  WHY DON'T YOU TURN IT.

8           **MR. ANDRADA:**  SURE.

9           **THE COURT:**  THE CAVALIER, ILL WILL AND SPITE, THAT'S

10   WHAT IS REQUIRED TO FIND PUNITIVE DAMAGES.  THAT IS NOT

11   REQUIRED TO FIND DELIBERATE INDIFFERENCE.

12          **MR. ANDRADA:**  ALL RIGHT, YOUR HONOR.  I WAS TRYING

13   TO PARAPHRASE IT.

14          **THE COURT:**  THOSE WORDS ARE SPECIFICALLY USED IN THE

15   PUNITIVE DAMAGES INSTRUCTION, BUT NOT IN THE DELIBERATE

16   INDIFFERENCE INSTRUCTION.

17          GO AHEAD.

18          WHY DON'T YOU TURN THE PAGE.  WOULD YOU?

19          **MR. ANDRADA:**  YES, YOUR HONOR.

20          I WAS GOING TO FINISH UP WITH DELIBERATE

21   INDIFFERENCE.

22          IS THERE EVIDENCE OF DELIBERATE INDIFFERENCE?  NO.

23          IS THERE EVIDENCE TO SUPPORT PUNITIVE DAMAGES?  NO,

24   NO, NO.  THERE IS NO EVIDENCE OF ILL WILL OR SPITE OR MALICE

25   ANY OF THOSE INAPPROPRIATE ATTITUDES ON THE PART OF DR. SAYRE.

1      ALL RIGHT.  BREACH OF CONTRACT.

2      YOUR HONOR, I HAVE ANOTHER 20 MINUTES I THINK; IS

3  THAT CORRECT?

4      **THE COURT:**  YES.

5      **MR. ANDRADA:**  I AM DOING FINE.

