UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

**ORIGINAL**

| | | |
|---|---|---|
| TODD L. ASHKER, | ) | VOLUME 1 |
| | ) | JURY TRIAL |
| PLAINTIFF, | ) | PAGES 1 – 278 |
| | ) | |
| VS. | ) | NO. C 05–03759 CW |
| | ) | |
| ALAMEIDA, ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | MONDAY, MAY 11, 2009 |

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

FOR PLAINTIFF:              TODD A. ASHKER C58191
                           PELICAN BAY STATE PRISON
                           BOX 7500
                           D1–119
                           CRESCENT CITY, CA  95532


FOR DEFENDANT              ANDRADA & ASSOCIATES, P.C.
MICHAEL C. SAYRE           180 GRAND AVENUE, SUITE 225
AND MATTHEW CATE:          OAKLAND, CALIFORNIA  94612
                     BY:  J. RANDALL ANDRADA,
                          ALICIA KENNON, ATTORNEYS AT LAW




REPORTED BY:       RAYNEE H. MERCADO, CSR NO. 8258

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 451-7530*

# I N D E X

|  | PAGE | VOL. |
|---|---|---|
| Opening Statement by MR. ASHKER | 200 | 1 |
| Opening Statement by Mr. Andrada | 214 | 1 |

| **PLAINTIFF'S WITNESSES** | PAGE | VOL. |
|---|---|---|
| ASHKER, TODD | | |
| DIRECT EXAMINATION BY MR. ASHKER | 232 | 1 |

# E X H I B I T S

| **PLAINTIFF'S EXHIBITS** | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 140 | | | 261 | 1 |

--oOo--

```
1    MONDAY, MAY 11, 2009                                  8:45 A.M.

2                      P R O C E E D I N G S

3              (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

4    PRESENCE OF THE JURY:)

5              THE COURT:  PLEASE BE SEATED.

6              YOU CAN --

7              THE CLERK:  CALLING THE MATTER OF THE ASHKER VERSUS

8    SAYRE, CIVIL ACTION NO. C05-3759.

9              COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

10   RECORD.

11             MR. ANDRADA:  MY NAME IS RANDY ANDRADA, YOUR HONOR.

12   GOOD MORNING.  I REPRESENT DR. SAYRE AND MATTHEW CATE.  I GATHER

13   FROM THE COURT'S PRETRIAL ORDER THAT THE MATTER HAS BEEN

14   DISMISSED AS TO MS. MCLEAN, MAUREEN MCLEAN.

15             THE COURT:  I DON'T KNOW ABOUT THAT.  IT STRIKES

16   ME -- WELL, WE'LL JUST HOLD OFF ON THAT.

17             DID YOU -- MR. ASHKER IS PRESENT IN CUSTODY

18   REPRESENTING HIMSELF, I TAKE IT.

19             MR. ASHKER:  YES.  TODD ASHKER, PRO PER.

20             THE COURT:  DO YOU WANT TO PULL THAT MIKE OVER

21   TOWARDS YOU?  AND I DON'T -- WE SORT OF -- THE MIKE OVER THERE

22   GOT UNPLUGGED SOMEHOW.  WE'RE GOING TO HAVE TO PLUG THAT IN AT

23   SOME POINT, BUT --

24             MR. ANDRADA:  I'LL JUST SHOUT LOUDLY.

25             THE COURT:  YOU CAN SPEAK LOUDLY, OR YOU CAN COME TO
```

| | |
|---|---|
| 1 | THE PODIUM.  IF YOU NEED TO, WE'VE GOT THE OTHER MIKE, BUT |
| 2 | DURING THE JURY SELECTION, WE NEED THAT ONE FOR THE JURY -- |
| 3 | **MR. ANDRADA:**  I UNDERSTAND, YOUR HONOR.  THANK YOU. |
| 4 | **THE COURT:**  BUT -- YEAH, WITH RESPECT TO MCLEAN, |
| 5 | MR. ASHKER, I THINK THAT YOU MENTIONED SOMEWHERE OR OTHER THAT |
| 6 | YOU WEREN'T PURSUING HER WITH RESPECT TO THE 1983 CLAIM OR THE |
| 7 | MEDICAL MALPRACTICE CLAIM.  AM I RIGHT ABOUT THAT? |
| 8 | **MR. ASHKER:**  YES, THAT'S CORRECT, YOUR HONOR. |
| 9 | **THE COURT:**  OKAY.  WELL, WITH RESPECT TO THE BREACH |
| 10 | OF CONTRACT CLAIM, SHE'S NOT A PARTY TO THE CONTRACT.  AS I |
| 11 | UNDERSTAND IT, SHE DIDN'T SIGN IT OR ANYTHING, SO I DON'T THINK |
| 12 | YOU CAN PURSUE HER ON THE BREACH OF CONTRACT CLAIM EITHER. |
| 13 | **MR. ASHKER:**  I -- I SUBMITTED A RESPONSE TO |
| 14 | DEFENDANT'S MOTION ON MAY 5TH, 2009. |
| 15 | **THE COURT:**  YEAH, I'M AFRAID WE DIDN'T GET THAT. |
| 16 | **MR. ASHKER:**  OKAY.  I JOTTED DOWN A FEW NOTES 'CAUSE |
| 17 | I WASN'T ABLE TO MAKE A COPY.  MY RESPONSE WAS THAT OKAY. |
| 18 | DEFENDANT'S MOTION TO DISMISS DR. SAYRE AND MCLEAN FROM THE |
| 19 | BREACH OF CONTRACT CLAIM, MY POSITION WOULD BE THE 2002 |
| 20 | SETTLEMENT AGREEMENT CONTRACT IS A LEGAL CONTRACT ENTERED INTO |
| 21 | BETWEEN MYSELF AND CDCR.  AS SUCH, IT IS BINDING NOT ONLY ON THE |
| 22 | SECRETARY OF CORRECTIONS BUT ON ALL THE CDCR'S AGENTS AS WELL. |
| 23 | AND IN THIS CASE, I REPEATEDLY NOTIFIED SAYRE, |
| 24 | MCLEAN, AND MR. CATE OF THE AGREEMENT, AND THAT THEIR ACTS |
| 25 | AND/OR FAILURES TO ACT CONSTITUTED A BREACH.  THEY ACKNOWLEDGED |

1    PERSONAL AWARENESS OF THE CONTRACT, AND MY POSITION IS THEY

2    REFUSED TO FOLLOW IT, AND, THUS, THEY SHOULD BE, IN PART, LIABLE

3    FOR BREACHING THE CONTRACT.

4            **THE COURT:**  YEAH, I DON'T THINK THAT'S GOING TO WORK.

5    THE PEOPLE WHO CAN BE SUED FOR BREACH OF CONTRACT ARE THE

6    CONTRACTING PARTIES.  I CAN'T THINK OF ANY OTHER THEORY UNDER

7    WHICH YOU COULD SUE SOMEONE WHO WASN'T A CONTRACTING PARTY.  SO

8    TO THE EXTENT THAT THE CONTRACTING PARTY DIDN'T CAUSE THE PEOPLE

9    WHO WORKED UNDER HIM TO FULFILL THE CONTRACT, THAT'S ON THE

10   CONTRACTING PARTY, NOT ON THE UNDERLINGS.

11           SO -- SO THAT MEANS WE WILL DISMISS THE CLAIMS

12   AGAINST MCLEAN AND THE CONTRACT CLAIM AGAINST SAYRE.  SO, YES,

13   THAT MEANS MCLEAN IS NOT SUED IN ANY OF THE CAUSES OF ACTION AT

14   THIS POINT.

15           **MR. ANDRADA:**  VERY GOOD, YOUR HONOR.  THANK YOU.

16           **THE COURT:**  SO THAT LEAVES YOU REPRESENTING SAYRE AND

17   CATE.

18           **MR. ANDRADA:**  YES.

19           **THE COURT:**  AND WHO DO YOU HAVE WITH YOU HERE?

20           **MR. ANDRADA:**  I HAVE DR. SAYRE WITH ME THIS MORNING,

21   YOUR HONOR.  MS. MCLEAN IS ALSO HERE, BUT, OBVIOUSLY, THERE'S NO

22   NEED FOR HER TO SIT AT THE --

23           **THE COURT:**  OKAY.

24           **MR. ANDRADA:**  -- COUNSEL TABLE.

25           **THE COURT:**  ALL RIGHT.

1      **MR. ASHKER:**  YOUR HONOR, MAY I BE -- EXCUSE ME.   MAY

2  I BE HEARD ON A MATTER REAL QUICK?

3      **THE COURT:**  YES.

4      **MR. ASHKER:**  I JUST BECAME AWARE -- I DON'T KNOW IF

5  THE COURT RECEIVED MY OTHER MOTION REGARDING DR. ALLEN.  I JUST

6  BECAME AWARE THAT DR. ALLEN IS IN THE COURTROOM RIGHT NOW BEHIND

7  ME, AND HE INFORMED ME THAT HE HAS IMPORTANT -- NEW INFORMATION

8  THAT HE WOULD LIKE TO, IN SOME WAY, SHARE WITH ME RELEVANT TO

9  HIS, I ASSUME, TESTIMONY AND THINGS OF THAT NATURE.  AND HE WAS

10  WONDERING HOW THAT MIGHT HAPPEN.

11      **THE COURT:**  WELL, I DON'T KNOW.  HE COULD WRITE IT

12  DOWN, I GUESS.  AND DO YOU HAVE ANY PROBLEM WITH --

13      WHO'S IN CHARGE HERE, THE CUSTODIAL STAFF?

14      YOU ARE, SIR?

15      **CORRECTIONS OFFICER:**  SERGEANT BAXTER.

16      **THE COURT:**  SERGEANT BAXTER.

17      HOW WOULD YOU SUGGEST WE GET SOME INFORMATION FROM

18  MR. -- OR DR. ALLEN TO MR. ASHKER?  COULD HE WRITE IT DOWN ON A

19  PIECE OF PAPER?

20      **CORRECTIONS OFFICER:**  LOOKS LIKE HE ALREADY HAS

21  SOMETHING WRITTEN DOWN.  I COULD JUST --

22      **THE COURT:**  DO YOU HAVE ANY PROBLEM WITH GIVING THAT

23  TO MR. ASHKER?  OR DO YOU WANT SOMEBODY TO LOOK AT IT FIRST,

24  OR -- IF YOU'VE GOT STAPLES IN THERE, WE HAVE A STAPLE REMOVER.

25      **CORRECTIONS OFFICER:**  NO, NO STAPLES.

1          **THE COURT:**  ALL RIGHT.

2          **MR. ASHKER:**  ANOTHER -- ANOTHER MATTER, YOUR HONOR.

3    I'M -- I JUST RECEIVED SOME OF THESE ORDERS RIGHT NOW.

4          **THE COURT:**  YEAH, I FIGURED YOU MIGHT NOT HAVE GOTTEN

5    THEM SINCE THEY CAME OUT RATHER RECENTLY.  SO WE TRIED TO PUT

6    TOGETHER A PACKET FOR YOU OF THE THINGS THAT WE SENT OUT

7    RECENTLY.

8          **MR. ASHKER:**  I APPRECIATE THAT.

9          **THE COURT:**  PROBABLY HAVEN'T HAD A CHANCE TO LOOK AT

10   THEM YET, BUT MAYBE DURING A BREAK, YOU CAN --

11         **MR. ASHKER:**  I JUST EXAMINED THIS ONE.  WOULD IT BE

12   BETTER TO DISCUSS ANYTHING DURING A BREAK?

13         **THE COURT:**  WELL, I HAVE A FEW THINGS I WANT TO BRING

14   UP.

15         **MR. ASHKER:**  OKAY.

16         **THE COURT:**  SO WHY DON'T YOU LET ME BRING UP MY

17   ISSUES FIRST.  AND THEN IF YOU HAVE OTHER ISSUES AND WE HAVE

18   TIME, WE'LL TAKE THOSE UP NOW.  AND IF NOT, WE CAN TAKE THEM UP

19   AT A BREAK.

20         NOW, FOR THE DEFENDANTS, I DON'T IMAGINE YOU HAVE A

21   DISPUTE THAT DR. SAYRE WAS ACTING UNDER COLOR OF LAW.

22         **MR. ANDRADA:**  CORRECT.

23         **THE COURT:**  YOU DO NOT HAVE A DISPUTE.

24         **MR. ANDRADA:**  CORRECT.

25         **THE COURT:**  OKAY.  SO WE CAN -- THE JURY DOESN'T HAVE

1    TO FIND THAT, THEN.

2          NOW, WITH RESPECT TO TESTIMONY FROM THE PELICAN BAY

3    VIDEO SOURCE, WE DID HAVE TO HAVE THE -- OR WE DIDN'T HAVE TO, I

4    SUPPOSE, BUT I FELT IT WAS BEST TO HAVE THE INMATE WITNESSES

5    TESTIFY FROM UP THERE RATHER THAN HAVE THE ADDED EXPENSES AND

6    SECURITY ISSUES OF BRINGING THEM DOWN HERE.  BUT I HADN'T RULED

7    ONE WAY OR THE OTHER ON OTHER WITNESSES FROM UP THERE.

8          I TAKE IT YOU WOULD LIKE TO HAVE SOME OF YOUR

9    NON-INMATE WITNESSES TESTIFY FROM UP THERE.

10          **MR. ANDRADA:**  YES, IF IT PLEASE THE COURT.  AND WE

11    DID SUBMIT A FORMAL APPLICATION ON FRIDAY.  FRANKLY, WE

12    INTERPRETED YOUR PREVIOUS ORDERS TO, IN EFFECT, ALLOW US TO DO

13    THAT.  WE APOLOGIZE IF WE MISUNDERSTOOD.  BUT WE DID SUBMIT AN

14    APPLICATION, AND WE WOULD BE MOST GRATEFUL IF COURT WOULD ALLOW

15    US TO HAVE THOSE WITNESSES TESTIFY BY VIDEO CONFERENCE.

16          **THE COURT:**  OKAY.  AND WHO WOULD THOSE BE?

17          **MR. ANDRADA:**  WELL, THEY WOULD INCLUDE DR. ROWE.

18    THEY MIGHT INCLUDE -- IS IT TODD ROY?

19          **DR. SAYRE:**  DR. TODD ROY.

20          **MR. ANDRADA:**  DR. TODD ROY, AND MS. RISENHOOVER.  SO

21    IT WOULD -- ALMOST CERTAINLY BE THOSE THREE.  THERE MIGHT BE ONE

22    OR TWO OTHERS, DEPENDING UPON WHAT THE PLAINTIFF PRESENTS AS

23    EVIDENCE.

24          **THE COURT:**  OKAY.  IS THAT ALL RIGHT WITH YOU?

25          **MR. ASHKER:**  I DIDN'T -- I CAUGHT DR. ROWE AND --

```
 1            THE COURT:  ROWE, ROY, AND RISENHOOVER --

 2            MR. ASHKER:  OH.

 3            THE COURT:  -- WOULD TESTIFY FROM PELICAN BAY, THE

 4  VIDEO --

 5            WELL, THE ONLY PROBLEM WITH ROY IS HE'S NOT ON YOUR

 6  WITNESS LIST, SO THAT'S A DIFFERENT ISSUE.

 7            MR. ANDRADA:  WELL --

 8            THE COURT:  BUT RISENHOOVER AND -- IS IT ROWE -- OH,

 9  LINDA ROWE.  OH.  OH.  OKAY.  RISENHOOVER AND ROWE.

10            MR. ASHKER:  AS FAR AS THEM TESTIFYING OVER A VIDEO

11  CONFERENCE, I DON'T HAVE A PROBLEM WITH THAT.

12            I WOULD HAVE A PROBLEM WITH DR. ROY ON -- I MEAN,

13  HE'S NOT ON THEIR WITNESS LIST AND HE'S -- I FAILED TO SEE THE

14  RELEVANCE OF HIS TESTIMONY.

15            THE COURT:  YEAH.  WELL, HE ISN'T ON YOUR WITNESS

16  LIST; THAT'S QUITE TRUE, SO --

17            MR. ANDRADA:  HE IS A TREATER.  HE'S OBVIOUSLY KNOWN

18  TO THE PLAINTIFF.  HIS TESTIMONY --

19            THE COURT:  WELL, WE DON'T NEED TAKE THAT UP RIGHT

20  NOW.  IF HE DOES TESTIFY, HE CAN TESTIFY FROM UP THERE.

21            MR. ANDRADA:  YES.

22            THE COURT:  BUT YOU WILL NEED TO JUSTIFY AND EXPLAIN

23  WHY HE'S NOT ON YOUR WITNESS LIST AND HOW THAT -- ANY -- WHY

24  THAT WOULD NOT PREJUDICE THE PLAINTIFF.  ORDINARILY, WE DO HAVE

25  THE WITNESSES LISTED ON THE WITNESS LISTS.
```

     1          NOW, WITH RESPECT TO THE PROCEEDINGS, WE'LL HAVE THE

     2   JURY IN SHORTLY.  THEY'LL SITTING HERE, 14 ON THEM, AND THEN THE

     3   REST WILL BE IN THE ROWS BACK THERE.  I'LL QUESTION ENOUGH OF

     4   THEM THAT I THINK I HAVE THE NUMBER THAT I NEED.  I'LL PICK, I

     5   GUESS, EIGHT JURORS, AND THEY'LL ALL DELIBERATE.  WE NEED SIX IN

     6   THE END, SO IF TWO OF THEM GET SICK OR SOMETHING, THEN WE WOULD

     7   STILL HAVE THE SIX.  BUT IF NOBODY GETS SICK, THEY'LL ALL

     8   DELIBERATE.

     9          I WILL DEAL WITH HARDSHIP EXCUSES AND DECIDE WHO HAS

    10   A HARDSHIP.  AFTER I'VE FINISHED QUESTIONING ENOUGH JURORS, I'LL

    11   ASK YOU ALL WHETHER YOU HAVE ANY NEED TO ADDRESS THE COURT, AND

    12   BY THAT I WILL MEAN, DO YOU HAVE ANY CAUSE CHALLENGES,

    13   CHALLENGES FOR CAUSE OF JURORS.

    14          AND IF YOU DON'T, THEN YOU CAN JUST SAY NO.  AND IF

    15   YOU DO HAVE A CAUSE CHALLENGE, THEN YOU CAN SAY YES.  AND AT

    16   THAT POINT -- AT SOME POINT, THEN, WE'LL TAKE A BREAK, AND YOU

    17   CAN MAKE YOUR CAUSE CHALLENGES TO ANYBODY THAT YOU HAVE A CAUSE

    18   CHALLENGE FOR.

    19          ONCE THAT'S DONE, THEN WE'LL DO PEREMPTORY

    20   CHALLENGES.  YOU EACH GET THREE, AND WE'LL DO IT OUTSIDE THE

    21   PRESENCE OF THE JURY, AND I'LL ASK THE PLAINTIFF WHO HIS FIRST

    22   CAUSE -- FIRST PEREMPTORY CHALLENGE IS.  YOU'LL TELL ME WHO IT

    23   IS, AND THEN I'LL ASK DEFENDANT.  WE'LL GO BACK AND FORTH UNTIL

    24   EACH OF YOU HAS EITHER WAIVED OR EXERCISED EACH OF YOUR

    25   PEREMPTORY CHALLENGES.

1          AND ONCE THAT'S DONE, THEN THE FIRST EIGHT PEOPLE WHO

2   HAVEN'T GOTTEN OUT FOR SOME OTHER REASON WILL BE THE JURY.  AND

3   THEN I'LL EXCUSE THE REST OF THEM.

4          AT THAT POINT, WE'LL GIVE OPENING STATEMENT.

5          MR. ASHKER, DO YOU PLAN TO GIVE AN OPENING STATEMENT?

6          **MR. ASHKER:**  YES, I DO, YOUR HONOR.

7          **THE COURT:**  ABOUT HOW LONG WILL IT TAKE, DO YOU

8   THINK?

9          **MR. ASHKER:**  I'M NOT SURE.  I HAVEN'T BEEN ABLE TO

10  TIME IT.  I HAVE SOME NOTES THAT I'M GOING TO GO OFF OF ON IT.

11  IF YOU -- FEW PAGES, MAYBE FIVE -- BETWEEN FIVE AND TEN PAGES.

12  I -- I SHOULD BE ABLE TO READ THROUGH THEM FAIRLY -- FAIRLY

13  QUICKLY.  I DON'T SEE IT BEING MORE THAN A HALF AN HOUR AT THE

14  LONGEST.

15         **THE COURT:**  OKAY.

16         AND WHAT ABOUT YOU?

17         **MR. ANDRADA:**  WELL, YOUR HONOR, I KNOW YOU HAVE A

18  TIME LIMIT OF 30 MINUTES.  I DON'T THINK THAT I WILL GO THE FULL

19  30.  I'M GUESSING MAYBE 20, 25.  LOTS DEPENDS ON WHAT HE SAYS.

20         YOUR HONOR, I DO HAVE SOMEONE FROM MY OFFICE WHO'S

21  GOING TO BE HERE AROUND 10:00 O'CLOCK, AND WE HAVE WHAT I CALL

22  ELMO SLIDES THAT WE'D LIKE TO USE, AND I ASSUME THAT THAT'S ALL

23  RIGHT WITH THE COURT.

24         **THE COURT:**  SURE.  YES, ALTHOUGH YOU WILL NEED TO

25  COME IN AT SOME POINT AND LEARN HOW TO USE IT BECAUSE I DON'T

1    WANT A LOT OF FIDDLING AROUND WHILE THE JURY'S WAITING.  YOU'LL

2    NEED TO GET IT SET UP AND FIGURE IT OUT HOW TO USE IT.

3              **MR. ANDRADA:**  RIGHT.  SHE -- I'M VERY TECHNOLOGICALLY

4    CHALLENGED.  SHE IS NOT, SO SHE'S GOING TO, WITH YOUR

5    PERMISSION, LITERALLY STAND UP THERE AND MOVE THE SLIDES AND

6    MAKE SURE I DON'T MESS IT UP.

7              **THE COURT:**  OKAY.

8              **MR. ANDRADA:**  IS THAT --

9              **THE COURT:**  THAT'S FINE.  YEAH.

10             **MR. ANDRADA:**  GREAT.

11                   (OFF-THE-RECORD DISCUSSION.)

12             **MR. ANDRADA:**  I SEE.  THIS BIG SCREEN HERE.

13             **THE COURT:**  YEAH.

14             **MR. ANDRADA:**  WHICH IS MY KIND OF TECHNOLOGY.  THAT

15   IS TO SAY SIMPLE.

16             **THE COURT:**  YEAH, THERE'S ALSO ANOTHER TELEVISION

17   ABOUT LIKE THAT THAT'S IN THE JURY ROOM, WHICH YOU COULD

18   CONCEIVABLY SET UP OVER HERE.  SOMETIMES WE PUT THE BIG SCREEN

19   OVER HERE, BUT SINCE WE'VE GOT THE VIDEO SCREEN WE CAN'T DO

20   THAT.  WE CAN PUT IT OVER HERE, SO YOU'RE GOING TO NEED TO WORK

21   THAT OUT.

22             **MR. ANDRADA:**  VERY WELL, YOUR HONOR.  THANK YOU.

23             **THE COURT:**  SO THEN ONCE WE GET FINISHED WITH THE

24   OPENING STATEMENT, WE'LL TAKE A LUNCH BREAK ABOUT NOONISH,

25   DEPENDING ON HOW THINGS GO, COME BACK AFTER THE LUNCH BREAK --

1   THAT'S FOR TODAY ONLY.  AFTER TODAY, WE'LL BE GOING 8:30 TO

2   1:30, BUT WHO IS YOUR FIRST WITNESS, MR. ASHKER?

3           **MR. ASHKER:**  I WILL BE CALLING MYSELF AS THE FIRST

4   WITNESS, YOUR HONOR.

5           **THE COURT:**  OKAY.  AND THEN WHEN DO YOU -- WELL, I

6   GUESS YOU DON'T REALLY KNOW WHEN -- I'M JUST TRYING TO ALERT

7   PELICAN BAY TO WHEN THEY'RE GOING TO NEED TO SET UP THE OTHERS,

8   BUT I GUESS WE'LL HAVE TO FIGURE THAT OUT AFTER WE HEAR YOUR

9   TESTIMONY.

10          DO YOU HAVE ANY IDEA HOW LONG YOU'LL BE TESTIFYING?

11          **MR. ASHKER:**  I'LL PROBABLY BE A WHILE, YOUR HONOR.

12          **THE COURT:**  OKAY.  SO MAYBE WE WON'T GET TO THE

13  PELICAN BAY PEOPLE UNTIL TOMORROW.  WHO'S COMMUNICATING WITH

14  THEM TO TELL THEM WHEN TO TURN ON THEIR MACHINE AND SO ON?

15          **MR. ANDRADA:**  I HAVE A -- AN ASSOCIATE IN MY OFFICE

16  WHO'S UP THERE, AND WE INTENTIONALLY PUT HIM UP THERE KNOWING

17  THAT WE HAVE THESE SORTS OF LOGISTICAL PROBLEMS.

18          I UNDERSTOOD -- FOR WHAT IT'S WORTH, I UNDERSTAND

19  FROM MR. ASHKER THAT HE WAS GOING TO CALL DR. SAYRE AND

20  DR. WEINSTEIN -- I KNOW PEOPLE ARE NOT WEDDED TO AN ORDER OF

21  WITNESSES, BUT IT WAS MY UNDERSTANDING THAT HE WAS GOING TO CALL

22  HIMSELF AND THEN DR. SAYRE AND THEN DR. WEINSTEIN, AND THEN WE

23  HADN'T REALLY DISCUSSED BEYOND THAT.

24          SO MY POINT IS, YOUR HONOR, THAT I DON'T THINK WE'RE

25  GOING TO GET TO ANY PELICAN BAY WITNESSES EVEN TOMORROW IF WE

1  ADHERE TO THAT PROPOSED SCHEDULE OF WITNESSES.

2           **THE COURT:**  OKAY.

3           **MR. ASHKER:**  MAY I BE HEARD --

4           **THE COURT:**  YES.

5           **MR. ASHKER:**  -- YOUR HONOR?

6           I HAVE -- I DIDN'T KNOW HOW IT WAS GOING TO GO SO

7  I -- I NOTIFIED DR. WEINSTEIN THAT -- FOR HIM TO SHOW UP AT

8  8:30, NOT -- 8:30 A.M. ON WEDNESDAY MORNING.  AS FAR AS --

9  THERE'S A FEW PROBLEMS WITH A COUPLE OF MY WITNESSES.  ONE WOULD

10  BE THE PHYSICAL THERAPIST, PATRICK DODGEN, WHO I TRIED TO

11  CONTACT ON MY OWN AND GIVE HIM A HEADS UP THAT I WAS GOING TO

12  GET -- TRY TO SEND HIM A SUBPOENA.  I GOT THE LETTER RETURNED TO

13  SENDER.

14           AND THEN I -- THE COURT ORDERED THAT DEFENDANTS

15  PROVIDE ME WITH HIS ADDRESS, WHICH WAS THE SAME ADDRESS THAT I'D

16  MAILED THAT LETTER TO.  APPARENTLY HE MUST HAVE SOME KIND OF

17  ORDER WITH THE POST OFFICE NOT TO ACCEPT PRISONER MAIL.  AND

18  THEN I ASKED THE COURT FOR ASSISTANCE WITH THE MARSHAL SERVICE

19  ON SUBPOENAS FOR DODGEN AND ALLEN.  I DIDN'T KNOW HE WAS GOING

20  TO SHOW UP.  AND ALSO DR. DUNCAN, A ORTHOPEDIC SPECIALIST WHO

21  TREATED ME FROM 1994 TO 2002, AND HE'S A VERY IMPORTANT WITNESS.

22           WHEN I RECEIVED THE COURT'S ORDER DENYING MY MOTION

23  FOR MARSHAL'S ASSISTANCE, I SENT IN A RENEWED MOTION.  I'M NOT

24  SURE IF THE COURT RECEIVED IT.  BUT I EXPLAINED THAT I WAS

25  WILLING TO PAY THE COST OF THE U.S. MARSHAL.

 1           **THE COURT:**  YEAH, I JUST DON'T KNOW IF THERE'S ANY

 2 WAY TO DO THAT.  I MEAN, THE FEDERAL GOVERNMENT DOESN'T HIRE

 3 ITSELF OUT --

 4           **MR. ASHKER:**  WELL, I HAVE CASE LAW --

 5           **THE COURT:**  -- TO PRIVATE ATTORNEYS, SO I DON'T THINK

 6 I CAN -- I'D JUST NEVER DONE THAT, AND I DON'T KNOW OF ANY WAY I

 7 COULD DO THAT.

 8           **MR. ASHKER:**  WELL, I HAD A CASE --

 9           **THE COURT:**  WHAT ABOUT HIRING A PRIVATE PROCESS

10 SERVER?

11           **MR. ASHKER:**  THERE WAS NO POSSIBLE WAY FOR ME TO DO

12 THAT WITH -- WHEN I CONTACTED THE COURT ON APRIL 2ND FOR THAT

13 ASSISTANCE, I HAVE NOBODY OUT THERE ON THE STREETS.  AND IT WAS

14 JUST -- IT WASN'T POSSIBLE FOR ME TO DO THAT.  I KNOW PATRICK

15 DODGEN HAS -- THE DEFENDANTS HAVE HIM FOR ME, THAT HE'LL BE

16 AVAILABLE TO TESTIFY, IF HE'S REQUIRED, ON THURSDAY AT 1:30 IN

17 THE AFTERNOON, I ASSUME, VIA VIDEO CONFERENCE.  AND I HAVE A

18 SUBPOENA FILLED OUT FOR HIM.

19        AND AS FAR AS DR. DUNCAN GOES, I REALLY NEED HIM FOR

20 MY WITNESS.  HE -- I'M SURE HE COULD ALSO TESTIFY -- HE GOES TO

21 THE PRISON ONCE A WEEK OR SO, AND HE COULD ALSO TESTIFY OVER THE

22 VIDEO CONFERENCE.  I HAVE HIS SUBPOENA FILLED OUT.  AND AFTER I

23 GOT THE COURT'S ORDER AND I SENT IN MY RENEWED MOTION, I DID

24 FIND CASE LAW THAT PERMITS THE COURT TO HAVE THE MARSHALS ASSIST

25 AN INMATE WITH SERVICE OF PROCESS OF A COMPLAINT AND THINGS OF

1   THAT NATURE AT THE PRISONER'S EXPENSE.

2          I HAVE THE CASE LAW RIGHT HERE.

3          **THE COURT:**  OKAY.  WELL --

4          **MR. ASHKER:**  WOULD YOU LIKE TO HEAR IT?

5          **THE COURT:**  WELL, WE BETTER -- CAN YOU JUST GIVE ME

6   THE CITE OF THE CASE?

7          **MR. ASHKER:**  YES, I HAVE A --

8          **THE COURT:**  WE NEED TO -- I THINK THE JURY'S PROBABLY

9   READY, SO WE'RE GOING TO NEED TO --

10          **MR. ASHKER:**  WOULD YOU LIKE TO WAIT UNTIL WE DO --

11          **THE COURT:**  WELL, IF YOU HAD THE CITE OF THE CASE

12   HANDY, YOU COULD GIVE THAT TO ME RIGHT NOW.

13                  (SIMULTANEOUS COLLOQUY.)

14          **THE COURT:**  IF IT'S NOT HANDY, YOU COULD GIVE IT TO

15   ME LATER.

16          **MR. ASHKER:**  I HAVE IT RIGHT HERE.

17          **THE COURT:**  BUT WHILE YOU'RE DOING THAT, LET ME ASK

18   MR. ANDRADA, DO YOU -- ARE YOU GOING TO -- DO YOU HAVE DODGEN?

19   ARE YOU GOING TO CALL DODGEN?

20          **MR. ANDRADA:**  THE ANSWER IS WE MAY WELL CALL HIM, AND

21   I SHOULD HAVE MENTIONED HIM EARLY AS OUR LIST OF POSSIBLE

22   WITNESSES TESTIFYING FROM PELICAN BAY BY VIDEO CONFERENCE.  WE

23   HAVE TALKED TO HIM.  AND WE MAY CALL HIM DEPENDING UPON, AGAIN,

24   WHAT THE TESTIMONY IS, WHAT THE EVIDENCE IS FROM THE PLAINTIFF'S

25   SIDE.

```
 1              THE COURT:  DO YOU HAVE HIM UNDER SUBPOENA?

 2              MR. ANDRADA:  NO.  HE'S JUST GOING -- HE'S JUST

 3     AGREED TO TESTIFY.

 4              THE COURT:  AND HE WOULD BE UP IN PELICAN BAY

 5     TESTIFYING FROM THE PRISON?

 6              MR. ANDRADA:  YES, HE LIVES, AS I UNDERSTAND IT, JUST

 7     ACROSS THE -- THE STATE LINE IN -- IN OREGON.

 8              THE COURT:  OKAY.  WELL, CAN WE -- IF YOU DECIDE YOU

 9     DON'T WANT HIM, CAN WE TAKE ADVANTAGE OF YOUR CONTACTS WITH HIM

10     AND ASK HIM TO COME AND TESTIFY ON PLAINTIFF'S BEHALF?  OR

11     JUST -- I DON'T KNOW WHO HE -- WHOSE BEHALF IT WOULD BE, BUT ASK

12     HIM TO COME AND TESTIFY AS THE COURT'S WITNESS?

13              MR. ANDRADA:  WE WOULD CERTAINLY -- IF THAT IS WHAT

14     THE COURT WOULD LIKE US TO DO, WE WOULD GLADLY CONTACT HIM AND

15     INQUIRE AS TO WHAT HE WANTS TO DO IN THAT REGARD.

16              THE COURT:  OKAY.  SO YOU HAD TENTATIVELY SCHEDULED

17     HIM FOR THURSDAY AT 1:30?

18              MR. ANDRADA:  AGAIN --

19              THE COURT:  WELL, THAT'S NOT A GOOD TIME SINCE WE GO

20     8:30 TO 1:30.  THAT WOULD BE KIND OF.

21              MR. ANDRADA:  YEAH, THAT WOULD NOT BE A GOOD TIME.

22     UNDER THE RADAR.  WE -- AGAIN, WE'RE -- WE BEEN JUGGLING THE

23     SCHEDULE, BUT WE'VE TALKED TO HIM ABOUT TESTIFYING LATE IN THE

24     WEEK, YOUR HONOR.

25              THE COURT:  OKAY.  WELL, WOULD YOU FOLLOW UP WITH
```

```
 1    THAT AND EVEN IF YOU DECIDE YOU DON'T WANT HIM, IF YOU WOULD

 2    PLEASE ASK HIM IF HE'D BE WILLING TO TESTIFY AS THE COURT'S

 3    WITNESS EVEN IF YOU DON'T WANT TO CALL HIM AND FIND OUT WHEN, ON

 4    A 8:30 TO 1:30 SCHEDULE MONDAY THROUGH THURSDAY, HE WOULD -- OR

 5    EVEN FRIDAY MORNING FIRST THING IF WE HAD TO.  BUT MONDAY

 6    THROUGH THURSDAY WOULD BE BETTER.  AND GET HIM SET UP TO DO

 7    THAT.

 8             MR. ANDRADA:  WE WILL BE GLAD TO INQUIRE, YOUR HONOR.

 9             THE COURT:  OKAY.  AND WHAT ABOUT DUNCAN?  ARE YOU

10    CALLING HIM?

11             MR. ANDRADA:  NO, WE ARE NOT, AND WE DON'T BELIEVE --

12    I DON'T KNOW IF YOUR HONOR WANTS TO HEAR --

13             THE COURT:  YEAH, I KNOW YOU THINK IT WAS TOO LONG

14    AGO, BUT SETTING THAT ASIDE, JUST LOGISTICALLY, DO YOU KNOW

15    WHERE HE IS?  DOES HE STILL WORK AT THE PRISON?

16             MR. ANDRADA:  I'M -- DR. SAYRE?

17             DR. SAYRE:  DR. DUNCAN'S IN PRIVATE PRACTICE ORTHO

18    SURGEON IN CRESCENT CITY.  I DON'T KNOW IF HE'S ON VACATION THIS

19    WEEK OR WHAT AS FAR AS HIS PERSONAL SCHEDULE.

20             THE COURT:  DID YOU WRITE TO HIM OR TRY AND --

21             MR. ASHKER:  I WROTE HIM, AND I SENT HIM A SUBPOENA.

22    I HAVE A COPY OF IT HERE.  I SENT HIM A SUBPOENA BACK ON -- IN

23    EARLY APRIL.

24             THE COURT:  DID HE RESPOND?

25             MR. ASHKER:  I SENT HIM A SUBPOENA REQUESTING A COPY
```

```
 1    OF HIS CURRICULUM VITAE AND FOR THE MEDICAL RECORDS THAT HE HAD

 2    AT HIS OFFICE, AND I -- I SENT IT THROUGH THE LAW LIBRARY.

 3              THE COURT:  I'M JUST ASKING WHETHER HE RESPONDED.

 4           MR. ASHKER:  HE DID NOT RESPOND, YOUR HONOR.

 5              THE COURT:  BUT IT DID NOT COME BACK "RETURN TO

 6    SENDER" LIKE THE OTHER --

 7           MR. ASHKER:  NO, IT DID NOT.

 8              THE COURT:  OKAY.  AND YOU'RE NOT IN TOUCH WITH HIM.

 9           MR. ANDRADA:  NO, YOUR HONOR.

10              THE COURT:  WELL, I DON'T KNOW WHAT TO DO ABOUT THAT.

11              IF YOU WANT TO FIND ME THAT CASE THAT YOU SAID YOU

12    HAD, WE CAN, I GUESS, LOOK INTO THAT AND SEE IF WE CAN SEND THE

13    MARSHAL UP TO SUBPOENA HIM.

14              UNLESS YOU'D BE WILLING TO CONTACT HIM.

15           MR. ANDRADA:  NO, YOUR HONOR.  RESPECTFULLY, WE DON'T

16    THINK HE SHOULD BE A WITNESS AT TRIAL, GIVEN THE FACT THAT HE

17    HASN'T SEEN THE PLAINTIFF FOR MANY, MANY YEARS, AND GIVEN OUR

18    BRIEF TIME TO PUT ON THE CASE.

19              THE COURT:  OKAY.

20           MR. ASHKER:  YOUR HONOR?  EXCUSE ME.  YOU HAD ALREADY

21    RULED IN -- IN YOUR MOTIONS IN LIMINE RULINGS THAT DR. DUNCAN,

22    BASED ON THE PAPERS THAT WE FILED ON HIM, WAS A RELEVANT --

23              THE COURT:  OKAY.

24           MR. ASHKER:  -- WITNESS.

25              THE COURT:  RIGHT.
```

1              **MR. ASHKER:**  AND ONE OTHER THING --

2              **THE COURT:**  YEAH.

3              **MR. ASHKER:**  ONE LITTLE THING -- ONE LAST THING, REAL

4      QUICK.  I HAVE A LETTER HERE WITH DOCUMENTS ATTACHED WHICH I

5      RECEIVED FROM DR. ALLEN ON A VERY IMPORTANT MATTER THAT HE

6      WANTED ME TO SUBMIT TO THE COURT CONCERNING A CONFLICT WITH

7      ATTORNEY ANDRADA.

8              **THE COURT:**  HMM.  OKAY.

9              SO YOU WANT TO GIVE ME THOSE PAPERS; THAT WHAT YOU'RE

10     SAYING?

11             **MR. ANDRADA:**  I AM AWARE OF THESE PAPERS, YOUR HONOR,

12     I RECEIVED THEM 5:45 FRIDAY NIGHT AND WOULD BE MORE THAN PLEASED

13     TO RESPOND.

14             **THE COURT:**  OKAY.  WELL, NOT RIGHT NOW.

15             SO, MR. ASHKER, WHAT ORDER OF WITNESSES DO YOU HAVE

16     IN MIND?  I GUESS WE CAN WORRY ABOUT THAT LATER.  WE KNOW YOU'RE

17     FIRST.  WE KNOW WE DON'T NEED ANY PELICAN BAY PEOPLE TODAY, SO

18     WE'LL TALK ABOUT THIS LATER.

19             **MR. ASHKER:**  OKAY.

20             **THE COURT:**  ONE LAST QUESTION ON DUNCAN, THOUGH.  IF

21     HE WERE TO BE WILLING TO TESTIFY SOME WAY OR OTHER, IF I -- I

22     DON'T KNOW IF I ALREADY RULED -- I CAN'T REMEMBER -- THAT -- IF

23     I ALREADY DENIED YOUR MOTION AND RULED THAT HE COULD TESTIFY, OR

24     IF I DO THAT AND SOMEHOW I FIGURE OUT SOME KIND OF WAY TO GET

25     HIM UNDER SUBPOENA, WOULD YOU BE WILLING TO LET HIM -- AND WOULD

 1    THE PRISON BE WILLING TO LET HIM COME TO PELICAN BAY TO TESTIFY

 2    ON THE VIDEO TERMINAL, OR WOULD I HAVE TO GET HIM TO COME DOWN

 3    HERE?

 4              **DR. SAYRE:**  DR. DUNCAN HAS A GATE PASS AT PELICAN

 5    BAY, YOUR HONOR.

 6              **THE COURT:**  SO HE CAN GO IN THERE AND TESTIFY.

 7              **DR. SAYRE:**  YES, HE COULD.

 8              **THE COURT:**  OKAY.

 9              **MR. ASHKER:**  YOUR HONOR, I HAVE THE COURT'S ORDER

10    RIGHT HERE.

11              **THE COURT:**  OKAY.  I JUST CAN'T REMEMBER ALL THESE

12    THINGS.  IF I DID IT, I DID IT, IT'S WRITTEN DOWN SOMEWHERE.  IF

13    I DIDN'T DO IT, I'LL THINK ABOUT IT.

14              **MR. ASHKER:**  IT WAS RIGHT HERE ON THE ORDER OF

15    MAY 6TH, 2009, IN LIMINE MOTION RULINGS AT PAGE 4, NO. 7,

16    WHERE -- MOTION TO STRIKE PLAINTIFF'S SUPPLEMENTAL NOTICE

17    DESIGNATING DR. DUNCAN AS AN EXPERT WITNESS AND TO PRECLUDE

18    DR. DUNCAN FROM TESTIFYING REGARDING HIS TREATMENT OF PLAINTIFF

19    AFTER MARCH 6TH, 2002.

20              THE MOTION TO STRIKE IS DENIED.  AS PLAINTIFF'S

21    FORMER TREATING PHYSICIAN, DR. DUNCAN MAY PRESENT HIS OPINION OF

22    CAUSATION, DIAGNOSIS, AND PROGNOSIS DERIVED FROM HIS TREATMENT

23    OF PLAINTIFF.  HOWEVER, HE MAY NOT TESTIFY TO ANY OPINIONS HE

24    FORMED BASED ON FACTS.

25              **THE COURT:**  OKAY.  ALL RIGHT.

```
 1                    (SIMULTANEOUS COLLOQUY.)

 2           THE COURT:  ALL RIGHT.  SO LOOKS LIKE I ALREADY

 3   ALLOWED HIM TO TESTIFY AS A PERCIPIENT WITNESS ABOUT THE

 4   BEGINNINGS OF THE PROBLEMS AND SO ON.

 5           MR. ANDRADA:  CORRECT.

 6           THE COURT:  SO WE'LL -- IF YOU'RE NOT WILLING TO

 7   CONTACT HIM, I'LL FIGURE OUT -- MAYBE I'LL HAVE THE CLERK CALL

 8   HIM OR SOMETHING.

 9                NOW, WHAT ABOUT DR. ALLEN?  HE IS HERE.  DID YOU WANT

10   TO LET HIM KNOW WHEN YOU WANT HIM TO TESTIFY?

11           MR. ASHKER:  CAN I ASK HIM WHETHER IT WOULD BE --

12           THE COURT:  WHEN WOULD YOU LIKE?  DO YOU HAVE ANY

13   SCHEDULING DIFFICULTIES, DR. ALLEN?

14           DR. ALLEN:  NO, I DO NOT.

15           THE COURT:  SO MONDAY THROUGH THURSDAY, 8:30 TO 1:30.

16           DR. ALLEN:  HOW ABOUT -- TOMORROW OR WEDNESDAY WOULD

17   BE GOOD FOR ME.

18           MR. ASHKER:  THAT -- WHEN WOULD IT BE BEST FOR YOU?

19           DR. ALLEN:  WEDNESDAY WOULD BE --

20           MR. ASHKER:  WEDNESDAY.  OKAY.  I HAVE DR. WEINSTEIN

21   HOPEFULLY SCHEDULED FIRST THING IN THE MORNING ON WEDNESDAY.

22   AND AS SOON AS HE WAS DONE, I'D PUT YOU ON.

23           DR. ALLEN:  OKAY.

24           THE COURT:  OKAY.

25           MR. ASHKER:  YOUR HONOR?
```

```
 1              THE COURT:  SO WHY DON'T YOU COME IN AT, LIKE, 9:30

 2    ON WEDNESDAY JUST TO BE SAFE.  THAT ALL RIGHT?

 3              DR. ALLEN:  THAT'S ALL RIGHT.

 4              MR. ASHKER:  YOUR HONOR, I HAVE AN IDEA ON POSSIBLY

 5    RESOLVING THIS PROBLEM WITH DR. DUNCAN'S RECEIPT OF A SUBPOENA.

 6    WOULD IT BE ALL RIGHT IF I ASK DR. ALLEN IF HE COULD PERHAPS

 7    SERVE -- HELP ME WITH THE SERVICE OF DR. DUNCAN?

 8              THE COURT:  WELL, DUNCAN IS UP IN CRESCENT CITY, AND

 9    ALLEN IS DOWN HERE, SO I'M NOT SURE THAT WILL WORK OUT TOO WELL.

10    WE'LL TRY TO FIGURE SOMETHING OUT.

11              MR. ASHKER:  OKAY.

12              THE COURT:  OKAY.  SO I'M GOING TO GET THE JURY AND

13    WE'LL --

14              MR. ANDRADA:  YOUR HONOR, WILL WE HAVE A CHANCE TO

15    DISCUSS WITH YOU PRIOR TO OPENING STATEMENT SOME CONCERNS WE

16    HAVE ABOUT WHAT MIGHT BE SAID DURING OPENING STATEMENTS?

17              THE COURT:  OKAY.  SHEILAH, DO YOU THINK THEY'RE

18    READY?

19              THE CLERK:  AS FAR AS I KNOW, THEY SHOULD BE READY

20    AROUND 9:00 O'CLOCK.

21              THE COURT:  OKAY.  WE'LL TALK ABOUT THAT AT ANOTHER

22    BREAK.

23              MR. ANDRADA:  VERY WELL.  THANK YOU, YOUR HONOR.

24              THE COURT:  I DON'T LIKE TO KEEP THEM TOO LONG WHEN

25    THEY'RE READY TO GO.
```

```
 1              SO I'M GOING TO GO TO CHAMBERS WHILE SHE BRINGS THEM

 2     IN.  SHE CALLS THE ROLL, CALLS THEM IN ORDER, SWEARS THEM,

 3     ET CETERA, AND THEN I'LL COME BACK OUT AND DOING THE

 4     QUESTIONING.  SO --

 5              OKAY.

 6              MR. ANDRADA:  YOUR HONOR, MAY I INTRODUCE --

 7              THE COURT:  PLEASE.

 8              MR. ANDRADA:  -- GRACE GOODMAN.  SHE IS AN ATTORNEY,

 9     LICENSED IN THE STATE.  SHE'S NOT YET LICENSED IN THE NORTHERN

10     DISTRICT.  SHE'S GOT HER APPLICATION, I THINK, WITH HER.  IF WE

11     CANNOT GET HER SWORN IN, SHE'S PREPARED TO HELP IN THE CAPACITY

12     OF A PARALEGAL.

13              THE COURT:  OKAY.

14              EITHER WAY IS FINE, IF YOU --

15              MR. ANDRADA:  ALL RIGHT.

16              THE COURT:  I DON'T KNOW HOW HARD IT IS TO GET HER

17     SWORN IN.

18              MR. ANDRADA:  SHE SAYS IT'S EASY.

19              THE COURT:  WELL, THEN --

20              MR. ANDRADA:  I'LL TAKE HER AT HER WORD.

21              THE COURT:  ALL RIGHT.  SO WE'LL BE IN RECESS UNTIL

22     THE JURY'S READY TO GO.

23              I'M GOING TO FILL THE JURY BOX, AND ONCE THE JURY BOX

24     IS FILLED, I'M GOING TO CONTINUE TO CALL NAMES UNTIL I'VE CALLED

25     EVERYBODY'S NAME AND I'VE SEATED YOU IN THE ORDER THAT I'VE
```

1    CALLED YOUR NAME.  SO ONCE THE JURY BOX IS FILLED, THEN WE'LL

2    FILL THIS ROW, AND ONCE THIS ROW GETS FILLED, IF THERE'S ANYBODY

3    SITTING ON THIS ROW, I'M GOING TO ASK YOU JUST TO TEMPORARILY

4    FIND ANOTHER SEAT 'CAUSE I'M GOING TO BE CALLING EVERYONE'S

5    NAME, AND I'M GOING TO BE SEATING YOU IN THE ORDER THAT I'VE

6    CALLED YOUR NAME.

7             THEN WHEN THE JUDGE COMES OUT AND TAKES THE BENCH,

8    SHE'LL BEGIN WHAT'S CALLED THE VOIR DIRE PROCESS.  SHE'LL BE

9    ASKING QUESTIONS THAT WILL BE TOUCHING UPON YOUR QUALIFICATIONS

10   TO SERVE AS A JUROR.  IF THERE'S ANYTHING THAT NEEDS TO BE

11   BROUGHT TO THE JUDGE'S ATTENTION, PLEASE BRING IT TO HER

12   ATTENTION WHILE SHE'S QUESTIONING YOU REGARDING ANY KIND OF

13   PROBLEMS YOU HAVE WITH SERVICE AS A JUROR.  ONCE YOU'RE PICKED,

14   THEN IT'S TOO LATE.  YOU NEED TO BRING IT TO HER ATTENTION WHEN

15   SHE'S QUESTIONING YOU.

16             SO, AGAIN, THE FIRST THING I'M GOING TO DO RIGHT NOW

17   IS JUST RANDOMLY BEGIN TO CALL NAMES.  AS I SAID, AS I CALL YOUR

18   NAME, PLEASE COME FORWARD, BE SEATED IN THE JURY BOX.  I'LL BE

19   CALLING EVERYONE'S NAME.  AND IF I MISPRONOUNCE YOUR NAME,

20   PLEASE CORRECT ME.  AND I APOLOGIZE AHEAD OF TIME.

21             (PAUSE IN THE PROCEEDINGS.)

22        **THE CLERK:**  I'M GOING TO BE SPELLING YOUR LAST NAME

23   FOR THE BENEFIT OF THE COURT REPORTER.  SO THE FIRST PERSON IS

24   MAKAPUGAY, M-A-K-A-P-U-G-A-Y.

25        **PROSPECTIVE JUROR:**  THAT'S ME.

```
 1                    THE CLERK:  OH, COME FORWARD.  YOU'LL NEED TO BRING

 2    YOUR STUFF WITH YOU.  AND I'LL HAVE YOU SIT IN THE JURY BOX.

 3                    (PAUSE IN THE PROCEEDINGS.)

 4                    THE CLERK:  VU, V-U, UYEN.

 5                    PROSPECTIVE JUROR:  IT'S WEN (PHONETIC).

 6                    THE CLERK:  OH, WEN (PHONETIC)?

 7                    IS IT W-Y?

 8                    PROSPECTIVE JUROR:  IT'S U-Y.  BUT IT'S PRONOUNCED

 9    WEN.

10                    THE CLERK:  I APOLOGIZE.  THANK YOU.

11                    IS IT LATCH (PHONETIC) -- LAKSHMANAN?

12                    PROSPECTIVE JUROR:  YES.

13                    THE COURT:  LAKSHMANAN.  OKAY.  L-A-K-S-H-M-A-N-A-N,

14    HARI.

15                    VANOPPEN, V-A-N-O-P-P-E-N, TIMOTHY.

16                    PROSPECTIVE JUROR:  YES.

17                    THE CLERK:  GOODKIND, G-O-O-D-K-I-N-D, MARY.

18                    FRIEDMAN, F-R-I-E-D-M-A-N, NANCY.

19                    JOHNSON, J-O-H-N-S-O-N, JULIE.

20                    IS IT BOYADJIEFF?  B-O-Y-A-D-J-I-E-F-F, CASEY.

21                    TOROIAN, T-O-R-O-I-A-N, VICKY.

22                    CABICO, C-A-B-I-C-O, ROBERT.

23                    PROSPECTIVE JUROR:  CABICO.

24                    THE CLERK:  CABICO.

25                    BANERJEE, B-A-N-E-R-J-E-E, AYAN.
```

```
1              WILCOX, W-I-L-C-O-X, DIANE.

2              CRAVEA, C-R-A-V-E-A, MATT.

3              PROSPECTIVE JUROR:  CRAVEA.

4              THE CLERK:  CRAVEA, APOLOGIZE.

5              IS IT WONG (PHONETIC), W-A-N-G, MELANIE?

6              PROSPECTIVE JUROR:  WANG.

7              THE CLERK:  OH, WANG.  OKAY.  SORRY.

8              SAULSBURY, S-A-U-L-S-B-U-R-Y, DALENE.

9              PROSPECTIVE JUROR:  DALENE.

10             THE CLERK:  DALENE.

11             RICHARDSON, R-I-C-H-A-R-D-S-O-N, LISA.

12             HARWOOD, H-A-R-W-O-O-D, PATRICIA.

13             IS IT DAI?  D-A-I, ELIZABETH.

14             LINDO, L-I-N-D-O, MIRIAMA.

15             HAMMER, H-A-M-M-E-R, CATHY.

16             FERRARO, F-E-R-R-A-R-O, ROBERT.

17             TALLEY, T-A-L-L-E-Y, REBECCA.

18             MUGGENTHALER, M-U-G-G-E-N-T-H-A-L-E-R, MONA.

19             OKAY.  IF THERE'S ANYBODY IN THAT SECOND ROW, IF YOU

20   COULD JUST TEMPORARILY -- IS THAT EMPTY?  OKAY.  JUST

21   TEMPORARILY FIND ANOTHER SEAT.

22             YEE, Y-E-E, KAREN.

23             SARMIENTO, S-A-R-M-I-E-N-T-O, TEDDY.

24             DIFILIPPO, D-I-F-I-L-I-P-P-O, MICHAEL.

25             VIERA, V-I-E-R-A, KATHY.
```

```
 1              MYERS, M-Y-E-R-S, JOHNNIE.

 2              IS IT KHUFU?  KHUFU, K-H-U-F-U, SITA.

 3              SALINAS, S-A-L-I-N-A-S, ESTEVAN.

 4              SILVAS, S-I-L-V-A-S, ARCULANO.

 5              LO-LI, L-O, HYPHEN, L-I, CAMMILLE.

 6              THANK YOU.

 7              COUNTER, C-O-U-N-T-E-R, STEVE.

 8              KERBY, K-E-R-B-Y, BRENDA.

 9              GILMOUR, G-I-L-M-O-U-R, KATHLEEN.

10              SMITH, S-M-I-T-H, EDWARD.

11              EVRIPIDOU, E-V-R-I-P-I-D-O-U, MARIANNA.

12              BASULTO, B-A-S-U-L-T-O, CARMEN.

13              AND KIRCHNER, K-I-R-C-H-N-E-R, ROGER.

14              ALL RIGHT, LADIES AND GENTLEMEN.

15              THE JUDGE WILL BE OUT SHORTLY TO BEGIN AGAIN WHAT'S

16  CALLED THE VOIR DIRE PROCESS.  SHE'LL BE ASKING QUESTIONS

17  UPON (SIC) YOU, TOUCHING UPON YOUR QUALIFICATIONS TO SERVE AS A

18  JUROR.  AND THE ANSWERS YOU GIVE TO THOSE QUESTIONS ARE GIVEN

19  UNDER OATH, SO IF EVERYBODY WOULD PLEASE STAND AND RAISE THEIR

20  RIGHT HAND.

21                      (VENIRE SWORN.)

22              (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE

23  OF THE JURY:)

24          THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

25          MR. ANDRADA:  MORNING, YOUR HONOR.
```

 1          **THE COURT:**  YOU'VE BEEN CALLED AS POTENTIAL JURORS IN

 2   A FEDERAL CIVIL TRIAL THAT'S ABOUT TO BEGIN.  I'M JUDGE CLAUDIA

 3   WILKEN.  I'LL BE PRESIDING OVER THE TRIAL.

 4          YOU'VE FILLED OUT SOME QUESTIONNAIRES, AND WE HAVE

 5   THOSE QUESTIONNAIRES, AND AT THIS POINT, WE'LL BE ASKING YOU

 6   SOME ADDITIONAL QUESTIONS TO FILL IN THE INFORMATION THAT WE

 7   NEED IN ORDER TO SELECT A FAIR JURY.

 8          I'LL START WITH ASKING SOME OF THE QUESTIONS OF ALL

 9   OF YOU AS A WHOLE AND ASK YOU TO RAISE YOUR HAND IF YOU HAVE A

10   "YES" ANSWER TO THE QUESTION.

11          MY FIRST QUESTION IS GOING TO BE WHETHER YOU'RE

12   FAMILIAR WITH ANY OF THE PARTIES OR THE ATTORNEYS IN THIS CASE,

13   AND TO DO THAT, I'M GOING TO HAVE THE CLERK CALL THE CASE AND

14   ASK THE ATTORNEYS AND THE PARTIES TO STATE THEIR APPEARANCES,

15   WHICH MEANS INTRODUCE THEM TO YOU, AND THEN I'LL BE ASKING YOU

16   WHETHER ANY OF YOU ARE ACQUAINTED WITH ANY OF THEM.

17          SO, SHEILAH, IF YOU COULD CALL THE CASE.

18          **THE CLERK:**  CALLING THE MATTER OF ASHKER VERSUS

19   SAYRE, CIVIL ACTION NO. C05-3769.

20          COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

21   RECORD.

22          **MR. ANDRADA:**  GOOD MORNING.  MY NAME IS RANDY

23   ANDRADA, AND I REPRESENT DR. MICHAEL SAYRE, WHO IS HERE WITH US

24   TODAY.  AND I ALSO REPRESENT A MR. MICHAEL CATE, WHO YOU WILL

25   LEARN IS THE EXECUTIVE DIRECTOR OF THE STATE PRISON SYSTEM.

1          THANK YOU VERY MUCH.

2          **THE COURT:**  DO YOU WANT TO INTRODUCE THE PEOPLE AT

3    COUNSEL TABLE?

4          **MR. ANDRADA:**  YES, I WOULD LIKE TO DO THAT AS WELL.

5    AND LET ME STEP THIS WAY.  IT'S A LITTLE EASIER.  THIS IS ALICIA

6    KENNON.  SHE'S A LAWYER WHO IS GOING TO BE IN AND OUT OF THE

7    COURTROOM THIS WEEK.  AND GRACE GOODMAN IS ALSO A LAWYER WHO'S

8    GOING TO BE IN AND OUT OF THE COURTROOM THIS WEEK.

9          THANK YOU, YOUR HONOR.

10         **THE COURT:**  AND MR. ASHKER.

11         **MR. ASHKER:**  YES.  GOOD MORNING, PEOPLE OF THE

12   POSSIBLE JURY.  MY NAME'S TODD ASHKER, AND I'M REPRESENTING

13   MYSELF PRO PER AGAINST THE DEFENDANT HERE.

14         I'M A STATE PRISONER, AND THAT'S ABOUT IT.

15         **THE COURT:**  SO IS THERE ANYONE WHO'S ACQUAINTED WITH

16   ANY OF THESE PEOPLE THAT HAVE JUST BEEN INTRODUCED?  IF YOU ARE,

17   IF YOU COULD JUST RAISE YOUR HANDS.

18         NO HANDS.  OKAY.

19         THIS LAWSUIT IS AN ACTION WHICH ARISES OUT OF THE

20   MEDICAL CARE THAT THE PLAINTIFF TODD LOUIS ASHKER, WHO JUST

21   INTRODUCED HIMSELF, WHO IS A STATE PRISONER, RECEIVED WHILE HE

22   WAS AT WHERE HE STILL IS, PELICAN BAY STATE PRISON IN

23   CRESCENT CITY, CALIFORNIA.

24         THE PLAINTIFF CLAIMS THAT THE DEFENDANT FAILED TO

25   PROVIDE HIM WITH APPROPRIATE MEDICAL CARE AND THAT AS A RESULT,

1    HE SUFFERED UNNECESSARY PAIN AND A PREEXISTING MEDICAL CONDITION

2    OF HIS WAS AGGRAVATED.  THE PLAINTIFF SEEKS MONEY DAMAGES FOR

3    HIS PAIN AND THE ALLEGED AGGRAVATION OF HIS INJURY.

4            THE DEFENDANTS DENY THE PLAINTIFF'S ALLEGATIONS,

5    CONTEND THAT THEY PROVIDED APPROPRIATE MEDICAL CARE, AND DENY

6    THAT THEY CAUSED THE PLAINTIFF ANY HARM.

7            THE PLAINTIFF ALSO ALLEGES THAT THE DEFENDANTS

8    BREACHED OR BROKE A MAY 24TH, 2002, SETTLEMENT AGREEMENT IN

9    WHICH THEY AGREED TO REFER HIM TO U.C. DAVIS TO A PAIN

10   MANAGEMENT CLINIC CONSULTATION AND TO PROVIDE WITH HIM THE

11   MEDICAL TREATMENT AND THERAPEUTIC DEVICES THAT WOULD BE

12   RECOMMENDED FOR AS LONG AS THEY WERE MEDICALLY INDICATED.

13           THE DEFENDANTS CONTEND THAT THEY COMPLIED WITH THAT

14   AGREEMENT TO THE EXTENT IT WAS POSSIBLE TO DO SO.

15           HAVE ANY OF YOU HEARD ANYTHING ABOUT THIS DISPUTE?

16   IT'S UNLIKELY THAT YOU WOULD HAVE.  IT WASN'T IN THE PAPERS OR

17   ANYTHING, BUT IS THERE ANYONE WHO'S HEARD OF THIS BEFORE COMING

18   HERE THIS MORNING?  RAISE YOUR HAND IF YOU HAVE.

19           ALL RIGHT.  NO ONE HAS APPARENTLY.

20               (OFF-THE-RECORD DISCUSSION.)

21   **THE COURT:**  SO WHEN YOU WERE FILLING OUT YOUR JURY

22   QUESTIONNAIRES, YOU WERE GIVEN A LIST OF PEOPLE WHO MAY BE

23   WITNESSES OR WHOSE NAMES MAY COME UP.

24           ARE THERE ANY OF YOU WHO ARE ACQUAINTED WITH ANY OF

25   THESE PEOPLE?  NOW, SOME OF THEM ARE COMMON NAMES, SO IF YOU

 1   KNOW A BARRY O'NEILL, MIGHT NOT BE THE BARRY O'NEILL IN

 2   QUESTION, AND IF THAT'S THE CASE, WE CAN ASK YOU WHO YOUR BARRY

 3   O'NEILL WAS AND SEE IF IT IS THE SAME PERSON.

 4          SO DO ANY OF THESE NAMES RING A BELL TO ANY OF YOU?

 5          OKAY.  IF YOU COULD THEN -- THOSE OF YOU WHO RAISED

 6   YOUR HAND, I'M GOING TO BE ASKING A FEW QUESTIONS OF EACH OF YOU

 7   INDIVIDUALLY.  IF YOU COULD, WHEN I DO THAT, REMIND ME THAT YOU

 8   HAD RAISED YOUR HAND AND THAT YOU HAD HEARD OF SOME OF THESE

 9   PEOPLE AND WE'LL FIND OUT WHO IT IS THAT YOU'VE HEARD OF.

10          SO THE PROCESS THAT WE'RE GOING TO UNDERTAKE, WHICH

11   IS CALLED VOIR DIRE AS I HAD MENTIONED, WILL CONSIST OF MY

12   ASKING YOU SOME ADDITIONAL QUESTIONS, EITHER TO FOLLOW UP ON

13   YOUR QUESTIONNAIRE OR SOME -- SOME OTHERS -- FORM QUESTIONS THAT

14   I HAVE.

15          WE'RE ASKING YOU THESE QUESTIONS NOT TO INVADE YOUR

16   PRIVACY OR TO EMBARRASS YOU BUT SO THAT WE CAN GET ENOUGH

17   INFORMATION ABOUT YOU ALL TO CHOOSE A FAIR AND IMPARTIAL JURY TO

18   SIT ON THIS CASE.  SO IT'S IMPORTANT THAT YOU ANSWER THE

19   QUESTIONS HONESTLY AND TRUTHFULLY AND FULLY.  IF THERE IS

20   SOMETHING THAT YOU FIND EMBARRASSING OR PRIVATE FOR SOME REASON,

21   RATHER THAN SIMPLY NOT ANSWER IT, IF YOU COULD JUST ASK ME OR

22   TELL ME THAT THERE'S SOMETHING YOU'D RATHER DISCUSS OUTSIDE THE

23   PRESENCE OF THE OTHER JURORS, AND WE'LL TRY TO ACCOMMODATE THAT.

24          I DON'T THINK I'LL BE ASKING YOU ANY PARTICULARLY

25   EMBARRASSING QUESTIONS, BUT IF THAT DOES COME UP, BE SURE AND

1   MENTION THAT.  YOU ARE -- YOU HAVE BEEN SWORN, AND YOUR ANSWERS

2   ARE UNDER PENALTY OF PERJURY.  THE QUESTIONNAIRE WAS ALSO FILLED

3   OUT UNDER PENALTY OF PERJURY, SO AS YOU THINK ABOUT THIS, IF IT

4   OCCURS TO YOU THAT YOU'VE FORGOTTEN SOMETHING ON YOUR

5   QUESTIONNAIRE OR MISSTATED SOMETHING, BE SURE AND BRING THAT TO

6   MY ATTENTION WHEN I SPEAK WITH YOU INDIVIDUALLY.

7            THIS CASE IS SCHEDULED TO GO THIS WEEK.  WE ARE

8   HOPING THAT WE WILL HAVE THE EVIDENCE PORTION OF THE TRIAL

9   FINISHED BY THE END OF THIS WEEK.  THE JURY THEN WOULD BEGIN

10  DELIBERATING.  YOU MIGHT GO INTO NEXT WEEK IN TERMS OF TIME

11  SPENT ON DELIBERATION, BUT CERTAINLY WE COULD BE QUITE SAFE TO

12  SAY THAT BY THE END OF NEXT WEEK, YOUR DELIBERATIONS WOULD BE

13  FINISHED ONE WAY OR THE OTHER.  AND EVEN IF THE TRIAL TAKES A

14  LITTLE BIT LONGER THAN FIVE DAYS AND GOES INTO MONDAY, YOU'D

15  CERTAINLY START DELIBERATING EARLY NEXT WEEK.

16           THE SCHEDULE WE'LL HAVE TODAY WILL BE WE'LL GO FROM

17  NOW UNTIL ABOUT NOONISH.  WE'LL TAKE ABOUT AN HOUR OR SO LUNCH

18  BREAK, COME BACK, AND START THE TRIAL THIS AFTERNOON.  WE'LL RUN

19  TILL ABOUT 4:00 OR SO TODAY.  BUT AFTER TODAY, TUESDAY THROUGH

20  FRIDAY, OUR SCHEDULE WILL BE 8:30 IN THE MORNING TILL 1:30 IN

21  THE AFTERNOON.  WE WON'T TAKE A LUNCH BREAK.  WE'LL TAKE TWO

22  SHORT 15-MINUTE BREAKS.  IF YOU NEED TO EAT, BRING A SNACK THAT

23  YOU CAN -- THAT YOU CAN EAT DURING THE BREAK.

24           AND WE'VE FOUND THAT IF WE DON'T TAKE A LONG BREAK

25  FOR LUNCH BUT JUST GO STRAIGHT THROUGH, WE CAN GET MORE DONE IN

1    A -- IN A LITTLE OVER A HALF A DAY THAN WE COULD IF WE TOOK A

2    LONG BREAK AND LEFT AND CAME BACK.  AND MOST JURORS HAVE FOUND

3    THAT THAT MAKES IT MUCH EASIER FOR THEM TO SERVE BECAUSE IF

4    THEY'VE GOT KIDS TO PICK UP OR WORK TO GO BACK TO, IT GIVES THEM

5    A LITTLE TIME IN THE AFTERNOON.

6            SO HOPEFULLY THAT WILL MAKE IT EASIER FOR SOME OF YOU

7    TO SERVE, AND IT'S HELPFUL FOR THE ATTORNEYS AND FOR THE COURT

8    AS WELL.

9            I UNDERSTAND THAT JURY SERVICE CAN BE INCONVENIENT,

10   BUT THIS WILL BE A RELATIVELY SHORT TRIAL.  IT WILL BE AN

11   INTERESTING TRIAL.  AND I THINK YOU'LL FIND, IF YOU ARE SELECTED

12   TO SERVE, THAT IT WILL BE A VALUABLE AND INTERESTING EXPERIENCE

13   FOR YOU.  AND IT IS SOMETHING -- ONE OF THE FEW THINGS THAT,

14   BESIDES TAXES, THAT WE'RE ALL CALLED UPON TO DO AS CITIZENS OF

15   THE COUNTRY, IS TO MAKE IT POSSIBLE FOR PEOPLE TO HAVE JURY

16   TRIALS AND TO HAVE DISPUTES RESOLVED BY JURORS SUCH AS YOURSELF.

17           SO I HOPE IT -- THAT YOU WILL THINK ABOUT THAT.  IF

18   YOU DO HAVE A SEVERE PERSONAL HARDSHIP, YOU CAN CERTAINLY TELL

19   ME ABOUT THAT, BUT I HOPE THAT EACH OF YOU WILL TRY, IF YOU

20   POSSIBLY CAN, TO MAKE YOURSELF AVAILABLE TO SERVE.

21           ALL RIGHT.  I'M GOING TO START WITH MS. MAKAPUGAY.

22           WE'VE GOT A MICROPHONE RIGHT THERE FOR YOU.  IT WILL

23   PICK UP.  YOU HAVE TO HOLD IT PRETTY CLOSE TO YOUR MOUTH TO

24   ANSWER.  I'LL BE ASKING, AS I SAID, SOME QUESTIONS THAT I'LL ASK

25   ALL OF YOU, SO I'LL ASK THE SORT OF LONG VERSION TO THE FIRST

```
1   JUROR, BUT I'LL BE ASKING BASICALLY THE SAME QUESTIONS OF ALL OF

2   YOU.  SO IF EACH OF YOU WOULD KIND OF LISTEN TO THE LONG

3   VERSION, THEN I CAN -- I'LL ASK A SHORT VERSION WHEN I GET TO

4   EACH OF YOU.

5           SO YOU WERE BORN IN THE PHILIPPINES.  HOW -- WHEN DID

6   YOU COME TO THIS COUNTRY?

7           PROSPECTIVE JUROR:  1988.

8           THE COURT:  1988.  AND YOU -- SO YOU WENT TO COLLEGE

9   IN THE PHILIPPINES?

10          PROSPECTIVE JUROR:  YES.

11          THE COURT:  AND CAME HERE AFTER COLLEGE?

12          PROSPECTIVE JUROR:  YES.

13          THE COURT:  AND WHAT DO YOU ANALYZE AT THE GAP?

14  FINANCIAL MATTERS?

15          PROSPECTIVE JUROR:  I DO BUDGETING AND FORECASTING

16  FOR THE FINANCE DEPARTMENT FOR THE CORPORATE DEPARTMENT (SIC).

17          THE COURT:  OKAY.

18          AND YOU'RE NOT RESIDING WITH ANYONE AT THIS TIME;

19  YOU'RE LIVING BY YOURSELF?

20          PROSPECTIVE JUROR:  WITH MY SISTER.

21          THE COURT:  WITH YOUR SISTER.  WHAT DOES YOUR SISTER

22  DO?

23          PROSPECTIVE JUROR:  MY SISTER'S AN AUDITOR FOR -- I'M

24  SORRY.  I FORGOT THE COMPANY THAT SHE WORKS FOR.  AND MY MOTHER.

25          THE COURT:  OKAY.  OH, YOUR MOTHER.  OH, I SEE.  AND
```

1    SHE'S RETIRED?

2              **PROSPECTIVE JUROR:**  YES.

3              **THE COURT:**  AND WHAT DID SHE DO BEFORE SHE RETIRED?

4              **PROSPECTIVE JUROR:**  SHE WAS A BUSINESS WOMAN IN THE

5    PHILIPPINES.

6              **THE COURT:**  OKAY.

7              SO MY FIRST QUESTION IS WHETHER YOU OR ANYONE IN YOUR

8    IMMEDIATE FAMILY, LIKE YOUR SISTER OR YOUR MOTHER, OR A CLOSE

9    FRIEND BEEN INVOLVED IN ANY SORT OF LITIGATION AND/OR LAWSUIT.

10             AND BY THAT I MEAN, YOU SUED SOMEONE; SOMEONE SUED

11   YOU; YOU WERE A WITNESS IN SOMEBODY ELSE'S LAWSUIT; YOU FILED A

12   GRIEVANCE AT WORK; YOU WERE INVOLVED IN AN ARBITRATION; SMALL

13   CLAIMS; ANYTHING ALONG THOSE LINES, A CRIMINAL CASE.

14             **PROSPECTIVE JUROR:**  NO, YOUR HONOR.

15             **THE COURT:**  NO?  NOTHING LIKE THAT?

16             **PROSPECTIVE JUROR:**  (SHAKES HEAD.)

17             **THE COURT:**  OKAY.

18             NOW I'M GOING TO ASK ABOUT A COUPLE OF FIELDS OF WORK

19   THAT MIGHT BE RELEVANT TO THE CASE, AND MY QUESTION IS GOING TO

20   BE WHETHER YOU OR, AGAIN, ANY FAMILY MEMBER OR CLOSE FRIEND EVER

21   WORKED IN ONE OF THESE FIELDS OR WAS TRAINED IN ONE OF THESE

22   FIELDS.

23             THE FIELDS I'M INTERESTED IN ARE LAW, JUDGES,

24   LAWYERS; LAW ENFORCEMENT, POLICE OFFICERS; CORRECTIONS, PEOPLE

25   WHO WORK IN A PRISON; OR MEDICINE, DOCTORS, NURSES, ET CETERA.

```
 1              SO DO YOU HAVE ANY CLOSE FRIENDS OR RELATIVES IN ANY
 2   OF THOSE FIELDS?
 3              THE WITNESS:  I HAVE AN UNCLE WHO'S A NURSE, AND I
 4   HAVE A COUSIN WHO IS A LAWYER, IS PRACTICING HIS OWN LAW FIRM.
 5              THE COURT:  OKAY.  AND WHERE DOES HE PRACTICE?
 6              PROSPECTIVE JUROR:  IN STOCKTON.
 7              THE COURT:  IN WHERE?  STOCKTON?
 8              PROSPECTIVE JUROR:  STOCKTON.
 9              THE COURT:  THAT'S FUNNY.  THE MIKE SEEMS LIKE IT'S
10   ON BECAUSE I CAN HEAR NOISE FROM IT, BUT IT'S NOT PICKING UP HER
11   VOICE VERY WELL.
12              THE CLERK:  I DON'T KNOW.
13              THE COURT:  OKAY.
14              AND WHAT KIND OF LAW DOES YOUR COUSIN PRACTICE, DO
15   YOU KNOW?  DO YOU KNOW WHAT KIND OF CASES HE OR SHE DOES?
16              PROSPECTIVE JUROR:  I BELIEVE IMMIGRATION.
17              THE COURT:  IMMIGRATION?  OKAY.
18              HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS EVER
19   SEEN A DOCTOR FOR A BROKEN BONE OR ANY OTHER SORT OF
20   ORTHOPEDIC-TYPE PROBLEM?
21              PROSPECTIVE JUROR:  NO, YOUR HONOR.
22              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY
23   MEMBERS SEEN A DOCTOR FOR A CHRONIC PAIN PROBLEM, SOME CONDITION
24   THAT CAUSED CONTINUING PAIN?
25              PROSPECTIVE JUROR:  FROM AN INJURY?  OR --
```

```
1              THE COURT:  OR ANYTHING?

2              PROSPECTIVE JUROR:  -- FROM AN ACCIDENT?

3              THE COURT:  ACCIDENT, INJURY, CONGENITAL, ANY KIND OF

4    THING THAT CAUSED THE PERSON TO BE IN PAIN OVER A LONG PERIOD OF

5    TIME AND NEED SOME SORT OF PAIN RELIEF.

6              PROSPECTIVE JUROR:  MY MOM SAW A THERAPIST TWO YEARS

7    AGO WHEN SHE EXPERIENCED PAIN IN HER NECK FOR SIX MONTHS.

8              THE COURT:  OKAY.

9              ARE YOU FAMILIAR WITH A PAIN RELIEVER CALLED

10   TRAMADOL?

11             PROSPECTIVE JUROR:  NO, YOUR HONOR.

12             THE COURT:  HAVE YOU EVER HEARD OF PELICAN BAY STATE

13   PRISON?

14             PROSPECTIVE JUROR:  YES, YOUR HONOR.

15             THE COURT:  OKAY.  WHERE HAVE YOU HEARD ABOUT IT?

16             PROSPECTIVE JUROR:  NPR.

17             THE COURT:  NPR?

18             PROSPECTIVE JUROR:  YES.

19             THE COURT:  IS THERE ANYTHING ABOUT WHAT YOU HEARD

20   ABOUT PELICAN BAY THAT WOULD MAKE IT HARD FOR YOU TO BE A FAIR

21   JUROR IN THIS CASE?

22             PROSPECTIVE JUROR:  NONE THAT I CAN THINK OF, YOUR

23   HONOR.

24             THE COURT:  OKAY.

25             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS EVER
```

```
 1   BEEN THE VICTIM OF A CRIME?

 2              PROSPECTIVE JUROR:  NO, YOUR HONOR.

 3              THE COURT:  DO YOU FEEL THAT A CORRECTIONAL OFFICER

 4   OR SOMEONE WHO WORKS AT A PRISON IS MORE LIKELY OR LESS LIKELY

 5   TO TELL THE TRUTH THAN SOMEONE WHO ISN'T A CORRECTIONAL OFFICER?

 6              PROSPECTIVE JUROR:  NO, YOUR HONOR.

 7              THE COURT:  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

 8   PRISON?

 9              PROSPECTIVE JUROR:  JUST ALCATRAZ.

10                      (LAUGHTER.)

11              THE COURT:  WELL, THAT COUNTS, I GUESS.

12              OKAY.  CAN YOU THINK OF ANYTHING AT ALL THAT WOULD

13   MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU WERE

14   SELECTED TO SERVE AS A JUROR IN THIS CASE?

15              PROSPECTIVE JUROR:  CAN'T THINK OF ANYTHING RIGHT

16   NOW, YOUR HONOR.

17              THE COURT:  OKAY.  IF YOU WOULD PASS THE MICROPHONE

18   TO MS. VU.

19              YOU WERE WORN IN VIETNAM.  WHEN DID YOU COME TO THIS

20   COUNTRY?

21              PROSPECTIVE JUROR:  1980.

22              THE COURT:  AND YOU WENT TO COLLEGE HERE?

23              PROSPECTIVE JUROR:  YES.

24              THE COURT:  SO YOU WORK WITH DISABLED CHILDREN, I

25   GUESS --
```

```
1                  PROSPECTIVE JUROR:  YES.

2            THE COURT:  -- AT THE REGIONAL CENTER.

3            PROSPECTIVE JUROR:  YES, EXACTLY.

4            THE COURT:  AND PRIOR TO THE REGIONAL CENTER, DID

5    YOU -- YOU WORKED IN SOCIAL SERVICE IN SOME OTHER ORGANIZATION?

6            PROSPECTIVE JUROR:  YES.

7            THE COURT:  WHAT WAS THAT?

8            PROSPECTIVE JUROR:  ADOPTION.

9            THE COURT:  FOR A COUNTY AGENCY?

10           PROSPECTIVE JUROR:  NO.

11           THE COURT:  PRIVATE.

12           PROSPECTIVE JUROR:  PRIVATE ADOPTION.

13           THE COURT:  OKAY.

14                AND YOU SERVED ON A JURY ONCE BEFORE IN A CRIMINAL

15   TRIAL, AND THAT WAS IN -- WHAT COUNTY DO YOU LIVE IN?

16           PROSPECTIVE JUROR:  ALAMEDA COUNTY.

17           THE COURT:  SO THAT WAS IN ALAMEDA COUNTY?

18           PROSPECTIVE JUROR:  YES.

19           THE COURT:  WHAT COUNTY DO YOU LIVE IN -- I FORGOT TO

20   ASK YOU THAT -- MS. MAKAPUGAY.

21           PROSPECTIVE JUROR:  ALAMEDA COUNTY.

22           THE COURT:  I WAS ASKING JUROR NO. 1, I FORGOT TO ASK

23   YOU WHAT COUNTY YOU LIVE.

24           PROSPECTIVE JUROR:  SAN FRANCISCO COUNTY.

25           THE COURT:  SAN FRANCISCO.  OKAY.
```

```
1              SO -- AND THE JURY REACHED A VERDICT IN THAT CASE?

2         PROSPECTIVE JUROR:  YES.

3         THE COURT:  IS THERE ANYTHING ABOUT YOUR EXPERIENCE

4    AS A JUROR IN THAT CASE THAT WOULD MAKE IT HARD FOR YOU TO BE

5    FAIR AND IMPARTIAL IN THIS CASE?

6         PROSPECTIVE JUROR:  NO.

7         THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

8    MEMBERS BEEN INVOLVED IN ANY SORT OF LAWSUIT OR DISPUTE LIKE I

9    WAS ASKING --

10        PROSPECTIVE JUROR:  NO.

11        THE COURT:  -- THE FIRST JUROR?

12             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS

13   WORKED OR BEEN TRAINED IN THE FIELDS THAT I MENTIONED EARLIER,

14   LAW, LAW ENFORCEMENT, CORRECTIONS, OR MEDICINE?

15        PROSPECTIVE JUROR:  MY FATHER WAS A SUPERIOR COURT

16   JUDGE IN VIETNAM, AND MY MOM WAS A CIVIL ATTORNEY.  AND MY DAD'S

17   REAL CLOSE FRIEND IS A FEDERAL IMMIGRATION COURT IN

18   SAN FRANCISCO NOW.

19        THE COURT:  OKAY.  AND YOUR -- DID YOU SAY YOUR MOM

20   WAS AN ATTORNEY?

21        PROSPECTIVE JUROR:  MY MOM WAS A CIVIL ATTORNEY IN

22   VIETNAM.  MY DAD DID THAT, TOO.

23        THE COURT:  IN VIETNAM.  NOT HERE, THOUGH.

24        PROSPECTIVE JUROR:  NOT HERE.

25        THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY
```

1    MEMBERS HAD MEDICAL CARE FOR A BROKEN BONE OR OTHER ORTHOPEDIC

2    PROBLEM OR FOR CHRONIC PAIN?

3              **PROSPECTIVE JUROR:**  I AM.  I HAVE ARTHRITIS IN MY

4    BACK.

5              **THE COURT:**  OKAY.  AND SO YOU'RE UNDER MEDICAL CARE

6    FOR THAT?

7              **PROSPECTIVE JUROR:**  YES.

8              **THE COURT:**  AND ON MEDICATION?

9              **PROSPECTIVE JUROR:**  NO.

10             **THE COURT:**  DO YOU -- ARE YOU FAMILIAR WITH A PAIN

11   RELIEVER CALLED TRAMADOL?

12             **PROSPECTIVE JUROR:**  NO.

13             **THE COURT:**  HAVE YOU EVER HEARD OF PELICAN BAY STATE

14   PRISON?

15             **PROSPECTIVE JUROR:**  I HAVE.

16             **THE COURT:**  WHERE HAVE YOU HEARD ABOUT IT?

17             **PROSPECTIVE JUROR:**  IN THE NEWSPAPER.  I THINK A

18   COUPLE OF YEARS AGO, IT WAS THAT FIGHT, I THINK, THAT BROKE OUT

19   IN PELICAN BAY.

20             **THE COURT:**  OKAY.

21             **PROSPECTIVE JUROR:**  THE STAFF WAS INVOLVED.  I

22   BRIEFLY REMEMBER IT, BUT I DO --

23             **THE COURT:**  OKAY.  WOULD YOU BE ABLE TO DECIDE THIS

24   CASE BASED ON WHAT YOU HEAR IN COURT AND NOT BE INFLUENCED BY

25   ANYTHING YOU MIGHT HAVE HEARD IN THE NEWS ABOUT THINGS THAT HAVE

```
 1    GONE ON --

 2                 PROSPECTIVE JUROR:  YES.

 3                 THE COURT:  -- OTHERWISE?

 4                 HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS EVER

 5    BEEN THE VICTIM OF A CRIME?

 6                 PROSPECTIVE JUROR:  NO.

 7                 THE COURT:  DO YOU THINK THAT A CORRECTIONAL OFFICER

 8    OR A PERSON WHO WORKS AT A PRISON IS MORE LIKELY OR LESS LIKELY

 9    TO TELL THE TRUTH THAN A PERSON WITH A DIFFERENT LIFESTYLE?

10                 PROSPECTIVE JUROR:  (SHAKES HEAD.)

11                 THE COURT:  HAVE YOU EVER BEEN IN A JAIL OR PRISON?

12                 PROSPECTIVE JUROR:  JAIL.

13                 THE COURT:  AND WHAT CAN YOU TELL US ABOUT THAT,

14    BRIEFLY?

15                 PROSPECTIVE JUROR:  I THINK IT WAS LIKE WHEN I WAS IN

16    MY TEENS, I HAD A BOYFRIEND, WENT OUT THERE, WENT TO VISIT HIM.

17                 THE COURT:  OH, OKAY.  YOU WENT AS A VISITOR.

18                 PROSPECTIVE JUROR:  YEAH.

19                 THE COURT:  OKAY.

20                 CAN YOU THINK OF ANYTHING AT ALL THAT WOULD MAKE IT

21    DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU WERE SELECTED

22    TO SERVE AS A JUROR IN THIS CASE?

23                 PROSPECTIVE JUROR:  NO.

24                 THE COURT:  ALL RIGHT.

25                 IF YOU'D PASS THE MICROPHONE, PLEASE, TO
```

1   MR. LAKSHMANAN?

2              PROSPECTIVE JUROR:  THAT'S CORRECT.

3              THE COURT:  AND YOU ARE A PHYSICIAN FOR -- IS THAT

4   A -- OH, THAT'S A MEDICAL GROUP, I GUESS.

5              PROSPECTIVE JUROR:  YEAH, THE -- I WORK AT KAISER

6   SANTA ROSA.

7              THE COURT:  I SEE.  OKAY.  AND DO YOU HAVE A

8   SPECIALTY?

9              PROSPECTIVE JUROR:  YES.

10             THE COURT:  WHAT IS IT?

11             PROSPECTIVE JUROR:  I'M A PHYSICAL MEDICINE

12  SPECIALIST.

13             THE COURT:  OKAY.

14             AND YOUR WIFE IS A FINANCIAL ANALYST.  WHAT TYPE OF

15  COMPANY DOES SHE WORK FOR?

16             PROSPECTIVE JUROR:  SHE'S RETIRED CURRENTLY.

17             THE COURT:  OKAY.  WHAT COMPANY DID SHE WORK FOR?

18             PROSPECTIVE JUROR:  SHE WORKED FOR KAISER AS WELL.

19             THE COURT:  I SEE.  AND WHAT COUNTY DO YOU LIVE IN?

20             PROSPECTIVE JUROR:  SONOMA COUNTY.

21             THE COURT:  AND IS THAT WHERE YOU WORK ALSO?

22             PROSPECTIVE JUROR:  YES.

23             THE COURT:  AND YOU WENT TO DAVIS FOR MEDICAL SCHOOL

24  OR UNDERGRAD?

25             PROSPECTIVE JUROR:  THAT'S WHERE I DID MY RESIDENCY,

1   U.C. DAVIS.

2            **THE COURT:**  OKAY.  WHAT ABOUT MEDICAL SCHOOL?

3            **PROSPECTIVE JUROR:**  TULANE.  TULANE MEDICAL SCHOOL.

4            **THE COURT:**  THERE ARE A COUPLE OF POTENTIAL WITNESSES

5   WHO ARE AT DAVIS.  PAUL KREIS IS ONE.  AND WHO'S THE OTHER?

6            **MR. ANDRADA:**  DR. FISHMAN, YOUR HONOR.

7            **THE COURT:**  FISHMAN.  SCOTT FISHMAN.  EITHER OF THOSE

8   NAME RING A BELL?

9            **PROSPECTIVE JUROR:**  YEAH, I KNOW DR. SCOTT FISHMAN.

10           **THE COURT:**  HOW DO YOU KNOW HIM?

11           **PROSPECTIVE JUROR:**  WHEN I WAS A RESIDENT THERE, I

12  WENT THROUGH A ROTATION ANESTHESIA -- HE WAS A ANESTHESIA PAIN

13  SPECIALIST.  I WORKED WITH HIM FOR ABOUT FOUR OR FIVE MONTHS.

14           **THE COURT:**  OKAY.

15           YOU HEARD THAT ONE OF THE ISSUES IN THIS CASE IS AN

16  AGREEMENT THAT THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

17  REHABILITATION AGREED TO TAKE MR. ASHKER TO U.C. DAVIS TO A PAIN

18  CLINIC THEY HAVE THERE.  AND ONE OF THE DISPUTES IS WHETHER THEY

19  DID THAT.  AND IF NOT, WHY NOT, AND SO ON.

20           HAVING GONE TO U.C. DAVIS OR SERVED THERE, CAN YOU

21  THINK OF ANY REASON WHY THAT WOULD CAUSE YOU TO HAVE A PROBLEM

22  BEING FAIR AND IMPARTIAL?

23           **PROSPECTIVE JUROR:**  I DON'T KNOW.  I MEAN --

24           **THE COURT:**  HE ACTUALLY DIDN'T GO THERE, SO --

25           **PROSPECTIVE JUROR:**  I WORKED IN THAT CLINIC.  IT WAS

1    ABOUT THE YEAR 2000.  BUT I CAN'T THINK OF AN EXACT REASON TO BE

2    IMPARTIAL.

3              **THE COURT:**  OKAY.  DO YOU HAVE ANY PARTICULAR

4    FEELINGS ONE WAY OR THE OTHER ABOUT DR. FISHMAN THAT --

5              **PROSPECTIVE JUROR:**  YEAH, I -- I DO.  I THINK HE'S A

6    GOOD PHYSICIAN.

7              **THE COURT:**  OKAY.

8              ALL RIGHT.  WELL, I'LL -- WE'LL -- I DON'T KNOW

9    EXACTLY WHAT HIS ROLE IS IN THE CASE, SO WE CAN -- I'LL HEAR

10   ABOUT THAT AT SOME POINT DURING A BREAK.

11             **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

12             **THE COURT:**  AND YOU -- OH, AND YOU WERE THE ONE --

13   YOU CHECKED "YES" ON THE THING, AND THAT WAS THE LIST OF

14   WITNESSES, AND THAT WAS BECAUSE OF DR. FISHMAN.

15             **PROSPECTIVE JUROR:**  THAT'S CORRECT.

16             **THE COURT:**  ANYBODY ELSE?

17             **PROSPECTIVE JUROR:**  NO.

18             **THE COURT:**  OKAY.

19             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

20   INVOLVED IN ANY SORT OF LAWSUIT OR CIVIL DISPUTE OF ANY KIND?

21             **PROSPECTIVE JUROR:**  I BEEN DEPOSED AS A WITNESS FOR A

22   THIRD-PARTY LITIGATION ON NUMEROUS OCCASIONS.

23             **THE COURT:**  IN CONNECTION WITH YOUR WORK?

24             **PROSPECTIVE JUROR:**  IN CONNECTION WITH MY WORK.

25             **THE COURT:**  OKAY.

1        YOU WEREN'T THE PLAINTIFF OR THE DEFENDANT IN THE

2   CASE?

3        **PROSPECTIVE JUROR:**  NO.  MOST LIKELY AS AN EXPERT

4   WITNESS.

5        **THE COURT:**  OKAY.  SO YOU WERE DEPOSED.  HAVE YOU

6   EVER TESTIFIED IN COURT?

7        **PROSPECTIVE JUROR:**  NO.

8        **THE COURT:**  AND WOULD ANY OF THOSE EXPERIENCES MAKE

9   IT HARD FOR YOU TO BE FAIR IN THIS CASE?

10       **PROSPECTIVE JUROR:**  IT'S A GOOD QUESTION.  I'D NEED

11  TO KNOW MORE DETAILS ABOUT THE CASE.

12       **THE COURT:**  OKAY.  WELL, I CAN'T TELL YOU TOO MANY

13  MORE DETAILS AT THIS POINT, BUT THE REAL ISSUE IS WHETHER YOU

14  WOULD BE ABLE TO DECIDE THIS CASE BASED ON WHAT YOU HEARD HERE

15  IN COURT RATHER THAN ON PREJUDICES THAT YOU FORMED FROM OTHER

16  SITUATIONS.

17       IN OTHER WORDS, YOU'RE CERTAINLY WELCOME TO HAVE YOUR

18  OPINIONS.  I'M SURE YOU DO ABOUT LITIGATION AND OTHER KINDS OF

19  CASES AND WHETHER THEY'RE MERITORIOUS OR NOT MERITORIOUS.

20       THE QUESTION IS COULD YOU KEEP AN OPEN MIND ABOUT

21  THIS CASE, OR WOULD YOU -- DO YOU HAVE A PRECONCEIVED NOTION

22  THAT YOU JUST COULDN'T SET ASIDE SO FOR THAT REASON, YOU DON'T

23  NEED THE DETAILS OF THIS CASE, YOU JUST NEED TO KNOW WHETHER YOU

24  COULD BASE YOUR DECISION ON THE DETAILS OF THIS CASE OR WHETHER

25  YOU HAVE SUCH STRONG FEELINGS ABOUT CASES LIKE THIS THAT YOU

1   JUST WOULDN'T BE ABLE TO LISTEN, THAT YOU'D JUST BE FAVORING ONE

2   SIDE OR THE OTHER, AND IT JUST WOULDN'T MATTER.

3          **PROSPECTIVE JUROR:**  YEAH.  NO, I UNDERSTAND, YOUR

4   HONOR.  I THINK IT'S STILL DIFFICULT.  I AM A PHYSICIAN.  I DO

5   SEE LOTS OF CHRONIC PAIN.  I DO HAVE MY OWN OPINIONS THAT I

6   THINK ARE FAIRLY STRONG.  SO IT'S HARD FOR ME TO TELL YOU

7   EXACTLY HOW I'D FEEL ABOUT THIS CASE.

8          **THE COURT:**  OKAY.

9          SO, OBVIOUSLY, YOU HAVE BEEN TRAINED IN MEDICINE AND,

10  I'M SURE, KNOW MANY PEOPLE WHO HAVE.  WHAT ABOUT LAW, LAW

11  ENFORCEMENT OR CORRECTIONS?

12         **PROSPECTIVE JUROR:**  NO.

13         **THE COURT:**  AND YOU'VE BEEN INVOLVED, I GUESS, IN

14  TREATMENT OF ORTHOPEDIC PROBLEMS OR CHRONIC PAIN PROBLEMS.  HAVE

15  YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN THE RECIPIENT OF

16  SUCH TREATMENT?

17         **PROSPECTIVE JUROR:**  YEAH, I DID BREAK MY WRIST LAST

18  YEAR.

19         **THE COURT:**  OKAY.

20         ARE YOU FAMILIAR WITH A DRUG CALLED TRAMADOL?

21         **PROSPECTIVE JUROR:**  YES.

22         **THE COURT:**  HAVE YOU HEARD OF PELICAN BAY STATE

23  PRISON?

24         **PROSPECTIVE JUROR:**  NO.

25         **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

1  MEMBERS BEEN THE VICTIM OF A CRIME?

2          **PROSPECTIVE JUROR:**  NO.

3          **THE COURT:**  DO YOU BELIEVE THAT A CORRECTIONAL

4  OFFICER IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH

5  THAN A WITNESS THAT ISN'T A CORRECTIONAL OFFICER?

6          **PROSPECTIVE JUROR:**  NO.

7          **THE COURT:**  HAVE YOU EVER BEEN IN A JAIL OR A PRISON?

8          **PROSPECTIVE JUROR:**  NO.

9          **THE COURT:**  OTHER THAN WHAT WE DISCUSSED IN TERMS OF

10  YOUR MEDICAL BACKGROUND -- CAN YOU THINK OF ANYTHING ELSE THAT

11  WOULD MAKE IT DIFFICULT FOR YOU TO BE A FAIR AND IMPARTIAL JUROR

12  IF YOU WERE SELECTED?

13          **PROSPECTIVE JUROR:**  JUST THE FACT THAT I FEEL LIKE I

14  DO HAVE A WORK HARDSHIP.  I AM A SUBSPECIALIST AT MY FACILITY.

15  WE DO HAVE PEOPLE THAT CAN COVER FOR ME, BUT WE DO HAVE POOR

16  ACCESS AT OUR DEPARTMENT RIGHT NOW, AND SO PEOPLE ARE GOING TO

17  HAVE TO WAIT TO DO SOME OF THE PROCEDURES THAT I DO PERFORM FOR

18  PAIN.

19          SO FOR ME, IT'S FOR MY PATIENTS, THEIR HARDSHIP IN

20  HAVING TO WAIT.

21          **THE COURT:**  OKAY.  IF YOU WOULD PASS THE MICROPHONE

22  PLEASE TO MR. VANOPPEN.

23          YES, MA'AM?

24          **PROSPECTIVE JUROR:**  CAN I GO TO THE BATHROOM?

25          **THE COURT:**  OKAY.

1          HAS YOUR WIFE EVER WORKED OUTSIDE THE HOME?

2          **PROSPECTIVE JUROR:**  YES.

3          **THE COURT:**  WHAT DID SHE DO WHEN SHE WORKED?

4          **PROSPECTIVE JUROR:**  SHE WAS A CONTROLLER AND BEFORE

5  THAT, AN AUDITOR.

6          **THE COURT:**  OKAY.

7          WHAT COUNTY DO YOU LIVE IN?

8          **PROSPECTIVE JUROR:**  SAN MATEO.

9          **THE COURT:**  AND YOUR DAUGHTER IS AN ADMISSIONS

10  OFFICER FOR A COLLEGE?

11          **PROSPECTIVE JUROR:**  YES.

12          **THE COURT:**  AND YOU SERVED ON A JURY ONCE IN A

13  CRIMINAL CASE, AND THAT WAS IN -- IN SAN MATEO COURT?

14          **PROSPECTIVE JUROR:**  YES.

15          **THE COURT:**  ANYTHING ABOUT THAT EXPERIENCE THAT WOULD

16  MAKE IT HARD FOR YOU TO BE FAIR AS A JUROR IN THIS CASE?

17          **PROSPECTIVE JUROR:**  NO.

18          **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

19  MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING IN ANY

20  WAY?

21          **PROSPECTIVE JUROR:**  NO.

22          **THE COURT:**  HAVE YOU OR CLOSE FRIENDS OR FAMILY

23  MEMBERS WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW

24  ENFORCEMENT, CORRECTIONS, OR MEDICINE?

25          **PROSPECTIVE JUROR:**  I WAS IN A LAW ENFORCEMENT ROLE

```
1    AT THE COAST GUARD FOR FOUR YEARS IN THE '70'S.

2              THE COURT:  OKAY.

3              HAVE YOU OR CLOSE FRIENDS OR FAMILY MEMBERS BEEN

4    TREATED FOR A BROKEN BONE OR OTHER ORTHOPEDIC PROBLEM OR FOR

5    CHRONIC PAIN?

6              PROSPECTIVE JUROR:  I'VE HAD A BROKEN KNEE.

7              THE COURT:  OKAY.  WHEN WAS THAT?

8              PROSPECTIVE JUROR:  EARLY '90'S.

9              THE COURT:  AND DID THAT RESOLVE WITHOUT CONTINUING

10   PROBLEMS, OR DO YOU HAVE CONTINUING PROBLEMS FROM IT?

11             PROSPECTIVE JUROR:  THE -- IT -- THEY -- I HAD A --

12   PROBLEMS FOR A FEW YEARS THAT HAVE GOTTEN PRETTY MUCH BETTER.

13             THE COURT:  OKAY.

14             PROSPECTIVE JUROR:  YEAH.

15             THE COURT:  AND DO YOU -- ARE YOU FAMILIAR WITH THE

16   DRUG CALLED TRAMADOL?

17             PROSPECTIVE JUROR:  NO.

18             THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

19   PRISON?

20             PROSPECTIVE JUROR:  YEAH, GENERALLY, NEWS REPORTS.

21             THE COURT:  OKAY.  ANYTHING ABOUT WHAT YOU'VE HEARD

22   THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

23             PROSPECTIVE JUROR:  NO.

24             THE COURT:  I DON'T KNOW WHY THAT MICROPHONE IS

25   MAKING SO MUCH NOISE.  IT'S PICKING UP THE NOISE A LOT BETTER
```

1    THAN IT'S PICKING UP THE VOICE FOR SOME REASON.

2              HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

3    THE VICTIM OF A CRIME?

4              **PROSPECTIVE JUROR:**  I WAS BURGLARIZED A COUPLE TIMES

5    IN BERKELEY.

6              **THE COURT:**  OKAY.

7              **PROSPECTIVE JUROR:**  LONG TIME AGO.

8              **THE COURT:**  WHEN YOU WERE LIVING THERE?

9              **PROSPECTIVE JUROR:**  YES.

10             **THE COURT:**  DO YOU THINK THAT A CORRECTIONAL OFFICER

11   IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A

12   PERSON WITH A DIFFERENT OCCUPATION?

13             **PROSPECTIVE JUROR:**  NO.

14             **THE COURT:**  HAVE YOU EVER BEEN IN A JAIL OR A PRISON?

15             **PROSPECTIVE JUROR:**  I'VE VISITED THE WASHINGTON STATE

16   PENITENTIARY IN WALLA WALLA, AND I WAS TRAINED AT CAMP PENDELTON

17   AND VISITED THE BRIG THERE A NUMBER OF TIMES.

18             **THE COURT:**  OKAY.  CAN YOU THINK OF ANYTHING AT ALL

19   THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF

20   YOU WERE SELECTED TO SERVE AS A JUROR IN THIS CASE?

21             **PROSPECTIVE JUROR:**  NO.

22             **THE COURT:**  OKAY.

23             PASS THE MICROPHONE TO MS. GOODKIND.  AM I

24   PRONOUNCING THAT RIGHT?

25             AND YOU LIVE DOWN THE PENINSULA AS WELL?

```
1                    PROSPECTIVE JUROR:  RIGHT.  REDWOOD CITY.

2                    THE COURT:  AND FOR WHAT KIND OF COMPANY DOES YOUR

3      HUSBAND WORK?

4                    PROSPECTIVE JUROR:  IT'S AMERICAN CENTURY

5      INVESTMENTS.

6                    THE COURT:  AND YOU SERVED IN JURIES ALWAYS IN -- I

7      GUESS IT'S SAN MATEO COUNTY.

8                    PROSPECTIVE JUROR:  IT'S SAN FRANCISCO WHEN WE LIVED

9      THERE.

10                    THE COURT:  OH.  OH, IT WAS ALL IN SAN FRANCISCO --

11                    PROSPECTIVE JUROR:  IN SAN FRANCISCO.

12                    THE COURT:  -- BEFORE YOU MOVED?

13                    PROSPECTIVE JUROR:  THEN I'VE BEEN CALLED FOR JURY

14      DUTY IN SAN MATEO BUT NOT PUT ON A JURY --

15                    THE COURT:  OKAY.  AND THE THREE THAT YOU WERE ON,

16      THEN, I GUESS, WAS SOMETIME BACK --

17                    PROSPECTIVE JUROR:  YEAH.

18                    THE COURT:  AND THERE WERE BOTH CIVIL AND CRIMINAL

19      CASES.

20                    PROSPECTIVE JUROR:  RIGHT.

21                    THE COURT:  AND TWO OF THEM, YOU REACHED VERDICTS;

22      AND ONE, YOU DID NOT REACH A VERDICT.  WAS IT THE JURY COULDN'T

23      AGREE, OR DID THE CASE END BEFORE IT WAS --

24                    PROSPECTIVE JUROR:  THE JURY COULDN'T AGREE.

25                    THE COURT:  OKAY.
```

```
 1              AND IS THERE ANYTHING ABOUT THOSE EXPERIENCES THAT
 2   WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?
 3              PROSPECTIVE JUROR:  NO.
 4         THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY
 5   MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING IN ANY
 6   WAY?
 7              PROSPECTIVE JUROR:  WHEN I WAS JUST OUT OF COLLEGE,
 8   I -- A GROUP OF RENTERS WERE SUED BY A LANDLORD WHOSE BUILDING
 9   WAS ON SUBSTANDARD SOIL, AND HE BLAMED THE TENANTS.
10              IT WAS THROWN OUT, AND WE ALL MOVED OUT.
11         THE COURT:  SO YOU WERE ONE OF THE TENANTS.
12         PROSPECTIVE JUROR:  I WAS ONE OF THE TENANTS.
13         THE COURT:  OKAY.
14              HAVE YOU OR ANY CLOSE FAMILY MEMBERS WORKED IN THE
15   FIELDS OF LAW, LAW ENFORCEMENT, CORRECTIONS, OR MEDICINE?
16         PROSPECTIVE JUROR:  MY FATHER WAS AN ATTORNEY.
17         THE COURT:  WHAT KIND OF WORK DID HE DO?
18         PROSPECTIVE JUROR:  MOSTLY CIVIL.  CORPORATE.
19         THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY
20   MEMBERS BEEN TREATED FOR AN ORTHOPEDIC PROBLEM OR FOR CHRONIC
21   PAIN?
22         PROSPECTIVE JUROR:  I HAVE CHRONIC PAIN, BACK PAIN,
23   AND I'M WEARING A KNEE BRACE RIGHT NOW.
24         THE COURT:  OKAY.  ARE YOU FAMILIAR WITH TRAMADOL?
25         PROSPECTIVE JUROR:  NO.
```

1               **THE COURT:** HAD YOU HEARD OF PELICAN BAY STATE

2 PRISON?

3               **PROSPECTIVE JUROR:** JUST IN THE NEWS.

4               **THE COURT:** ANYTHING ABOUT WHAT YOU HEARD THAT WOULD

5 MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

6               **PROSPECTIVE JUROR:** NO, I DON'T THINK SO.

7               **THE COURT:** HAVE YOU OR ANY CLOSE FRIEND OR FAMILY

8 MEMBER BEEN THE VICTIM OF A CRIME?

9               **PROSPECTIVE JUROR:** BURGLARIES WHEN I WAS YOUNGER,

10 AND A FRIEND WAS BURGLED, EVERYTHING WAS TAKEN.

11               **THE COURT:** DO YOU THINK THAT A CORRECTIONAL OFFICER

12 IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A

13 WITNESS WITH A DIFFERENT OCCUPATION?

14               **PROSPECTIVE JUROR:** I DON'T THINK SO.

15               **THE COURT:** HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

16 PRISON?

17               **PROSPECTIVE JUROR:** NO.

18               **THE COURT:** CAN YOU THINK OF ANYTHING AT ALL THAT

19 WOULD MAKE IT DIFFICULT FOR YOU TO BE A FAIR AND IMPARTIAL JUROR

20 IF YOU WERE SELECTED TO SERVE IN THIS CASE?

21               **PROSPECTIVE JUROR:** WELL, I DO THINK WE HAVE TOO MANY

22 PEOPLE IN PRISON AND TOO MANY PRISONS.

23               **THE COURT:** OKAY.

24               THAT ISN'T THE -- THAT ISN'T REALLY THE ISSUE HERE.

25 THE ISSUE IS JUST ONE INDIVIDUAL CASE OF MEDICAL CARE IN A

```
 1    PRISON.  WOULD YOU BE ABLE TO DECIDE THAT CASE BASED ON THE

 2    EVIDENCE YOU HEAR IN COURT AND NOT ON YOUR POLICY VIEWS ABOUT

 3    OTHER THINGS?

 4               PROSPECTIVE JUROR:  I THINK SO.

 5               THE COURT:  OKAY.

 6               IF YOU WOULD PASS THE MICROPHONE, THEN, TO

 7    MS. FRIEDMAN.

 8               YOUR ESTRANGED SPOUSE, WHAT DOES HE DO?

 9               PROSPECTIVE JUROR:  HE WAS IN INSURANCE -- HAD A

10    BUSINESS IN SAN FRANCISCO.

11               THE COURT:  OKAY.

12               AND YOUR MOTHER LIVES WITH YOU, I GUESS?

13               PROSPECTIVE JUROR:  WE LIVE ON A DAIRY IN

14    SONOMA COUNTY, AND THEY LIVE NEARBY.

15               THE COURT:  OKAY.

16               PROSPECTIVE JUROR:  IT'S TWO SEPARATE HOUSES, BUT I

17    CARE FOR HER AND MY BROTHER.

18               THE COURT:  I SEE.  AND DID SHE EVER WORK OUTSIDE THE

19    HOME?

20               PROSPECTIVE JUROR:  NO.

21               THE COURT:  AND YOU HAVE A CHECKMARK THAT YOU HAD

22    HEARD OF SOME OF THESE WITNESSES, OR WHO DID YOU --

23               PROSPECTIVE JUROR:  WELL, DR. JACK FRIEDMAN.  I DON'T

24    KNOW IF HE'S MY HUSBAND'S COUSIN OR NOT.  I KNOW HE DOES HAVE A

25    DR. JACK FRIEDMAN AS A COUSIN, BUT I HAVEN'T HAD ANY CONTACT
```

```
1    WITH HIM FOR OVER 20 YEARS, SO I DON'T THINK IT WOULD PREJUDICE

2    ME.

3              THE COURT:  SO EVEN IF IT IS THE SAME JACK FRIEDMAN,

4    IT WOULDN'T AFFECT YOU.

5              PROSPECTIVE JUROR:  I REALLY AM NOT ACQUAINTED WITH

6    HIM PERSONALLY.

7              THE COURT:  WHERE DOES HE WORK?

8              PROSPECTIVE JUROR:  I -- I DON'T KNOW.

9              THE COURT:  OKAY.

10             PROSPECTIVE JUROR:  YEAH.

11             THE COURT:  WHERE DOES THIS JACK FRIEDMAN WORK?

12                  (OFF-THE-RECORD DISCUSSION.)

13             DR. SAYRE:  I ASSUME DAVIS, BUT I REALLY DON'T KNOW.

14             THE COURT:  OKAY.  THIS ONE WORKS IN -- WE THINK IN

15   DAVIS, BUT -- OKAY.

16             PROSPECTIVE JUROR:  "FRIEDMAN'S" A REAL COMMON NAME,

17   SO --

18             THE COURT:  TRUE.

19             PROSPECTIVE JUROR:  AND "JACK" IS ALSO COMMON.

20             THE COURT:  TRUE.  MIGHT WELL BE SOMEBODY ELSE.

21             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

22   INVOLVED IN ANY SORT OF LEGAL PROCEEDINGS?

23             PROSPECTIVE JUROR:  YES, MY HUSBAND.

24             THE COURT:  WHAT WAS HE INVOLVED WITH?

25             PROSPECTIVE JUROR:  HE WAS CHARGED BY THE CITY OF
```

```
1    SAN FRANCISCO WITH A CRIME.

2              THE COURT:  OKAY.  AND WAS THIS WHEN YOU WERE

3    TOGETHER OR --

4              PROSPECTIVE JUROR:  YES, IT WAS WHEN WE WERE MARRIED.

5    IT WAS OVER -- MAYBE 15 YEARS AGO NOW.

6              THE COURT:  OKAY.  AND WAS HE PROSECUTED AND

7    CONVICTED OR --

8              PROSPECTIVE JUROR:  HE -- MADE A DEAL WITH THE

9    DISTRICT ATTORNEY'S OFFICE.

10             THE COURT:  OKAY.  AND DID THAT INVOLVE ANY JAIL OR

11   PRISON TIME?

12             PROSPECTIVE JUROR:  HE HAD A ANKLE BRACELET.

13             THE COURT:  OKAY.  AND IS THERE ANYTHING ABOUT THAT

14   EXPERIENCE THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS

15   CASE?

16             PROSPECTIVE JUROR:  NO, I DON'T THINK THEY'RE

17   RELATED.

18             THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

19   MEMBERS WORKED OR BEEN TRAINED IN THE FIELD -- ANY FIELD OF LAW,

20   LAW ENFORCEMENT, CORRECTIONS, OR MEDICINE?

21             PROSPECTIVE JUROR:  I HAVE A -- MY -- A CLOSE

22   RELATIVE THAT'S AN ANESTHESIOLOGIST.  AND I DO MEDICAL

23   PROCEDURES WITH MY WORK WITH THE SEVERELY HANDICAPPED, I DO

24   G-TUBE FEEDINGS, GIVE MEDICATIONS, BUT NOTHING -- I'M NOT A

25   DOCTOR OR A NURSE.
```

```
 1              THE COURT:  SO YOU WERE TRAINED HOW TO DO THOSE

 2    PROCEDURES?

 3              PROSPECTIVE JUROR:  UM-HMM.  YEAH.

 4              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

 5    MEMBERS BEEN TREATED FOR A BONE OR ORTHOPEDIC PROBLEM OR FOR

 6    CHRONIC PAIN?

 7              PROSPECTIVE JUROR:  I WAS BORN WITH CONGENITAL HIP --

 8    AND HAD TREATMENT FOR THAT OFF AND ON OVER THE YEARS BECAUSE I

 9    HAVE SCIATICA AS A RESULT OF IT.  BUT MY SON RECENTLY HAD A

10    FOOTBALL INJURY AND REQUIRED PINS IN HIS ANKLES, AND SO THAT WAS

11    QUITE A INJURY.

12              THE COURT:  OKAY.

13              ARE YOU FAMILIAR WITH TRAMADOL?

14              PROSPECTIVE JUROR:  I THINK IT WAS ONE OF THE

15    MEDICATIONS THAT MY SON TOOK.  HE WAS IN A LOT OF PAIN FOR

16    SEVERAL MONTHS, SO --

17              THE COURT:  OKAY.

18              PROSPECTIVE JUROR:  I DON'T REMEMBER THE SPECIFIC

19    NAMES.

20              THE COURT:  OKAY.  HAVE YOU HEARD OF PELICAN BAY

21    STATE PRISON?

22              PROSPECTIVE JUROR:  JUST IN THE NEWS.

23              THE COURT:  ANYTHING ABOUT WHAT YOU'VE HEARD THAT

24    WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

25              PROSPECTIVE JUROR:  NO.
```

| | |
|---|---|
| 1 | **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY |
| 2 | MEMBERS BEEN THE VICTIM OF A CRIME? |
| 3 | **PROSPECTIVE JUROR:**  NOTHING. |
| 4 | **THE COURT:**  DO YOU THINK THAT A CORRECTIONAL OFFICER |
| 5 | IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN |
| 6 | ANOTHER PERSON? |
| 7 | **PROSPECTIVE JUROR:**  NO. |
| 8 | **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A |
| 9 | PRISON? |
| 10 | **PROSPECTIVE JUROR:**  JUST TO STEP IN TO VISIT. |
| 11 | **THE COURT:**  OKAY.  AND THAT WAS WHEN YOUR HUSBAND WAS |
| 12 | HAVING HIS PROBLEMS OR SOMEBODY ELSE? |
| 13 | **PROSPECTIVE JUROR:**  NO, ACTUALLY WAS VISITING |
| 14 | SOMEBODY ELSE. |
| 15 | **THE COURT:**  OKAY.  CAN YOU THINK OF ANYTHING AT ALL |
| 16 | THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF |
| 17 | YOU WERE SELECTED TO SERVE AS A JUROR IN THIS CASE? |
| 18 | **PROSPECTIVE JUROR:**  NOT IN THIS CASE. |
| 19 | **THE COURT:**  OKAY. |
| 20 | IF YOU WOULD PASS THE MICROPHONE TO MS. JOHNSON. |
| 21 | YOU HAVE NOT BEEN WITH YOUR CURRENT EMPLOYER FOR TOO |
| 22 | LONG.  WHO WAS -- WHO DID YOU WORK FOR PRIOR TO THIS ONE? |
| 23 | **PROSPECTIVE JUROR:**  VOYAGER -- AND MY CLIENTS WERE |
| 24 | OAKLAND UNIFIED SCHOOL DISTRICT, SPECIAL ED. |
| 25 | **THE COURT:**  COULD YOU PUT THAT MIKE UP A LITTLE |

```
1    CLOSER.

2              PROSPECTIVE JUROR:  SURE.

3              THE COURT:  AND WHAT SORT OF SALES DOES YOUR HUSBAND

4    DO?

5              PROSPECTIVE JUROR:  MANUFACTURING.

6              THE COURT:  HE WORKS FOR A MANUFACTURER?

7              PROSPECTIVE JUROR:  HE WORKS FOR HIS FATHER'S

8    MANUFACTURING COMPANY.

9              THE COURT:  I SEE.  AND WHAT COUNTY DO YOU LIVE IN?

10             PROSPECTIVE JUROR:  SAN MATEO.

11             THE COURT:  AND YOU SAID YOU MIGHT KNOW DR. SHIN

12   (PHONETIC).

13             PROSPECTIVE JUROR:  I THINK THEY'RE DIFFERENT.  IT

14   WAS OUT OF STANFORD PEDIATRIC FOR MY SON, SO I DON'T THINK SO

15   IT'S THE SAME ONE.

16             THE COURT:  YEAH, I DON'T THINK THAT'S THE GUY.

17   DR. SHIN IS NOT A STANFORD --

18             MR. ANDRADA:  NOT THE GUY.

19             THE COURT:  -- PEDIATRICIAN.

20             MR. ANDRADA:  NOT THE SAME.

21             THE COURT:  OKAY.

22             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

23   INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

24             PROSPECTIVE JUROR:  WE HAD A SMALL CLAIMS COURT

25   PROBABLY ABOUT SIX YEARS AGO FOR A REAL ESTATE PURCHASE.
```

```
 1                THE COURT:  OKAY.

 2                HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS

 3   WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW ENFORCEMENT,

 4   CORRECTIONS, OR MEDICINE?

 5                PROSPECTIVE JUROR:  MY BROTHER'S AN ATTORNEY.

 6                THE COURT:  WHERE DOES HE PRACTICE?

 7                PROSPECTIVE JUROR:  IN SACRAMENTO.

 8                THE COURT:  WHAT KIND OF WORK DOES HE DO?

 9                PROSPECTIVE JUROR:  WILLS, ESTATES, AND TRUSTS.

10                THE COURT:  OKAY.

11                HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

12   TREATED FOR A BONE OR ORTHOPEDIC PROBLEM OR CHRONIC PAIN?

13                PROSPECTIVE JUROR:  WELL, MY HUSBAND WAS JUST IN THE

14   ER ON SATURDAY FOR -- FOR WE'RE NOT SURE WHAT, BUT -- SO YES,

15   VERY RECENTLY.

16                THE COURT:  OKAY.  WAS IT A BONE OR ORTHOPEDIC KIND

17   OF PROBLEM OR --

18                PROSPECTIVE JUROR:  HE JUST HAD HIS WHOLE LEFT LEG

19   WENT NUMB.  THEY'RE NOT SURE IF IT'S, LIKE, A DISK THAT

20   COLLAPSED OR SCIATIC NERVE.  WE'RE NOT SURE.

21                THE COURT:  SO HE'S GOING TO BE TREATED FOR THAT?

22                PROSPECTIVE JUROR:  WE'RE DOING THAT THIS WEEK.

23   YEAH.

24                THE COURT:  OKAY.

25                ARE YOU FAMILIAR WITH A DRUG CALLED TRAMADOL?
```

```
 1                    PROSPECTIVE JUROR:  NO.

 2                    THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

 3       PRISON?

 4                    PROSPECTIVE JUROR:  YES.

 5                    THE COURT:  WHERE HAVE YOU HEARD ABOUT IT?

 6                    PROSPECTIVE JUROR:  JUST IN THE NEWS.

 7                    THE COURT:  ANYTHING THAT YOU'VE HEARD THAT WOULD

 8       AFFECT YOUR ABILITY TO BE FAIR IN THIS CASE?

 9                    PROSPECTIVE JUROR:  NO.

10                    THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

11       MEMBERS BEEN THE VICTIM OF A CRIME?

12                    PROSPECTIVE JUROR:  I'VE HAD IDENTITY THEFT.

13                    THE COURT:  OKAY.  IS THAT ONGOING, OR HAS IT BEEN

14       RESOLVED?

15                    PROSPECTIVE JUROR:  IT'S BEEN RESOLVED.  I MEAN, THEY

16       NEVER CAUGHT THE PERSON, BUT IT'S BEEN RESOLVED.

17                    THE COURT:  OKAY.  DO YOU THINK THAT A CORRECTIONAL

18       OFFICER IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH

19       THAN SOMEONE WHO ISN'T A CORRECTIONAL OFFICER?

20                    PROSPECTIVE JUROR:  NO.

21                    THE COURT:  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

22       PRISON?

23                    PROSPECTIVE JUROR:  NOT ACTIVE PRISON.  ALCATRAZ.

24                    THE COURT:  ALCATRAZ?

25                    CAN YOU THINK OF ANYTHING AT ALL THAT WOULD MAKE IT
```

1   DIFFICULT FOR YOU TO BE A FAIR AND IMPARTIAL JUROR IF YOU WERE

2   SELECTED TO SERVE IN THIS CASE?

3               **PROSPECTIVE JUROR:**  NO.  I MEAN, I'VE TAKEN TWO WEEKS

4   OFF OF WORK, THAT'S COVERED.  I JUST DON'T KNOW WITH MY HUSBAND

5   WHAT -- HE CAN'T DRIVE.  SO I'M NOT REALLY SURE HOW I WOULD GET

6   THE KIDS TO SCHOOL AND THEN GET HIM TO HIS APPOINTMENTS.  THAT'S

7   JUST --

8               **THE COURT:**  WHAT COUNTY DID YOU SAY YOU LIVED IN?

9               **PROSPECTIVE JUROR:**  I LIVE IN SAN MATEO.  SO OUR DAY

10  CARE OPENS ABOUT 7:30.

11              **THE COURT:**  OKAY.

12              ALL RIGHT.  IF YOU WOULD PASS IT DOWN -- DOWN THE

13  FRONT.  IF YOU JUST PASS IT DOWN THE FRONT ROW, AND THEN WE CAN

14  PASS IT TO MR. -- IS IT BIYAJEFF (PHONETIC)?

15              **PROSPECTIVE JUROR:**  BOYADJIEFF.

16              **THE COURT:**  BOYADJIEFF IN THE BACK ROW.

17                    (PAUSE IN THE PROCEEDINGS.)

18              **THE COURT:**  SO WHAT COUNTY DO YOU LIVE IN?

19              **PROSPECTIVE JUROR:**  SONOMA.

20              **THE COURT:**  AND YOU WORK FOR A COINCIDENTALLY NAMED

21  COMPANY?

22              **PROSPECTIVE JUROR:**  MY FATHER'S COMPANY.

23              **THE COURT:**  OKAY.

24              AND YOU HAVE A SON, THE -- DOES THE MOM WORK OUTSIDE

25  THE HOME?

 1          **PROSPECTIVE JUROR:**  YES.  SHE'S A FRUIT BROKER.  SHE

 2    SELLS PEARS TO WAL-MART, THAT SORT OF THING.

 3          **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

 4    MEMBERS BEEN INVOLVED IN ANY SORT OF THE LEGAL PROCEEDING?

 5          **PROSPECTIVE JUROR:**  NO.

 6          **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

 7    MEMBERS WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW

 8    ENFORCEMENT, CORRECTIONS, OR MEDICINE?

 9          **PROSPECTIVE JUROR:**  NO.

10          **THE COURT:**  HAVE YOU OR CLOSE FRIENDS OR FAMILY

11    MEMBERS BEEN TREATED MEDICALLY FOR A BROKEN BONE OR ANY

12    ORTHOPEDIC PROBLEM OR CHRONIC PAIN PROBLEM?

13          **PROSPECTIVE JUROR:**  I'VE HAD -- WELL, I HAVE INSOLES

14    TO -- FOR MY ARCHES IN MY FEET.  AND THAT WAS ACTUALLY QUITE A

15    LARGE -- IT WAS WHEN I WAS A KID, PRETTY YOUNG, AND IT WAS A BIG

16    PAIN.  MY KNEES REALLY HURT.  AND IT TOOK QUITE A FEW DIFFERENT

17    DOCTORS TO EVEN ACTUALLY FIGURE OUT THAT -- HOW SIMPLE THE

18    SOLUTION WAS.

19          **THE COURT:**  AND SINCE THEN, YOU HAVEN'T HAD --

20          **PROSPECTIVE JUROR:**  YEAH, AND I STILL -- THEY MADE

21    THEM, THEY FIT MY FEET, AND THEY WORK GOOD.

22          **THE COURT:**  OKAY.

23          ARE YOU FAMILIAR WITH A PAIN RELIEVER CALLED

24    TRAMADOL?

25          **PROSPECTIVE JUROR:**  NO.

```
 1                   THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

 2       PRISON?

 3                   PROSPECTIVE JUROR:  IT SOUNDS FAMILIAR, BUT I

 4       DON'T --

 5                   THE COURT:  OKAY.

 6                   HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

 7       THE VICTIM OF A CRIME?

 8                   PROSPECTIVE JUROR:  I THINK MY DAD WAS ROBBED WHEN HE

 9       WAS YOUNGER, BUT -- THAT'S ALL.

10                   THE COURT:  OKAY.

11                   DO YOU THINK THAT A CORRECTIONAL OFFICER IS EITHER

12       MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A PERSON WHO'S

13       NOT A CORRECTIONAL OFFICER?

14                   PROSPECTIVE JUROR:  NO.

15                   THE COURT:  HAVE YOU EVER BEEN INSIDE OF A JAIL OR

16       PRISON?

17                   PROSPECTIVE JUROR:  NO.

18                   THE COURT:  CAN YOU THINK OF ANYTHING AT ALL THAT

19       WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU

20       WERE SELECTED TO SERVE AS A JUROR IN THIS CASE?

21                   PROSPECTIVE JUROR:  I THINK I FIND DOCTORS TO BE

22       FAIRLY DISMISSIVE IN GENERAL, BUT, YOU KNOW, MY -- MY ORTHOPEDIC

23       SITUATION, I'VE HAD OTHER NOT EVEN SERIOUS THINGS, MINOR MEDICAL

24       ISSUES, BUT USUALLY THEY SEEM TO BE PRETTY DISMISSIVE IN

25       GENERAL.  THAT'S MY TAKE.
```

1      **THE COURT:**  WOULD YOU BE ABLE TO DECIDE THE MERITS ON

2  THIS CASE BASED ON THE PEOPLE INVOLVED HERE, AS OPPOSED TO A

3  GENERAL FEELING ABOUT DOCTORS?

4      **PROSPECTIVE JUROR:**  WELL, I COULD TRY.  I --

5      **THE COURT:**  OKAY.  DO YOU THINK YOU'D BE ABLE TO DO

6  THAT?

7      **PROSPECTIVE JUROR:**  I THINK I'VE HAD MORE BAD

8  EXPERIENCES WITH DOCTORS THAN GOOD, BUT I MEAN --

9      **THE COURT:**  OKAY.  WOULD YOU BE ABLE TO LISTEN TO THE

10 EXPERIENCES IN THIS CASE AND DECIDE IT BASED ON THIS CASE AS

11 OPPOSED TO YOUR OWN EXPERIENCES?

12     **PROSPECTIVE JUROR:**  WELL, LIKE I SAID, I WOULD -- IF

13 I FELT THAT THE DOCTORS WAS REALLY JUST DISMISSIVE, AND I THINK

14 I WOULD BE AGAINST HIM REGARDLESS BECAUSE I'VE HAD EXPERIENCE

15 WITH THAT.  BUT, YOU KNOW, IF IT SEEMED LIKE A -- THE DOCTOR DID

16 EVERYTHING RIGHT, I THINK I COULD SIDE WITH HIM.

17     **THE COURT:**  OKAY.  WELL, THE COURT WILL INSTRUCT YOU

18 AS TO THE LAW THAT YOU WOULD HAVE TO APPLY -- AND THIS -- THIS

19 GOES FOR EVERYONE REALLY.  EVERYBODY HAS OPINIONS, BOTH ABOUT

20 WHAT THE LAW SHOULD BE AND ABOUT HOW PEOPLE SHOULD BEHAVE.  BUT

21 WHAT YOU TAKE AN OATH TO DO AS A JUROR IS TO FOLLOW THE LAW AS

22 THE COURT GIVES IT TO YOU.

23     SO THE COURT WOULD DESCRIBE, WHAT IS A DOCTOR

24 REQUIRED TO DO, WHAT IS -- WHAT MUST A PLAINTIFF PROVE IN ORDER

25 TO PROVE A CASE AGAINST A DOCTOR, AND YOUR JOB WOULD BE TO

1    LISTEN TO THE EVIDENCE FAIRLY AND TO APPLY THE LAW THAT THE

2    COURT EXPLAINS.

3          DO YOU THINK YOU'D BE ABLE TO DO THAT?

4          **PROSPECTIVE JUROR:**  I THINK SO.

5          **THE COURT:**  WOULD YOU TRY YOUR BEST TO DO IT?

6          **PROSPECTIVE JUROR:**  YES.

7          **THE COURT:**  OKAY.

8          IF YOU WOULD PASS THE MIKE TO MS. TOROIAN?

9          **PROSPECTIVE JUROR:**  YES.

10         **THE COURT:**  AND WHAT COUNTY DO YOU LIVE IN?

11         **PROSPECTIVE JUROR:**  CONTRA COSTA.

12         **THE COURT:**  AND WHAT SORT OF INSURANCE DOES YOUR

13   COMPANY WRITE?

14         **PROSPECTIVE JUROR:**  GROUP LIFE AND DISABILITY

15   INSURANCE AND DENTAL INSURANCE.

16         **THE COURT:**  HAVE YOU DONE OTHER TYPES OF WORK IN THE

17   PAST?

18         **PROSPECTIVE JUROR:**  I'VE BEEN IN INSURANCE FOR MOST

19   OF MY --

20         **THE COURT:**  KEEP THAT MIKE UP THERE.

21         **PROSPECTIVE JUROR:**  I'VE BEEN IN INSURANCE FOR MOST

22   OF MY CAREER.  I WORKED IN A START-UP FOR ABOUT THREE YEARS, AND

23   THEN I WORKED IN MEDICAL CLAIMS PRIOR TO THAT.

24         **THE COURT:**  AND YOUR SON IS AT UCSD RESEARCHING WHAT?

25         **PROSPECTIVE JUROR:**  HE RESEARCHES CALCIUM IN BONES.

1    HE'S A PH.D.

2              **THE COURT:**  OKAY.  AND YOU SERVED ON JURIES IN YOUR

3    CURRENT COUNTY OR AT SOME PREVIOUS LOCATION?

4              **PROSPECTIVE JUROR:**  IN CONTRA COSTA COUNTY.

5              **THE COURT:**  AND THAT WAS TWO TIMES, ONE CRIMINAL, ONE

6    CIVIL.

7              **PROSPECTIVE JUROR:**  NO, BOTH CRIMINAL.

8              **THE COURT:**  BOTH CRIMINAL?

9              **PROSPECTIVE JUROR:**  UM-HMM.

10             **THE COURT:**  AND THE JURY REACHED VERDICTS IN BOTH.

11             **PROSPECTIVE JUROR:**  YES.

12             **THE COURT:**  ANYTHING ABOUT THOSE EXPERIENCES THAT

13   WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

14             **PROSPECTIVE JUROR:**  NO.

15             **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

16   MEMBERS BEEN INVOLVED IN ANY SORT OF LAWSUIT OR LEGAL

17   PROCEEDINGS OF ANY KIND?

18             **PROSPECTIVE JUROR:**  WHEN I WORKED IN MEDICAL CLAIMS,

19   I WAS DEPOSED A NUMBER OF TIMES ON CIVIL CASES.

20             **THE COURT:**  IN TERMS OF INSURANCE PRACTICES.

21             **PROSPECTIVE JUROR:**  RIGHT.  AND I WAS ACTUALLY NAMED

22   IN ONE OF THE LAWSUITS WHICH WAS LATER DISMISSED.

23             **THE COURT:**  OKAY.

24             LIKE A BAD-FAITH CLAIM AGAINST AN INSURANCE

25   COMPANY --

1          **PROSPECTIVE JUROR:**  CORRECT.

2          **THE COURT:**  -- TYPE OF THING.

3          **PROSPECTIVE JUROR:**  CORRECT.

4          **THE COURT:**  ANYTHING ABOUT THOSE EXPERIENCES THAT

5   WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

6          **PROSPECTIVE JUROR:**  NO, IT WAS A LONG TIME AGO.

7          **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

8   MEMBERS WORKED OR BEEN TRAINED IN FIELDS OF LAW, LAW

9   ENFORCEMENT, CORRECTIONS, OR MEDICINE?

10          **PROSPECTIVE JUROR:**  I HAVE A BROTHER-IN-LAW THAT'S A

11  LAWYER.  MY SISTER'S A NURSE.  MY NIECE IS A NURSE.  AND MY

12  NEPHEW IS A POLICE OFFICER.

13          **THE COURT:**  OKAY.

14          THE LAWYER, WHAT KIND OF LAW DOES HE PRACTICE?

15          **PROSPECTIVE JUROR:**  I DON'T KNOW.

16          **THE COURT:**  OKAY.

17          **PROSPECTIVE JUROR:**  HE WRITES APPEALS, I KNOW.

18          **THE COURT:**  OKAY.  AND THE POLICE OFFICER NEPHEW, HOW

19  OFTEN DO YOU SEE HIM?

20          **PROSPECTIVE JUROR:**  EVERY FEW MONTHS.  HE LIVES IN --

21  HE'S A PASADENA CITY POLICE OFFICER ON THE SWAT TEAM.

22          **THE COURT:**  OKAY.

23          HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

24  TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR CHRONIC PAIN?

25          **PROSPECTIVE JUROR:**  YES, I HAD A BROKEN FOOT -- I HAD

1    A BROKEN BONE IN MY FOOT.

2              **THE COURT:**  OKAY.  WHEN WAS THAT?

3              **PROSPECTIVE JUROR:**  ABOUT 12 YEARS AGO.

4              **THE COURT:**  AND DOES THAT STILL BOTHER YOU --

5              **PROSPECTIVE JUROR:**  NO.

6              **THE COURT:**  -- OR HAS IT BEEN RESOLVED?

7              ARE YOU FAMILIAR WITH TRAMADOL?

8              **PROSPECTIVE JUROR:**  NO, I'VE NEVER HEARD OF IT.

9              **THE COURT:**  HAVE YOU HEARD OF PELICAN BAY STATE

10   PRISON?

11             **PROSPECTIVE JUROR:**  YES, JUST IN THE NEWS.

12             **THE COURT:**  OKAY.  ANYTHING ABOUT WHAT YOU'VE HEARD

13   THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR AND IMPARTIAL IN THIS

14   CASE?

15             **PROSPECTIVE JUROR:**  NO.

16             **THE COURT:**  OKAY.

17             HAVE YOU OR A CLOSE FRIEND OR FAMILY MEMBER BEEN THE

18   VICTIM OF A CRIME?

19             **PROSPECTIVE JUROR:**  MY SON HAD HIS APARTMENT ROBBED

20   ONCE.

21             **THE COURT:**  WAS IT ROBBED WHEN HE WAS THERE, OR

22   BURGLED WHEN HE WASN'T HOME?

23             **PROSPECTIVE JUROR:**  HE WAS NOT HOME AT THE TIME.  IT

24   WAS WHEN HE WAS A STUDENT AT U.C. DAVIS.

25             **THE COURT:**  OKAY.  DO YOU THINK THAT A CORRECTIONAL

```
 1    OFFICER IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH

 2    THAN SOMEONE WHO'S NOT A CORRECTIONAL OFFICER?

 3              PROSPECTIVE JUROR:  MY NEPHEW BEING A POLICE OFFICER,

 4    I -- YOU KNOW, I HAVE A LITTLE DIFFICULTY -- YOU KNOW, KNOWING

 5    HIM, I KNOW THAT HE WOULD TELL THE TRUTH, AND I DON'T KNOW IF I

 6    CAN SEPARATE THAT OR NOT.

 7              THE COURT:  OKAY.

 8              WELL, YOU'RE OBVIOUSLY AWARE THAT PEOPLE ARE

 9    DIFFERENT.

10              PROSPECTIVE JUROR:  RIGHT.  RIGHT.

11              THE COURT:  DO YOU THINK THAT YOU'D BE ABLE TO JUDGE

12    THE PEOPLE THAT YOU HEAR IN COURT DIFFERENTLY BASED ON THEIR OWN

13    MERITS --

14              PROSPECTIVE JUROR:  RIGHT.  SINCE I DON'T KNOW THEM,

15    I WOULD NOT -- YEAH.

16              THE COURT:  OKAY.  HAVE YOU EVER BEEN INSIDE OF A

17    JAIL OR PRISON?

18              PROSPECTIVE JUROR:  JUST ALCATRAZ.

19              THE COURT:  CAN YOU THINK OF ANYTHING AT ALL THAT

20    WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU

21    WERE SELECTED TO SERVE AS A JUROR IN THIS CASE?

22              PROSPECTIVE JUROR:  NO.

23              THE COURT:  OKAY.

24              PASS THE MICROPHONE TO MR. CABICO.

25              PROSPECTIVE JUROR:  CABICO.
```

```
1            THE COURT:  CABICO.

2            SO YOU'RE THE DIRECTOR OF RADIOLOGY.  DOES THAT

3   INVOLVE MEDICAL TRAINING?

4            PROSPECTIVE JUROR:  I'M THE ASSISTANT DIRECTOR OF

5   RADIOLOGY.  NO, NOT SPECIFICALLY.  MY ROLE IS SUPPORTING DIGITAL

6   IMAGING, THE SERVERS AND STORAGE MATRIXES, THINGS LIKE THAT.

7            THE COURT:  AND YOU HAVE WORKED FOR THAT EMPLOYER FOR

8   QUITE A WHILE, BUT YOU HAD A PREVIOUS TYPE OF JOB BEFORE.  WHAT

9   TYPE OF JOB --

10            PROSPECTIVE JUROR:  I WAS -- I WAS IN INFORMATION

11   TECHNOLOGY DOING DESKTOP SUPPORT, THEN TRANSFERRED BACK INTO

12   RADIOLOGY TO DO IMAGING SUPPORT.

13            THE COURT:  OKAY.

14            AND YOUR FORMER SPOUSE, WHAT TYPE OF WORK DOES SHE DO

15   IF SHE WORKS?

16            PROSPECTIVE JUROR:  SHE DOES CLERICAL WORK FOR AN

17   INSURANCE COMPANY.

18            THE COURT:  AND YOU SERVED ON A JURY IN -- WHAT

19   COUNTY DO YOU LIVE?

20            PROSPECTIVE JUROR:  ALAMEDA.  IT WAS ALAMEDA COUNTY.

21            THE COURT:  OKAY.  AND WERE YOU ACTUALLY SITTING ON

22   THE JURY, AND THEN THEY SETTLED IN THE MIDDLE OF A TRIAL OR --

23            PROSPECTIVE JUROR:  THAT'S CORRECT.

24            THE COURT:  OKAY.

25            HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN
```

1   INVOLVED IN ANY SORT OF LEGAL PROCEEDINGS?

2           **PROSPECTIVE JUROR:**  I'VE BEEN DEPOSED AS PART OF MY

3   ROLE AT WORK AS A WITNESS.

4           **THE COURT:**  OKAY.

5           AND DID -- DID YOU HAVE TO TESTIFY IN COURT, TOO?

6           **PROSPECTIVE JUROR:**  NO.

7           **THE COURT:**  AND DID THE CASE -- WAS RESOLVED IN SOME

8   WAY, I GUESS.

9           **PROSPECTIVE JUROR:**  I BELIEVE IT'S STILL ONGOING.

10          **THE COURT:**  OKAY.  AND YOU'RE NOT A DEFENDANT IN THE

11  CASE.  YOU WERE JUST DEPOSED AS A WITNESS?

12          **PROSPECTIVE JUROR:**  NO. THAT'S CORRECT.

13          **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

14  MEMBERS WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW

15  ENFORCEMENT, CORRECTIONS, OR MEDICINE?

16          **PROSPECTIVE JUROR:**  YES.  THROUGH EVERGREEN VALLEY

17  COLLEGE IN SAN JOSE, I ATTENDED THE RESERVE POLICE ACADEMY AND

18  GRADUATED IN 1991.

19          **THE COURT:**  OKAY.

20          AND DID YOU TRY TO GO INTO LAW ENFORCEMENT OR --

21          **PROSPECTIVE JUROR:**  NO.

22          **THE COURT:**  -- THINK THE BETTER OF IT?

23          **PROSPECTIVE JUROR:**  YEAH, I -- HALFWAY THROUGH, I

24  REALIZED IT REALLY WASN'T WHAT I WANTED TO DO.

25          **THE COURT:**  OKAY.  SO YOU NEVER DID ACTUALLY WORK IN

```
1    LAW ENFORCEMENT.

2                 PROSPECTIVE JUROR:  NO.

3                 THE COURT:  ANYTHING ELSE IN ANY OF THOSE OTHER

4    FIELDS?

5                 PROSPECTIVE JUROR:  I HAVE FRIENDS IN THE OAKLAND

6    POLICE DEPARTMENT AND A FEW FRIENDS THAT ARE SHERIFF'S OFFICERS,

7    BOTH FOR ALAMEDA COUNTY AND SANTA CLARA COUNTY.

8                 THE COURT:  OKAY.  AND ARE THOSE PEOPLE YOU MET WHEN

9    YOU WERE IN SCHOOL OR JUST COINCIDENTALLY?

10                 PROSPECTIVE JUROR:  SOME -- SOME ARE FRIENDS SINCE

11   CHILDHOOD.  OTHERS I MET THROUGH THE ACADEMY.

12                 THE COURT:  ANYTHING ABOUT THOSE RELATIONSHIPS THAT

13   WOULD MAKE IT HARD FOR YOU TO BE FAIR AND IMPARTIAL IN THIS

14   CASE?

15                 PROSPECTIVE JUROR:  NO.

16                 THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

17   MEMBERS BEEN TREATED FOR A BROKEN BONE OR ORTHOPEDIC PROBLEM OR

18   FOR CHRONIC PAIN?

19                 PROSPECTIVE JUROR:  I'VE HAD KNEE SURGERY.

20                 THE COURT:  HOW LONG AGO WAS THAT?

21                 PROSPECTIVE JUROR:  SEVEN YEARS AGO.

22                 THE COURT:  AND IS THAT STILL BOTHERING YOU OR --

23                 PROSPECTIVE JUROR:  NO.

24                 THE COURT:  IS THAT AN INJURY OR CHRONIC PROBLEM

25   OR --
```

1          **PROSPECTIVE JUROR:**  IT WAS AN INJURY.

2          **THE COURT:**  ARE YOU FAMILIAR WITH TRAMADOL?

3          **PROSPECTIVE JUROR:**  NO.

4          **THE COURT:**  HAVE YOU HEARD OF PELICAN BAY STATE

5  PRISON?

6          **PROSPECTIVE JUROR:**  JUST IN THE NEWS.

7          **THE COURT:**  ANYTHING ABOUT WHAT YOU'VE HEARD THAT

8  WOULD MAKE IT HARD TO BE FAIR IN THE CASE THAT I'VE DESCRIBED?

9          **PROSPECTIVE JUROR:**  NO.

10         **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

11  MEMBERS BEEN THE VICTIM OF A CRIME?

12         **PROSPECTIVE JUROR:**  I'VE HAD A FEW CAR STEREOS

13  STOLEN, BUT OTHER THAN THAT, NO.

14         **THE COURT:**  DO YOU BELIEVE THAT A CORRECTIONAL

15  OFFICER IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH

16  THAN A PERSON WITH A DIFFERENT OCCUPATION?

17         **PROSPECTIVE JUROR:**  NO.

18         **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

19  PRISON?

20         **PROSPECTIVE JUROR:**  NO.

21         **THE COURT:**  CAN YOU THINK OF ANYTHING AT ALL THAT

22  WOULD MAKE IT DIFFICULT FOR YOU TO BE A FAIR AND IMPARTIAL JUROR

23  IF YOU WERE SELECTED TO SERVE IN THIS CASE?

24         **PROSPECTIVE JUROR:**  NO.

25         **THE COURT:**  ALL RIGHT.  IF YOU'D PASS THE MICROPHONE

1    PLEASE TO MR. BANERJEE?

2            **PROSPECTIVE JUROR:**  YES.

3            **THE COURT:**  YOU WERE BORN IN INDIA.  WHEN DID YOU

4    COME TO THIS COUNTRY?

5            **PROSPECTIVE JUROR:**  '92.

6            **THE COURT:**  AND YOU GOT YOUR PH.D. IN THIS COUNTRY?

7            **PROSPECTIVE JUROR:**  YES.

8            **THE COURT:**  DID YOU GO ALL THROUGH COLLEGE HERE OR --

9            **PROSPECTIVE JUROR:**  OH, NO.  I DID UNDERGRADUATE BACK

10   IN INDIA, AND MASTER'S AND PH.D. HERE.

11           **THE COURT:**  OKAY.  AND WHAT COUNTY ARE YOU LIVING IN

12   NOW?

13           **PROSPECTIVE JUROR:**  ALAMEDA.

14           **THE COURT:**  AND YOUR WIFE IS IN SCHOOL?

15           **PROSPECTIVE JUROR:**  YES.

16           **THE COURT:**  WHAT IS SHE STUDYING?

17           **PROSPECTIVE JUROR:**  TRANSPORTATION ENGINEERING.

18           **THE COURT:**  AND HAVE YOU OR ANY CLOSE FRIENDS OR

19   FAMILY MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING OF

20   ANY KIND?

21           **PROSPECTIVE JUROR:**  NO.

22           **THE COURT:**  HAVE YOU OR CLOSE FRIENDS OR FAMILY

23   MEMBERS WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW

24   ENFORCEMENT, CORRECTIONS, OR MEDICINE?

25           **PROSPECTIVE JUROR:**  MY SISTER IS A ANESTHESIOLOGIST,

1    AND MY BROTHER-IN-LAW IS A RESIDENT RIGHT NOW.

2                    THE COURT:  OKAY.  AND WHERE DOES YOUR BROTHER-IN-LAW

3    WORK?

4                    PROSPECTIVE JUROR:  IN JOHN (SIC) HOPKINS.

5                    THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

6    MEMBERS BEEN TREATED FOR A BROKEN BONE OR ORTHOPEDIC PROBLEM OR

7    FOR CHRONIC PAIN?

8                    PROSPECTIVE JUROR:  NO.

9                    THE COURT:  HAVE YOU HEARD OF TRAMADOL?

10                   PROSPECTIVE JUROR:  NO.

11                   THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

12   PRISON?

13                   PROSPECTIVE JUROR:  CAN'T RECOLLECT.  I DON'T KNOW.

14   I DON'T THINK SO.

15                   THE COURT:  I DIDN'T HEAR THE FIRST THING YOU SAID.

16                   PROSPECTIVE JUROR:  I MEAN, I CAN'T RECALL.  I MEAN,

17   I DON'T REMEMBER.  I DON'T THINK SO.

18                   THE COURT:  OH, YOU CAN'T RECALL IT.

19                   PROSPECTIVE JUROR:  YEAH.  YEAH.

20                   THE COURT:  OH, OKAY.

21                   HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

22   THE VICTIM OF A CRIME?

23                   PROSPECTIVE JUROR:  BURGLARIZED HOUSE.  FRIEND.

24                   THE COURT:  DO YOU THINK THAT A CORRECTIONAL OFFICER

25   IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A

1    PERSON WHO'S NOT A CORRECTIONAL OFFICER?

2              **PROSPECTIVE JUROR:**  NO.

3              **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

4    PRISON?

5              **PROSPECTIVE JUROR:**  NO.

6              **THE COURT:**  CAN YOU THINK OF ANYTHING AT ALL THAT

7    WOULD MAKE IT DIFFICULT FOR YOU TO BE A FAIR AND IMPARTIAL JUROR

8    IF YOU WERE SELECTED?

9              **PROSPECTIVE JUROR:**  YES, MA'AM.  ACTUALLY, MY WIFE --

10   MY WIFE GOES TO SCHOOL TO U.C. BERKELEY, AND I WORK IN SAN JOSE,

11   AND SO IT'S -- IT'S REALLY A LITTLE BIT OF A HARDSHIP RIGHT NOW

12   FOR ME TO -- AND BECAUSE IT'S END OF SEMESTER FOR HER, SO IF I

13   COULD GET POSTPONED TO A TRIAL DOWN THE ROAD, THAT WOULD REALLY

14   HELP ME A LOT.

15             **THE COURT:**  WHAT WOULD BE THE PROBLEM?

16             **PROSPECTIVE JUROR:**  JUST -- MY SON'S DAY-CARE IS AT

17   MY WORK, AND THAT'S IN MILPITAS.  AND MY WIFE COMES TO SCHOOL IN

18   BERKELEY, AND SHE HAS -- SHE'S IN THE PH.D. PROGRAM, AND SHE'S

19   GOING THROUGH HER QUALIFIERS RIGHT NOW, SO --

20             **THE COURT:**  SO ORDINARILY, YOU TAKE YOUR SON TO WORK

21   WITH YOU AND USE THE CHILD CARE THERE.

22             **PROSPECTIVE JUROR:**  DAY-CARE, YEAH.  AND I GET HIM

23   BACK, TOO.  AND IT'S KIND OF GOING TO BE A REALLY LONG COMMUTE

24   FOR HER IF SHE HAS TO DO THIS, ESPECIALLY AT THIS TIME.

25             **THE COURT:**  IS THERE ANY ALTERNATIVE CHILD CARE YOU

1    COULD COME UP WITH CLOSER TO YOUR HOME FOR A WEEK OR SO?

2              **PROSPECTIVE JUROR:**  IT'S GOING TO BE HARD.  I'M

3    NOT -- I'M NOT SURE.  IT'S JUST -- IT'S JUST THAT THAT'S THE

4    ROUTINE, AND SO IT'S EASIER -- AND IF YOU TAKE HIM OUT OF HIS

5    ROUTINE THAN THE USUAL THINGS, I MEAN -- SETTLING HIM DOWN OR

6    SOMETHING --

7              **THE COURT:**  ALL RIGHT.  WELL, WE'LL TAKE THAT INTO

8    ACCOUNT.

9              **PROSPECTIVE JUROR:**  THANK YOU.

10             **THE COURT:**  IF YOU WOULD PASS THE MICROPHONE TO

11   MS. WILCOX, IS IT?

12             **PROSPECTIVE JUROR:**  (NODS HEAD.)

13             **THE COURT:**  WHAT SORT OF WORK -- OH, YOU WERE A

14   FINANCIAL DIRECTOR WHEN YOU WERE WORKING FOR BAY AREA TELEPORT?

15             **PROSPECTIVE JUROR:**  THAT'S RIGHT.

16             **THE COURT:**  WHAT KIND OF COMPANY IS THAT?  WHAT DO

17   THEY DO?

18             **PROSPECTIVE JUROR:**  IT WAS A TELECOMMUNICATIONS

19   COMPANY.

20             **THE COURT:**  AND YOUR FORMER SPOUSE, WHAT DOES HE DO?

21             **PROSPECTIVE JUROR:**  HE WAS IN CONSTRUCTION.

22             **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

23   MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

24             **PROSPECTIVE JUROR:**  NOTHING THAT EVER WENT TO COURT.

25   THERE WERE BUSINESS ISSUES THAT WERE ALWAYS DONE IN COURT, AND

1    THEN THERE WAS THE DIVORCE.

2              **THE COURT:**  OKAY.  AND THE BUSINESS ISSUES WERE IN

3    CONNECTION WITH YOUR JOB OR --

4              **PROSPECTIVE JUROR:**  ONE WAS A REAL ESTATE TRANSACTION

5    WITH A PARTNERSHIP DISSOLVING.  ONE WAS -- I WASN'T INVOLVED

6    DIRECTLY, BUT IT WAS ALSO A PARTNERSHIP DISSOLUTION.

7              **THE COURT:**  OKAY.  AND WHAT COUNTY DO YOU LIVE IN?

8              **PROSPECTIVE JUROR:**  CONTRA COSTA.

9              **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

10   MEMBERS WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW

11   ENFORCEMENT, CORRECTIONS, OR MEDICINE?

12             **PROSPECTIVE JUROR:**  I HAVE A GOOD FRIEND WHO'S A

13   PHARMACIST, AND I HAVE SEVERAL FRIENDS WHO ARE ATTORNEYS, MOSTLY

14   IN BUSINESS, AND ONE IN INSURANCE DEFENSE FOR A -- CONSTRUCTION

15   DEFECT.

16             **THE COURT:**  OKAY.

17             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

18   TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR CHRONIC PAIN?

19             **PROSPECTIVE JUROR:**  ALL MY CHILDREN HAD BROKEN BONES

20   AT ONE POINT IN CHILDHOOD, AND MY EX-HUSBAND HAD A BAD BACK.

21             **THE COURT:**  OKAY.  AND THE CHILDREN'S BROKEN BONES

22   HAVE RESOLVED?

23             **PROSPECTIVE JUROR:**  ALL RESOLVED.

24             **THE COURT:**  HAVE YOU HEARD OF TRAMADOL?

25             **PROSPECTIVE JUROR:**  NO.

1          **THE COURT:**  HAVE YOU HEARD OF PELICAN BAY STATE

2     PRISON?

3          **PROSPECTIVE JUROR:**  JUST IN THE NEWS.

4          **THE COURT:**  ANYTHING ABOUT WHAT YOU'VE HEARD THAT

5     WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

6          **PROSPECTIVE JUROR:**  NO.

7          **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

8     MEMBERS BEEN THE VICTIM OF A CRIME?

9          **PROSPECTIVE JUROR:**  JUST A FRIEND'S PURSE WAS STOLEN

10    OUT OF HER CAR.

11         **THE COURT:**  DO YOU THINK THAT A CORRECTIONAL OFFICER

12    IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A

13    PERSON WITH A DIFFERENT OCCUPATION?

14         **PROSPECTIVE JUROR:**  NO.

15         **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

16    PRISON?

17         **PROSPECTIVE JUROR:**  I VISITED SAN QUENTIN WITH A POLY

18    SCI CLASS IN 1980.

19         **THE COURT:**  CAN YOU THINK OF ANYTHING AT ALL THAT

20    WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU

21    WERE SELECTED TO SERVE AS A JUROR IN THIS CASE?

22         **PROSPECTIVE JUROR:**  NO.

23         **THE COURT:**  ALL RIGHT.

24         IF YOU'D PASS THE MICROPHONE, PLEASE, TO MR. CRAVEA.

25         **PROSPECTIVE JUROR:**  PERFECT.

```
 1                    THE COURT:  WE HAVE TWO PEOPLE BORN IN DEER PARK,

 2    CALIFORNIA.  I DON'T KNOW WHERE DEER PARK, CALIFORNIA IS.

 3                    PROSPECTIVE JUROR:  I WENT TO SCHOOL THERE.

 4                    THE COURT:  YOU WENT TO SCHOOL IN DEER PARK.

 5                    PROSPECTIVE JUROR:  HE WENT TO SCHOOL WITH ME.

 6                    THE COURT:  OH, YOU WENT TO SCHOOL TOGETHER.

 7                    WAS IT YOU WHO WAS BORN IN DEER PARK?

 8                    PROSPECTIVE JUROR:  THAT'S WHERE THE HOSPITAL IS, THE

 9    LOCAL HOSPITAL.

10                    THE COURT:  SO YOU ALL WENT THROUGH SCHOOL TOGETHER

11    UP THROUGH HIGH SCHOOL.

12                    PROSPECTIVE JUROR:  CALISTOGA HIGH SCHOOL.

13                    THE COURT:  SO TELL ME ABOUT YOUR MEDICAL TRAINING.

14                    PROSPECTIVE JUROR:  I HAVE A BACHELOR'S OF SCIENCE

15    DEGREE IN HEALTH CARE ADMINISTRATION WITH THE UNIVERSITY OF

16    PHOENIX.  I'M A EMT.  I DON'T PRACTICE AS AN EMT RIGHT NOW.  AND

17    I'M A PHLEBOTOMIST AT QUEEN OF THE VALLEY MEDICAL CENTER IN

18    NAPA.  AND WITH MENTAL HEALTH IN ANGUINE, AND THAT'S PRETTY MUCH

19    IT.

20                    THE COURT:  WHAT SORT OF TRAINING DO YOU HAVE TO HAVE

21    TO BE A PHLEBOTOMIST?

22                    PROSPECTIVE JUROR:  IT WAS ABOUT THREE OR FOUR MONTHS

23    AT SANTA ROSA JUNIOR COLLEGE.

24                    THE COURT:  OKAY.

25                    AND YOU ALSO STUDIED ADMINISTRATION OF JUSTICE?
```

1          **PROSPECTIVE JUROR:**  YEAH, THAT'S CORRECT.  BACK IN

2  ABOUT -- 15 YEARS AGO AT SANTA ROSA JUNIOR COLLEGE.  I -- I GOT

3  MY ASSOCIATE'S DEGREE IN ADMINISTRATION OF JUSTICE AND ACTUALLY

4  WORKED AS A PROBATION INTERN WITH SONOMA COUNTY PROBATION FOR

5  ABOUT A YEAR AND THEN DECIDED NOT TO GO INTO PROBATION.

6          **THE COURT:**  OKAY.  SO THE ADMINISTRATIVE --

7  ADMINISTRATION OF JUSTICE WAS AIMED AT A POSSIBLE CAREER IN

8  PROBATION --

9          **PROSPECTIVE JUROR:**  CORRECT.

10         **THE COURT:**  -- AS OPPOSED TO LAW ENFORCEMENT.

11         **PROSPECTIVE JUROR:**  UM-HMM.

12         **THE COURT:**  AND YOU SERVED ON A JURY ONCE IN NAPA

13  COUNTY IN A CRIMINAL CASE?

14         **PROSPECTIVE JUROR:**  THAT'S CORRECT.

15         **THE COURT:**  ANYTHING ABOUT THAT EXPERIENCE THAT WOULD

16  MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

17         **PROSPECTIVE JUROR:**  NOPE.

18         **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

19  MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

20         **PROSPECTIVE JUROR:**  NOPE.

21         **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

22  MEMBERS WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW

23  ENFORCEMENT, CORRECTIONS, OR MEDICINE, OTHER THAN WHAT YOU'VE

24  TOLD US ABOUT YOUR OWN EDUCATION?

25         **PROSPECTIVE JUROR:**  YEAH, JUST MYSELF.  AND MY

1    COUSIN'S A SECOND LIEUTENANT IN THE ARMY, AND HE DOES MEDICAL IN

2    THE ARMY.

3              THE COURT:  OKAY.

4              HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

5    TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR CHRONIC PAIN?

6              PROSPECTIVE JUROR:  MYSELF.  I ACTUALLY HAD A

7    SHATTERED SHOULDER 27 YEARS AGO, AND A BROKEN ARM -- A BROKEN

8    WRIST ABOUT 24 YEARS AGO.

9              THE COURT:  DO EITHER OF THOSE STILL BOTHER YOU?

10             PROSPECTIVE JUROR:  NO, NOT WHATSOEVER.

11             THE COURT:  HAVE YOU HEARD OF A DRUG -- A PAIN

12   RELIEVER CALLED TRAMADOL?

13             PROSPECTIVE JUROR:  I'VE HEARD OF IT AT THE HOSPITAL

14   BEFORE, BUT I DON'T KNOW ANYTHING ABOUT IT.

15             THE COURT:  OKAY.  HAVE YOU HEARD OF PELICAN BAY

16   STATE PRISON?

17             PROSPECTIVE JUROR:  IN THE NEWS, AND THEN IN MY

18   CLASSES.

19             THE COURT:  OKAY.  ANYTHING ABOUT WHAT YOU'VE HEARD

20   ABOUT THE PRISON THAT WOULD AFFECT YOUR ABILITY TO BE A FAIR

21   JUROR IN THIS CASE?

22             PROSPECTIVE JUROR:  NO.

23             THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

24   MEMBERS BEEN THE VICTIM OF A CRIME?

25             PROSPECTIVE JUROR:  NOPE.

```
1              THE COURT:  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A
2     PRISON?
3              PROSPECTIVE JUROR:  SONOMA COUNTY JAIL A FEW TIMES
4     FOR INTERVIEWING INMATES FOR PROBATION.
5              THE COURT:  OKAY.
6              CAN YOU THINK OF ANYTHING AT ALL THAT WOULD MAKE IT
7     DIFFICULT FOR YOU TO BE A FAIR AND IMPARTIAL JUROR IF YOU WERE
8     SELECTED FOR THIS CASE?
9              PROSPECTIVE JUROR:  NO.
10             THE COURT:  ALL RIGHT.
11             AND MS. WONG (PHONETIC)?  SO CAN YOU TELL US WHAT YOU
12    DO ON YOUR JOB?
13             PROSPECTIVE JUROR:  I --
14             THE COURT:  YOU'RE GOING TO NEED TO PUT THAT MIKE
15    RIGHT UP.
16             PROSPECTIVE JUROR:  I WORK AT SCHOOL.  IT'S LIKE A
17    HEALTH CLASS.  I'M JUST LIKE A MENTO.
18             THE COURT:  TO A STUDENT?
19             PROSPECTIVE JUROR:  YEAH.
20             THE COURT:  TO STUDENTS?
21             PROSPECTIVE JUROR:  FIRST AID, SLASH, EMERGENCY CARE.
22             THE COURT:  OKAY.  SO YOU HELP THE STUDENTS WHO ARE
23    TAKING THE CLASSES?
24             PROSPECTIVE JUROR:  IT'S LIKE THE TEACHER GIVES A
25    LECTURE, AND THEN LIKE WHEN THEY LEARN STUFF, LIKE PACKAGING
```

```
 1   (PHONETIC) AND CPR, I'M THERE TO ASSIST THEM TEACHING THEM HOW.

 2              THE COURT:  I SEE.

 3              AND HAVE YOU DONE ANY OTHER WORK BESIDES THAT JOB

 4   PREVIOUSLY?

 5              PROSPECTIVE JUROR:  SALESPERSON OR CASHIER.

 6              THE COURT:  OKAY.

 7              AND YOU LIVE WITH YOUR PARENTS AND YOUR SISTER.  ARE

 8   ANY OF THEM WORKING?

 9              PROSPECTIVE JUROR:  NO.

10              THE COURT:  NONE OF THEM WORKS?

11              PROSPECTIVE JUROR:  MY PARENTS ARE UNEMPLOYED.

12              THE COURT:  OKAY.  HAVE THEY WORKED IN THE PAST?

13              PROSPECTIVE JUROR:  YEAH.

14              THE COURT:  WHAT KIND OF WORK HAVE THEY DONE?

15              PROSPECTIVE JUROR:  MY DAD'S A CONSTRUCTION WORKER,

16   AND MY MOM'S -- WORKS FOR SEE'S CANDY, SEASONAL.

17              THE COURT:  OKAY.  AND WHAT ABOUT YOUR SISTER?  WHAT

18   DOES SHE DO?

19              PROSPECTIVE JUROR:  SHE DON'T HAVE A JOB.  SHE DON'T

20   WORK.

21              THE COURT:  SHE'S NOT A STUDENT OR ANYTHING?

22              PROSPECTIVE JUROR:  SHE'S A STUDENT.

23              THE COURT:  OKAY.  AND WHAT COUNTY DO YOU LIVE IN?

24              PROSPECTIVE JUROR:  SAN FRANCISCO.

25              THE COURT:  YOU WERE BORN IN CHINA.  WHEN DID YOU
```

1    COME TO THIS COUNTRY?

2                 PROSPECTIVE JUROR:   '96.

3                 THE COURT:   SO YOU WENT TO HIGH SCHOOL AND COLLEGE

4    HERE.

5                 PROSPECTIVE JUROR:   YEAH, BUT I'M STILL IN COLLEGE.

6                 THE COURT:   ARE YOU IN COLLEGE AT THE MOMENT?   ARE

7    YOU ENROLLED THIS SEMESTER?

8                 PROSPECTIVE JUROR:   YES.

9                 THE COURT:   OKAY.

10                WHAT'S THE -- DO YOU HAVE FINALS COMING UP OR --

11                PROSPECTIVE JUROR:   YEAH, I HAVE FINAL THIS COMING

12   WEDNESDAY AND FRIDAY.

13                THE COURT:   OKAY.

14                SO THAT WOULD BE A PROBLEM FOR YOU?

15                PROSPECTIVE JUROR:   YEAH.

16                THE COURT:   HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

17   MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

18                PROSPECTIVE JUROR:   NO.

19                THE COURT:   HAVE YOU OR CLOSE FRIENDS OR FAMILY

20   MEMBERS WORKED OR BEEN TRAINED IN LAW, LAW ENFORCEMENT,

21   CORRECTIONS, OR MEDICINE?

22                PROSPECTIVE JUROR:   NO.

23                THE COURT:   HAVE YOU OR CLOSE FRIENDS OR FAMILY

24   MEMBERS BEEN TREATED FOR AN ORTHOPEDIC PROBLEM OR FOR CHRONIC

25   PAIN?

```
 1                    PROSPECTIVE JUROR:  NO.

 2               THE COURT:  HAVE YOU HEARD OF TRAMADOL?

 3                    PROSPECTIVE JUROR:  NO.

 4               THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

 5    PRISON?

 6                    PROSPECTIVE JUROR:  NO.

 7               THE COURT:  HAVE YOU OR CLOSE FRIENDS OR FAMILY

 8    MEMBERS BEEN THE VICTIM OF A CRIME?

 9                    PROSPECTIVE JUROR:  NO.

10               THE COURT:  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

11    PRISON?

12                    PROSPECTIVE JUROR:  NO.

13               THE COURT:  OTHER THAN YOUR SCHOOL SITUATION, CAN YOU

14    THINK OF ANYTHING THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE A

15    FAIR AND IMPARTIAL JUROR IN THIS CASE?

16                    PROSPECTIVE JUROR:  YEAH, I NEED TO STUDY FOR MY

17    FINAL AND --

18               THE COURT:  I NEED YOU TO PUT YOUR --

19                    PROSPECTIVE JUROR:  I CAN'T COME, 'CAUSE THEN I HAVE

20    FINALS AND -- PROJECT'S DUE TOMORROW, AND, LIKE, I'M NOT DONE

21    YET.

22               THE COURT:  OKAY.  WE'LL TAKE THAT INTO

23    CONSIDERATION.

24               AND YOU WOULD PASS THE MIKE -- ACTUALLY, MAYBE I

25    THINK WHAT WE BETTER DO IS, SHEILAH, WOULD YOU GO GET THAT?  AND
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 451-7530*

```
 1   IF YOU PASS IT DOWN TOWARDS ME, AND THEN SHEILAH WILL GET IT,

 2   AND THEN WE CAN PULL IT OVER TO THE FRONT ROW OF THE AUDIENCE

 3   THERE.

 4                  (PAUSE IN THE PROCEEDINGS.)

 5            THE COURT:  YES, MA'AM?

 6            PROSPECTIVE JUROR:  CAN I GO TO THE REST ROOM,

 7   PLEASE.

 8            THE COURT:  YES, I'M GOING TO ASK QUESTIONS OF A FEW

 9   MORE PEOPLE BEFORE WE TAKE A BREAK FOR EVERYONE.  BUT IF YOU

10   NEED TO LEAVE AND YOU'RE NOT IN THE FRONT ROW -- WELL, IF YOU

11   REALLY NEED TO LEAVE AND YOU ARE IN THE FRONT ROW, YOU CAN LEAVE

12   ALSO.  BUT --

13            WE'LL BE TAKING -- I'M TRYING TO GET TO A GOOD

14   STOPPING POINT TO TAKE THE BREAK WHEN WE'VE QUESTIONED ENOUGH

15   PEOPLE, SO IF THE -- ABOUT THE NEXT FIVE PEOPLE CAN MANAGE FOR A

16   FEW MORE MINUTES.

17            MS. SAULSBURY?

18            PROSPECTIVE JUROR:  YES.

19            THE COURT:  WOULD YOU MIND STANDING UP?  I CAN'T SEE

20   YOU TOO WELL FROM BACK THERE.  THANKS.

21            DEER PARK AGAIN?

22            PROSPECTIVE JUROR:  I LIVE IN ANGUINE.

23            THE COURT:  OKAY.  ANOTHER PERSON BORN IN DEER PARK.

24   TODAY MUST BE DEER PARK DAY.

25            OKAY.  AND YOU WORK FOR THE POSTAL SERVICE.  AND YOUR
```

1    HUSBAND WORKS -- DOES HE WORK FOR HIMSELF OR WORK FOR A COMPANY?

2                **PROSPECTIVE JUROR:**  HE WORKS FOR PACIFIC UNION

3    COLLEGE IN ANGUINE.

4                **THE COURT:**  OKAY.

5                AND YOUR CHILDREN ARE ALL STUDENTS BUT WORKING

6    PART-TIME.

7                **PROSPECTIVE JUROR:**  CORRECT.

8                **THE COURT:**  AND YOU TRAINED AS A NURSE BUT YOU'RE NOT

9    WORKING AS A NURSE?

10                **PROSPECTIVE JUROR:**  I TOOK PREREQ'S TO NURSING.

11                **THE COURT:**  I SEE, BUT YOU NEVER FINISHED UP NURSING.

12                **PROSPECTIVE JUROR:**  NO.

13                **THE COURT:**  OKAY.  AND YOU SERVED ON A JURY ONCE

14    BEFORE IN NAPA COUNTY AND THE JURY REACHED A VERDICT.  WHAT SORT

15    OF A CASE WAS IT?

16                **PROSPECTIVE JUROR:**  IT WAS A DRUNK-DRIVING CASE.

17                **THE COURT:**  OKAY.

18                USUALLY THAT'S A CRIMINAL CASE.

19                **PROSPECTIVE JUROR:**  IT COULD HAVE BEEN.  I DON'T

20    REMEMBER.

21                **THE COURT:**  OKAY.  ALL RIGHT.

22                HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

23    INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

24                **PROSPECTIVE JUROR:**  MY -- OUR FAMILY WAS.  MY

25    DAUGHTER WAS SEXUALLY HARASSED BY AN EL SALVADORAN JANITOR.

1    GETS ME EMOTIONAL.  AND HE HAD TO SERVE TIME IN NAPA COUNTY.

2              **THE COURT:**  OKAY.  AND DID THE CASE GO -- WAS HE

3    PROSECUTED CRIMINALLY?

4              **PROSPECTIVE JUROR:**  YES.

5              **THE COURT:**  AND DID THE CASE GO TO TRIAL, OR DID HE

6    PLEAD GUILTY?

7              **PROSPECTIVE JUROR:**  NO, IT WAS -- THERE WAS NO JURY.

8    WE HAD TO GO TO COURT AND TESTIFY.  I DON'T KNOW WHAT KIND OF

9    COURT IT WAS BECAUSE THERE WAS NO JURY.  IT WAS JUST BETWEEN THE

10   D.A. AND THE PUBLIC DEFENDER.

11             **THE COURT:**  OKAY.  WELL, I SUPPOSE HE COULD HAVE --

12   YOU CAN WAIVE YOUR RIGHT TO HAVE A JURY.  I GUESS HE COULD HAVE

13   WAIVED A JURY AND JUST HAD A TRIAL BEFORE THE COURT.

14             BUT HE WAS CONVICTED --

15             **PROSPECTIVE JUROR:**  YES.

16             **THE COURT:**  -- AND SENTENCED?

17             **PROSPECTIVE JUROR:**  HE SERVED TEN MONTHS.

18             **THE COURT:**  OKAY.  AND IS THERE ANYTHING ABOUT THAT

19   EXPERIENCE THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS

20   CASE?  THE PLAINTIFF IS A PRISONER.  HOWEVER, HIS -- THE REASON

21   HE'S IN PRISON IS NOT RELEVANT TO THIS CASE AT ALL.  THIS CASE

22   HAS TO DO ONLY WITH HIS MEDICAL CARE WHILE HE'S IN PRISON.

23             **PROSPECTIVE JUROR:**  RIGHT.

24             I SUPPOSE I COULD SAY NO, BUT I DON'T KNOW FOR SURE.

25             **THE COURT:**  YOU'D DO THE BEST YOU COULD?

```
1              PROSPECTIVE JUROR:  I WOULD TRY.

2              THE COURT:  OKAY.

3              ANY OTHER CONNECTIONS TO LEGAL PROCEEDINGS BESIDES

4     THAT ONE?

5              PROSPECTIVE JUROR:  NO.

6              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

7     MEMBERS WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW

8     ENFORCEMENT, CORRECTIONS, OR MEDICINE?

9              PROSPECTIVE JUROR:  MY IN-LAWS ARE BOTH NURSES.  MY

10    NIECE IS A NURSE.  I STARTED NURSING.

11             THE COURT:  OKAY.

12             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

13    MEDICAL TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR

14    CHRONIC PAIN?

15             PROSPECTIVE JUROR:  YES.  AND I HAVE A NOTE FROM MY

16    SON'S DOCTOR.  HE WAS IN A MOTORCYCLE ACCIDENT, AND, YOU KNOW,

17    HE HAD A BROKEN FOOT AND A REALLY BAD BRUISED RIGHT LEG, AND

18    HE'S AT HOME.  HE'S NOT LIVING IN THE DORM RIGHT NOW.

19             THE COURT:  HE'S WHAT?

20             PROSPECTIVE JUROR:  HE'S NOT IN THE LIVING IN THE

21    DORM RIGHT NOW 'CAUSE HE CAN'T GET AROUND.

22             THE COURT:  I SEE.  OKAY.

23             PROSPECTIVE JUROR:  IT WAS A GOOD MOTHER'S DAY,

24    THOUGH.

25             THE COURT:  ARE YOU FAMILIAR WITH TRAMADOL?
```

1          **PROSPECTIVE JUROR:**  YES, HE WAS GIVEN THAT IN THE ER.

2          **THE COURT:**  HAVE YOU HEARD OF PELICAN BAY STATE

3     PRISON?

4          **PROSPECTIVE JUROR:**  YES.

5          **THE COURT:**  HOW HAVE YOU HEARD OF IT?

6          **PROSPECTIVE JUROR:**  THROUGH THE -- THE NEWS WITH

7     EVERYTHING THAT HAPPENED IN SAN FRANCISCO AND THEN THE RIOTS UP

8     THERE.

9          **THE COURT:**  OKAY.

10         HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS,

11    OTHER THAN YOUR DAUGHTER THAT YOU TOLD US ABOUT, BEEN THE VICTIM

12    OF A CRIME?

13         **PROSPECTIVE JUROR:**  NO.

14         **THE COURT:**  DO YOU THINK THAT A CORRECTIONAL OFFICER

15    IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH?

16         **PROSPECTIVE JUROR:**  NO.

17         **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR

18    PRISON?

19         **PROSPECTIVE JUROR:**  JUST IN GRADE SCHOOL, TOURS.

20         **THE COURT:**  OKAY.  OTHER THAN WHAT YOU'VE TOLD US,

21    CAN YOU THINK OF ANYTHING THAT WOULD MAKE IT DIFFICULT FOR YOU

22    TO BE FAIR AND IMPARTIAL IF YOU WERE SELECTED TO SERVE AS A

23    JUROR IN THIS CASE?

24         **PROSPECTIVE JUROR:**  NO.

25         WOULD YOU LIKE THE NOTE FROM MY SON'S DOCTOR?

```
1              THE COURT:  OKAY.

2                    (OFF-THE-RECORD DISCUSSION.)

3              THE COURT:  AND, MS. RICHARDSON?

4              PROSPECTIVE JUROR:  YES.

5              THE COURT:  SO YOU'VE BEEN SELF-EMPLOYED AS AN

6    ACCOUNTANT FOR QUITE A WHILE?

7              PROSPECTIVE JUROR:  YES, I HAVE.

8              THE COURT:  AND YOUR HUSBAND IS A CHEF AT A

9    RESTAURANT.

10             PROSPECTIVE JUROR:  CORRECT.

11             THE COURT:  AND YOU SERVED AS A JUROR IN A CIVIL CASE

12   IN SAN FRANCISCO QUITE A LONG TIME AGO.

13             DO YOU LIVE IN SAN FRANCISCO COUNTY NOW?

14             PROSPECTIVE JUROR:  NO, SAN MATEO.

15             THE COURT:  SAN MATEO.

16             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

17   INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

18             PROSPECTIVE JUROR:  NO, BUT I HAVE CLIENTS THAT ARE

19   LAWYERS.

20             THE COURT:  OKAY.  DO YOU TALK ABOUT THEIR WORK WITH

21   THEM OR JUST ABOUT THEIR INCOME?

22             PROSPECTIVE JUROR:  WELL, SOMETIMES, YES.

23             THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

24   MEMBERS WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW

25   ENFORCEMENT, CORRECTIONS, OR MEDICINE OTHER THAN YOUR --
```

1        **PROSPECTIVE JUROR:**  NO.

2            **THE COURT:**  -- CLIENT LAWYERS?

3            HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

4    TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR CHRONIC PAIN?

5            **PROSPECTIVE JUROR:**  YES.

6            **THE COURT:**  CAN YOU --

7            **PROSPECTIVE JUROR:**  MY FATHER'S HAD A KNEE

8    REPLACEMENT, AND MY HUSBAND HAD CHRONIC KNEE PAIN.

9            **THE COURT:**  OKAY.

10           HAVE YOU HEARD OF TRAMADOL?

11           **PROSPECTIVE JUROR:**  NO.

12           **THE COURT:**  HAVE YOU HEARD OF PELICAN BAY STATE

13   PRISON?

14           **PROSPECTIVE JUROR:**  YES.

15           **THE COURT:**  WHERE HAVE YOU HEARD ABOUT IT?

16           **PROSPECTIVE JUROR:**  IN THE NEWS.

17           **THE COURT:**  ANYTHING ABOUT WHAT YOU'VE HEARD THAT

18   WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

19           **PROSPECTIVE JUROR:**  NO.

20           **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

21   MEMBERS BEEN THE VICTIM OF A CRIME?

22           **PROSPECTIVE JUROR:**  YES.

23           **THE COURT:**  TELL ME ABOUT THAT.

24           **PROSPECTIVE JUROR:**  I WAS A VICTIM OF A CRIME.

25           **THE COURT:**  OKAY.  ONE THAT YOU DON'T WANT TO TALK

```
1    ABOUT?

2              PROSPECTIVE JUROR:  I WOULD PREFER NOT.

3              THE COURT:  WOULD IT AFFECT YOUR ABILITY TO BE FAIR

4    IN THIS CASE?

5              PROSPECTIVE JUROR:  NO.

6              THE COURT:  DO YOU THINK THAT A CORRECTIONAL OFFICER

7    IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A

8    PERSON WHO'S NOT A CORRECTIONAL OFFICER?

9              PROSPECTIVE JUROR:  NO.

10             THE COURT:  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

11   PRISON?

12             PROSPECTIVE JUROR:  YES.

13             THE COURT:  COULD YOU TELL ME ABOUT THAT.

14             PROSPECTIVE JUROR:  FOR SCARED STRAIGHT IN HIGH

15   SCHOOL.

16             THE COURT:  OKAY.

17             PROSPECTIVE JUROR:  OKAY.

18             THE COURT:  CAN YOU THINK OF ANYTHING AT ALL THAT

19   WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU

20   WERE SELECTED TO SERVE AS A JUROR IN THIS CASE?

21             PROSPECTIVE JUROR:  BEING SELF-EMPLOYED, I DON'T GET

22   PAID UNLESS I SHOWED UP AT THE CLIENT'S, AND I WOULD BE VERY

23   CONCERNED SITTING HERE, WORRYING ABOUT HOW I'M GOING TO MAKE

24   MORTGAGE.

25             MY HUSBAND IS IN FINE DINING, AND IT'S TAKEN A HUGE
```

```
1   HIT WITH THE ECONOMIC PROBLEMS, AND HIS SALARY HAS BEEN REDUCED,

2   SO MY INCOME IS VERY IMPORTANT AT THIS POINT.

3             THE COURT:  WOULD THE MORNING SCHEDULE ENABLE YOU TO

4   WORK --

5             PROSPECTIVE JUROR:  NO.

6             THE COURT:  -- IN THE AFTERNOONS.

7             PROSPECTIVE JUROR:  NO, I GO -- I HAVE CLIENTS THAT I

8   SEE WEEKLY, MONTHLY, AND BI-MONTHLY, AND THE SCHEDULE CHANGES

9   EVERY WEEK.  SO IF I DON'T SEE THEM ON THEIR APPOINTED DAY, I'M

10  NOT GOING TO BE ABLE TO MAKE IT UP, NO.

11            THE COURT:  OKAY.  WE'LL TAKE THAT INTO ACCOUNT.

12            PROSPECTIVE JUROR:  THANK YOU.

13            THE COURT:  MS. HARWOOD, WHAT COUNTY DO YOU LIVE IN?

14            PROSPECTIVE JUROR:  CONTRA COSTA.

15            THE COURT:  AND YOU'RE A NURSE PRACTITIONER.  WHAT

16  SORT OF TRAINING HAVE YOU HAD?

17            PROSPECTIVE JUROR:  I HAVE A BACCALAUREATE DEGREE IN

18  NURSING AND A DEGREE FROM UCSF IN -- AS A NURSE PRACTITIONER.

19            THE COURT:  AND DO YOU HAVE A PARTICULAR SPECIALTY?

20            PROSPECTIVE JUROR:  ADULT AND COLLEGE HEALTH.

21            THE COURT:  AND YOU SERVED ON A JURY IN A CRIMINAL

22  CASE A WHILE BACK.  WAS THAT IN ALAMEDA COUNTY?

23            PROSPECTIVE JUROR:  CONTRA COSTA.

24            THE COURT:  CONTRA COSTA.

25            ANYTHING ABOUT THAT EXPERIENCE THAT WOULD MAKE IT
```

```
1   HARD FOR YOU TO BE FAIR IN THIS CASE?

2              PROSPECTIVE JUROR:  NO.

3              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

4   MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDINGS?

5              PROSPECTIVE JUROR:  NO.

6              THE COURT:  HAVE YOU OR CLOSE FRIENDS OR FAMILY

7   MEMBERS WORKED OR BEEN TRAINED IN LAW, LAW ENFORCEMENT,

8   CORRECTIONS, OR MEDICINE?

9              PROSPECTIVE JUROR:  WELL, BESIDES MYSELF?

10             THE COURT:  BESIDES YOUR OWN NURSING TRAINING.

11             PROSPECTIVE JUROR:  MY FATHER WAS AN ORTHOPEDIC

12  SURGEON, AND MY SISTER'S A NURSE.

13             THE COURT:  OKAY.  AND IS YOUR FATHER STILL WORKING?

14             PROSPECTIVE JUROR:  NO.  HE'S DECEASED.

15             THE COURT:  AND HOW LONG AGO WAS --

16             PROSPECTIVE JUROR:  HE DIED ABOUT FIVE YEARS AGO.

17             THE COURT:  OKAY.

18             AND WHEN DID HE STOP WORKING?

19             PROSPECTIVE JUROR:  OH, NOT -- NOT -- NOT -- I DON'T

20  KNOW.  MAYBE TEN YEARS AGO.

21             THE COURT:  OKAY.  HAVE YOU OR ANY CLOSE FRIENDS OR

22  FAMILY MEMBERS BEEN TREATED FOR A BROKEN BONE, ORTHOPEDIC

23  PROBLEM, CHRONIC PAIN?

24             PROSPECTIVE JUROR:  I HAD A FRACTURED HIP TWO YEARS

25  AGO.
```

```
 1                THE COURT:  OKAY.

 2                PROSPECTIVE JUROR:  NO LONGER BOTHERING ME.

 3                THE COURT:  OKAY.

 4                ARE YOU FAMILIAR WITH TRAMADOL?

 5                PROSPECTIVE JUROR:  VAGUELY.

 6                THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

 7    PRISON?

 8                PROSPECTIVE JUROR:  NO.

 9                THE COURT:  HAVE YOU OR A CLOSE FRIEND OR FAMILY

10    MEMBER BEEN THE VICTIM OF A CRIME?

11                PROSPECTIVE JUROR:  NO, NOTHING.

12                THE COURT:  DO YOU THINK THAT A CORRECTIONAL OFFICER

13    IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A

14    PERSON WITH A DIFFERENT OCCUPATION?

15                PROSPECTIVE JUROR:  NO.

16                THE COURT:  HAVE YOU EVER BEEN IN A JAIL OR A PRISON?

17                PROSPECTIVE JUROR:  NO.

18                THE COURT:  CAN YOU THINK OF ANYTHING AT ALL THAT

19    WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU

20    WERE SELECTED TO SERVE AS A JUROR IN THIS CASE?

21                PROSPECTIVE JUROR:  NO.

22                THE COURT:  ALL RIGHT.

23                IF YOU WOULD PASS THE MICROPHONE TO MS. DIE

24    (PHONETIC), IS IT?

25                PROSPECTIVE JUROR:  DAY (PHONETIC).
```

1            **THE COURT:**  DAI.

2            YOU WERE BORN IN THE PHILIPPINES.  WHEN DID YOU COME

3   TO THIS COUNTRY?

4            **PROSPECTIVE JUROR:**  1986.

5            **THE COURT:**  BUT YOU WENT TO COLLEGE IN THE

6   PHILIPPINES?

7            **PROSPECTIVE JUROR:**  YES.

8            **THE COURT:**  AND HIGH SCHOOL AS WELL?

9            **PROSPECTIVE JUROR:**  YES.

10           **THE COURT:**  AND WHAT COUNTY ARE YOU LIVING IN NOW?

11           **PROSPECTIVE JUROR:**  SAN MATEO.

12           HAVE YOU DONE OTHER KINDS OF WORK PRIOR TO YOUR

13  CURRENT JOB?

14           **PROSPECTIVE JUROR:**  YES, I WORKED AT NORDSTROM.

15           **THE COURT:**  AND YOU LIVE BY YOURSELF?

16           **PROSPECTIVE JUROR:**  YES.

17           **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

18  MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

19           **PROSPECTIVE JUROR:**  YES.  MY SISTER AND MY MOM WERE

20  WITNESSES FOR A POLITICAL PRISONER BACK HOME IN THE PHILIPPINES.

21           **THE COURT:**  OKAY.

22           HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS

23  WORKED OR BEEN TRAINED IN THE FIELDS OF LAW, LAW ENFORCEMENT,

24  CORRECTIONS, OR MEDICINE?

25           **PROSPECTIVE JUROR:**  MY SISTER AND HER HUSBAND ARE

1    DOCTORS IN MICHIGAN.  I HAVE A COUSIN WHO'S A FIRE -- WHO'S A

2    FIRE FIGHTER FOR THE SAN FRANCISCO DEPARTMENT.  AND COUSINS AND

3    AUNTS THAT ARE ALSO DOCTORS.

4                    **THE COURT:**  OKAY.

5                    HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

6    TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR CHRONIC PAIN?

7                    **PROSPECTIVE JUROR:**  I HAVE A BAD BACK.

8                    **THE COURT:**  OKAY.

9                    **PROSPECTIVE JUROR:**  AND ALL MY SISTERS AND MY MOM AS

10   WELL.

11                   **THE COURT:**  ALL HAVE BAD BACKS?

12                   **PROSPECTIVE JUROR:**  YES, UNFORTUNATELY.

13                   **THE COURT:**  DO YOU GET TREATMENT FOR THAT, OR

14   PHYSICAL THERAPY, OR MEDICATION?

15                   **PROSPECTIVE JUROR:**  I DO CHIROPRACTOR.  I TRIED

16   PHYSICAL THERAPY.  IT DIDN'T WORK.  CHIROPRACTOR SEEMS TO WORK,

17   SO I GO EVERY MONTH.

18                   **THE COURT:**  OKAY.  ARE YOU FAMILIAR WITH TRAMADOL?

19                   **PROSPECTIVE JUROR:**  NO.

20                   **THE COURT:**  HAVE YOU HEARD OF PELICAN BAY STATE

21   PRISON?

22                   **PROSPECTIVE JUROR:**  TELEVISION.

23                   **THE COURT:**  LIKE, A NEWS SHOW OR --

24                   **PROSPECTIVE JUROR:**  I WATCH A LOT OF THE COURT DRAMA

25   T.V. SHOWS.

1              **THE COURT:**  OKAY.  ANYTHING ABOUT ANYTHING YOU'VE

2   SEEN THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

3              **PROSPECTIVE JUROR:**  NO.

4              **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

5   MEMBERS BEEN THE VICTIM OF A CRIME?

6              **THE WITNESS:**  YES.  JUST CAR THEFT, BURGLARY --

7              **THE COURT:**  DO YOU THINK THAT A CORRECTIONAL OFFICER

8   IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A

9   WITNESS WITH A DIFFERENT OCCUPATION?

10             **PROSPECTIVE JUROR:**  NO.

11             **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

12  PRISON?

13             **PROSPECTIVE JUROR:**  YES.  ALSO BACK HOME IN THE

14  PHILIPPINES, I DID VOLUNTEER WORK.

15             **THE COURT:**  OKAY.  CAN YOU THINK OF ANYTHING AT ALL

16  THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF

17  YOU WERE SELECTED TO SERVE AS A JUROR IN THIS CASE?

18             **THE DEFENDANT:**  NO.

19             **THE COURT:**  ALL RIGHT.  IF YOU'D PASS THE MICROPHONE

20  TO MS. MARIAMA?

21             **PROSPECTIVE JUROR:**  YEAH.

22             **THE COURT:**  ARE -- WHAT COUNTY ARE YOU LIVING IN NOW?

23             **PROSPECTIVE JUROR:**  SAN MATEO.

24             **THE COURT:**  AND YOU ARE ENROLLED IN COLLEGE THIS

25  SEMESTER?

1          **PROSPECTIVE JUROR:**  UH-HUH.

2          **THE COURT:**  WHAT'S THE STATE OF THE SEMESTER?  IT'S

3    ALMOST OVER?  OR DO YOU HAVE FINALS COMING UP?

4          **PROSPECTIVE JUROR:**  I HAVE EXAMS COMING UP.

5          **THE COURT:**  WHEN?

6          **PROSPECTIVE JUROR:**  NEXT WEEK.

7          **THE COURT:**  NEXT WEEK.

8          DO YOU HAVE CLASSES THIS WEEK?

9          **PROSPECTIVE JUROR:**  UM-HMM.  TUESDAY, WEDNESDAY, AND

10   THURSDAY.

11         **THE COURT:**  SO WOULD IT BE A PROBLEM FOR YOU TO SERVE

12   ON A JURY?

13         **PROSPECTIVE JUROR:**  I COULDN'T MISS MORE THAN TWO OR

14   THEY WOULD DROP ME OUT OF MY CLASSES, TWO SESSIONS.

15         **THE COURT:**  ARE YOUR CLASSES IN THE MORNINGS OR THE

16   AFTERNOONS?

17         **PROSPECTIVE JUROR:**  MIDDAY.

18         **THE COURT:**  AND SO YOU'RE -- YOU WERE WORKING AS A

19   PATIENT REGISTRAR AS CPMC.  IS IT, LIKE, A PART-TIME --

20         **PROSPECTIVE JUROR:**  FULL-TIME.  I LIVE WITH MY

21   MOTHER, AND SHE'S DISABLED, SO I PAY ALL THE BILLS, SO -- I DO

22   GO TO SCHOOL FULL-TIME AND WORK FULL-TIME.

23         **THE COURT:**  OKAY.

24         AND DID YOUR MOTHER WORK BEFORE SHE BECAME DISABLED?

25         **PROSPECTIVE JUROR:**  YEAH.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 451-7530*

1    **THE COURT:**  WHAT DID SHE DO?

2    **PROSPECTIVE JUROR:**  SHE WORKED AT THE SAME HOSPITAL

3    FOR TEN YEARS.  SHE WAS A UNIT COORDINATOR.

4    AND YOU SAID YOU KNEW SOMEBODY ON THE WITNESS LIST?

5    **PROSPECTIVE JUROR:**  I WORK WITH DOCTORS, SO THE

6    DOCTORS' NAMES, THEY SOUND REAL FAMILIAR.

7    **THE COURT:**  OKAY.

8    HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

9    INVOLVED IN ANY KIND OF LEGAL PROCEEDINGS?

10   **PROSPECTIVE JUROR:**  YEAH, MY -- MY MOM'S IDENTITY WAS

11   STOLEN ABOUT A YEAR AGO.

12   **THE COURT:**  OKAY.

13   HAVE YOU OR CLOSE FRIENDS OR FAMILY MEMBERS WORKED OR

14   BEEN TRAINED IN LAW, LAW ENFORCEMENT, CORRECTIONS, OR MEDICINE?

15   **PROSPECTIVE JUROR:**  I HAVE A COUSIN THAT'S A NURSE

16   AND ANOTHER COUSIN THAT'S A DISABILITY ATTORNEY AND ANOTHER

17   COUSIN THAT'S EITHER A -- A SERGEANT OR A LIEUTENANT AT

18   SAN QUENTIN, BUT I'M NOT SURE.

19   **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

20   MEMBERS BEEN TREATED FOR AN ORTHOPEDIC PROBLEM OR A CHRONIC PAIN

21   PROBLEM?

22   **PROSPECTIVE JUROR:**  MY MOM AND MYSELF.  LAST YEAR I

23   THINK AROUND TO THIS DATE, I FELL DOWN EIGHT STAIRS GOING TO

24   JURY DUTY, AND THEN MY MOM --

25   **THE COURT:**  BE CAREFUL.

```
1              PROSPECTIVE JUROR:  SHE HAS RHEUMATOID ARTHRITIS,

2    ALONG WITH A LOT OTHER HEALTH ISSUES.

3              THE COURT:  I'M SORRY.  WAS THIS YOUR MOM --

4              PROSPECTIVE JUROR:  NO, I FELL.

5              THE COURT:  OH, YOU FELL.

6              PROSPECTIVE JUROR:  AND THEN MY MOM HAS A LOT OF

7    HEALTH ISSUES.  SHE'S RHEUMATOID ARTHRITIS, SHE HAD BOTH OF HER

8    KNEES REPLACED, AND SHE HAS HIP AND BACK PROBLEMS.

9              THE COURT:  OKAY.  ARE YOU FAMILIAR WITH TRAMADOL?

10             PROSPECTIVE JUROR:  SHE TAKES 14 PILLS A DAY, SO I

11   MIGHT -- IF I SEE IT, I COULD TELL YOU, BUT NOT BY THE NAME, NO.

12             THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

13   PRISON?

14             PROSPECTIVE JUROR:  UH-HUH.

15             THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

16   MEMBERS BEEN THE VICTIM OF A CRIME?

17             PROSPECTIVE JUROR:  JUST BESIDES THE IDENTITY THEFT.

18             THE COURT:  DO YOU THINK A CORRECTIONAL OFFICER IS

19   EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A

20   PERSON WITH A DIFFERENT JOB?

21             PROSPECTIVE JUROR:  YEAH, TELL THE TRUTH?

22             THE COURT:  YEAH.

23             PROSPECTIVE JUROR:  MORE -- LESS LIKELY, YES.

24             THE COURT:  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

25   PRISON?
```

1              **PROSPECTIVE JUROR:**  YEAH, 850, SAN BRUNO, JAMESTOWN,

2     AND SOLANO COUNTY.  SOLANO STATE PRISON.

3              **THE COURT:**  IS THERE ANYTHING OTHER THAN YOUR STUDIES

4     THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE A FAIR AND IMPARTIAL

5     JUROR?

6              **PROSPECTIVE JUROR:**  I TAKE MY MOTHER TO THE DOCTOR AT

7     LEAST TWICE A WEEK.  SHE HAS A PROCEDURE COMING UP ON THURSDAY.

8     AND I'M THE ONLY ONE THAT WORKS IN MY HOUSE, SO FOR ME NOT TO GO

9     TO WORK, THEY'RE NOT GOING TO PAY ME BECAUSE THEY TAKE IT OUT OF

10    YOUR PTO BANK.  AND I HAVE NOTHING IN MY PTO BANK BECAUSE I TAKE

11    MY MOTHER TO THE DOCTOR SO OFTEN.  SO IT WOULD BE HARD FOR MY

12    BILLS TO GET PAID.

13             **THE COURT:**  OKAY.  WE'LL TAKE THAT INTO ACCOUNT.

14             IF YOU'D PASS THE MICROPHONE TO MS. HAMMER.  WHAT

15    COUNTY DO YOU LIVE IN?

16             **PROSPECTIVE JUROR:**  SAN FRANCISCO.

17             **THE COURT:**  AND WHAT SORT OF CONSULTING DO YOU DO?

18             **PROSPECTIVE JUROR:**  MANAGEMENT CONSULTING.

19             **THE COURT:**  AND HAVE YOU DONE OTHER TYPES OF WORK

20    PRIOR TO THIS?

21             **PROSPECTIVE JUROR:**  YES, I WAS A COMPUTER PROGRAMMER

22    AND SYSTEMS MANAGER, AND I WAS ALSO A STAGE MANAGER IN

23    LOS ANGELES.

24             **THE COURT:**  AND YOU SERVED ON JURORS -- JURIES IN A

25    CIVIL CASE AND A CRIMINAL CASE IN SAN FRANCISCO COUNTY?

1              **PROSPECTIVE JUROR:**  I SERVED ON A CRIMINAL CASE IN

2    LOS ANGELES, AND I SERVED ON A CIVIL CASE IN SAN FRANCISCO.

3              **THE COURT:**  ANYTHING ABOUT THOSE EXPERIENCES THAT

4    WOULD MAKE IT A HARD FOR YOU TO BE FAIR IN THIS CASE?

5              **PROSPECTIVE JUROR:**  NO.

6              **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

7    MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

8              **PROSPECTIVE JUROR:**  NO.

9              **THE COURT:**  HAVE YOU OR CLOSE FRIENDS OR FAMILY

10   MEMBERS WORKED OR BEEN TRAINED IN LAW, LAW ENFORCEMENT,

11   CORRECTIONS, OR MEDICINE?

12             **PROSPECTIVE JUROR:**  YES, MY FATHER WAS A MERGER AND

13   ACQUISITIONS LAWYER, BUT HE'S BEEN RETIRED FOR OVER 20 YEARS.

14   MY MOTHER PASSED THE BAR, BUT SHE NEVER PRACTICED.  MY UNCLE HAS

15   BEEN A PRIVATE ATTORNEY FOR A SINGLE FAMILY MY WHOLE LIFE.  AND

16   I HAD A COUSIN WHO WORKED BRIEFLY AS A PUBLIC DEFENDER.

17             **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

18   MEMBERS BEEN TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEMS, OR

19   CHRONIC PAIN?

20             **PROSPECTIVE JUROR:**  I'VE GONE THROUGH PHYSICAL

21   THERAPY FOR A KNEE INJURY.

22             **THE COURT:**  AND WHEN WAS THE INJURY?

23             **PROSPECTIVE JUROR:**  LAST YEAR.

24             **THE COURT:**  IS THE THERAPY OVER WITH --

25             **PROSPECTIVE JUROR:**  YES.

| | |
|---|---|
| 1 | **THE COURT:** -- AT THIS POINT?  AND YOU'VE RECOVERED |
| 2 | FROM -- |
| 3 | **PROSPECTIVE JUROR:**  YES. |
| 4 | **THE COURT:**  -- FROM IT? |
| 5 | ARE YOU FAMILIAR WITH TRAMADOL? |
| 6 | **PROSPECTIVE JUROR:**  NO. |
| 7 | **THE COURT:**  HAVE YOU HEARD OF PELICAN BAY STATE |
| 8 | PRISON? |
| 9 | **PROSPECTIVE JUROR:**  NO. |
| 10 | **THE COURT:**  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY |
| 11 | MEMBERS BEEN THE VICTIM OF A CRIME? |
| 12 | **PROSPECTIVE JUROR:**  I HAD A FEW ITEMS TAKEN FROM MY |
| 13 | APARTMENT IN LOS ANGELES. |
| 14 | **THE COURT:**  DO YOU THINK THAT A CORRECTIONAL OFFICER |
| 15 | IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A |
| 16 | WITNESS WITH A DIFFERENT OCCUPATION? |
| 17 | **PROSPECTIVE JUROR:**  NO. |
| 18 | **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A |
| 19 | PRISON? |
| 20 | **PROSPECTIVE JUROR:**  NO. |
| 21 | **THE COURT:**  CAN YOU THINK OF ANYTHING AT ALL THAT |
| 22 | WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU |
| 23 | WERE SELECTED TO SERVE ON THIS JURY? |
| 24 | **PROSPECTIVE JUROR:**  NO. |
| 25 | **THE COURT:**  ALL RIGHT.  IF YOU'D PASS THE MICROPHONE |

```
 1   TO MR. FERRARO.  HAS YOUR WIFE EVER WORKED OUTSIDE THE HOME?
 2              PROSPECTIVE JUROR:  TWENTY YEARS AGO.
 3              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY
 4   MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING?
 5              PROSPECTIVE JUROR:  NO.
 6              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY
 7   MEMBERS WORKED OR BEEN TRAINED IN LAW, LAW ENFORCEMENT,
 8   CORRECTIONS, OR MEDICINE?
 9              PROSPECTIVE JUROR:  NO.
10              THE COURT:  HAVE YOU OR CLOSE FRIENDS OR FAMILY
11   MEMBERS BEEN TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR
12   CHRONIC PAIN?
13              PROSPECTIVE JUROR:  MY FATHER HAD SURGERY PROBABLY 12
14   YEARS AGO FOR A KNEE REPLACEMENT, HIP REPLACEMENT.  BOTH DIDN'T
15   GO VERY WELL.  THERE WAS NEVER ANY -- ANYTHING LEGAL DONE ABOUT
16   IT.  JUST NEVER REALLY RECOVERED.  NOW, HE'S FINALLY GOING TO A
17   WHEELCHAIR THIS WEEK AFTER 12 YEARS.
18              THE COURT:  ANYTHING ABOUT HIS EXPERIENCES THAT WOULD
19   MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?
20              PROSPECTIVE JUROR:  NOT THAT I CAN THINK OF.
21              THE COURT:  HAVE YOU HEARD OF TRAMADOL?
22              PROSPECTIVE JUROR:  NO.
23              THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE
24   PRISON?
25              PROSPECTIVE JUROR:  YES, JUST IN THE NEWS.
```

```
1              THE COURT:  ANYTHING ABOUT WHAT YOU'VE HEARD THAT

2    WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

3              PROSPECTIVE JUROR:  NO.

4              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

5    MEMBERS BEEN THE VICTIM OF A CRIME?

6              PROSPECTIVE JUROR:  WE WERE VANDALIZED AT OUR HOME

7    LAST YEAR.

8              THE COURT:  HAVE YOU OR -- WELL, DO YOU -- DO YOU

9    THINK THAT A CORRECTIONAL OFFICER IS EITHER MORE LIKELY OR LESS

10   LIKELY TO TELL THE TRUTH THAN A PERSON WITH A DIFFERENT

11   OCCUPATION?

12             PROSPECTIVE JUROR:  THAT'S A CONFUSING QUESTION.  I

13   DON'T UNDERSTAND.  COULD YOU -- BASED ON WHAT?  COMPARED TO WHO?

14   COMPARED TO WHAT?

15             THE COURT:  WELL, COMPARED TO REALLY ANYONE WHO ISN'T

16   A CORRECTIONAL OFFICER.  IN OTHER WORDS, WOULD YOU HAVE

17   PARTICULAR BIAS EITHER IN FAVOR OF OR AGAINST SOMEONE WHO WAS

18   EMPLOYED AS A CORRECTIONAL OFFICER BECAUSE THEY WERE A

19   CORRECTIONAL OFFICER?

20             PROSPECTIVE JUROR:  I WOULD SAY YES.

21             THE COURT:  OKAY.  AND CAN YOU TELL US ABOUT THAT.

22             PROSPECTIVE JUROR:  -- TELL THE TRUTH.

23             THE COURT:  PARDON ME?

24             PROSPECTIVE JUROR:  IT'S JUST TAKEN OUT OF CONTEXT.

25   I'M TRYING TO THINK OF WHAT THE QUESTION IS ABOUT, RATHER THAN
```

1    JUST SAYING "YES" OR "NO."  WHAT DO YOU MEAN BY THAT?

2              **THE COURT:**  WELL, WE WILL HAVE VARIOUS WITNESSES WHO

3    WILL TESTIFY, AND IT'S IMPORTANT THAT EACH JUROR IS ABLE TO

4    JUDGE THE CREDIBILITY OF EACH WITNESS ON THE BASIS OF THAT

5    WITNESS'S DEMEANOR, APPEARANCE, TESTIMONY, BELIEVABILITY, AND

6    THAT THE JURORS NOT HAVE AN ADVANCED BIAS EITHER FOR OR AGAINST

7    THE WITNESS, THINKING, OH, THIS GUY IS A CORRECTIONAL OFFICER,

8    HE MUST BE TELLING THE TRUTH.  OR, OH, THIS GUY'S A CORRECTIONAL

9    OFFICER, HE'S PROBABLY LYING.

10             OR WOULD YOU BE ABLE TO SAY THIS GUY'S A CORRECTIONAL

11   OFFICER, HE'S JUST LIKE ANY OTHER PERSON AND -- DEPENDS ON THE

12   INDIVIDUAL, AND I'LL JUDGE HIM BASED ON WHAT I SEE OF HIM ON THE

13   STAND, OR HER.  WOULD YOU BE ABLE TO DO THAT?

14             **PROSPECTIVE JUROR:**  I WOULD TEND TO THINK THEY'RE

15   TELLING TRUTH.

16             **THE COURT:**  WOULD YOU BE ABLE TO GIVE EACH PERSON

17   INDIVIDUAL CONSIDERATION, OR WOULD YOU BE UNABLE TO DO THAT?

18             **PROSPECTIVE JUROR:**  PROBABLY BE UNABLE.

19             **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

20   PRISON?

21             **PROSPECTIVE JUROR:**  NO.

22             **THE COURT:**  OTHER THAN WHAT YOU'VE DISCUSSED, CAN YOU

23   THINK OF ANYTHING AT ALL THAT WOULD MAKE IT DIFFICULT FOR YOU TO

24   BE FAIR AND IMPARTIAL IF YOU WERE SELECTED TO SERVE IN THIS

25   CASE?

1              **PROSPECTIVE JUROR:**  MY ONLY QUESTION IS IN THIS

2     PARTICULAR CASE, IT'S THE PRISONER OF STATE OF CALIFORNIA

3     AGAINST THE STATE.  IN THE EVENT THE DEFENDANT LOSES, THE STATE

4     OF CALIFORNIA PAYS OUT MORE MONEY?

5              **THE COURT:**  THAT WOULDN'T BE YOUR CONCERN.  HE IS

6     SUING BOTH AN INDIVIDUAL DOCTOR AND THE DIRECTOR OF THE

7     CORRECTIONS DEPARTMENT.  AND WHO WOULD PAY, IF MONEY WERE

8     AWARDED, WOULD NOT BE SOMETHING THAT WOULD BE EVIDENCE IN THE

9     CASE AND WOULD NOT BE SOMETHING THAT YOU WOULD NEED TO CONCERN

10    YOURSELF WITH.

11             **PROSPECTIVE JUROR:**  WELL, I'M A TAXPAYER, LIKE

12    EVERYBODY ELSE IN THIS ROOM, AND I HAPPEN TO BE IN A VERY

13    HIGH-INCOME BRACKET IN THE STATE OF CALIFORNIA WHERE WE CHARGE

14    HIGH-INCOME PEOPLE MORE THAN ANYONE ELSE IN THE COUNTRY.  AND WE

15    JUST RAISED MY TAXES PERSONALLY, AND I SEE IT AS MONEY AGAINST

16    WHAT I'M PAYING INTO.

17             I GET VERY LITTLE SERVICES, IF ANY, EXCEPT FOR COMING

18    HERE TO COURT, SPENDING MORE TIME AWAY FROM ME MAKING ANY MONEY

19    SO I CAN PAY MORE TO THE STATE.  SO I'M KIND OF SITTING HERE

20    GOING, WELL, GOSH, I GET TO MAKE A DECISION ON WHETHER MORE

21    MONEY COMES OUT OF MY POCKET OR NOT.  I -- THAT'S THE WAY IT

22    AFFECTS ME.  THAT'S THE WAY I SEE IT.

23             **THE COURT:**  ALL RIGHT.  WELL, WE'LL TAKE THAT INTO

24    ACCOUNT.

25             **PROSPECTIVE JUROR:**  OKAY.

114

```
1              THE COURT:  IF YOU WOULD PASS THE MICROPHONE TO

2    MS. TALLEY.

3              HAVE YOU HAD MEDICAL TRAINING?

4              PROSPECTIVE JUROR:  NO.

5              THE COURT:  SO YOUR JOB WITH THE ORTHOPEDIC

6    SPECIALIST IS ONE OF ADMINISTRATION AND --

7              PROSPECTIVE JUROR:  JUST ADMINISTRATION ON THE

8    BUSINESS SIDE.

9              THE COURT:  OKAY.

10             AND YOU CHECKED THAT YOU HAD HEARD ONE OF THE PEOPLE

11   ON THE PEOPLE ON THE WITNESS LIST.

12             PROSPECTIVE JUROR:  I DON'T THINK THEY'RE THE SAME

13   PERSON -- I HOPE NOT -- BUT MY HUSBAND IS J.R. COX, JAMES

14   RICHARD COX.

15             THE COURT:  I THINK YOU PROBABLY WOULD KNOW IF --

16             PROSPECTIVE JUROR:  I -- I THINK SO, TOO, BUT IT

17   STARTLED ME WHEN I SAW HIS -- THE NAME LIKE THAT, SO I CHECKED

18   IT BECAUSE I WASN'T SURE.

19             THE COURT:  OKAY.  IS IT JAMES RICHARD COX?

20             MR. ANDRADA:  WE DON'T HAVE TO WORRY.

21             THE COURT:  DIFFERENT GUY.  OKAY.

22             PROSPECTIVE JUROR:  I WOULD HOPE SO.

23             THE COURT:  OKAY.  HAVE YOU OR ANY CLOSE FRIENDS OR

24   FAMILY MEMBERS BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING?

25             PROSPECTIVE JUROR:  MY HUSBAND.  HE'S IN A CIVIL
```

```
1    PROCEEDING RIGHT NOW WITH HIS BUSINESS.

2              THE COURT:  OKAY.

3              HE'S BEING SUED, OR HE'S SUING SOMEONE?

4              PROSPECTIVE JUROR:  HE'S -- HE'S SUING SOMEONE.

5              THE COURT:  OKAY.

6              ANYTHING ABOUT THAT EXPERIENCE THAT WOULD MAKE IT

7    HARD FOR YOU TO BE FAIR IN THIS CASE?

8              PROSPECTIVE JUROR:  NO.

9              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

10   MEMBERS WORKED OR BEEN TRAINED IN LAW, LAW ENFORCEMENT,

11   CORRECTIONS, OR MEDICINE?

12             PROSPECTIVE JUROR:  MY NEPHEW IS AN ATTORNEY IN

13   FRESNO IN FAMILY LAW, AND OTHER THAN MY EMPLOYERS, WHO ARE

14   DOCTORS --

15             THE COURT:  OKAY.

16             HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

17   TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR CHRONIC PAIN?

18             PROSPECTIVE JUROR:  YES.  MYSELF, MY HUSBAND, AND MY

19   MOTHER.

20             THE COURT:  MR. ANDRADA, YOU'RE KIND OF RIGHT IN MY

21   LINE --

22                       (SIMULTANEOUS COLLOQUY.)

23             THE COURT:  IF YOU WOULD SCOOT OVER JUST A LITTLE BIT

24   TO YOUR RIGHT OR YOUR LEFT.

25             MR. ANDRADA:  HOW ABOUT --
```

```
 1                THE COURT:  NO, NO, NO.  JUST MOVE YOUR CHAIR.

 2                MR. ANDRADA:  I'LL MAKE A DEAL, IF WE CAN TAKE A

 3   BREAK SO I CAN GO TO THE REST ROOM IN ABOUT FIVE MINUTES.

 4                THE COURT:  OKAY.

 5                MR. ANDRADA:  THEN I'LL MOVE.  THANK YOU, YOUR HONOR.

 6                DR. SAYRE:  THANK YOU, YOUR HONOR.

 7                THE COURT:  WELL, WE WERE GOING TO TAKE A BREAK

 8   ANYWAY, SO DON'T --

 9                          (LAUGHTER.)

10                THE COURT:  DID I ASK YOU ABOUT THE MEDICAL

11   TREATMENT?

12                PROSPECTIVE JUROR:  YEAH.  AND MY ANSWER WAS YES.  DO

13   YOU WANT TO KNOW MORE DETAILS?

14                THE COURT:  PLEASE.

15                PROSPECTIVE JUROR:  I HAVE ARTHRITIS IN BOTH KNEES.

16   MY MOTHER HAS ARTHRITIS.  MY HUSBAND HAD CARPAL TUNNEL SURGERY.

17   AND ALSO MY SON HAD A -- A COUPLE OF BROKEN BONES.

18                THE COURT:  OKAY.

19                AND YOU'RE CURRENTLY BEING TREATED FOR ARTHRITIS?

20                PROSPECTIVE JUROR:  YEAH, IT'S LIFELONG.

21                THE COURT:  OKAY.

22                AND YOU TAKE MEDICATION OR --

23                PROSPECTIVE JUROR:  NO, JUST ALLEVE OVER THE COUNTER.

24                THE COURT:  OKAY.

25                ARE YOU FAMILIAR WITH TRAMADOL?
```

1          PROSPECTIVE JUROR:  YES.

2              THE COURT:  HAVE YOU TAKEN THAT?

3          PROSPECTIVE JUROR:  NO, MY HUSBAND WAS PRESCRIBED

4     TRAMADOL.

5              THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

6     PRISON?

7          PROSPECTIVE JUROR:  NO, I HAVE NOT.

8              THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

9     MEMBERS BEEN THE VICTIM OF A CRIME?

10         PROSPECTIVE JUROR:  MY DAUGHTER HAD HER CAR STOLEN

11    ABOUT FIVE, SIX YEARS AGO.

12             THE COURT:  DO YOU BELIEVE THAT A CORRECTIONAL

13    OFFICER IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH

14    THAN A --

15         PROSPECTIVE JUROR:  NO.

16             THE COURT:  -- PERSON WITH A DIFFERENT OCCUPATION?

17         PROSPECTIVE JUROR:  (SHAKES HEAD.)

18             THE COURT:  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

19    PRISON?

20         PROSPECTIVE JUROR:  NO, I HAVE NOT.

21             THE COURT:  CAN YOU THINK OF ANYTHING AT ALL THAT

22    WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU

23    WERE SELECTED TO SERVE AS A JUROR IN THIS CASE?

24         PROSPECTIVE JUROR:  NO.

25             AND I LIVE IN CONTRA COSTA COUNTY.

1          **THE COURT:** OH, OKAY.  FORGOT THAT ONE.

2          WE'RE GOING TO TAKE A BREAK IN JUST A MOMENT.  IF

3     YOU'D PUT THAT MICROPHONE RIGHT ON THE BENCH THERE.

4          LADIES AND GENTLEMEN, DURING THE BREAK IF YOU WOULD

5     PLEASE REMEMBER NOT TO DISCUSS THE CASE AMONGST YOURSELVES OR

6     WITH ANYONE ELSE.  IF YOU SHOULD HAPPEN TO RUN INTO IN THE

7     HALLWAY ANY OF THE ATTORNEYS OR PEOPLE INVOLVED, DON'T SPEAK

8     WITH THEM.  IF YOU WANT TO LEAVE COATS OR SO ON IN THE ROOM, YOU

9     CAN DO THAT.  YOU SHOULD TAKE YOUR PURSES AND THINGS WITH YOU.

10          WE'RE GOING TO HAVE TO TAKE A BREAK.  BREAKS ARE

11    GENERALLY 15 MINUTES, BUT WE'RE GOING TO NEED TO DISCUSS SOME

12    MATTERS OUTSIDE OF YOUR PRESENCE, SO WE'RE GOING TO TAKE

13    15-MINUTE BREAK OURSELVES HERE.  BUT YOU ALL ARE GOING TO TAKE A

14    HALF-AN-HOUR BREAK, SO IF YOU WANT TO, YOU CAN GO OUT TO THE

15    PLAZA AND GET A COFFEE OR GOT TO THE JURY ROOM.

16          IT'S QUARTER PAST 11:00.  IF YOU COULD BE BACK HERE

17    BY QUARTER TILL 12:00.  AND COME BACK AND SIT IN THE SAME PLACE

18    YOU'RE SITTING IN NOW.  SO REMEMBER WHERE YOU'RE SITTING.  WE'LL

19    SEE YOU IN A HALF AN HOUR.  AND THE REST OF YOU, YOU WILL BE

20    TAKING A 15-MINUTE BREAK, SO IF YOU ALL COULD BE BACK HERE AT

21    11:30.

22          (RECESS TAKEN AT 11:15 A.M.)

23          (PROCEEDINGS RESUMED AT 11:29 A.M.)

24          (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

25    PRESENCE OF THE JURY:)

1      **THE COURT:**  SO EVERYTHING OKAY?

2      **CORRECTIONS OFFICER:**  OH, YEAH, EVERYTHING'S FINE.

3      **THE COURT:**  OKAY.

4          SO I WAS TRYING TO GET ENOUGH JURORS QUESTIONED SO

5      THAT WE COULD GO AHEAD AND SELECT THE JURY DURING THE BREAK, BUT

6      I HAD SO MANY PROBLEMS TOWARDS THE END, THAT I COULDN'T DO IT.

7      SO OF THE -- BY MY COUNT -- MAYBE I HAVE ENOUGH, BUT I THINK I

8      DON'T.  BUT I THINK BY MY COUNT, I'VE GOT 13 WHO I THINK COULD

9      SIT, AND I NEED 14 IF YOU ALL ARE GOING TO EXERCISE ALL YOUR

10     CHALLENGES.

11         THOSE OF YOU WHO ARE STANDING CAN HAVE A SEAT IF

12     YOU'D LIKE TO.  YOU'RE WELCOME TO STAND.  YOU DON'T HAVE.

13         SO IN TERMS OF HARDSHIP, OR -- WELL, REALLY CAUSE,

14     TOO, I'M INCLINED TO EXCUSE MR. LAKSHMANAN, WHO KNOWS

15     DR. FISHMAN RATHER WELL.  I DON'T KNOW WHETHER DR. FISHMAN IS

16     SAYING ANYTHING THAT'S REALLY IN DISPUTE.  HE --

17     **MR. ANDRADA:**  I DON'T THINK DR. FISHMAN WILL SAY

18     ANYTHING THAT'S IN DISPUTE.

19     **THE COURT:**  BUT HE ALSO HAS A FAIR AMOUNT OF

20     FAMILIARITY WITH THE WHOLE SITUATION.

21     **MR. ANDRADA:**  SO I WOULD SUGGEST -- RESPECTFULLY

22     SUGGEST, YOUR HONOR, THAT -- THAT JUROR NO. 3 -- HAVE A

23     DIFFICULT TIME PRONOUNCING HIS NAME -- I'M GOING TO SAY IS

24     DR. LAKSHMANAN, I DON'T SEE THAT THERE'S A NEED TO DISCHARGE HIM

25     FOR -- FOR CAUSE.  I DON'T SEE HIM EXPRESSING ANY FEELING ONE

1    WAY OR THE ANOTHER ABOUT THE CASE.

2              **THE COURT:**  WHAT IS FISHMAN GOING TO TESTIFY ABOUT?

3              **MR. ANDRADA:**  DR. -- IF HE TESTIFIES, HE IS ONE OF

4    THE DOCTORS AT U.C. DAVIS.

5              **THE COURT:**  RIGHT.

6              **MR. ANDRADA:**  THE EVIDENCE WILL -- WE TOOK

7    DR. FISHMAN'S DEPOSITION SEVERAL MONTHS AGO, YOUR HONOR, AND THE

8    EVIDENCE WILL BE -- FROM BOTH DR. FISHMAN AND DR. KREIS WILL BE

9    VERY SIMPLE.  THE CDCR PELICAN BAY REFERRED MR. ASHKER TO DAVIS

10   IN OCTOBER OF 2002.  THERE'S PAPERWORK TO MEMORIALIZE IT.  DAVIS

11   DECLINED TO ACCEPT THE REFERRAL.  DR. FISHMAN, WHO IS THE -- THE

12   HEAD OF THE DEPARTMENT, AUTHORIZED A LETTER TO BE SENT UNDER HIS

13   SIGNATURE TO PELICAN BAY INDICATING THAT THEY WOULD NOT ACCEPT

14   THE REFERRAL, ESSENTIALLY BECAUSE OF THE PRESS OF BUSINESS AT

15   U.C. DAVIS.

16             PELICAN BAY ASKED AGAIN IN DECEMBER OF 2002, AND THE

17   RESPONSE FROM DAVIS WAS ESSENTIALLY THE SAME, THAT THEY HAD TOO

18   MANY PATIENTS WITHIN THEIR OWN HEALTH SYSTEM.  THOSE PATIENTS

19   OBVIOUSLY TOOK -- TOOK PRIORITY.

20             THERE'S ALSO SOME EVIDENCE, AND IT WILL PROBABLY COME

21   FROM DR. KREIS AS OPPOSED TO DR. FISHMAN THAT DR. KREIS REVIEWED

22   CERTAIN MEDICAL RECORDS FROM PELICAN BAY IN CONNECTION WITH

23   MR. ASHKER, DETERMINED THAT HE WAS GETTING APPROPRIATE CARE,

24   THAT DAVIS HAD NOTHING MORE TO OFFER, AND DECLINED TO ACCEPT THE

25   REFERRAL.

1          SO THERE WILL BE TWO WITNESSES FROM DAVIS AT LEAST

2     AND SEVERAL WITNESSES FROM PELICAN BAY WHO WILL CONFIRM WHAT

3     I'VE JUST REPRESENTED TO THE COURT.

4          SO DR. FISHMAN NEVER SAW MR. ASHKER AND PROBABLY

5     NEVER EVEN SAW ANY MEDICAL RECORDS.  SO HE IS NOT A BIG PLAYER

6     IN THIS CASE, AND WE CONTINUE TO BELIEVE THAT THE U.C. DAVIS

7     CAUSE OF ACTION IS UNMERITORIOUS (PHONETIC).  WE'RE GOING TO BE

8     EVENTUALLY MOVING UNDER RULE 50 FOR JUDGMENT IN THAT REGARD.

9          WE'VE DISCUSSED OUR SENSE OF THE CAUSE OF ACTION WITH

10    MR. ASHKER.  HE'S -- AS I UNDERSTAND IT, MAINTAINS THAT THE

11    REFERRAL WAS A SHAM, AND SO WE'VE TRIED TO RESOLVE THIS BUT

12    UNSUCCESSFULLY.

13         IN SHORT, I DON'T THINK THIS JUROR, UPON HEARING WHAT

14    DR. FISHMAN IS GOING TO SAY, IS GOING TO BE UN- -- IS GOING TO

15    BE UNDULY INFLUENCED ONE WAY OR ANOTHER.

16         **THE COURT:**  SO DO YOU HAVE A -- FISH -- LAKSHMANAN

17    SHOULD BE CHALLENGED FOR CAUSE?

18         **MR. ASHKER:**  WELL, I -- I -- BASED ON A -- SOME OF

19    HIS ANSWERS AND HIS DEMEANOR DURING HIS ANSWERS, I BELIEVE HE'D

20    HAVE A PROBLEM, BUT I MEAN, I'LL LEAVE THAT UP TO THE COURT.

21         I WOULD LIKE TO SAY THAT I DISAGREE WITH

22    MR. ANDRADA'S REPRESENTATION ABOUT THE BREACH OF CONTRACT ISSUE

23    AND DR. KREIS AND FISHMAN, BUT I DON'T KNOW IF THIS IS THE TIME

24    TO GET INTO THAT OR NOT.

25         **THE COURT:**  NO, IT ISN'T.  WE'LL TALK ABOUT THAT SOME

1    OTHER TIME, BUT -- YOU KNOW, I CAN'T REMEMBER WELL ENOUGH NOW,

2    BUT I THINK HE SORT OF ENDED UP SAYING IT WOULD BE RATHER HARD

3    FOR HIM TO BE FAIR BECAUSE HE KNEW A FAIR AMOUNT ABOUT THE --

4    ABOUT PAIN MANAGEMENT AND SO FORTH.

5              NOW, I DON'T --

6              **MR. ANDRADA:**  WELL, HE CERTAINLY KNOWS A CONSIDERABLE

7    AMOUNT OF -- ABOUT PAIN MANAGEMENT.  BUT I HAVE DOWN HERE -- AND

8    I DON'T KNOW IF THIS IS A QUOTE FROM HIM, THAT HE WOULD LOOK AT

9    THE EVIDENCE AND CONSIDER IT, BUT -- AGAIN, MY NOTES ARE JUST MY

10   NOTES, YOUR HONOR.

11             **THE COURT:**  OKAY.

12             **MR. ASHKER:**  WAY I TOOK HIS REPRESENTATION WAS HE'D

13   TRY TO BE FAIR BUT HE DIDN'T KNOW IF THAT WOULD BE POSSIBLE.

14             **THE COURT:**  HMM.  OKAY.  YEAH, I WROTE DOWN NO.  I

15   CAN'T REMEMBER WHAT HE SAID, BUT I WROTE DOWN NO, SO I THINK

16   I'LL HAVE TO NOT USE HIM.

17             **MR. ANDRADA:**  I'M SORRY, YOUR HONOR?

18             **THE COURT:**  SORRY, RAYNEE.  LET'S GO BACK ON THE

19   RECORD.

20                  (OFF-THE-RECORD DISCUSSION.)

21             **THE COURT:**  AND THEN WE HAD THIS --

22             **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.  I'M JUST NOT

23   SURE WHAT YOU DECIDED.

24             **THE COURT:**  YEAH, I'M NOT -- I'M GOING TO NOT USE

25   THAT JUROR.

 1            MR. **ANDRADA:**  OH.

 2            THE **COURT:**  JULIE JOHNSON, HER HUSBAND HAS A MEDICAL

 3   PROBLEM.

 4            OH, HE WAS THE ONE THAT WAS IN THE EMERGENCY ROOM,

 5   AND HIS LEG WENT NUMB, AND -- WAS SHE UNABLE TO SERVE?

 6            MR. **ASHKER:**  SHE STATED IT WOULD BE A REAL

 7   HARDSHIP --

 8            MR. **ANDRADA:**  WELL --

 9            MR. **ASHKER:**  -- BEHIND THAT.

10            MR. **ANDRADA:**  YOUR HONOR, APPARENTLY THERE WERE SOME

11   COMMENTS BY HER THAT SHE NEEDED TO GET HER HUSBAND TO AND FROM

12   THE DOCTOR.

13            THE **COURT:**  THAT SHE (SIC) COULDN'T DRIVE AND HE HAD

14   TO GO TO MEDICAL APPOINTMENTS.

15            CASEY BOYADJIEFF, DO YOU HAVE A CAUSE CHALLENGE?

16            MR. **ANDRADA:**  YES, WE DO, YOUR HONOR.  CLEARLY HE'S

17   INDICATED PERHAPS THREE OR FOUR TIMES --

18            THE **COURT:**  YEAH, I TEND TO AGREE.

19            MR. **ANDRADA:**  ALL RIGHT.  THANK YOU.

20            THE **COURT:**  HE DOESN'T LIKE DOCTORS, AND HE DOESN'T

21   REALLY TALK TO OTHER --

22            MR. **ANDRADA:**  CORRECT.

23            MR. **ASHKER:**  WHO WAS THAT?

24            THE **COURT:**  THIS GUY CASEY BOYADJIEFF WHO DOESN'T

25   LIKE DOCTORS.

1          **MR. ASHKER:**  WHAT NUMBER WAS HE?

2          **THE COURT:**  HE'S THE LONG-HAIRED ONE.  HE'S THE

3   LONG-HAIRED GUY IN BACK, ONE OF THE DEER PARK PEOPLE.

4          THEN WE HAVE AYAN BANERJEE, WHOSE WIFE IS IN THE

5   PH.D. PROGRAM, AND HIS SON IS IN THE DAY-CARE DOWN WHERE HE

6   WORKS, AND I THINK WE HAVE TO LET HIM GO ALSO.

7          **MR. ANDRADA:**  WE'D LOVE TO HAVE HIM, YOUR HONOR, BUT

8   I AGREE.

9          **THE COURT:**  YEAH.  AND THEN WE HAVE THE PERSON -- THE

10  YOUNG WOMAN -- YOUNG CHINESE-AMERICAN WOMAN WHO'S IN FINALS WHO

11  CAN'T MAKE HER -- MISS HER FINALS.

12         WE'VE GOT THE WOMAN WHOSE DAUGHTER WAS MOLESTED, AND

13  HER SON WAS IN A MOTORCYCLE ACCIDENT, SHE WAS CLEARLY TOO

14  EMOTIONAL TO SERVE.  AND PLUS SHE HAS A JURY NOTE FROM THE

15  DOCTOR OF THE SON SAYING THAT SHE HAS TO TAKE CARE OF HIM, SO

16  SHE'S OUT.

17         SELF-EMPLOYED ACCOUNTANT, I GUESS WE'D HAVE TO SAY

18  WOULD HAVE A FINANCIAL HARDSHIP.  THAT'S LISA RICHARDSON.

19         THE OTHER WOMAN WHO'S THE FULL-TIME STUDENT AND

20  WORKING AND TAKING CARE OF HER MOTHER, SHE'D HAVE TO DROP OUT OF

21  SCHOOL AND MISS HER FINALS.  THIS IS MIRIAMA, SO I HAVE TO LET

22  HER GO.

23         AND THEN WE HAVE OUR FRIEND MR. FERRARO, WHO JUST

24  DOESN'T WANT TO SERVE AND EXPRESSES THAT BY SAYING THAT HE

25  DOESN'T LIKE TAXES, SO ALTHOUGH I DON'T LIKE TO GIVE IN TO THAT

1    SORT OF DISHONESTY, I CAN'T KEEP HIM EITHER.  SO HE'S OUT.

2              **MR. ANDRADA:**  YOUR HONOR, JUST BRIEFLY --

3              **THE COURT:**  WISH I COULD IMPOSE COMMUNITY SERVICE

4    INSTEAD.

5              **MR. ANDRADA:**  BRIEFLY, JUST FOR THE RECORD, I HEARD

6    HIS COMMENTS.  I DON'T THINK THAT THEY WERE TO THE POINT WHERE

7    HE SAID, "I CAN'T BE FAIR."

8              **THE COURT:**  YEAH, BUT IF I'D GIVEN HIM A CHANCE, HE

9    WOULD HAVE.  I JUST DIDN'T WANT TO HAVE HIM POLLUTING THE REST

10   OF THE JURY PANEL WITH HIS REMARKS.  BUT HE WAS CLEARLY TRYING

11   TO GET OFF THE JURY.  I, FRANKLY, THINK HE PROBABLY COULD BE A

12   FAIR JUROR.  HE JUST DOESN'T WANT TO.  HE'S WILLING TO MAKE

13   THOSE KIND OF STATEMENTS IN AN EFFORT TO GET STRICKEN.  AND

14   SOMEBODY WHO'S THAT DISHONEST, I DON'T WANT ON MY JURY ANYWAY,

15   SO --

16              SO YOU CAN HELP ME COUNT HOW MANY THAT LEAVES ME

17   WITH.  I THINK THAT'S NOT QUITE ENOUGH, UNFORTUNATELY.

18              **MR. ASHKER:**  I'M NOT CLEAR ON WHICH ONES WE'RE ALL

19   SPEAKING OF, YOUR HONOR.  I HAVE NO. 3, NO. 7, NUMBER 8, NO. 11,

20   NO. 15, NO. 19, AND NO. 21.

21              **THE COURT:**  I'LL TELL YOU THAT IN A MINUTE.  I JUST

22   DON'T HAVE THEM DOWN BY NUMBERS.  I JUST HAVE THE NAMES.  I'LL

23   TELL YOU THE ONES WHO ARE NOT STRICKEN, BUT I'M COUNTING 12 WHO

24   ARE NOT STRICKEN.

25              AND WE NEED EIGHT, AND THERE'S SIX CHALLENGES, SO I

1    GUESS I'LL HAVE TO -- I WAS HOPING WE COULD DO OUR PEREMPTORY

2    CHALLENGES NOW WHILE THEY'RE STILL OUT THERE AND NOT HAVE TO

3    QUESTION A FEW MORE AND BRING THEM BACK.  BUT I GUESS THAT'S

4    WHAT WE'LL HAVE TO DO.

5             **MR. ASHKER:**  SO YOU HAVE 12 THAT WERE STRICKEN?

6             **THE COURT:**  NO, I HAVE 12 THAT WEREN'T STRICKEN.

7             **MR. ASHKER:**  OH, 12 THAT WEREN'T.

8             **THE COURT:**  YEAH.

9             **MR. ASHKER:**  OH, I --

10                    (PAUSE IN THE PROCEEDINGS.)

11            **MR. ASHKER:**  YEAH, YOU MISSED -- I MISSED --

12            **THE COURT:**  YEAH, I'LL TELL YOU IN A MINUTE.

13            **MR. ASHKER:**  OKAY.

14            **MR. ANDRADA:**  WE HAVE 13, YOUR HONOR.

15            **THE COURT:**  WHY DON'T I -- I'LL READ OFF THE PEOPLE

16   THAT I THINK HAVE NOT BEEN STRICKEN, AND I'LL HAVE TO DO IT WITH

17   THEIR NAMES AND NOT THEIR NAMES, UNLESS MAYBE -- SHEILAH, DO YOU

18   HAVE THEIR NUMBERS?

19            **THE CLERK:**  I THINK THERE ARE 13.

20            **THE COURT:**  YOU HAVE 13 ALSO.

21            **THE CLERK:**  YEAH.

22            **THE COURT:**  OKAY.  WELL, IN ANY EVENT, SHEILAH, IF I

23   READ THE NAME, CAN YOU TELL ME THE NUMBER OF THE PERSON?

24            **THE CLERK:**  YES.

25            **THE COURT:**  SO THE PEOPLE I HAVE AS NOT STRICKEN ARE

```
 1   MAKAPUGAY, THAT'S NO. 1.

 2             THE CLERK:  NO. 1.

 3             THE COURT:  VU.

 4             THE CLERK:  NO 2.

 5             THE COURT:  VANOPPEN.

 6             THE CLERK:  NO. 4.

 7             THE COURT:  GOODKIND.

 8             THE CLERK:  NO. 5.

 9             THE COURT:  FRIEDMAN.

10             THE CLERK:  NO. 6.

11             THE COURT:  TOROIAN.

12             THE CLERK:  NO. 9.

13             THE COURT:  CABICO.

14             THE CLERK:  NO. 10.

15             THE COURT:  WILCOX.

16             THE CLERK:  NO. 12.

17             THE COURT:  CRAVEA.

18             THE CLERK:  NO. 13.

19             THE COURT:  HARWOOD.

20             THE CLERK:  NO. 17.

21             THE COURT:  DAI, D-A-I.

22             THE CLERK:  NO. 18.

23             THE COURT:  HAMMER.

24             THE CLERK:  NO. 19 --

25             MS. KENNON:  YOUR HONOR, I HAVE JULIE JOHNSON.
```

1    **THE COURT:**  AND MS. TALLEY, I QUESTIONED HER AS WELL.

2    SHE'S OKAY.  SO THAT'S THE 13TH.

3    JULIE JOHNSON WAS THE WOMAN WHOSE HUSBAND HAD THE

4    MEDICAL PROBLEM.

5    **MS. KENNON:**  THANK YOU, YOUR HONOR.

6    **THE COURT:**  SO I HAVE -- YOU'RE RIGHT.  I DO HAVE 13,

7    BUT THAT'S NOT 14.

8    SO I COULD GO WITH 7 INSTEAD OF 8.  OR I CAN HAVE

9    THEM ALL IN AND THEN I JUST HAVE TO TAKE A BREAK RIGHT AWAY AS

10   SOON AS I -- DO YOU HAVE ANY MORE CAUSE CHALLENGES, MR. ANDRADA?

11   **MR. ANDRADA:**  WELL, I HAVE A CONCERN ABOUT -- LET ME

12   FIND HER NAME.

13   YES, MS. GOODKIND.  THOSE LAST FEW COMMENTS FROM HER

14   ABOUT TOO MANY PEOPLE IN PRISONS, TOO MANY PRISONS, AND THEN YOU

15   ASKED HER, OF COURSE, WELL, CAN YOU BE FAIR?  CAN YOU SET IT

16   ASIDE?  AND SHE SAID THAT PHRASE THAT WE ALL HATE TO HEAR,

17   "WELL, I THINK I CAN."  AND I DIDN'T HEAR IT WITH A GREAT DEAL

18   OF CONVICTION.  SO I HAVE SOME CONCERNS ABOUT HER.

19   **THE COURT:**  SHE DID SAY THAT ON THE OTHER HAND, THAT

20   ISN'T THE ISSUE.  MR. ASHKER ISN'T GOING TO NOT BE IN PRISON

21   BECAUSE OF THIS CASE, SO WHETHER SHE THINKS HE SHOULD OR SHOULD

22   NOT BE IN PRISON, I THINK, IS UNRELATED TO WHETHER -- WHAT HIS

23   MEDICAL CARE IS, SO I WASN'T AS CONCERNED ABOUT THAT.

24   DID YOU HAVE ANY OTHER CAUSE CHALLENGES?

25   **MR. ASHKER:**  WELL, I -- I HAD A SOME CONCERNS JUST

```
 1   BASED ON -- WITH THREE JURORS.  THAT WOULD BE NO. 4, VANOPPEN,

 2   SOMETHING LIKE THAT; NO. 9, TOROIAN; AND I THINK THIS NO. 10,

 3   CABICO; AND ALSO WITH HARDWOOD.  BASICALLY THOSE FOUR RIGHT

 4   THERE WERE OF CONCERN TO ME BASED ON THEIR -- HARWOOD, I -- I --

 5   THINK -- I THINK SHE'D BE A FAIR JUROR IF SHE WAS ON THERE.

 6            THE OTHER THREE, I HAD CONCERNS BASED ON THEIR

 7   BACKGROUNDS OR FRIENDSHIPS WITH LAW ENFORCEMENT AND -- AND

 8   WORKING IN THAT FIELD OR FRIENDSHIPS, THINGS OF THAT NATURE.

 9            THE COURT:  WELL, THAT WAS CABICO.

10            WHAT ABOUT VANOPPEN?

11            MR. ASHKER:  VANOPPEN WAS -- HE WAS THE -- SOME KIND

12   OF DOCTOR OR SOMETHING.

13            THE COURT:  C.P.A.

14            MR. ASHKER:  A C.P.A.  OH, HE WAS A C.P.A.?  I'M NOT

15   SURE.  I -- I MARKED DOWN SOMETHING, BUT I CAN'T BE CLEAR ABOUT

16   IT, THEN I CAN'T ARGUE IT, SO -- BUT THIS CABICO, CABICO?

17            THE COURT:  CABICO.

18            MR. ASHKER:  AND TOROIAN, BOTH OF THOSE I WAS

19   CONCERNED ABOUT BASED ON THEIR DEMEANORS AND WHERE THEY HAD THAT

20   BACKGROUND WITH THE LAW ENFORCEMENT AND THINGS OF THAT NATURE.

21            THE COURT:  I DON'T REMEMBER ANYTHING LIKE THAT WITH

22   TOROIAN.  WHAT WAS --

23            MR. ASHKER:  THERE WAS SOMETHING --

24            THE COURT:  IT'S A WOMAN.  VICKY TOROIAN.

25            MR. ASHKER:  SHE WAS A FEMALE?
```

1          **THE COURT:**  YEAH.

2          **MR. ASHKER:**  I --

3          **THE COURT:**  WHY DON'T WE DO THIS:  SHEILAH, WILL YOU

4    GO OUT THERE AND SEE IF YOU CAN FIND MONA MUGGENTHALER.  SHE'S

5    THE NEXT ONE UP.  I COULD JUST BRING HER IN AND --

6          **MR. ASHKER:**  I STILL DIDN'T GET ALL THE ONES THAT

7    WERE LEFT.  I WAS UP TO TALLEY, AND THEN THE NEXT ONE WOULD BE

8    MUGGEN- -- AFTER HER, THERE WAS THESE OTHER ONES, YEE, SAMADO

9    (PHONETIC) --

10          **THE COURT:**  WE HAVEN'T QUESTIONED ANY OF THEM YET.

11          **MR. ASHKER:**  OH, OKAY.  EXCUSE ME.  YEAH.

12          **THE COURT:**  LET'S TRY IT THAT WAY.

13          WHY DON'T YOU SEE IF YOU CAN FIND -- LET'S GET

14    MUGGENTHALER.  I DON'T KNOW WHAT SHE LOOKS LIKE, BUT SHE WAS UP

15    IN THE FRONT ROW ON THE FAR END ON THE RIGHT.  AND THEN MS. YEE

16    WOULD HAVE BEEN THE FIRST PERSON ON THE BACK ROW.  IF YOU COULD

17    FIND THE TWO OF THEM AND BRING THEM IN, THEN I DON'T HAVE TO

18    DRAG EVERYBODY IN HERE AND THEN SEND THEM ALL BACK OUT AGAIN.

19          **MR. ASHKER:**  YOUR HONOR, COULD I --

20          **THE COURT:**  YEAH.

21          **MR. ASHKER:**  COULD I INQUIRE IF THE DEFENDANTS ARE

22    INTENDING TO PRODUCE THAT VIDEOTAPE IN THE BOX THAT IT'S IN?

23          **MR. ANDRADA:**  GOT IT RIGHT HERE.

24          **THE COURT:**  BOX, TOO?

25          **MR. ANDRADA:**  GOT THE BOX.

1     **THE COURT:**  OKAY.

2        **MR. ANDRADA:**  WHAT I UNDERSTAND TO BE THE BOX.

3        **THE COURT:**  OKAY.

4        **MR. ANDRADA:**  WE GOT IT.

5        **MR. ASHKER:**  I'D LIKE TO SEE IT.

6        **THE COURT:**  YEAH, MAYBE YOU COULD SHOW IT TO

7  MR. ASHKER SOMETIME.  YEAH, SEE, IF YOU CAN FIND MUGGENTHALER

8  AND KAREN YEE.

9              (OFF-THE-RECORD DISCUSSION.)

10       **MR. ASHKER:**  NO, I DON'T KNOW IF THIS IS THE TAPE.

11 I'M POSITIVE THIS IS NOT THE BOX.

12       **THE COURT:**  HMM.

13       **MR. ASHKER:**  SO WE'LL HAVE TO DEAL WITH THAT.  I HAVE

14 A MOTION -- I DON'T KNOW IF YOU RECEIVED IT --

15       **THE COURT:**  WOULD YOU ALL COME ON IN AND HAVE A SEAT

16 UP IN THE FRONT ROW.

17              (PAUSE IN THE PROCEEDINGS.)

18       **PROSPECTIVE JUROR:**  HERE WHERE THE MIKE IS?

19       **THE COURT:**  YEAH, THAT'D BE GREAT.  THANK YOU.

20       AND MS. YEE.

21       **THE COURT:**  I'LL START WITH MS. -- IS IT --

22       **PROSPECTIVE JUROR:**  EASIER IF YOU JUST CALL ME

23 "MONA."  IT'S A VERY LONG LAST NAME.

24       **THE COURT:**  MUGGENTHALER.

25       **PROSPECTIVE JUROR:**  MUGGENTHALER.  YES.

1          **THE COURT:**  AND WHAT COUNTY DO YOU LIVE IN?

2          **PROSPECTIVE JUROR:**  MARIN.

3          **THE COURT:**  AND YOUR -- ARE YOU CURRENTLY DOING BOTH

4     OF THESE JOBS?

5          **PROSPECTIVE JUROR:**  YES, I AM.

6          **THE COURT:**  OKAY.

7          **PROSPECTIVE JUROR:**  DAY AND NIGHT.

8          **THE COURT:**  SO YOU'RE SELF-EMPLOYED IN THIS PLANNING

9     BUSINESS AND ALSO A PROFESSOR?

10         **PROSPECTIVE JUROR:**  NO, I WORK FOR CHEVRON

11    CORPORATION AS A HR PERSON.

12         **THE COURT:**  OH.

13         **PROSPECTIVE JUROR:**  AND THEN AT NIGHTTIME, I TEACH AS

14    AN ADJUNCT PROFESSOR CURRENTLY WITH GOLDEN GATE FOR THIS TERM,

15    BUT IN THE PAST, IT'S BEEN U.S.F.

16         **THE COURT:**  I SEE.

17         AND YOU'VE BEEN WORKING FOR CHEVRON FOR 28 YEARS.

18         **PROSPECTIVE JUROR:**  LONG TIME.

19         **THE COURT:**  AND TEACHING FOR NINE YEARS.

20         **PROSPECTIVE JUROR:**  (NODS HEAD.)

21         **THE COURT:**  OKAY.  AND WHAT SORT OF BUSINESS DID YOUR

22    HUSBAND WORK FOR BEFORE HE RETIRED?

23         **PROSPECTIVE JUROR:**  HE ALSO WORKED FOR CHEVRON.

24         SO YOU ATTENDED LAW SCHOOL BUT DIDN'T FINISH?

25         **PROSPECTIVE JUROR:**  NO.  I WAS DISQUALIFIED IN MY

```
 1   THIRD YEAR BY ONE-HUNDREDTH (SIC) OF A DEGREE, SO IT'S A BIT

 2   HARD TO SWALLOW.  WENT BACK FOR A MASTER'S AND THEN DECIDED TO

 3   GO FOR A BUSINESS FOR A DOCTORATE.

 4           THE COURT:  AND YOU SERVED ON A JURY ONCE IN

 5   MARIN COUNTY.

 6           PROSPECTIVE JUROR:  CORRECT.

 7           THE COURT:  AND IT WAS A CIVIL CASE?

 8           PROSPECTIVE JUROR:  YES.

 9           THE COURT:  AND WHAT KIND OF CASE WAS IT?

10           PROSPECTIVE JUROR:  IT WAS A PROPERTY CASE.

11           THE COURT:  OH, OKAY.

12           AND HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS

13   BEEN INVOLVED IN ANY SORT OF LEGAL PROCEEDING OF ANY KIND?

14           PROSPECTIVE JUROR:  YES, I'VE HAD BOTH.  NEPHEWS

15   INVOLVED IN DRUG CASES, BEEN ARRESTED FOR DRUGS, AND CLOSE

16   FRIENDS OF MINE ALSO ARRESTED FOR DRUGS.

17           THE COURT:  OKAY.

18           THE NEPHEWS, ARE THEY LOCAL OR --

19           PROSPECTIVE JUROR:  IN SANTA ROSA.  I'VE ACTUALLY

20   HELPED PUT ONE THROUGH COLLEGE.  SO I'M -- HOPEFULLY HE'S

21   CLEANED UP.  BUT THE OTHER, UNFORTUNATELY, IS NOT.

22           THE COURT:  AND BOTH OF THEM WERE CONVICTED?

23           PROSPECTIVE JUROR:  BOTH OF THEM WERE IN COURT.  BOTH

24   OF THEM WERE ARRESTED.  ONE OF THEM PLEA-BARGAINED OUT, AND I

25   DON'T KNOW WHAT HAPPENED WITH THE OTHER.
```

1        **THE COURT:**  OKAY.  DID THEY GO TO JAIL OR PRISON?

2        **PROSPECTIVE JUROR:**  THEY DIDN'T GO TO PRISON.  THEY

3   WENT -- THEY HAD TO SERVE TIME OR DO COUNTY THINGS, AND THEN

4   ALSO HAD TO GO TO DRUG REHAB AS PART OF THE DEAL.

5        **THE COURT:**  OKAY.

6        AND THE CLOSE FRIEND, WHAT WAS THAT SITUATION?

7        **PROSPECTIVE JUROR:**  IS -- ALSO WAS ARRESTED.  HE WAS

8   SUICIDAL, SO THEY TOOK HIM TO MARIN GENERAL, AND HE BROKE OUT OF

9   THERE, AND THEY WENT FOR A SEARCH AND RESCUE -- OR THEY,

10  ACTUALLY, HAD A WARRANT OUT FOR HIS ARREST.  AND AT THE TIME

11  THIS WAS ALL GOING ON, I WAS WITH MY FRIEND WHILE THE MOM WAS

12  EXPERIENCING ALL OF THIS.

13       **THE COURT:**  OH, THIS WAS THE CHILD OF A FRIEND OF

14  YOURS?

15       **PROSPECTIVE JUROR:**  YEAH.

16       **THE COURT:**  OH, OKAY.

17       WOULD THOSE EXPERIENCES MAKE IT HARD FOR YOU TO BE

18  FAIR IN THIS CASE?

19       **PROSPECTIVE JUROR:**  I DON'T KNOW, TO TELL YOU THE

20  TRUTH.  I AM EMOTIONAL ABOUT MY NEPHEWS, PARTIALLY BECAUSE ONE

21  MADE IT AND ONE DIDN'T, SO -- AND THE OTHER ONE, FOR MY BEST

22  FRIEND, IS STILL IN PROGRESS, BUT I'D TRY TO DO MY BEST.

23       **THE COURT:**  DO YOU SEE THOSE ISSUES AS RELATED TO

24  PRISON HEALTH CARE IN ANY WAY?

25       **PROSPECTIVE JUROR:**  NOT THROUGH PRISON HEALTH CARE,

1    NO.

2              THE COURT:  ANY OTHER WAY?

3              PROSPECTIVE JUROR:  JUST THROUGH THE LEGAL SYSTEM

4    MORE THAN ANYTHING ELSE.

5              THE COURT:  OKAY.

6              HAVE YOU OR CLOSE FRIENDS OR FAMILY MEMBERS WORKED OR

7    BEEN TRAINED IN LAW, LAW ENFORCEMENT, CORRECTIONS, OR MEDICINE?

8              PROSPECTIVE JUROR:  BOTH OF MY BEST FRIENDS ARE

9    ATTORNEYS.  ONE WORKS FOR PG&E, AND THE OTHER WORKS FOR

10   INSURANCE AND -- USED FOR WORK FOR INSURANCE.  SHE NO LONGER

11   WORKS THERE, INSURANCE CLAIMS.

12             THE COURT:  AND YOU HAD THE LAW TRAINING YOURSELF, OF

13   COURSE.

14             PROSPECTIVE JUROR:  YEAH.

15             THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

16   MEMBERS BEEN TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR

17   CHRONIC PAIN?

18             PROSPECTIVE JUROR:  I'VE BROKEN MY FOOT ALSO.  WAS

19   MISDIAGNOSED.  IT WAS A LIGAMENT -- THEY THOUGHT IT WAS, BUT

20   THEN IT WAS A BROKEN BONE.  AND I ALSO HAD FIBROMYALGIA, WHICH

21   IS THE CHRONIC PAIN, BUT I'VE ELECTED NOT TO USE PAIN KILLERS.

22   I DON'T WANT TO USE THEM FOR THIS.

23             THE COURT:  OKAY.

24             PROSPECTIVE JUROR:  I ACTUALLY HAD BEEN GIVEN A

25   PRESCRIPTION FOR ANTIDEPRESSANTS, WHICH I DIDN'T WANT TO TAKE.

```
 1                  THE COURT:  OKAY.  SO ARE YOU UNDER A DOCTOR'S CARE

 2     FOR YOUR FIBROMYALGIA?

 3                  PROSPECTIVE JUROR:  RIGHT NOW, SINCE I'VE KIND OF

 4     REFUSED WHAT THEY ARE OFFERING TO ME, I'VE GONE MORE TOWARDS A

 5     HOLISTIC VIEW, SO I'M TRYING TO DO IT WITH HERBS AND OTHER

 6     THINGS AND TRYING TO DO YOGA AND, YOU KNOW, ALL THAT STUFF.

 7                  THE COURT:  ARE YOU FAMILIAR WITH TRAMADOL?

 8                  PROSPECTIVE JUROR:  NO, I AM NOT.

 9                  THE COURT:  HAVE YOU HEARD OF PELICAN BAY STATE

10     PRISON?

11                  PROSPECTIVE JUROR:  ONLY THROUGH THE NEWS, LIKE MOST

12     PEOPLE.

13                  THE COURT:  AND IS THERE ANYTHING ABOUT WHAT YOU'VE

14     HEARD THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS CASE?

15                  PROSPECTIVE JUROR:  I DON'T THINK SO.

16                  THE COURT:  HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY

17     MEMBERS BEEN THE VICTIM OF A CRIME?

18                  PROSPECTIVE JUROR:  YES.  MY SISTER WAS ATTACKED IN

19     HER HOUSE AND KNOCKED UNCONSCIOUS AND THEN ROBBED.

20                  THE COURT:  WAS ANYONE CAUGHT?

21                  PROSPECTIVE JUROR:  NO, THEY WERE NOT.

22                  THE COURT:  SHE RECOVERED?

23                  PROSPECTIVE JUROR:  THEY THINK THAT SHE WAS SEXUALLY

24     ABUSED, BUT THEY COULD NEVER -- THEY NEVER REALLY PROVED IT, SO

25     SHE'S STILL A LITTLE FREAKED ABOUT BEING BY HERSELF, BUT --
```

1              **THE COURT:**  DO YOU BELIEVE THAT A CORRECTIONAL

2    OFFICER IS EITHER MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH

3    THAN A PERSON WITH A DIFFERENT JOB?

4              **PROSPECTIVE JUROR:**  NO.

5              **THE COURT:**  HAVE YOU EVER BEEN INSIDE OF A JAIL OR A

6    PRISON?

7              **PROSPECTIVE JUROR:**  ONLY THROUGH TOURS AS WAS NOTED

8    BEFORE.  BUT NO, I DIDN'T WANT TO VISIT MY NEPHEWS WHEN THEY

9    WERE IN JAIL.

10             **THE COURT:**  CAN YOU THINK OF ANYTHING AT ALL THAT

11   WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL IF YOU

12   WERE SELECTED TO SERVE AS A JUROR IN THIS CASE, OTHER THAN WHAT

13   YOU'VE TOLD US ABOUT YOUR NEPHEWS AND YOUR FRIEND'S CHILD?

14             **PROSPECTIVE JUROR:**  I DON'T KNOW, BUT I WOULD TRY TO

15   DO MY BEST.

16             **THE COURT:**  OKAY.  AND IF YOU WOULD PASS THE

17   MICROPHONE TO MS. YEE.

18             WHAT COUNTY DO YOU LIVE IN?

19             **PROSPECTIVE JUROR:**  SAN FRANCISCO.

20             **THE COURT:**  AND YOUR HUSBAND IS A -- BOTH A FIRE

21   FIGHTER AND A BUILDER?

22             **PROSPECTIVE JUROR:**  CORRECT.

23             **THE COURT:**  OKAY.  HAVE YOU OR ANY CLOSE FRIENDS OR

24   FAMILY MEMBERS BEEN INVOLVED IN ANY SORT OF CIVIL PROCEEDING OR

25   LAWSUIT?

1          PROSPECTIVE JUROR:  NO.

2          THE COURT:  HAVE YOU OR CLOSE FRIENDS OR FAMILY

3    MEMBERS WORKED OR BEEN TRAINED IN LAW, LAW ENFORCEMENT,

4    CORRECTIONS, OR MEDICINE?  YOU'VE OBVIOUSLY BEEN TRAINED IN

5    DENTISTRY.

6          PROSPECTIVE JUROR:  CORRECT.

7          THE COURT:  OTHER THAN THAT.

8          PROSPECTIVE JUROR:  MY FAMILY MEMBERS IN DENTISTRY,

9    NURSING, AND MEDICINE.  AND NUMBER OF CLOSE FRIENDS ALSO IN

10   MEDICINE AND LAW.  AND THEN I HAVE THREE FRIENDS WHO ARE IN

11   HEALTH CARE SYSTEM IN THE CORRECTIONAL SYSTEM.

12         THE COURT:  OKAY.

13         PROSPECTIVE JUROR:  SO THEY PROVIDE HEALTH CARE.

14         THE COURT:  AND WHAT PRISON?

15         PROSPECTIVE JUROR:  IN SAN FRANCISCO AND SAN MATEO

16   COUNTY.

17         THE COURT:  IN THE COUNTY JAILS?

18         PROSPECTIVE JUROR:  YES.

19         THE COURT:  DO THEY WORK FOR AN OUTSIDE AGENCY THAT

20   GOES INTO THE JAIL -- JAILS, OR DO THEY WORK FOR THE JAILS?

21         PROSPECTIVE JUROR:  FOR THE CITY AND COUNTY.

22         THE COURT:  THEY WORK FOR THE CITY AND COUNTY.

23         PROSPECTIVE JUROR:  UM-HMM.

24         THE COURT:  AND WHO ARE THESE PEOPLE AGAIN?

25         PROSPECTIVE JUROR:  THEY PROVIDE DENTISTRY.

1          **THE COURT:**  BUT I MEAN, THEY'RE YOUR FRIENDS?

2          **PROSPECTIVE JUROR:**  FRIENDS.

3          **THE COURT:**  RELATIVES?  FRIENDS?  AND THREE DIFFERENT

4   FRIENDS?

5          **PROSPECTIVE JUROR:**  YES.

6          **THE COURT:**  HOW --

7          **PROSPECTIVE JUROR:**  ONE IS A FORMER EMPLOYEE.  I CAN

8   JUST CLARIFY THAT.

9          **THE COURT:**  OKAY.  AND HOW OFTEN DO YOU SEE THEM?

10          **PROSPECTIVE JUROR:**  TWO OF THEM, I SEE WEEKLY OR

11   TWICE A WEEK AT CHURCH.  AND THEN ANOTHER WAS A FORMER EMPLOYEE.

12   WE PROBABLY HAVE CONTACT MAYBE ONCE OR TWICE A MONTH.

13          **THE COURT:**  OKAY.  DO YOU DISCUSS THEIR WORK WITH

14   THEM?

15          **PROSPECTIVE JUROR:**  SOMETIMES, YES.

16          **THE COURT:**  ARE THEY DOCTORS AND NURSES?

17          **PROSPECTIVE JUROR:**  DENTIST, A DENTAL AUXILLIARY AND

18   A PHARMACIST.

19          **THE COURT:**  IS THERE ANYTHING ABOUT THEIR WORK OR

20   WHAT THEY'VE TOLD YOU THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR

21   IN THIS CASE?

22          **PROSPECTIVE JUROR:**  NO.

23          **THE COURT:**  THESE ARE PEOPLE YOU KNOW THROUGH YOUR

24   CHURCH?

25          **PROSPECTIVE JUROR:**  TWO.  AND THEN ONE IS A FORMER

1   EMPLOYEE.

2          **THE COURT:**  FORMER EMPLOYEE OF YOURS.

3          **PROSPECTIVE JUROR:**  YES, CORRECT.

4          **THE COURT:**  OH.

5          HAVE YOU OR ANY CLOSE FRIENDS OR FAMILY MEMBERS BEEN

6   TREATED FOR A BROKEN BONE, ORTHOPEDIC PROBLEM, OR CHRONIC PAIN?

7          **PROSPECTIVE JUROR:**  MY DAD'S CURRENTLY IN A BOOT FOR

8   A FOOT INJURY, A SPORTS INJURY, AND HE'LL BE IN A CAST NEXT

9   WEEK.

10          **THE COURT:**  ARE YOU FAMILIAR WITH TRAMADOL?

11          **PROSPECTIVE JUROR:**  I AM NOT.

12          **THE COURT:**  HAD YOU EVER HEARD OF PELICAN BAY STATE

13   PRISON?

14          **PROSPECTIVE JUROR:**  THROUGH THE MEDIA.

15          **THE COURT:**  ANYTHING ABOUT WHAT YOU'VE HEARD ABOUT

16   THAT PRISON THAT WOULD MAKE IT HARD FOR YOU TO BE FAIR IN THIS

17   CASE?

18          **PROSPECTIVE JUROR:**  NO.

19          **THE COURT:**  HAVE YOU OR CLOSE FRIENDS OR FAMILY

20   MEMBERS BEEN THE VICTIM OF A CRIME?

21          **PROSPECTIVE JUROR:**  WE DID RESTORE OUR HOME

22   EXTENSIVELY.  WE WERE -- AS IT WAS VACANT, WE WERE BURGLARIZED

23   NUMEROUS TIMES.  I THINK BECAUSE IT WAS A CONSTRUCTION SITE

24   MAINLY TARGET BECAUSE OF THAT, I BELIEVE.

25          **THE COURT:**  HMM.

1          DO YOU THINK THAT A CORRECTIONAL OFFICER IS EITHER

2   MORE LIKELY OR LESS LIKELY TO TELL THE TRUTH THAN A PERSON WITH

3   A DIFFERENT OCCUPATION?

4          **PROSPECTIVE JUROR:**  NO.

5          **THE COURT:**  HAVE YOU EVER BEEN IN A JAIL OR A PRISON?

6          **PROSPECTIVE JUROR:**  NO, I HAVE NOT.

7          **THE COURT:**  CAN YOU THINK OF ANYTHING AT ALL THAT

8   WOULD MAKE IT DIFFICULT FOR YOU TO BE A FAIR AND IMPARTIAL JUROR

9   IF YOU WERE SELECTED TO SERVE IN THIS CASE?

10          **PROSPECTIVE JUROR:**  I DID PUT IN A REQUEST FOR

11  POSTPONEMENT, MAINLY BECAUSE I HAVE A THREE-MONTH BABY --

12  THREE-MONTH-OLD BABY AT HOME, AND I'M PRIMARILY NURSING AND

13  PUMPING, AND THIS IS A SORT OF A CRUCIAL TIME FOR MILK

14  PRODUCTION TO BE ESTABLISHED.

15          AND IN ADDITION, HE WAS HOSPITALIZED LAST MONTH FOR

16  AN INFECTION, AND OUR FAMILY PEDIATRICIAN DID WRITE A LETTER

17  DOCUMENTING THAT.  HOWEVER, I DON'T THINK IT REACHED YOUR SYSTEM

18  IN TIME SO SHE OFFERED TO FAX THAT IF NECESSARY.

19          **THE COURT:**  AND WHAT ARE YOU DOING ABOUT WORK?

20          **PROSPECTIVE JUROR:**  I'M JUST GRADUALLY RETURNING TO

21  WORK HALF DAYS AT A TIME OR PART-TIME.

22          **THE COURT:**  OKAY.

23          ALL RIGHT.  IF YOU WOULD PUT DOWN THE MICROPHONE, IF

24  YOU TWO WOULD EXCUSE US AGAIN FOR A MOMENT, WE SHOULD BE BACK

25  WITH YOU IN PROBABLY ANOTHER FIVE, TEN MINUTES.

1      **THE COURT:**  ACTUALLY, SHEILAH, WHY DON'T YOU GO OUT

2   AND TELL THE REST OF THEM THAT IT'S GOING TO BE ABOUT -- WELL,

3   JUST LEAVE THEM ALONE FOR THE MOMENT.

4           (PAUSE IN THE PROCEEDINGS.)

5      **THE COURT:**  DO WE HAVE A CAUSE CHALLENGE -- WELL --

6   OH, THERE YOU ARE?

7      **MR. ANDRADA:**  YES.

8      **THE COURT:**  DO WE HAVE A CAUSE CHALLENGE FOR EITHER

9   OF THESE TWO?

10     **MR. ANDRADA:**  YES, YOUR HONOR.  MS. MUGGENTHALER,

11  I'D -- AM CONCERNED ABOUT HER DISENCHANTMENT WITH THE LEGAL

12  SYSTEM.  AND I WAS FRANKLY SURPRISED AT HER -- I WON'T SAY

13  INSISTENCE, BUT HER TROUBLE WITH THE LEGAL SYSTEM SEEMED TO BE

14  GENUINE AND DEEP, AND SO I HAVE SOME CONCERNS ABOUT HER THAT

15  MAKE ME BELIEVE THAT SHE IS NOT APPROACHING THE CASE AS

16  OBJECTIVELY AS WE ALL NEED.  SO --

17         AND I'M ALSO CONCERNED ABOUT THE -- SHE MENTIONED A

18  MISDIAGNOSIS, SO I THINK THAT THERE IS GOOD CAUSE TO CHALLENGE

19  AND EXCUSE HER.

20     **MR. ASHKER:**  I THINK SHE COULD GET BY ALL THAT AND BE

21  A FAIR JUROR.

22     **THE COURT:**  YEAH, SHE STRUCK ME AS A -- AS A FAIR AND

23  HONEST PERSON.  I THINK SHE WAS GOING OUT OF HER WAY TO BE AS

24  HONEST AS SHE COULD, SO I'M NOT GOING TO STRIKE HER FOR CAUSE.

25         AND, MS. YEE, WE WON'T GET TO ANYWAY, BUT I WOULD

```
 1   GIVE HER A HARDSHIP ON ACCOUNT OF HER NURSING.  BUT WE DON'T

 2   NEED HER, SO THAT MEANS WE HAVE 14 PEOPLE FROM WHICH TO CHOOSE.

 3   YOU EACH HAVE THREE PEREMPTORY CHALLENGES.

 4          WE CAN GO AHEAD AND DO THOSE NOW.

 5       MR. ASHKER:  YOUR HONOR?

 6       THE COURT:  AND THEN WE CAN BRING THE JURY BACK IN

 7   AND EXCUSE THE ONES WE'RE NOT GOING TO KEEP AND SEND THE REST TO

 8   LUNCH AND THEN COME BACK AND DO THE OPENING STATEMENT.

 9          SO, MR. ASHKER, YOU HAVE THE FIRST CHALLENGE OF ALL

10   THE PEOPLE WHO ARE LEFT.  YOU CAN EXCUSE WHOEVER YOU WANT TO.

11       MR. ASHKER:  OKAY.  I WAS NOT CLEAR.  DID YOU MAKE A

12   RULING ON -- ON CABICO?

13       THE COURT:  YEAH.  I HAVE NOT EXCUSED HIM FOR CAUSE.

14       MR. ASHKER:  OKAY.  I'LL MAKE THAT MY FIRST ONE,

15   CABICO.  HE WAS JUROR NO. -- HE WAS SELECTED IN THE TENTH SPOT,

16   I THINK.

17       THE COURT:  OKAY.

18          AND YOUR FIRST CAUSE CHALLENGE, YOUR FIRST

19   PEREMPTORY.

20       MR. ANDRADA:  EXCUSE ME, YOUR HONOR.  I BEG YOUR

21   PARDON.  MR. ASHKER BOUNCED MR. VANOPPEN?

22       THE COURT:  NO, CABICO.  CABICO.

23       MR. ANDRADA:  CABICO.  ALL RIGHT.

24       THE COURT:  CABICO.

25       MR. ANDRADA:  WE WOULD EXCUSE -- EXCUSE ME --
```

1  MS. GOODKIND.

2         **THE COURT:**  ALL RIGHT.  NOW, YOU ACTUALLY DON'T HAVE

3  TO CHALLENGE ANYBODY IF YOU DON'T WANT TO.  IT'S UP TO YOU, BUT

4  IF YOU HAVE ANOTHER PEREMPTORY CHALLENGE, YOU CAN GIVE THAT TO

5  US.

6         **MR. ASHKER:**  I'LL USE IT ON A -- THE FOURTH ONE

7  SELECTED, VANOPPEN.

8         **THE COURT:**  MR. ANDRADA?

9         **MR. ANDRADA:**  YES, YOUR HONOR.

10        YOUR HONOR, WE'RE TAKING -- EXCUSE ME.  I'M SORRY.

11  WE'RE TAKING FROM THE FIRST EIGHT RIGHT NOW?

12        **THE COURT:**  WELL, IT GOES IN ORDER, 1 TO 14, AND THE

13  FIRST EIGHT ARE THE ONES WHO SIT.

14        **MR. ANDRADA:**  YES.  ALL RIGHT.

15        **THE COURT:**  SO IF ALL OF YOU USE ALL OF YOUR

16  CHALLENGES, THEN THERE'LL ONLY BE EIGHT LEFT, AND THEY'LL ALL

17  SIT.

18              (PAUSE IN THE PROCEEDINGS.)

19        **MR. ANDRADA:**  I'M GOING TO CHALLENGE

20  MS. MUGGENTHALER, YOUR HONOR.

21        **THE COURT:**  I'M SORRY?

22        **MR. ANDRADA:**  MS. MUGGENTHALER.

23        **THE COURT:**  MUGGENTHALER.

24        AND, MR. ASHKER, THIS WOULD BE YOUR LAST CHALLENGE IF

25  YOU CHOOSE TO EXERCISE IT.

1          **MR. ASHKER:**  OKAY.

2          I'M GOING TO GO AHEAD AND TAKE HARWOOD OFF.

3          **THE COURT:**  OKAY.

4          SO YOU HAVE ONE MORE CHALLENGE, MR. ANDRADA.  AND IF

5    YOU DON'T CHALLENGE ANYBODY, THEN WE WON'T USE TALLEY.  BUT IF

6    YOU DO CHALLENGE SOMEONE, THEN WE GET DOWN TO TALLEY.

7          **MR. ANDRADA:**  OKAY.

8              (PAUSE IN THE PROCEEDINGS.)

9          YOUR HONOR, WE WOULD CHALLENGE JUROR NO. 2, MS. VU.

10         **THE COURT:**  OKAY.

11         SO THAT'S ALL THE CHALLENGES.  I HOPE WE'RE GOING TO

12   HAVE EIGHT LEFT, AND THEY ARE GOING TO BE MS. MAKAPUGAY,

13   MS. FRIEDMAN IS 2; AND MS. TOROIAN IS 3; MS. WILCOX IS 4;

14   MR. CRAVEA IS 5; MS. DAI IS 6; MS. HAMMER IS 7; AND MS. TALLEY

15   IS 8.

16         SO IF THAT'S YOUR CALCULATION AS WELL, THEN WE'LL GO

17   AHEAD AND BRING THEM IN.  WE'LL ANNOUNCE WHO'S BEEN SELECTED.

18   WE'LL EXCUSE THE REST FOR GOOD, AND WE'LL SEND THE ONES WHO ARE

19   SELECTED OUT TO LUNCH, AND THEN WE'LL TALK SOME MORE.

20         **THE COURT:**  OKAY.  SHEILAH, YOU CAN BRING THEM IN.

21             (PAUSE IN THE PROCEEDINGS.)

22          (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE

23   OF THE JURY:)

24         **THE COURT:**  YOU ALL MAY BE SEATED.

25         SO SORRY TO KEEP YOU WAITING, LADIES AND GENTLEMEN.

1    BUT WE DID IT BECAUSE WE WERE ABLE TO SELECT A JURY WITH THE

2    PEOPLE THAT WE'VE QUESTIONED SO FAR.  SO IN A FEW MOMENTS, I'LL

3    BE EXCUSING THOSE OF YOU WHO HAVE NOT BEEN SELECTED, AND THOSE

4    OF YOU WHO HAVE BEEN SELECTED WILL BE TAKING A LUNCH BREAK.

5            I DON'T KNOW IF MY MIKE IS ON, SHEILAH.  IS IT -- I

6    DON'T THINK IT IS.  OH, I GUESS IT IS.

7            SO THE PERSONS WHO'VE BEEN SELECTED TO SERVE ON THE

8    JURY -- AND I'LL READ OFF THE EIGHT NAMES.  AND IF THOSE OF YOU

9    WHO ARE SELECTED WOULD STAND WHEN I CALL YOUR NAME AND WE'LL

10   SWEAR YOU IN.

11           THE JURY WILL BE MS. MAKAPUGAY, MS. FRIEDMAN,

12   MS. TOROIAN, MS. WILCOX, MR. CRAVEA, MS. DEE (PHONETIC) OR

13   DAI -- DID I SAY THAT WRONG?

14           **PROSPECTIVE JUROR:**  IT'S DAY (PHONETIC).

15           **THE COURT:**  DAY?  OKAY.

16           MS. HAMMER, AND MS. TALLEY.

17           SO IF I COULD GET EACH OF YOU TO PLEASE RAISE YOUR

18   RIGHT HAND, THE CLERK WILL SWEAR YOU IN, AND YOU MAY JUST

19   ANSWER, "I WILL."

20                   (JURORS SWORN.)

21           **THE COURT:**  ALL RIGHT.

22           ALL RIGHT.  IF YOU ALL WOULD HAVE A SEAT AND LET ME

23   JUST THANK ALL THE REST OF YOU FOR COMING IN AND OFFERING YOUR

24   SERVICE AS JURORS.  AS I SAID EARLIER, IF YOU EVER GET A CHANCE

25   TO SERVE, I THINK YOU WILL FIND IT A VERY, VERY INTERESTING AND

1   EDUCATIONAL EXPERIENCE, AND I HOPE THAT IF YOU DO GET A CHANCE,

2   THAT YOU'LL COME BACK IN AND OFFER YOUR SERVICES AGAIN.  AND I

3   THANK YOU FOR COMING IN THIS TIME AND BEING PREPARED TO SERVE.

4           SO IF YOU WOULD EACH GO BACK TO EITHER THE JURY

5   ASSEMBLY ROOM WHERE YOU STARTED, OR, IF NOBODY'S THERE, GO TO

6   THE CLERK'S OFFICE AND FIND OUT IF THEY HAVE ANY OTHER NEEDS FOR

7   YOU TODAY OR ANY OTHER INSTRUCTIONS FOR YOU.  AND IF THEY DON'T,

8   THEN YOU'RE FREE TO LEAVE FOR THE DAY, AGAIN WITH THE THANKS OF

9   THE COURT AND THE PARTIES.

10                  (PAUSE IN THE PROCEEDINGS.)

11          **THE COURT:**  THOSE WHO ARE STAYING, WE'LL RESEAT YOU.

12          MS. FRIEDMAN, IF YOU COULD MOVE RIGHT DOWN AND TAKE

13  THE SECOND SEAT.  AND, MS. TOROIAN, IF YOU'D COME UP IN THE

14  SECOND ROW AND TAKE THE THIRD SEAT.  AND THEN WE'LL HAVE

15  MS. WILCOX IN THE FOURTH SEAT IN THE FRONT ROW.

16          MR. CRAVEA, IF YOU WOULD TAKE THIS FIRST SEAT ON THE

17  LEFT.

18          AND THEN AFTER YOU WILL BE MS. DAI IN THE BACK ROW

19  THERE.  AND MS. HAMMER, AND THEN MS. TALLEY.

20          SO -- AND YOU ALL CAN HAVE A SEAT.

21          I'M GOING TO HAVE SOME INITIAL INSTRUCTIONS FOR YOU,

22  BUT I'M GOING TO GO AHEAD AND TAKE A LUNCH BREAK BEFORE I DO

23  THAT.

24          SO LET ME JUST GIVE YOU A FEW OF THE INSTRUCTIONS,

25  AND THAT IS THAT YOU SHOULD NOT DISCUSS THE CASE AMONGST

 1    YOURSELVES OR WITH ANYONE ELSE OR DISCUSS ANYTHING ABOUT THE

 2    CASE.  IF YOU SHOULD HAPPEN TO RUN INTO ANY OF THE PEOPLE IN THE

 3    HALLWAYS, YOU SHOULD NOT ACKNOWLEDGE THEM OR SPEAK WITH THEM.

 4    THEY WON'T ACKNOWLEDGE YOU OR SPEAK WITH YOU, NOT BECAUSE

 5    THEY'RE RUDE, BUT JUST BECAUSE THEY KNOW THEY'RE NOT SUPPOSED

 6    TO.

 7            THE CLERK WILL BE GIVING YOU SOME YELLOW OR BLUE JURY

 8    BADGES THAT YOU CAN WEAR IN AND OUT OF THE BUILDING SO THAT YOU

 9    WILL BE EASILY ALLOWED IN AND OUT.  WE HAVE A JURY ROOM, AND

10    WHEN I EXCUSE YOU, MS. CAHILL, SHEILAH CAHILL, OUR COURTROOM

11    DEPUTY, WILL TAKE YOU OUT THROUGH THIS DOOR, AND SHE'LL SHOW YOU

12    THE JURY ROOM, WHICH IS WHERE YOU CAN COME TO IN THE MORNINGS

13    AND COME TO BEFORE WE'RE IN COURT OR DURING BREAKS AND SO ON.

14            ONCE SHE'S SHOWN YOU THAT, THEN YOU CAN GO OUT TO

15    LUNCH.  THERE'S A NUMBER OF PLACES TO EAT LUNCH ACROSS THE

16    STREET IN THAT LITTLE PLAZA THERE BY THE BART, SO THERE SHOULD

17    BE PLENTY OF PLACES OR SANDWICHES OR WHATEVER.  YOU'RE WELCOME

18    TO EAT THERE OR IF YOU WANT TO PICK UP SOMETHING AND BRING IT

19    BACK, YOU CAN COME BACK AND EAT IN THE JURY ROOM IF YOU'D

20    PREFER.

21            IF YOU HAVE YOUR JURY BADGES, THE MARSHALS WILL LET

22    YOU IN WITH FOOD AND DRINK EVEN THOUGH IT SAYS NOT TO DOWN

23    THERE.

24            WE WILL BE GIVING YOU SOME NOTE PADS AND PENCILS SO

25    THAT YOU CAN TAKE NOTES AFTERWARDS IF YOU WANT TO.  IT'S 12:15.

1   WE DO HAVE SOME LEGAL MATTERS WE NEED TO DISCUSS, SO I THINK

2   WE'LL TAKE A TOTAL OF AN HOUR AND 15 MINUTES SO THAT WILL GIVE

3   US 15 MINUTES TO TALK ABOUT SOME LEGAL MATTERS.  SO IF YOU COULD

4   PLEASE BE BACK IN THE JURY ROOM THERE BY 1:30.

5          YES, MA'AM?

6          **PROSPECTIVE JUROR:**  PEOPLE KNOW I'M ON A JURY.  I'VE

7   TOLD PEOPLE I WAS GOING TO JURY DUTY, SO IF THEY SAY ANYTHING,

8   IS THERE SOMETHING I CAN SAY?  IT'S A FEDERAL CASE?

9          **THE COURT:**  YEAH, YOU CAN TELL THEM IT'S A FEDERAL

10  CIVIL TRIAL.

11          **PROSPECTIVE JUROR:**  AND THAT'S IT.

12          **THE COURT:**  THAT WOULD BE ABOUT AS FAR AS YOU SHOULD

13  GO, YEAH.  I SOMETIMES TELL PEOPLE TO BE CAREFUL ABOUT THE NEWS

14  OR THE T.V.'S.  I DON'T THINK THIS TRIAL IS BEING COVERED, BUT

15  IF IT IS AND YOU SHOULD HAPPEN TO SEE SOMETHING ABOUT THE TRIAL

16  OR ABOUT ANYTHING INVOLVED WITH IT ON TELEVISION OR IN A

17  NEWSPAPER, BE SURE THAT YOU DON'T READ THAT OR WATCH IT.  DON'T

18  LOOK ON THE INTERNET, DON'T DO ANY RESEARCH ON YOUR OWN, DON'T

19  BLOG ABOUT IT OR LOOK UP THINGS ABOUT IT ON THE INTERNET AT ALL.

20          SO SHEILAH WILL TAKE YOU OUT TO THE JURY ROOM, AND

21  WE'LL SEE YOU -- SHE'LL BRING YOU BACK IN FROM THE JURY ROOM AT

22  ABOUT 1:30.

23          AND IF I COULD SEE COUNSEL, PLEASE, AND MR. ASHKER.

24          (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

25  PRESENCE OF THE JURY:)

```
 1                    THE COURT:  SO I GAVE YOU WHAT I PROPOSE TO GIVE AS

 2   THE PRELIMINARY JURY INSTRUCTIONS.  I DON'T KNOW IF YOU'VE HAD A

 3   CHANCE TO LOOK AT THEM.

 4                    MR. ANDRADA:  YES, YOUR HONOR, WE HAVE.

 5                    THE COURT:  DO YOU HAVE ANY PROBLEM WITH ANY OF THEM?

 6                    MR. ANDRADA:  I DON'T THINK SO.

 7                    THE COURT:  MR. ASHKER?

 8                    MR. ANDRADA:  PRETTY STANDARD.

 9                    MR. ASHKER:  YOU'RE TALKING ABOUT THE PRELIMINARY

10   JURY INSTRUCTIONS?

11                    THE COURT:  RIGHT.

12                    MR. ASHKER:  I JUST HAD A CHANCE TO GLANCE AT THEM

13   REAL QUICK, YOUR HONOR, BUT, HEY, IT -- I'M SURE THEY'RE ALL IN

14   ORDER AND GOOD TO GO.

15                    THE COURT:  OKAY.  WELL, IF YOU HAVE A CHANCE OVER

16   THE LUNCH BREAK TO READ THEM AND SOMETHING COMES TO MIND THAT

17   YOU THINK IS WRONG, YOU CAN BRING IT UP BEFORE WE START UP

18   AGAIN.

19                    ONE THING IT IS MISSING, MR. ANDRADA, IS -- AM I

20   PRONOUNCING YOUR NAME RIGHT?

21                    MR. ANDRADA:  ANDRADA, YES, YOUR HONOR.

22                    THE COURT:  WE DON'T HAVE A -- AN IMPOSSIBILITY

23   INSTRUCTION.  I GATHER YOUR DEFENSE ON THE BREACH OF CONTRACT

24   HAS TO DO WITH IMPOSSIBILITY, AND I DON'T THINK YOU SUBMITTED

25   ONE ON THAT, SO YOU SHOULD LOOK FOR ONE.
```

1          **MR. ANDRADA:**  THAT IS AN ALTERNATIVE DEFENSE TO THE

2   BREACH OF CONTRACT CLAIM, AND WE WILL BE HAPPY TO DO THAT, YOUR

3   HONOR.  THANK YOU.

4          **THE COURT:**  OKAY.

5          AND THEN -- SO WHEN THEY COME BACK FROM LUNCH, THEN,

6   I'LL READ THOSE INSTRUCTIONS.  THAT WILL TAKE ABOUT 20 MINUTES.

7   AND THEN WE'LL HAVE MR. ASHKER'S OPENING STATEMENT.

8          ARE YOU GOING TO GIVE IT FROM THERE?  ARE YOU ABLE TO

9   STAND UP OR --

10          **MR. ASHKER:**  YEAH, I CAN STAND UP.  THAT'S NO

11   PROBLEM.  THERE'S -- I NEEDED TO KNOW A FEW THINGS ABOUT -- THEY

12   WERE TALKING ABOUT -- THEY WERE LOOKING TO TRY TO RESTRICT MY --

13   THE CONTENT OF MY OPENING IN SOME WAY, AND THEY HAVEN'T

14   SPECIFIED WHAT.  AND THEN I JUST RECEIVED THESE ORDERS ON --

15   WHERE THE COURT HAS STATED THAT CLEMENT, WILLIAMS, AND SNEDEKER

16   WILL NOT BE ALLOWED TO TESTIFY; IS THAT CORRECT?

17          **THE COURT:**  RIGHT.

18          **MR. ASHKER:**  OKAY.  THEN SO THE OTHER WITNESSES WILL

19   BE ALLOWED.

20          **THE COURT:**  WELL, I DON'T HAVE IT RIGHT IN FRONT OF

21   ME AND I DON'T REMEMBER.  THE ONLY INMATE WITNESSES ARE TROXELL.

22          **MR. ANDRADA:**  THERE'S TROXELL AND MR. ALFONSO.  HE

23   HAD NINE.

24          **THE COURT:**  PALOMINO.

25          **MR. ANDRADA:**  PALOMINO.  HE HAD ALFONSO PALOMINO --

1        **THE COURT:**  TROXELL AND PALOMINO.

2        **MR. ASHKER:**  THOSE ARE THE ONLY TWO WILL BE ALLOWED.

3        **THE COURT:**  THE ONLY TWO INMATE WITNESSES, RIGHT.

4        **MR. ASHKER:**  OKAY.

5        NOW, AS FAR AS THAT VIDEOTAPE GOES, WHEN I -- I

6   RECEIVED DEFENDANTS' OPPOSITION OR SOME KIND OF NOTICE ABOUT THE

7   VIDEOTAPE NO LONGER EXISTS, AND THEN I FILED -- I SENT THE COURT

8   THAT MOTION ON, I THINK, THE -- THE 6TH OF MAY -- MAY 5TH.  I

9   DON'T KNOW IF THE COURT RECEIVED IT.  BUT IT WAS A PLAINTIFF'S

10  NOTICE OF MOTION FOR THE COURT TO IMPOSE SANCTIONS AT TRIAL IN

11  RESPONSE TO DEFENDANTS' LOSS AND OR DESTRUCTION OF THE

12  VIDEOTAPE.  NOW, EARLIER, THEY REPRESENTED THAT THEY HAVE THE

13  VIDEOTAPE AND THE BOX.

14       **THE COURT:**  WELL, THE QUESTION IS WHICH VIDEOTAPE.

15  AS I UNDERSTAND IT, THERE WAS A VIDEOTAPE THAT DR. SAYRE SAW

16  UPON WHICH HE RELIED TO FORM THE OPINION THAT YOU DIDN'T NEED

17  PHYSICAL THERAPY OR SOMETHING.  AND THEN YOU WERE SHOWN A

18  VIDEOTAPE, AND IT WAS YOUR VIEW THAT THE VIDEOTAPE YOU WERE

19  SHOWN WAS NOT THE VIDEOTAPE THAT HE COULD HAVE SEEN BECAUSE THE

20  VIDEOTAPE YOU WERE SHOWN SHOWS YOU GIVING THE FINGER TO SOMEONE,

21  AND YOU DID THAT AFTER DR. SAYRE SAW A VIDEOTAPE SO, THEREFORE,

22  THAT COULDN'T BE THE VIDEOTAPE HE SAW.

23       I DON'T KNOW IF THAT'S TRUE OR NOT, BUT THAT'S THE

24  ALLEGATION.  SO THE VIDEOTAPE THEY HAVE, I PRESUME, IS THE ONE

25  THAT YOU WERE SHOWN IN WHICH YOU'RE GIVING THE FINGER TO

```
 1    SOMEONE, I TAKE IT.

 2              MR. ANDRADA:  I LOOKED AT THE FILM THIS WEEKEND, AND

 3    THERE IS MR. ASHKER GIVING THE FINGER TO --

 4              MR. ASHKER:  OKAY.

 5              MR. ANDRADA:  -- PRESUMABLY THE CAMERAMAN OR WHOEVER.

 6              THE COURT:  SO THAT'S THE ONE THAT YOU THINK IS NOT

 7    THE RIGHT ONE.

 8              MR. ASHKER:  WELL, THAT'S -- YEAH, WHAT REALLY --

 9    ACTUALLY, YEAH, THAT -- THAT'S GOING TO COME UP, BUT IN THE

10    WHOLE SCOPE OF THINGS, IT'S IRRELEVANT AND TO A CERTAIN EXTENT

11    BECAUSE DR. SAYRE REPRESENTED IN A SUBSEQUENT DECLARATION THAT

12    HE APPARENTLY LOOKED AT THAT TAPE AGAIN AND SAID, "THAT MUST BE

13    THE TAPE THAT I WAS REFERRING TO."

14              AND THE WHOLE PURPOSE OF THE TAPE IS -- IRREGARDLESS

15    (SIC) OF WHAT TIME PERIOD THE TAPE WAS -- CAME OUT IN, IT

16    DOESN'T SHOW ME DOING ANYTHING.  SO THAT'S THE ISSUE RIGHT

17    THERE.  THE ONE THING --

18              THE COURT:  OKAY.  SO WHAT IS THE PROBLEM, THEN?

19                        (SIMULTANEOUS COLLOQUY.)

20              THE COURT:  WE HAVE THAT VIDEOTAPE.  WE CAN SHOW THAT

21    VIDEOTAPE IF EITHER SIDE WANTS TO.  THAT'S THE ONLY VIDEOTAPE WE

22    HAVE.  SO WHETHER THERE WAS ONE AT ANOTHER TIME, I CAN'T DO

23    ANYTHING ABOUT IT BECAUSE I DON'T KNOW WHERE IT IS.

24              MR. ASHKER:  I KNOW, BUT THE THING IS --

25              THE COURT:  SO DO YOU WANT THIS ONE SHOWN OR --
```

1           **MR. ASHKER:**  YES.  YES, I WOULD.

2           **THE COURT:**  OKAY.

3           **MR. ASHKER:**  THE BOX IS NOT THE CORRECT -- THE THING

4    WITH THE BOX WAS, YOUR HONOR --

5           **THE COURT:**  WELL, THE IDEA WAS THAT TO PROVE THAT

6    THAT WASN'T THE RIGHT VIDEOTAPE.  SO IF THAT'S WHAT -- YOU WISH

7    TO SORT OF PURSUE AN ARGUMENT THAT THIS ISN'T THE RIGHT

8    VIDEOTAPE --

9           **MR. ASHKER:**  WELL --

10          **THE COURT:**  -- THEN WE HAVE A PROBLEM ABOUT THE BOX.

11          BUT IF THIS VIDEOTAPE IS JUST AS GOOD AS THE ONE THAT

12   THEY SHOULD HAVE HAD, THEN MAYBE WE DON'T EVEN CARE ABOUT THE

13   BOX.  I DON'T KNOW.

14          **MR. ASHKER:**  WELL, THE THING IS, IS IT -- THE TIME

15   PERIOD OF THIS ACTUAL TAPE IS -- IS VERY IMPORTANT FOR ANOTHER

16   REASON, BECAUSE MY POSITION IS THEY -- THEY INTEND TO PORTRAY ME

17   AS A DIFFICULT, RECALCITRANT PRISONER WHO'S DIFFICULT TO TREAT,

18   UNCOOPERATIVE, AND THINGS OF THIS NATURE.

19          MY POSITION IS -- IS THAT THE -- THE ONLY THING

20   THAT'S EVER PRESERVED OR DOCUMENTED BY CDC AND/OR THEIR AGENTS

21   ARE -- IS EVIDENCE THAT THEY BELIEVE WILL REFLECT ME IN A

22   NEGATIVE LIGHT.  AND WHEN --

23          THE THING WITH THE TAPE IS ON THE BOX, THE BOX THAT I

24   SAW HAD THE DATE, WHICH WAS 11/16 -- NO, 11/15 -- 11/16 --

25   RIGHT -- '06, AND IT HAD THE TIME.  AND THE TIME CORRESPONDS

1   WITH AN EXHIBIT IN MY TRIAL EXHIBIT OF WHAT'S CALLED A 114,

2   INMATE ACTIVITY LOG, WHICH SHOWS THAT ON THAT DAY THAT I'M

3   SAYING WHEN THAT TAPE HAPPENED, WAS -- I WENT TO THE YARD ON

4   THAT SAME TIME PERIOD THAT'S -- WAS ON -- WRITTEN ON THAT BOX,

5   WHICH GOES TO SUPPORT ME THAT THAT TAPE IS A TAPE THAT OCCURRED

6   FIVE DAYS AFTER.  AND THE ONLY REASON THEY PRESERVED IT IS

7   BECAUSE THEY HAD ME ON CAMERA FLIPPING THE CAMERA OFF, SEE.

8            AND --

9            **THE COURT:**  OKAY.  BUT I'M NOT GETTING THE POINT

10  HERE.  IS -- IS THE PROBLEM THAT YOU DON'T WANT TO BE SEEN

11  GIVING THE FINGER TO THE CAMERA?

12           **MR. ASHKER:**  NO.

13           **THE COURT:**  IS THE PROBLEM YOU'RE TRYING TO MAKE SOME

14  CLAIM ABOUT SOMEBODY'S LYING ABOUT SOMETHING OR --

15           **MR. ASHKER:**  WELL --

16           **THE COURT:**  WHAT ARE WE REALLY GETTING AT HERE?  I'M

17  NOT FOLLOWING IT.

18           **MR. ASHKER:**  WELL, WHAT WE'RE GETTING AT IS THAT

19  THAT'S THE ONLY THING THAT'S EVER -- THE DEFENDANTS PRESERVE IS

20  EVIDENCE THAT THEY BELIEVE --

21           **THE COURT:**  OKAY.

22           **MR. ASHKER:**  -- WILL SHOW ME IN A NEGATIVE LIGHT.

23           **THE COURT:**  WHAT, BECAUSE YOU'RE GIVING THE FINGER TO

24  THE CAMERA?

25           **MR. ASHKER:**  EXACTLY.

1          **THE COURT:**  WELL, THAT'S PRETTY -- I THINK THAT'S A

2     LITTLE ATTENUATED.

3          **MR. ASHKER:**  WELL, HERE'S THE POINT, THOUGH:  THE

4     OTHER TAPE DIDN'T HAVE ME -- THE OTHER ALLEGED TAPE DIDN'T HAVE

5     ME DOING NONE OF THAT.  THAT TAPE DISAPPEARED.

6          **THE COURT:**  OKAY.  WELL, WHAT WE CAN DO IS NOT SHOW

7     THE PART WHERE YOU'RE GIVING THE FINGER.

8          **MR. ASHKER:**  OKAY.  THAT WILL WORK.

9          **MR. ANDRADA:**  THAT'S FINE.

10          **THE COURT:**  I MEAN, HOW MUCH TIME IS INVOLVED.

11          **MR. ANDRADA:**  IN THE TAPE?

12          **THE COURT:**  YEAH, NO, OF GIVING THE FINGER.

13          **MR. ANDRADA:**  OH.

14          **MR. ASHKER:**  I THINK I DO IT TWO OR THREE TIMES.

15          **THE COURT:**  FOR VERY LONG?

16          **MR. ASHKER:**  SECONDS.

17          **MR. ANDRADA:**  PROBABLY TALKING ABOUT TEN SECONDS OF

18     THE TAPE, YOUR HONOR.  I DIDN'T TIME THE TAPE AT HOME.

19          **MR. ASHKER:**  IT'S ONE HOUR.

20          **MR. ANDRADA:**  YEAH, I DON'T KNOW IF IT GOES A

21     WHOLE -- I MEAN, IT'S A WHOLE VCR TAPE, AND I GUESS IT RUNS AN

22     HOUR.  I DON'T KNOW.  I MEAN, FRANKLY, I FAST-FORWARDED A LOT

23     BECAUSE I JUST COULDN'T STAND IT; IT WAS SO BORING.

24          **THE COURT:**  ARE WE PLANNING ON WATCHING THE WHOLE

25     HOUR HERE?

```
 1              MR. ASHKER:  WHAT I WOULD LIKE TO DO, YOUR HONOR, IS

 2    GET AN AGREEMENT, IF POSSIBLE, THAT WE SHOW -- I DON'T KNOW,

 3    FIVE MINUTES, TEN MINUTES, BECAUSE I'M NOT DOING NOTHING ON THE

 4    TAPE.  I WALK AROUND.  I SQUAT DOWN A FEW TIMES.

 5              THE COURT:  OKAY.  WELL, LET'S DO THAT.  YOU PICK --

 6    DO YOU WANT TO SHOW THE TAPE?

 7              MR. ANDRADA:  NO.  I DON'T HAVE ANY INTEREST IN

 8    SHOWING --

 9              THE COURT:  OH, YOU DON'T.

10              MR. ANDRADA:  I'M NOT AWARE --

11              THE COURT:  WELL, THE ALLEGATION WAS THAT DR. SAYRE

12    SAW THE TAPE, AND THAT IS WHAT, AS I UNDERSTOOD IT, LED HIM TO

13    BELIEVE THAT MR. ASHKER DIDN'T NEED TREATMENT.

14              MR. ASHKER:  PART OF THE REASON.

15              THE COURT:  AND, THEREFORE, HE WANTED TO SHOW THE

16    TAPE TO SHOW, OH, SEE, I SAW HIM DOING THIS, I SAW HIM DOING

17    THAT.  THIS SHOWED ME HIS HAND WASN'T REALLY IN THAT BAD A

18    SHAPE, OR WHATEVER.  THAT WOULD BE SOMETHING HE WOULD WANT TO DO

19    IN HIS OWN DEFENSE, I SUPPOSE.

20              BUT IF NOT AND YOU DON'T WANT TO SHOW ANY OF IT, THEN

21    MR. ASHKER CAN SHOW WHATEVER PART OF IT HE WANTS TO -- MAKE THE

22    ARGUMENT THAT IF DR. SAYRE SAYS THIS TAPE IS WHAT SHOWED HIM I

23    DIDN'T NEED TREATMENT, THERE'S NOTHING ON IT.

24              SO IF YOU DON'T WANT ANY OF IT, I GUESS, IS THE

25    BOTTOM LINE, THEN HE CAN PICK THE PARTS HE WANTS.
```

1              **MR. ANDRADA:**  MY UNDERSTANDING FROM THE DOCTOR IS

2      THAT THIS TAPE PLAYED A MINIMAL ROLE, IF ANYTHING, IN THIS

3      DECISION.

4              **THE COURT:**  OKAY.  SO YOU DON'T WANT TO SHOW ANY OF

5      THE TAPE?

6              **MR. ANDRADA:**  SO I MEAN, THE -- I'D LIKE THE

7      OPPORTUNITY TO MEET -- TALK TO MY CLIENT ABOUT IT A LITTLE MORE.

8      BUT MY SENSE IS, GIVEN THE TIME CONSTRAINTS OF THE CASE, YOUR

9      HONOR, WE DON'T HAVE THE LUXURY OF PUTTING IN EVERY LITTLE PIECE

10     OF EVIDENCE.  AND SO I WAS NOT PLANNING ON DOING SO.

11             **THE COURT:**  OKAY.

12             **MR. ANDRADA:**  BUT IF MR. ASHKER THINKS IT'S A BIG

13     DEAL AND IT BECOMES A BIGGER DEAL, THEN WE'D LIKE WITH THE

14     COURT'S PERMISSION TO HAVE THE OPPORTUNITY TO SHOW A FEW MINUTES

15     OF IT.

16             **THE COURT:**  OKAY.

17             **MR. ANDRADA:**  I'M NOT TRYING TO BE DIFFICULT.

18             **THE COURT:**  YOU'RE NOT BEING DIFFICULT.  THAT'S FINE.

19     SO THE BOTTOM LINE IS YOU MAY SHOW WHICHEVER PARTS OF IT YOU'D

20     LIKE TO SHOW, AND YOU MAY SHOW ANY PARTS OF IT YOU'D LIKE TO

21     SHOW WITH THE EXCEPTION OF THE PART WHERE MR. ASHKER IS GIVING

22     THE FINGER TO THE CAMERA.  SO I DON'T KNOW HOW YOU'LL -- ARE YOU

23     ABLE TO FIGURE OUT WHAT PART YOU WANT TO SHOW SOMEHOW?

24             **MR. ASHKER:**  I -- I DON'T KNOW.  I HAVE NO WAY OF

25     LOOKING AT IT RIGHT NOW.  I JUST WANTED TO POSSIBLY INCORPORATE

| | |
|---|---|
| 1 | MENTION OF IT INTO MY OPENING STATEMENT.  I WOULD JUST PREFER A |
| 2 | SECTION WHERE I'M WALKING -- WALKING BACK AND FORTH OR WHATEVER |
| 3 | ON THE YARD WHERE YOU CAN SEE WHAT I'M DRESSED IN, WHAT I'M |
| 4 | WEARING, AND HOW MY ARM IS MOVING, AND THAT'S IT. |
| 5 | **THE COURT:**  OKAY.  ALL RIGHT. |
| 6 | **MR. ASHKER:**  TAKE TWO MINUTES. |
| 7 | **THE COURT:**  OKAY.  SO YOU WANT ME TO JUST LOOK AT IT |
| 8 | AND PICK OUT FIVE MINUTES? |
| 9 | **MR. ASHKER:**  THAT WILL WORK. |
| 10 | **THE COURT:**  ALL RIGHT.  I DON'T KNOW -- I DON'T KNOW |
| 11 | HOW WE CAN GET A VIDEOTAPE MACHINE BACK THERE, SO -- |
| 12 | **MR. ASHKER:**  NO, THAT'S FINE, YOUR HONOR.  YOU CAN -- |
| 13 | I'M PERFECTLY COMFORTABLE WITH YOU PICKING OUT A FEW MINUTES OF |
| 14 | THE TAPE. |
| 15 | **THE COURT:**  OKAY.  ALL RIGHT.  SO DID YOU HAVE SOME |
| 16 | OTHER CONCERNS?  YOU MENTIONED SOME CONCERNS YOU HAD. |
| 17 | **MR. ANDRADA:**  I DO HAVE TWO CONCERNS, YOUR HONOR. |
| 18 | THEY'RE RELATED, SO BEAR WITH ME.  ON WEDNESDAY, THIS |
| 19 | PAST WEEK, MR. -- |
| 20 | **THE COURT:**  I'LL BEAR WITH YOU, BUT KEEP IT AS BRIEF |
| 21 | AS YOU CAN, BECAUSE WE DO NEED TO GET SOME LUNCH FOR THE -- |
| 22 | **MR. ANDRADA:**  I WILL TRY TO BE BRIEF, BUT IT IS |
| 23 | IMPORTANT, I THINK. |
| 24 | **THE COURT:**  OKAY. |
| 25 | **MR. ANDRADA:**  SO ON WEDNESDAY, WE HAD A |

1   MEET-AND-CONFER TELEPHONE CONVERSATION.  MR. ASHKER THREATENED

2   ME IN THE PHONE CONVERSATION.

3              **MR. ASHKER:**  NOW, STOP LYING, MAN.

4              **THE COURT:**  MR. ASHKER, I'LL TURN TO YOU -- EVERY

5   TIME HE SPEAKS, I'LL ALWAYS GIVE YOU A CHANCE TO GIVE YOUR

6   VIEWS, BUT IF YOU WOULD PLEASE WAIT UNTIL I DO THAT RATHER THAN

7   INTERRUPTING.

8              **MR. ANDRADA:**  HE STATED IN WORDS TO THIS EFFECT, YOU

9   DON'T KNOW WHO YOU'RE DEALING WITH.  AND I TOOK IT TO BE A

10  THREAT.

11             AND NOW ON FRIDAY AT 5:45 P.M., I RECEIVED THIS NOTE

12  FROM DR. ALLEN REPORTING ME TO THE STATE BAR FOR SOME PURPORTED

13  CONFLICT OF INTEREST.

14             SO I'D BE VERY HAPPY TO ADDRESS THAT AT THE

15  CONVENIENCE OF THE COURT.  THE TWO ARE CLEARLY RELATED IN MY

16  OPINION, AND I WOULD ASK THE COURT TO PRECLUDE MR. ASHKER FROM

17  REFERRING IN OPENING STATEMENT TO THE FACT THAT I DID PREVIOUSLY

18  REPRESENT DR. ALLEN IN TWO OR THREE TRIVIAL CASES BROUGHT

19  AGAINST DR. ALLEN WHEN HE WAS AN EMPLOYEE OF PELICAN BAY.

20             MORE PRECISELY -- AND, FRANKLY, THIS IS THE PART THAT

21  TRULY -- TRULY CONCERNS ME, FRIES ME -- DR. ALLEN'S NOTE --

22  WROTE TO THE STATE BAR AND SAID THAT I, IN EFFECT, SUBORNED

23  PERJURY BY TELLING HIM TO CLAM UP, NOT COOPERATE IN CONNECTION

24  WITH THIS CASE.

25             **THE COURT:**  I DIDN'T SEE THAT.

 1          **MR. ANDRADA:**  THAT IS AN OUTRAGE.

 2          **THE COURT:**  I READ WHAT HE WROTE, AND I DIDN'T SEE

 3   THAT.

 4          **MR. ANDRADA:**  WELL, I'VE GOT -- HERE --

 5          **THE COURT:**  WELL, I HAVE IT.  I HAVE IT, AND I READ

 6   IT.  I JUST DON'T REMEMBER SEEING WHAT YOU'RE DESCRIBING.  YOU

 7   CAN POINT ME TO A PAGE AND LINE.

 8          **MR. ANDRADA:**  SURE.  "HE TOLD ME HE WAS GOING TO

 9   REPRESENT --"

10          **THE COURT:**  CAN YOU GIVE ME A PAGE?

11          **MR. ANDRADA:**  YES, IT'S THE BOTTOM OF THE -- THE

12   BOTTOM OF THE FIRST PAGE AND THEN OVER TO THE TOP.

13          **THE COURT:**  THE FRONT PAGE IS A FAX COVER SHEET.

14   THEN I HAVE ANOTHER FAX COVER SHEET --

15          **MR. ANDRADA:**  AND THEN I HAVE --

16          **THE COURT:**  -- THAT'S LABELED ZERO, AND THEN AFTER

17   THAT, THE PAGES ARE NUMBERED IN CIRCLES ON THE UPPER RIGHT-HAND

18   CORNER.

19          **MR. ANDRADA:**  YES, YOUR HONOR.

20          **THE COURT:**  MINE ARE.  MAYBE YOURS AREN'T.

21          **MR. ANDRADA:**  AND IT'S CIRCLED 2.

22          **THE COURT:**  OKAY.  SO WE'RE LOOKING AT PAGE 2,

23   UH-HUH.  TOWARDS THE BOTTOM?

24          **MR. ANDRADA:**  YES.

25          **THE COURT:**  ALL RIGHT.  AND WHAT IS IT?

1          **MR. ANDRADA:**  ALL RIGHT.  "THE CALL WAS VERY

2    DISTURBING TO ME AS IT REPRESENTED AN IMPLICIT THREAT FOR ME TO

3    BACK OFF ON THIS CASE BECAUSE OF WHAT MR. ANDRADA KNEW ABOUT

4    ME."

5          THAT IS AN OUTRAGE.  I NEVER SUGGESTED TO DR. ALLEN

6    TO BACK OFF THE CASE.  I NEVER TOLD HIM ANYTHING ABOUT WHAT HE

7    SHOULD SAY IN THE CASE.  I DON'T HAVE ANY SECRET INFORMATION

8    ABOUT DR. ALLEN.

9          WHAT I KNOW ABOUT DR. ALLEN THAT MIGHT BE USED ON

10   CROSS-EXAMINATION, YOUR HONOR, IS PUBLIC RECORD AND/OR IT WAS

11   PROVIDED TO ME BY MY CLIENTS AT PELICAN BAY.  IT HAS TO DO WITH

12   HIS TERMINATION AND -- FOR COKE ABUSE, HIS PROBLEMS WITH THE

13   STATE MEDICAL BOARD.  THOSE MATTERS ARE PUBLIC RECORD.

14         SO TO SUGGEST THAT SOMEHOW I'M GOING TO USE SECRET

15   INFORMATION AGAINST DR. ALLEN IS ABSURD.  AND I REALLY TAKE

16   EXCEPTION TO WHAT I BELIEVE IS THIS SUGGESTION HERE THAT I'VE

17   TOLD HIM TO CLAM UP, SHUT UP, NOT COOPERATE, AND NOT TELL THE

18   TRUTH.

19         **THE COURT:**  OKAY.  WELL, I DON'T -- THERE'S NOT TOO

20   MUCH I CAN DO ABOUT THAT.  HE'S NOT HERE.  I CAN'T REPRIMAND HIM

21   FOR IT, BUT THE BOTTOM LINE --

22         **MR. ANDRADA:**  SO.

23         **THE COURT:**  -- FOR THIS CASE IS THAT MR. ASHKER PLANS

24   TO CALL DR. ALLEN AS A WITNESS.  YOU WILL BE CALLED UPON TO

25   CROSS-EXAMINE HIM.  IT IS SOMEWHAT AWKWARD IF YOU REPRESENTED

```
 1   HIM IN THE PAST.  THE POSSIBILITY EXISTS THAT YOU MIGHT HAVE

 2   ATTORNEY-CLIENT-PRIVILEGED INFORMATION ABOUT HIM.  I DON'T KNOW

 3   IF YOU DO OR NOT.  BUT IT STRIKES ME AS SOMETHING THAT'S WORTH

 4   DEALING WITH.

 5            WE COULD ASSURE HIM THAT YOU WILL NOT USE AGAINST HIM

 6   IN YOUR CROSS-EXAMINATION ANYTHING THAT YOU'VE LEARNED AS AN

 7   ATTORNEY-CLIENT SITUATION FROM HIM.  YOU COULD TELL US WHAT YOU

 8   DO PLAN TO CROSS-EXAMINE HIM ABOUT IN TERMS OF HIS COCAINE OR --

 9   OR THIS OR THAT SO THAT WE'RE ALL CLEAR ON WHAT'S COMING IN AND

10   WHAT ISN'T COMING IN.

11            BEYOND THAT, I DON'T KNOW WHAT ELSE TO SUGGEST.

12            MR. ANDRADA:  THAT WOULD BE JUST FINE, YOUR HONOR.

13            THE COURT:  OKAY.

14            MR. ANDRADA:  THE ONLY OTHER THING I WOULD SUGGEST AT

15   THE MOMENT --

16            THE COURT:  OH, AND THEN YOU WANTED IT NOT KNOWN THAT

17   YOU DID REPRESENT HIM.  I GUESS THAT'S NOT RELEVANT.  I GUESS --

18            MR. ANDRADA:  I DON'T THINK IT'S RELEVANT.

19            THE COURT:  -- IT DOESN'T NEED TO COME IN THAT YOU

20   REPRESENTED HIM IN THE PAST, AS LONG AS YOU DON'T BRING IT UP.

21   I CAN ASK HIM NOT TO BRING IT UP.

22            DO YOU SEE ANY REASON TO BRING IT UP?

23            MR. ASHKER:  NO, YOUR HONOR.

24            THE COURT:  OKAY.  SO WE'LL ALL AGREE NOT TO BRING IT

25   UP.
```

1      **MR. ANDRADA:** ALL RIGHT. THAT WILL GO A LONG WAY

2   TO --

3           **THE COURT:** I NEED TO REMIND -- OR YOU SHOULD PERHAPS

4   REMIND ME JUST BEFORE HE COMES IN SO I DON'T FORGET TO GIVE HIM

5   THAT INSTRUCTION.

6           **MR. ANDRADA:** OKAY.

7           **THE COURT:** BUT I'LL TELL ALLEN.

8           AND THEN IF YOU COULD, I GUESS, MAYBE FILE SOMETHING

9   THAT INDICATES THE SPECIFIC THINGS YOU INTEND TO CROSS-EXAMINE

10  HIM ABOUT --

11          **MR. ANDRADA:** ALL RIGHT.

12          **THE COURT:** -- THAT YOU THINK ARE ADMISSIBLE AND

13  RELEVANT TO HIS CREDIBILITY --

14          **MR. ANDRADA:** RIGHT.

15          **THE COURT:** -- AND THEN I CAN LOOK AT IT, MR. ASHKER

16  CAN LOOK AT IT, DR. ALLEN CAN LOOK AT IT, AND IF ANYBODY HAS A

17  PROBLEM WITH ANY OF IT OR IF DR. ALLEN THINKS IT SOMEHOW ARISES

18  FROM THE REPRESENTATION, WE CAN DEAL WITH IT THEN. OR IF I

19  THINK IT'S IRRELEVANT, I'LL LET YOU KNOW.

20          **MR. ANDRADA:** THAT SOUNDS FINE, YOUR HONOR.

21          **THE COURT:** -- MR. ASHKER THINK IT'S IRRELEVANT, HE

22  CAN LET ME KNOW, AND I'LL DECIDE.

23          **MR. ANDRADA:** THAT SOUNDS FINE.

24                  (SIMULTANEOUS COLLOQUY.)

25          **THE COURT:** AND I THINK WE TOLD HIM TO COME IN AT

1    8:30 ON WEDNESDAY, AS I RECALL --

2              **THE CLERK:**  9:30.

3              **MR. ASHKER:**  WHAT I HAD SUGGESTED TO HIM WAS THAT I

4    HAVE TOLD DR. WEINSTEIN TO COME IN TO COURT AT 8:30 ON

5    WEDNESDAY.

6              **THE COURT:**  RIGHT.

7              **MR. ASHKER:**  SO AS SOON AS DR. WEINSTEIN WAS DONE, WE

8    COULD PUT ALLEN ON.

9              **THE COURT:**  RIGHT.  SO IF YOU COULD JUST GET ME YOUR

10   LIST OF --

11             **MR. ANDRADA:**  YES.  AREAS OF INQUIRY?

12             **THE COURT:**  -- EXAMINATION TOPICS BY TOMORROW, THEN

13   I'LL BE PREPARED TO RULE ON -- AND GIVE IT TO MR. ASHKER AS WELL

14   SO THAT HE CAN -- CAN YOU -- ARE THERE WAYS YOU CAN GIVE HIM

15   THINGS?

16             **MR. ASHKER:**  MAYBE IN THE COURTROOM OR SOMETHING.

17             **MR. ANDRADA:**  GIVE THEM TO THE DEPUTIES AND --

18             **THE COURT:**  ALL RIGHT.  HAVE IT READY BY THE END OF

19   THE DAY TOMORROW, AND THAT WAY YOU CAN GIVE IT TO HIM IN THE

20   COURTROOM.  JUST NO STAPLES.

21             **MR. ASHKER:**  YOUR HONOR?

22             **THE COURT:**  YES, SIR.

23             **MR. ASHKER:**  IF I MAY, I'D LIKE TO RESPOND TO -- JUST

24   VERY BRIEFLY TO MR. ANDRADA'S CLAIMS THAT I THREATENED HIM AND

25   THAT SOMEHOW DR. ALLEN'S RECENT ALLEGATIONS AGAINST HIM ARE

1   SOMEHOW RELATED IN SOME WAY TO ME THREATENING HIM.

2              THAT'S ABSOLUTELY NOT TRUE.  I NEVER --

3              **THE COURT:**  WELL, THE QUOTE THAT HE GAVE WAS, YOU

4   DON'T KNOW WHO YOU'RE DEALING WITH, WHICH IS OBVIOUSLY NOT AN

5   EXPLICIT THREAT.  IF HE TOOK IT AS A THREAT, I CAN'T REALLY

6   SPEAK TO IT.  SO IT'S NOT --

7              ANOTHER THING, MR. ASHKER, IS THE COURT REPORTER HAS

8   TO WRITE DOWN EVERYTHING THAT'S SAID.

9              **MR. ASHKER:**  I APOLOGIZE.

10             **THE COURT:**  IF I'M TALKING, SHE'S WRITING DOWN WHAT

11  I'M SAYING, BUT IT'S HARD FOR HER TO HEAR WHAT I'M SAYING IF

12  YOU'RE ALSO TALKING.  SO YOU NEED TO WAIT TILL I FINISH BEFORE

13  YOU START.

14             **MR. ASHKER:**  OKAY.  I APOLOGIZE FOR THAT, YOUR HONOR.

15             MR. ANDRADA, HE -- I BEEN DEALING WITH HIM FOR A

16  WHILE.  GENERALLY, IT'S BEEN DECENT ON FACE-TO-FACE DEPOSITIONS

17  AND THINGS OF THAT NATURE.  THERE'S TIMES WHEN HE HAS A -- WHERE

18  I FEEL LIKE HE'S GETTING AT ME IN A WAY THAT'S PATRONIZING AND

19  DISPARAGING.  AND ON THAT PARTICULAR DAY RIGHT THERE, HE CAME

20  OFF TO ME LIKE THAT, REAL STRONG.

21             AND ALL I MERELY TOLD HIM WAS, HEY, YOU'RE NOT

22  DEALING WITH -- YOU DON'T KNOW WHO YOU'RE TALKING TO.  YOU'RE

23  NOT DEALING WITH SOME PUNK; IN OTHER WORDS, SOMEBODY WHO -- I'M

24  A MAN.  I'M A HUMAN BEING.  I DON'T DESERVE TO HAVE SOMEBODY GET

25  AT ME IN A PATRONIZING OR DISPARAGING MANNER WHEN WE'RE TRYING

1   TO DEAL WITH LEGAL MATTERS.

2            SO THAT'S ALL THERE WAS TO IT.  I WAS NOT THREATENING

3   HIM IN ANY FORM OR FASHION.  LIKE I SAID, USUALLY WE'VE HAD A

4   FAIRLY GOOD RAPPORT, AND THERE WAS NO THREAT THERE.

5            I HAVEN'T BEEN IN CONTACT WITH DR. ALLEN.  I DON'T

6   UNDERSTAND WHERE THAT CAME FROM.  SO I JUST WANTED THE RECORD TO

7   REFLECT THAT, AND IT'S NOTHING LIKE ANY THREAT OR CONSPIRACY OR

8   NONE OF THIS STUFF.

9            **THE COURT:**  OKAY.

10           I WILL SAY THAT DR. ALLEN HAS BEEN CALLING THE COURT

11  FOR HELP IN KNOWING WHEN TO COME AND SO ON.  AND HE HAS

12  MENTIONED THAT HE'S UNABLE TO CONTACT MR. ASHKER.  SO THAT DID

13  LEND SOME CREDIBILITY TO THE FACT THAT MR. ASHKER DIDN'T INCITE

14  HIM TO DO WHATEVER HE DID, BUT THAT'S ALL I CAN ADD.

15           **MR. ANDRADA:**  WE COULD ARGUE THAT A LITTLE FURTHER,

16  YOUR HONOR, BUT I KNOW THE COURT DOES NOT WANT TO HEAR THAT AT

17  THIS POINT.  BUT, YOU KNOW, THERE ARE OTHER -- THERE ARE OTHER

18  WAYS TO MAKE CONTACT.  I DON'T KNOW IF IT WAS -- I DON'T KNOW IF

19  THERE WAS CONTACT THROUGH A THIRD PERSON.  I JUST FOUND THE

20  TIMING REMARKABLY COINCIDENT.

21           **THE COURT:**  ALL RIGHT.

22           **MR. ANDRADA:**  COINCIDENTAL.

23           **THE COURT:**  WELL, THERE'S NOTHING THAT I CAN OR WILL

24  DO ABOUT THAT, SO --

25           **MR. ANDRADA:**  AGAIN, AND I THINK MR. ASHKER CLEARLY

```
 1   HAS ADMITTED HERE THAT HE DID MAKE -- I DIDN'T -- I WASN'T

 2   PATRONIZING TO HIM OR DISPARAGING.

 3         THE COURT:  OKAY.  THIS IS JUST NOT WORTH THE TIME

 4   WE'RE SPENDING ON IT.  YOU SHOULD BOTH TRY TO BE AS POLITE TO

 5   EACH OTHER AS YOU CAN.  IF YOU CAN'T, THEN WE JUST WON'T HAVE

 6   YOU TALKING TO EACH OTHER.  AND IF SOMEONE NEEDS ME TO DO

 7   SOMETHING, THEY CAN TELL ME WHAT THEY THINK I NEED TO DO.

 8         BUT AT THE MOMENT, I DON'T SEE ANY NEED FOR ME TO DO

 9   ANYTHING.

10         MR. ANDRADA:  THANK YOU FOR YOUR TIME, YOUR HONOR.  I

11   APPRECIATE GOING INTO THE NOON HOUR.

12         MR. ASHKER:  YOUR HONOR?

13         THE COURT:  NOW, WE DO HAVE SOME OTHER PENDING

14   ISSUES.  YES, SIR?

15         MR. ASHKER:  REAL QUICK, IS THERE -- IS THERE GOING

16   TO BE A LIMIT ON MY OPENING STATEMENT AS FAR AS LIKE ME TALKING

17   ABOUT MY ORIGINAL INJURY --

18         THE COURT:  NO, YOU NEED TO -- THE THING YOU NEED TO

19   DO IN OPENING STATEMENT IS REMEMBER THAT OPENING STATEMENT IS

20   NOT ARGUMENT.  IT'S TO DESCRIBE WHAT YOU BELIEVE THE EVIDENCE

21   WILL SHOW.  SO EVERYTHING YOU SAY SHOULD BE PREFACED IN YOUR

22   MIND -- YOU DON'T HAVE TO SAY IT EVERY TIME, BUT THINK TO

23   YOURSELF, "THE EVIDENCE WILL SHOW THAT...," "THE EVIDENCE WILL

24   SHOW THAT...," AND AS LONG AS YOU ANSWER THAT QUESTION IN WHAT

25   YOU SAY, THEN YOU'RE OKAY.
```

1          YOU NEED TO TALK ABOUT RELEVANT MATTERS, AND I THINK

2     THAT IT IS -- IT WOULD BE MY VIEW THAT IT WOULD BE RELEVANT TO

3     DESCRIBE BRIEFLY HOW THE INJURY OCCURRED IN THE FIRST PLACE, NOT

4     BECAUSE -- NOT IN A WAY THAT WE'RE STARTING THAT TRIAL OVER

5     AGAIN.  BUT IT DID RESULT FROM A GUNSHOT WOUND IN PRISON, AND A

6     BRIEF DESCRIPTION OF THE MEDICAL CARE ISSUES THAT YOU HAD AFTER

7     THAT, UP UNTIL THE TIME THAT IS RELEVANT, WHICH IS THE TIME

8     FOLLOWING THE SETTLEMENT AGREEMENT.

9          AND THERE WOULD BE THE TIME WHERE MORE DETAIL WOULD

10    BE RELEVANT --

11         **MR. ASHKER:**  OKAY.

12         **THE COURT:**  -- OF WHAT -- WHEN MEDICAL CARE THAT YOU

13    THOUGHT YOU SHOULD STILL BE GETTING, YOU GOT -- STOPPED GETTING

14    AFTER THAT SETTLEMENT AGREEMENT, AND THEN THE MEDICAL CARE THAT

15    YOU WERE PROVIDED BY DR. SAYRE.  THOSE WOULD BE THE RELEVANT

16    POINTS.

17         **MR. ASHKER:**  ONE POINT I WAS GOING TO RAISE ALSO IS

18    VERY BRIEFLY ON THE -- I WAS GOING TO GIVE A LITTLE DESCRIPTION

19    OF SHU BECAUSE THAT'S GOING TO BE COMING UP A WHOLE LOT DURING

20    THE TRIAL.

21         **THE COURT:**  YEAH, I DON'T SEE A PROBLEM WITH THAT, DO

22    YOU?

23         **MR. ANDRADA:**  NO, NOT AT ALL.

24         **THE COURT:**  ONE OF THE ISSUES WAS SOME PHOTOS HE

25    WANTED TO PUT IN OF HIS CELLS AND OF THE YARD, I THINK.  DID YOU

1   HAVE ANY PROBLEMS WITH THOSE?

2           **MR. ANDRADA:**  NO, THAT WAS ONE OF THE THINGS WE'VE

3   SPOKEN ABOUT.  I THINK IT'S APPROPRIATE TO PUT IN SOME

4   PHOTOGRAPHS OF HIS CELL.  I HAVE SOME COPIES HERE.  AND, YES,

5   THE -- I THINK THE JURY SHOULD SEE THE LAY OF THE LAND, SO TO

6   SPEAK.

7           **THE COURT:**  OKAY.

8           **MR. ASHKER:**  WILL I BE ABLE TO USE REFERENCE TO A FEW

9   OF THOSE DURING MY OPENING --

10          **THE COURT:**  YES.

11          **MR. ASHKER:**  -- ARGUMENT (SIC)?

12          **THE COURT:**  YOU CAN.  AND LOGISTICALLY, I DON'T QUITE

13  KNOW HOW WE'RE GOING TO SHOW THEM TO THE JURY.  ARE THEY --

14  WHAT?  ARE THEY JUST HARD COPY?

15          **MR. ASHKER:**  YEAH, I HAVE ONE SINGLE COPY MYSELF.  I

16  WAS HOPING MR. ANDRADA HAD SOME EXTRA COPIES MAYBE WE COULD PASS

17  ALONG TO LET THE JURORS.

18          **THE COURT:**  WELL, WE COULD PUT THEM ON THE ELMO IF

19  YOU ALL ARE USING THE ELMO.

20          **MR. ANDRADA:**  WE ARE.

21          **THE COURT:**  OR SHEILAH COULD DO IT.  DO YOU HAVE

22  ANOTHER COPY OF THOSE PHOTOS THAT HE CAN USE?

23          **MR. ANDRADA:**  YES, YOUR HONOR, I BELIEVE WE DO HAVE

24  TWO OR THREE COPIES.

25          **THE COURT:**  WOULD YOU MIND ASKING YOUR PERSON TO PUT

1    THOSE ON THE ELMO, OR SHALL I GET SHEILAH TO DO IT?

2            **MR. ANDRADA:**  NO, WE'LL HAVE MS. KENNON --

3            **THE COURT:**  I THINK THE OFFICERS PROBABLY WOULDN'T

4    WANT MR. ASHKER GETTING UP AND WANDERING AROUND TO PUT THEM ON

5    THERE, SO IF YOU WOULDN'T MIND DOING THAT, THAT WOULD BE GREAT.

6            **MR. ANDRADA:**  WE'LL COOPERATE.

7            **THE COURT:**  IF YOU FEEL COMPROMISED BY THAT, I CAN

8    HAVE MY CLERK DO IT.

9            **MR. ANDRADA:**  NO, WE'LL COOPERATE, YOUR HONOR.

10           **THE COURT:**  THAT REMINDS ME, THOUGH, IN TERMS OF YOUR

11   RELEVANCE, I NOTICED YOU HAVE SOME -- WHAT I TAKE TO BE FORMER

12   ARYAN BROTHERHOOD PEOPLE ON YOUR WITNESS LIST.  I'M NOT SEEING

13   THEM -- WELL, YOU CAN TELL ME WHAT YOU HAVE IN MIND, BUT I DON'T

14   SEE -- I'M NOT PLANNING ON ADMITTING THINGS ABOUT THE ARYAN

15   BROTHERHOOD AND OTHER FORMER INMATES WHO HAVE BAD THINGS TO SAY

16   ABOUT MR. ASHKER.  I DON'T SEE THAT AS RELEVANT TO THIS CASE.

17           **MR. ANDRADA:**  ONE OF THE REASONS WHY WE BELIEVE THAT

18   IT IS STILL RELEVANT IS BECAUSE IN THE COMPLAINT ITSELF AND

19   ACCORDING TO DR. WEINSTEIN, ONE OF THE THEORIES IS THAT

20   DR. SAYRE HAS INTENTIONALLY MANIPULATED MR. ASHKER'S MEDICAL

21   CARE TO MAKE MR. ASHKER CONFESS ABOUT HIS ROLE IN THE ARYAN

22   BROTHERHOOD AND ABOUT WHAT HE KNOWS ABOUT CRIMINAL ACTIVITY IN

23   THE PRISONS.

24           WE, OF COURSE, DENY THAT, BUT IT'S THE PLAINTIFF WHO

25   HAS PUT IT AT ISSUE IN HIS COMPLAINT.  AND IT'S DR. WEINSTEIN

1  WHO THEN CARRIED THE BALL EVEN FURTHER FOR THE PLAINTIFF AT HIS

2  DEPOSITION.  SO IF THEY'RE CONTENDING THAT DR. SAYRE HAS

3  INTENTIONALLY MANIPULATED THE MEDICAL CARE FOR THE PURPOSE OF

4  GETTING MR. ASHKER TO CONFESS, THEY HAVE PUT IT AT ISSUE.  THEY

5  HAVE OPENED THE DOOR.

6          **THE COURT:**  OKAY.  WELL, I GUESS WE CAN LEAVE IT AT

7  THAT.  IF YOU BRING THAT UP OR DR. WEINSTEIN BRINGS IT UP, THEN

8  THEY WILL RESPOND TO IT.  IF YOU DON'T BRING IT UP, THEY WON'T.

9          **MR. ASHKER:**  OKAY.  AND THE -- I'D LIKE TO BRING --

10 BRING UP THAT IN THIS -- THERE'S ONE PARAGRAPH ABOUT THAT IN MY

11 SUPPLEMENTAL COMPLAINT --

12         **THE COURT:**  WELL, THE COMPLAINT DOESN'T GO TO THE

13 JURY.

14         **MR. ANDRADA:**  I UNDERSTAND.

15         **MR. ASHKER:**  AND ALSO IN THE COURT'S ORDER GRANTING

16 MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING IT, AT PAGE 4,

17 ON FOOTNOTE 3, I ATTEMPTED TO RAISE THAT ISSUE IN MY OPPOSITION

18 TO SUMMARY JUDGMENT WITH REFERENCE TO THAT ONE PARAGRAPH SAYING

19 THAT DR. SAYRE'S ACTIONS WERE A FORM OF TORTURE AND IN ORDER --

20 WORKING WITH THE GANG UNIT AND ALL THIS TO HELP THEIR INFORMANT

21 PROCUREMENT PROGRAM, THE COURT SPECIFICALLY RULED RIGHT HERE ON

22 PAGE 4, PARAGRAPH -- OF THIS ORDER THAT THAT WAS NOT GOING TO BE

23 ALLOWED TO BE RAISED AS A WHOLE SEPARATE ISSUE.  AND THEN

24 THEY'RE THE ONES WHO RAISED IT WITH DR. WEINSTEIN DURING HIS

25 DEPOSITION.  I HAVE NO INTENTION OF RAISING THAT.

1    **THE COURT:**  OKAY.  GOOD.  WELL, AS LONG AS YOU DON'T,

2  THEN YOU WILL NOT RESPOND WITH ANY EVIDENCE ABOUT GANGS OR GANG

3  MEMBERS OR ANY OF THAT.

4    **MR. ANDRADA:**  IF WE'RE GETTING CLOSE TO THE EDGE,

5  PERHAPS WE COULD HAVE A CHAT WITH YOUR HONOR.

6    **THE COURT:**  WELL, LET'S SAY THIS:  IF YOU THINK

7  MR. ASHKER IS OPENING THE DOOR, THEN YOU COULD SAY, YOUR HONOR,

8  I BELIEVE THIS AREA IS OPENING THE DOOR TO THE MATTERS THAT WE

9  DISCUSSED EARLIER.

10    **MR. ANDRADA:**  FINE.

11    **THE COURT:**  AND IF YOU HEAR HIM SAY THAT, THEN THAT'S

12  YOUR CLUE TO KNOW THAT HE AT LEAST THINKS THAT AND YOU SHOULD

13  WATCH YOURSELF.

14    **MR. ASHKER:**  OKAY.

15    **MR. ANDRADA:**  OKAY.  THANK YOU, YOUR HONOR.

16    **THE COURT:**  OKAY.  SO LET ME JUST LOOK AND SEE IF

17  THERE'S ANYTHING ELSE THAT IS GOING TO COME UP.

18    WELL, THEN AFTER THE OPENINGS, WHICH WILL BE ABOUT A

19  HALF AN HOUR EACH, WE'LL GO DIRECTLY INTO YOUR TESTIMONY.  NOW

20  CAN YOU TESTIFY FROM WHERE YOU ARE?

21    **MR. ASHKER:**  YES.  WILL MY TESTIMONY BE IN, LIKE, A

22  SUMMARY FASHION?

23    **THE COURT:**  WELL, THE BEST WAY TO DO IT, IF YOU CAN,

24  IS TO -- IT'S A LITTLE AWKWARD -- IS TO ASK YOURSELF A QUESTION

25  AND GIVE YOURSELF THE ANSWER.

```
 1                    MR. ASHKER:  ALL RIGHT.

 2                    THE COURT:  THAT WAY, YOU KNOW, THOUGH IT'S A LITTLE

 3      ARTIFICIAL, BUT THE PROBLEM IS THAT ORDINARILY A LAWYER IS ABLE

 4      TO OBJECT TO A QUESTION BEFORE THE ANSWER COMES OUT.  SO THE

 5      QUESTION IS THE CLUE TO THE LAWYER TO NOW WHETHER TO OBJECT OR

 6      NOT.

 7                    SO EVEN THOUGH IT DOES SEEM AWKWARD -- AND, IN FACT,

 8      I'LL EXPLAIN THAT TO THE JURY, THAT I'VE ASKED YOU TO DO IT THAT

 9      WAY BECAUSE IT ALLOWS COUNSEL TO OBJECT BEFORE THE ANSWER COMES

10      OUT.

11                    SO, YEAH, IF YOU WOULD EITHER ASK YOURSELF A QUESTION

12      OR YOU COULD SORT OF SAY, "WOULD YOU STATE YOUR NAME," OR "I'M

13      GOING TO STATE MY NAME."

14                    "MY NAME IS TODD ASHKER."

15                    "I'M GOING TO SAY WHERE I'M FROM."

16                    "I'M FROM WHEREVER."

17                    "I'M GOING TO SAY WHERE I'M RESIDING NOW."

18                    "I'M RESIDING AT...."

19                    MAYBE THAT WILL BE A LITTLE LESS AWKWARD.  BUT AS

20      LONG AS YOU GIVE A CLUE TO COUNSEL AS TO WHAT YOU'RE NEXT GOING

21      TO SAY SO THAT HE GETS THE CHANCE TO OBJECT.

22                    "I'M GOING TO DESCRIBE HOW I WAS INJURED," AND THEN

23      DESCRIBE IT.

24                    "I'M GOING TO DESCRIBE MY MEDICAL CARE DIRECTLY AFTER

25      THE INJURY," DESCRIBE IT.
```

```
 1                 "I'M GOING TO DESCRIBE WHEN I FIRST MET DR. SAYRE,"
 2    DESCRIBE IT.  LIKE THAT.
 3              MR. ASHKER:  OKAY.  I'LL TRY TO DO MY BEST FOLLOWING
 4    THAT FORMAT RIGHT THERE.
 5              THE COURT:  OKAY.
 6              MR. ASHKER:  ONE THING, AS FAR AS DR. WEINSTEIN GOES,
 7    WILL I HAVE AN OPPORTUNITY TO LET HIM KNOW THAT THAT'S A
 8    RESTRICTED PARAMETER BEFORE HE GETS ON THE WITNESS STAND?
 9              THE COURT:  OH, YES.
10              MR. ASHKER:  OKAY.
11              THE COURT:  BUT YOU'RE GOING TO NEED TO REMIND ME.
12              MR. ASHKER:  OKAY.
13              THE COURT:  WHEN HE COMES IN TO TESTIFY, I'LL HAVE
14    HIM IN HERE BEFORE THE JURY COMES IN, AND I'LL TELL HIM THAT.
15                 WOULD YOU REMIND ME ALSO.
16              MR. ANDRADA:  WE WILL, YOUR HONOR.
17              THE COURT:  AND YOU, OF COURSE, WON'T -- WITHOUT A
18    RULING FROM ME THAT THE DOOR HAS BEEN OPENED, YOU WON'T ASK HIM
19    ANY QUESTIONS THAT WOULD OPEN THAT DOOR.
20              MR. ANDRADA:  CORRECT.  WE'LL STAY AWAY FROM IT.
21              THE COURT:  OKAY.  LET ME JUST LOOK THROUGH MY NOTES
22    AND SEE IF THERE'S ANYTHING ELSE.
23              MR. ASHKER:  YOUR HONOR, DID YOU HAVE AN OPPORTUNITY
24    TO LOOK UP THAT CASE LAW THAT -- THE THINGS I GAVE YOU ON THE
25    MARSHAL'S ASSISTANCE WITH SERVICE?
```

1          **THE COURT:**  YES.  CASE LAW IS LAW THAT COMES IN A

2     CASE, LIKE ROWE VS. WADE.  WHAT YOU GAVE ME WAS STATUTORY LAW --

3          **MR. ASHKER:**  OKAY.

4          **THE COURT:**  -- WHICH IS STATUTES.  AND, YES, WE DID

5     LOOK IT UP AND, YES, IT DOES SAY WHAT YOU SAID IT SAID, AND WE

6     WILL SEE WHAT WE CAN DO TO -- IT'S JUST SORT OF SHORT NOTICE.

7     AND I'D HAVE TO GET THE MARSHAL TO DRIVE UP TO EUREKA.  I DON'T

8     KNOW IF THEY HAVE MARSHALS -- THEY DON'T HAVE A MARSHALS OFFICE

9     UP THERE, I GUESS.

10          WHAT I THINK I'LL DO IS HAVE THE CLERK CALL HIM AND

11     SEE IF HE'D BE WILLING TO ACCEPT FAX SERVICE OR SOMETHING LIKE

12     THAT.

13          **MR. ASHKER:**  I HAVE THESE --

14          **THE COURT:**  AND I WILL TALK TO THE MARSHAL AND SEE IF

15     THEY'RE ABLE TO MAKE A LITTLE DRIVE UP TO EUREKA IN THE NEXT DAY

16     OR GO TO SERVE IT.

17          **MR. ASHKER:**  OH, EXCUSE ME, YOUR HONOR.  WOULD YOU

18     LIKE THE SUBPOENAS?  IT HAS HIS PHONE NUMBER AND ALL THAT.

19          **THE COURT:**  YEAH, WE SHOULD HAVE HIS SUBPOENA, 'CAUSE

20     THAT -- IF WE NEED TO, LIKE, FAX IT UP OR SOMETHING, WE CAN DO

21     THAT.

22          (PAUSE IN THE PROCEEDINGS.)

23          **THE COURT:**  AND I WAS THINKING OF PROPOSING THURSDAY

24     FOR DODGEN, AND THEN PROPOSING THURSDAY FOR DUNCAN AS WELL, JUST

25     TO HAVE A DAY AND TIME TO TELL THEM.  OR I COULD TELL THEM --

1          **MR. ANDRADA:**  CERTAINLY DODGEN IS FINE ON THURSDAY.

2          **THE COURT:**  I COULD TRY DODGEN FOR LATE -- FOR

3     WEDNESDAY AFTERNOON OR WEDNESDAY LATE MORNING AFTER --

4          **MR. ANDRADA:**  THURSDAY, I SUPPOSE, IS OKAY FOR DUNCAN

5     AS WELL.

6          **THE COURT:**  MIGHT BE EASIER FOR THEM UP THERE TO HAVE

7     IT ALL -- TO HAVE THEM AT THE SAME TIME.  ALTHOUGH WE'RE GOING

8     TO DO THE INMATE WITNESSES, I SUPPOSE, ON TUESDAY.

9          **MR. ANDRADA:**  WELL, I'M NOT SURE -- AGAIN, YOUR

10    HONOR, I'M --

11         **THE COURT:**  YEAH, WHAT -- WHAT DO YOU HAVE IN MIND,

12    MR. ASHKER, IN TERMS OF THE ORDER OF YOUR WITNESSES WHICH WE MAY

13    OR MAY NOT BE ABLE TO DO JUST WHAT YOU WANT, BUT -- WHAT IS YOUR

14    DESIRE IN TERMS OF THE ORDER OF THE WITNESSES?

15         **MR. ASHKER:**  WHAT I WAS PLANNING WAS MYSELF,

16    DR. SAYRE SECOND.  THIRD IS UP IN THE AIR.  DR. -- DR. WEINSTEIN

17    WAS SCHEDULED FOR 8:30 WEDNESDAY.  DR. ALLEN AFTER HIM.

18    THURSDAY, DR. WINSLOW, ACCORDING TO CONVERSATIONS I HAD WITH

19    MR. LORIAN (PHONETIC), I GAVE HIM A SUBPOENA FOR DR. WINSLOW.

20    DR. WINSLOW WAS GOING TO BE AVAILABLE ON THURSDAY AT 9:00 A.M.

21         PAT -- PAT DODGEN, PHYSICAL THERAPIST, WAS THURSDAY

22    AT 1:30.  THAT'S NOT GOING TO BE POSSIBLE.  IT'D BE SOONER.  I

23    DON'T THINK WINSLOW -- I'M NOT GOING TO TAKE THAT LONG WITH

24    DR. WINSLOW.  AND THEN AFTER THAT WOULD BE, I GUESS, MR. TROXELL

25    AND PALOMINO.

```
 1              THE COURT:  WELL, WE'RE GOING TO HAVE TO DO THEM ON

 2    TUESDAY BECAUSE --

 3              MR. ASHKER:  OH.

 4              THE COURT:  WE DON'T HAVE ANYBODY ON TUESDAY AT THE

 5    MOMENT.

 6              MR. ASHKER:  OKAY.  WELL, MY TESTIMONY'S GOING TO BE

 7    A WHILE.  I'VE -- AND DR. SAYRE, I HAVE A LOT OF TESTIMONY TO --

 8    AND EVIDENCE TO DEAL WITH WITH HIM.

 9              THE COURT:  HMM.  I'M WONDERING IF WE SHOULDN'T DO

10    HIS DIRECT FIRST.

11              MR. ANDRADA:  WHOSE DIRECT, YOUR HONOR?

12              THE COURT:  DR. SAYRE'S?  WOULD YOU RATHER DO HIS

13    DIRECT FIRST, AND THEN DO WHAT MR. ASHKER HAS AS CROSS?  OR DO

14    YOU WANT TO DO HIS DIRECT LATER ON?

15              MR. ANDRADA:  NO, YOUR HONOR -- IF IT'S ALL RIGHT

16    WITH THE COURT, I WOULD RATHER HAVE MR. ASHKER CALL DR. SAYRE IN

17    HIS OWN CASE AND CROSS-EXAMINE THE DOCTOR FIRST.

18              THE COURT:  OKAY.

19              OKAY.  WELL, I THINK WE SHOULD TELL THEM TO HAVE THE

20    INMATE WITNESSES READY ON TUESDAY MORNING.

21              MR. ANDRADA:  TOMORROW MORNING?

22              THE COURT:  YEAH.  WELL --

23              MR. ANDRADA:  YIKES.

24              THE COURT:  WELL, SOMETIME TOMORROW.  I MEAN, IT'S

25    JUST NOT GOING TO TAKE FIVE HOURS --
```

1          **MR. ASHKER:**  NO, THEY'LL BE BOTH BE --

2          **THE COURT:**  -- MR. ASHKER AND MR. SAYRE -- OR

3    DR. SAYRE TO TESTIFY, SO MAYBE NOT TUESDAY MORNING BUT TUESDAY

4    MID-MORNING, I THINK.

5          **MR. ANDRADA:**  OKAY.

6          **THE COURT:**  WE DON'T WANT -- WE DON'T WANT TO RUN

7    OUT, SO I THINK -- LET'S SAY 10:30, THEY SHOULD BE READY.

8          **MR. ASHKER:**  AND BOTH OF THEM I FORESEE AS BEING

9    BRIEF.

10          **THE COURT:**  YEAH, THEY'RE BOTH SHORT, SO WE -- YOU

11    KNOW, WE COULD RUN OUT.  IT'S GOING TO BE TOUGH TO GET DODGEN OR

12    DUNCAN -- IS THERE ANYONE ELSE YOU'RE WANTING TO CALL?

13          **MR. ASHKER:**  NO.  BUT THIS -- THIS CASE WITH --

14    BETWEEN MYSELF AND DR. SAYRE, IT SPANS SEVERAL -- FEW YEARS AND

15    A LOT OF DOCUMENTS AND STUFF.

16          **THE COURT:**  WHO ARE YOU CALLING FIRST?

17          **MR. ANDRADA:**  AGAIN, YOUR HONOR, I'M NOT TRYING TO BE

18    DIFFICULT.  IT DEPENDS ON WHEN MR. ASHKER RESTS.  I'VE GOT MY

19    EXPERT DR. SHIN LINED UP FOR FRIDAY MORNING.  MR. ASHKER'S

20    INDICATED WE'VE GOT DR. WINSLOW.

21          **THE COURT:**  ARE YOU CALLING WINSLOW, OR IS HE CALLING

22    WINSLOW?

23          **MR. ANDRADA:**  TO TELL YOU THE TRUTH, I DON'T REMEMBER

24    WHO WAS GOING TO CALL HIM.  BUT THERE WAS AN ARRANGEMENT THAT

25    WINSLOW WAS GOING TO BE AVAILABLE ON THURSDAY MORNING.

1         **THE COURT:**  OKAY.

2         **MR. ANDRADA:**  AND THEN I HAVE THE -- IF THIS U.C.

3 DAVIS CAUSE OF ACTION IS STILL IN EXISTENCE, I'VE GOT TO SQUEEZE

4 IN DRS. FISHMAN AND KREIS, AND SO -- YOU CAN JUST PUT THEM DOWN

5 FOR THURSDAY AS WELL.

6         **THE COURT:**  WELL, OR YOU COULD CALL THEM ON

7 WEDNESDAY.  I MEAN, WE MAY NOT BE ABLE TO DO THIS IN ORDER.

8         **MR. ANDRADA:**  OH, I UNDERSTAND.  BELIEVE ME, JUDGE.

9 I KNOW THAT.  I KNOW THAT.  AND THEN WE HAVE SUE RISENHOOVER,

10 AND DR. ROWE, AND MS. MCLEAN.  AND MS. MCLEAN IS -- YOU KNOW,

11 SHE'S NO LONGER A DEFENDANT.  I'M THINKING OUT LOUD NOW.  IF

12 MR. ASHKER RUNS SHORT ON TUESDAY AND THE COURT IS NOT INCLINED

13 TO MAKE HIM REST AT THAT JUNCTURE -- IT SOUNDS LIKE YOU'RE

14 NOT -- SHE COULD BE CALLED OUT OF ORDER BY ME, AND WE COULD FILL

15 THAT TIME FRAME.

16         **THE COURT:**  OKAY.

17         **MR. ANDRADA:**  IT WOULD BE, FRANKLY, AN INCONVENIENCE

18 FOR ME, BUT WE'LL GET IT DONE.

19         **THE COURT:**  SHE'S -- SHE'S STILL A WITNESS FOR YOU,

20 EVEN THOUGH SHE'S NOT A DEFENDANT?

21         **MR. ANDRADA:**  YES.  YES.

22         **THE COURT:**  OKAY.  OKAY.  WELL, THAT WOULD BE GOOD.

23 AND THEN I THINK TO THE EXTENT YOU HAVE OTHER WITNESSES, I THINK

24 YOU SHOULD PLAN ON HAVING SOME OF THEM AVAILABLE ON WEDNESDAY.

25         **MR. ANDRADA:**  YES, YOUR HONOR.

1          **THE COURT:**  AND ON FRIDAY, ONE WITNESS IS OKAY, BUT

2     WE NEED TO INSTRUCT AND ARGUE ON FRIDAY.

3          **MR. ANDRADA:**  I KNOW THAT, YOUR HONOR.

4          **THE COURT:**  SO WE SHOULD HAVE EVERYBODY BUT SHIN DONE

5     BY FRIDAY.

6          **MR. ANDRADA:**  I UNDERSTAND.  DR. SHIN IS COMING DOWN

7     THURSDAY NIGHT, AND HE KNOWS THAT HE'S GOING TO BE ON FIRST

8     THING FRIDAY MORNING.  AND SO I ANTICIPATED HAVING HIM DONE LATE

9     MORNING ON FRIDAY.  THEN I'M AWARE THAT YOU WANTED TO ARGUE AND

10    INSTRUCT.

11         **THE COURT:**  OKAY.  AND I -- I'M -- MAYBE I'LL GO BACK

12    AND READ YOUR PAPERS, BUT I'M NOT CLEAR AT ALL ON THIS

13    IMPOSSIBILITY DEFENSE.  I MEAN, IT KIND OF DEPENDS ON HOW THE

14    FACTS COME OUT, BUT IF U.C. DAVIS MADE CLEAR THAT THEY WOULD

15    NEVER SEE HIM NO MATTER WHAT, MAYBE THAT'S IMPOSSIBLE.  IF THEY

16    SAID AT THIS TIME, WE WON'T, THEN I'M NOT SURE IF IT WOULD BE

17    IMPOSSIBLE NOT TO KEEP TRYING OVER THE YEARS EVERY NOW AND THEN.

18         **MR. ANDRADA:**  WELL --

19         **THE COURT:**  OR WHETHER IT MIGHT NOT BE THE THING TO

20    DO IF THE EXACT ACTION CALLED FOR IN THE CONTRACT WAS U.C. DAVIS

21    AND THAT BECAME IMPOSSIBLE FOR REASONS THAT WERE NOT FORESEEN BY

22    YOU AND CERTAINLY NOT BY MR. ASHKER WHETHER THE RIGHT THING TO

23    DO WOULD NOT HAVE BEEN TO FIND SOME REASONABLE SUBSTITUTE FOR

24    THAT AS OPPOSED TO SIMPLY NOT DOING IT.

25         SO I'M NOT -- I CAN'T PREJUDGE IT BECAUSE I DON'T

1   KNOW WHAT THE EVIDENCE IS.  BUT IT'S NOT OBVIOUS TO ME THAT THIS

2   IMPOSSIBILITY DEFENSE IS REALLY GOING ANYWHERE.

3              **MR. ANDRADA:**  WELL, WE -- THAT'S OUR SECOND DEFENSE,

4   YOUR HONOR.  WE TAKE THE VIEW WE PERFORMED THE CONTRACT WHICH

5   WAS AGREED UPON, NEGOTIATED BY MR. ASHKER'S LAWYER, SAID, WE

6   WANT A REFERRAL TO DAVIS.  THEY WERE VERY SPECIFIC ABOUT IT.  WE

7   DID THAT.  AND THERE WAS --

8              **THE COURT:**  WELL, I THINK WHAT WAS MEANT WAS PROBABLY

9   WE WANT HIM TO GO TO DAVIS AND BE SEEN THERE AND GET A TREATMENT

10  PLAN THERE WHICH YOU WILL THEN FOLLOW.

11             **MR. ANDRADA:**  WELL, THE FACT THAT DAVIS DECLINED

12  TWICE TO SEE HIM, FRANKLY, IS NOT THE CD -- AND THIS -- IN THIS

13  CONTEXT OF THE LITIGATION, THE BREACH OF CONTRACT, IT'S NOT THE

14  CDCR'S FAULT OR PROBLEM.

15             **THE COURT:**  WELL, IT DEPENDS ON WHAT THE EVIDENCE IS.

16  I MEAN, I DON'T KNOW WHAT THEY SAID.  I DON'T KNOW IF THEY LEFT

17  OPEN ANY FUTURE POSSIBILITY.  I DON'T KNOW IF THEY HAD

18  CONDITIONS.  I DON'T KNOW IF -- IF IT WAS -- I DON'T KNOW WHAT

19  THE FACTS ARE, BUT THAT'S ONE ISSUE.

20             AND THEN THE OTHER ISSUE IS WHETHER IT WOULDN'T HAVE

21  BEEN INCUMBENT UPON CDCR AT THAT POINT TO EITHER NEGOTIATE OR

22  PROPOSE OR -- OR DO SOME OTHER SUBSTITUTE TO GET A TREATMENT

23  PLAN, WHICH THEY WOULD BE REQUIRED TO FOLLOW.  SO ALL I'M SAYING

24  IS IT DOESN'T SOUND TO ME AT THIS POINT LIKE YOU SHOULD COUNT ON

25  HAVING THAT CAUSE OF ACTION NOT IN THE CASE IN TERMS OF

1   SCHEDULING YOUR WITNESSES.

2           OKAY.  SO WE BETTER BREAK OR WE'RE NOT GOING TO HAVE

3   ANY TIME FOR YOU ALL TO TAKE LUNCH.  SO WHAT DID I TELL THEM?

4           **MS. KENNON:**  1:30.

5           **THE COURT:**  1:30?

6           **MR. ANDRADA:**  DO WE -- I WOULD REALLY LIKE TO GET

7   SOMETHING TO EAT.  I'M SURE EVERYBODY WOULD.

8           **THE COURT:**  OH, YEAH.  OH, YEAH.  THERE'S FAST FOOD

9   OVER THERE.

10           **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

11           **THE COURT:**  DOES 1:00 -- IT'S ALMOST 1:00.  DOES A

12   HALF AN HOUR GIVE YOU ENOUGH TIME?  WE CAN MAKE IT.

13           **MR. ANDRADA:**  WE'LL -- WE'LL MAKE IT DO.  WE'LL MAKE

14   DO.

15           **THE COURT:**  THEY'LL LET YOU -- WE CAN TELL THEM TO

16   LET YOU BRING FOOD IN IF YOU WANT.  WE HAVE AN ATTORNEY LOUNGE

17   OVER THERE, WHICH IS QUITE NICE.

18           **MR. ANDRADA:**  YOU KNOW, IT MIGHT EVEN JUST BE FASTER

19   JUST TO EAT AND JUST HUSTLE BACK.  WE'LL TRY TO BE HERE ON TIME.

20   CERTAINLY MAKE EVERY GOOD FAITH EFFORT --

21           **THE COURT:**  OKAY.

22           **MR. ANDRADA:**  -- TO BE HERE.

23           **THE COURT:**  OKAY.

24           **MR. ANDRADA:**  THANK YOU.

25               (RECESS TAKEN AT 12:59 P.M.)

```
 1              (PROCEEDINGS RESUMED AT 1:48 P.M.)

 2              (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

 3   PRESENCE OF THE JURY:)

 4          THE COURT:  SO YOU ALL ARE COMFORTABLE WITH HIM

 5   SEATED THERE?

 6          CORRECTIONS OFFICER:  YES, YOUR HONOR.  HE'S ABLE TO

 7   SEE THE SCREEN AT THIS ANGLE.

 8          THE COURT:  OKAY.  AND THAT'S ALL RIGHT WITH YOU?

 9          CORRECTIONS OFFICER:  UM-HMM.

10          THE COURT:  OKAY.  ALL RIGHT.  WE'LL BRING IN THE

11   JURY.

12          MR. ASHKER:  YOUR HONOR?

13          THE COURT:  HOLD ON.

14          MR. ASHKER:  REAL QUICK, I REVIEWED THESE PRELIMINARY

15   JURY INSTRUCTIONS.

16          THE COURT:  OH, RIGHT.

17          MR. ASHKER:  AND THEY LOOK GREAT.  THERE'S ONE

18   OMISSION THAT I WOULD LIKE TO HAVE INCORPORATED.  IT'S JUST A

19   REAL BRIEF SENTENCE REGARDING THE ARM BRACE, WHICH WAS ALSO A

20   PROVISION OF MY SETTLEMENT AGREEMENT AT PAGE 3 AND BOTTOM OF

21   PAGE 7.  THE PROVISION IN MY ARM BRACE WAS WITH REGARDS TO --

22   THAT WAS SPECIFICALLY THAT -- AT SECTION -- PAGE 3 OF THE 2002

23   SETTLEMENT AGREEMENT AT MEDICAL CARE SECTION 4.1, THE

24   RELEASEES'S AGREE TO CONTINUE TO ALLOW RELEASOR APPROPRIATE USE

25   OF HIS ARM BRACE.  RELEASOR SHALL HAVE APPROPRIATE USE OF THE
```

```
 1    ARM BRACE UNTIL HIS MEDICAL NEEDS REQUIRE OTHERWISE.

 2              THE COURT:  OKAY.  SO AT THE BOTTOM OF PAGE 2?

 3              MR. ASHKER:  PAGE 3 AT --

 4              THE COURT:  MAYBE WE HAVE A DIFFERENT --

 5              MR. ASHKER:  LINE 3.  AND PAGE 7 AT THE BOTTOM OF

 6    PAGE 7.

 7              PROBABLY AT THE END OF LINE 26.  THAT'S WHERE IT ENDS

 8    ON THE PHYSICAL THERAPY.

 9              THE COURT:  WELL, MAYBE OURS ARE PAGINATED

10    DIFFERENTLY.  MINE -- IT SEEMS LIKE IT'S ON PAGE 2, THE FIRST

11    PART UNDER "CLAIMS AND DEFENSES."

12              MR. ASHKER:  YES, IT RUNS OVER INTO THE TOP OF PAGE 3

13    WHERE IT SAYS, "CHANGE IN PLAINTIFF'S MEDICAL NEEDS

14    CONTRAINDICATED THE THERAPY."  AND THEN IT COULD INCLUDE THAT

15    ARM BRACE ISSUE, AND THEN CLOSE WITH "DEFENDANTS CONTEND THAT

16    THEY COMPLIED WITH THE 2002 SETTLEMENT AGREEMENT."

17              THE COURT:  OKAY.  WELL, I'LL ADD IT IN --

18              MR. ASHKER:  OKAY.

19              THE COURT:  -- IN THAT GENERAL AREA.

20              OKAY.

21              (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE

22    OF THE JURY:)

23              THE COURT:  PLEASE BE SEATED.

24              YOU MAY BE SEATED WHEN YOU COME IN.  THEY'RE STANDING

25    FOR YOU.
```

1          ALL RIGHT.  OH, LET'S SEE.  WHY DON'T YOU ALL MOVE

2    DOWN ONE SPOT THERE.  IT WILL BE EASIER FOR EVERYBODY TO SEE.

3          THANKS.

4          LADIES AND GENTLEMEN, YOU ARE NOW JURY IN THIS CASE,

5    AND IT IS MY DUTY TO INSTRUCT YOU ON THE LAW.  THESE

6    INSTRUCTIONS ARE PRELIMINARY INSTRUCTIONS TO HELP YOU UNDERSTAND

7    THE PRINCIPLES THAT APPLY TO CIVIL TRIALS AND TO HELP YOU

8    UNDERSTAND THE EVIDENCE AS YOU LISTEN TO IT.

9          YOU WILL BE ALLOWED TO KEEP A SET OF THESE

10   INSTRUCTIONS THROUGHOUT THE TRIAL AND REFER TO IT.  SO I'LL BE

11   GIVING YOU A WRITTEN EACH A COPY OF THESE INSTRUCTIONS SO YOU

12   DON'T NEED TO WORRY ABOUT TAKING NOTES WHILE I GIVE THEM.  YOU

13   SHALL NOT TAKE THE SET OF INSTRUCTIONS HOME IN THE EVENING,

14   THOUGH.  THEY SHOULD REMAIN IN THE JURY ROOM WHEN YOU LEAVE.

15         AT THE END OF THE TRIAL, I'LL BE GIVING YOU A FINAL

16   SET OF INSTRUCTIONS, AND IT IS THE FINAL SET OF INSTRUCTIONS

17   THAT WILL CONTROL YOUR DELIBERATIONS.

18         YOU SHOULD NOT INFER FROM THESE INSTRUCTIONS OR FROM

19   ANYTHING THAT I MAY SAY OR DO DURING THE TRIAL THAT I HAVE AN

20   OPINION REGARDING THE EVIDENCE OR AS TO WHAT YOUR VERDICT SHOULD

21   BE.

22         IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE

23   EVIDENCE IN THE CASE.  TO THOSE FACTS, YOU WILL APPLY THE LAW AS

24   I WILL GIVE IT TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT TO

25   YOU, WHETHER YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT BE

1    INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS,

2    PREJUDICES, OR SYMPATHY.

3            THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON

4    THE EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK AN OATH

5    TO DO SO.

6            IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF

7    THEM AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

8    IMPORTANT.

9            TO HELP YOU FOLLOW THE EVIDENCE, I'LL FIRST GIVE YOU

10   SOME GENERAL BACKGROUND INFORMATION ABOUT THE CASE.

11           AS I MENTIONED AT THE BEGINNING, THIS IS AN ACTION

12   ARISING FROM THE MEDICAL CARE RECEIVED BY PLAINTIFF TODD LOUIS

13   ASHKER, A STATE PRISONER WHILE AT PELICAN BAY STATE PRISON IN

14   CRESCENT CITY, CALIFORNIA.  PLAINTIFF CLAIMS THAT DEFENDANTS

15   FAILED TO PROVIDE HIM WITH APPROPRIATE MEDICAL CARE AND THAT, AS

16   A RESULT, HE SUFFERED UNNECESSARY PAIN AND A PREEXISTING MEDICAL

17   CONDITION WAS AGGRAVATED.

18           PLAINTIFF SEEKS MONEY DAMAGES FOR HIS PAIN AND THE

19   ALLEGED AGGRAVATION OF HIS INJURY.  DEFENDANTS DENY PLAINTIFF'S

20   ALLEGATIONS AND CONTEND THAT THEY PROVIDED APPROPRIATE MEDICAL

21   CARE AND DENY THAT THEY CAUSED PLAINTIFF ANY HARM.

22           PLAINTIFF ALSO ALLEGES THAT DEFENDANTS BREACHED A

23   MAY 24TH, 2002, SETTLEMENT AGREEMENT IN WHICH THEY PROMISED TO

24   REFER HIM TO A PAIN MANAGEMENT SPECIALIST AT THE

25   UNIVERSITY OF CALIFORNIA AT DAVIS CLINIC FOR A PAIN MANAGEMENT

1    EXAMINATION AND CONSULTATION TO IMPLEMENT THE PAIN MANAGEMENT

2    REGIMEN RECOMMENDED BY THE SPECIALIST, TO CONTINUE -- AND TO

3    CONTINUE THE PAIN MANAGEMENT REGIMEN UNTIL PLAINTIFF'S MEDICAL

4    NEEDS CHANGED.

5            DEFENDANTS ALSO PROMISED TO ALLOW PLAINTIFF TO USE AN

6    ARM BRACE TO REINSTATE THE PHYSICAL THERAPY PLAINTIFF HAD BEEN

7    RECEIVING TO REHABILITATE HIS ARM, AND TO CONTINUE THE PHYSICAL

8    THERAPY UNTIL A CHANGE IN PLAINTIFF'S MEDICAL NEEDS

9    CONTRAINDICATED THE THERAPY.

10           DEFENDANTS CONTEND THAT THEY COMPLIED WITH THE 2002

11   SETTLEMENT AGREEMENT TO THE EXTENT IT WAS POSSIBLE TO DO SO.

12           PLAINTIFF MUST PROVE HIS CLAIMS BY A PREPONDERANCE OF

13   THE EVIDENCE.  WHEN A PARTY HAS THE BURDEN OF PROOF ON ANY CLAIM

14   BY A PREPONDERANCE OF THE EVIDENCE, IT MEANS THAT YOU MUST BE

15   PERSUADED BY THE EVIDENCE THAT THE CLAIM IS MORE PROBABLY TRUE

16   THAN NOT TRUE.

17           YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE

18   REGARDLESS OF WHICH PARTY PRESENTS IT.

19           THE PLAINTIFF, MR. ASHKER, IS REPRESENTING HIMSELF AT

20   THE TRIAL.  HE DOESN'T HAVE AN ATTORNEY.  ALL PARTIES ARE EQUAL

21   BEFORE THE LAW, AND A PERSON WHO IS REPRESENTING HIMSELF IS

22   ENTITLED TO THE SAME FAIR AND CONSCIENTIOUS CONSIDERATION BY YOU

23   AS ANY PARTY.

24           THE EVIDENCE FROM WHICH YOU ARE TO DECIDE WHAT THE

25   FACTS ARE CONSISTS OF, ONE, THE SWORN TESTIMONY OF ANY WITNESS;

```
1    TWO, THE EXHIBITS WHICH WILL BE RECEIVED INTO EVIDENCE; AND

2    THREE, ANY FACTS TO WHICH THE PARTIES AGREE.

3              IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

4    TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN THINGS

5    ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT

6    THE FACTS ARE.  I WILL LIST THEM FOR YOU:

7              ARGUMENTS AND STATEMENTS BY DEFENSE COUNSEL OR

8    PLAINTIFF AT TIMES WHEN HE IS NOT ON THE WITNESS STAND UNDER

9    OATH ARE NOT EVIDENCE; DEFENSE COUNSEL AND PLAINTIFF WHEN ACTING

10   AS COUNSEL ARE NOT WITNESSES; WHAT IS SAID IN OPENING

11   STATEMENTS, CLOSING ARGUMENTS, AND DURING OBJECTIONS IS INTENDED

12   TO HELP YOU INTERPRET THE EVIDENCE BUT IT IS NOT EVIDENCE.

13             IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY

14   DEFENSE COUNSEL AND PLAINTIFF ARGUE THEM, YOUR MEMORY OF THEM

15   WILL CONTROL.

16             MAYBE I SHOULD EXPLAIN THAT A LITTLE BIT MORE.  WHEN

17   THE PLAINTIFF IS ACTING AS A WITNESS, YOU'LL KNOW BECAUSE HE'LL

18   BE GIVEN AN OATH AND HE'LL BE TESTIFYING.  AND WHAT HE SAYS

19   UNDER OATH WHILE HE'S TESTIFYING, THAT IS EVIDENCE.  AND HE IS A

20   WITNESS AT THAT TIME.

21             AT OTHER TIMES, WHEN HE'S GIVING AN OPENING

22   STATEMENT, MAKING A CLOSING ARGUMENT, MAKING OBJECTIONS, THEN

23   HE, JUST LIKE THE DEFENSE ATTORNEY, IS ACTING AS AN ATTORNEY.

24   SO THOSE STATEMENTS ARE NOT UNDER OATH AND AREN'T TO BE

25   CONSIDERED AS EVIDENCE.
```

1      SO IT'S A LITTLE TRICKY, BUT YOU'RE GOING TO HAVE TO

2   TRY TO DRAW THAT DISTINCTION.

3      QUESTIONS AND OBJECTIONS ARE NOT EVIDENCE.  PARTIES

4   HAVE A RIGHT TO OBJECT WHEN THEY BELIEVE A QUESTION IS IMPROPER

5   UNDER THE RULES OF EVIDENCE.  YOU SHOULD NOT BE INFLUENCED BY

6   THE OBJECTION OR BY THE COURT'S RULING ON IT.  ANY TESTIMONY

7   THAT IS EXCLUDED OR STRICKEN OR THAT YOU ARE INSTRUCTED TO

8   DISREGARD IS NOT EVIDENCE AND MUST NOT BE CONSIDERED.

9      IN ADDITION, SOME TESTIMONY AND EXHIBITS MAY BE

10   RECEIVED ONLY FOR A LIMITED PURPOSE.  IF I GIVE YOU A LIMITING

11   INSTRUCTION, YOU MUST FOLLOW IT.  ANYTHING YOU SEE OR HEAR WHEN

12   COURT IS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE

13   CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

14      EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

15   EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A

16   WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

17   CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM WHICH

18   YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH KINDS OF

19   EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE

20   GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR

21   YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

22      THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

23   RECEIVED INTO EVIDENCE.  WHEN SOMEONE ASKS A QUESTION OR OFFERS

24   AN EXHIBIT INTO EVIDENCE AND THE OTHER SIDE THINKS IT IS NOT

25   PERMITTED BY THE RULES OF EVIDENCE, THEY MAY OBJECT.  IF I

1   OVERRULE THE OBJECTION, THE QUESTION MAY BE ANSWERED OR THE

2   EXHIBIT RECEIVED.  IF I SUSTAIN THE OBJECTION, THE QUESTION

3   CANNOT BE ANSWERED OR THE EXHIBIT CANNOT BE RECEIVED.

4           WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU

5   MUST IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER

6   MIGHT HAVE BEEN.

7           SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM

8   THE RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

9   MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT CONSIDER

10  THE EVIDENCE THAT I TOLD YOU TO DISREGARD.

11          IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

12  DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

13  BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF

14  IT, OR NONE OF IT.

15          IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY

16  TAKE INTO ACCOUNT, ONE, THE OPPORTUNITY AND ABILITY OF THE

17  WITNESS TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO; TWO, THE

18  WITNESS'S MEMORY; THREE, THE WITNESS'S MANNER WHILE TESTIFYING;

19  FOUR, THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE AND ANY

20  BIAS OR PREJUDICE; FIVE, WHETHER OTHER EVIDENCE CONTRADICTS THE

21  WITNESS'S TESTIMONY; SIX, THE REASONABLENESS OF THE WITNESS'S

22  TESTIMONY IN THE LIGHT OF ALL THE EVIDENCE; AND SEVEN, ANY OTHER

23  FACTORS THAT BEAR ON BELIEVABILITY.

24          THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

25  NECESSARILY DEPEND UPON THE NUMBER OF WITNESSES WHO TESTIFY

```
 1   ABOUT IT.

 2              PLAINTIFF ASSERTS TWO CLAIMS AGAINST DR. SAYRE BASED

 3   UPON DR. SAYRE'S MEDICAL TREATMENT OF PLAINTIFF.  PLAINTIFF

 4   ASSERTS THAT DR. SAYRE VIOLATED PLAINTIFF'S EIGHTH AMENDMENT

 5   RIGHTS BY KNOWINGLY DISREGARDING PLAINTIFF'S SERIOUS MEDICAL

 6   NEEDS.  TO PROVE THAT DR. SAYRE DISREGARDED PLAINTIFF'S SERIOUS

 7   MEDICAL NEEDS, PLAINTIFF MUST PROVE ALL OF THE FOLLOWING

 8   ELEMENTS BY A PREPONDERANCE OF THE EVIDENCE:

 9              ONE, THAT PLAINTIFF HAD A SERIOUS MEDICAL NEED; TWO,

10   THAT DR. SAYRE WAS AWARE OF PLAINTIFF'S SERIOUS NEED FOR MEDICAL

11   CARE; THREE, THAT DR. SAYRE DISREGARDED PLAINTIFF'S SERIOUS

12   MEDICAL NEED; FOUR, THAT PLAINTIFF WAS FURTHER INJURED AS A

13   RESULT OF DR. SAYRE'S CONDUCT; AND, FIVE, THAT DR. SAYRE WAS

14   ACTING UNDER COLOR OF STATE LAW.

15              THAT LAST ELEMENT IS AGREED UPON, SO YOU DON'T NEED

16   TO WORRY ABOUT THAT ONE.

17              INDICATIONS OF A SERIOUS MEDICAL NEED ARE, ONE, THE

18   PRESENCE OF A MEDICAL CONDITION THAT AFFECTS AN INDIVIDUAL'S

19   DAILY ACTIVITIES; TWO, A MEDICAL CONDITION THAT CAUSE CHRONIC

20   AND SUBSTANTIAL PAIN; THREE, A MEDICAL CONDITION THAT A

21   REASONABLE DOCTOR OR PATIENT WOULD FIND IMPORTANT AND WORTHY OF

22   COMMENT OR TREATMENT; OR, FOUR, A MEDICAL CONDITION THAT COULD

23   RESULT IN FURTHER SIGNIFICANT INJURY OR THE UNNECESSARY

24   INFLICTION OF PAIN IF LEFT UNTREATED.

25              PLAINTIFF ALSO ASSERTS THAT DR. SAYRE WAS NEGLIGENT
```

1    IN PROVIDING HIS MEDICAL TREATMENT.  TO ESTABLISH THIS CLAIM,

2    PLAINTIFF MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT,

3    ONE, DR. SAYRE WAS MEDICALLY NEGLIGENT; AND, TWO, THAT

4    DR. SAYRE'S NEGLIGENCE WAS A SUBSTANTIAL FACTOR IN CAUSING HARM

5    TO PLAINTIFF.

6            TO FIND THAT DR. SAYRE WAS NEGLIGENT, YOU MUST DECIDE

7    IF HIS MEDICAL TREATMENT OF PLAINTIFF FELL BELOW THE STANDARD OF

8    CARE.  THE STANDARD OF CARE IS THE LEVEL OF SKILL, KNOWLEDGE,

9    AND CARE IN DIAGNOSIS AND TREATMENT THAT OTHER REASONABLY

10   CAREFUL MEDICAL DOCTORS WOULD USE IN THE SAME OR SIMILAR

11   CIRCUMSTANCES MODIFIED TO THE EXTENT REQUIRED BY PRISON SECURITY

12   CONCERNS.

13           A DOCTOR IS NOT NECESSARILY NEGLIGENT BECAUSE HE

14   CHOOSES ONE MEDICALLY ACCEPTED METHOD OF TREATMENT OR DIAGNOSIS

15   AND IT TURNS OUT THAT ANOTHER MEDICALLY ACCEPTED METHOD WOULD

16   HAVE BEEN A BETTER CHOICE.  A SUBSTANTIAL FACTOR IN CAUSING HARM

17   IS A FACTOR THAT A REASONABLE PERSON WOULD CONSIDER TO HAVE

18   CONTRIBUTED TO THE HARM.

19           PLAINTIFF ALSO ALLEGES THAT DEFENDANT CATE BREACHED A

20   MAY 24TH, 2002, SETTLEMENT AGREEMENT IN WHICH HE PROMISED TO

21   REFER PLAINTIFF TO A PAIN MANAGEMENT SPECIALIST AT THE

22   UNIVERSITY OF CALIFORNIA AT DAVIS CLINIC FOR A PAIN MANAGEMENT

23   EXAMINATION AND CONSULTATION TO IMPLEMENT THE PAIN MANAGEMENT

24   REGIMEN RECOMMENDED BY THE SPECIALIST AND TO CONTINUE THE PAIN

25   MANAGEMENT REGIMEN UNTIL PLAINTIFF'S MEDICAL NEEDS CHANGED.

1     DEFENDANT CATE ALSO PROMISED TO ALLOW PLAINTIFF TO

2  USE AN ARM BRACE, TO REINSTATE PHYSICAL THERAPY PLAINTIFF HAD

3  BEEN RECEIVING TO REHABILITATE HIS ARM AND TO CONTINUE THE

4  PHYSICAL THERAPY UNTIL A CHANGE IN PLAINTIFF'S MEDICAL NEEDS

5  CONTRAINDICATED THE THERAPY.

6     TO FIND THAT DEFENDANT CATE BREACHED THIS AGREEMENT,

7  PLAINTIFF MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT

8  DEFENDANT CATE FAILED TO PERFORM HIS PART OF THE AGREEMENT AND

9  THAT PLAINTIFF SUFFERED DAMAGES AS A RESULT.  DEFENDANT CATE

10 CONTENDS THAT HE PERFORMED THE AGREEMENT AND THAT ANY FAILURE TO

11 PERFORM WAS EXCUSED BY THE IMPOSSIBILITY OF PERFORMING.

12     IT IS THE COURT'S DUTY TO INSTRUCT YOU ABOUT THE

13 MEASURE OF DAMAGES.  BY INSTRUCTING ON DAMAGES, I DO NOT MEAN TO

14 SUGGEST FOR WHICH PARTY YOUR VERDICT SHOULD BE RENDERED.  IF YOU

15 FIND FOR PLAINTIFF ON ANY OF HIS CLAIMS, YOU MUST DETERMINE HIS

16 DAMAGES.  PLAINTIFF HAS THE BURDEN OF PROVING DAMAGES BY A

17 PREPONDERANCE OF THE EVIDENCE.  DAMAGES MEANS THE AMOUNT OF

18 MONEY THAT WILL REASONABLY AND FAIRLY COMPENSATE PLAINTIFF FOR

19 ANY INJURY YOU FIND WAS CAUSED BY DEFENDANTS.

20     YOU SHOULD CONSIDER THE FOLLOWING:  THE NATURE AND

21 EXTENT OF THE INJURY; THE LOSS OF ENJOYMENT OF LIFE EXPERIENCED

22 AND WHICH, WITH REASONABLE PROBABILITY, WILL BE EXPERIENCED IN

23 THE FUTURE; THE MENTAL, PHYSICAL, AND/OR EMOTIONAL PAIN AND

24 SUFFERING EXPERIENCED AND WHICH, WITH REASONABLE PROBABILITY,

25 WILL BE EXPERIENCED IN THE FUTURE.

1    IT IS FOR YOU TO DETERMINE WHAT DAMAGES, IF ANY, HAVE

2  BEEN APPROVED.  YOUR AWARD MUST BE BASED UPON EVIDENCE AND NOT

3  UPON SPECULATION, GUESSWORK, OR CONJECTURE.

4    IF YOU FIND FOR PLAINTIFF ON HIS CLAIM OF DELIBERATE

5  INDIFFERENCE AGAINST DR. SAYRE, YOU MAY BUT ARE NOT REQUIRED TO

6  AWARD PUNITIVE DAMAGES.  THE PURPOSES OF PUNITIVE DAMAGES ARE TO

7  PUNISH A DEFENDANT AND TO DETER A DEFENDANT AND OTHERS FROM

8  COMMITTING SIMILAR ACTS IN THE FUTURE.

9    PLAINTIFF HAS THE BURDEN OF PROVING BY A

10  PREPONDERANCE OF THE EVIDENCE THAT PUNITIVE DAMAGES SHOULD BE

11  AWARDED AND THE AMOUNT.  YOU MAY AWARD PUNITIVE DAMAGES ONLY IF

12  YOU FIND THAT DR. SAYRE'S CONDUCT WAS MALICIOUS OR IN RECKLESS

13  DISREGARD OF PLAINTIFF'S RIGHTS.

14    CONDUCT IS MALICIOUS IF IT IS ACCOMPANIED BY ILL WILL

15  OR SPITE OR IF IT IS FOR THE PURPOSE OF INJURING ANOTHER.

16  CONDUCT IS RECKLESS IF, UNDER THE CIRCUMSTANCES, IT REFLECTS

17  COMPLETE INDIFFERENCE TO THE SAFETY AND RIGHTS OF OTHERS.

18    I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS

19  JURORS.

20    FIRST, YOU ARE NOT TO DISCUSS THIS CASE WITH ANYONE,

21  INCLUDING MEMBERS OF YOUR FAMILY, PEOPLE INVOLVED IN THE TRIAL,

22  OR ANYONE ELSE.  THIS INCLUDES DISCUSSING THE CASE ON THE

23  INTERNET.  NOR ARE YOU ALLOWED TO PERMIT OTHERS TO DISCUSS THE

24  CASE WITH YOU.  IF ANYONE SHOULD APPROACH YOU AND TRY TO TALK TO

25  YOU ABOUT THE CASE, PLEASE LET ME KNOW ABOUT IT IMMEDIATELY

1    THROUGH MS. CAHILL, THE COURTROOM DEPUTY.

2              SECOND, DO NOT READ OR LISTEN TO ANY NEWS STORIES,

3    ARTICLES, RADIO, TELEVISION, OR ON-LINE REPORTS ABOUT THE CASE,

4    OR ABOUT ANYONE WHO HAS ANYTHING TO DO WITH IT.

5              THIRD, DO NOT DO ANY RESEARCH, SUCH AS CONSULTING

6    DICTIONARIES, SEARCHING THE INTERNET OR USING OTHER REFERENCE

7    MATERIALS, AND DO NOT MAKE ANY INVESTIGATION ABOUT THE CASE ON

8    YOUR OWN.

9              FOURTH, IF YOU NEED TO COMMUNICATE WITH ME, SIMPLY

10   GIVE ME A SIGNED -- GIVE A SIGNED NOTE TO THE CLERK, MS. CAHILL,

11   TO GIVE TO ME.

12             AND, FIFTH, DO NOT MAKE UP YOUR MIND ABOUT WHAT THE

13   VERDICT SHOULD BE UNTIL YOU HAVE GONE TO THE JURY ROOM TO DECIDE

14   THE CASE AND YOU AND YOUR FELLOW JURORS HAVE DISCUSSED THE

15   EVIDENCE.  KEEP AN OPEN MIND UNTIL THEN.

16             FINALLY, UNTIL THIS CASE IS GIVEN TO YOU FOR YOUR

17   DELIBERATION AND VERDICT, YOU ARE NOT TO DISCUSS THE CASE WITH

18   YOUR FELLOW JURORS.  DURING DELIBERATIONS, YOU WILL HAVE TO MAKE

19   YOUR DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU

20   WILL NOT HAVE A TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY

21   CLOSE ATTENTION TO THE TESTIMONY AS IT IS GIVEN.

22             IF AT ANY TIME, YOU CANNOT HEAR OR SEE THE TESTIMONY,

23   EVIDENCE, QUESTIONS OR ARGUMENTS, LET ME KNOW SO THAT I CAN

24   CORRECT THE PROBLEM.  JUST WANT TO RAISE YOUR HAND OR PUT UP

25   YOUR HAND IF YOU CAN'T HEAR.

1     IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER

2     THE EVIDENCE.  YOU WILL BE OR HAVE BEEN PROVIDED WITH PAPER AND

3     PENCIL TO TAKE NOTES.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO

4     YOURSELF UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO

5     DECIDE THE CASE.  DO NOT LET THE NOTE-TAKING DISTRACT YOU.

6         WHEN YOU LEAVE IN THE AFTERNOON, YOUR NOTES SHOULD BE

7     LEFT IN THE JURY ROOM.  NO ONE WILL READ YOUR NOTES, AND THEY'LL

8     BE DESTROYED AT THE CONCLUSION OF THE CASE.

9         WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON

10    YOUR OWN MEMORY OF THE EVIDENCE.  THE NOTES ARE ONLY TO ASSIST

11    YOUR MEMORY.  YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES

12    OR THOSE OF YOUR FELLOW JURORS.

13        YOU MAY PROPOSE WRITTEN QUESTIONS TO WITNESSES, YOU

14    MAY PROPOSE QUESTIONS IN ORDER TO CLARIFY THE TESTIMONY, BUT YOU

15    ARE NOT TO EXPRESS ANY OPINION ABOUT THE TESTIMONY OR ARGUE WITH

16    A WITNESS.  IF YOU PROPOSE ANY QUESTIONS, REMEMBER THAT YOUR

17    ROLE IS THAT OF A NEUTRAL FACT FINDER, NOT AN ADVOCATE.  IF YOU

18    WISH, YOU MAY WRITE OUT OUR QUESTION ON A FORM PROVIDED BY THE

19    COURT.  DO NOT SIGN THE QUESTION.

20        GIVE IT TO THE COURTROOM DEPUTY CLERK DURING ONE OF

21    YOUR BREAKS.  I WILL REVIEW THE QUESTION TO DETERMINE IF IT IS

22    LEGAL PROPER.  THERE ARE SOME QUESTIONS THAT I WILL NOT PERMIT

23    OR WILL NOT ASK IN THE WORDING THAT YOU SUBMIT.  THIS MIGHT

24    HAPPEN, EITHER DUE TO THE RULES OF EVIDENCE OR OTHER LEGAL

25    REASONS, OR BECAUSE THE QUESTION IS EXPECTED TO BE ANSWERED

1    LATER IN THE CASE.

2             IF I DO NOT ASK A PROPOSED QUESTION OR IF I REPHRASE

3    IT, DO NOT SPECULATE AS TO THE REASONS.

4             DO NOT GIVE UNDUE WEIGHT TO QUESTIONS YOU OR OTHER

5    JURORS PROPOSE.  YOU SHOULD EVALUATE THE ANSWERS TO THOSE

6    QUESTIONS IN THE SAME MANNER THAT YOU EVALUATE ALL OF THE OTHER

7    EVIDENCE.

8             BY GIVING YOU THE OPPORTUNITY TO PROPOSE QUESTIONS,

9    I'M NOT REQUESTING OR SUGGESTING THAT YOU DO SO.  IT WILL OFTEN

10   BE THE CASE THAT A QUESTION IS NOT ASKED BECAUSE IT'S LEGALLY

11   OBJECTIONABLE OR BECAUSE A LATER WITNESS WILL BE ADDRESSING THAT

12   SUBJECT.

13            THE TRIAL WILL NOW BEGIN.  FIRST, EACH SIDE MAY MAKE

14   AN OPENING STATEMENT.  AN OPENING STATEMENT IS NOT EVIDENCE.  IT

15   IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND WHAT THAT PARTIES

16   EXPECTS THE EVIDENCE WILL SHOW.  AFTER OPENING STATEMENTS,

17   PLAINTIFF WILL PRESENT EVIDENCE.  AFTER PLAINTIFF CONDUCTS A

18   DIRECT EXAMINATION OF A WITNESS, DEFENSE COUNSEL MAY

19   CROSS-EXAMINE THE WITNESS.

20            DURING PLAINTIFF'S PRESENTATION OF EVIDENCE, THE

21   COURTED MAY, FOR EFFICIENCY REASONS, REQUIRE DEFENSE COUNSEL TO

22   CONDUCT HIS EXAMINATION OF THE WITNESS FOLLOWING PLAINTIFF'S

23   EXAMINATION.

24            WHEN PLAINTIFF HAS CONCLUDED HIS PRESENTATION OF

25   EVIDENCE, DEFENDANTS MAY PRESENT ADDITIONAL EVIDENCE, AND

1    PLAINTIFF MAY CROSS-EXAMINE THOSE WITNESSES.

2              AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL

3    INSTRUCT YOU ON THE LAW THAT APPLIES TO THE CASE, AND CLOSING

4    ARGUMENTS WILL BE GIVEN.  AFTER THAT, YOU WILL GO TO THE JURY

5    ROOM TO DELIBERATE ON YOUR VERDICT.  AFTER YOU'VE REACHED YOUR

6    VERDICT, YOU'LL BE EXCUSED.

7              SO WE'LL FIRST BE HEARING AN OPENING STATEMENT FROM

8    THE PLAINTIFF.  AS I EXPLAINED EARLIER, THE OPENING STATEMENT

9    ITSELF IS TECHNICALLY NOT EVIDENCE.  IT'S THE PLAINTIFF STATING,

10   JUST LIKE THE DEFENSE WILL, WHAT HE THINKS THE EVIDENCE WILL

11   SHOW.  THEN WE'LL HEAR THE DEFENSE ATTORNEY'S OPENING STATEMENT.

12             AFTER THAT, THE PLAINTIFF WILL TESTIFY.  NOW, IT'S A

13   LITTLE DIFFICULT TO REPRESENT ONE'S SELF BECAUSE THE WAY THINGS

14   GO IN COURT IS USUALLY BY QUESTION-AND-ANSWER FORMAT.

15             AND THE REASON FOR THAT IS THE OTHER SIDE IS ENTITLED

16   TO HAVE A CLUE AS TO WHAT THE ANSWER IS GOING TO BE BEFORE IT'S

17   GIVEN SO THEY CAN OBJECT IF IT'S OBJECTIONABLE.  AND IF SOMEONE

18   JUST TALKS, IT'S HARD TO KNOW WHAT THEY'RE GOING TO SAY NEXT SO

19   AS TO KNOW WHETHER TO OBJECT.

20             SO I'VE EXPLAINED TO MR. ASHKER THAT HE'S GOING TO

21   NEED, ALTHOUGH IT'S A LITTLE AWKWARD, TO ASK HIMSELF QUESTIONS

22   AND GIVE THE ANSWER.  OR TO SAY WHAT HE'S GOING TO TALK ABOUT,

23   AND THEN TALK ABOUT IT, WHICH WOULD THEN GIVE THE DEFENSE

24   ATTORNEY THE OPPORTUNITY TO OBJECT IF THAT'S APPROPRIATE.

25             SO THAT'S HOW HE'S BEEN ASKED TO PROCEED.  IT IS A

```
 1   LITTLE BIT DIFFICULT, SO YOU'LL JUST HAVE TO BEAR WITH IT IN

 2   TERMS OF THE PROCESS.

 3          I'VE LIMITED BOTH SIDES TO UP TO A HALF AN HOUR FOR

 4   THEIR OPENING STATEMENTS.

 5          SO AT THIS TIME, THEN, WE'LL HEAR FROM MR. ASHKER IF

 6   YOU'D LIKE TO GIVE AN OPENING STATEMENT.

 7          MR. ASHKER:  OKAY.

 8          OKAY.  GOOD AFTERNOON, MEMBERS OF THE JURY.

 9          THE COURT:  YOU'LL HAVE TO SPEAK UP.

10          CAN SOMEBODY HELP HIM WITH THAT?  DOES THAT THING

11   MOVE?

12          THE COURT:  CAN YOU MOVE THE STAND?

13              (OFF-THE-RECORD DISCUSSION.)

14          THE COURT:  YOU MIGHT HAVE TO LEAN RIGHT UP INTO IT

15   AND SPEAK LOUDLY.

16          PUT YOUR HAND UP IF YOU CAN'T HEAR.
```

<strong>OPENING STATEMENT</strong>

```
18          MR. ASHKER:  GOOD AFTERNOON, MEMBERS OF THE JURY.

19          MY NAME IS TODD ASHKER.  I'M 45 YEARS OLD.  I HAVE

20   BEEN CONVICTED OF SEVERAL FELONIES, MOST RECENT BEING A -- AN

21   APRIL 1990 CONVICTION OF TWO FELONY CHARGES STEMMING FROM AN

22   INCIDENT AT FOLSOM STATE PRISON IN 1987.

23          I'VE BEEN INCARCERATED IN THE CDCR, CALIFORNIA

24   DEPARTMENT OF CORRECTIONS AND REHABILITATION, SINCE JANUARY OF

25   1985.  I HAVE BEEN HOUSED IN THE SECURITY HOUSING UNIT ALSO
```

1   KNOWN AS SHU SINCE AUGUST OF 1986, INITIALLY AT FOLSOM UNTIL MY

2   TRANSFER TO PELICAN STATE PRISON SHU ON MAY 2ND, 1990.

3           NOW, I WOULD LIKE TO GIVE YOU A BRIEF SUMMARY OF THE

4   SHU BECAUSE YOU'LL BE HEARING IT MENTIONED A LOT IN THIS CASE.

5   THE SHU IS ALSO KNOWN AS THE HOLE.  AND THE PURPOSE IS TO

6   SEGREGATE CERTAIN INMATES FROM THE GENERAL PRISON POPULATION IN

7   A MORE SECURE ENVIRONMENT.

8           THERE ARE VARIOUS REASONS FOR SHU PLACEMENT.  BRIEFLY

9   AND IN GENERAL -- IN GENERAL TERMS, SUCH REASONS ARE, NUMBER

10  ONE, BEING INVESTIGATED FOR POSSIBLE INVOLVEMENT IN BEHAVIOR

11  CLASSIFIED AS SERIOUS MISCONDUCT WITHIN THE PRISON SYSTEM, WHICH

12  WOULD BE ON A PAR WITH FELONIOUS ACTIVITY ON THE STREETS.

13          NUMBER TWO WOULD BE A SET SHU TERM, ALSO KNOWN AS A

14  DETERMINATE SHU TERM, WHICH IS IMPOSED FOR PUNITIVE REASONS.

15  THAT'S WHEN YOU'RE BEING -- BEEN CHARGED AND FOUND GUILTY OF

16  COMMITTING A SERIOUS RULE VIOLATION IN PRISON FOR WHICH YOU

17  WOULD BE GIVEN THE SET SHU TERM PURSUANT TO GUIDELINES IN THE

18  RULES AND REGULATIONS.

19          AN EXAMPLE WOULD BE IF YOU WERE FOUND GUILTY FOR

20  POSSESSING A KNIFE IN PRISON.  THIS WOULD CARRY A SET SHU TERM

21  OF BETWEEN SIX AND FIFTEEN MONTHS.

22          GUILT FOR KILLING ANOTHER INMATE CARRIES A MAXIMUM

23  SHU TERM OF FIVE YEARS.  THE THIRD REASON FOR PLACEMENT IN THE

24  SHU IS WHAT'S REFERRED TO AS AN INDETERMINATE SHU TERM FOR

25  ADMINISTRATIVE REASONS.  THIS WOULD BE BASED ON A DETERMINATION

1    BY PRISON CLASSIFICATION COMMITTEE PROCESS THAT YOU CANNOT BE IN

2    GENERAL POPULATION BECAUSE YOU ARE DEEMED TO BE AN IMMEDIATE

3    SERIOUS THREAT TO THE SAFETY OF STAFF AND INMATES AND/OR THREAT

4    TO THE SECURITY OF THE GENERAL POPULATION INSTITUTIONS.

5            IN PELICAN BAY STATE PRISON SHU, THE RULES,

6    REGULATIONS, RESTRICTIONS IN THE SHU ARE THE SAME WHETHER YOUR

7    PLACEMENT IS PUNITIVE OR ADMINISTRATIVE.  BETWEEN 1986 AND

8    JANUARY OF 1992, MY SHU PLACEMENT WAS PUNITIVE AS I WAS SERVING

9    SET SHU TERMS AFTER BEING FOUND GUILTY OF SERIOUS MISCONDUCT.

10           IN JANUARY OF 1992, I WAS RETAINED IN SHU FOR

11   ADMINISTRATIVE REASONS, WHERE I REMAIN TO THIS DAY.

12           PELICAN BAY STATE PRISON SHU, YOU'RE BASICALLY

13   ISOLATED IN A CELL, IN A POD CONTAINING EIGHT CELLS, FOUR UPPER

14   CELLS ON A UPPER TIER, FOUR LOWER CELLS ON A LOWER TIER.  A

15   SHOWER CELL IS AT THE END OF THE TIER.  ON THE OPPOSITE END OF

16   THE TIER, THERE IS THE DOOR TO THE SMALL CONCRETE YARD.

17           THE YARD IS APPROXIMATELY TWO CELLS IN SIZE, MAYBE

18   APPROXIMATELY 10 FEET WIDE BY 20 FEET LONG, ALL CONCRETE,

19   NOTHING ELSE ON IT, CEMENT WALLS, 15 FEET HIGH COVERED WITH WIRE

20   MESH AND MONITORED BY A CAMERA BY THE CONTROL BOOTH OFFICER

21   WHO'S IN THE BLOCK.

22           THE CELL DOORS, SHOWER DOORS, YARD DOORS ARE ALL

23   OPERATED ELECTRONICALLY BY THE OFFICER STATIONED IN THE CONTROL

24   BOOTH.  THIS OFFICER CAN SEE INTO THE POD AREA DOWN THE TIER.

25   HE CANNOT SEE INTO THE CELLS OR THE SHOWER.  THE CELLS IN THE

1    POD HAVE OPEN, PERFORATED CELL FRONTS WHICH I CAN DEMONSTRATE

2    FOR YOU BY SHOWING PHOTOGRAPH NO. 1, WHICH IS A PHOTOGRAPH OF MY

3    CELL, THE FRONT OF MY CELL AT PELICAN BAY PRISON WHERE YOU CAN

4    SEE THE FRONT IS OPEN.  BASICALLY, THE STEEL THERE IS -- IS

5    PERFORATED, BUNCH OF SMALL PERFORATED HOLES.  THAT'S HOW EACH

6    CELL IS.

7            THE AIR VENTS IN EACH CELL ARE LOCATED APPROXIMATELY

8    THREE AND A HALF FEET ABOVE THE CEMENT DESK AREA.

9            YOU CANNOT SEE THE AIR VENT IN THIS PHOTO, BUT I WILL

10   TESTIFY AND OTHER INMATES WILL TESTIFY THAT THE AIR VENT IS

11   APPROXIMATELY THREE AND A HALF FEET OR SO ABOVE THAT DESK AREA

12   WHERE THAT TELEVISION SET IS SITTING ON.  THESE -- THESE CELL

13   AIR VENTS ARE INTERCONNECTED WITH EACH OTHER.  IN OTHER WORDS,

14   YOU HAVE A TWO CELLS ON THE BOTTOM AND TWO UP ON THE TOP TIER,

15   THE VENTS ARE ALL INTER- -- THAT VENT IS ALL INTERCONNECTED.

16           YOU WILL HEAR TESTIMONY THAT WHEN SPEAKING INTO ONE

17   AIR VENT, YOUR VOICE WILL BE HEARD BY THE OCCUPANTS IN THE OTHER

18   THREE CELLS.  YOU WILL ALSO HEAR TESTIMONY ABOUT THE ACOUSTICS

19   IN THE POD AND HOW SOMEONE SPEAKING IN A NORMAL VOICE ON THE END

20   OF THE TIER OF THE UPPER TIER MAY SOUND LIKE HE'S SPEAKING

21   LOUDLY IN THE LOWER MIDDLE TIER CELLS.

22           AND SOMEONE IN THE CELL RIGHT NEXT DOOR TO YOU

23   SPEAKING WITH A NORMAL TONE OF VOICE OVER THE TIER CAN BE

24   DIFFICULT FOR YOU TO HEAR BUT SOUND LOUDLY IN A CELL FARTHER

25   AWAY.

1          PURSUANT TO CALIFORNIA DEPARTMENT OF -- CALIFORNIA

2    DEPARTMENT OF CORRECTIONS AND REHABILITATION RULES AND

3    REGULATIONS, THE ACTUAL CONDITIONS IN SHU ARE TO BE AS SIMILAR

4    TO THAT OF THE GENERAL POPULATION AS POSSIBLE WHILE MAINTAINING

5    SAFETY AND SECURITY.  WITH THIS IN MIND, ADDITIONAL RESTRICTIVE

6    MEASURES IN SHU ARE TO BE BASED ON LEGITIMATE SAFETY AND

7    SECURITY NEEDS.

8          **THE COURT:**  MR. ASHKER, THIS HAS BEEN TEN MINUTES OUT

9    OF 30.  YOU MIGHT WANT TO MOVE ON TO THE MEDICAL ISSUES SO YOU

10   HAVE TIME TO COVER THOSE.

11         **MR. ASHKER:**  OKAY.

12         **THE COURT:**  DO WHAT YOU WANT.  JUST A SUGGESTION.

13         **MR. ASHKER:**  OKAY.  I'LL JUST HAVE TO SPEED IT UP.

14         IN PBSP, SHU INMATES ARE SUBJECT TO RESTRICTIONS ON

15   THE AMOUNT AND TYPES OF PROPERTY WE CAN HAVE, BOTH PERSONAL

16   PROPERTY AND STATE-ISSUED PROPERTY, AS WELL AS THE AMOUNT WE CAN

17   SPEND ON COMMISSARY SPECIAL PURCHASE ITEMS.  EXAMPLE, WE'RE

18   ALLOWED ONE SET OF THERMAL UNDERWEAR WHILE PELICAN BAY STATE

19   PRISON GENERAL POPULATION IS ALLOWED TWO SETS OF THERMALS AND

20   TWO SETS OF SWEATSHIRTS.

21         WE'RE ALLOWED ONE APPLIANCE, WHILE GENERAL POPULATION

22   IS ALLOWED A T.V., RADIO, CASSETTES, TYPEWRITERS, ELECTRIC

23   RAZORS, ET CETERA.

24         IN SHU PHONE CALLS ARE RESTRICTED TO EMERGENCIES

25   ONLY, A DEATH IN THE FAMILY, THAT TYPE OF THING AND LIMITED

1    LEGAL PHONE CALLS.

2          VISITING IS BEHIND THE GLASS OVER A PHONE FOR ONE

3    HALF -- ONE AND ONE HALF HOUR SATURDAY AND SUNDAYS.

4          YOU WILL HEAR TESTIMONY FROM ME ABOUT THE RARITY OF

5    SUCH VISITS AND THAT MY SOLE AVENUE FOR COMMUNICATION OUTSIDE OF

6    MY POD AREA IS BY WRITTEN COMMUNICATIONS.  THIS APPLIES TO MY

7    ABILITY TO KEEP IN CONTACT WITH FAMILY AND FRIENDS, LEGAL

8    ISSUES, EDUCATIONAL, INSTITUTIONAL CONTACTS FOR MEDICAL

9    COUNSELORS, LIBRARY, ET CETERA.  IN SHU, YOU'RE CONFINED TO YOUR

10    CELL 22 AND ONE HALF HOURS A DAY.  YOU HAVE THE OPTION OF GOING

11    OUT TO THE EXERCISE YARD ONE AND A HALF HOURS PER DAY.  SHOWERS

12    ARE PROVIDED THREE TIMES A WEEK.

13          THIS EVIDENCE WILL SHOW THAT UP UNTIL THE EVENTS YOU

14    ARE GOING TO HEAR ABOUT, MY DAILY ACTIVITIES IN SHU GENERALLY

15    CONSISTED OF WRITING AN AVERAGE OF FOUR TO EIGHT HOURS A DAY FOR

16    PERSONAL, LEGAL, EDUCATIONAL PURPOSES.  A LOT OF IT WAS ON LEGAL

17    ISSUES PER MY INTEREST AND STUDY OF LAW SINCE 1987.  SUCH

18    WRITING WAS NEVER A PROBLEM, AND I COULD EASILY KNOCK OUT 14 TO

19    20 PAGES OF WRITING IN SIX TO EIGHT HOURS.

20          I ALSO DID A VIGOROUS EXERCISE ROUTINE SIX DAYS A

21    WEEK, ONE AND A HALF TO TWO HOURS EACH TIME, WHICH IS VERY

22    BENEFICIAL IN THE SHU ENVIRONMENT FOR HEALTH, BOTH PHYSICAL,

23    MENTAL, A GREAT STRESS RELIEVER.  I WOULD SHOWER EVERY DAY.

24    THREE -- THREE SHOWERS A WEEK THAT WERE PROVIDED BY THE -- BY

25    THE CONTROL BOOTH OFFICER AND FOUR DAYS A WEEK IN MY CELL.

1    WASHING BY POURING WATER OVER MYSELF FROM THE SINK.

2    I'D WASH MY CLOTHES, CLEAN MY CELL, I'D READ, LAW, HISTORY,

3    PHILOSOPHY.  WHEN I HAD A T.V., I'D WATCH AN AVERAGE FROM TWO TO

4    FOUR HOURS A DAY.  MY GENERAL HEALTH WAS EXCELLENT, AND I SLEPT

5    GOOD EACH NIGHT.

6    THIS ALL CHANGED ON THE AFTERNOON OF OCTOBER 24TH,

7    1990, WHICH IS WHEN I BECAME INVOLVED IN A MUTUAL COMBAT-TYPE

8    FIST FIGHT WITH ANOTHER INMATE ON THE TIER OF MY PELICAN BAY

9    STATE PRISON SHU POD.

10    THERE WERE NO WEAPONS INVOLVED.  THIS FIST FIGHT WAS

11    OCCURRING DIRECTLY IN FRONT OF THE CONTROL BOOTH OFFICER.  AND

12    IN RESPONSE TO THIS, THE CONTROL BOOTH GUARD SHOT ME WITH HIS

13    HIGH-POWERED H -- H&K 9-MILLIMETER ASSAULT RIFLE WITH A BULLET

14    CALLED A GLACIER ROUND, WHICH IS DESIGNED TO CAUSE MAXIMUM

15    TISSUE DAMAGE.

16    WHAT IT DOES IS WHEN IT -- WHEN IT HITS YOUR -- WHEN

17    IT HITS YOUR BODY, IT EXPLODES AND 180 TO 300 BB'S ARE EXPLODED

18    INTO THE WOUND.

19    DURING THIS MUTUAL UNARMED FIST FIGHT, THE OFFICER

20    UTILIZED HIS HIGH-POWERED RIFLE AND SHOT ME AT CLOSE RANGE.  THE

21    BULLET ENTERED MY RIGHT FOREARM NEAR THE WRIST AREA RIGHT HERE

22    (INDICATING).  THE BULLET -- THIS CAUSED PERMANENT, MASSIVE BONE

23    AND SOFT TISSUE DAMAGE, NEARLY COMPLETELY SEVERING THE HAND FROM

24    THE WRIST.  IT DISINTEGRATED TWO -- TWO INCHES OF MY RADIUS BONE

25    AND SNAPPED IT OFF AT A REAL BAD ANGLE.  UP A LITTLE HIGHER, MY

1    ULNAR BONE WAS BROKEN, TEN SEPARATE PIECES, IN AN EIGHT-INCH

2    LENGTH RESULTING IN THE PERMANENT LOSS OF BONE STOCK, SOFT

3    TISSUE, AND MUSCLE, EVENTUALLY REQUIRING SHORTENING AND REMOVAL

4    OF PART OF THE ULNAR BONE WITH RELATED REMOVAL OF THE

5    STABILIZING BONE BETWEEN THE ULNAR AND HAND BONES RIGHT HERE

6    (INDICATING) AT THE WRIST, AS WELL AS A BONE GRAFT MATERIAL FROM

7    MY HIP TO REPLACE PART OF THE DISINTEGRATED RADIUS, WHICH

8    INCLUDED A -- AND INCLUDED SIX-INCH STEEL PLATE WITH MULTIPLE

9    SCREWS NEEDED TO FURTHER STABILIZE AND SUPPORT THE RADIUS BONE.

10          THE DAMAGE TO MY RIGHT ARM HAS BEEN REPEATEDLY

11   DESCRIBED BY EVERY SPECIALIST IN ORTHOPEDICS, WHO HAVE EVER

12   EXAMINED ME BETWEEN 1990 AND 2002, AS SEVERE, PERMANENT, AND

13   COMPLICATED, REQUIRING REGULAR FOLLOW-UP EXAMS BY QUALIFIED

14   SPECIALISTS.

15          NOTABLY, SINCE SIGNING THE MAY 24TH, 2002, SETTLEMENT

16   AGREEMENT, DEFENDANTS HAVE REFUSED TO HAVE MY ARM EXAMINED BY

17   ANY ORTHO SPECIALIST, DESPITE ORTHO SPECIALIST DR. DUNCAN, WHO

18   YOU WILL HEAR TESTIMONY FROM, MARCH 6TH, 2002, STATEMENT

19   RECOMMENDING TREATMENT OF MY RIGHT ARM SHOULD BE WITH BRACING,

20   ARM BRACING, AND MEDICATION WITH FOLLOW-UPS AS NEEDED.

21          I WAS DENIED ADEQUATE FOLLOW-UP MEDICAL CARE AFTER

22   THE 1990 SHOOTING, RESULTING IN AN UNTREATED RIGHT ARM RADIAL

23   ARTERY ANEURYSM BEING IGNORED BY PELICAN BAY PRISON STAFF UNTIL

24   IT EXPLODED ON DECEMBER 31ST, 1990, RESULTING IN AN EMERGENCY

25   FLIGHT TO U.C. DAVIS MEDICAL CENTER FOR SURGERY RESULTING IN THE

1   LIGATION OF THE RIGHT RADIAL ARTERY.  BLOOD FLOW TO THE RIGHT

2   HAND IS PRIMARILY THROUGH MY ULNAR ARTERY.

3             SPECIALISTS HAVE TOLD ME IF THE ULNAR BLOOD FLOW TO

4   THE HAND IS LOST FOR OVER SIX HOURS, I HAVE A GOOD CHANCE OF

5   LOSING THE HAND.  THESE PROBLEMS CONTINUED.

6             IN 1991, OUTSIDE SPECIALIST EXAMS WERE MISSED.  AT

7   ONE TIME, AN EXAM THAT WAS TO TAKE PLACE IN SIX WEEKS DIDN'T

8   HAPPEN FOR 14 WEEKS, AT WHICH TIME I LOST A LOT OF THE MOVEMENT

9   IN MY WRIST.  THE RIGHT JOINT LOST A LOT OF MOBILITY

10  PERMANENTLY.

11            ALSO IN 1991 AND '92, THERE WERE TWO INCIDENTS WHERE

12  SHARP PIECES OF BONE WERE SAWING AND CUTTING UNDER THE CASTS I

13  HAD.  MY COMPLAINTS ABOUT THIS WERE IGNORED FOR SEVERAL WEEKS

14  EACH TIME.

15            THE EVIDENCE WILL SHOW THAT BASED ON REPEAT ONGOING

16  PROBLEMS WITH -- REGARDING PAIN MANAGEMENT, WHICH INCLUDED

17  MEDICATION, A PROPERLY FITTING ARM BRACE, AND PHYSICAL THERAPY,

18  FOR MY PERMANENTLY DAMAGED CHRONICALLY PAINFUL RIGHT ARM

19  RESULTED IN A SETTLEMENT AGREEMENT, MAY 24TH, 2002.

20            THE SETTLEMENT AGREEMENT PROVISIONS WERE ALREADY

21  EXPLAINED TO YOU BY THE JUDGE IN THE INSTRUCTIONS, SO I'LL SKIP

22  ON TO THE NEXT -- THE NEXT PART.

23            THE EVIDENCE WILL SHOW -- OH, DEFENDANTS HAVE NEVER

24  COMPLIED WITH THE SETTLEMENT AGREEMENT PROVISIONS REGARDING

25  REFERRAL, CONSULTATION, AND EXAM BY U.C. DAVIS PAIN MANAGEMENT

1    SPECIALISTS.  ADDITIONALLY, EVIDENCE WILL SHOW THAT ANY

2    REFERRALS THAT DEFENDANTS REPRESENTED THEY DID MAKE WERE MADE IN

3    BAD FAITH WITHOUT REFERENCE TO THE SETTLEMENT AGREEMENT

4    PROVISIONS.

5              ON JANUARY 22ND, 2002, PELICAN BAY PRISON DR. WOLF

6    PRESCRIBED TRAMADOL, WHICH IS A PAIN MEDICATION, AND TYLENOL.

7    THE EVIDENCE WILL SHOW TRAMADOL WAS PRESCRIBED AS A PAIN RELIEF

8    MEDICATION BECAUSE NSAID'S WERE NOT -- NSAID'S, OTHER TYPES OF

9    ASPIRIN, OVER-THE-COUNTER-TYPE STUFF, WERE NOT EFFECTIVE AND

10   CAUSED STOMACH PROBLEMS BEGINNING IN 1995.

11             THIS IS WHY DR. DUNCAN SPECIFICALLY ORDERED THAT

12   NSAID'S NOT BE USED IN 2001.  THE EVIDENCE WILL SHOW THE

13   TRAMADOL/TYLENOL COMBINATION HELPED BETTER THAN ANY OF THE OTHER

14   MEDS I WAS GIVEN BETWEEN 1990 AND 2002 WITHOUT ANY NEGATIVE SIDE

15   EFFECTS.

16             I WAS ON THE LOW DOSE OF 100 MILLIGRAMS A DAY OF

17   TRAMADOL FROM JANUARY 2002 THROUGH SEPTEMBER 2006.  THE TRAMADOL

18   WAS ORDERED AND APPROVED BETWEEN 2002 AND 2006 BY 13 DIFFERENT

19   DOCTORS, INCLUDING FORMER PELICAN BAY STATE PRISON CHIEF MEDICAL

20   OFFICER, DR. WINSLOW, WHO WILL ALSO BE TESTIFYING.

21             AT SOME POINT IN 2006, DR. SAYRE TOOK DR. WINSLOW'S

22   PLACE AS THE CHIEF MEDICAL OFFICER.

23             IN APRIL 2006, DR. SAYRE REVIEWED A 602 APPEAL THAT I

24   HAD FILED ABOUT PROBLEMS WITH MY MEDICATION ISSUES, AND HE

25   DETERMINED -- A 602 APPEAL IS A ADMINISTRATIVE GRIEVANCE FOR

1    PRISONERS.  HE DETERMINED IN THAT 602 THAT FAMILY NURSE

2    PRACTITIONERS' RENEWAL OF MY TRAMADOL FOR 90 DAYS IN MARCH OF

3    2006 WAS APPROPRIATE CARE.

4            ON JUNE 20TH, 2006, DR. SAYRE RECOMMENDED NURSE

5    PRACTITIONER RISENHOOVER TAPER OFF THE TRAMADOL AND REPLACE IT

6    WITH NSAID'S.  NEITHER DR. SAYRE NOR FAMILY NURSE PRACTITIONER

7    RISENHOOVER HAD EVER CONDUCTED ANY TYPE OF COMPLETE PHYSICAL

8    EXAMINATION OF ME AT THE TIME SAYRE MADE THIS RECOMMENDATION TO

9    RISENHOOVER.

10           I HAD NEVER MET SAYRE BEFORE IN MY LIFE.

11           ON AUGUST 20TH, 2006 -- WELL, ON JUNE -- JUNE 21ST,

12   2006, WHEN RISENHOOVER INFORMED ME OF THIS, I DETAILED ALL OF MY

13   MEDICAL PROBLEMS AND HISTORY.  I PROVIDED HER COPY OF -- COPIES

14   OF DOCTORS' REPORTS, AND MEDICAL RECORDS FOR THE REASON WHY I

15   WAS ON THE TRAMADOL AND NOT ON NSAID'S.  SHE SAID SHE WAS NOT

16   COMFORTABLE FOLLOWING SAYRE'S RECOMMENDATIONS UNTIL HE EXAMINED

17   ME.  BUT ON AUGUST 20TH, 2006, DR. SAYRE AND OTHER MEMBERS OF

18   WHAT'S KNOWN AS A MAR COMMITTEE ORDERED THAT I BE DISCONTINUED

19   FROM TRAMADOL AND REPLACED WITH NSAID'S ANYHOW WITHOUT ANY

20   PHYSICAL EXAMINATION.

21           ON SEPTEMBER 27TH, THE MEDICATION TRAMADOL WAS

22   STOPPED AND REPLACED WITH 400 MILLIGRAMS OF IBUPROFEN,

23   1300 MILLIGRAMS OF TYLENOL PER DAY.  MY REPEATED, NUMEROUS

24   VERBAL, WRITTEN -- AND WRITTEN COMPLAINTS HAVE ALL BEEN DENIED.

25           ON AUGUST 30TH, 2006, I PERSONALLY MET DR. SAYRE FOR

```
 1   THE FIRST TIME IN RESPONSE TO A 602 APPEAL I HAD FILED.

 2             WITHOUT ANY TYPE OF THOROUGH PHYSICAL EXAMINATION,

 3   DR. SAYRE DENIED EVERYTHING THAT I HAD UP TO THAT POINT.  HE

 4   STATED I DID NOT NEED AN ARM BRACE.  I DID NOT NEED MORE

 5   MEDICATION THAN THE NSAID'S AND TYLENOL.  I DID NOT NEED ANY

 6   PHYSICAL THERAPY, THAT MY ARM WAS HEALTHY, WELL HEALED, FULLY

 7   REHABILITATED, AND THERE WAS NO SUBSTANCE TO MY COMPLAINTS OF

 8   EXPERIENCING ANY PAIN.

 9             I HAVE NOT HAD A -- I HAVE NOT HAD A PROPERLY FITTING

10   ARM BRACE SINCE EARLY 2006, DESPITE DR. DUNCAN, THE ORTHOPEDIC

11   SPECIALIST REPEATEDLY SAYING I NEEDED THE ARM BRACE

12   INDEFINITELY.

13             YOU WILL HEAR MY TESTIMONY -- NO, YOU WILL HEAR --

14   YOU WILL HEAR MY TESTIMONY ABOUT MY REPEATED COMPLAINTS TO

15   MEDICAL STAFF, INCLUDING DR. SAYRE, CONCERNING MY ONGOING PAIN

16   AND SUFFERING SINCE BEING TAKEN OFF TRAMADOL AND PUT BACK ON THE

17   NSAID'S IN 2006, THE LACK OF A USABLE ARM BRACE AND

18   DISCONTINUANCE OF MY PHYSICAL THERAPY WITH THE PHYSICAL

19   THERAPIST.

20             YOU WILL HEAR TESTIMONY OF MY FORMER CELLMATE DANNY

21   TROXELL, WHOM I SHARED A CELL WITH FROM JULY 2003 TO JUNE 2004

22   AND HAVE BEEN NEIGHBOR -- IN NEIGHBORING CELLS WITH HIM EVER

23   SINCE THAT TIME ABOUT HIS OBSERVATIONS OF WHAT HE HAS WATCHED ME

24   GO THROUGH SINCE SAYRE'S ACTIONS.

25             YOU WILL HEAR THE TESTIMONY OF ANOTHER INMATE ALFONSO
```

 1   PALOMINO, SIMILAR IN NATURE TO DANNY TROXELL'S, WITH A FEW

 2   ADDITIONS.

 3            YOU WILL HEAR THE TESTIMONY OF DR. DUNCAN, WHO IS AN

 4   ORTHOPEDIC SPECIALIST IN CRESCENT CITY, WHO PERSONALLY EXAMINED

 5   ME AND TREATED ME AN AVERAGE OF TWO TIMES A YEAR BETWEEN AUGUST

 6   '94 AND MARCH '02.  DR. DUNCAN WILL TESTIFY CONCERNING THE

 7   TREATMENT, CONDITION, AND PROGNOSIS OF MY ARM BETWEEN '94 AND

 8   '02.  HE WILL TESTIFY ABOUT THE ARM BRACE HE INITIALLY

 9   RECOMMENDED IN '94 AND THE BASIS FOR HIS CONTINUED

10   RECOMMENDATIONS THAT THE BRACE WAS REQUIRED INDEFINITELY.

11            HE ALSO REFERRED ME FOR PHYSICAL THERAPY NUMEROUS

12   TIMES AND WILL EXPLAIN ISSUES RELEVANT TO THE CONDITION OF MY

13   ULNAR NERVE AT THAT TIME.

14            YOU WILL HEAR TESTIMONY OF DR. CORY WEINSTEIN, A

15   GENERAL MEDICAL PRACTITIONER SINCE 1969, AND CORRECTIONAL

16   MEDICAL CONSULTANT WHOM HAS BEEN RETAINED BY ME TO TESTIFY AS TO

17   HIS EXPERT OPINION REGARDING MY CARE, TREATMENT, AND PROGNOSIS

18   PER HIS PERSONAL PHYSICAL EXAMS, MEDICAL RECORD AND OTHER

19   DOCUMENT REVIEWS OCCURRING BETWEEN 2000, 2002, 2005, 2007, AND

20   RECENTLY UP TO DATE 2009 AND HIS OPINION CONCERNING THE ACTS

21   AND/OR FAILURES TO ACT BY DR. SAYRE WITH REGARD TO MY CARE,

22   TREATMENT, AND PROGNOSIS ISSUES.

23            YOU WILL HEAR THE TESTIMONY OF FORMER PELICAN BAY

24   STATE PRISON DR. EVERETT ALLEN CONCERNING HIS PERSONAL KNOWLEDGE

25   OF PELICAN BAY STATE PRISON'S PROCEDURES FOR MEDICAL CARE OR

1  REFERRAL TO MEDICAL SPECIALISTS, DIRECT OBSERVATIONS OF

2  DEFENDANT DR. SAYRE'S TREATMENTS ORDERED BY OTHER MEDICAL

3  DOCTORS AND SPECIALISTS WITHOUT CONSULTATING (PHONETIC) OR

4  NOTIFYING THESE OTHER DOCTORS OR PATIENTS AND WITHOUT CAREFUL

5  EXAM OR CAREFUL DOCUMENTATION AND THE CREATION OF FALSE

6  DOCUMENTS TO COVER THIS UP.

7           YOU WILL HEAR OF AN -- OF STATEMENTS MADE BY

8  DR. SAYRE BRAGGING ABOUT TORTURING PATIENTS THAT HE THOUGHT WERE

9  LYING.

10          YOU WILL HEAR THE TESTIMONY OF DR. WINSLOW, FORMER

11 CHIEF MEDICAL OFFICER OF PELICAN BAY STATE PRISON REGARDING

12 MEDICAL POLICY, PROCEDURES, AND PRACTICES, CONCERNING

13 MEDICATIONS, MY MEDICATIONS, ARM BRACE, AND PHYSICAL THERAPY

14 REFERRAL FOR SPECIALIST ISSUES, THE PROVISIONS AND MEANING TO

15 HIM OF MY 2002 SETTLEMENT AGREEMENT.

16          YOU WILL HEAR -- YOU WILL HEAR THE TESTIMONY OF MY

17 PHYSICAL THERAPIST, PATRICK DODGEN, WHO DOCUMENTED MY USE OF

18 PELICAN BAY STATE PRISON SPECIALTY CLINIC PHYSICAL THERAPY ROOM

19 BETWEEN 2002 AND 2007.  HE WILL TESTIFY ABOUT THE CONDITION,

20 PROGNOSIS, AND TREATMENT OF MY ARM AND HAND DURING THIS TIME

21 PERIOD.

22          YOU WILL HEAR THE TESTIMONY OF DEFENDANTS' RETAINED

23 EXPERT, DR. CARL SHIN, WHOM IS A BOARD-CERTIFIED LEVEL ONE AND

24 TWO PAIN MANAGEMENT SPECIALIST WHOM DEFENDANTS PAID TO COME TO

25 PELICAN BAY STATE PRISON TO EXAMINE AND DO SOME TESTS ON ME ON

1    DECEMBER 20TH, 2008, AND WHOSE OPINION IS PARTLY SUPPORTIVE OF

2    MY POSITION.  AND THE OTHER ISSUES WILL BE FOR YOU GUYS TO

3    DECIDE ON THAT.

4            MY POSITION IS THE EVIDENCE IN THIS CASE WILL PROVE

5    ALL OF MY CLAIMS.  AND I AM SEEKING COMPENSATORY AND PUNITIVE

6    DAMAGES FROM YOU AND INJUNCTIVE RELIEF FROM THE COURT.

7            THANK YOU.

8            **THE COURT:**  MR. ANDRADA?

9                           **OPENING STATEMENT**

10           **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

11           YOUR HONOR, THANK YOU.

12           LADIES AND GENTLEMAN OF THE JURY, MY NAME IS RANDY

13   ANDRADA.  AND AS I MENTIONED THIS MORNING, I HAVE THE PRIVILEGE

14   OF REPRESENTING DR. SAYRE, WHO IS WITH US HERE IN COURT.  I ALSO

15   HAVE THE PRIVILEGE OF REPRESENTING MR. MATTHEW CATE, WHO IS THE

16   CHIEF EXECUTIVE OF THE STATE PRISON SYSTEM.

17           YOU'VE BEEN TOLD THAT DR. SAYRE INAPPROPRIATELY

18   REPLACED TRAMADOL WITH OTHER WELL-KNOWN PAIN RELIEVERS AND

19   ANTI-INFLAMMATORIES.  THE MAIN QUESTION IN THE CASE IS WHETHER

20   IT WAS REASONABLE FOR HIM TO DO SO.  THE EVIDENCE WILL SHOW THAT

21   IT WAS CLEARLY APPROPRIATE FOR HIM TO MAKE THAT CHANGE.

22           THE EVIDENCE WILL SHOW THAT DR. SAYRE CONSIDERED THE

23   PLAINTIFF'S MEDICAL HISTORY, HE CONSIDERED THE RISKS OF THE DRUG

24   ITSELF -- AND YOU WILL LEARN QUITE A BIT ABOUT THOSE RISKS -- HE

25   CONSIDERED THE OPINIONS OF HIS PROFESSIONAL COLLEAGUES, WHO ALL

1    AGREED WITH DR. SAYRE THAT IT WAS REASONABLE AND APPROPRIATE AND

2    TIME TO CHANGE MR. ASHKER'S MEDICATIONS.

3            HE ALSO CONSIDERED THE UNIQUE CIRCUMSTANCES OF PRISON

4    LIFE, INCLUDING THE HARSH REALITY THAT DRUGS ARE TRADED AND SOLD

5    AMONG THE INMATES, AND ARE THUS ABUSED BY THE INMATES.

6            IN SHORT, DR. SAYRE MADE AN INFORMED AND REASONABLE

7    CLINICAL JUDGMENT AS TO WHETHER IT WOULD HAVE BEEN APPROPRIATE

8    FOR MR. ASHKER TO BE TAKEN OFF TRAMADOL AND FOR SOME OTHER

9    MEDICATIONS TO BE TRIED.

10           IN MAKING THAT DECISION, DR. SAYRE MET THE STANDARD

11   OF CARE.

12           NOW, WHO IS DR. SAYRE?  WELL, DR. SAYRE IS, OF

13   COURSE, A MEDICAL DOCTOR, OBTAINED HIS MEDICAL DEGREE IN 1972.

14   AND YOU WILL SEE ON THE SLIDE HERE THAT HE IS A MEMBER OF THE

15   AMERICAN BOARD OF FAMILY PRACTICE AND THE AMERICAN BOARD OF

16   ANESTHESIOLOGY.

17           NOW, YOU WILL LEARN THAT DOCTORS IN SPECIALTIES

18   TYPICALLY JOIN WHAT IS CALLED THE AMERICAN BOARD WITHIN THAT

19   SPECIALTY.  AND IT'S A MARK OF DISTINCTION AND EXCELLENCE.  YOU

20   HAVE TO QUALIFY FOR ADMISSION, SIT THROUGH VARIOUS EXAMS, AND BE

21   ACCEPTED BY YOUR PEERS.

22           IT IS, THE EVIDENCE WILL SHOW, QUITE UNIQUE TO HAVE

23   TWO BOARD CERTIFICATIONS.  AND AS YOU CAN SEE THERE, DR. SAYRE

24   HAS TWO SUCH BOARDS.

25           NOW, THE AMERICAN BOARD OF ANESTHESIOLOGY TYPICALLY

1    HAS WITHIN ITS RANKS MANY PHYSICIANS WHO HAVE A GREAT DEAL OF

2    EXPERIENCE IN PAIN MANAGEMENT.  YOU WILL LEARN THAT PAIN

3    MANAGEMENT IS ONE OF THESE AREAS OF MEDICINE WHERE THE

4    APPROACHES AND TECHNIQUES HAVE CHANGED DRAMATICALLY OVER THE

5    LAST 25 TO 30 YEARS.  THERE'S A GREAT DEAL OF GOOD-FAITH DEBATE

6    ABOUT THE VARIOUS APPROACHES, REGIMENS, MODALITIES.  THERE'S A

7    GREAT DEAL OF DISCUSSION GOING ON WITHIN THE PROFESSION ITSELF.

8              HISTORICALLY, MANY MEMBERS OF THE AMERICAN BOARD OF

9    ANESTHESIOLOGY FOCUSED, TO A GREAT EXTENT, ON PAIN MANAGEMENT,

10   AND DR. SAYRE FOCUSED TO A GREAT EXTENT ON PAIN MANAGEMENT

11   DURING THE COURSE OF HIS CAREER.

12             SO DR. SAYRE, THE EVIDENCE WILL SHOW, IS VERY, VERY

13   FAMILIAR WITH TRAMADOL AND THE OTHER MEDICATIONS THAT MR. ASHKER

14   HAS BEEN TAKING ON A CONTINUOUS BASIS SINCE 1990.  AND WE'LL

15   TALK A LITTLE BIT ABOUT THAT IN MORE DETAIL IN A MOMENT HERE.

16             NOW, LET'S TURN TO WHAT THE ALLEGATIONS OF THIS CASE

17   ARE ALL ABOUT.

18             (EXHIBIT PUBLISHED TO JURY.)

19        **MR. ANDRADA:**  AND HER HONOR INDICATED TO YOU, FIRST

20   OF ALL, THAT THE PLAINTIFF DOES HAVE THE BURDEN OF PROOF BY A

21   PREPONDERANCE OF THE EVIDENCE.  AND MR. ASHKER'S BURDEN IS TO

22   SHOW THAT DR. ASHKER (SIC) -- THAT DR. SAYRE BREACHED THE

23   STANDARD OF CARE.

24             GENERALLY, WHAT DOES THAT MEAN?  THERE WILL BE

25   EVIDENCE THAT THE STANDARD OF CARE IS GENERALLY THE LEVEL OF

 1   CARE THAT'S PROVIDED BY REASONABLE PHYSICIANS IN THE PARTICULAR

 2   CLINICAL SETTING.  AND HER HONOR MENTIONED TO YOU THAT IN THIS

 3   SPECIFIC CASE, THE -- THE UNIQUE CLINICAL SETTING IS PELICAN

 4   BAY.

 5           SO MR. ASHKER MUST PROVE THAT DR. SAYRE, IN LAYMAN'S

 6   TERMS, COMMITTED MALPRACTICE, THAT THE MALPRACTICE CAUSED AN

 7   INJURY, AND THAT THE INJURY CAUSED SOME DAMAGE TO MR. ASHKER.

 8           THERE WAS ALSO SOME REFERENCE BY HER HONOR TO A CLAIM

 9   THAT DR. SAYRE HAD BEEN DELIBERATELY INDIFFERENT.  AND IT'S MUCH

10   THE SAME SYLLOGISM.  MR. ASHKER MUST PROVE THAT DR. SAYRE WAS

11   INDIFFERENT, THAT THE INDIFFERENCE CAUSED AN INJURY, AND THAT

12   THE INJURY CAUSED DAMAGES.

13           SO THAT'S A LITTLE ROAD MAP FOR YOU.  AND I HOPE THAT

14   IT HELPS PROVIDE YOU SOME GUIDANCE AS YOU HEAR THE EVIDENCE OVER

15   THE COURSE OF THIS WEEK.

16           NOW, LET'S TURN TO THE NEXT SLIDE.

17           (EXHIBIT PUBLISHED TO JURY.)

18           **MR. ANDRADA:**  AND WHAT SPECIFICALLY IS MR. ASHKER

19   CLAIMING?  THE EVIDENCE, AS WE UNDERSTAND IT, IS THAT MR. ASHKER

20   AND HIS EXPERT MAINTAIN THAT THE TRAMADOL PRESCRIPTION SHOULD

21   HAVE BEEN CONTINUED IN THE FALL OF 2006 AND THE PLAINTIFF

22   MAINTAINS THAT NO REASONABLE PHYSICIAN WOULD HAVE SUBSTITUTED

23   ANY OTHER MEDICATION FOR TRAMADOL.  THOSE, OF COURSE, ARE THE

24   ALLEGATIONS, AND WE, OF COURSE, DISPUTE THOSE ALLEGATIONS.

25           (EXHIBIT PUBLISHED TO JURY.)

1          **MR. ASHKER:**  EXCUSE ME.  AM I PERMITTED TO OBJECT AT

2    ALL DURING OPENING ARGUMENTS (SIC)?

3          **THE COURT:**  YES.

4          **MR. ASHKER:**  I WOULD LIKE TO OBJECT ON THE BASIS THAT

5    MR. ANDRADA'S REPRESENTATION OF WHAT THIS CASE IS ABOUT AS FAR

6    AS PAIN MEDICATION GOES IS NOT CORRECT.  A READING OF MY

7    SUPPLEMENTAL COMPLAINT WILL SHOW THAT WHAT -- WHEN I WAS

8    INFORMED OF DR. SAYRE'S --

9          **THE COURT:**  OKAY.  WELL, IF HE'S SAYING -- NOT SAYING

10   RIGHT WHAT YOU'RE CLAIMING, YOU CAN CLEAR THAT UP LATER.

11         **MR. ASHKER:**  OKAY.  ALL RIGHT.

12         **THE COURT:**  GO AHEAD.

13         **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

14         AS WE UNDERSTAND THE CASE, MR. ASHKER CLAIMS THAT IT

15   WAS UNREASONABLE TO STOP TRAMADOL.  THE DEFENSE MAINTAINS THAT

16   IT WAS WELL WITHIN THE STANDARD OF CARE AND PERFECTLY REASONABLE

17   TO STOP TRAMADOL IN THE FALL OF 2006 AND TRY OTHER MEDICATIONS.

18         YOU WILL SEE THE PHRASE THERE, MANY WAYS TO APPROACH

19   A PROBLEM.  THERE WILL BE AN ABUNDANCE OF EVIDENCE THAT THERE

20   ARE MANY, MANY APPROACHES TO PAIN MANAGEMENT WITHIN THE FIELD OF

21   MEDICINE.  AND, AGAIN, I MENTIONED EARLIER, IT'S AN EXCITING --

22   FRANKLY, IT'S AN EXCITING TIME FOR PHYSICIANS WHO PRACTICE IN

23   THIS AREA BECAUSE THEY ARE ACQUIRING NEW INSIGHTS, DEVELOPING

24   NEW MODALITIES, AND THERE'S A GREAT DEAL OF GOOD-FAITH DEBATE

25   ABOUT WHAT WORKS FOR WHAT PARTICULAR PATIENTS.  REASONABLE MINDS

1    CAN DIFFER ABOUT WHAT WORKS BEST FOR A PARTICULAR PATIENT.

2              AND YOU WILL LEARN, AND HER HONOR ALLUDED TO THIS IN

3    THE INSTRUCTIONS, YOU WILL LEARN FROM THE VARIOUS WITNESSES THAT

4    IT IS WITHIN THE STANDARD OF CARE FOR DOCTORS TO DISAGREE ABOUT

5    HOW TO APPROACH A PATIENT AS LONG AS THEIR PERSPECTIVE IN THAT

6    APPROACH IS REASONABLE.

7              SO THE -- THE -- THE BENCH MARK IS, IS THE APPROACH

8    REASONABLE.  AND IF IT IS, THE EXPERTS WILL TELL YOU FROM THE

9    WITNESS STAND THAT IT IS NOT MALPRACTICE IF -- EVEN IF YOU

10   DISAGREE WITH THAT DOCTOR'S VIEW AND OPINION AND APPROACH.

11             NOW, I MENTIONED EARLIER THAT THERE'S A -- A GREAT

12   MANY MEDICATIONS THAT ARE USED TO COMMONLY TREAT PAIN.  AND --

13   THERE WILL BE EVIDENCE ABOUT ALL OF THESE.  WE KNOW MANY OF THEM

14   OURSELVES.  SOME OF THE -- THE CLASSICS RANGING FROM ASPIRIN

15   TO -- ON THE FAR RIGHT THERE, IT'S CUT OFF A LITTLE BIT ON THIS

16   SCREEN, BUT THAT'S -- THAT LONG LINE THERE'S A FANCY WAY TO SAY

17   TYLENOL.

18             AND THEN, LIKEWISE, THE NEXT LINE, IBUPROFEN.  AND

19   ONE OF THE BRAND NAMES FOR IBUPROFEN, OF COURSE, IS MOTRIN.  AND

20   ALLEVE.

21             SO THERE ARE CATEGORIES.  ONE OF THE CATEGORIES IS

22   ASPIRIN.  ONE OF THE CATEGORIES IS WHAT ARE CALLED THE NON- --

23   THE NON-OPIATE ANALGESICS.

24             ANOTHER CATEGORY IS WHAT IS CALLED THE NONSTEROIDAL

25   ANTI-INFLAMMATORY DRUGS, COMMONLY KNOWN AS ANTI-INFLAMMATORIES.

 1          THERE'S ANOTHER CATEGORY OF OPIATES, AND WE COMMONLY

 2   KNOW THEM AS MORPHINE AND CODEINE.  NOW, TRAMADOL IS A BIT LIKE

 3   AN OPIATE, YOU WILL LEARN FROM THE WITNESSES.  AND IT HAS MANY

 4   OF THE BENEFITS BUT ALSO MANY OF THE HAZARDS AND RISKS

 5   ASSOCIATED WITH VARIOUS OPIATE MEDICATIONS.

 6          BUT LET ME CONTINUE ON HERE.  SOME DOCTORS PRACTICING

 7   IN GOOD STANDING IN THE COMMUNITY USE ANTIDEPRESSANTS AS PART OF

 8   A PAIN MANAGEMENT REGIMEN.  SOME USE ANTI- SEIZURE MEDICATION.

 9   SOME USE MUSCLE RELAXANTS.  OTHER TYPES OF MEDICATIONS CAN BE

10   USED.

11          THE POINT IS THAT THE EVIDENCE WILL SHOW THERE ARE

12   MANY, MANY APPROACHES TO DEALING WITH PAIN MANAGEMENT IN A

13   PARTICULAR CLINICAL SETTING.  AND, IN FACT, THE PLAINTIFF HAS

14   BEEN DESCRIBED -- HAS BEEN PRESCRIBED MANY, MANY MEDICATIONS IN

15   MANY DOSES BY MANY DOCTORS OVER MANY YEARS.

16          IN FACT, MOST OF THE DRUGS THAT I MENTIONED A MOMENT

17   AGO THAT WE HAD UP THERE ON THAT LIST -- MR. ASHKER HAS RECEIVED

18   VARIOUS TYPES OF THOSE MEDICATIONS IN VARIOUS AMOUNTS FOR

19   VARIOUS TIMES FROM VARIOUS PROVIDERS EVER SINCE 1990.

20          NOW, THE EVIDENCE WILL SHOW THAT NO MEDICATION,

21   NEITHER TRAMADOL NOR ANY OTHER MEDICATION, WILL MAKE MR. ASHKER

22   PAIN FREE.

23          RATHER -- SO WITH THAT IN MIND, HIS PHYSICIANS OVER

24   THE YEARS, INCLUDING DR. SAYRE, HAVE APPROACHED MR. ASHKER'S

25   CASE WITH THESE PRINCIPLES IN MIND:  WE PROVIDE MEDICATION.  WE

1    MONITOR THE MEDICATION.  AND WHEN YOU MONITOR, YOU ASK AT LEAST

2    THREE QUESTIONS.  THE MOST OBVIOUS, IS IT EFFECTIVE?  IS IT

3    BEING ABUSED?  IS THE PATIENT BECOMING INAPPROPRIATELY DEPENDENT

4    UPON IT?

5            AND IF THERE ARE SUCH PROBLEMS, IT IS PERFECTLY

6    APPROPRIATE TO CHANGE MEDICATION.

7            NOW, MR. ASHKER'S OWN EXPERT, DR. WEINSTEIN, HAS

8    TESTIFIED THAT IT IS, IN FACT, THE IDEAL TO HAVE MR. ASHKER TO

9    BE MEDICINE FREE.  THE GOAL, THEN, IS TO MONITOR HIS MEDICATIONS

10   AND REDUCE THEM, IF APPROPRIATE, SO THAT HE CAN NO LONGER BE

11   TAKING THEM EVERY DAY.  AND THERE'S --

12           **MR. ASHKER:**  I OBJECT TO THAT ON A

13   MISCHARACTERIZATION OF WHAT DR. WEINSTEIN TESTIFIED TO.

14           **THE COURT:**  WELL, ACTUALLY, IT DOESN'T -- HE'S SAYING

15   WHAT HE EXPECTS DR. WEINSTEIN WILL TESTIFY TO, AND IF HE'S

16   WRONG, THEN THE JURY WILL TAKE NOTE OF THAT.

17           **MR. ASHKER:**  I THOUGHT I HEARD HIM SAY THAT

18   DR. WEINSTEIN HAD ALREADY TESTIFIED TO THAT.

19           **THE COURT:**  WELL, OKAY.

20           WHY DON'T YOU REPHRASE IT, COUNSEL.

21           **MR. ANDRADA:**  WELL, DR. WEINSTEIN, TO MY

22   RECOLLECTION, TESTIFIED AT HIS DEPOSITION THAT THE IDEAL

23   SITUATION WOULD BE TO HAVE PATIENTS WHO ARE MEDICATION FREE, WHO

24   ARE NOT FOREVER TAKING MEDICATION BECAUSE THE EVIDENCE WILL

25   SHOW -- EVEN DR. WEINSTEIN WILL ADMIT THAT THESE VARIOUS

1   MEDICATIONS ALL HAVE RISKS, AND WE'RE GOING TO TALK ABOUT THAT

2   IN A MOMENT HERE.

3          SO, ALICIA.

4               (EXHIBIT PUBLISHED TO JURY.)

5          **MR. ANDRADA:**  NOW, THERE WAS SOME COMMENT BY

6   MR. ASHKER, AND, FRANKLY, IT WAS A LITTLE HARD FOR ME TO FOLLOW,

7   BUT I THOUGHT THE GIST -- GIST OF IT WAS THAT HE HAD DONE MUCH,

8   MUCH BETTER ON TRAMADOL AND DIDN'T HAVE ANY PROBLEMS WHEN HE WAS

9   ON TRAMADOL.

10          THE -- THE EVIDENCE WILL SHOW THAT PRIOR TO THE TIME

11  HE WAS ON TRAMADOL, DURING THE TIME HE WAS TAKING TRAMADOL, AND

12  AFTER THE TRAMADOL ENDED, THAT HE HAD ESSENTIALLY THE SAME TYPES

13  OF PROBLEMS.  HE HAD CHRONIC PAIN.  HE'S HAD A -- A REDUCED

14  RANGE OF MOTION IN HIS WRIST WITH THE FLEXION AND EXTENSION.

15          THE EVIDENCE WILL SHOW THAT FORTUNATELY FOR HIM,

16  IT'S, ALL THINGS CONSIDERED, QUITE SATISFACTORY, THAT HE CAN

17  WRITE WITH HIS HAND, THAT HE CAN USE HIS HAND TO EXERCISE.  HE

18  WAS DOING PUSH-UPS AT ONE POINT WITH HIS RIGHT -- WITH BOTH

19  HANDS.  HE HAD PROBLEMS WITH SLEEP BEFORE HE TOOK TRAMADOL,

20  DURING THE TIME HE TOOK TRAMADOL, AND AFTER HE STOPPED TRAMADOL.

21          HE ALSO HAD STOMACH COMPLAINTS, GASTROINTESTINAL

22  COMPLAINTS BEFORE, DURING, AND AFTER.

23          FORTUNATELY, AS A POSITIVE, THE EVIDENCE WILL SHOW

24  THAT HE WAS ABLE TO EXERCISE STRENUOUSLY BEFORE TRAMADOL, DURING

25  THE TIME HE WAS TAKING IT, AND AFTER HE STOPPED TAKING TRAMADOL.

1    NOW, HE ALLUDED IN HIS OPENING STATEMENT TO THE FACT

2    THAT HE WRITES AND WRITES AND WRITES IN HIS LEGAL MATTERS.  AND

3    HE'S DONE EXTENSIVE WRITING IN THAT REGARD.  AND THERE WILL BE

4    AN ABUNDANCE OF TESTIMONY ABOUT THAT.

5    AND LIKEWISE, HE -- HAS ALWAYS -- HAS GENERALLY BEEN

6    NOTED IN THE MEDICAL RECORDS BEFORE, DURING, AND AFTER TO BE

7    ALERT AND ORIENTED AND, THUS, NOT HAVING THE -- THE UNFORTUNATE

8    COMPLICATION OF CAUSING HIS MEDICATION TO MAKE HIM DYSFUNCTIONAL

9    IN THAT REGARD.

10    SO THE EVIDENCE WILL SHOW THAT, GENERALLY SPEAKING,

11    BEFORE, DURING, AND AFTER THE TRAMADOL, THAT MR. ASHKER'S HAD

12    ESSENTIALLY THE SAME LEVEL OF FUNCTIONING.

13    WE TALKED A MOMENT AGO ABOUT HOW MEDICATIONS HAVE

14    SIDE EFFECTS.  AND ALL -- YOU WILL LEARN FROM THE DOCTORS THAT

15    ALL MEDICATIONS HAVE SIDE EFFECTS.  TRAMADOL HAS A SIDE EFFECT

16    IN MANY PEOPLE, WHAT WOULD COMMONLY BE CALLED A BUZZ OR GIVING

17    YOU A HIGH.  IT CAN CAUSE A DEPENDENCE MUCH LIKE MORPHINE.

18    THERE IS A -- ABUNDANT EVIDENCE THAT TRAMADOL IS

19    ABUSED NOT ONLY IN PRISONS BUT ALSO IN THE COMMUNITY AT LARGE.

20    YOU WILL ALSO LEARN THAT THE CDCR, WHICH IS THE FANCY NAME FOR

21    THE PRISON SYSTEM IN CALIFORNIA, HAS EXPRESSED ITS OWN

22    INSTITUTIONAL CONCERNS ABOUT TRAMADOL AND ITS ABUSE BY PRISONERS

23    IN THE STATE OF CALIFORNIA.

24    (EXHIBIT PUBLISHED TO JURY.)

25    **MR. ANDRADA:**  MR. ASHKER MENTIONED THAT SEVERAL

1    DOCTORS HAD RENEWED HIS PRESCRIPTION OF TRAMADOL OVER THE YEARS,

2    AND HE'S CORRECT.  HOWEVER, SOME OF THOSE SAME PROVIDERS

3    EXPRESSED IN THEIR NOTES A CONSIDERABLE AMOUNT OF CONCERN ABOUT

4    MR. ASHKER'S USE OF TRAMADOL OVER A LONG PERIOD OF TIME.  AND

5    THEY EXPRESSED CONCERN IN LIGHT OF THE FACT THAT MR. ASHKER WAS

6    THOUGHT TO BE DOING RATHER WELL, THAT IT -- IN MEDICAL TERMS,

7    HIS CONDITION HAD STABILIZED.

8         MR. ASHKER DOES HAVE A PAST HISTORY OF SUBSTANCE

9    ABUSE.  THERE WAS CONCERN BY VIRTUE OF WHAT TRAMADOL CAN DO TO

10   THOSE WHO TAKE IT, AND BY THAT, THE DOCTORS WILL TESTIFY THAT

11   THEY HAVE IN MIND THE FACT THAT IT CAN BE ABUSED, SOMETHING TO

12   BE USED TO GET -- TO GET A HIGH.

13        ALSO THERE WAS A CONCERN NOTED BY MANY PROVIDERS THAT

14   MR. ASHKER WOULD INSIST AND INSIST AND INSIST ON TRAMADOL.

15   THERE WERE SEVERAL TIMES DURING THE FOUR YEARS, HE TOOK TRAMADOL

16   WHEN PHYSICIANS WOULD DISCUSS WITH HIM THEIR SUGGESTION THAT HE

17   TRY ANOTHER PRESCRIPTION FOR A LITTLE WHILE TO SEE WHAT EFFECT

18   THERE -- THERE WOULD THAT (SIC) BE ON HIS DAY-TO-DAY ACTIVITIES.

19        AND THE EVIDENCE WILL SHOW THAT MR. ASHKER TIME AND

20   TIME AND TIME AGAIN WAS ADAMANT THAT HE HAD TO HAVE TRAMADOL.

21        THERE WILL BE EXPERT TESTIMONY THAT SAYS THAT TYPE OF

22   SPECIFIC INSISTENCE ON THE PART OF A PATIENT CAN BE EVIDENCE OF

23   INAPPROPRIATE USE AND DEPENDENCE.  SO THERE WERE -- THE EVIDENCE

24   WILL SHOW, AT LEAST SIX PROVIDERS WHO EXPRESSED CONCERN DURING

25   THIS PERIOD ABOUT MR. ASHKER'S USE OF THE MEDICATION.

1          NOW, LET'S TALK A LITTLE BIT MORE SPECIFICALLY ABOUT

2    THE HISTORY OF MR. ASHKER'S ACTUAL USE OF TRAMADOL.

3          **MS. KENNON:**  TEN MORE MINUTES.

4          **MR. ANDRADA:**  I HAVE TEN MINUTES?

5          **THE COURT:**  2:40.

6          **MR. ANDRADA:**  OKAY.  ALL RIGHT.  WE'RE DOING FINE.

7    WE'RE GOING TO GO THROUGH THIS VERY QUICKLY HERE.  YOU CAN SEE

8    THAT MR. ASHKER STARTED TRAMADOL IN JANUARY OF 2002.

9          AND LET'S MOVE -- YOU CAN -- ALICIA, COULD YOU MOVE

10   THE SLIDE A LITTLE BIT --

11               (EXHIBIT PUBLISHED TO JURY.)

12         **MR. ANDRADA:**  THERE YOU GO.  THERE YOU GO.

13         NOW, RECALL THAT MR. ASHKER MENTIONED, I THINK, AS I

14   UNDERSTOOD HIM IN HIS OPENING STATEMENT, THAT HE WAS DOING JUST

15   GREAT ON TRAMADOL.

16         JUNE 14TH, YOU WILL SEE, AND THERE WILL BE TESTIMONY,

17   THAT THE TRAMADOL WAS TO EXPIRE IN TWO DAYS, AND THUS THERE WAS

18   CONSIDERATION GIVEN TO WHETHER IT SHOULD BE RENEWED, AND

19   MR. ASHKER TOLD THE MEDICAL PROVIDER THAT HIS ARM PAIN WAS WORSE

20   THAN EVER, THAT HE HAD CONSTANT PAIN, TERRIBLE PAIN, SIX TO

21   EIGHT ON A SCALE OF TEN AND THUS NEEDED TRAMADOL.  AND SO IT

22   WAS, IN FACT, RENEWED AT THAT TIME.

23         MY POINT IS THAT THE EVIDENCE WILL SHOW THAT

24   MR. ASHKER'S SUGGESTION THAT TRAMADOL WAS SOMEHOW A PANACEA FOR

25   HIM IS -- IS NOT BORNE OUT BY THE EVIDENCE.

1          NOW, AGAIN, LET'S MOVE FORWARD HERE.  IN OCTOBER OF

2    2002, DR. FRIEDMAN, A PAIN MANAGEMENT SPECIALIST, WANTED TO TAKE

3    MR. ASHKER OFF OF TRAMADOL BECAUSE OF HIS CONCERN ABOUT THE

4    CHRONIC USE OF THE DRUG.  AND MR. ASHKER ESSENTIALLY REFUSED TO

5    COOPERATE.  HE TOOK ONE OF THE PILLS THAT WAS GIVEN -- ONE DOSE

6    OF THE MEDICATION THAT WAS GIVEN AS A SUBSTITUTE AND THEN

7    REFUSED TO TAKE ANY MORE.

8          SIMILAR PROBLEM IN JANUARY OF 2003.  APRIL 2003,

9    DR. FRIEDMAN CONSIDERED FURTHER WEANING OFF TRAMADOL.

10         DECEMBER 2004, MR. ASHKER, OBVIOUSLY UNHAPPY ABOUT

11   DR. FRIEDMAN'S PREVIOUS CONCERNS, REFUSED TO SEE DR. FRIEDMAN,

12   DESCRIBED HIM AS A CLOWN.

13         2005, DR. DAVID CONCERNED ABOUT TRAMADOL, DR. ROWE

14   CONCERNED ABOUT TRAMADOL.

15         ALICIA.

16              (EXHIBIT PUBLISHED TO JURY.)

17         **MR. ANDRADA:**  2006, FAMILY NURSE PRACTITIONER SUE

18   RISENHOOVER CONCERNED ABOUT TRAMADOL.

19         NOW, DR. SAYRE CAME TO PELICAN BAY IN 2005.  AND HE,

20   ALONG WITH VARIOUS PHYSICIANS AND NURSE PRACTITIONERS, EVALUATED

21   MANY PATIENTS TO MAKE CERTAIN THAT THEIR -- THEIR MEDICATION

22   REGIMENS WERE APPROPRIATE.  DR. SAYRE WOULD OFTEN MEET WITH WHAT

23   IS CALLED THE MEDICAL COMMITTEE TO CONSIDER TREATMENT OPTIONS.

24         SO ON AUGUST 21ST, 2006, DR. SAYRE AND DR. ROWE AND

25   MS. RISENHOOVER, WHO FORMED THE COMMITTEE, HAD A FORMAL MEETING,

 1   DISCUSSED MR. ASHKER'S USE OF TRAMADOL AND DECIDED UNANIMOUSLY

 2   THAT TRAMADOL SHOULD BE ELIMINATED.

 3            THEY WERE CONCERNED ABOUT THE FACT THAT MR. ASHKER

 4   HAD BEEN USING IT FOR FOUR YEARS, WHICH SUGGESTED PERHAPS

 5   DEPENDENCE OR ABUSE.  THEY WERE CONCERNED THAT, IN FACT, HE WAS

 6   GETTING A HIGH FROM IT AND THAT'S WHY HE WAS SO INSISTENT ON --

 7   ON HAVING IT.  SO THEY REDUCED THE MEDICATION AND THEN ENDED IT

 8   ABOUT A MONTH LATER AND SUBSTITUTED TYLENOL AND IBUPROFEN,

 9   AGAIN, VERY COMMON DRUGS USED TO TREAT PAIN OF THE SORT THAT

10   MR. ASHKER HAS.  AND YOU WILL HEAR FROM NUMEROUS PHYSICIANS THAT

11   THAT DECISION WAS WELL WITHIN THE STANDARD OF CARE.

12            (EXHIBIT PUBLISHED TO JURY.)

13       **MR. ANDRADA:**  NOW, WITH REGARD TO THE EXPERTS,

14   DR. WEINSTEIN WAS MENTIONED BY MR. ASHKER, AND THE DEFENSE IS

15   ENTITLED UNDER THE LAW TO RETAIN AN EXPERT TO EXAMINE THE -- THE

16   PLAINTIFF.  WE DID THAT.  WE RETAINED AN EXPERT BY THE NAME OF

17   DR. SHIN.  HE'S A FULL-TIME PAIN MANAGEMENT SPECIALIST, BOARD IN

18   PAIN -- IN PHYSICAL MEDICINE, AND THUS SPENDS ESSENTIALLY ALL OF

19   HIS PROFESSIONAL TIME DEALING WITH PAIN MANAGEMENT PROBLEMS.

20            HE PRESCRIBES TRAMADOL AND NUMEROUS OTHER

21   MEDICATIONS.  HE DOES A MINIMAL AMOUNT OF FORENSIC WORK,

22   MEDICOLEGAL WORK.  MR. ASHKER RETAINED A DR. WEINSTEIN.

23   MR. ASHKER MENTIONED THAT DR. WEINSTEIN HAS WORKED FOR

24   MR. ASHKER IN THE PAST.  MR. -- MR. -- EXCUSE ME --

25   DR. WEINSTEIN IS A PART -- SELF-DESCRIBED PART-TIME FAMILY

1   PRACTITIONER, NEVER DONE A RESIDENCY, NEVER DONE A FELLOWSHIP,

2   NO BOARD CERTIFICATION, NO HOSPITAL PRIVILEGES, THAT MEANS HE

3   CAN'T ADMIT A PATIENT TO A HOSPITAL.  AND HE'S, BY HIS OWN

4   ADMISSION, NOT A PAIN MANAGEMENT SPECIALIST, AND, IN FACT, THE

5   EVIDENCE WILL SHOW, HAS NEVER INITIATED A PRESCRIPTION FOR

6   TRAMADOL.

7          AND ADDITIONALLY, HAS OVER THE LAST 10 TO 15 YEARS,

8   HAS SPENT A SIGNIFICANT AMOUNT OF HIS TIME WORKING FOR PRISONERS

9   OR THEIR ATTORNEYS.  WE SUGGEST THAT THE EVIDENCE WILL SHOW THAT

10  HE IS NOT OBJECTIVE BUT RATHER AN ADVOCATE ON BEHALF OF

11  MR. ASHKER, AND, THUS, HIS TESTIMONY IS TO BE PERHAPS TAKEN WITH

12  CONSIDERABLE SKEPTICISM.

13         NOW, THE EVIDENCE WILL SHOW THAT DR. SAYRE WAS

14  REASONABLE IN CONCLUDING THAT TRAMADOL SHOULD BE REPLACED.

15  THUS, DR. SAYRE MET THE STANDARD OF CARE.

16         LET'S TALK BRIEFLY ABOUT THIS BREACH OF CONTRACT.  I

17  THINK I HAVE ABOUT FIVE MORE MINUTES, YOUR HONOR.  THERE WAS A

18  CONTRACT ENTERED INTO ON BEHALF OF THE CDCR BY MR. -- MR. CATE

19  IS NOW THE CHIEF EXECUTIVE OFFICER.  THE -- THE BREACH OF

20  CONTRACT --

21         **THE COURT:**  WHY DON'T WE JUST TAKE THAT -- LET'S TAKE

22  THAT SLIDE DOWN.

23         **MR. ANDRADA:**  -- IS REALLY ONLY DIRECTED NOW TO

24  MR. CATE.  AND THE GIST OF THE CONTRACT WAS THIS:  MR. ASHKER,

25  THROUGH HIS LAWYER, NEGOTIATED A CONTRACT WITH THE CDCR WHEREBY

1    IT WAS AGREED THAT THE CDCR WOULD REFER MR. ASHKER TO THE PAIN

2    MANAGEMENT CLINIC AT U.C. DAVIS.  AND IT WAS SPECIFIC IN THE

3    CONTRACT THAT MR. ASHKER WANTED TO GO U.C. DAVIS, AND SO THE

4    EVIDENCE WILL SHOW THAT MR. ASHKER WAS REFERRED TO U.C. DAVIS IN

5    OCTOBER OF 2002 BUT THAT DAVIS REJECTED OR REFUSED TO TAKE

6    THE -- THE PATIENT, REFUSED THE REFERRAL.

7              THE EVIDENCE WILL SHOW THAT THE REFERRAL WAS MADE

8    AGAIN IN 2000 -- IN DECEMBER OF 2002 AND DAVIS AGAIN REFUSED TO

9    TAKE MR. ASHKER.

10             NOW, THE REASONS WHY DAVIS REFUSED TO TAKE MR. ASHKER

11   AS A PATIENT ARE PROBABLY TWO, AND THERE WILL BE EVIDENCE TO

12   SUPPORT THIS.  ONE, DAVIS SIMPLY HAD TOO MANY OF ITS OWN

13   PATIENTS TO TAKE CARE OF, AND THEY JUST -- THEY LITERALLY DID

14   NOT HAVE THE TIME AND THE MANPOWER TO TAKE MR. ASHKER.

15             THERE IS ALSO IN THE RECORDS FROM DAVIS FROM DECEMBER

16   OF 2002 AN ENTRY TO THE EFFECT THAT THE DOCTORS AT DAVIS

17   REVIEWED SOME RECORDS FROM PELICAN BAY AND THOUGHT MR. ASHKER

18   WAS GETTING GOOD CARE AND DIDN'T THINK THEY HAD ANYTHING TO

19   OFFER HIM.

20             IN ANY EVENT, DAVIS DECLINED THE REFERRALS.

21   MR. ASHKER THEREAFTER WAS REFERRED TO A PAIN MANAGEMENT

22   SPECIALIST AT -- IN THE CENTRAL VALLEY AT MANTECA.  HE REFUSED

23   TO GO.

24             MR. ASHKER WAS ALSO SEEN BY OTHER PAIN MANAGEMENT

25   SPECIALISTS SINCE 2002.  SO THE EVIDENCE WILL SHOW THAT, IN

1    FACT, THE CDCR MET ITS CONTRACTUAL OBLIGATIONS WITH REGARD TO

2    REFERRING MR. ASHKER TO U.C. DAVIS.

3              NOW, THERE WAS ALSO A COMMENT BY MR. ASHKER ABOUT

4    A -- A STOPPAGE OF THE PHYSICAL THERAPY THAT HE WAS RECEIVING.

5              YOU WILL HEAR FROM VARIOUS MEDICAL PROFESSIONALS,

6    INCLUDING THE PHYSICAL THERAPIST WHO WAS GIVING HIM THE THERAPY,

7    WHO IS NOT AN EMPLOYEE OF PELICAN BAY, BY THE WAY.  HE WAS AN

8    INDEPENDENT CONTRACTOR.  HE WILL TESTIFY THAT WHEN THE PHYSICAL

9    THERAPY WAS STOPPED IN MARCH OF 2007, THAT HE THOUGHT THAT THAT

10   WAS REASONABLE BECAUSE THE -- BECAUSE MR. ASHKER WAS NO LONGER

11   RECEIVING ANY SIGNIFICANT BENEFIT FROM THE THERAPY.

12             YOU WILL HEAR FROM MEDICAL PROFESSIONALS AT PELICAN

13   BAY THAT THEY BELIEVED IT WAS TIME TO STOP THAT THERAPY.  IT WAS

14   NO LONGER PROVIDING MUCH ASSISTANCE TO MR. ASHKER.

15             MR. ASHKER HAS HAD AN ARM BRACE FOR MANY YEARS.  AND,

16   IN FACT, IT APPARENTLY DOESN'T FIT NOW BECAUSE HIS FOREARM HAS

17   INCREASED IN SIZE.  EVIDENTLY HE'S BEEN EXERCISING AND WORKING

18   OUT TO THE POINT WHERE, AGAIN, THIS FOREARM IS BIGGER NOW, AND,

19   THUS, THIS BRACE FITS TOO TIGHTLY THROUGH THAT -- THROUGH THAT

20   PART OF HIS ANATOMY.

21             SO, YES, HE HAS BEEN PRESCRIBED A BRACE.  HE HAS A

22   BRACE.  IT DOESN'T -- IT APPARENTLY DOESN'T FIT RIGHT NOW

23   BECAUSE OF SOMETHING THAT'S VERY POSITIVE.  MR. ASHKER'S

24   APPARENTLY DEVELOPING -- DEVELOPING SOME MUSCLE IN THAT FOREARM.

25             SO, LADIES AND GENTLEMEN, THAT'S A SNAPSHOT OF THE

1    CASE.  THE EVIDENCE WILL SHOW THAT DR. SAYRE MET THE STANDARD OF

2    CARE IN ALL RESPECTS WITH REGARD TO TRAMADOL.  THE EVIDENCE WILL

3    SHOW THAT THE CDCR MET ITS CONTRACTUAL OBLIGATIONS WITH REGARD

4    TO THE U.C. DAVIS REFERRAL.  AND ASSUMING FOR THE SAKE OF THE

5    DISCUSSION HERE, THAT THERE WAS A CONTRACTUAL OBLIGATION TO GIVE

6    PHYSICAL THERAPY, THEY MET THAT, AND THEY'VE ALSO PROVIDED HIM

7    AN ARM BRACE.  SO THE CDCR HAS MET ITS OBLIGATIONS.

8            AND AT THE END OF THE CASE ON FRIDAY, WHEN WE VISIT

9    AGAIN, I WILL BE RESPECTFULLY ASKING YOU TO FIND IN FAVOR OF

10   DR. SAYRE AND THE CDCR AND AGAINST THE PLAINTIFF TODD ASHKER.

11           THANK YOU VERY MUCH FOR YOUR TIME.

12           THANK YOU, YOUR HONOR.

13       **THE COURT:**  ALL RIGHT.  WE'LL TAKE A SHORT BREAK.

14   IT'S TEN AFTER 3:00.  WE'LL BREAK UNTIL 3:25, AND THEN WE'LL

15   START MR. ASHKER'S TESTIMONY.  AND WE'LL TAKE ABOUT AN HOUR OF

16   HIS TESTIMONY, AND THEN WE'LL BREAK FOR THE DAY.

17           SO YOU MAY RECESS TO THE JURY ROOM.

18           (RECESS TAKEN AT 3:12 P.M.)

19           (PROCEEDINGS RESUMED AT 3:27 P.M.)

20           (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE

21   OF THE JURY:)

22       **THE COURT:**  PLEASE BE SEATED.

23       **THE CLERK:**  SHEILAH, YOU'LL NEED TO SWEAR IN

24   MR. ASHKER.

25           WANT TO RAISE YOUR RIGHT HAND.

1    **THE CLERK:**  PLEASE STAND AND RAISE YOUR RIGHT HAND.

2                        **TODD ASHKER,**

3    CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

4    TESTIFIED AS FOLLOWS:

5    **THE CLERK:**  PLEASE BE SEATED AND STATE YOUR FULL

6    NAME, SPELLING YOUR LAST NAME FOR THE RECORD.

7    **THE WITNESS:**  TODD LOUIS ASHKER, A-S-H-K-E-R.

8    **THE COURT:**  OKAY.  SO AT THIS POINT, MR. ASHKER IS

9    NOW A WITNESS UNDER OATH TESTIFYING, AND WHAT HE SAYS NOW IS

10   EVIDENCE.

11            YOU MAY PROCEED.

12                      **DIRECT EXAMINATION**

13   BY MR. ASHKER:

14   **Q.**  MR. ASHKER, CAN YOU PLEASE STATE WHERE YOU'RE FROM.

15   **A.**  I'M FROM CONTRA COSTA COUNTY.

16   **Q.**  AND WHERE ARE YOU LIVING AT NOW?

17   **A.**  I'M RESIDING IN PELICAN BAY STATE PRISON SECURITY HOUSING

18   UNIT IN CRESCENT CITY.

19   **Q.**  CAN YOU DESCRIBE YOUR INJURIES TO YOUR ARM?

20   **A.**  WELL, I WAS SHOT IN 1990, AND I SUSTAINED SEVERE FRACTURES

21   TO BOTH BONES OF THE FOREARM, SOFT TISSUE DAMAGE, LOSS OF BONE

22   STOCK.

23   **Q.**  CAN YOU SHOW THE JURY WHERE YOUR INJURIES WERE AT.

24   **A.**  (INDICATING) THE BULLET ENTERED MY WRIST RIGHT HERE AND

25   SHATTERED THIS MUCH --

 1           **A JUROR:** CAN'T SEE --

 2           **MR. ASHKER:** EXCUSE ME.

 3                 (PAUSE IN THE PROCEEDINGS.)

 4           **THE WITNESS:** (INDICATING) THE BULLET ENTERED MY ARM

 5    RIGHT HERE.  IT EXPLODED ON IMPACT, SHATTERED THIS MUCH OF MY

 6    RADIUS BONE AND SNAPPED IT AT A REAL BAD ANGLE UP HERE.  IT

 7    BROKE MY BACK FOREARM BONE RIGHT HERE IN TEN SEPARATE PIECES.

 8           AS SOON AS THE BULLET HIT ME, I WENT DOWN ON THE

 9    GROUND ONTO MY STOMACH.  MY HAND WAS HANGING DOWN ON TO MY

10    FOREARM.  IT WAS ALL GROSSLY SWOLLEN.  THERE WAS NO REAL EXIT

11    WOUND.  THERE WAS, LIKE, BLOWOUT AREAS.  IT WAS GROSSLY SWOLLEN

12    LIKE WHEN YOU TAKE THE TENSION OUT OF A RUBBER BAND AND IT SNAPS

13    IN ON ITSELF.  AND I LAID ON MY STOMACH WAITING FOR THEM TO COME

14    INTO THE POD AREA.

15           NO, I STILL HAVE A FEW MORE.

16           I WAS LAYING DOWN WAITING FOR THEM TO COME, AND I'M

17    THINKING IT HURT, BUT IT -- IT WAS PAINFUL, OF COURSE, BUT I'M

18    THINKING, AH, IT'S NO BIG DEAL.  THEY'LL TAKE ME TO THE HOSPITAL

19    AND FIX ME UP, AND I'LL BE GOOD AS NEW IN SIX WEEKS.

20           WELL, WHEN THEY COME INTO THE POD, THE MT -- MEDICAL

21    TECHNICAL ASSISTANCE LIFTED MY HAND UP AND WRAPPED A -- A

22    BANDAGE AROUND MY ARM AS THEY PUT ME AROUND THE GURNEY, AND SHE

23    SQUEEZED IT WITH BOTH HANDS PUTTING DIRECT PRESSURE WHERE I

24    COULD FEEL THE BONE -- TORN-UP PIECES OF BONE TEARING THROUGH MY

25    SKIN.

```
 1         I DIDN'T SAY NOTHING.  THAT WAS PROBABLY THE WORST

 2   PAIN I EVER FELT IN MY LIFE.  I JUST GRITTED MY TEETH.  I DIDN'T

 3   SAY A WORD.  I DIDN'T CRY OUT, I DIDN'T SCREAM, I DIDN'T BEG FOR

 4   HELP.

 5         THEY WHEELED ME DOWN AND TOOK ME TO THE MEDICAL

 6   SECTION, AND I -- I'M WAITING OVER THERE, TOOK ABOUT A 45

 7   MINUTES OR SO TO GET ME TO THE OUTSIDE HOSPITAL.  I'M LAYING

 8   THERE WAITING.  I DON'T GET ANYTHING FOR THE PAIN, FOR THE --

 9   NOTHING.  I'M JUST WAITING WHILE IT TURNS OUT THEY WERE TRYING

10   TO FIGURE OUT WHETHER TO AMPUTATE IT OR TRY TO SAVE IT AND --

11         MY POINT BEING IS AFTER TWO -- TWO HOURS OR SO, I

12   FINALLY WASN'T GETTING NOTHING.  I'M JUST LAYING THERE IN THE

13   EMERGENCY ROOM, AND I TELL THE DOCTOR, HEY, YOU THINK I COULD

14   GET SOMETHING FOR THIS.  I'M IN -- YOU KNOW, THIS IS A LOT OF

15   PAIN RIGHT HERE.

16         OH, YOU HAVEN'T GOT NOTHING YET.  HE GAVE ME --

17         MR. ANDRADA:  I'M SORRY, YOUR HONOR.  OBJECTION.  I

18   MUST SAY, THIS IS HEARSAY.  WE'RE APPARENTLY TALKING ABOUT

19   TREATERS WHO ARE NOT AT ONE OF THE CDR FACILITIES.  WE'RE

20   TALKING ABOUT OUTSIDE TREATERS, SO THIS IS CLEARLY HEARSAY AND

21   403 AS WELL.  IT'S NOT RELEVANT.

22         THE COURT:  WHY DON'T YOU FINISH UP ON THE

23   DESCRIPTION OF THIS PART.

24         MR. ASHKER:  OKAY.

25         THE COURT:  AND AS YOU'RE DOING IT, DON'T SAY WHAT
```

1   OTHER PEOPLE SAID TO YOU BECAUSE THAT'S HEARSAY.

2          **MR. ASHKER:**  OKAY.

3          **THE WITNESS:**  THE REASON I'M BRINGING THAT TO YOUR

4   ATTENTION IS BECAUSE –– WELL, THERE'S –– IT'S NOT –– I'M NOT A

5   PERSON WHO COMPLAIN (SIC) OR CRIES ABOUT SOMETHING.  OKAY?

6          WHAT ENDED UP HAPPENING IS I GOT AN OPERATION.  IT

7   WAS JUST UNBELIEVABLE.  I HAD TWO –– TWO EXTERNAL FIXATORS WITH

8   SIX –– SIX SCREWS IN EACH BONE.  ALL OPEN.  THIS WAS JUST OPENED

9   UP.

10          AND A FEW WEEKS LATER, THEY NOTICED THIS LITTLE

11  BUBBLE BEGINNING RIGHT NEAR MY –– IN MY WRIST AREA WHERE THE

12  RADIAL ARTERY IS, AND THEY SUSPECTED IT WAS A POSSIBLE ANEURYSM.

13  IT GOT BIGGER AND BIGGER, AND THEY PUT A COMPRESSION BANDAGE ON

14  IT, AND IT GOT WORSE.  AND THEN THEY –– IT EXPLODED.  THEY HAD

15  TO FLY ME DOWN THERE TO U.C. DAVIS MEDICAL CENTER AND TIE THAT

16  OFF.

17          WHEN THEY PUT THE PRESSURE ON THAT, IT REBROKE MY

18  BONES BACK HERE IN SEVERAL PLACES WHICH WERE JUST KIND OF

19  ALLOWED TO HEAL LIKE THAT, AND THAT'S –– I DON'T KNOW IF YOU

20  GUYS CAN SEE IT THERE (INDICATING), BUT MY ARM IS REAL –– REAL,

21  LIKE, DEFORMED AND –– AND SO FOR ABOUT 18 MONTHS, I WENT THROUGH

22  VARIOUS MEDICAL PROCEDURES, TRYING TO REBUILD IT AND SAVE IT.

23  AND I ENDED UP EVENTUALLY GETTING A BONE GRAFT FROM MY HIP AREA

24  WITH A SIX-INCH STEEL PLATE, WHICH I STILL HAVE.  LIKE, THIS

25  BONE RIGHT HERE WAS REMOVED, AND I HAVE SERIOUS PAIN IN HERE IN

 1    MY WRIST AREA ALL THE TIME BECAUSE I DON'T HAVE THAT SUPPORT

 2    BONE IN THERE ANYMORE.

 3            I'M NOT A DOCTOR.  THAT'S JUST WHAT IT FEELS LIKE TO

 4    ME.  AND I HAVE PAIN THERE.  AND SO FOR 18 MONTHS, I WAS WEARING

 5    A CAST.  I WAS DEALING WITH TRYING TO SAVE THIS ARM, AND THAT'S

 6    WHAT MY FOCUS WAS ON.

 7            WHEN I FINALLY GOT THE CAST OFF, MY ARM WAS LIKE AS

 8    BIG AS MY WRIST ALL THE WAY UP TO MY SHOULDER.  BEFORE -- BEFORE

 9    THAT, I'D ALWAYS BEEN VERY ACTIVE, REAL HEALTHY.  I EXERCISED

10    SIX DAYS A WEEK.  I COULD -- I COULD DO HANDSTAND PUSH-UPS,

11    COULD -- I COULD DO 20 SETS OF 20 HANDSTAND PUSHUPS IN -- IN A

12    HALF AN HOUR, 45 MINUTES.  THAT WAS PART OF MY ROUTINE, AND THAT

13    WOULD BE WITH OTHER -- A LOT OF OTHER EXERCISES.

14            WRITING WAS ONE OF MY MAIN DAILY ACTIVITIES.  I COULD

15    KNOCK OUT 14, 20 PAGES IN A DAY WITHOUT ANY PROBLEM.  I DO A LOT

16    OF LEGAL WORK ON MY OWN AND HELPING OTHER PRISONERS.  AND I

17    WOULD SPEND -- THAT WAS ONE OF MY MAIN DAILY ACTIVITIES, WAS

18    WRITING.  AND IT WAS NEVER A PROBLEM.  I COULD -- I DIDN'T HAVE

19    ANY PROBLEM WITH FOCUSING ON WHAT I WAS GOING TO WRITE.

20            WHEN I WOULD TAKE MY -- WRITE UP MY BRIEFS OR MY

21    LEGAL BRIEFS, IT WAS SIMPLE.  I COULD JUST RUN -- RUN IT RIGHT

22    FROM MY HEAD.  OFTEN I WOULDN'T EVEN HAVE TO DO A ROUGH DRAFT.

23    THAT WOULD BE MY FINAL DRAFT.  AND SINCE THAT TIME, MY ARM'S

24    BEEN IN PAIN, THAT CHANGED MY LIFE RIGHT THERE.  IT'S BEEN

25    PAINFUL.  I -- IT CHANGED MY WHOLE WAY OF LIVING.  MY SLEEP HAS

 1    BEEN -- I -- I CAN'T EVEN SLEEP.  I HAVE TO SLEEP A CERTAIN WAY

 2    BECAUSE IN -- OFTEN, IF I SLEEP ON MY ARM WRONG OR I -- IN

 3    THE -- AT NIGHT, WHEN I GET UP IN THE MORNING, MY ARM WILL BE

 4    HURTING.  IT WILL BE PAINFUL.  AND SO I HAVE TO SLEEP IN CERTAIN

 5    WAYS.

 6            I -- EVER SINCE THIS, I'VE NEVER SLEPT ON MY STOMACH

 7    BECAUSE I CAN'T -- LIKE, IF I'M LAYING THERE LIKE THAT, IT'S

 8    HARD FOR ME TO CHANGE POSITIONS BECAUSE I CAN'T PUT THE WEIGHT

 9    AND THE PRESSURE ON MY ARM.  SO IT'S HAD AN EFFECT ON ME LIKE

10    THAT.

11            IT'S -- WRITING EVERY LETTER, EVERY SINGLE LETTER

12    THAT I WRITE IS PAINFUL.  IT CAUSES PAIN IN MY WRIST AREA.

13    IT -- THIS -- THIS AREA RIGHT HERE (INDICATING), IN THESE

14    TENDONS RIGHT ALONG IN HERE -- WILL JUST BE INFLAMED.  THEY'RE

15    TIGHTENED UP.  THIS -- ALL THIS IN HERE IS -- IS TIGHT LIKE --

16    LIKE IT FEELS LIKE NOTHING BUT YOU -- LIKE, SCAR TISSUE,

17    GRISTLE.

18            AND THE MORE I WRITE, IF I HAVE TO WRITE, AND -- AND

19    HERE'S THE THING, IN MY CONDITION -- THAT'S WHY I TOOK THE

20    TROUBLE IN -- USING A LOT OF MY OPENING ARGUMENT TO TRY TO

21    EXPLAIN THE SHU TO YOU GUYS.  BECAUSE IN MY SITUATION, IF I

22    DON'T WRITE, IT DOESN'T GET DONE.

23            NOW, IN 2000 AND -- DECEMBER 2004 -- I'VE HAD

24    CELLIES -- SEE, I HAD CELL PARTNERS.

25            **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  I'M NOT QUITE

1    SURE WHERE WE'RE GOING HERE.

2            THE COURT:  YEAH, WHY DON'T YOU ASK YOURSELF ANOTHER

3    QUESTION AND ALERT US TO WHAT YOU'RE UP TO, WHERE YOU'RE GOING

4    WITH THIS LINE OF DISCUSSION.

5            MR. ASHKER:  OKAY.  WELL --

6            THE COURT:  SOMETHING LIKE I -- PERHAPS YOU'RE

7    DESCRIBING THE EFFECT THAT THIS LACK OF PHYSICAL THERAPY AND

8    MEDICATION HAD ON YOUR LIFESTYLE.

9            MR. ASHKER:  OKAY.

10   Q.  CAN YOU PLEASE DESCRIBE FOR THE JURY THE EFFECT OF YOUR

11   INJURY ON YOUR ABILITY TO DO DAILY ACTIVITIES?

12           MR. ANDRADA:  I'M GOING TO -- EXCUSE ME, YOUR HONOR.

13   I'M GOING TO OBJECT.  THE QUESTION IS OVERLY BROAD, AND IT'S

14   VAGUE AND AMBIGUOUS.  WE'RE TALKING ABOUT 19 YEARS' WORTH OF

15   TIME SINCE THE INJURY.  IS HE TALKING ABOUT PRE2002?

16           THE COURT:  OKAY.  WELL, WHY DON'T -- WHAT'S RELEVANT

17   HERE -- REALLY, OTHER THAN GENERAL BACKGROUND OF WHAT HAPPENED

18   UP UNTIL 2002, WHAT'S SPECIFICALLY RELEVANT IS FROM 2002 ON,

19   WHAT MEDICAL CARE YOU GOT, WHAT PAIN RELIEF YOU GOT, AND WHAT

20   EFFECT THAT HAD ON YOUR ACTIVITIES AFTER THAT POINT.

21           SO PERHAPS THE BEST WAY WOULD BE TO DESCRIBE THE

22   MEDICAL CARE AND THERAPY AND SO ON THAT YOU WERE GETTING OR NOT

23   GETTING AS OF 2002 AND WHAT EFFECT THAT HAD ON YOUR ACTIVITIES

24   AS OF 2002.

25           MR. ASHKER:  WHAT I WAS TRYING TO LEAD UP TO IS -- IS

1    WHAT I HAD GONE THROUGH THAT LED UP TO AND RESULTED IN THE CDC

2    AGREEING TO THE PROVISIONS IN THE 2002 SETTLEMENT AGREEMENT.

3               **THE COURT:**  OKAY.  WELL, THAT'S --

4               **MR. ASHKER:**  IS THAT FAIR ENOUGH?

5               **MR. ANDRADA:**  WELL, QUESTION BY QUESTION PERHAPS

6    MIGHT BE THE BEST APPROACH.

7               **THE COURT:**  OKAY.

8               **MR. ANDRADA:**  YOUR HONOR, I'M SORRY, BUT IT'S

9    IMPORTANT.

10              **THE COURT:**  OKAY.

11   BY MR. ASHKER:

12   **Q.**  MR. ASHKER, CAN YOU PLEASE DESCRIBE THE EFFECT OF THE INJURY

13   TO YOUR DAILY ACTIVITIES?

14              **THE COURT:**  IN WHAT TIME FRAME?

15              **MR. ASHKER:**  UP -- UP TO -- IN GENERAL TERMS UP TO

16   THE POINT OF THE 2002 SETTLEMENT AGREEMENT.

17              **THE COURT:**  OKAY.

18              SO THIS IS BEING OFFERED NOT BECAUSE IT'S RELEVANT TO

19   DR. SAYRE OR MR. CATE BUT TO EXPLAIN WHAT LED UP TO THE

20   SETTLEMENT AGREEMENT, WHICH IS THE SUBJECT OF THIS CASE.  AND

21   THE SAME GOES, REALLY, FOR THE INJURY ITSELF AND THE FIRST PART

22   ABOUT THAT, THAT DR. SAYRE WASN'T WORKING THERE AT THAT TIME,

23   AND IT WASN'T -- THE SETTLEMENT AGREEMENT HADN'T HAPPENED, SO

24   THAT'S BACKGROUND INFORMATION.

25              OKAY.  GO AHEAD.

1    **THE WITNESS:**  YES.  IT CHANGED THE WAY I CONDUCT ALL

2    MY DAILY ACTIVITIES.

3    BY MR. ASHKER:

4    **Q.**  CAN YOU STATE IN WHAT MANNER ARE YOU TALKING ABOUT?  WHAT

5    DAILY ACTIVITIES?

6    **A.**  WELL, IN SHU, MY MAIN DAILY ACTIVITIES ARE -- ARE WRITING

7    BECAUSE THAT'S MY ONLY WAY OF COMMUNICATING OUTSIDE OF MY POD

8    AREA WITH FAMILY, THE COURTS, EVERYTHING FROM THE -- EVERY --

9    EVERY COMMUNICATION OUTSIDE OF MY POD AREA REQUIRES HANDWRITING.

10           NOW, I'VE HAD CELLMATES AND THOSE CELLMATES WOULD

11   ASSIST ME WITH A LOT OF THAT STUFF.  BUT I WOULD STILL HAVE TO

12   DO SOME ON MY OWN BECAUSE MY CELLMATE -- I'M REALLY NOT

13   COMFORTABLE WITH HAVING A CELLMATE WRITE TO MY WIFE OR MY MOTHER

14   ON PERSONAL THINGS LIKE THAT.  THEY'D HELP ME WITH MY -- A LOT

15   OF LEGAL WRITING AND STUFF, BUT I WOULD STILL HAVE TO DO A LOT,

16   EVERY DAY.  EVERY DAY, MOST OF THE TIME I HAVE TO DO SOME

17   WRITING.

18           AND IN THE SENSE OF WITH LEGAL STUFF, IF I -- IF I

19   DON'T DO IT, IT DOESN'T GET DONE, PERIOD.  I DON'T -- I MEAN --

20   IF I HAVE A LEGAL DEADLINE, I HAVE TO -- I HAVE TO DO IT, AND I

21   TRY TO BREAK IT UP AND -- AND WORK IT TO WHERE IT'S AN HOUR, TWO

22   HOURS, THREE HOURS A DAY, AS MUCH AS I CAN POSSIBLY TRY TO DO.

23           BUT AS I DO THAT, THE PAIN WILL GET WORSE, AND IT

24   WILL INCREASE TO WHERE I'M NOT ABLE TO SLEEP.  I'M LUCKY IF I

25   CAN GET ONE TO THREE HOURS OF SLEEP A NIGHT.  AND THEN AFTER

1    FOUR OR FIVE DAYS OF BEING TOTALLY EXHAUSTED, I MIGHT GET FOUR

2    OR FIVE.

3              AND I HAVE TO WASH MY LAUNDRY, BECAUSE IN SHU, THEY

4    PROVIDE LAUNDRY SERVICE ONCE A WEEK, BUT THEY DON'T PROVIDE IT

5    FOR YOUR PERSONAL THERMAL UNDERWEARS, AND MY THERMALS ARE THICK,

6    THEY'RE REAL THICK.  AND WHEN THEY GET WET WITH WATER AND I TRY

7    TO RING THEM OUT, THAT PUTS A LOT OF STRESS ON THE BONES IN MY

8    HAND AND MY FOREARM AREA AND THAT -- IT MIGHT CAUSE PAIN THAT

9    WILL LAST FOR A DAY OR TWO LATER.

10             I HAVE TO CLEAN MY OWN CELL.  WHAT I DO -- WHAT I'VE

11   LEARNED TO DO IS I -- I USE MY FOOT.  I'LL CLEAN THE FLOOR WITH

12   MY FOOT.  WHEN I GOT TO CLEAN UP WATER, I'LL HAVE TO USE THE

13   TOWEL AND WRING UP THE WATER AND WRING IT OUT AND THAT CAUSES A

14   WHOLE LOT OF PAIN.  MY ARM IS IN PAIN EVERY DAY.

15             THE MEDICATIONS THAT I WAS RECEIVING UP TO THE

16   2002 --

17   Q.  EXCUSE ME.  MR. ASHKER, WHAT MEDICATIONS WERE YOU RECEIVING

18   FOR YOUR ARM PAIN UP TO THE POINT OF THE 2002 SETTLEMENT

19   AGREEMENT?

20             **MR. ANDRADA:**  I'M SORRY.  EXCUSE ME.  I APPRECIATE

21   THE FACT THERE WAS A QUESTION.  BUT IT IS STILL OVERLY BROAD AS

22   TO TIME.  IS HE TALKING ABOUT ESSENTIALLY AT THE TIME THE

23   SETTLEMENT AGREEMENT -- WHEN?  WE'VE GOT 12 YEARS THERE, 1990 TO

24   2002.  SO -- WE -- I CAN MAKE -- I CAN REPRESENT TO YOU THAT IT

25   CHANGED OVER TIME.

1    **THE COURT:**  OKAY.  WELL, DO YOU WANT TO TELL YOUR

2    WHOLE HISTORY OF MEDICATION FROM THE INJURY TO DATE, OR DO YOU

3    WANT TO FOCUS ON THE PART RIGHT BEFORE 2002 OR WHAT?

4    JUST MAKE CLEAR WHAT YOU'RE REFERRING TO.

5    BY MR. ASHKER:

6    **Q.**  I WAS -- I WAS GOING TO -- MR. ASHKER, CAN YOU PLEASE STATE

7    WHAT MEDICATIONS YOU TRIED TO HELP YOUR ARM PAIN BETWEEN 1990

8    AND 2002?

9    **A.**  THE MEDICATIONS I WAS ON WAS TYLENOL, ENTERIC ASPIRIN,

10   IBUPROFEN, NAPROXEN, NAPROSYN, BACLOFEN, CELEBREX, NEURONTIN,

11   ELAVIL.

12   **Q.**  AND WERE THOSE MEDICATIONS EFFECTIVE FOR TREATING YOUR ARM

13   PAIN?

14   **MR. ANDRADA:**  OBJECTION, VAGUE AND AMBIGUOUS, YOUR

15   HONOR, OVERLY BROAD.

16   **THE COURT:**  WELL, WE'LL GO THROUGH THEM ONE BY ONE.

17   **MR. ANDRADA:**  WELL, I'M ALSO CONCERNED, FRANKLY,

18   ABOUT WHAT -- I DON'T MEAN TO BE DISRESPECTFUL IN ANY WAY, BUT

19   WHAT "EFFECTIVE" MEANS IN THE CONTEXT OF THE QUESTION IN THE

20   CASE.  DOES HE MEANS ELIMINATE HIS PAIN?  REDUCE IT FOR A WHILE?

21   WHAT DO WE REALLY MEAN?

22   **THE COURT:**  WELL, WHY DON'T YOU ADDRESS THOSE POINTS

23   AS YOU DESCRIBE IT, WHICH -- I GUESS DESCRIBE A PARTICULAR

24   MEDICAL REGIMEN AND SAY WHAT WORKED, WHAT DIDN'T WORK, WHAT SIDE

25   EFFECTS IT HAD.  AND THEN THE NEXT REGIMEN, WHAT WORKED, WHAT

1   DIDN'T WORK, WHAT SIDE EFFECTS IT HAD.

2          **MR. ASHKER:**  OKAY.

3          **THE COURT:**  CAN YOU DO THAT?

4          **MR. ASHKER:**  YES.

5   **Q.**  MR. ASHKER, COULD YOU PLEASE GIVE US SOME EXAMPLES OF YOUR

6   PAIN MEDICATION REGIMEN DURING THE TIME PERIOD BETWEEN 1990 AND

7   2002?

8   **A.**  YES, I WILL.

9          ON AUGUST 3RD, 1994, ORTHOPEDIC SPECIALIST DR. DUNCAN

10  ORDERED ANTI-INFLAMMATORIES OF IBUPROFEN PER REQUESTED NEED FOR

11  90 DAYS.  ON 11/1/94, DR. JOHNS ORDERED MOTRIN PER REQUESTED

12  NEED FOR 90 DAYS.

13         IN JANUARY OF 1995, I BEGAN REQUESTING REFILLS OF MY

14  PAIN MEDICATIONS.  ON FEBRUARY 20TH, 1995, I FILED A 602 APPEAL

15  ABOUT DENIALS AND REFUSALS TO REFILL MY PAIN MEDICATIONS.

16         ON MARCH 6TH, 1995, I FILED ANOTHER 602 APPEAL ABOUT

17  DENIALS OR -- TO REFILL MY PAIN MEDICATIONS.  WHAT WAS HAPPENING

18  WAS -- IS THE PAIN IN MY ARM WAS TO THE EXTENT THAT I WOULD HAVE

19  TO TAKE THE MEDICATIONS AND USE THEM UP BEFORE THE PRESCRIPTION

20  WAS DUE FOR REFILL.  AND WHEN I -- WHEN I PUT IN FOR IT, THEY'D

21  TELL ME NO BECAUSE THE -- IT WASN'T TIME TO REFILL THEM YET.

22  I'D JUST BE WITHOUT MEDICATIONS.

23         SO I BEEN TAKING THE MOTRIN IBUPROFEN FOR -- I -- I

24  STARTED TAKING THAT WAY BACK IN 1987 JUST FOR GENERAL ACHES AND

25  PAINS, AND BY 19 -- BY MAY 31ST OF 1995, WAS THE FIRST TIME THAT

1    THEY DOCUMENTED STOMACH PROBLEMS.

2              AND ON JUNE 4TH, 1995, I REQUESTED REFILL OF MY PAIN

3    MEDICATIONS.  AND ON JUNE 6TH, 1995, I FILED ANOTHER 602 ABOUT

4    REFUSALS TO REFILL MY PAIN MEDICATIONS.  ON 6/21/95, DR. DUNCAN

5    DISCONTINUED THE MOTRIN AND ORDERED SALICYLATE FOR TWO MONTHS.

6    THAT'S BECAUSE THE MOTRIN WASN'T EFFECTIVE.  I WAS USING IT UP

7    AND -- AND BEFORE THE PRESCRIPTIONS WERE DUE TO BE REFILLED, AND

8    MY STOMACH -- AND SO HE ORDERED THE ALTERNATIVE TO TRY -- CALLED

9    SALICYLATE.  OKAY.

10             ON 7/31/95, DR. GUARD (PHONETIC) ORDERED SALICYLATE

11   FOR 90 DAYS AND DISCONTINUED THE PEPTO-BISMOL THAT HAD BEEN

12   ORDERED BY DR. WINSLOW BACK IN MAY OF '95.

13             AND THESE -- THESE KIND OF EXAMPLES JUST GO ON EVERY

14   MONTH, EVERY COUPLE OF MONTHS ON UP TO 2002.  I MEAN, AND, LIKE,

15   ON ANOTHER --

16   Q.  CAN YOU GIVE US ANOTHER EXAMPLE.

17   A.  WELL, ON 6/9/97, REGISTERED NURSE BREE NOTED IN THE MEDICAL

18   RECORDS THAT I WAS TAKING 4,000 MILLIGRAMS OF MOTRIN A DAY FOR

19   SEVERE PAIN, AND THE MOTRIN WAS HURTING MY STOMACH.

20             ON 6/29/97, I FILED ANOTHER 602 APPEAL ABOUT

21   CONTINUED SERIOUS ARM AND WRIST PAIN.

22             ON 7/8/97, DR. KUSHNER ORDERED MOTRIN PER REQUESTED

23   NEED AND ANTACIDS FOR 60 DAYS.

24             ON 8/16/97, DR. KUSHNER DISCONTINUED THE MOTRIN AND

25   ORDERED TYLENOL AND PEPTO-BISMOL PER REQUESTED NEED FOR 30 DAYS.

1    ON 9/2/97, REGISTERED NURSE BREE AGAIN NOTES THAT

2    ASHKER FORCED TO TAKE TO TAKE TOO MANY TYLENOL FOR SEVERE PAIN

3    AND MOTRIN HURTS HIS STOMACH.

4         **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  I'M WONDERING

5    IF MR. ASHKER PERHAPS HAS A SUMMARY OR COMPILATION OF THIS

6    INFORMATION.

7         I'M JUST CONCERNED THAT IT'S NOT -- AS PRESENTED,

8    YOUR HONOR, I WOULD RESPECTFULLY SUGGEST THAT IT DOESN'T HAVE

9    MUCH RELEVANCE OR 403 MIGHT APPLY IN THE MANNER THAT IT'S BEING

10   PRESENTED.  IT'S -- I FIND IT DIFFICULT TO FOLLOW.  I'M NOT SURE

11   WHERE WE'RE GOING HERE.  WE SEEM TO BE BOUNCING AROUND IN SOME

12   YEARS AS WELL.

13        **THE COURT:**  WELL, HE HAD ONE AT ONE TIME.  I THINK

14   YOU OBJECTED TO IT.

15        **MR. ANDRADA:**  WELL, IT WAS 35 PAGES, AND I MUST SAY,

16   YOUR HONOR, A LOT OF INAPPROPRIATE AREAS.

17        **THE COURT:**  I JUST DON'T --

18        DO YOU HAVE A SUMMARY AFTER THE -- I JUST --

19        YOU HAD OBJECTED TO IT.  I THINK I SUSTAINED YOUR

20   OBJECTION AND SAID HE COULD USE ONE THAT WAS SHORTER.

21        **MR. ANDRADA:**  CORRECT.

22        **THE COURT:**  BUT I DON'T -- SINCE WE HAD THE PROBLEMS

23   WITH THE MAIL, I'M NOT SURE MR. ASHKER EVER GOT THE ORDER SAYING

24   THAT HE COULDN'T USE THE ONE THAT HE HAD DONE AND THAT HE'D HAVE

25   TO DO A DIFFERENT ONE.  SO I DON'T KNOW IF HE KNEW TO DO THAT.

1      **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

2      **MR. ASHKER:**  YOUR HONOR -- YOUR HONOR, I RECEIVED

3   THAT ORDER, I THINK, ON FRIDAY.  AND THERE WAS JUST NO POSSIBLE

4   WAY THAT I COULD DO THAT.  I WANTED TO GIVE A SUMMARY EARLIER,

5   AND MR. ANDRADA OBJECTED.  I WAS GOING TO GIVE A SUMMARY OF

6   MEDICATIONS THAT I HAD BEEN ON AND TRIED AND HAD PROBLEMS WITH

7   DEFECTIVENESS (SIC) AND ALL THAT UP TO THE POINT IN 2002.

8      **THE COURT:**  YEAH, WELL, MAYBE IF YOU HAD THE SUMMARY

9   YOU HAD DONE, YOU COULD USE IT FOR YOUR OWN REFERENCE AND GO

10  THROUGH IN CHRONOLOGICAL ORDER.

11     **MR. ASHKER:**  THAT'S WHAT I WAS READING OFF OF RIGHT

12  NOW.

13     **THE COURT:**  OKAY.

14     WELL, JUST TRY TO MAKE SURE --

15     **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

16     **THE COURT:**  -- YOU GO IN CHRONOLOGICAL ORDER SO THAT

17  IT'S EASIER TO FOLLOW.

18     **MR. ASHKER:**  OKAY.

19     **THE COURT:**  AND YOU HAVE THE PREVIOUS ONE, SO YOU CAN

20  FOLLOW ALONG.

21     **MR. ANDRADA:**  YES, WE DO.  YES, YOUR HONOR.

22     **THE COURT:**  MAYBE I SHOULD -- COPY SOMEWHERE, TOO.

23     GO AHEAD.

24  BY MR. ASHKER:

25  Q.  MR. ASHKER, BETWEEN THE TIME PERIOD OF 4/30/97 AND 2/17/98,

1    DID YOU HAVE ONGOING PROBLEMS AND NEEDING TO TAKE EXCESSIVE

2    AMOUNTS OF MOTRIN TO OBTAIN RELIEF?

3    **A.**  YES, I DID.

4    **Q.**  CAN YOU PLEASE GIVE US SOME EXAMPLES.

5    **A.**  ON 6/9/97, RN BREE NOTES ASHKER FORCED TO TAKE

6    4,000 MILLIGRAMS OF MOTRIN A DAY FOR SEVERE PAIN AND THE MOTRIN

7    WAS HURTING HIS STOMACH.

8              ON 6/29/97, I FILED A 602 APPEAL ABOUT CONTINUED

9    SERIOUS ARM AND WRIST PAIN.

10             ON 7/8/97, DR. KUSHNER ORDERS MOTRIN PER REQUESTED

11   NEED AND ANTI- ACIDS FOR 60 DAYS.

12             ON 7/16/97, I REQUESTED A REFILL OF PAIN MEDICATIONS.

13             ON 7/22, I REQUESTED ANOTHER REFILL OF MOTRIN

14   MEDICATIONS.

15             ON 8/16/97, DR. KUSHNER DISCONTINUED MOTRIN AND

16   ORDERED TYLENOL AND PEPTO-BISMOL PER REQUESTED NEED FOR 30 DAYS?

17             ON 9/2/97, RN BREE AGAIN NOTES THAT ASHKER FORCED TO

18   TAKE TOO MANY TYLENOL FOR SEVERE PAIN, AND MOTRIN HURTS MY

19   STOMACH.

20             ON 9/19/97 RN BREE NOTES THAT I WAS OUT OF PAIN MEDS

21   FOR TWO AND A HALF WEEKS, AND I REQUESTED A REFILL FOR TYLENOL.

22             ON 9/25/97, DR. KUSHNER ORDERS MOTRIN, THE ANTACIDS

23   PER REQUESTED NEED FOR 60 DAYS BECAUSE TYLENOL DO NOT RELIEVE

24   PAIN.

25             ON 10/21/97, DR. KUSHNER ORDERS MOTRIN FOR 90 DAYS

1    AND NSAID TREATMENT FOR ARM PAIN.

2                   ON 10/21/97, DR. KUSHNER ORDERS MOTRIN FOR 90 DAYS --

3    OH, I JUST READ THAT ONE.

4                   ON 11/19/97, DR. DUNCAN NOTES ASHKER TAKING MORE THAN

5    RECOMMENDED DOSE OF MOTRIN.  THE MOTRIN UPSETS HIS STOMACH.

6    RECOMMENDATION STOP TAKING ANTI-INFLAMMATORY IF THERE'S ANY GI

7    SYMPTOMS.

8                   **MR. ANDRADA:**  EXCUSE ME, YOUR HONOR.  IF MR. ASHKER

9    WANTS TO SAY THAT ON A CERTAIN DATE, HE GOT A PRESCRIPTION

10   FILLED OR REFILLED, I DON'T HAVE ANY OBJECTION TO THAT.  BUT I

11   DO HAVE A CONCERN ABOUT HIM READING INTO THE RECORD COMMENTS

12   FROM -- APPARENTLY COMMENTS FROM VARIOUS TREATERS.  WE DON'T

13   HAVE THE MEDICAL -- SPECIFIC EXHIBIT REFERRED TO, AND I'D LIKE

14   TO BE ABLE TO DO THAT IF WE DON'T HAVE IT IN EVIDENCE, AND THERE

15   ARE SOME OTHER MATTERS THAT, OBVIOUSLY, ARE --

16                  **THE COURT:**  WELL, I THINK WHAT HE'S DOING IS GOING

17   THROUGH MEDICAL RECORDS WHICH YOU DO HAVE A COPY OF.  AND, IN

18   FACT, THIS SUMMARY LISTS THE EXHIBIT NUMBER OF EACH THING THAT

19   HE'S SAYING, SO IT LOOKS LIKE YOU COULD LOOK THEM UP.

20                  **MR. ANDRADA:**  OKAY.  AND THEN BEAR WITH ME.  LET ME

21   GET THE REST OF THE VOLUMINOUS RECORDS.

22                  **THE COURT:**  GO AHEAD.

23   BY MR. ASHKER:

24   Q.  ON 11/19/97 --

25                  **MR. ANDRADA:**  I'M SORRY, MR. ASHKER.  WOULD YOU BE SO

1    KIND AS TO LET ME CATCH UP WITH YOU THERE FOR JUST ONE SEC.

2                   (PAUSE IN THE PROCEEDINGS.)

3              MR. ASHKER:  I'M ON NO. 20 OF THE PAIN MEDICATION

4    SUMMARY.  PAGE -- WOULD BE PAGE 2, NUMBER --

5              MR. ANDRADA:  REFERRING -- I'M SORRY.  REFERRING TO

6    EXHIBIT 77?

7              MR. ASHKER:  YEAH, THAT WOULD BE EXHIBIT 184.

8              THE COURT:  OH, NO, THAT'S THE SUMMARY HE'S GOT THAT,

9    BUT WITHIN THE SUMMARY --

10             MR. ASHKER:  OH.

11             THE COURT:  -- IT'S EXHIBIT 44, I GUESS.

12             ARE THOSE MEDICAL RECORDS?

13             MR. ASHKER:  YES, YOUR HONOR.  THIS IS WHAT I WAS

14   REFERRING TO.

15             THE COURT:  AND THAT'S YOUR MEDICAL FILE?

16             MR. ASHKER:  THIS IS -- THIS IS THE MEDICAL RECORDS.

17   THESE ARE THE EXAMPLES.  EVERYTHING THAT I'M READING TO THE JURY

18   RIGHT NOW IS DOCUMENTED RIGHT HERE.

19             THE COURT:  SO THOSE ARE THE MEDICAL RECORDS.  IF YOU

20   LOOK AT THE SUMMARY, WHICH IS EXHIBIT 184, WITHIN THE SUMMARY --

21             MR. ANDRADA:  YES.

22             THE COURT:  -- HE'S GOING THROUGH.  EACH HAS AN

23   EXHIBIT NUMBER.

24             MR. ANDRADA:  YES.

25             THE COURT:  WE'RE UP TO, I THINK, EXHIBIT 45.

 1              **MR. ASHKER:**  NO. 20.

 2              **THE COURT:**  YEAH, NO. 20, EXHIBIT 44 AND 45.

 3              **MR. ASHKER:**  YES.

 4              **THE COURT:**  AND THAT THEN, IN TURN, REFERS TO HIS

 5   MEDICAL RECORDS --

 6              **MR. ANDRADA:**  OKAY.

 7              **THE COURT:**  -- WHICH I THINK YOU HAVE.

 8              **MR. ANDRADA:**  I DO HAVE THE RECORDS, YOUR HONOR.

 9              THERE ARE SEVERAL SUMMARIES WITHIN MR. ASHKER'S

10   SUMMARY, AND SO IF HE COULD KINDLY TELL ME WHICH OF THE

11   SUMMARIES --

12              **MR. ASHKER:**  THIS IS SUMMARY NO. 1 ON PAIN MEDICATION

13   ISSUES RIGHT THERE ON PAGE 2, NO. 20.

14              **MR. ANDRADA:**  I SEE.  THANK YOU.

15              THANK YOU.  THANK YOU VERY MUCH.

16              THANK YOU, YOUR HONOR, FOR YOUR PATIENCE.

17              **THE COURT:**  GO AHEAD.

18   BY MR. ASHKER:

19   **Q.**  MR. ASHKER, CAN YOU CONTINUE WITH YOUR SUMMARY OF PAIN

20   MEDICATION ISSUES?

21   **A.**  YES.

22   **Q.**  ON 11/26/97, DR. KILTEY (PHONETIC) NOTES MOTRIN NOT HELPING

23   ARM PAIN AND ORDERS ENTERIC ASPIRIN FOR 60 DAYS.

24              ON 12/18/97, RN BREE NOTES SEVERE ARM PAIN.

25              ON 2/3/98, REQUESTED MOTRIN REFILL.  IT WAS REJECTED

1   BASED ON NO CURRENT ORDER FOR MOTRIN.

2           ON 2/13/98, RN BREE NOTES ENTERIC ASPIRIN NOT WORKING

3   FOR ARM PAIN.

4           **MR. ANDRADA:**  YOUR HONOR, EXCUSE ME.  I APOLOGIZE

5   AGAIN.  IS IT MR. ASHKER'S INTENTION TO INTRODUCE THESE

6   DOCUMENTS?  I'M CONCERNED IF HE JUST TAKES LITTLE PHRASES OUT OF

7   A LENGTHY MEDICAL RECORD, SO I'M JUST TRYING TO DETERMINE WHAT

8   HIS INTENTIONS ARE WITH REGARD TO THE RECORDS -- CONCERNED WHEN

9   HE QUOTES PIECES FROM THE RECORD.

10          **THE COURT:**  WELL, WHAT WOULD YOU LIKE?  I MEAN, WE

11  CAN INTRODUCE THE ENTIRE FILE IF YOU'D LIKE?

12          **MR. ANDRADA:**  AYE-YI-YI (PHONETIC).

13          **THE COURT:**  OR WE CAN JUST HAVE THIS SUMMARY, AS HE'S

14  DOING NOW.

15          **MR. ANDRADA:**  WELL, I SUPPOSE THEN BEST WAY IS JUST

16  TO SOLDIER ON THROUGH THE SUMMARY, BECAUSE I THINK IT WOULD BE

17  REALLY UNDULY BURDENSOME FOR THE JURY TO HAVE HUNDREDS AND

18  HUNDREDS AND HUNDREDS OF PAGES.  IT WOULD BE UNFAIR.

19          **THE COURT:**  OKAY.

20          **MR. ANDRADA:**  SO WE'LL JUST CARRY ON.

21          **THE COURT:**  OKAY.

22          **MR. ANDRADA:**  THANK YOU.

23          **THE COURT:**  NOW, AT SOME POINT, YOU MIGHT FIND A WAY

24  TO SUMMARIZE SOME OF IT.  BETWEEN DECEMBER AND JUNE OF A CERTAIN

25  YEAR, YOU KNOW, X, Y, AND Z MEDICATIONS WERE TRIED.  AND X, Y,

1    AND Z SIDE EFFECTS WERE NOTED, RATHER THAN GOING THROUGH EACH

2    ONE SPECIFICALLY.

3            YOU MIGHT TRY TO DO THAT.

4            **MR. ASHKER:**  YES, THAT'S WHAT I WAS GOING TO TRY TO

5    DO EARLIER, YOUR HONOR, BUT MR. ANDRADA OBJECTED.

6            **THE COURT:**  OH.  OH, THAT'S TRUE.  WELL, HOW ABOUT

7    BREAKING IT DOWN INTO MANAGEABLE CHUNKS, LIKE A THREE-MONTH

8    PERIOD OR A SIX-MONTH PERIOD, EXPLAIN TO HIM WHICH PERIOD YOU'RE

9    TALKING ABOUT, AND THEN SUMMARIZE WITHIN THAT PERIOD.

10           WHY DON'T WE TRY IT THAT WAY.

11           **MR. ASHKER:**  BASED ON THE SUMMARY, WOULD THE ENTIRE

12   THING BE ABLE TO BE PUT INTO AN EXHIBIT?

13           **THE COURT:**  WHAT?  THIS?  YOUR SUMMARY?

14           **MR. ASHKER:**  YEAH.

15           **THE COURT:**  WELL, NO, BECAUSE LATER ON IT GETS TO BE

16   WAY MORE NARRATIVE.  AND --

17           **MR. ASHKER:**  YEAH.

18           **THE COURT:**  -- SOMETHING LIKE THIS WE COULD USE, BUT

19   NOT THIS PRECISE THING.

20           **MR. ASHKER:**  YEAH, I WASN'T ABLE TO -- OKAY.  I'M

21   GOING TO -- I MEAN, BECAUSE THIS IS ALL IMPORTANT, BECAUSE THIS

22   IS THE BASIS -- THE BASIS FOR -- WELL, LET ME ASK MYSELF A FEW

23   MORE QUESTIONS AND SEE HOW IT GOES FROM THERE.

24           **THE COURT:**  ALL RIGHT.

25

1   BY MR. ASHKER:

2   **Q.**   MR. ASHKER, CAN YOU PLEASE STATE THE FIRST TIME THAT YOU

3   WERE PRESCRIBED THE MEDICATION REFERRED TO AS TRAMADOL?

4   **A.**   YES.

5   **Q.**   PLEASE DO SO.

6   **A.**   ON JANUARY 22ND, 2002, PELICAN BAY STATE PRISON DR. WOLF

7   PRESCRIBED TRAMADOL FOR ME FOR THE FIRST TIME.

8   **Q.**   AND WHAT WAS THE DOSE OF THAT TRAMADOL MEDICATION AT THAT

9   TIME?

10  **A.**   WELL, AT THAT TIME, HE PRESCRIBED 50 MILLIGRAMS OF TRAMADOL

11  IN THE MORNING, AND 50 MILLIGRAMS OF TRAMADOL AT NIGHT.

12  **Q.**   WAS THAT THE ONLY MEDICATION THAT YOU WERE ON AT THAT TIME?

13  **A.**   NO, IT WASN'T.

14  **Q.**   WHAT OTHER MEDICATIONS WERE YOU ON AT THAT TIME?

15  **A.**   I WAS ALSO PRESCRIBED 10 MILLIGRAMS OF ELAVIL EVERY OTHER

16  DAY.

17  **Q.**   WHO PRESCRIBED THAT MEDICATION FOR YOU?

18  **A.**   THAT WOULD BE ORTHOPEDIC SPECIALIST DR. DUNCAN.

19  **Q.**   AND DO YOU KNOW WHY DR. DUNCAN PRESCRIBED THAT ELAVIL

20  MEDICATION FOR YOU?

21          **MR. ANDRADA:**   CALLS FOR HEARSAY, YOUR HONOR.   NO

22  FOUNDATION.

23          **THE COURT:**   IS IT IN THE MEDICAL RECORD?

24          **MR. ASHKER:**   YES, IT IS.

25          **THE COURT:**   OKAY.

1    **THE WITNESS:**  DR. DUNCAN PRESCRIBED THE ELAVIL

2    MEDICATION FOR ME BECAUSE OF ULNAR NERVE PAIN IN MY RIGHT ARM.

3    **BY MR. ASHKER:**

4    **Q.**  AND WERE YOU ALWAYS TAKING 10 MILLIGRAMS EVERY OTHER DAY?

5    **A.**  NO, I WASN'T.

6    **Q.**  WAS DR. DUNCAN THE FIRST DOCTOR WHO PRESCRIBED ELAVIL FOR

7    YOU?

8    **A.**  NO, HE WASN'T.

9    **Q.**  WELL, DO YOU KNOW THE NAME OF THE DOCTOR WHO FIRST

10   PRESCRIBED THE ELAVIL FOR YOU?

11   **A.**  I CAN'T RECALL.

12   **Q.**  AT SOME POINT IN TIME, DO YOU RECALL WHAT THE DOSAGE WAS AND

13   THE GENERAL TIME FRAME?

14   **A.**  YES.  IT WAS 10 MILLIGRAMS EVERY DAY, ONCE IN THE MORNING

15   AND ONCE AT NIGHT.  AROUND 1997, I BELIEVE.

16   **Q.**  AND WAS THAT MEDICATION EFFECTIVE FOR YOUR NERVE PAIN?

17   **A.**  WELL, INITIALLY IT WAS, AND IT HELPED ME TO SLEEP A LITTLE

18   BETTER.  BUT IT QUICKLY BEGAN HAVING SERIOUS ADVERSE SIDE

19   EFFECTS ON ME.

20   **Q.**  CAN YOU EXPLAIN WHAT YOU MEAN BY "ADVERSE SIDE EFFECTS"?

21   **A.**  WELL, INITIALLY, IT CAUSED MY VISION TO BECOME BLURRY.

22   **Q.**  OKAY.  DID YOU CONTINUE TO TAKE IT?

23   **A.**  YES.

24   **Q.**  YOU CONTINUED TO TAKE IT EVEN THOUGH YOUR VISION HAD STARTED

25   TO BECOME BLURRY?

1   A.   YES, I DID.

2   Q.   AND WHY DID YOU CONTINUE TO TAKE IT WHEN YOUR VISION BECAME

3   BLURRY?

4   A.   WELL, I NEEDED SOMETHING FOR THE -- THE NERVE PAIN AND -- TO

5   TRY TO GET SOME SLEEP AND STUFF.  SO I KEPT -- I KEPT TRYING IT

6   TO SEE IF I GET THROUGH IT.  MAYBE IT WOULD -- MAYBE THE SIDE

7   EFFECTS WOULD PASS.

8   Q.   AND DID THEY PASS?

9   A.   NO.

10  Q.   WELL, WHAT HAPPENED?

11  A.   THEY GOT WORSE.

12  Q.   AND IN WHAT WAY DID THEY GET WORSE?

13  A.   WELL, AS TIME PASSED, I CONTINUED TO HAVE THE BLURRY VISION.

14  AND, ADDITIONALLY, MY BALANCE, WHEN I WOULD WALK, FELT OFF, AND

15  IT MADE ME REAL LETHARGIC ALL DAY WHERE I JUST -- I WOULDN'T

16  FEEL LIKE DOING NOTHING.

17  Q.   OKAY.  AND DID YOU TELL THE DOCTOR ABOUT THIS?

18  A.   YES, I DID.

19  Q.   WHAT DID THE DOCTOR SAY?

20           MR. ANDRADA:  WELL --

21           THE WITNESS:  WELL --

22           MR. ANDRADA:  EXCUSE ME.

23           THE COURT:  YEAH, THAT WOULD BE HEARSAY UNLESS IT'S

24  IN THE RECORD.

25           MR. ASHKER:  I WAS JUST GETTING TO THE RECORD RIGHT

1    NOW.

2             **MR. ANDRADA:**  AND SO -- SO, AGAIN, I APOLOGIZE AGAIN,

3    YOUR HONOR.  WHAT RECORD ARE WE REFERRING TO NOW?

4             **MR. ASHKER:**  I WOULD REFER YOUR ATTENTION TO PAGE 3

5    OF THE SUMMARY AT NO. 25.

6             **MR. ANDRADA:**  JUST A SECOND.

7                   (PAUSE IN THE PROCEEDINGS.)

8             **MR. ANDRADA:**  OKAY.  SO THIS IS DR. WEAVER YOU'RE

9    TALKING ABOUT?

10            **MR. ASHKER:**  YES.

11            **THE COURT:**  AND IT SEEMS TO BE --

12            **MR. ANDRADA:**  OKAY.  I THINK IT'S ALL RIGHT.

13            **THE COURT:**  -- EXHIBIT 48 OF THE MEDICAL RECORD.

14            **MR. ANDRADA:**  YEAH.

15            **THE COURT:**  OKAY.

16    BY MR. ASHKER:

17    Q.  AND, MR. ASHKER, DID YOU TALK TO MEDICAL STAFF ABOUT THESE

18    SIDE EFFECTS THAT YOU WERE HAVING FROM ELAVIL?

19    A.  YES, I DID.

20    Q.  WHO DID YOU TALK TO?

21    A.  I TALKED TO DR. WEAVER ON 5/1/98.

22    Q.  AND YOU TOLD DR. WEAVER THAT THE ELAVIL 10 MILLIGRAMS TWICE

23    A DAY WAS HAVING ADVERSE SIDE EFFECT -- WHAT YOU DESCRIBED AS

24    ADVERSE SIDE EFFECTS OF BLURRY VISION, BALANCE PROBLEMS, AND

25    LETHARGY ALL DAY?

1    A.   YES, I DID.

2    Q.   WHAT WAS DR. WEAVER'S RESPONSE?

3    A.   WELL, HE UPPED THE DOSE TO 25 MILLIGRAMS TWICE A DAY.

4    Q.   AND DID YOU TRY THE 25 MILLIGRAMS TWICE A DAY?

5    A.   YES, I DID.

6    Q.   DID THAT WORK FOR YOU?

7    A.   WELL, I ONLY TOOK THAT DOSAGE A COUPLE OF TIMES BECAUSE I

8    WOULDN'T WANT TO EVEN GET UP OUT OF BED ALL DAY AT THAT

9    INCREASED DOSAGE.

10   Q.   OKAY.  SO WHAT HAPPENED THEN?

11   A.   WELL, ON 6/16/98, DR. WEAVER DISCONTINUED THE ELAVIL.

12   Q.   OKAY.  SO APPARENTLY YOU WERE ON ELAVIL FOR A -- VARIOUS

13   TIME PERIODS BETWEEN 1997 UP TO 1992 -- I MEAN, 2002; IS THAT

14   CORRECT?

15   A.   YES, IT IS.

16   Q.   AND DID YOU HAVE ANY OTHER SIDE EFFECTS DURING THE TIME

17   PERIODS WHEN YOU WOULD TRY ELAVIL?

18   A.   YES, I DID.

19   Q.   CAN YOU PLEASE DESCRIBE THEM FOR US.

20   A.   YES, I WILL, SOON AS I CAN FIND IT ON MY SUMMARY.

21        WELL, WITHOUT REFERRING TO MY SUMMARY, ALTHOUGH THE

22   MEDICAL RECORDS ARE HERE, AND IT IS IN MY SUMMARY, THE

23   ADDITIONAL SIDE EFFECTS THAT I HAD WAS, ON TOP OF GETTING BLURRY

24   VISION AND BALANCE PROBLEMS AND LETHARGY, AROUND I THINK IT

25   WOULD HAVE BEEN 2000, 2001, I BEGAN TO HAVE -- MY LEFT EYELID,

1    INVOLUNTARY MUSCLE SPASMS.

2    **Q.**  HAD YOU EVER HAD ANYTHING LIKE THAT IN YOUR LIFE BEFORE FROM

3    A MEDICATION?

4    **A.**  NO.

5    **Q.**  AND WHAT HAPPENED THEN?

6    **A.**  WELL, AS I CONTINUED TO TAKE THE MEDICATION, THE INVOLUNTARY

7    MUSCLE SPASMS WENT FROM MY LEFT EYE TO MY WHOLE LEFT CHEEK.

8    **Q.**  AND AT THAT POINT, WHAT DID YOU DO?

9    **A.**  WELL, I STOPPED TAKING ELAVIL.

10   **Q.**  WHY?

11   **A.**  BECAUSE OF MY CONCERNS ABOUT THOSE TYPE OF SIDE EFFECTS ON

12   MY BODY.

13   **Q.**  DID IT HAVE ANY OTHER EFFECTS ON YOU?

14   **A.**  YES, IT DID.

15   **Q.**  WHAT WERE THOSE?

16   **A.**  WELL, THE -- THE LETHARGY THAT THEY CAUSED MADE IT DIFFICULT

17   FOR ME TO CARRY OUT MY OTHER DAILY ACTIVITIES.

18   **Q.**  SUCH AS WHAT IS?

19   **A.**  WRITING, MAINLY WRITING.

20   **Q.**  OKAY.  AND YOU STATED EARLIER THAT ON JANUARY 22ND, 2002,

21   DR. WOLF HAD PRESCRIBED TRAMADOL FOR THE FIRST TIME FOR YOU.

22   **A.**  YES, HE DID.

23   **Q.**  AND DO YOU KNOW WHY DR. WOLF PRESCRIBED TRAMADOL FOR YOU ON

24   JANUARY 22ND, 2002?

25   **A.**  YES, I DO.

1      **MR. ANDRADA:**  WELL, YOUR HONOR, CALLS FOR

2  SPECULATION, HEARSAY AS STATED, UNLESS HE'S GOING TO READ

3  SOMETHING FROM THE RECORDS.  SO --

4      **THE COURT:**  I'M GUESSING ALL THIS IS IN THE RECORDS.

5  BUT YOU NEED TO --

6      **MR. ASHKER:**  I WOULD --

7      **THE COURT:**  -- CONFINE YOURSELF TO WHAT'S IN THE

8  RECORDS.  MAYBE YOU COULD POINT OUT TO COUNSEL WHERE IT IS.

9      **MR. ASHKER:**  I WOULD REFER MR. ANDRADA TO PAGE 5 OF

10 THE SUMMARY AT NO. 45 AND 46.

11          (PAUSE IN THE PROCEEDINGS.)

12     **MR. ANDRADA:**  YOUR HONOR, LET'S JUST HEAR THE ANSWER,

13 AND IF IT'S OKAY, THEN I WON'T SAY ANY MORE.  IF I FIND

14 SOMETHING WRONG, I'LL MOVE TO STRIKE.  IS THAT ALL RIGHT?

15     **THE COURT:**  OKAY.

16     **MR. ANDRADA:**  WE'VE GOT FOUR OR FIVE SUMMARIES WITHIN

17 HIS SUMMARY AND, AND IT'S REALLY DIFFICULT TO FOLLOW.

18     **THE COURT:**  OKAY.  GO AHEAD.

19     **THE WITNESS:**  YES.

20 BY MR. ASHKER:

21 **Q.**  MR. ASHKER, CAN YOU PLEASE TELL US WHY YOU BELIEVE DR. WOLF

22 ORDERED THE TRAMADOL ON JANUARY 22ND, 2002?

23 **A.**  WELL, BECAUSE I HAD FILED A 602 APPEAL REQUESTING SPECIALIST

24 CARE FOR STOMACH PROBLEMS AND ADEQUATE PAIN MANAGEMENT ON

25 11/25/01.  THIS WAS AFTER I HAD BEEN -- I HAD TRIED MOTRIN,

1   TYLENOL, SALICYLATE, ENTERIC ASPIRIN, NAPROSYN, NAPRO- --

2   NAPROXEN, DISALSATE (PHONETIC), BACLOFEN, NEURONTIN, AND ELAVIL.

3   AND MY STOMACH PROBLEMS HAD BEGUN IN 1995, FOR WHICH I HAD TRIED

4   PEPTO-BISMOL, ANTACIDS, MYLANTA, MAALOX, ZANTAC, AND PRILOSEC.

5   Q.   AND WHY DO YOU BELIEVE DR. WOLF THEN ORDERED THE TRAMADOL ON

6   JANUARY 22ND, 2002?

7   A.   I BELIEVE IT WAS IN RESPONSE -- IN RESPONSE TO HIS REVIEW OF

8   MY MEDICAL RECORDS AND MY 602 APPEAL THAT I HAD FILED ON

9   11/25/01 REQUESTING ADEQUATE PAIN MANAGEMENT AND TO SEE THE

10  SPECIALIST ABOUT MY STOMACH PROBLEMS.

11  Q.   OKAY.

12          DO YOU HAVE THAT 602 WITH YOU TODAY?

13  A.   YES, I DO.  IT'S EXHIBIT NO. 140 OF MY EXHIBITS RIGHT HERE.

14  Q.   CAN WE SEE THAT EXHIBIT?

15  A.   SURE.

16          MR. ASHKER:  YOUR HONOR, I'M NOT SURE HOW TO PROCEED

17  WITH THIS EXHIBIT, BECAUSE THIS IS A SPECIFIC EXHIBIT THAT I'D

18  LIKE TO -- I DON'T KNOW WHAT THE PROCEDURE IS.

19          THE COURT:  YOU WANT TO OFFER IT INTO EVIDENCE; IS

20  THAT --

21          MR. ASHKER:  YEAH, WELL, I WANT TO OFFER ALL -- WELL,

22  I WANT TO OFFER ALL THESE INTO EVIDENCE, BUT IF THIS SUMMARY'S

23  GOOD ENOUGH -- BUT THIS 602 RIGHT HERE IS RELEVANT TO WHY I

24  BELIEVE THE TRAMADOL WAS ORDERED FOR THE FIRST TIME.

25          THE COURT:  OKAY.  DO YOU HAVE ANY --

 1              **MR. ANDRADA:**  WELL, YOUR HONOR --

 2              **THE COURT:**  -- OBJECTION?

 3              **MR. ANDRADA:**  LET ME -- I THINK HE'S REFERRING TO THE

 4     602 OF NOVEMBER 2001.  AND IN THE INTEREST OF TIME, HOW ABOUT

 5     I -- IN THE INTEREST OF TIME, I WILL AGREE THAT IT COULD BE

 6     ADMITTED SUBJECT TO A MOTION TO STRIKE ONCE I GET A CHANCE TO

 7     LOOK AT IT IN THE CONTEXT OF HIS TESTIMONY, YOUR HONOR.

 8              **THE COURT:**  ALL RIGHT.

 9              **MR. ANDRADA:**  IS THAT ALL RIGHT?

10              **THE COURT:**  THAT'S FINE.  SO WE'LL RECEIVE EXHIBIT

11     140, AND YOU JUST HAVE THE ONE COPY, I PRESUME.

12              **MR. ASHKER:**  YES, I HAD SENT THE COURT A COPY AND THE

13     DEFENDANTS A COPY.

14              **THE COURT:**  RIGHT.  YEAH.

15              **MR. ASHKER:**  SPECIFICALLY ON THIS DOCUMENT, RIGHT

16     HERE, I'M REFERRING TO SECTION D WHERE --

17              **THE COURT:**  YEAH, I HAVE A COPY.

18              **MR. ASHKER:**  OKAY.

19              **THE COURT:**  AND I GUESS WE CAN USE MY COPY AS THE

20     CLERK'S COPY.  AND THE DEFENDANT HAS HIS COPY.

21                        (PLAINTIFF'S EXHIBIT 140

22                         RECEIVED IN EVIDENCE)

23              **MR. ASHKER:**  OKAY.

24     Q.  MR. ASHKER, WAS THE TRAMADOL HELPFUL FOR YOUR ARM PAIN?

25     A.  YES, IT WAS.

1   **Q.**  WAS IT BETTER THAN THE OTHER MEDICATIONS THAT YOU HAD TRIED

2   IN THE PREVIOUS 12 YEARS?

3   **A.**  YES, IT WAS.

4   **Q.**  DID IT TOTALLY ALLEVIATE YOUR ARM PAIN?

5   **A.**  NO, IT DIDN'T.

6   **Q.**  WELL, HOW EFFECTIVE WAS IT?

7           **MR. ANDRADA:**  OBJECTION, VAGUE AND AMBIGUOUS, OVERLY

8   BROAD.

9           **THE COURT:**  OVERRULED.

10          **THE WITNESS:**  WELL, IT WAS USUALLY DECENT PAIN RELIEF

11  FOR AROUND 16 HOURS A DAY.

12  **BY MR. ASHKER:**

13  **Q.**  AND HOW -- WHAT DO YOU MEAN, 16 HOURS A DAY?

14  **A.**  WELL, I GET THE MORNING DOSE, AND IT WOULD -- DEPENDING, IT

15  WOULD ALL DEPEND ON THE USE OF MY ARM, WHAT I DID IN DAILY

16  ACTIVITIES THAT DAY AND THE PREVIOUS DAYS.  IT WOULD -- IT MIGHT

17  BE -- TAKE MY PAIN DOWN TO A -- KEEP IT AT AROUND A LEVEL THREE

18  OUT OF A -- ON A DAILY OF ONE TO TEN FOR SIX TO EIGHT HOURS, AND

19  THEN I WOULD BE WAITING AROUND 3:00, 4:00 O'CLOCK IN THE

20  AFTERNOON UNTIL I'D GET MY NEXT NIGHTLY DOSE AROUND 6:30 OR SO.

21  AND THEN THAT WOULD WORK UNTIL MAYBE 3:00, 4:00 O'CLOCK IN THE

22  MORNING WHERE I WOULD OFTEN WAKE UP IN THE MIDDLE OF THE

23  NIGHT -- 3:00 O'CLOCK -- NO, 4:00 -- 4:00 -- AROUND 4:00

24  GENERALLY, AND I WOULD BE LAYING THERE WAITING FOR MY MORNING

25  DOSE.

1   Q.   OKAY.  SO IT DID NOT TOTALLY ALLEVIATE ALL YOUR PAIN?

2   A.   NO.

3   Q.   BUT YOUR TESTIMONY WAS THAT IT WAS BETTER THAN THE OTHER

4   MEDICATIONS THAT YOU HAD TRIED UP TO THE POINT IN 2002.

5   A.   YES, THAT'S CORRECT.

6   Q.   OKAY.

7              THE COURT:  WHY DON'T WE BREAK AT THIS POINT.

8              AND WE'LL BREAK FOR THE DAY FOR YOU ALL.  AGAIN, IF

9   YOU WOULD LEAVE THE -- OH, I DIDN'T GIVE YOU THE JURY

10  INSTRUCTIONS YET.  I'M GOING TO PRINT OUT A SET OF THOSE JURY

11  INSTRUCTIONS FOR YOU.  I'LL HAVE THOSE FOR YOU TOMORROW.  THERE

12  WERE SOME TYPOS IN IT THAT I HAD TO FIX UP.  YOUR NOTES, YOU

13  SHOULD LEAVE IT IN JURY ROOM.  WEAR YOUR BADGES WHEN YOU LEAVE.

14  AND THEN WEAR THEM IN TOMORROW MORNING AGAIN WHEN YOU COME IN.

15             WE'LL TRY TO START PROMPTLY AT 8:30.  WE CAN'T START

16  TILL ALL OF YOU ARE HERE, SO WHEN YOU'RE PLANNING YOUR TRIPS,

17  KEEP IN MIND TRAFFIC CAN BE DELAYED AND BART CAN BE DELAYED AND

18  MAKE SURE THAT YOU ALLOW YOURSELF PLENTY OF TIME TO GET HERE

19  BEFORE 8:30, BECAUSE WE'RE MOVING ON A PRETTY AGGRESSIVE TIME

20  SCHEDULE, AND OUR ABILITY TO KEEP IT WILL DEPEND ON BEING ABLE

21  TO START ON TIME EACH DAY SO --

22             SO, AGAIN, REMEMBER NOT TO DISCUSS THE CASE AMONGST

23  YOURSELVES OR WITH ANYONE ELSE, NOT TO READ ANYTHING ABOUT THE

24  CASE OR DO ANY RESEARCH ABOUT THE CASE.  AND THEN TOMORROW WE'LL

25  START IN A SCHEDULE OF 8:30 TO 1:30.

1          SO WE'LL SEE YOU TOMORROW MORNING AT 8:30.

2          AND I'D LIKE TO SEE PARTIES FOR A MOMENT, PLEASE.

3          (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

4     PRESENCE OF THE JURY:)

5          **THE COURT:**  SO WE HAVE -- I'VE FORGOTTEN WHAT I TOLD

6     YOU.  THE CLERK TALKED TO DR. DUNCAN'S OFFICE MANAGER.  AND SHE,

7     AFTER WE BELIEVE CONSULTING WITH HIM, INSISTED UPON BEING SERVED

8     WITH A SUBPOENA.  SO WE'LL GIVE A SUBPOENA TO THE MARSHAL.  I

9     DON'T KNOW IF THE MARSHAL CAN GET HIM SERVED -- THEY CAN.  OKAY.

10    I GUESS THE MARSHAL WILL DRIVE UP TO CRESCENT CITY AND SERVE

11    HIM.

12         **THE CLERK:**  THEY HAVE SOMEONE UP THERE.

13         **THE COURT:**  OH, THEY HAVE SOMEONE UP THERE, SO WE'LL

14    TRY TO SERVE HIM.  AGAIN, HE'S NOT ENTHUSIASTIC, SO I DON'T KNOW

15    IF WE'LL BE ABLE TO SERVE HIM.  BUT WE'LL TRY TO SERVE HIM.  WE

16    PUT IT DOWN FOR THURSDAY AT 8:30 IN THE PRISON VIDEO ROOM.  HE

17    DID MENTION A LITTLE SOMETHING ABOUT A $3,000 EXPERT WITNESS

18    FEE.  BUT HE'S BEING CALLED AS A PERCIPIENT WITNESS, SO

19    THAT'S -- WITNESS FEE IS NOT GOING TO BE FORTHCOMING, I DON'T

20    SUPPOSE.

21         HE IS ENTITLED TO HIS REGULAR WITNESS FEE.  I DON'T

22    EVEN KNOW WHAT THAT IS.

23         **MR. ASHKER:**  $40.

24         **THE COURT:**  FORTY?  AND I DON'T KNOW HOW YOU --

25         **MR. ASHKER:**  I HAVE THE MONEY ON MY ACCOUNT.  I'LL

```
 1    JUST -- I HAVE TO SIGN A TRUST WITHDRAWAL, AND I'LL GET THAT

 2    MONEY TO HIM.

 3              THE COURT:  OKAY.  OR -- OR --

 4          MR. ASHKER:  I CAN BRING IT TO COURT OR --

 5              THE COURT:  YEAH, I DON'T QUITE KNOW HOW WE'RE GOING

 6    TO WORK THAT OUT, BECAUSE HE'LL BE SERVED BY SOMEBODY UP THERE.

 7    AND I DON'T KNOW HOW WE COULD GET THAT FEE TO THE PERSON UP

 8    THERE SINCE WE DON'T REALLY KNOW WHO IT IS.  BUT LET'S JUST SEE

 9    HOW IT GOES.

10              IF YOU WOULD TRY, MR. ASHKER, TO GO THROUGH YOUR

11    SUMMARIES.

12          MR. ASHKER:  YOU'RE --

13          THE COURT:  THE LEVEL OF DETAIL IS NOT EVEN GOING TO

14    HELP YOU BECAUSE IT GETS BORING, IT GETS HARD TO FOLLOW, IT GETS

15    HARD TO REMEMBER.  SO GIVE SOME THOUGHT TONIGHT TO MAYBE

16    HIGHLIGHTING OR STARRING CERTAIN THINGS OR FIGURING OUT THINGS

17    YOU CAN SUMMARIZE WITHOUT GOING THROUGH IT PIECE BY PIECE.

18              BUT YOU HAVE TO SUMMARIZE IT CLEARLY NOW SO THAT

19    COUNSEL KNOWS WHICH TIME PERIOD YOU'RE TALKING ABOUT SO IT

20    DOESN'T -- YOU HAVE TO TREAD A FINE LINE BETWEEN BEING OVERBROAD

21    AND BEING TOO DETAILED, AND IT'S A DIFFICULT ONE TO DO, BUT

22    YOU'RE GOING TO HAVE TO WORK ON IT.

23          MR. ASHKER:  YES, I APOLOGIZE, YOUR HONOR.  I -- I

24    JUST -- I HAVEN'T HAD ANY SLEEP AT ALL FOR A COUPLE DAYS NOW.

25          THE COURT:  OKAY.  WELL, DO THE BEST YOU CAN.
```

1          **MR. ASHKER:**  ALL RIGHT.

2          **THE COURT:**  WHAT ELSE?

3          YOU HAD MENTIONED EXHIBITS OF YOUR ARM BRACE AND YOUR

4  THERABALL AND ALL THAT STUFF.  DO YOU HAVE THAT WITH YOU --

5          **MR. ASHKER:**  YES.

6          **THE COURT:**  -- OR WHAT?

7          **MR. ASHKER:**  YES, I HAVE --

8          **THE COURT:**  WE DON'T WANT TO KEEP IT, BUT WE COULD

9  TAKE A PICTURE OF IT.  YOU COULD SHOW IT IF YOU HAVE IT, AND IF

10  THE -- IF YOUR PEOPLE DON'T MIND -- NOT NOW, BECAUSE THEY'RE NOT

11  HERE.  BUT IF YOU ALL DON'T MIND, HE COULD SHOW THOSE THINGS

12  TOMORROW, AND THEN WE COULD -- WE HAVE A LITTLE CAMERA HERE.  WE

13  COULD TAKE A PICTURE OF THEM AND USE THE PICTURE AND THEN YOU

14  COULD TAKE IT BACK WITH YOU.

15          **MR. ASHKER:**  OKAY.

16          **THE COURT:**  YOU DON'T HAVE A PROBLEM WITH, THAT I

17  PRESUME.

18          **MR. ANDRADA:**  THAT'S FINE.  FINE.

19          **THE COURT:**  WE'LL WORK ON THAT VIDEO SEGMENT.

20          NOW, THIS IS SOMETHING I DON'T REALLY KNOW THE ANSWER

21  TO, BUT PUNITIVE DAMAGES ARE POTENTIALLY AVAILABLE ON THE 1983

22  CLAIM, AS YOU KNOW.  AND IN STATE COURT, IT'S REQUIRED THAT THE

23  PLAINTIFF -- I THINK I HAVE THIS RIGHT -- THAT THE PLAINTIFF

24  PROVIDE EVIDENCE OF THE DEFENDANT'S FINANCIAL CONDITION.

25          NOW, I THINK IN FEDERAL COURT THAT IS NOT REQUIRED

1    AND THAT THE PLAINTIFF CAN SEEK PUNITIVE DAMAGES WITHOUT INQUIRY

2    ABOUT THE FINANCIAL CONDITION.

3              IF THAT'S TRUE, I'M ASSUMING THAT DR. SAYRE WOULD

4    PREFER NOT TO HAVE TO TESTIFY ABOUT HIS FINANCIAL CONDITION.

5              **MR. ANDRADA:**  CORRECT.

6              **THE COURT:**  SO IF YOU WOULD AGREE THAT THAT'S NOT

7    NEEDED TO MAKE THE ARGUMENT FOR IT AND THAT YOU'D PREFER NOT TO

8    HAVE IT, THEN WE COULD PROCEED THAT WAY.

9              **MR. ANDRADA:**  WHY DON'T WE TOMORROW, YOUR HONOR, LOOK

10   AT THAT AND WE CAN LET YOU KNOW.

11             **THE COURT:**  OKAY.

12             **MR. ANDRADA:**  HOW'S THAT?

13             **THE COURT:**  ALL RIGHT.

14             I'M GOING TO GIVE YOU, AS SOON AS I CAN, A PROPOSED

15   SET OF FINAL INSTRUCTIONS WHICH WILL INCLUDE A DRAFT ON

16   IMPOSSIBILITY THAT WE CAME UP WITH.

17             **MR. ANDRADA:**  OKAY.

18             **THE COURT:**  BUT YOU MIGHT WANT TO TRY YOUR HAND AT IT

19   YOURSELF.

20             AND WE'RE GOING TO COME UP WITH A DRAFT OF THE

21   VERDICT FORM AS WELL.

22             **MR. ANDRADA:**  WE'VE -- WE SUBMITTED ONE, YOUR HONOR.

23   AND WE'VE LOOKED AT IT AGAIN.  WE'RE STILL LOOKING AT IT.  IT'S

24   A LITTLE DIFFICULT --

25             **THE COURT:**  WELL, WE'VE GOT ONE GOING.

1          **MR. ANDRADA:** DO YOU? OKAY.

2          **THE COURT:** BASED ON YOUR -- SO AS SOON AS I CAN,

3    I'LL GIVE IT TO BOTH OF YOU AND YOU CAN SEE WHAT YOU THINK OF

4    IT.

5          **MR. ANDRADA:** I'D BE VERY HAPPY TO --

6          THANK YOU.

7          AND ARE WE MEETING TOMORROW STILL, YOUR HONOR, AFTER

8    LUNCH AT 2:30 TO TALK ABOUT INSTRUCTIONS AND SO ON?

9          **THE COURT:** OH.

10         WE MAY HAVE TO PUSH THAT OFF TILL WEDNESDAY SINCE I

11   HAVEN'T GOTTEN YOU THE INSTRUCTIONS YET. IF I CAN GET THEM TO

12   YOU TOMORROW, THEN WE COULD YOU'D HAVE A CHANCE TO LOOK AT THEM

13   AND WE COULD MEET ON WEDNESDAY.

14         **THE CLERK:** WE HAVE CALENDAR ON WEDNESDAY.

15         **THE COURT:** I KNOW, BUT WE HAVE TO DO IT AFTER THE

16   CALENDAR. HOW BAD IS MY CALENDAR?

17         AND THEN I HAVEN'T REALLY LOOKED AT THIS EITHER, BUT

18   I KNOW THAT HE HAD A REQUEST OF JUDICIAL NOTICE OF DR. ALLEN'S

19   DISCIPLINARY ACTION, AND I DON'T THINK THAT MR. ASHKER HAS -- I

20   DON'T KNOW IF YOU'VE SEEN THAT REQUEST FOR JUDICIAL NOTICE. I

21   HAVEN'T SEEN ANY RESPONSE TO IT.

22         **MR. ASHKER:** I JUST RECEIVED THAT, I THINK, ON

23   FRIDAY, AND I HADN'T HAD A CHANCE TO RESPOND TO IT.

24         MY POSITION IS -- IS, OF COURSE, HE'S ENTITLED TO

25   QUESTION DR. ALLEN FOR IMPEACHMENT PURPOSES. I DON'T KNOW WHAT

1  KIND OF LIMITS OR ANYTHING LIKE THAT.  I'M NOT -- I HAVEN'T HAD

2  A CHANCE TO DO ANY RESEARCH AT ALL ON THAT.  AND I WON'T BE ABLE

3  TO, SO I'M JUST -- MY POSITION IS IT IS HIGHLY PREJUDICIAL, BUT

4  AT THE SAME TIME, I KNOW THAT IT -- HE'S ENTITLED TO QUESTION A

5  WITNESS ABOUT IMPEACHMENT ISSUES.

6          **THE COURT:**  OKAY.

7          **MR. ASHKER:**  SO --

8          **THE COURT:**  WELL, I'LL TAKE ANOTHER LOOK AT IT.  BUT

9  I AM A LITTLE CONCERNED ABOUT THE NOTION THAT YOU DID REPRESENT

10 HIM BEFORE AND HAVE -- I DON'T KNOW WHAT SORT OF ATTORNEY-CLIENT

11 INFORMATION YOU MIGHT HAVE.  HE SEEMS TO HAVE A CONCERN ABOUT

12 IT.

13          I DON'T KNOW OF ANY LAW ON THAT POINT.  OBVIOUSLY, WE

14 CAN'T DISQUALIFY YOU FROM REPRESENTING THE DEFENDANTS AT THIS

15 STAGE OF THE GAME, NOR CAN WE EXCLUDE DR. ALLEN AS A WITNESS

16 BECAUSE OF THE FORTUITY THAT YOU HAD PREVIOUSLY REPRESENTED HIM.

17          AND I DON'T KNOW OF ANY LAW ON THE POINT.

18          WE CAME UP WITH THE NOTION OF YOUR MAKING A LIST OF

19 THE SORTS OF THINGS YOU WANTED TO USE, BUT EVEN THAT, YOU KNOW,

20 STRIKES ME THAT AS YOU QUESTION HIM AND HE TALKS, SOMETHING

21 MIGHT COME TO YOU THAT YOU KNOW ABOUT FROM YOUR PRIOR

22 REPRESENTATION.

23          THE THOUGHT OCCURRED TO ME -- I DON'T KNOW IF EITHER

24 OF YOUR ASSOCIATES COULD PERHAPS DO HIS CROSS-EXAMINATION IF

25 THEY WERE NOT IN A POSITION TO HAVE ATTORNEY-CLIENT CONFIDENCES.

1          **MR. ANDRADA:**  YOU SPOKE WITH HIM, DID YOU NOT?

2          **MS. KENNON:**  I REPRESENTED HIM AT DEPOSITION FOR THE

3    PURPOSES OF DEPOSING THEIR EXPERTS.  SO I'VE TALKED TO HIM A

4    LOT.

5          **MR. ANDRADA:**  YEAH.

6          **THE COURT:**  AND WHAT ABOUT --

7          **MS. KENNON:**  PROBABLY MORE SO THAN MR. ANDRADA.

8          **MR. ANDRADA:**  I'VE NEVER MET HIM.  I KNEW HE WAS

9    AFRICAN-AMERICAN.  THAT'S WHY I RECOGNIZED HIM AS THE MAN

10   SITTING IN THE COURTROOM, BUT I'VE -- LIKE I SAID, I'VE NEVER

11   MET HIM FACE TO FACE.

12          **THE COURT:**  OH, HAVE YOU SPOKEN WITH HIM?

13          **MR. ANDRADA:**  YES.  YES.

14          **THE COURT:**  AND WHAT ABOUT YOUR OTHER --

15          **MR. ANDRADA:**  MS. GOODMAN REALLY DOESN'T KNOW THE

16   FILE WELL ENOUGH, YOUR HONOR, TO GET INTO THAT SORT OF THING.

17   SHE JUST DOESN'T.  I'M SORRY.  BUT I CAN -- I DON'T KNOW IF THE

18   COURT WANTS TO TAKE FIVE MINUTES.

19          AGAIN, OUR REPRESENTATION -- MY REPRESENTATION OF HIM

20   WAS IN A COUPLE OF VERY SMALL CASES, AND I DIDN'T LEARN ANY

21   SECRET INFORMATION ABOUT HIM.

22          **THE COURT:**  OKAY.  WELL, WE'LL JUST HAVE --

23          **MR. ANDRADA:**  I JUST DIDN'T.

24          **THE COURT:**  WELL, JUST HAVE TO HAVE YOU MAKE THAT

25   REPRESENTATION TO HIM TOMORROW.  IT'S NOT MY CONCERN.  IT'S NOT

1    MR. ASHKER'S CONCERN.  IT'S DR. ALLEN'S CONCERN.  SO I GUESS

2    WE'LL JUST HAVE TO HAVE YOU TELL HIM THAT TOMORROW.  AND YOU'LL

3    HAVE YOUR -- OR WEDNESDAY I GUESS HE'S COMING.

4            **MR. ANDRADA:**  WEDNESDAY.

5            **THE COURT:**  AND YOU'LL HAVE YOUR LIST OF THINGS THAT

6    YOU INTEND TO USE.  OKAY.

7            OKAY.  I GUESS THAT'S IT THEN.  SO WE'LL SEE YOU

8    8:30.

9            **MR. ANDRADA:**  SO THEN TOMORROW, YOUR HONOR, WE'RE

10   GOING TO CONTINUE WITH MR. ASHKER.

11           MR. ASHKER, DO YOU KNOW HOW MUCH LONGER YOU'RE GOING

12   TO BE WITH YOUR -- ON DIRECT?  LITTLE WHILE?

13           **MR. ASHKER:**  YEAH, I'M GOING TO -- I'M TRY TO -- I'M

14   GOING TO TRY TO SEE WHAT I CAN DO TO, LIKE, REFINE -- REFINE

15   THAT AND GET MORE WORKABLE IN A -- IN A MORE TIMELY FASHION,

16   BECAUSE I DON'T -- I DON'T WANT TO SIT HERE AND HAVE THE JURY

17   FALLING ASLEEP WHILE I READ EACH, YOU KNOW -- I MEAN, BUT AT THE

18   SAME TIME, I DON'T WANT TO LEAVE OUT IMPORTANT FACTS AND

19   EVIDENCE.

20           **THE COURT:**  WELL, YOU'LL BE CROSS-EXAMINED.  AND I

21   HAVE A FEELING THAT COUNSEL WILL BRING OUT SOME OF THE THINGS IN

22   YOUR MEDICAL FILE, AND THEN YOU'LL HAVE ANOTHER CHANCE ON

23   REDIRECT TO FILL IN ANY GAPS.  SO I WOULD SAY YOU COULD DO WITH

24   QUITE A BIT LESS DETAIL THAN YOU'RE GIVING US RIGHT NOW,

25   PARTICULARLY ABOUT THE TIME SO FAR BACK.  I MEAN, I WOULD TRY TO

```
 1    MOVE QUICKLY UP TO THE PART WHERE DR. SAYRE IS --

 2              MR. ASHKER:  RIGHT.

 3              THE COURT:  -- TREATING YOU AND GET TO THAT PART

 4    BECAUSE THAT'S THE PART YOU NEED TO DEAL WITH HERE.

 5              MR. ASHKER:  I KNOW.

 6              THE COURT:  SO --

 7              MR. ANDRADA:  AND THEN I'M SORRY, YOUR HONOR, JUST

 8    TWO MORE LITTLE THINGS.  WITH REGARD TO THE MEDICAL RECORDS,

 9    IF -- IF HE REFERS TO ONE, MAYBE WHAT WE COULD DO, AGAIN IN THE

10    INTEREST OF TIME, IS AGREE THAT IT CAN BE ADMITTED SUBJECT TO A

11    MOTION TO STRIKE.  BECAUSE, AGAIN, IT'S VERY -- I DON'T KNOW

12    WHERE HE'S GOING WITH, YOU KNOW, NEXT EXHIBIT, NEXT EXHIBIT, AND

13    SO FORTH, SO IT'S VERY DIFFICULT TO FOLLOW.

14              AND THEN ALSO I THINK SO THAT WE CAN EXPEDITE THE

15    CROSS, IF WE CAN HAVE A STIP -- ESSENTIALLY THE SAME STIP, THAT

16    IF I WANT TO CONFRONT HIM WITH A MEDICAL RECORD THAT WE CAN DEEM

17    IT -- THAT IT WILL BE ADMITTED SUBJECT TO A SUBSEQUENT MOTION TO

18    STRIKE IF THERE'S A PROBLEM.

19              THE COURT:  YEAH, WELL --

20              MR. ANDRADA:  IS THAT ALL RIGHT?

21              THE COURT:  YES, I -- AS FAR AS I'M CONCERNED, ALL

22    THE MEDICAL RECORDS COULD POTENTIALLY COME IN.  IT'S JUST THAT

23    WE DON'T WANT THEM ALL IN BECAUSE THERE'S TOO MUCH OF THEM.

24              MR. ANDRADA:  CORRECT.

25              THE COURT:  SO I WOULD SAY THAT ANYTHING THAT EITHER
```

```
 1   PARTY HAS A PARTICULAR DESIRE TO HAVE IN, WE CAN PUT IN.

 2              MR. ANDRADA:  OKAY.  THEN WE DON'T TO HAVE WAIT FOR

 3   DR. SAYRE OR SOMEBODY ELSE TO COME IN AND AUTHENTICATE IT AS

 4   THE --

 5              THE COURT:  NO.

 6              MR. ANDRADA:  -- AS A COPY AND SO ON AND SO FORTH.

 7              THE COURT:  NO.

 8              MR. ANDRADA:  GREAT.

 9              THE COURT:  NOT IF IT'S IN HIS PRISON MEDICAL FILE

10   THAT BOTH OF YOU HAVE ACCESS TO.

11              MR. ANDRADA:  GREAT.  THANK YOU.  OKAY.

12              THE COURT:  BUT WHAT YOU COULD DO IS -- WOULD BE TO

13   GO THROUGH HIS -- THIS IS BASICALLY WHAT HE WANTS TO TESTIFY TO.

14   IF YOU COULD FAMILIARIZE YOURSELF WITH IT AND SEE, YOU KNOW,

15   WHAT IT'S REFERRING TO AND DO THE CROSS-REFERENCING TONIGHT,

16   THEN I THINK YOU'LL BE ABLE TO FOLLOW -- HOPEFULLY, IT WILL BE A

17   LITTLE SHORTER AND MORE SUMMARY AND --

18                   (SIMULTANEOUS COLLOQUY.)

19              THE COURT:  -- IF YOU FAMILIARIZE YOURSELVES WITH

20   THESE EXHIBITS, THEN -- THEN THAT WILL HELP, TOO.

21              MR. ANDRADA:  LET ME ASSURE YOU, JUDGE, I DID TRY TO

22   DO THAT SEVERAL TIMES PRIOR TO COMING TODAY, BUT IT'S JUST VERY

23   DIFFICULT GIVEN THE VOLUME OF MATERIALS.

24              THE COURT:  YEAH.

25              MR. ANDRADA:  AND THEN TOMORROW, YOUR HONOR, WE HAVE
```

1   LIVE AND DIRECT FROM PELICAN BAY, I GUESS, AT 10:30 THE TWO

2   PRISONERS?

3          **THE COURT:**  YEAH, I THINK THE BEST THING TO DO WOULD

4   BE JUST TO -- EVEN IF YOU'RE NOT DONE AND YOU'RE DONE AND

5   DR. SAYRE'S ON THE STAND, JUST INTERRUPT AND DO THOSE TWO

6   PEOPLE.  JUST MAKE SURE THINGS DON'T GO WRONG AND WE GET IT

7   DONE.

8          **MR. ASHKER:**  YES.

9          **THE COURT:**  SO LET'S JUST PLAN ON 10:30, EVEN IF WE

10  HAVE TO INTERRUPT SOMEBODY'S TESTIMONY TO DO IT.

11         **MR. ANDRADA:**  YES, I UNDERSTAND WHAT YOU'RE SAYING.

12         **THE COURT:**  OKAY.

13         **MR. ANDRADA:**  WE WILL CALL --

14         **THE COURT:**  SET THAT UP.

15         **MR. ANDRADA:**  LIKE I SAID, JUDGE, WE HAVE A LAWYER UP

16  IN PELICAN BAY FROM MY FIRM.  WE'LL CALL HIM.  HE'S BEEN THERE

17  TODAY, SO THEY SHOULD BE ABLE TO MOVE THESE TWO FELLOWS --

18         **THE COURT:**  YEAH.  SO IF YOU WOULD CONCENTRATE ON A

19  SUMMARY DESCRIPTION OF UP UNTIL 2002 --

20         **MR. ASHKER:**  THAT'S RIGHT WHERE I WAS.

21         **THE COURT:**  -- OF THE MEDS AND THE PHYSICAL THERAPY.

22  AND JUMP TO 2002, EXPLAIN THE SETTLEMENT AGREEMENT AND WHAT YOU

23  HAD IN MIND AND THOUGHT YOU WERE GETTING, ET CETERA, AND THEN

24  WHAT HAPPENED RIGHT AFTER IT AND THEN JUMP TO 2005 OR -6,

25  WHENEVER IT IS THAT DR. SAYRE CAME ON THE SCENE, AND DESCRIBE

1    WHAT YOU WERE GETTING BEFORE HE CAME, WHAT HE DID, AND WHAT YOU

2    GOT AFTER HE CAME.

3            **MR. ASHKER:**  YOUR HONOR, I THINK -- YOU KNOW, I JUST

4    THOUGHT OF SOMETHING I WAS GOING TO BRING IT UP BEFORE BUT WE

5    GOT SIDE-TRACKED ON ALL THIS STUFF.  YOU KNOW, THE 2002

6    SETTLEMENT AGREEMENT KIND OF SPEAKS FOR ITSELF.

7            **THE COURT:**  TRUE.

8            **MR. ASHKER:**  BECAUSE THE BOTTOM LINE IS, IS THAT

9    REFERRAL FOR PAIN MANAGEMENT SPECIALIST, CONTINUED ARM BRACE,

10   AND PHYSICAL THERAPY -- I MEAN, ALL OF THOSE THINGS CAME INTO

11   PLAY AND WERE AGREED TO BY CDC AND MYSELF BASED ON MY PRIOR

12   HISTORY.  SO IF WE -- MAYBE WE COULD COME TO SOME KIND OF

13   STIPULATION OR SOMETHING WITH REGARD -- WITH REGARDS TO THAT.

14   THEN I COULD JUST NOT EVEN TRIP ON THIS OTHER STUFF.

15           **THE COURT:**  WELL, THE AGREEMENT WILL COME INTO

16   EVIDENCE.  AND -- BUT WHAT IT SAYS IS THAT THEY WILL CONTINUE

17   THE ARM BRACE AND THE PHYSICAL THERAPY THAT YOU WERE GETTING AT

18   THAT TIME, SO YOU DO NEED TO DESCRIBE WHAT ARM BRACE AND

19   PHYSICAL THERAPY YOU WERE GETTING AT THAT TIME --

20           **MR. ASHKER:**  RIGHT.

21           **THE COURT:**  -- SO WE'LL KNOW WHAT THAT MEANT IN TERMS

22   OF WHAT'S SUPPOSED TO CONTINUE.

23           **MR. ASHKER:**  OKAY.

24           **THE COURT:**  AND THEN YOU CAN DESCRIBE WHATEVER IT WAS

25   THAT HAPPENED AFTER THAT, IF YOU QUIT HAVING THE ARM BRACE OR

```
1    QUIT HAVING THE PHYSICAL THERAPY OR WHATEVER.

2              MR. ASHKER:  RIGHT.

3              THE COURT:  NOW, THE AGREEMENT ITSELF DOES NOT SAY

4    ANYTHING ABOUT WHAT MEDS YOU SHOULD GET.

5              MR. ASHKER:  I KNOW.

6              THE COURT:  SO THAT'S -- CAN'T BE SOLVED BY REFERENCE

7    TO THE AGREEMENT.

8              MR. ASHKER:  WHAT ABOUT -- WHAT ABOUT THIS?  MY

9    SUMMARY WHERE I JUST SUM UP TOMORROW MORNING, AND I SAY BASED ON

10   MY MEDICAL RECORDS, MY MEDICAL HISTORY WITH MEDICATIONS AND

11   STOMACH PROBLEMS, THIS WILL BE MY POSITION THAT THE EVIDENCE

12   SHOWS THAT I WAS PROVIDED WITH THE TRAMADOL AND WHAT ALL WAS UP

13   TO THAT SETTLEMENT AGREEMENT, AND THEN GO FROM THERE.

14             THE COURT:  THAT'S FINE.

15             MR. ASHKER:  DOES THAT SOUND GOOD?

16             THE COURT:  YEAH.

17             MR. ASHKER:  AND THERE WOULD -- THEN HE CAN

18   CROSS-EXAMINE ME OR TRY -- YOU KNOW, IF HE DISAGREES WITH ANY OF

19   THAT, THEN HE CAN TRY TO BRING SOMETHING OUT TO DISCREDIT THAT,

20   AND I CAN DO THE SAME THING WITH THE PHYSICAL THERAPY.

21             I CAN SAY, LOOK, ON THESE DAYS, THE ORTHOPEDIC

22   DOCTOR, BOOM, BOOM, ORDERED PHYSICAL THERAPY.  I FILED 602'S.

23   THIS -- THAT WERE GRANTED ABOUT PHYSICAL THERAPY.  AND THEN THAT

24   WAS WHAT I GOT REINSTATED AS THE 2002 SETTLEMENT AGREEMENT, LIKE

25   THAT.
```

1          **THE COURT:**  YEAH, JUST SAY TIME FRAMES, OTHER -- SO

2    THAT YOU DON'T DRAW AN OBJECTION THAT IT'S TOO VAGUE AND BROAD,

3    BUT IT CAN BE A BIG TIME FRAME.

4          **MR. ASHKER:**  ALL RIGHT.

5          **THE COURT:**  IF YOU WERE USING A THERAPY BALL FOR AN

6    ENTIRE YEAR, YOU CAN JUST SAY FROM THIS DATE TO THAT DATE, WHAT

7    DID YOU HAVE FOR PHYSICAL THERAPY?

8          FROM THIS DATE TO THAT DATE, I WAS ALLOWED TO USE A

9    THERAPY BALL THAT I WAS ALLOWED TO HAVE ANY MY CELL OR WHATEVER

10   THE CASE MAY BE.  AS LONG AS YOU EXPLAIN THE TIME FRAME, YOU CAN

11   DO IT IN A MUCH MORE ABBREVIATED FASHION.

12         **MR. ASHKER:**  OKAY.  AND THEN FOR THE SPECIFIC

13   RELEVANT EXHIBITS, I GUESS I'LL JUST TRY TO GO THROUGH AND JUST

14   GRAB OUT THE ONES THAT REALLY MAKE A STATEMENT.

15         **THE COURT:**  THAT'S WHAT I WOULD DO IF I WERE YOU.

16         **MR. ASHKER:**  OKAY.

17         **THE COURT:**  ALL RIGHT.

18         **MR. ANDRADA:**  THANK YOU, YOUR HONOR.

19          (PROCEEDINGS WERE CONCLUDED AT 4:42 P.M.)

20                    --O0O--

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C05-03759CW, ASHKER V. ALAMEIDA, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_Raynee H. Mercado_

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

MONDAY, MARCH 29, 2010