6      ALL RIGHT.  BREACH OF CONTRACT.  HER HONOR HAS

7  INSTRUCTED YOU THAT THE COURT BELIEVES THAT THE CDCR BREACHED

8  THE CONTRACT.  SO NOW WE ARE GOING TO TALK ABOUT THE CDCR.

9      HER HONOR INSTRUCTED YOU THAT EACH DEFENDANT IS

10  ENTITLED TO HIS OWN CONSIDERATION, HIS OWN DAY IN COURT, IF YOU

11  WILL.  SO, THE ACTIVITY OF THE CDCR, THE STATE OF CALIFORNIA,

12  MR. CATE, WITH REGARD TO THE CONTRACT IS A SEPARATE MATTER FROM

13  THE ALLEGATIONS AGAINST DR. SAYRE.

14      NOW, JUST SO WE ARE CLEAR, I AM NOT GOING TO ARGUE

15  ABOUT WHETHER THERE WAS A BREACH.  HER HONOR HAS INSTRUCTED YOU

16  THAT THERE IS.  AS YOU MIGHT IMAGINE, WE DISAGREE, BUT THAT IS

17  FOR ANOTHER DAY.  THAT IS NOT WHAT IS BEFORE US RIGHT NOW.

18      I AM GOING TO TALK ABOUT WHETHER THAT BREACH CAUSED

19  MR. ASHKER ANY HARM.  AND WE BELIEVE THAT IT DID NOT.  THERE IS

20  NO -- FOR EXAMPLE, LET US ASSUME, LET US ASSUME THAT

21  MR. ASHKER -- EXCUSE ME, LET'S ASSUME CDCR KEPT POUNDING THE

22  DOOR OF DAVIS SAYING YOU'VE GOT TO SEE HIM, YOU'VE GOT TO SEE

23  HIM.  FINALLY AFTER THE TWO REFUSALS, DAVIS RELENTS AND SAYS,

24  ALL RIGHT, WE WILL SEE HIM.  THERE IS NO EVIDENCE AS TO WHAT

25  THE SPECIALIST AT UC DAVIS WOULD HAVE DONE WITH REGARD TO

1    MR. ASHKER'S TREATMENT PLAN HAD HE BEEN SEEN AT UC DAVIS.

2         WE SUGGEST THAT THE PLAINTIFF HAS FAILED IN HIS

3    BURDEN OF PROOF.  HE HAD EVERY OPPORTUNITY TO ASK DR. KREIS OR

4    SOME OTHER PHYSICIAN AT DAVIS WHAT WOULD HAVE BEEN YOUR

5    APPROACH TO MY CASE IN 2002 OR EARLY 2003, AND THERE WAS NO

6    SUCH TESTIMONY.

7         WE SUGGEST THAT THERE IS NO REASONABLE INFERENCE

8    THAT CAN BE DRAWN FROM THE OTHER EVIDENCE WITH REGARD TO WHAT

9    UC DAVIS WOULD HAVE DONE IN 2002 WITH REGARD TO HIS PAIN

10   MANAGEMENT.  AND, IN FACT, IN 2002 WE KNOW THAT HE WAS STILL

11   GETTING TRAMADOL, HE WAS GETTING PT, AND THAT HE HAD HIS BAND

12   AND BALL, IF I RECALL THE EVIDENCE CORRECTLY, AND THAT HE DID

13   HAVE HIS BRACE.

14        SO, TO SUGGEST THAT SOMEHOW THE FAILURE TO SEND HIM

15   TO DAVIS TO FINALLY CONVINCE DAVIS TO SEE HIM SOMEHOW DAMAGED

16   THE PLAINTIFF IS NOT SUPPORTED BY THE EVIDENCE.  AND IT IS

17   MR. ASHKER'S BURDEN TO PROVE HIS CASE.

18        SO OUR COMMENTS WOULD BE THE SAME WITH REGARD TO THE

19   PHYSICAL THERAPY.  THE FACT THAT THERE REALLY IS NO EVIDENCE OF

20   DAMAGE IN 2002, 2003, AND '04, SO FORTH BY VIRTUE BY NOT HAVING

21   PHYSICAL THERAPY, THE EVIDENCE, IF I RECALL MR. DODGEN'S

22   TESTIMONY WAS, HE WAS GETTING PHYSICAL THERAPY DURING THOSE

23   YEARS.

24        AGAIN, WITH REGARD TO THE BRACE, WE BELIEVE THAT ONE

25   PROBABLY LOOKED TO DR. DUNCAN'S VIEW THAT THE BRACE IS REALLY

1    FOR COMFORT AS OPPOSED TO PART OF SOME THERAPEUTIC REGIMEN.  SO

2    WE SUGGEST THAT THE ALLEGED BREACH OF CONTRACT ON THE PART OF

3    MR. CATE, CDCR DID NOT CAUSE THE PLAINTIFF ANY INJURY.

4             ALL RIGHT.  I THINK I COVERED ALL OF THAT.

5             SO, LADIES AND GENTLEMAN OF THE JURY, WHO DO YOU

6    TRUST?  THE PLAINTIFF, MR. TROXELL AND DR. WEINSTEIN OR DO YOU

7    TRUST DR. DUNCAN, MR. DODGEN, DR. SHIN, DR. FRIEDMAN AND

8    DR. SAYRE?  AND I LIST ONLY THOSE BECAUSE THEY SEEM TO HAVE

9    BECOME THE MOST PROMINENT PLAYERS IN THE CASE.

10            THE ANSWER IS OBVIOUS.  THE ONES THAT I HAVE

11   MENTIONED IN THE SECOND GROUP ARE CLEARLY THE MOST RELIABLE,

12   THE MOST TRUSTWORTHY, THE ONES WHO WE BELIEVE THAT YOU SHOULD

13   RECOGNIZE TO BE THE MOST CREDIBLE WITNESSES IN THE CASE.

14            THE PLAINTIFF HAS SPENT QUITE A BIT OF TIME ARGUING

15   THAT HE HAS THE RIGHT TO A CERTAIN LEVEL OF CARE, HE HAS A

16   RIGHT TO BRING LAWSUITS, AND HE HAS OVER THE YEARS, AND A RIGHT

17   TO BRING 602'S, AND HE HAS THAT RIGHT UNDER CERTAIN

18   CIRCUMSTANCES.  HE HAS THOSE RIGHTS.  IF YOU WILL, SORT OF LIKE

19   A BENEFIT.  WE ALL HAVE, I GUESS, BENEFIT OF BEING ABLE TO FILE

20   A LAWSUIT, BUT THERE IS A BURDEN HERE.  HE HAS A BURDEN WITH

21   THIS BENEFIT.  AND IT'S CALLED THE BURDEN OF PROOF.

22            AND WE SUGGEST TO YOU THAT HE HAS FAILED TO MEET HIS

23   BURDEN OF PROOF WITH REGARD TO DR. SAYRE, AND FAILED TO MEET

24   HIS BURDEN OF PROOF WITH REGARD TO THE STATE OF CALIFORNIA,

25   MR. CATE BY VIRTUE OF THE BREACH OF CONTRACT.

1        IF, HOWEVER, YOU FIND THAT YOU DISAGREE WITH THE

2    DEFENSE AND THAT DR. SAYRE CAUSED THE PLAINTIFF SOME INJURY, WE

3    SUGGEST THAT THAT INJURY SHOULD BE WORTH IN DOLLARS THE SUM OF

4    $1,000.  LIKEWISE, IF YOU BELIEVE THAT THE STATE HAS HARMED

5    MR. ASHKER BY VIRTUE OF THE BREACH OF CONTRACT, THAT WOULD BE

6    WORTH $1,000.

7        SO, MR. ASHKER HAS HAD HIS CHANCE, BROUGHT IN

8    EXPERTS, HE HAS PUT ON WITNESSES, HE HAD EXECUTIVES OF THE CDCR

9    TESTIFY, HE HAD PRIOR TREATERS TESTIFY, HE'S HAD HIS DAY IN

10   COURT.  BUT HE HAS FAILED IN HIS BURDEN OF PROOF.

11       THE DEFENSE, MORE SPECIFICALLY DR. SAYRE, IS

12   ENTITLED TO A DEFENSE VERDICT.  WE BELIEVE THAT HE HAS FAILED

13   TO SHOW THAT HE HAS BEEN DAMAGED BY THE ALLEGED BREACH OF

14   CONTRACT, BUT IF HE HAS BEEN, THEN YOU ALREADY HAVE OUR

15   THOUGHTS ABOUT THE VALUE OF THAT CLAIM.

16       THANK YOU VERY MUCH FOR YOUR TIME.  WE, SPEAKING ON

17   BEHALF OF THE DEFENDANTS, WE APPRECIATE VERY MUCH YOUR COURTESY

18   AND YOUR ATTENTIVENESS.  THANK YOU VERY MUCH.

19       THANK YOU, YOUR HONOR FOR YOUR COURTESY.

20       **THE COURT:**  YOU HAVE RESERVED FIVE MINUTES.

21       **MR. ASHKER:**  FIVE MINUTES?  CAN I GO OVER TO THE

22   OTHER SIDE REAL QUICK?

23       **THE COURT:**  THAT'S FINE.

24                 REBUTTAL CLOSING ARGUMENT

25       **MR. ASHKER:**  VERY BRIEFLY, AND IN RESPONSE TO THE

1    DEFENDANTS' CLOSING, THERE HAS BEEN REFERENCES SEVERAL TIMES TO

2    THE NUMBER OF LAWSUITS I HAVE FILED OVER THE YEARS.

3            I NEVER REALLY MENTIONED THAT, IF YOU WILL RECALL,

4    BECAUSE IT WASN'T ACTUALLY RELEVANT TO THIS CASE OTHER THAN MY

5    SETTLEMENT AGREEMENT.  AND THE COURT SPECIFICALLY SAID I WAS

6    NOT TO BRING UP SPECIFICS OF ANY OF THAT.  I FILE LAWSUITS

7    CHALLENGING WHAT I BELIEVE SERIOUS PRISON CONDITIONS OF

8    CONFINEMENT LIKE, FOR INSTANCE --

9            **THE COURT:**  I THINK THAT WE SHOULD STRIKE THE

10   REFERENCE REALLY FROM THE CLOSING ARGUMENT.

11           **MR. ASHKER:**  HE BROUGHT IT UP NUMEROUS TIMES, YOUR

12   HONOR.  I AM FINE NOT EVEN TALKING ABOUT IT THOUGH.

13           **THE COURT:**  THE OTHER -- YOU HAVE NO INFORMATION

14   ABOUT OTHER, THESE OTHER THINGS.  WE CAN TELL YOU ALL ABOUT

15   THEM, IT WOULD TAKE A LOT OF TIME, SO YOU REALLY SHOULD NOT

16   CONSIDER THEM.

17           THE ONE THAT'S RELEVANT IS THE PRIOR LAWSUIT THAT

18   LED TO THE SETTLEMENT AGREEMENT.  AND OTHER THAN THAT, I WISH

19   YOU WOULD DISREGARD COUNSEL'S REFERENCE TO HOW MANY THERE WERE,

20   YOU DON'T KNOW WHETHER THOSE WERE MERITORIOUS OR WEREN'T

21   MERITORIOUS, IT'S BEST NOT TO HAVE TO GO INTO THEM AT LENGTH.

22           **MR. ASHKER:**  OKAY.

23           THEY SAY THAT DR. DUNCAN WAS A CREDIBLE WITNESS, AND

24   I AGREE.  THE RECITATIONS THAT HE GAVE YOU FROM DR. DUNCAN'S

25   TESTIMONY WERE TAKEN OUT OF CONTEXT.

1          WILL THEY HAVE A COPY OF THE TRANSCRIPT FOR

2    DELIBERATIONS?

3               **THE COURT:**  NO.  THE TRIAL TRANSCRIPT HERE?

4               **MR. ASHKER:**  I THOUGHT THEY ASKED FOR ONE.

5               **THE COURT:**  THEY ASKED, BUT AS I EXPLAINED, WE

6    CAN'T -- THE TRANSCRIPT ISN'T PREPARED UNTIL MUCH LATER.  THERE

7    IS A ROUGH TRANSCRIPT, BUT IF YOU NEED PORTIONS READ BACK, YOU

8    CAN SAY THE WITNESS AND THE DATE AND SUBJECT MATTER, AND WE CAN

9    READ BACK CERTAIN PORTIONS.

10              **MR. ASHKER:**  DR. DUNCAN ACTUALLY STATED WHEN I READ

11   TO HIM HIS DECEMBER 12TH, 2001 REPORT, CONCERNING THE NATURE OF

12   MY INJURY, THE VASCULAR PROBLEMS I HAD, SWELLING, ALL THIS FROM

13   PREVIOUS SURGERIES, THAT NO SURGERY LAST RESORT.  BOTTOM LINE,

14   RISKY, MIGHT LOSE THE ARM.  HE ADMITTED, HEY, YOU KNOW NOW THAT

15   I HAVE SEEN YOUR ARM AGAIN AND YOU REMINDED ME, HE HADN'T SEEN

16   ME IN SEVEN YEARS, YES, YOU NEED THE BRACE.  THE BONES ARE

17   STABLE, THE BRACE IS NEEDED TO PROTECT IT BECAUSE YOU HAVE NO

18   SOFT TISSUE COVERAGE OVER THE BONES THAT ENABLE ME TO EXERCISE

19   MY UPPER ARM AREA.

20              NOW, THE BRACE I HAVE DOESN'T FIT.  DR. SHIN LOOKED

21   AT IT, HAD ME PUT IT ON, HE NOTED IT DIDN'T FIT.  WHEN YOU HAVE

22   A BRACE THAT'S FOR PROTECTING YOUR ARM AND TO HELP YOU EXERCISE

23   THAT CAUSES YOU TO EXPERIENCE MORE PAIN WEARING IT THAN IT DOES

24   WITHOUT IT, AND YOUR CHOICE IS, WELL, I CAN WEAR THE BRACE AND

25   I GET THIS PROTECTION AND I CAN EXERCISE MY UPPER ARM, BUT THE

1    REST OF THE DAY MY ARM IS GOING TO BE IN PAIN; TO ME, THAT IS

2    NO BRACE AT ALL.  THAT'S HOW MY BRACE HAS BEEN SINCE FEBRUARY

3    OF 2006.

4           THEY STATED I ALWAYS HAD THE BALL AND THE BAND.  ONE

5    OF THE EXHIBITS I REFERRED TO YOU GUYS FROM AROUND APRIL OF

6    2007, THEY ACTUALLY CONFISCATED THE BAND AND IT TOOK ME EIGHT

7    DAYS TO GET IT BACK BECAUSE SAYRE DENIED IT AND REFUSED TO DO

8    THE CHRONO AND THEY -- I JUST GOT THE COURT ORDER.  AND I

9    PRESENTED THEM WITH THAT COURT ORDER AND THEY HAD TO GIVE IT

10   BACK.  THAT'S THE ONLY REASON.

11          AS FAR AS THE BURDEN OF PROOF GOES, WELL, THE BURDEN

12   OF PROOF IN THIS CASE IS A PREPONDERANCE OF THE EVIDENCE.  AND

13   MY UNDERSTANDING OF THE PREPONDERANCE OF THE EVIDENCE STANDARD

14   IN THESE KINDS OF CASES IS YOU TAKE A WEIGHING SCALE.  AND IF

15   YOU HAVE 51 PERCENT OF THE EVIDENCE IN MY FAVOR, THEN THAT'S A

16   PREPONDERANCE OF THE EVIDENCE RIGHT THERE.

17          AND I WOULD SUBMIT TO YOU THAT TAKEN ALL THE

18   EVIDENCE INTO CONSIDERATION, THERE IS NO DOUBT THAT DR. SAYRE

19   HAS ACTED BELOW THE STANDARD OF CARE, TREATED ME LIKE I AM

20   NOTHING, LIKE I AM NOBODY.  I'VE REPEATEDLY, IF YOU LOOK AT

21   THESE RECORDS, THERE'S NO IFS, ANDS OR BUTS ABOUT IT, CHECK

22   THESE RECORDS OUT ON THE 602'S AND YOU WILL SEE WHERE I HAVE

23   REPEATEDLY DONE EVERYTHING I CAN TO TRY TO GET ADEQUATE CARE

24   AND TREATMENT AND BEEN DENIED EVERY SINGLE TIME.

25          TOLD THAT I DON'T HAVE NOTHING WRONG WITH ME, WHICH

1   IS CONTRARY TO THEIR OWN EXPERT, DR. SHIN, WHO THEY

2   EMPHATICALLY SAID WAS ON THE WHO DO YOU TRUST YES LIST.  AND

3   DR. SHIN SAID, THEY ALSO MISREPRESENTED TO YOU THAT DR. SHIN

4   HAD STATED THAT THERE WAS NO BREACH BY DR. SAYRE OF THE

5   STANDARD OF CARE PERIOD.  AND THAT'S NOT WHAT DR. SHIN SAID.

6            WHAT DR. SHIN ACTUALLY SAID WAS, JUST ON THAT ONE

7   SINGLE OCCASION OF DENYING THAT TRAMADOL ON AUGUST 20TH OF

8   2006, IN YOUR OPINION, DID THAT FALL BELOW THE STANDARD OF

9   CARE.  AND DR. SHIN, EVEN THEN RELUCTANTLY, YOU COULD TELL HE

10  WAS TROUBLED, IT BOTHERED HIM, AND HE SAID, HEY, I HAVE TO SAY

11  THAT, BY ITSELF, WAS NOT BELOW THE STANDARD OF CARE.

12           WHEN I PRESENTED TO HIM THE ACTUAL FACTS OF WHAT HAD

13  REALLY TRANSPIRED AND WHAT THIS CASE WAS REALLY ABOUT IN A

14  HYPOTHETICAL QUESTION, DR. SHIN SAID, HEY, IF ALL THAT YOU ARE

15  TELLING ME IS TRUE, THEN, YES, I WOULD HAVE TO SAY DR. SAYRE'S

16  ACTIONS FELL BELOW THE STANDARD OF CARE.

17           AND THAT'S ALL THERE REALLY IS TO IT BECAUSE MY

18  DOCTOR SAID THAT, AND THEIR OWN EXPERT SAID THAT.  THAT'S IT.

19  THAT'S A DONE DEAL.  WITH THOSE EXPERTS SAYING THAT, THAT'S THE

20  BOTTOM LINE.  THAT'S THE STANDARD IN CALIFORNIA ON MEDICAL

21  MALPRACTICE, IF YOU HAVE THE EXPERTS SAYING THAT DEFENDANT FELL

22  BELOW THE STANDARD OF CARE, THAT IS IT.

23           AS FAR AS ME ALWAYS COMPLAINING NEVER HAVING RELIEF,

24  THE MEDICAL RECORDS THAT YOU CAN LOOK AT, YOU WILL BE LOOKING

25  AT, WILL SHOW YOU THAT IN 2002, LATE 2002 I SAW DR. ARENAS AND

1    I WAS GETTING THE THERAPY, I HAD MY CELLIE, MY BAND, BALL, ALL

2    THAT STUFF WAS WORKING GOOD.  AND I TOLD HER IN HER REPORTS,

3    SHE -- I TOLD HER, HEY, MY -- EVERYTHING'S FINE.  IT IS WORKING

4    GOOD.  I DIDN'T NEED ANYTHING MORE.  THAT WAS GOOD.  AND SHE

5    DOCUMENTED THAT.

6            IT SEEMS LIKE EVERY TIME I GET TO A PLACE WHERE

7    EVERYTHING IS RUNNING SMOOTH AND I AM STABLE, A LOT OF THOSE

8    YEARS, YEAH, YOU WILL SEE THERE WAS NO COMPLAINTS OR PROBLEMS

9    BECAUSE I WAS GETTING WHAT I NEEDED.  AND EVERY TIME I GET TO A

10   PLACE WHERE I AM STABLE, EVERYTHING IS WORKING GOOD, NOT

11   PERFECT, I MEAN, I AM NEVER PAIN FREE, BUT IT'S GOOD ENOUGH, I

12   KNOW THAT THAT'S THE BEST I AM GOING TO GET, I CAN DEAL WITH

13   THAT, THEY WILL COME ALONG AND THEY WILL TAKE IT.  YOU DON'T

14   NEED IT NO MORE, AND I HAVE TO START ALL OVER.  AND IT HAS BEEN

15   LIKE THAT PERIODICALLY REPEATEDLY FOR THE LAST 19 YEARS.

16           AND DR. SAYRE, I MEAN I JUST CANNOT BELIEVE -- HE'S

17   GOING TO COME INTO COURT AND HE'S GOING TO SIT HERE IN FRONT OF

18   YOU PEOPLE WHEN THE TRIAL FIRST STARTED, HE WAS SITTING OVER

19   THERE SMIRKING LIKE IT WAS A BIG JOKE, AND THE JUDGE HAD TO PUT

20   HIM IN CHECK.

21           **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.

22           **THE COURT:**  THAT COMMENT IS STRICKEN.

23           **MR. ANDRADA:**  IT'S INAPPROPRIATE.

24           **MR. ASHKER:**  I SUBMIT TO YOU THAT THIS IS NOT A

25   JOKE.  THIS IS A VERY SERIOUS MATTER.  I MEAN, IF I WAS GETTING

 1   THE PROPER CARE AND TREATMENT THAT ALL THESE DOCTORS, ALL THE

 2   ONES THAT THEY SAID WERE CREDIBLE, ADMITTED THAT MY CONDITION

 3   WAS SERIOUS, THAT I WOULD HAVE ONGOING PAIN AND PROBLEMS, THAT

 4   SPECIALISTS CARE WAS REQUIRED -- I MEAN, DR. SHIN, YOU SEE THEY

 5   DIDN'T MENTION A WORD ABOUT DR. SHIN RECOMMENDING I BE SEEN BY

 6   A WRIST SPECIALIST BACK IN DECEMBER.

 7           THE UC DAVIS ISSUE, THAT WAS PART OF THE CONTRACT IN

 8   2002, BUT THE BOTTOM LINE IS, HEY, THEY NEVER BOTHERED TO GET

 9   AT ME AND SAY, HEY, WE CAN'T DO THIS FOR YOU, HOW ABOUT IF WE

10   GET SOMEBODY ELSE.  WOULD YOU BE AGREEABLE TO THIS?

11           AND AS A MATTER OF FACT, ON DECEMBER 23RD, 2002, I

12   FILED THIS APPEAL RIGHT HERE, WHICH IS EXHIBIT 157, WHERE I WAS

13   COMPLAINING ABOUT DR. FRIEDMAN.  MY RECOLLECTION OF WHAT

14   TRANSPIRED WAS REAL CLEAR RIGHT AT THIS TIME.  AND I STATED IN

15   HERE, HEY, WHAT ABOUT UC SAN FRANCISCO?  IF UC DAVIS CAN'T SEE

16   ME, WHAT ABOUT UC SAN FRANCISCO?  AND I DIDN'T GET NO RESPONSE

17   TO THAT.

18           SIX MONTHS LATER THEY TELL ME ABOUT MANTECA, AND I

19   AM GOING TO BE HONEST WITH YOU, THE WHOLE PURPOSE OF MY

20   AGREEMENT WAS TO BE SEEN BY SOMEBODY WHO WAS NOT IN CDC'S BACK

21   POCKET.  AND I WANTED SOMEBODY INDEPENDENT BECAUSE AFTER ALL

22   THE YEARS OF PROBLEMS I HAVE BEEN HAVING, I DON'T TRUST NONE OF

23   THEM.

24           AND SO THAT WAS WHERE THAT UC DAVIS CAME FROM.  WHEN

25   THEY SAID, NO, THEY CAN'T, I TOLD THEM, OKAY, WHAT ABOUT UC SAN

1   FRANCISCO?  I 602'D IT.  I PURSUED MY 602.  THEY DIDN'T RESPOND

2   TO THAT.  SIX MONTHS LATER THEY COME OUT OF THE BLUE, HEY, YOU

3   ARE BEING TRANSFERRED, MANTECA DOCTOR.  RIGHT AT THE TIME, IT

4   JUST SO HAPPENED, WHEN I WAS GETTING PROPERTY RETURNED TO ME.

5   MY PROPERTY HAD BEEN SEIZED, BUT I WILL PRESENT TO YOU I WAS

6   NOT CHARGED WITH ANYTHING.

7           AND MY PROPERTY WAS RETURNED TO ME EIGHT MONTHS

8   LATER.  IT WAS ALL MY LEGAL STUFF.  I HAD BEEN WITHOUT IT FOR

9   EIGHT MONTHS.  I HAD CASES GOING.  I NEEDED TO GET IT BACK, SO

10  I DIDN'T GO.  AND I HAD THAT CLEARED WITH THE LIEUTENANT AND

11  THE DOCUMENTS IS ONE OF THE ONES THAT'S GOING TO BE IN THE

12  EXHIBITS YOU CAN LOOK AT.

13          AND THE THING IS, TOO, MANTECA, I MEAN, WHAT'S

14  MANTECA?  JUST LIKE I TOLD THEM ON DEPOSITION, YOU BLINK YOUR

15  EYES AND YOU DONE BLOWN THROUGH MANTECA.  AS FAR AS I KNOW THAT

16  WAS A CONTRACT POSITION WITH CDC.  SO I NEVER AGREED TO

17  DR. FRIEDMAN.  I DIDN'T REFUSE IT, BUT THAT WAS NOT MY

18  AGREEMENT.

19          AND I HAVE ALWAYS PRESENTED THAT THEY NEVER INTENDED

20  TO FOLLOW MY AGREEMENT.  THEY PUT OFF HAVING ME EVEN REFERRING

21  ME TO UC DAVIS FOR FIVE AND A HALF MONTHS DURING WHICH TIME

22  PERIOD THEY HAD ME SEEN BY FRIEDMAN, AND THEN THEY PRESENTED

23  THOSE DOCUMENTS TO UC DAVIS.  HEY, LOOK, WE ARE GIVING HIM ALL

24  THIS.  JUST SOLELY FOR THE PURPOSE OF CIRCUMVENTING ME BEING

25  SEEN BY UC DAVIS.

1    AS FAR AS THE HARM GOES --

2    **THE COURT:**  YOU ARE PRETTY MUCH OUT OF TIME.  YOU

3    MIGHT WANT TO SUMMARIZE AND CONCLUDE.

4    **MR. ASHKER:**  OKAY.

5    AS FAR AS MY DAMAGE GOES, I HAVE TESTIFIED AT LENGTH

6    ABOUT THAT.  I MEAN, HEY, WHEN YOU DON'T HAVE DOCUMENT, WHEN IT

7    IS NOT DOCUMENTED BY CDC, I AM A PRISONER.  I CAN'T JUST GO OUT

8    AND PICK ANY DOCTOR I WANT AND SAY, HEY, I NEED YOU TO SUPPORT

9    ME IN THIS LAWSUIT.

10    YOU KNOW, DR. WEINSTEIN SUPPORTED ME.  DR. SHIN

11    SUPPORTED ME.  DR. DUNCAN SUPPORTED ME.  IF YOU LOOK AT

12    DR. DUNCAN'S TESTIMONY IN THE ENTIRE CONTEXT THAT IT WAS

13    PRESENTED, HE SUPPORTED ME AND HE STATED VERY CLEARLY THAT,

14    YEAH, HE DOES NOT LIKE TO USE MEDS, BUT SOME CONDITIONS REQUIRE

15    MEDS, AND IT SHOULD BE THE MINIMUM WITH THE LEAST AMOUNT OF

16    SIDE EFFECTS.  AND THAT'S WHAT I WAS GETTING BEFORE DR. SAYRE

17    CAME AND JUST DENIED ME EVERYTHING.

18    AND I WILL PRESENT TO YOU THAT DAMAGES ARE WARRANTED

19    IN THIS CASE.  IF YOU THINK ABOUT THREE YEARS EVERY SINGLE DAY

20    OF GOING THROUGH CHANGES AND BEING TOLD THAT BASICALLY YOU'RE

21    TREATED LIKE YOU ARE NOTHING, IGNORED, YOU DON'T HAVE NOTHING

22    WRONG WITH YOU, THAT'S ALL YOU'VE GOT COMING, TAKE IT OR LEAVE

23    IT, FOR THREE YEARS.

24    AND THEN THIS ATTITUDE OF I CAN DO WHATEVER I WANT.

25    NOBODY IS GOING TO CALL ME ON IT.  I'M RUNNING PELICAN BAY

1    PRISON MEDICAL.

2            AND WITH THE TESTIMONY OF DR. ALLEN, DR. ALLEN HAS

3    PROBLEMS, BUT HE DID NOT DENY OR EVEN RESPOND TO DR. ALLEN'S

4    CLAIMS ABOUT THE OTHER PATIENTS HE PUT AT RISK ALMOST FATALLY.

5            SO I THINK PUNITIVE DAMAGES ARE WARRANTED AND THEY

6    NEED TO BE IN AN AMOUNT THAT WILL SEND A CLEAR MESSAGE THAT

7    PEOPLE LIKE SAYRE, EVEN THOUGH THEY ARE SHIELDED AND IN A

8    PRISON SYSTEM, THEY CAN'T GET AWAY WITH THAT.  THAT'S NOT GOING

9    TO BE TOLERATED AND THAT WILL SEND -- YOU CAN SEND A MESSAGE

10   TODAY AND THAT COULD HAVE THE EFFECT OF BRINGING CHANGES THAT

11   ARE REALLY NEEDED SO THAT PEOPLE LIKE DR. SAYRE AREN'T JUST

12   TREATING PEOPLE LIKE HE HAS BEEN DOING WITH IMPUNITY.

13           AND THAT'S WHAT I HAVE RIGHT THERE.  I THANK ALL OF

14   YOU FOR YOUR TIME AND PATIENCE.  I WISH YOU ALL THE BEST

15   REGARDLESS.  THANK YOU.

16           **THE COURT:**  ALL RIGHT.

17           LADIES AND GENTLEMAN, WHEN YOU BEGIN YOUR

18   DELIBERATIONS, YOU SHOULD ELECT ONE MEMBER OF THE JURY AS YOUR

19   PRESIDING JUROR.  THAT PERSON WILL PRESIDE OVER YOUR

20   DELIBERATIONS AND RETURN YOUR VERDICT HERE IN COURT.

21           YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW

22   JURORS TO REACH AGREEMENT, IF YOU CAN DO SO.  IN ANSWER TO THE

23   QUESTION THAT YOU SENT OUT, YES, YOUR VERDICT MUST BE

24   UNANIMOUS.

25           EACH OF YOU SHOULD DECIDE THE CASE FOR YOURSELF, BUT

1    YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL THE

2    EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

3    LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.  DO NOT HESITATE

4    TO CHANGE YOUR OPINION IF THE DISCUSSION PERSUADES YOU THAT YOU

5    SHOULD, BUT DO NOT COME TO A DECISION SIMPLY BECAUSE THE OTHER

6    JURORS THINK IT IS RIGHT.

7             IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A

8    UNANIMOUS VERDICT, BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO

9    SO AFTER HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT

10   CHANGE AN HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE

11   EVIDENCE SIMPLY TO REACH A VERDICT.

12            SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.

13   WHETHER OR NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN

14   MEMORY OF WHAT WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

15   YOU SHOULD NOT BE OVERLY INFLUENCED BY THE NOTES.

16            IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

17   COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE MARSHAL

18   WHO WILL NOT STATIONED OUTSIDE YOUR DOOR SHORTLY, SIGNED BY

19   YOUR PRESIDING JUROR OR BY ONE OR MORE MEMBERS OF THE JURY.  NO

20   MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE WITH ME

21   EXCEPT BY A SIGNED WRITING, AND I WILL COMMUNICATE WITH ANY

22   MEMBER OF THE JURY ON ANYTHING CONCERNING THE CASE ONLY IN

23   WRITING OR HERE IN OPEN COURT.

24            IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

25   PARTIES BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU MAY

1    CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

2    QUESTION.

3              REMEMBER THAT YOU ARE NOT TO TELL ANYONE, INCLUDING

4    ME, HOW THE JURY STANDS NUMERICALLY OR OTHERWISE UNTIL AFTER

5    YOU HAVE REACHED A UNANIMOUS VERDICT OR HAVE BEEN DISCHARGED.

6    DO NOT DISCLOSE ANY VOTE COUNT IN ANY NOTE TO THE COURT.

7              A VERDICT FORM HAS BEEN PREPARED FOR YOU, WHICH I

8    READ TO YOU EARLIER.  AFTER YOU HAVE REACHED UNANIMOUS

9    AGREEMENT ON THE VERDICT, YOUR PRESIDING JUROR WILL FILL IN

10   THAT FORM, SIGN AND DATE IT, AND ADVISE THE COURT THROUGH THE

11   MARSHAL WHO WILL BE OUTSIDE YOUR DOOR THAT YOU ARE READY TO

12   RETURN TO THE COURTROOM.

13             I FOUND SOME TYPOS IN THE INSTRUCTIONS, SO I WILL

14   HAVE TO FIX THOSE, BUT THEN I WILL MAKE COPIES FOR EACH OF YOU

15   AND WE'LL HAVE THE ORIGINAL COPY OF THE VERDICT FORM AND THEN

16   WE'LL MAKE JUST A SCRATCH COPY FOR EACH OF YOU SO YOU WILL HAVE

17   THOSE QUESTIONS IN FRONT OF YOU.

18             WE WILL BE SENDING THE EXHIBITS BACK.  THERE IS A

19   COUPLE OF NUMBERING PROBLEMS HERE THAT I AM GOING TO FIX BEFORE

20   SENDING THEM BACK.  THERE IS A PLAINTIFF'S BINDER AND DEFENSE

21   BINDER.  SOME OF THE EXHIBITS IN THE DEFENSE BINDER ARE THE

22   SAME AS WHAT IS IN THE PLAINTIFF'S, SO YOU MIGHT NOTICE THAT.

23   AND THEN I THINK OCCASIONALLY, CORRECT ME IF I AM WRONG, BUT I

24   THINK SOMETIMES THE 602 APPEALS WILL CONTAIN SUPPORTING

25   DOCUMENTS, AND THOSE SUPPORTING DOCUMENTS ARE SOMETIMES THE

1    SAME MEDICAL RECORDS THAT YOU WILL SEE THE ORIGINALS OF

2    SOMEWHERE ELSE.  SO YOU MAY SEE THE SAME RECORD ONE OR MORE

3    TIMES.

4              IS THAT RIGHT?  I THINK THAT'S RIGHT.  SO IT'S NOT

5    QUITE A INTENSE AS IT MIGHT SEEM.

6              IT'S LUNCHTIME.  I DON'T KNOW WHAT YOU WOULD LIKE TO

7    DO.  I THINK MAYBE YOU SHOULD GO BACK, PICK YOUR PRESIDING

8    JUROR, AND THEN HAVE YOUR PRESIDING JUROR HELP YOU DECIDE WHAT

9    YOU WANT TO DO.  FIND OUT HOW LATE EACH OF YOU CAN STAY TODAY.

10   IF YOU ARE GOING TO STAY A LITTLE BIT LATER THAN 1:30, YOU

11   MIGHT WANT TO BREAK SOON AND GO TO LUNCH.  YOU ARE WELCOME TO

12   GO OUT TO LUNCH ACROSS THE STREET THERE, OR IF YOU WANT TO GO

13   OUT AND GET SANDWICHES SO ON AND BRING THEM BACK AND CONTINUE

14   DELIBERATING, YOU CAN DO THAT.

15             IF YOU DO THAT, IF YOU LET THE MARSHAL KNOW WHEN YOU

16   HAVE LEFT AND WHEN YOU'VE DECIDED TO RETURN SO WE KNOW WHEN YOU

17   ARE NOT HERE.

18             AND IF THAT'S WHAT YOU DO WANT TO DO, COME BACK AND

19   START YOUR DELIBERATIONS AFTER YOU HAVE GOTTEN YOURSELVES SOME

20   LUNCH.  IF YOU WANT TO GO TO 1:30 TODAY, HAVE LUNCH AFTERWARD,

21   START AGAIN TOMORROW, THAT'S FINE, TOO.

22             IF YOU DO NOT REACH A VERDICT TODAY, I WILL ASK YOU

23   TO COME BACK TOMORROW MORNING AT 8:30 AND COMMENCE DISCUSSIONS

24   AGAIN.

25             REMEMBER, WHEN YOU ARE COMING AND GOING, OR IF YOU

1   ARE HAVING LUNCH TOGETHER OR SEPARATELY, YOU ARE NOT THE JURY

2   EXCEPT WHEN YOU ARE IN THE ROOM AND ALL EIGHT OF YOU ARE THERE.

3   SO DON'T DISCUSS THE CASE WITH JUST TWO OR THREE OF YOU WHO

4   MIGHT HAVE GONE TO THE SAME PLACE FOR A SANDWICH.

5            AT THIS TIME WE WILL EXCUSE YOU TO BEGIN YOUR

6   DELIBERATIONS.  WE'LL SEND YOUR MATERIALS BACK AS SOON AS WE

7   CAN, AND WE WILL WAIT TO HEAR FROM YOU.

8            (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

9        **THE COURT:**  WE DO NEED MR. ASHKER HERE WHILE THE

10  JURY IS DELIBERATING BECAUSE THEY MIGHT HAVE QUESTIONS, AND I

11  HAVE TO -- HE HAS TO BE ABLE TO BE PRESENT WHEN I DECIDE HOW TO

12  ANSWER THEM.

13           SO, THERE WILL BE A MARSHAL -- OH, THERE WILL BE A

14  MARSHAL OUTSIDE THE DOOR.  AND IF THEY LEAVE FOR ANY LENGTH OF

15  TIME, THEN WE WILL LET YOU KNOW.  WHEN THEY ARE GONE FOR THE

16  DAY, WE WILL LET YOU KNOW.  ASSUMING THEY DON'T REACH A VERDICT

17  TODAY, WHICH I DON'T THINK THEY WILL, WE WILL NEED YOU BACK

18  HERE AT 8:30 IN THE MORNING AS WELL.

19           ON THE EXHIBITS, THERE'S A LITTLE PROBLEM HERE WHERE

20  PAGE -- THERE'S A PAGE THAT'S LABELED 163, AND THEN ATTACHED TO

21  IT IS ANOTHER PAGE THAT'S LABELED 166.  BUT YET 166 IS A

22  SEPARATE EXHIBIT.

23           SO, SHEILAH IS NOT HERE.  I GUESS I SHOULD TAKE THIS

24  EXTRA 166 TAG OFF OF 163.

25           DIANE, GO OFFER THE RECORD.

1          (DISCUSSION HELD OFF THE RECORD.)

2          **THE COURT:**  THANK YOU.  IF WE CAN GET THE MARSHAL TO

3  BE SWORN PLEASE.

4          (MARSHAL SWORN.)

5          **THE COURT:**  IF YOU WOULD GO TO THE HALLWAY SIDE.  I

6  TOLD THEM IF THEY WERE GOING TO GO TO LUNCH, THEY SHOULD LET

7  YOU KNOW WHEN THEY LEAVE AND WHEN THEY COME BACK.  AND THEN AT

8  THE END OF THE DAY WHEN THEY LEAVE, PLEASE LET THESE GENTLEMEN

9  KNOW BECAUSE THEY WILL BE HERE WITH MR. ASHKER UNTIL THE JURY

10  GOES HOME.  SO YOU NEED TO BE SURE TO TELL THEM WHEN THEY CAN

11  GO.

12          **THE CLERK:**  THEY TOLD ME THEY WILL BE HERE TODAY

13  UNTIL 4:00 O'CLOCK.

14          **THE COURT:**  THEY JUST TOLD HER THAT THEY WILL BE

15  STAYING UNTIL FOUR.

16          **THE CLERK:**  AS SOON AS THEY PICK A FOREPERSON, THEY

17  ARE GOING TO LUNCH.

18          **THE COURT:**  THANK YOU SO MUCH.

19          **MR. ANDRADA:**  CAN WE PUT A SMALL THING ON THE

20  RECORD, YOUR HONOR?

21          **THE COURT:**  SURE.

22          **MR. ANDRADA:**  WITH REGARD TO SHOWING MR. ASHKER THE

23  TIME LINE AND SO FORTH, I'VE BEEN PRACTICING 30 PLUS YEARS, I

24  HAVE TRIED CASES IN FEDERAL COURTS AND STATE COURTS, AND I HAVE

25  NEVER HAD A JUDGE ASK ME TO DO THAT.  HOWEVER -- SO, THAT'S WHY

1    I DIDN'T DO IT.  IT NEVER DAWNED ON ME THAT I WOULD HAVE TO DO

2    THAT.

3            **THE COURT:**  THE REASON I ASKED IS JUST BECAUSE HE

4    COULDN'T SEE THEM AS YOU SHOWED THEM.  SO IF HE HAD ALREADY

5    SEEN THEM, THEN I WASN'T GOING TO WORRY ABOUT HIM SEEING THEM

6    AS YOU SHOWED THEM.  IF HE HAD NEVER SEEN THEM, AND NEITHER HE

7    NOR I COULD SEE THEM AS YOU SHOWED THEM, YOU, OF COURSE, WOULD

8    NEVER LET OPPOSING COUNSEL SHOW SOMETHING TO THE JURY THAT

9    NOBODY ELSE COULD SEE.  SO THAT'S THE ONLY REASON I ASKED IS

10   BECAUSE IF HE DIDN'T KNOW WHAT THEY WERE, I WAS GOING TO HAVE

11   TO MAKE SOME ARRANGEMENTS SO HE COULD SEE THEM.

12           **MR. ANDRADA:**  PERHAPS I MISUNDERSTOOD, BUT THAT

13   CERTAINLY WASN'T WHAT I WAS HEARING.  IT WAS SOMEHOW I HAD DONE

14   SOMETHING INAPPROPRIATE.

15           **THE COURT:**  NO.  IT WAS JUST THAT THEY WERE SITUATED

16   SO THAT WE COULDN'T SEE THEM AND HADN'T SEEN THEM.  SO ONE

17   CAN'T SHOW THE JURY THINGS THAT NO ONE HAS SEEN BEFORE.

18           I AM SORRY IF I WAS NOT CLEAR ABOUT THAT.  THAT WAS

19   MY CONCERN.

20           SO, IF YOU ALL HAVE GONE THROUGH THE EXHIBITS THEN,

21   I'LL GET SHEILAH TO TAKE THESE TWO BINDERS IN THERE RIGHT NOW.

22           THEY CAN'T -- LET'S NOT BRING IN THE VIDEOTAPE.  IF

23   THEY WANT TO SEE IT, THEY CAN COME OUT AND SEE IT.

24           THEY HAD HANDED ME A NOTE WHICH SAID:  DOES THE

25   JURY'S DECISION ON EACH QUESTION WE NEED TO DECIDE MUST BE

1    UNANIMOUS.  SIGNED REBECCA TALLEY ON BEHALF OF THE JURY.

2              THEY JUST HANDED IT TO ME RIGHT BEFORE THE

3    INSTRUCTIONS, SO I WENT AHEAD AND ALLUDED TO THAT OBVIOUSLY IN

4    THE ENDING INSTRUCTIONS THAT IT DOES HAVE TO BE UNANIMOUS.

5              ON THE INSTRUCTIONS AND THE VERDICT FORM, AS I SAID,

6    I DID NOTICE A FEW TYPOS AND THINGS FROM THE LAST VERSION, SO

7    I'M GOING BACK RIGHT NOW AND CORRECT THOSE.  IF YOU ARE

8    CONCERNED, YOU MAY STAY AND I WILL SHOW YOU THE FINAL VERSION

9    BEFORE I COPY IT AND GIVE IT BACK TO THEM.

10             **MR. ANDRADA:**  IF THEY ARE MERELY SPELLING ERRORS,

11   YOUR HONOR, THEN –– OR GRAMMAR, OR PUNCTUATION, THEN THERE IS

12   FRANKLY NO POINT.

13             **THE COURT:**  WELL, I PUT THE CAUSATION INSTRUCTION.

14   I DIDN'T HAVE THAT FOR THE BREACH OF CONTRACT SO I ADDED THAT

15   IN THERE, AND THERE WERE A COUPLE OF CHANGES ––

16             **MR. ANDRADA:**  WE BETTER LOOK AT IT THEN IF IT'S ALL

17   RIGHT WITH THE COURT.

18             **THE COURT:**  THEN THE VERDICT FORM, I MADE A SLIGHT

19   CHANGE TO AS WELL.  I DO HAVE ANOTHER JURY TRIAL STARTING AT

20   1:00 O'CLOCK, SO I WILL HAVE TO ASK YOU TO MOVE YOUR STUFF SORT

21   OF TO THE SIDE BECAUSE WE HAVE A NEW GROUP COMING IN.

22             **MR. ANDRADA:**  THEY ARE GOING TO LUNCH.  THEY'RE

23   GOING TO START AT 2:00 O'CLOCK?  IS THAT WHAT ––

24             **THE COURT:**  I DIDN'T HEAR TWO.

25             **THE CLERK:**  THEY SAID THEY WERE GOING TO PICK A

1   FOREPERSON, GO TO LUNCH, AND THEY'LL STAY UNTIL FOUR.  I DON'T

2   KNOW HOW LONG A LUNCH THEY WILL TAKE.

3          **THE COURT:**  WE DO NEED MS. CAHILL TO BE ABLE TO GET

4   YOU ON FIVE TO TEN MINUTE'S NOTICE.

5          **MR. ANDRADA:**  I WILL BE HERE.

6          **THE COURT:**  THERE'S AN ATTORNEYS' ROOM WE HAVE OVER

7   NEAR THE LIBRARY.  YOU CAN GO ACROSS THE STREET IF YOU HAVE A

8   CELL PHONE.  IF THEY DO LEAVE AND GIVE US A TIME THEY ARE GOING

9   TO BE GONE FOR LUNCH, WE'LL LET YOU KNOW THAT SO YOU'LL KNOW

10  YOU'RE OFF CALL FOR THAT TIME PERIOD.

11         **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

12         **THE COURT:**  ALL RIGHT.

13         (PROCEEDINGS RECESS WHILE JURY DELIBERATES.)

14         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY

15  AT 3:10 P.M.)

16         **THE COURT:**  AS YOU ARE AWARE, THE JURY HAS GIVEN US

17  A NOTE, AND IT SAYS: "TRANSCRIPT NOTES FROM TODD ASHKER'S

18  TESTIMONY, FIRST DAY OF TESTIMONY RE MANTECA REFERRAL.  MAY BE

19  AROUND 2:00 O'CLOCK.

20         I THINK THEY'RE CONFUSED BECAUSE, AS THE COURT

21  REPORTER TELLS ME, MR. ASHKER DIDN'T GET ON THE STAND UNTIL

22  3:30.  RAYNEE HAS WORD SEARCHED HER TRANSCRIPT FROM MONDAY AND

23  SHE'S NOT FINDING MANTECA, HOWEVER, DIANE HAS FOUND MANTECA ON

24  TUESDAY MORNING.

25         SO WHY DON'T I HAVE DIANE TELL YOU WHAT SHE'S GOT.

1    WE CAN GO OFF THE RECORD AND SHE CAN READ TO YOU WHAT SHE'S GOT

2    ABOUT MANTECA AND SEE WHETHER YOU FEEL LIKE THAT'S WHAT THEY

3    ARE ASKING FOR.

4             (DISCUSSION HELD OFF THE RECORD.)

5             **THE COURT:**  WE WILL GO BACK ON THE RECORD.

6             WHAT I SAID WAS I THINK THAT THAT, WHAT THE COURT

7    REPORTER JUST READ SOUNDS TO ME LIKE WHAT IT IS THEY ARE ASKING

8    FOR.

9             SO UNLESS ANYONE DISAGREES, I WILL BRING THEM IN NOW

10   AND SHE CAN READ THEM JUST WHAT SHE READ TO US, AND THEN WE

11   WILL SEND THEM BACK, IF THAT'S AGREEABLE.

12            **MR. ANDRADA:**  YES.

13            **MR. ASHKER:**  YES, THAT'S AGREEABLE, YOUR HONOR.

14            (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

15            **THE COURT:**  PLEASE BE SEATED.  I HAVE A NOTE FROM

16   YOU WHICH SAYS:  "TRANSCRIPT NOTES FROM TODD ASHKER'S TESTIMONY

17   FIRST DAY OF TESTIMONY, RE MANTECA REFERRAL.  MAY BE AROUND

18   2:00 O'CLOCK."

19            BOTH REPORTERS HAVE SEARCHED THEIR NOTES.  AND THE

20   REPORTER WHO WAS HERE ON MONDAY WAS UNABLE TO FIND THE WORD

21   "MANTECA" MENTIONED ON MONDAY.  HOWEVER, THE WORD "MANTECA" WAS

22   MENTIONED ON TUESDAY MORNING, AND THE SECOND COURT REPORTER

23   DOES HAVE THOSE NOTES, AND SHE WILL NOW READ YOU THE PORTION

24   THAT WE THINK YOU MIGHT BE REFERRING TO.  AND IF THAT'S NOT IT,

25   THEN YOU CAN GO BACK IN THE ROOM AND GIVE ME MORE OF A CLUE.

1          THIS MAY BE WHAT YOU ARE LOOKING FOR.

2          (TESTIMONY READ BACK.)

3          **THE COURT:**  OKAY?  SO, IF THAT WASN'T IT, SEND US

4     ANOTHER NOTE.

5               **JUROR:**  THAT WAS IT.

6          **THE COURT:**  OKAY.  I UNDERSTAND YOU ARE PLANNING ON

7     STAYING UNTIL FOUR TODAY.  IF WE HAVEN'T HEARD FROM YOU BY

8     THEN, WE WILL ASSUME THAT YOU WILL GO HOME AT FOUR AND COME

9     BACK AT 8:30 AND START AGAIN.

10         THANK YOU.  SEE YOU TOMORROW THEN.

11         (JURORS RETURN TO DELIBERATIONS.)

12         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

13         **THE COURT:**  WHY DON'T WE GO ON THE RECORD FOR THE

14    MOMENT.

15         SO THAT SEEMED TO BE IT.  IS EVERYONE --

16         **MR. ANDRADA:**  JUDGING FROM THE NODS OF ASSENT, IT

17    SEEMED TO BE WHAT THEY WERE LOOKING FOR.

18         **THE COURT:**  RIGHT.  SO, WE WILL STAY UNTIL FOUR.  IF

19    YOU HAVEN'T HEARD ANYTHING BY 4:00 O'CLOCK, WHY DON'T YOU GIVE

20    US UNTIL 4:10 JUST TO MAKE SURE.  IF YOU HAVEN'T HEARD ANYTHING

21    FROM US BY 4:10, YOU CAN GO AHEAD AND GO BACK TO SAN QUENTIN.

22    IF YOU WOULD PLEASE COME BACK TOMORROW AT 8:30.

23         AND YOU WILL BE EXCUSED AS WELL AT 4:10 JUST TO MAKE

24    SURE, AND THEN WE WILL NEED YOU BACK ON CALL AT 8:30 TOMORROW.

25         **MR. ANDRADA:**  I UNDERSTAND.

REBUTTAL CLOSING ARGUMENT – MR. ASHKER

1                 I WILL BE DOWN THE HALL IN THE LAWYER LOUNGE.

2                 **THE COURT:**  OKAY.

3                 WOULD YOU MIND WHEN YOU GO OUT THERE TELL THE

4      ATTORNEYS IN THE OTHER CASE THEY CAN COME IN NOW?

5                 THANK YOU.

6                    (PROCEEDINGS ADJOURNED AT 4:00 P.M.)

CERTIFICATE OF REPORTER


        I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED

STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY

THAT THE FOREGOING PROCEEDINGS IN C-05-3759 CW, TODD L. ASHKER

V. MICHAEL SAYRE AND MATTHEW CATE, PAGES NUMBERED 1052 THROUGH

1176, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND

WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO

TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE

RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF

FILING.

        THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF

SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT

FILE.


            /S/ DIANE E. SKILLMAN

        DIANE E. SKILLMAN, CSR 4909, RPR, FCRR